## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LONTEX CORPORATION, | : |
| Plaintiff, | :    **CIVIL ACTION NO. 18-cv-5623** |
| v. | : |
| NIKE, INC., | : |
| Defendant. | : |

## REPORT AND RECOMMENDATIONS OF SPECIAL DISCOVERY MASTER

### I.    INTRODUCTION

The Parties have reached an impasse on several discovery issues which have been submitted to the Court for consideration.  On October 15, 2019, pursuant to Rule 53 of the Federal Rules of Civil Procedure, the Court appointed this Special Master to address certain discovery issues.  Three motions were referred: (1) NIKE's Motion to Compel Discovery Responses; (2) Lontex's Motion to Compel NIKE's Compliance with Agreed Production; and (3) NIKE's Motion to Compel Lontex to Amend Privilege Log and Produce Non-Privileged Documents.

After diligent efforts in meeting and conferring on their differences, the Parties have reduced their disputes as detailed herein.

Each motion is separately addressed below.

II.     **NIKE, INC.'S MOTION TO COMPEL DISCOVERY RESPONSES**

NIKE's First Requests for Production ("Requests") contained 79 document requests.  In its Motion, NIKE seeks documents responsive to its Requests for Production Nos. 4, 6, 12, 14, 15, 16, 21, 23, 40, 41, and 73, each of which is addressed below.

**Relevant Time Period**

The relevant time period is a disputed issue that affects most of the aforementioned disputed discovery requests.  NIKE seeks discovery beginning 2006, while Lontex seeks to limit the relevant time period.

**NIKE Inc.'s Position**

NIKE argues that Lontex imposed arbitrary temporal limitations (prior to 2012) on discovery over many categories of information of its hard copy records while claiming not to limit its searches of electronically stored information.  Because Lontex is primarily a hard copy record-based company, NIKE seeks hard copy records from 2006 to the present based on Lontex's allegation that it first used the Marks in commerce in 2006 and has continued to do so since.  NIKE Motion at 7.

NIKE claims that evidence on Lontex's assertions of continuous use of the Marks in commerce on or in connection with each good listed in the asserted registrations from 2006 to the present is relevant and important.  Such evidence goes to a central aspect of Lontex's claims and NIKE's affirmative defenses and counterclaims that Lontex abandoned its alleged COOL COMPRESSION Mark long ago and made misrepresentations to the U.S. Patent and Trademark Office regarding its purported use of the Mark.

With regard to NIKE's counterclaim for abandonment, it argues that evidence of such use since 2006 is relevant because a party establishes a prima facie case of abandonment by proving non-use of the Marks for three consecutive years.  *Id.* at 8 (citations omitted).  Evidence

regarding the nature, character, and extent of Lontex's use of the Marks from 2006 to the present is equally relevant, since "'residual' or 'nominal' use of a mark will not suffice to avoid abandonment" and Lontex's use must be "deliberate rather than sporadic, casual, or transitory." *Id.* at 8-9 (citations omitted).

With regard to NIKE's counterclaim for fraud, it argues that a trademark registration may be cancelled if it was fraudulently obtained, which includes knowingly and falsely declaring at the time of renewal that the registrant has used the relevant mark in connection with all of the goods and services in the corresponding registration.  *Id.* at 9 (citations omitted).  NIKE argues that a two-year statute of limitations should not be applied to limit NIKE's counterclaim for fraudulent procurement or maintenance and cancellation of Lontex's registrations.

NIKE also asserts that information on Lontex's use of the Marks since 2006 is highly relevant to the validity and strength of the asserted Marks, as well as damages and that it is entitled to test the veracity of Lontex's allegations.  *Id.* at 10.  Without such discovery, NIKE argues that it would be denied the ability to discern whether there was continuous use of the marks in commerce—or any use of the Marks on Lontex's products—from 2006 to 2012.  *Id.* at 16.

NIKE further argues that Lontex must produce other evidence of its alleged continuous use or non-use of the Marks throughout the entire relevant period, including advertisements, business plans, press coverage because such evidence is relevant given Lontex's position that its purported "Cool Compression" products did not physically bear the Marks.  *Id.* at 16.  Without this evidence, NIKE argues that it is deprived of the ability to test Lontex's allegations of continuous use in commerce since 2006, and to demonstrate that Lontex abandoned its Marks

through non-use and the submission of false declarations and evidence to the USPTO to maintain its registrations.  *Id.* at 16.

It further argues that Lontex's claims of burden are speculative and even if Lontex could show that production would be burdensome, any such burden is far outweighed by the benefits of production, particularly where Lontex has placed a more than $40 million valuation on its claims.  *Id.* at 11 (citations omitted).

**Lontex's Position**

Lontex rejects NIKE's argument that evidence of alleged continuous use since 2006 is relevant and essential to NIKE's affirmatives defenses and counterclaims for fraud and abandonment.  With regard to fraud, Lontex argues that Third Circuit's two-year statute of limitations for fraud on the USPTO bars any attempt to assert fraud occurring before then. Lontex Opp. at 11 (citations omitted).  Therefore, whether Lontex was using COOL COMPRESSION in 2006, 2007, 2008, etc. is irrelevant and not probative to whether Lontex made a false statement of current use of COOL COMPRESSION at the time of its 2018 and 2019 filings.  *Id.* at 11.

As to NIKE's abandonment defense, Lontex argues that NIKE admits that the requisite showing to undermine continuous use is sporadic, token or casual use.  *Id.* at 10 (citing NIKE Mot. at 8-9).  Lontex claims that its produced records have already shown sales of tens of thousands of compression garments that were marked with COOL COMPRESSION inside the label.  *Id.* at 10.

With regard to NIKE's arguments that strength of the mark is a factor in the likelihood of confusion analysis, Lontex argues that strength of the mark in 2015 – not before – is the relevant issue.  *Id.* at 11.  NIKE cites no authority for the proposition that NIKE is now "entitled to test

the veracity" of Lontex's statement without restriction or restraint. *Id.* Nor has NIKE cited authority for its position that evaluations of lost profits analyses and corrective advertising analyses require data tracing back a decade before the infringement began. *Id.*

NIKE has also not demonstrated its need for documents dating back to 2006 to understand "growth trends" by state from 2006 to the present by state. Lontex argues that it already produced sales reports showing every sale from 2006 to the present by city, state, product number and price. Further, Lontex's interrogatory responses identify the product numbers for which COOL COMPRESSION labels were used inside the garments to denote the COOL COMPRESSION technology. *Id.* at 10.

