# Exhibit 02

HIGHLY CONFIDENTIAL

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                        - - -

LONTEX CORPORATION,          :  Civil Action No.
                             :  18-cv-5623
       Plaintiff and         :
       Counterclaim-Defendant:
                             :
            vs.              :
                             :
NIKE, INC.,                  :
                             :
       Defendants and        :
       Counterclaim-Plaintiff:

                        - - -

            THURSDAY, NOVEMBER 14, 2019
                   VOLUME II
                HIGHLY CONFIDENTIAL

                        - - -
```

Continued Videotape Deposition of EFRAIM

NATHAN, taken pursuant to Notice, at the law

offices of DLA PIPER, LLP, One Liberty Place,

1650 Market Street, Suite 5000 Floor,

Philadelphia, Pennsylvania, commencing at

approximately 7:39 a.m., on the above date,

before Rose A. Tamburri, RPR, CM, CCR, CRR,

USCRA Speed and Accuracy Champion and Notary

Public.

```
                        - - -
```

414

HIGHLY CONFIDENTIAL

```
 1   APPEARANCES:
 2
         TROUTMAN SANDERS LLP
 3       BY:  BEN L. WAGNER, ESQUIRE
         11682 El Camino Real, Suite 400
 4       San Diego, California  92130
         (858) 509-6000
 5       benwagner@troutman.com
         Representing the Plaintiff and
 6       Counterclaim-Defendant,
 7       Lontex Corporation
 8
 9
10       DLA PIPER LLP
11       BY:  GINA DURHAM, ESQUIRE
12             and
13          BEN FABENS-LASSEN, ESQUIRE
14       1251 Avenue of the Americas
15       New York, New York  10020
16       (410) 580-4398
17       gina.durham@dlapiper.com
18       ben.fabens-lassen@dlapiper.com
19       Representing the Defendant and
20       Counterclaim-Plaintiff, Nike
21
22
23   ALSO PRESENT:
24
25       RUSS STRAIN, Videographer
```

415

HIGHLY CONFIDENTIAL

```
 1              (Whereupon, the deposition
 2     commenced at 7:39 a.m.)
 3                     -  -  -
 4              THE VIDEOGRAPHER:  Good morning.
 5     We're now on the record.  The time is
 6     approximately 7:39 a.m., Thursday,
 7     November 14th, 2019.  Please note that the
 8     microphones are sensitive and may pick up
 9     whispers, private conversations and cellular
10     interference.  Audio and video recording will
11     continue to take place unless all parties
12     agree to go off the record.
13              This is Media Unit 1 of the video
14     recorded deposition of Efraim Nathan, taken by
15     counsel for the defendant, in the matter of
16     Lontex Corporation versus Nike Corporation,
17     filed in the U.S. District Court for the
18     Eastern District of Pennsylvania, Case No.
19     18-CV-5623.
20              This deposition is being held at
21     the office of DLA Piper, located at 1650
22     Market Street, Philadelphia, PA.  My name is
23     Russ Strain from Veritext.  I'm the
24     videographer.  The court reporter is Rose
25     Tamburri from Veritext.  I'm not related to
```

421

HIGHLY CONFIDENTIAL

1    any party in this action, nor am I financially

2    interested in the outcome.

3                 Counsel will state their

4    appearance and affiliation for the record,

5    beginning with the noticing attorney.

6                 MS. DURHAM:  Gina Durham on behalf

7    of Nike, Inc., and I have here with my -- me

8    my colleague, Ben Fabens-Lassen, also from DLA

9    Piper.

10                MR. WAGNER:  Ben Wagner from

11   Troutman Sanders, appearing on behalf of

12   Lontex.  Thank you.

13                THE VIDEOGRAPHER:  Will the court

14   reporter now please swear in the witness.

15                      - - -

16                ...EFRAIM NATHAN, after having

17   first been duly sworn and/or affirmed, was

18   examined and testified as follows...

19                      - - -

20                THE VIDEOGRAPHER:  Thank you.  We

21   may proceed.

22                (Whereupon, a document was marked,

23   for identification purposes, as Defendant's

24   Exhibit 52.)

25

                                                422

HIGHLY CONFIDENTIAL

