**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NIKE, INC.,<br><br>　　　　　Defendant. | Civil Action No.  2:18-cv-05623-MMB<br><br>(Hon. Michael M. Baylson)<br>(Master Sandra Jeskie, Esq.) |

**<u>PLAINTIFF LONTEX CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO COMPEL DEFENDANT NIKE, INC.'S FURTHER RESPONSES TO
LONTEX'S FIRST SET OF REQUESTS FOR PRODUCTION</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................................... 2

III.  LEGAL STANDARD ................................................................................................ 6

IV.  LEGAL ARGUMENT ............................................................................................... 9

    A.  Nike Must Produce Documents Regarding Nike's Awareness of Lontex ............. 9

    B.  Nike Must Produce Documents Regarding Nike's Trademark Clearance
    for the Accused Products and Lontex's COOL COMPRESSION Mark ............. 12

    C.  Nike Must Produce Documents Regarding Nike's Conducted or
    Sponsored Studies Regarding Compression Products ........................................ 18

V.  LOCAL RULE 26.1 CERTIFICATION ................................................................... 19

VI.  CONCLUSION ........................................................................................................ 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000)................................................................................7, 8, 9

*Adidas Am., Inc. v. TRB Acquisitions LLC*,
   2018 U.S. Dist. LEXIS 172601 (D. Or. Oct. 5, 2018)............................................17

*All. Bank v. New Century Bank*,
   742 F. Supp. 2d 532 (E.D. Pa. 2010) ....................................................................14

*Banjo Buddies, Inc. v. Renosky*,
   399 F.3d 168 (3d Cir. 2005)..................................................................................11

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999)...............................................................................11

*Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*,
   214 F.3d 432 (3d Cir. 2000)..................................................................................11

*Cytosport, Inc. v. Nature's Best, Inc.*,
   2007 U.S. Dist. LEXIS 29039, 2007 WL 1040993 ................................................18

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
   30 F.3d 466 (3d Cir. 1994)....................................................................................16

*Fleet Feet, Inc. v. Nike Inc.*,
   2019 U.S. Dist. LEXIS 207068, 2019 U.S.P.Q.2D (BNA) 460563, 2019 WL
   6468114 (M.D.N.C. Dec. 2, 2019) ............................................................12, 15, 16

*Groupion, LLC v. Groupon, Inc.*,
   2012 U.S. Dist. LEXIS 12684 ...............................................................................17

*Interpace Corp. v. Lapp, Inc.*,
   721 F.2d 460 (3d Cir. 1983)...........................................................................8, 9, 11

*Jama Corp. v. Gupta*,
   No. 3:99-CV-01624, 2008 WL 53101 (M.D. Pa. Jan. 2, 2008)..............................11

*Klayman v. Freedom's Watch, Inc.*,
   2007 U.S. Dist. LEXIS 91990, 2007 WL 4414803 (S.D. Fl. Dec. 14, 2007)..........17

*Morrison v. Phila. Hous. Auth.*,
   203 F.R.D. 195 (E.D. Pa. 2001).............................................................................7

*Vynamic, LLC v. Diebold Nixdorf, Inc.*,
  No. 18-577, 2019 U.S. Dist. LEXIS 101661 (E.D. Pa. June 17, 2019) ..................................8

*Williams v. CVS Caremark Corp.*,
  No. 15-5773, 2016 U.S. Dist. LEXIS 109708 (E.D. Pa. Aug. 18, 2016)
  (Baylson, J.) ..................................................................................................................7

**Statutes**

15 U.S.C. § 1115 ..........................................................................................................7

15 USCS § 1065 ..........................................................................................................7

**Other Authorities**

Fed. R. Civ. P. 26 ....................................................................................................6, 7

Fed. R. Civ. P. 26(b)(1) ................................................................................................7

Fed. R. Civ. P. 34 ........................................................................................................6

Fed. R. Civ. P. 37(a)(3)(B)(iv) ....................................................................................6

FRCP 37(e) ..................................................................................................................4

Local Rule 26.1 ..........................................................................................................19

Plaintiff Lontex Corporation ("Lontex") respectfully submits this memorandum of law in support of its Motion to Compel Defendant Nike, Inc. ("Nike") to Respond to Lontex's Requests for Production of Documents, Set One ("RFP Set One") served May 16, 2019.  For the reasons set forth below, Lontex moves this Court for an order compelling Nike to further respond to RFP Set One Nos. 22, 24, 28, 29, 40, and 41 within 14 days.

