**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION, | Civil Action No.:  18-cv-5623 |
|                Plaintiff, | |
| | (Hon. Michael M. Baylson) |
|   v. | |
| | **PUBLICLY FILED WITH** |
| NIKE, INC., | **REDACTIONS** |
|                Defendant. | |

**DEFENDANT NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR SANCTIONS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Introduction ................................................................................................................1

II.    Statement of Relevant Facts .......................................................................................4

    A.    The Nature and Stage of the Proceeding ......................................................4

    B.    Lontex Recently Issued Sham "Trial Subpoenas" to at Least 40 Undisclosed Non-Parties to Coerce Them to Sign A Misleading Declaration .....................................................................................................6

    C.    Lontex Also Recently Procured the Same Misleading Declaration From 5 Previously Undisclosed Non-Parties .........................................12

III.    Argument ...............................................................................................................13

    A.    Legal Standard ..........................................................................................13

    B.    Lontex's Sham "Trial Subpoenas" Serve an Improper Purpose and Are Unduly Burdensome ..................................................................................15

    C.    Lontex's Conduct is Highly Prejudicial to NIKE ................................20

    D.    The Requested Relief Is Appropriate in Light of Mr. Wagner's Sanctionable Conduct ..............................................................................22

IV.    Conclusion ............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Crash at Charlotte, N.C. on July 2, 1994*,
  982 F. Supp. 1092 (D.S.C. 1997) ............................................................18

*Bufkin v. Norfolk S. Corp.*,
  No. 1:00–cv–424, 2002 WL 32144317 (N.D. Ind. Mar. 20, 2002) .........................15

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ......................................................................14

*Coleman-Hill v. Governor Mifflin Sch. Dist.*,
  271 F.R.D. 549 (E.D. Pa. 2010) .........................................................13

*Kenney, Becker LLP v. Kenney*,
  No. 06 CIV. 2975 (JSR), 2008 WL 681452 (S.D.N.Y. Mar. 6, 2008) ...................14

*Mattel Inc. v. Walking Mt. Prods.*,
  353 F.3d 792 (9th Cir. 2003) ...........................................................14

*McCurdy v. Wedgewood Capital Mgmt. Co.*,
  No. 97–4304, 1998 WL 964185 (E.D. Pa. Nov. 16, 1998).............................13

*Melore v. Great Lakes Dredge & Dock Co.*,
  Civ. No. 95-7644, 1996 WL 548142 (E.D. Pa. Sept. 20, 1996) .......................19

*Mick Haig Productions, e.K. v. Does*,
  No. 3:30-cv-1900, 2011 WL 5104095 (N.D. Tex. Sept. 9, 2011), *aff'd Mick
  Haig Productions E.K. v. Does 1-670*, 687 F.3d 649 (5th Cir. 2012) ..................22

*Mid–Atlantic Constructors Inc. v. Stone & Webster Constr., Inc.*,
  231 F.R.D. 465 (E.D. Pa. 2005).....................................................13, 16

*Molefi v. Oppenheimer Trust*,
  No. 03 Civ. 5631, 2007 WL 538574 (E.D.N.Y. Feb. 15, 2007)........................14

*Ready Transp., Inc. v. CRST Malone, Inc.*,
  No. 07-0905, 2009 WL 1916405 (C.D. Cal. June 30, 2009) ..........................21

*Ready Transportation, Inc. v. CRST Malone, Inc.*,
  No. EDCV 07-0905-JTL, 2009 WL 10669743 (C.D. Cal. June 18, 2009) .............22

*Revander v. Denman*,
  No. 00 Civ. 1810 (RJH), 2004 WL 97693 (S.D.N.Y. Jan. 21, 2004)....................15

*Topalian v. Ehrman*,
    3 F.3d 931 (5th Cir. 1993) ................................................................................22

**Other Authorities**

Fed. R. Civ. P. 30 ...........................................................................................12, 19

Fed. R. Civ. P. 30(a) .........................................................................................6, 19

Fed. R. Civ. P. 45 .....................................................................................13, 15, 16

Fed. R. Civ. P. 45(a) ..............................................................................................7

Fed. R. Civ. P. 45(b)(1)..........................................................................................7

Fed. R. Civ. P. 45(c)(1)..........................................................................................7

Fed. R. Civ. P. 45(d)............................................................................................17

Defendant NIKE, Inc. ("NIKE") respectfully submits this memorandum of law in support of its Motion for Sanctions pursuant to Federal Rules of Civil Procedure 26, 30, and 45 and the Court's inherent authority to control its proceedings and sanction parties and their attorneys.

## I.   **INTRODUCTION**

NIKE brings this Motion because NIKE recently learned that Lontex, through its lead counsel, Mr. Ben Wagner, is actively engaged in a concerted effort to manufacture evidence to support its case.  Specifically, ***without any notice to NIKE***, Mr. Wagner issued "trial subpoenas" to ***at least 40*** (and possibly more) non-party individuals in order to coerce each of these non-party individuals to sign an attorney-drafted, self-serving, and misleading declaration that is factually inconsistent with the record developed through discovery to date.

Each trial subpoena, signed by Mr. Wagner, commands non-party individuals—athletic trainers employed by various National Football League ("NFL") teams around the country—to appear in person to testify at trial in Courtroom 3A of the U.S. District Court for the Eastern District of Pennsylvania at 9:30 am on November 2, 2020.  Mr. Wagner issued these trial subpoenas ***knowing that:*** (1) November 2 is in the middle of the upcoming NFL season (a season that will be complicated by the COVID-19 public health crisis); (2) most, if not all, of the non-party individuals reside and work well beyond the Court's subpoena power under Rule 45(c)(1); and (3) this case is not at all likely to go to trial on November 2, 2020.

