**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION | Civil Action No. 2:18-cv-05623-MMB |
| Plaintiff, | |
| v. | |
| NIKE, INC., | |
| Defendant. | |

**LONTEX'S OPPOSITION TO NIKE'S MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

I.  RELEVANT BACKGROUND .................................................................. 2

    A.  The Court Authorized the Parties to Seek Out Additional Witnesses ................... 2

    B.  The five witnesses and declarations Lontex obtained in May through informal discovery .......................................................................... 3

    C.  The June 25 Letters Sent After Conversations with Jason Daffner, Esq. .............. 5

II.  LEGAL STANDARD ......................................................................... 10

III.  ARGUMENT ............................................................................... 11

    A.  There is No Basis to Seek Sanctions for the Declarations of Peduzzi, Cunningham, Smith, Leo and Kozak ................................................ 11

    B.  No Sanctionable Conduct Occurred with the June 25 Letters ........................... 14

        1.  The Letters with Trial Subpoenas and Proposed Declarations in Word Format Were Not "Sham," And Did Not "Serve an Improper Purpose" or Cause "Undue Burden" ......................................... 14

        2.  Nike Has Not Been Prejudiced by the June 25 Letters ........................... 19

        3.  No trainers receiving the June 25 Letters (including the 3 that have provided declarations) should have their testimony excluded ................ 21

    C.  The Other Requested Sanctions Should Also Be Denied ................................... 23

    D.  Nike's Request for Attorneys' Fees and Costs Should be Denied ....................... 24

IV.  CONCLUSIONS ............................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Chambers v. NASCO,
501 U.S. 32 (1991).............................................................................................10

Charles v. Wade,
665 F.2d 661 (5th Cir. 1982) ............................................................................17

Coleman-Hill v. Governor Mifflin Sch. Dist.,
271 F.R.D. 549 (E.D. Pa. 2010).............................................................11, 23, 25

Harker v. Maryland,
800 F.2d 437 (4th Cir. 1986) ............................................................................12

Interpace Corp. v. Lapp, Inc.,
721 F.2d 460 (3d Cir. 1983).........................................................................13, 23

Martin v. Brown,
63 F.3d 1252 (3d Cir. 1995)..............................................................................25

Melore v. Great Lakes Dredge & Dock Co.,
1996 U.S. Dist. LEXIS 14003 (E.D. Penn. Sept. 20, 1996) ...................................18

Revander v. Denman,
No. 00 Civ. 1810 (RJH), 2004 WL 97693 (S.D.N.Y. Jan. 21, 2004) .....................16

U.S. Info. Sys. v. IBEW, Local Union No. 164,
2011 U.S. Dist. LEXIS 123682 (D.N.J. Oct. 25, 2011).........................................25

**Other Authorities**

FRCP 30...........................................................................................................17, 18

FRCP 30(a)(2)...................................................................................................17, 18

FRCP 45 ......................................................................................................... passim

FRCP 45(a)(4) .......................................................................................................10

FRCP 45(d)(1) .......................................................................................................10

Nike seeks sanctions for Lontex's alleged misconduct. There was no misconduct. Lontex simply carried out the Court's March 13 authorization for parties to seek out and disclose additional witnesses.

First, Nike asks the Court to impose sanctions for five witness declarations that Lontex obtained in May 2020, including excluding the five witnesses. But no trial subpoenas were proposed, issued to or even discussed with these five witnesses, who are former athletic trainers for the Philadelphia Eagles, Baltimore Ravens, Minnesota Twins, and Florida Marlins. The voluntary witnesses and their declarations were timely disclosed to Nike on June 30, 2020.

Second, Nike asks the Court to impose sanctions for letters sent to a set of MLB and NFL trainers beginning June 25, 2020 ("June 25 Letters"). Each letter attached a proposed declaration and a trial subpoena. The letters were proper and sent only after repeated collaboration with the general counsel for an organization of which many were members, Jason Daffner, Esq. of PFATS. The June 25 Letters were not inaccurate or intended to coerce trainers and had no such effect. Trainers could ignore the letters altogether, refuse to sign the declaration, indicate objection to providing any testimony, or refuse to voluntarily accept service of the attached trial subpoena, at which point Lontex would need to ultimately decide whom to serve with trial subpoenas from their local district to obtain local trial depositions. Based on the influence of Nike on these trainers, most of the trainers who received the June 25 Letters overwhelmingly chose not to voluntarily cooperate with Lontex. Contrary to Nike's claims of duress, the three declarations returned to Lontex show the opposite.

Even if Nike succeeded in suggesting any improper conduct (which it has not), the sanctions requested are inappropriate. Nike failed to cite the Third Circuit factors for exclusion sanctions, and does not meet them. There is no bad faith warranting serious sanctions such as fees and costs, and this good faith dispute does not warrant a pre-approval process for future

subpoenas. As Lontex voluntarily provided a list of letter recipients, relief aimed toward such disclosure is moot. And, Nike's claim that fairness requires Lontex to produce all communications with potential witnesses fails, especially when considering that Nike ignored every inquiry about such a reciprocal exchange.

Thus, Lontex respectfully requests Nike's Motion be denied.

## I.   RELEVANT BACKGROUND

### A.   The Court Authorized the Parties to Seek Out Additional Witnesses

This dispute arises out of Nike's request that the parties be allowed to contact potential witnesses and supplement the parties' disclosures to identify additional trial witnesses. At the March 13, 2020 hearing on outstanding discovery issues, the Court ruled on the "issue about customer interviews." Transcript 7:5-6 [ECF 158]. The Court explained: "I'm not going to put any restrictions on that. And, that [referring to contacting potential witnesses] applies in every case. In this case, it will apply starting today until the trial is over. In some cases, you have witnesses who you didn't know about and come in at the last minute. And there's nothing new about that. So I'm not prepared to make any drastic rules prohibiting you from finding witnesses." *Id.* 13:15-21.

During the March 13, 2020, counsel for Lontex emphasized that such a ruling could put "every single one of [Lontex's] customers" in a position of being contacted by Nike, but the issue was decided, and both parties were given the green light to contact Lontex's customers to identify potential trial witnesses. *Id.* 17:3-5.

