**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION,<br>Plaintiff,<br><br>v.<br><br>NIKE, INC.,<br>Defendant. | Civil Action No.: 18-cv-5623<br><br>(Hon. Michael M. Baylson)<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT NIKE, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SANCTIONS**

**TABLE OF CONTENTS**

**Page**

I. Response to Lontex's Relevant Background ..... 1

A. The Court Did Not Authorize Lontex's Conduct ..... 2

B. NIKE's Conduct Since March 13, 2020 ..... 4

C. Mr. Daffner Did Not "Collaborate" With Mr. Wagner and Did Not Instruct, Direct, or Otherwise Suggest Lontex's Course of Conduct ..... 5

II. Argument ..... 6

A. Lontex Violated the Federal Rules and this Court's Orders ..... 7

B. Lontex's Conduct Severely Prejudices NIKE ..... 10

C. Lontex's Conduct Warrants Sanctions and All of the Requested Relief ..... 12

1. All of the false and misleading declarations should be excluded ..... 12

2. Lontex should disclose all subpoenas and communications ..... 13

3. Lontex should swear that it has not conducted any further extra-judicial discovery ..... 14

4. Lontex should pre-clear any additional trial subpoenas ..... 14

5. Lontex should pay NIKE's fees and costs for the Motion ..... 14

III. Conclusion ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arconic Inc. v. Novelis Inc.*,
2018 WL 6732992 (W.D. Pa. Nov. 6, 2018) ....................8

*Chrysler Int'l Corp. v. Chemaly*,
280 F.3d 1358 (11th Cir. 2002) ....................8

*Coleman-Hill v. Governor Mifflin Sch. Dist.*,
271 F.R.D. 549 (E.D. Pa. 2010)....................14, 15

*In Integra Lifesciences I, Ltd. v. Merck KGaA*,
190 F.R.D. 556 (S.D. Cal. 1999) ....................9

*Lujan v. Cabana Mgmt., Inc.*,
284 F.R.D. 50 (E.D.N.Y. 2012)....................8

*Melore v. Great Lakes Dredge & Dock Co.*,
1996 WL 548142 (E.D. Pa. Sept. 20, 1996) ....................8

*Mid-Atl. Constructors Inc. v. Stone & Webster Const., Inc.*,
231 F.R.D. 465 (E.D. Pa. 2005)....................14

*Muldrow v. Brooks*,
34 F. App'x 854 (3d Cir. 2002) ....................8

*Nicholas v. Pennsylvania State Univ.*,
227 F.3d 133 (3d Cir. 2000)....................12

**Statutes**

28 U.S.C. § 1927....................15

**Other Authorities**

8A Fed. Prac. & Proc. Civ. § 2053 ....................10

Fed. R. Civ. P. 1....................10

Fed. R. Civ. P. 26....................3, 7, 10, 11, 12

Fed. R. Civ. P. 30....................8, 10, 12

Fed. R. Civ. P. 45....................9, 14

## I. RESPONSE TO LONTEX'S RELEVANT BACKGROUND

NIKE provides the following response to Lontex's relevant background because the accurate factual context is necessary to understand the depth of Lontex's misconduct.

**Two Key Issues**: Two key issues in this case are (1) whether Lontex abandoned the asserted COOL COMPRESSION marks between 2008 and 2016 and (2) whether NIKE's alleged use of "cool compression" was likely to cause consumer confusion. The record developed through more than 9 months of discovery is devastating to Lontex's case on both points. First, the record is clear that there was no actual confusion and no likelihood of confusion, as shown by NIKE's two consumer studies. Lontex's owner Mr. Nathan admitted there was never any confusion, and Lontex failed to produce a consumer study. Second, the record is clear that Lontex did not continuously use COOL COMPRESSION between 2008 and 2016. Lontex has tried to prop up its allegations of use by claiming that: (a) every Lontex SWEAT IT OUT garment sold since 2007 contained a care label sewn inside that said COOL COMPRESSION and (b) since 2007 Mr. Nathan always orally referred to the fabric in the SWEAT IT OUT garments as "COOL COMPRESSION technology." But the record contains no reliable evidence to corroborate these claims.

