**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LONTEX CORPORATION,

                Plaintiff,

      v.

NIKE, INC.,

                Defendant.

Civil Action No.  2:18-cv-05623-MMB

**<u>PLAINTIFF LONTEX CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO EXCLUDE THE SURVEYS, REPORTS, AND RELATED
TESTIMONY OF HAL PORET, MATTHEW EZELL, AND CAROL A. SCOTT, PH.D.</u>**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 3

    A.   Lontex's SWEAT IT OUT® Compression Garments and Their COOL
    COMPRESSION® Stretch Technology ....................................................... 3

    B.   Nike's Infringing Use of COOL COMPRESSION® For Over 50 Products
    In Its Nike Pro Line, Aimed at Current and Former Game-Day Athletes ............ 4

    C.   Nike's Survey Experts ................................................................................. 6

        1.   Poret's Squirt Confusion Survey Uses the Wrong Universe For
        Measuring Forward or Reverse Confusion and Had Too Much
        Noise .................................................................................................... 7

        2.   Ezell's Eveready Confusion Survey The Wrong Universe Required
        to Meaningfully Measure Either Forward or Reverse Confusion ............. 9

        3.   Scott's Misguided "Purchase Interest" Survey Uses the Wrong
        Universe ............................................................................................ 10

III.   LEGAL STANDARD ......................................................................................... 11

IV.   ARGUMENT ...................................................................................................... 13

    A.   The Surveys Failed to Sample the Proper Universe of Respondents and
    Should be Excluded ..................................................................................... 13

    B.   Both the Poret and Ezell Surveys are Inadmissible On the Issue of Reverse
    Confusion as They Failed to Sample Lontex's Potential Customer Base
    (and Ezell Failed to Provide the Appropriate Stimulus) ..................................... 16

    C.   The Overwhelming Noise Experienced Due to Poret's Survey Design Is
    Fatal ........................................................................................................... 20

    D.   The Surveys, Reports, and Related Testimony are Prejudicial, Misleading,
    and a Waste of Time, and Should Be Excluded Pursuant to FRE 403 ................ 24

V.   CONCLUSION .................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*,
  402 F. Supp. 2d 1312 (D. Kan. 2005) ....................................................................13

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
  No. CIV.A. 01-1524, 2003 WL 24010950 (W.D. Pa. Apr. 23, 2003), *aff'd sub
  nom. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d
  110 (3d Cir. 2004) ...............................................................................................15

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
  383 F.3d 110 (3d Cir. 2004) ..........................................................14, 16, 17, 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ..................................................................................... *passim*

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
  No. 12 CIV. 4112 AJP, 2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ...............20, 22

*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*,
  30 F.3d 466 (3d Cir. 1994) .................................................................................16

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
  220 F. Supp. 2d 358 (D.N.J. 2002) .....................................................................12

*Kars 4 Kids, Inc. v. Am. Can!*,
  No. 314CV7770PGSDEA, 2019 WL 1755912 (D.N.J. Apr. 18, 2019) ............12, 15

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...........................................................................................11

*Pittsburgh Press Club v. United States*,
  579 F.2d 751 (3d Cir. 1978) .........................................................................12, 13

*Smith v. Wal-Mart Stores, Inc.*,
  537 F. Supp. 2d 1302 (N.D. Ga. 2008) ...............................................................13

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 276 (2d Cir. 1999) ...............................................................................24

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
  868 F. Supp. 2d 415 (E.D. Pa. 2012) ..................................................................24

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ..................................................................12

*Trouble v. Wet Seal, Inc.*,
179 F. Supp. 2d 291 (S.D.N.Y. 2001) .................................................................13

*United States v. Dorsey*,
45 F.3d 809 (4th Cir. 1995) ................................................................................24

*Valador, Inc. v. HTC Corp.*,
242 F. Supp. 3d 448 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) ............19

*vonRosenberg v. Lawrence*,
413 F. Supp. 3d 437 (D.S.C. 2019) ................................................................13, 19

*Water Pik, Inc. v. Med-Sys., Inc.*,
No. 10-CV-01221-PAB-CBS, 2012 WL 27598 (D. Colo. Jan. 5, 2012) ...............13

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
913 F. Supp. 1454 (D. Kan. 1996) .................................................................14, 19

*Wreal, LLC v. Amazon.com, Inc.*,
No. 14-21385-CIV, 2016 WL 8793317 (S.D. Fla. Jan. 7, 2016) ..........................20

**Other Authorities**

Federal Rule of Evidence 403 ...........................................................1, 3, 14, 15, 25

Federal Rule of Evidence 702 .......................................................1, 3, 11, 14, 15, 25

Plaintiff Lontex Corporation ("Lontex") respectfully submits this memorandum of law in support of its Motion to Exclude the Surveys, Expert Reports, and Related Testimony of Hal Poret, Mathew Ezell, and Carol A. Scott, Ph.D., pursuant to Federal Rules of Evidence 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

## I.   __INTRODUCTION__

Survey results are only probative where designed to meaningfully test the issues of the specific case. Particular vigilance must be paid to gatekeeping on this area of expert testimony, as improper design can lead to survey outputs that are useless, or worse, misleading. Efforts by experts to stretch a survey beyond its useful breaking point must be stopped.

Defendant Nike, Inc. ("Nike") proffers Hal Poret, Matthew Ezell, and Carol A. Scott, Ph.D. to provide surveys and related expert opinions going to likelihood of confusion and consumer purchase interest. Despite Nike's product names using Lontex's full COOL COMPRESSION® mark for the same products as Lontex, Hal Poret and Matthew Ezell wrongly claim this resulted in zero likelihood of confusion. And despite Nike's experienced product development personnel specifically insisting on use of the full COOL COMPRESSION® mark for the product names of over ███████ worth of Accused Products, Carol A. Scott concluded that the name did not matter to enough consumers. Her conclusion relies entirely on a survey designed to be no more useful than asking a sample of starving people how interested they are in eating the only food available to them, and using their eager willingness to consume such food to conclude humans do not prefer one food over another.

