**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION, | Civil Action No.:  18-cv-5623 |
| Plaintiff, | |
| | (Hon. Michael M. Baylson) |
| v. | |
| NIKE, INC., | |
| Defendant. | |

**DEFENDANT NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
ITS OMNIBUS MOTION TO EXCLUDE THE PROFFERED TESTIMONY AND
OPINIONS OF SUSAN MCDONALD, JEFFREY PARKHURST, AND DAVID DREWS**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    BRIEF BACKGROUND RELEVANT TO THE MOTION ................................3

      A.    NIKE's Longstanding NIKE PRO Product Line & Its Lack of Promotion of Anything "Cool Compression"...............................................4

      B.    Lontex and Its Lack of Promotion of Cool Compression .......................4

      C.    Lontex's Allegations and the Role of the Experts ...................................5

III.    LEGAL STANDARD .........................................................................................9

IV.    ARGUMENT ....................................................................................................11

      A.    This Court Should Exclude Dr. McDonald...........................................11

            1.    Dr. McDonald's Testimony Is Not Based on Sufficient Facts or Data .....................................................................................11

            2.    Dr. McDonald Criticizes Well-Respected and Reliable Survey Methodologies by Hypothesizing that Unorthodox Methodologies Should Have Been Used Instead.......................17

            3.    Dr. McDonald Relies Solely on Her Own *Ipse Dixit* ...............20

            4.    Dr. McDonald Seeks to Offer Many Opinions that Are Not Rebuttal Opinions, But Rather Are Improper Opinions on Marketing and Branding, Trademark Law, and Intent. ...........23

      B.    This Court Should Exclude Jeffrey Parkhurst .......................................28

            1.    Mr. Parkhurst's Opportunity Value Opinion Should Be Excluded ..........28

                 a.    Mr. Parkhurst Concedes that His Proposed "Lost Opportunity Value" Measure Ignores Causation Principles. ...........................29

                 b.    Mr. Parkhurst Concedes that His Lost Opportunity Value Opinion Is Speculative................................................30

                 c.    Mr. Parkhurst's Methodology for Determining Opportunity Value Is Novel and Unreliable......................................................33

             2.    This Court Should Exclude Mr. Parkhurst's Corrective Advertising Opinion ......................................................................35

                 a.    It is Inappropriate for Mr. Parkhurst to Opine on Consumer Perception Without Conducting a Survey of Consumers' Perceptions ...............................................35

                 b.    Mr. Parkhurst's Corrective Advertising Methodology Layers on Additional Speculation to "Design" a Remedy .......................39

                 c.    Mr. Parkhurst Is Out of Sync with the Law and the Facts............40

i

    C.    This Court Should Exclude Almost All of David Drews's Opinions ................... 41

        1.    Mr. Drews's Corrective Advertising Opinion Should Be Excluded ........ 42

        2.    Mr. Drews's Reasonable Royalties Opinion Should Be Excluded ........... 42

        3.    Mr. Drews's Profits Disgorgement Opinion Should Be Excluded ........... 43

            a.    Mr. Drews's Profits Disgorgement Opinion Is Unreliable ........... 44

            b.    Mr. Drews's Profits Disgorgement Opinion Is Speculative and Contradicted by the Evidence ....................................................... 49

V.    Conclusion ................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    166 F.3d 197 (3d Cir. 1999).................................................................................45

*AstraZeneca LP v. TAP Pharmaceutical Products, Inc.*,
    444 F .Supp. 2d 278 (D. Del. 2006)...............................................................9, 27

*Berckeley Inv. Grp. Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)...............................................................................28

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) .............................................................................49

*Broan Mfg. Co., Inc. v. Associated Distributors, Inc.*,
    923 F.2d 1232 (6th Cir. 1991) ...........................................................................30

*Castrol, Inc. v. Pennzoil Quaker State Co.*,
    169 F. Supp. 2d 332 (D.N.J. 2001) ...................................................................45

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
    921 F.2d 467 (3d Cir. 1990)...............................................................................13

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
    No. CIV.A. 01-1524, 2003 WL 24010950 (W.D. Pa. Apr. 23, 2003).............21, 22, 27, 35, 42

*Citrus Grp., Inc. v. Cadbury Beverages, Inc.*,
    781 F. Supp. 386 (D. Md. 1991) .......................................................................26

*Cole v. Homier Distrib. Co.*,
    599 F.3d 856 (8th Cir. 2010) .............................................................................35

*Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*,
    855 F.3d 163 (3d Cir. 2017)...............................................................33, 35, 48, 50

*CPC Properties, Inc. v. Dominic, Inc.*,
    No. CIV.A. 12-4405, 2013 WL 5567584 (E.D. Pa. Oct. 9, 2013).........................45

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D. N.J. 2004) ..................................................................23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).............................................................................. *passim*

*Dominguez v. Yahoo!, Inc.*,
No. CV 13-1887, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017) .................................................10

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)........................................................................................................10

*Elorac, Inc. v. Sanofi-Aventis Can., Inc.*,
2017 WL 3592775 (N.D. Ill. Aug. 21, 2017) ..................................................................30, 49

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)........................................................................................................10

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997).......................................................................................10, 20, 29, 32

*Goodman v. Harris Cnty.*,
571 F.3d 388 (5th Cir. 2009) ..................................................................................................25

*Gucci Am., Inc. v. Daffy's Inc.*,
354 F.3d 228 (3d Cir. 2003) (en banc)....................................................................................45

*J.T. Colby & Co. v. Apple Inc.*,
2013 WL 1903883 (S.D.N.Y. May 8, 2013) ................................................................9, 18, 20

*Jimenez v. City of Chicago*,
732 F.3d 710 (7th Cir. 2013) ..................................................................................................25

*Karn v. Ingersoll-Rand Co.*,
168 F.R.D. 633 (N.D. Ind. 1996) .............................................................................................17

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ................................................................16, 50

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................................................10, 11

*Lang v. Kohl's Food Stores, Inc.*,
217 F.3d 919 (7th Cir. 2000) ..................................................................................................16

*Lindy Pen Co. v. Bic Pen Corp.*,
982 F.2d 1400 (9th Cir. 1993) ................................................................................................45

*Liu v. Sec. & Exch. Comm'n*,
140 S. Ct. 1936 (2020)..............................................................................................................45

*Marketquest Grp., Inc. v. BIC Corp.*,
316 F. Supp. 3d 1234 (S.D. Cal. 2018)....................................................................................42

*Marmo v. Tyson Fresh Meats, Inc.*,
   457 F.3d 749 (8th Cir. 2006) ................................................24

*McNeal v. SDG Macerich Properties, L.P.*,
   No. C 07-4015 MWB, 2008 WL 2691047 (N.D. Iowa July 1, 2008) ....................32

*Merisant Co. v. McNeil Nutritionals, LLC*,
   242 F.R.D. 315 (E.D. Pa. 2007)...................................................9, 15, 25

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
   316 U.S. 203 (1942)................................................46

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994).................................................10, 25, 42, 49

*Peals v. Terre Haute Police Dep't*,
   535 F.3d 621 (7th Cir. 2008) ................................................25

*Restivo v. Hessemann*,
   846 F.3d 547, 577 (2d Cir. 2017)................................................32

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................21

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010)................................................7, 25

*Saxon Glass Techs., Inc. v. Apple Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019)................................................27, 35

*Schiller & Schmidt v. Nordisco Corp.*,
   969 F.2d 410 (7th Cir. 1992) ................................................33

*Silver Stage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ................................................33

*SportFuel, Inc. v. PepsiCo, Inc.*,
   932 F.3d 589 (7th Cir. 2019) ................................................26

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999)................................................10, 34, 35

*Trouble v. Wet Seal, Inc.*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001)................................................15

*Trovan, Ltd. v. Pfizer, Inc.*,
   No. cv 98–94 LGB (MCX), 2000 WL 709149 (C.D. Cal. May 24, 2000)............43

*United States v. 87.98 Acres of Land*,
    530 F.3d 899 (9th Cir. 2008) ..............................................................11

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984)..............................................................15

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) ...............................................20

*Water Pik, Inc. v. Med-Sys., Inc.*,
    726 F.3d 1136 (10th Cir. 2013) .........................................................17

*Zazu Designs v. L'Oreal, S.A.*,
    979 F.2d 499 (7th Cir. 1992) .............................................................40

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*,
    LLC, 571 F.3d 206 (2d Cir. 2009) .....................................................31

*Zimmer, Inc. v. Stryker Corp.*,
    2018 WL 276324 (N.D. Ind. Jan. 3, 2018) ........................................49

**Statutes**

15 U.S.C. § 1115(b)(4) .............................................................................26

15 U.S.C. § 1117(a) .................................................................................40

**Other Authorities**

Fed. R. Evid. 403 ...............................................................................11, 27

Fed. R. Evid. 702 ............................................................................. *passim*

Fed. R. Evid. 702 advisory committee note.........................................11, 34

McCarthy on Trademarks and Unfair Competition (5th ed.).................... *passim*

Defendant NIKE, Inc. ("NIKE") respectfully submits this memorandum of law in support of its Motion to Exclude the testimony of Plaintiff Lontex Corporation's ("Lontex") proposed expert witnesses, Susan McDonald, Jeffrey Parkhurst, and David Drews, pursuant to Federal Rule of Evidence 702.

## I.     INTRODUCTION

This Court should exclude the opinions and proffered testimony of the proposed experts because their opinions do not meet the minimum standards of reliability for admissible expert testimony under the Federal Rules of Evidence and *Daubert*.  Each has offered opinions: (1) based on unreliable methodologies, (2) untethered from the facts and evidentiary record, and (3) that simply parrot the legal conclusions of Lontex's counsel.  More specifically:

>  **1.**     Lontex proffers the testimony of a rebuttal expert, Susan McDonald, to criticize the three consumer surveys NIKE produced in this case.  Instead of presenting its own survey evidence, Lontex retained Dr. McDonald to lob unfounded criticisms at NIKE's survey experts, and her testimony needs to be excluded for three key reasons: (a) she criticizes NIKE's experts based on an "understanding" of the facts that Dr. McDonald admitted during her deposition was erroneous, (b) she opines that NIKE's experts' results may have been flawed because those experts did not use *unorthodox* methodologies (more akin to those that Dr. McDonald has herself been previously excluded for using), and (c) her opinion strays well beyond her authorized rebuttal by offering non-rebuttal marketing opinions and improper legal conclusions about trademark law, including NIKE's purported intent (another transgression for which she has previously been excluded).  Moreover, ***she does not cite any evidence or any authority anywhere in her rebuttal report***.  Dr. McDonald's testimony, which is not based on sufficient facts or data

and has not reliably applied principles or methods accepted for surveys in trademark cases, would only mislead, instead of assist, the trier of fact.

**2.**     Lontex proffers the testimony of Jeffrey Parkhurst, a so-called "branding" expert, who serves as a hired gun to buttress Lontex's wildly inflated damages demands, using methodologies that Mr. Parkhurst admitted at his deposition have never been credited by any court.   One of these methodologies is something Mr. Parkhurst defines as "opportunity value" – a novel theory under which he suggests Lontex should be entitled to recover ▮▮▮▮▮ in lost "expansion opportunities."   This superficial financial analysis assumes that Lontex would have increased its business by a rate of 2,485% in 2016 (a rate that is incredibly inconsistent with prior operating data for the company), and is completely untethered from any facts in the record.   And if that were not enough, this opinion fails as a matter of law because ***Mr. Parkhurst conceded at his deposition that NIKE did not cause Lontex to lose any opportunities.*** Without proximate cause, Mr. Parkhurst's opinion that Lontex "lost opportunities" has no relevance other than to attempt to prejudice the trier of fact against NIKE.   Mr. Parkhurst's second opinion takes that attempt to bias a step further.   Mr. Parkhurst opines that Lontex is entitled to a "corrective advertising" remedy that would expose 80 million consumers to Lontex based on an imaginary number of NIKE "misimpressions" – ***a prejudicial term that Mr. Parkhurst concedes he made up for purposes of this case.***   The law is clear that the purpose of corrective advertising is to remedy *past or existing* consumer confusion in the purchasing context, yet Mr. Parkhurst admits that he made no effort to measure or identify the confusion for which he offers his corrective "marketing plan," even though he is well aware of study designs that can be used

2

to do so. Mr. Parkhurst's testimony, which skips over the quintessential inquiry to offer any corrective advertising opinion, lacks any probative value.

