**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION, | Civil Action No.:  18-cv-5623 |
| Plaintiff, | |
| | (Hon. Michael M. Baylson) |
| v. | |
| | |
| NIKE, INC., | |
| Defendant. | |

# EXHIBIT 10

# EXHIBIT FILED UNDER SEAL PURSUANT TO STIPULATED PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LONTEX CORPORATION, | ) | Civil Action No.: 2:18-cv-05623-MMB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NIKE, INC., | ) | |
| | ) | |
| Defendant | ) | |

**Expert Testimony of Susan Schwartz McDonald, Ph.D. on behalf of Plaintiff:**

**Rebuttal Commentary on Defendant's Surveys**

## I.    Introduction:  Scope of Testimony, Qualifications, and Compensation

### A.   Responsibilities and Scope of Testimony

1.    I have been retained by Troutman Sanders, attorney for Plaintiff in Lontex Corporation v. NIKE, Inc., to review and offer rebuttal commentary on three expert reports conveying the results of a consumer survey commissioned by NIKE.  Two of them (the Ezell Survey and the Poret Survey) address likelihood of confusion based on Defendant' use of the term "cool compression" to sell some athletic apparel with compression features, and the third (the Scott Survey) attempts to quantify the materiality of that mark as a basis for generating consumer interest in NIKE goods.  I offer my opinions based on a four-decade-long career as a behavioral scientist and research methodologist. conducting surveys for commercial enterprises and government entities, including evidentiary surveys for regulatory and judicial proceedings arising under the Lanham Act (see professional qualifications below).  My expert commentary also reflects my professional career as a marketing consultant and brand expert, whose role involves the development, statistical manipulation, and interpretation of various types of data to guide strategic marketing decisions.

### B.   Background and Brief Summary of my Opinions

2.    Lontex, a maker of high-performance athletic apparel that incorporates advanced compression fabric technology, has earned a reputation among professional teams and athletes, as well as among a subset of informed consumers, for the exceptional quality of its garments.  In 2008], Lontex secured registration for the words, COOL COMPRESSION, to convey the distinctive performance properties of its compression apparel line, which exhibits true 365-degree stretch and an exceptional level of cooling.  In 2015, NIKE began using the words, "cool compression" to market its own compression garments directly to consumers under its Nike Pro label online and through NIKE storefronts, and to other retail distributors (both small stores and chains) for sale through those other retail operations.  It is my understanding that NIKE has now ceased active use of the mark, although the words, "cool compression" may continue to see some residual use throughout NIKE's distribution channels.

3.    NIKE has offered these three expert survey reports to support its arguments that: (1) there is, and was, no likelihood of consumer confusion – literally *zero* likelihood of confusion – between the two

product lines; and that (2) whatever NIKE might have expected when originally appropriating the mark for its own use, the words, "cool compression" had no actual ultimate bearing on consumers' decision to purchase NIKE goods, with the resulting implication that there could be no argument for disgorgement of profits based on misappropriation of the Lontex mark. Rather than confirming these assertions, however, NIKE's survey reports actually invite skepticism about based on the pattern of the findings -- specifically, the anomalous, almost stunning, finding of _zero confusion_ in two surveys, and the equally noteworthy finding of _zero_ materiality, at clear odds with NIKE's original decision to appropriate "cool compression" in  marketing its own Nike Pro line.

4.   ***Based on a careful review of these studies, I believe the unaccountably low numbers can be traced in all cases to methodologies that were:  (a) ill-suited and inadequate to address this very particular set of circumstances in this case, and (b) executed in ways that were literally destined to produce no effects  -- either no audible signal or a deafening abundance of noise.***  Squaring off here, we have in Plaintiff a small but ambitious company whose brand has earned the advocacy of discerning customers based on high-performance fabric technology, and in Defendant, we have one of the world's best-known and most muscular brands.  *The huge disparity in those market footprints* places us in a realm of *quantum brand mechanics*, where ordinary scales of measurement cannot be made to apply to both brands, and routine techniques are more likely to suppress or preclude effective measurement than they are to advance it.  More acute measurement tools, and more effective noise-cancelling techniques are required both to simultaneously detect the relative benefit to NIKE and also measure the relative harm to Lontex.  In the three surveys submitted by NIKE, we can see that basic design choices (all three surveys) and some analytic decisions (Scott Survey) worked to eliminate measurement sensitivity in a way that clearly favored Plaintiff.

5.   *Not only did NIKE's experts fail to use appropriately sensitive measurement techniques with the consumers they chose to survey; they also failed to direct their surveys to relevant customers* – the consumers whom, by their own accounts, they target with the Nike Pro line of apparel, as well as retail channel buyers most likely to encounter both Lontex and NIKE products and make decisions with serious potential harm to Lontex.  The data we have from NIKE's very broad-based surveys reflect a universe definition that is both under- and over-inclusive, producing likelihood of confusion measurement for customers who are outside the target zone for both companies, and therefore beyond the pale of relevance.  Even if NIKE's target population were broader than its own experts purport it to be, several

additional sampling "gaffes" were committed that raise serious concerns about survey representativeness.

6. ***As a consequence of the measurement choices made by NIKE experts, I believe that there is no valid survey evidence in this case regarding either the benefit to NIKE or the harm to Lontex associated with NIKE's use of "cool compression."*** There is need to look elsewhere for insight regarding what percentage of the consumers targeted by NIKE with the Lontex mark might have been confused regarding source, what benefit was reaped by NIKE, and what consequences there were for Lontex. *M*y specific methodological objections and the implications for survey outcomes are addressed in separate chapters below.

**C.   Professional Credentials and Compensation**

7.   I am President and CEO of NAXION, a century-old marketing research and consulting organization that advises companies on product development, brand strategy, and other strategic marketing activities.   As an expert in marketing and opinion research, I consult to companies on a variety of strategic issues including brand health, opportunity assessment, innovation, commercialization strategy, and lifecycle management.   My marketing and research experience encompass assignments designed to improve customer experience and strengthen brand reputation, as well as develop and commercialize new market offerings in a number of industries – particularly Healthcare, Consumer products, and Financial services.

8.   Survey research is a principal tool in a large number of these engagements, and I am relied on by clients and colleagues for my expertise in designing and developing surveys with complex objectives, many of which are used to measure opinions and behaviors within challenging or sensitive populations. Throughout my career, I have personally designed and conducted thousands of surveys, many of them in the service of developing new products, optimizing product configuration, projecting demand or measuring public health consequences of product usage. I have also consulted and testified frequently on the application and interpretation of survey research to adjudicate claims under the Lanham Act (as well as decide patent claims) and my survey work has been utilized by government agencies like FDA and FTC, as well as USPTO.

9.    Although my professional focus is on commercial application, not academics, I make regular podium appearances and have lectured extensively on research methodology and marketing at major universities (e.g., University of Pennsylvania and Princeton University), commercial organizations, and industry-training programs sponsored by major professional organizations—for instance, the Council of American Survey Research Organizations (CASRO), the Pharmaceutical Marketing Research Group (PMRG), Healthcare Marketing and Communications Council (HMC), and the Advertising Research Foundation (ARF).  I have also served as Chair of the Board of Directors of CASRO, the trade association of the US marketing and survey-research industry, recently renamed The Insights Association. In my decade of CASRO board service, I was actively involved in the development of standards for survey research, both ethical and technical.  Currently, I am a trustee of The Wistar Institute, the world's second oldest incubator of biomedical research discoveries, as well as President of the Board of The Chamber Orchestra of Philadelphia.

10.    My professional marketing career has been spent at NAXION, known until 2014 as National Analysts Worldwide, and previously a division of the global commercial and technology consulting firm Booz•Allen & Hamilton, where I was a partner and vice president.  My tenure there included a period during which I served as the leader of that firm's worldwide pharmaceutical-industry practice.  NAXION traces its roots directly to the world's first business intelligence unit and progenitor of the survey research discipline (1911).  Some of the nation's first commercial and government sponsored surveys were conducted by National Analysts and the firm is known to have shaped the opinion research and marketing research fields through the development of probability sampling and other landmark survey techniques, as well as the genesis of the focus group. In 1992, National Analysts became an independent entity, under my co-ownership, and is now an Employee-Owned Stock Ownership Corporation (ESOP) of which I am majority shareholder.  Renamed NAXION, the firm retains the same ownership and management structure, and the same corporate mission.  It has consistently been listed as one of the AMA "Top 40" market research firms in the US.

11.    I received my BA degree magna cum laude, Phi Beta Kappa, from Smith College, and my MA and doctoral degrees from the University of Pennsylvania's Annenberg School for Communication, where my studies were concentrated in the field of social psychology and communications theory.  I am the author of a text on market research and of numerous publications and speeches on marketing and market

research methodology.  A complete copy of my vitae along with a list of publications authored in the past ten years, and testimony and depositions taken in the past five years is included in Exhibit 1.

12.   I am being compensated for my work in this case at my customary fee of $675 per hour.  My compensation is in no way contingent on the outcome of the case.  In addition, although this report reflects my views at this time, I reserve the right to amend or expand on my opinions on the basis of additional information or analyses, if asked to do so.

