**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION, | Civil Action No.:  18-cv-5623 |
| Plaintiff, | |
| | (Hon. Michael M. Baylson) |
| v. | |
| | |
| NIKE, INC., | |
| Defendant. | |

**DEFENDANT NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.      Introduction ..................................................................................................1

II.     Summary of Material Undisputed Facts .......................................................3

    A.    2006-2008:  Lontex's failure to launch the "Cool Compression" brand ................3

    B.    2008-2016:  Lontex promoted SWEAT IT OUT, not COOL COMPRESSION.......................................................................................5

    C.    NIKE and its NIKE PRO product line ................................................8

        1.    NIKE's use of "compression" to describe fit and "cool" to describe thermoregulation ...................................................................9

        2.    NIKE's non-consumer-facing materials where the word "cool" appeared next to the word "compression" ................................10

        3.    NIKE's consumer-facing material where the word "cool" appeared next to the word "compression"...................................11

        4.    Where NIKE did not use the words "cool" and "compression" next to each other ......................................................................11

    D.    Lontex contacts NIKE in 2016, and then goes silent for years............................12

    E.    2016 Onward: Lontex begins using COOL COMPRESSION ...........................14

III.    Argument .....................................................................................................15

    A.    Legal standard on summary judgment ................................................15

    B.    Lontex cannot establish trademark infringement against NIKE...........................17

    C.    No likelihood of confusion exists ......................................................20

        1.    The parties' "marks" are dissimilar (Lapp factor one). ...........................21

        2.    COOL COMPRESSION is a weak mark (Lapp factor two). ...................26

            a.    COOL COMPRESSION is conceptually weak ............................28

            b.    COOL COMPRESSION is also commercially weak ..................31

            c.    NIKE did not saturate the market with a "cool compression" mark .............................................................................32

        3.    The actual confusion factors heavily favor NIKE (Lapp factors four and six). ......................................................................33

            a.    There is no evidence of actual consumer confusion. ...................33

            b.    NIKE's consumer surveys establish zero confusion.....................34

            c.    Lontex's anecdotal evidence does not show confusion. ...............35

         4.    Reasonably prudent consumers of the products at issue employ a high level of care (Lapp factor three). .......................................38

5.      NIKE used the common words "cool" and "compression" in good faith (Lapp factor five). ..............................................................40

6.      The parties' products are meaningfully different and the parties target their respective products to different consumers through different trade and advertising channels (Lapp factors seven, eight & nine). ........................................................................................44

7.      Likelihood of expansion in the other party's market (Lapp factor ten). ..............................................................................................47

D.      NIKE's alleged use was fair ........................................................................48

1.      NIKE did not use "cool" and "compression" as a trademark ...................49

2.      NIKE used "cool" and "compression" to describe its products................52

3.      NIKE used "cool" and "compression" in good faith ...............................53

E.      NIKE is not contributorily liable for any alleged third-party use .........................56

IV.     CONCLUSION.......................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) ............................................56

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
  414 F.3d 400 (2d Cir. 2005)............................................17

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000)............................................ passim

*Accu Personnel, Inc. v. AccuStaff, Inc.*,
  823 F. Supp. 1161 (D. Del. 1993)............................................29, 30

*Adidas America, Inc. v. Skechers USA, Inc.*,
  No. 15-cv-01741, 2017 WL 3319190 (D. Or. Aug. 3, 2017) ................................51

*Am. Orthodontics Corp. v. Atlantic Dental, Inc.*,
  Civ. No. 17-8098, 2017 WL 8776960 (D.N.J. Dec. 7, 2017)................................25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................15

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*,
  LLC, 793 F.3d 313 (3d Cir. 2015)............................................37

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
  560 F.3d 1350 (Fed. Cir. 2009)............................................5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................16

*Charles Et Cie, Inc. v. Destileria Serralles, Inc.*,
  921 F.2d 467 (3d Cir. 1990)............................................34

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*,
  333 F. Supp. 2d 239 (D. Del. 2004), *aff'd in part sub nom.*, 432 F.3d 463 (3d
  Cir. 2005) ............................................37

*Checkpoint Sys., Inc. v. Check Point Soft. Techs., Inc.*,
  269 F.3d 270 (3d Cir. 2001)............................................ passim

*In re Chocolate Confectionary Antitrust Litig.*,
  801 F.3d 383 (3d Cir. 2015)............................................16

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
   383 F.3d 110 (3d Cir. 2004)...........................................................................37

*Citrus Grp., Inc. v. Cadbury Beverages, Inc.*,
   781 F. Supp. 386 (D. Md. 1991) ...................................................................49

*Componentone, L.L.C. v. Componentart, Inc.*,
   No. 02: 05CV1122, 2008 WL 4790661 (W.D. Pa. Oct. 27, 2008).........................36

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
   125 F.3d 28 (2d. Cir. 1997)...........................................................................50

*Dessert Beauty, Inc. v. Fox*,
   568 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x. 333 (2d Cir. 2009)....................55

*Eniva Corp. v. Global Water Sols., Inc.*,
   440 F. Supp. 2d 1042 (D. Minn. 2006)...............................................................39

*First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*,
   923 F. Supp. 693 (E.D. Pa. 1996) ...................................................................36

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
   30 F.3d 466,477 (3d Cir. 1994).................................................................21, 42

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
   432 F.3d 463 (3d Cir. 2005)................................................................... passim

*Fuel Clothing Co. v. Nike, Inc.*,
   7 F. Supp. 3d 594,620 (D. S.C. 2014)......................................................35, 41, 53

*Giftboxcenter, LLC v. Petbox, Inc.*,
   No.15-4390, 2018 WL 734664 (D.N.J. Feb. 5, 2018) .........................................29

*GOLO, LLC v. Goli Nutrition Inc.*,
   No. CV 20-667-RGA, 2020 WL 5203601 (D. Del. Sept. 1, 2020) .......................39, 40, 44, 55

*Healthbox Glob. Partners, LLC v. Under Armour, Inc.*,
   Civ. No. 16-146 SLR, 2016 WL 3919452 (D. Del. July 19, 2016)........................46

*Hershey Co. & Hershey Chocolate & Confectionery Corp. v. Promotion in
   Motion, Inc.*,
   Civ. No. 0-1601 SDW, 2013 WL 12157828 (D.N.J. Jan. 18, 2013) ......................28

*Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.*,
   145 F. Supp. 2d 422 (D. Del. 2001)................................................................25

*Int'l Stamp Art, Inc. v. U.S. Postal Service*,
   456 F.3d 1270 (11th Cir. 2006) ..................................................................54, 55

*Interpace Corp. v. Lapp, Inc.*
    721 F.2d 460 (3d Cir. 1983)............................................................................ passim

*InterState Net Bank v. NETB@NK, Inc.*,
    348 F. Supp. 2d 340 (D.N.J. 2004) .............................................................17, 25

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
    456 U.S. 844 (1982)...................................................................................56

*Kate Spade LLC v. Saturdays Surf LLC*,
    950 F. Supp. 2d 639 (S.D.N.Y. 2013)........................................................39

*Kelly-Brown v. Winfrey*,
    95 F. Supp. 3d 350 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 55 (2d Cir. 2016)..............50, 51, 54

*Kinbook, LLC v. Microsoft Corp.*,
    866 F. Supp. 2d 453 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) .............. passim

*Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*,
    Civ. No. 11-3684 SRC CLW, 2017 WL 3719468 (D.N.J. Aug. 29, 2017) ...........................28

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)........................................................................34

*KP Permanent Make-up, Inc. v. Lasting Impression I Inc.*,
    543 U.S. 111 (2004).............................................................................48, 49

*Mad Hops, ltd. v. adidas-Salomon AG*,
    No. C-2-00-1445, 2003 WL 26616891 (S.D. Ohio July 16, 2003) ........................................38

*Marketquest Grp., Inc. v. BIC Corp.*,
    862 F.3d 927(9th Cir. 2017), *cert. denied*, 138 S. Ct. 1988(2018)........................................49

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................16

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
    511 F. 3d 350 (3d. Cir. 2007)...............................................................37, 38, 39

*MNI Mgmt., Inc. v. Wine King, LLC*,
    542 F. Supp. 2d 389 (D.N.J. 2008) .............................................................43

*Nature's Best, Inc. v. Ultimate Nutrition, Inc.*,
    323 F. Supp. 2d 429 (E.D.N.Y. 2004) .........................................................39

*Nunez v. Heere*,
    438 F. Supp. 3d 321 (E.D. Pa. 2020) .........................................................16

*Omicron Capital, LLC v. Omicron Capital, LLC*,
433 F. Supp. 2d 382 (S.D.N.Y. 2006)..................................................................20

*R.J. Ants., Inc. v. Marinelli Enterprises, LLC*,
771 F. Supp. 2d 475 (E.D. Pa. 2011) ..................................................................17

*Sabinsa Corp. v. Creative Compounds, LLC*,
609 F.3d 175 (3d Cir. 2010)..............................................................22, 28, 40

*Sorensen v. WD-40 Co.*,
792 F.3d 712 (7th Cir. 2015) ..............................................................................55

*SportFuel, Inc. v. PepsiCo, Inc.*,
932 F.3d 589 (7th Cir. 2019) ...................................................................... passim

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
868 F. Supp. 2d 415 (E.D. Pa. 2012) ..................................................................31

*Suntree Technologies, Inc. v. Ecosense Intern., Inc.*,
693 F.3d 1338 (11th Cir. 2012) ..........................................................................56

*United States Patent & Trademark Office v. Booking.com B.V.*,
140 S. Ct. 2298 (2020)..............................................................................3, 48, 49

*United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.*,
2 F.3d 529 (3d Cir. 1993)....................................................................................16

*Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*,
511 F. Supp. 2d 482 (E.D. Pa. 2007) (Baylson, J.).......................................38, 39

*Versa Prods., Co. v. Bifold Co. (Mfg.) Ltd.*,
50 F.3d 189 (3d Cir.1995)..................................................................................34

*Vynamic, LLC v. Diebold Nixdorf, Inc.*,
No. 18-577, 2019 WL 2895711 (E.D. Pa Jun. 17, 2009)...............................32, 39

*Warren Pub. Co. v. Spurlock*,
645 F. Supp. 2d 402 (E.D. Pa. 2009) (Baylson, J.).............................................17

*Xtreme Caged Combat v. ECC Fitness*,
No. 12-cv-3855, 2013 WL 6022135 (E.D. Pa. Nov. 12, 2013) ............................29

*Zaletel v. Prisma Labs, Inc.*,
Civ. No. 16-1307-SLR, 2017 WL 877302 (D. Del. Mar. 6, 2017)........................25

**Statutes**

15 U.S.C. § 1114................................................................................................17

15 U.S.C. § 1115(b)(4) .................................................................................................2, 49, 56

15 U.S.C. § 1125(a) ......................................................................................................................17

Lanham Act...................................................................................................................2, 17, 38, 49

**Other Authorities**

FED. R. CIV. P. 56.........................................................................................................................16

FED. R. CIV. P. 56(a) ....................................................................................................................15

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:5  ................................................18

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:24 ..........................................28

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:46 ..........................................51

3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:9 ............................................17

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:13 ..........................................36

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:21.50 ....................................22

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:53.50 ....................................46

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:17 ..........................................56

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:189 ........................................35

Defendant NIKE, Inc. ("NIKE") respectfully submits this memorandum of law in support of its motion for summary judgment seeking dismissal of all of Plaintiff Lontex Corporation's ("Lontex") claims against NIKE.

## I.    **INTRODUCTION**

In this lawsuit, Lontex, a company that sells compression garments, alleges that NIKE, a company well known for its famous NIKE and SWOOSH trademarks, infringed its COOL COMPRESSION trademark. Words like "compression" and "cool" have been used disjunctively by NIKE (and other athletic apparel companies) for years—not unexpectedly, given that tight, compressive fitting athletic apparel is commonly described using the word "compression," and apparel that has sweat-wicking fabric to keep a wearer cool is often described using the word "cool." Because these common words appeared next to each other in some written NIKE product descriptions, with the word "cool" immediately preceding the word "compression," Lontex asserts that consumers are likely to believe that NIKE is using Lontex's technology or that Lontex's products are affiliated with NIKE, thereby diminishing the value of Lontex's COOL COMPRESSION mark. Neither is true.

Lontex has submitted no evidence that consumers are likely to be confused. Notably, more than half a decade has passed since NIKE first began the allegedly infringing use of these descriptions, and Lontex does not have a single piece of competent evidence to suggest actual consumer confusion ever occurred. In fact, Lontex admits confusion is lacking. This is not surprising given that Lontex never promoted COOL COMPRESSION to the public as a primary trademark. Instead, Lontex freely acknowledges that all along its company and products have been known outwardly by an entirely different name: SWEAT IT OUT. To the extent Lontex ever had a plan for using COOL COMPRESSION as a separate brand, it dropped that plan long ago. The

theories of confusion Lontex puts forth now are, at most, abstract ideas spawned by opportunistic recovery goals instead of true concerns about protecting consumers from confusion in the marketplace.

