# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LONTEX CORPORATION,<br>                    Plaintiff,<br><br>        v.<br><br>NIKE, INC.,<br>                    Defendant. | Civil Action No.:  18-cv-5623<br><br>(Hon. Michael M. Baylson)<br><br>**<u>REDACTED PUBLIC VERSION</u>** |

---

## NIKE, INC.'S BRIEF IN OPPOSITION TO LONTEX CORPORATION'S MOTION TO EXCLUDE THE SURVEYS, REPORTS, AND RELATED TESTIMONY OF HAL PORET, MATTHEW EZELL, AND CAROL A. SCOTT, PH.D.

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

    A.    NIKE's Longstanding NIKE PRO Product Line, Its Lack of Promotion of
Anything "Cool Compression," and Its Customer Base ........................................2

    B.    Lontex, Its Lack of Promotion of Cool Compression, and Potential and
Actual Customer Base.............................................................................................4

    C.    Lontex's Allegations and the Role of the Experts ...................................................6

LEGAL STANDARD.........................................................................................................9

ARGUMENT ...................................................................................................................10

    A.    Lontex's Motion Should Be Denied Because Each of Its Arguments Go to
Weight Not Admissibility .....................................................................................11

    B.    Each Survey Is Admissible ...................................................................................15

          1.    Dr. Scott's Survey Is Admissible ................................................................16

          2.    Mr. Ezell's Survey Is Admissible. ..............................................................22

          3.    Mr. Poret's Survey Is Admissible. ..............................................................26

CONCLUSION................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.,*
2013 WL 12122803 (C.D. Cal. June 21, 2013) ....................................................................28

*AHP Subsidiary Holding Co. v. Stuart Hale Co.,*
1 F.3d 611 (7th Cir. 1993) ...............................................................................................12

*Alco Indus., Inc. v. Wachovia Corp.,*
527 F. Supp. 2d 399 (E.D. Pa. 2007) ...............................................................................14

*AstraZeneca LP v. Tap Pharm. Prods., Inc.,*
444 F. Supp. 2d 278 (D. Del. 2006).................................................................................13

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.,*
No. 07 C 4718, 2010 WL 1687883 (N.D. Ill. Apr. 26, 2010)...........................................12, 19

*Charles Et Cie, Inc. v. Destileria Serralles, Inc.,*
921 F.2d 467 (3d Cir. 1990)................................................................................................1

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City,*
383 F.3d 110 (3d Cir. 2004)....................................................................11, 12, 14, 15, 20

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
251 F.3d 1252 (9th Cir. 2001) ...........................................................................................12

*CytoSport, Inc. v. Vital Pharm., Inc.,*
894 F. Supp. 2d 1285 (E.D. Cal. 2012).......................................................................2, 12, 31

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)................................................................................................9, 10, 13

*Dominguez v. Yahoo!, Inc.,*
No. CV 13-1887, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017) ....................................10, 15, 18

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000)..............................................................................................10

*Schneider ex rel. Estate of Schneider v. Fried,*
320 F.3d 396 (3d Cir. 2003)..............................................................................................10

*Firefly Digital, Inc. v. Google, Inc.,*
No. 10-cv-0133, 2011 WL 6160222 (W.D. La. July 7, 2011)................................8, 13, 19, 20

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ............................................................... 1

*Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*,
   82 F.3d 1533 (10th Cir. 1996) ............................................................. 12

*Hartle v. FirstEnergy Generation Corp.*,
   2014 WL 1317702 (W.D. Pa. Mar. 31, 2014) ...................................... 13

*ID Security Canada, Inc. v. Checkpoint Systems, Inc.*,
   249 F. Supp. 2d 622 (E.D. Pa. 2003) .................................................. 11

*Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club*,
   34 F.3d 410 (7th Cir. 1994) ................................................................. 12

*Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*,
   716 F.2d 833 (11th Cir. 1983) ............................................................. 13

*Kars 4 Kids, Inc. v. Am. Can!*,
   No. 14-cv-7770, 2019 WL 1755912 (D.N.J. Apr. 18, 2019) ........... 12, 21

*Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*,
   No. 11-cv-3684, 2016 WL 3545529 (D.N.J. June 29, 2016) ................ 14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................ 10

*Linkstrom v. Golden T. Farms*,
   883 F.2d 269 (3d Cir. 1989) ................................................................ 10

*Macfarlan v. Ivy Hill SNF, LLC*,
   675 F.3d 266 (3d Cir. 2012) ................................................................ 30

*Merisant Co. v. McNeil Nutritionals, LLC*,
   242 F.R.D. 315 (E.D. Pa. 2007) ............................................... 18, 23, 29

*Parks LLC v. Tyson Foods, Inc.*,
   863 F.3d 220 (3d Cir. 2017) ........................................................... 24, 26

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010) .................................................................. 1

*Smith v. Wal-Mart Stores, Inc*,
   537 F. Supp. 2d 1302 (N.D. Ga. 2008) ............................................... 21

*In re Suboxone Antitrust Litig.*,
   No. 13-md-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020 ...... *passim*

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................................1, 11

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ............................................................................................10

*Trouble v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ........................................................................19, 29

*U.S. Surgical Corp. v. Orris, Inc.*,
    983 F. Supp. 963 (D. Kan. 1997) ....................................................................................20

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984) ............................................................................................19

*Valodor, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) ................................................................................6

*vonRosenberg v. Lawrence*,
    413 F. Supp. 3d 437 (D.S.C. 2019) ..................................................................................21

*Water Pik, Inc. v. Med-System, Inc.*,
    No. 10-cv-01221, 2012 WL 27598 (D. Colo. Jan. 5, 2012) ................................................21

**Other Authorities**

Fed. R. Evidence 401(a) ......................................................................................................15

Fed. R. Evidence 403 ..........................................................................................................31

Fed. R. Evid. 702 ..................................................................................................1, 9, 10, 13

McCarthy on Trademarks and Unfair Competition (5th ed. 2019):

    § 32:159 ..........................................................................................................................23

    § 32:162 ....................................................................................................................13, 20

    § 32:170 ..........................................................................................................................12

    § 32:174 ............................................................................................................................7

    § 32:174:50 ..........................................................................................................8, 26, 27

    § 32:178 ..........................................................................................................................12

Swann, *Eveready and Squirt-Cognitively Updated*,
    106 Trademark Rep. 727, 738 (2016) ......................................................................7, 26, 28

Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*,
    98 Trademark Rep. 739, 754 (2008) ................................................................................28

Defendant NIKE, Inc. ("NIKE") respectfully submits this brief in opposition to Plaintiff Lontex Corporation's ("Lontex") Motion to Exclude the surveys, reports, and related testimony of NIKE's expert witnesses Hal Poret, Matthew Ezell, and Carol A. Scott, Ph.D. *See* ECF No. 189.

## INTRODUCTION

In this trademark action, Lontex bears the burden of showing that consumer confusion is likely. Consumer surveys are "the most direct method of demonstrating [] likelihood of confusion" in this context. *Charles Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990); *see, e.g.*, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010). Yet Lontex failed to present *any* survey evidence as part of its case-in-chief to support its nonsensical theories of reverse and forward confusion. That gaping hole in Lontex's case gives rise to the reasonable inference that Lontex "expected that any survey results would undermine its case." *See Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 190 (3d Cir. 2010) (Ambro, J., concurring).