Finally, Lontex argues that its physical documents span approximately 45-50 boxes and 5-6 file cabinets, two sets of overhead shelves, and additional documents spread throughout its warehouse. *Id.* at 12. Files are organized as they were created and kept in business, not by the categories NIKE requested. As such, it would be burdensome and time consuming for Lontex to isolate the documents NIKE seeks. That burden is however only associated with Lontex's physical records and not its electronically stored information. *Id.* at 11.

### Recommended Resolution

It is well settled that parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ P. 26(b)(1).

Here, NIKE asserted affirmative defenses and counterclaims alleging that Lontex abandoned its alleged COOL COMPRESSION Mark and engaged in fraud on the U.S. Patent and Trademark Office regarding its purported use of the mark.

Because Lontex acknowledges that all COOL COMPRESSION products did not physically bear the Marks, evidence of Lontex's continuous use or non-use of the marks throughout the period beginning 2006 appears relevant to the claims and defenses of the parties. Evidence related to NIKE's affirmative defenses and counterclaims of abandonment and fraud is not limited by a two year statute of limitations, as suggested by Lontex.  In *Marshak v. Treadwell*, 240 F.3d 184, 193 (3d Cir 2001), the Third Circuit held that under the Lanham Act, a claim for cancellation of a mark based on fraudulent procurement and a defense to an otherwise incontestable mark on a similar ground may be asserted at any time.  As such, Lontex's objection that discovery should be limited to a two year statute of limitations is without merit.

Discovery from 2006 to the present appears relevant and proportional to the needs of the case, where the discovery is material to the claims and defenses in the case and amount in controversy is approximately $40 million.  I am not persuaded that the burden or expense of the proposed discovery outweighs its likely benefit.  While there might be some burden for Lontex to produce certain records from the 2006 to the present, such burden has not been shown to be disproportional to the amount in controversy or unduly burdensome.  Lontex chose to initiate this action and must comply with its discovery obligations.  There is nothing in the record to suggest that NIKE is merely seeking to raise Lontex's discovery costs.  Rather, as referenced above, its proposed relevant time period appears relevant and proportional to the needs of the case.

Subject to the limitations further discussed in this Report and Recommendation, the relevant time period for the discovery requested by NIKE's Motion to Compel should begin in 2006.

**Requests 4 and 6**

**NIKE Inc.'s Position**

*Relevance*

NIKE moves to compel Lontex to produce all documents relating to its "use of the COOL COMPRESSION Marks" and documents demonstrating continuous use of each of the Marks "on or in connection with each good identified in the registrations for the COOL COMPRESSION Mark." It claims that Lontex failed to produce all responsive documents and instead, selectively produced: (i) *all* "COOL COMPRESSION invoices from 2007"; (ii) only "representative invoices for 2008, 2016, 2017 and 2018"; and (iii) "all invoice[s] using 'Cool Compression'". NIKE argues that selective production of invoices denies it responsive evidence of Lontex's non-use of the Marks  NIKE Motion at 18.

During argument on this motion, NIKE made clear that when the parties first addressed discovery of invoices, the issue was whether the words COOL COMPRESSION appeared on the invoices. Lontex has since made clear that from the period of January 1, 2008 through March 31, 2016, it did not use the words COOL COMPRESSION on invoices. According to NIKE, the issue that remains is whether Lontex used the words "Sweat It Out" on the invoices and pick tickets because Lontex asserts that the Cool Compression Mark epitomized its technology that makes the Sweat it Out line of products so successful.

NIKE also argues that it needs Lontex's invoices and pick tickets from January 1, 2008 to March 31, 2016, including customer names and contact information, so it can engage in third

party discovery of Lontex's customers.  NIKE plans to seek discovery from some customers to determines if they still have the garments they purchased from Lontex.  *See* Nov. 25, 2019 Hr'g Tr. at 15.

The primary basis for Lontex's alleged continuous use of the Marks between 2007 and 2016 was the content/care label sewn inside the product and Mr. Nathan's oral presentations. Third party discovery of Lontex's customers is necessary to test the credibility of Lontex's claims of continuous use because in NIKE's view, "[o]nly the customers can corroborate whether Mr. Nathan used the asserted Marks in his oral presentations and whether Lontex's "Sweat it Out" products contained sewn-in "Cool Compression" content/care labels."  NIKE Suppl. at 2.   NIKE argues that another court in this District recently decided the issue of priority and continuous use of a trademark based on the plaintiff's invoices in evidence.  *Id.* at 2-3 (citing In *Maduka v. Tropical Naturals, Ltd.*, No. 17-cv-1835, __ F. Supp. 3d __, 2019 WL 4384138 (E.D. Pa. Sept. 12, 2019)).

NIKE also argues that if Lontex can demonstrate ownership of valid marks, the Court will need to decide whether NIKE's alleged use is likely to cause consumer confusion by applying the ten-factor test enumerated in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).  NIKE Suppl. at 4.  It asserts that other courts have compelled trademark owner plaintiffs to produce customer information in discovery to address the likelihood of confusion factors.  *Id.* (citing *Brown v. Bridges*, No. 12-cv-4947, 2013 WL 11842015, at *5-6 (N.D. Tex. Aug. 26, 2013)).

NIKE also argues that discovery from Lontex's customers would be relevant to NIKE's counterclaim of fraud because if Lontex made representations about its use to the USPTO during

this period and such representations were inconsistent with the customer experience, it would be evidence that Lontex deceived the USPTO to maintain the registrations asserted in this case.

In NIKE's view, Lontex waived any objection that its invoices are not relevant by producing all invoices from 2007 and "representative" samples from 2008, 2016, 2017, and 2018.  It claims that concerns about confidentiality were also waived and to the extent such concerns were not waived, they are addressed by the two-tier confidentiality order entered in this action (ECF No. 44).  *Id.* at 5.   NIKE also notes that Lontex served subpoenas on NIKE's customers, including Dick's Sporting Goods.  *See* Nov. 25, 2019 Hr'g Tr. at 28.