```
 1              Have you ever used the Cool
 2   Compression man logo on the care label?
 3        A.   On the care label, the sewn inside
 4   label, no.  The -- the -- the -- little man or
 5   little figurine is -- is really not a care
 6   label.  You really, to stand out, you put
 7   it -- it's -- it's really adhesively goes on
 8   the garment --
 9        Q.   Okay.
10        A.   -- on the bottom of the leg or on the
11   thigh or on the bottom of the tights, or on a
12   shirt on the chest.  That's what reinforce it
13   with heat, heat transfer -- we call it heat
14   transfer label.
15        Q.   So when did you apply that heat
16   transfer label to any garments?
17        A.   When we -- when we actually were
18   thinking of -- of making the two lines of Cool
19   Compression separate from Sweat It Out, when
20   we were working on the Cool Compression
21   website and were really thinking of moving in
22   two direction with the same product, different
23   packaging, different look, more sophisticated,
24   at that time.
25              So I would say, to answer by year,
```

439

HIGHLY CONFIDENTIAL

1    as I answered before, '07, '08.  And after I

2    decided not to, I stopped with the little

3    figurine, but not with the Cool Compression

4    care label.  That was going in.

5         Q.   Did you ever actually sell any of

6    those products that had the heat label little

7    man on them from the 2000 --

8         A.   No.

9         Q.   Let -- let me get my question out.

10        A.   Yeah.

11        Q.   Did you ever actually sell any of

12   those products that had the heat label with

13   the little man on it from the 2007/2008 time

14   period?

15        A.   Okay.  That's very good you asked me

16   to wait.  Not with the Cool Compression

17   packaging, the board that going inside, but we

18   probably did sell with the Cool Compression

19   insignia, it went in the packages with the

20   Sweat It Out logo also.

21             So I real -- I -- I can't be sure,

22   but we didn't put it on just to leave it in

23   the office or leave it in the factory or in

24   the warehouse.  We definitely got rid of them,

25   but not with the packaging of Cool

440

HIGHLY CONFIDENTIAL

1    Compression.

2        Q.    Okay.  I just want to make sure I

3    understand your answer.

4              So I believe you told me that

5    board packaging that shows the man logo was

6    never used for any product that was sold;

7    correct?

8        A.    Correct.

9        Q.    Then I believe you said, though,

10   there may have been some products that had the

11   heat label Cool Compression man on it that may

12   have been sold somewhere, but you -- you don't

13   really know when or where; is that correct?

14       A.    Yes.  That was a long time ago.  You

15   don't expect me to remember what I did with

16   them.

17       Q.    And I'm not sure I quite understand

18   why sometimes you would just pull a Sweat It

19   Out label for the special order products

20   instead of Cool Compression?

21       A.    Because if you would know how I work,

22   you would not even be surprised a minute.  I

23   could be jumping over a 96 inches table from

24   one side to the other because a garment is for

25   a 6'8 person.  I make sometimes somersault,

441

HIGHLY CONFIDENTIAL

1    you know, just to get to something to be able

2    to cut it quickly.  And sometimes I have

3    15 minutes to get back in the car and to drive

4    with it to Allentown because a person need it

5    badly, I will make the trip of two hours, an

6    hour back and forth, you know, to put it in.

7                  You think I care what label I

8    took?  You think that was on my mind?  On my

9    mind is not to get killed on the highway, on

10   my mind is to get to the factory to put it in,

11   sew it, say good-bye, thank you, get back in

12   the car, put the heat transfer on back at the

13   factory in Norristown, package it, examine it,

14   package it and ship it to the customer.

15       Q.   Why do you have Sweat It Out labels

16   that have the 70/30 information at all on it?

17       A.   It's -- it's really for insurance.

18   Why should I throw them away?  They're all

19   interchangeable.  Why should I throw them

20   away?  It's money, I paid money.

21                  It's like you buy something and

22   you put it in the freezer and you don't

23   like -- you don't like turkey hot dog, okay?

24   But you put it in.  Expiration date is 2021.

25       Q.   Okay.  Let me -- let me -- we're --

442

HIGHLY CONFIDENTIAL

```
 1              I would simply like to know why

 2    you changed your signature block to include

 3    Cool Compression just days before you sued

 4    Nike?

 5              MR. WAGNER:  Objection, compound.

 6              THE WITNESS:  I guess Samantha

 7    found out that she did not do it and she

 8    change it.  She probably did not even tell me

 9    that.  I have no idea.  My sales is going down

10    and that's what I have to worry about?  I

11    don't take a salary, and that's what I have to

12    worry about?

13              (Whereupon, a document was marked,

14    for identification purposes, as Defendant's

15    Exhibit 84.)

16    BY MS. DURHAM:

17       Q.   I'm showing you what's been marked

18    Defendant's Exhibit 84.  What is this, Mr.

19    Nathan?

20       A.   Um-hmm.

21       Q.   What -- what is it?

22       A.   That's 1900AK performance compression

23    tights.