**I.**

**INTRODUCTION**

The present action involves Lontex's claims of trademark infringement under federal and state law. (Dkt. No. 20 at p. 10-18.)  Despite being justified in pressing, Lontex has largely omitted from this motion most of the categories of items that Nike has refused to produce in response to specific requests for production.  However, Lontex presses this Motion on the following responsive records that are highly relevant, discoverable, and tailored to important issues in this case, including:  Nike's awareness of Lontex and its trademarks; Nike's trademark clearance regarding the Accused Products; and Nike's studies regarding compression products.  These various categories of documents concern issues that are direct and center in this case.  For instance, if Nike's trademark clearance searches lack any search for COOL or COOL COMPRESSION, that carries distinct implications from a different factual scenario than if, instead, such trademark search reports were run and did contain any of Lontex's three incontestable federal COOL COMPRESSION trademarks in them.  Nike's objections have no merit and should be overruled as they simply attempt to hide the ball on discovery to which Lontex is readily entitled.

Accordingly, Lontex requests that the Court compel Nike to produce documents responsive to Requests for Production Nos. 22, 24, 28, 29, 40, and 41, and to supplement all of

its responses to code-compliant responses without objection, including clearly indicating whether responsive documents exist, used to exist, or do not exist.

## II.
## FACTUAL BACKGROUND

This tribunal will recall many facts regarding Lontex's RFP Set One were already extensively advanced in Lontex's Motion to Compel records Nike already *agreed* to produce, which was an arduous Motion process resulting in Nike supplementing its production by adding at least nine custodians and items as basic as the tech sheets used to train retailer associates. (*See, e.g.*, Dkt. No. 56-1 at 3-7; Ex. 1, pp. 76-82)[1]. However, where Lontex's previous motion to compel related to documents Nike *already agreed* to produce in response to certain requests, the present motion addresses Nike's objections and refusal to produce in response to other requests in Lontex's RFP Set One (and a very small subset of those refused RFPs, at that).

Lontex has asserted claims of federal and state trademark infringement for its registered trademarks. (Dkt. No. 20 at pp. 10-18; ¶ 16 ("The federal registrations for the COOL COMPRESSION Mark are all incontestable.").) Nike has falsely associated itself with Plaintiff's brand and conveyed to consumers and the public that it has rights to use and sell compression products with Lontex's trademarks, even though Nike's own compression products lack the reputation of the same effective use as Lontex's products. (Dkt. No. 20 at ¶¶ 21-22.) Nike's infringement has caused damage to Lontex by both forward (direct) and reverse confusion. (Dkt. No. 20 at ¶ 42.)

Lontex's RFP Set One was served on May 16, 2019. (Ex. 2.) Nike responded on June 17, 2019 (Ex. 3 at p. 1), but its responses contained a number of deficiencies. (Ex. 4 ("Lontex's June 21 Letter").) In particular, Nike's responses contained improper general objections

---

[1] All exhibits are attached to the concurrently filed Declaration of Ben. L. Wagner.

regarding Nike's production timing (ultimately forcing Lontex's prior motion to compel agreed production), the definition of the "Accused Mark," [2, 3] the definition of the "Accused Products," [4, 5] and the relevant time period encompassed by Nike's document production. (*Id.* at 2-4) Nike's deficient responses also included: (1) boilerplate objections; (2) improper limitation

---

[2] Lontex's RFP Set One sets forth the following definition of ACCUSED MARK (Ex. 2 at p. 2.): The term "ACCUSED MARK" refers to Nike's use of "Cool Compression," "Cool Comp," "COOLCOMPRESSION," "cool-comp," "coolcomp," "cool-compression," or any other variation of both "cool" and "compression" (or "comp"), whether or not incorporated into a symbol, design, or other terms or phrases. It is Lontex's understanding that Nike generally developed one "cool compression" line of products that was then expanded into additional SKUs of other "cool compression" garments, offered in an increasing number of divisions within Nike over time. However, this definition is written so as to require Nike to engage in reasonable diligence to make sure that all uses of both "cool" and "compression" in the product name are located and included in the responsive information sought in discovery.

[3] Nike's 9/13/2019 supplemental responses continue to object to Lontex's definition of ACCUSED MARK and set forth the following (Ex. 3 at p. 4.): Accordingly, NIKE will interpret the term "ACCUSED MARK" to mean NIKE's alleged use of the phrase "cool compression" in connection with any NIKE Products, as defined below. NIKE will produce non-privileged, responsive information and documents that can be located after conducting a reasonable search, including using the relevant search terms (including "Cool Comp," "COOLCOMPRESSION," "cool-comp," "coolcomp," and "cool-compression," and other variations of both "cool" and "compression" (or "comp")) and custodians that will be exchanged pursuant to the Stipulated ESI Order entered in this action (Dkt No. 43). As NIKE explained during the parties' August 2, 2019 telephonic meet and confer, not all documents using these terms are relevant or responsive, but NIKE will not and has not withheld otherwise relevant and responsive documents on the sole ground that those documents only use one of the derivate phrases listed above (i.e., "Cool Comp," "coolcomp," etc.), instead of the term "Cool Compression."