Not only did Lontex fail to alert NIKE that it was issuing trial subpoenas, Lontex never identified a single one of these non-party individuals as persons likely to have discoverable information that Lontex may use to support its claims or defenses, even though this action has been pending since December 31, 2018.  Mr. Wagner completely disregarded this Court's admonishment at the March 13, 2020 hearing that courts in this District, including this Court, "don't allow surprise witnesses at the last minute who counsel knew were knowledgeable about facts and didn't disclose

them." Hr'g Tr. at 64:23-65:3, ECF No. 157. And Mr. Wagner knowingly violated the Court's March 13, 2020 Order that the parties are "under the obligation to identify by name and title if they are employed, . . . witnesses who may be called as trial witnesses. And if they're unwilling to come to Philadelphia, . . . that the party may seek to take a trial deposition." *Id*. at 65:24-66:5

NIKE learned that Mr. Wagner had issued these trial subpoenas only when it received several concerned communications from General Counsels of some NFL teams. NIKE has since learned that Mr. Wagner issued these trial subpoenas along with a cover letter and an attorney-drafted declaration containing false or misleading statements. Mr. Wagner's cover letter threatens formal service of the trial subpoena, and warns the non-party individual to arrange his/her schedule to appear at trial on November 2, 2020. Immediately following that threat, Mr. Wagner offers the non-party individuals an easy alternative: sign Mr. Wagner's declaration and maybe Mr. Wagner will not require the non-party individual to appear at trial in Philadelphia on November 2, 2020.

Not only is Mr. Wagner's conduct highly improper, it threatens to multiply the proceedings by requiring NIKE to take yet more depositions—of dozens of individuals never listed in Lontex's Rule 26(a) disclosures—to respond to the false and misleading statements Mr. Wagner included in the declarations. But even if NIKE could cross-examine these individuals at some point, such depositions would hardly be fair, as Mr. Wagner's carefully-crafted, self-serving, and misleading declarations have undoubtedly tainted the memories of these individuals. Mr. Wagner's conduct is highly prejudicial to NIKE.

What would motivate Lontex and its counsel Mr. Wagner to resort to such tactics? Trademark owners seek redress in federal litigation for one key reason: to swiftly quell the sale of a product or service that has caused or is likely to cause confusion with its own valuable brand. But this is not Lontex's concern here. Rather, this case was filed years after Plaintiff tried

unsuccessfully to sell its long-abandoned "Cool Compression" trademarks to a number of companies, including NIKE, between 2014 and 2016.  After those attempts failed, Mr. Wagner apparently convinced his prior law firm in or around May, 2018 to take a financial stake in pursuing trademark claims against NIKE.[1]  Lontex then waited another 7 months to file a complaint against NIKE, further belying any argument that the filing of the complaint was predicated on bona fide concerns of trademark confusion.  Now, in its continued zeal to collect millions from NIKE, Lontex's recent litigation conduct, through Mr. Wagner, has taken this disturbing, and sanctionable, turn.

Mr. Wagner has knowingly violated this Court's March 13 Order and the Federal Rules of Civil Procedure, including at least Rules 26(g), 30(a)-(b), and 45(c)-(d), and has misused his *pro hac vice* admission by abusing this Court's subpoena power.  Accordingly, NIKE seeks sanctions against Lontex in order to: (1) prohibit the use, in any manner, of any improperly obtained declarations, evidence, or testimony; (2) determine if additional improper non-party "discovery" has taken place or is taking place; and (3) prevent any additional improper conduct by Mr. Wagner and Lontex.  NIKE also seeks fees and costs incurred in connection with this Motion and responding to Mr. Wagner's improper conduct.

---

[1] Lontex first contacted Mr. Wagner's prior firm, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., near the end of 2016, about taking on this case against NIKE.  Declaration of Marc E. Miller in Support of NIKE, Inc.'s Motion for Sanctions ("Miller Decl."), Ex. 1, Nathan Tr. 1158:14-1159:6.  Lontex "needed a law firm that . . . will be able to represent us . . . and the funding they will take care of."  *Id*. at 1114:19-1115:9.  Lontex remained in regular contact with Mintz Levin "every week" between the end of 2016 and January 2018, but "could not come to agreement based on how much . . . money Lontex would have to put toward the lawsuit."  *Id*. at 1134:23-1135:22, 1158:14-1159:6.  So Mintz Levin recommended that Lontex retain its former partner, Mr. Harvey Safterstein, to contact NIKE.  *Id*. at 1134:23-1135:22.  When that did not work out, Lontex fired Mr. Saferstein and retained Mr. Wagner.  *Id*. at 1140:1-10.

## II.     STATEMENT OF RELEVANT FACTS

### A.     The Nature and Stage of the Proceeding

On December 31, 2018, almost 3 years after Lontex first wielded infringement threats in an attempt to get NIKE to purchase Lontex's purported COOL COMPRESSION trademarks (*see* Miller Decl., Exhibit 2), Lontex filed this action with a complaint announcing that NIKE should pay Lontex at least $40 million dollars.[2]  See Compl. ¶ 1, ECF No. 1.

Although Lontex's amended complaint alleges that NIKE sells a "COOL COMPRESSION" line of apparel products (*see* Am. Compl. ¶¶ 18-35, ECF No. 20), Lontex has long known that NIKE has never sold a single product bearing a "COOL COMPRESSION" mark, but has only used words like "cool" and "warm" to describe product attributes and "compression" to describe product fit in select written materials conveying information about the products.  Indeed, on March 4, 2016, Efraim Nathan, Lontex's principal, admitted: "I do not think that Nike is interested in purchasing the COOL COMPRESSION® Trademark.  They are just using it to describe this 'Pro Lite Compression Apparel' online."  Miller Decl., Exhibit 3.

NIKE's affirmative defenses and counterclaims challenge the validity of Lontex's alleged rights in the purported COOL COMPRESSION trademarks and its highly suspect allegations of continuous use of those marks in commerce in the United States since 2006.  *See* NIKE Counterclaims ¶¶ 16-30, ECF No. 45.

As this Court is aware, discovery in this case has been a contentious affair, involving extensive motion practice, engagement of a special master, and finally a comprehensive hearing with the Court on March 13, 2020 to deal with "a lot of open discovery issues," in which the Court made clear its intention "to have this hearing as long as it takes, up to several hours if necessary, to

---

[2] Lontex has since more than tripled its already exorbitant (and baseless) monetary claims.

deal with all of these [discovery] motions."  H'rg Tr. at 5:9-14, ECF No. 157.  In fact, the Court repeatedly admonished the parties that if there exists an open discovery issue that was not addressed at the March 13 hearing, then counsel was "under an obligation to bring it up" (*id*. at 6:1-8), and at the close of the hearing the Court posited: "Good.  All right.  Any other discovery issues?  Remember, it's fish or cut bait right now."  *Id.* at 82:17-19.