In addition to the customers contacted by Nike in the months prior to the March 13 hearing, Lontex had just obtained evidence from eight more customers who had used SWEAT IT OUT products and added those potential trial witnesses to its initial disclosures just before the hearing. The Court continued: "But you may – you may find more witnesses the day before trial.

- 2 -

You may have a very good reason why you didn't find them beforehand. And I may allow that. So we're still in discovery. I'm not going to prohibit them from adding witnesses. I'm not going to prohibit either one of you from adding witnesses." *Id.* 14.

In the days after the hearing, COVID-19 quarantines went into full gear, but counsel for both sides searched out additional witnesses based on the Court's ruling.

In a May 1, 2020 email, counsel for Lontex responded to Nike's demand that Lontex make a one-sided production of litigation communications with third parties and expressed willingness to consider a reciprocal exchange. *See* Declaration of Ben L. Wagner in Support of Opposition ("Wagner"), ¶ 6 Ex. 1 at pp. 2-3. On May 12, 2020, counsel for Lontex advised Nike's counsel that Lontex had learned of Nike's detailed communications with potential witnesses, and asked whether Nike took the position that Lontex should disclose such communications while Nike "may contact third parties about this litigation without producing those communications." *Id.* For 3 months, Nike avoided the topic and produced nothing.

**B.**     **The five witnesses and declarations Lontex obtained in May through informal discovery**

On April 8, 2020, Keith Dugger—longtime head trainer for the Colorado Rockies—executed a declaration providing his knowledge of Lontex's use of COOL COMPRESSION. Wagner, Ex. 2. This testimony was consistent with the conversation Mr. Dugger had with counsel for Lontex on March 10, a conversation whose substance was relayed to Nike's counsel on a meet and confer call just moments later. Wagner ¶ 4.

Over a month later, in a span of just more than a week starting May 20, 2020, five more trainers executed declarations. Miller Ex. 11. Each trainer had been a trainer for one or more NFL and MLB professional teams since before Lontex had adopted the COOL COMPRESSION mark in 2018, including the Philadelphia Eagles, Baltimore Ravens, Minnesota Twins, and

Florida Marlins. *Id.* The three MLB trainers were members of PBATS, the leading trainer's organization for trainers of professional baseball teams, since prior to Lontex's adoption of COOL COMPRESSION. *Id.* at Kozak, Leo, Cunningham. Similarly, the two NFL trainers were a member of PFATS, the leading trainer's organization for trainers of professional football teams, since prior to Plaintiff's adoption of COOL COMPRESSION. *Id.* at Smith and Peduzzi. These five trainers were no longer with any MLB and NFL teams, having left their employ variously from 2016 to 2019. *Id.*

These five declarations were provided voluntarily by the declarants. Wagner ¶ 8. Lontex spoke to each about their relevant knowledge before draft declarations were sent in Word format for review and editing, and each was advised multiple times about the importance of accuracy. Decl. of Efraim Nathan in Support of Opposition ("Nathan Decl.") ¶ 3. The vast majority of the declarants in fact did have revisions to the draft declarations. Wagner ¶ 8. Only then did the declarants sign and return final declarations. *Id.* Contrary to Nike's suggestion, the notion of a trial subpoena (or any discovery device) was ***not*** raised with any of these declarants, and none were provided with trial subpoenas. Wagner ¶ 8.

The declarations provide sworn testimony consistently attesting to a number of facts:[1]

1.      Plaintiff's SWEAT IT OUT garments are effective at rehabilitation, exercise and recovery, and the trainers consistently had their pro team players use them;

2.      Since at least 2008, Mr. Nathan consistently presented the SWEAT IT OUT garments' COOL COMPRESSION stretch technology under the name "COOL COMPRESSION" at the annual PBATS and PFATS conference (respectively), at in-person interactions, at spring training and training-room visits (for MLB trainers), and on phone calls;

---

[1] Mr. Dugger's declaration covers somewhat less subject matter than the others, but does not contradict them. For example, his referenced time period for Lontex's use of the COOL COMPRESSION mark is "since at least prior to 2010" rather than "since at least 2008" and does not speak to trade channels or beliefs pertaining to confusion.

3.    Over this same time period, the SWEAT IT OUT garments have consistently had "COOL COMPRESSION" on the inside care label, with each declaring to the accuracy of a representative "COOL COMPRESSION" inside care label;

4.    The relevant personnel at the trainer's team regularly saw, held and discussed amongst themselves their team players' Nike and SWEAT IT OUT garments;

5.    Upon review of examples of Nike catalog, Nike.com and retailer "use of 'COOL COMPRESSION' in the product name for its compression tops and bottoms, each trainer believed "that Nike is using Lontex's COOL COMPRESSION technology in these compression garments." Declaration of Marc E. Miller re Motion for Sanctions ("Miller"), Ex. 11, p. 3.

On June 30, 2020, Lontex and Nike made a voluntary exchange of all declarations, and Lontex provided all six of these declarations. Wagner ¶ 9. Lontex had already provided the contact information for Keith Dugger on March 11, 2020, and Nike's exchange included a subsequent declaration it had obtained from Mr. Dugger. *Id.* ¶¶ 5, 10, Ex. 3; Miller, Ex. 4, p. 5. For the remaining declarants exchanged on June 30, Lontex provided their known phone numbers on July 2, 2020 (Lontex did not have known current physical addresses). Wagner ¶ 9.

C.    **The June 25 Letters Sent After Conversations with Jason Daffner, Esq.**

With sworn testimony from multiple witnesses validating Lontex's course of conduct for its SWEAT IT OUT garments with COOL COMPRESSION technology, Lontex sought to identify other potential trial witnesses who had trained during the relevant time frame for pro teams and were members of their respective PBATS and PFATS organizations.

As discussed at the March 13 hearing, Lontex's March 11 amended disclosures included a number of trainers for MLB and NFL teams that had provided pictures of inside care labels on SWEAT IT OUT compression garments prominently displaying the COOL COMPRESSION trademark. Miller, Ex. 4. The trainers provided these pictures to Lontex voluntarily, without any

compulsion, and at the time Mr. Nathan found the trainers to be quite cooperative and friendly. Nathan Decl. ¶ 4. As a byproduct of Lontex requesting further details from these trainers about the label images they had provided, Mr. Nathan received a call from Jason Daffner, Esq., an attorney who explained he was the general counsel for PFATS. Nathan Decl. ¶ 5.