Lontex went to great lengths to prevent NIKE (and the Court) from discovering the truth about its non-use of the COOL COMPRESSION marks. Lontex identified in its May 21, 2019 Amended Initial Disclosures a small number of hand-selected customers to whom Lontex fed SWEAT IT OUT garments manufactured *after 2016* containing COOL COMPRESSION labels inside. (*See* 8/7/20 Decl. of Marc E. Miller ("Miller Reply Decl."), Ex. 17.) Lontex withheld the remaining customers' identities by refusing to produce invoices between 2008-16. NIKE moved to compel and Lontex opposed, asserting that NIKE should not be allowed to contact *any* of Lontex's customers—and urging that NIKE should not receive the customer list and instead be limited to those individuals selected by Lontex who would confirm Mr. Nathan's story that every garment

contained a COOL COMPRESSION label sewn inside. (ECF 52, 87, 96, 98.) Lontex even went as far as to state that "the best method to corroborate Lontex's use of COOL COMPRESSION on inside labels is to depose Golden Stitch, ***not to scare Lontex's customers with reach-outs***." (ECF 98 at 3 (emp. added)). Lontex stated Golden Stitch "would have the broadest percipient knowledge next to Mr. Nathan" regarding the labels. (*Id*.) Lontex urged that "[t]here is no need to impose upon Lontex's customers to validate [this] fact." (*Id*.) Lontex put Golden Stitch on its initial disclosures, and NIKE deposed this individual during the discovery period. (Miller Reply Decl., Ex. 18.)

The Court ordered production of Lontex's customer information subject to a protocol allowing NIKE to subpoena some customers for Lontex garments and the care labels or photographs thereof. (ECF 117-1, 136, 147.) These customers *all* produced garments purchased between 2008-16 with SWEAT IT OUT care labels, *not* COOL COMPRESSION care labels. (ECF 136, 147.)

On March 10, 2020, Lontex stated it needed "clean-up" discovery, including depositions to authenticate photographs of Lontex garments it received from recently-contacted customers. (ECF 147, 148.) On March 11, Lontex served its Fourth Amended Initial Disclosures, adding 6 NFL and MLB trainers (Keith Dugger, Shawn Fcasni, Greg Gaither, Daveon Lee, Chris Conroy, and Kyle Davis). (*See* Miller Decl., Ex. 4.) On March 12, Mr. Nathan admitted he requested photographs from these 6 trainers without advising that the photographs were for this lawsuit or that Lontex was listing them as witnesses, contrary to his mischaracterization that the trainers "were incredibly receptive and willing to provide relevant information." (*See* Ex. 19 at 974-79; ECF 169-13 ¶ 4.)

### A. The Court Did Not Authorize Lontex's Conduct

At the March 13 hearing, the parties agreed not to serve any "new" discovery, meaning that fact discovery effectively closed on March 13. (Hr'g Tr. 70:6-71:15, ECF 157.) Remaining discovery was limited to the specific outstanding fact discovery items discussed at the hearing and outstanding expert discovery. This included Lontex's so-called "clean-up" depositions to

authenticate the photographs received from these 6 trainers, as Mr. Schwartz represented to the Court. (*See id.* at 62:7-66:24.) Lontex never once flagged its intention to seek "new" discovery from 68 undisclosed non-parties or to issue 63 sham trial subpoenas.

Lontex now tries to whitewash Mr. Wagner's egregious behavior by contending that he was only "doing exactly what the Court authorized at the March 13, 2020 hearing–contacting customers to identify those with relevant percipient knowledge that could serve as potential trial witnesses." (Lontex Br. at 13.) The Court absolutely did not authorize Mr. Wagner's abuse of its subpoena power to issue 63 sham trial subpoenas. And Lontex grossly mischaracterizes the Court's March 13 ruling by claiming that "both parties were given the green light to contact Lontex's customers to identify potential trial witnesses." (*Id.* at 2.) The Court carefully admonished the parties that, if they learn of a new potential trial witness, "to be honest as you identify yourself and who represent and what the purpose is," then "you have an interview, write down their name and address and put them on your witness list." (Hr'g. Tr. 15:5-18.) Lontex did not obey the Court's instruction. Mr. Wagner did not uncover new potential witnesses through an ongoing investigation and he did not interview anyone. Rather, Mr. Wagner mined Lontex's list of longtime customers—***the very individuals that it fought so hard to keep from NIKE during discovery***—and blasted out 63 sham trial subpoenas to coerce these customers into signing declarations that he simply made up. Lontex did not need a "green light" from the Court to speak with its own customers—in fact, the Court's March 13 ruling about customer contact pertained to ***NIKE's*** request to interview or depose the 6 trainers disclosed on March 11. Lontex, on the other hand, knew exactly who these longtime customers were and, if Lontex believed that they were so vital to its case, it could have, and should have, identified them on its Rule 26(a)(1) initial disclosures ***during the discovery period*** so this supposed "crucial" information could be properly developed and vetted by the parties. Manufacturing "new" evidence