Many of these Experts' flaws go to the weight of the evidence, and provide a glutton of critiques lodged by Lontex's survey rebuttal expert Susan McDonald. However, a number of

---

[1] For efficiency purposes, Lontex submits this *Daubert* motion rather than submitting three independent motions to exclude each of Nike's survey experts.

those flaws rise to a level warranting exclusion.

Specifically, the surveys, reports, and related testimony should be excluded for each and all of the following reasons:

- ***The sampling universe warrants exclusion of all surveys***: Each of the surveys failed to sample the proper universe of respondents. Nike's corporate designee explained at deposition that Nike's "sharp point" for its compression apparel are individuals between the ages of 18-26 who are or were "game-day athlete[s]." Despite this clear delineation, the universe sampled included much older individuals as well as individuals who did nothing more vigorous than purchasing athletic apparel. This overinclusive universe sampled by the Experts made it far less likely that consumers with a genuine focus on athletic performance apparel as described by Nike were included. Such skewing renders the Experts' surveys fatally flawed and irrelevant.

- ***No survey can be proffered as a measure of reverse confusion***: The Poret and Ezell surveys further failed to sample Lontex's customer base in this reverse confusion case. It is axiomatic that the proper universe to test the likelihood of confusion in a reverse confusion survey is the senior user's customer base. Nevertheless, Poret and Ezell failed to sample from Lontex's customer base, which rendered their survey and related testimony useless. Additionally, Ezell further failed to provide the appropriate stimulus to account for reverse confusion. Rather than using a Lontex product as a stimulus, Ezell instead used Nike products. This methodological flaw further renders the Ezell Survey excludable and irrelevant for reverse confusion.

- ***The Poret study design resulted in too much static to assess what was playing on the radio, failing to provide a meaningful read-out of the likelihood of confusion***:

The Poret survey design suffered from the malady of including controls which created overwhelming noise causing a high base confusion rate among respondents. Specifically, his survey yielded a staggering confusion rate of five times the standard rate in the control groups accepted by courts. This noise adds another reason why the Poret Survey is fatally flawed and subject to exclusion.

Thus, each of the Experts' surveys, reports, and testimony are unreliable, untrustworthy, and irrelevant to the issues they purport to address and should be excluded pursuant to Federal Rules of Evidence 403 and 702. All three Experts and the Surveys they rely upon should be fully excluded based on their improper universe, and Poret for the additional reason of deafening noise. Poret and Ezell (and their Surveys) should also be excluded for failing to account for issues of reverse confusion.

## II.   FACTUAL BACKGROUND

### A.   Lontex's SWEAT IT OUT® Compression Garments and Their COOL COMPRESSION® Stretch Technology

Lontex owns the incontestable, federally registered trademarks for COOL COMPRESSION® -- two word marks, U.S. Registration Nos. 3,416,053 and 3,611,406 (collectively, the "COOL COMPRESSION® marks"). Since at least 2007, Lontex's proprietary COOL COMPRESSION® technology has been consistently used, including on garment labels for its SWEAT IT OUT® products, on its website (www.sweatitout.com), at conventions and meetings with customers, as well as on invoice and client advertising materials. (*See*, *e.g.*, Wagner Decl, Ex. E, Nathan Tr. 84:6-89:20, 94:5-95:3; Ex. F, Cammarota Tr. 41:14-42:25, 51:8-22; Ex. G, Williams Tr. 47:16-48:1).[2]

---

[2] All exhibit cites refer those attached to the Declaration of Ben L. Wagner ("Wagner Decl.")

Lontex is a family-owned business established under the tireless leadership and persistence of Mr. Efraim Nathan. Prior to Nike's infringement, Lontex enjoyed success with at least four core demographics, including professional athletes, individuals focusing on physical rehabilitation, serious non-professional athletes, and individuals seeking the benefits of compression technology. (Ex. E, Nathan Tr. 287:16-289:21; Ex. H, Bechtel Tr. 244:17-245:25; Ex. I, Expert Report of David Drews ("Drews Report"), Schedule 9).[3] Lontex's COOL COMPRESSION® branded technology has been recognized as making its SWEAT IT OUT® garments high-quality products that (unlike Nike's compression garments) actually work for their intended purpose. (*See, e.g.*, Ex. F, Cammarota Tr. 91:14-92:17, 238:21-240:18, 155:9-156:22; Ex. G, Williams Tr. 68:18-69:5).

Lontex's ownership and use of the COOL COMPRESSION® marks has been acknowledged by its customers in the NFL and MLB – well-respected veterans in their industries tasked with keeping professional athletes safe and at peak performance. (Ex. K, Expert Report of Jeffrey D. Parkhurst ("Parkhurst Report"), ¶¶ 42, 72-82; Ex. N, Supplemental Expert Report of Jeffrey D. Parkhurst ("Supplemental Parkhurst Report"), ¶¶ 27-28; Ex. O, Declaration of Mark Smith, ¶¶ 1-10; Ex. O, Declaration of Chris Peduzzi, ¶¶ 1-10).[4] However, Nike's unauthorized use of the COOL COMPRESSION® marks on the Accused Products causes confusion among Lontex's customers, as multiple actual customers of Lontex have declared to under oath. (*Id.*).

**B.      Nike's Infringing Use of COOL COMPRESSION® For Over 50 Products In Its Nike Pro Line, Aimed at Current and Former Game-Day Athletes**

Despite Lontex's longstanding efforts to maintain and expand its goodwill in the market, Nike, a multi-billion-dollar-a-year apparel and shoes company, began flooding the United States marketplace in late 2015 with competing compression garments branded as COOL

---

[3] *Id.* at ¶¶ 10-11
[4] *Id.* at ¶¶ 13, 16

COMPRESSION® clothing (the "Accused Products"), products sold by Nike and its third party intermediaries, which include distributors, resellers, and third party retailers. (First Amended Complaint ("FAC"), ¶ 19). Notably, Nike's compression garments may look nice, but even their best compression has been academically studied and determined ineffective for any purpose. (Wagner Decl., ¶ 12, Ex. J).