    **3.**    Lontex proffers the testimony of David Drews, a damages expert, who has opined that Lontex is entitled to damages well in excess of  ███████ – an inequitable windfall that cannot be justified by the facts and evidence. His estimate of Lontex's recovery has four components: (i) a ████████ corrective advertising award (based, in part, on the unreliable analysis of Mr. Parkhurst); (ii) a ███████ reasonable royalties award; (iii) disgorgement of NIKE's estimated ███████ in profits for NIKE's sale of NIKE Pro products which Lontex has recharacterized as the "Accused Products"; and (iv) a ██████ award of Lontex's lost profits. While NIKE disputes all four conclusions for a variety of reasons, Mr. Drew's first three conclusions suffer so severely from unscientific guesswork and blind reliance on Lontex's counsel that the Court should exclude all testimony on them under Federal Rule of Evidence 702(b).

## II.    BRIEF BACKGROUND RELEVANT TO THE MOTION

Lontex alleges that NIKE infringed its COOL COMPRESSION trademark by virtue of NIKE's past use of the generic words "cool" and "compression" next to each other in some written product descriptions for some NIKE products. (SOF ¶¶ 162-166; *see* First Am. Compl. ¶ 20-21, ECF No. 20.)[1] Although Lontex speaks in terms of "Accused Products" when referring to NIKE's sales, this is a self-serving misnomer, as there is nothing infringing about NIKE's products. (*See* SOF ¶¶ 128-162.) This is a case about words that appeared in some written materials only – not on products.

---

[1] Citations throughout this brief to "SOF" refer to paragraphs in the Statement of Undisputed Fact submitted in support of NIKE's motion for summary judgment, which was filed concurrently with this *Daubert* motion.

**A.     NIKE's Longstanding NIKE PRO Product Line & Its Lack of Promotion of Anything "Cool Compression"**

NIKE has long sold a popular line of NIKE PRO products that provide thermoregulation benefits to the wearer, with a family of products that keep the wearer "cool" and a family of products that keep the wearer "warm." (*See* SOF ¶¶ 128-135)  Because products in the NIKE PRO product line were offered in a variety of fit preferences, including a "fitted" fit and a tigther "compression" fit, the words "cool" and "compression" sometimes appeared next to each other when describing products in certain limited written materials for a limited period of time. (*See* SOF ¶¶ 138-140, 145, 162-166.)  NIKE PRO products prominently feature NIKE's SWOOSH mark on the chest or leg of the garment and the NIKE mark and "NIKE PRO" branding on the waistband, neck tape, hemline, and interior labeling. (*See* SOF ¶¶ 150-153.)  No NIKE product bears the phrase "Cool Compression" anywhere on the garment, garment labeling, or on any hangtags sold with the garment. (*See id.*)  NIKE never had any advertising campaigns featuring "Cool Compression." NIKE also never displayed the word "cool" next to the word "compression" in any other places that a consumer might encounter when looking to purchase a product from NIKE, such as retail store signage, press releases, athlete endorsements, or e-mail blasts. (*See* SOF ¶ 149.)

**B.     Lontex and Its Lack of Promotion of Cool Compression**

Lontex does business under the name SWEAT IT OUT and has two employees, Efraim Nathan and his daughter. (SOF ¶ 2.)  Lontex promotes its SWEAT IT OUT garments as having a special high-grade compression for prevention and rehabilitation of injury. (SOF ¶ 51.)  The compression fabric that Lontex uses is not proprietary to Lontex. (*See* SOF ¶¶ 41-44.)  According to Mr. Nathan, the high-grade compression "technology" for his SWEAT IT PRODUCTS is branded COOL COMPRESSION.  Lontex did not promote "COOL COMPRESSION" in any places where a customer would regularly encounter a mark, like on its website, social media, press

releases, brochures, or in a single e-mail to a customer any time ***until after*** Mr. Nathan saw some product descriptions containing "cool" next to "compression" within the nike.com webpages in December 2015.  (*See* SOF ¶¶ 62-98.)  Mr. Nathan explained why he never used COOL COMPRESSION in Lontex's promotions as follows:

> NIKE's Counsel:  But let me ask you this question: How do you expect anyone to know about this Cool Compression trademarks of yours if you never say it in any of the promotions?
>
> Mr. Nathan:  That's a great question.  Okay.  Let me give you a short answer. . . . Our product was unique and the only way to really actually make sense out of it is you liking it because it did what it did to you and you talked to your friends and they're buying.  This—that's why we never went to retail store. . . . In retail store is just to excite you.  We don't excite you.
>
> NIKE's Counsel:  So you don't think it would enticing, in your words, to put Cool Compression in an advertisement like this?
>
> Mr. Nathan:  I don't think so.  I really don't….

(Efraim Nathan Dep. at 990:24-992:23.)

### C.     Lontex's Allegations and The Role of the Experts

Lontex alleges in its complaint that NIKE's written descriptions that have strings of words, like "728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP  or 728049 NIKE PRO COOL 6" COMPRESSION SHORT, "leads consumers to falsely believe that Nike has obtained permission to use Plaintiff's COOL  COMPRESSION  branded  technology,  tapping  into  the goodwill associated with it,"  and suggests that NIKE "has acquired the rights to bring Plaintiff's COOL COMPRESSION products in-house."  (First Am. Compl. ¶¶ 20-21, ECF No. 20.)  Since Lontex's theory of the case presumes that consumers would already be aware of "COOL COMPRESSION" and would believe that NIKE is now associated with it, NIKE tested that theory by retaining a seasoned expert, Matt Ezell, to conduct a consumer survey using the *Eveready* methodology.  (Exhibit 1, M. Ezell Report.)  An *Eveready* study is considered the "gold standard"

for assisting courts in trademark infringement cases, as it exposes the relevant universe of defendant's consumers to defendant's use as it appears in the marketplace and asks questions designed to determine if consumers believe that defendant's products is put out by or affiliated with plaintiff or plaintiff's brand. *See* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:174 (5th ed.) (hereinafter, "MCCARTHY ON TRADEMARKS"); J.B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rptr 727, 733-734 (2016). Mr. Ezell's study found zero percent confusion. (Ezell Rep. ¶¶ 7-8.)

Because Lontex also opaquely alleges it "has been damaged by both forward and reverse confusion" in a single allegation of its complaint (First Am. Compl. ¶ 42, ECF No. 20), NIKE retained well-reputed expert, Hal Poret, to conduct a *Squirt* study, a methodology commonly recognized by courts to assist in trademark infringement cases which can measure both for forward and reverse confusion. (Exhibit 2, H. Poret Report); *see* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:174:50 ("Survey Formats—The Squirt Format for testing the likelihood of confusion issue."); *see also* Poret Rep. at 10. This sort of study favors a plaintiff who has a mark that is not well-known because it places it in a line-up with the use of the defendant which allows survey takers to familiarize themselves with the use of defendant's mark, and then asks survey takers standard questions to elicit any confusion as to source or affiliation between the plaintiff and defendant. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:174:50. Even with this more plaintiff-favorable methodology, Mr. Poret's study, found zero percent confusion. (Poret Rep. at 41-44.)

Next, since Lontex has theorized that NIKE received some benefit from using the generic terms "cool" and "compression" next to each other in some written descriptions within nike.com product pages, Dr. Carol Scott conducted a purchase interest study using standard scientific

principles governing survey research.  (*See* Exhibit 3, Dr. Scott Report.)  This survey tested whether consumers, upon seeing a nike.com page which was a replica of the one Lontex has complained about, are more interested than purchasing the product than are consumers who see the same page absent the inclusion of the "cool" and "compression" words.  (*Id.*; *see* SOF ¶¶ 223-226.) Dr. Scott's study found that use of those terms in the descriptions resulted in no increase to consumers' interest in purchasing the product.  (*See* Scott Report ¶ 26.)

Lontex, on the other hand, conducted no consumer surveys.  This is despite the fact that Lontex bears the burden of proof for likelihood of confusion, and consumer surveys are "the most direct method of demonstrating [] likelihood of confusion."  *Charles Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990); *see Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 190 (3d Cir. 2010) (Ambro, J., concurring) (explaining that where a trademark plaintiff "could have easily conducted a survey of customers to assess actual confusion in the relevant market . . . we could reasonably infer that [the plaintiff] expected that any survey results would undermine its case").  Instead, in its case in chief, Lontex disclosed Mr. Parkhurst, a consultant who styles himself as an expert in the "creation, management and valuation of brands" and David Drews, a damages expert.   (Exhibit 4, Jeffrey Parkhurst Report (quote from Parkhurst C.V.); *see* Exhibit 5, J. Parkhurst Supp. Report; Exhibit 6, J. Parkhurst Dep.; Exhibit 7, David Drews Report; *see* Exhibit 8, D. Drews Supp. Report; Exhibit 9, D. Drews Dep.)

Mr. Parkhurst admits that he is versed in conducting consumer surveys to measure consumer perceptions, but did not do so here.  (J. Parkhurst Dep. at 58:5-16, 127:8-23; *see* SOF ¶ 227.)  The only field work that Mr. Parkhurst did was to ask a sales clerk in a major retailer to direct him to "NIKE Cool Compression," which caused the sales clerk to lead him to a NIKE rack in the store, from which he opines this is evidence of association between "COOL

COMPRESSION" and NIKE.  (J. Parkhurst Dep. at 74:15-75:19.)  However, when asked why he did not simply ask a store clerk to direct him to "Cool Compression" to see where that would have caused the store clerk to lead him, he could not explain.  (*Id.* at 262:4-267:21.) Without having asked a single consumer about his/her perception of NIKE's use of the words "cool" and "compression" on a product page within nike.com, he opined that every sale NIKE made of certain NIKE PRO products identified by Lontex's counsel, ███████████████████████████ was as the result of a "misimpression" that would need to be corrected through a corrective advertising campaign funded by NIKE so Lontex's products could be exposed to 240 million views. (J. Parkhurst Rep. ¶¶ 97-102 & Figure 6.)  Mr. Parkhurst also offers speculation in the form of something he calls an "opportunity value" opinion on how COOL COMPRESSION could have grown at exponential rates in the 2016 and forward time frame, based on his review of ***other*** companies that have had growth success stores.  (J. Parkhurst Rep. ¶¶ 53-58.) But Mr. Parkhurst does not consider the differences between these other companies and Lontex, nor does he contemplate Lontex's long history of meager financials, lack of proprietary technology, lacking ability to scale given its size and sourcing models, or the fact that Mr. Nathan admitted that "COOL COMPRESSION" was not enticing enough for Lontex to consider including in its out advertisements for approximately 8 years.  (*See, e.g.*, J. Parkhurst Rep. ¶¶ 43-53; Parkhurst Dep. at 65:5-66:19.)

David Drews, Lontex's "damages expert" also opines that NIKE should pay corrective advertising damages to Lontex based on Parkhurst's opinion that there were millions of "misimpressions" associated with the sale of NIKE Pro product, opining the campaign would cost ██████████. (Drews Report at 20-23; *see* Drews Supp. Report 3-4.) In addition, Mr. Drew tallies together totals from multiple other forms of compensatory damage theories plus an unjust

enrichment theory based on disgorgement of NIKE profits to opine on a total damages award of over ██████████ for Lontex, notwithstanding that Mr. Drews calculates Lontex's alleged lost profits at no more than ██████████ (Drews Supp. Report at 3-4 & Schedule 1.)

Finally, Dr. McDonald was retained by Lontex after NIKE disclosed its consumer survey experts. (*See* Exhibit 10, McDonald Report; Exhibit 11, McDonald Dep.)  Lontex sought leave on March 13, 2020, "to have a single *rebuttal* expert who is not going to duplicate a survey, [but] who is going to evaluate their surveys and be able to explain . . . the flaws of their three survey experts." (Hr'g Tr. at 72:1-14, ECF No. 157.)  NIKE did not object to the rebuttal-only expert, and this Court allowed Lontex to "serve a rebuttal report." *Id.* at 72:21-73:4; *see also id.* at 67:23-25 ("I don't allow new experts to come in on rebuttal.").  Dr. McDonald's expert work and opinions have been excluded and seriously questioned by Courts in a number of past cases. *See, e.g.*, *J .T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *17-20 (S.D.N.Y. May 8, 2013) (excluding Dr. McDonald); *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 322 (E.D. Pa. 2007) (describing Dr. McDonald's survey methods "far from perfect"); *AstraZeneca LP v. TAP Pharmaceutical Products, Inc*., 444 F. Supp. 2d 278, 293-94 (D. Del. 2006) (excluding Dr. McDonald for opining on intent).