**D.  Documents and Materials Relied On**

I considered the following documents and materials for purposes of my rebuttal:

**Pleadings and Discovery**

- Lontex's First Amended Complaint and Exhibits
- NIKE's Answer to Lontex's First Amended Complaint and Amended Counterclaims
- Exhibit 1 to Court Authorized Joint Submission Regarding NIKE's Partial Motion to Dismiss
- Expert Report of Matthew G. Ezell (and related survey data and exhibits produced by NIKE)
- Expert Report of Hal Poret (and related survey data and appendices produced by NIKE)
- Expert Report of Carol A. Scott, Ph.D. (and related survey data and exhibits produced by NIKE)
- Expert Report of Jeffrey D. Parkhurst (produced by Lontex on February 10, 2020)
- Expert Report of David Drews, CLP (produced by Lontex on February 10, 2020)
- Deposition of Neil Munro
- Lontex's Corrected Second Supplemental Response and Objections to NIKE's First Set of Interrogatories (Nos. 1-19)

**Documents Produced**

- LTX_EDPA_00000066 – LTX_EDPA_00000067
- LTX_EDPA_00000161 (also bates-numbered LTX_EDPA_00006270)
- LTX_EDPA_00000175 (also bates-numbered LTX_EDPA_00006284)
- LTX_EDPA_00000183
- LTX_EDPA_00000232
- LTX_EDPA_00000238
- LTX_EDPA_00000252 (also bates-numbered LTX_EDPA_00006361)
- LTX_EDPA_00000277
- LTX_EDPA_00000283
- LTX_EDPA_00000399 (also bates-numbered LTX_EDPA_00006509)
- LTX_EDPA_00000551 – LTX_EDPA_00000552
- LTX_EDPA_00000837

- LTX_EDPA_00000845 – LTX_EDPA_00000847
- LTX_EDPA_00000852
- LTX_EDPA_00000862
- LTX_EDPA_00000863 – LTX_EDPA_00000866
- LTX_EDPA_00003402 – LTX_EDPA_00003413
- LTX_EDPA_00005564
- LTX_EDPA_00007035 – LTX_EDPA_00007062
- LTX_EDPA_00007063 – LTX_EDPA_00007098
- LTX_EDPA_00007099 – LTX_EDPA_00007142
- LTX_EDPA_00007241 – LTX_EDPA_00007242
- LTX_EDPA_00007274
- LTX_EDPA_00007857 – LTX_EDPA_00007858
- LTX_EDPA_00011646 – LTX_EDPA_00011647
- LTX_EDPA_00012579 – LTX_EDPA_00012600
- LTX_EDPA_00013083 – LTX_EDPA_00013086
- LTX_EDPA_00013224
- LTX_EDPA_00013226
- LTX_EDPA_00013228
- LTX_EDPA_00013230 – LTX_EDPA_00013232
- LTX_EDPA_00013234 – LTX_EDPA_00013235
- NIKE-00041189 – NIKE-00041192
- NIKE-00044660
- NIKE-00044666
- NIKE-00044735
- NIKE-00044776
- NIKE-00044788
- NIKE-00044803
- NIKE-00044884
- NIKE-00044987 – NIKE-00044988
- NIKE-00044813 – NIKE-00044814
- NIKE-00045049 – NIKE-00045050

**Webpages**

- Nike.com
- Sweatitout.com
- Uspto.gov (specifically, for Registration Nos. 77476891, 78864885, and 78963029)
- https://web.archive.org/web/20150906084928/http:/store.nike.com/us/en_us/pd/pro-cool-compression-long-sleeve-shirt/pid-10300565/pgid-11042822
- https://web.archive.org/web/20160422053844/http:/store.nike.com/us/en_us/pd/pro-cool-compression-tights/pid-10738142/pgid-11177416
- https://web.archive.org/web/20150905103504/http:/store.nike.com:80/us/en_us/pw/mens-nike-pro-hypercool-training-clothing/7puZbgdZ7u9Z9hkZc0s

- https://web.archive.org/web/20150906084928/http://store.nike.com/us/en_us/pd/pro-cool-compression-long-sleeve-shirt/pid-10300565/pgid-11042822
- https://web.archive.org/web/20150905150633/http://store.nike.com/us/en_us/pd/pro-cool-compression-tank-top/pid-10276921/pgid-10967919

**II.  General Critique of NIKE Surveys based on Universe Definition**

13.   Each of the three surveys incorporates basic design decisions that I believe conspired to produce no measurable effects of any kind – regardless of what was being measured in each survey – but all three share one common flaw: a trio of universe definitions that failed to align with NIKE's own definition of the market for its Nike Pro line of apparel, and a consequent failure to include any consumers who were likely to have been target customers of Lontex.  The universe definition in all three studies was so broad as to underweight NIKE's own target customers and preclude all statistical likelihood of representing a Lontex customer.  The consuming public in this case has been observed through a wide-angle survey lens when a narrow view of the true market would have shown a clearer picture of consumers we need most to see.

14.   Reliable survey research rests on the foundational premise that the people interviewed are qualified to speak on behalf of the broader universe they are meant to represent. If there is a failure to represent the correct universe in a survey based either on the survey universe definition or the methodological protocols used to sample them, then the survey data have nothing to tell us.  Thus, in evaluating the relevance and rigor of a survey, we must look first to the universe definition and the eligibility criteria used to sample them.

15.   For purposes of testing likelihood of confusion under the Lanham Act, the relevant universe is *generally* understood to be Defendant's market.  To the extent that there is overlap, Plaintiff's market will *normally* be included as a matter of course, thereby allowing both forward and reverse confusion to be measured.  I say, "normally", because under circumstances in which the Defendant's market definition is exceedingly large and Plaintiff's is very much smaller, customary survey sample sizes will not necessarily train a lens on the overlap unless special pains are taken to ensure the full picture is captured.  But none of NIKE's three survey experts made any attempt to sample from Plaintiff's customer lists, even though they had them available.  With a customer list no larger than 30,000 for Lontex (fewer than .00001 of the US adult population), no general population survey of consumers who

dabble in athletic activity or who purchase athletic apparel could expect to include even *one* Lontex customer by mere chance.

16.   But that, in fact, is the broad universe definition all three survey experts used:  adult consumers. *As it happens, however, NIKE itself contradicts that premise* – as reflected in deposition testimony from one of NIKE's own product directors (Neil Munro), who – by his own account – "led the product creation efforts for the Nike Pro product line" from January 2016 to June 2017 and "focused on the Nike Pro product line in that role."  In his deposition, Mr. Munro described the target  customer for the NIKE Pro line as a relatively young, fit, "game date athlete," and went on to paint a physical and psychographic portrait consistent with serious investment in athletic activity and performance products (pp. 18, 35-36). In his broadest conception, Mr. Munroe expands the target to include people who are committed to fitness and working out at the gym, even if they do not play on teams (pp. 35-36):

```
19      Q    So I think you mentioned statement

20   products, perhaps smaller, more targeted offerings.

21   But overall in terms of Nike Pro, who is your

22   customer?

23        Who are you trying to design and market

24   products for?

25        MS. DURHAM:  Objection.


1        THE WITNESS:  We have a sharp point with

2   the consumer.  And I'm going to speak from my

3   experience within men's training.  So we will speak

4   to males typically between the age of 18 and 25, 26.

5   Those who may have -- currently be a game day

6   athlete.  What I mean by "game day" is they could be


7   a football player, a soccer player, a baseball

8   player, et cetera.
```

```
 9              But also those athletes may have moved

10    beyond that but still have a passion for Nike Pro

11    and the product or being in the gym and working out

12    at that level knowing that they have the confidence

13     that Nike delivers through their product line.
```

17.   Mr. Munroe's characterization of the NIKE Pro consumer does not square with a survey sample comprised of people who attest to nothing more vigorous than purchasing athletic apparel, or even athletic "performance" apparel.  Although the screening questions and eligibility requirements varied in subtle ways, each of these surveys was just as likely to capture many consumers who do nothing more energetic than run errands in their athletic apparel.  *Indeed, broader-based samples were less likely to include consumers with a genuine focus on athletic performance apparel – the sort of consumers who gravitate to Lontex and whom, presumably, the two brands share.*  In a sample with zero Lontex customers, we might well expect to measure zero actual or real-world confusion – and none of the three surveys made any effort to include any, despite access to the Lontex customer list.  In effect, all three samples were simultaneously <u>over</u>-inclusive (based on admission of people who met the lowest possible bar for athletic apparel purchase) and <u>under</u>-inclusive (based on the virtual certainty that Lontex customers were excluded).

18.   I note that surveys are not typically meant to capture actual confusion so much as likelihood of confusion, a more abstract, probabilistic idea.  But to test likelihood of confusion among consumers who might potentially be confused, you must first select a relevant universe of consumers who are in the target market, and then create a scenario in which the prospect of confusion could be accurately measured.  If you don't have the right consumers in your sights, then any measure of confusion is irrelevant, much less a methodologically flawed one.

19.   Meanwhile, there is another critical group of <u>NIKE</u> customers who were also overlooked:  NIKE's own retail distribution chain of NIKE Authorized retailers, through which a significant amount of NIKE apparel is sold.  That wholesale customer base includes large chains and many independent store fronts with access to NIKE merchandise through its on-line portal, as well as sports teams, rehabilitation and training professionals.  (For example, Nike has a discounted purchase program for sports trainers.

https://www.nike.com/us/en_us/e/training/nike-training-club-pro.) The wholesale and institutional customer base is targeted by both brands in various ways but they are entirely missing from NIKE's likelihood of confusion calculus.   Indeed, some of those customers may well have been exposed to Lontex at the trade shows through which both companies market, but likelihood of confusion among those customers has not been tested in any study of which I am aware.  Professional purchasers are different from consumers to be sure, but it should never be assumed that professional purchasers are entirely immune to likelihood of confusion in all the forms it may take, including affiliation, licensing, or permission.  Thus, the absence of such a survey leaves another gap in the picture.

20.   The specific sampling "gaffes" I referenced earlier are described in the chapters that address each of the surveys individually.

## III.  Rebuttal Commentary on the Ezell Survey

### A.  Overview

21.   Matthew Ezell conducted what appears to have been the first of two "likelihood of confusion" surveys out of the gate for NIKE.  Like the subsequent Poret Survey, it purports to demonstrate that NIKE's use of "cool compression" to market its athletic apparel created *no* likelihood of confusion – not *de minimis* but rather, absolutely <u>none</u>. Given that even formal disclaimers don't necessarily result in *zero* confusion, that finding is so striking, it has to give one pause.

22.   Each of the two confusion surveys produced exceptionally high levels of noise, though for slightly different reasons.  In the case of Mr. Ezell's survey, the reason, however, is quite easy to pinpoint.  Mr. Ezell made use of the so-called, "Eveready" format, a methodology entirely inappropriate for the circumstances at hand, and virtually destined to prove no confusion whatsoever between Lontex and NIKE.

23.   By common expert agreement, Eveready studies are properly reserved for "top-of-mind" or exceedingly well-known marks ("household names," as they once were called) because measurement of confusion hangs on the capacity to be *reminded* of a brand by the infringer's mark.  As already noted, the Lontex brand and its marks are known to only to an infinitesimally small percentage of the total US

population (even of all US consumers who purchase athletic apparel). As a matter of irrefutable logic, Lontex cannot be "brought to mind" for people who are altogether unaware of it.

24.    The enormous disparity between levels of familiarity with Lontex and NIKE would have disqualified Eveready under the best of circumstances; but Mr. Ezell's broad universe definition (adults 18 plus who purchase athletic performance apparel) further stretched the sample well beyond NIKE's target market definition for its Pro line. In so doing, it took what had been almost infinitesimally low odds of capturing Lontex-aware consumers in his survey sample to a true vanishing point.  Mr. Ezell may imagine that his use of the term "athletic performance apparel" – borrowed from the ResearchNow Omnibus Survey – served to separate NIKE's "game day athletes" from the less-committed, more casual users but there is good reason to doubt that.[1]  Much athletic performance apparel is purchased for everyday wear – a category also known by consumers as active-wear and in the trade, athleisure.