Lontex posits that NIKE intentionally used the words "cool" and "compression" in succession to overwhelm the market and lure customers to purchase NIKE product because of some perceived value in Lontex's COOL COMPRESSION trademarks.  Lontex's position misconstrues the law and is not supported by the evidence.  Trademark registrations do not remove common words from the English lexicon or create a monopoly on who can use those words.  Trademark law is concerned only with preventing consumer confusion in the actual marketplace, and the Lanham Act is not intended to reach abstract ideas about how confusion might occur.  In this case, a robust record, accumulating years of evidence, demonstrates that NIKE received no special benefit from using these common words to describe its products—as there never existed any purchasing conditions that made any consumer think that NIKE's products were associated with Lontex or that Lontex's products were associated with NIKE.  Moreover, because NIKE used the common words "cool" to describe cooling aspects of its apparel, and "compression" to describe a tight fit, the accused use is not actionable for another independent reason—such use is indisputably a fair use, for which the Lanham Act grants a complete affirmative defense under 15 U.S.C. § 1115(b)(4).

NIKE, recognized for its memorable and purpose driven marketing campaigns, never launched a marketing campaign featuring the phrase "cool compression," and it never sought to apply that phrase to any of its products, which instead prominently feature the NIKE, SWOOSH, and DRI-FIT brands.  Nor would there have been anything for NIKE to gain from doing so with Lontex's alleged trademark.  The undisputed facts show that Lontex never made a public-facing use of the COOL COMPRESSION mark until ***after*** it saw that NIKE had some product descriptions

which used the words "cool" and "compression."  Lontex eschews common sense and ignores the fact that NIKE's use of the common words "cool" and "compression," even if in succession, does not automatically violate a trademark right.

As a result, NIKE respectfully requests that this Court grant summary judgment: (1) disposing of Lontex's federal and state trademark and unfair competition claims on the basis that no reasonable trier of fact could find that a likelihood of confusion exists and (2) disposing of Lontex's federal and state trademark and unfair competition claims on the basis that NIKE's use is protected by the affirmative defense of fair use.[1]

## II.    SUMMARY OF MATERIAL UNDISPUTED FACTS[2]

### A.    2006-2008:  Lontex's failure to launch the "Cool Compression" brand

Lontex, located in Norristown, Pennsylvania, is operated by Efraim Nathan and his daughter.  (SOF ¶¶ 1-2.)  Lontex does business as SWEAT IT OUT and has been selling compression garments under the SWEAT IT OUT brand since 1990.  (SOF ¶ 4.)  Lontex has always promoted its SWEAT IT OUT garments as having a special high-grade compression for prevention and rehabilitation of injury.  (SOF ¶¶39, 49.)

In February 2006, Mr. Nathan decided to create a new business—focused specifically on selling to the healthcare industry with the idea his compression garments might qualify for insurance reimbursement.   (SOF ¶ 6.)   Lontex created a separate company, called Cool Compression LLC, registered the domain names "coolcompression.com" and "cool-compression.com" and filed trademark applications for "COOL COMPRESSION" claiming an

---

[1] "[T]he doctrine known as classic fair use protects from liability anyone who uses a descriptive term, fairly and in good faith and otherwise than as a mark merely to describe her own goods." *United States Patent & Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2307 (2020).

[2] In support of this Motion, and pursuant to D.1. of the Court's Pretrial Procedures, NIKE submits herewith a Statement of Undisputed Facts ("SOF") setting forth, in numbered paragraphs, all undisputed material facts with record references.

"intent to use" the mark on a wide variety of clothing items, headwear and shoes.  (SOF ¶¶ 10-12, 14-16).

However, at some point in this period, people with whom Mr. Nathan consulted told him it was not a good idea to market the same compression garments under two different marks (SWEAT IT OUT and COOL COMPRESSION) because it would be confusing to Lontex's customers.  Specifically, Mr. Nathan testified:

> "Well, we ---we--- we came across the people that said, what are you doing: I really don't care what you call it, it does what I want to my team.  It does what I want for my rehab, it does what I want, you know, please, don't confuse us.  So the overwhelming was not to go into that, as we call it, two different brand with the same [g]ood, but two different brand with the same theory, but to just stay with one brand."

(SOF ¶ 33, 8.)

Lontex dropped the idea of the separate COOL COMPRESSION brand, and never launched the prototype "Cool Compression" e-commerce website developed by a consultant.  (SOF ¶¶ 34, 36, 37.)  Lontex never sold any of the compression garments like the one shown below which, as prototypes, were outwardly branded with the COOL COMPRESSION Mark.  (SOF ¶ 32.)



(SOF ¶32.)  Ultimately, Lontex dissolved Cool Compression LLC.  (SOF ¶38.)

Notwithstanding the failure to launch the COOL COMPRESSION business, Lontex filed "statements of use" with the USPTO in 2007 and 2008 claiming that the products with the prototype branding had been sold in commerce.  (SOF ¶¶ 18, 20, 23, 25.)  Mr. Nathan has since admitted that those statements made to the USPTO to secure registration were false as Lontex never sold any of the garments with the prototype branding and never sold the full array of goods listed in the trademark registrations.[3]  (SOF ¶¶ 18, 23.)  The registrations that issued are the same registrations asserted against NIKE in this lawsuit.  (ECF No. 20 at ¶¶ 11-14, Ex. A.)

### B.    2008-2016:  Lontex promoted SWEAT IT OUT, not COOL COMPRESSION

From 2008 to 2016, Lontex continued to market its garments under the SWEAT IT OUT brand, making *no mention of COOL COMPRESSION* on or within any brochure, website, social media, blog, press release, other piece of promotional material or in any email communications with customers.  (SOF ¶¶ 34, 45, 46, 62, 64-69, 89, 90.)  Lontex's products continued to be outwardly branded with the SWEAT IT OUT mark, and the company's sun logo as shown below:

---

[3] "Use in commerce" is required before a trademark application will be allowed to register in the United States. *See Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009). ("For trademarks, the 'use in commerce' requirement is met when a mark is (1) placed on the good or container, or on documents associated with the goods if the nature of the goods makes placement on the good or container impracticable, and (2) that good is then 'sold or transported in commerce.'") (citing 15 U.S.C. § 1127).  In connection with its counterclaim for fraud on the USPTO, NIKE maintains that Lontex's false statements to the USPTO were made knowingly with the intent to procure registrations which it knew it was not entitled; however, NIKE has not moved for summary judgment on its fraud claim and believes the issue of whether Lontex's misrepresentations were mistaken or intentional is matter for the trier of fact in the event the instant summary judgment does not moot the issue.



(SOF ¶¶ 45, 46.)

Lontex's marketing materials during this period prominently feature the SWEAT IT OUT mark and the Sun Logo.  And, instead of COOL COMPRESSION, Lontex repeatedly referenced "TRUE COMPRESSION" in these materials, as shown below in an excerpt from Lontex's product brochure used in 2014:



(SOF ¶¶ 44, 67, 74, 80, 85, 86, 88.)

In 2011, Lontex engaged 1SEO, a digital marketing firm, to perform "social media optimization" services, which included the creation (or utilization) of Lontex's Facebook, Twitter, LinkedIn, Blog, and photos/video (e.g., YouTube) accounts to help generate Internet traffic to Lontex's website via these social media outlets.  (SOF ¶¶ 71, 72.)  Lontex instructed 1SEO to use the SWEAT IT OUT brand to advertise, market, and promote its compression garments and to use

7

the phrase "True Compression" (not "Cool Compression") to drive traffic to the website.  (SOF ¶¶ 73, 75.)

Lontex's press releases used the same marketing approach.  (SOF ¶¶ 84-87.)  For example, in January 2013, Mr. Nathan wrote the following text for a Lontex press release:

> We at SWEAT IT OUT® specialize in TRUE COMPRESSION for both the Upper and Lower body to help prevent injuries and also to help with rehabilitation from an existing injury.

(SOF ¶ 86.)

Lontex hired a few athletes to promote its SWEAT IT OUT products, and pursuant to the agreements with these athletes, they were never hired to promote COOL COMPRESSION and never mentioned COOL COMPRESSION in their testimonial videos.  (SOF ¶¶ 81, 91-93.)

Finally, Lontex maintained a customer e-mail list between 2008 and 2016 and regularly sent e-mails to customers, such as athletic trainers employed by professional sports teams, to market and promote Lontex's compression garments using the SWEAT IT OUT Marks.  (SOF ¶ 88.)  Lontex has not produced a single written communication with any customer or potential customer between 2008 and 2016 that contains use of the COOL COMPRESSION Marks. (SOF ¶ 90).

During this time period, however, there are several communications reflecting that Lontex made numerous attempts to sell the COOL COMPRESSION trademark registrations as standalone assets but was never successful in consummating a deal.  (SOF ¶¶ 114-119.)

### C.   NIKE and its NIKE PRO product line

NIKE, based near Beaverton, Oregon, is the world's leading designer, marketer and distributor of authentic athletic footwear, apparel, equipment, and accessories for a wide variety of sports and fitness activities.  (SOF ¶ 120.)  The NIKE brand is one of the most recognizable in the world, most recently ranked as the 16th best brand globally.  (SOF ¶ 122.)

1.      **NIKE's use of "compression" to describe fit and "cool" to describe thermoregulation**

NIKE launched the "NIKE PRO" product line in 2004, years before Lontex claims it first used the asserted COOL COMPRESSION Marks, and about a decade before the alleged infringing conduct Lontex complains of in this action.  (SOF ¶ 128.)  NIKE created the NIKE PRO line to provide baselayer products with the design ideal of creating thermoregulation and comfort.  (SOF ¶ 129.)

The products in the NIKE PRO product line were offered in a variety of fit preferences since baselayer products fit close to the skin and can be worn under other layers of clothing.  (SOF ¶¶ 138, 145.)  Since at least as early as 2009, NIKE offered a "compression" fit as a tighter fitting alternative to the "fitted" fit.  (SOF ¶¶ 133, 134.)  The fit information (e.g. "compression" or "fitted") was applied to a heat transfer label on the inside of garments, next to the size information, and below NIKE's SWOOSH and DRI-FIT marks:



(SOF ¶ 152.)

In line with the objective of the NIKE PRO line to provide thermoregulation benefits to the wearer, NIKE has a family of products that keep the wearer "cool" and a family of products that keep the wearer "warm."  (SOF ¶ 137.)  This thermoregulation benefit is described on hang tags that are attached to the outside of the garment and removed after purchase:



(Durham Decl. ¶ 253, Ex. 249.)

The exterior of NIKE PRO products prominently features NIKE's SWOOSH mark on the chest or leg of the garment and the NIKE mark and "NIKE PRO" branding on the waistband, neck tape, hemline, and interior labeling.



(SOF ¶ 164.)

No NIKE product bears the phrase "Cool Compression" anywhere on the garment, garment labeling, or on any hangtags sold with the garment.  (SOF ¶¶ 150-152.)

### 2. NIKE's non-consumer-facing materials where the word "cool" appeared next to the word "compression"

In certain ***written materials***, NIKE used the words "cool" and "compression" to describe NIKE Pro products with the cool thermoregulation benefit and a compression fit.  (SOF ¶¶ 164, 165, 170.)  These written materials were either purely internal to NIKE or made available to the professional buyers or employees of NIKE's wholesale retail partners like Dick's Sporting Goods. (SOF ¶¶ 167-169)  In some instances, the words "cool" and "compression" appeared in succession inside a longer string of other words describing the NIKE product such as in: "Nike Pro Combat

10

Cool Compression Men's Long-Sleeve Shirt" or "Nike Pro Combat Cool Compression 6" Men's Shorts."  (SOF ¶ 164.)  Products descriptions like these appeared in NIKE's: (1) internal business records; (2) product "tech sheets," which contain educational information about product features, benefits, and technology; and (3) wholesale product catalogs.  (SOF ¶¶ 158-161, 163-165, 167-172.)  NIKE does not provide any of these materials to consumers.  (SOF ¶¶ 161, 169.)