By contrast, NIKE has retained three indisputably qualified experts to conduct consumer surveys in this case. The surveys test with actual consumers the key theories that Lontex puts forward, and the surveys are fatal to Lontex's case because they demonstrate *zero* likelihood of confusion and a lack of purchase interest associated with use of the common words "cool" and "compression" when appearing in written descriptions for NIKE products. This is precisely why Lontex asks this Court to exclude them. But the surveys are admissible, and Lontex's contrary arguments lack any factual or legal foundation. The surveys are reliable because they were conducted in accordance with widely accepted survey methods, and they are highly relevant and helpful because they were specifically designed to test the very theories of liability that Lontex is pursuing here. That is all that Rule 702 requires. Indeed, courts "have long held that survey evidence should be admitted as long as [it is] conducted according to accepted principles and [is] relevant," *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

618 F.3d 1025, 1036 (9th Cir. 2010) (citing cases) (brackets in original), and that "technical flaws" concerning survey design and execution "go to weight not admissibility." *In re Suboxone Antitrust Litig.*, No. 13-md-2445, 2020 WL 6887885, at *17-18 (E.D. Pa. Nov. 24, 2020); *see, e.g.*, *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1292 (E.D. Cal. 2012). This Court accordingly should deny Lontex's motion in its entirety and deem the surveys admissible.

**BACKGROUND**

Before summarizing the survey evidence, it is helpful to begin with an overview of: (i) NIKE's alleged infringement, and Lontex's purported "use" of "Cool Compression"; (ii) the Rule 30(b)(6) testimony defining the parties' actual and potential customer bases, and (iii) the theories of liability that Lontex puts forward here. This limited background demonstrates that the survey experts properly designed their surveys to "fit" the facts and theories of this case and that the results of those surveys will be helpful to the factfinder.

### A.  NIKE's Longstanding NIKE PRO Product Line, Its Lack of Promotion of Anything "Cool Compression," and Its Customer Base

There is no Cool Compression line of products made by NIKE. Rather, NIKE has long sold a popular line of NIKE PRO products that provide thermoregulation benefits to the wearer, with a family of products that keep the wearer "cool" and a family of products that keep the wearer "warm." (*See* ECF No. 192, NIKE's Statement of Undisputed Fact ("SOF") ¶¶ 128-135.) Because products in the NIKE PRO product line were offered in a variety of fit preferences—including a "fitted" fit and a tighter "compression" fit—the words "cool" and "compression" sometimes appeared next to each other when describing products in certain limited written materials for a limited period of time. (*See* SOF ¶¶ 138-140, 145, 162-166.)

NIKE PRO products prominently feature NIKE's SWOOSH mark on the chest or leg of the garment and the NIKE mark and "NIKE PRO" branding on the waistband, neck tape, hemline,

and interior labeling.  (*See* SOF ¶¶ 150-153.)   No NIKE product bears the phrase "Cool Compression" anywhere on the garment, garment labeling, or on any hangtags sold with the garment.  (*See id.*)   NIKE never had any advertising campaigns featuring "Cool Compression." (*See* SOF ¶ 149.)  NIKE also never displayed the word "cool" next to the word "compression" in any other places that a consumer might encounter when looking to purchase a product from NIKE, such as retail store signage, press releases, athlete endorsements, or e-mail blasts. (*See id.*)

NIKE has a broad customer base for these NIKE PRO Products, encompassing everyone from "a 15 year old boy to an 84 [year old] man."  (*See* Munro Dep. at 36:15-37:8, ECF No. 190-14, Ex. 12.)[1]   Yet Lontex's motion rests heavily on the mistaken premise that NIKE's customer base for these products is *only* a "young fit game day athlete" between the ages of 18 and 26.  *See, e.g.*, Lontex's Brief at 2, 4, 6, ECF No. 189-1 (hereinafter, "Lontex Br.").   To concoct this argument, Lontex cherry-picks a sentence from a portion of the testimony of Neil Munro, NIKE's 30(b)(6) witness, while ignoring Mr. Munro's testimony about the relevant customer audience to whom NIKE sells the NIKE Pro products.  (*See, e.g.*, Munro Dep. at 18:10-20, 36:15-37:8, 126:10-135:25.)  Specifically, although Mr. Munro discusses a "design" ideal of a "young fit game day athlete," he then goes on to describe the ***actual*** customers of NIKE Pro products as follows:

> We also understand that we serve a great large demographic through our distribution point and our geography. So Nike baselayer typically goes to a lower level of distribution such as moderate department stores like Kohl's and it is typically at a lower price point. ***Therefore, it could encompass and be super democratic, a 15 year old boy to an 84 [year old] man.***

(*Id.* at 36:15-37:8 (emphasis added); *see id.* at 40:13-41:8 (explaining that NIKE "want[s] to be inclusive. . . . [and] want[s] to allow everybody to have the ability to wear our product and to feel

---

[1] Each of the experts reports and deposition excerpts cited throughout this brief are attached as exhibits to NIKE's Motion to Exclude Lontex's Proposed Experts. *See* ECF No. 190 (Motion); ECF No. 190-3 – No. 190-17 (exhibits).

good about doing so").)   By ignoring NIKE's testimony about its *actual* customer, Lontex incorrectly concludes throughout its motion that NIKE's typical customer is only a young adult who is a game-day athlete, when that is not the case.

**B.    Lontex, Its Lack of Promotion of Cool Compression, and Potential and Actual Customer Base**

Lontex does business under the name SWEAT IT OUT and has two employees, Efraim Nathan and his daughter.  (SOF ¶ 2, ECF No. 192.)  Lontex promotes its SWEAT IT OUT garments as having a special high-grade compression for prevention and rehabilitation of injury.  (SOF ¶ 51.) The compression fabric that Lontex uses is not proprietary to Lontex.  (*See* SOF ¶¶ 41-44.) According to Mr. Nathan, the high-grade compression "technology" for his SWEAT IT PRODUCTS is branded COOL COMPRESSION.    Lontex did not promote "COOL COMPRESSION" in any places where a customer would regularly encounter a mark—like on its website, social media, press releases, brochures, or in a single e-mail to a customer—***until after*** Mr. Nathan saw some product descriptions containing "cool" next to "compression" within the nike.com webpages in December 2015.  (*See* SOF ¶¶ 62-98.)  Mr. Nathan explained why he never used COOL COMPRESSION in Lontex's promotions as follows:

> NIKE's Counsel:  But let me ask you this question: How do you expect anyone to know about this Cool Compression trademarks of yours if you never say it in any of the promotions?
>
> Mr. Nathan:  That's a great question.  Okay.  Let me give you a short answer. . . . Our product was unique and the only way to really actually make sense out of it is you liking it because it did what it did to you and you talked to your friends and they're buying.  ***This—that's why we never went to retail store. . . . In retail store is just to excite you.  We don't excite you***.
>
> NIKE's Counsel:  ***So you don't think it would be enticing, in your words, to put Cool Compression in an advertisement like this***?
>
> Mr. Nathan:  ***I don't think so.  I really don't….***

(Efraim Nathan Dep. at 990:24-992:23, ECF No. 190-15, Ex. 13.)

- 4 -

Notwithstanding this sworn testimony, Lontex claims to have a very broad *potential* customer base, which it uses to support its grossly inflated demand for more than ███████ in this case from NIKE (a demand that appears premised on Lontex's theory that it could have sold its products to the same customers that NIKE did). At his deposition, Mr. Nathan broadly defined Lontex's *potential* customer base (*i.e.*, its target audience) as including <u>all</u> "purchasers of athletic apparel and equipment." (*Id.* at 287:17-288:8.) On this point, Mr. Nathan was unequivocal:

> NIKE's Counsel: At some point in the Complaint, it states that you and NIKE targeted at the same audience purchasers of athletic apparel and equipment. Do you agree with that statement?
>
> Mr. Nathan: Yes.
>
> NIKE's Counsel: Who – so that's **how you would define the audience here, purchasers of athletic apparel and equipment?**
>
> Mr. Nathan: **Yes**.
>
> NIKE's Counsel: So anybody, not just people at schools or –
>
> Mr. Nathan: Oh, absolutely. No, absolutely.
>
> NIKE's Counsel: And why is that?
>
> Mr. Nathan: Because I think that anybody that does activity, whether its walking, whether it's flying or whether it's sitting down for a longtime or whether it's playing professional football, **which is all of us**, we all do one of those things . . . . **So really, anybody that wants to be healthy, anybody that want to do any type of activity, whether you're old, whether you're young, whether you're 10 or whether you're 80, if they are wearing the right compression, that can help them at least, not only psychologically, but it can help them physically and mentally.**

(*Id.* at 287:17-289:21.) In this instance, Mr. Nathan self-servingly testified under oath that Lontex defines its hypothesized customer base in near-identical terms as Mr. Munro had earlier defined NIKE's customer base.[2]

---

[2] For purposes of assessing the likelihood of confusion factors, NIKE disagrees that its customers necessarily overlap with Lontex's to the full extent of Mr. Nathan's testimony. Because

As to Lontex's *actual* customer base, however, Mr. Nathan later testified that his actual customers were well-educated buyers, intimately familiar with Lontex's products, and would never confuse his products for NIKE's products:

> NIKE's Counsel: I'm asking you if these trainers who know you and you say have known your product have ever confused your product with Nike's product?
>
> Mr. Nathan: **You know the difference between my product and Nike product with your eyes closed**. You don't really have to even look at it. You just have to touch it. That's it.