### Harm

According to NIKE, there is no harm to Lontex by disclosure of its customer names because NIKE sells on a wholesale basis to sporting goods stores like Dick's Sporting Goods and Modell's and therefore, there is virtually no overlap between its customers and Lontex's customers.  *See* Nov. 25, 2019 Hr'g Tr. at 14.

### Burden

NIKE argues that Lontex failed to substantiate its claim that production of its invoices would impose undue burden and expense.  NIKE Suppl. at 5.  Lontex's principal, Mr. Nathan, confirmed that sales invoices are organized in file folders by year and testified that he had no problem producing all invoices to NIKE and thought they had already been produced.  *Id.* at 6.  He also testified that Lontex maintains handwritten pick tickets organized in boxes by year and that it would not be difficult to produce the pick tickets, as well as invoices.  NIKE Reply at 7.  NIKE claims to have offered to review these files at its own expense and to pay the costs for scanning these files.  *Id.*

NIKE rejects Lontex's suggestion that QuickBooks is the most reliable and cost effective means to access sales information, relying on Mr. Nathan's testimony that: (a) Lontex uses invoices, pick tickets and hard copy documents in general as the "bible" of information; (b) information on the data exports could be verified only by cross-referencing the invoices themselves; and (c) Lontex manually recreated the electronic database after it lost a substantial amount of data in 2013 due to a computer virus.  *Id.* at 5.  During the hearing, NIKE also asserted that there is a level of distrust between the parties and NIKE is not confident that what is on the invoice will flow through to QuickBooks accurately.  *See* Nov. 25, 2019 Hr'g Tr. at 32.

**Lontex's Position**

*Relevance*

Lontex, a small, family-owned corporation, claims to have faithfully discharged its discovery obligations while producing over 6,000 documents.  Lontex Opp. at 1.  It asserts that it has not withheld electronic data based on any date restriction, and instead, Lontex's objections concern a significant volume of physical paper files.  Id.  Because Lontex exported and produced that sales data from its accounting records in QuickBooks for the entire period 2006 to June 2019, it claims that NIKE already has all the relevant sales data from the invoices, except customer names and addresses, which it argues are not relevant.  Lontex Opp. at 9; Nov. 25, 2019 Hr'g Tr. at 29.  Lontex offered to stipulate that its invoices during that time did not use the COOL COMPRESSION Mark and therefore, NIKE has no need for those documents because the issue is not in dispute.  Lontex Opp. at 1.  It also offered to produce representative invoices from each year.  *Id.* at 2.

Lontex disputes NIKE's assertion that it intends to claim that marketing and sales of "Sweat it Out" branded products are sufficient to establish continuous use since 2006 of the

COOL COMPRESSION Marks.  *Id.* at 3.  Instead, it argues that Lontex "primarily relies upon branding COOL COMPRESSION in the garment labels and the regular presentations and conversations of Efraim Nathan with customers, potential customers, and constituents in the relevant industry regarding Lontex's COOL COMPRESSION technology, with other uses being merely supplemental and confirmatory."  *Id.*

Lontex argues that invoices are not relevant to the claims and defenses at issue and that it did not waive its objections by producing certain invoices.  Some invoices were produced through an inadvertent vendor error and were not a waiver of its objections to relevance, confidentiality or competitive-sensitivity.  *Id.* at 5.

### *Harm*

Lontex opposes NIKE's request for identification of Lontex's customers.  It argues that in Lanham Act cases, such as this, "the names of the defendant's customers or clients are rarely -- if ever -- revealed."  Lontex Suppl. at 2 (citing *Globalaw Ltd. v. Carmon & Carmon Law Office & Globalaw, Inc.*, 452 F. Supp. 2d 1, 62 (D.C.C. 2006)).  Parties are generally prohibited "from contacting the customers and former customers of the other party on the subject matter of the action," including to "develop evidence relating to the likelihood of confusion."  *Id.* at 4 (citing *Foxworthy v. Sun Art Designs, Inc.*, 1997 U.S. Dist. LEXIS 6411, at *3-5 (S.D. Fla. Mar. 4, 1997)).

Whatever need NIKE could assert, Lontex claims that it cannot "outweigh[] the possible harm, such as harassment of its customers, which might result."  *Id.*  The "prejudice to the [party resisting contacting of its customers] is obvious and irreparable."  *Id.* (citing *Aktienge-Sellschaft v. Westburg*, 260 F. Supp. 636, 637 (E.D. Pa. 1966); *see also Ikon Office Sols., Inc. v. Konica Minolta Bus. Sols., U.S.A., Inc.*, 2009 U.S. Dist. LEXIS 116372, at *14-15 (W.D.N.C. Nov. 25,

2009); *Easy Life, LLC v. Godaddy Operating Co., LLC*, 2015 U.S. Dist. LEXIS 103489, at *8-9 (C.D. Ill. Aug. 7, 2015)).

In its initial disclosures, Lontex identified a sampling of 12 customers who NIKE could contact and Lontex takes the position that NIKE has failed to demonstrate why this sampling is insufficient. Lontex Supp. at 4. Lontex also points to the declaration from a customer provided in its initial disclosures for whom NIKE subpoenaed for documents and deposed on October 2, 2019. *Id.* at 2. The declaration states that NIKE's counsel attempted to prescreen on a phone call whether garments had labels with "COOL COMPRESSION" or instead "SWEAT IT OUT". Id. After it was confirmed that the garment had the COOL COMPRESSION Mark, NIKE failed to disclose this evidence to Lontex. *Id.*

In Lontex's view, the best method to corroborate Lontex's use of COOL COMPRESSION on inside labels is to depose a representative from a sewing company that has sewn the majority of labels on Lontex's garments for over a decade. *Id.* at 3. NIKE has not done so and therefore should not impose upon Lontex's customers to validate these facts when there is a third party in a position to testify on this issue.