24       Q.   And --

25       A.   But I don't see the color of it.
```

731

HIGHLY CONFIDENTIAL

1      Q.   All right.

2             Was this product actually ever

3  sold?

4      A.   I don't see the color of it.   No, we

5  did not put Cool Compression heat transfer

6  label on one leg and Sweat It Out on the other

7  leg.   We put the Cool Compression care label

8  inside and the Sweat It Out was visible

9  outside.   That was -- I bet you that was one

10 of those orange colors or purple colors that I

11 bought some material to do for like a spring

12 sale, something, and advertise it on the

13 Internet.

14     Q.   But -- but you never sold this

15 product; is that correct?

16     A.   I don't think so, no.

17     Q.   Okay.

18     A.   I think I have it on one of the

19 tables in the back in the warehouse.

20             (Whereupon, a document was marked,

21 for identification purposes, as Defendant's

22 Exhibit 85.)

23 BY MS. DURHAM:

24     Q.   I'm showing you what's been marked

25 Defendant's Exhibit 85.   Do you recognize this

732

HIGHLY CONFIDENTIAL

1   document?

2       A.   Yeah.

3       Q.   What is this?

4       A.   That's a 3019, but I think that's the

5   child.  I don't know.  The photo does not tell

6   me really.

7       Q.   Okay.

8            Is -- is this something that was

9   ever sold?

10      A.   That's the 3019.  Was it sold?  I'm

11  not sure.  I'm really not sure.  I'll have to

12  look at that table where I put the one with

13  the adhesive label, the logo with the person.

14  We don't put them like that in stock.

15      Q.   Okay.

16      A.   So we made like a promo on that, but

17  not really -- you know, we might do it right

18  now in a new Internet that we are building

19  website.  We took some photo last month and we

20  did blend it with people with a Cool

21  Compression logo and the Sweat It Out for the

22  photo shoot.

23      Q.   Okay.

24           So you think this may be a recent

25  photo or something that's old?

733

HIGHLY CONFIDENTIAL

1      A.   I -- I -- I really -- honest to God,

2  I really wouldn't know.  I mean, I really

3  wouldn't know.  From the picture, I really

4  don't know if it's an adult or a child.  It

5  look like a large picture, but it look like a

6  small neck, so I'm really -- I'm not sure.

7      Q.   But a shirt like this with the Cool

8  Compression man logo and the Sweat It Out

9  logo is not something that you regularly

10  sell --

11      A.   No.

12      Q.   -- correct?

13      A.   Right.

14      Q.   When was your recent photo shoot you

15  just mentioned?

16      A.   Right, for the new website.

17      Q.   When?  When was it, the date?

18      A.   The 10th, Saturday, October 10th.

19           (Whereupon, a document was marked,

20  for identification purposes, as Defendant's

21  Exhibit 86.)

22  BY MS. DURHAM:

23      Q.   I'm showing you what's been marked

24  Defendant's Exhibit 86, and I'll just

25  represent for the record that there is a whole

734

HIGHLY CONFIDENTIAL

```
 1    bunch of images that you produced that are
 2    similar like this and we just selected some of
 3    them for this Exhibit 86.
 4              Would you take a look at them and
 5    tell me --
 6         A.   Yeah.   Those I know exactly what they
 7    are.
 8         Q.   Okay.   What are they?
 9         A.   They are for the Cool Compression
10    website.
11         Q.   Okay.   That Cool Compression website
12    that was never operational?
13         A.   Exactly.   So that's really from 2006
14    and '7.
15         Q.   Okay.
16         A.   That's for the medical.
17              (Whereupon, a document was marked,
18    for identification purposes, as Defendant's
19    Exhibit 87.)
20    BY MS. DURHAM:
21         Q.   I'm showing you what's been marked
22    Defendant's Exhibit 87.   Do you recognize this
23    document, sir?
24         A.   Yeah.
25         Q.   What is it?
```

735

HIGHLY CONFIDENTIAL

1    page?

2         Q.   We're back on page 44410, the

3    Statement of Use.

4         A.   Right, right, okay.

5         Q.   Okay.

6              And you say you've never seen this

7    document?

8         A.   No.

9         Q.   Okay.  "The applicant is submitting

10   one specimen for the following -- for the

11   class showing the mark as used in commerce on

12   or in connection with any item in the class."

13        A.   Where does it say that?  Where are

14   you reading?

15        Q.   It's -- it's right here, right -- see

16   where it says, "Specimen-1 and Specimen-2"?

17        A.   Okay.

18        Q.   Okay?

19             And then there's a -- a link to

20   the specimens which start on page NIKE 44411

21   and go through NIKE 44413.

22        A.   Um-hmm.

23        Q.   Okay?

24             What -- what is that shown in the

25   specimens?

761

HIGHLY CONFIDENTIAL