[4] Lontex's RFP Set One sets forth the following definition of ACCUSED PRODUCTS (Ex. 2 at p. 2-3.): The term "ACCUSED PRODUCTS" refers to any goods or services for which the ACCUSED MARK is used in connection with advertising, display, promotion, marketing, sale, or offer for sale of those good or services, and whether or not the use is on the clothing or hangtag.

[5] Nike's 9/13/2019 supplemental responses continue to object to Lontex's definition of ACCUSED PRODUCTS and set forth the following (Ex. 3 at p. 4-5.): On July 11, 2019, August 5, 2019, and August 12, 2019, Lontex identified the following NIKE products that it alleges infringe its purported trademark rights: 642350; 642351; 642352; 642354; 679444; 683134; 687837; 687839; 687840; 688614; 703084; 703086; 703088; 703092; 703094; 703096; 703098; 715907; 719903; 719903; 724354; 724782; 724785; 726460; 726461; 726462; 726464; 726465; 728044; 728047; 728048; 728049; 728343; 728357; 728358; 728359; 728361; 728363; 729269; 729273; 742959; 742961; 804337; 804655; 828642; 833544; 837174; 837181; 844306; and 848199. Accordingly, in responding to these Requests, NIKE interprets the term "ACCUSED PRODUCT" to mean the above-referenced NIKE products identified by Lontex on July 11, August 5, and August 12, 2019. NIKE will refer to these products herein as the "NIKE Products." Should Lontex identify additional NIKE products in the future, NIKE will take those under advisement and consider supplementing these Responses to include those products in this definition of NIKE Products.

of the Accused Products in this case; (3) responses indicating only a narrowed class of documents would be produced; (4) responses suggesting documents within Nike's possession, custody, or control would not be produced because they related to third-parties; (5) responses indicating documents did not exist, but only "as far as Nike is aware"; (6) responses indicating that certain documents were not retained by Nike in the ordinary course (without the information going to a FRCP 37(e) determination); and (7) outright refusals to produce documents. (*Id.* at 4-11.) Lontex attempted to address Nike's objections and responses itself through clarifying the meaning of various requests. (*Id.* at 11-14.)

In response to Lontex's letter detailing the various issues with Nike's responses to RFP Set One, among other discovery issues, the parties held a meet and confer on June 24, 2019 to outline open issues for discussion on a more comprehensive meet and confer to occur later in the week, on June 26, 2019. (Ex. 5 at pp. 8-9.) One such issue slated for discussion was Lontex's concerns regarding Nike's objections and responses to Lontex's discovery requests. (*Id.*) However, on the scheduled June 26, 2019 meet and confer and a later June 28, 2019 meet and confer, Nike was unprepared to respond to or engage in any meaningful discussion regarding resolution of the various issues raised in Lontex's June 21 Letter. (Ex. 5 at pp. 3-4.) Nike later indicated that supplemental responses to Lontex's RFP Set One would be served by July 10, 2019 that would address the issues raised by Lontex's June 21 Letter. (Ex. 5 at pp. 1-3; Ex. 6.)

On July 10, 2019, Nike served first supplemental responses to Lontex's RFP Set One, which purportedly addressed the issues raised by Lontex's June 21 Letter. (*Id.*; Ex. 3.) However, Nike's first supplemental responses only addressed some of the concerns previously raised by Lontex, and in fact continued to provide improper objections, deficient responses, and outright refusals to produce documents in response to many of Lontex's requests. (Ex. 7.) The parties

continued to meet and confer on various discovery issues, including Nike's deficient responses, with calls occurring on July 26, July 31, August 1, and August 2. (Ex. 8 at pp. 2-4.)  The parties continued email discussions on the numerous discovery issues and held another meet and confer on August 27, 2019. (Ex. 9.) As outlined in Lontex's previous motion to compel, throughout the hours of meet and confer discussions and written communications, Nike repeatedly expressed that it would produce responsive documents on a rolling basis and substantially complete its intended production on August 30, 2019, which did not occur. (Dkt. No. 56-1 at 2.)

On September 13, 2019, Nike served second supplemental responses to Lontex's RFP Set One.   (Ex. 3.) Nike's second supplemental responses only amended certain responses and generally did not otherwise indicate any clarifications that were made during the meet and confer process. (Ex. 10.) Additionally, Nike's second supplemental responses provided the same deficiencies identified in Lontex's previous letters of June 21 and July 23. (*Id.*) Although Nike "agreed" to produce documents in certain responses, the agreement was subject to the improper qualification that documents would be produced "to the extent that [documents] exist and can be located with reasonable diligence":

> Nike incongruously asserts that, '[s]ince being served with the Requests on May 16, 2019, NIKE has been conducting a reasonable investigation into the existence and location of potential responsive materials and the burdens of compiling and producing responsive materials.' Nike cannot claim to have been diligently searching for documents since May 2019, and five months later still equivocate whether documents exist. Nike's responses are improper and evasive, and must be supplemented to state if documents exist and can be located.