Two days before the March 13 hearing, Lontex served its Fourth Amended Initial Disclosures, identifying 6 athletic trainers from NFL and Major League Baseball ("MLB") professional teams as persons likely to have discoverable information.  Miller Decl., Exhibit 4.  At the March 13 hearing when NIKE raised concerns about late disclosure of these 6 individuals, Lontex explained to the Court its late disclosure as follows: "we've found witnesses on this abandonment claim that's contrary to [NIKE's] witnesses. . . .  They've given us some labels that are COOL COMPRESSION labels used in the relevant time frame.  They live outside the subpoena power of this court."  Hr'g Tr. at 62:7-63:17, ECF No. 157.  Recognizing that the parties might not stipulate as to the admissibility of the "labels" and that NIKE "may want to cross-examine these people," Lontex stated its intention, "once we get close to a trial date," "to work with a mutually agreeable time, if we can't agree to the admissibility of those documents or those products, to take their trial depositions where they live."  *Id*.

In response, the Court advised that courts in this District, including this Court, "don't allow surprise witnesses at the last minute who counsel knew were knowledgeable about facts and didn't disclose them."  *Id*. at 64:23-65:3.  The Court then "enter[ed] an order in this case that both sides would be under the obligation to identify by name and title if they are employed, . . . witnesses who may be called as trial witnesses.  And if they're unwilling to come to Philadelphia, you know, that the party may seek to take a trial deposition."  *Id*. at 65:24-66:5

At no point prior to or during the March 13 hearing did Lontex raise any desire to take depositions beyond the limits set forth in Fed. R. Civ. P. 30(a).  Nor did Lontex raise any desire to take "trial depositions" of any individuals other than the 6 individuals it identified its March 11, 2020 Fourth Amended Initial Disclosures.  Nor did Lontex suggest that it believed it had not had an opportunity to fully develop through third parties the evidentiary record which it intended to rely upon for summary judgment or at trial.

### B.    Lontex Recently Issued Sham "Trial Subpoenas" to at Least 40 Undisclosed Non-Parties to Coerce Them to Sign A Misleading Declaration

Nevertheless, in the months that followed the hearing, unbeknownst to NIKE and without seeking leave of the Court, Lontex's counsel sent "subpoenas" seeking "trial testimony" to *at least 40 individual athletic trainers* employed by some or all of the NFL teams.  Miller Decl. ¶¶ 20.b, 20.d; *see* Miller Decl., Exhibit 5 (subpoenas).  These subpoenas were prepared using Form AO88, include the caption for the instant case, purport to be issued under this Court's authority, and were signed by Mr. Ben Wagner, counsel for Lontex.  *See* Miller Decl., Exhibit 5.  These subpoenas command the recipient, who is listed by name, to appear in Courtroom 3A of the U.S. District Court for the Eastern District of Pennsylvania at 9:30 am on November 2, 2020.[3]  *Id.*  Lontex did not serve NIKE with copies of the subpoenas or otherwise notify NIKE of their issuance.  Miller Decl. ¶ 18.

---

[3] The trial date included on the subpoenas is not a real trial date, and counsel for Lontex knows this. In fact, the Court explained during the March 13, 2020 hearing that a final pretrial conference would be held to set a date for trial: "Now, trial pool date, as Mr. Schwartz [Mr. Wagner's co-counsel] knows, is a date before which the case will not be called. But when that date approaches, my practice is to . . . have a phone call with counsel where we'll talk about how long the case -- the trial might take and some dates to accommodate.  But I would probably anticipate having the trial in November."  Hr'g Tr. 74:23-75:8, ECF No. 157.

Mr. Wagner sent these subpoenas with a cover letter and a declaration to trainers at NFL teams in states all around the country in or around June 26, 2020 (the "June 26 Letter(s)").[4]  Miller Decl., Exhibit 6 (Letters), Exhibit 7 (Declarations).  The June 26 Letter instructs the trainers that "we have attached a trial subpoena for your appearance on Monday November, 2, 2020 to ensure that you can arrange your schedule well in advance of this trial date."  Miller Decl., Exhibit 6 at 1. The June 26 Letter goes on to urge the trainer to "agree to accept service," and then threatens:

> If you are unwilling to accept service of this subpoena, we will have the subpoena served on you in accordance with Fed. R. Civ. P. 45(b)(1).

*Id.*  In the portion of the letter that threatens formal service of the attached subpoena and warns the recipients to arrange their schedules for the November trial date, Mr. Wagner does not explain to the recipients that this Court lacks the power via the attached subpoena to compel their appearance at trial in Philadelphia if they reside or work more than 100 miles from Philadelphia, which is likely the case for most—if not all—of the recipients of the June 26 Letters.  *Id.* at 1-2.

Instead, immediately following the threat, Mr. Wagner offers an alternative to "make this as easy of a process as possible." *Id.* at 1.  First, Mr. Wagner urges the recipients to sign the attached declaration that he has prepared for them, urging that if they are willing to sign such a declaration, there is a chance the recipient will not be needed to provide live trial testimony.  *Id.*

The draft declarations that Mr. Wagner attached to each of the June 26 Letters appear to be virtually identical in substance but for the individual declarant's name and biographical information.  Miller Decl., Exhibit 7.  Incredibly, the draft declarations were prepared by Mr.

---

[4] NIKE is aware that Mr. Wagner also sent the subpoena, declaration, and June 26 Letter to athletic trainers employed by some or all of the 30 MLB teams.  Miller Decl. ¶ 20.i.  While only Mr. Wagner knows how many individuals received the subpoena, declaration, and June 26 Letter, it possible that Mr. Wagner sent subpoenas to more than 70 individual athletic trainers.  *See* Miller Decl. ¶¶ 20.d, 20.i.