Counsel for Lontex promptly called and spoke with Mr. Daffner on April 15, 2020. During this call, Mr. Daffner explained that the trainers were open to finding a way to coordinate the process of providing information relevant to this lawsuit. Wagner ¶ 10. He reiterated that the trainers were very appreciative of SWEAT IT OUT's longstanding involvement with PFATS and regarded Mr. Nathan highly. *Id*. Mr. Daffner voiced his understanding that if Lontex were seeking documentary evidence in the form of garment pictures, this would require involving the teams themselves rather than the individual trainers, since that would require going "into the locker room." *Id*. Mr. Wagner explained that this was not the case, and what Lontex wanted for this litigation was to confirm the details that each trainer had in their own head – their percipient knowledge. *Id*. Counsel for Lontex discussed with Mr. Daffner potential means of minimizing burdens on trainers, and Lontex's counsel reiterated that the goal with each trainer was to make the process of providing the details of what they knew as easy of a method as possible. *Id*. ¶ 11.

Counsel for Lontex explained to Mr. Daffner that an MLB trainer (Keith Dugger) had provided a sworn declaration concerning the same details which Lontex was seeking from other trainers and proposed the concept of a customizable form declaration that Mr. Daffner, as general counsel for PFATS, could circulate to trainers. Wagner ¶ 11. The two discussed such concept further over the next week. *Id*.

But ultimately, by the beginning of May, Mr. Daffner advised that he had consulted further with PFATS leadership and that Lontex should obtain testimony from each individual team trainer directly. Wagner ¶ 12. Mr. Daffner again reiterated that the trainers very much liked

and appreciated Mr. Nathan, but that a coordinated process was not practical and that each trainer should be contacted and information sought on an individual basis. Wagner ¶ 13. Mr. Daffner also said that—even if it was just percipient knowledge of the individual that was sought—some may find the need to run details by their team counsel first, before providing a declaration or other form of testimony. *Id*. He advised counsel for Lontex to include a subpoena in contacting the trainers. *Id.* ¶ 12.

Lontex then proceeded to follow Mr. Daffner's instruction. Lontex's co-counsel Mr. Wagner and Mr. Schwartz discussed next steps in light of Eastern District of Pennsylvania practice and Mr. Daffner's direction, and prepared a draft form cover letter to trainers and trial subpoena to accompany a proposed declaration. Wagner ¶ 14.

Identifying the trainers who were potential trial witnesses was no easy task. These trainer groups were groups that Lontex had been presenting to and working with since the early 2000s and were incredibly valuable to its business. Nathan Decl. ¶ 6. Lontex sought to minimize burden. Thus, Lontex limited itself to teams that repeatedly purchased SWEAT IT OUT garments, which teams were parsed out from the sortable spreadsheet of all Lontex sales which had been produced to Nike on January 23, 2020. Wagner ¶ 15. Lontex limited itself to the trainers on those teams who were with those teams for at least some of the years during which those purchases were made. *Id*. This parsing was done painstakingly with the aid of researching PFATS and PBATS' publicly-accessible online directories. *Id*.

Notably, neither party had a shortage of such information. Lontex had produced many of its lists of PFATS and PBATS trainers in its early second production in this case, which included contact information for each individual trainer. Wagner ¶ 16. Lontex's July 2, 2019 interrogatory responses identified athletic teams and industry associations as examples of its channels of trade, including athletic trainers associated with athletic teams, and explained that its advertising,

marketing and promotional activities of the COOL COMPRESSION brand included "direct meetings" with these people. *Id.* ¶ 17. It was the topic of multiple depositions, and both Lontex and Nike had Mr. Nathan's repeated deposition testimony that pro team trainers were key purchasers of Lontex's product. *E.g.* Wagner ¶ 18 Ex. 4 503:10-16, 504:5-15. Lontex's March 11 initial disclosures listed a set of eight PBATS and PFATS trainers. Miller Ex. 4. Mr. Nathan's March 12 deposition went into detail about his regular interactions with PBATS and PFATS trainers and their teams' history of purchases. Wagner Ex. 6 pp. 911-912, 915-918, 920, 962-963 (PBATS), 954-955, 998-999 (PFATS).

Every effort was made to minimize the burden on these potential trial witnesses. With its researched subset of potential additional trial witnesses, Lontex's counsel sent this subset of 63 trainers the June 25 Letters. Wagner ¶ 22, Ex. 7; ¶ 29, Ex. 11. The June 25 letters accurately identified the case details and advised of the then-current November 2, 2020 trial pool date and included a trial subpoena with a request to voluntarily accept service. Wagner ¶ 22; Ex. 7. The June 25 letters were sent 4 months *before* the trial date, averting any sense of crisis and allowing for any necessary accommodations to play out. Wagner ¶ 23.

Each June 25 letter then went on to explain that every effort was being made to "make this as easy of a process as possible." Each letter explained Lontex could "arrange to take a video recorded trial deposition (*likely by Zoom*) at a location within 100 miles of where you live/work sometime before November 2, 2020." Wagner ¶ 22; Ex. 7.

Also, greatly minimizing potential burden on the potential trial witness, for each trainer a customized declaration had been drafted using the details from the sworn declarations already provided by 4 MLB trainers and 2 NFL trainers, the trainer's bio, and Lontex's January 23, 2020 sales spreadsheet. Wagner ¶ 21. Each letter attached a draft declaration for that trainer *in Word format*, and explained the declaration was "based on what we understand about your knowledge

of the relevant facts," and that if the trainer was "willing to sign this declaration (with whatever modifications you would like to make the declaration complete and accurate)" then there was a "chance that you will not be needed as a trial witness." *Id.* ¶ 22 & Ex. 7.

On June 30, 2020, PFATS' general counsel, Mr. Daffner, called counsel for Lontex. Wagner ¶ 24. Mr. Daffner explained that he had been provided a number of these letters, and it appeared that another attempt to coordinate trainers might be underway. *Id.*

REDACTED

Miller Ex. 10, p. 3.