through "informal discovery" (Lontex's words) from 5 undisclosed non-parties and issuing 63 trial subpoenas after the fact discovery period effectively closed goes well beyond "clean-up" discovery. Lontex has not given any credible explanation for why it did not include these 68 customers on its initial disclosures, even though it included other customers in earlier disclosures.

**B. NIKE's Conduct Since March 13, 2020**

Lontex tries to distract from Mr. Wagner's egregious misconduct by accusing NIKE of having the same "detailed communications with potential witnesses" behind Lontex's back. Nothing could be further from the truth. NIKE sought to interview the 6 trainers identified by Lontex by contacting their team's counsel. Through this appropriate channel, NIKE learned, either directly from the trainers or indirectly from their counsel, that these trainers could not corroborate Lontex's incredible claims. NIKE did not issue 63 sham trial subpoenas or have "detailed communications" with undisclosed non-parties that it seeks to use as trial witnesses.

**Mr. Dugger**: NIKE interviewed him on May 6, 2020 with the Colorado Rockies general counsel on the call and at his counsel's suggestion, NIKE prepared a draft declaration based on that interview. (Miller Reply Decl. ¶ 9.) Mr. Dugger and his counsel reviewed and revised the declaration and Mr. Dugger signed it on June 1, 2020. (*Id.*, Ex. 20.) This declaration is consistent with the facts developed in discovery (*i.e.*, not every Lontex SWEAT IT OUT garment sold since 2007 contained a COOL COMPRESSION care label and that no trainer was ever confused that NIKE and Lontex were affiliated). (*Id.*, Ex. 20 ¶¶ 8-16.)

**Mr. Fcasni**: NIKE spoke with the Philadelphia Phillies general counsel on April 20 and May 8, 2020, who provided detailed information from Mr. Fcasni and agreed that NIKE should prepare a draft declaration based on that information. (*Id.* ¶ 10.) Mr. Fcasni and his counsel reviewed and revised the declaration and Mr. Fcasni signed it on May 14, 2020. (*Id.*, Ex. 21.) This declaration is also consistent with the facts developed in discovery.

**<u>Mr. Davis</u>**: NIKE interviewed him on April 16, 2020 with the Indianapolis Colts general counsel on the call. (*Id.* ¶ 11.) The information that Mr. Davis provided was also consistent with the facts developed in discovery. (*Id.*) The Colts' counsel agreed that NIKE should prepare a draft declaration based on the interview, which remains under review with counsel and Mr. Davis. (*Id.*)

**<u>Messrs. Gaither & Lee</u>**: NIKE spoke with the general counsels for the Dallas Cowboys and Pittsburgh Steelers and learned from them that both trainers have information consistent with the facts developed in discovery and not consistent with Lontex's claims. (*Id.* ¶¶ 12-13.)

### C. Mr. Daffner Did Not "Collaborate" With Mr. Wagner and Did Not Instruct, Direct, or Otherwise Suggest Lontex's Course of Conduct

Lontex next attempts to sanitize Mr. Wagner's egregious misconduct with another incredible claim that Mr. Wagner sent his letters, draft declarations, and sham trial subpoenas "only after repeated collaboration" with Jason Daffner, general counsel of PFATS and PBATS. Mr. Wagner misrepresents and mischaracterizes his conversations with Mr. Daffner. (*Id.* ¶¶ 15-19.) According to Mr. Daffner, what really happened was that Mr. Wagner wanted to draft a declaration on behalf of PFATS to be signed by each member. (*Id.* ¶ 17.) PFATS declined. (*Id.*.) Mr. Daffner told Mr. Wagner that, while he is the general counsel to PFATS, he does not represent each individual member. (*Id.*) He told Mr. Wagner that, if Lontex wanted information from PFATS members, Mr. Wagner should contact them through their team's counsel. (*Id.*)