Despite Nike's compression products generally being ineffective, Nike ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ (Ex. P, Supplemental Expert Report of David "Drews Supplemental Report") Revised Schedule 4).[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Rather than put a stop to the infringement, Nike expressly ignored Lontex's pleas to contact its own retailers for a whole two years, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ (Ex. P, Drews Supplemental Report, Revised Schedule 4). As a matter of fact, at last check in <u>2020</u>, a large number of Nike third party intermediaries have continued to sell or offer to sell Accused Products online. (Ex. N, Supplemental Parkhurst Report ¶ 47).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ (Ex. D, Susan Schwartz McDonald's Rebuttal Commentary on Defendant's Surveys ("McDonald Rebuttal"), ¶ 16 (quoting ▮▮▮▮▮▮▮▮▮▮).[6]  Specifically, Nike's



---

[5] Wagner Decl., ¶ 18.
[6] *Id*. at ¶ 6.

corporate designee, Neil Munro, described in binding testimony Nike's core demographic for the Accused Products as follows:



Nike's eager effort to develop negative evidence on the actual confusion factor of trademark infringement lead it to implement numerous surveys designed to ignore this critical fact.

C.     **Nike's Survey Experts**

From even before the start of this case, Nike's trademark counsel knew that incorporating the full registered mark into over 50 product names all but assures a finding of likely confusion. So in the face of such a similar mark and clear incidences of mistaken belief of association between Lontex's SWEAT IT OUT® compression products with COOL COMPRESSION® technology and Nike's Accused Products, a few months back Nike developed its own litigation-motivated evidence in the form of survey experts Hal Poret, Matthew Ezell, and Carol A. Scott, Ph.D. (collectively, the "Experts"). In an attempt to dazzle by sheer number, these experts cumulatively engaged in two likelihood of confusion surveys and one purchase interest survey (collectively, the "Surveys") and related expert reports (collectively, the "Reports").

Below Lontex refrains from delving into those category of flaws that Courts recognize simply go to weight and render these surveys nugatory or near nugatory on their own. Instead, Lontex sets forth below the *Daubert*-fatal design flaws of each of the three surveys.

<u>**1.**</u>        <u>**Poret's *Squirt* Confusion Survey Uses the Wrong Universe For Measuring Forward *or* Reverse Confusion and Had Too Much Noise**</u>

Poret submitted a report (the "Poret Report")[7] purporting to "describe the methodology, execution and results of [his] survey [(the "Poret Survey")]." (Ex. A, Poret Report at 3). According to Poret, the scope of his work was to determine whether Nike's unauthorized use of COOL COMPRESSION® created a "likelihood of confusion with respect to Lontex's COOL COMPRESSION mark/products." (*Id*.). Poret conducted a *Squirt* survey sampling "[a] total of 400 respondents . . . among 'prospective consumers' of the relevant products." (*Id*. at 7). Poret claims in his report to have found zero net confusion, which Nike intends to use to argue that use of the infringing product name in the actual marketplace did not create a likelihood of confusion. (*Id*.).

His report concludes there is "zero" percent confusion, simply subtracting out a staggering amount of what he calls "noise." (*Id*. at 29). A finding of zero net confusion is a shocking result even to rebuttal expert, Susan Schwartz McDonald, who has over 35 years of experience in the field. (Ex. D, McDonald Rebuttal ¶ 38 (explaining that Poret's finding of zero net confusion was "a blinking hazard light once again, that something was amiss")).

Poret's flawed conclusion is the result of methodological flaws dooming the efficacy of his survey, including the following two flaws most relevant to this *Daubert* motion:

*First*, and importantly, Poret sampled an improper universe. Specifically, during the initial survey screening questions, survey respondents were asked "Which of the following, if

---

[7] Wagner Decl., ¶ 3.

any, have you personally purchased in the past 6 months?" and gave the following options: clothing, footwear, jewelry, backpack, smartphone, none of these. (*Id*. at 30). Respondents were then asked whether they were likely to purchase any of the above-listed items within the next 6 months. (*Id*. at 31). Only if a respondent answered "clothing" in either of the screener questions were they able to advance. (*Id*)

The next screener question asked respondents: "Which of the following type(s) of clothing have you personally purchased in the past 6 months, if any? Clothing for . . ." and gave the options of athletic or exercise performance or support; casual everyday wear or leisure; business, professional or office wear; eveningwear or nightlife; beach, pool or spa wear; or none of these. (*Id*. at 32). Respondents were then asked whether they were likely to personally purchase any of the above-listed types of clothing within the next 6 months. (*Id*.). Only if a respondent answered "athletic or exercise performance or support" in at least one of the above questions were they able to advance. (*Id*. at 33).

As will be discussed below, this made the Poret Survey universe of respondents far broader than Nike's prospective customer base for its Nike Pro products while simultaneously failing to sample respondents in Lontex's customer base. (*See* Ex. D, McDonald Rebuttal ¶ 15 ("[N]o general population survey of consumers who dabble in athletic activity or who purchase athletic apparel could expect to include even *one* Lontex customer by mere chance."; ¶ 17 (explaining that universe samples were simultaneously <u>over</u>-inclusive (based on admission of people who met the lowest possible bar for athletic apparel purchase) and <u>under</u>-inclusive (based on the virtual certainty that Lontex customers were excluded)).