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the framework governing the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;

9

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, trial judges should admit into evidence reliable testimony from qualified experts that is helpful to the factfinder and exclude expert testimony where the proposed expert is unqualified, the expert's conclusions or methods are unreliable, or the expert's testimony would be unhelpful.  *See, e.g.*, *Daubert*, 509 U.S. at 589-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-52 (1999); *Dominguez v. Yahoo!, Inc.*, No. CV 13-1887, 2017 WL 390267, at *13 (E.D. Pa. Jan. 27, 2017).

Distilled to its essence, "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); S*chneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003); *In re TMI Litig.*, 193 F.3d 613, 664-65, 714 (3d Cir. 1999). To satisfy the reliability requirement, the proponent must show both that the expert's opinions are the "product of reliable principles and methods" and that "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(c), (d); *see General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another.").  As the Third Circuit has explained, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). "This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Id*.  And the "fit" requirement "ensures that the evidence or testimony '[helps] the trier of fact to understand the evidence or to determine a fact in issue.'"  *In re TMI Litig.*, 193 F.3d at 663 (quoting Fed. R. Evid. 702(a)).

To be clear, these requirements apply with equal force both to scientific expert testimony

and nonscientific expert testimony, such that "[a]n opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." Fed. R. Evid. 702 advisory committee's note; *Kumho Tire Co.*, 526 U.S. at 147. And even if the requirements of Rule 702 are satisfied, an expert's testimony still should be excluded if the probative value of that testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

Finally, regardless of the expert's proposed field of expertise, the party asserting the admissibility of expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the testimony satisfies the requirements of Rule 702. Fed. R. Evid. 702 advisory committee's note (citing Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171 (1987)); *Daubert*, 509 U.S. at 593 n.10; *see, e.g.*, *United States v. 87.98 Acres of Land,* 530 F.3d 899, 904 (9th Cir. 2008). Thus, even though NIKE is the moving party, Lontex ultimately bears the burden of establishing that the proffered testimony of its experts is admissible. It cannot meet that burden.

## IV.   ARGUMENT

### A.   This Court Should Exclude Dr. McDonald

Dr. McDonald's opinions and report is the classic example of an "expert" being paid to promote a party's position without meeting the requisite standards of Rule 702. She should be excluded for the following reasons:

#### 1.   Dr. McDonald's Testimony Is Not Based on Sufficient Facts or Data

Dr. McDonald lacks the requisite knowledge of the record to critique the surveys of the experts retained by NIKE. She simply parrots the opinions of Lontex's counsel, which is not helpful to the trier of fact.

Because Dr. McDonald did not conduct any studies of her own, the probative value of her rebuttal depended largely on her understanding of the facts and how it applied to the science. On

both counts she failed. **Dr. McDonald does not cite any evidence anywhere in her report.** (McDonald Report; *see* McDonald Dep. at 215:9 ("It is just not my habit to cite."). She concedes that she never spoke to or reviewed the testimony of anyone from Lontex, noting "I've not been made privy to [Lontex's] strategy for brand architecture," nor did she review Lontex's interrogatory responses to learn about the actual nature of Lontex's marketplace use (or lack thereof); yet, she offers opinions on Lontex's purported brand, its customers and her opinion of the alleged allure of the Cool Compression brand.  (McDonald Dep. at 18:24-19:23, 86:4-19) Notably, Dr. McDonald never asked Lontex's counsel for details about *any instances of actual confusion in the record* (there are none), but incredibly claims that she has no hesitation declaring that NIKE's surveys *must be* unreliable because they found zero percent confusion.  (*Id.* at 54:20-57:5.)

Dr. McDonald also failed to educate herself about the way NIKE sold or marketed its NIKE Pro products and its customers.  She claims she reviewed the entire deposition of Mr. Munro, who was a Product Director for the NIKE Pro product line, but her deposition testimony quickly revealed that Dr. McDonald had cherry-picked a single sentence from Mr. Munro's deposition, while failing to read Mr. Munro's entire testimony about the relevant customer audience to whom NIKE sells the NIKE Pro products. (*See, e.g.*, *id.* at 18:10-20, 126:10-135:25; *see* McDonald Rep. ¶¶ 16-17.)  Mr. Munro discusses a "design" ideal of a "young fit game day athlete," but then goes on to describe the actual customers of NIKE Pro products as follows:

> We also understand that we serve a great large demographic through our distribution point and our geography. So Nike baselayer typically goes to a lower level of distribution such as moderate department stores like Kohl's and it is typically at a lower price point. Therefore it could encompass and be super democratic, a 15 year old boy to an 84 [year old]  man.

(Exhibit 12, Munro Dep. at 36:15-37:8).  Dr. McDonald stopped reading at the "design" point, ignored the testimony about the actual customer, and on that basis, incorrectly concluded that

12

NIKE's typical customer is only a young game day athlete, when that is not the case.   (McDonald Dep. at 134:23-137:23; *see* McDonald Rep. ¶¶ 16-17.)

Dr. McDonald's avoidance of the record facts about the parties' respective uses and marketplace realities undermines her ability to properly analyze the surveys offered by NIKE's experts.   Surveys in Lanham Act cases are intended to simulate marketplace confusion under the circumstances which a plaintiff claims confusion is likely to occur.  *See, e.g.*, 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 32:194–32:196 (5th ed.) (hereinafter, "MCCARTHY ON TRADEMARKS"); *see also Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467 (3d Cir. 1990) (explaining that "consumer surveys, in which a representative sample of the consumers of a product are presented with the parties' products in a controlled setting, are the most direct method of showing the likelihood of confusion created by an infringing defendant").  Dr. McDonald had to put blinders on as to those circumstances in order to offer a critique of NIKE's carefully conducted studies.

Dr. McDonald's failure to review record facts is perhaps most flagrant in her criticism that each of NIKE's experts chose an overinclusive universe of survey takers because they surveyed a much broader universe than young "game day athletes."  (McDonald Report ¶ 24.)  This incorrect critique stems from Dr. McDonald's misunderstanding about the demographic which comprises NIKE's actual customer base.  In the studies conducted for NIKE by Mr. Ezell and Dr. Scott, the proper universe is NIKE's customers for its NIKE Pro products.  (*See* Scott Report; Ezell Report.)  Dr. McDonald does not dispute this as Mr. Ezell tested for direct (also called forward) confusion, which seeks to determine if any customers of NIKE (the purported newcomer or junior user) mistakenly believe that NIKE's products originate from or are associated with Lontex.  Dr. McDonald also does not dispute that it was proper for Dr. Scott to survey NIKE's customers to

determine if any of them were more interested in purchasing NIKE PRO products due to seeing the words "cool" and "compression" in written descriptions next to those products.  What Dr. McDonald does, however, is claim that NIKE's relevant customer base is not actually as broad as the demographic tested by the experts.  (*See* McDonald Report ¶¶ 16-17, 24.) This criticism is flat wrong, because Dr. McDonald relies on the single statement in Mr. Munro's deposition testimony where he is talking about a design ideal for the NIKE Pro products, instead of the portion of Mr. Munro's deposition testimony where we talks about the *actual consumer* demographic for the NIKE Pro products at issue, which NIKE experts correctly surveyed.  (McDonald Dep. at 130:5-135:25, 142:18-146:12.)

In the study conducted by Mr. Poret (*see* Poret Report), which utilizes the well-recognized *"Squirt"* methodology (also called a line-up survey which shows both the plaintiff's and defendant's uses among other controls) to test both reverse and forward/direct confusion, the appropriate universe is NIKE's customers for its NIKE Pro products and Lontex's prospective customers.  *See, e.g.*, MCCARTHY ON TRADEMARKS §§ 32:174.50, 32:177; *see also* Shari Seidman Diamond, Fed. Judicial Center: Reference Manual on Scientific Evidence, *Reference Guide on Survey Research*, 359-423 (3d ed.), *available at*: https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.   Here, McDonald's universe criticisms are mistaken on two levels because she offers the same erroneous "over-inclusiveness" opinion as to the NIKE universe based on her misunderstanding of the NIKE testimony discussed above, and she also misidentifies Lontex's relevant universe.  Specifically, Dr. McDonald opines that Mr. Poret's survey must be flawed because it may not have included any of Lontex's actual consumers in the study, as opposed to those fairly defined (under Lontex's theory of the case) as Lontex's prospective customers.  (McDonald Report ¶¶ 42, 93.)  In lodging this opinion, Dr.

14

McDonald ignores case law which makes clear that it is proper for consumer surveys in trademark cases to include *potential* customers:  "In Lanham Act cases that seek to prove rates of "confusion" among consumers, however, ***it is typical to survey prospective consumers***." *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 322 (E.D. Pa. 2007) (emphasis added) (describing Dr. McDonald's survey methods "far from perfect"); *see also Trouble v. Wet Seal, Inc*., 179 F. Supp. 2d 291, 307-08 (S.D.N.Y. 2001) (citing cases for proposition that "a survey must be designed to examine an accused mark's impression on a potential consumer").   For example, in *Universal City Studios, Inc. v. Nintendo Co.,* the Second Circuit held that a survey purporting to measure "confusion" was flawed because the survey was conducted only among individuals who had already purchased or leased the product rather than those who were contemplating a purchase or lease.  746 F.2d 112, 118 (2d Cir. 1984).   Yet that is precisely what Dr. McDonald wrongly demands here.

Dr. McDonald's reliability was further undermined when she was surprised to learn at her deposition (because she had never before reviewed Lontex's testimony), that Mr. Nathan, Lontex's principle, testified under oath that he defines his prospective customer base in almost identical terms as Mr. Munro had earlier defined NIKE's customer base.  *Compare* Exhibit 13, Efraim Nathan Dep. at 287-88 (testifying that Lontex's target audience includes all "purchasers of athletic apparel and equipment."), *with* Munro Dep. at 40:13-41:8 (explaining that NIKE "want[s] to be inclusive. . . .  we want to allow everybody to have the ability to wear our product and to feel good about doing so").

As to Lontex's actual customer base, Dr. McDonald would have learned, had she read Mr. Nathan's deposition, that it would have made no sense to survey possible confusion among

Mr. Nathan's actual customers and he had already definitely stated that they would never be confused:

> NIKE's Counsel: I'm asking you if these trainers who know you and you say have known your product have ever confused your product with Nike's product?
>
> Mr. Nathan: **You know the difference between my product and Nike product with your eyes closed**. You don't really have to even look at it. You just have to touch it. That's it.

(Efraim Nathan Dep. at 919-920; *see id.* at 1036:4-17, 1150-52.)

As it turns out, Dr. McDonald ultimately conceded that most of the "factual" assertions relied on for her opinions were based largely on "the complaint and representations by the attorneys who hired" her.  (McDonald Dep. at 63:4-64:19; *see id.* at 54:20-57:5.)  And in her report, she merely offers the legal conclusions of plaintiff's counsel as fact, without any citation, while most often using prejudicial language about NIKE.  *See, e.g.*, McDonald Rep. ¶ 93 ("NIKE rode the Lontex horse and came back with real revenue."); *id.* ("The fact that NIKE chose to use 'cool compression' should, itself, give pause. . . They [NIKE] know[s] a good phrase—packed with potential meaning and commercial value—when they see it."); *id.* ¶ 3 (contending that NIKE made the "original decision to appropriate 'cool compression' in marketing its own NIKE Pro line").

To be reliable, however, experts need to perform an actual analysis of the evidence and not merely recite the positions of counsel. *See, e.g.*, *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (excluding expert report that did "little more than parrot" client's position). "When an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 07-cv-00341, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (excluding damages opinion for "parrot[ing] [cost] information" where it was not independently verified); *MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 07-cv-1096, 2009 WL 1916728, at *4 (S.D.

Ind. June 29, 2009) (explaining "expert must independently verify facts given to him, rather than 'accepting [them] at the word of … counsel'"); *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633, 639 (N.D. Ind. 1996) ("[E]xpert testimony has often been subject to improper influences, and that counsel can all too easily color the expert's opinion by simply controlling the expert's access to information."). Simply put, expert testimony "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009). Because Dr. McDonald's report and testimony violates fundamental precepts of reliability, she should not be permitted to testify.