**B.   Inappropriate Use of the Eveready Format**

25.   There are two generally accepted options for testing likelihood of confusion:  The so-called "Eveready" format and the "Squirt" format -- named eponymously after brands whose claims inspired the respective study designs.  Each format is deemed appropriate for certain market circumstances, and each is also considered _in_appropriate for others.  A determination of methodological appropriateness must reflect the ability of either approach to faithfully represent the structure of the market structure in which two brands compete.

26.   Brand source confusion is fundamentally an example of pattern recognition – the process of matching cues and impressions to derive inferences about source.  When first devised, the Eveready format was an ingenious approach to the problem of testing likelihood of confusion under a very particular set of market circumstances: word mark infringement by a very obscure junior user on a very prominent brand whose products were different (batteries vs lamps) and did not compete in the same channels. Then as now, Eveready was a product known to most American consumers and easily summoned to mind by those words.  When asked whether the company that made the junior user's

---

1.    Omnibus surveys simply list categories of goods and ask consumers to check what they purchase.  No attempt is typically made to define specific categories, nor to manage over-statement/acquiescence.

product (bearing that same name) made any other products, consumers readily said "batteries" because the Eveready brand was already available to be called up in consumers' "cognitive work-space."  The Eveready format is sometimes referred to as the "gold standard" for testing likelihood of confusion *because it not inherently suggestive*. It owes its luster entirely to the spontaneous, unprimed nature of the associations it calls forth, not broad applicability. Where appropriate, it works exceedingly well, but it is not fit for all purposes.

27.  The Eveready format has developed adaptations to accommodate circumstances in which the brands at issue actually *do* compete in the same channels, whether or not side-by-side, which has broadened its use to situations like this one, where the two companies make competing products, both encountered on the internet.  Mr. Ezell showed respondents a NIKE shirt with or without the words, "Cool Compression", and asked each respondent a series of questions about source:  who makes or puts out this product, what other brands, if any, are put out by whoever makes or puts out this product, etc. I will offer no comments on the particular wording of these questions because *the real problem lies elsewhere -- in the misapplication of the Eveready technique.*  This race was over before it was run because NIKE was the only recognizable runner at the gate.

28.  As noted, effective use of Eveready requires enough consumers to have sufficient experience with the Plaintiff's mark to be mentally accessible, absent any prompt other than the allegedly infringing brand.  Even in a survey of 1000 respondents – unusually generous by Lanham Act survey standards, it was all but statistically impossible for anyone to have mentioned Lontex or "Sweat It Out."  As noted earlier, there are not enough US consumers already familiar with those marks to have appeared in a "random sample" of even 1000 respondents drawn from a general population sampling frame.  The odds were against even a handful being captured by Mr. Ezell's sample.

29.  *The marks of niche brands and small companies simply cannot be tested with Eveready surveys*. As noted, a precondition for use of Eveready is that <u>Plaintiff</u> be "top of mind." Among those with an interest in Lanham Act survey protocols, there have been lively, almost Jesuitical, debates about how to define "top-of-mind" – i.e., must a brand be volunteered on an unaided basis in awareness studies or is mental accessibility sufficient?  Increasingly, commentators have argued that literal top-of-mind is too high a hurdle, especially in markets with deep brand benches. Regardless, the argument concerning how famous a brand should be to qualify for Eveready is happening in rarefied air.  With a national customer

base of no more than 50,000 consumers, Lontex simply does not make the Eveready cut.  I don't understand what Mr. Ezell had in mind when he made his decision.  He does not explain.

30.  Perhaps Mr. Ezell imagined that in a circumstance where Plaintiff is too small a company to be known to a random sample of Defendant's potential customers, an Eveready survey simply affirms what seems self-evident: there is low  absolute number (and hence percentage) of people nationwide who will believe there to be an association since only a small number of people are aware of the senior user's brand to begin with.  Under those circumstances, using an enormous junior user's target customer base as the denominator for a survey of confusion literally precludes a survey finding of confusion, making any survey moot.

31.  *But it is my understanding that a likelihood of confusion survey needs to accommodate broader possibilities. It should properly offer insight as to whether shared target customers are likely to be confused in the event that they are exposed to both Plaintiff and Defendant's brands --* and it should offer the possibility of measuring reverse confusion as well as forward.  For an energic company like Lontex, with a duly-registered trademark and ambitions to grow, there are current and prospective customers at stake.  No survey was needed to prove merely that Lontex is a small company, and thus, could not be "brought to mind" by some other stimulus, even with the words, "cool compression." Nor was a survey needed to prove that Lontex customers (and their likelihood of confusion) could not emerge as an "audible" signal in a broader nationwide survey of consumers who know only NIKE.  A "thought experiment" would have proven the same pair of propositions just as well.  But that's all Mr. Ezell can be said to have proven with this survey.  Here a finding of zero confusion – the absence of any signal (zero) or noise (zero) – proved the irrelevance of Eveready in a market scenario like this one.

32.  Ultimately, NIKE must have recognized the irrelevance of the Ezell survey when it commissioned a survey from Hal Poret, who chose to deploy a sequential Squirt format instead. *Unlike Eveready*, *Squirt does not require fame or even brand prominence.  It requires only that goods compete in the same channels of trade, even if not side-by-side or even in the same stores.* Accommodations in the Squirt survey design are used to replicate market scenarios in which two brands don't tend to share the same retail "real estate", although internet commerce is reshaping how we think of retail channels, and reducing the perceptual distance between products that were never previously encountered in proximity.  Many such brands can now be compared in real-time from one website to the next.

33. I find nothing else in the Ezell Survey worthy of comment because, once the Eveready format was chosen, no other consideration could possibly have had bearing on the outcome.  Eveready was simply not fit-for-purpose, and it produced the only result it could possibly have produced under the circumstances.

## IV.  Rebuttal Commentary on The Poret Survey

### A.  Overview

34. Both of NIKE's confusion surveys got to the same zero endpoint based on different methodological errors but they share in common a way of thinking about survey design ill-suited for measuring the consequences to a niche brand experiencing infringement by one of the world's most powerful.

35. In a nod to the possibility that Plaintiff and Defendant might share the same customers or target market definition, Hal Poret used a Squirt design to *re-test* likelihood of confusion among a  sample of men and women who had purchased some kind of athletic apparel in the past 6 months or intended to do so in the next.  I note, for the record, his curious reference in the title (and elsewhere in the report) to NIKE's "use of the terms cool <u>and</u> compression" (emphasis added)."  That title would appear to imply that what's at issue is use of the two terms *individually*, when, of course, what's at issue is a registered mark, "cool compression."  As is often the case with marks consisting of several common words, the whole is decidedly greater and more commercially powerful than the parts.  NIKE surely does not think of its rights in the word mark, "Just Do It" as rights in the words, "just," "do," and "it."  Lontex has rights in the term, "cool compression," whenever NIKE used either that term, or off-hand variations (COOL COMP), it was appropriating another company's registered mark as its own.

36. Mr. Poret implies that his *do-over* using Squirt can be justified only if one is willing to make a generous concession to the Lontex claim that its market overlaps with NIKE.  Again, for the record, I note that the issue of market overlap has no real bearing on template per se -- only on how the proper universe is defined.  What made Squirt an appropriate format to consider, broadly speaking, is that

Lontex does have customers among the general consuming public, not just professional athletes, and it has aspirations to expand its penetration into that much larger market.

37. In Mr. Poret's sequential line-up approach, he presented respondents first with an on-line "brochure" for Lontex and then with three randomly sequenced images of shorts from NIKE, Under Armour, and Hyperform, replacing the words, "cool compression," with "compression" to create the NIKE Control. He then posed a series of fairly standard common source questions designed to establish any form of association between each brand and Lontex (put out by, affiliated with, permission to use). The anchor for purposes of comparison was always Lontex.

38. *Despite the shift from Eveready to Squirt, Mr. Poret, too, found zero net confusion – a blinking hazard light once again, warning that something was amiss.* And, indeed, I believe there was. Given how rarely we see literally zero confusion in surveys of this kind, *two* such occurrences in one case qualify as a "black swan" event, to be properly interpreted not as cross-validation but rather, as grounds to question the validity of both. Ironically – but not accidentally – Mr. Poret's zero confusion is the product of different kind of strained calculus. Here, he had some confusion "signal" in the test column but, however high that number was (27%), it was entirely offset by noise (27.5%). This is the sort of eccentric outcome that Lanham Act survey experts have frequently cited as evidence of methodological artifact or error. Typically, in any experimental survey designs, we expect to see noise levels ranging from 5% to 12%, perhaps as high 15%. Noise levels approaching 30% have been flagged as evidence of an inherently noisy design, or a noisy control that is prompting some level of acquiescence. High levels of control arm noise have been used to challenge certain kinds of methods (e.g. Squirt paired comparisons) and have ultimately led to disuse of those methods.

39. Mr. Poret's decision to introduce consumers to Lontex for research purposes via a full "brochure" did Lontex no favors (on the contrary); and his use of a *sequential* Squirt in which Plaintiff Lontex was presented first, did nothing to mitigate that problem. It is hard to see how this crash course in the Lontex brand, followed by presentation of specific garments for sale from other, much better-known companies, corresponds to the scenarios that Plaintiff has feared -- or any sort of brand attribution scenario that could ever occur in the consumer athletic apparel marketplace today. It replicates neither the possibility that (a) a current Lontex customer might encounter NIKE Cool Compression first and then infer a relationship (since no such respondents were in the survey); nor (b)

the possibility that someone whose *first* encounter with "Cool Compression" occurs in a NIKE context will  – if then later exposed to Lontex -- presume that Lontex is borrowing NIKE's term. (Within the period of infringement, both scenarios were entirely possible.)  A simultaneous Squirt array presenting multiple products together (as online "shopping" makes possible, even easy) would have done a fairer job of representing the various ways in which Lontex might experience risk.  Far better to have shown respondents a single garment on a product page from the website.  Better, too, would have been a Squirt format in which the anchor brand was not Lontex but NIKE – since statistically speaking, that is the logical order of exposure in the broad consumer marketplace; not Lontex and then NIKE.

40.  In sum, I don't believe there is anything to be learned from this study, other than the complete mismatch between this protocol, designed for other market scenarios, and the specific market circumstances of this David-and-Goliath contest over David's own registered mark. Templates are heuristics, nothing more.  When they don't fit, they need to be adapted and made to fit.  While, admittedly,  it would have been exceedingly difficult to design a survey to replicate the real world here, Poret's design did not come even close to the mark, nor even approximate it.  Like Mr. Ezell's Eveready, Mr. Poret's Squirt design was a "Procrustian bed" that Lontex should not have been made to lie on.