### 3. NIKE's consumer-facing material where the word "cool" appeared next to the word "compression"

Starting sometime in 2015, the words "cool" and "compression" appeared in the descriptions of some NIKE Pro products with the cool thermoregulation benefit and a compression fit on the nike.com e-commerce website.  (SOF ¶¶ 139, 173.)  More specifically, on certain product detail pages deep within the thousands of product pages on the nike.com site, the word "cool" appeared next to the word "compression" inside a longer string of other words describing the NIKE product such as: "Nike Pro Cool Compression Long-Sleeve Men's Shirt" and "Nike Pro Cool Compression Men's Tights."  (SOF ¶ 174.)   The product descriptions on these product detail pages are the only instances where a consumer would encounter word "cool" next to the word "compression" when looking to purchase a product from NIKE.  (SOF ¶ 164.)  By August 2016, these types of product descriptions no longer appeared on product detail pages within nike.com. (SOF ¶ 175.)

### 4. Where NIKE did not use the words "cool" and "compression" next to each other

In addition to never using the words "cool" and "compassion" on any NIKE apparel, NIKE also never displayed the word "cool" next to the word "compression" in any other places that a consumer might encounter when looking to purchase a product from NIKE, such as retail store signage, press releases, athlete endorsements, or e-mail blasts.  (SOF ¶¶ 149, 163.)  And NIKE never launched any marketing campaign using the phrase "cool compression."  (SOF ¶ 149.)

11

### D.     Lontex contacts NIKE in 2016, and then goes silent for years

Lontex saw some product descriptions containing "cool" next to "compression" within the nike.com webpages in December 2015, but Lontex did not immediately reach out to NIKE.  (SOF ¶¶ 184, 187, 197.)  Rather on March 3, 2016, Lontex purchased a NIKE PRO product (Style No. 703094 which Lontex now accuses of being infringing), and at the time Mr. Nathan admitted: "I do not think that Nike is interested in purchasing the COOL COMPRESSION® Trademark.  They are just using it to describe this 'Pro Lite Compression Apparel' online." (SOF ¶ 185.)  Mr. Nathan made the foregoing admission on March 4, 2016, but about a month later, Mr. Nathan decided to try to license COOL COMPRESSION to NIKE in any event.  (SOF ¶ 186.)  Lontex made this offer to license through a letter written on April 8, 2016 by a contingency fee attorney, which claimed that Lontex was the owner of the COOL COMPRESSION Mark, that Lontex had used the COOL COMPRESSION mark in connection with athletic apparel since 2007, and that NIKE was allegedly using the COOL COMPRESSION Mark without Lontex's authorization.  (SOF ¶¶ 185, 187.)

This letter was the first NIKE became aware of Lontex and the asserted COOL COMPRESSION Marks.  (SOF ¶¶ 178, 179.)  The legal department investigated Lontex's claims and found several inconsistencies, most notably around Lontex's claims of use of the COOL COMPRESSION mark.  (SOF ¶ 181.)  NIKE learned, for example, that prior to January 2016, Lontex's website made no reference to "COOL COMPRESSION," as this screenshot from a capture from May 10, 2015 shows:



(SOF ¶ 75.)

In addition, NIKE retained the services of a private investigator who purchased a compression product from Lontex's website, and received a product branded only with SWEAT IT OUT not COOL COMPRESSION.  (SOF ¶ 47.)

NIKE did not, of course, detail all aspects of its legal investigation to Lontex, but NIKE sent responsive correspondence to Lontex respectfully denying any claims of infringement and pointing to the limited nature of Lontex's purported rights in COOL COMPRESSION due to the descriptive nature of the words "cool" and "compression" and their widespread use in the field. (SOF ¶ 188)  In addition, NIKE informed Lontex that, notwithstanding NIKE's disagreement with Lontex's claims, NIKE had already begun implementing changes to the way it displayed the wording used to describe features of its products.  (SOF ¶ 188.)  This was true, as internally at NIKE, discussions were already underway (prior to and independent of Lontex's April 8, 2016 letter) to simplify consumer-facing product names by removing various product descriptors, such as those for length and fit.  (SOF ¶¶ 156-158.)

The parties continued to exchange correspondence between May and September 2016, during which Lontex demanded that NIKE pay Lontex various sums of money and NIKE declined. (SOF ¶¶ 188- 191.)  Then, Lontex went silent.  It was not until January 23, 2018, over a year later, when NIKE received a letter from a new attorney, who briefly represented Lontex until he was fired by Mr. Nathan.  (SOF ¶ 195.)  Behind the scenes, Lontex had already begun talks to retain its current trial counsel in this lawsuit (near the end of 2016), who ultimately filed this lawsuit on Lontex's behalf two years later.  (SOF ¶¶  192-197.)

E.    **2016 Onward: Lontex begins using COOL COMPRESSION**

Before it asserted a claim, Lontex started adding COOL COMPRESSION to "everything in 2016," including invoices; website; brochure; tweets; blog posts; press releases; Mr. Nathan's e-mail signature; product packaging; and a distributor's (Medco) catalog.  (SOF ¶¶  198-208.)  In most instances, Lontex placed the "COOL COMPRESSION" phrase directly next to the SWEAT IT OUT brand.   (SOF ¶¶  204, 208.)   Lontex referenced the urgency of adding COOL COMPRESSION to its advertising materials in 2016, and even discussed it as a legal matter that

required pre-approval from Lontex's counsel.  (SOF ¶203.)  For example, in November 2016, 1SEO helped Mr. Nathan "optimize" Lontex's tweets around "Cool Compression" "with keywords for Twitter search, similar to Nike."  (SOF ¶ 83.)  In February 2018, Lontex emailed 1SEO to "urgently" add "cool compression shorts," "cool compression tights," "cool compression shirts," "cool compression pants," "buy cool compression shorts," "buy cool compression tights," "buy cool compression shirts," and "buy cool compression pants" as keywords.  (SOF ¶ 202.)  Lontex initially added COOL COMPRESSION in a haphazard manner by simply appending it to SWEAT IT OUT and has more recently adopted the branding "SWEAT IT OUT® with COOL COMPRESSION® technology."  (Durham Decl, ¶ 254, Ex. 250.)  A side-by-side comparison of Lontex's brochure is illustrative:



(SOF¶ 67; Durham Decl. ¶¶ 255, 256, Exs. 250, 251.)

## III.   ARGUMENT

### A.   Legal standard on summary judgment

Summary judgment is proper if the movant can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At the summary judgment stage, the court is obligated to "review the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015).  It is the moving party's responsibility to inform the court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute. FED. R. CIV. P. 56.  The non-moving party fails to meet this burden if it does not make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 323.

"Determining whether the nonmoving party has adduced the required quantum of evidence to survive summary judgment 'must be done on a case-by-case basis.'"  *Nunez v. Heere*, 438 F. Supp. 3d 321, 323 (E.D. Pa. 2020) (quoting *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 464 (3d Cir. 1989).  To defeat summary judgment, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Indeed, they can "successfully resist a motion for summary judgment *only* by coming forward with *competent* evidence."  *United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.,* 2 F.3d 529, 534 (3d Cir. 1993) (emphasis added).  As a result, "if a plaintiff solely relies on his own testimony [to meet this burden], uncorroborated by any other direct evidence, which is 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the plaintiff's allegations,' it is appropriate to effectively decide that the testimony is insufficient to survive summary judgment."  *Nunez*, 438 F. Supp. 3d at 324 (quoting *Jeffreys v.*

*City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005) and citing cases).

**B.      Lontex cannot establish trademark infringement against NIKE**

To prevail on its Lanham Act and state law claims,[4] Lontex must demonstrate: (1) ownership of valid rights in the COOL COMPRESSION Marks and (2) that NIKE's use of the words "cool" and "compression" is likely to cause marketplace confusion with COOL COMPRESSION. *A & H Sportswear*, 237 F.3d at 210.  Lontex will claim it can establish these two elements, but it cannot.  Lontex cannot carry its burden to establish a likelihood of confusion, which is the keystone of every claim it has asserted against NIKE.[5]

As a threshold matter, NIKE's non-consumer-facing use of the word "cool" next to the word "compression" is not relevant to the ultimate issue of whether consumers were likely to be confused because consumers never saw those uses.  *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 409 (2d Cir. 2005) ("A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to

---

[4] The elements for Lanham Act trademark infringement (15 U.S.C. § 1114) and unfair competition, (15 U.S.C. § 1125(a)) are "identical." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).  In addition, Lontex's asserted state law claims of trademark infringement and unfair competition are coextensive with the Act.  *See, e.g., R.J. Ants., Inc. v. Marinelli Enterprises, LLC*, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011).

[5] Separate and apart from Lontex's failure to establish a likelihood of confusion, Lontex's claims fail because it abandoned any trademark rights in COOL COMPRESSION.  NIKE has developed ample evidence to establish its counterclaim that Lontex abandoned COOL COMPRESSION and that its registrations are thus invalid and should be cancelled.  Incontestable registrations, like Lontex's, "may be cancelled at any time if the registered mark has been abandoned." *InterState Net Bank v. NETB@NK, Inc.*, 348 F. Supp. 2d 340, 352 (D.N.J. 2004).  It is the "actual usage of a symbol as a 'trademark' in the sale of goods which creates and builds up rights in a mark."  3 MCCARTHY § 17:9.  As a result, because Lontex abandoned COOL COMPRESSION, that mark "falls into the public domain and is free for all to use" and cannot be asserted against NIKE. *See Warren Pub. Co. v. Spurlock*, 645 F. Supp. 2d 402, 444–45 (E.D. Pa. 2009) (Baylson, J.).

consumer confusion as to the source of such goods or services."); 4 McCarthy on Trademarks and Unfair Competition § 23:5 (5th ed.) ("In-house, private use where the trademark is not seen publicly is not sufficient to constitute infringement.").  Based on the undisputed facts, no reasonable juror could conclude that NIKE's limited consumer-facing use of the word "cool" next to the word "compression" is likely to cause consumer confusion under either the "direct" or "reverse" confusion theories put forward by Lontex.

Under the widely accepted direct (or forward) confusion theory of infringement, a plaintiff claims that a new market entrant is reaping the benefits of the good will a senior user built in its mark because consumers will mistakenly believe that the senior user is the source of or is affiliated with the newcomer's product. *A & H Sportswear.*, 237 F.3d at 228.  The direct confusion theory espoused by Lontex is that NIKE benefited from the alleged use of the phrase "cool compression" because consumers purchased NIKE PRO products mistakenly believing that NIKE's products were affiliated with Lontex or this so-called "COOL COMPRESSION technology."

However, Lontex's direct confusion theory falls apart given the undisputed *absence* of any evidence of actual marketplace confusion during the limited period when NIKE used the words "cool" and "compression" to describe the NIKE PRO products, and the circumstances which militate *against* the possibility of any consumer being familiar with Lontex's COOL COMPRESSION mark when purchasing NIKE PRO products.  *See* Sec. II.B, *supra*.  Prior to the limited period of NIKE's use, Lontex had not promoted "COOL COMPRESSION" in any places where a customer would regularly encounter a mark, like on its website, social media, press releases, brochures, or even in a single e-mail to a customer.  *See id*.  As a result, consumers had not experienced COOL COMPRESSION in the marketplace *prior* to NIKE's limited use of the words "cool" and "compression" to describe NIKE Pro products with the cool thermoregulation

benefit and a compression fit.  Thus, even if NIKE used those words in a trademark sense (which it did not), any such use did not and was not likely to cause any consumer to mistakenly believe that NIKE's long standing, popular NIKE PRO line (a line that predates Lontex's COOL COMPRESSION) had anything to do with Lontex or COOL COMPRESSION.

Lontex's reverse confusion theory is equally implausible.  Fundamental to reverse confusion is a newcomer's "pervasive advertising and promotion caus[ing] consumers to believe that the [newcomer] is the source of the senior user's goods."  TRADEMARK INFRINGEMENT REMEDIES 57 (Steven Meleen ed., 3d ed. 2017) (citing *A & H Sportswear*, 237 F.3d at 210). Lontex's reverse confusion theory falls apart from the start because NIKE never had any advertising campaigns featuring "Cool Compression," nor did it promote a non-existent "Cool Compression" line of clothing.  (SOF ¶ 149.)  NIKE used the words "cool" and "compression" externally in limited written materials for a limited period of time—and always in longer strings of words to describe the fit and thermoregulation features of products.  (SOF ¶ 162, 166.)  If this is a "use" of a mark at all, it is certainly not one that saturated the market and eclipsed Lontex's purported trademark rights.  And, although Lontex tried to manufacture opportunities for confusion by instructing its marketing company to begin using COOL COMPRESSION on the internet *after* it saw these words on NIKE's website, years have now passed with no indication of any confusion, and Lontex's principle was forced to admit:

> NIKE's Counsel:  Mr. Nathan…[h]as any person ever asked you if Nike licensed your Cool Compression technology?
>
> Mr. Nathan: … No.
>
> Q:  Has anyone ever asked you whether you authorized Nike to use the Cool Compression technology?
>
> A:  No.