(*Id.* at 919-920; *see id.* at 1036:4-17, 1150-52.)  Regardless of how he ultimately defined Lontex's shifting customer base, Mr. Nathan admitted that he is *not* aware of **any customer** mistakenly believing that NIKE was using Lontex's supposed COOL COMPRESSION technology, that Lontex authorized NIKE to use that technology, or that Lontex and NIKE were affiliated or connected in any way. (SOF ¶¶ 209-212, 217, ECF No. 192.)

### C.    Lontex's Allegations and the Role of the Experts

Even though Lontex conceded that none of its actual customers had been or would be confused, it persisted with its theories of hypothetical confusion scenarios.  While Lontex was content to rely on untested hypotheses, NIKE used widely accepted consumer survey methodologies to further illustrate Lontex's failure to meet its burden of demonstrating likely confusion.

"There are two common methods for surveying the likelihood of confusion," the *Everready* method and the *Squirt* method. *Valodor, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464–65 (E.D. Va. 2017).  Mr. Poret used one of those survey designs to test the likelihood of confusion, while Mr. Ezell used the other method.  **Each of these confusion surveys showed that there is <u>zero</u>**

---

this is how Mr. Nathan defined Lontex's potential customer base under oath, however, NIKE's survey experts treated that testimony as true to ensure the accuracy of the survey environment.

**likelihood of confusion in this case.**  (Ezell Report, ECF 190-3, Ex. 1; Poret Report, ECF 190-4, Ex. 2.)  Because Lontex opaquely alleges it "has been damaged by both forward and reverse confusion" in a single allegation of its complaint (First Am. Compl. ¶ 42, ECF No. 20), NIKE retained experts to design surveys to test each of those theories.

First, Lontex alleges in its complaint that NIKE's written descriptions that have strings of words—like "728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP  or 728049 NIKE PRO COOL 6" COMPRESSION SHORT—"leads consumers to falsely believe that Nike has obtained permission to use Plaintiff's COOL COMPRESSION branded technology, tapping into the goodwill associated with it," and suggests that NIKE "has acquired the rights to bring Plaintiff's COOL COMPRESSION products in-house."  (*Id.* ¶¶ 20-21.)  Since this forward-confusion theory of the case presumes that consumers would already be aware of "COOL COMPRESSION" and would believe that NIKE is now associated with it, NIKE tested that theory by retaining a seasoned expert, Matt Ezell, to conduct a consumer survey using the *Eveready* methodology.[3]  An *Eveready* study is considered the "gold standard" for assisting courts in trademark infringement cases involving allegations such as Lontex's forward-confusion argument here, as it exposes the relevant universe of defendant's consumers to defendant's use as it appears in the marketplace and asks questions designed to determine if consumers believe that defendant's products is put out by or affiliated with plaintiff or plaintiff's brand.  *See* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.) (hereinafter, "McCarthy on Trademarks"); Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rptr 727,

---

[3] Contrary to Lontex's argument, Mr. Ezell's survey is *not* offered on the issue of reverse confusion.  *See* Lontex Br. at 16.  It tests forward (or direct) confusion only.

733-734 (2016).  Mr. Ezell's study found *zero* percent confusion.  (Ezell Rep. ¶¶ 7-8, ECF 190-3, Ex. 1.)

Given Lontex's allegations of reverse and forward confusion and allegations regarding the relatedness of the parties' goods, NIKE also retained well-reputed expert, Hal Poret, to conduct a *Squirt* study, a methodology commonly recognized by courts to assist in trademark infringement cases, which can measure both for forward and reverse confusion and can simulate scenarios where a prospective consumer encounters both parties' goods in the marketplace.[4]  (Poret Report at 10, ECF No. 190-4, Ex. 2); *see* MCCARTHY ON TRADEMARKS § 32:174:50 ("Survey Formats—The Squirt Format for testing the likelihood of confusion issue.").  This sort of study favors a plaintiff who has a mark that is not well-known because it places it in a line-up with the use of the defendant, which allows survey takers to familiarize themselves with the use of the plaintiff's mark shortly before being exposed to the allegedly infringing use, and then asks survey takers standard questions to elicit any confusion as to source or affiliation between the plaintiff and defendant. *See* MCCARTHY ON TRADEMARKS § 32:174:50.  Even with this more plaintiff-favorable methodology, Mr. Poret's study also found zero percent confusion.  (Poret Rep. at 41-44.)

Next, since Lontex has theorized that NIKE received some benefit when the generic terms "cool" and "compression" happened to appear next to each other in some written descriptions within nike.com product pages, Dr. Carol Scott conducted a "purchase interest" study using standard scientific principles governing survey research.  (*See* Scott Report, ECF No. 190-5, Ex.

---

[4] "In a forward confusion case, the trademark holder alleges [that] customers will purchase goods from the infringing junior user under the mistaken belief that they are purchasing from the senior user.  In a reverse confusion case, it is alleged that customers will purchase the senior user/trademark holder's goods because they mistakenly believe that the junior user/infringer is the source of the senior user's goods." *Firefly Digital, Inc. v. Google, Inc.,* No. 10-cv-133, 2011 WL 6160222, at *1 n.5 (W.D. La. July 7, 2011) (internal quotations and citations omitted).

3.)  This survey tested whether consumers, upon seeing a nike.com page that was a replica of the one Lontex has complained about, are more interested in purchasing the product than are consumers who see the same page absent the inclusion of the "cool" and "compression" words. (*Id.*; *see* SOF ¶¶ 223-226.) Dr. Scott's study found that use of those terms in the descriptions resulted in *no* increase to consumers' interest in purchasing the product.  (*See* Scott Report ¶ 26.) This consumer survey response is in no way suspect and is, in fact, consistent with Mr. Nathan's own testimony that Lontex never used the phrase "cool compression" in advertisements or written materials because Cool Compression does not "excite" consumers.  (Efraim Nathan Dep. at 990:24-992:23, ECF No. 190-15, Ex. 13.)

Far from an attempt to "dazzle by sheer number," as Lontex contends (Br. at 6), these three surveys are highly probative, as each demonstrates in different ways that Lontex's claims of likely confusion and unjust enrichment lack any basis in reality.

## LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the framework governing the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, trial judges should admit into evidence reliable testimony from qualified experts that is helpful to the factfinder and exclude expert testimony where the

proposed expert is unqualified, the expert's conclusions or methods are unreliable, or the expert's testimony would be unhelpful. *See, e.g.*, *Daubert*, 509 U.S. at 589-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-52 (1999); *Dominguez v. Yahoo!, Inc.*, No. Civ. 13-1887, 2017 WL 390267, at *13 (E.D. Pa. Jan. 27, 2017).

Distilled to its essence, "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); S*chneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003); *In re TMI Litig.*, 193 F.3d 613, 664-65, 714 (3d Cir. 1999). To satisfy the reliability requirement, the proponent must show both that the expert's opinions are the "product of reliable principles and methods" and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d).