### Burden

Lontex also argues that production of these invoices is not proportional to the needs of the case. Lontex Opp. at 8. The burden and expense of collecting, reviewing, and producing those old records outweigh any speculative benefit. *Id.* at 1. The QuickBooks data that was already produced to NIKE includes the same information that is included on the invoices.

While Lontex opposes production of customer names and addresses, it argues that if ordered to produce it, discovery should be in the form of QuickBooks data that reflects customer names and addresses. *See* Nov. 25, 2019 Tr. at 34. According to Lontex, QuickBooks is the

primary source of data from which the invoices are generated, so the invoices are incapable of being a more reliable means of discovering customer sales information and are much more burdensome to produce than a QuickBooks export.  *Id.* at 6.

Without a showing that QuickBooks data is not accurate, it argues that NIKE has not met its burden and there is no basis for the production of invoices.  *See* Nov. 25, 2019 Hr'g Tr. at 32-33.  While Lontex opposes disclosure of its customer names and contact information, to the extent the court allows NIKE to contact Lontex customers, Lontex proposes that it contact a random sampling of customers on Lontex letterhead offering a gift to motivate them to provide pictures without the mention of litigation.  *Id.* at 6 n.4.

### Recommended Resolution

#### *Customer Names and Contact Information*

Concerns about the disclosure of Lontex's customers are not taken lightly.  After careful consideration of the arguments and cases cited by the parties, I conclude that the identity of Lontex's customers is relevant to the parties' claims and defenses.

First, although Lontex rejects NIKE's argument that Lontex intends to claim that marketing and sales of Sweat it Out branded products are sufficient to establish continuous use since 2006 of the COOL COMPRESSION Marks, in its opposition to this motion, Lontex admits that it only "*primarily* relies upon branding COOL COMPRESSION in the garment labels and the regular presentations and conversations of Efraim Nathan with customers, potential customers, and constituents in the relevant industry regarding Lontex's COOL COMPRESSION technology" and that other uses are "merely supplemental and confirmatory."  Lontex Opp. at 3 (emphasis added).  Such statements do not dispel the view that Lontex intends to rely, at least in part, on its use of the Sweat it Out branded products to establish continuous use of the Cool

Compressions marks since 2006.  Such statements also demonstrate the relevance of Mr.

Nathan's conversations with customers, potential customers, and constituents about Lontex's

COOL COMPRESSION technology.

Second, Lontex readily admits that it has only limited garment samples and images dating

back to 2006.  With no ability to obtain this discovery from Lontex, it is therefore reasonable to

expect that NIKE would seek to determine if there was evidence of Lontex's continuous use of

the Marks from other sources, such as Lontex customers who may have retained some of

garments purchased from Lontex or associated images.

Finally, NIKE's counterclaims and affirmative defenses of  abandonment and fraud put

the issues of Lontex's representations to customers and potential customers at issue.  NIKE

should therefore be permitted to seek third party discovery from some of Lontex's customers.

I also find the cases cited by Lontex in support of its opposition to customer discovery to

be distinguishable from this case.  See *Easy Life, LLC v. Godaddy Operating Co., LLC*, 2015

U.S. Dist. LEXIS 103489, at \*8-9 (C.D. Ill. Aug. 7, 2015) (finding that customer information

and experiences were relevant and reasonably calculated to lead to admissible evidence and such

discovery was ordered under a protective order); *Ikon Office Sols., Inc. v. Konica Minolta Bus.*

*Sols., U.S.A., Inc.*, 2009 U.S. Dist. LEXIS 116372, at \*14 (W.D.N.C. Nov. 25, 2009) (granting

protective order in trade secret case where plaintiff failed to establish that customer information

was sufficiently necessary and relevant to the case to outweigh the harm of disclosure);

*Globalaw Ltd. v. Carmon & Carmon Law Office & Globalaw, Inc.*, 452 F. Supp. 2d 1, 62

(D.C.C. 2006) (association of law firms not required to provides names of clients to law

partnership to interview about possible confusion of service mark); *Foxworthy v. Sun Art*

*Designs, Inc.*, 1997 U.S. Dist. LEXIS 6411, at \*4 (S.D. Fla. Mar. 4, 1997) (customer discovery

denied on issue of confusion where actual confusion was not a necessary element of proof to

plaintiff's case); *Volkswagenwerk Aktienge-Sellschaft v. Westburg*, 260 F. Supp. 636, 637 (E.D.

Pa. 1966) (holding that the present state of the record did not evidence need for customer

discovery but some limited customer inquiries may be permitted upon a showing of a valid need

for discovery at a later stage of the litigation).

I am not persuaded by Lontex's argument that the sampling of 12 of its customers

selected by Lontex for NIKE to contact is sufficient.  Nor can Lontex demand that NIKE depose

a representative from the sewing company that has sewn the majority of labels on Lontex's

garments for over a decade.  A party served with discovery cannot unilaterally dictate which

discovery is, or is not, sufficient for an opposing party to prove its claims or defenses.

While NIKE has demonstrated that certain customer discovery is necessary, such

discovery should not be unlimited.  Customer discovery should be limited to a sampling of

customers that is tightly controlled with protections to help ensure that any burden on Lontex's

customers is limited and concerns of harassment are addressed.  There should also be limitations

on NIKE's direct contact with Lontex customers to address the legitimate concerns raised by

Lontex about NIKE's counsel communications with a customer after the deposition that were not

disclosed to Lontex.