```
 1       A.   Okay.  That's the board.  That's the
 2   one that will go -- that the garment will go
 3   inside.  It's a long board, maybe about
 4   24 inches by 8, and it's folded in half and
 5   the garment goes in and it goes in a bag.  I
 6   think I sent you a picture.
 7       Q.   Yeah.  This -- this is the one we
 8   talked about earlier where you said it was
 9   never -- never actually used; right?
10       A.   Exactly.
11       Q.   Okay.
12            Then why is it being submitted to
13   the Trademark Office --
14       A.   Because at that time, we --
15       Q.   -- at -- let -- let me finish.
16       A.   Yeah.
17       Q.   Why was it being submitted to the
18   Trademark Office in June of 2007 as proof that
19   you were using the mark as of that time?
20       A.   Because we were still thinking of
21   using it.
22       Q.   Okay.
23       A.   At that -- we didn't use it happen in
24   2008.
25       Q.   But you weren't actually using it in
```

762

HIGHLY CONFIDENTIAL

1  2007?

2      A.   Well, well, the plan was to use it.

3  The -- the website was going up, they were

4  late by a year.  We -- we -- we -- we got the

5  boards.  I mean, we spent thousands of dollars

6  on it.

7      Q.   Okay.

8           But the point is, is that you told

9  the Trademark Office that it was in use, but

10 it really wasn't; correct?

11          MR. WAGNER:  Objection, misstates

12 the documents, lacks foundation, calls for

13 speculation.

14          THE WITNESS:  I don't think -- I

15 don't think -- I don't think that there was

16 any intent to lie here.  That was in a

17 process.  Process sometimes take a year to

18 two.  What shall I tell them?  Hold, hold your

19 horses, give me another year?

20          MS. DURHAM:  Well, yeah, that is

21 actually what you do.

22          THE WITNESS:  Well, nobody told me

23 that.

24          MS. DURHAM:  Okay.

25 BY MS. DURHAM:

763

HIGHLY CONFIDENTIAL

```
 1        Q.   Well, your trademark lawyer, Mr.

 2   Lehrer, does he file lots of trademark

 3   applications?

 4             MR. WAGNER:  Objection, calls for

 5   speculation, lack of foundation.

 6             THE WITNESS:  I have no idea what

 7   he files.  You mean for me?

 8             MS. DURHAM:  Yes.

 9             THE WITNESS:  He just filed the

10   names that I have.

11             MS. DURHAM:  Okay.

12   BY MS. DURHAM:

13        Q.   Well, so did he reach out to you and

14   ask you if your mark was in use?

15        A.   No.  He send me the paper, you know,

16   he said we have to sign it because it's being

17   used, and I said, you know, we are working on

18   it.

19             He said, okay, send me the stuff

20   and I did.

21             When will you use it?  And I said,

22   you know, I don't know.  In the next year or

23   so.