(Ex. 10.)

Nike refused to timely respond to Lontex's September 27 letter regarding Nike's continuous deficient discovery responses, indicating that they would consider the issues and respond in due course. (Ex. 11.)  Afterwards, Lontex separately raised concerns regarding Nike's

- 5 -

already produced documents in response to RFP Set One (documents Nike had agreed to produce) and was to be provided with Nike's supplemental production of additional documents on October 4. (Ex. 12.)  Nothing was done to cure Nike's deficient responses to Lontex's other requests in RFP Set One, and after several weeks, Nike finally "responded" to Lontex's September 27 letter indicating that they would not respond to the substance of Lontex's letter, would supplement one response (RFP No. 22), and would otherwise stand on its second supplemental objections and responses. (Ex. 13.)

As such, the parties are now at an impasse regarding Nike's responses to Lontex's RFP Set One, and with the Motion concerning *agreed* production now resolved, the resulting agreed production having just been produced, and Lontex having reviewed the production to further minimize potential disputes, Lontex moves on just six Requests for Production.

### III.
### LEGAL STANDARD

Lontex moves to compel Nike to respond to RFP Set One for the six disputed RFPs promptly.  "As a general rule, the parties should serve document requests forthwith and arrange for the production and copying of documents in a cooperative manner."  Judge Baylson's Pretrial and Trial Procedures – Civil Cases § B(5) (Dkt. No. 26-2).

"A party seeking discovery may move for an order compelling … [a] production, or inspection . . . if . . . a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34."  Fed. R. Civ. P. 37(a)(3)(B)(iv).

Rule 26 provides that:

[p]arties may obtain discovery regarding any nonprivileged matter that is *relevant to any party's claim or defense and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). In moving to compel a party to respond to discovery requests, "[a] party moving to compel bears the initial burden of showing the relevance of the requested information." *Morrison v. Phila. Hous. Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001).

Once met, the burden shifts to the party resisting discovery "to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under [Rule 26], or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the *ordinary presumption in favor of broad disclosure*." *Williams v. CVS Caremark Corp.*, No. 15-5773, 2016 U.S. Dist. LEXIS 109708, at *13-14 (E.D. Pa. Aug. 18, 2016) (Baylson, J.) (quoting *Cope v. Brosius*, No. 12-2382, 2016 U.S. Dist. LEXIS 16712, 2016 WL 539142, at *2 (M.D. Pa. Feb. 11, 2016)) (emphasis added).

In a claim for federal trademark infringement, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Once a trademark has become incontestable, then validity and ownership are proved. 15 U.S.C. § 1115 ("To the extent that the right to use the registered mark has become incontestable under section 15 [15 USCS § 1065], the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.").

- 7 -

With regard to the third requirement of trademark infringement, in demonstrating likelihood of confusion, courts in the Third Circuit may use the *Lapp* factors. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 214-15 (3d Cir. 2000); *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). Specifically, likelihood of confusion regarding competing and noncompeting goods can be evaluated based on the following factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A&H Sportswear*, 237 F.3d at 215 (3d Cir. 2000).

As this case involves both forward and reverse confusion, particulars concerning reverse confusion are also germane. "In a reverse confusion case, the consuming public may assume the that the junior, but more powerful, mark user is the source of the senior user's products. The harm to the senior user is not just that its goodwill is appropriated, but that the value of its mark is diminished." *Vynamic, LLC v. Diebold Nixdorf, Inc.*, No. 18-577, 2019 U.S. Dist. LEXIS 101661, at *17 (E.D. Pa. June 17, 2019). Generally, the *Lapp* factors are evaluated the same way for reverse confusion, but with certain differences. With regard to the strength of the mark (*Lapp* factor 2), courts should examine "the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor." *A&H Sportswear*, 237 F.3d at 234 (3d Cir. 2000).  Defendant's intent (*Lapp* factor 5)

- 8 -

encompasses a broad inquiry into the infringer's diligence, investigation and culpability in adopting and using the accused mark in light of other senior user's existing rights.  *See infra* p. 11.  And courts should also examine any "other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market." *Id*. (*Lapp* factor 10).

## IV.
## <u>LEGAL ARGUMENT</u>

The present motion deals with categories of documents that Nike has flatly refused to provide, has hid the ball on, and for which Nike has narrowed the scope of its production in ways that make its responses essentially meaningless. Lontex's present motion to compel winnows down the dispute to the bare essentials and relates to Lontex's requests regarding documents and information concerning: (1) Nike's awareness of Lontex (*see, e.g.*, Request for Production ("RFP") No. 22)[6]; (2) Nike's trademark clearance searches using its ANAQUA system for the Accused Products, and any results with hits to Lontex or its registered marks or applications (*see, e.g.*, RFP Nos. 24, 28, 29); and (3) Nike's studies regarding compression products (*see, e.g.*, RFP No. 40, 41).[7] Lontex also requests the costs and attorneys' fees incurred in connection with the filing of this motion.