Wagner (or someone working under his supervision) ***without first speaking with the potential non-party declarant and without first obtaining and reviewing any oral or written evidence from the potential non-party declarant***.  While Mr. Wagner's June 26 Letter invites modifications to the language of the declaration he drafted, the declaration provides to the potential declarant a clear road map of the desired testimony.

The declarations drafted by Mr. Wagner touch on two topics that NIKE and Lontex already vetted extensively throughout more than a year of discovery via party and non-party document productions that cumulatively exceed 83,000 pages; party and non-party depositions (to date, Lontex has taken 6, and NIKE has taken 9); a court-monitored protocol to subpoena Lontex's consumers for pictures of Lontex products during the relevant time period; investigations of two private investigators; and three survey experts who conducted consumer studies under recognized and accepted methodologies.  Those topics include fundamental conclusory allegations in Lontex's First Amended Complaint, namely that:

1. Lontex made continuous use of the purported "COOL COMPRESSION" mark; and

2. NIKE's alleged use of "COOL COMPRESSION" caused consumers to be confused about an association between NIKE and Lontex.

*See* Lontex First Am. Compl. ¶¶ 15, 21-22, ECF No. 20

The form draft declaration that Mr. Wagner attached to each of the June 26 Letters is inconsistent with the record that was developed throughout the extensive discovery discussed above, including Mr. Nathan's testimony, Lontex's own documents, and other evidence received from non-parties.  Just by way of example:

1. The form declaration seeks to have the declarant swear that "since at least 2008 [or 2011 for some], Lontex's 'COOL COMPRESSION' technology is the main item

8

covered by Mr. Nathan, and in hearing him over this time he has always referred to the 'COOL COMPRESSION' technology by that name."  Miller Decl., Exhibit 7 ¶ 7.

a.     As Mr. Wagner is well aware, this statement stands in stark contrast to the materials that Lontex submitted to trainers from 2008 to 2016 which do not contain even a single reference to "COOL COMPRESSION" technology (but instead referenced "True Compression" technology and "Performance Compression").  *See, e.g.*, Miller Decl., Exhibits 8, 9.  Indeed, discovery has revealed that Lontex did not use the purported COOL COMPRESSION trademarks on its invoices, website, product packaging, or any other written marketing materials until *after* it discovered NIKE's alleged infringing use at the end of 2015.  Miller Decl., Ex. 1 at 88:12-90:5.

2.     The form declaration also seeks to have the declarant swear that he/she would be confused into believing that Nike is "using Lontex's COOL COMPRESSION technology in [NIKE's] compression garments."  Miller Decl., Exhibit 7 ¶ 10.

a.     As Mr. Wagner is well aware, this statement also stands in stark contrast to Mr. Nathan's admissions that Lontex's professional trainer customers never confused Lontex's products with NIKE's, and that he is not aware of any customer mistakenly believing that NIKE was using Lontex's COOL COMPRESSION technology, that Lontex authorized NIKE to use its COOL COMPRESSION technology, or that Lontex and NIKE were affiliated in any way.  *See* Miller Decl., Exhibit 1 at 919:15-23; 1036:4-17.  This manufactured expression of "confusion" also followed Lontex's

failure to secure a competent consumer study finding any likelihood of confusion, and NIKE's disclosure of two consumer studies demonstrating zero consumer confusion, based on reliable and accepted survey methodologies.

After Mr. Wagner's June 26 Letter urges the recipient to sign this declaration, it goes on to conclude with two confusingly worded paragraphs, which: (1) suggest taking a video deposition as a potentially easier alternative for those who live outside the Philadelphia area to the live trial testimony threatened earlier in the letter, and (2) warn that failure to commit to live trial testimony or sign the form declaration will "require us to schedule a trial deposition in lieu of an appearance in Philadelphia."  Miller Decl., Exhibit 6 at 1-2.

Lontex did not provide a service copy or other notice that the trial subpoenas had been issued, and thus NIKE had no knowledge that Mr. Wagner sent the trial subpoenas, declarations, and June 26 Letters until June 30, 2020 when concerned General Counsels of several NFL teams contacted NIKE.  Miller Decl. ¶¶ 18, 19.  The General Counsel for the Professional Football Athletic Trainers Society ("PFATS") also reached out to NIKE on July 1, 2020.  Miller Decl. ¶ 20.  PFATS, for the Court's benefit, is a professional association representing the athletic trainers of the NFL. NIKE's counsel had never before spoken to PFATS counsel, and PFATS counsel wanted to know whether NIKE was aware of the trial subpoenas that Mr. Wagner issued to at least 40 members of its society.  *Id.* ¶¶ 20.a, 20.b.  NIKE counsel explained that it had not had prior notice of this activity. *Id.* ¶ 20.c.  PFATS counsel went on to explain that the trial subpoenas, declarations, and June 26 Letters were causing concern among the PFATS membership because of (1) the November 2, 2020 date on the trial subpoenas being in the middle of the upcoming NFL season, (2) concern about travel to Philadelphia in light of the ongoing COVID-19 public health crisis, and (3) the nature of

the statements Mr. Wagner included in the declaration.  *Id.* ¶ 20.e.  As a result, PFATS counsel

indicated that it had felt compelled to send a notice to the PFATS members and announced a Zoom

conference call to address their concerns.  *Id.* ¶ 20.f.  The PFATS notice prompted by Mr. Wagner's

trial subpoenas, declarations, and June 26 Letters states, in pertinent part, the following:



Miller Decl., Exhibit 10.

NIKE still does not know the full extent to which Mr. Wagner has sent these trial subpoenas,

declarations, and June 26 Letters, since Lontex did not produce its communications with these non-

parties.  PFATS counsel indicated that PFATS is not comfortable voluntarily sharing the full extent

of this information with NIKE, and NIKE certainly respects that decision.  Miller Decl. ¶ 20.d.