Also that day, just prior to Mr. Daffner's PFATS trainer conference call, Mr. Daffner spoke with counsel for Lontex. Wagner ¶ 24. Mr. Daffner stated he wanted to make sure that he understood the proposed process. *Id.* He suggested that the deposition route might actually be the most efficient method since Nike might have questions to ask, too. *Id.* Counsel for Lontex suggested that if each trainer settled on a declaration stating the facts as they knew them, if trial went forward and trial depositions ultimately were necessary, Lontex envisioned them being incredibly efficient and short using a remote Zoom deposition platform in light of COVID-19 for convenience and timing of the witnesses. *Id.*

REDACTED

(Miller Ex. 10), it at no time before filing this Motion for Sanctions requested such basic list from Lontex. Wagner ¶ 25.

None of the trainers receiving letters from June 25, 2020 onward have felt pressured.

Prior to the June 25 Letters, Lontex readily obtained voluntary declarations from five trainers no longer with their Nike-sponsored organizations. In contrast, for the active trainers who received the June 25 Letters, Lontex has been virtually shut down in obtaining testimony from these potential trial witnesses, demonstrating Nike's influence on the MLB and NFL, not surprising given that Nike is an exclusive sponsor of both organizations.

The reasons are varied but the net effect is consistent. One trainer spoke with Mr. Nathan by phone on July 16, 2020, explaining that everything said in the draft declaration was 100% true but that he did not have the authority to sign it and would lose his job if he did. Nathan Decl., ¶ 7. Another trainer returned a signed declaration that crossed out everything potentially damaging to Nike's legal position in this case. Wagner ¶ 26; Ex. 8. Eight team counsel have contacted counsel for Lontex, without one resulting declaration and only one indicating a potential willingness to accept service of subpoena. Wagner ¶ 27. **REDACTED** Miller, Ex. 10.

As of this filing, Lontex received three signed trainer declaration in response to all of the June 25 letters, one retaining most content from the draft declaration, one with a large section of the draft declaration omitted, and one mostly crossed-out declaration. Wagner ¶ 28; Exs.8-10.

## II.   **LEGAL STANDARD**

Nike stylized this as a motion for sanctions. In framing the Court's authority, Nike's statement of legal standards deals exclusively with asserted misuses of FRCP 45 subpoena power, absent a single general reference to *Chambers v. NASCO*, 501 U.S. 32, 44-46 (1991).

The Federal Rules of Civil Procedure require that Lontex "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." FRCP 45(d)(1). Contrary to Nike's claims that it should have received advance notice of the trial subpoenas, no document request was included, so these subpoenas did not require prior notice. FRCP 45(a)(4).

And, even if Lontex should have given Nike notice or if Lontex should have issued the subpoenas from the Courts in the Districts where the potential trial witnesses resided, "[m]ere violations" of a discovery obligation are generally addressed through things like admonishments or the like. *Coleman-Hill v. Governor Mifflin Sch. Dist.*, 271 F.R.D. 549, 552 (E.D. Pa. 2010). More "severe" sanctions such as attorneys' fees only may be imposed for parties acting "in bad faith, vexatiously, wantonly or for oppressive purposes." *Id.*

And "the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Id.* quoting *Quinn v. Consol. Freightways*, 283 F.3d 572, 576 (3d Cir. 2002). At least four factors "must" be considered for exclusion sanctions: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which  allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *Id. quoting Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000). "Courts should also consider the importance of the excluded evidence in making its decision." *Id.* citing *Quinn*, 283 F.3d at 577.

## III.   ARGUMENT

### A.   There is No Basis to Seek Sanctions for the Declarations of Peduzzi, Cunningham, Smith, Leo and Kozak

Lontex did nothing wrong in locating the five additional witnesses Peduzzi, Cunningham, Smith, Leo and Kozak, obtaining their voluntary sworn declarations in May with no use or suggestion of trial subpoenas, and disclosing these witnesses and their declarations on the agreed June 30 exchange date. And, no factors warrant excluding these witnesses and their testimony.

Nike's Motion for Sanctions is based on an alleged misuse of FRCP 45 subpoena power.

*See* Mtn. §2. But such concerns are irrelevant to these five declarations. No proposed trial subpoena was provided or suggested, and the declarations were entirely voluntary. Wagner ¶ 8.

Lontex acted appropriately in seeking out these additional witnesses, obtaining their declarations and exchanging their identities and declarations with Nike on June 30. Lontex followed the Court's March 13 directive that both sides may search out and identify additional witnesses. Such directive contained no restriction on obtaining declarations prior to adding the witnesses to a party's disclosed witness list, and this process was followed by *both* parties in obtaining and exchanging customer declarations on June 30.[2]

While Nike has shown no legally-mandated process for obtaining witness declarations, Lontex's process was reasonable and appropriate. Lontex contacted these five individuals in the second half of May 2020 to inquire as to their relevant percipient knowledge and, having confirmed that knowledge, obtained declarations of the relevant facts. That attorneys participated in the drafting of the declarations is nothing shocking, and in fact Nike utilized a form declaration of its own with largely standardized content for multiple trainer declarations, including two trainer declarations Nike sought in May and June.[3]

Such memorializing of witness testimony in declarations does not "taint" such witness, (Mtn. 21), but rather amply frames the declarant's relevant testimony for Nike. All were advised multiple times how important accuracy was to their declarations, and the majority of these witnesses further edited their declarations before signing. Wagner ¶ 8; Nathan ¶ 8. Regardless, concerns over witness influence go to weight or credibility, not outright refusal to admit testimony. *Cf. Harker v. Maryland*, 800 F.2d 437, 442 (4th Cir. 1986) (even in a situation with

---

[2] Nike exchanged May 29 and June 8 declarations from individuals at Alert Services and School Health Services, customers of Lontex that neither party had included in their initial disclosures.

[3] The draft declaration Nike counsel provided to trainer Rick Fcasni shares 11 nearly-verbatim paragraphs (out of 15 total) with the separate declaration that Nike obtained from trainer Keith Dugger. *See* Wagner Ex. 3 & Nathan Ex. 1 at (Paragraphs 1-5, 8, and 12-16).

something a bizarre as prior use of hypnosis with a witness with its "possibility of suggestiveness," such prior use of hypnosis on a witness goes to the weight to be given his testimony rather than its admissibility").