Contrary to Mr. Wagner's misrepresentations, Mr. Daffner did not suggest that the PFATS members were "amenable to providing testimony and simply needed the right mechanism to do so." (*Id.* ¶ 18.) Mr. Daffner did not "instruct," "direct," or otherwise suggest that Mr. Wagner should issue trial subpoenas to more than 40 individual members requiring their appearance in court in Philadelphia on November 2, 2020. (*Id.*) And Mr. Daffner did not in any way "collaborate" with Mr. Wagner on the letters or the draft declarations that he sent to the more than 40 individual

members of PFATS. (*Id.*) Quite the contrary, as his warning email to the PFATS membership shows, Mr. Daffner was quite concerned about Lontex's discovery tactics.[1] (Miller Decl., Ex. 10.)

Lontex then goes on to claim that it took "every effort" to minimize the burden on the 63 non-parties and states, ***without any factual support***, that "[n]one of the trainers receiving letters from June 25, 2020 onward have felt pressured." (Br. at 9.) Contrary to Lontex's conjecture, Mr. Wagner's sham trial subpoenas have raised great concern and distress among the PFATS members. (Miller Reply Decl. ¶ 19.) On July 1, Mr. Daffner hosted a Zoom information session for members to address these concerns and discuss with them Mr. Wagner's letters, subpoenas, and declarations. (*Id.*) The members are concerned that they will be required to appear in court in Philadelphia on November 2, 2020 during the upcoming NFL season. (*Id.*) They are deeply concerned and distressed about any extraneous travel during the COVID crisis. (*Id.*) They are also concerned by the substance of Mr. Wagner's declarations, another indication of the false and misleading nature of the words he seeks to put into their mouths. (*Id.*; *see* Miller Decl., Ex. 10.) In sum, the members do not want to be involved in this lawsuit, contrary to Mr. Wagner's suggestions that they were willing to assist because they "liked and appreciated" Mr. Nathan. (ECF 169-1 ¶ 13.)

## II. ARGUMENT

NIKE's Motion is premised on Lontex's flagrant violations of Rules 26(a), 30, and 45, and the Court's March 13 Order. This Court also has the inherent authority to impose appropriate sanctions to address Lontex's egregious misconduct. Lontex criticizes NIKE's Motion as framed

[1] Mr. Wagner claims that "after discussing Eastern District of Pennsylvania practice with co-counsel Michael Schwartz concerning next steps in light of Mr. Daffner's direction, Mr. Schwartz and I prepared a draft form cover letter and trial subpoena to accompany proposed declarations." (ECF 169-1 ¶ 14.) Mr. Schwartz did not speak with Mr. Daffner and it is unclear how much Mr. Schwartz knew about these discussions because Mr. Wagner does not say. At best, Mr. Schwartz was unaware and misled by Mr. Wagner into believing that Mr. Daffner directed Mr. Wagner to issue 63 trial subpoenas to members of PFATS and PBATS. At worst, Mr. Schwartz was aware and is equally responsible for directing and crafting Mr. Wagner's egregious conduct, willful violations of the Federal Rules and this Court's orders, and his gross abuse of this Court's subpoena power.

"exclusively with asserted misuses of FRCP 45 subpoena power," and then characterizes its conduct as "mere violations of a discovery obligation." (Lontex Br. at 10-11.) Lontex's misconduct goes well beyond a "mere violation of a discovery obligation." Lontex, through Mr. Wagner, knowingly flouted the Rules to obtain made up and untrustworthy evidence at the 12th hour to change the facts that had been developed and vetted through more than 9 months of discovery. Mr. Wagner's misconduct is even more egregious because he invoked—and abused—this Court's subpoena power to obtain this incompetent evidence behind NIKE's back. Lontex's misconduct is highly-prejudicial to NIKE and patently unfair to the non-parties. NIKE's Motion should be granted.

### A. Lontex Violated the Federal Rules and this Court's Orders

**Fed. R. Civ. P. 26**: Rule 26(a)(1)(A)(i) directs disclosure of the name of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." The disclosure requirement is absolutely vital to ensure fairness and an orderly discovery process. Mr. Wagner was obligated, under Rule 26(g)(1), to reasonably investigate the facts of the case and provide the required disclosures. *See* Committee Notes to Rule 26 ("As officers of the court, counsel are expected to disclose the identity of those persons who may be used by them as witnesses[.]"). If Lontex believed 68 customers were so vital to its case as "trial witnesses," Lontex was obligated to identify them on its initial disclosures during the discovery period.