*Second*, the Poret Survey included what he used as "controls" that were extremely "noisy" rendering the surveys nothing more than self-serving. Without what Poret described as

the strength of an extremely well-known brand name in the control, the structural noise without any potentially confusing trademark was 59.5%, using what Poret found to be an acceptable control from the company Augusta Sportswear and its Hyperform compression shorts. (Ex A, Poret Report at 44). Using what Poret found to be an acceptable Nike control – again without any potentially confusing trademark use – brought the structural noise down to about 27.5%. (*Id.* at 42). Because the Nike test – the survey run using the infringing "Nike Pro Cool Compression 6" Shorts" product name – had 27% confusion, Poret simply waved his hand to "zero" out what he called noise and conclude a zero percent "net" confusion rate. (*Id.* at 18-29).

2. **Ezell's *Eveready* Confusion Survey the Wrong Universe Required to Meaningfully Measure Either Forward *or* Reverse Confusion**

Ezell submitted a report (the "Ezell Report")[8] purporting to provide an analysis of a survey designed and conducted at Nike's request (the "Ezell Survey"). (Ex. B, Ezell Report, ¶ 2). According to Ezell, the scope of his work was "to measure the degree, if any, to which NIKE's athletic performance apparel (shown on a webpage with the words COOL COMPRESSION) is likely to cause confusion as to source, authorization or approval of, or business affiliation, or business connection with Plaintiff Lontex Corporation ('Lontex')." (*Id.*). Ezell conducted an *Eveready* survey sampling "four hundred (400) interviews." (*Id.* at ¶ 5). Similar to Poret, Ezell claims in his report to have found "none of the relevant universe of potential buyers of athletic performance apparel are likely to be confused," which Nike intends to use to argue that there is no likelihood of confusion. (*Id.* at ¶ 7). This conclusion was similarly shocking to Dr. McDonald because, "[g]iven that formal disclaimers don't necessarily result in *zero* confusion, that finding is so striking, it has to give one pause." (Ex. D, McDonald Rebuttal ¶ 21).

Similar to the Poret Survey, Ezell's conclusion is methodologically flawed because he

---

[8] Wagner Decl., ¶ 4.

also failed to sample the proper universe. Ezell only purported to sample "potential purchasers of Defendant's class of goods (i.e., athletic performance apparel) . . . ." completely ignoring Lontex's customer base. (Ex. B, Ezell Report ¶ 11; Ex. D, McDonald Rebuttal, ¶ 24 ("In so doing, [Ezell's improper universe] took what had been almost infinitesimally low odds of capturing Lontex-aware consumers in his survey sample to a true vanishing point.")). For example, during the initial survey screener questions, Ezell asked respondents, "In the next year, are you likely to purchase any of the following online?" to which respondents had the option of answering "yes" or "no" to any of the following: "apparel"; "kitchen appliances"; and "office supplies." (Ex. B, Ezell Report Appendix A at 4). Respondents were able to advance only if they answered "yes" to "apparel" in this screener question. (*Id*). Ezell then asked respondents, "In the next year, are you likely to purchase any of the following online?" to which respondents had the option of answering "yes" or "no" to any of the following: "athletic performance apparel"; "business apparel"; and "formal apparel." (*Id*.). Respondents were able to advance only if they answered "yes" to "athletic performance apparel" in this screener question. (*Id*)

Indeed, Ezell similarly failed to capture Nike's own relevant universe. Ezell's sampling of anyone who had purchased or would be purchasing "athletic performance apparel," without more, served only to "stretch[] the sample well beyond NIKE's target market definition for its Pro line . . . ." (Ex. D, McDonald Rebuttal ¶ 24).

### 3.    Scott's Misguided "Purchase Interest" Survey Uses the Wrong Universe

Scott submitted a report (the "Scott Report")[9] purporting to "determine the extent to which interest in purchasing the NIKE apparel products accused in this matter is increased if those products are shown using 'Cool Compression' in the product descriptions." (the "Scott

---

[9] Wagner Decl., ¶ 5, Ex. C.

Survey"). (Ex. C, Scott Report, ¶ 7).

The Scott Survey sampled 840 respondents and concluded that "interest in purchasing products at issue in this matter is not increased by the use 'Cool Compression' as a product descriptor." (*Id*. at ¶ 8). Scott claims that the Scott Survey "sampled from the appropriate population, ask[ed] clear and unbiased questions, accurately record[ed] and cod[ed] the data obtained from respondents, and accurately analyz[ed] the data." (*Id*. at ¶ 9).

However, contrary to Scott's assertions, a sampling of "individuals currently residing in the United States who are 18-64 years of age and who either have recently been in the market (i.e., purchased in the last 12 months) or plan to soon be in the market (i.e., plan to purchase in the next 12 months) for athletic apparel . . ." made no attempt to adequately represent either Lontex's *or* Nike's customer bases. (Ex. C, Scott Report ¶ 11; Ex. D, McDonald Rebuttal ¶ 56 ("Dr. Scott's approach to building the sampling frame all but ensured that no Lontex customers would be represented in the survey sample, and appears to have ensured that even NIKE's own target customer base for NIKE Pro was underrepresented.")).

## III.   <u>LEGAL STANDARD</u>

A party offering expert testimony bears the burden of showing by a preponderance of the evidence that the proffered testimony is admissible. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). Under Rule 702, expert testimony is admissible only if the "specialized knowledge will assist the trier of fact" and the testimony is based on sufficient data, utilizing reliable principles and methods that have been properly applied to the facts of the case. The trial judge must therefore ensure that the proffered testimony of an expert is not only relevant, but also reliable. *Daubert*, 509 U.S. at 589. The district court's gatekeeping responsibility "is to make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

A trademark survey's evidentiary value depends on the methodology used and the questions presented to respondents. Thus, in the context of trademark surveys, "when the deficiencies are so substantial that they render the survey's conclusions untrustworthy, the court should exclude the survey from evidence." *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219 (S.D.N.Y. 2010) ("Exclusion may be justified, however, where a single error or the cumulative errors are so serious that the survey is unreliable or insufficiently probative."). Furthermore, in an action to be tried to a jury, as here, "the court should scrutinize survey evidence with particular care." *THOIP*, 690 F. Supp. 2d at 231. "The factors are non-exclusive, but it remains essential to consider whether the population and terms were properly defined, . . . whether data was properly analyzed, whether the questions asked were unrelated to the material issues of the case . . . ." *J & J Snack Foods*, 220 F. Supp. 2d at 369. The Third Circuit has explained that a properly conducted survey must meet the following requirements:

> A proper universe must be examined and a Representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware.