  **2. Dr. McDonald Criticizes Well-Respected and Reliable Survey Methodologies by Hypothesizing that Unorthodox Methodologies Should Have Been Used Instead.**

  Dr. McDonald criticizes the Ezell Survey's use of the *Everready* method and the Poret Survey's use the *Squirt* method. (McDonald Rep. ¶¶ 23-33, 36, 43-54.) These are the "two common methods for surveying the likelihood of confusion," and courts routinely admit *Everready* and *Squirt* surveys and treat them as reliable survey methodologies. *See, e.g.*, *Valodor, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464-65 (E.D. Va. 2017); McCARTHY ON TRADEMARKS § 32:173 ("Survey Formats—Two commonly used formats to test for confusion—The Eveready Format and the Squirt Format."). Instead of these tried-and-true survey methodologies, Dr. McDonald opines that NIKE's experts should have used a non-traditional survey methodology that she conceptualized (but did not actually conduct) for purposes of this litigation.

  Courts agree that, to be probative of actual consumer confusion, a survey should replicate market conditions. *See J.T. Colby & Co. v. Apple Inc.,* 2013 WL 1903883, at *20 (S.D.N.Y. May 8, 2013) (collecting cases); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1146 (10th Cir. 2013) (consumer surveys "should be compared 'as a whole as *they are encountered by consumers in the marketplace*.'"). That is because "the closer the survey methods mirror the situation in which the

ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." MCCARTHY ON TRADEMARKS § 32:163.  Yet, Dr. McDonald opines that NIKE's experts should have eschewed actual marketplace conditions and presented the survey respondents with stimuli that placed artificial emphasis on the words "cool" and "compression."  (*See* McDonald Rep. ¶¶ 23-33, 45-50.) This artificial emphasis methodology is one that Dr. McDonald has tried before and has been excluded for.  *See J .T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at \*17-20 (S.D.N.Y. May 8, 2013). In *J.T. Colby*, the plaintiff who was a small company suing Apple under a reverse confusion theory, attempted to offer Dr. McDonald's opinion wherein she had "made no attempt to replicate market conditions and deprived the survey takers of every contextual clue they would encounter when looking at the plaintiff's products."  *Id.*  The Court in that case wrote extensively about the deficiencies in Dr. McDonald's reports and surveys, excluded them in full, and found no likelihood of confusion on summary judgment.  *Id.* at \*20-23.

Two examples of Dr. McDonald's insistence on presenting survey respondents in this case with stimuli that do not reflect actual market conditions stand out.  The Poret survey used Lontex's actual product brochure and website in order to simulate a consumer's exposure to Lontex's COOL COMPRESSION trademark.  Dr. McDonald criticizes the Poret survey as unreliable because the Lontex brochure did not place enough emphasis on "Cool Compression" and was too "dense" to be useful.  (McDonald Rep. ¶ 47.)  Like in the *J.T. Colby* case, Dr. McDonald speculates that someone may have indicated some confusion had NIKE's survey expert "deprived the survey takers of every contextual clue they would encounter when looking at the plaintiff's products." 2013 WL 1903883, at \*21.  Dr. McDonald's opinion criticizing Mr. Poret's survey for not artificially dissecting "Cool Compression" from its contextual surrounding is not consistent with

the Lanham Act, as the "Act does not protect against confusion in the abstract, instead it protects consumers from confusion in the marketplace." *See id.*

Dr. McDonald advocates for a similar artificial circumstance to criticize Dr. Scott's consumer perception survey on purchase interest.  In Dr. Scott's study, certain survey respondents were shown and told to read the webpage for a NIKE Pro product, as that product appeared for a time period on NIKE's website; other survey respondents were shown the same images with the words "Cool" and "Compression" removed:



(McDonald Rep., App'x A, Image A3 & A4 (red circles added for emphasis).)  The results showed that survey takers were no more interested in purchasing the NIKE Pro product shown on the left were the survey takers who saw and were asked about their purchase interest for the same NIKE Pro product on the right.  Even though this stimulus replicates the actual marketplace conditions, Dr. McDonald opines that its use as a stimulus renders the entire survey invalid because "the word mark was easily lost in the din."  (McDonald Rep. ¶¶ 77-79.)  As an alternative, she faults Dr. Scott because the survey did not show respondents "only the top half of the pages" – even though

19

the bottom half also would have been unquestionably visible to online consumers. (*Id.* ¶ 80.)  And as another artificial alternative, Dr. McDonald said survey respondents should have "been shown pairs of NIKE products, one labeled 'NIKE Pro Cool Compression' and one labeled 'Nike Pro Compression'" (*id.*) – even that would *not* have shown NIKE products as they appeared in the marketplace, since it is undisputed that *no* NIKE products ever were "labeled" with the phrase "NIKE Pro Cool Compression."  Again, Dr. McDonald apparently wants to remove all context to force a result disconnected with reality.

In this case, Dr. McDonald's errors are a level worse than her errors in *J.T. Colby* since she *did not even test any of her non-traditional survey methods.*  She should not be able to offer testimony that NIKE's experts should have designed their surveys in a way that does not test consumer confusion or perceptions based on *actual* market conditions.  Under Rule 702, Dr. McDonald's opinions should be excluded as they are unreliable and would be more confusing to a jury than helpful.  Courts have excluded survey experts in precisely these circumstances.  *See, e.g.*, *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464–65 (E.D. Va. 2017) (excluding survey expert in trademark case for (i) proposing novel survey methodologies that did not use *Everready* or *Squirt*, (ii) failing to show respondents the parties' actual marks as they appear in the marketplace, and (iii) "creating his methodology specifically for this litigation").

### 3.        Dr. McDonald Relies Solely on Her Own *Ipse Dixit*

Dr. McDonald's opinions are not supported by citation to any evidence or any authority, peer reviewed literature, publication, or case law.  (*See* McDonald Rep.)  Courts do not admit an expert's opinion just because the expert says so; indeed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997);

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. CIV.A. 01-1524, 2003 WL 24010950, at *9 (W.D. Pa. Apr. 23, 2003).

Dr. McDonald fully owns the lack of supporting citations in her report, justifying those omissions on the ground that "it is just not my habit to cite." (McDonald Dep. at 215:9.) Some examples illustrate the problem with Dr. McDonald's "habitual" failure to support her opinions. She opines that the Poret Survey had too much "noise" to be valid. (McDonald Report ¶¶ 40, 51.) Yet when asked if there is authority supporting her opinion, she responded obliquely, "Yes, there are – I didn't bother to supply them[.]" (McDonald Dep. at 225:10-18.) When asked about the basis for another opinion, she testified, "I didn't come prepared for citations. Because this was not a school paper, this is my expert opinion." (*Id.* at 230:5-16; *see id.* at 231:7-8 ("I am ill-prepared to hand you a citation this afternoon.").) Finally, she relies heavily on a so-called "cognitive primacy" theory to criticize the Poret Survey (McDonald Rep. ¶¶ 40-46), but did not bother to provide any support for that theory. (McDonald Dep. at 253:19-23 ("There is no citation for it. Could I find a definition[?] [P]robably. But I haven't thought to cite it here.").) Dr. McDonald relies on this theory to suggest that survey takers should not have been exposed to Lontex's use first in the sequence – but instead should have been familiarized with NIKE's use first. But this theory makes no sense when Lontex's whole gripe is that it must be awarded over ███████ dollars because, according to Lontex, the damage has already been done by NIKE saturating the market. In other words, Dr. McDonald lacks citation in her report to this theory because it cannot be reconciled with Lontex's reverse confusion theory that NIKE's use has been so prevalent that it has already saturated the entire market, such that when prospective consumers for Lontex encounter Lontex's product, they believe it is associated with NIKE.

The foregoing are not cherry-picked examples; her entire report is devoid of supporting

citation.  When asked "Why are there no citations anywhere in your report, Dr. McDonald?" she

explains:

> Dr. McDonald:  ***I didn't think they were necessary***. I'm offering opinions based on long experience, lots of opportunity to think about these issues, a pretty large range of methodological tools that are probably, forgive the implied vanity, quite a bit larger than are normally needed for litigation work and available to people who testify pretty exclusively in this realm.
>
> … ***I didn't feel it was necessary to find citations for my opinion and I don't think for a variety of reasons that it would have been useful because they all would have spoken to very specific fact patterns and circumstances***. I'm not accustomed to citing case law when I write an expert report criticizing surveys.
>
> NIKE's Counsel:  Well, I'm not just referring to case law, you cited no publications either for some of the theories that you have put forth here as well. Is that true?
>
> Dr. McDonald: …I could certainly have…I chose not to do it…. ***The answer is, I'll just leave it at this, I have no citations. I have strong opinions.***

(McDonald Dep. at 196-97 (emphasis added).)  Rule 702 and *Daubert* demand that experts rely

on something more than their own say-so.  Dr. McDonald's failure to provide any support for her

opinions renders her testimony unreliable.

    *Citizens Financial Group* is instructive.  2003 WL 24010950, at *9 (W.D. Pa. Apr. 23,

2003), *aff'd sub som.*, 383 F.3d 110 (3d Cir. 2004).  There, the court excluded a "name confusion"

and damages expert from a trademark case because, as here, the expert's report lacked any support

or citations.   As the court explained when exercising its gatekeeper function to exclude the

proposed expert (whose name is Werner):

> If Werner does cite to support, ***then he relies on his experience*** without any further elucidation on what specifically in his experience supports that opinion. ***Werner simply does not cite to any reports, treatises, tests, or any other authority for making his name confusion opinions. I cannot discern from his report or his testimony any methodology or principles he relied on in making his opinions***. * * *

> Werner's damage opinions, like his name rehabilitation opinion, *appear to be nothing more than his instinctive reaction to the materials provided to him. He cites to no standards for his opinions, nor does he provide any explanation that could be tested or subjected to peer review as to how he reached his opinions. As a gatekeeper, I simply cannot permit Werner's ipse dixit damage testimony to go to the jury*.

*Id.* at *9 (emphasis added; citations omitted). The same is true here. Dr. McDonald's opinions are just instinctive reactions to NIKE's surveys based on her own personal experience and colored by the legal opinions of Lontex's counsel. No methodology or supporting authority can be discerned. Her opinions are unreliable and should not be permitted before the jury.

> **4.     Dr. McDonald Seeks to Offer Many Opinions that Are Not Rebuttal Opinions, But Rather Are Improper Opinions on Marketing and Branding, Trademark Law, and Intent.**

"Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party. It is not an opportunity for the correction of any oversights in the plaintiff's case in chief." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D. N.J. 2004) (internal quotation marks and citations omitted). Despite this limitation, Dr. McDonald seeks to offer opinions on marketing and branding – based on her personal experiences – that go well beyond the scope of the authorized rebuttal-only. Moreover, in doing so, Dr. McDonald seeks to offer legal conclusions on trademark law principles at issue in the case as well as the intent of NIKE, which is not only outside the scope of rebuttal, but patently improper for an expert (as Dr. McDonald should know, since she had been excluded for attempting to do so previously).

Dr. McDonald testified that in *other* cases she has testified as "a marketing expert not a survey expert" and that "sometimes [she] serves in both roles and sometimes . . . only as a brand expert." (McDonald Dep. at 31:8-16.) She attempted to wear each of those many hats in this case, even though her purview was limited to survey rebuttals. Several examples stand out. For one, Dr. McDonald conceded that she is not allowed to offer legal opinions, but explicitly says that she

was "only entitled to an opinion about marketing and about research methodology.  Those are the

opinions that I most deeply want to defend."  (McDonald Dep. at 246:4-7.)  In other words, Dr.

McDonald readily admits that she opined about marketing – an affirmative opinion that is clearly

beyond "rebuttal" critique of NIKE's experts survey methodology.  Dr. McDonald fundamentally

misunderstands her very limited role in this case, and so does Lontex.

Moreover, in her report, Dr. McDonald wrote that "whenever NIKE used" the term "cool

compression . . . or off-hand variations (COOL COMP), it was appropriating another company's

mark as its own."  (McDonald Rep. ¶ 35.)  That is not the opinion of a survey rebuttal expert; it is

in inadmissible legal conclusion, as explained below.  Dr. McDonald struggled to defend it during

her deposition, describing it as a "marketing conclusion [and] . . . a linguistic conclusion."