**B.   Universe Definition**

41.  Mr. Poret asserts that his survey "errs on the side of  crediting Lontex's allegations regarding the parties' products by showing both Lontex's use of COOL COMPRESSION and NIKE's allegedly infringing use of 'Cool' and 'Compression' in close proximity and in a manner that assures that respondents had more than adequate exposure to both parties' uses." (Poret Report, p. 11.)

42.  Below I discuss how the marks were actually presented, justifying serious doubt that respondents did, in fact, have "adequate", or truly meaningful, exposure to *both*.  For the moment, I note again that by sampling only from a broad population of consumers who purchase "clothing for exercise or athletic performance or support" (again, a universe definition more expansive than NIKE's own stated target market), Mr. Poret virtually guaranteed that none of Lontex's current customers or those who had ever actually been exposed to the mark would be represented in his survey.  With no more than 30,000 Lontex customers nationwide, the statistical odds were stacked against any representation in Mr. Ezell's sample of 1000 consumers, much less Mr. Poret's sample of 400. *Due the*

*striking asymmetry of the two brands – i.e., the fact that any Lontex customers have 100% chance of knowing NIKE but essentially 0% chance of having been surveyed on a purely random basis, the study was, by definition, incapable of shedding insight on how actual <u>Lontex customers</u> might react to NIKE's use of the mark.  Due to the broad way in which survey eligibility was defined, there is reason to doubt that the study shed adequate light even on NIKE's own Pro brand target customer.*

**C.   Stimulus Selection and Presentation in Sequential Squirt Context**

   43.   As already noted, we can point to certain experimental survey approaches that have earned sufficient credibility to be treated as templates in Lanham Act proceedings.  And much of the time, those templates work well enough, although they often require adaptions in order to work effectively or even justify their use. *Templates are only as reliable as their ability to do justice to actual market conditions.* The greater the deviance, the more vulnerable to legitimate criticism they truly are.

   44.   I've spoken already about Eveready.  Now we must turn to Squirt and examine that template more closely. There are two basic variants on the Squirt format:  a simultaneous array (including side-by-side pairs) and a sequential line-up.

- ***A simultaneous Squirt array is clearly appropriate when consumers might expect to see any of the products in close physical proximity and, in theory, have an opportunity to confuse any one of them with any other for various reasons*.**  No assumptions need be made about which brand is the mental starting point for the process of making brand associations. The survey typically asks respondents for any common source associations they might make between any of the brands, and, by taking account of chance, it parses the statistics that link any two brands in the array to arrive at likelihood of confusion for the brands at issue.

- ***A sequential line-up might be considered more appropriate when there is a very widely-known senior mark experiencing infringement by a junior user.***  In that instance, the sequential format attempts to replicate the presumed cognitive primacy of Plaintiff's mark, bringing it first to mind for purposes of pursuing associations.  Respondents are typically asked whether they associate any of the subsequently presented brands with the first one seen.

45.    So long as it fits the marketplace scenario, the simultaneous array has the virtue of leaving respondents full latitude to organize their own cognitive pathways and create their own hierarchies of brand relevance.  No one brand sits at the "head of the table"; no brand is singled out to establish an initial frame of reference.   *By contrast, the sequential array makes greater sense when Plaintiff's brand truly is so ubiquitous that it represents an ambient market presence or an anchor to which other brands might relate – a sort of North Star to the Big Dipper.*  A brand doesn't have to be the clear market leader to sit at the head of the table in a sequential Squirt line-up, but it should have sufficient prominence to justify the assumption that many consumers already have it somewhere in mind when an infringer comes on the scene.  A "brochure" should not be needed.  If the condition of cognitive primacy or even prior exposure cannot be met by Plaintiff, there is reason to argue that the anchor position should be randomized in a sequential array.

46.    Surely the Plaintiff in this case does not qualify for cognitive primacy.  Lontex has many customers and brand champions, but as my early math suggests, few, if any, were likely to find their way into Mr. Poret's survey.  Thus, among those consumers who were actually surveyed, Lontex could look confusingly similar to NIKE, but the reverse would not be true – at least not at a statistically detectable level. Given the market that Mr. Poret set out to replicate, it made no sense to introduce Lontex to everyone *for the first time* and then designate it as the *anchor* for all subsequent brand association questions.

47.    Mr. Poret certainly understood (unlike Mr. Ezell) that he had to place Lontex in front of consumers in order to test likelihood of confusion, and perhaps supply enough brand education to somehow meet the conditions of a sequential array with Lontex as anchor.  But this immersive education -- a dense web "brochure" -- did more to obscure the COOL COMPRESSION mark than feature it. Notably, the brochure he used is actually not generally used by Lontex to create an initial understanding of the brand or to present its products.  It is merely a refresher and would not qualify as a consumer-facing initial representation of Lontex, COOL COMPRESSION, or Lontex merchandise.

48.    In real life, consumers make their way to a website from some vantage point of their own, based on a personal set of objectives and a handful of search terms.  The consumers in this survey were primed in no way other way but to "imagine themselves shopping for clothing for athletic performance or exercise."  They had no particular mission, merely a reading assignment -- five pages of fine print

aplenty, in which the words COOL COMPRESSION occur in several places but not always in the largest typeface on the page.  (Notably, ordinary consumers would be unlikely to find themselves at such a site unless they had been directed there, i.e., were already familiar with COOLCOMPRESSION.com, SWEATITOUT.COM, or had done a particular keyword search that ranked high enough for the website).

49.   This sort of exposure – both too little and too much at the same time -- does not qualify as instant brand familiarity.  It does not replicate, much less mimic, marketplace exposure; and it does not call proper attention to the mark in question.  Respondents could not possibly have known what they were looking *at* or what they were looking *for*.  The very notion of using those five pages to create a Lontex "brand presence" by requiring respondents without meaningful orientation to read this "brochure" (for a scant minimum of 15 seconds, no less) and then passing them down the line to three other products for association questions, was all beyond the tensile strength of Squirt.

50.   If Mr. Poret wanted to do Lontex the favor of creating brand awareness out of whole cloth, he would have served them better by showing a lot *less content – potentially a product-specific page from SweatItOut.com or only the first page of the catalog/brochure*. The fact that there is more confusion registered with Hyperform comes as no surprise. Hyperform is a red herring here; its own obscurity creates noise, making its selection as a control seems almost mischievous. Consumers were more likely to link two unfamiliar brands with one another than to link NIKE with an unfamiliar brand featured in a "brochure."  With all this taken into account, the Poret Survey qualifies as a noisy experiment in which no signal could possibly be heard.

51.   So what actually happened?  Roughly 27% of test arm respondents connected NIKE back to Lontex and an identical percentage of control arm respondents did the same, zeroing out the results. But by all standards, 27% is a very high noise level – high enough to suggest that however high or low the test effects might literally be, the noise was keeping pace.  I have seen low levels of confusion nearly zeroed out (or almost), but I have never seen very high levels zeroed out in a study without some fundamental flaw in design or execution, whether choice of control or other.  Further evidence of the noise in this experiment is the extraordinarily high level of connection between Hyperform and Lontex. That number has no consequence for Mr. Poret's calculus but it does raise concerns about how respondents were processing information in this experimental scenario and what/where they were prone to guess, absent a clear Lontex stimulus, filtered for its own noise.

*52.*   Let's now imagine reversing this experiment.  Let's consider what might have happened had NIKE Cool Compression (or Pro) been at the head of the table and just two brands, Under Armour and Lontex, were positioned below.  (And let's also imagine that a subgroup of consumers who knew Lontex were represented in the sample.)  Finally, let's also imagine that Lontex is represented by a piece of apparel from its catalogue or a specific product offered, not a general brochure.  The survey findings might have been quite different. Respondents looking at a Lontex product act might have been more likely to associate Lontex with NIKE than Under Armour with NIKE. And even respondents who already knew Lontex, or thought they did, might have made the assumption that NIKE was in some way behind the Lontex brand.  Awareness of Lontex was highly unlikely to have preceded awareness of NIKE in this small sample drawn from a broadly-defined population of consumers .  *Reversing the sequence of stimulus presentation would have more closely approximated the reality of the market scenario for Lontex.  And doing so would have properly adapted the sequential Squirt format to replicate market conditions rather than distorting conditions to fit the format.*

53.   As a result of this mismatch between survey method and market reality, we get no insight at all into how real-world consumers — not NIKE's customers, nor Lontex's current customers – would draw connections between these brands based on the words, "cool compression." We do not know what percentage of people who had experience with Lontex COOL COMPRESSION would think about NIKE Cool Compression products, nor the reverse.  For a determination of risk and consequence, I believe there is need to look elsewhere, outside the survey data.

54.   I want to add one final note.  Survey experts are fond of explaining experimental designs in terms of placebo-control drug trials, and Mr. Poret is no exception (Poret Report, footnote, p 12).  That analogy may have the potential to elucidate but it also has the potential to mislead.  The reality is that placebo-control drug trials do a very good job of parsing noise because they rely largely on physical measurement.  The test stimulus is clearly formulated to be active (whether or not effective) and the control is always completely inactive.  Not so here, surely.  Biochemical outcomes may be every bit as complex as human behavior, but their measurement does not rely on human cognition and perception, with its own unique, unmapped, complexity; nor does measurement leave much discretion to the researcher. *This survey was nothing like a drug trial, and there is very good reason to doubt that it did much more than measure its own noise.*

## V.   Rebuttal Commentary on The Scott Survey

### A.   Overview

55.   The Scott Survey was conducted with the stated goal of determining "the extent to which interest in purchasing the NIKE apparel products accused in this matter is increased if those products are shown using 'Cool Compression' in the product description" (Scott Report, p. 3).  In my opinion, it does no such thing.  The methodological deficiencies of this survey – which afflict virtually every aspect from universe definition and sampling strategy; to stimulus presentation and question structure; and finally to statistical analysis and interpretation -- deprive us of any insight as to whether and how much Nike benefited from misappropriation of the registered mark, "cool compression."  *Dr. Scott contrived a blunt instrument to accomplish a nuanced measurement task.  The result was, predictably, a failure to measure much, including the materiality of Cool Compression*. My criticisms fall under three main headings:

56.   **First, the sample was both over-inclusive and under-inclusive for the purposes to which it was put --and in ways more egregious than either the Ezell or Porot surveys**.  Dr. Scott's survey employed the broadest possible universe definition – *men and women* who have purchased (any) athletic apparel for themselves or others in the past 12 months (or intend to in the next 12) – and then asked respondents to rate an item of *male apparel only,* without first establishing whether the women in the sample might ever be purchasing clothing on behalf of men.  Once again, no attempt was made to represent Lontex's current or likely customer base; indeed, Dr. Scott's approach to building the sampling frame all but ensured that no Lontex customers would be represented in the survey sample, and appears to have ensured that even NIKE's own target customer base for NIKE Pro was underrepresented.  <u>NIKE's potential to gain</u> material benefit from the mark would, in theory, be measured by a properly-designed study conducted with a sample of relevant NIKE customers.  <u>Lontex's potential to lose</u> business can only be addressed by a study that represents its own current and likely customer base.