> Q:  Has anyone ever asked whether Lontex and Nike are affiliated
> in any way?
>
> A:  No.
>
> Q:  Has anyone ever asked you whether Lontex has any affiliation
> with Nike?
>
> A:  No.

(SOF ¶¶ 210, 209.)

NIKE retained survey experts, Matthew Ezell and Hal Poret, to conduct consumer surveys using methodologies well recognized in trademark disputes to assess the likelihood of direct and reverse confusion.  (SOF ¶¶ 219-222.)  These studies confirmed there is no likely consumer confusion of either type.  (SOF ¶¶ 221, 222.)  NIKE also retained Carol Scott to conduct a "purchase interest" survey which tested whether consumers were more interested in purchasing a NIKE PRO product when the word "cool" appeared next to the word "compression" on a nike.com product describing the NIKE product as opposed to when "cool" and "compression" did not appear at all.  (SOF ¶¶ 223-225.)  That study confirmed that consumers were not more interested in purchasing a NIKE product based on use of "cool" and "compression."  (SOF ¶ 226.)  Lontex, on the other hand, notwithstanding its burden to prove a likelihood of confusion, conducted no consumer studies.  (SOF ¶ 227.)

Analysis of the record evidence under the "*Lapp Factors*" set forth by the Third Circuit further demonstrates why no actual confusion has occurred and why no confusion is likely.

### C.    No likelihood of confusion exists

"Summary judgment is appropriate in trademark cases where the plaintiff fails to raise a genuine issue of material fact as to the likelihood that the defendant's use of the mark will confuse reasonably prudent consumers."  *Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 388 (S.D.N.Y. 2006).  Third Circuit courts analyze likelihood of confusion by examining

the factors first articulated in *Interpace Corp. v. Lapp, Inc.* 721 F.2d 460 (3d Cir. 1983)*,* which are: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." *Id*. at 463. "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." *Checkpoint Sys., Inc. v. Check Point Soft. Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001). When analyzing reverse confusion, "[e]conomic reality and common sense" dictate that certain of the *Lapp* factors (particularly the second, fifth, and sixth factors) must be analyzed differently than in a typical direct confusion case." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 472 (3d Cir. 2005).

### 1.    The parties' "marks" are dissimilar (*Lapp* factor one).

"The single most important factor in determining likelihood of confusion is mark similarity." *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 465 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) (citing *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466,477 (3d Cir. 1994)). Marks are confusingly similar "if ordinary customers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477. In evaluating the similarity of two marks, a "[s]ide-by-side comparison of the two

marks is improper where the products are not normally displayed together in the market to consumers." *Kinbook*, 866 F. Supp. 2d at 465. (citing *A & H Sportswear*, 237 F.3d at 216). Instead, the proper test is "whether the labels create the same overall impression when viewed separately." *Id* at 462. "Overall impression is created by the sight, sound, and meaning of the mark." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010) (citing *A & H Sportswear*, 237 F.3d at 217). Inconveniently for Lontex, similarity is not determined by merely focusing on the words "cool" and "compression," but rather by assessing the total commercial impression of each party's use thereof. *A & H Sportswear*, 237 F.3d at 216; *Checkpoint Sys., Inc. v. Check Point Software Techs. Inc.*, 269 F.3d 270, 281 (3d Cir. 2001); *see also* 4 MCCARTHY § 23:21.50. Nor is a "side-by-side" comparison appropriate here given that no evidence exists of the respective "marks" being displayed together in the market. *Kinbook*, 866 F. Supp. 2d at 465 (citing *A & H Sportswear*, 237 F.3d at 216).

A proper review of the parties' uses *as they appear in the marketplace* belies any argument that the parties' uses of these terms is similar. The NIKE PRO products alleged to infringe were branded with NIKE's NIKE, SWOOSH, and DRI-FIT marks, not "cool compression." (SOF ¶¶ 150-152.) On the other hand, the COOL COMPRESSION marks, to the extent even promoted by Lontex in a public-facing way, appear with the SWEAT IT OUT Marks, *i.e.*, "SWEAT IT OUT®COOL COMPRESSION®" or the more recently adopted "SWEAT IT OUT® with COOL COMPRESSION® technology," and the SWEAT IT OUT sun logo. *See* Sec. II.E, *supra*.

NIKE's written copy in its catalogs and website made no repeated, consistent use of "COOL COMPRESSION" in any stand-alone form, but rather included detailed descriptions of the NIKE PRO products, including "cool" to describe the thermoregulation benefit to the wearer and "compression" to describe the products' fit, often along with other descriptors for consumer

group (like "Men's"), silhouette (like "Shorts"), and/or length (like 6"). (SOF ¶¶164-166.) The specific examples of word strings alleged in Lontex's Complaint to be infringing are:

> 728044 NIKE PRO COOL COMPRESSION SLEEVELESS TOP
>
> 728048 NIKE PRO COOL COMPRESSION SHORT-SLEEVE TOP
>
> 719903 NIKE PRO COOL COMPRESSION 1/2 SLEEVE TOP
>
> 828642 NIKE PRO COOL COMPRESSION 3/4 TIGHT
>
> 728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP
>
> 728049 NIKE PRO COOL 6" COMPRESSION SHORT

(ECF 20 at ¶ 20.) These are meaningfully different than Lontex's purported COOL COMPRESSION Mark, given the additional terms around the words "cool" and "compression." The differences between NIKE's and Lontex's uses become even more stark when viewed in the context of the actual marketplace presentation.



(SOF ¶ 173.)

NIKE's display of its NIKE PRO products in a marketplace setting—on the nike.com

23

website—is quite obviously just that—a detailed description of NIKE PRO baselayer pair of tights. The specific webpages at issue—which are product detail pages that appear deep on the nike.com ecommerce site among thousands of other product detail pages—describe the products and prominently display NIKE's famous marks on the products and in the written description surrounding the products.  (SOF ¶¶ 173-177.)  The same holds true for NIKE's display of its NIKE PRO products on pages inside the NIKE product catalogs.  (SOF ¶¶163-165.)  To the extent they appear at all, the words "cool" and "compression" are embedded between other words describing the NIKE PRO product, with further contextual cues (both in writing and in display of the product) that make clear that, e.g., the word "cool" explains that the product is made with DRI-FIT sweat-wicking fabric and has mesh panels to provide "optimum breathability," and the word "compression" explains that the product fits tightly and provides a "locked-in feel."  Notably, there is no mention of "SWEAT IT OUT" or any sun logo imagery in the NIKE pages, which Lontex admits is ubiquitous with any use of COOL COMPRESSION it made.  (SOF ¶¶ 164, 165.)  An example of Lontex's marketplace facing use (*made only after March 2016, as it made no market facing use before*) is as follows:



(SOF ¶ 74.)

Although Lontex characterizes the NIKE PRO products as the "accused" or "infringing" products, this is a self-serving misnomer, as there is nothing infringing about NIKE's products. Neither the garments themselves, nor the externally attached hang tags, nor the interior label bear the words "cool" and "compression."  (SOF ¶¶ 152, 153.)  As such, any consumer viewing the Lontex and NIKE products side-by-side would see *no use of any mark with any word in common*.

In this case, the parties' marketplace presentations are strikingly distinct.  *See, e.g., Zaletel v. Prisma Labs, Inc*., Civ. No. 16-1307-SLR, 2017 WL 877302, at *4 (D. Del. Mar. 6, 2017) ("Certainly there is a degree of similarity between the look and sound of the words 'Prizmia' and 'Prisma.'  However, the marketplace presents the two marks very differently, which distinct presentations create distinct commercial impressions."); *Am. Orthodontics Corp. v. Atlantic Dental, Inc.*, Civ. No. 17-8098, 2017 WL 8776960, at *4 (D.N.J. Dec. 7, 2017) (same); *InterState Net Bank v. NETB@NK, Inc.*, 348 F. Supp. 2d 340, 354–55 (D.N.J. 2004) (same); *Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.*, 145 F. Supp. 2d 422, 435 (D. Del. 2001) (same).

Adding to these stark differences are both parties' use of their respective house marks (SWEAT IT OUT and NIKE) alongside the alleged use of "cool compression."  The Third Circuit has held that courts must consider the use of housemarks in the comparison of the "overall impression" of the parties' marketplace uses.  *See A & H Sportswear*, 237 F.3d at 218.  In a direct confusion case, "affixing a well-known housemark…can help diminish the likelihood of confusion."  *Id*.  Even in a reverse confusion case, the Third Circuit has not held that the junior user's housemark *per se* aggravates confusion, only that there is a "possibility" that such use can be an aggravating factor based on the specific facts of the case.  *Id*. at 230.  Indeed, in *A & H* the Court in noting the possibility was not "suggest[ing] that [any such aggravation] actually occurred" because, just like Lontex uses SWEAT IT OUT with every use of COOL COMPRESSION, "A & H typically includes its own housemark on Miraclesuits."  *Id*.  The marketplace conditions presented here demonstrate why the parties' respective uses of their housemarks alleviate, not aggravate, any reverse confusion.  *See, e.g.*, *Kinbook,* 866 F. Supp. 2d at 465 (first factor weighed against reverse confusion and similarity was "substantially and further diminished" because accused product affixed Microsoft's well known "XBOX 360" mark).

In light of these key distinctions, this "single most important" *Lapp* factor weighs against a finding of likelihood of confusion and in favor of NIKE.

### 2.    COOL COMPRESSION is a weak mark (*Lapp* factor two).

"The term 'strength' in the context of trademarks refers to the distinctiveness of the mark; 'its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'"  *Kinbook*, 866 F. Supp. 2d at 465 (quoting *Ritz Hotel, Ltd. v. Shen. Mfg. Co., Inc.*, No. 05–4730, 2009 WL 1838357, at *4 (E.D. Pa. June 25, 2009)).  For this factor to favor its position on forward confusion, Lontex must prove both "conceptual" strength (the inherent features of COOL COMPRESSION contributing to its distinctiveness) and "commercial"

strength (evidence of the marketplace recognition of the marks).  *A & H Sportswear*, 237 F.3d at

221.  On reverse confusion, Lontex still must establish that its mark is conceptually strong,[6] and

while the commercial strength of its mark remains "relevant" for reverse confusion, the focus of

the Court for the commercial strength prong is whether "any advertising or marketing campaign

by [NIKE] has resulted in a saturation in the public awareness of the junior user's mark." *Freedom

Card*, 432 F.3d at 473.

Lontex has failed to establish ownership of a strong mark for both reverse and direct

confusion because COOL COMPRESSION is comprised of highly descriptive terms, is hemmed

in by third party use of the same terms, and was not promoted to the marketplace in the manner

expected of a mark owner.  Lontex's principal, Mr. Nathan, summed it best when asked at his

deposition why he never used COOL COMPRESSION in his own promotions:

> Q.  But let me ask you this question: How do you expect anyone to
> know about this Cool Compression trademarks of yours if you
> never say it in any of the promotions?
>
> A:  That's a great question.  Okay.  Let me give you a short
> answer…Our product was unique and the only way to really
> actually make sense out of it is you liking it because it did what it
> did to you and you talked to your friends and they're buying.
> This—that's why we never went to retail store…In retail store is
> just to excite you.  We don't excite you…
>
> Q.  So you don't think it would enticing, in your words, to put
> Cool Compression in an advertisement like this?
>
> A:  I don't think so.  I really don't….

(SOF ¶¶ 55, 97.)

Nor could NIKE have saturated the market with its limited descriptive uses of the words

"cool" and "compression" on some product detail pages deep within the nike.com website.

---

[6] *Id*. at 231 ("When it comes to conceptual strength ... we believe that, just as in direct confusion
cases, a strong mark should weigh in favor of a senior user.")

### a.      COOL COMPRESSION is conceptually weak[7]

Courts classify conceptual strength as either: "(1) generic, like 'Diet Chocolate Fudge Soda'; (2) descriptive, like 'Security Center'; (3) suggestive, like 'Coppertone'; or (4) arbitrary or fanciful, like 'Kodak,'" with the mark being considered progressively weaker the further it gets from the fanciful category. *Sabinsa*, 609 F.3d at 184-85 (internal citations and quotations omitted). Arbitrary or fanciful marks use "terms that neither describe nor suggest anything about the product." *Id*. Suggestive marks require consumer "imagination, thought, or perception" to determine what the product is. *Id*. Descriptive marks "convey an immediate idea of the ingredients, qualities or characteristics of the goods." *Id*. Notably, "[d]escriptiveness cannot be determined as an abstraction. The possible descriptiveness of a designation is highly dependent on the goods or services in connection with which the designation is used." 2 MCCARTHY § 11:16.[8] On this spectrum, COOL COMPRESSION is weak.