"The Third Circuit has interpreted Rule 702 to have a preference toward admissibility; and has noted that the most important consideration is whether the evidence would be helpful to the trier of fact in a broad sense." *Dominguez*, 2017 WL 390267, at *13 (citing *Linkstrom v. Golden T. Farms*, 883 F.2d 269, 270 (3d Cir. 1989)). Indeed, "[t]he rule does not require the party proffering the expert to demonstrate the 'correctness' of the expert's opinion. Rather, the party need only demonstrate 'by a preponderance of the evidence' that the expert's opinion bears adequate indicia of reliability." *In re Suboxone Antitrust Litig.*, 2020 WL 6887885, at *17-18 (quoting *In re Paoli R.R. Yard*, 35 F.3d 717, 744 (3d Cir. 1996)). NIKE's surveys plainly satisfy that standard.

### ARGUMENT

Lontex does not challenge the qualifications of NIKE's survey experts or the reliability of the widely accepted survey methods they employed. NIKE's survey experts are unquestionably qualified to conduct consumer surveys, and their surveys were conducted using commonly

employed and widely accepted survey designs.  But Lontex, as the plaintiff, bears the burden of proving likelihood of confusion, and it did not survey *any consumers* to meet that burden—despite the backing of litigation financers.  So it now seeks to exclude NIKE's survey based on so-called "technical flaws" in each survey's design or execution.  Lontex's technical criticisms lack merit because they have no scientific basis, are unsupported by legal authority, and are inconsistent with record evidence.  In any event, even if there were technical flaws of the nature Lontex claims (*e.g.*, qualms with universe and stimulus selection), the law is clear that these types of issues do not warrant exclusion because they "go to weight not admissibility."  *In re Suboxone Antitrust Litig*., 2020 WL 6887885, at \*17-18 (citing cases). As a result, Lontex's motion should be denied.

## A.    Lontex's Motion Should Be Denied Because Each of Its Arguments Go to Weight Not Admissibility

Lontex's motion fundamentally misunderstands this Court's role, as the gatekeeper, "to determine the admissibility of evidence, and the role of the jury, as a fact finder, to determine the weight to be accorded to admitted evidence."  *Id.* at \*30 (quoting *ID Security Canada, Inc. v. Checkpoint Systems, Inc.*, 249 F. Supp. 2d 622, 691-93 (E.D. Pa. 2003)).  Each of the survey critiques lodged by Lontex—such as complaints about over- or under-inclusivity of the universe, the propriety of the stimulus selection, and noise levels—could only be considered "'mere technical flaws' in a survey's design or execution [that] go to the weight to be afforded to the survey, not its admissibility."  *Id.* at \*17 (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004)).  This Court should deny the motion on this basis alone.

Surveys are commonly admitted in trademark actions.  That is because "surveys create an experimental environment from which we can get useful data from which to make informed inferences about the likelihood that actual confusion will take place."  *THOIP*, 690 F. Supp. 2d at

230.  It is well-settled, however, that "survey evidence need not be perfect to be admissible." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, Civ. No. 07-4718, 2010 WL 1687883, at *5 (N.D. Ill. Apr. 26, 2010) (citing *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club,* 34 F.3d 410, 416 (7th Cir. 1994)).  Instead, "[s]urveys are to be admitted in trademark cases so long as they are conducted according to accepted principles."  *CytoSport, Inc.*, 894 F. Supp. 2d at 1291 (citing cases).  Exclusion of a survey is therefore warranted only in "rare" instance where a survey is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible."  *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993); *see, e.g.*, *Fortune Dynamic, Inc.*, 618 F.3d at 1036.

By contrast, as the Third Circuit has observed, "courts have held generally that mere technical unreliability goes to the weight accorded a survey, not its admissibility."  *Citizens Fin. Grp., Inc.*, 383 F.3d at 121; *see, e.g.*, *In re Suboxone Antitrust Litig.*, 2020 WL 6887885, at *17-*18.  The foremost treatise on this issue explains that "[t]he majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."  MCCARTHY ON TRADEMARKS § 32:170 (5th ed. 2019); *see Kars 4 Kids, Inc. v. Am. Can!,* Civ. No. 14-7770, 2019 WL 1755912, at *7 (D.N.J. Apr. 18, 2019).  Those renowned commentators urge that "[t]he proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand."  MCCARTHY ON TRADEMARKS § 32:178 ("One must keep in mind that there is no such thing as a 'perfect' survey.").  Consistent with that approach, courts have explained that "issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252,

1263-64 (9th Cir. 2001); *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.,* 82 F.3d 1533, 1544

(10th Cir. 1996) ("Technical and methodological deficiencies in the survey . . . bear on the weight

of the evidence, not the survey's admissibility.").[5]  And "[t]he jurisprudence is clear that 'an

imperfect universe is not fatal to the survey's admissibility,'" because "[t]he use of an

inappropriate universe 'generally affects the weight of the resulting survey data, not its

admissibility.'" *Firefly Digital, Inc.*, 2011 WL 6160222, at *4 (quoting MᴄCᴀʀᴛʜʏ ᴏɴ

Tʀᴀᴅᴇᴍᴀʀᴋs § 32:162 (4th Ed.)); *In re Suboxone Antitrust Litig.*, 2020 WL 6887885, at *17-18

(similar).

Despite this wealth of case law, Lontex urges this Court to exceed its role as gatekeeper by

excluding three relevant surveys, conducted by indisputably qualified experts, based entirely on

purported technical flaws in the survey design or universe—issues that (if they existed at all)

plainly go only to weight not admissibility.  This Court should decline the invitation.  Doing so

would be faithful to the proper role of the trier of fact and the Supreme Court's admonishment in

*Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence." *Daubert*, 509 U.S. at 596.  Indeed, "[a]s long as an expert's scientific

---

[5] *See, e.g.*, *Hartle v. FirstEnergy Generation Corp.*, 2014 WL 1317702, at *6 (W.D. Pa. Mar. 31, 2014) ("Defendant's arguments with respect to insufficient pretesting, improper information gathering, confusion by respondents, nonrepresentative and nonrandom sampling, hypothetical bias, error rate, and inconsistent and unconventional statistical analysis are 'technical flaws' that go to the weight rather than admissibility of the survey."); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 291 (D. Del. 2006) (admitting expert testimony on survey despite objection that survey did not address certain relevant questions because the objection "can effectively be dealt with on cross-examination, and thus goes to the weight, not the admissibility of the survey"); *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844–45 (11th Cir. 1983) (holding that "(1) poor sampling; (2) inexperienced interviewers; (3) poorly designed questions; and (4) other errors in execution" constituted "technical deficiencies" affecting the survey's weight).

testimony rests upon good grounds, based upon what is known, it should be tested by the adversary process . . . rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399 (E.D. Pa. 2007).

On this point, this Court's recent opinion in *In re Suboxone Antitrust Litigation* is both persuasive and instructive. No. 13-md-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020). There, Judge Goldberg examined in detail the case law governing the admissibility of survey evidence, denied a motion to exclude an expert who relied on purportedly flawed consumer surveys, and concluded that the movants' technical challenges to the survey evidence went only to weight not admissibility—much like Lontex's challenges here. *Id.* at *15-20 ("The arguments raised by the States are certainly fodder for cross-examination and may be fair grounds for challenging Dr. Curtis's credibility at trial. They are not, however, a basis on which to exclude her testimony entirely."). The challenged expert had relied on various consumer surveys to support her opinion that patients and prescribing physicians preferred one type of drug formulation (film) over another (tablets), and the plaintiffs challenged the reliability of those studies, arguing that the survey universes "were deliberately biased in favor of those who preferred film." *Id.* at *16-17. Judge Goldberg rejected the argument and concluded the survey evidence was admissible. Most importantly, he explained, Third Circuit precedent is clear that "'mere technical flaws' in a survey's design or execution go to the weight to be afforded to the survey, not its admissibility.'" *Id.* at *17 (quoting *Citizens Fin. Grp., Inc.*, 383 F.3d at 121). And "[i]mperfections in the extent of a survey's universe—i.e., overinclusivity or underinclusivity—generally constitute technical flaws that do not undermine a survey's admissibility." *Id.* (citing *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11-cv-3684, 2016 WL 3545529, at *6–7 (D.N.J. June 29, 2016)).