To address these issues, the following limits should be imposed on Lontex customer

discovery:

1. Lontex must produce names and contact information of customers who purchased
   Lontex's COOL COMPRESSION technology (as described in the ruling below);

2. NIKE may seek discovery from no more than 7 Lontex customers with the
   limitations described below:

   a. All discovery from Lontex customers shall be used only for the purposes
      of this litigation;

    b.  NIKE counsel shall not engage in communications with Lontex customers without participation by Lontex counsel;

    c.  Subpoenas served on Lontex's customers shall be accompanied by an introductory statement drafted by counsel for both parties that provides in relevant part:

        i.  NIKE is the defendant in litigation initiated by Lontex in which Lontex asserts that NIKE infringed Lontex's COOL COMPRESSION family of trademarks;

        ii.  NIKE disputes Lontex's claims and asserts counterclaims and affirmative defenses against Lontex;

        iii.  In this litigation, NIKE is seeking customary pre-trial discovery in connection with its counterclaims and affirmative defenses and the court has allowed NIKE to engage in such discovery;

        iv.  The information sought by this subpoena will be kept confidential, used only for purposes of this litigation and not used for commercial purposes;

        v.  Although the subpoena sets a date and time for production of documents/things, and/or a date for deposition, counsel for the parties will provide reasonable accommodations to the scheduled dates/times as necessary;

        vi.  NIKE will reimburse costs and expenses associated with the production of documents or things in response to the subpoena; and

        vii.  If there are any questions about this subpoena, please email counsel for *both* parties at [emails for NIKE and Lontex counsel] and we can arrange a discussion with both parties to address your questions.

3.  Consistent with Fed. R. Civ. P 45(a)(4), before the subpoena is served, notice and a copy of the subpoena must be provided to Lontex;

4.  Lontex shall be given a copy of the subpoena and accompanying letter to its customers at least 3 days before NIKE intends to serve it;

5.  Lontex objections to the subpoena should be raised directly with NIKE in a meet and confer before addressing issues with the court;

6.  All written discovery received in response to the subpoena should be promptly shared with Lontex; and

7. To the extent one party receives communications from a Lontex customer about a served subpoena, such communications should promptly be shared with counsel for the other party and arrangements should be made for both parties to engage in a call with the customer about the subpoena or issues raised.

### *Physical Invoices and Pick Tickets*

With regard to how customer information is disclosed to NIKE, I am not persuaded by NIKE's argument that Lontex should be required to produce all of its physical records in addition to the QuickBooks data because it appears that such information would be duplicative. NIKE's concerns that the QuickBooks data may not be accurate may later be justified but, at the present time, such concerns appear speculative.

NIKE acknowledges that Lontex produced: (i) *all* "COOL COMPRESSION invoices from 2007"; (ii) only "representative invoices for 2008, 2016, 2017 and 2018"; and (iii) "all invoice[s] using 'Cool Compression'".  Lontex also produced some QuickBooks data containing information from its invoices.  NIKE therefore has a reasonable sample of invoices to determine if the information provided by Lontex in the form of QuickBooks data is not accurate but it has not raised any actual discrepancies between the physical invoices and the electronic data.  The only issue raised was the production of customer names and contact information on the invoices, which can be readily obtained through the QuickBooks data once Lontex produces that data with the customer information.  To the extent NIKE can show cause that QuickBooks data is materially different than the produced invoices, after a meet and confer with Lontex, it may raise the issue of additional physical invoices in a subsequent motion.  Lontex should therefore be ordered to produce QuickBooks data relating to the Marks and such data should include customer names and contact information beginning 2006.

While Lontex has made it clear that from the period of January 1, 2008 through March 31, 2016, it did not use the words COOL COMPRESSION on invoices, no such representation

has been made concerning its use of "Sweat it Out" on invoices or pick tickets during that same

time period. If Lontex intends to rely on its use of "Sweat It Out" on its invoices or pick tickets

as evidence of continuous use, it must produce invoices and pick tickets that bear the label

"Sweat it Out".

### Request 12

**NIKE's Position**

NIKE requests that this Court order Lontex to produce representative product samples

(or, alternatively, legible photographs thereof) for each good identified in its registrations or

affirmatively state that it does not possess such samples.  NIKE Motion at 16.

NIKE asserts that Lontex's trademark registrations identify a wide variety of goods and it

is therefore entitled to samples of all products that Lontex sells or sold in connection with the

Marks, including samples of each product identified in the asserted registrations.  *Id.* at 13.

According to NIKE, Lontex has produced samples of only five Lontex products, from

unknown dates, and has not produced samples for the following goods identified in its

registration: "men's, women's and children's clothing, namely, boxer shorts, bikini underpants,

long johns, polo shirts, swimwear, sweatpants, sweatshirts, body armor carrier compression

shirts for military and law enforcement personnel, sports bras, halter tops, singlets, caps, hats,

headbands, bandanas, balaclavas, sneakers and shoes."  *Id.* at 13.  Lontex also produced some

illegible photographs of Lontex products (without any information identifying which product is

shown) and illegible photographs of models wearing a few Lontex products without any

identifying information.  *Id.*

NIKE seeks to test the veracity of Lontex's assertions that the Marks were used on the

products' labels. NIKE argues that Lontex has not however produced product samples (or even

legible photographs of the products) from the relevant period where such a label bearing the Marks is shown as having been affixed to the product. *Id.* at 13-14. Instead, Lontex produced a few loose labels not affixed to any products, and "order instructions from 2008 for inside labels containing the COOL COMPRESSION Mark and pictures of the boxes containing the remainder of the 39,600 labels Lontex obtained from said ordering." *Id.* at 14.

Lontex's offer to produce three "representative packaged samples" of its products "compression products," "children's compression products," and "loose or form-fitting product," from some unspecified time, are not sufficient according to NIKE. *Id.* It asserts that Lontex is depriving NIKE of the ability to determine whether Lontex's use of the Marks was consistent across its product packaging and to test the veracity of Lontex's other assertions. *Id.*

Lontex previously agreed to "conduct a reasonable search and produce one representative sample within *each category of product (i.e., shirt, pants, etc.)* that Lontex has offered for sale in connection with the COOL COMPRESSION Marks from January 1, 2012 to the present." *Id.* at 14-15 Lontex later objected, saying that it "does not keep on hand inventory of each and every product that Lontex offers or sells, or has ever offered or sold, in connection with the COOL COMPRESSION Marks" but NIKE asserts that Lontex has waived its right to make such an objection. *Id.* at 15.

**Lontex's Position**

Lontex asserts that it conducted a reasonable inquiry and produced the responsive product samples and images that are available, and it does not have other responsive product samples and images dating back to 2006. Lontex Opp. at 15.