24        Q.   So you said he sent you the paper.  I

25   -- did he send you the certificate?
```

764

HIGHLY CONFIDENTIAL

```
 1        A.   No, the paper said sign and send it
 2   back to him.
 3        Q.   Okay.
 4             What -- what papers were there
 5   that you signed?
 6        A.   I have no idea what it is.  It's a
 7   letter that, you know, we have to send with
 8   the specimen.
 9        Q.   Okay.
10             Do you have any problem providing
11   that letter to me?
12        A.   Why would I?
13             MR. WAGNER:  We talked about it.
14   We're willing to do that.
15             THE WITNESS:  Yeah.
16             MS. DURHAM:  Okay.
17             THE WITNESS:  Sure.
18             MS. DURHAM:  Yes, I'd appreciate
19   that.
20   BY MS. DURHAM:
21        Q.   And so did you, to your recollection,
22   tell -- tell Mr. Lehrer at that time that your
23   mark was in use?
24        A.   No.  I'm sure I did not tell him it's
25   in use.  It's in use is -- mean that you sold
```

765

HIGHLY CONFIDENTIAL

1   it, okay?  I haven't sold it yet.  I haven't

2   had the Internet yet, the website, Cool

3   Compression.

4        Q.   So why do you think Mr. Lehrer would

5   have filed a Statement of Use at the Trademark

6   Office if it wasn't in use?

7        A.   Because I told him we're going to use

8   it, absolutely.  I was all definitely we're

9   going to use it.

10       Q.   Okay.

11            But a lawyer that files trademark

12   applications knows that there's a big

13   difference between intending to use it and

14   actually using it.  In fact, that's why your

15   application was originally filed, based on

16   intent to use.  This was the big important

17   change about you putting it -- telling the

18   Trademark Office that it had been put in use.

19   So I will ask the question again.

20            Why would Mr. Lehrer file a

21   Statement of Use with the Trademark Office if

22   you were just still intending to use the mark?

23       A.   I don't know.

24       Q.   Did you authorize this filing?

25       A.   Did I authorize it?  I don't know.  I

766

HIGHLY CONFIDENTIAL

1   **have to look at the paper.  If I have a**

2   **signature, I authorized it.**

3            MS. DURHAM:  It would have been

4   nice to have those documents for this

5   deposition.

6            When will we have them, Ben?

7            MR. WAGNER:  Those are privileged

8   documents which we're going to give you

9   anyways.  As soon as I can copy them.

10           MS. DURHAM:  Okay.  Are you giving

11  them because you are relying on advice of

12  counsel and -- and waiving privilege as to

13  those documents?

14           MR. WAGNER:  I don't know what you

15  mean by advice of counsel.

16           MS. DURHAM:  Well, I -- I guess

17  I'm -- I'm just trying to clar -- are you --

18           MR. WAGNER:  We're not --

19           MS. DURHAM:  You're not claiming

20  privilege.

21           MR. WAGNER:  We are not asserting

22  privilege as to those documents.

23           MS. DURHAM:  Okay.  Understood.

24  BY MS. DURHAM:

25      **Q.   Let's look at NIKE 44397.  It's a**

767

HIGHLY CONFIDENTIAL

```
 1    single good in this registration?
 2              MR. WAGNER:  Objection,
 3    argumentative.
 4              THE WITNESS:  I don't remember.
 5    BY MS. DURHAM:
 6        Q.    Did you personally review this
 7    Declaration?
 8        A.    This?
 9        Q.    Yes.
10        A.    No.  I don't see any -- any of the
11    one, just the specimen.
12        Q.    Okay.
13              But -- but Mr. Lehrer would not
14    have signed this Declaration without checking
15    with you; correct?
16        A.    Well, checking with me is the letter.
17        Q.    Okay.  The -- this letter that --
18    that now your attorney, Ben, is going to
19    provide to me?
20        A.    Yeah.
21        Q.    And you --
22        A.    So I really don't know.  I mean, the
23    only thing the letter is check, one checkmark,
24    specimen, sign, one copy for me, one copy for
25    him.  So I really can't tell you.  I mean, I
```

789

HIGHLY CONFIDENTIAL

1   don't know.

2       Q.   Are you telling me that the only

3   communication you had with Mr. Lehrer about

4   submitting this document that we're looking at

5   is this letter exchange?

6       A.   About -- about submitting it to the

7   patent office, yeah.

8       Q.   Okay.

9       A.   Yeah, I mean, I -- I did not see any

10  of the pages that you showed me here.

11          MS. DURHAM:  Okay.  And I'll

12  reiterate for the record my request that we

13  need that -- that correspondence.

14          (Whereupon, a document was marked,

15  for identification purposes, as Defendant's

16  Exhibit 93.)

17  BY MS. DURHAM:

18      Q.   Okay.

19          Mr. Nathan, I'm showing you what's

20  been marked Defendant's Exhibit 93.  This is

21  the -- well, in -- actually, let's look

22  specifically at 44503 within that exhibit.

23      A.   44453?

24      Q.   44503.

25      A.   Okay.

790

HIGHLY CONFIDENTIAL

1      Q.    So this is a Trademark/Service Mark

2   Application on the Principal Register for

3   Serial Number 78963029 that is the application

4   that corresponds to your Registration 3416236.

5              Do you see that this is the

6   application that was filed on August 29th,

7   2006, for the Cool Compression and the -- the

8   stylized man logo?

9      A.    Yes.

10      Q.    And do you see here where it says

11   about halfway down the page, this is an Intent

12   to Use application?

13      A.    Yes.

14      Q.    Um-hmm.   "The applicant has a bona

15   fide intention to use," and then it lists all

16   your 25, Class 25 goods there?

17      A.    Um-hmm.

18      Q.    Okay.

19              And is that the list you developed

20   with the intention to use the man logo on all

21   of those goods?

22      A.    Yes.

23      Q.    Let's flip to NIKE 44492 so we can

24   take a look at the Notice of Allowance for

25   this application.

791

HIGHLY CONFIDENTIAL

1      A.   444 what?

2      Q.   92.

3      A.   Okay.

4      Q.   And do you see here this is

5  indicating that the Trademark Office is

6  allowing your trademark application for the

7  Cool Compression man logo for this entire list

8  of Class 25 goods, the same list that we just

9  looked at the -- in the other filing?

10     A.   Um-hmm, yeah.

11     Q.   Okay.

12          Let's look at then the Statement

13 of Use that you filed on June 18th, 2007,

14 which we can find at NIKE 44487.

15     A.   Okay.

16     Q.   Here it says, "This Allegation of Use

17 is being filed after a Notice of Allowance has

18 issued.  The applicant, Lontex Corporation,"

19 it states your address, "is using or is using

20 through a related company or licensee the mark

21 in commerce on or in connection with the goods

22 and/or services as follows:"

23          And it lists that whole Class 25

24 description we've talked about -- well,

25 actually, it doesn't list it, it refers to the

792

HIGHLY CONFIDENTIAL