### A. <u>Nike Must Produce Documents Regarding Nike's Awareness of Lontex</u>

Lontex has requested documents relating to Nike's first awareness of Lontex:

---

[6] The text of RFPs at issue are set forth in detail below.

[7] Lontex does not include with this motion all technical specifications or "tech sheets" for the Accused Products and Nike's advertising and promotional materials displayed on nike.net and sku.nike.net (*see, e.g.*, RFP Nos. 6 and 73), based on Nike's representation during the November 25, 2019 call with Discovery Master Jeskie, that Nike would produce all "tech sheets" for the Accused Products.

40577800

**REQUEST FOR PRODUCTION NO. 22:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to YOUR first awareness of LONTEX.

(Ex. 2 at p. 10.) Nike has refused to produce documents relating to its first awareness of Lontex, indicating that such documents and information are "not relevant to any claims or defenses in this action and any speculative relevance of such information would not be proportional to the needs of the case given the importance of the discovery in resolving the issues," and that the request is "harassing, overbroad, and disproportionate to the needs of the case." (Ex. 3 at 24.) This is plainly incorrect.

Indeed, Nike's requests for production to Lontex demanded "all Documents and Communications … relating to NIKE and NIKE's Products." (*See* Dkt. 87-6, Lontex Resp. to Nike First RFP, No. 62 at pp. 63-54.)  Lontex's Request No. 22, by contrast, is more narrowly tailored to Nike's first awareness of Lontex.

Further, Lontex has alleged in written discovery responses and court filings that its logos have been removed or concealed from compression garments worn by athletes whose teams are sponsored by Nike, strongly indicating Nike had knowledge of Lontex and its compression garments many years ago. (*See, e.g.,* Dkt. 34-1 at ¶ 98.)  In fact, athletes from teams and leagues sponsored by Nike regularly wear Lontex garments with the logo removed or concealed. *Compare*, *e.g.*, Ex. 20 (pictures of Eagles players with logo of Lontex Compression products showing from 2007) with Ex. 21 (pictures of Eagles players from 2019 with Lontex's logo cut out of the Compression products.

Nike most certainly has procedures for addressing athletes wearing logos other than Nike's swoosh for Nike-sponsored leagues like NFL, including an evaluation of the other brand such as Lontex being worn.  For example, a New York times article reports that Nike "expected

that its sponsored athletes 'will always wear Nike products unless there is some specific, *mutually agreed* exception.'"[8]  And publicly available Nike sponsorship contracts indicate that Nike monitors teams for compliance with contractual provisions regarding the display of Nike and third-party logos.[9]

Lontex is entitled to discovery concerning Nike's awareness of Lontex through actions such as removal of Lontex logos, which would demonstrate to the trier of fact knowledge of Lontex and its marks before Nike adopted the Accused Marks.  Such evidence is probative of Nike's intent in adopting the Accused Marks, which is probative of both likelihood of confusion and willful infringement.  *See Interpace Corp. v. Lapp, Inc*., 721 F.2d 460, 463 (3d Cir. 1983) ("the intent of the defendant in adopting the mark" relevant to likelihood of confusion); *Jama Corp. v. Gupta*, No. 3:99-CV-01624, 2008 WL 53101, at *11 (M.D. Pa. Jan. 2, 2008) (knowing or willful infringement "involves an intent to infringe or a deliberate disregard of a mark holder's rights"); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1059 (9th Cir. 1999) (intent prong "favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.").

Further, such evidence of Nike's intent in adopting the Accused Marks is "an important—but not indispensable—factor in evaluating whether equity supports disgorging" Nike's profits. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005). Finally, Nike's prior knowledge of Lontex's COOL COMPRESSION mark is probative of whether Nike engaged in copying, which would support a finding of secondary meaning. *See, e.g.*, *Commerce*

---

[8] https://www.nytimes.com/2016/08/03/sports/olympics/olympic-cover-up-why-you-wont-see-some-shoe-logos.html  (last visited Dec. 3, 2019) (emphasis added).

[9] *E.g.*, Sponsorship Agreement between Nike and Arizona Board of Regents at Section 4(d)–(e), pp. 4-5 (available at http://media.oregonlive.com/pac10/other/Arizona-State-Nike-Sponsorship.pdf, last visited Dec. 3, 2019).

40577800

*Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (confirming copying is a factor to be considered in evaluating secondary meaning).