Based on NIKE's investigation to date, however, NIKE understands that Mr. Wagner sent the trial

subpoena, declaration, and June 26 Letter to individuals that Lontex *did not* identify in its initial disclosures as persons likely to have discoverable information.  Miller Decl. ¶ 21.  And, as far as NIKE is aware, Mr. Wagner *did not* send the trial subpoena, declaration, and June 26 Letter to the 6 athletic trainers that Lontex identified in its Fourth Amended Initial Disclosures.  *See* Miller Decl. ¶¶ 22.  NIKE also understands that, in most cases, Mr. Wagner *did not* direct the trial subpoena, declaration, and June 26 Letter to the general counsel for each NFL teams, but rather directed them to the individual trainers.  Miller Decl. ¶ 20.h.

## C.    Lontex Also Recently Procured the Same Misleading Declaration From 5 Previously Undisclosed Non-Parties

In addition to inappropriately issuing trial subpoenas and misleading declarations to 40 or more undisclosed non-parties, Lontex also surprised NIKE by producing new declarations from 5 new individuals *never before disclosed* on any Lontex Rule 26(a) initial disclosures.  This also is highly prejudicial to NIKE and further underscores Lontex and Mr. Wagner's inappropriate tactics.

After Lontex produced its March 11, 2020 Fourth Amended Initial Disclosures, NIKE counsel promptly contacted in-house counsel at the NFL and MLB teams that employed the 6 team athletic trainers that Lontex disclosed on the Initial Disclosures, seeking permission to interview those athletic trainers and obtain a declaration, since Lontex disclosed them at the end of discovery and indicated it would not stipulate to NIKE taking any depositions beyond the 10 provided for in Fed. R. Civ. P. 30.  Miller Decl. ¶ 22, Exhibit 16.  At NIKE's suggestion, Lontex and NIKE agreed to exchange any declarations obtained from these individuals on June 30, 2020.  Miller Decl. ¶ 23.

On June 30, Lontex produced to NIKE declarations from 2 of the 6 trainers listed on its Initial Disclosures along with declarations from 5 *new* individuals that Lontex had never identified before: Messrs. Chris Peduzzi, Sean Cunningham, Mark Smith, Tony Leo, and Mike Kozak.  Miller Decl. ¶ 23, Exhibit 11; *see* Miller Decl., Exhibit 4.  Notably, these 5 new individuals are *former*

athletic trainers previously employed by various NFL and MLB teams.  Miller Decl. ¶ 24.  Their declarations are virtually identical in substance to each other (and to the draft declaration Mr. Wagner sent to the other 40 athletic trainers) but for the individual declarant's name and biographical information.  *Compare* Miller Decl., Exhibit 11, *with* Miller Decl., Exhibit 7.  These 5 declarations do not just authenticate certain Lontex product labels or photographs thereof (which was the original basis for any additional trainer witness, as Lontex represented to this Court); rather, as discussed above, they include new "evidence" on two topics which NIKE and Lontex already vetted extensively throughout more than a year of discovery.  *See* Miller Decl., Exhibit 11.  Based on its investigation to date, NIKE believes that these 5 declarations were also prepared by Mr. Wagner ***without first speaking with the declarant and without first obtaining and reviewing any oral or written evidence from the declarant***.  *See* Miller Decl. ¶¶ 25, 28.  They were signed by the declarants between May 20 and May 29, 2020.  *See* Miller Decl., Exhibit 11.  NIKE's investigation also suggests these 5 declarants were not represented by counsel when Lontex approached them with Mr. Wagner's draft declaration.  *See* Miller Decl. ¶¶ 25, 28.  NIKE does not know whether Lontex or Mr. Wagner issued to these individuals the same trial subpoena or otherwise threatened to hail them to court to testify at trial, since Lontex did not produce its communications with them.

## III.   ARGUMENT

### A.   Legal Standard

"Courts have the inherent authority to ensure that parties abide by the Federal Rules of Civil Procedure, protect the integrity of the judicial system, and prevent abuse of the judicial process." *Coleman-Hill v. Governor Mifflin Sch. Dist.*, 271 F.R.D. 549, 552 (E.D. Pa. 2010) (citing *Mid–Atlantic Constructors Inc. v. Stone & Webster Constr., Inc.*, 231 F.R.D. 465, 467 (E.D. Pa. 2005)).  Through Rule 45, attorneys may invoke a court's power to assist in obtaining evidence or command the presence of key fact-based witnesses.  "[S]ubpoenas represent the delegation of

authority to attorneys.  The abuse of subpoena power is most dangerous because it threatens to erode public confidence in the judicial system.  Attorneys must understand the high degree of trust that is imposed upon them, and must conduct themselves with the utmost care when using the Court's subpoena power."  *Coleman-Hill*, 271 F.R.D. at 554 (citing *McCurdy v. Wedgewood Capital Mgmt. Co.*, No. 97–4304, 1998 WL 964185, at *7 (E.D. Pa. Nov. 16, 1998)).

As such, courts have "the authority to impose sanctions in connection with the improper use of the court's subpoenas under Federal Rule of Civil Procedure 45," which provides that a party issuing a subpoena has a duty to "'take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena,'" and that "'the issuing court must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.'"  *Kenney, Becker LLP v. Kenney*, No. 06 CIV. 2975 (JSR), 2008 WL 681452, at *2 (S.D.N.Y. Mar. 6, 2008) (quoting Fed. R. Civ. P. 45(c)(1)). "[A] Court determining whether sanctions are appropriate under Rule 45(c)(1) should examine whether the subpoena served an improper purpose and whether it was unduly burdensome."  *Id.*

Courts' inherent power also includes the power to impose sanctions for abuses of discovery and the litigation process.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991) ("[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"); *see also Molefi v. Oppenheimer Trust*, No. 03 Civ. 5631, 2007 WL 538574, at *2-4 (E.D.N.Y. Feb. 15, 2007) (awarding sanctions because the subpoena was burdensome and had no proper purpose); *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 814 (9th Cir. 2003) (affirming district court's award of sanctions based on finding that subpoena was "overly burdensome and served for an improper purpose").

**B.      Lontex's Sham "Trial Subpoenas" Serve an Improper Purpose and Are Unduly Burdensome**

Previously unbeknownst to NIKE, Mr. Wagner wielded this Court's subpoena power for improper purposes; namely, to attempt to coerce at least 40 individual non-parties to sign an attorney-drafted, self-serving, and misleading declaration that is factually inconsistent with the record developed through discovery to date.