With these considerations in mind, unsurprisingly, the factors required for a sanction involving exclusion overwhelmingly *disfavor* Nike's motion: (1) Nike has no prejudice or surprise at trial (or summary judgment) because the declarations were given many months before either, (2) any prejudice Nike perceives is appropriately addressed through challenges to the weight of witness testimony rather than its exclusion, (3) the five declarants will not disrupt orderly trial as no trial details have yet been arrived at and trial is still months away, and (4) there was no violation of a court order or discovery obligation by Lontex. And, exclusion of critical testimony is highly disfavored – these witnesses' proffered testimony go to many of the key *Lapp* trademark infringement factors (e.g. mark strength, continuous use, overlapping channels, and confusion). *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

The Court's reasoning in refusing Nike's request to exclude 8 trainer witnesses disclosed just prior to the March 13 hearing applies equally here: "But you may – you may find more witnesses the day before trial. You may have a very good reason why you didn't find them beforehand. And I may allow that. So we're still in discovery. I'm not going to prohibit them from adding witnesses. I'm not going to prohibit either one of you from adding witnesses." 2020-03-13 Transcript 14:16-17 [ECF 158] .

In sum, these five declarations were obtained by doing exactly what the Court authorized at the March 13, 2020 hearing – contacting customers to identify those with relevant percipient knowledge that could serve as potential trial witnesses. The testimony of these witnesses has been supplied far in advance to Nike. No sanctionable conduct has occurred, and the sanctions request pertaining to these five witnesses should be denied.

**B.** **No Sanctionable Conduct Occurred with the June 25 Letters**

       1.     The Letters with Trial Subpoenas and Proposed Declarations in Word Format Were Not "Sham," And Did Not "Serve an Improper Purpose" or Cause "Undue Burden"

             a.     The letters did not coerce and deceive trainers into signing declarations.

Nike claims the letters were designed to "coerce" trainers to sign "factually inconsistent" declarations, given the choice to sign the declaration as-written or "appear at trial." Mtn. 15, 17. The June 25 Letters do nothing of the sort.

The actual trainer reactions to the June 25 letters undermine any claim of coercion or duress. If such allegation were reality, Lontex would have received a stack of signed declarations back. Instead, from 63 letters Lontex received only three declarations, two of which had been substantially edited. Wagner, ¶ 26, Ex. 8; ¶ 28, Exs. 9, 10. Instead of coercing trainers, eight team counsel have contacted counsel for Lontex, without one resulting declaration and only one indicating a potential willingness to accept service of subpoena. Wagner ¶ 27.

Also undermining Nike's claim of coercion is the fact that Lontex sent the June 25 letters after an extended dialogue with counsel for the trainers' association, and only when Mr. Daffner directed that Lontex should reach out directly to each trainer to obtain the relevant information and include a subpoena with the draft declarations. Wagner ¶ 12. The June 25 letters were sent under the understanding that the trainers wanted to be cooperative in providing relevant information, and simply need the right process to do so.

Adding to these critical details, a fair reading of the brief six-paragraph letter shows it is just as straightforward, logical and accurate as it was intended:

*First*, the letter correctly identifies the case and the scheduling order's then trial pool date, sticking to the facts and not varied hypotheticals. Wagner, Ex. 7.

*Second*, the letter explains Lontex's understanding that the trainer has relevant information. Lontex's understanding were based on carefully researching that each trainer's station for the relevant years, a station that had allowed six other trainers to previously declare to relevant facts. Wagner, Ex. 7.

*Third*, the letter identified an attached trial subpoena and accurately conveyed the trainer's options with respect to the request to voluntarily accept service or the potential service of the subpoena. Wagner, Ex. 7. Providing the trial subpoenas far in advance of trial was advisable to avoid last-minute procedural problems for trial and crises for trainers.

*Fourth*, the letter explains the trainer's full control over the process and did not "deceive" trainers to believe that during COVID-19 "they would be hailed to court in Philadelphia on November 2, 2020." Mtn. 19. The letter contains an entire paragraph explaining "you live and work more than 100 miles from Philadelphia" and thus at the trainer's election "***we can arrange to take a video recorded trial deposition (likely by Zoom) at a location within 100 miles of where you live/work sometime before November 2, 2020***." Wagner, Ex. 7. When counsel for Lontex and Mr. Daffner spoke just before Mr. Daffner's call with PFATS trainers, counsel for Lontex again reiterated these details about a simple remote Zoom testimony on any date the trainers selected. Wagner ¶ 24.

*Fifth*, the letter explained the option of providing a declaration. The option of a declaration was discussed with Mr. Daffner repeatedly well before the letters were ever sent. Wagner ¶ 11. As discussed later, the proposed declarations were consistent with substantial evidence adduced to-date, albeit this substantial evidence is at odds with Nike's litigation narrative. *See infra* p. 19. And Lontex carefully selected trainers with stations that naturally made them witness to the broad relevant facts. Wagner ¶ 15.

The letters aren't written to deceive or coerce trainers and absolutely had no such effect.

b.  Proposing trial depositions was proper and consistent with the Court's March 13 Order

Nike suggests that proposing trial depositions was improper because the Court had only "allowed for the possibility of trial depositions for [the] limited purposes of authenticating certain Lontex products labels."  Mtn. 15-16.

Not so.  Rather, the topic of trial subpoenas may have arisen in the context of authenticating customer images, but in no way did Lontex or the Court purport to limit trial depositions to only this one topic. 2020-03-13 Transcript 62:12-63:18 [ECF 158].  To the contrary, after explaining to Nike's counsel the usefulness of trial depositions, the Court stated its intention that at some point it would "enter an order" requiring both parties to identify by name and title "witnesses who may be called as trial witnesses" and, if they were unwilling to come to Philadelphia, that the party "seek to take a trial deposition."  *Id.* 65:20-66:5.