These are not "new" witnesses Lontex uncovered during some type of ongoing investigation. Rather, Lontex knew exactly who these 68 customers were, yet Lontex never included them in its initial disclosures, and only disclosed 5 to NIKE when it produced their declarations and the remaining 63 a few hours before it filed its opposition to this Motion. (ECF 169-12.) "During discovery a party is required to disclose the names of witnesses that may be called to testify at trial. Failure to do so will preclude the party use of those witnesses, unless such failure

is harmless." *Muldrow v. Brooks*, 34 F. App'x 854, 855 (3d Cir. 2002). Lontex's failure to disclose these individuals has severely prejudiced NIKE*, see infra*.[2]

**Fed. R. Civ. P. 30**: Rule 30(a)(2)(A)(i) limits each side to ten depositions unless leave is obtained to exceed that number. The party seeking leave must make a "particularized showing" as to why the excess depositions are "reasonable and necessary" to satisfy the standard under Rules 30(a)(2)(A) and 26(b)(2). *Arconic Inc. v. Novelis Inc.,* 2018 WL 6732992, at *6 (W.D. Pa. Nov. 6, 2018). On March 13, the Court approved Lontex's request for clean-up trial depositions to authenticate photographs received from the 6 trainers on the March 11 initial disclosures. But Lontex never sought leave to take trial depositions of 68 undisclosed non-parties. If this testimony was so "crucial" to Lontex's "important" case, which it gratuitously calls "the fight of its life," then why did Mr. Wagner never raise this issue during discovery? Lontex never explains its abrupt departure from its prior entrenched position that customer contact was "prohibited" and should not be used "to develop evidence relating to the likelihood of confusion." (ECF 98 at 4-5.)

Lontex cannot sanitize this violation by calling its pursuit of 63 "trial depositions" just a "proposal" that should not count toward Rule 30's limit. "The Federal Rules do not distinguish between discovery and trial depositions." *Melore v. Great Lakes Dredge & Dock Co.*, 1996 WL 548142, at *3 (E.D. Pa. Sept. 20, 1996). "A district court's identical treatment (for timing purposes) of discovery and *de bene esse* depositions is consistent with the language of the [Rules], which draw no distinction between the two. The federal rules simply limit the instances in which a deposition can be used at trial." *Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1362 n.8 (11th Cir. 2002).

[2] It does not matter that Lontex produced documents which included these 68 customers' names, or categorically identified its "athletic trainer" customers in written discovery responses or deposition testimony because "mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 72 (E.D.N.Y. 2012); *see also Muldrow*, 34 F. App'x at 855 (party cannot satisfy Rule 26(a)(1)(A) requirement by mentioning the excluded witness several times during its own deposition).

Courts routinely deny requests to conduct trial depositions after the close of fact discovery as untimely and improper—especially where, as here, the party seeking the trial deposition failed to engage in basic pretrial diligence and preparation. For example, in *In Integra Lifesciences I, Ltd. v. Merck KGaA*, defendant sought a trial deposition of an unavailable witness after the close of discovery. 190 F.R.D. 556, 557 (S.D. Cal. 1999). The court denied the request, rejecting the urged distinction between trial and discovery depositions, which finds no support in the Rules, and would eliminate "any need to conduct discovery of 'unavailable witnesses during the discovery period." *Id.* at 559. "[I]f a party wishes to introduce deposition testimony at trial, that testimony should be procured during the time set by the court to conduct discovery absent exceptional circumstances." *Id*. *Integra*'s reasoning applies here: if Lontex wanted testimony from 68 customers, it should have put them on its initial disclosures and procured their testimony during discovery. There are no exceptional circumstances to excuse Lontex's conduct.

**Fed. R. Civ. P. 45**: Rule 45(c)(1) requires a party issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Lontex completely disregarded this Rule by issuing sham trial subpoenas to 63 non-parties. Lontex's ham-fisted tactics have created great distress among these non-parties and caused them substantial undue burden. (Miller Reply Decl. ¶ 19.) Mr. Wagner's letters and sham subpoenas were carefully tailored to create the impression that these non-parties, who reside beyond the Court's subpoena power, were required to appear before this Court on November 2, 2020, during the COVID crisis, in the middle of the upcoming NFL season. (*Id.*; *see* ECF 168.) If these non-parties were as truly ready and willing to assist Lontex, as Mr. Wagner says, then one would think Lontex would have simply asked them for help. Instead, Mr. Wagner wielded the Court's subpoena power to create duress and manipulate them into signing his made-up declaration.