*Kars 4 Kids, Inc. v. Am. Can!*, No. 314CV7770PGSDEA, 2019 WL 1755912, at *8 (D.N.J. Apr. 18, 2019) (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)).

"'Only if the expert testimony and related survey are useful, reliable, and have probative value

after all of their deficiencies are taken into account is the evidence admissible.'" *Id.* (quoting *J&J Snack Foods*, 220 F. Supp. 2d at 370).

## IV.   ARGUMENT

### A.   The Surveys Failed to Sample the Proper Universe of Respondents and Should be Excluded

A fundamental requirement of a trademark survey recognized by the Third Circuit (who is not alone in such recognition) is that participants must be from "a proper universe" and "a Representative sample must be chosen."[10] *Pittsburgh Press Club*, 579 F.2d at 758; *see also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) ("To be probative and meaningful, a survey must rely upon responses from all potential consumers of the product in question.").

To be clear, it is well-settled that surveying an improper universe renders the resulting survey data worthless. *See vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 455 (D.S.C. 2019) ("This defect with choosing the proper universe, skewing the results and excluding individuals who are relevant consumers, requires exclusion of the survey."); *Water Pik, Inc. v. Med-Sys., Inc.*, No. 10-CV-01221-PAB-CBS, 2012 WL 27598, at *4 (D. Colo. Jan. 5, 2012) ("A court should only exclude a survey if the 'sample of respondents clearly does not represent the universe it is intended to reflect.'" (quoting *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005)).

Thus, where surveys rely on improper universes, courts do not hesitate to conclude that their methodologies are so flawed that they should be entitled to no weight at all. *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1328 (N.D. Ga. 2008) (finding defendant's likelihood of

---

[10] "The 'universe' is that segment of the population whose perceptions and state of mind are relevant to the issues in this case. § 32:159.Relevant "universe" surveyed—Defining the universe, 6 McCarthy on Trademarks and Unfair Competition § 32:159 (5th ed.).

confusion survey as having "dubious value as proof of consumer confusion" because the survey was overinclusive by failing to screen respondents to ensure that they would likely be aware of and be able to make relevant distinctions concerning the products); *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1467 (D. Kan. 1996) (excluding trademark survey because it was "clearly not representative" of the relevant consumer market).

Here, Nike's Experts each failed to ensure the universe sampled "align[ed] with NIKE's own definition of the market for its Nike Pro line of apparel, and a consequent failure to include any consumers who were likely to have been target customers of Lontex." (Ex. D, McDonald Rebuttal, ¶ 13). ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Nevertheless, the Experts each instead made the fatal mistake of surveying only "consumers who dabble in athletic activity or who purchase athletic apparel . . . ." (*Id*. at ¶ 15).

"If the universe is skewed, then the conclusion will similarly be skewed. If an expert . . . testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 120 (3d Cir. 2004) (affirming district court's exclusion of survey testimony based on improper survey universe as fundamentally flawed and inadmissible under *Daubert* and Rules 403 and 702). In *Citizens Financial Group*, the exclusion of the survey was affirmed by the Third Circuit because it included an overbroad universe of respondents. *Id*. at 120-21. The same fundamental problem taints Nike's Surveys here.

As described above, the Experts' Surveys are based on questions posed to a general swath of the population, which disregards whether they actually fall within even Nike's

target/core demographic for its relevant Nike Pro clothing category. In general, well over half of the respondents were outside the Nike Pro population of 18-26 year old. (Ex. A, Poret Report at 36; Ex. B, Ezell Report, ¶ 15 n.5; Ex. C, Scott Report, ¶ 24). As long as the respondent had or planned to buy athletic or exercise apparel, that was enough, ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████ (Ex. D, McDonald Rebuttal, ¶ 16 (quoting ████████████████)). The prospective customers of Nike's specific Nike Pro line are not "people who [do] nothing more vigorous than purchasing athletic apparel . . . ." nor are they individuals "who do nothing more energetic than run errands in their athletic apparel." (*Id.* at ¶ 17).

There is no reason why Nike could not have sampled the appropriate universe. There was plenty of evidence informing the Experts what the appropriate universe was, every ability to qualify this narrower actual audience of prospective customers of Nike Pro. But Nike's experts summarily ignored this in favor of an improperly overinclusive universe that serves no purpose. Thus, while perhaps buried somewhere in this overinclusive universe may be lurking some respondents who actually fit the profile, the results are skewed against knowing how such "sharp point" and narrow subset actually think. And Nike gathered no information that would allow Nike, Lontex, the Court or any trier of fact to winnow the results down to a meaningful un-skewed and representative sample size of just such actual prospective customers of Nike Pro. (*See* McDonald Report, ¶ 18 ("If you don't have the right consumers in your sights, then any measure of confusion is irrelevant, much less a methodologically flawed one.")).

The Court should exclude the Surveys for this purpose. *See Kars 4 Kids, Inc.*, 2019 WL 1755912, at *9 (finding survey results and any opinion evidence based on the survey results

inadmissible under Rules 403 and 702 in part due to failure to properly limit the universe of the survey); *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. CIV.A. 01-1524, 2003 WL 24010950, at *1 (W.D. Pa. Apr. 23, 2003), *aff'd sub nom. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) (rejecting survey because survey was "fatally flawed due to an irrelevant and improper universe . . . .").