(McDonald Dep. at 246:22-247:2.)  Even if one were to accept that mischaracterization, such

affirmative "marketing conclusions" are well outside the scope of her authorized "rebuttal."  As

another example, Dr. McDonald's report contains the following "conclusion":

> Finally, we have no survey evidence whatsoever that can speak to the very
> important retail distribution chain of buyers, whose viability as a target for
> Lontex was undermined by NIKE's use of "cool compression". This last
> point is especially important, because *by usurping the term, NIKE was
> depriving Lontex of the ability to represent its own unique technology and
> customer value proposition with its own duly-registered mark* -- either
> because *buyers might mistakenly attribute a common source or they might
> assume NIKE to be using Lontex technology.  Especially among
> knowledgeable buyers, COOL COMPRESSION was not, and is not, a mere
> catch-phrase. Above and beyond brand source or origin* – understood to be
> a critical property of trademarks – *it also signals a very particular brand
> promise about an exceptional level of product performance, performance
> which I understand exceeds NIKE's.*

(McDonald Report ¶ 93.)  Since Dr. McDonald did not conduct her own consumer survey and was

not privy to Lontex's brand positioning, this opinion is not only highly speculative, but also

irrelevant to a "rebuttal" critique of NIKE's consumer surveys.

This is not proper rebuttal testimony and it should be excluded.  *See, e.g.*, *Marmo v. Tyson*

*Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."); *Peals v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008) (same).   Rule 702 prohibits such improper speculation because an "expert's opinions 'must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Merisant Co.*, 242 F.R.D. at 317-18 (quoting *In re Paoli*, 35 F.3d at 741).   Lontex's failure to proffer a consumer survey leads to the reasonable inference that Lontex "expected that any survey results would undermine its case." *Sabinsa Corp.*, 609 F.3d at 190 (Ambro, J., concurring) (admonishing that the trademark plaintiff "could have easily conducted a survey of customers to assess actual confusion in the relevant market" and explaining that in light of this failure "w*e* could reasonably infer that [the plaintiff] expected that any survey results would undermine its case"); *see, e.g.*, MCCARTHY ON TRADEMARKS § 32:195 (citing similar cases). Lontex may not negate this inference and confuse the finder of fact by injecting a speculative legal conclusion unsupported by any science into this case through a rebuttal expert.

Experts may not offer legal opinions that invade the role of the jury or the Court.  *Jimenez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013); *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009). Yet, Dr. McDonald repeatedly offers legal opinions about trademark law, infringement, and NIKE's purported "intent."   As explained above, she concludes that "whenever NIKE used" the term "cool compression . . . or off-hand variations (COOL COMP), it was appropriating another company's mark as its own."  (McDonald Rep. ¶ 35.)  This is a textbook example of an improper legal opinion; not a "marketing conclusion," as Dr. McDonald testified. (McDonald Dep. at 237:6-238:22, 246:20-247:9).   Whether NIKE's alleged use of "cool compression" or "Cool Comp" are infringing is the ultimate legal issues for this Court to resolve.

Dr. McDonald repeatedly opined that use of the words "cool" and "compression" next to each other results in "trademark violations."   (*Id.* at 160:12-16.)   When challenged during deposition, Dr. McDonald tried to deny she was offering a legal conclusion about the scope of Lontex's purported trademark rights and whether NIKE's alleged use infringes those rights, but would end up reverting right back to the legal conclusion in any event:

> NIKE's Counsel: Are you saying just because two descriptive words appear subsequently in a longer description they automatically become a mark?
>
> Dr. McDonald: I'm clearly not saying that.  This is a registered mark. …  It is clear there is a registration…. So, I'm offering no legal opinions about what can be registered….  I'm just saying there is a registration for cool compression which means that while cool can be used by itself and compression with [sic] be used by itself, ***cool compression is ring fenced by that registration***.

(*Id.* at 88:9-89:7 (emphasis added).)  These legal conclusions are plainly improper for any expert, much less a survey rebuttal expert.  Worse, Dr. McDonald's legal conclusions are erroneous.  They read out of the law the concept of fair use, which is a statutory affirmative defense explicitly set out in the Lanham Act. 15 U.S.C. § 1115(b)(4); *see also SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019) ("The fair use defense is available against even incontestable trademarks, like [Lontex]'s."); *Citrus Grp., Inc. v. Cadbury Beverages, Inc.*, 781 F. Supp. 386, 391 (D. Md. 1991) ("[T]he owner of a registered mark may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense.").  Trademark law does not recognize Dr. McDonald's novel concept of a monopoly on descriptive words "ring fenced" by a registration.

Dr. McDonald also offers opinions about NIKE's intent in using the words "cool" and "compression."  "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (precluding an expert from opinion on whether the defendant viewed certain words as a

trademark).  That is because "'[t]he opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."  *Id.* at 546; *see, e.g.*, *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 293–94 (W.D.N.Y. 2019) (precluding expert in trademark case from opinion on a defendant's intent and whether they intended to use a mark in a generic sense for fair use purposes).

In violation of this authority, Dr. McDonald opines that she "believe[s] firmly that one should draw the inference that NIKE chose to use 'Cool Compression' because they thought it was a beneficial." (McDonald Dep. at 154:14-155:10; *see* McDonald Rep. ¶¶ 93-95.)  Later she offered the same opinion, testifying that NIKE "chose it because they thought it would be useful to them to characterize their product benefit in that way." (McDonald Dep. at 157:18-24.)  These assertions, made without any evidentiary support, are speculative and highly prejudicial to NIKE. *See* Fed. R. Evid. 403, 702.  Dr. McDonald's report contains additional opinions on NIKE's state of mind such as her opinion "that NIKE chose to use 'cool compression,'" and that NIKE "knows a good phrase has a potential meaning and commercial value when they see it." (McDonald Rep. ¶ 93; *see* McDonald Dep. at 158:14-17 ("It doesn't matter why Nike uses cool.  It doesn't matter why Nike uses compression.  Nike chose to use cool compression together."))  Dr. McDonald was forced to concede that she has no evidentiary basis for these opinions on NIKE's intent. (McDonald Dep. at 163:7-164:3.)  Dr. McDonald has been excluded for improperly opining on the intent of a Lanham Act defendant before, *AstraZeneca LP*, 444 F. Supp. 2d at 293-94, and her opinions about NIKE's intent should be excluded here as well.

In summary, it is not an expert's role to offer any legal conclusions to the Court or the jury, much less legal conclusions that conflict with basic tenets of trademark law.  These opinions will confuse the jury, not assist it. *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *16 (excluding expert

in trademark case for offering inadmissible legal conclusions "because such matters are the exclusive province of the judge and jury" (citing *Dunn v. HOVIC,* 1 F.3d 1362, 1369 (3d Cir. 1993)); *see also Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).  The Court instructs the jury on the law, not Lontex's expert.  As a result, Dr. McDonald's legal musings on infringement, the scope of Lontex's trademark rights, and trademark law concepts like intent are entirely improper and should be excluded.

### B.    This Court Should Exclude Jeffrey Parkhurst

Lontex retained Mr. Parkhurst to "opine on the COOL COMPRESSION® brand's differentiation and expansion potential as of 2016 and related brand value, the adverse impact created by NIKE with the COOL COMPRESSION® brand from use of 'Cool Compression' in connection with NIKE shirts, shorts, and tights, and the corrective action that is required to restore the brand."  (Exhibit 5, Parkhurst Rep. ¶ 16.)  But his opinions and testimony on those issues do not come close to satisfying the admissibility standards and should be excluded.

### 1.    Mr. Parkhurst's Opportunity Value Opinion Should Be Excluded

Mr. Parkhurst opines on the "opportunity value" of Lontex's "Cool Compression brand," which he measured based on future revenues that Lontex would have made from hypothetical expansion.  He speculates that Lontex would have made ███████ in future revenue from "Cool Compression" between 2015 and 2020.  (Parkhurst Rep. ¶¶ 5, 61-63.)

Mr. Parkhurst's opportunity value opinion is unreliable, as shown by even a cursory review of his "methods" for calculating that number.  From 2006 to 2019, Lontex made ███████ in sales of all "Cool Compression products."  (SOF ¶ 60; Exhibit 14, J. Anderson Rep. at 8.)  Ignoring Lontex's operating results prior to the alleged infringement, Mr. Parkhurst justifies his unreliable "Cool Compression revenue projections" based on vague "case studies" of the peak growth periods of highly successful companies that experienced "extraordinary growth."  (Parkhurst Rep. ¶ 53;

*see id.* ¶¶ 43-52.)  Using these "extraordinary" case studies, Mr. Parkhurst arbitrarily assumes that Lontex's would have likewise experienced extraordinary rates of growth, including "grow[ing] from 0 to 300 store fronts in 5 years."  (*Id.* ¶ 56.)  Mr. Parkhurst's "opinion" and novel application of these "extraordinary growth" case studies to Lontex is "junk science."  *Joiner*, 522 U.S. at 154 n.6.  For the following reasons, he should be excluded as unreliable, speculative, and lacking any probative value or fit with facts and evidence.

**a.      Mr. Parkhurst Concedes that His Proposed "Lost Opportunity Value" Measure Ignores Causation Principles.**

Mr. Parkhurst's own testimony disqualifies his opportunity value opinion as a matter of law.  Mr. Parkhurst states in his report that his opportunity value opinion seeks "to adduce reasonable bases for measuring [Lontex's] future opportunities and resulting value."  (Parkhurst Rep. ¶ 56; *see* Parkhurst Dep. at 119-120 ("The opportunity analysis represents an opportunity potentially for Lontex." (emphasis added).)  Although the case studies on which he relies are not "reasonable bases" for measuring future opportunity value, this Court need not even reach that conclusion to exclude his opinion.  That is because Mr. Parkhurst conceded that NIKE did not cause Lontex to lose any opportunity.   In other words, he testified that the specific "lost opportunities" were not attributable to NIKE.  For example:

> NIKE's Counsel**:** What did you do to satisfy yourself that any of these lost opportunities you identified in your report were as a result of some conduct by Nike?
>
> Mr. Parkhurst**:** ***They weren't***. They were opportunities that Lontex – in my practitioner experience having done this many times with different clients, that is what consultants do, not all of them, but a chunk of them do is to find growth opportunities a make it happen. That is the circumstance that is what this was about. ***I wasn't saying this is because or not because of Nike***. This is the potential with the brand going forward and if you take away the brand this becomes a little harder to do.

29

(Parkhurst Dep. 168:12-169:4 (emphasis added); *see id.* at 252:4-253:16.)  This testimony is fatal to his opinion that Lontex can recover the opportunity value of "Cool Compression."

In providing the foregoing testimony, Mr. Parkhurst concedes that his proposed "opportunity value" method eschews basic causation principles, and that his opinion is based on the erroneous belief that causation was irrelevant.  As a result, the opinion itself lacks any cognizable legal foundation or probative value.  Indeed, "any opinion that purports to measure damages without making a judgment as to which effects stem from [wrongful conduct] and which do not is useless."  *Elorac, Inc. v. Sanofi-Aventis Can., Inc.,* 2017 WL 3592775, at *16 n.6 (N.D. Ill. Aug. 21, 2017).  The Lanham Act's remedies regime incorporates basic tort principles of causation.  *See, e.g.*, *Broan Mfg. Co., Inc. v. Associated Distrib., Inc.*, 923 F.2d 1232, (6th Cir. 1991) ("The general proof and measure of damages in a trademark action is governed by the law of damages of tort actions.").  As a result, "[r]ecovery of damages for trademark infringement is subject to the usual standards of damages: plaintiff must prove both causation and amount." MCCARTHY ON TRADEMARKS § 30:72.

These basic causation principles require the exclusion of Mr. Parkhurst's opportunity value opinion.  It is no wonder why Mr. Parkhurst's novel "opportunity value" approach is not one that has ever been credited as appropriate under the Lanham Act.  At bottom, it proposes a compensatory measure based on wild speculation, not a reliable a principle or method that has ever been offered by an expert in Court pursuant to Rule 702.