57.   **Second, the methodology chosen was one that is known to minimize measurement sensitivity**. In an exercise that might better have been designed to amplify sensitivity, Dr. Scott used the dull blade of monadic presentation -- i.e., each respondent was shown only one Nike-brand garment, labeled

either "cool compression" or merely "pro".  Dr. Scott's stimulus presentation deprived consumers of context while also doing everything possible to expose respondents to the same detailed product description in both arms.  With stimuli like these, monadic measurement had the predictable effect of dampening attention to, or salience of, the words, "cool compression," thereby minimizing any ability to detect its materiality in the marketplace.

58.  **Finally, the survey cherry-picked statistical testing approaches, and also literally *cherry-picked respondents,* to reduce the odds of demonstrating significance**.  When Dr. Scott saw an ember of statistical significance in her analysis, she snuffed it out with a clumsy rejigger of the original sampling design, by removing some female respondents from her sample after the fact. That unusual decision heaped insult upon injury in a study whose very design made measurement *in*sensitivity a foregone conclusion. Each of the various design elements and their deficiencies are discussed below.

## A.   Universe Definition and Sampling Criteria

*59.*   In order to justify generalizing survey results to a broader universe, it is important that (a) the universe for the assignment be appropriately defined and correctly sampled; and also that (b) the survey content itself be structured to match the universe definition.  Here, we have the first instance of misalignment between Dr. Scott's objectives and her methodology. *Her sample was, by virtue of its design, both over and under-inclusive in ways that precluded effective measurement of materiality through any means.*

60.   *First, Dr. Scott surveyed nearly equal proportions of men and women in a survey that was dedicated entirely to athletic apparel for men*.  If Dr. Scott intended to generalize her survey results to a universe of male and female consumers who purchase athletic apparel, she should have been prepared to show them all garments they might be expected to consider for purchase.  And if she intended to survey a universe of people – male or female -- who purchase athletic apparel for adult <u>males</u>, she should have confirmed that the female survey participants do, indeed, purchase athletic apparel on behalf of adult males.  She did not.

61.   The screener question wording was loose enough to *admit* of that possibility but also flabby enough not to specifically confirm it: "Please tell us which of the following products, if any, you plan to

purchase for yourself or others <u>in the next 12 months?</u>"  (Scott Report, p. 5, emphasis hers).  In theory, Dr. Scott could have found herself with a sample of nearly 400 women who play no meaningful role whatsoever in purchasing the athletic garments for anyone but themselves, much less, adult males.  Dr. Scott's rationale for including women was the premise (unsupported in her report) that women "often purchase men's products for male members of their family." *Perhaps so, but there is also no reason to assume that the number of proxy-purchasers amounts to 45% of adult women, nor that women who do purchase on behalf of men were represented by the particular women she sampled.*  Even now, we have no way of confirming what percentage of those women were truly relevant to the endeavor.

62.   This failure of diligence in screening female respondents qualifies as a serious sampling blunder – one that cannot be corrected *post hoc* in the manner Dr. Scott employed (i.e., by removing *some* respondents after the fact based on verbatim commentary).  Her too-little-too-late "remedy," (spurred by discomfort with the study outcome) is addressed in greater detail later in this report.

63.   *In the same vein of over-inclusiveness, it is also worth noting that Dr Scott's sampling criteria were set rather loosely with respect to timeframe of past purchase or purchase intent*.  For a category as broad as athletic apparel, a 12-month purchase interval (past 12 or next) seems curiously long. By implication, in order to qualify for the Scott survey, one could have purchased any form of athletic apparel, including socks, no more recently than 12 months ago – and if not, one would only have needed to anticipate purchase within the coming year, not necessarily sooner. The Poret Survey utilized a more conventional time frame of 6 months.  I can't ever recall seeing a 12-month window used to define eligibility, even for products whose purchase cadence is far less frequent than athletic apparel.

64.   As it happens, roughly 1 in 5 who ultimately qualified for the Scott Survey had not purchased athletic apparel in the past year and were admitted only on the basis of predicted (future) 12-month purchase, setting a fairly low bar for marketplace participation.  The result was little more than a "gen-pop" survey of people for whom compression apparel, much less high-performance compression apparel was not necessarily relevant in any way.[2]  I believe this "stretchy" sample definition is

---

[2] Future purchase intent was never established for *most* respondents. Evidently, respondents were only meant to be asked about future purchase in the event they had not purchased athletic apparel in the past 12 months but, as it happens, a misfire in the skip pattern produced answers to both questions for about 40 respondents. There are circumstances in which past purchases can be sufficient to qualify someone for a survey without future due to normal purchase cadence.  Here, however, past 12-months is not sufficiently recent and neither is future 12 months sufficient for products subject to frequent washing and likely to need periodic replacement.

improperly shaped to either company's target market in a way that would disqualify it as a basis for determining whether properties of "cool compression" would be material to relevant consumers.

65.   *While overinclusive with respect to Defendant's market, this sample was destined to* <u>*exclude Plaintiff's own current customer base*</u>, a population not necessarily much larger than 30,000 and certainly too small to be captured by a sample of even 800 broadly-defined athletic apparel consumers. In order to represent a population which accounts (by any calculation) for less than .0001 of the relevant purchasing universe, Dr. Scott would have had to sample explicitly from Plaintiff's own customer list -- a list I have been led to understand was available to NIKE, though untapped by any of its experts.  Had Dr. Scott made use of it, she would have been in a position to potentially measure the materiality of "cool compression" in inducing interest among a base of customers who have already demonstrated some appreciation for Lontex COOL COMPRESSION product benefits. When the Scott Survey is placed side-by-side with Plaintiff's other two, we have a perfect trifecta of missed opportunities to measure harm to Plaintiff or value to Defendant.

**B.   Monadic Test Design and its Implications for Sensitivity**

*66.*   Dr. Scott's sampling strategy set sights on many more i*rrelevant* consumers than relevant ones -- shaky ground, indeed, for the survey that followed. Perched on that weak foundation was a survey methodology with its own built-in structural deficiencies.  Having produced a survey sample that appears to represent the vast majority of US adults while including virtually none of Plaintiff's customers, Dr. Scott put her respondents to the task of (a) viewing the website representation of a single male athletic garment, and (b) rating <u>interest in purchasing the one item</u>, absent any sort of broader shopping context. *Dr. Scott's decision to employ a monadic test design for her experiment was a choice with clear implications for measurement sensitivity.  And without a doubt, it favored NIKE.*

67.   In order to explain how and why, it is necessary to describe several basic methods for presenting stimuli and their implications for research outcomes.

68.   Because experimental research involves a bit of art as well as science, researchers get to exercise discretion when they make certain critical design decisions. Behavioral science experiments extend greater design latitude than scientific experiments, and they are also more vulnerable to the

implications of those design decisions.  That's because they require us to: (a) mimic a complex psycho-social reality and (b) measure effects that are mediated through cognitive processes – i.e., the perceptions, motivations, and interpretations of the subjects we are studying.  That turns out to be a tall order.  As noted earlier, biochemical outcomes are actually much easier to measure, and the tools we have for doing it are more objective.

*69.*   Design decisions in experimental surveys can have significant implications – sometimes so significant that they can qualify as inadvertent "thumbs on the scale." As a result, researchers need to weigh the implications and be able to justify why they chose to err on one side of the scale rather than the other.

70.   One set of relevant decisions is the way a researcher structures the choices or decisions that subjects are asked to make in response to presentation of experimental stimuli.  Loosely speaking, there are several design approaches that can be used to test effects in an experiment or an experimental survey:

- ***A "monadic" or "between-group" approach, which exposes each respondent to only one stimulus, a test and a control.***  The impact of the test stimulus is measured by comparing the results from multiple arms – typically one test and one control arm, although additional arms are possible in some designs to accommodate more than one test stimulus.

- ***A "comparative" or "within-group" approach, which exposes each respondent to more than one stimulus*** (presumably at least one test and one control or multiple test stimuli). Effects are measured by comparing respondents' reactions to those multiple stimuli.

- ***A hybrid variation on monadic testing in which each respondent sees either the test or the control stimulus positioned amid a fixed array of options (common to both arms).*** This approach focuses on between-group comparisons (test versus control) but creates greater context for respondents' decisions by presenting each respondent with multiple options to evaluate or select.

71.    All three approaches see substantial use in behavioral science research, and all three approaches are routinely applied to address questions under the Lanham Act. The monadic approach is encountered primarily in "secondary meaning surveys"; the comparative approach in Teflon-format "genericness surveys"; and the hybrid approach in Squirt-format "likelihood of confusion surveys."  In routine market research, measurement of preference is one of the most common goals of survey research.  As a result, researchers have frequent occasion to decide which measurement tool will best serve their needs.

72.    ***In behavioral science research generally, it is well-understood that monadic testing – though often quite useful – tends to understate differences and therefore produces less sensitive measure of preference than a direct comparison.***  It is an inherently conservative measurement protocol because life circumstances tend to be comparative by nature. When we open the refrigerator, we typically have more than one thing we can choose to eat.  When we shop, even from the online safety of our homes, we usually have multiple options to consider.  Such decisions are seldom made in a true vacuum. Even when the consideration set is mostly carried around in our head, real-life intentions and choices occur in a rich context that surveys can't easily evoke.

73.    To illustrate why and how a monadic survey test tends to be insensitive, let's imagine we ask people to pretend they are very hungry, and we conduct a monadic test of their interest in a single item of food.   Imagine that we offer each person only one thing:  a slice of pizza or a piece of layer cake. (Let's further assume no food allergies.) Without laying bets on which of those two foods is more generally popular, we might expect to get statistically comparable scores for both items in a scenario where only one option was available for a hungry person to consider.  Even crackers and milk might score just about as high if nothing else were on the table, so-to-speak – assuming, for the moment, that we could really induce people to respond "as if" they were really hungry in our survey. (That is not, by the way, a foregone conclusion.)