There is no reasonable dispute that each of the words that make up the COOL COMPRESSION mark are highly descriptive of Lontex's products. Lontex has itself used the terms descriptively, touting its sale of *compression* products that use Coolmax® technology are designed to keep the wearer *cool*. (SOF ¶ 41.) This is the epitome of a mark comprised of descriptive terminology. *See* 2 MCCARTHY § 11:24 (Examples of marks that have been deemed descriptive include: AFTER TAN for after sunning lotion, BLISS for a beauty salon, ENRICHED

---

[7] "The inquiry into distinctiveness or conceptual strength is the same whether plaintiff is alleging direct or reverse confusion." *Freedom Card, Inc.*, 432 F.3d at 476.

[8] A mark's registration status is irrelevant to the strength inquiry, as it is well established that "[e]ven where a trademark is incontestable and 'worthy of full protection,' the significance of its presumed strength will depend upon its recognition among members of the public." *Hershey Co. & Hershey Chocolate & Confectionery Corp. v. Promotion in Motion, Inc.,* Civ. No. 0-1601 SDW, 2013 WL 12157828, at *11 (D.N.J. Jan. 18, 2013) (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.* 295 F.3d 623, 632 (6th Cir. 2002)); *see also Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, Civ. No. 11-3684 SRC CLW, 2017 WL 3719468, at *25 (D.N.J. Aug. 29, 2017) (incontestable status "does not mean that the mark is conceptually strong.").

FLAVOR for cigarettes, 5-HOUR ENERGY for an "energy shot" drink, LOTSA SUDS for dish washing liquid; NO SPOT for a car wash system, QUIK-PRINT for printing and duplication services, SUPER BLEND for a superior blend of motor oil, and TRUE-FIT for software to provide proper wearing apparel fit information.).   Indeed, the fact that the USPTO required Lontex to disclaim "compression" from its COOL COMPRESSION registrations, (SOF ¶ 14-16), "strongly suggest[s] that Plaintiff's mark cannot be considered suggestive." *Xtreme Caged Combat v. ECC Fitness*, No. 12-cv-3855, 2013 WL 6022135 at *5 (E.D. Pa. Nov. 12, 2013); *see also, e.g., Giftboxcenter, LLC v. Petbox, Inc.*, No.15-4390, 2018 WL 734664, at *4 (D.N.J. Feb. 5, 2018) ("Defendants were required to disclaim use of the words PET and BOX because they were merely descriptive marks.")

In addition to analyzing marks along the aforementioned spectrum of distinctiveness, courts have found that marks are conceptually weak where there exists significant third party use of the same or similar terms. *See, e.g., A & H Sportswear*, 237 F.3d at 223; *Freedom Card*, 432 F.3d at 476; *Accu Personnel, Inc. v. AccuStaff, Inc.*, 823 F. Supp. 1161, 1166 (D. Del. 1993).  Here, there exist numerous third-party uses in the market of the words "cool" and "compression" in connection with athletic apparel.  (SOF ¶¶ 228-236).  In fact, as shown below, simple internet searches reveal that other apparel companies have used similar terms in the market (which when shown to Lontex during deposition, Lontex admitted to not having asked these companies to cease these uses):



(SOF ¶¶ 229-230). There are other examples too: FJM's CORELEMENTS STAY COOL COMPRESSION FIT LONG SLEEVE; Honig's COOL SKIN COMPRESSION TIGHTS; McDavid's UCOOL COMPRESSION ARM and LEG SLEEVES; Senfloco's WOMEN'S COOL COMPRESSION FIT TERYLENE SPANDEX TIGHT PANTS.



(SOF ¶¶ 232, 234, 235.)

The Third Circuit has explained that wide use of a term within the market is "probative" of the weakness of a trademark. *A & H Sportswear*, 237 F.3d at 223. This extensive third party usage further demonstrates the conceptual weakness of Lontex's marks. *See, e.g., Id.*; *see also Freedom Card*, 432 F.3d at 476; *Accu Personnel.*, 823 F. Supp. at 1166. Because COOL COMPRESSION is conceptually weak, this factor weighs against Lontex for both forward and reverse confusion theories.

### b.   COOL COMPRESSION is also commercially weak

"In examining a mark's commercial strength, [courts] examine marketplace recognition." *Freedom Card*, 432 F.3d at 472.  "Such evidence includes records showing the nature of the mark, the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace." *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 427 (E.D. Pa. 2012).  Here, Lontex failed to provide any evidence that the COOL COMPRESSION marks have any sort of marketplace recognition.  (SOF ¶ 3.)  There is no dispute that the COOL COMRPESSION mark is not well-known by the consuming public, and even Lontex's own expert admits that its brand and its marks are known only to an infinitesimally small percentage of the total U.S. population.  (SOF ¶ 3.)  Lontex does not sell COOL COMPRESSION products through any mass-market retailers, and had, at most, ███████ in total sales between 2007 and 2019 (which indisputably includes sales of products without any reference to COOL COMPRESSION).  (SOF ¶¶ 53-56.)  Lontex also acknowledges that it has not dedicated *any* significant time, money, or effort to advertise, promote, or market the COOL COMPRESSION marks.  (SOF ¶ 62.)  In reviewing Lontex's financials, Lontex could point to no specific advertising expenditures dedicated to "COOL COMPRESSION."  (SOF ¶ 62.)  And, following NIKE's alleged use of the words "cool" and "compression," Lontex admits to making the choice to scale down its company advertising and marketing activities to just a few thousand dollars.  (SOF ¶ 63.)  As such, to the extent Lontex attempts to argue that its mark lacks commercial strength because NIKE drove it from the marketplace, it would be a "frivolous rejoinder." *Freedom Card*, 432 F.3d at 477 ("Chase did not drive UTN out of the marketplace in the first place.  Rather, UTN stopped marketing and issuing FREEDOM CARD more than a year before CHASE FREEDOM card was launched.")

In *Kinbook*, which is instructive here, the court found that the second *Lapp* factor weighed

against a finding of likelihood of confusion "because no reasonable jury could conclude based on the record evidence that plaintiff Kinbook's asserted marks are strong." *Kinbook*, 866 F. Supp. 2d at 467. There, like Lontex here, plaintiff (1) "failed to provide any evidence that its Kinbox and Munchkinbox marks have any sort of marketplace recognition," (2) "admit[ted] that its mark is not well-known by consumers" and had "only 16,685 active monthly users out of over 750 million regular Facebook users," and (3) "admit[ted] that it has not dedicated any significant time, money, or effort to advertise, promote, or market its marks or services." *Id*. "In fact, [Plaintiff] admit[ted] that it affirmatively scaled down its advertising and marketing activities from aspirations of $250,000 to just a few thousand dollars following Microsoft's release of Kinect [(the accused infringing product)]." *Id*. The same facts exist here, and the same conclusion of a lack of commercial strength is evident.

**c.** **NIKE did not saturate the market with a "cool compression" mark**

Finally, there is zero evidence that NIKE saturated the market with a "cool compression" mark, as is necessary to establish reverse confusion under this factor. NIKE did not brand the NIKE PRO products with "cool compression;" those products were branded with NIKE's core NIKE, SWOOSH, and DRI-FIT marks. (SOF ¶¶ 150-151.) NIKE did not directly market or advertise the NIKE PRO products at issue in this lawsuit, as ███████████████████ ████████████████████████████████████, as these particular baselayer products were. (SOF ¶ 149.) And, it simply cannot be disputed that NIKE did not launch any sort of advertising campaign featuring "cool compression." *See, e.g., Vynamic, LLC v. Diebold Nixdorf, Inc*., No. 18-577, 2019 WL 2895711, at *8 (E.D. Pa Jun. 17, 2009) ("Plaintiff has failed to demonstrate commercial strength because the record lacks evidence that Diebold has overwhelmed the marketplace. . . There is simply no evidence in the record that the value of

32

Vynamic's mark has been diminished because of Diebold's use of the term.").  NIKE anticipates that Lontex may characterize some product detail pages deep within the nike.com website as marketing.  Even if one were to accept such a mischaracterization, it strains credulity to assert that this is a market-saturating advertising campaign, and furthermore, there is unrebutted evidence in the record that suggests those words on a webpage had no impact on consumers at all.  Specifically, Dr. Scott conducted a purchase interest survey that fielded information about consumer's impression of nike.com webpages where test cells of respondents were shown pages with and without the "cool" and "compression" wording that Lontex claims is infringing, and the responses revealed that consumers do not even perceive NIKE's use of the words as a brand.  (SOF ¶223.)

*     *     *

In sum, because COOL COMPRESSION is a conceptually and commercially weak mark and because NIKE did not saturate the market with its alleged infringing use, this factor heavily favors NIKE on both forward and reverse confusion.

### 3.   The actual confusion factors heavily favor NIKE (*Lapp* factors four and six).

The fourth and sixth *Lapp* factors, which weigh against any finding of likelihood of confusion, are addressed together because they are closely related: the length of time NIKE alleged use without evidence of actual confusion arising and any evidence of actual confusion itself.

#### a.   There is no evidence of actual consumer confusion.

According to Lontex, NIKE sold the NIKE PRO products alleged to infringe at least from 2015 and 2018, and Lontex claims that it sold products bearing the COOL COMPRESSION mark during that same time period.  If Lontex's claim is true, during that entire period there was not one single instance of actual consumer confusion in the purchasing context.  (SOF ¶¶ 209-211, 217.) NIKE no longer uses the same wording in descriptions around these NIKE PRO products because

33

it long ago decided to shorten descriptions in written copy, and there is no ongoing alleged infringement.  (SOF ¶¶ 156-160.)  Even if, for the sake of argument, NIKE were to continue using words like "cool" and "compression" to  describe these NIKE PRO products in website materials, given the absence of any actual confusion over that three year period, there would be a strong inference that such conduct would not lead to any instances of actual consumer confusion in the marketplace.  *See Versa Prods., Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir.1995) ("If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be."); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 717 (3d Cir. 2004) (quoting *Fisons*, 30 F.3d at 476) ("[T]wo parties' concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'").

Lontex has not produced any competent evidence of consumer confusion under actual marketplace conditions, as discussed below.  Plus, Lontex admitted that its professional trainer customers never confused Lontex's products with NIKE's or vice versa, and that Mr. Nathan is not aware of any customer mistakenly believing that NIKE was using Lontex's COOL COMPRESSION technology, that Lontex authorized NIKE to use its COOL COMPRESSION technology, that COOL COMPRESSION was NIKE's technology, or that Lontex and NIKE were affiliated or connected in any way.  (SOF ¶¶ 209-212, 217.)

### b.   NIKE's consumer surveys establish zero confusion.

NIKE submitted consumer surveys, which are "the most direct method of demonstrating [] likelihood of confusion."  *Charles Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990).  "When the percentage results of a confusion survey dip below 10%, they can become

evidence which will indicate that confusion is not likely." 6 MᴄCᴀʀᴛʜʏ § 32:189 (collecting cases).  Here, Hal Poret and Matthew Ezell, two seasoned trademark survey experts, conducted two different surveys in the well-established "*Squirt*" and "*Eveready*" formats.  (SOF ¶ 219.)  In the former, Mr. Poret found a **zero percent net confusion rate**; in the latter, Mr. Ezell also found **a zero percent confusion rate**.  (SOF ¶¶ 220, 222.)  Mr. Poret even tested NIKE's wholesaler materials that use the same words "cool" and "compression" to describe the NIKE PRO products and likewise found a zero percent net confusion rate.  (SOF ¶ 222.)  These consumer results are consistent with the complete lack of actual confusion that occurred between 2015 and 2018 when the written materials alleged to have the infringing use were in market and provides powerful evidence of a lack of confusion, or any likelihood thereof, between the COOL COMPRESSION marks and NIKE's alleged use.

### c.  Lontex's anecdotal evidence does not show confusion.

In a last-minute attempt to manufacture evidence of actual consumer confusion, Lontex introduced: (1) anecdotal evidence from Mr. Nathan and Lontex's "brand" expert" witness about visiting various retail sporting goods stores, asking "for Cool Compression by Nike," and being directed "to a rack with a lot of Nike compression garment."  (SOF ¶ 215); and (2) declarations recently drafted by Lontex's counsel for a handful of current or former athletic trainers of NFL and MLB teams purporting to express "confusion."  (SOF ¶ 218.)