Although Judge Goldberg acknowledged that "a survey that excludes the *entire* relevant population may be so unreliable as to be inadmissible, *a survey that is simply underinclusive or has other flaws in sampling remains admissible but subject to challenge.*" *Id.* (citing *Citizens Fin. Grp.*, 383 F.3d at 118-21) (internal citation omitted). The same holds true here. As in *Suboxone*, Lontex's challenges to the survey universe and other issues concerning survey design and execution are mere "technical flaws" that, at best, go to weight not admissibility.

This body of case law on the admissibility of survey evidence forecloses Lontex's motion. Because Lontex ignores this caselaw and confuses the role of the Court and the role of the factfinder, its motion should be denied.

### B.    Each Survey Is Admissible

Even if Lontex's criticisms of the surveys went to admissibility (and they do not), those criticisms are wrong as a matter of fact and law. Nothing in Lontex's motion supports its argument that exclusion is required or that this highly probative survey evidence is somehow "irrelevant," "useless," or "worthless." Lontex Br. at 2, 10, 13. Those gross overstatements cannot be reconciled with the definition of relevance in Rule 401, which simply means something that "has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Surely the surveys are relevant, even though Lontex disagrees with their results. Each survey was conducted by qualified experts in accordance with accepted and reliable survey methodologies and would be "helpful to the trier of fact in a broad sense." *Dominguez*, 2017 WL 390267, at *13-14 (explaining that to be admissible "the expert testimony must help the trier of fact understand the evidence or determine a fact issue"). Nothing more is required, so Lontex's motion should be denied.

1.    ***Dr. Scott's Survey Is Admissible***

Dr. Scott is a Professor of Marketing Emeritus at UCLA's Anderson Graduate School of Management, where she taught courses on marketing at the undergraduate and graduate levels and published numerous articles and publications on marketing research and consumer behavior. (*See* Scott Rep. ¶¶ 1-2, ECF No. 190-5, Ex. 3.) She has had "extensive doctoral level education in the design, analysis, and interpretation of experiments designed to determine casual relations" and she has "conducted many such studies for litigation in state and federal courts." (*Id.* ¶ 4.) As set forth in her report, Dr. Scott has "over thirty years of experience in providing expert marketing analysis" in trademark actions, including "the development of surveys and experiments to determine consumer perceptions and beliefs, the assessment of drivers of purchase, consumer perceptions of product features and advertising claims, factors that influence pricing products in the marketplace and consumers' understanding of various marketing materials." (*Id.* ¶ 3 & Ex. 2.) It is thus hardly surprising that Lontex does not challenge Dr. Scott's qualifications here.

To test Lontex's theory that NIKE received some benefit from the generic terms "cool" and "compression" appearing next to each other in some written product descriptions, Dr. Scott conducted a "purchase interest" study using standard scientific principles governing survey research. The purpose of the study was to assess "the extent to which interest in purchasing the NIKE apparel products accused in this matter is increased if those products are shown using 'Cool Compression' in the product descriptions." (*Id.* ¶ 7.) To do so, Dr. Scott designed a survey that tested whether consumers, upon seeing a nike.com page that was a replica of the one Lontex has complained about, are more interested in purchasing the product than are consumers who see the same page absent the inclusion of the "cool" and "compression" words. (*Id.*; *see* SOF ¶¶ 223-226.) Dr. Scott's study found that use of those terms in the descriptions resulted in *no* increase to consumers' interest in purchasing the product. (*See* Scott Report ¶¶ 8, 26 ("Based on a survey of

840 consumers I conducted in February 2020, it is apparent that interest in purchasing the products at issue in this matter is not increased by the use [of] 'Cool Compression' as a product descriptor.").)

Lontex raises a single, meritless objection to the admissibility of Dr. Scott's survey. Without calling into question the reliability of Dr. Scott's survey methodology, Lontex argues that Dr. Scott's survey "uses the wrong universe."  Lontex Br. at 10-11, ECF No. 189-1.  Lontex's chief contention is that the universe of survey respondents (in both Dr. Scott's survey *and* Mr. Ezell's surveys) should have been limited to young athletes between the ages of 18 and 26. But Lontex is wrong on the law and the facts.

As to the facts, Lontex simply faults Dr. Scott for sampling a population of survey respondents that squarely aligns with both NIKE's *and* Lontex's potential customer base. Specifically, Dr. Scott's survey properly sampled U.S.-based individuals between the ages of 18 and 64 who either had purchased athletic apparel in the past 12 months or planned to purchase such apparel in the next 12 months.  (*See* Scott Rep. ¶ 11, ECF No. 190-5, Ex. 3.)  Although Lontex argues that this universe does not "adequately represent either Lontex or NIKE's customer bases" (Lontex Br. at 11), that assertion cannot be reconciled with the record evidence of NIKE's actual customer base and Lontex's hypothesized prospective customer base.  Efraim Nathan testified that Lontex's target audience includes *all* "purchasers of athletic apparel and equipment"—"really, *anybody* that wants to be healthy, *anybody that want[s] to do any type of activity*"—whether those people are ten-years old or eighty-years old.  (*See* Efraim Nathan Dep. 287:17-289:10, ECF No. 190-15, Ex. 13 (emphasis added).)[6]  And NIKE's 30(b)(6) witness likewise testified that, as to the

---

[6] Ignoring this testimony entirely, Lontex argues that NIKE's surveys improperly included individuals who were over the age of 26 and "individuals who did nothing more vigorous than

NIKE PRO products at issue, NIKE "serve[s] a great large demographic through our distribution points," which could encompass "a 15-year-old boy to an 84-year old man." (Munro Dep. at 36:15-37:24, ECF No. 190-14, Ex. 12; *see id*. at 40:13-41:8 (explaining that NIKE "want[s] to be inclusive. . . . [and] want[s] to allow everybody to have the ability to wear our product and to feel good about doing so").) In light of this testimony, there is no basis in fact or law for Lontex's assertion that the survey results are somehow "irrelevant," "useless," or "worthless" merely because certain respondents were between the ages of 27 and 64. *See, e.g.*, Lontex Br. at 1, 2, 13. Surely, as past or prospective purchasers of athletic apparel, these individuals' perceptions of the phrase "cool compression" in the purchasing context would be "helpful to the trier of fact in a broad sense." *Dominguez*, 2017 WL 390267, at *13. Lontex's ageist view that the survey is "useless" because it includes people over the age of 26 should be flatly rejected.

Lontex is also wrong on the law. It cites no authority for its repeated assertions that a survey universe *must* be limited to each party's "core demographic" for the survey results to be relevant and admissible. *See, e.g.*, Lontex Br. at 2, 6, 14-15, 19.[7] That is not the law. "In Lanham Act cases that seek to prove rates of "confusion" among consumers, however, *it is typical to survey prospective consumers*." *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 322 (E.D.

---

purchasing athletic apparel." Lontex Br. at 2, 10. But those are the very people that allegedly make up Lontex's potential customer base, as defined under oath by Efraim Nathan.

[7] The term "core demographic" appears at least five times in Lontex's brief, but Lontex cites no authority for its assertion that a survey universe should be limited to NIKE's or Lontex's "core demographic." Lontex has not attempted to define the phrase in its motion, and Mr. Nathan never testified about it either. Lontex oddly cites pages 287 to 289 of Mr. Nathan's deposition to support its assertion that Lontex has "four core demographics" (Lontex Br. at 17), but the transcript reflects that Mr. Nathan said no such thing. To the contrary, on those very pages of the transcript, Mr. Nathan unequivocally testified that Lontex's target audience includes "all purchasers of athletic equipment." (Efraim Nathan Dep. at 287:17-288:4, ECF No. 190-15, Ex. 13.) Lontex's testimony on this issue cannot be rewritten by counsel.