Lontex's counsel explained during the hearing that Lontex maintains about 1200 products in inventory in boxes. *See* Nov. 25, 2019 Hr'g Tr. at 43. Products are restocked by dumping

new product in the boxes.  *Id.* at 44.  It is therefore possible that there may be samples in storage before 2016 because the box is commingled, but there is nothing on the products to identify the year it was produced and sold.  *Id.*  Lontex has given samples from each of those boxes for the ones that they agreed to produce.  *Id.*

      **Recommended Resolution**

As noted above, Lontex asserts that it conducted a reasonable inquiry and produced the responsive product samples and images that are available, and it does not have other responsive product samples and images dating back to 2006.  Lontex cannot produce samples it does not possess.  To the extent Lontex has responsive products or images in its possession, custody or control, it must produce them or affirmatively state that it does not possess such materials.

**<u>Requests 15 and 16</u>**

**NIKE's Position**

Lontex alleges that it markets a "successful COOL COMPRESSION line of clothing," and has sold "over 40,000 COOL COMPRESSION Goods" since 2006.  NIKE Motion at 12.  NIKE argues that Lontex produced several documents that discuss its plan to launch a separate COOL COMPRESSION business in 2006 but has not produced a business plan for that separate business, even though that business plan was mentioned by both Efraim and Samantha Nathan in their respective depositions.  NIKE Reply at 10.  NIKE argues that such documents are relevant to its defenses and counterclaims, as well as an evaluation of Lontex's purported trademark rights, as these documents will show whether Lontex had any intent to continue using and exploiting the COOL COMPRESSION Marks (and the Sweat it Out Mark.  *Id.* at 9-10.

Because Lontex's asserts that "'Sweat it Out' products are 'COOL COMPRESSION' products, and vice versa", NIKE argues that evidence concerning Lontex's "Sweat it Out" Marks

is similarly relevant to NIKE's defenses.  NIKE Mot at 19.  Lontex has however refused to produce any documents concerning its past, present, or future plans to expand or use the Marks or its Sweat it Out Marks before 2012.

### Lontex's Position

Lontex claims that its business plans dating back to 2006 are irrelevant.  Lontex Opp. at 16.  It argues that "[l]ikelihood of expansion and business valuation as of 2015 when the infringement occurred simply do not require documentation of what Lontex may or may not have been planning back in 2010, 2006, or the like."  Lontex Opp. at 16.

During the hearing, counsel for Lontex asserted that Lontex produced the only business plans it has in its possession.  No additional business plans exist.  *See* Nov. 25, 2019 Hr'g Tr. at 48-49.

### Recommended Resolution

As referenced in in my Recommended Resolution to RFP 4 and 6, Lontex has not foreclosed its reliance on Sweat it Out branded products to establish continuous use since 2006 of the COOL COMPRESSION Marks.  *See* Lontex Opp. at 3 (Lontex argues that it only "*primarily* relies upon branding COOL COMPRESSION in the garment labels and the regular presentations and conversations of Efraim Nathan with customers, potential customers, and constituents in the relevant industry regarding Lontex's COOL COMPRESSION technology" and that other uses are "merely supplemental and confirmatory") (emphasis added).  Such statements do not dispel the view that Lontex intends to rely, at least in part, on its use of the Sweat it Out branded products to establish continuous use of the COOL COMPRESSION Marks since 2006.

Therefore, to the extent that Lontex has documents concerning its past, present, or future plans to expand or use of the COOL COMPRESSION or Sweat it Out Marks before 2012, such documents should be produced.

**Request Nos. 14, 21 and 23**

NIKE seeks all advertising, promotional, and marketing materials for the COOL COMPRESSION Marks, which is evidence of trademark "use" to support its affirmative defenses and counterclaims. NIKE Motion at 20.   It seeks not only the advertisements themselves, but also documents related to the advertisement expenses associated with the Marks.

In its opposition, Lontex averred that it already produced non-privileged, responsive electronic documents, and is agreeable to searching the remaining physical files for documents regarding usage of COOL COMPRESSION and additional advertising and marketing documents back to 2006 (whether or not it uses the mark "COOL COMPRESSION" in the advertising and marketing).  Lontex Opp. at 16.

During the hearing with the Parties, NIKE acknowledged that if Lontex was going to produce year-by-year advertising folders, the aforementioned offer by Lontex was acceptable and therefore this dispute has been resolved by consent of the parties.  *See* Nov. 25, 2019 Hr'g Tr. at 50.

**Requests 40 and 41**

NIKE requested that Lontex produce: (i) "For each good or service using the COOL COMPRESSION Marks, Documents sufficient to establish Lontex's annual revenue, costs, and profits since 2007 generated from Lontex's use of the COOL COMPRESSION Marks"; and (ii) "All Documents and things relating to any of Lontex's profit and loss statements, sales figures, schedules, reports, income statements, balance sheets, and other economic, financial, or

accounting documents, including without limitation, all standard cost reports or other documents that set forth or identify material, labor, overhead, and fixed or variable costs relating to any and all goods and/or services offered in conjunction with the COOL COMPRESSION Marks."

NIKE asserts that Lontex is improperly withholding essential, responsive financial data that NIKE needs for purposes of evaluating Lontex's damages theories and, ultimately, rebutting the same.  NIKE Motion at 24.  According to NIKE, such evidence is relevant, as it will allow analysis of Lontex's sales, profits, investments from 2007 to 2015—which were steeply declining well before NIKE ever sold any alleged "infringing product."  *Id.* at 24.  Because this financial data is highly probative as to damages and causation and because Lontex does not assert any burden associated with producing this information, production of this evidence is proportionate to NIKE's need.  *Id.* at 24.

In its Reply, NIKE argues that this information is now more pressing than a month ago, because Lontex has a new theory of damages that NIKE caused it harm because its revenues from the specific products it recently identified, declined over a period of years.  NIKE Reply at 12.  As such, NIKE argues that full financials for the entire relevant period are necessary for NIKE to rebut this causation theory, as well as Lontex's damages demand.  *Id.*

**Lontex's Position**

Lontex asserts that it has already produced non-privileged, responsive electronic documents, including data from accounting software and copies of tax returns back to 2006. Lontex Opp. at 16.  It does not have documents or data, however, reporting expenses solely on COOL COMPRESSION isolated from other expenses.  *Id.* at 16.  Because it is not a large company, it asserts that it does not have profit and loss or income statements. *Id.* Thus, Lontex has offered to provide that which is available after conducting a reasonable inquiry.