```
 1    Notice of Allowance that has the whole list
 2    that we looked at at 44492.  Are you following
 3    me?
 4         A.   Yeah, but I don't see the list here.
 5         Q.   Okay.  Well, look at 44492 and you'll
 6    see the entire Class 25 list.
 7         A.   Right.  Okay.
 8         Q.   Okay?
 9              And at the time this statement was
10    filed on June 19th, 2007, that Cool
11    Compression man logo was not actually in use
12    with all of those goods; is that correct?
13         A.   Right.
14         Q.   Okay.
15         A.   Correct.
16         Q.   Then why did you submit the Statement
17    of Use to the Trademark Office saying that it
18    was?
19              MR. WAGNER:  Objection, assumes
20    facts not in evidence.
21              THE WITNESS:  Well --
22              MR. WAGNER:  Lacks foundation.
23              THE WITNESS:  -- we really -- we
24    really actually thought that we were going to
25    use it.
```

                                                        793

HIGHLY CONFIDENTIAL

```
 1                MS. DURHAM:  Okay.
 2    BY MS. DURHAM:
 3        Q.    But that's what the Intent to Use
 4    application is for.  Why would you submit a
 5    Declaration of Use when you were still only
 6    intending to use?
 7        A.    It's the same thing with the other
 8    one.  I did not know that we cannot -- we have
 9    to do it all together.
10        Q.    So do you, again, think that you have
11    some correspondence with your attorney that
12    would --
13        A.    On the insignia, sure.  It's the same
14    thing.  Everything come through me.
15        Q.    Okay.
16              So in other words, you believe you
17    have correspondence from your attorney that
18    led you to believe it was okay to submit a
19    Statement of Use, even though you didn't have
20    use?
21        A.    I don't know if I put it that way.
22    The letter doesn't say that.  The letter says
23    what it says.  I don't remember what the
24    letter says now in front of me.
25        Q.    Okay.  Well, we'll come back and talk
```

794

HIGHLY CONFIDENTIAL

```
1                    C E R T I F I C A T E
2
3              I do hereby certify that I am a
     Notary Public in good standing, that the
4    aforesaid testimony was taken before me,
     pursuant to notice, at the time and place
5    indicated; that said deponent was by me duly
     sworn to tell the truth, the whole truth, and
6    nothing but the truth; that the testimony of
     said deponent was correctly recorded in
7    machine shorthand by me and thereafter
     transcribed under my supervision with
8    computer-aided transcription; that the
     deposition is a true and correct record of the
9    testimony given by the witness; and that I am
     neither of counsel nor kin to any party in
10   said action, nor interested in the outcome
     thereof.
11
             WITNESS by hand and official seal
12   this 2nd day of December, 2019.
13
14
15           <%8008,Signature%>
             _____
16             Notary Public
17   Job No. 3568330
18
19
20
21
22
23
24
25
                                                   844
```

HIGHLY CONFIDENTIAL

1    Ben L. Wagner, Esq.

2    bwagner@troutman.com

3                         December 2, 2019

4    RE: Lontex Corporation v. Nike, Inc.

5         11/14/2019, Efraim Nathan (#3568330)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

                                                              845