As another Court recently explained concerning Nike's knowledge of another trademark owner's rights in granting an injunction against Nike's infringement, "as the companies are longstanding partners and competitors, many Nike employees were certainly aware of Fleet Feet's use… before [Nike's use] started." *Fleet Feet, Inc. v. Nike Inc.*, 2019 U.S. Dist. LEXIS 207068, *45, 2019 U.S.P.Q.2D (BNA) 460563, 2019 WL 6468114 (M.D.N.C. Dec. 2, 2019).  As a competitor, there are those within Nike's organization that had awareness, and the *Fleet v. Nike* court's recognition that this favors a finding of infringement is confirmation that Lontex seeks plainly relevant, discoverable records that Nike should diligently search for and produce.

In sum, RFP No. 22 seeks documents that are highly relevant to several material issues in this action. Nike must engage in a diligent inquiry and reasonable search for communications with athletic teams and organizations regarding the removal or concealment of Lontex logos, or other documents indicating Nike's first awareness of Lontex was prior to April 2016 (when Lontex sent its first demand letter).

###    B.    Nike Must Produce Documents Regarding Nike's Trademark Clearance for the Accused Products and Lontex's COOL COMPRESSION Mark.

Nike has refused to produce documents relating to Nike's internal trademark clearance searches, even though what steps Nike took for trademark clearance are a key part of the issues in this case. Lontex has requested all documents relating to Nike's "investigation" or "searches" related to the Accused Products, Lontex, or the COOL COMPRESSION Mark:

> **REQUEST FOR PRODUCTION NO. 24:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to any investigation taken regarding the COOL COMPRESSION Mark.

- 12 -

**REQUEST FOR PRODUCTION NO. 28:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to any trademark searches or investigations undertaken of LONTEX or the COOL COMPRESSION Mark.

**REQUEST FOR PRODUCTION NO. 29:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to trademark searches, clearances, internet printouts, and other due diligence, inquiries, or research conducted by YOU, or on behalf of YOU, concerning the availability to sell, offer for sale, distribute, or advertise ACCUSED PRODUCTS.

(Ex. 2 at pp. 10, 11.)

Nike asserts that it has no "full search report generated by an independent trademark search vendor such as Compumark or Corsearch prior to the initiation of this action." (Ex. 3 at pp. 25-26, 28-29.) During meet and confer efforts, Lontex had expressly clarified that it is seeking documents regarding any internal searches, as well as external searches by third parties. (Ex. 8 at p. 1.) On that basis, Nike was to consider supplementing its responses to agree to produce documents encompassing internal searches. (*Id.*) However, Nike's supplemental responses indicated that it would withhold such documents based on privilege: "Any other 'investigation' would have occurred, if at all, under the direction of counsel. On the basis of this objection, NIKE will withhold privileged documents that may be responsive to this Request." (*Id.*)

Since 2012, Nike has used a third-party platform named ANAQUA to conduct trademark clearance searches. *See, e.g.*, Ex. 14 (https://www.anaqua.com/company/news/nike-rolls-out-anaqua-ip-management-solution (last visited Feb. 7, 2020)). Redacted

Redacted

(Ex. 15 at bullet points.) Redacted

- 13 -



*Id.*; Ex. 14.

And confirming that Nike's attempt to limit its written response to only full, external searches was a deliberate attempt to shield relevant and highly probative records from production, Nike's representative <u>designated to testify on topics pertaining to ANAQUA</u>, Nick Johnson, testified that the product line manager (Parker Mangum), not counsel, "entered information with the term 'cool' in ANAQUA in 2014 for Nike Pro" in connection with "the change from Nike Pro Core to Nike Pro Cool," but that the deponent was unfamiliar with the results.  Ex. 16 at pp. 148:16-151:14 *esp.* pp. 150:17-24 & 151:6-11

This testimony and evidence provides that one or more ANAQUA search reports exists and was done at least in connection with changing Nike Pro Core to Nike Pro Cool, the change that resulted in the accused COOL COMPRESSION style names at-issue in this suit.  Nike knows how probative of evidence these trademark searches would be.

The ANAQUA documents will be probative of Nike's awareness and knowledge of Lontex and its marks in 2014 and 2015 when it was switching from "Core" to "Cool" for its style names, before Nike adopted the Accused Marks and launched its products in 2015, as courts have recognized. *See, e.g. All. Bank v. New Century Bank*, 742 F. Supp. 2d 532, 562 (E.D. Pa. 2010) ("New Century first became aware of Alliance's trademark registration for the mark CUSTOMER FIRST because it was listed on the Clearance Search commissioned by New

- 14 -

Century's counsel."). As the cases cited above regarding RFP No. 22 demonstrate, Nike's awareness and knowledge of Lontex is relevant to several material issues including disgorgement, secondary meaning, likelihood of confusion, and willful infringement.[10]