When Lontex's belated disclosure of 6 athletic trainers was raised at the March 13, 2020 hearing, the issue was whether, in the absence of a stipulation, trial depositions would be necessary to authenticate certain Lontex products labels (or photographs thereof) that Lontex had obtained from these individuals in early March 2020.  Hr'g Tr. at 62:7-63:17, ECF No. 157.  The Court allowed the possibility of trial depositions for that limited purpose of authenticating certain Lontex products labels (or photographs thereof) from identified witnesses that reside and/or work beyond 100 miles from Philadelphia.  But the Court made clear that it "[does not] allow surprise witnesses at the last minute who counsel knew were knowledgeable about facts and didn't disclose them." *Id.* at 64:23-65:3.  The Court also admonished at the March 13 hearing that the parties are "under the obligation to identify by name and title if they are employed, . . .  witnesses who may be called as trial witnesses.  And if they're unwilling to come to Philadelphia, . . . that the party may seek to take a trial deposition."  *Id.* at 65:24-66:5.

Lontex did not follow the Court's March 13 Order and it did not seek to use trial subpoenas and/or trial depositions to authenticate certain Lontex products or photographs thereof that Lontex had obtained from the 6 athletic trainers listed on its Fourth Amended Initial Disclosures, as Mr. Schwartz represented to the Court it would.  Instead, Mr. Wagner wielded the Court's trial subpoena power to manufacture new evidence from undisclosed non-parties in support of Lontex's claims *after* the discovery period was effectively closed. "Trial subpoenas are appropriate in

certain circumstances, such as securing an original document previously disclosed during discovery, or for purposes of memory recollection or trial preparation." *Revander v. Denman*, No. 00 Civ. 1810 (RJH), 2004 WL 97693, at *1 (S.D.N.Y. Jan. 21, 2004) (citing *Bufkin v. Norfolk S. Corp.*, No. 1:00-cv-424, 2002 WL 32144317, at *1 (N.D. Ind. Mar. 20, 2002)).  But Lontex was aware of the existence of these individuals before the discovery cutoff deadline and, had it wished to rely on their testimony, should have issued Fed. R. Civ. P. 45 deposition subpoenas during the discovery period.  *Id.*  This is an abuse of the Court's trial subpoena power.

Moreover, in direct violation of the Court's March 13, 2020 Order, Lontex never disclosed to NIKE that Messrs. Peduzzi, Cunningham, Smith, Leo, and Kozak, or any of the other 40 or more athletic trainers that Mr. Wagner subpoenaed, are persons likely to have discoverable information or that Lontex may call them as trial witnesses.  *See* Miller Decl., Exhibit 4.  NIKE only learned about Messrs. Peduzzi, Cunningham, Smith, Leo, and Kozak when it received their signed declarations, and NIKE learned from the concerned third parties—not from Lontex—that Mr. Wagner had issued more than 40 sham trial subpoenas.  Miller Decl.¶¶ 19, 20.

These undisclosed individuals are the exact type of "surprise witnesses at the last minute" that this Court said it would not permit.  Lontex has apparently been doing business with these professional athletic trainers for decades, and only now wants to use their testimony to corroborate Mr. Nathan's incredible claim that, since 2008, he "always" orally referred to the fabric in Lontex's "Sweat it Out" compression garments as "COOL COMPRESSION technology."  *See* Miller Decl., Exhibits 7 & 11.  Lontex first discovered NIKE's alleged infringement at the end of 2015, it first sent NIKE a demand letter in April 2016, and it filed this lawsuit on December 31, 2018.  Miller Decl., Exhibit 2; *see* Compl., ECF No. 1.  Discovery in this case has been open since May 2019. ECF No. 29.  Yet Lontex never disclosed these individuals as persons likely to have discoverable

information.  How can that be?  Lontex will likely contend that it wished to avoid imposing any burden on its "prized" customers.  But such a contention strains credulity when one considers the undue burden that Mr. Wagner brought upon these same customers with his ham-fisted efforts to coerce them to sign an attorney-drafted declaration.

Lontex violated Rule 45 by issuing trial subpoenas, and attaching each subpoena to the June 26 Letters.  Any argument that Lontex might raise that Mr. Wagner did not violate Rule 45 because he did not formally serve the trial subpoenas fails.  It makes no difference whether he effected service because he nevertheless wielded the Court's subpoena power by issuing them and attaching them to the June 26 Letter.  Plus, there is no such thing as issuing a "proposed" subpoena. See *Mid-Atl. Constructors Inc.*, 231 F.R.D. at 467 ("Although [counsel] characterizes the subpoena as a 'courtesy' and merely 'proposed' until further order of the Court, the manner in which [counsel] sought the discovery violated several rules of civil procedure. . . . [T]here is no authority under Rule 45(a) for serving a non-party with a 'proposed' subpoena.").

In fact, given Mr. Wagner's statements in the June 26 Letter, issuing the subpoena and attaching it to that letter is actually worse than simply serving the subpoena.  The June 26 Letter is confusing, and its wording would lead any recipient who does not regularly litigate to believe they were being compelled to appear at trial in this action in November unless they agreed to sign Mr. Wagner's declaration.  *See* Miller Decl., Exhibit 6.  Even PFATS counsel seemed to think so. *See* Miller Decl., Exhibit 10.

The June 26 Letter's ostensible offers to mitigate burden on the recipient were also a sham. In fact, Mr. Wagner manufactured duress to create the false implication of a mitigation.  Given even his own recent concerns about traveling to take in-person depositions in this case, Mr. Wagner had to know that the individual recipients of his June 26 Letter would have similar concerns about

traveling to Philadelphia in November during the COVID-19 public health crisis, let alone during the middle of the upcoming NFL season. The media has widely reported on the NFL's COVID-19 protocols (*see e.g.*, https://www.nfl.com/news/nfl-sends-covid-19-protocols-for-camp-preseason-to-clubs), and NFL athletic trainers will play a large role implementing protocol and keeping the team's players healthy. Issuing a trial subpoena for the NFL athletic trainer's appearance in court in Philadelphia on Monday, November 2, 2020 and threatening the trainer to "arrange your schedule well in advance of this trial date" (Miller Decl., Exhibit 6) is blatantly manipulative and harassing and clearly violates Fed. R. Civ. P. 45(d)'s directive that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."