Nor can Nike's out of circuit *Revander* case be squared with the March 13, 2020 hearing. Mtn. 15. Nike cites *Revander v. Denman*, No. 00 Civ. 1810 (RJH), 2004 WL 97693, at *1 (S.D.N.Y. Jan. 21, 2004) for the proposition that "had Lontex wished to rely on their testimony, it should have issued Fed. R. Civ. P. 45 deposition subpoenas during the discovery period."  The idea that all potential witnesses must be deposed during the discovery period rather than obtaining declarations and/or serving trial subpoenas is fundamentally inconsistent with this Court's recognition that trial depositions "conserve energy and conserve expenses and so forth *until you know that a trial is ready*."  2020-03-13 Transcript 66:20-23 [ECF 158].

Thus, comporting with Rule 45's instruction to avoid "undue burden or expense," the June 25 letters appropriately suggested the burden-avoiding convenience of trial depositions.

c.      Rule 30's deposition limits do not undermine Lontex's good faith in proposing trial depositions[4]

Nike asserts that Lontex ignored the presumptive 10-deposition limit of FRCP 30 by proposing trial depositions. Mtn. 19-20. This argument fails on multiple fronts.

*First*, Lontex was free to propose this alternative to having witnesses appear in person, and Nike cites no case law that the mere offer of an efficient trial deposition in lieu of live trial testimony itself constitutes a violation on any numerical deposition limit. No deposition subpoena had been issued. And, no trial depositions have been scheduled. Wagner ¶ 28.

*Second*, and importantly, Nike's position that each proposed trial deposition should be treated as an actual discovery deposition is inconsistent with the March 13, 2020 Hearing. As of that hearing, Nike already had taken its 10 discovery depositions, while Lontex had (and still has) multiple depositions left before reaching 10 depositions. Wagner ¶ 3. Yet, Nike requested the right to depose the 8 newly-identified trainers who had produced garment labels, without any mention of the numerical limit. 2020-03-13 Transcript 66:10-12 [ECF 158] Similarly, Lontex, Nike and the Court each discussed trial depositions of such trainers, again without either party raising the numerical limit of 10 discovery depositions found in FRCP 30. *Id.* at 63-66.

Clearly not all depositions including trial depositions go toward the Rule 30(a)(2) limit on discovery depositions, and trial depositions accomplish the different purpose of that party's right "to present his witnesses," so discovery limits have "no bearing on [that] need, or his right, to have the jury hear [such] testimony." *See Charles v. Wade*, 665 F.2d 661, 664 (5th Cir. 1982) (discovery deadline was not basis for denying trial deposition; "the distinction is a valid one").

---

[4] Nike also contends the subpoenas were issued from the wrong Court. Mtn. 19-20. The issue is far from clear. This Court is the Court with a general practice in favor of trial depositions and responsible for managing the efficiency of trial. Trial testimony in which remote presentation is a potential (given COVID-19) implicates multiple locations. However, for any later trial subpoenas actually served for trial witnesses to testify at their remote locations, Lontex is more than willing to issue them from the witness's home district as counsel for Lontex explained to multiple team counsel. Wagner Decl. ¶ 27.

While Nike cites to *Melore v. Great Lakes Dredge & Dock Co.*, 1996 U.S. Dist. LEXIS 14003, \*9 (E.D. Penn. Sept. 20, 1996) for the proposition that Rule 30(a)'s numerical deposition limits do not distinguish between discovery depositions and trial depositions. But, quite the opposite of Nike's assertion, the case interpreted Rule 30 so as to reject the notion that trial depositions could not be used at trial in lieu of testimony – hardly a ruling in favor of using Rule 30(a)(2)'s numerical limit to restrict trial testimony, simply because that testimony is recorded in the form of a trial deposition.

*Third*, Nike's fundamental misunderstanding is that Lontex was somehow trying to strong-arm unwilling witnesses and designed a letter with attachments that had this effect. To the contrary, Lontex's understanding as confirmed by Mr. Daffner was that the trainers were amenable to providing testimony and simply needed the right mechanism to do so. Wagner ¶ 14; Nathan ¶¶ 5, 8]. Providing the draft declarations (in Word format based on sworn testimony of trainers in the same station as the potential witnesses) and trial subpoenas (noting likely availability of a Zoom trial deposition) provided the trainers two convenient mechanisms to voluntarily do so. <span>REDACTED</span>. Miller, Ex. 10.

Thus, including trial subpoenas and advising of the convenience of a trial deposition "at a location within 100 miles of where you live/work sometime before November 2, 2020" was a proper, reasonable, and appropriate proposal made in a good faith effort to avoid undue burden and expense to these potential witnesses.

### d.  These are not "surprise" last-minute trial witnesses

Trial is not here, nor is the discovery cutoff. It is not a "surprise" or "last minute" to have more witnesses added. Mtn. at 16 quoting 2020-03-13 Hearing at 64:25-65:3. But Nike persists in claiming Lontex "never disclosed" these individuals, asking: "How can that be?" Mtn. 16-17.

The simple answer is that Lontex provided its full customer sales list since 2006 to Nike, and these trainer names and contacts are littered across them. Wagner ¶ 22. Lontex provided Nike with its full lists of PBATS and PFATS trainers and contacts early on, and emphasized the role of such trainer organizations both in its interrogatory responses and in depositions. *Id.* ¶ 16.

Prior to March 13, 2020, for business relationship reasons, Lontex pursued a strategy of minimal customer contact, and fought to have Nike honor this same limit. Wagner ¶ 3. But as of the March 13 hearing, the Court lifted all restrictions on customer contacts and instructed both parties that they were free to continue seeking out additional witnesses. ECF 158 at 13:15-21. Thus, Lontex changed course and sought out a broader set of potential trial witnesses.

Thus, after contacting former team trainers who freely provided declarations, Lontex's counsel completed the arduous work product of comparing PBATS and PFATS biographical information against the records of sales to teams contained in the sales spreadsheet produced to Nike, to identify a subset of trainers that had been both in a position to observe Mr. Nathan's annual conference presentations and also to have had sufficiently regular contact with their team's SWEAT IT OUT and NIKE garments over the year so as to have personal knowledge of the relevant facts. Wagner ¶ 15. Nike's counsel was free to do the same thing, but did not.