Lontex claims that its conduct did not coerce any trainers into signing because Mr. Wagner did not receive a "stack of signed declarations." (Lontex Br. at 14.) That's not the point. Mr. Wagner has not withdrawn his sham trial subpoenas—or communicated to the recipients that trial will not be commencing on November 2, 2020 (not that it ever was anyway, as Mr. Wagner knew). Clearly, Mr. Wagner would prefer to allow the stench of his manufactured duress to linger and wait to see if any other trainers sign his false and misleading declaration just to get Lontex off their back.

**B. Lontex's Conduct Severely Prejudices NIKE**

Discovery periods and disclosure requirements exist for a reason: to allow "parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Rules required Mr. Wagner to investigate the facts and disclose each individual likely to have discoverable information that Lontex intends to use to support its claims. Rule 30's presumptive limitation was added "in part due to the expectation that Rule 26(a) disclosures will enable parties to avoid wasted depositions by pinpointing the discovery that needs to be done." 8A FED. PRAC. & PROC. CIV. § 2053. Based on Lontex's Rule 26(a) disclosures, NIKE painstakingly planned out how to spend its resources in discovery. Lontex's ever shifting-theories forced NIKE to make important decisions about how to spend those resources on Lontex's "whack-a-mole" discovery game. Nevertheless, NIKE kept pace, properly issuing Rule 45 subpoenas for documents and testimony to the non-parties Lontex added to its May 19, 2019 Amended Initial Disclosures and its December 19, 2019 Third Amended Initial Disclosures, and seeking to interview and obtain testimony from the 6 trainers Lontex added to its March 11, 2020 Fourth Amended Initial Disclosures. And even though Lontex withheld its customers' identities by refusing to produce any invoices between 2008-16, insisting that NIKE was prohibited from contacting any customers, NIKE complied with the protocol that Lontex imposed for issuing subpoenas to a limited number of Lontex's customers. Once NIKE completed all of that discovery (which did not turn out the way Lontex hoped, despite

its attempts to restrict and control the process), Lontex shifted gears again, dragging in more of the very customers it fought so hard to keep from NIKE during discovery.

Lontex started with the 6 trainers it put on its March 11 Rule 26(a) disclosures, but did not stop there. After interviewing only one trainer (Mr. Dugger) from the 6 on those initial disclosures, Mr. Wagner tried a new tack: he reached out to 5 *new* individuals—this time former trainer customers—and with Mr. Nathan's help, encouraged them to sign a declaration that Mr. Wagner simply made up. He then used the Court's subpoena power to coerce 63 additional trainer customers to sign this same stock declaration. All the while, NIKE did not even know this "after the fact evidence gathering" was taking place. NIKE learned from concerned team counsels—not Lontex—about the sham subpoenas and pressure tactics. Had NIKE not discovered this and brought this Motion, it firmly believes that Lontex would never have shared the declarations or the identities of these "surprise" witnesses, and would have instead simply slipped the declarations into a summary judgment opposition in an effort to create a disputed issue of fact.

As for Messrs. Peduzzi, Cunningham, Smith, Leo, and Kozak (the 5 former trainer customers discussed above), Mr. Wagner admits that he never interviewed them, as the Court admonished, to learn what knowledge they possess. (ECF 169-1 ¶ 8.) Instead, Mr. Wagner drafted a declaration for each individual "based on our understanding," and sent it to each individual but only after "Mr. Nathan confirmed they had the relevant knowledge." (*Id.*) Although Mr. Wagner claims that "over half of these declarants did have revisions to the draft declarations and those revisions were made," a comparison of the declarations reveals that each one is, in fact, substantively identical but for the customized biographical information. (Miller Decl., Ex. 11 ¶¶ 4-10.) Even if Mr. Wagner is telling the truth that revisions were made, any revisions appear to be non-substantive. One look at these declarations shows that these 5 former trainers are simply a

mouthpiece for Mr. Wagner's made-up words.