**B.** **Both the Poret and Ezell Surveys are Inadmissible On the Issue of Reverse Confusion as They Failed to Sample Lontex's Potential Customer Base (and Ezell Failed to Provide the Appropriate Stimulus)**

Reverse confusion is not susceptible here to a two-for-one survey. Yet that is exactly what Poret and Ezell attempted – to opine on reverse confusion through surveys that made design choices fundamentally inconsistent with and disqualifying of a reverse confusion survey.

 As this Court previously observed, Lontex's claims involve theories of both forward and reverse confusion. (*See* FAC, ¶ 42). "'Reverse confusion occurs when a larger, more powerful company . . . uses the trademark of a smaller, less powerful senior owner . . . and thereby causes likely reverse confusion as to the source of the senior user's goods.'" *Citizens Fin. Grp., Inc.*, 383 F.3d at 120 (quoting *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 474 (3d Cir. 1994)). Specifically, Nike's use of Lontex's COOL COMPRESSION® mark has caused confusion as to the source of Lontex's goods. (*See*, *e.g.*, FAC, ¶ 76). This results in two flaws warranting *Daubert* exclusion.

*First*, Poret and Ezell use the wrong universe of respondents for a reverse confusion survey. It is axiomatic in trademark law that the proper universe for a likelihood of confusion survey in a reverse confusion scenario is the "senior user's" (*i.e.*, Lontex) customer base. *Citizens Fin. Grp., Inc.*, 383 F.3d at 120. (citations omitted). Poret and Ezell's Surveys should be excluded for failing to do just that. *Id.* at 119 ("'A survey of the wrong 'universe' will be of little probative value in litigation.'").

The Poret and Ezell Surveys did not focus on Lontex's customer base rendering their respective surveys methodologically flawed and properly excluded. Stated differently, these surveys do not "fit" the facts of the case, the prototypical grounds for exclusion under *Daubert*. The Third Circuit case, *Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*, is instructive. In *Citizens Financial Group, Inc.*, the Defendant submitted a survey purporting to demonstrate reverse confusion. 383 F.3d at 119. However, Defendant's expert did not survey Plaintiff's "customer 'base'" because respondents were selected from areas where Plaintiff had little to no presence. *Id*. The Third Circuit also agreed with the district court's rejection of Defendant's argument that, in reverse confusion scenarios, the proper universe is potential customers of both parties. *Id*. at 121. Rather, the Third Circuit made clear that "[t]he court should limit survey evidence in reverse confusion cases to the customers of the senior user." *Id*.

Here, as detailed above, the Poret and Ezell surveys, which are being submitted to show a zero percent likelihood of confusion, failed to account for the proper universe for reverse confusion and definitely drew from a universe that excluded large parts of Lontex's customer demographics. Poret and Ezell instead focused on customers who were outside the target zone, and therefore beyond the pale of relevance. (Ex. D, McDonald Rebuttal, ¶ 5; *see also* Poret Tr. 45:23-25 ("Q: How many – how many actual Lontex customers were included in you sample size? A: I don't know, but it's not relevant.")).[11] It is undeniable that Nike also had knowledge of Lontex's four core demographics, including professional athletes, individuals focusing on physical rehabilitation, serious non-professional athletes, and individuals seeking the benefits of compression technology. (Ex. E, Nathan Tr. 287:16-289:21; Ex. H, Bechtel Tr. 244:17-245:25; Ex. I, Drews Report, Schedule 9). Indeed, Poret admitted in deposition to committing the same

---

[11] Wagner Decl., ¶ 14, Ex. L.

mistake that was made in *Citizens Financial Group, Inc.* by focusing on potential customers of both parties.

> Q: and where – what did you determine was the universe for your survey?

> A: well, on a high level, I – well, to clarify, we have both Lontex and Nike here, and they – I basically, for the purposes of this survey, you know, credited or gave the benefit of the doubt to Lontex's allegations or claims that there is meaningful overlap in the customers of both parties. So I basically defined what would be the universe of individuals who would be ***prospective purchasers of either parties' products in this case***, and I referred to that as clothing for athletic, or exercise performance, or support. (Ex. L, Poret Tr. 26:5-17).

Ezell similarly admits in the Ezell Report that he surveyed "a survey universe of ***potential purchasers of Defendant's class of goods (i.e., athletic performance apparel)***. (Ex. B, Ezell Report, ¶ 11).

Over the relevant time period, purchases of Lontex's SWEAT IT OUT® compression garments with COOL COMPRESSION® technology were largely accounted for by professional athletes or their teams, an overlapping base with Nike's accused COOL COMPRESSION products. (Ex. I, Drews Report, Schedule 9). In fact, NFL teams alone accounted for well over half of Lontex's relevant sales. (*Id*. at Schedules 9-10). Yet the odds of even a single professional player being in the generalized sample size of 400 used by Poret and Ezell is staggering. For example, of 482,740 high school baseball athletes, only 7.5% go on to NCAA, and only 9.9% of those go on to play professionally – *i.e.*, 0.74% of baseball athletes. (Wagner Decl., ¶ 15, Ex. M). Football is a similar 7.3% to NCAA and 1.6% to professional football, or a miniscule 0.12%. (*Id*.). Thus, even if every one of the 800 respondents from Porret and Ezell's surveys had even played high school athletics, only somewhere between 1 and 6 would be professional players. And because a number far less than 100% of Respondents would have actually played high school athletics to begin with, the number is actually far below that. This is far below a meaningful sample size for statistical survey purposes, nor can the Respondents fitting this

parameter be teased out, because this demographic data was not gathered in the first place. This means the surveys are misleading and can offer zero relevance as to over half of the overlapping prospective customers of Nike and Lontex's relevant products.