> **b.    Mr. Parkhurst Concedes that His Lost Opportunity Value Opinion Is Speculative.**

Even if Mr. Parkhurst's lost opportunity opinion had a viable legal foundation, which it does not, it would still be inadmissible because it lacks factual foundation and is grounded in pure speculation.  "[A] trial judge should exclude expert testimony if it is speculative or conjectural or

based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 214 (2d Cir. 2009) (citing cases). Mr. Parkhurst's opportunity value opinion lacks any basis in facts or evidence and will not be remotely helpful to the trier of fact.

Mr. Parkhurst's opinion is based on the notion that there was "expansion potential" and "opportunity" for Lontex. (*See, e.g.*, Parkhurst Rep. ¶¶ 5, 55.) As a result, his valuation of those opportunities allegedly captured "the potential value that could be lost with a weakened brand." (Parkhurst Dep. at 167:10-168:11.) "What I did was I looked at the potential given those two current opportunities with the brand cool compression and the product technology, what could you do with it." (*Id.* at 239:17-240:13.) As his own explanation shows, Mr. Parkhurst performed an abstract analysis involving considerable guess work and conjecture.

Mr. Parkhurst did not rely on any facts about Lontex, such as its historical operational revenues, for purposes of quantifying Lontex's lost opportunity potential. Rather, he relied exclusively on facts about Rhone, an apparel company with no relationship to Lontex. (Parkhurst Rep. ¶¶ 45, 55-56.) Rhone's sales and growth are irrelevant and cannot reliably serve as the evidentiary basis for any expert opinion in this case.

Rhone opened in 2014 and immediately experienced "extraordinary growth," as Mr. Parkhurst acknowledges. (*Id.* ¶ 53; *see id.* ¶¶ 45, 56.) By 2016, Rhone had "had 220 storefronts plus online . . . that captured $9 million." (*Id.* ¶ 56.) And fby 2019, it expanded further to 680 "non-owned storefronts." (*Id.*) From these facts, Mr. Parkhurst assumes "that the product line with COOL COMPRESSION® technology could build out to 300 storefronts." (*Id.*) He then assumes that each of Lontex's hypothetical storefronts would have made the same extraordinary revenues (and the same annual growth rate) that Rhone generated from its retail operations during

its first five years of business.   From there, Mr. Parkhurst concludes that Lontex lost the opportunity to make millions of dollars in retail sales at hundreds of "Lontex Cool Compression" retail storefronts:

> Thus, adducing from case studies with similar differentiation, and noting that Lontex in fact was looking to build out retail channels at approximately the same time as infringement began, ***it is reasonable to conclude that that the product line with COOL COMPRESSION® technology could build out to 300 storefronts, that offers $12 million in revenue in 5 years and continued growth thereafter at 7%"***

(*Id.*)  Because this conclusion is neither reasonable nor tethered to reality, it is not a reliable opinion that belongs before a jury or court.  There is no evidence underlying this opinion, so it should be excluded.  *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion offered.'" (quoting *Joiner*, 522 U.S. at 146)).  Indeed, Mr. Parkhurst explicitly testified that his selection of "300 stores is arbitrary," but somehow still appropriate because 300 is "a more conservative number which makes that more attainable and it's a reasonable chunk of sales."  (Parkhurst Dep. at  239:11-15.)  Using admittedly "arbitrary" estimates to speculate about lost opportunities is inherently unreliable.

Mr. Parkhurst does not supply any evidentiary basis for his speculation that, by 2020, Lontex would or could have expanded into 300 highly profitable retail locations.  Lontex has been selling Sweat it Out–branded apparel for twenty-six years.  (SOF ¶ 4.)  Its revenue in its best years did not exceed ███████ annually, and none of that revenue came from retail sales.  (SOF ¶ 60; *see i*J. Anderson Rep. at 8.)  Yet Mr. Parkhurst opines that Lontex is entitled to millions of dollars in future lost profits for a business it never ran.  That assumption is not only implausible, but also is impermissibly speculative.  *See McNeal v. SDG  Macerich Properties, L.P.,* No. C 07-4015

MWB, 2008 WL 2691047, at *16 (N.D. Iowa July 1, 2008) ("The lost profits evidence identified here is . . . even more speculative, because McNeal is seeking future lost profits for a Christian-themed clothing business that she never operated at all, not just future lost profits for the kiosk business that she did operate."); *cf.*, *e.g., Silver Stage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 823-24 (9th Cir.2001) (upholding a district court decision that damages based on an expert's predicted future change in the applicable tax rate were "too speculative").

In short, Mr. Parkhust's lost opportunity opinion is arbitrary and speculative. "People who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller & Schmidt v. Nordisco Corp.,* 969 F.2d 410, 415 (7th Cir. 1992). Mr. Parkhurst's opinion would improperly require a jury to "resort[] to guesswork" when fashioning a damages award. *See Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 176 (3d Cir. 2017) (admonishing that courts abuse their discretion "by resorting to guesswork" when fashioning a damages award). It should be excluded.

### c.   Mr. Parkhurst's Methodology for Determining Opportunity Value Is Novel and Unreliable

Mr. Parkhurst opines that the jury should measure Lontex's "opportunity value" by: (i) cherry-picking a handful of outlier companies that were extraordinarily successful, (ii) drawing tenuous analogies between them and Lontex, and then (iii) assuming Lontex might have experienced similar levels of success. (Parkhurst Rep. ¶¶ 38-64.) Instead of examining evidence *about Lontex*, Mr. Parkhurst measured the rates of expansion experienced by *other companies*, including *Intel* (a multinational technology company), *Westinghouse* (a multinational electronics company), *UNTUCKit* (an apparel company that sells mens shirts), *Gore-tex* (a textiles company), and *Big Boss Noodles* (the company that created the "Noodle" pool toy). (*Id.* ¶¶ 45-53.) Mr. Parkhurst's testimony, which speculates that Lontex will perform as these companies did, is not

"the product of reliable principles and method."  Fed. R. Evid. 702(c).  An "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  Fed. R. Evid. 702 advisory committee's note (emphasis added)).

Mr. Parkhurst's justification for this "method" is that "[t]t is common in brand expansion planning and measurements to look to case studies to adduce reasonable bases for measuring the brand's future opportunities and resulting value." (Parkhurst Rep. ¶ 44.)  Yet he provides no support for that assertion.  And the reliability factors the Third Circuit has urged courts to consider weigh heavily against admitting this evidence.  *See In re TMI Litig.*, 193 F.3d 613, 664-65 (3d Cir. 1999).  Mr. Parkhurst has never been permitted to testify about this methodology in any case, and it is not "generally accepted" in trademark cases.  *Id.*  In fact, no court has accepted this "case study method" as a reliable method to measure opportunity value in a trademark case, as Mr. Parkhurst acknowledged.  (*See* Parkhurst Dep. at 249-51.)  This method has not been subjected to peer review or endorsed by published literature.  Instead of involving a "testable hypothesis," an indicator of reliability, Mr. Parkhurst's use of case studies is both amorphous and easily manipulated.  *In re TMI Litig.*, 193 F.3d at 664-65.  That is clear from the fact that, by his own account, all the case studies are "extraordinary"—which is hardly the marking of reliable science—and the fact that Mr. Parkhurst admitted that his extrapolation of those case studies was "arbitrary." (Parkhurst Rep. ¶ 53; Parkhurst Dep. at  239:11-15.)  There is no way to discern the potential "rate of error" of Mr. Parkhurst's calculations.  (But that rate appears incredibly high, since it is inconceivable Lontex, which never made close to ▉▉▉▉ in a single year, would have generated ▉▉▉▉ in *additional revenue* but-for NIKE's alleged infringement.)  And there are

no "standards controlling the technique's operation," as evidenced by the outcome-oriented process for selecting the case studies. *In re TMI Litig.*, 193 F.3d at 664-65.

In short, none of the typical indications of reliability underlie Mr. Parkhurst's opportunity value opinion.  And it is based on "incorrect factual premises and contained speculative calculations, . . . rendering it of little assistance to the jury." *See, e.g.*, *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865-66 (8th Cir. 2010) (excluding damages expert's testimony).  It should be deemed inadmissible under Rule 702.

### 2.   This Court Should Exclude Mr. Parkhurst's Corrective Advertising Opinion

Next, Mr. Parkhurst opines that "corrective advertising is required" to cure supposed "misimpressions" created by NIKE's alleged use of "cool" and "compression" as product descriptors.  (Parkhurst Rep. ¶¶ 27-33.)  He further opines that the corrective advertising award must correct *80 million misimpressions*.  Each aspect of this opinion—(i) the need for corrective advertising, and (ii) the amount of corrective advertising needed—is unreliable and speculative, requiring exclusion of the entire opinion.

### a.   It is Inappropriate for Mr. Parkhurst to Opine on Consumer Perception Without Conducting a Survey of Consumers' Perceptions

Mr. Parkhurst's newly minted term "misimpression," which was contrived for purposes of his report, constitutes an impermissible legal opinion that NIKE has created a "misimpression" without giving the trier of fact the opportunity to decide this issue on its own.  Mr. Parkhurst's corrective advertising opinion should be excluded on this basis alone.  *See, e.g.*, *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *16 (excluding expert in trademark case for offering inadmissible legal conclusions "because such matters are the exclusive province of the judge and jury"); *see, e.g.*, *Saxon Glass Techs.*, 393 F. Supp. 3d at 293-94 (similar).  But Mr. Parkhurst's opinion is

inadmissible for other reasons as well.  His testimony is unreliable and cannot pass evidentiary muster, since he bluntly assumes that every sale that NIKE made of certain NIKE Pro products during a particular time period, 2015 to 2018, was the result of a "misimpression" without actually asking surveying consumers as to how or why they purchased those products, or what their perception was of any NIKE written materials they may (or may not) have seen leading up to the purchase.  (*See* Parkhurst Rep. ¶ 100.)  Mr. Parkhurst's deposition testimony is instructive in demonstrating the unscientific nature of his analysis:

> NIKE's Counsel: Are you assuming that people understood that cool compression was a Lontex brand to begin with?
>
> Mr. Parkhurst**:** I think I'm going the other way, they are more likely -- we are not talking about Lontex here. We are talking about Nike's actions. And that they are now associating -- a portion are associating cool compression with Nike.
>
> NIKE's Counsel**:** Are you saying that Lontex is not a consideration in terms of determining whether they need any compensatory damages in this case?
>
> Mr. Parkhurst:  Well, I understand this trial is more about Nike' actions, it is not about Lontex's actions. Lontex said the assets that Nike took advantage of, so it is more about Nike's actions.
>
> *     *        *
>
> NIKE's Counsel**:** Sir, don't you think you would need to do some investigation about what actually drives Nike's sales before you could conclude that words like cool and compression being on a web page actually has some role in driving that purchase?
>
> Mr. Parkhurst*: **I think it's a fun project, it wasn't in my scope. I wasn't asked to do that.***
>
> NIKE's Counsel: Mr. Parkhurst, you do know how to do that sort of thing, right, because you've done marketing research before, that's what you told me at the beginning of the deposition, right?
>
> Mr. Parkhurst: I have one marketing analytic team that can tease out that payment, that amount per person, ***but I wasn't asked to do that*** but that implies different data sources. * * *

> NIKE's Counsel: But you also didn't ask consumers why they might be interested in purchasing the Nike products at issue here, did you?
>
> Mr. Parkhurst. ***I didn't do confusion research and again it was -- I wasn't asked to do that.***

(Parkhurst Dep. at 119:2-19, 127:8-128:10.) Mr. Parkhurst's failure to consider whether there is any confusion to correct renders his testimony on corrective advertising unreliable.

Mr. Parkhurst improperly resorted to speculation about the possibility of confusion, as he testified:

> NIKE's Counsel**:** What is the misimpression that you are trying to correct for?
>
> Mr. Parkhurst: The misimpression is the people that bought ████████ units thought they bought cool compression.
>
> NIKE's Counsel. How do you know they bought cool compression if you didn't ask them, sir?
>
> Mr. Parkhurst: I guess I give consumers more credit when they shop that they know what they are buying. And it's a little bit holistic to know that cool compression from a functional word choice might mean something different than from Dri-FIT.