74.    From the responses to that monadic survey question, we could conceivably learn that hungry people may eat just about anything -- but we would not have learned anything about whether, or how much more, they prefer one food over another, whether under circumstances or starvation or satiety. Even if there were a statistical winner, we should still expect differences to be blunted by a "this-or-nothing" choice scenario.

75.   We have just measured what behavioral scientists sometimes refer to as the ability of an option to "satisfice" – in other words, serve the purposes of the moment rather than necessarily to delight or achieve first place among other options.  Now, let's take another approach.  Let's offer all three of these foods to every "hungry" respondent.  If we want to understand which one is truly preferred and by what margin, we will clearly learn much more in a head-to-head contest. Comparisons make it easier to measure whether something matters, even in real life, because they sharpen sensitivities to real distinctions by providing each respondent with the opportunity to rate multiple options on the same scale.

76.   Researchers need to select their tools carefully because they don't want a dull blade to deprive them of an opportunity to make fine cuts *when they need them*. *When monadic testing of two products or ideas is the method chosen, more often than not it is chosen specifically to withhold the opportunity of expressing direct preference for one reason or another*. If the goal in enterprise decision-making is not so much to find a clear winner as to demonstrate that there is little risk attached to any option being tested, then monadic testing is acceptable. It may help you find a favorite, but it isn't guaranteed to do that because it doesn't put respondents in a comparative frame of mind.  **If the goal is to ensure that preference (as opposed to sufficiency) is detected, then the researcher must seriously consider some sort of comparative testing** or *risk losing the opportunity to measure it.*  In Dr. Scott's design, everything was working against measurement sensitivity; nothing was working to enhance it, or even give it a fair shot.  How so?

77.   Let's return to the original example of artificially constrained food options (how likely are you to accept this particular item?) and transpose it to the realm of apparel shopping. Here, I should note, many respondents simply were not "hungry" nor were they otherwise well-primed for the task at hand. Despite general agreement that effort should be taken to put respondents in a relevant frame of mind, Dr. Scott gave no context for the image she presented, beyond asking respondents to "review it as if you were considering purchasing the product on this page."  There was nothing done to confirm that the respondent would actually ever buy sports tights (women's *or* men's), nothing done to prequalify an interest in product performance for physical activity (many people purchase "athletic apparel" for casual wear, nothing more), and nothing done to put them in mind of other options they might have available, even though online shopping is a virtual "souk" of comparative shopping opportunities. Whatever rating

the respondents gave was not so much a clear referendum on "cool compression" as it was a casual verdict on a diffuse array of considerations:  How they felt about the Nike brand, the type and style of garment depicted and its relevance to them personally, the specific product benefits listed at the bottom of the page, the price point, even the  task itself, and what respondents imagined the survey researcher might be looking to uncover by posing this constrained "shopping" scenario.  A great deal of cognitive processing had to happen before the salience of the words, "cool compression," could even come into play. That word mark was easily lost in the din.

78.    A proponent of Dr. Scott's design decision might argue that all those noisy signals are naturally present in the marketplace, and that this exercise was therefore a realistic one, well-suited to measure the impact of those words when used to market NIKE goods. In my view, it was *not*.  In developing print or digital advertising, where consumers may stop reading at any time, agencies routinely test headline content in isolation if the goal is to understand the effect of the headline – i.e., to learn whether it does the job of prompting a closer look at the product or inspiring a favorable impression. In Dr. Scott's experiment, survey respondents were shown a single, potentially irrelevant, piece of apparel and obligated by the survey instructions to read the entire page -- even though in "real life", they might not have spent any additional time doing so. *Indeed, the instruction to review the entire page gave respondents an opportunity to see all the related product benefits, thereby leveling the playing field and neutralizing whatever initial interest the words, "cool compression" might have prompted.*

79.    The value of "cool compression" to NIKE in real life would have been the ability of those words -- whether related or not to Lontex's good will to:  (a) attract consumers to the product for further consideration, (b) signal in a potent bit of shorthand what the key benefits or value proposition might be (making a full reading of the fine print unnecessary), and (c) make NIKE more appealing than any other brand option consumers might also be considering.  In no way can the Scott Survey be said to have accomplished this.

80.    ***There were several other ways the task could have been structured to avoid unwanted design artifact that would muffle the signal, and more accurately capture the true benefit of that term to NIKE.***  Respondents could have been presented with only the top half of the page so as to determine what Nike Pro Cool Compression (versus Nike Pro Compression) actually signaled to them, and how much interest the term inspired. Respondents could have been shown pairs of Nike products, one

labeled "Nike Pro Cool Compression" and one labeled "Nike Pro Compression," and asked which they were more likely to purchase. (If NIKE had wanted to test the salience of that term to consumers before appropriating it, the company would have been advised to choose a more sensitive, comparative measure of that sort in order to make sure the full measure of value were understood.)  Respondents could have been channeled by more specific screening questions to a type of apparel they might actually consider purchasing, thus ensuring that the rating exercise measured the relevance of product attributes rather than personal relevance of the garment itself.  In short, there were other study design options and adaptations that would have made this measurement exercise potentially more sensitive while rendering it no less authentic or "realistic" than Dr. Scott's.

**C.  Analytic Approach**

81.   In statistical analysis, as in other methodological choices, there is sometimes room for expert disagreement, and I do, indeed, disagree with Dr. Scott on several points for which I will make my case. *As a general theme, however, my objection is this:  Dr. Scott took an approach to data analysis that cherry-picked and discarded data not entirely to her liking.  Doing so in an already insensitive study design heaped statistical insult on methodological injury.* To be clear, I am not arguing that a different method of approaching the calculations would have produced clear significance.  On the contrary, the die was cast here by other choices made in the cascade of decisions that preceded the statistical computations.  But Dr. Scott's approach to the analysis was both unconventional and opportunistic, in ways that deserve criticism.

82.   I'll start with the decision I find merely eccentric:  the decision to avoid calculating means and confine herself to "top-box" and "bottom-box" comparisons across the two arms.  As someone who has reported consumer rating data to many of the nation's major corporation throughout a long career, I can't ever recall presenting only top and bottom boxes without also presenting the mean. There are real consumers and real consequence in the middle of the rating scale, and no good reason to discard them. Ratio analysis is not merely inefficient in this survey context, it was potentially less sensitive because it does not use all the available data.

83.   A focused examination of top and bottom boxes is sometimes used by marketers to identify and profile their champions or detractors, but profiling subgroups was not the goal here. And bottom-box

analysis is exceedingly *uncommon* in two-arm comparisons – especially if the focus is on whether an attribute hypothesized to be *positive* or motivating has had any effect on ratings.  For an experiment like this, the bottom box is simply not a routine or especially productive place to be looking for evidence of differences.

84.   I note that likelihood of confusion, secondary meaning, and genericness surveys all use ratio data (percentages) to create consumer population estimates because that is all they have to work with and that is their mission – to test those population estimates against a defined legal threshold. This, however, was not a study of proportionality, it was a study of materiality -- an attempt to gauge the marketing leverage associated with a particular word mark based on *rating scale data*.  There is no better summary statistic available for the purpose than a mean.

85.   Failure to report the means is ultimately a moot point because the means for test and control arms here were not, themselves, significantly different. *Vastly more troublesome is the fact that, after detecting some significance by her own chosen method, Dr. Scott went on to discard some of her respondents, based on a post hoc analysis that lead her to doubt the basic relevance of those respondents in the first place*.  Dr. Scott could, of course, have ascertained in the screening process whether the women she was admitting to her survey actually did shop for men's athletic apparel, but she did not avail herself of that earlier opportunity.  Only when the results were in did she deem it relevant to consider.

86.   At that point, a showing of statistical significance on the side of materiality (among women who viewed shirts only) sent her hunting for an explanation in the verbatim responses. In that process, she discovered that some female respondents in both arms had given negative ratings because they didn't have a role to play or an interest in the purchase of men's athletic apparel.  On that basis, she removed them from the analysis, and in so doing, eliminated all statistical significance.  This decision was methodologically incorrect – even though respondents were presumably discarded on that basis from both arms.  ***There is a very strong prohibition in experimental research against looking for a basis to discard respondents previously deemed eligible based on an objection to the answers they supplied.***

87.   A researcher certainly has the right to set certain respondents aside based on strong indications that they may have been inattentive or confused, or that they did not respond to the survey in good

faith.  A researcher does not, however, have the latitude to remove anyone based on survey responses that prompt her to second-guess the eligibility criteria she has set in the first place.  It is even more difficult for a researcher to justify retrofitting the sample based on a finding of statistical significance that seems inconvenient or even implausible. Doing so is, at best, arbitrary – and, by common agreement, a violation of research canon. I do not believe a peer-reviewed journal would publish a study whose data had been reanalyzed on that basis.  At best, the researcher would be limited to a discussion of the issue in theorizing about the findings.

88.    For the sake of argument, though, let's imagine that a researcher really does have second thoughts about study inclusion criteria and wants a "do-over".  ***Verbatim responses would not be a legitimate way to re-adjudicate eligibility because the decision would hang entirely on what each respondent chose to say and how thoroughly or unambiguously she was able to articulate it***. Presumably, there could have been other women for whom these garments were irrelevant but whose verbatim answers lacked specificity or clarity.  What does "not interested" mean?  Or "I would not wear them?"  Or, "not for me?"  (These are all sample verbatims from the Scott database.) When we rely on verbatim content to decipher respondent's meanings or intentions, we must live by the limitations.  *Not all of the women who gave low ratings to either test or control items can be assumed to have provided a clear indication of the reason.*  And while we're at it, why would Dr. Scott retain anyone – man or woman -- who indicates he or she would never wear tights while removing women who don't shop for men's apparel?   This is a slippery slope with no clear or safe landing place.  There is no way to shore up a sample like this after the fact.  Sensible, defensible decisions about how to present *realistic choices to the right respondents* should have been made by Dr. Scott at the outset.

89.    *At its heart, the decision to remove any respondents based on any answer literally contradicts the premise on which Dr. Scott's sampling plan was based, and effectively acknowledges that she began with an over-inclusive sample that was misaligned with the survey task*.  The very idea that every single woman in this survey was enlisted only as (at best) a proxy shopper for men – and may not even have qualified on those grounds – raises serious questions.

90.    *There is an ironic postscript to all this.  Dr. Scott's removal of some female respondents based on stated disinterest in men's athletic apparel eliminated statistical significance in <u>her</u> calculations (a Z-test of ratios) but it <u>would have had the effect of producing statistical difference in mine</u> (using a T-test of*

*mean ratings, p=.05).*[3]  Despite that finding – a finding which hints at the fact that a different sample might have produced different results -- I neither endorse Dr. Scott's decision to cull respondents, nor do I argue that these data, if only we pan for glints of gold, will produce it.  The two arms display no meaningful difference because the study design was inherently flawed, capable only of skimming the very top, not spooning for anything more.  We cannot draw any inferences about the real world, or the value to NIKE, of "cool compression" from the numbers that Dr Scott has presented.