The fact that Mr. Nathan and Lontex's "brand expert" asked sales clerks to direct them to "Cool Compression by NIKE" or "NIKE Cool Compression" suggests that they were only directed to a NIKE rack because they asked for NIKE in their question.  (SOF ¶¶ 214, 215.)  When Lontex's "brand expert" was asked why he did not simply ask a store clerk to direct him to "Cool Compression" to see where that would have caused the store clerk to lead him, he could not explain.  (SOF ¶ 216.)  This is not evidence of actual confusion.  Neither are the declarations

drafted by Lontex's counsel.  The individuals who Lontex contacted and requested sign the declarations did not encounter the NIKE PRO products under any actual marketplace circumstances, nor did they purchase or attempt to purchase them because they mistakenly believed that Lontex had authorized NIKE's use of "cool compression" or that the parties were otherwise affiliated.  (SOF ¶ 218.)  Instead, Lontex's counsel prepared the declarations for these individuals after counsel cut and pasted out-of-context images from NIKE's wholesaler materials into the declarations, and drafted a statement that stated upon reviewing those images (selected by counsel, outside of any marketplace context) "[they] make me believe that Nike is using Lontex's COOL COMPRESSION technology in these compression garments." (SOF ¶ 218, ECF 169-1 at ¶ 8.) Leaving aside the evidentiary failings (which are discussed in more detail below), these "trainer" declarations are particularly incredulous since Mr. Nathan already testified months earlier, that these specific consumers were not confused.  (SOF ¶¶ 211, 212, 217.)

Lontex's manufactured evidence is also not probative of a likelihood of confusion because there is no causal connection between the alleged use of similar marks resulting in a mistaken purchasing decision.  *See First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 705 (E.D. Pa. 1996) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions."); *Componentone, L.L.C. v. Componentart, Inc.*, No. 02: 05CV1122, 2008 WL 4790661, at *19 (W.D. Pa. Oct. 27, 2008) ("In order for an alleged actual confusion event to be probative of a likelihood of confusion, there must be a causal connection between the use of similar marks and instances of actual confusion."); 4 MCCARTHY § 23:13 ("[N]ot all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases.").  This manufactured evidence is "de

36

minimis" and "does not establish a genuine issue of fact." *Freedom Card*, 432 F.3d at 478–79. It is well-settled that "evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F. 3d 350, 366 (3d. Cir. 2007) (quoting 4 MCCARTHY § 23:14); *see also Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 250 (D. Del. 2004), *aff'd in part sub nom.*, 432 F.3d 463 (3d Cir. 2005).[9]

Even if this evidence were somehow probative of likelihood of confusion, which it is not, it should be rejected as unreliable. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 325 (3d Cir. 2015). In the Third Circuit, "'actual confusion' evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 122 (3d Cir. 2004); *see also Checkpoint Sys*., 269 F.3d at 298 ("the District Court properly took into account the potential bias of the Checkpoint System's employees who testified [regarding actual confusion]."); *A & H Sportswear*, 237 F.3d at 227 ("The District Court, while not explicitly discrediting this evidence, viewed it with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals.").

\*    \*    \*

In sum, no actual consumer confusion exists, despite three years of NIKE's alleged use in the marketplace. Lontex's manufactured anecdotes of "confusion" cannot create a genuine dispute of fact. *Lapp* factors 4 and 6 weigh heavily against a finding of likelihood of confusion and in favor of NIKE.

---

[9] "Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *A & H Sportswear*, 237 F.3d at 226–27.

### 4.    Reasonably prudent consumers of the products at issue employ a high level of care (*Lapp* factor three).

The third *Lapp* factor assesses "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *A & H Sportswear*, 237 F.3d at 215.  "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint*, 269 F.3d at 284 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995)); *see also Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*, 511 F. Supp. 2d 482, 493 (E.D. Pa. 2007) (Baylson, J.) ("[C]onsumers are going to be much less likely to be confused by the similarity in two marks when choosing between cars than when buying an air freshener to hang from the rearview mirror of a car.").  This factor also favors NIKE.

Lontex primarily sells its compression products to a niche of sophisticated professionals in the sports medicine field—physicians, physical therapists, athletic trainers for professional and collegiate sports teams.[10]  (SOF ¶¶ 7, 51-53, 56.)  Lontex claims that it takes years to acquire its customers and allocates significant resources to attending professional trade shows and speaking to customers about the products prior to purchase.  (SOF ¶ 98.)  And, because its products are only available to the general consumer public (a minor percentage of its clientele) on the internet, "[t]his requires a purchaser to be knowledgeable about the product to know where to purchase it."  *Mad Hops, ltd. v. adidas-Salomon AG*, No. C-2-00-1445, 2003 WL 26616891, at *9 (S.D. Ohio July

---

[10] While Lontex claims that some portion of its consumers are the general consuming public, its sales are primarily to professional customers.  (SOF ¶¶ 48-52.)  Thus, the Court should not consider Lontex's consumer base to be a "mix" of professional and non-professional consumers.  *See McNeil* 511 F. 3d at 364.

16, 2003).  These facts reflect an overall consumer group that utilizes a high degree of care in making purchasing decisions.  *See, e.g., Vynamic*, 2019 WL 2895711, at *8 (Third *Lapp* factor favored defendant where its "customers are also mostly sophisticated" and "[r]egardless of how the Court defines the exact contours of the customers here, the evidence points to goods and services that are costly and customers that take considerable time before making purchases."). Indeed, the price points of Lontex products, which cost upwards of $160 to $200 per garment (with a floor of $57) (SOF ¶¶ 57, 58), confirm this finding.  *See e.g.*, *A & H*, 237 F.3d at 225 (purchasers of $50-$70 women's swimwear were likely to be sophisticated); *GOLO, LLC v. Goli Nutrition Inc.*, No. CV 20-667-RGA, 2020 WL 5203601, at *7 (D. Del. Sept. 1, 2020) ($49.95-$99.90 is an expensive good requiring a higher degree of care); *Kinbook*, 866 F. Supp. at 467 ($150 gaming sensor alone or $300-500 when bundled with gaming console are sufficiently expensive so as not to constitute an impulse-purchase); *Urban Outfitters*, 511 F. Supp. 2d at 494 ($68 and $188 apparel "make consumers of those goods particularly likely to be discriminating in selecting clothing."); *Kate Spade LLC v. Saturdays Surf LLC*, 950 F. Supp. 2d 639, 646 (S.D.N.Y. 2013) ($40-$100 apparel not "priced at an 'impulse' purchase level for most consumers.").  In addition, health related goods like those sold by Lontex "'raises the standard of care.'"  *See, e.g., McNeil*, 511 F.3d at 364; *Eniva Corp. v. Global Water Sols., Inc*., 440 F. Supp. 2d 1042, 1052 (D. Minn. 2006) ("consumers in the niche wellness market likely use care when selecting health-based products"); *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 434 (E.D.N.Y. 2004) (same). All these facts lead to only one conclusion, that Lontex's consumers use a high degree of care in purchasing the asserted products and are therefore not likely to be confused into somehow believing that Lontex's goods are affiliated with NIKE.

NIKE, on the other hand, sells the NKE Pro products primarily to wholesale buyers for its

retail distributors and to the general consumer through its website and NIKE-owned retail outlets. (SOF ¶ 131.)  A small percentage of the NIKE PRO products were also sold to equipment managers for professional sports teams, but the teams' athletic training staff does not purchase NIKE Pro products from NIKE.  (SOF ¶ 132.)

There is also no evidence that either party's products were purchased on impulse. Moreover, "[w]here goods are set at different price points [] as here, consumers generally distinguish them."  *GOLO, LLC*, 2020 WL 5203601, at \*7 (citing *Kinbook*, 866 F. Supp. 2d at 467 & *R.J. Ants, Inc. v. Marinelli Enters., LLC,* 771 F. Supp. 2d 475, 495 (E.D. Pa. 2011)).  The NIKE PRO products sell for between $28 and $35 (SOF ¶ 130), which is significantly less expensive than Lontex's products, which sold between $56.95 and $125.95.  (SOF ¶¶ 57, 58.)

Given the high cost of Lontex's health-related products and its mostly professional consumer base, along with the distinct price points of the parties' products, the third *Lapp* factor weighs against a finding of likelihood of confusion and in favor of NIKE.

### 5.   NIKE used the common words "cool" and "compression" in good faith (*Lapp* factor five).

For this factor "courts must look at whether the defendant chose the mark to intentionally confuse consumers," and a "defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the seniors."   *Sabinsa*, 609 F.3d at 187 (internal citations and quotations omitted; emphasis in original).  "Intent to confuse is relevant both in direct and reverse confusion cases." *Kinbook*, 866 F. Supp. 2d at 465. (citing *A & H Sportswear*, 237 F.3d at 232).  "The difference is that the tenor of the intent to confuse evidence changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion), to the deliberate intent to push the senior user out of the market (reverse confusion)."  *Id*. (quoting *Freedom Card*, 432 F.3d

at 479).  There is no evidence in the record that NIKE acted with either required form of intent.  In fact, NIKE had no prior knowledge of Lontex's COOL COMPRESSION Marks at all.  (SOF ¶¶ 178, 179, 180.)  There is no genuine dispute that NIKE used "cool" and "compression" in good faith merely to describe features and attributes of the NIKE PRO products.  (SOF ¶ 162.)

The words "cool" and "compression" are commonly used product descriptors throughout the athletic apparel industry.  (SOF ¶¶ 228-236.)  There is widespread third-party use of these terms in connection with athletic apparel.  (SOF ¶¶ 228-236.)  And there is no reasonable dispute that COOL COMPRESSION, even when used in connection with Lontex's own compression garments, is a descriptive, weak mark hemmed in by widespread third-party use that would have provided NIKE no benefit.  (SOF ¶¶ 228-236.)  It is also not logical to posit that NIKE intended to trade off of such a conceptually weak and unknown mark—one that Mr. Nathan even admits is not "enticing" to consumers—when there was already a great sense of brand pride and recognition around NIKE PRO.  As a NIKE retail store manager, who has worked in NIKE direct retail for over 12 years, testified, NIKE PRO is a "very popular line" and it "is a sought-after item for both working out and for just leisure."  (SOF ¶ 131.)  *See Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594,620 (D. S.C. 2014) (citing *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 697 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007).  Lontex has not shown any evidence that NIKE intended to trade off its weak and non-source-identifying COOL COMPRESSION Marks.

Instead, the evidence shows that NIKE's long-standing use of the common words "cool" and "compression" to describe its products has nothing to do with Lontex or the COOL COMPRESSION Marks.  (SOF ¶ 224.)  NIKE has been using the common words "cool" and "compression" to describe its products years before the alleged infringing NIKE PRO products

41

were even on the market.  (SOF ¶¶ 128, 129.)  NIKE has used the word "compression" to describe the tight fit of its baselayer apparel since the introduction of the NIKE PRO product line in 2004.  (SOF ¶ 128.)  And NIKE has used the word "cool" to describe how the DRI-FIT materials and innovative design of its apparel help the wearer "stay cool" since at least as early as 2009 with its NIKE Pro Hypercool products.  (SOF ¶ 134.)  The NIKE PRO "Cool" family, which included garments offered in "fitted" and "compression" fits had nothing to do with Lontex or the COOL COMPRESSION Marks.  (SOF ¶ 179.)  Indeed, the NIKE PRO product team had no knowledge of Lontex or the COOL COMPRESSION Marks at the time.  (SOF ¶ 179.)  The fact that the words "compression" and cool appeared together in some product descriptions is merely coincidental and has nothing to do with Lontex.  This is demonstrated by NIKE's analogous use of the words "cool" and "fitted" to describe other NIKE PRO products that keep a wearer cool and come in a looser fit or the words "warm" and "compression" to describe products that keep the wearer warm with a tight fit.  (SOF ¶ 142.)  There is simply no evidence in the record that NIKE intended to prey on Lontex's alleged reputation when it used the common words "cool" and "compression" to describe the NIKE PRO products, and there is no evidence that NIKE intended to adopt "cool compression" as a phrase.

Lontex is likely to contend that NIKE recklessly disregarded Lontex's rights because it did not conduct a trademark clearance search for "cool compression," which Lontex believes would have identified the asserted registrations.  Lontex is wrong because a party's failure to conduct a trademark clearance search, which "might constitute carelessness at best," is not sufficient to demonstrate an intent to deceive and swing this factor in Lontex's favor on either its forward or reverse confusion theories.  *Freedom Card*, 432 F.3d at 480; *see also A & H Sportswear*, 237 F.3d at 232–33 ("Although we recognize that our opinion in *Fisons* perhaps implied that mere

carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement claims."); *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 417 (D.N.J. 2008) (finding that "although there is evidence that defendants did not adequately search for use of the name "WINE KING," it is not enough to show that defendants had the requisite intent to push plaintiff out of its market."). Even if the Court finds that it "would have been prudent" for NIKE to have conducted a trademark clearance search for "cool compression," the fact that NIKE did not "indicates that [NIKE] did not act with intent to prey on [Lontex]," and confirms that NIKE was unaware of Lontex's (and the COOL COMPRESSION Marks') "very existence." *See Kinbook*, 866 F. Supp. 2d at 469.