Pa. 2007) (emphasis added).[8]  For example, in *Universal City Studios, Inc. v. Nintendo Co.*, the Second Circuit held that a survey purporting to measure "confusion" was flawed because the survey was conducted *only* among individuals who had already purchased or leased the product rather than those who were contemplating a purchase or lease.  746 F.2d 112, 118 (2d Cir. 1984). That is precisely why Dr. Scott's survey universe included actual and potential purchasers of athletic apparel.  A broad universe of potential customers is particularly appropriate here—and in fact is the *only* test universe that makes sense—given Lontex's theory that it is entitled to recover ***more than*** ███████████ from NIKE on account of some hypothesized lost "opportunity value" for itself and baseless notions that NIKE was somehow unjustly enriched by the appearance of common words in some written product descriptions.  (*See* Parkhurst Rep., ECF No. 190-8; Drews Supp. Rep., ECF No. 190-10.)  Because Dr. Scott's survey universe was comprised of actual and potential purchasers of athletic apparel, the sample was entirely appropriate, and the survey results are highly probative.

In any event, Lontex's challenge to the over-inclusiveness of Dr. Scott's survey is at best a technical issue that goes to weight, not admissibility.  Lontex is free to cross-examine Dr. Scott and argue to the jury that her survey should be discredited because the universe of respondents included people who were older than 26-years old, but that is hardly a basis for exclusion. "Imperfections in the extent of a survey's universe—i.e., overinclusivity or underinclusivity— generally constitute technical flaws that do not undermine a survey's admissibility." *In re*

---

[8] *See, e.g.*, *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307-08 (S.D.N.Y. 2001) (citing cases for proposition that "a survey must be designed to examine an accused mark's impression on a potential consumer"); *Bobak Sausage Co.*, 2010 WL 1687883, at *6 ("In a trademark case, the proper universe usually is potential purchasers of the junior users' products or services."); *Firefly Digital, Inc.*, 2011 WL 6160222, at *4 ("When a survey is conducted to test the likelihood of confusion between two products, the potential buyers of the products should be surveyed.").

*Suboxone,* 2020 WL 6887885, at *17; *see, e.g., Firefly Digital, Inc.*, 2011 WL 6160222, at *4 (explaining that "[t]he jurisprudence is clear that 'an imperfect universe is not fatal to the survey's admissibility'" (citing MCCARTHY ON TRADEMARKS § 32:162).  This clear line of authorities forecloses Lontex's attempt to exclude all the surveys by criticizing the population of respondents.

    None of the cases Lontex cites (Br. at 13-15) suggests that the purported flaws in the survey universes rise to the level of an admissibility issue.  As Judge Goldberg recently explained, those types of cases simply hold that "a survey that excludes the *entire* relevant population may be so unreliable as to be inadmissible," but that "*a survey that is simply underinclusive or has other flaws in sampling remains admissible but subject to challenge.*"  *In re Suboxone,* 2020 WL 6887885, at *17 (citing *Citizens Fin. Grp.*, 383 F.3d at 118-21) (emphasis added); *see, e.g., U.S. Surgical Corp. v. Orris, Inc.,* 983 F. Supp. 963, 968 (D. Kan. 1997) (explaining that while a clearly non-representative sample may warrant exclusion, "the *sufficiency* of the sample universe is relevant to the weight and not the admissibility of the survey").  In fact, all the universe-selection cases cited by Lontex demonstrate that Lontex's isolated objections go only to the *sufficiency* of the survey universe, which is not enough to warrant exclusion.

    For example, in Citizens *Financial,* the Third Circuit held that the District Court did not abuse its discretion by excluding a survey where none of the survey respondents were located in the geographic area relevant to the case.  383 F.3d at 118-21.[9]  Given those facts, Lontex is incorrect that the *Citizens Financial* court upheld the exclusion merely because the survey "included an overbroad universe of respondents."  Lontex Br. at 14.  Rather, the universe excluded the entire relevant population.  In *vonRosenberg v. Lawrence,* moreover, the survey was excluded

---

    [9] In any event, the survey at issue in *Citizen Financial* was a reverse confusion survey, rendering it inapplicable to Dr. Scott's consumer purchase interest survey and Mr. Ezell's forward-confusion survey.

because it was designed to test whether "The Episcopal Church" is viewed as a religious organization, but the universe was limited to "self-identified Episcopalians," which in turn had the effect of excluding "a variety of individuals who may be consumers" and "improperly weighing respondents who currently attend Plaintiffs' parishes and excluding parishioners of the defendants. 413 F. Supp. 3d 437, 454–55 (D.S.C. 2019).  But nothing like that happened here; nor could it have happened, given Lontex's hypothesized overlap between NIKE's and Lontex's target customers.  Although Lontex cites *Water Pik, Inc. v. Med-System, Inc.*, the court in that case ruled that exclusion of a survey was *not* warranted because, as here, the movant's objections to the survey universe "relate only to the sufficiency of the sample," which is an issue of weight not admissibility.  No. 10-cv-01221, 2012 WL 27598, at *5 (D. Colo. Jan. 5, 2012) (explaining that the survey is admitted "because it has some probative value as it is representative of a fair sample of purchasers likely to purchase the junior user's goods").

In *Smith v. Wal-Mart Stores, Inc*, the court excluded a survey not merely because the universe was overbroad, but also because the person who conducted the survey "failed to adequately replicate the shopping experience," "asked leading questions," and "surveyed a non-random sample that in any case was too small to allow the results to be projected upon the general market." 537 F. Supp. 2d 1302, 1334 (N.D. Ga. 2008).  None of those other objections have been lodged by Lontex here, nor could they be.  And in *Kars 4 Kids, Inc.*, the court concluded that the universe was too broad because it literally encompassed "all adults residing in the United States," without any attempt to limit it to the parties' actual or potential customers—*i.e.*, "potential donors of vehicles to a not-for-profit corporation."  2019 WL 1755912, at *8.  But that is the opposite of what occurred here, where Dr. Scott (and all the other survey experts) limited their universe to

individuals who had recently purchased athletic apparel or intended to do so in the near future.  All of the cases Lontex relies upon are inapposite.  *See* Lontex Br. at 13-15.

In sum, Dr. Scott's survey is highly probative and admissible.  Lontex's sole objection to its admissibility relates only to the sufficiency of the survey's universe, but that objection lacks merit, is irreconcilable with law, and at most goes to weight not admissibility.

### 2.    *Mr. Ezell's Survey Is Admissible*

Lontex's arguments for exclusion of Mr. Ezell's survey can be swiftly rejected.  Most of those arguments are based on the mistaken premise that Mr. Ezell's survey is a "two-for-one survey" designed to test forward *and* reverse confusion.  Not so.  Mr. Ezell's survey tests only forward (or direct) confusion, which seeks to determine if any customers of NIKE (the purported newcomer or junior user) mistakenly believe that NIKE's products originate from or are associated with Lontex.  Mr. Ezell does not intend to opine on the issue of reverse confusion here, and Lontex cites nothing in his testimony, survey, or report suggesting otherwise.  Yet for some reason Lontex urges this Court to exclude Mr. Ezell's survey on the ground that the universe and stimuli used in his survey are inappropriate for testing reverse confusion.  Lontex Br. at 16-20.  There is of course no basis to exclude Mr. Ezell's survey "as to reverse confusion"—as Lontex requests—if Mr. Ezell's survey does not even address reverse confusion in the first place.  The mistaken assumption is fatal to Lontex's attempts to exclude Mr. Ezell's survey and opinions.