**Recommended Resolution**

Lontex cannot produce financial documents that it does not have in its possession, custody or control.  To the extent, however, that Lontex has not provided all aforementioned documents responsive to Requests 40 and 41, such documents should be produced.  Because Lontex asserts a theory of damages that its revenues from the specific products declined over a period of years due to NIKE, financial documents supporting those damages would also be relevant and must be produced for the relevant period.

**Request 73**

Request 73 seeks in relevant part all communications between Lontex and third-parties concerning this action.  The Parties advised that during meet and confers, the dispute narrowed to whether NIKE is entitled to communications concerning litigation funding.  NIKE also served its Fifth Requests for Production which focuses on requests specific to litigation funding documents.  NIKE has also filed a separate motion to compel Lontex to amend its privilege log, addressing some of Lontex's relevance and privilege arguments concerning litigation funding.

During the hearing on this motion, the Parties agreed that the remaining dispute about discovery of communications concerning litigation funding would be addressed in connection with NIKE's Motion to Compel Lontex to Amend Privilege Log and Produce Non-Privileged Documents, addressed below.

## III.   LONTEX'S MOTION TO COMPEL NIKE'S COMPLIANCE WITH AGREED PRODUCTION

On December 19, 2019, the parties advised that after the hearing before this Special Master, they reached a compromise on all but one issue in Lontex's Motion to Compel.  The parties expected that final issue to be resolved and agreed that, if necessary, they will raise the issue in a separate motion.  As such, Lontex's Motion to Compel is moot.

## IV.   NIKE'S MOTION TO COMPEL LONTEX TO AMEND PRIVILEGE LOG AND PRODUCE NON-PRIVILEGED DOCUMENTS

NIKE seeks an order for Lontex to amend its privilege log and remove entries for any non-privileged documents and produce those documents.  It also asks that Lontex be sanctioned for refusing to timely amend its privilege log.  Lontex opposes the motion.

**NIKE's Position**

Although Lontex's November 8, 2019 Privilege Log contains only ten entries, NIKE argues that it fails to provide the basic level of detail required by Fed. R. Civ. P. 26(b)(5) and violates the "ESI Order" entered in this case.  NIKE Motion at 1. The first seven entries, described as "communication [with TradeMark Express] relating to legal advice, have been resolved by consent of the parties.  The final three entries in dispute relate to litigation funding. NIKE stressed in its Motion that the Court need not decide whether privilege applies to the litigation funding documents at this time.  Instead, NIKE seeks an order for Lontex to log those documents individually so NIKE (and if necessary the Court) will have the information needed to make that determination.  *Id.* at 12.

With regard to relevance, NIKE argues that Lontex conceded that litigation funding documents are relevant by including them on its Privilege Log because Rule 26(b)(5) and relevant case law only requires a party to log relevant privileged documents.  *Id.* at 7.  NIKE concedes that the inquiry on whether litigation funding documents are relevant is highly fact-specific.  NIKE Reply at 10.  Here, NIKE argues that the litigation funding documents are: (1) important to NIKE's delay-based defenses, such as laches based on Lontex's delay in bringing this litigation; (2) relevant to an "exceptional case" determination brought under the Lanham Act should NIKE be deemed a prevailing party because such a determination takes into consideration the totality of the circumstances surrounding pursuit of the case; (3) discoverable as a party

admission in connection with what Lontex told its litigation funder about the merits or lack

thereof of its claims, if not covered by a common interest privilege; and (4) may be relevant to

the reason third parties identified by Lontex in its Initial Disclosures failed to engage with NIKE

if those same third parties are involved in a funding arrangement with Lontex.  NIKE Motion at

9-11.

In response to Lontex arguments that it has a common legal interest with litigation

funders, NIKE argues that is irrelevant to the proper disclosure of relevant documents in a

privilege log.   It further acknowledges that the issue of a litigation funder common interest

privilege has not been determined in this District, and cases from other courts go both ways.

NIKE Reply at 4.  Finally, NIKE seeks sanctions against Lontex for failing to timely cure the

deficiencies in its Privilege Log by requiring it to pay NIKE's attorneys' fees associated with this

motion.  NIKE Motion at 12-13.

**Lontex's Position**

Lontex argues that NIKE's motion should be denied because Lontex provided sufficient

information for NIKE to assess Lontex's privilege claims without conceding the relevance of any

document pertaining to litigation funding.  Lontex Opp. at 1-2.  Its privilege log entries comply

with Fed. R. Civ. P. 26(b)(5)(A)(ii) and the ESI Order, Section III.2.  It asserts attorney-client

privilege, work product, and common interest privilege because all documents created or

exchanged with a litigation funder were prepared in anticipation of litigation, pursuant to

communications with Lontex's attorneys, and subject to non-disclosure and common interest

provisions.  *Id.* at 3. Lontex also asserts that the privilege log entries explain that the withheld

documents consist of "[r]ecords and communications concerning litigation funding in

anticipation of litigation," which is sufficient for NIKE to evaluate relevance and privilege. *Id.* at 2.

With regard to relevance, Lontex argues that it did not concede the relevance of litigation funding documents by including them on the privilege log. Lontex agreed to include information on its privilege log concerning litigation funding records expressly pursuant to its reserved objections, including as stated in its objections and responses to NIKE's Fifth Requests for Production. *Id.* Nor does NIKE establish the relevance of such documents; instead relying on four unfounded scenarios and hypotheticals to support its argument of relevance. *Id.* 8-9.

Even if the documents were relevant (which it disputes), Lontex argues that litigation funding documents are privileged and protected from disclosure because the documents were prepared in anticipation of litigation and pursuant to communications with attorneys. *Id.* Providing additional information in an amended privilege log would "reveal[] information itself privileged or protected" or "reveal protected content". *Id.*

Finally, Lontex asserts that there is no basis for NIKE to be awarded fees related to its motion because Lontex complied with its obligations and its objections to disclosure of litigation funding documents and communications are justified. *Id.* at 13.