Further, an ANAQUA search report at any time prior to Lontex's April 2016 cease and desist letter identifying Lontex or any of its three COOL COMPRESSION marks would be significant evidence bearing on the merits of Nike's allegations that its conduct was innocent, without culpability or fair use. *See, e.g.* Dkt. No. 45 (Nike Answer to FAC) at Ninth Affirmative Defense ("Nike's alleged use…is not a trademark use and/or constitutes fair use"), Thirteenth Affirmative Defense ("Nike's actions were innocent and non-willful"). While Nike will undoubtedly try to dispute the point, Nike loses any shred of plausibility to claim innocent or fair use if any such trademark search report notified it that COOL COMPRESSION was a registered mark covering the same class of goods and exact goods (compression shirts, shorts, tights and pants) as the Accused Products. *See, e.g.* Dkt. No. 20, (FAC) at Ex. A (Lontex's COOL COMPRESSION registrations on the USPTO trademark register since well-before 2014 listing compression shirts, shorts, tights and leggings). And as this case involves "both forward and reverse confusion," (Dkt. No. 20 FAC at ¶ 42), the intent inquiry is the broadest possible for trademark infringement cases.

Just two months ago, another Court saw through Nike's claims of innocence in light of the realities of its sophistication and even issued strong injunctions relying upon them. *Fleet Feet, Inc. v. Nike Inc.*, 2019 U.S. Dist. LEXIS 207068, **13, 45, 2019 U.S.P.Q.2D (BNA) 460563, 2019 WL 6468114 (M.D.N.C. Dec. 2, 2019) (Intent supported granting of injunction; "Nike has presented no evidence as to whether it did or did not do a trademark search before

---

[10] Thus, Nike's indication that it is not relying on advice of counsel as a defense to willful infringement is insufficient to shield such documents from discovery because they are relevant to several other issues in dispute and are not privileged, as discussed below.

- 15 -

beginning to use the SCE phrase. From this silence and Nike's level of business sophistication generally and as to trademarks specifically, the Court infers and finds for purposes of this motion that Nike did do such a search and was aware of Fleet Feet's "Change Everything" mark.)

Like the *Fleet v. Nike* court, the Third Circuit explained this breadth of the intent inquiry in *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 480 *41-42 (3d Cir. 1994). Where there is a large junior user, the "intent inquiry" looks squarely at whether the infringer "was careless in not conducting a thorough name search for American uses of the name." *Id.* quoting *Lapp*, 721 F.2d at 463. "The questions the district court should consider here are whether [the defendant] conducted an adequate name search for other companies marketing similar goods under trademarks including the name[,] and whether it followed through with its investigation when it found there were such companies. Did [defendant] consider the likelihood of confusion with other companies' marks and products (as opposed to considering the likelihood that someone would contest its new mark)? Did it attempt to contact companies using a similar mark, such as [plaintiff]? Was [defendant] careless in its evaluation of the likelihood of confusion?" *Id.* The full record of trademark searches conducted that relate to COOL, COOL COMPRESSION and the Accused Products is directly relevant to these issues, whether or not Nike wishes to assert a reliance-on-counsel theory, and Nike cannot hide behind a blanket and unsupported privilege assertion and the limited disclosure that an outside third-party full search was not run.

Turning to Nike's privilege assertion, Nike bears the burden to establish that privilege applies to the requested discovery. Nike cannot satisfy the burden, and such discovery is routinely ordered in trademark infringement cases. As an initial matter, Nike does not assert privilege over third party trademark clearance searches, and ANAQUA is a third-party vendor. Accordingly, no privilege applies to these documents.

Even if ANAQUA was an "internal" trademark search, however, privilege does not protect discovery of the trademark clearance documents.   The reality is "trademark search reports[] are not privileged. [A] factual statement that a client instructed counsel to perform trademark searches does not reveal a privileged communication. Trademark searches can, and are, done by non-lawyers. The fact that [] an attorney [was asked] to perform a task that can be performed by a non-attorney does not demonstrate that [a party] was seeking legal advice and does not make the communication privileged. Additionally, a factual statement [] reflecting what the trademark searches revealed does not reveal a privileged communication." *Adidas Am., Inc. v. TRB Acquisitions LLC*, 2018 U.S. Dist. LEXIS 172601, *14-15, 107  (D. Or. Oct. 5, 2018).

For example, in *Groupion, LLC v. Groupon, Inc.*, a defendant baldly asserted that information concerning its trademark clearance efforts were privileged. No. 11-0870 MEJ, 2012 U.S. Dist. LEXIS 12684, at *11 (N.D. Cal. Feb. 2, 2012).  Further, the defendant produced a witness at deposition who had "little knowledge" of any trademark searches performed by the defendant.  *Id*.  The court, however, found that information regarding trademark searches were likely relevant to infringement claims, and that there is no "blanket privilege" for trademark searches.  *Id*.  Instead, a party asserting privilege must articulate facts supporting the privilege, which the defendant failed to do.  *Id*.  Accordingly, while denying something as intrusive as an apex deposition, the court readily held that discovery regarding trademark searches (and potentially depositions of other witnesses) was proper.  *Id*.  *Groupion, LLC v. Groupon, Inc.*, 2012 U.S. Dist. LEXIS 12684, at *11.