Moreover, each trial subpoena is plainly deficient on its face in that it commands an individual who lives and resides well beyond 100 miles from this Court to appear in Courtroom 3A of the U.S. District Court for the Eastern District of Pennsylvania at 9:30 am on November 2, 2020. Each trial subpoena also improperly misleads the recipient to believe that trial will commence on November 2, 2020, when, in reality, it will not. Mr. Wagner did not explain to the recipients of the June 26 Letters that the November 1, 2020 trial pool date is likely to be rescheduled for any number of reasons, including the ongoing—and worsening—COVID-19 public health crisis.[5] Mr.

---

[5] Mr. Wagner did not disclose that the District's May 29, 2020 Standing Order continued indefinitely all civil jury trials scheduled to begin on or before August 31, 2020 (*see* E.D. Pa. May 29, 2020 Standing Order on COVID-19), nor did he disclose that this Court explained during the May 14, 2020 teleconference that courts in this District "are not having any jury trials until September at the earliest and that is probably going to be limited to criminal trials so I have been extending the schedule in any case that counsel ask." Hr'g Tr. at 13:11-16, Miller Decl. Exhibit 12. And Mr. Wagner did not disclose that this Court told him that, although he may keep the November 1, 2020 trial pool date, "there is no way any human being can tell you that is going to happen. . . . I will be glad to agree to any extension." *Id.* at 14:6-19. Mr. Wagner did not disclose that NIKE, on June 25, 2020, proposed extending the remaining deadlines, including the trial pool date, by 60 days in light of the public health crisis. Miller Decl., Exhibit 13. Finally, Mr. Wagner

Wagner wanted the recipients of the trial subpoena and June 26 Letter to believe that the trial subpoena was valid and that the November 2, 2020 trial date was real in order to maximize the pressure for the recipients to sign the form declaration, rather than risk having to leave their job in the middle of the intense NFL season, which was only being made more challenging by the COVID-19 protocols.   Mr. Wagner was, or should have been, aware of these realities and the problems with the issuance of these trial subpoenas.   Yet he knowingly signed and issued invalid trial subpoenas to more than 40 non-parties who were beyond the subpoena power of this Court, deceiving them into believing that during a public health crisis they would be hailed to court in Philadelphia on November 2, 2020.   This conduct is inappropriate and plainly sanctionable.   *See In re Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1092, 1095 (D.S.C. 1997) (counsel was sanctioned for knowingly issuing an invalid trial subpoena to a witness who was beyond the subpoena power of the court and representing to the witness, expressly or by inference, that the subpoena was valid.).

Finally, Mr. Wagner's offer in the June 26 Letter of a "trial deposition" instead of appearance at trial, does not excuse counsel's inappropriate wielding of this Court's subpoena power.   First, offering a trial deposition as an alternative on the second page of the June 26 Letter only reinforced the misleading nature of the directives and threats on the first page of that letter, which implied that the enclosed trial subpoena *required* the recipient's attendance at trial in Philadelphia on November 2, 2020.   Second, Lontex was not permitted to take an additional 40, or more, "trial depositions," since it had not disclosed these individuals to NIKE, nor stipulated with NIKE to exceed Fed. R. Civ. P. 30(a)'s limit on depositions, nor sought leave from the Court

---

did not disclose that the trial pool date is likely to be pushed back so that the Court may evaluate and decide all pretrial and dispositive motions, a fact that Mr. Wagner later conceded.   Miller Decl., Exhibit 14.

to do so.  Lontex cannot merely label these threated depositions as "trial depositions" as means to evade Rule 30(a)'s limit because there is no distinction between a discovery deposition and a trial deposition under Rule 30.  *See Melore v. Great Lakes Dredge & Dock Co.*, Civ. No. 95-7644, 1996 WL 548142, at *3 (E.D. Pa. Sept. 20, 1996) ("[t]he Federal Rules do not distinguish between discovery and trial depositions.").

### C.    Lontex's Conduct is Highly Prejudicial to NIKE

Mr. Wagner's conduct is inexcusable, highly prejudicial to NIKE, and indisputably sanctionable.  One must question why Mr. Wagner would resort to the extreme tactics described above.  The answer lies in the false and misleading language of the declarations that accompanied the sham subpoenas.  As the baseless nature of Lontex's claims becomes increasingly clear through the progression of discovery, Lontex, through Mr. Wagner, has engaged in a concerted effort to manufacture evidence to prop up its case.  Mr. Wagner's form declaration is entirely inconsistent with the record that has been developed and vetted extensively by the parties for more than a year of discovery.  And he prepared it without first speaking with the trainer declarants.  Then he sent it to them and threatened to hail them to court in the middle of the NFL season during the COVID-19 public health crisis unless they signed it.  This type of attorney-drafted and self-serving declaration, obtained under duress, is neither competent firsthand knowledge nor trustworthy.

For example, Mr. Wagner's declaration seeks to have the declarant swear that "since at least 2008, Lontex's "COOL COMPRESSION" technology is the main item covered by Mr. Nathan, and in hearing him over this time he has always referred to the "COOL COMPRESSION" technology by that name."  Miller Decl., Exhibit 7 ¶ 7.  These statements stand in stark contrast to the materials that Lontex submitted to its customers from 2008 to 2016 which do not contain even a single reference to "COOL COMPRESSION" technology (but instead referenced "True Compression" or "Performance Compression"). Miller Decl., Exhibits 8 & 9.  Indeed, discovery

has revealed that Lontex did not use the purported COOL COMPRESSION trademarks on its invoices, website, product packaging, or any other written marketing materials until *after* it discovered NIKE's alleged infringing use at the end of 2015.  Miller Decl., Exhibit 1 at 88:12-90:5. Moreover, the declarations require the trainers to swear they are confused, without ever having confirmed that the recipient encountered NIKE's alleged use under actual marketplace conditions, and in direct contravention to Lontex's own testimony that trainers have never been confused.  *Id.* at 919:15-23; 1036:4-17; Miller Decl., Exhibit 7.