2.     Nike Has Not Been Prejudiced by the June 25 Letters

Nike fails to demonstrate any improper conduct by virtue of Lontex's June 25 Letters, let alone sanctionable conduct. But beyond this, each of Nike's claims of prejudice also fail:

*First*, Nike claims the June 25 Letter recipients have been tainted by misleading and suggestive declarations that go way too far. Not so. The draft declarations enclosed with the June 25 Letters track the sworn declarations of multiple NFL and MLB trainers in the same stations as the letter recipients.

*Second*, Nike claims it is highly prejudicial that these trainers received draft declarations stating facts inconsistent with evidence Nike intends to rely upon, namely evidence of Lontex's written materials which it believes casts doubt on the extensiveness of Mr. Nathan's oral use of "COOL COMPRESSION." Mtn. 20. But Lontex has a host of direct evidence of just such longstanding extensive oral use. Six uncoerced uninterested, unrelated, uninterested declarants corroborate it. And while Nike questions it, Mr. Nathan has provided the logical explanation for this dichotomy: While the COOL COMPRESSION mark works particularly well in Lontex's business for face-to-face meetings ("like a movie"), certain print materials lend themselves particularly well to descriptive phrases like "TRUE COMPRESSION." Wagner, Ex. 4 at 504:5-18; Ex. 6 at 966:11-967:17.[5] █████████████ REDACTED █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ Miller, Ex. 10. Instead, Mr. Daffner suggested it advisable to respond "with a revised declaration," the same suggestion made in the June 25 Letter for any potential witness who wanted to make such changes to the draft declaration. *Id.*

*Third*, Nike claims prejudice from not knowing "the identity" of the trainers receiving the June 25 Letter. To cure any such potential prejudice, which Nike had not previously raised, Lontex produced a list of all trainers receiving the June 25 Letters, so this issue is moot. Wagner, ¶ 29, Ex. 11. Despite the list's length, notably it has resulted in only a modest *three* declarations.

*Fourth*, Nike claims prejudice by alleging Lontex "tainted the memories" of the June 25 Letter recipients by including a draft declaration with a proposed set of facts. As noted above, Nike's concerns of suggestibility will be tested through cross-examination and go to the

---

[5] Mr. Nathan further testified that Lontex stepped up its print use of COOL COMPRESSION in print *after* learning Nike had flooded the market was a mitigation effort to gain back the "credibility" of its mark that Nike had taken. Wagner ¶ 19 Ex. 5 at 88:12-89:20.

evidence's weight and credibility, not admissibility. Such issues of credibility are routine and present no unfair prejudice to Nike. Were Nike's logic sound, then the mere use of a deposition preparation session would prejudicially "taint" a deponent and require excluding their testimony.

*Finally*, Nike argues prejudice from having been kept from such trainers before Lontex's June 25 letters. Lontex did no such thing. Nike has had the ability to speak with all PFATS and PBATS trainers since March 13, given Mr. Nathan prominently emphasized their importance in his depositions the day before the hearing. Wagner, Ex. 6. Lontex's inclusion of 8 NFL and MLB trainers in Lontex's March 11 amended initial disclosures removed any doubt. Miller, ¶ 30, Ex. 7. Again, these trainers have largely ignored Lontex's requests for voluntary cooperation, and Nike has now been given a full list of recipients of the June 25 Letters, further undermining Nike's claim of prejudice. Wagner, ¶ 29, Ex. 11.

Nike has failed to establish any valid form of prejudice, let alone sufficiently drastic prejudice to suggest that a harsh exclusion order of the June 25 Letter recipients would be an appropriately-tailored remedy. The three witnesses that have come from these Letters to-date are a small and manageable number, and nothing Lontex did justifies excluding these witnesses.

3. No trainers receiving the June 25 Letters (including the 3 that have provided declarations) should have their testimony excluded

In response to the June 25 Letters, Nike suggests an Order prohibiting Lontex from using any of the documents, testimony, or declarations obtained from any "undisclosed" athletic trainers, including but not limited to the 40 or more recipients of the June 25 Letters.[6] Nike has established no sanctionable conduct as to the June 25 Letters, but even assuming arguendo to the contrary, none of the relevant factors support any such sanction:

---

[6] The May 2020 declarations obtained without any such letter are addressed in Section I.B above.

No willful deception or flagrant disregard of court order: Lontex's sending of the June 25 Letters was not willful deception or a flagrant disregard of a court order. The letters were sent at the direct suggestion of the general counsel of one of the trainers' associations to reach out to each trainer directly, Lontex utilized declarations tracking sworn declarations already received from trainers in the same station, and the letters sought relevant testimony through the least intrusive means. Although Nike attempts to argue a violation of court orders, as shown above, no court order was violated.

No prejudice or severe prejudice: Nike's "prejudice" is absent. The letters were overwhelmingly ignored by recipients, resisted by those who did respond, and resulted in one full declaration, another that omitted any testimony on the trainer's confusion, and another even more heavily crossed-out declaration. As set out in the previous section, there is no prejudice.

No trial disruption: Trial is still many months out, and Nike brought this Motion with plenty more time left in discovery. There has been no suggestion as to how the proposed excluded testimony would disrupt the orderly and efficient trial of the case. And, the declarations received provide the parties and Court with even more alternatives in streamlining pretrial motion practice and the eventual trial.

No bad faith or willful violation of order: Lontex has explained its conduct, and were the Court to find any fault in such conduct, nothing rises to the level of a bad faith or willful violation of a court order or discovery violation. This is an important case to Lontex – perhaps the fight of its life – and it and its counsel have endeavored to operate well within the rules. Lontex took a reasonable course of action to identify the subset of customers and relevant customer contacts it wished to pursue as potential trial witnesses in light of the March 13, 2020 Order permitting as much. Lontex promptly agreed to Nike's suggestion of exchanging declarations, and quite frankly intended to produce its declarations anyhow. Wagner ¶ 9. Nike

suggests that what it views as technical violations are something more than that, but they are not.

The challenge testimony is crucially important:  As noted above with respect to the five May declarants, any witnesses identified through the June 25 Letters provide crucially important testimony on many of this trademark case's key *Lapp* factors. *See above* p. 13. This factor weighs strongly against exclusion. *Coleman-Hill*, 271 F.R.D. at 552 citing *Quinn*, 283 F.3d at 577.