Putting aside Mr. Wagner's highly-questionable ethics, he has made a mockery of the discovery process under the Federal Rules. Mr. Wagner's extreme tactics have multiplied the proceedings, and robbed NIKE of the opportunity to seek proper discovery from these 68 individuals. Discovery is now effectively closed. NIKE already used its presumptive 10 depositions on the party and non-party individuals that Lontex identified in its Rule 26(a)(1) disclosures during discovery—and Lontex already indicated it would not stipulate to NIKE taking any depositions beyond the 10 provided for in Rule 30.[3] (Miller Decl., Ex. 16.)

The prejudice to NIKE is severe and irreparable and cannot be cured by forcing NIKE to take dozens of additional depositions of individuals whose memories have already been tainted by Mr. Nathan and Mr. Wagner's false and misleading declarations.

### C. Lontex's Conduct Warrants Sanctions and All of the Requested Relief

#### 1. All of the false and misleading declarations should be excluded

Lontex claims that four factors must be considered for exclusion sanctions. *See Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000). These factors strongly favor preclusion of these untrustworthy, incompetent, and highly-prejudicial declarations.

**Prejudice against NIKE**: Lontex has severely prejudiced NIKE with its latest evidence-manufacturing charade. It used highly inappropriate (and unethical) tactics to go behind NIKE's back—and outside of the normal discovery process—to change the record developed through discovery. The declarations that Mr. Wagner prepared, without interviewing a single one of the 68

[3] Even if there were time left in discovery, Lontex refuses to disclose its communications with these declarants and Lontex never produced evidence corroborating what Mr. Nathan did or did not say to these individuals during some vaguely-recalled conversation that happened many years ago. (Br. at 23-24.) Moreover, the declarants did not provide documents to corroborate Mr. Wagner's made-up facts. In fact, Mr. Smith told NIKE that he spoke with Mr. Nathan for a few minutes, did not review any documents, and agreed to sign whatever Mr. Nathan's lawyer sent. (Miller Reply Decl. ¶ 14.) When questioned about how he verified that the declaration was correct without reviewing any documents, his response was: "I don't know. You'll have to ask Mr. Nathan. He has all of the documents." (*Id.*)

individuals, are neither trustworthy nor competent.

**Prejudice against NIKE is irreparable**: The damage that Lontex caused cannot be cured by deposing 68 individuals whose memories have already been tainted by Mr. Nathan's influence and Mr. Wagner's false and misleading declarations. Discovery is effectively closed, and it would be patently unfair to force NIKE to depose upwards of 70 potential trial witnesses.

**Lontex's manufactured evidence has derailed the case**: Mr. Wagner's willful violations of the Federal Rules, his abuse of this Court's subpoena power, and his evidence-manufacturing tactics have already multiplied the proceedings (*e.g.*, this Motion), and derailed the orderly resolution of this case. Discovery is effectively closed, and all that remains are a few outstanding fact and expert depositions and some of Lontex's "clean-up" discovery. Lontex never put these 68 non-parties on its initial disclosures and even if it does now, NIKE should not be expected to start seeking to interview and depose them. The MLB and NFL trainers are now in the middle of their COVID-challenged seasons and are highly-unlikely to be available for interviews and/or depositions. Lontex waited years to file this action and it should have had this supposed "critical" evidence ready to be disclosed and properly vetted at the outset of discovery. This late-stage gamesmanship threatens to derail this case's orderly progression to summary judgment.

**Lontex's bad faith**: Mr. Wagner indisputably acted in bad faith by knowingly violating the Federal Rules and abusing this Court's subpoena power. Mr. Wagner violated this Court's March 13 Orders and sought to willfully deceive and severely prejudice NIKE in the process. His and Mr. Nathan's blatant mischaracterizations in Lontex's opposition to this Motion and their supporting declarations only further underscore the necessity of the sanctions sought here.

**2. Lontex should disclose all subpoenas and communications**

Lontex refuses to disclose all subpoenas, documents, and communications with these 68 non-parties. To be sure, this disclosure remedy cannot cure the severe prejudice to NIKE, but such

information is highly-relevant and directly responsive to NIKE's Request for Production No. 73 ("All Communications between Lontex and third-parties concerning this Action, the NIKE Products, or the COOL COMPRESSION Marks."), and Lontex is already under a Court Order to produce documents responsive to this Request.[4] (*See* ECF 117-1 at 24; ECF 150 ¶ 1.)