The same basic math is evident for the other core demographics of Lontex: Individuals focusing on physical rehabilitation and serious non-professional athletes. (Ex. E, Nathan Tr. 84:6-89:20, 94:5-95:3; Ex. F, Cammarota Tr. 41:14-42:25, 51:8-22; Ex. G, Williams Tr. 47:16-48:1). The proportions of such groups in a general audience of those who have or might buy athletic or exercise clothing is far different than in Lontex's potential customer base, given these are its core audience. The surveys thus only potentially measure Lontex's final catch-all core audience of those seeking the benefits of compression garments.

Because large portions of Lontex's relevant potential customers are not included in Poret or Ezell's surveys, and because even if they were there was no information gathered (or a sufficient sample size of such groups) that would allow adjustments to be made to approximate actual proportions of Lontex's relevant marketplace, such skewed results cannot be properly put into perspective and adjusted by the trier of fact in attempting to assess reverse confusion. As all Nike's experts recognize, having respondents track the demographic proportions of the relevant universe is critical to a survey. (Ex. A, Poret Report at 30, 35; Ex. B, Ezell Report, ¶ 13; Ex. C, Scott Report, ¶¶ 11-14).

Thus, as explained by the Third Circuit in *Citizens Financial Group, Inc.*, the Poret and Ezell surveys should be excluded and barred from use as to reverse confusion, because they did not limit the universe to Lontex's customer base. *See also Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 460 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (excluding survey in part because the survey "did not even attempt to gauge or contact [Plaintiff's] customer base" in a

reverse confusion scenario and also failed to replicate marketplace conditions because the expert did not present the parties' marks as they appear in commerce); *vonRosenberg*, 413 F. Supp. 3d at 455; *Winning Ways, Inc.*, 913 F. Supp. at 1467.

*Second*, compounding to this fundamental flaw of reverse confusion for the Ezell survey, the Ezell survey also shows only a stimulus of Nike's infringing product, not Lontex's product. In a reverse confusion survey, it is a consumer's likely confusion when presented with the senior user's stimulus that matters. *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2016 WL 8793317, at *12 (S.D. Fla. Jan. 7, 2016) ("In a reverse confusion case, the ***[Eveready] survey shows respondents an example of the senior user's mark as used in commerce*** and then asks respondents a series of open-ended questions designed to test whether respondents believe the junior user is the source, affiliate, or sponsor of the senior user's mark." (emphasis added)); *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 CIV. 4112 AJP, 2014 WL 814532, at *20 (S.D.N.Y. Mar. 3, 2014) (finding persuasive defendant's *Eveready* survey using a pair of Plaintiffs jeans as a stimulus for a reverse confusion analysis). Reverse confusion is the consumer's confusion when encountering the senior user's mark (Lontex) after seeing the larger junior user's (Nike) mark, in believing that Lontex is using Nike's mark. *Id*. at *21 (S.D.N.Y. Mar. 3, 2014). Thus, Ezell's stimulus of Nike's accused product leaves him unable to draw any meaningful conclusions about the likelihood of reverse confusion here. Ezell's survey and opinion should be excluded as to reverse confusion for this additional reason.

### C.     The Overwhelming Noise Experienced Due to Poret's Survey Design Is Fatal

Not every trademark case is conducive to a survey. Particularly, where a study cannot be or simply is not designed and carried out so as to minimize inherent "noise" to an acceptable level, then it should be excluded as unreliable and not helpful to the trier of fact. If a survey's

noise rises to levels well-recognized as legally sufficient to demonstrate likely confusion, then the survey's foundation upon which the test trademark is built is itself too infirm to support the weight of any meaningful conclusions.

The Poret Survey here is also properly excluded because its reliability is undermined by the high confusion rate elicited by the controls he used. As Dr. McDonald explained, "noise levels approaching 30% have been flagged as evidence of an inherently *noisy* design, or a *noisy* control that is prompting some level of acquiescence." (Ex. D, McDonald Rebuttal ¶ 38). Here, the control arm of the Poret Survey reached a minimum of 27%, a number which Poret expressed no concern over as he appears content to blunder past high noise rates in his studies:

> Q: In your professional experiences, would you – following up – strike that. I'm following up on your last statement. In your professional experiences, what do you consider, in a Squirt survey, to be ordinary or the normal range of noise?
>
> A: Most of the Squirt surveys that I do or see have noise levels in the 20 to 40 percent range, I would say. (Ex. L, Poret Tr. 127:21-128:4).

Showing himself out of touch with reasonable measures, Poret seems to not be concerned with high levels of noise until it reaches a staggering 80%:

> Q: Have you ever criticized, in a likelihood of confusion survey in a Lanham Act case, a survey of other experts for having too much noise?
>
> A: Not that I can think of. I've certainly criticized surveys for having controls that were insufficient to contend with high levels of noise. I do think that if a level of noise gets to a certain point, it might suggest that there's some other problems. You know I do have a vague sense that I run into surveys that have had, you know, 70 or 80 percent noise levels, which clearly had some problem that goes beyond what is – what is normal and standard. So it's – it's possible. I certainly would have concerns about noise levels that go far beyond anything that, you know should be expected. (Ex. L, Poret Tr. 127:4-20).

In his quest to pull off over 100 surveys a year, Poret seems unable to admit that there are many scenarios where noise or setting are simply not conducive to a reliable and useful survey, or to depart from his over-simplified noise-cancellation arithmetic. But Courts cannot accept such unscientific approach. For example, the Court in *Academy of Motion Pictures Arts and Sciences*

*v. GoDaddy.com, Inc.* excluded a survey (of another expert in this case, Dr. Scott) exhibiting a "'background environmental' confusion rate of 18%." No. CV 10-3738 ABC (CWX), 2013 WL 12122803, at *4 (C.D. Cal. June 21, 2013). Relying on Jacob Jacoby's article, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REP. 890, 932 (2002), the Court determined that with 18% noise "Scott's controls yielded a confusion rate almost double the maximum rate that a control should yield." Thus, the Daubert motion was granted.