(*Id.* at 101:2-15.) This opinion rests on conjecture, not science.  The only reliable scientific evidence on these issues – NIKE's experts' consumer surveys – directly refutes this speculation. (*See* Exhibits 1-3, Reports of Dr. Scott, H. Poret, and M. Ezell.) Mr. Parkhurst, by contrast, did not survey any consumers to determine whether any "thought they bought cool compression."  (*See* Parkhurst Dep. at 101:2-15.)  Mr. Parkhurst's failure to do so is inexcusable.  He testified that he has a "marketing analytic team" that can test "what actually drives Nike's sales," but "*I wasn't asked to do that*" by Lontex. (*Id.* at 127:8-23; *see id.* at 58 (discussing past surveys he has conducted).)  And he certainly would have had enough time to conduct such a survey – given that he was retained in November 2019 and did not need to be disclosed as an expert until February 10,

2020. (*Id.* at 7:3-20; Parkhurst Rep. at 1.) Mr. Parkhurst's speculations should be excluded because they are not probative of corrective advertising.[2]

Finally, Mr. Parkhurst's opinion is based on fundamental misunderstandings of basic facts of this case. He assumed there was a "NIKE Cool Compression line of clothing" and he was unaware that the words "Cool Compression" never appeared on any NIKE product at any time:

> NIKE's Counsel**:** I'm sorry, how do you know what consumers think if you didn't ask them?
>
> Mr. Parkhurst: *I think a little bit of common sense here*. When you buy Tide Detergent or whatever brand you buy, when you buy it, do you know that it is Tide? I think most people do, it says it right on the box. So they think they are buying cool compression clothing. They may or may not care whether it is by Nike or Lontex or whoever, but I think when they pay 65 or $80, I think Nike clothing could a little cheaper, *it says cool compression right on the clothing, they think they are buying that. So they think it's cool compression brand*. So part of the future confusion could be if they think they bought cool compression, *if Lontex comes out with cool compression clothing, they might still think it is Nike*. So the confusion study could show that as well.
>
> NIKE's Counsel**:**  Mr. Parkhurst, are you aware that no where on Nike's clothing does it say cool  compression?
>
> Mr. Parkhurst:  *What about in the 2015 to 2018 timeframe*?
>
> NIKE's Counsel: No, sir, it never did. That is not a disputed issue or fact in this case.

(Parkhurst Dep. at 79:10-80:15.)  Mr. Parkhurst cannot offer reliable opinions if he does not know the facts of the case.

Moreover, Mr. Parkhurst admitted he did not know the "digital journey" that occurs when a consumer purchases a NIKE product, how generic words like "cool" and "compression" are perceived, or whether any consumer cares about them for making purchase.  (*Id.* at 84-87, 277-

---

[2] For these same reasons, Mr. Parkhurst should not be permitted to offer any opinions about the similarities of the marks or how they are perceived, such as his opinion that "the NIKE Cool Compression parallels Lontex Corporation's COOL COMPRESSION® closely." (Parkhurst Rep. ¶ 71.)

78.)  He did not review critical record evidence, including the testimony of NIKE's 30(b)(6) witness describing how words like "cool" and "compression" are used to describe NIKE's products.  (*Id.* at 91, 124-25.)  And he did not review the testimony of Lontex's digital marketing company to determine how Lontex used – or did not use – "Cool Compression" online historically.  (*See* Parkhurst Rep., App'x C.)  This renders Mr. Parkhurst unqualified to opine on what type of corrective advertising Lontex allegedly requires and makes his opinion pure speculation.

> **b.     Mr. Parkhurst's Corrective Advertising Methodology Layers on Additional Speculation to "Design" a Remedy**

As discussed above, Mr. Parkhurst improperly presumes consumers formed "misimpressions" (without actually surveying consumers), from which he speculates that ███ ████ units were purchased under a misimpression.  (Parkhurst Rep. ¶¶ 97-100.) Mr. Parkhurst's opinion then goes even a step further in its unreliability.   Based on his assumption of the total number of allegedly infringing NIKE products sold under a "misimpression," he posits that "[c]orrective advertising would need to reach near 80 Million consumers to offset NIKE's misimpression actions with Cool Compression."  (*Id.* ¶ 102)  Mr. Parkhurst then concludes that that number must be multiplied by 3, such that a corrective advertising campaign must reach 240 million views.  (Rep. ¶ 100 & n.96.)  To support his opinion that 3 corrective impressions are required, Mr. Parkhurst relies on a suggestion in a single, twenty-year old article from The Commerce Commission in New Zealand discussing settlement negotiations with companies accused of using false or misleading information in advertisements, not a scientific study that used reliable methodology and published in a peer-reviewed publication.  (*Id.*) In other words, he speculated about how many people viewed NIKE products online, concluded that every estimated view is a *per se* misimpression, then arbitrarily multiplied that number by 3, before summarily concluding that NIKE would needs to pay for an extraordinary advertising campaign that bears no

reasonable relationship to any advertising that Lontex or NIKE has ever done for their respective products at issue in the past.

This is not a "generally accepted" methodology for calculating corrective advertising awards in trademark cases.  Indeed, no court has recognized this approach to measuring corrective advertising.  And for good reason.  It lacks any support in peer reviewed literature, is arbitrary and speculative, and it appears to have been created largely for purposes of this litigation.

### c.      Mr. Parkhurst Is Out of Sync with the Law and the Facts

Mr. Parkhurst's corrective advertising opinion is based on a misunderstanding of the law on corrective advertising damages and the circumstances in which they are recoverable.  Moreover, the opinion hinges on speculation (*e.g.*, that advertising occurred that mislead someone) as opposed to facts in the record (which is bereft of evidence of any advertising campaign by NIKE, let alone any evidence that anyone was misled).   Under the Lanham Act, a plaintiff is "entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  Corrective advertising is a form of compensatory damages, which falls within this second category of potentially recoverable damages.  The purpose of corrective advertising is to "undo the confusion or deception caused by" the defendant's infringement.   MCCARTHY ON TRADEMARKS § 30:80.  The remedy addresses existing marketplace confusion caused by the defendant's alleged conduct and allows a plaintiff "to recover from the infringer the actual or estimated costs of corrective advertising."  *Id.*

"[To] justify damages to pay for corrective advertising a plaintiff must" make two showings. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506, 509 (7th Cir. 1992).  First, it must show that the confusion caused by the defendant's mark injured the plaintiff.  *Id.*  And second, because Lanham Act recovery is based on "principles of equity," the plaintiff also must show "that repair of the old mark . . . is the least expensive way to proceed."  *Id.*

Mr. Parkhurst did not work within this legal framework, which renders his opinions unreliable and unhelpful to the jury.  His disregard for the role he should be playing within this legal framework is evidenced by his failure to inquire whether either essential requirement of a corrective advertising award is supported by the record.  As discussed above, Mr. Parkhurst admits that he focused only on NIKE (and presuming "misimpressions") and did not inquire about whether Lontex had previously advertised COOL COMPRESSION.  It does not follow that Mr. Parkhurst could be a credible expert to opine on Lontex's corrective advertising needs when he did not make any reasonable inquiry into whether Lontex had done any advertising to begin with to provide consumers with any baseline impressions of its COOL COMPRESSION mark.  And he certainly cannot assume that "misimpressions" were formed by anything NIKE did when he made no inquiry with any consumer about any impression made in a purchasing context for NIKE's products.   Nor, can he design a remedial campaign for Lontex if he does not know what actual harm or deception exists that needs to be corrected, and Mr. Parkhurst admits that he never inquired about any harm or actual deception because that would have been a "**fun project**" that he was not asked to do.   Mr. Parkhurst's opinions and testimony do not meet the minimum standards of *Daubert* and should be excluded.

### C.    This Court Should Exclude Almost All of David Drews's Opinions

Mr. Drews is Lontex's proffered damages expert.  His opinion of Lontex's recovery has four components: (i) a ███████ corrective advertising award; (ii) a ███████ reasonable royalties award; (iii) disgorgement of NIKE's estimated ███████ in profits for the Accused Products; and (iv) a ██████ award of Lontex's lost profits.[3]  (Exhibit 8, Drews Supp. Rep. at 3-

---

[3] Even though NIKE is not seeking to exclude this component of Mr. Drews's opinion, Lontex is not entitled to recover any actual damages because Lontex cannot meet its burden to "prove [NIKE]'s Lanham Act violation, that the violation caused actual confusion among consumers and, as a result, that it suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)."

4.) The first three components of this opinion should be excluded as entirely unreliable.

### 1.    Mr. Drews's Corrective Advertising Opinion Should Be Excluded

Mr. Drews's corrective advertising opinion derives entirely from Mr. Parkhurst's unreliable opinion and should also be excluded.  (Exhibit 7, Drews Rep. at 20-23.)  Mr. Drews adopts Mr. Parkhurst's opinion that 80 million "misimpressions" were created and that corrective advertising must reach three times that many people.  (*Id.* at 20-21.)  As explained above, this Court should preclude Mr. Parkhurst from offering any opinions about corrective advertising.  It is well settled that "[a]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible."  *In re Paoli*, 35 F.3d at 745.  If the Court excludes Mr. Parkhurst's corrective advertising opinion, then Mr. Drews's corrective advertising opinion would lack any factual predicate, and this Court should not allow him to testify about corrective advertising either.  *See, e.g.*, *Citizen Fin. Grp., Inc.*, 2003 WL 24010950, at *17.

### 2.    Mr. Drews's Reasonable Royalties Opinion Should Be Excluded

Mr. Drews's reasonable royalties calculation should be excluded because it is speculative. It is based on the unfounded assumption that Lontex could have licensed the Cool Compression Marks to NIKE (or any other company).  A speculative damages opinion cannot assist the jury.

"Reasonable royalties are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark and can be recovered as a measure of damages in trademark infringement cases."  *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018).  In the absence of a prior licensing agreement between the parties, courts may permit an award of a reasonable royalty only if the evidence provides a sufficiently reliable basis on which to calculate a reasonable royalty.  *See id.* at 1301 (excluding royalties

---

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, No. 09-cv-2857, 2011 WL 3679155, at *9 (E.D. Pa. Aug. 23, 2011).

opinion because there was no evidence to establish a reasonable royalty "and any attempt to discern one is completely speculative.").

Here there is no evidence that Lontex ever licensed or attempted to license the Cool Compression Marks. (Drews Dep. at 118:18-22.) To the contrary, Lontex cannot dispute that it made no outwardly facing use of the Cool Compression Marks for nearly a decade before trying unsuccessfully to sell the marks to any willing buyer, including to NIKE. (SOF ¶¶ 62-98, 198-208.) Mr. Nathan was unable to find a buyer, and the █████ royalty award proposed by Mr. Drews vastly exceeds Mr. Nathan's initial asking price of █████ to sell the Marks outright, making the opinion nonsensical. (SOF ¶ 116.)

In these circumstances, any reasonable royalties award would be improperly speculative. Courts have stressed that "[t]he mere possibility of a future license cannot create an issue of fact as to the availability of lost royalties, any more than speculation about the possibility of lost sales can create an issue of fact as to lost profits." *Quia Corp.*, 2011 WL 2749576, at *7 (emphasized); *Trovan, Ltd. v. Pfizer, Inc.,* No. cv 98–94 LGB (MCX), 2000 WL 709149, at *16 (C.D. Cal. May 24, 2000) (royalties generally require that the parties have shown a willingness to license the mark). A reasonable royalty analysis necessarily is speculative and unreliable where, as here, a plaintiff fails to present evidence of an intent to license its trademark. Because Mr. Drews does not have a sufficient basis on which to calculate reasonable royalty damages, his testimony on this issue is not reliable, helpful to the jury, or "based on sufficient facts or data." Fed. R. Evid. 702(b).

### 3.      Mr. Drews's Profits Disgorgement Opinion Should Be Excluded

Mr. Drews opines that NIKE would be unjustly enriched unless every single dollar of profit on every sale of the NIKE Pro products that Lontex has categorized as the "Accused Product" is disgorged to Lontex, which he values at █████. (Drews Rep. at 7-10; Drews Supp. Rep. at 3.) Mr. Drew's calculation, however, improperly relies on a patent concept of damages that

presumes the "Accused Product," as represented to him by Lontex, was actually an infringing product.  Lontex characterization of the NIKE Pro products as the "accused" or "infringing" products, however, is a self-serving misnomer, as there is nothing infringing about NIKE's products because they do not bear the COOL COMPRESSION Mark or any variation thereof.  Yet Mr. Drews was content not to look under the hood of Lontex's characterization – and assumed that every sale of a NIKE Pro product, which bears only the NIKE, DRI FIT, and SWOOSH marks, somehow results in "unjust enrichment" to NIKE, simply because Lontex said it was an "Accused Product."  Even if one assumes liability (which a damages expert is entitled to do), it is not reasonable for Mr. Drews to assume that NIKE received some value from the words "cool" and "compression" with every sale it made of NIKE Pro products during the 2015-2018 period defined by Lontex as "Accused Product."  That is because it is patently obvious that not every consumer purchasing the products would have seen those words given that they were nowhere on the product and nowhere in a physical NIKE retail setting. Drew's opinion is impermissibly unreliable and would result in a windfall that cannot be reconciled with the Lanham Act.