## VI.  Conclusions

91.    I have written extensively in this report about the serious, in some cases, disabling, methodological flaws in all three NIKE surveys.  Having catalogued the ones I see, I'd like to focus now on the implications -- what we do not know and cannot say, in light of those deficiencies and the untrustworthy data they produced.

92.    The ultimate requirement for measurement validity is the use of an accurate and relevant measurement tool.  That precondition was not met in any of those three studies. As a result, these studies add nothing to what we knew at the outset because they were not "tuned" to the Lontex marketplace frequency.  We already knew that Lontex is a relatively small brand dwarfed in scale by NIKE.  We did not need a survey to prove that most people in the US population are unfamiliar with Lontex or that Nike is a mega-brand.  If these surveys accomplished anything, it was to remind us that Lanham Act survey templates need to be carefully customized to fit market circumstances, and that if they are not, there is serious risk of injustice, especially to small brands.

93.   Since NIKE appears to have ceased the use of "cool compression", the surveys in this case hold relevance for NIKE primarily with respect to their interest in relying on them for a determination of damages.  Presumably, NIKE would like to use these data to make the argument that (a) no relevant consumer could have been confused by NIKE's use of the Lontex mark, so there could have been no

---

[3] Based on an unpooled test for comparing two independent means to compare mean responses for A3 (NIKE Pro Cool Compression Long-sleeve) and A4 (NIKE Pro Long-sleeve) in Scott Exhibit 7-2B:  A3 mean=5.31, se=0.12; n=196, A4 mean=4.96, se=0.13, n=200. Test statistic = (5.31-4.96)/sqrt(0.12^2 + 0.13^2) =1.95, p=0.051 (two-sided).

damage incurred by Lontex as a consequence; and (b) the mark is actually immaterial to consumers, so that NIKE gained literally nothing by its use.  In my view, neither of these assertions has been proven.

- It seems fair to posit that not one single Lontex customer has been surveyed, and that there is, thus, no measure whatsoever of whether Lontex could have lost customers or whether current or prior Lontex customers now believe that Lontex COOL COMPRESSION technology is available through NIKE.

- It also seems fair to posit that we have very limited insight about consumers who are genuinely interested in athletic apparel made from high performance fabric – the customer Lontex clearly relies on and whom NIKE claims to target with its Nike Pro line.  Those consumers were, at best, an unquantified and unidentified subset of those whom NIKE actually surveyed for any purpose.

- For lack of clarity about universe/sample relevance as well as survey design flaws, we cannot conclude that relevant NIKE consumers exposed to its Pro line "cool compression" apparel wouldn't ultimately draw a connection between NIKE and Lontex COOL COMPRESSION, assuming they were to encounter Lontex subsequently.

- In light of the improper universe definition and insensitive test method used in the materiality survey, we cannot conclude that "cool compression" had zero impact on NIKE sales among any consumer segment – and most assuredly not among the Lontex current customer base, who would have found that mark meaningful, but whose voice was not heard or counted in the Scott Survey.  The fact that NIKE chose to use "cool compression" should, itself, give pause.  NIKE is a talented marketing enterprise.  They know a good phrase -- packed with potential meaning and commercial value -- when they see it.  Even if a group of largely irrelevant survey respondents did not notice it on one-time exposure (with no attempt made to contextualize or feature it), I think it would be completely unjustified to assert that no marketplace value was obtained.  *NIKE rode the Lontex horse and came back with real revenue.  The survey evidence in this case cannot possibly support the argument either that NIKE got nowhere on that horse or that Lontex did not suffer consequence of its use by NIKE.*

- Finally, we have no survey evidence whatsoever that can speak to the very important retail distribution chain of buyers, whose viability as a target for Lontex was undermined by NIKE's use of "cool compression". This last point is especially important, because by usurping the term, NIKE was depriving Lontex of the ability to represent its own unique technology and customer value proposition with its own duly-registered mark -- either because buyers might mistakenly attribute a common source or they might assume NIKE to be using Lontex technology. Especially among knowledgeable buyers, COOL COMPRESSION was not, and is not, a mere catch-phrase. Above and beyond brand source or origin – understood to be a critical property of trademarks – it also signals a very particular brand promise about an exceptional level of product performance, performance which I understand exceeds NIKE's. Even sophisticated wholesale purchasers are definitely not immune to such confusion, which means that Lontex was not protected against its consequences.

94.    I believe that due the host of methodological flaws I've described, there is no useful survey evidence in this case. No one has submitted a survey that successfully couture-cut the methodology to the exceptional market circumstances; no one has submitted a survey that does more than highlight, as almost an object lesson, where traditional Lanham Act survey templates fall short in attempting to develop relevant, valid data.

95.    The harm to Lontex – its magnitude and implications -- can be seen only if survey researchers succeed in shedding a bright light on that portion of the Venn diagram in which both companies compete today, or might compete in the future. To do that, though, one has to define the markets correctly so that the overlap comes into sharp relief, and then one has to adjust the survey design to measure that landscape effectively. Absent survey data capable of accomplishing that, other data sources and perspectives need to be the basis for arriving at a determination of damages.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 9, 2020

Susan Schwartz McDonald, Ph. D.
President and CEO, NAXION

# EXHIBIT 1

CV of Susan Schwartz McDonald, Ph.D.





**Susan Schwartz McDonald, Ph.D.**
*President & CEO*

As CEO of **NA**XION, and leader of the firm's Healthcare practice, Susan is a marketing strategist whose areas of expertise include demand forecasting and product optimization, pricing, market segmentation, brand positioning and portfolio strategy.  She is known for her marketing ingenuity and her track record in guiding commercialization of paradigm-changing technologies that require new market models, including some of the industry's most important global brands.  Other sectors in which she has extensive experience include OTC pharmaceuticals and consumer products – both packaged goods and technology-driven categories.

As a respected expert on brand marketing, Susan also directs the Litigation Support practice of **NA**XION.  In that context, she is frequently called upon to conduct and rebut surveys, and testify as a marketing methodology expert in cases pertaining to trademark confusion, secondary meaning, patent infringement, brand dilution, and deceptive advertising.  The focus of her testimony as a marketing expert is often on the process of brand development and cultivation of strong, distinctive brand identity, as well as on factors putting brands at risk of source confusion or dilution.

Much of Susan's 35-year marketing career was spent at Booz•Allen & Hamilton, a worldwide management and technology consulting firm, of which she was a Vice President for over five years.  She lectures and writes frequently on marketing issues and market research techniques, and has contributed to medical journals as well as marketing texts. Susan is also coauthor of a standard text on qualitative research methods, *The Group Depth Interview:  Principles and Practice* (Simon & Schuster/Prentice Hall).  Her early professional years were spent as a journalist and a poet, contributing regularly to a number of major magazines and newspapers, including *National Review* and *Harper's*.

Susan is the 2011-2012 Past Chair of the CASRO Board of Directors, the trade association of the US marketing and survey research industry, recently renamed The Insights Association.  Currently, she is a trustee of The Wistar Institute, the world's oldest incubator of biomedical discoveries in cancer and immunology, and a member of the Advisory Board to the marketing research program of the Rutgers University Graduate School of Business. She is also President of the Board of the Chamber Orchestra of Philadelphia.

Susan holds M.A. and Ph.D. degrees from the Annenberg School for Communication, University of Pennsylvania, where she was trained in communications theory and social psychology.  Her B.A. was awarded magna cum laude, Phi Beta Kappa, from Smith College.

# SUSAN SCHWARTZ McDONALD
# MARKETING PUBLICATIONS

### BOOKS AND BOOK CHAPTERS

The Group Depth Interview:  Principles and Practice, Goldman, A. E., & McDonald, S. S., Prentice-Hall, Inc., Englewood Cliffs, New Jersey, 1987.

"Evaluation of Federally Funded Family-Planning Programs," Program Evaluation at HEW:  Research Versus Reality (265-310) Henry, Nicholas, Marcel Dekker, Inc., New York, Basel, 1979.

*Market Segmentation*, Handbook of Business Strategy (second edition), Glass, Harold E., Editor, Warren Gorham & Lamont, Boston, Massachusetts, January 1991.

### ARTICLES, PAPERS AND SPEECHES

*Strategies of Segmentation Research*, Proceedings of the Tenth Attitude Research Conference, Goldman, A. E., & McDonald, S. S., American Marketing Association, 30-42, 1979.

*The Psychology of Consumer Promotions*, presented at the meeting of the Promotion Marketing Association of America, Inc., New York, NY, March 1982.

*Targeting and Research Development:  Matching New Products and New Solutions*, Product Development and Management Association, Minneapolis, MN, March 1982.

*Practices, Strategies, and Motivations in Treatment of Rheumatoid Arthritis*, Goldman, A. E., & McDonald, S. S., The American Journal of Medicine, December 1983.

*Position and Forecasting for New Medical Products:  The Application of Segmentation and Conjoint Analyses*, The Joint Meeting of the Pharmaceutical and the Medical Surgical Marketing Research Groups, Chicago, IL, October 1985.

*The Case Against Peer Influence Groups*, Medical Marketing and Media, 23, 13, 4-8, October 1988.

*An Introduction to Market Segmentation*, International Association of Business Communications, Harrisburg Chapter, November 1988.

*Successful Needs/Benefits Segmentation:  A User's Guide*, The Journal of Consumer Marketing, Greenberg, M. G., and McDonald, S. S., 6, 29-36, Summer 1989.

*Brand Equity:  Working Toward a Disciplined Methodology for Measurement*, Advertising Research Foundation, New York, NY, January 1990.

*Getting Your Client to 'Buy Into' Marketing Research*, Pharmaceutical Market Research Group Meeting, Spring 1990, Philadelphia, PA.

*The Morning After:  Market Research Problems and How to Avoid Them*, Pharmaceutical Market Research Group Developmental Seminar, Fairfield, New Jersey, June 1990.

*Contamination in Qualitative Research*, presented at the 47th Annual Conference of the American Association for Public Opinion Research, St. Petersburg, Florida, May 1992.

*Multivariate Techniques*, Pharmaceutical Market Research Group, Developmental Seminar:  Quantitative Research - Design and Analysis, Philadelphia, PA, June 1992.

*Making Optimal Use of Your Sales and Marketing Levers,* presented at the Institute for International Research conference on "Marketing and Sales Force Reengineering," Philadelphia, PA, September 1994.