Regardless, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SOF ¶ 183.) ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SOF ¶ 183.) In any event, these are generic terms that NIKE has used for years with its NIKE Pro products (since at least 2004 for "compression" and since at least 2009 for "cool"). (SOF ¶¶ 128, 133.) Not submitting a trademark clearance search for "cool compression" does not evidence predatory intent on the part of NIKE.

Lontex is also likely to contend that NIKE acted in bad faith because it continued to use

"cool" and "compression" after Lontex demanded that it cease doing so. This is not evidence of bad faith. NIKE responded to Lontex's claim, asserting that it was using "cool" and "compression" merely to describe its products, just as Mr. Nathan admitted the day before his lawyer sent the letter. (SOF ¶ 188.) And, because it takes intellectual property rights seriously, NIKE investigated Lontex's claim and discovered that Lontex was not, in fact, using COOL COMPRESSION in commerce. (SOF ¶ 47.) NIKE's conduct after April 8, 2016 "just as equally supports an inference that [NIKE] disagrees with [Lontex]'s infringement analysis. By [Lontex]'s logic, if a defendant defends against a trademark lawsuit, that is evidence that the defendant should lose the lawsuit. I do not think that makes any sense." *Golo*, 2020 WL 5203601, at *8.

There is no genuine dispute that NIKE did not have the required intent. NIKE did not intend to trade on Lontex's alleged goodwill in COOL COMPRESSION (and there was none on which to trade). It did not intend to push Lontex out of the market. And it did not intend to deceive consumers by using "cool" and "compression" to describe features and attributes of the NIKE PRO products. This factor favors NIKE.

> **6.    The parties' products are meaningfully different and the parties target their respective products to different consumers through different trade and advertising channels (*Lapp* factors seven, eight & nine).**

The parties sell different products, to different consumers, and in different ways. On the one hand, Lontex sells a highly specialized, expensive, sports medicine product through doctors, physical therapists, and athletic trainers for injury prevention and rehabilitation. (SOF ¶¶ 7, 8, 37, 50, 51, 56, 111, 112.) On the other hand, the accused NIKE PRO products are "core" level baselayer product that are widely distributed through general consumer retail outlets at an accessible price point. (SOF ¶¶ 125-127.)

First, Lontex's products and the accused NIKE PRO products are different, even though they may be broadly described as athletic apparel. Lontex differentiates its SWEAT IT OUT

"Performance Compression" garments from other garments on the market with compressive fits, such as the NIKE PRO products.  (SOF ¶¶ 42, 88, 101-110.)  In fact, Lontex proudly admits that it teaches its customers how to distinguish Lontex's "True Compression" garments from other compression fit garments on the market, such as NIKE PRO and Under Armour.  (SOF ¶¶ 102.)  In fact, Mr. Nathan has previously disparaged NIKE products generally to Lontex's customers in distinguishing Lontex's garments from NIKE's: "Take the Nike back to the store and demand a refund—even if you have worn them, you should not pay for garbage."  (SOF ¶ 113.)

Lontex's garments are constructed with a high percentage of LYCRA® fabric, whereas the accused NIKE PRO products are made with 10-20% of spandex or "lingerie fabric," as Mr. Nathan calls it, so they do not actually compete in the marketplace.  (SOF ¶ 101.)  Lontex claims that its garments provide "True Compression" for injury prevention and rehabilitation, among many other claimed medical benefits.  (SOF ¶ 104.)  NIKE does not market these NIKE PRO products for injury prevention and rehabilitation or other medical use; they are designed for the general consumer as a tight-fitting baselayer to keep the wearer cool.  (SOF ¶¶ 131, 132.)

The parties target different consumers through different channels of trade.  Almost all of Lontex's sales of the SWEAT IT OUT "Performance Compression" garments come after interactions directly with Mr. Nathan or from physician and physical therapist referrals.  (SOF ¶ 53.)  Mr. Nathan also admitted that there is a long period of time between his sales pitch and the purchase transaction—for example, it took Lontex *thirteen years* of product education and marketing effort to convince a customer to buy Lontex's compression garments.  (SOF ¶ 98.)  And Lontex has not sold SWEAT IT OUT "Performance Compression" garments through any other general consumer retail channels, such as Dick's Sporting Goods, REI, Macy's, Amazon, or Zappos.  (SOF ¶ 55.)  NIKE, on the other hand, sold most of the accused NIKE PRO products

45

through these general consumer retail channels or NIKE's own direct retail outlets.  (SOF ¶¶ 125-127.)  While Lontex claims that anyone can wear its garments, its marketing, product education, and sales efforts are very specifically targeted to the sports medicine field: physicians, physical therapists, athletic trainers, the medical staff of professional and collegiate teams, and the athletes themselves.  (SOF ¶¶ 7, 8, 37, 50, 51, 56, 111, 112.)  The accused NIKE PRO products are broadly distributed and targeted to everyone.  (SOF ¶¶ 131, 148.)

That two parties advertise and sell on the Internet has become largely irrelevant to this factor.  4 MCCARTHY § 24:53.50; *see also Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, Civ. No. 16-146 SLR, 2016 WL 3919452, at *7 (D. Del. July 19, 2016).  Indeed, the parties use the Internet via their own distinct websites and social media pages, and Lontex did not even begin to use the COOL COMPRESSION Marks on its www.sweatitout.com website until 2016, *after* it discovered saw the words "cool" and "compression" on NIKE's website.  (SOF ¶¶ 198-208.)

There is also no similarity in advertising and marketing campaigns because it is undisputed that neither party ran any advertising and marketing campaigns for COOL COMPRESSION: NIKE did not directly market, advertise or promote the accused NIKE PRO products.  (SOF ¶ 149.)  Lontex did not run any advertising or marketing campaigns using COOL COMPRESSION between 2008 and 2016 either.  (SOF ¶¶ 34, 45, 46, 62, 64-69, 89, 90.)  To the extent that Lontex did any "advertising or marketing" during this time, it was limited to Mr. Nathan's oral presentations to audiences at various conferences and events.  (SOF ¶¶ 94-97.)  Lontex's efforts to "promote" COOL COMPRESSION *after* 2016 suggest that Lontex's "promotion" was done in consultation with counsel to manufacture the appearance of use that looked like what NIKE might do.  For example, in November 2016, 1SEO helped Mr. Nathan "optimize" Lontex's tweets around "Cool Compression" "with keywords for Twitter search, similar to Nike."  (SOF ¶ 83.)

46

Finally, there is no evidence that the parties directly compete or that purchasers would be willing to substitute the NIKE PRO products for Lontex's products, or vice versa.   Despite Lontex's unsupported overgeneralizations to the contrary, "[w]hen two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark."   *Checkpoint,* 269 F.3d at 288.

These three factors favor NIKE.

### 7.      Likelihood of expansion in the other party's market (*Lapp* factor ten).

There is no evidence in the record that Lontex has any intention to expand its compression garments into mainstream retail outlets such as Dick's Sporting Goods, REI, Macy's, Amazon, or Zappos.   In fact, just the opposite is true: Mr. Nathan admitted that he intentionally did not promote COOL COMPRESSION in a retail setting because "retail store is just to excite you. We don't excite you" because COOL COMPRESSION is not "enticing."   (SOF ¶¶ 55, 97.)   And Lontex differentiates its SWEAT IT OUT "Performance Compression" garments from other garments with compressive fits sold through mainstream retailers (such as NIKE PRO and Under Armour) but which do not offer medical-grade compression for injury prevention and rehabilitation.   (SOF ¶¶ 106-109.)   NIKE no longer uses the same wording in written descriptions for these NIKE PRO products, but even if it were to continue to describe its products with "cool" and "compression," there is also no evidence in the record that NIKE has any intention to expand these NIKE PRO products into the healthcare or medical field for injury prevention and rehabilitation.

Moreover, Lontex readily admits that it never sold its "Performance Compression" garments in mainstream outlets because its garments are too specialized for mainstream retailers. (SOF ¶¶ 55, 97.)   Lontex states that its garments are unique and sell when Mr. Nathan can talk to customers and teach them about Lontex's garments.   (SOF ¶¶ 96, 97.)   According to Lontex, retailers want consumers to buy a big brand garment from NIKE, Reebok, Adidas, or Under

47

Armour and Lontex is not a good fit for those retailers because its products "don't excite you," instead they "help you to prevent or rehabilitate." (SOF ¶¶ 55, 97.)

This factor favors NIKE.

*         *         *

In sum, not one single *Lapp* factor favors Lontex's position. No reasonable juror could conclude that an appreciable number of ordinary prudent consumers are likely to be confused that NIKE PRO products are associated with Lontex or that Lontex's SWEAT IT OUT products are associated with NIKE. Nor has Lontex come forward with any credible scenario of how confusion is likely to occur in the marketplace. To the contrary, NIKE anticipates that Lontex will raise only superficial argument that the parties both used similar words in written materials about similar athletic apparel products at some point in time. No reasonable juror could find trademark infringement on this type of record. Summary judgment should be entered for NIKE on this ground alone.

### D.    NIKE's alleged use was fair

Lontex's claims of trademark infringement fail as a matter of law because of an additional, independent reason: they seek to impose liability based on a non-trademark use of the highly descriptive and commonly used words "cool" and "compression." For the reasons set forth in detail above, there is no consumer confusion between the parties' uses of the subject terms. Yet, "even where some consumer confusion exists, the doctrine known as classic fair use protects from liability anyone who uses a descriptive term, fairly and in good faith and otherwise than as a mark merely to describe her own goods." *United States Patent & Trademark Office v. Booking.com B. V.*, 140 S. Ct. 2298, 2307 (2020) (citing 15 U.S.C. § 1115(b)(4)); *see also KP Permanent Make-up, Inc. v. Lasting Impression I Inc.*, 543 U.S. 111, 122-23 (2004) (the "mere risk of confusion" or "some possibility of consumer confusion" does not prevent a court finding that the accused use is

48

a "fair use"); *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 938(9th Cir. 2017), *cert. denied*, 138 S. Ct. 1988(2018) ("Some consumer confusion is compatible with fair use, and when a plaintiff chooses 'to identify its product with a mark that uses a well-known descriptive phrase' it assumes the risk of some confusion."). The Supreme Court has recently explained that the fair use doctrine "guard[s] against the anticompetitive effects" that would result from a trademark owner holding a "monopoly" over descriptive terms. *Booking.com*, 140 S. Ct. at 2307. This is precisely what Lontex attempts here.

The doctrine of fair use recognizes that words will always be read as words, but not always as trademarks. *See KP Permanent Make-up*, 543 U.S. at 122 ("there [is] no indication that the [Lanham Act] was meant to deprive commercial speakers of the ordinary utility of descriptive words."). Lontex's case misunderstands this simple concept. Under the fair use doctrine, Lontex does not have the right to prevent others from using "cool" and "compression" in good faith in their primary, descriptive sense. "The fair use defense is available against even incontestable trademarks, like [Lontex]'s." *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019) (citing *Sorensen v. WD-40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015)). Those common words remain part of the English lexicon and remain free for others, including NIKE, to use to describe their goods. *See Citrus Grp., Inc. v. Cadbury Beverages, Inc.*, 781 F. Supp. 386, 391 (D. Md. 1991) ("the owner of a registered mark may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense."). To prevail on its classic fair use affirmative defense, NIKE must show that: (1) it used "cool" and "compression" in a non-trademark manner; (2) the use is descriptive of its goods or services; and (3) it used "cool" and "compression" in good faith. 15 U.S.C. § 1115(b)(4). NIKE readily meets this test here.

### 1.    NIKE did not use "cool" and "compression" as a trademark

NIKE did not use "cool" and/or "compression" as a trademark or as a symbol to attract

public attention.  NIKE's apparel was branded and sold in connection with NIKE's *actual* marks— NIKE, SWOOSH, and DRI-FIT.  *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30-31 (2d. Cir. 1997) ("The non-trademark use of the challenged phrase [is] evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks."); *Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 363-64 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 55 (2d Cir. 2016) (the court found that defendants' use was not as a trademark because, inter alia, it was always accompanied by use of defendants' actual marks).  "Words or phrases function as trademarks when they are used by a source of a product to identify itself to the public as the source of its product and to create in the public consciousness an awareness of the uniqueness of the source and of its products."  *SportFuel*, 932 F.3d at 596.  As discussed at Sec. II.C, *supra*, NIKE did not use "cool compression" on any NIKE PRO product or any product labels or hangtags, *SportFuel*, 932 F.3d at 597-98; nor did NIKE use "cool compression" in any NIKE print, media, or digital advertisements or on any in-store signage or displays.  *Cosmetically Sealed*, 125 F.3d at 30-31 (applying the fair use defense where the allegedly infringing mark was only used in a single advertising campaign).  NIKE did not seek ownership of "cool compression" as a trademark.  *SportFuel*, 932 F.3d at 597-98.