Lontex's sole remaining attack on Mr. Ezell's survey is that the survey also employs the wrong universe to test *forward* confusion.  *Id.* at 9-11.  This argument fails for all the same reasons that Lontex's objection to Dr. Scott's survey fails.  *See*, *supra*, Section B.1.  As explained above, Lontex's objection to the sufficiency of the universe goes to weight not admissibility and ignores key portions of both NIKE's and Lontex's testimony concerning each company's target audience. *Id.*; *see, e.g.*, *In re Suboxone*, 2020 WL 6887885, at *7.  More fundamentally, Mr. Ezell properly

limited the survey to adults who were likely to purchase athletic performance apparel in the next year (Ezell Rep. ¶ 14), as that universe aligns with NIKE's broad potential customer base and the large body of case law holding that "[i]n a traditional case claiming 'forward' confusion . . . the proper universe to survey is composed of the potential buyers of the junior user's goods or services." MᶜCARTHY ON TRADEMARKS § 32:159 (citing cases); *see Merisant Co.*, 242 F.R.D. at 322. Again, the use of a broad customer base makes perfect sense here given that Lontex is demanding more than ▮▮▮▮▮▮▮ from NIKE. Lontex's scattershot challenges to the Ezell survey lack merit and should be rejected.

The Court could stop here, since Lontex raises no other objections to the admissibility of Mr. Ezell's survey. But for the sake of completeness and proper context, NIKE briefly explains why Mr. Ezell's survey is highly probative and will be helpful to the factfinder on the issue of likely consumer confusion as to the source of NIKE's goods.

Lontex's theory of confusion in this case rests on the dubious premise that consumers would already be aware of Lontex "COOL COMPRESSION" and would believe that NIKE is now associated with it. For instance, Lontex alleges that NIKE's written descriptions that have strings of words—like "728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP or 728049 NIKE PRO COOL 6" COMPRESSION SHORT—"leads consumers to falsely believe that Nike has obtained permission to use Plaintiff's COOL COMPRESSION branded technology, tapping into the goodwill associated with it," and suggests that NIKE "has acquired the rights to bring Plaintiff's COOL COMPRESSION products in-house." (First Am. Compl. ¶¶ 20-21, ECF No. 20.) By definition, these allegations assume that the consumers who saw these product descriptions: (i) were aware of Lontex's "COOL COMPRESSION technology"; (ii) made the mental connection between Lontex and NIKE upon seeing the words "cool" and "compression";

- 23 -

(iii) mistakenly assumed the use of those words meant that Lontex had licensed its "technology" to NIKE; and (iv) then decided to purchase NIKE's product based on this mistaken assumption. While Lontex did *not* introduce any survey testing this theory (and in fact Mr. Nathan flatly rejected that any such associations or mistaken assumptions were ever made by Lontex's customers), NIKE nevertheless tested Lontex's allegation by retaining Mr. Ezell to conduct a consumer survey. Mr. Ezell used the *Eveready* survey methodology, which "does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience"—a necessary and foundational assumption of Lontex's theory of confusion. McCarthy on Trademarks § 32:174; *see Parks LLC v. Tyson Foods, Inc*., 863 F.3d 220, 232 (3d Cir. 2017) (explaining that *Eveready* "involves showing consumers only the potentially-infringing product and asking open-ended questions to determine whether they believe the product is associated with the senior mark").

Mr. Ezell's survey design consisted of two survey cells: (1) one cell designed "to measure likelihood of confusion, if any, with respect to the source, authorization or approval of, or business affiliation or business connection of NIKE's athletic performance apparel (shown on a web page with the words COOL COMPRESSION) with Lontex; and (2) a control survey cell designed to measure the extent of mismeasurement in the test cell survey results." (Ezell Rep. ¶ 4, ECF No. 190-3, Ex. 1.) As depicted below, "[t]he stimuli utilized in the survey were either 1) a web page for athletic performance apparel from NIKE's website with the words COOL COMPRESSION (test cell), or 2) an identical web page with the words COOL COMPRESSION removed (control cell)." (*Id.* ¶ 6.) The first image depicted below on the left is the control cell, and the image on the right is the test cell:

- 24 -




In total, four hundred interviews were conducted, two hundred in the test cell and two hundred in the control cell. (*Id.* ¶ 6.) Yet not a *single* person thought that there was a relationship between NIKE's products and Lontex's products, and Mr. Ezell's study found *zero percent confusion*. (*Id.* ¶¶ 7-8.) These survey results "fit" with the facts of the case and will be helpful to the factfinder in assessing whether confusion is likely to occur.

Lontex does not challenge Mr. Ezell's qualifications to design and conduct the survey or to analyze the survey results. (*See id.* ¶¶ 34-40 & Exs. B-D.) Nor does Lontex object to the reliability of the survey methodology that Mr. Ezell employed to study the likelihood of confusion. Such an objection would have been futile. An *Eveready* study is considered the "gold standard" for assessing trademark confusion allegations such as Lontex's theory of forward confusion, as it

exposes the relevant universe of defendant's consumers to defendant's use as it appears in the marketplace and asks questions designed to determine if consumers believe that defendant's products is put out by or affiliated with plaintiff or plaintiff's brand. *See* MCCARTHY ON TRADEMARKS § 32:174; Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rptr. 727, 733-734 (2016).

In short, Mr. Ezell is unquestionably qualified; he reliably conducted his survey using the widely accepted *Eveready* methodology for testing consumer confusion; the survey universe was properly limited to potential NIKE and Lontex customers; and the results of his survey are relevant, highly probative, and very helpful to the factfinder on the issue of liability in this case. Nothing in Lontex's brief seriously calls any of that into question. This Court should reject Lontex's motion insofar as it seeks to exclude Mr. Ezell's survey.

### 3.    *Mr. Poret's Survey Is Admissible*

Mr. Poret's survey reliably tests the likelihood of both forward *and* reverse confusion—using a model that was most favorable to Lontex in that it showed Lontex's mark to all respondents *before* showing the allegedly infringing use by NIKE—and the results of that survey are relevant and helpful in this case. To test both forward and reverse confusion, Mr. Poret conducted a *Squirt* study—a methodology commonly recognized by courts to assist in trademark infringement cases, which can measure both for forward and reverse confusion and simulate a scenario where prospective consumers encounter both parties' goods. (Poret Report, ECF No. 190-4, Ex. 2); *see also id.* at 7-10 (describing *Squirt* studies); MCCARTHY ON TRADEMARKS § 32:174:50 ("Survey Formats—The Squirt Format for testing the likelihood of confusion issue."). As the Third Circuit has explained, in "a *Squirt* survey, two products are placed side by side, often with other products that serve as controls, and participants are asked questions to determine if confusion exists as to the source of the products." *Parks LLC*, 863 F.3d at 233. This sort of study favors a plaintiff who

has a mark that is not well-known because it places it in a line-up with the use of the defendant, which allows survey takers to familiarize themselves with the use of the plaintiff's mark shortly before they are shown the allegedly infringing use, and then asks survey takers standard questions to elicit any confusion as to source or affiliation between the plaintiff and defendant.  *See* McCarthy on Trademarks § 32:174:50.  Despite employing this more plaintiff-favorable methodology, Mr. Poret's study also found zero percent confusion.  (Poret Rep. at 41-44.)

Lontex does not challenge the reliability of the *Squirt* methodology or otherwise object to Mr. Poret's qualifications.  That is because the *Squirt* format is commonly accepted as reliable, and Mr. Poret (a Harvard Law School graduate with more than 15 years of experience conducting market research surveys) is eminently qualified to assist the factfinder with his opinions in this case.  Instead, Lontex seeks to exclude the survey on the grounds that: (i) the survey had "too much noise," and (ii) the survey universe was inappropriate for purposes of testing reverse confusion. *See* Lontex Br. at 7-9, 16-24.  Each argument is flawed and should be rejected.