**Recommendations**

*Compliance with Fed. R. Civ. P. 26(b)(5)(A)(ii) and ESI Order*

Fed. R. Civ. P. 26(b)(5)(A) requires that:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> **(i)** expressly make the claim; and
>
> **(ii)** describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner

that, without revealing information itself privileged or protected,
will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A).

Here, Lontex's privilege log contains three entries (LTX_Priv 00008–10), listing the file
name/subject as "Records and communications concerning litigation funding in anticipation of
litigation" and Lontex asserts attorney client privilege, work product and common interest
privileges.  While information about date and category are redacted, in accordance with Fed. R.
Civ. P. 26(b)(5)(A), the log provides sufficient information to convey that Lontex is withholding
documents concerning litigation funding on the basis of the referenced privileges.

Section III.2. of the ESI Order requires that Lontex's log provide the date, author,
custodian, recipient, file type, and subject of each withheld document "to the extent it is
reasonably available and to the extent is does not reveal protected content."  The ESI Order also
allows for the use of categorical descriptions of the documents after discussion with the other
party.

The information presented in the privilege log about litigation funding documents is
sufficient for NIKE to assert its objections without revealing the information Lontex asserts is
privileged.  Although Lontex did not discuss with NIKE the use of categorical descriptions for
litigation funding in advance of using them on the privilege log, its failure to do so was not a
material breach of the ESI Order because categorical descriptions were contemplated by the ESI
Order and as discussed above, NIKE was presented with sufficient information to raise its
objections, which it has done.

*Relevance*

I am not persuaded that Lontex's objections to the relevance of litigation funding
documents are waived by the simple act of listing them on a privilege log.  Exhibits to this

motion and opposition reflect numerous oral and written communications between the parties about their respective positions on the production of litigation funding documents.  In those exchanges, Lontex maintains its position that such documents are privileged and refused to withdraw its other objections (including relevance).  *See* Exhibits to Declaration of Ben Wagner in Support of Lontex's Opposition.  Lontex also asserted objections to relevance and privilege in its Responses and Objections to NIKE's recent requests for production directed at litigation funding.  *See* Lontex Opp., Ex. 5.  Lontex therefore preserved its objections to the relevance of its litigation funding documents.

NIKE concedes that the inquiry on whether litigation funding documents are relevant is highly fact-specific.  As reflected in *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.*, No. 19-cv-2875 (RBK/JS), 2019 WL 4485702, at *2 (D.N.J. Sept. 18, 2019), "there is no binding Third Circuit precedent on whether a plaintiff's litigation funding is a proper subject of discovery."  *In re Valsartan* further references the "plethora of authority holding that discovery directed to a plaintiff's litigation funding is irrelevant."  *Id.* at *3.  While the *In re Valsartan* court did not hold that litigation funding is off limits in all instances, it found that it could be relevant where there was a showing that something untoward occurred.  Id.  The court then rejected the "parade of horribles" that might arise from the litigation funding agreements because there was no evidence that any such events occurred.  *Id.* at *4.

Here, NIKE's has not demonstrated that the litigation funding documents are anything more than a collateral issue.  Its arguments that litigation funding (a) may be responsible for delays in bringing the litigation; (b) may be necessary for an "exceptional case" determination if it is a prevailing party; (c) may lead to party admissions; and/or (d) may be the cause of the

failure of third parties to engage with NIKE during discovery are not persuasive.  There is presently nothing in the record presented on this motion that leads to a determination that litigation funding documents are relevant under Fed. R. Civ P. 26(b)(1).

Because the litigation funding documents are not relevant, there is no need to address whether the documents are privileged, nor has NIKE sought such a determination in its motion. NIKE's Motion to Compel Lontex to Amend its Privilege Log and Produce Non-Privileged Documents should therefore be denied.

## V.      SUMMARY OF RECOMMENDATIONS TO THE COURT

Based on the foregoing, the undersigned make the following recommendations:

### NIKE's Motion to Compel Discovery Responses

1. Subject to the limitations further discussed in this Report and Recommendation, the Relevant Time Period for discovery relating to this motion is January 1, 2006 until the present.

2. *Requests 4 and 6*

    a. Lontex shall produce QuickBooks data containing customer names and contact information;

    b. NIKE discovery of Lontex customers is limited by the procedures identified in this Report and Recommendation;

    c. If Lontex intends to rely on its use of "Sweat It Out" on its invoices or pick tickets as evidence of continuous use, it must produce invoices and pick tickets that bear the label "Sweat it Out".

3. *Request 12* - To the extent Lontex has responsive products or images in its possession, custody or control, it must produce them or affirmatively state that it does not possess such materials.

4. *Requests 15 and 16* – To the extent that Lontex has documents concerning its past, present, or future plans to expand or use the COOL COMPRESSION or Sweat it Out Marks before 2012, such documents should be produced.

5. *Requests 14, 21, 23* – By consent of the parties, Lontex will search the remaining physical files for documents regarding usage of COOL COMPRESSION and additional advertising and marketing documents back to 2006, whether or not it

uses the mark "COOL COMPRESSION" in the advertising and marketing.  Such production will include year by year advertising folders.

6. *Requests 40 and 41* - Lontex shall produce documents responsive to Requests 40 and 41.  Production shall include all financial documents during the relevant period supporting Lontex's theory that its revenues from the specific products declined over a period of years due to NIKE.

7. *Request 73* – This request concerns litigation funding and is addressed by NIKE's Motion to Compel Lontex to Amend Privilege Log and Produce Non-Privileged Documents, discussed below.

8. NIKE's request for an award of costs and fees incurred with this motion is denied.

**Lontex's Motion to Compel NIKE's Compliance with Agreed Production**

By Consent of the parties, Lontex's Motion to Compel is moot.

**NIKE's Motion to Compel Lontex to Amend its Privilege Log and Produce Non-Privileged Documents**

NIKE's Motion should be denied.


Respectfully Submitted


    /s/ Sandra A. Jeskie
Sandra A. Jeskie
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: 215.979.1395
Jeskie@duanemorris.com

*Discovery Master*


Dated: January 8, 2020