Other cases agree such search reports and their surrounding details are not privileged. *See, e.g. Klayman v. Freedom's Watch, Inc.*, 2007 U.S. Dist. LEXIS 91990, *13, 2007 WL 4414803 (S.D. Fl. Dec. 14, 2007) (whether search was run, identification of the search, and

- 17 -

"trademark search itself" were not privileged); *Cytosport, Inc. v. Nature's Best, Inc.*, 2007 U.S. Dist. LEXIS 29039, *18, 2007 WL 1040993 (collecting authority for both trademark clearance and watch reports in stating rule of law that "search reports, by themselves, contain factual information and not an attorney's mental impressions" and such reports "are not entitled to work product protection or attorney-client privilege.")

The documents Lontex seeks to compel (and rule-compliant responses about any non-existence) are very modest in comparison to the scope of relevance for trademark search records. Nike should be compelled to produce copies of any internal or external trademark searches.

**C.** **Nike Must Produce Documents Regarding Nike's Conducted or Sponsored Studies Regarding Compression Products**

Lontex has requested studies conducted or sponsored by Nike, concerning the effectiveness or performance of a compression product or the Accused Products, including but not limited to the study performed by Dr. Ajit Chaudhari of The Ohio State University, as requested under RFP Nos. 40 and 41:

> **REQUEST FOR PRODUCTION NO. 40:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to research or studies, conducted or sponsored by NIKE, concerning the effectiveness or performance of a compression product or the ACCUSED PRODUCTS, including but not limited to the study performed by Dr. Ajit Chaudhari of The Ohio State University.

> **REQUEST FOR PRODUCTION NO. 41:** All DOCUMENTS and COMMUNICATIONS reflecting, referring, or relating to the effectiveness of the ACCUSED PRODUCTS in improving performance.

(Ex. 2 at 13.)  Nike has objected to Request Nos. 40 and 41 on, inter alia, relevance grounds. (Ex. 3 at 37-39.)  Notably, Nike sought Lontex's similar surveys and spent good portions of Mr. Efraim Nathan's deposition inquiring about similar studies (such as the Lycra Power studies from as far back as *the 1990s* that scientifically confirmed the many benefits of Lontex's 70/30

- 18 -

composition technology later branded as its COOL COMPRESSION technology in 2007).  *See, e.g.* Ex. 17 at pp. 275-279, 397-398.

These requests seek documents and information regarding the effectiveness of, or studies on, compression products, particularly Nike's Accused Products, which is relevant to at least damages and corrective advertising particularly where Nike's compression products lack the reputation for effective use that is associated with Lontex's products.  (Dkt. No. 20 at ¶ 21.)  For example, as a result of Nike's infringing use of COOL COMPRESSION, Lontex requires corrective advertising to alleviate any misimpression that Lontex's COOL COMPRESSION product is somehow ineffective like the Accused Products.  Further, the confusion caused by Nike's ineffective Accused Products wrongly impugns and damages the goodwill associated with Lontex's COOL COMPRESSION product.

Nike is not just applying a double standard, its cherry-picked production concedes relevance.  Lontex already cited and produced to Nike an actual study that Nike produced, which Nike then just turned around and produced the most watered-down news release about the study it could find (with only a passing reference to Nike).  RFP No. 41; *contrast, e.g.* Exs. 18 and 19.  Nike should be compelled to produce all documents and communications regarding the effectiveness of the Accused Products, not just cherry-pick its single carefully-manicured press release.

## V.
## LOCAL RULE 26.1 CERTIFICATION

The undersigned certifies that counsel have conferred with Nike in good faith to resolve this dispute before filing this motion, including through the communications disclosed herein and attached to the Declaration of Ben L. Wagner.

- 19 -

## VI.
## <u>CONCLUSION</u>

Based on the foregoing, Lontex respectfully requests that the Court grant the Motion to Compel and enter an order compelling Nike to fully respond to Lontex's RFP Set One and, and given the more limited nature of the subject matter sought, order the production to take place within no more than 14 days of issuance of the order compelling production.

Dated:  February 8, 2020              TROUTMAN SANDERS LLP


By: */s/ Ben L. Wagner*
      Ben L. Wagner (CA SBN 243594)
      ben.wagner@troutman.com
      *Admitted Pro Hac Vice*
      11682 El Camino Real, Suite 400
      San Diego, CA  92130-2092
      Telephone:   858-509-6000
      Facsimile:    858 509 6040

      Michael B. Dubin, Esq.
      (PA SBN 70681)
      SEMANOFF ORMSBY GREENBERG &
      TORCHIA, LLC
      2617 Huntingdon Pike
      Huntingdon Valley, PA 19006

      Attorneys for Plaintiff
      LONTEX CORPORATION

40577800

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2020, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Ben L. Wagner*
Ben L. Wagner

40577800