Mr. Wagner's conduct also robbed NIKE of the opportunity to seek proper discovery from these individuals.  Lontex never disclosed to NIKE during the discovery period that Messrs. Peduzzi, Cunningham, Smith, Leo, and Kozak were likely to have discoverable information or that Lontex may call them as trial witnesses.  NIKE was not given a fair opportunity to cross-examine these individuals before Mr. Wagner put his own words into their mouths and tainted their memories with the statements in his false and misleading form declarations.  As to the 40 or more athletic trainers to whom Mr. Wagner issued trial subpoenas, NIKE does not even know their identities or for which professional team they work.  Presumably, Mr. Wagner is hoping to put his own words in their mouths and/or taint their memories as well.

Competent evidence is not developed through suggesting to previously undisclosed fact witnesses that they have certain memories reaching back over a decade or that they would be confused in a hypothetical context.  The declarations at issue here lack credibility on their face and are highly prejudicial to NIKE.  They should not play any role in fairly adjudicating this case. Moreover, this is not a matter that can simply be resolved by allowing NIKE to take more depositions.  Mr. Wagner has already succeeded in "poisoning the well" by sending the June 26 Letter and his attorney-drafted and self-serving declaration to these 40 or more athletic trainers.

21

Mr. Wagner's draft declaration has tainted the memories of these individuals as to whether or not

Mr. Nathan, in 2008, orally referred to the fabric in Lontex's "Sweat it Out" compression garments

as "COOL COMPRESSION technology by suggesting to all of these trainers that he did.[6]  This

too is highly prejudicial to NIKE, as it prevents NIKE—and the Court—from ever discovering the

unvarnished truth, free from Mr. Wagner's interference.  Not to mention that it would be patently

unfair to make NIKE incur the additional expense of potentially dozens of depositions to address

all of the misleading statements in the declarations.  *See Ready Transp., Inc. v. CRST Malone, Inc.*,

No. 07-0905, 2009 WL 1916405 (C.D. Cal. June 30, 2009) (awarding attorneys' fees against

defense counsel who filed in support of a summary judgment motion a false and intentionally

misleading declaration and holding that such conduct multiplied the proceedings to the extent it

caused plaintiff to take more discovery and to respond to the false declaration); *Ready*

*Transportation, Inc. v. CRST Malone, Inc*., No. EDCV 07-0905-JTL, 2009 WL 10669743, at *8-

*11 (C.D. Cal. June 18, 2009) (granting motion for fees in same case).

The Court should exclude these highly prejudicial declarations because they were drafted

by an attorney, not based on the declarants' firsthand knowledge, secured without any opportunity

for cross-examination, and obtained through coercion under the duress of a sham trial subpoena.

### D.    The Requested Relief Is Appropriate in Light of Mr. Wagner's Sanctionable Conduct

"The district courts wield their various sanction powers at their broad discretion."  *Mick*

*Haig Productions, e.K. v. Does*, No. 3:30-cv-1900, 2011 WL 5104095, at *3 (N.D. Tex. Sept. 9,

2011), *aff'd Mick Haig Productions E.K. v. Does 1-670*, 687 F.3d 649 (5th Cir. 2012) (quoting

---

[6] Given that Lontex's own documents show that Mr. Nathan consistently used the terms "True Compression" or "Performance Compression" with trainers to describe how Lontex's 70% COOLMAX / 30% LYCRA fabric blend stretches 200% in every direction, it would be relatively easy to distort a trainer's memory with the suggestion that the term Mr. Nathan used to describe this fabric was "Cool Compression."  Miller Decl., Exhibits 8 & 9.

*Topalian v. Ehrman*, 3 F.3d 931, 934 (5th Cir. 1993)).  Mr. Wagner's conduct was egregious, intentional, and clearly sanctionable.  Accordingly, NIKE seeks the following relief:

1. An Order prohibiting Lontex from using any of the documents, testimony, or declarations obtained from any undisclosed athletic trainers, including but not limited to the 40 or more recipients of the June 26 Letter, and Messrs. Peduzzi, Cunningham, Smith, Leo, and Kozak;

2. An Order requiring Lontex to disclose and produce to the Court and to NIKE any other subpoenas issued or documents, communications, testimony, declarations or other discovery that Lontex has procured from any other parties and non-parties since March 13, 2020 to present;

3. To the extent Lontex claims it has not conducted any further extra-judicial discovery, a written representation of same made under oath by Mr. Nathan and Mr. Wagner and filed with the Court and served upon NIKE;

4. An Order prohibiting Lontex or Mr. Wagner from issuing any additional subpoenas and obtaining any additional testimony related to this lawsuit or to NIKE without complying with the Federal Rules of Civil Procedure and obtaining pre-clearance of the subpoenas from this Court;

5. An Order awarding NIKE its reasonable attorneys' fees and costs for having to prepare and file this Motion; and

6. Any such other and further relief to which NIKE may be entitled.

## IV.     <u>CONCLUSION</u>

For each of the reasons stated herein, NIKE respectfully requests that this Motion be granted in its entirety, and that it be awarded the relief sought herein.

July 17, 2020                                          Respectfully submitted,

                                                      By:   _/s/ Gina L. Durham_

                                                      DLA PIPER LLP (US)

                                                      Gina L. Durham (admitted *pro hac vice*)
                                                      555 Mission Street, Suite 2400
                                                      San Francisco, CA 94105

                                                      Frank W. Ryan (admitted *pro hac vice*)
                                                      Andrew J. Peck (admitted *pro hac vice*)
                                                      Marc E. Miller (admitted *pro hac vice*)
                                                      1251 Avenue of the Americas, 27th Fl.
                                                      New York, NY 10020

                                                      Ben C. Fabens-Lassen
                                                      1650 Mark Street, Suite 5000
                                                      Philadelphia, PA  19103

                                                      *Attorneys for Defendant NIKE, Inc.*