The factors overwhelmingly weigh against exclusion of any trainer at this time.

### C.    The Other Requested Sanctions Should Also Be Denied

*First*, Nike seeks an Order requiring Lontex to disclose the subpoenas it has issued. But FRCP 45 requires no such disclosure for no-document subpoenas. Nevertheless, once such list was requested in Nike's Motion, Lontex voluntarily disclosed its list, which solely includes certain PFATS and PBATS trainers. Wagner, ¶ 29, Ex. 11. Lontex made a similar disclosure to PFATS' attorney immediately upon request. *Id.* ¶ 25. Thus, this proposed sanction is moot.

*Second*, Nike seeks an order requiring Lontex to "disclose and produce to the Court and to NIKE any other subpoenas issued or documents, communications, testimony, declarations or other discovery that Lontex has procured from any other parties and non-parties since March 13, 2020 to present."  To the extent Nike intends the request to include disclosure untethered to the June 25 Letters, it is overbroad and has no tether to Nike's complaints. As worded, it would appear to include every business record or email of Lontex's since March 13, 2020. It also would include privileged communications. And since Lontex and Nike are the "parties" here, including "discovery that Lontex has procured from any *other parties* and non-parties" makes no sense.

This second sought remedy seems to be instead tethered to the disclosure of communications, documents or declarations exchanged with potential fact witnesses, particularly customers / trainers. However, Lontex repeatedly proposed the parties consider reciprocal

exchange of all such communications, which Nike has outright ignored. Wagner ¶¶ 6, 7. Nike had communications with at least Keith Dugger, Sean Fcasni, School Health, Alert Services, and Craig Soon, not to mention any further communications it had with other trainers, customers or potential witnesses. *Id*. ¶ 7 Nike produced none of its communications with these customer witnesses, including the draft form declarations it sent to them. Thus, unless and until Nike agrees to a level playing field where it will produce such documents from whichever Nike representative has them, there is no basis to suggest such disclosure is appropriate or would somehow cure prejudice unique to Nike.

*Third*, Nike seeks relief in the event Lontex claims it has not conducted additional extra-judicial discovery, but this is irrelevant as Lontex is not so claiming.

*Fourth*, Nike seeks a prohibition on Lontex issuing further subpoenas without the Court's pre-clearance. This relief goes beyond FRCP 45, which requires no prior Court approval to issue subpoenas. Nike has supported its request with no authority providing similar relief. To the contrary, Nike points to a single series of subpoenas issued for a discrete purpose to PBATS and PFATS trainers. Once Nike raised its concerns through this Motion, Lontex provided its list of subpoenaed parties to Nike. Wagner ¶ 29. Had Nike been concerned with stopping Lontex's challenged conduct, it could have promptly advised Lontex, rather than taking weeks to prepare this Motion in silence. Thus, Nike has suggested no repeat reasons for concern, nor basis to impose special rules upon Lontex that Rule 45 does not impose. Even if the Court believes that the June 25 Letters were somehow improper, this is not a one-strike-your-out situation.

These other sanctions suggested by Nike should be denied.

### D.   Nike's Request for Attorneys' Fees and Costs Should be Denied

Nike seeks an award of attorney's fees and costs. The conduct here involves both parties working to identify and secure testimony from Lontex's customers consistent with the Court's

March 13 rulings. Such a "severe" sanction as fees and costs generally requires a party acting "in bad faith, vexatiously, wantonly or for oppressive purposes." *Coleman-Hill*, 271 F.R.D. 549, 552 (E.D. Pa. 2010). Such inherent power to impose fee sanctions should be invoked "sparingly and under limited circumstances where misconduct is clear," generally reserving it "'for those cases in which the conduct of a party or an attorney is egregious.'" *U.S. Info. Sys. v. IBEW, Local Union No. 164*, 2011 U.S. Dist. LEXIS 123682, *3-4 (D.N.J. Oct. 25, 2011) citing *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995). Such sanction power warrants "restraint and caution." *Id.* quoting *In re Prudential*, 278 F.3d 175, 181 (3d Cir. 2002). Nothing of the sort attends Lontex's conduct here, as already addressed above.

*First,* Lontex's informal discovery of five trainers Peduzzi, Cunningham, Smith, Leo and Kozak and identification of them along with the exchange of their declarations was done without any suggestion of a trial subpoena and simply located additional witnesses as the Court instructed both parties could at the March 13 hearing. That both parties proceeded to seek out additional witnesses from Lontex's disclosed customer list shows no bad faith, vexation, or wanton discovery abuses.

*Second*, Lontex's June 25 letter was sent out after consulting with the attorney for one of the trainer's associations, Mr. Daffner, and the letters' content and intent had no derogative purpose. The sending of the June 25 Letter constituted no blatant violation of a court order, and the trainers have suffered no undue burden by receipt of letters pursuing the convenient securing of relevant trial testimony. And, Nike's concern of prejudice are overstated and undermined by how trainers actually responded to the letters.

In no event should the small family company of Lontex seeking to vindicate its rights in this very important case be paying Nike's fees or costs for racing to file this Motion.

## IV.    CONCLUSIONS

For all of the foregoing reasons, Nike's Motion for Sanctions should be denied.

Dated:    July 31, 2020                          TROUTMAN PEPPER HAMILTON
                                                 SANDERS LLP


                                    By: /s/ *Ben L. Wagner*
                                    Ben L. Wagner (CA SBN 243594)
                                    ben.wagner@troutman.com
                                    *Admitted Pro Hac Vice*
                                    11682 El Camino Real, Suite 400
                                    San Diego, CA  92130-2092
                                    Telephone:   858.509.6000
                                    Facsimile:    858.509.6040

                                    Michael A. Schwartz (PA 60234)
                                    TROUTMAN PEPPER HAMILTON
                                    SANDERS LLP
                                    3000 Two Logan Square
                                    Eighteenth & Arch Streets
                                    Philadelphia, PA 19103-2799


                                    *Attorneys for Plaintiff*
                                    LONTEX CORPORATION

109060122v11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2020, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Ben L. Wagner*
Ben L. Wagner

109060122v11