**3. Lontex should swear that it has not conducted any further extra-judicial discovery**

Lontex still has not stated that this is the complete universe of its extra-judicial "discovery" or that it has ceased or will cease this egregious conduct.

**4. Lontex should pre-clear any additional trial subpoenas**

The court's March 13 Order set out requirements that it expected counsel to follow. Lontex did not follow them. If Lontex will be permitted to issue any trial subpoenas or take any trial depositions, it should be done under tight supervision from the Court (or the Special Master).

**5. Lontex should pay NIKE's fees and costs for the Motion**

Lontex's conduct is very similar to *Mid-Atl. Constructors Inc. v. Stone & Webster Const., Inc.*, 231 F.R.D. 465 (E.D. Pa. 2005). There, counsel sent a subpoena after discovery closed, without prior notice to plaintiff and without leave. *Id.* at 466. Defendant characterized its subpoena as merely "proposed" and noted that the recipient voluntarily agreed to produce documents. *Id.* The court found counsel violated several Rules. *Id.* at 467. The court noted Rule 45 does not permit a "proposed" subpoena, and Rule 16 requires compliance with scheduling orders. *Id.* The court found counsel's conduct was intentional and in bad faith, and awarded monetary sanctions, which also served to deter future similar conduct. *Id.*

*Coleman-Hill v. Governor Mifflin Sch. Dist.*, 271 F.R.D. 549 (E.D. Pa. 2010) is also

[4] Lontex cannot hide behind a manufactured false equivalency or threat of mutual production. NIKE appropriately sought to interview the 6 trainers identified in Lontex's initial disclosures by contacting their team's counsel. *See, infra*. NIKE did not send letters, sham trial subpoenas, and declarations to 63 undisclosed non-parties or have "detailed communications" with undisclosed non-parties that it seeks to use as trial witnesses.

instructive. There, counsel was dissatisfied with discovery she received from defendant. *Id.* at 550. Instead of moving to compel, counsel resorted to "self-help" by serving a defective subpoena on defendant's employee for defendant's documents. *Id.* at 551. The subpoena sought irrelevant documents and did not specify a date and time for production, instead referencing a cover letter requesting production at the recipient's "earliest convenience." *Id.* Counsel did not give prior notice to defendant, robbing defendant of the opportunity to object before the employee produced voluminous documents. *Id.* The court awarded fees and costs and "easily conclude[d] that [plaintiff's counsel] acted in bad faith." *Id.* at 555. Counsel knew how to obtain proper discovery, yet abused the court's subpoena power to gain information and did so without noticing defendant. *Id.* Similarly, Lontex's counsel knew that discovery had effectively closed without Lontex raising this issue. Instead, Mr. Wagner issued 63 sham trial subpoenas at the 12th hour to obtain manufactured evidence to prop up Lontex's failing case. NIKE is entitled to recover fees and costs expended alerting the Court of Mr. Wagner's abusive tactics and egregious, bad faith conduct.

Lontex may be a "small family company" but it is represented by a large law firm that has either taken this case on contingency or is being paid by a third-party litigation funder. Lontex has spared no expense, it has filed countless discovery motions, litigated every issue, and driven up NIKE's costs in its quest to turn its previously-abandoned trademark registrations into a monetary windfall. Regardless, the Court has the inherent authority under 28 U.S.C. § 1927 to require ***Mr. Wagner***, not Lontex, to personally satisfy the excess fees and costs that NIKE incurred because of his unreasonable and vexatious multiplication of the proceedings.

## III. CONCLUSION

NIKE respectfully requests that this Motion be granted in its entirety and that it be awarded the relief sought herein. NIKE requests oral argument.

August 7, 2020

Respectfully submitted,

By: *_/s/ Gina L. Durham*

DLA PIPER LLP (US)

Gina L. Durham (*pro hac vice*)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Frank W. Ryan (*pro hac vice*)
Andrew J. Peck (*pro hac vice*)
Marc E. Miller (*pro hac vice*)
1251 Avenue of the Americas, 27th Fl.
New York, NY 10020

Ben C. Fabens-Lassen
1650 Mark Street, Suite 5000
Philadelphia, PA 19103

*Attorneys for Defendant NIKE, Inc.*