In the case at bar, the Poret Survey yielded a staggering confusion rate of 59.5% in the control groups. (Ex. A, Poret Report at 44). Under Poret's survey design this many people were confused into thinking there was an association with Lontex even with a control trademark name "Hyperform Compression Shorts" – a name that did not even use any form or synonym of the word "COOL." (*Id*. at 21, 44). The only similarity appears to be that Lontex's product and the control product are both compression products that identify themselves as "compression." (*Id*.). That is the structural noise of the surveyed population being confused that is built right into the survey design. That is nearly 6 times the usual limit for noise. *Acad. of Motion Pictures Arts & Scis.*, 2013 WL 12122803, at *4 (citing Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REP. 890, 932 (2002) ("[I]n the best of all possible worlds, it would not be desirable for a control to yield confusion estimates that exceeded 10 percent. If it did, the control itself would begin to reach an actionable level of confusion and its utility as a control thereby compromised.")).

Whatever reason one might ascribe to it, that Poret's controls could create confusion as high as 59.5% without a single similar trademark is a foundational problem. That the audience was confused into an affiliation simply because both were compression products means the

survey itself was too confusing to be of assistance. Poret's survey – with control confusion as high as 59.5% – should be excluded.

Nike may attempt to suggest that its ability to get controls down to the 30% range using stronger brands warrants a different result. Not so. It simply confirms this initial confusion.

According to Poret, using a stronger brand as a control was able to reduce some of the survey's noise. (Ex. L, Poret Tr. 136:1-137:19). Thus, he chose for a Nike control the product name "Nike Compression 6" Shorts – Men's," a control trademarks that uses no form, synonym, antonym, or approximation of "Cool" in proximity to "Compression." (Ex. A, Poret Report at 21, 27). But even accepting Poret's leap that use of the Nike brand is what brought noise below 59.5% (an unsupported leap), that only reduced structural noise to about 27.5%. This is still about three times the amount required to prove likelihood of confusion – and all without the trademark being introduced.

The inability to curb noise in Poret's survey design below this means it remains fatally unhelpful and unreliable at measuring an accused trademark dropped into such environment. That is still noise nearly triple the amount of permissible noise and triple the usual amount of confusion accepted as proof of actual trademark confusion. *Acad. of Motion Pictures Arts & Scis.*, 2013 WL 12122803, at *4. Introducing Nike's infringing trademark into such an environment to measure its effect did *not* actually allow its effect to be meaningfully measured. (Ex. D, McDonald Rebuttal ¶¶ 39, 50-53).

As *Academy of Motion Pictures* recognizes, at some point the static in the radio is too loud to make out the tune being played. For that case, 18% "noise" was well above it. Nike's multiple noisy controls show this to also be just such an instance, with 59.5% built in and an inability to curb that asserted noise sufficiently to avoid even the approximately 30% number –

leading Dr. McDonald to find the survey unhelpful and elucidating nothing as to the likelihood of confusion in this case. Far from being helpful to the jury and reliable, it simply risks confusing the jury. (Ex. D, McDonald Rebuttal ¶ 53).

Thus, the noise is yet an additional reason the Poret Survey is fatally flawed and should be excluded. *See also Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 436 (E.D. Pa. 2012) (disregarding proffered likelihood of confusion rate where the survey "lacked a valid control under the accepted methods of taking trademark surveys").

### D. The Surveys, Reports, and Related Testimony are Prejudicial, Misleading, and a Waste of Time, and Should Be Excluded Pursuant to FRE 403

Even if the Surveys had any potential relevance to likelihood of confusion or consumers' purchase interest in this case (which they do not), the Surveys, the Reports, and any related testimony should still be excluded because any probative value is substantially outweighed by the dangers of their being unfairly prejudicial, misleading, and wasteful of the Court's time. Fed. R. Evid. 403; *See United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995) ("Even after the Daubert decision, otherwise admissible evidence may be properly excluded under Rule 403."). The Surveys are rife with design deficiencies, the above-noted design deficiencies being more than enough but only emblematic of other deficiencies; as a result, they only serve to prejudice Lontex and to waste the Court's and jury resources. Rule 403 is designed to prevent this. *See Citizens Fin. Grp., Inc.*, 383 F.3d at 121 (holding district court properly excluded survey because its "methodology was fundamentally flawed and because the danger of undue prejudice far outweighed the limited probative value of the survey, especially for a jury"); *Starter Corp. v. Converse, Inc.*, 170 F.3d 276, 297 (2d Cir. 1999) (holding district court "did not abuse its discretion finding that any probative value of the survey was outweighed by its potential to confuse the issues in the case").

## V.  **CONCLUSION**

For all these reasons, the Surveys, Reports, and related testimony are not probative or relevant to the issues in this case under Rule 403 and also are not sufficiently reliable under Rule 702. All three should be excluded for using a fatally defective universe. Poret and Ezell's surveys and opinions should also be excluded as to reverse confusion. And Poret's survey should be excluded for the additional reason of its fatally high levels of noise. Accordingly, Lontex respectfully requests this Court to exclude from evidence the Surveys, the Reports, and any related testimony.

Dated: November 4, 2020               TROUTMAN PEPPER HAMILTON SANDERS LLP

By: */s/ Ben L. Wagner*
　　Ben L. Wagner (CA SBN 243594)
　　ben.wagner@troutman.com
　　*Admitted Pro Hac Vice*
　　11682 El Camino Real, Suite 400
　　San Diego, CA  92130-2092
　　Telephone:   858-509-6000
　　Facsimile:    858 509 6040

　　Michael A. Schwartz (PA 60234)
　　3000 Two Logan Square
　　Eighteenth & Arch Streets
　　Philadelphia, PA 19103-2799

　　*Attorneys for Plaintiff*
　　*LONTEX CORPORATION*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 4, 2020, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


*/s/ Ben L. Wagner*
Ben L. Wagner