### a. Mr. Drews's Profits Disgorgement Opinion Is Unreliable

In calculating NIKE's profits, Mr. Drews did not analyze or consider whether sales of NIKE products were, in fact, sales made in connection with the alleged infringing use of "cool compression."  This required "causal nexus" is especially important in this case because of the nature of the alleged infringement, which arises from NIKE's use the words "cool" and "compression" on certain product detail pages of its nike.com website and on pages of its wholesale product catalogs.  The NIKE products themselves were not actually branded with a "cool compression" mark.  Thus, Lontex, as plaintiff seeking to disgorge NIKE's profits, has the burden to demonstrate that NIKE's sales of the accused NIKE products—whether wholesale or retail sales—are attributable to the alleged infringing use of the words "cool" and "compression."

44

Mr. Drews did not do this analysis; instead, he made a sweeping assumption in Lontex's favor, which is a critical error that renders his opinion on profits disgorgement unreliable.

To understand the significance of Mr. Drews's error, it is necessary to explain the legal framework governing disgorgement of profits. Profits disgorgement is an award predicated on the principles of unjust enrichment. *See, e.g.*, *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943 (2020) (describing "disgorgement" as a "profit-based measure of unjust enrichment"); *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 344 (D.N.J. 2001) (explaining that "[d]isgorgement of profits focuses on the prevention of unjust enrichment"). Because "an accounting for profits is a form of equitable relief," the Third Circuit has held that "it does not follow as a matter of course upon the mere showing of an infringement." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 209 (3d Cir. 1999); *see, e.g.*, *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 241-43 (3d Cir. 2003) (en banc) (applying disgorgement factors and holding that they "weigh against awarding profits"); *CPC Props., Inc. v. Dominic, Inc.*, No. CIV.A. 12-4405, 2013 WL 5567584, at *3 (E.D. Pa. Oct. 9, 2013) (applying each factor on summary judgment and concluding disgorgement is not warranted).

Where disgorgement is deemed an appropriate remedy, courts follow a two-step burden-shifting framework to calculate defendant's profits: first, "the trademark owner is tasked with proving the infringer's sales," and second, "the burden of proof shifts to the defendant to show costs and deductions." *Covertech Fabricating*, 855 F.3d at 177. This calculation framework is important because profits disgorgement "is intended to award profits only on sales that are attributable to the infringing conduct." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993). Where plaintiff cannot tie defendant's profits directly to the alleged infringement, plaintiff fails to meet its initial burden of proof, and defendant's sales cannot be disgorged as a

matter of law.  *Covertech Fabricating*, 855 F.3d at 176; *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942) ("The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark.").

Applying this framework to this case, Lontex (and Mr. Drews) must first prove NIKE's gross revenues attributable to the alleged infringement, *i.e.*, sales made in connection with use of "cool compression," and NIKE must then prove expenses that should be deducted from those gross revenues.  In order to carry its burden, NIKE can present evidence and opinions about costs it incurred in selling its goods (*e.g.*, cost of goods sold and other allowable deductions) as well as a proposed apportionment of the revenue within the pool of gross sales Lontex properly established as attributable to the infringement.  *See Mishawaka Rubber & Woolen Mfg. Co.*, 316 U.S. at 206 (explaining courts must consider "[i]f . . . the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol" because "[t]he plaintiff, of course, is not entitled to profits demonstrably not attributable to the unlawful use of his mark"); *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 2019 WL 1320313 (E.D. Wis. Mar. 22, 2019) (allowing deductions of applicable costs and then further apportioning down to isolate the value of the trademark at issue). To be clear, Plaintiff's burden on establishing gross sales with the proper "nexus" to the alleged infringement is a different exercise than Defendant's burden on apportioning what cash value the alleged infringing mark has within the appropriate universe of gross sales.  Defendant's apportionment exercise in this regard may include an inquiry into whether the alleged unlawful mark use drove any of those gross sales, or whether there were other more likely demand drivers like the famous NIKE brand, the popularity of the NIKE Pro line, the breadth of distribution

channels, etc.  While Mr. Drew's opinion also criticizes NIKE's deduction and apportionment opinions, and while NIKE strongly disagrees with Mr. Drews's methodology for doing so (*see* Exhibit 15, Paul Meyer Report at 34-36), NIKE is not seeking to exclude Mr. Drew's opinion due to that attack he offers on NIKE.  Rather, for purpose of this motion, NIKE seeks to exclude Mr. Drews's profits disgorgement opinion because his methodology for calculating NIKE's gross revenues attributable to the alleged infringement is unreliable and deeply flawed.

Mr. Drews clearly knows that Lontex, as plaintiff, bears this initial nexus burden, yet he does devise a reliable methodology for doing so.  His February 10, 2020 expert report states "[w]hen measuring the revenue in the Defendant's profit analysis it includes those sales where a nexus between the infringing activity and the revenue received exists."  (Drews Rep. at 7.)  Yet, Mr. Drews did not conduct an analysis that would reliably satisfy Lontex's initial burden of demonstrating the nexus between alleged infringing use of "cool compression" and the revenues NIKE received from sales of the accused products.  Instead, Mr. Drews simply assumed that every single sale of every accused NIKE product between 2015 and 2018 should be included in the gross revenue pool because that's what Lontex's counsel told him to do.

When asked to identify the nexus, Mr. Drews testified:

> NIKE's Counsel: What is the nexus between the infringing activity and revenue received in this case? …
>
> Mr. Drews: The sales of accused products is the revenue and the fact that they are accused products is because they were marketed and sold utilizing the cool compression marks. That is the nexus.

(Drews Dep. at 213:14-24.)  When asked what Mr. Drews did to confirm that the accused NIKE products were, in fact, "marketed and sold utilizing the cool compression marks," he testified:

> NIKE's Counsel: You didn't do anything to independently confirm or deny whether any of the Nike sales in this timeframe were actually made in connection with the cool compression trademark, right?

> Mr. Drews: …I don't remember if I crossed referenced every product code against a tech sheet or every product code against an entry in a catalogue or on the website or what have you. I did do some of that cross-referencing so there was an indication that some of these product codes at a minimum are associated with the use of the cool compression marks on those various marketing vehicles, the website, the catalog, the tech sheets, what have you.

(*Id.* at 217:10-218:3.)  As to the nike.com website that Mr. Drews referenced, he admitted "I did not do anything to verify each and every sale that was made through nike.com" [used the cool compression marks.  (*Id.* at 225:18-226:21.)  Mr. Drews assumes "that every sale that Nike made through nike.com after September 15, 2016 was made in connection with the words cool and compression on the product page."  (*Id.* at 228:14-229:6.)  Mr. Drews also assumes that all sales between 2015 and 2018 through NIKE-owned retail stores used the cool compression marks even though he admitted "I don't know how these [accused] products were presented" and could not recall any evidence showing that NIKE used cool and compression in connection with a sale at a NIKE-owned retail store.  (*Id.* at 230:2-232:7.)  Finally, Mr. Drews assumes that every sale of a NIKE accused product through a wholesale retailer between 2015 and 2018 – whether online or in the bricks and mortar store – used the cool compression marks.  (*Id.* at 233:4-237:6.)

Mr. Drews justifies his sweeping assumptions by characterizing them as part of his "foundational assumption" that liability will be established at trial (*id.* at 84:4-16), but assuming that liability will be established does permit Mr. Drews to assume facts will be established that do not exist in the record.  Mr. Drews's assumption that liability will be established is not a substitute for demonstrating, as Lontex is required, that the revenue received for each sale was, as in fact, attributable to the alleged infringing use of the cool compression marks.  *See, e.g.*, *Covertech Fabricating, Inc.*, 855 F.3d at 176.  Especially where, as here, the product sold did not bear the alleged infringing mark.

For these reasons, Mr. Drews's assumption that Lontex could meet is burden of disgorging

NIKE's profits merely by identifying all gross product sales of product Lontex has "accused" of infringement is unreliable.  The failure of a damages expert to consider whether a sale was attributable to infringement is a critical error that undermines the opinion entirely.  That is consistent with basic concepts of causation underlying all recovery.  In all contexts, "any opinion that purports to measure damages without making a judgment as to which effects stem from [wrongful conduct] and which do not is useless."  *Elorac, Inc.,* 2017 WL 3592775, at *16 n.6; *see Zimmer, Inc. v. Stryker Corp.,* 2018 WL 276324, at *4 (N.D. Ind. Jan. 3, 2018) (excluding damages expert who "presume[d] causation" and "attribute[d] [damages] to alleged wrongdoing, without ever considering the possibility that [damages] flowed from other non-actionable events"); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir. 1998) (explaining that damages opinions that "fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.").  Because any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745, Mr. Drews's disgorgement opinion should be excluded outright.

> **b.      Mr. Drews's Profits Disgorgement Opinion Is Speculative and Contradicted by the Evidence**

Mr. Drews's failure to consider or analyze whether NIKE's sales were attributable to the alleged infringing activity is fatal.  As explained above, he assumes that all sales listed on a spreadsheet of gross sales of NIKE products given to him by Lontex were attributable to NIKE's use of "cool" and "compression."  Mr. Drews admits to his error, testifying that he thought the spreadsheet was a compilation of product sales for which NIKE had admitted were sold in connection with COOL COMPRESSION.  (Drews Dep. at 218:10-219:11.)  Lontex apparently did not inform, or perhaps Mr. Drews never asked, about how the spreadsheet was compiled – which

involved NIKE producing raw wholesale sales data generated from its SAP system **based on product style numbers that Lontex had dictated to NIKE**. (*Id.* at 213:5-220:5); *see King-Indiana Forge, Inc*, 2009 WL 3187685, at *2 ("When an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations."). Mr. Drews's error leads him to calculate every single sale of these NIKE products – regardless of whether the sale of that product was made in connection with the alleged used of COOL COMPRESSION. This alone is enough to reject his opinion.

Mr. Drews never conducted the analysis required of an expert to support his assumption that each sale of each "Accused" product can be disgorged as attributable to infringement. "[W]here a district court endeavors to calculate damages under the Lanham Act on the basis of the defendant's actual profits, rather than awarding statutory damages, it must ground its estimate in the record . . . in order to pass muster as a reasonable estimate and an appropriate exercise of discretion." *Covertech Fabricating*, 855 F.3d at 176. And "[w]here the court lacks a sound basis for extrapolating actual profits, it abuses its discretion by resorting to guesswork." *Id.* So is the case here. Mr. Drew's speculative disgorgement calculations accordingly should be excluded.

## V.    CONCLUSION

For each of the reasons stated herein, NIKE respectfully requests that this Motion be granted, and that Dr. McDonald's testimony be excluded in its entirety, Mr. Parkhurst's testimony be excluded in its entirety, and Mr. Drew's be excluded from testifying on corrective advertising, reasonable royalty, and profits disgorgement.

November 4, 2020                                  Respectfully submitted,

                                                 By:   */s/ Gina L. Durham*

                                                 DLA PIPER LLP (US)

                                                 Gina L. Durham (admitted *pro hac vice*)
                                                 555 Mission Street, Suite 2400
                                                 San Francisco, CA 94105

                                                 Frank W. Ryan (admitted *pro hac vice*)
                                                 Andrew J. Peck (admitted *pro hac vice*)
                                                 Marc E. Miller (admitted *pro hac vice*)
                                                 1251 Avenue of the Americas, 27th Fl.
                                                 New York, NY 10020

                                                 Ben C. Fabens-Lassen
                                                 1650 Market Street, Suite 5000
                                                 Philadelphia, PA  19103

                                                 *Attorneys for Defendant NIKE, Inc.*