*Another Look at Managed Care:  Reassessing Their Priorities ... and Ours,* presented at the Pharmaceutical Marketing Research Group Meeting on "Redesigning Marketing Research in a Restructured Environment," Philadelphia, PA, April 30 - May 3, 1995.

*How to Design and Implement Successful Pricing Research:  Counsel and Caveats from the Trenches,* presented at the Professional Pricing Society, 6th Annual Pricing Conference, Chicago, IL, October 1995; reprinted in The Journal of Professional Pricing, 13, 3, 2004.

*Charting the New Product Development Course:  A Market Research Case Study Workshop*, conducted at the Institute for International Research's 2nd Annual Pharmaceutical Marketing Research Roundtable, Philadelphia, PA, November 1996.

*The Positioning Research Ritual:  When Not to Bother At All,* presented at the Pharmaceutical Marketing Research Group Fall '98 Meeting, Baltimore, MD, September 1998.

*Project Conception:  Questioning Your Client/Designing the Study*, presented at the CASRO Advanced Project Directors Training Conference, Philadelphia, PA, September 14, 2000.

*Transforming Market Strategy into Marketing Action:  An Overview of Primary Research Techniques*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, November 2001.

*The Positioning Paradox:   When Words Hold Ideas Captive,* presented at the Pharmaceutical Marketing Research Group Fall '02 Meeting, Tysons Corner, VA, October 2002.

MARKETING PUBLICATIONS                                SUSAN SCWARTZ McDONALD, Ph.D.

*The Long and Winding Road:  Market Research in Support of Creative Concept Development*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, October 2004 and May 2007.

*Taking Care of Business:  Defending Pharmaceutical Market Research against the Perils of Industry Regulation,* presented at the Pharmaceutical Marketing Research Group 2006 Spring Conference, Las Vegas, NV, March 5-7, 2006.

*AE Reporting in the Market Research Industry:  An Update on the Still-Gathering Storm,* presented at the Pharmaceutical Marketing Research Group Fall 2006 Conference, Baltimore, MD, September 10-12, 2006.

*A"Brief History of Time" in the Pharmaceutical Industry … And a Quick Peek into the Future,* presented at the Market Research Association Philadelphia Chapter Meeting, Philadelphia, PA, May 2007.

*Improving Survey Efficiency:  Understanding the Relationships Among Standard Measures of Concept Evaluations,* Polster, M., McDonald, S. & Boldry, J., poster presented at 2009 PBIRG Annual General Meeting, Phoenix, AZ, May 17-20, 2009.

*Evaluation of GLP-1 Product Attributes in Treating People with Type 2 Diabetes in US:  Comparing Time Trade-off and Willingness to Pay Methodologies,* Zanutto, E., Conner, C., Polster, M., McDonald, S. & Hammer, M, poster presented at ISPOR 14th Annual Meeting, Orlando, FL, May 18, 2009.

*Reinventing the Market Research Function:  In a Disruptive Era of Change, Old-fashioned Intuition Still Counts,* McDonald, S. and Sharma, S., Pharmaceutical Executive, January 2010.

*Assessing Drug Treatment Preferences of Patients with Crohn's Disease:  A Conjoint Analysis,* Lichtenstein, G.R., Waters, H., Kelly, J., McDonald, S., Zanutto, E, Hendricks, D. and Rahman, M. The Patient:  Patient-Centered Outcomes Research, 2010.

*Much not Understood about Physicians, and Even Less about Patients and MCOs,* Pharma Market Research Report, February 2010.

*The True Importance of Derived Importance for In-line Pharmaceutical Products:  Putting a Valuable Tool into Context,* Polster, M., and McDonald, S., in PBIRG's Perspective, Vol. 12 No. 1.

*When a Single Measure Is Sufficient:  Optimizing Survey Efficiency in Concept Evaluation Research,* Boldry, J., Polster, M. & McDonald, S., poster presented at 2010 AAPOR Conference, Chicago, IL, May 13-16, 2010.

*Understanding and Surviving the Regulatory Environment:  A 'State of the Union' Perspective,* Pharmaceutical Marketing Research Group Webinar, May 20, 2010.

*A Comparison of Preferences for Two GLP-1 Products − Liraglutide and Exenatide − for the Treatment of Type 2 Diabetes,* Polster, M., Zanutto, E., McDonald, S., Conner, C. & Hammer, M., <u>Journal of Medical Economics</u>, 2010 13(4):655-661.

*MD Attitude Segmentation:  Can You Ever Get There from Here?*  Presented at the PharMArket Research Conference, Parsippany, NJ, February 2011.

*The Quantum Mechanics of Brand: What You See – and Don't See – with Derived Importance Analysis.* Polster, M. and McDonald, S. April 2011.

*The Art of the Ask in Forecast Modeling: Implications of 'Allocation' vs. 'Discrete Choice' Projections.* Polster, M. and McDonald, S. January, 2012.

*DTC ROI:  When We Advertise to Consumers, What Do They Hear?*  Presented at the PharMArket Research Conference, Parsippany, NJ, February 2012.

*The Impact of Nausea and Vomiting of Pregnancy on Quality of Life:  Report of a National Consumer Survey and Recommendations for Improving Care,* Clark, S., Hughes, B., and McDonald, S., <u>Obstetrical and Gynecological Survey</u>, September 2013, Vol. 68, No. 9, Supplement 1:S1-S10.

*The End of Pharma Marketing − or a New Beginning?*  Sharma, S., and McDonald, S., <u>Pharmaceutical Executive,</u> February 2015.

*Using Data to Make Decisions:  Ten Things I've Learned in 35 Years.*  Presented at the MSMR Alumni Market Research Conference, Arlington, TX, April 2015.

*When Size Matters … And What You Can Do About It:  Mapping the Dark Frontiers of 'Small Data' Modeling.*   Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*The 'Art of the Ask' in Choice Modeling:  Discrete Choice vs Allocation.*  Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*New PhRMA Campaign 'Goes Boldly' But Treads Unevenly.* May 2017.

*Ten New Year's Resolutions for Using Data to Make Marketing Decisions.* January 2018.

*Is Market Research Really Getting Emotional? Discovering What Implicit Metrics Actually Measure.* July 2018

## SUSAN SCHWARTZ McDONALD
## TESTIMONY AND DEPOSITION ACTIVITY SUMMARY


Glaxosmithkline LLC, Plaintiff v. Boehringer Ingelheim Pharmaceuticals, Inc., Defendant
U.S District Court for the Eastern District of Pennsylvania
Case No.:  2:19-cv-05321-CMR
*Deposition on behalf of Plaintiff* (January 22, 2020)


The Vineyard House, LLC, Plaintiff v. Constellation Brands U.S. Operations, Inc.,
Defendant
U.S. District Court for the Northern District of California – Oakland
Case No.:  4:19-cv-1424-YGR
*Deposition on behalf of Defendant (*January 14, 2020)


Monique Russell, et al., Plaintiffs v. Educational Commission for Foreign Medical
Graduates, Defendant
U.S. District Court for the Eastern District of Pennsylvania
Case No.:  2:18-cv-05629-WB
*Deposition on behalf of Defendant* (December 19, 2019)


Serenity Pharmaceuticals, LLC, et al., Counterclaim-Plaintiffs v. Ferring B.V., et al.,
Counterclaim Defendants
U.S. District Court for the Southern District of New York
C.A. No. 1:17-cv-09922 (RWS), ECF Case
*Deposition on behalf of Counterclaim-Plaintiffs* (November 27, 2018)


J-B Weld Company, LLC, Plaintiff v. The Gorilla Glue Company, Defendant
U.S. District Court for the Northern District of Georgia
Atlanta Division
Case No.  17-CV-03946-LMM
*Deposition on behalf of Plaintiff (July 10, 2018)*


Forever 21, Inc., Plaintiff v. Gucci America, Inc., et al., Defendants
U.S. District Court of California, Western Division
Case No.  2:17-cv-04706-FMO-E
*Deposition on behalf of Defendants (June 28, 2018, New York)*


MARS, Incorporated, et al., Plaintiffs v. The J.M. Smucker Company, et al., Defendants
U.S. District Court for the Eastern District of Virginia Alexandria Division
No. 1:16-cv-1451 (CMH/MSN)
*Deposition on behalf of Defendants (July 12, 2017, Philadelphia)*


Adidas America, Inc., et al., Plaintiffs v. TRB Acquisitions, LLC, et al., Defendants
U.S. District Court, District of Oregon Portland Division
No. 3:15-cv-02113-SI
*Deposition on behalf of Defendants (May 31, 2017, Philadelphia)*

Pinterest, Inc., Plaintiff v. Pintrips, Inc., Defendant
U.S. District Court for the Northern District of California
No. CV 113-04608-PS-KAW
*Deposition on behalf of Defendant (January 14, 2015, Philadelphia)*
*Testimony on behalf of Defendant (May 26, 2015, San Francisco)*

In the Matter of Investigation:  Certain Footwear Products
U.S. International Trade Commission
No. 337-TA-936
*Deposition (May 21, 2015, Washington, DC)*

HM Electronics, Inc., Plaintiff v. R.F. Technologies, Inc., Defendant
U.S. District Court, Southern District of California
No. CV12-2884-BAS (MDD)
*Deposition on behalf of Defendant (November 24, 2014, Philadelphia)*

OraLabs, Inc., Plaintiff v. The Kind Group LLC, Defendant
U.S. District Court for the District of Colorado
Civil Action No. 1:13-cv-00170-PAB-KLM
*Deposition on behalf of Defendant (July 24, 2014, Philadelphia)*

Healthcare Royalty Partners, L.P. (f/k/a Cowen Healthcare Royalty Partners, L.P.),
Plaintiff v. Shionogi Inc., LLC, Defendant
Supreme Court of the State of New York, New York County
Index No. 650424/2012
*Deposition on behalf of Plaintiff (June 18, 2014, New York)*

Zest IP Holdings; Zest Anchors, LLC, Plaintiffs v. Implant Direct Mfg., LLC;
Implant Direct LLC; Implant Direct International, Defendants
U.S. District Court, Southern District of California
No. 10-0541 LAB (WVG)
*Deposition on behalf of Plaintiffs (June 3, 2014, Chicago)*

T-Mobile US, Inc., T-Mobile USA, Inc. and Deutsche Telekom AG, Plaintiffs v.
Aio Wireless LLC, Defendant
U.S. District Court for the Southern District of Texas, Houston Division
Civil Action No. 4:13-cv-2478
*Deposition on behalf of Plaintiffs (October 21, 2013, Philadelphia)*