NIKE did not use "cool compression" as a technology platform, material benefit, feature, or athlete insight.  (SOF ¶¶  140, 145, 154-162.)  NIKE's witnesses confirmed the NIKE PRO garments alleged to infringe were designed with materials to keep the wearer "cool" and offered in a "compression" fit.  (SOF ¶¶ 129, 135, 136, 137.)  NIKE's use of "cool" and "compression" as product descriptors on pages within its wholesale catalogs or on product description pages deep within nike.com appeared alongside core NIKE trademarks such as NIKE, SWOOSH, and DRI-FIT.  (SOF ¶¶ 150-153.)  And NIKE's use of "cool" and "compression" was inconsistent (as one

would expect of descriptors, as opposed to consistent use seen with trademarks)—sometime the words were directly next to each other, other times the words were separated by other product descriptors, and other times the words were abbreviated.  (SOF ¶¶ 160, 161.)  This inconsistent use does not constitute trademark use or intent to use words as a trademark.  *Kelly-Brown*, 95 F. Supp. 3d at 363-64 (applying the fair use defense where the allegedly infringing use was inconsistent, which "weigh[ed] against a finding of intent to create a sub-brand mark").  And NIKE's catalogs and nike.com product pages never displayed the product descriptors "cool" and "compression" any more prominently than the NIKE or SWOOSH trademarks.  Such conduct "generally does not constitute trademark use."  2 MCCARTHY § 11:46 (5th ed.) (citing *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 313 (S.D.N.Y. 2010)).

Lontex will likely contend that NIKE used "cool compression" as the product name for the NIKE PRO products and, thus, NIKE used "cool compression" as trademark.  *See Adidas America, Inc. v. Skechers USA, Inc.*, No. 15-cv-01741, 2017 WL 3319190, *22-24 (D. Or. Aug. 3, 2017) (summary finding of no fair use defense because Skechers used SUPERNOVA as a trademark, rather than to describe its shoe).  But this case is not at all like *adidas v. Skechers*.  There, the court found "undeniable evidence" that Skechers used "Supernova," which was adidas' mark, as the name of a shoe: "Relaxed Fit Supernova."  *Id*.  *Id*.  Here, there is no "undeniable evidence" that NIKE used "cool compression" as the consumer-facing product name of these NIKE PRO products.  (*See* Sec. II.C, *supra*).  To the contrary, the only consistent consumer-facing product name for these NIKE products was "NIKE PRO."  (SOF ¶¶ 158, 161.)  Lontex's contention that use of "cool" and "compression" in a product name is necessarily trademark use is wrong.  Common words that describe a product like "cool," "compression," "shirt," "tights," "shorts," "long-sleeve," or "short-sleeve" do not become trademarks just because they appear in a product

name.  Taken to its logical conclusion, Lontex would contend that the Keebler Company is using common words like "chocolate," "chip," and "cookie," as trademarks just because its products have names like "Keebler Chips Deluxe Original Chocolate Chip Cookies," "Keebler Chips Deluxe Soft 'N Chew Chocolate Chip Cookies," or "Keebler Chips Deluxe Chocolate Chunk Cookies."  This is not the law.  Those commonly used words describe what the product is; they do not act as a source-identifier.

NIKE refers to these products—and consumers know these products—as NIKE PRO products, which makes sense given that the products and their hangtags are prominently branded with the NIKE PRO mark.  (SOF ¶¶ 150-153.)  Lontex is asking this Court to find trademark use where other courts have rejected the same contention on similar facts.  For example, in *SportFuel, Inc. v. PepsiCo, Inc.*, the Seventh Circuit found that the Gatorade did not use the term "Sports Fuel" as a trademark or a source identifier because the term was only rarely used on product packaging and because the slogan "The Sports Fuel Company" was used only in advertisements with the house mark GATORADE.  932 F.3d at 598.

In sum, the record shows that NIKE did not use "cool" and "compression" as a trademark.

### 2.  NIKE used "cool" and "compression" to describe its products

As discussed in Section II.C, *supra*, NIKE used of the word "cool" to describe the thermoregulation qualities of its baselayer apparel products while "compression" described the tight fit.  Lontex's principle, Mr. Nathan, even admitted as much to a potential business partner: "I do not think that Nike is interested in purchasing the COOL COMPRESSION® Trademark. *They are just using it to describe this 'Pro Lite Compression Apparel' online*."  (SOF ¶189.)  NIKE did indeed use the word "cool" to describe the products' material benefit of keeping the athlete cool. (SOF ¶ 162.)  NIKE's "Stay Cool – NIKE PRO Silo Comparison" from Spring 2016 shows how the NIKE PRO products and the rest of the product silo are designed to keep the wearer

"cool," "cooler," and "coolest." (SOF ¶¶ 142-147.) NIKE used the word "compression" to describe the fit preference of the NIKE PRO product, *i.e.*, a tight fit that is close to the skin. (SOF ¶ 162.) This use—which literally describes the characteristics of the goods—is plainly descriptive. *See* 2 McCarthy § 11:48 (collecting cases upholding the fair use defense).

### 3.   NIKE used "cool" and "compression" in good faith

The words "cool" and "compression" are commonly used product descriptors throughout the athletic apparel industry. (SOF ¶¶ 228-236.) There is widespread third-party use of these terms in connection with athletic apparel. (SOF ¶¶ 228-236.) *See e.g., SportFuel*, 932 F.3d at 599 (affirming summary judgment of classic fair use and noting that makers of nutritional supplements "regularly invoke the 'Sports Fuel' terminology to describe the products they sell."). And there is no reasonable dispute that COOL COMPRESSION, even when used in connection with Lontex's own compression garments, is a descriptive, weak mark hemmed in by widespread third-party use. (SOF ¶¶ 228-236.) The COOL COMPRESSION Marks' weakness, and the overwhelming third party use of these words, demonstrates NIKE's good faith. *See e.g., Fuel Clothing Co.*, 7 F. Supp. 3d at 620. NIKE used "cool" and "compression" for the good faith reason of describing its NIKE PRO products, and there exists no contrary evidence that NIKE used these terms in order to trade off of Lontex's weak and non-source-identifying marks.

The historical timeline reflects the absurdity of any argument that NIKE used "cool" and "compression" in bad faith. Long before the NIKE PRO products alleged to infringe were on the market, NIKE used "compression" to describe the tight fit of its baselayer apparel and "cool" to describe how the DRI-FIT materials and innovative design of its apparel help the wearer "stay cool." (SOF ¶¶ 128, 162.) That the product descriptors "cool" and "compression" appeared next to each other in some written NIKE product descriptions, with the word "cool" immediately preceding the word "compression," is simply happenstance that has nothing to do with Lontex or

the COOL COMPRESSION Marks.  Indeed, the NIKE PRO product team had no knowledge of Lontex or the COOL COMPRESSION Marks at the time.  (SOF ¶¶ 178-180.)  There was no decision to adopt "cool compression" as a mark; rather, the NIKE PRO products were branded with the NIKE, SWOOSH, and DRI-FIT marks, not "cool compression."  *Kelly-Brown*, 95 F. Supp. 3d at 363-64.  NIKE's written copy in its catalogs and website included detailed descriptions of these NIKE PRO products, including "cool" to describe the products' material benefit of keeping the athlete cool and "compression" to describe the products' fit and other descriptors for consumer group, silhouette, and length.  (SOF ¶¶ 158, 162.)  But there is no evidence in the record that NIKE intended to adopt and use the phrase "cool compression," let alone evidence that NIKE intended to deceive any consumers when describing its products.  *See e.g.*, *Int'l Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) ("the standard for good faith for fair use is the same as the legal standard for good faith in any other trademark infringement context and that that standard asks whether the alleged infringer intended to trade on the good will of the trademark owner by creating confusion as to the source of the goods or services.").  Indeed, if NIKE actually believed it would achieve some benefit from purposefully using the phrase "cool compression," one would have expected to see a use more prominent than that buried on some product detail pages on NIKE's website or on a few pages out of hundreds in NIKE's catalogs which are consumed by wholesale buyers—particularly from a company who is known for its big, attention-getting marketing campaigns.

Throughout this litigation, Lontex has signaled its viewpoint that NIKE acted in "reckless disregard" or with "willful blindness" in using the two common words because it should have run a trademark clearance search to turn up Lontex's asserted COOL COMPRESSION registrations.  As discussed above, Sec. III.C.5, *supra*, Lontex is wrong.  Not conducting a trademark clearance

search is not evidence bad faith, *id.*, and the absence of a trademark clearance search here is **consistent** with NIKE's fair use of "cool" and "compression" for their commonly understood English meanings. *See Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x. 333 (2d Cir. 2009) (Neither failure to conduct a trademark search nor refusing to stop on receipt of a cease and desist letter are evidence of bad faith.  Summary judgment that this was a classic fair use); *Sorensen.*, 792 F.3d at 725 (failure to conduct a trademark search did not negate good faith.  If defendant believed that it was not using the word as a trademark, "it had no reason to conduct a trademark search.").  The NIKE PRO product team had absolutely no reason to believe that it should ask for trademark clearance on "cool compression."  (SOF ¶ 183.)  There was no "cool compression" in the NIKE lexicon, nor was "cool compression" intended to function as a trademark, nor did it.

Lontex has also made much out of the idea that NIKE acted in bad faith because it continued to use "cool" and "compression" after Lontex demanded that it cease doing so.  This is not evidence of bad faith and is, again, conduct consistent of a company using common words for their readily understood meanings to describe features of a product.  *See e.g.*, *SportFuel*, 932 F.3d at 601 ("[Defendant] Gatorade believed it had every right to use "Sport Fuel" in a descriptive sense, so its continued use after [plaintiff] filed suit also fails to justify an inference of bad faith.").  Moreover, NIKE investigated Lontex's claim (discovering that Lontex was not using COOL COMPRESSION, as it had claimed in its letter) and asserted its legal position disagreeing with Lontex's infringement theory.  Defending itself against Lontex's trademark lawsuit is not evidence of bad faith intend.  *See Golo*, 2020 WL 5203601, *8.

There is no genuine dispute that NIKE did not have any intent to trade on Lontex's alleged goodwill in COOL COMPRESSION (and there was none on which to trade) and it did not have

any intent to deceive consumers by using these terms to describe features and attributes of the NIKE PRO products.

*      *      *

For these reasons, NIKE's use of the words "cool" and "compression" is fair and cannot be subject to liability according the affirmative defense in 15 U.S.C. § 1115(b)(4).

### E.      NIKE is not contributorily liable for any alleged third-party use

In addition to its claims of direct infringement, Lontex has also asserted that NIKE is contributorily liable for the infringement of third parties alleged to have made sales of the accused products.  (ECF 20 at 58-72.)  As the Supreme Court has explained, "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982).  Lontex has failed to establish contributory infringement, however, for at least the same reasons it fails on its direct claims.  It is axiomatic that there can be no liability for contributory infringement unless there is direct infringement, as "contributory liability must be predicated on some direct infringement by the third party."  *1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1249 (10th Cir. 2013); *Suntree Technologies, Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1345-1346 (11th Cir. 2012); 4 MCCARTHY § 25:17.  As discussed in detail herein, because the asserted marks are invalid, because no likelihood of confusion exists, and because NIKE's alleged uses of "cool compression" were fair, NIKE is not directly liable to Lontex for trademark infringement.  As a result, NIKE cannot be liable under a contributory infringement theory.  *Id*.

**IV.**    <u>**CONCLUSION**</u>

For the foregoing reasons, this Court should enter judgment in NIKE's favor dismissing

Lontex's federal and state trademark and unfair competition claims as a matter of law.


November 4, 2020                                Respectfully submitted,

By:   <u>*/s/ Gina Durham*</u>

DLA PIPER LLP (US)

Gina L. Durham (admitted *pro hac vice*)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Frank W. Ryan (admitted *pro hac vice*)
Andrew J. Peck (admitted *pro hac vice*)
Marc E. Miller (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 100201

Ben C. Fabens-Lassen
1650 Mark Street, Suite 5000
Philadelphia, PA  19103

*Attorneys for Defendant NIKE, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of November, 2020, I caused Defendant NIKE, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system, it is available for viewing and downloading from the ECF system, and a true and correct copy was served via ECF to all counsel of record registered with the ECF system.


BY: */s/ Ben Fabens-Lassen*