*First*, Lontex provides no basis in research science for its argument that Mr. Poret's *Squirt* survey had "too much noise" to be valid.  *Id.* at 20-24.  Rather, Lontex relies entirely on the report and unsupported assertions of its own rebuttal expert, Dr. Susan McDonald, to support this assertion.[10]  *See id.* at 21, 24.  But Dr. McDonald's report ***does not contain a single citation to any authority.***  (*See* McDonald Rep. ECF No. 190-12, Ex. 10.)  And when asked at her deposition if there is authority supporting her opinion about the noise levels in Mr. Poret's survey, she responded obliquely, "Yes, there are – I didn't bother to supply them[.]"  (McDonald Dep. at 225:10-18, ECF No. 190-13, Ex. 11.)  Months later, however, Lontex has not supplied any such

---

[10] Dr. McDonald's rebuttal should be excluded for the reasons set forth in NIKE's omnibus motion to exclude.  *See* ECF No. 190-1.

citations either.  Lontex cannot exclude NIKE's expert by relying on the uncited and unsubstantiated assertions of Lontex's own rebuttal expert.

The only case Lontex cites in support of its "noise" argument—*Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.*—is inapposite because it did not involve a *Squirt* survey.  *See* No. 10-cv-3738, 2013 WL 12122803, at *4 (C.D. Cal. June 21, 2013).  That distinction is significant.  A relatively high level of noise is always present when the *Squirt* format is used because, by design, various products are presented in a line-up.  *See, e.g.*, Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 738 (2016) (discussing noise levels in *Squirt* surveys and noting they can be as high as 80%); Swann, *Likelihood of Confusion Studies and the Straitened Scope of* Squirt, 98 Trademark Rep. 739, 754 (2008) (explaining that *Squirt* noise levels can be significant, but "that for substantially overlapping marks, a *Squirt* format has significant scientific underpinnings").  Although Lontex argues that the noise levels in the Poret survey were "6 times the usual limit for noise," (Lontex Br. at 22), it provides no support for that baseless assertion in the context of a *Squirt* survey.  That is because Lontex has entirely made-up the notion that there is a "usual limit" for noise in a *Squirt* survey.  Lontex has not shown that the noise levels in Mr. Poret's *Squirt* survey were even unusual as measured against other *Squirt* surveys (and they are not)—much less that the results are so skewed that they should be excluded.  If Lontex's concerns about the noise levels in the Poret survey are to be addressed at all, it should be through cross-examination—not outright exclusion.

*Second*, Lontex argues the survey universe was too broad to effectively test reverse confusion because the survey "failed to sample Lontex's potential customer base."  Lontex Br. at 16-20.  Lontex's argument fails for several reasons.  At the outset, Lontex is wrong on the facts.  By sampling actual and prospective purchasers of athletic apparel, Mr. Poret *did* in fact survey a

universe of respondents that are firmly within Lontex's hypothesized target customer base.  As explained above, Mr. Nathan testified unequivocally that he would define Lontex's target audience as all "purchasers of athletic apparel. . . . ***really, anybody that wants to be healthy, anybody that want to do any type of activity, whether you're old, whether you're young, whether you're 10 or whether you're 80***[.]"  (Efraim Nathan Dep. 287:17-289:17, ECF No. 190-15, Ex. 13 (emphasis added).)  The factual record belies Lontex's assertion that the survey universe of prospective purchasers of athletic apparel somehow "excluded large parts of Lontex's customer demographics."  Lontex Br. at 17.  That is particularly true since Lontex's reverse-confusion theory rests on the premise that NIKE's use has been so prevalent that it has already saturated the entire market, such that when prospective consumers for Lontex encounter Lontex's product, they believe it is associated with NIKE.  And, once again, nothing in the law or the science supports Lontex's belief that a survey is "irrelevant" and "worthless" unless its universe is limited to a party's "core demographic."  *See* Lontex Br. at 17,19.  Here, the survey universe of Lontex's alleged potential customers was proper for testing both forward and reverse confusion, and nothing in the Third Circuit's decision in *Citizen Financial Group* is to the contrary.

Lontex also appears to take issue with the fact that Mr. Poret's survey did not include Lontex's *actual* customers.  Once again, that is not the law.  "In Lanham Act cases that seek to prove rates of "confusion" among consumers, however, ***it is typical to survey prospective consumers***." *Merisant Co.*, 242 F.R.D. at 322  (emphasis added) (describing Dr. McDonald's survey methods "far from perfect"); *see also Trouble*, 179 F. Supp. 2d at 307-08 (citing cases for proposition that "a survey must be designed to examine an accused mark's impression on a potential consumer").  In this case, it would make no sense to survey Lontex's actual customers for confusion because Mr. Nathan already testified definitively that such customers would *never*

confuse Lontex's products with NIKE's.  (Efraim Nathan Dep. at 919-920, 1036:4-17, 1150-52; *see* SOF ¶¶ 209-212, 217.)

In any event, Lontex is estopped from arguing that NIKE had to have surveyed Lontex's *actual* customers to conduct a valid survey in this case.  Judicial estoppel "seeks to prevent a litigant from asserting a position inconsistent with one that [he or she] has previously asserted in the same or in a previous proceeding.'" *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266 (3d Cir. 2012).  This doctrine applies here, given the positions Lontex took earlier in this litigation on producing its customer list and the limitations it sought (and obtained) on NIKE's ability to contact people on this list.  As this Court is aware, during discovery, Lontex fiercely opposed producing its customer lists raising contrived concerns and accusations that NIKE would "harass" its customers if given the opportunity.  (ECF No. 98 at 1-3 (arguing in opposition to NIKE's motion to compel that NIKE should not be allowed "to scare Lontex's customers with reach-outs . . . including team physicians and therapists of NIKE-sponsored leagues who will implicitly feel a treat").  Once NIKE demonstrated that those customers likely had evidence showing Lontex *did not use the Marks on its inside content/care labels*, the Court ordered Lontex to produce it.  (*See, e.g.*, ECF No. 117-1 at 13-17; *see also* ECF Nos. 133, 136.)  After producing the list, Lontex insisted on a protocol for contacting its customers with very narrow parameters.  (*See, e.g.*, ECF No. 137.)  Lontex appears to have forgotten this history, as it now seems to argue that Mr. Portet's survey would be admissible ***only if*** he had directly contacted *actual* Lontex customers and asked them to participate in a survey being conducted by NIKE for purpose of this litigation.  Surely had NIKE's survey experts contacted more than a hundred Lontex customers and asked them to take consumer surveys, Lontex would have complained.  (*See* ECF No. 98 at 1-3; EC No. 137.)  This Court should not allow Lontex to have it both ways.

In short, Mr. Poret's survey is relevant, helpful to the factfinder, and admissible on the issues of both forward and reverse confusion.  Lontex's contrary argument about noise levels and universe selection lack merit, and in any event would not warrant outright exclusion.  They are, at most, mere technical issues that go to weight not admissibility.  Accordingly, this Court should reject Lontex's attempts to exclude Mr. Poret's survey.

## CONCLUSION[11]

For these reasons, NIKE respectfully requests that this Court deny Lontex's motion to exclude the surveys, testimony, and reports of Dr. Scott and Messrs. Poret and Ezell.

December 4, 2020                                Respectfully submitted,

By:   /s/ *Gina L. Durham*

DLA PIPER LLP (US)

Gina L. Durham (*pro hac vice*)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Frank W. Ryan (*pro hac vice*)
Andrew J. Peck (*pro hac vice*)
Marc E. Miller (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 100201

Ben C. Fabens-Lassen
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Attorneys for Defendant NIKE, Inc.*

---

[11] Lontex's mere three-sentence Rule 403 argument is so cursory and underdeveloped that it hardly warrants a response. *See* Lontex Br. at 24. Lontex simply parrots the words of the Rule without explaining how admission of the surveys would be "unfairly prejudicial, misleading, and wasteful of the Court's time" (*id.*)—let alone explaining why such ostensible concerns "substantially outweigh" the probative value of these surveys. Calling something unfair does not make it so.  As one court explained, "while [the movant's] arguments about the technical reliability of the survey are persuasive, there is little danger of unfair prejudice because [the movant] can attack the survey at trial and convince the jury that the survey is to be accorded little weight." *CytoSport, Inc.*, 894 F. Supp. 2d at 1292.  This rationale forecloses Lontex's Rule 403 argument.