# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LONTEX CORPORATION,

                       Plaintiff,

        v.

NIKE, INC.,

                       Defendant.

Civil Action No.:  18-cv-5623

(Hon. Michael M. Baylson)

**REDACTED PUBLIC VERSION**

---

## DEFENDANT NIKE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO LONTEX'S PARTIAL MOTION FOR SUMMARY JUDGMENT

---

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     SUMMARY OF MATERIAL FACTS.............................................................3

    A.      Lontex .................................................................................................3

    B.      Lontex contacts NIKE demanding compensation and goes silent after
        NIKE rejects its demands....................................................................5

        1.      December 2015: Lontex discovers NIKE's product descriptions...............5

        2.      March to September 2016: the parties exchange correspondence ..............5

        3.      End of 2016: Lontex goes silent and contacts current trial counsel ...........9

        4.      January 2018: Lontex contacts NIKE again .................................9

        5.      March to December 2018: Lontex retains current trial counsel and
             initiates this action ....................................................................10

    C.      Relevant Procedural History ...............................................................11

III.    ARGUMENT ...............................................................................................12

    A.      Legal standard on summary judgment .................................................15

    B.      Laches bars Lontex's claims ...............................................................16

        1.      A presumption of laches should apply........................................17

        2.      Lontex's delay was inexcusable................................................19

        3.      Lontex's delay prejudices NIKE................................................27

    C.      Lontex acquiesced to NIKE's use, barring and/or waiving its claims.................36

    D.      Lontex's state claims are also barred by the applicable statute of
        limitations ...........................................................................................38

        1.      Pennsylvania law applies to Lontex's state claims ...................39

        2.      Lontex's state claims are time-barred under Pennsylvania law................40

IV.     CONCLUSION..............................................................................................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. Miller Formless Co., Inc.*,
  693 F.2d 697 (7th Cir. 1982) ...........................................................................26, 34

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992)...............................................................................34

*AirWair Int'l Ltd. v. Schultz*,
  84 F. Supp. 3d 943 (N.D. Cal. 2015) ......................................................................36

*Alfred Dunhill of London, Inc. v. Kasser Distillers Prod. Corp.*,
  350 F. Supp. 1341, 175 U.S.P.Q. 586 (E.D. Pa. 1972), *aff'd without published
  opinion*, 480 F.2d 917 (3d Cir. 1973) .....................................................................25

*Am. Diabetes Ass'n v. Friskney Family Trust*,
  177 F. Supp. 3d 855 (E.D. Pa. 2016) ............................................................. *passim*

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994)......................................................................................18

*Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*,
  165 F.2d 693 (4th Cir. 1947) ...................................................................................37

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252, 205 U.S.P.Q. 969 (5th Cir. 1980) ....................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................15, 16

*Armco, Inc. v. Armco Burglar Alarm Co., Inc.*,
  693 F.2d 1155 (5th Cir. 1982) .................................................................................26

*Berg Chilling Systems, Inc. v. Hull Corp.*,
  435 F.3d 455 (3d Cir. 2006)......................................................................................39

*Chambers v. Sch. Dist. of Phila. Bd. of Educ.*,
  587 F.3d 176 (3d Cir. 2009)......................................................................................16

*Charvet S.A. v. Dominique France, Inc.*,
  568 F. Supp. 470 (S.D.N.Y. 1983), *aff'd per curiam*, 736 F.2d 846 (2d Cir.
  1984) .........................................................................................................................27

*Cottman Transmission Sys., Inc. v. Melody*,
  851 F. Supp. 660 (E.D. Pa. 1994) ............................................................................40

*Country Floors, Inc. v. Gepner*,
  930 F.2d 1056 (3d Cir. 1991)..................................................................................15

*Covertech Fabricating, Inc. v. TVM Building Products, Inc.*,
  855 F.3d 163 (3d Cir. 2017)...........................................................................36, 37

*Danjaq L.L.C. v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) ...............................................................................35

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*,
  442 F.3d 812 (3d Cir. 2006)..................................................................................36

*Eat Right Foods Ltd. v. Whole Foods Market, Inc.*,
  779 F. App'x. 471 (9th Cir. 2019) ................................................................26, 27

*Eat Right Foods Ltd. v. Whole Foods Market, Inc.*,
  880 F.3d 1109 (9th Cir. 2018) ......................................................................20, 27

*EEOC v. A&P*,
  735 F.2d 69 (3d Cir. 1984)....................................................................................18

*Elvis Presley Enters. v. Elvisly Yours, Inc.*,
  936 F.2d 889 (6th Cir. 1991) ................................................................................28

*Emerson Elec. Co. v. Emerson Quiet Kool Co.*,
  No. CV 17-1846-LPS, 2019 WL 1397244 (D. Del. Mar. 28, 2019) ....................18

*First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*,
  896 F. Supp. 456 (E.D. Pa. 1995) ........................................................................15

*First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*,
  923 F. Supp. 693 (E.D. Pa. 1996) ........................................................................15

*Freeman v. Lawton*,
  46 A.2d 205 (Pa. 1946) .........................................................................................39

*Fruit Indus. v. Bisceglia Bros.*,
  101 F.2d 752 (3d Cir. 1939)..................................................................................20

*Gibson v. Mayor & Council of City of Wilmington*,
  355 F.3d 215 (3d Cir. 2004)............................................................................16, 41

*Giordano v. Claudio*,
  714 F. Supp. 2d 508 (E.D. Pa. 2010) ...................................................................40

*GOLO, LLC v. Goli Nutrition Inc.*,
  No. CV 20-667-RGA, 2020 WL 5203601 (D. Del. Sept. 1, 2020) ................22, 35

*Groupion, L.L.C. v. Groupon, Inc.*,
  826 F. Supp. 2d 1156 (N.D. Cal. 2011) ...............................................................22, 35

*Gruca v. United States Steel Corp.*,
  495 F.2d 1252 (3d Cir. 1974) ...................................................................................18

*Grupo Gigante Sa De CV v. Dallo & Co. Inc.*,
  391 F.3d 1088 (9th Cir. 2004) ......................................................................23, 34, 35

*Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co.*,
  943 F. Supp. 509 (E.D. Pa. 1996) .....................................................................17, 41

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*,
  270 F.3d 298 (6th Cir. 2001) ...................................................................................18

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
  191 F.3d 813 (7th Cir. 1999) ..............................................................................27, 34

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F. 3d 829 (9th Cir. 2002) ....................................................................13, 16, 17

*JBLU, Inc. v. United States*,
  813 F.3d 1377 (Fed. Cir. 2016).................................................................................29

*Johnny's Fine Foods, Inc. v. Johnny's Inc.*,
  286 F. Supp. 2d 876 (M.D. Tenn. 2003)...................................................................18

*Kepner-Tregoe, Inc. v. Exec. Dev., Inc.*,
  79 F. Supp. 2d 474 (D. N.J. 1999), *aff'd*, 276 F.3d 577 (3d Cir. 2001)...................32

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
  313 U.S. 487 (1941)...................................................................................................39

*Lomando v. United States*,
  667 F.3d 363 (3d Cir. 2011).......................................................................................15

*Merisant Co. v. McNeil Nutritionals, LLC*,
  515 F. Supp. 2d 509 (E.D. Pa. 2007) .......................................................................19

*Miller v. Glenn Miller Productions, Inc.*,
  454 F.3d 975 (9th Cir. 2006) ....................................................................................29

*Morgan v. Hawthorne Homes, Inc.*,
  No. 04 Civ. 1809, 2009 WL 1010476 (W.D. Pa. Apr. 14, 2009) ............................33

*NAACP v. NAACP Legal Defense & Educational Fund, Inc.*,
  753 F.2d 131 (D.C. Cir. 1985) ..................................................................................27

*Nartron Corp. v. STMicroelectronics, Inc.*,
  305 F.3d 397 (6th Cir. 2002) ..................................................................................33, 34

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
  143 F.3d 800 (3d Cir. 1998).................................................................................................36

*Perma-Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.*,
  630 F. Supp. 2d 516 (E.D. Pa. 2008) ...................................................................................39

*Polaroid Corp. v. Polorad Electronics*,
  287 F.2d 492 (2d Cir. 1961).................................................................................................34

*Procter & Gamble Co. v. J. L. Prescott Co.*,
  102 F.2d 773 (3d Cir. 1939).................................................................................................25

*Ross v. Johns-Manville Corp.*,
  766 F.2d 823 (3d Cir. 1985)...........................................................................................15, 39

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006)......................................................................................18

*Santana Prods. v. Bobrick Washroom Equip., Inc.*,
  401 F.3d 123 (3d Cir. 2005)...................................................................................... *passim*

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
  627 F. Supp. 2d 1096 (N.D. Cal. 2008) ..........................................................................17, 35

*Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*,
  621 F.3d 981 (9th Cir. 2010) ...............................................................................................36

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*,
  No. SA CV 06-679 AHS, 2011 WL 1211477 (C.D. Cal. Mar. 30, 2011) ..............................37

*Specht v. Google Inc.*,
  747 F.3d 929 (7th Cir. 2014) ...............................................................................................29

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*,
  77 F.3d 1325 (11th Cir. 1996) (Birch, J., concurring) ..........................................................37

*Tandy Corp. v. Malone & Hyde, Inc.*,
  769 F.2d 362 (6th Cir. 1985) ...............................................................................................28

*United States v. Amwest Surety Ins. Co.*,
  54 F.3d 601 (9th Cir. 1995) .................................................................................................36

*United States v. King Features Entm't, Inc.*,
  843 F.2d 394 (9th Cir. 1988) ...............................................................................................36

*Univ. of Pittsburgh v. Champion Prods.*,
    686 F.2d 1040 (3d Cir. 1982)...................................................................16, 17, 20

*Wafer Shave, Inc. v. Gillette Co.*,
    857 F. Supp. 112 (D. Mass. 1993), *aff'd*, 26 F.3d 140 (Fed. Cir. 1994)................................25

*Warren Pub. Co. v. Spurlock*,
    645 F. Supp. 2d 402 (E.D. Pa. 2009) (Baylson, J.)................................................29

*Welding Engineers Ltd. v. NFM/Welding Engineers, Inc.*,
    352 F. Supp. 3d 416 (E.D. Pa. 2018) ...................................................................16, 41

*Zimmerlink v. Zapotsky*,
    539 F. App'x 45 (3d Cir. 2013) ...........................................................................16, 41

**Statutes**

15 U.S.C. § 1115(b)(4) ............................................................................................1

15 U.S.C. § 1117(a) ..........................................................................................11, 17

42 Pa. C.S.A. § 5521(b).....................................................................................39, 40

42 Pa. C.S.A. § 5524(7) ....................................................................................*passim*

54 Pa. C.S.A. § 1123...............................................................................................40

Lanham Act.........................................................................................................*passim*

Pennsylvania's Unfair Trade Practices and Consumer Protection Law .................................14, 17

**Other Authorities**

Fed. R. Civ. P. 26(a)(1).....................................................................................10, 36

Fed. R. Civ. P. 56(a) ...............................................................................................15

Fed. R. Civ. P. 56(f)(1) .....................................................................................16, 41

2 J. McCarthy Trademarks and Unfair Competition § 573 (2d ed. 1984)...........................15

1 McCarthy on Trademarks and Unfair Competition § 2:22 (5th ed.) .......................28, 29

3 McCarthy on Trademarks and Unfair Competition § 22:1.50 (5th ed.) ........................13

6 McCarthy on Trademarks and Unfair Competition § 31:11 (5th ed.) ...........................24

6 McCarthy on Trademarks and Unfair Competition § 31:12 (5th ed.) ...........................28

6 McCarthy on Trademarks and Unfair Competition § 31:16 (5th ed.) ............................25

6 McCarthy on Trademarks and Unfair Competition § 31:19 (5th ed.) ............................23

6 McCarthy on Trademarks and Unfair Competition § 31:19 (5th ed.) ............................26

6 McCarthy on Trademarks and Unfair Competition § 31:42 (5th ed.) ............................38

Defendant NIKE, Inc. ("NIKE") respectfully submits this memorandum of law in opposition to Plaintiff Lontex Corporation's ("Lontex") motion for partial summary judgment as to NIKE's Fourteenth and Fifteenth Affirmative Defenses.  (ECF No. 188.)

## I.  <u>INTRODUCTION</u>

NIKE, like many other athletic apparel companies, has long used common words like "cool" and "compression" to describe features and benefits of its apparel.  Since at least 2004, its "NIKE Pro" line has included baselayer garments with a compression fit and thermoregulation features to keep the wearer cool.

In 2006, Lontex sought registration for the phrase "COOL COMPRESSION" as a trademark.  While claiming to the U.S. Patent & Trademark office the phrase would function as a trademark for its company, Lontex made no use of that phrase between 2008 and 2016 on any brochure, website, social media, blog, press release, other piece of promotional material or in any email communications with customers.  This remained the case until the end of 2015, when Lontex's principle saw the words "cool" and "compression" next to each other within longer phrases describing some NIKE products on pages within the nike.com website.  While use of common words for their commonly understood meanings does not constitute infringing use of a trademark,[1] as Lontex's principal admitted, Lontex nevertheless decided it would threaten NIKE and try to license to NIKE its COOL COMPRESSION marks (which until then had not appeared in Lontex's marketing materials).  NIKE investigated Lontex's claims and offer of a license in 2016 and declined based on an investigation that revealed NIKE had not used these common words as a trademark, Lontex's lack of use, and the limited scope of Lontex's purported trademark rights.  Lontex then waited for years to bring this suit against NIKE.

---

[1] Such use is a fair use, for which the Lanham Act grants a complete affirmative defense under 15 U.S.C. § 1115(b)(4).  *See* Sec. III.D. of NIKE's Memorandum of Law in Support of its Motion for Summary Judgment.  (ECF No. 191-1.)

Now, in this partial motion for summary judgment, Lontex seeks to excuse its failure to promptly enforce its purported rights and claims NIKE's delay-based defenses should be dismissed because Lontex filed its claims within six years of discovering the alleged wrongful conduct. Lontex "borrows" this six-year litmus test from the statute of limitations in the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")—a statute under which Lontex alleges no wrong, but which it claims is closely analogous to its asserted trademark claims. But the more closely analogous claim here is one for state tort actions for injury to personal property, which has a two-year statute of limitations under 42 Pa. C.S.A. § 5524(7). Regardless of the statute this Court ultimately applies, Lontex's long delay cannot be excused given the record facts here.

In cases involving trademark infringement, rightsholders who have bona fide concerns about confusion occurring in the marketplace and damage to their brand flowing from such confusion, typically waste no time seeking judicial intervention, and often will seek a preliminary injunction to enjoin the allegedly infringing activity during pendency of the action. Lontex did no such thing here.[2]  In fact, the years of delay that led up to the filing of this lawsuit are notable for the absence of any marketplace confusion and for Lontex's repeated efforts to extract payments from NIKE based on alleged trademark rights which it never promoted. Rather than manifest an interest in protecting an established brand from confusion in the marketplace, Lontex very publicly manifested its interest in disposing of these trademark registrations to whoever would pay for them, including by auctioning them on the U.S. Trademark Exchange.

These actions cannot be squared with Lontex's claims that the COOL COMPRESSION mark was an integral part of its business identity, inseparable from the SWEAT IT OUT brand,

---

[2] Lontex's failure to seek a preliminary injunction also discloses deep flaws in Lontex's claims.  Undisputed facts demonstrate that Lontex's claims fail as a matter of law because no actual consumer confusion ever occurred, nor was ever likely to occur.  Likelihood of confusion is the keystone of any trademark infringement claim and an issue on which Lontex cannot carry its burden of proof.  (*See* NIKE's Motion for Summary Judgment at ECF Nos. 191, 192.)

which Lontex has used throughout the years.  Rather than act as a diligent brand owner—consistently promoting, investing in, and protecting its trademark rights, reference to COOL COMPRESSION was nowhere to be found on any materials put out by Lontex until around the same time it retained an attorney to contact NIKE hoping to strike a deal.

Lontex wants the Court to believe that the years Lontex waited to sue NIKE should be meaningless because its delay is less than six years long, but those years are an eternity in the context of a trademark infringement claim where Lontex is asserting that the allegedly wrongful conduct destroyed its business to the tune of over ███████  It strains credulity for Lontex to suggest that its years-long delay was excusable if NIKE was, in fact, destroying over a ██████ of business opportunities, as Lontex has alleged.  Any reasonable finder of fact is going to ask why Lontex would have waited so long if the stakes were purportedly so high.  No justification exists under the law.  What does exist is extreme prejudice to NIKE—both economic and evidentiary.

Lontex's motion for partial summary judgment on NIKE's Fourteenth (statute of limitations) and Fifteenth Affirmative Defenses (laches/acquiescence) should be denied and summary judgment on NIKE's Fourteenth Affirmative Defense should be entered in NIKE's favor.

## II.   SUMMARY OF MATERIAL FACTS[3],[4]

### A.   Lontex

Lontex is operated by Efraim Nathan and his daughter.  (SOF ¶¶ 1-2.)  Lontex does business as SWEAT IT OUT and has been selling compression garments under the SWEAT IT

---

[3] References herein to "SOF" are to NIKE's Statement of Undisputed Facts in Support of its Motion for Summary Judgment, setting forth, in numbered paragraphs, all undisputed material facts with record references.  (ECF NO. 192.)

[4] Pursuant to D.2. of the Court's Pretrial Procedures, NIKE submits herewith a Statement of Disputed or Undisputed Facts ("Response SOF") responding to the numbered paragraphs set forth in Lontex's Statement of Undisputed Facts (ECF No. 188-2), either admitting that the paragraph is not disputed, or if it is disputed, setting forth those facts contended to be in dispute, with record reference to where the party's contention is supported in the papers.  NIKE also submits herewith a Statement of Additional Undisputed Facts ("SOAF") setting forth, in numbered paragraphs, all undisputed material facts with record references.

OUT brand since 1990.  (SOF ¶ 4.)  In early 2006, Lontex created a new business to sell its compression garments to the healthcare industry under a proposed new brand called COOL COMPRESSION.  (SOF ¶ 6.)  But by 2007, Lontex dropped the idea of a separate COOL COMPRESSION business and never sold any compression garments that were outwardly branded with the COOL COMPRESSION trademarks.  (SOF ¶¶ 32, 34, 36, 37.)

Between 2008 to January 2016, Lontex continued to market its compression garments under the SWEAT IT OUT brand, making *no mention of COOL COMPRESSION* on or within any brochure, website, social media, blog, press release, other piece of promotional material or in any email communications with customers (including the professional teams and famous athletes Lontex touts in its opening brief).  (SOF ¶¶ 34, 45, 46, 62, 64-69, 89, 90.)  Lontex's products and marketing materials continued to be outwardly branded with the SWEAT IT OUT mark and the company's sun logo.  (SOF ¶¶ 44-46, 67, 74, 80, 85, 86, 88.)  Lontex used the SWEAT IT OUT brand to advertise, market, and promote its compression garments and the phrase "True Compression" (not "Cool Compression") to drive traffic to its website.  (SOF ¶¶ 73, 75.)  Lontex has not produced a single written communication with any customer or potential customer between 2008 and January 2016 that contains use of COOL COMPRESSION.  (SOF ¶ 90.)

Quite the contrary, rather than using its COOL COMPRESSION trademarks, during this same time period, Lontex was actually trying to sell these registrations as standalone assets, including by publicly listing its registrations on the U.S. Trademark Exchange's online marketplace, but was never successful in finding a buyer to meet its asking price.  (SOF ¶¶ 114-119; SOAF ¶ 237).

NIKE is the world's leading designer, marketer and distributor of authentic athletic footwear, apparel, equipment, and accessories for a wide variety of sports and fitness activities.

(SOF ¶ 120.)  The NIKE brand is one of the most recognizable in the world, most recently ranked as the 16th best brand globally.  (SOF ¶ 122.)

Since 2004, NIKE has sold a popular line of NIKE Pro products that provide thermoregulation benefits to the wearer, with a family of products that keep the wearer "cool" and a family of products that keep the wearer "warm."  (SOF ¶¶ 128-135)  Because products in the NIKE Pro product line were offered in a variety of fit preferences, including a "fitted" fit and a tighter "compression" fit, the words "cool" and "compression" sometimes appeared next to each other when describing products in certain limited written materials for a limited period of time. (SOF ¶¶ 138-140, 145, 162-166.)  NIKE Pro products prominently feature NIKE's SWOOSH mark on the chest or leg of the garment and the NIKE mark and "NIKE Pro" branding on the waistband, neck tape, hemline, and interior labeling.  (SOF ¶¶ 150-153.)  No NIKE product bears the phrase "Cool Compression" anywhere on the garment, garment labeling, or on any hangtags included with the garment.  (Id.)  NIKE never had any advertising campaigns featuring "Cool Compression."  NIKE also never displayed the word "cool" next to the word "compression" in any other places that a consumer might encounter when looking to purchase a product from NIKE, such as retail store signage, press releases, athlete endorsements, or e-mail blasts.  (SOF ¶ 149.)

**B.     Lontex contacts NIKE demanding compensation and goes silent after NIKE rejects its demands**

**1.     December 2015: Lontex discovers NIKE's product descriptions**

Mr. Nathan testified that he saw some product descriptions containing "cool" next to "compression" on product pages within the nike.com website in December 2015, but Lontex did not immediately reach out to NIKE.  (SOF ¶¶ 184, 187, 197.)

**2.     March to September 2016: the parties exchange correspondence**

Lontex readily admits that, after it discovered these NIKE product descriptions, it began

putting COOL COMPRESSION on "everything in 2016," including invoices; website; brochure; tweets; social media, and product packaging.  (SOF ¶¶ 198, 199, 200, 201, 203.)  On May 13, 2016, Lontex asked its digital marketing agency to ███████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████  (SOAF ¶ 238.)  Lontex even asked its digital marketing agency to create tweets using COOL COMPRESSION that ████████████████████████████████████████

████████████████████████████████████████████████████████████  (SOF ¶ 203, SOAF ¶ 239.)

Lontex hired a contingency fee attorney and, on March 3, 2016, Mr. Nathan purchased a NIKE Pro product (Style No. 703094 which Lontex now accuses of being infringing), and the following day admitted: ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████  (SOF ¶ 185-186.)  Nevertheless, on April 8, 2016, Lontex had its attorney send a letter to NIKE claiming that Lontex was the owner of COOL COMPRESSION, that Lontex had used the COOL COMPRESSION marks in connection with athletic apparel since 2007, and that NIKE was allegedly using the COOL COMPRESSION marks without Lontex's authorization. (SOF ¶ 187.)

Thus, as early as April 2016, Lontex alleged in written correspondence to NIKE that NIKE's textual uses of the words "cool" and "compression" to describe NIKE products constituted an infringement of Lontex's alleged rights in the "Cool Compression" trademark, according to Lontex.  (SOF ¶ 187.)  More specifically, Lontex claimed that NIKE's conduct would allegedly create "a strong likelihood of forward and reverse confusion in the marketplace," yet Lontex took no action to enjoin this purportedly confusing use.  (*Id.*)  Rather, Lontex stated that, "██████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ (SOF ¶¶ 187, 189.)

NIKE looked at its own use of the words "cool" and "compression" that Lontex claimed was subject to its infringement claims as well as the trademark rights Lontex claimed to own. NIKE concluded that it was using the word "cool" to describe the cooling thermoregulation feature of its NIKE Pro apparel just as it had since 2004 and the word "compression" to describe the tight fit of the apparel just as it had since 2009. (SOF ¶ 188.) NIKE promptly wrote back to Lontex explaining the descriptive nature of its usage of these terms, refuted Lontex's claims of infringement, and declined the license offer. (*Id*.)

NIKE choose not to include all details of its investigation to Lontex regarding the findings NIKE had made regarding Lontex's purported COOL COMPRESSION marks. But, NIKE's investigation had uncovered several inconsistencies, most notably around Lontex's claims of continuous use of the COOL COMPRESSION mark. NIKE learned, for example, that prior to January 2016, Lontex's website made no reference to "COOL COMPRESSION." (SOF ¶ 75.) NIKE also learned that Lontex had tried to sell the COOL COMPRESSION marks on the U.S. Trademark Exchange. (SOAF ¶ 237.) In addition, NIKE retained the services of a private investigator who purchased a compression product from Lontex's website, and received a product branded only with SWEAT IT OUT *not* COOL COMPRESSION. (SOF ¶ 47.)

In its letter correspondence, NIKE also informed Lontex that, notwithstanding NIKE's disagreement with Lontex's claims, NIKE had already begun implementing changes to the way it displayed the wording used to describe features of its products on product pages within the nike.com website. (SOF ¶ 188.) This was true, as internally at NIKE, discussions were already

underway (prior to and independent of Lontex's April 8, 2016 letter) to simplify consumer-facing product descriptions by removing various product descriptors, such as those for length and fit.[5] (SOF ¶¶ 156-158.)   Thus, as of May 2016, Lontex was aware that NIKE's business objectives would result in shortened product descriptions so that at some point in time descriptions would not include the words like "compression" or "fitted."   NIKE did not promise Lontex that it would cease using "cool compression" for legal reasons because NIKE had never used "cool compression" as a composite phrase for anything.  (SOF ¶ 188.)  NIKE also did not promise Lontex that it would align the timing of its business objectives to simplify consumer-facing product descriptions because that business objective had nothing to do with Lontex or its letter.[6]  (*Id.*)

Lontex was not deterred in its attempts to extract money out of NIKE.  Lontex sent a May 16, 2016 letter in which it reiterated its claims and repeated its offer to discuss ████████████ ████████████████████████ for the COOL COMPRESSION marks.  (Response SOF ¶¶ 17-18.)  In a July 21, 2016 letter, Lontex suggested that NIKE's pre-existing business plans had something to do with its trademark claim ████████████████████████████ ████████████████████████████████████████████ ████████████ (SOF ¶ 191; Response SOF ¶¶ 21-22.)  NIKE again declined.  (SOF ¶¶ 188-191.)  The parties' communications continued into September and October 2016, with Lontex stating ████████████████████████████ (Response SOF ¶ 27-29.)  This "offer" was not accepted by NIKE, the discussions stopped and Lontex went silent.

---

[5] Indeed, NIKE internally referred to this business objective as "the new naming structure update," and believed that this update, which had been implemented even before NIKE received Lontex's first letter, "should resolve [Lontex's] issue as Compression should no longer show up in the product name."  (Response SOF ¶ 25.)

[6] NIKE even explained to Lontex that NIKE was "in the process of changing the format of all descriptors on its website and that should be completed in the coming months," but that the "process takes time."  (Response SOF ¶¶ 16, 20.) While NIKE's business objective was in process, "as a gesture of good faith," NIKE "attempted to offset 'cool' and 'compression' even further with the use of a hyphen."  (Id. at ¶ 20.)

### 3. End of 2016: Lontex goes silent and contacts current trial counsel

Near the end of 2016, Lontex's contingency attorney who had sent the original correspondence to NIKE, terminated his relationship with Lontex. (SOAF ¶ 240.) Lontex initiated talks to retain Ben Wagner, its current trial counsel in this action.[7] (SOF ¶ 192.) Lontex did not sue then either. Rather, Lontex and trial counsel Mr. Wagner remained in close contact "every week" between the end of 2016 and January 2018 and, with Mr. Wagner's close supervision, Lontex increased its efforts to create the appearance of consumer-facing use of the COOL COMPRESSION marks. (SOF ¶¶ 193, 194, 198-208.)

During this end of 2016 to 2018 period, Lontex did not contact NIKE to complain about any textual uses of the words "cool" and "compression" where the words sometimes appeared next to each other in third party retailer materials when describing NIKE Pro products (uses that Lontex has now belatedly claimed are NIKE's responsibility from a damages perspective).

### 4. January 2018: Lontex contacts NIKE again

In 2018, Mr. Wagner, whose firm at the time, Mintz Levin, had still not been formally retained, recommended instead that Lontex retain a former Mintz Levin partner to contact NIKE. (SOAF ¶ 243.) On January 23, 2018, that attorney sent a letter to NIKE. (SOF ¶ 195.) In this letter, Lontex's new attorney stated:



---

[7] Mr. Wagner was then affiliated with Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. (SOF ¶ 192.) Mr. Wagner was affiliated with Mintz Levin when this action was instituted on December 31, 2018. (ECF No. 1.) On May 16, 2019, Mr. Wagner notified the Court that he moved to Troutman Sanders LLP. (ECF No. 30.) On March 11, 2020, in anticipation of the merger between Troutman Sanders LLP and Pepper Hamilton LLP, Michael Schwartz of Pepper Hamilton LLP entered an appearance in this action and Lontex's former Pennsylvania local counsel, Michael Dubin, withdrew his appearance on April 16, 2020. (ECF Nos. 146, 160.)

(*Id.*)  In this letter, Lontex did not claim that NIKE was still infringing—referring only to "possible continued infringement by Nike"—while asking NIKE to help "stop other distributors such as ███████████████████████████████ from misusing the COOL COMPRESSION® marks."  (*Id.*)  Lontex admits it never itself attempted to contact any of those retailers regarding their alleged infringement.  (SOAF ¶ 244.)  NIKE again declined to pay Lontex for its purportedly "massive loss," and within two months Lontex had fired this new attorney and formally retained Mr. Wagner.  (SOAF ¶¶ 240-243.)

### 5.   March to December 2018: Lontex retains current trial counsel and initiates this action

Once Mr. Wagner had been retained, Lontex increased its efforts to create the appearance of consumer-facing use of the COOL COMPRESSION marks.  Lontex instructed its digital marketing agency to start building a new website and to add COOL COMPRESSION to its advertising keywords, social media platforms, blog posts, press releases, and any other promotion content.  (SOF ¶¶ 202, 204-208.)  Lontex referenced the urgency of adding the COOL COMPRESSION Marks to its advertising materials, even up to the day it initiated this action. (SOAF ¶¶ 245, 246.)

Lontex's compression garments have a fabric tag or label sewn into the garment's interior which provides the garment's fabric content and care instructions, *i.e.*, "machine wash cold" (hereinafter referred to as the "Content Label").  (SOAF ¶ 247.)  Sometime *after* December 2015, Lontex began sewing a Content Label into some of its garments that included the words "Cool Compression." (SOAF ¶ 248.)  In the months just before and just after the initiation of this lawsuit, Lontex sold and/or gave away compression garments using these "Cool Compression" Content Labels to a small number of hand-selected customers (and Lontex later disclosed these same hand-selected customers on its FED. R. CIV. P. 26(a)(1) Amended Initial Disclosures as individuals

having experienced Lontex's COOL COMPRESSION trademark)  (SOAF ¶ 250.)  When NIKE

subpoenaed customers not hand selected by Lontex who had made purchases of Lontex's products

*prior to* December 2015, every single one of the customers who responded to NIKE's subpoenas

provided images of compression garments with a Content Label that said "Sweat It Out" – *not*

*"Cool Compression."*[8]  (SOAF ¶ 249.)

### C.     Relevant Procedural History

Lontex filed this lawsuit on December 31, 2018, claiming that NIKE now owed it at least

███████  (SOF ¶ 197.)  Lontex alleged in its Complaint that NIKE's written descriptions that

have strings of words—like "728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP"

or "728049 NIKE PRO COOL 6" COMPRESSION SHORT"—cause "consumer confusion in the

market for athletic apparel, including because it indicated [(sic)] that NIKE is affiliated with

Lontex and has obtained access to Lontex's highly-regarded trademark COOL COMPRESSION

technology."  (ECF No. 1 at ¶¶ 20, 28.)

Based only on these textual word strings, Lontex's Complaint asserted a kitchen sink of

claims, apparently designed to needlessly complicate this case and, more importantly, maximize

Lontex's damages claims against NIKE.   First, Lontex pleaded conclusory allegations of

"counterfeiting" in an effort to recover enhanced statutory damages (a remedy not available in a

traditional trademark infringement case under 15 U.S.C. § 1117(a)).  (*Id.* ¶ 40.)  Second, in another

effort to recover enhanced remedies, Lontex pleaded a state-law count framed as "Statutory and

Common Law Unfair Competition/Passing Off," which did not state a single, unitary cause of

---

[8] Lontex vigorously objected to producing any customer information to NIKE from the pre 2015 time period claiming that NIKE should not be allowed to contact Lontex's customers but rather should rely only on the testimony of the witnesses that Lontex would identify.  (ECF Nos. 52, 87, 96, 98.)  When NIKE prevailed on its motion to compel Lontex's broader customer information, Lontex insisted that NIKE only contact such customers using a strict protocol that limited NIKE's ability to interact with these customers, and also attempted to persuade the Court that the protocol should allow Lontex—not NIKE—to select the customers who would be subpoenaed. NIKE ultimately prevailed in obtaining a court-approved protocol that allowed it to select customers to subpoena.  (ECF Nos. 117-1, 136, 147.)

action, but rather an undifferentiated aggregation of statutory and common-law claims arising under the laws of at least *seventeen* different jurisdictions, including Pennsylvania. (*Id.* ¶¶ 69-75.)

On February 19, 2019, NIKE moved to dismiss the counterfeiting "claim" as implausible and the state law claims as procedurally and substantively deficient. (ECF No. 18.)  On March 12, 2019, while NIKE's motion was pending, Lontex filed the First Amended Complaint (the "FAC"). (ECF No. 20.)   Lontex asserted the same implausible counterfeiting "claims," which were ultimately dismissed with prejudice when the Court granted NIKE's motion to dismiss those claims from the FAC.  (ECF Nos. 37-38.)  As for Lontex's state law claims in the FAC, Lontex abandoned its claims under Pennsylvania law, which were time-barred.  (ECF No. 20 at ¶¶ 74, 85.) Lontex still asserted claims under fourteen different inapplicable bodies of state law.[9]  (*Id.*)

In its Answer to the FAC, NIKE raises several affirmative defenses, including that Lontex's claims are barred, in part or in whole, by:  the applicable statute of limitations (Fourteenth Affirmative Defense); and the equitable doctrines of laches, waiver, acquiescence, and/or estoppel (Fifteenth Affirmative Defense).  (ECF No. 45.)  It is the delay-based defenses in Fourteenth and Fifteenth Affirmative Defense that are the subject of this motion.

## III.   **ARGUMENT**

For purposes of addressing the affirmative defenses at issue here, it is helpful to first focus on the claims to which they apply and the interplay of laws relevant to delay-based defenses in trademark actions.  Lontex asserts claims for trademark infringement and unfair competition under the federal Lanham Act and the statutory and common laws of various states.  While it is typical to assert a state claim that is the corollary to the federal infringement claims in the state where the federal claim has been filed—e.g. Pennsylvania common law or state statutory trademark

---

[9] Lontex now admits that its vaguely pleaded state law claims are merely intended to replicate the federal claims and would fall with the federal claims.  (Lontex Br. at 16.)

infringement along with the Lanham Act claims for a claim filed in Pennsylvania, it is not typical to do what Lontex has done, which is to purportedly interplead—by vague reference only—the laws of 14 different states into two general counts entitled "State Common Law Trademark Infringement" and "State Statutory Trademark Infringement and Unfair Competition." *See*, *e.g.,* 3 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 22:1.50 (5th ed.) ("[i]t is the usual practice in a Complaint for trademark infringement based on the federal Lanham Act to include as alternative counts infringement under the relevant state statutory and/or common law."). When Lontex filed its FAC, it dropped all reference to Pennsylvania statutory and common law, following NIKE's initial motion to dismiss which brought to the fore Pennsylvania's two-year statute of limitations for tort claims, 42 Pa. C.S. § 5524(7). (ECF No. 18-1.) Lontex never sought to further delineate the particular state laws outside of Pennsylvania which it believes NIKE has violated or how NIKE violated them, and now has admitted that its vaguely pleaded state law claims are intended to replicate its federal claims and would rise and fall together. (Lontex Br. at 16.)

Unfortunately for Lontex, it is now left in quite a predicament because of its delay, and through its motion, seeks to obscure the poignancy of that delay from the finder of fact. While the Lanham Act does not have a statute of limitations, the delay-based defenses of laches and acquiescence are very much at issue when an action is filed many years after a rightsholder has discovered the alleged infringement. *See e.g., Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F. 3d 829, 835 (9th Cir. 2002) ("Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights."). In fact, laches is such an important delay-based defense that courts around the country apply a *presumption* of laches with the passage of time that corresponds to the statute of limitations

of the most closely analogous law (to trademark law) under the law of state where the district court sits.  *See Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005).  Whether that statute of limitations has run for the analogous state statute determines which party bears the burden of proof on the laches defense.  In this case, NIKE's position is that the most analogous state statue is Pennsylvania's two-year statute of limitations for tort claims.  42 Pa. C.S. § 5524(7).  This is logical as it is the same statute of limitations that forced Lontex to amend its pleading to drop any reference to Pennsylvania statutory and common law in its FAC.  Under this construct, NIKE is entitled to a presumption of laches because Lontex discovered the conduct it claims to be an infringement in 2015, which is more than two years before it filed suit.

For purposes of its motion, Lontex has lobbied for this Court to apply the six-year statute of limitations in Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) to suggest that it does not bear the burden on establishing the *absence of laches* and in fact that the delay should be ignored altogether without that defense being put before a finder of fact.  While the Third Circuit has indicated that the UTPCPL statute is the most analogous statute for purposes of determining the presumptive laches period in false advertising claims, it has not addressed this issue for routine trademark claims like those brought against NIKE by Lontex in this action. *Santana*, 401 F.3d at 135-40.  As discussed more fully below, it makes more sense to apply the two year statute of limitations for those corollary state claims that Lontex voluntarily dropped from its FAC when faced with NIKE's first motion to dismiss, rather than a state statute which is not even pled by Lontex in this action.  But, in any event, the parties' dispute about whether two or six years should apply to the presumption of laches does not change the ultimate result which is that the laches defense cannot be disposed of on summary judgment.  Laches (NIKE's Fifteenth Affirmative defense) "usually requires the kind of record only created by full trial on the merits"

because "the correct disposition of the equitable defense of laches can only be made 'by a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public.'" *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1066 (3d Cir. 1991) (quoting 2 J. MCCARTHY TRADEMARKS AND UNFAIR COMPETITION § 573 (2d ed. 1984)). Acquiescence (NIKE's Fifteenth Affirmative Defense), the delay based defense which is highly similar to laches, fairs no better on summary judgment. *First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 896 F. Supp. 456, 460 (E.D. Pa. 1995) (denying summary judgment on acquiescence and laches because of existence of material disputes of fact and conflicting evidence), 923 F. Supp. 693, 702-03 (E.D. Pa. 1996) (finding, after bench trial, laches and acquiescence barred plaintiff's claims).

As to NIKE's Fourteenth Affirmative Defense—that the state statute of limitations bars the vaguely pled state claims in the Fourth and Fifth Counts of Lontex's FAC, summary judgment is appropriate—but for NIKE, not Lontex. Even though Lontex references 14 different state laws, Pennsylvania choice-of-law rules dictate that Pennsylvania statute of limitations apply. *See Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985). Pennsylvania's two-year statute of limitations for tort claims, 42 Pa. C.S. § 5524(7), applies to statutory and common law trademark infringement. Under this construct, NIKE is entitled to judgement as a matter of law because Lontex discovered the conduct it claims to be an infringement in 2015, which is more than two years before it filed suit.

### A.    Legal standard on summary judgment

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute is one that 'may reasonably be resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986)). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

"In determining whether such relief is warranted, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (quoting *Anderson*, 477 U.S. at 255). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson*, 477 U.S. at 251-52). "[P]ursuant to Rule 56(f)(1), a court may, after giving notice and a reasonable time to respond, "grant summary judgment for a nonmovant." *Welding Engineers Ltd. v. NFM/Welding Engineers, Inc.*, 352 F. Supp. 3d 416, 428–29 (E.D. Pa. 2018) (quoting FED. R. CIV. P. 56(f)(1)). "Although notice of a court's intent to grant summary judgment pursuant to Rule 56(f)(1) is typically required,…the Third Circuit recognized…that an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue." *Id.* (citing *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 223-24 (3d Cir. 2004) (affirming district court's grant of summary judgment in favor of a non-moving party and against a party that brought a motion for summary judgment, without first giving notice to moving party)); *see also  Zimmerlink v. Zapotsky*, 539 F. App'x 45, 49 (3d Cir. 2013).

### B.      Laches bars Lontex's claims

Laches is an equitable doctrine that applies to bar claims where there is: "(1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *See Santana Prods.*, 401 F.3d at138 (citing *Univ. of Pittsburgh v. Champion Prods.*, 686 F.2d 1040, 1044 (3d Cir. 1982)); *see also Jarrow Formulas, Inc.*, 304 F.3d at 835 ("Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights."). Laches "in effect works an equitable estoppel

barring all relief….” *Champion Prods. Inc.*, 686 F.2d at 1044; *Jarrow Formulas*, 304 F. 3d at 835, 840 (laches completely bars not only claims for past damages but also claims for injunctive relief). Laches is a defense to Lanham Act claims and related state law claims. *See Champion Prods. Inc.*, 686 F.2d at 1044 (“Pennsylvania and federal law in this field are identical for all practical purposes.”); *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1109 (N.D. Cal. 2008) (granting summary judgment on laches for all Lanham Act and California claims).

Here, the undisputed facts show that Lontex delayed inexcusably in bringing suit and that Lontex's delay has severely prejudiced NIKE.

### 1.  A presumption of laches should apply

The first step in analyzing the laches defense is to determine which statute of limitations governs Lontex's claims.  In Counts I through III of the FAC, Lontex asserts claims for trademark infringement under Lanham Act §§ 32 and 43(a) (15 U.S.C. §§ 1114, 1125(a)).  The Lanham Act does not contain a statute of limitations.  “Instead, the Act subjects all claims to the principles of equity.” *Santana*, 401 F.3d at 135 (quoting 15 U.S.C. § 1117(a)).  Courts look to the most closely analogous statute of limitations under the law of state where the district court sits.  The Third Circuit has previously held that a claim for false advertising (not trademark infringement) under the Lanham Act § 43(a) is “most analogous” to a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (“UTPCPL”), 73 Pa. Stat. Ann. § 201-1 et seq., which is subject to a six-year statute of limitations. *Santana*, 401 F.3d at 138.  But Lontex has not alleged a false advertising claim here.  Thus, the Court should, as other courts in the Circuit have done, find that Lontex's Lanham Act claims for trademark infringement under § 32 and unfair competition under § 43(a) are most closely analogous to state tort actions for injury to personal property, which have a two-year statute of limitations under 42 Pa. C.S.A. § 5524(7). *See Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co.*, 943 F. Supp. 509, 517 (E.D. Pa.

1996); *see also Emerson Elec. Co. v. Emerson Quiet Kool Co.*, No. CV 17-1846-LPS, 2019 WL 1397244, at \*3 (D. Del. Mar. 28, 2019) (citing *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 856 (D. Del. 2006)) ("The most analogous Delaware statute of limitations to Lanham Act claims is the three-year statute of limitations for non-violent tort claims."); *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298 (6th Cir. 2001) (applying Michigan state limitation for actions for injury to personal property); *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003) (finding a § 32 infringement suit barred by the state's three-year period for tortious injury to property and a § 43(a) unfair competition suit barred by the one-year period under the state's Consumer Protection Act).  Indeed, there is good reason for the Court to apply Pennsylvania's tort statute of limitations to Lontex's Lanham Act claims of trademark infringement and unfair competition: "the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1433 (3d Cir. 1994).

Whether that statute of limitations has run determines which party bears the burden of proof on the issue of laches.  *See Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir. 1974) ("The length of delay, while not mandating the outcome, does control burdens of proof.").  Once the statute of limitations has run, "[NIKE] 'enjoys the benefit of a presumption of inexcusable delay and prejudice.'"  *Santana*, 401 F.3d at 138 (citing *EEOC v. A&P*, 735 F.2d 69, 80 (3d Cir. 1984)).  To rebut this presumption, the Third Circuit has "consistently held," that plaintiffs like Lontex "must prove that laches does not exist by showing that its delay was excusable *and* that its delay did not prejudice the defendant."  *Santana*, 401 F.3d at 139-140 (emphasis in original).  On the other hand, if the statute of limitations has not run, NIKE has the burden of proving inexcusable

18

delay and prejudice as a result of the delay.  *See Am. Diabetes Ass'n v. Friskney Family Trust*, 177 F. Supp. 3d 855, 878 (E.D. Pa. 2016).[10]

Here, the Court should apply Pennsylvania's two-year limitations period to Lontex's Lanham Act claims for trademark infringement under § 32 and unfair competition under § 43(a), and therefore conclude that laches is presumed because Lontex filed its complaint after the statute of limitations had run.  *Santana*, 401 F.3d at 138.  Lontex should then have the burden to rebut the presumption of laches "by showing that its delay was excusable and that its delay did not prejudice [NIKE]."  *See id*. at 139-140.  Lontex has not carried and cannot carry its burden, and thus its motion should be denied.

Alternatively, if the Court concludes that the Pennsylvania UTPCPL is the most analogous state cause of action to Lontex's Lanham Act claims for trademark infringement under § 32 and unfair competition under § 43(a) and thus applies Pennsylvania's residual statutory limitations period (six years) to such claims, the presumption of laches will not apply and NIKE "bears the burden of establishing its entitlement to laches."  *Am. Diabetes Ass'n*, 177 F. Supp. 3d at 878.

As discussed below, regardless of the presumption, NIKE will establish both elements of laches: Lontex's delay was inexcusable and prejudicial to NIKE.

### 2.     Lontex's delay was inexcusable

Lontex discovered NIKE's alleged infringing conduct in or before December 2015 and waited more than three years to initiate this lawsuit on December 31, 2018, despite claiming that NIKE's conduct "resulted in the total destruction of Lontex's business."  (SOF ¶¶ 184, 195, 197.)

---

[10] Relying on out-of-Circuit cases, Lontex contends that courts "rarely" find laches where the limitations period has not run, and that NIKE must make a "substantial showing of *unexpected, unreasonable* delays" to overcome a "*strong presumption*" against laches.  (Lontex Br. at 6, 9, 12 (emphasis in original).)  Lontex is wrong.  The Third Circuit has not adopted these standards.  Instead, courts hold that when "the appropriate statute of limitations has not run," there is no presumption of laches and "the defendant bears the burden of establishing its entitlement to laches."  *Am. Diabetes Ass'n*, 177 F. Supp. 3d at 878; *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 517 (E.D. Pa. 2007).

Lontex does not explain the reason for its three-year delay nor does it provide any credible justification for it.  Instead, Lontex contends that waiting more than three years to file suit does not amount to any "delay" because it filed its claims within Pennsylvania's residual statutory limitations period of six years.  (Lontex Br. at 9.)  Lontex further contends that, even if waiting three years to file does amount to "delay," such "delay" was not "unreasonable" because Lontex sent letters to NIKE in 2016 and 2018 and claims to have made efforts to resolve this issue with NIKE.  (Lontex Br. at 10-11.)  Lontex is incorrect, and Lontex's actions do not excuse its delay— in fact, they emphasize the significance of it.

First, Pennsylvania's two-year limitations period should apply to Lontex's claims.  *See* Sec. III.B.1, *supra*.  And, based on Mr. Nathan's discovery of NIKE's alleged infringement in December 2015, that limitations period expired in December 2017, a year before Lontex filed suit. In any event, the Third Circuit has held that waiting three years to file suit is sufficient delay to find laches.  *See e.g., Fruit Indus. v. Bisceglia Bros.*, 101 F.2d 752 (3d Cir. 1939).

**Lontex's demand letter does not stop the clock.**  Lontex, relying on out-of-Circuit cases, contends that its April 8, 2016 demand letter to NIKE essentially stops the clock on the laches period.  (Lontex Br. at 10.)  But the Third Circuit measures "the delay *in bringing suit*;" the clock does not stop when plaintiff sends a demand letter.  *Santana*, 401 F.3d at 138 (emphasis added); *Champion Prod.*, 686 F.2d at 1044 ("It is hornbook law that laches consists of two essential elements: (1) inexcusable delay *in instituting suit*….") (emphasis added); *see also Eat Right Foods Ltd. v. Whole Foods Market, Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018) ("To measure the length of a delay, we start the clock when the plaintiff knew (or should have known) of the allegedly infringing conduct, and we stop it when the lawsuit in which the defendant seeks to invoke the laches defense is initiated.") (internal quotations omitted).  Lontex filed suit on December 31,

2018, more than three years after it discovered NIKE's alleged infringing conduct.   (Response SOF ¶ 12.)   And, tellingly, given its allegations of consumer confusion, Lontex does not explain why it did not file a lawsuit in 2016, rather than sitting on its hands until December 31, 2018.

Moreover, NIKE promptly responded to Lontex's complaints of trademark infringement, and it explained in at least two separate response letters that NIKE's use of common words like "cool" and "compression" to describe the NIKE Pro products was not infringing Lontex's purported rights in COOL COMPRESSION.   (SOF ¶ 188.)   NIKE also informed Lontex that, notwithstanding its disagreement with Lontex's claims, NIKE had already begun implementing changes to the way it displayed the wording used to describe its products on the nike.com website. (SOF ¶¶ 188, 156-158.)   NIKE's business discussions to shorten certain public-facing product descriptions by removing descriptors for length (e.g., '6'" for a six-inch short) and fit (e.g., "fitted," or "compression") were well underway before it received Lontex's first letter.   (*Id*.)   And NIKE did not promise that it would align the timing of its business objectives regarding when such common words would or would not appear in descriptions next to products because that business objective had nothing to do with Lontex or its legal claims.   (*Id*.)   In light of this, Lontex had no reasonable expectation that common words like "cool" and "compression" would not end up appearing next to each other in NIKE's written materials after a certain date, because NIKE never made any such representation to that effect.   Quite to the contrary, NIKE explained to Lontex in its responsive letters that it was under no obligation to cease using such descriptive language.   And NIKE even explained to Lontex that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████   (Response SOF ¶¶ 16, 20.)   Yet, Lontex never definitively insisted such use stop by a date certain, and it did not file suit claiming an infringement when this descriptive usage

continued.

Particularly challenging for Lontex is the fact that, back in September 2016, Lontex offered NIKE a time-specific compromise, that NIKE did not accept, yet Lontex still did not file suit. Specifically, on September 23, 2016, Lontex's counsel stated that if NIKE would commit to having "cool compression" removed from its website and the retailers' websites by October 15, 2016, Lontex ███████████████████████████ (Response SOF ¶ 27-29.) NIKE did not pay Lontex ██████ dollars, and it continued with its own product description modifications according to its own business objectives. Lontex indisputably knew at this time in 2016 that NIKE would not accede to its offers to settle. And, Lontex certainly knew that third party retailers who sold the same NIKE Pro products were describing them the same way—using descriptive language like "cool" to describe the cooling thermoregulation benefit, and the descriptive language of "compression" for the tightest fit and the "fitted" for the slightly less tight fit. Lontex belatedly claims in this lawsuit that such public use by third parties has caused it tens of million of dollars in harm (that NIKE should pay for), but such use was always on full display for Lontex to see, and Lontex never contacted these third parties to ask that they stop. Instead, it waited three years to file a lawsuit against NIKE attempting to hold it responsible for these other parties' actions. This is not reasonable behavior for a rights holder who is legitimately concerned about consumers confusing its brand with another company.

By refuting Lontex's allegations in its responsive letters, NIKE put Lontex on notice that it had a good faith belief that it had rights to use the common words "cool" and "compression" to describe the NIKE Pro products. *See GOLO, LLC v. Goli Nutrition Inc.*, No. CV 20-667-RGA, 2020 WL 5203601, at *7 (D. Del. Sept. 1, 2020) (continued use of mark after receipt of cease and desist letter not indicative of bad faith, but rather supports a finding of good faith); *Groupion,*

*L.L.C. v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1165 (N.D. Cal. 2011) (same).  Once Lontex had

notice of NIKE's position, Lontex's further delay amplified the potential prejudice to NIKE.  *See*

*Grupo Gigante Sa De CV v. Dallo & Co. Inc.*, 391 F.3d 1088, 1102-03 (9th Cir. 2004) ("Plaintiff

cannot simply wait without explanation to see how successful the defendant's business will be and

then ask for an injunction to take away good will developed by defendant in the interim.").  It

would be unjust to allow Lontex to take advantage of a thirty-two-month delay simply because it

sent a letter in April 2016 asserting claims that it did not pursue until December 2018.  Here, in

the very opposite of a typical trademark case, Lontex's evident strategy was to sit back while NIKE

continued to successfully sell NIKE Pro product so that Lontex could characterize them as

infringing (even though they do not bear a COOL COMPRESSION mark) and reap the profits that

NIKE had sown during the years of delay.  In the circumstances of this case, Lontex's demand

letters have no legal effect other than to reinforce the fact that Lontex continued to sit on its hands.

Indeed, courts agree with Professor McCarthy that a trademark owner "has no obligation

to sue until 'the likelihood of confusion looms large' and certainly, 'one cannot be guilty of laches

until his right ripens into one entitled to protection.  For only then can his torpor be deemed

inexcusable.'"  6 McCarthy on Trademarks and Unfair Competition § 31:19 (5th ed.)

(collecting cases).  Lontex's theory of the case is that NIKE's alleged use overwhelmed the market

in order to lure customers to purchase NIKE product because of some perceived value in Lontex's

COOL COMPRESSION marks, thus pushing Lontex out of the market and destroying its business.

If one accepts Lontex's theory of the case, its claims against NIKE were ripe in 2015.  So why not

sue then?  Lontex does not say.  Had Lontex truly been concerned about consumer confusion or

that its COOL COMPRESSION marks were being overwhelmed by NIKE, such that it was being

pushed out of the market and its business destroyed, a reasonable actor would have filed suit in

2016.  But it did not because (1) there was no evidence that COOL COMPRESSION was known in the marketplace due to Lontex's lack of promotion and (2) there was never any actual consumer confusion in 2016—or any time thereafter.[11]  Lontex was, instead, content to sleep on its rights through 2018 while it focused on *ex post facto* promotion of COOL COMPRESSION hoping to manufacture evidence of bona fide use in the market and evidence of actual consumer confusion.

Lontex's delay undermines its contentions that NIKE's alleged conduct was likely to cause consumer confusion.  *See* 6 MCCARTHY § 31:11 (5th ed.) (noting that plaintiff's delay will cause defendant to ask, "If there was and is such great confusion of customers and damage to your mark, as you now claim, why did you take so long to file this lawsuit?"); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 205 U.S.P.Q. 969 (5th Cir. 1980) (holding that plaintiff has not been vigilant in protecting its rights in the asserted mark.  "A trademark owner that strongly believed its customers were being deceived would hardly have remained idle for such an extended period of time.").  Lontex's actions demonstrate that its concern was not consumer confusion; rather, it only sought to weaponize the registrations it had already tried unsuccessfully to sell to others to pressure NIKE into paying it money.  NIKE did not yield to Lontex's threats, and Lontex did not sue for years.  Lontex should not now be rewarded for its delay when NIKE has been prejudiced by it, as discussed more fully below.

Lontex's delay also seriously undermines its claims that NIKE's alleged conduct has "resulted in the total destruction of Lontex's business."  (SOF ¶ 195.)  In fact, the Third Circuit has found a plaintiff's failure to file suit against the party that allegedly caused its business to fail is inexcusable and sufficient to bar plaintiff's claim, whether under laches or acquiescence.  *See*

---

[11] Given the inherent weakness of Lontex's COOL COMPRESSION mark, it is not surprising that NIKE's two likelihood of confusion surveys showed *zero* confusion.  (SOF ¶¶ 221, 222.)  It is equally unsurprising that Lontex failed to produce *any* survey in this case.  (SOF ¶ 227.)

*Procter & Gamble Co. v. J. L. Prescott Co.*, 102 F.2d 773, 780 (3d Cir. 1939) ("[Counterclaim-plaintiff's] was in fact a failing business from 1926 until 1930.  If this failure had been in fact due to acts of [counterclaim-defendant] complained of, it was to be expected that [plaintiff] would have expressed its objections to [counterclaim-defendant]'s course of conduct and would have brought that company to the bar of justice long before the time of the filing of the counterclaim in the instant case.").  Finally, Lontex cannot excuse its delay due to an alleged lack of funds.  *See Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 128–29 (D. Mass. 1993), *aff'd*, 26 F.3d 140 (Fed. Cir. 1994) ("Courts have consistently and correctly held, however, that delays for lack of funds to hire an attorney, or to search for an attorney, are not excused for the purpose of determining laches.").

**Lontex's delay was not caused by other litigation, since there was none.**  Lontex's delay is also indicative of its failure to vigilantly protect its purported rights in the COOL COMPRESSION marks.  Courts have excused a plaintiff's lengthy delay where it was busy asserting its rights against other alleged infringers.  *See e.g., Alfred Dunhill of London, Inc. v. Kasser Distillers Prod. Corp.*, 350 F. Supp. 1341, 175 U.S.P.Q. 586 (E.D. Pa. 1972) (delay excusable where plaintiff was "diligently asserting its trademark rights against at least four other alleged infringers during the five year period of delay"), *aff'd without published opinion*, 480 F.2d 917 (3d Cir. 1973); 6 MCCARTHY § 31:16 (5th ed.) (collecting cases).  Lontex cannot use this valid reason to justify its delay.  There exist numerous third-party uses in the market of the words "cool" and "compression" in connection with athletic apparel.  (SOF ¶¶ 228-236).  Despite Mr. Nathan testifying that many of these third-party uses infringe Lontex's purported rights in COOL COMPRESSION, he admitted that Lontex has never asked these companies to cease their use. (*Id*.)  Indeed, this action against NIKE is the first—*and only*—instance of Lontex enforcing its purported rights in the COOL COMPRESSION marks.  Lontex never even contacted other

retailers that were selling NIKE Pro products and describing them with the same descriptive wording of "cool" for cooling and "compression" for the compression fit—regarding Lontex's claims of alleged infringement.  (SOAF ¶ 244.)

**Lontex's efforts to extort a settlement from NIKE had no chance of success.**  Lontex also contends that there can be no laches because it promptly made efforts to resolve the issue with Nike in 2016 and continued to reach out to Nike even in early 2018 before filing suit.  (Lontex Br. at 11.)  But "settlement efforts only justify delay where those efforts have 'a fair chance of success.'"  *Eat Right Foods Ltd. v. Whole Foods Market, Inc.*, 779 F. App'x. 471, 473  (9th Cir. 2019) (quoting *A.C. Aukerman Co. v. Miller Formless Co., Inc.*, 693 F.2d 697, 700 (7th Cir. 1982)). Here, NIKE's alleged infringing use of the words "cool" and "compression" in product descriptions was on the consumer-facing, publicly available nike.com e-commerce website.  (SOF ¶¶ 139, 173, 174.)  NIKE responded to Lontex's claims in its demand letters, asserting that NIKE was using "cool" and "compression" merely to describe its products, just as Mr. Nathan admitted days before his contingency fee lawyer sent the April 8, 2016 letter.  (SOF ¶ 188.)  Certainly, Lontex could review the nike.com website and other retailers' websites to see whether the alleged use was ongoing.  If it was (whether by NIKE or by other retailers of NIKE's products), and Lontex truly believed that the alleged infringement was overwhelming its COOL COMPRESSION marks, and destroying its business, it had an obligation to take further action.  6 McCarthy § 31:19; *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982) ("The objective standard of 'knew or should have known' is a logical implementation of the duty to police one's mark.").

Instead, Lontex went away after NIKE repeatedly declined Lontex's offers to take a license to the COOL COMPRESSION marks and its demands that NIKE pay Lontex various sums of

money.  (SOF ¶¶ 188-191.)  It is a stretch to call the parties' cease and desist correspondence "settlement negotiations," and a further stretch to characterize those efforts having as "a fair chance of success." *Eat Right Foods*, 779 F. App'x at 476; *see also Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823-24 (7th Cir. 1999) ("sparse" letter writing campaign regarding defendant's alleged false advertising "can hardly be characterized as a serious attempt" to resolve the claims without litigation); *Charvet S.A. v. Dominique France, Inc.*, 568 F. Supp. 470 (S.D.N.Y. 1983) (sporadic negotiations do not excuse long delay), *aff'd per curiam*, 736 F.2d 846 (2d Cir. 1984).

In sum, Lontex has not provided any explanation for its three-year delay in filing this action.  NIKE, on the other hand, has marshalled substantial evidence demonstrating that Lontex's delay is inexcusable.  As such, the Court should find Lontex's delay inexcusable.

### 3.     Lontex's delay prejudices NIKE

In addition to establishing inexcusable delay, NIKE can also demonstrate harm due to the Lontex's inaction.  *Santana*, 401 F.3d at 139 (requiring delay and harm due to the delay to establish laches).  Courts have explained how accused parties can be harmed if plaintiffs are not diligent in protecting their trademark rights:

> Plaintiffs are encouraged to file suits when courts are in the best position to resolve disputes.  As claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome.

*NAACP v. NAACP Legal Defense & Educational Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985).

Indeed, courts have identified two types of prejudice that can give rise to laches: (1) evidentiary; and (2) economic or expectations-based.[12]  *See Eat Right Foods, Ltd.*, 880 F.3d at

---

[12] The Third Circuit has not adopted an elevated burden of proof for NIKE on this element, as Lontex suggests. (Lontex Br. at 12 "But because the presumption of no prejudice applies to Nike, the economic and evidentiary prejudice would normally attendant a delay of up to six years … is not enough – Nike must show that it is somehow

1119–20.  "Evidentiary prejudice encompasses such things as lost, stale or degraded evidence or witnesses whose memories have faded or who have died.  Economic prejudice encompasses actions made by the defendant that it would not have taken or consequences it would not have experienced had the plaintiff brought suit promptly."  6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:12 (5th ed.) (internal citations omitted).  On the record developed in this case, Lontex's unexplained delay has caused NIKE both evidentiary and economic prejudice.

### a.    Lontex's delay caused evidentiary prejudice to NIKE

Trademark owners seek redress in federal litigation for one key reason: to swiftly quell the sale of a product or service that has caused or is likely to cause confusion with its own valuable brand.  *See* 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 2:22 (5th ed.) ("When a business sues for trademark infringement the plaintiff acts to protect its own interest in sales and reputation, but it also incidentally acts in the public interest.  There is undoubtedly a public interest in preventing deception and confusion as to source and sponsorship of goods and services.")  But consumer confusion is not Lontex's concern here; indeed, there was never any actual consumer confusion in 2016—or any time thereafter—nor is NIKE's alleged conduct likely to cause confusion going forward.  This case is about monetizing Lontex's trademark registrations (for marks Lontex never previously promoted).

The undisputed record shows that, prior to 2016, Lontex had not promoted COOL COMPRESSION in any places where a customer would regularly encounter a mark, like on its website, social media, press releases, brochures, or even in a single e-mail to a customer.  *See* Sec.

---

set apart from the normal pack of defendants in their shoes." (citing *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985); *Elvis Presley Enters. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)).  Instead, where a plaintiff has filed suit within the applicable limitations period (which NIKE contests here), and laches is not presumed, the defendant simply "bears the burden of establishing its entitlement to laches."  *Am. Diabetes Ass'n*, 177 F. Supp. 3d at 878.

II.A, *supra*.  Lontex also tried unsuccessfully to sell its COOL COMPRESSION trademarks to several companies between 2014 and 2016.  (*Id*.)

During Lontex's unsuccessful efforts to sell COOL COMPRESSION, Mr. Nathan discovered that some product descriptions on the nike.com website contained strings of words where the words "cool" and "compression" appeared next to each other when describing NIKE Pro products with the cool thermoregulation benefit and a compression fit.  But, Lontex did not immediately reach out to NIKE.  (SOF ¶¶ 184, 187, 197.)  Rather, Lontex ceased its efforts to sell the COOL COMPRESSION marks (SOF ¶¶ 114-119), and urgently starting using COOL COMPRESSION on "everything in 2016," most likely pursuant to legal advice that proof of ownership of a valid trademark (*i.e.*, a mark that is in bona fide use in commerce) would be required to assert a claim against NIKE.  (SOF ¶¶ 198-208.)  In the United States, trademark rights derive through use of the mark in commerce, not federal registration.  *See e.g., Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark."); *JBLU, Inc. v. United States*, 813 F.3d 1377, 1381 (Fed. Cir. 2016) ("[T]rademark rights stem from use, not registration.").  After three years of non-use, abandonment is presumed as a matter of law.  *See Warren Pub. Co. v. Spurlock*, 645 F. Supp. 2d 402, 435 (E.D. Pa. 2009) (Baylson, J.) (citing 15 U.S.C. § 1127).  Use after abandonment cannot cure the prior abandonment of trademark rights.  *See Specht v. Google Inc.*, 747 F.3d 929, 935–936 (7th Cir. 2014) (a resumption of use after abandonment has occurred is too late to revive prior rights).  Nevertheless, Lontex apparently thought that if it muddied the waters enough with its ex post facto use, it could obscure the nearly eight years where no evidence of use existed.

Had Lontex filed suit in 2015 when it first discovered NIKE's limited use of the words

"cool" and "compression" to describe the NIKE PRO products, Lontex would not have been able to marshal *any* evidence of continuous bona fide use in commerce to carry its burden to prove validity of the COOL COMPRESSION marks.  Indeed, NIKE investigated Lontex's claims in 2016 and found no evidence of continuous use of COOL COMPRESSION mark, neither on Lontex's website nor its products.  And an investigative purchase of a compression product from Lontex's website at the time, returned a product which was branded only with SWEAT IT OUT, not COOL COMPRESSION.  (SOF ¶¶ 47, 75.)

Specifically now, Lontex claims that: (a) every Lontex SWEAT IT OUT garment sold since 2007 contained a care label sewn inside that said COOL COMPRESSION and (b) since 2007 Mr. Nathan always orally referred to the fabric in the SWEAT IT OUT garments as "COOL COMPRESSION technology."  But the record contains no reliable evidence to corroborate these claims—Lontex did not produce a single document supporting either of these two claims, and Lontex did not produce a single garment manufactured before 2016 that contained a care label sewn inside that said COOL COMPRESSION.  Lontex delayed filing suit—and went to great lengths in discovery—to prevent NIKE from developing evidence to support NIKE's defenses and its counterclaims for abandonment of the asserted trademarks and fraud on the U.S. Patent and Trademark Office.

For example, Lontex identified in its Amended Rule 26(a)(1) Initial Disclosures a small number of hand-selected customers to whom Lontex fed SWEAT IT OUT garments manufactured *after* 2016 containing COOL COMPRESSION labels inside.  (SOAF ¶ 251.)  Yet, when *NIKE*'s investigators and the Lontex customers that *NIKE* subpoenaed produced Lontex SWEAT IT OUT garments, each garment contained a SWEAT IT OUT label inside, not a COOL COMPRESSION one.  (SOAF ¶ 249.)  This non-party discovery, which was free from manipulation by Lontex and

its counsel, produced evidence that directly contradicts Lontex's claims of use.

Conversely, when NIKE deposed Lontex's hand-selected customers, who were represented by Lontex's trial counsel, they testified that, since 2007, Mr. Nathan had orally referred to the fabric in the SWEAT IT OUT garments as "COOL COMPRESSION technology." (SOAF ¶¶ 252-253.) But, either due to the passage of time or manipulation by Lontex and its counsel, these individuals' recollections were vague, and they could not testify as to any specific recollection about what Mr. Nathan said, when he said it, and where they were when he said it, and they had no access to emails from prior to 2016 that assisted their recollection. *Id.* In addition, at least one of those individuals testified that the Lontex SWEAT IT OUT garments he had received since 2007 contained a care label sewn inside that said COOL COMPRESSION, but he produced only products where the care label inside was either torn out or was illegible and faded due to wear. (SOAF ¶ 254.) None of these witnesses had a single document to corroborate their vague "memory" that they had ever received product or even heard Mr. Nathan utter the phrase "cool compression" before 2016. (SOAF ¶ 253.)

Lontex seeks to capitalize on these vague memories and lack of documentation to create the appearance of rights that do not exist. There is no plausible excuse for Lontex failing to sue at the end of 2016 when NIKE had squarely refuted Lontex's demands to pay it money. At that time, although its prior attorney had quit, Lontex had already located Mr. Wagner, its current trial counsel. (SOF ¶ 192.) Lontex and Mr. Wagner remained in close contact "every week" between the end of 2016 and January 2018 and, with Mr. Wagner's close supervision, Lontex increased its efforts to create the appearance of consumer-facing use of the COOL COMPRESSION marks notwithstanding the reality that came before. (SOF ¶¶ 193, 194, 198-208.)

Courts have held that "[e]videntiary prejudice may arise from a defendant's inability to

present a full and fair defense on the merits because of the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Kepner-Tregoe, Inc. v. Exec. Dev., Inc.*, 79 F. Supp. 2d 474, 491 (D. N.J. 1999), *aff'd*, 276 F.3d 577 (3d Cir. 2001) (citing *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). Here, the loss of evidence directly impacts NIKE's defenses and counterclaims regarding the vulnerabilities in Lontex's asserted trademark rights. NIKE bears a heavy burden to prove that Lontex (1) abandoned the COOL COMPRESSION mark through longstanding non-use of the mark and (2) committed fraud on the United States Patent & Trademark Office by intentionally deceiving the Office about its longstanding non-use of the mark to maintain its registrations. Knowing this, Lontex and Mr. Wagner delayed filing suit while creating the appearance of continuous consumer-facing use of the COOL COMPRESSION marks. Once they finally initiated this action, Lontex and Mr. Wagner engaged in a concerted effort to prevent NIKE from developing evidence in discovery that would undermine Lontex's carefully constructed narrative of continuous consumer-facing use of the COOL COMPRESSION marks. For example, Lontex vigorously objected to producing any customer information to NIKE from the pre 2015 time period claiming that NIKE should not be allowed to contact Lontex's customers but rather should rely only on the testimony of the witnesses that Lontex would identify. (ECF Nos. 52, 87, 96, 98.) After NIKE prevailed on its motion to compel, (ECF Nos. 117-1, 136, 147), and subpoenaed customers *not* hand selected by Lontex, every customer that responded produced evidence directly contradicting Lontex's narrative of continuous use. (SOAF ¶ 249.) Lontex's delay in filing suit robbed NIKE—and the Court—of non-party testimony and evidence that could provide an accurate and unvarnished record of Lontex's marketplace use—or complete lack thereof—of the COOL COMPRESSION marks. This is the exact type of evidentiary prejudice

that supports the defense of laches.  *Id.* (citing *Whitfield v. Anheuser–Busch, Inc.*, 820 F.2d 243, 245 (8th Cir. 1987)); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002) (finding the unavailability of important witnesses, dulling of memories of witnesses, and loss or destruction of relevant evidence all constitute evidentiary prejudice sufficient to support laches); *Morgan v. Hawthorne Homes, Inc.*, No. 04 Civ. 1809, 2009 WL 1010476, *11 (W.D. Pa. Apr. 14, 2009) (finding evidentiary prejudice where key pieces of evidence were missing, even though the court ultimately found genuine issues of material fact on laches defense)

### b.      Lontex's delay caused economic prejudice to NIKE

Not only did Lontex's delay result in evidentiary prejudice to NIKE, but because Lontex waited by the sidelines for three years while NIKE's sales of NIKE Pro products continued to multiply, Lontex's delay also caused economic prejudice to NIKE in the form of an overly inflated damages claim.

By May 2016, Lontex was aware that NIKE had no intention of paying to license the COOL COMPRESSION registrations and that NIKE's unwavering position was that its long time use of common words like "cool" and "compression" in textual descriptions was not a trademark infringement.  (SOF ¶¶ 188, 156-158.)  Lontex was nevertheless content to sit by and wait while NIKE continued to sell NIKE Pro products, and then file this suit years later, only to characterize every single NIKE Pro product sold from 2015 to 2018 as an "Accused Product" for purposes of damages calculations- notwithstanding the fact that no NIKE product has ever been branded with the phrase "Cool Compression."  Lontex's now aggrandized damages claim is purely a function of delay and Lontex's definitional sleight of hand—it is not reality.  Notably, the limited written descriptions that appeared on some product pages within the nike.com website which sometimes had the word "cool" appearing next to the word "compression" have not been on the nike.com website since September 2016 (SOF ¶ 175.)  Yet, Lontex seeks to disgorge every dollar of every

33

sale that NIKE and its retailers made of the NIKE Pro products between 2015 and 2018.  Lontex treats the NIKE Pro products as if the products themselves are "infringing products" (misleadingly, giving them the misnomer "Accused Products") and piles on years of sales to get a higher "profits disgorgement" claim against NIKE.  But there is no dispute over the fact that there is nothing "infringing" about the NIKE Pro products themselves *because these products do not bear the COOL COMPRESSION Mark or any variation thereof*.  (SOF ¶¶ 128-162.)  This is a case about words that appeared in a limited group of written materials only—not on products—for a limited time.  (SOF ¶¶ 162-166.)  Nevertheless, Lontex uses the passage of time to create the appearance of something more.

Lontex contends that "[m]onetary losses or damages are 'not merely those attributable to a finding of liability for infringement,' as otherwise economic prejudice would arise in every suit." (Lontex Br. at 12. (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992)).  But, "this does not mean that a [plaintiff] may intentionally lie silently in wait watching damages escalate," as *A.C. Aukerman* recognizes.  960 F.2d at 1033; *see also Polaroid Corp. v. Polorad Electronics*, 287 F.2d 492 (2d Cir. 1961) ("The holder of a trademark may not wait to see how successful an alleged infringer's business will be before seeking relief."); *Nartron*, 305 F.3d at 411 ("[Plaintiff], however, fails to appreciate that *any* prejudice [to defendant] is sufficient [for laches], including an increase in potential damages or a loss of evidence.") (emphasis in original) (citing *Herman Miller v. Palazzetti Imports and Exports*, 270 F.3d 298, 322 (6th Cir. 2001); *Grupo Gigante*, 391 F.3d at 1102-03; *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999).  Here, for example, between January 1, 2015 and April 8, 2016, when Lontex sent its first demand letter, NIKE sold approximately ██████ of the NIKE Pro styles (which Lontex now defines as "Accused Products") to wholesale retailers.   (SOAF ¶ 256.)

34

Between July 20, 2016, the date of NIKE's second response letter to Lontex, and December 31, 2018, the date Lontex initiated this action, NIKE sold approximately ████████ of the NIKE Pro styles (the so-called "Accused Products") to wholesale retailers.  It would be manifestly unjust to allow Lontex to sit and wait for two and a half years while NIKE continued to successfully sell NIKE Pro product (essentially doubling the revenues) so that Lontex could characterize all sales of those NIKE Pro products as "infringing sales" (even though they do not bear a COOL COMPRESSION mark) and reap NIKE's profits during the years of delay.

    **Expectation based prejudice.**  Another form of prejudice that courts consider in assessing laches is "expectations-based" prejudice.  *See Danjaq L.L.C. v. Sony Corp.*, 263 F.3d 942, 949, 955 (9th Cir. 2001).  Expectations-based prejudice derives from a defendant's taking actions or suffering consequences that it would not have, had the plaintiff brought suit promptly.  *Id*.  For example, a defendant suffers prejudice if, in reliance on plaintiff's delay, it invests labor and capital to build a trademark's goodwill and future value.  *See Saul Zaentz Co.*, 627 F. Supp. 2d at 1117.  "[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights."  *Grupo Gigante*, 391 F.3d at 1105.

    NIKE did not invest resources into "cool compression" because it did not use "cool compression" as trademark, nor launch any marketing using the phrase "cool compression."  (SOF ¶¶ 149, 163.)  Nevertheless, NIKE responded to Lontex's allegations, asserting its good faith belief that it had rights to use the common words "cool" and "compression" to describe the NIKE Pro products.  *See GOLO*, 2020 WL 5203601, at *7; *Groupion*, 826 F. Supp. 2d at 1165.  NIKE also investigated Lontex's claims and found several inconsistencies, most notably around Lontex's claims of continuous use of the COOL COMPRESSION mark.  (SOF ¶¶ 48, 75.)  Lontex went

away after NIKE repeatedly declined Lontex's offers to take a license to the COOL COMPRESSION marks and its demands that NIKE pay Lontex various sums of money.  (SOF ¶¶ 188-191.)  It would be inequitable to allow Lontex to sit back while NIKE continued to successfully sell the popular NIKE Pro products (under the NIKE brand) so that Lontex could later identify some limited instances where the words "cool" and "compression" appeared in consumer-facing written product descriptions for these products and then seek to disgorge *all* of NIKE's profits on these products from 2015 to 2018.

For the reasons discussed above, the Court should find Lontex's inexcusable delay caused prejudice to NIKE.  Accordingly, the Court should deny Lontex's motion.

### C.    Lontex acquiesced to NIKE's use, barring and/or waiving its claims[13]

"[T]he equitable defense of acquiescence [occurs] 'when the trademark owner, by affirmative word or deed, conveys its implied consent' to the use of a mark."  *Covertech Fabricating, Inc. v. TVM Building Products, Inc.*, 855 F.3d 163, 175 (3d Cir. 2017) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998)); *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*, 621 F.3d 981, 988 (9th Cir. 2010) ("*Seller Agency I*") (The doctrine of acquiescence "limits a party's right to bring suit following an affirmative act by word or deed by the party that conveys implied consent to another.").  Consequently, a defendant asserting that a plaintiff acquiesced to defendant's use of its mark must show that "(1) the senior user actively represented that it would not assert a right or a claim; (2) the senior user's delay between the active representation and assertion of the right or claim was

---

[13] In other Circuits, "[w]aiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 957 (N.D. Cal. 2015) (quoting *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988)).  "An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved."  *Id.* (quoting *United States v. Amwest Surety Ins. Co.*, 54 F.3d 601, 602–03 (9th Cir. 1995).  The Third Circuit used the term "waiver" as a synonym for the traditional defense of "acquiescence."  *See* 6 MCCARTHY § 31:43 (citing *Doebler's Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 821, n.10 (3d Cir. 2006)).

not excusable; and (3) the delay caused the defendant undue prejudice." *Covertech*, 855 F.3d at 175 (citing a number of other Circuit cases). "Active consent is implied by conduct on the plaintiff's part that amounts to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc*., No. SA CV 06-679 AHS, 2011 WL 1211477, at *6 (C.D. Cal. Mar. 30, 2011) ("*Seller Agency II*").[14]

The Eleventh Circuit has observed that an active representation does not require specific endorsement or formal agreement: "implied acquiescence may be inferred from a clear encouragement of the use of the allegedly infringing mark." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1348 (11th Cir. 1996) (Birch, J., concurring). Thus, a plaintiff's acquiescence can be express or implied in conduct. *See Seller Agency II*, 2011 WL 1211477, at *6; *see also Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*, 165 F.2d 693, 694-695 (4th Cir. 1947) (plaintiff's claims were barred by laches and acquiescence where plaintiff had approached the defendant "evinc[ing] interest" in a business relationship).

As discussed above, when Lontex discovered the word "cool" next to the word "compression" on the nike.com website, it sent a letter to NIKE on April 8, 2016, claiming NIKE was using COOL COMPRESSION without authorization and offering NIKE a license to use the marks. NIKE promptly responded to Lontex's letters, refuting Lontex's legal claims, and informing Lontex that, regardless, it had already begun implementing changes to the wording on its nike.com product pages. (SOF ¶ 188.) Lontex's silence combined with its inexcusable delay

---

[14] While *Seller Agency II* ultimately found no acquiescence on the facts there, this case is very different. Unlike in *Seller Agency II*, where defendants made ambiguous representations to plaintiff in the face of ongoing litigation, here, Lontex's letters were contradicted by its lack of public-facing use of COOL COMPRESSION, its efforts to sell COOL COMPRESSION, its offers to license COOL COMPRESSION to NIKE, and finally its silence in response to NIKE's position. *See Seller Agency II*, 2011 WL 1211477, at *6-7. Consequently, after not hearing from Lontex for more than a year, NIKE reasonably inferred that Lontex took no issue with NIKE's continued use of the common words "cool" and "compression" to describe the NIKE Pro products.

and the resulting prejudice to NIKE, constitute acquiescence to NIKE's use of the common words "cool" and "compression" to describe the NIKE Pro products.  Moreover, from NIKE's perspective, Lontex's silence in response to NIKE's position and its explanation of the independent business decision to make changes to its nike.com product pages conveyed approval of, and implied consent to, NIKE's continued sale of the NIKE Pro products.

In fact, when Lontex resurfaced in January 2018, it no longer claimed that *NIKE* was still infringing; rather, its concern was that NIKE's wholesale retailers, like ███████████████ ███████████████████ were "misusing the COOL COMPRESSION® marks."  (SOF ¶ 195.)  Lontex's January 2018 letter was an implied representation that Lontex had no further objection to NIKE's continued sale of the NIKE Pro products or use of the common words "cool" and "compression" to describe those products.  And, although NIKE continued to disagree with Lontex's claims, it was nevertheless reasonable for NIKE to rely on Lontex's implied representation and its inaction against NIKE.  Lontex cannot now erase that implied representation and its inaction in hope of capitalizing on the commercial success of the NIKE Pro products.  "A plaintiff cannot indicate at one time to defendant that defendant's acts are acceptable and then later sue defendant after it has acted in reliance on plaintiff's implied assurances."  6 MCCARTHY § 31:42 (5th ed.).

Accordingly, the Court should deny Lontex's motion.

### D.     Lontex's state claims are also barred by the applicable statute of limitations

Turning to NIKE's Fourteenth Affirmative Defense, Lontex's ***state law claims*** (Fourth and Fifth Counts) are time-barred and should be dismissed as a matter of law.  Lontex's Motion is framed narrowly on the applicability of NIKE's Fourteenth Affirmative Defense on Lontex's federal claims under the Lanham Act.[15]  But, here, Lontex misses the mark by mischaracterizing

---

[15] Curiously, Lontex's Motion omits any discussion of the statute of limitations applicable to its state law claims, other than to argue that it is entitled to summary judgment on this affirmative defense because its state and federal claims

the focus of NIKE's statute of limitations defense.  This affirmative defense does not apply to the Lanham Act claims because the Lanham Act does not have a statute of limitation; those claims are barred instead by NIKE's laches defense, as discussed above in Sec. III.B.[16]  While statutes of limitations are only guideposts for measuring delay when it comes to a delay-based laches defense to a Lanham Act claim, statutes of limitations serve as an absolute bar on state law causes of action. Such state claims are the focus of NIKE's statute of limitations defense.  In this case, choice of law dictates that Pennsylvania's two-year statute of limitations for tort claims applies to bar Lontex's statutory and common law trademark infringement claims.

### 1.     Pennsylvania law applies to Lontex's state claims

"In general, a federal court, sitting in diversity or with supplemental jurisdiction over a common law claim, must apply the choice of law rules of the forum state."  *Perma-Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.*, 630 F. Supp. 2d 516, 522 (E.D. Pa. 2008) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941); *Berg Chilling Systems, Inc. v. Hull Corp*., 435 F.3d 455, 462 (3d Cir. 2006)).  In statute-of-limitations disputes, federal courts consult the forum state's choice-of-law rules to determine the correct limitations period.  *See Klaxon*, 313 U.S. at 496; *Ross*, 766 F.2d at 826.  "Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations."  *Ross*, 766 F.2d at 826 (citing *Freeman v. Lawton*, 46 A.2d 205, 207 (Pa. 1946)).[17]

---

are congruent.  It is unclear whether Lontex is attempting to advocate that a statute of limitations should not apply to its state claims because those claims are congruent with its federal claims.  If so, Lontex should know this is not the law.  The congruency between federal and state trademark claims has no bearing on whether Lontex's state law claims are time-barred.  *See Am. Diabetes Ass'n*, 177 F. Supp. 3d at 882 (applying different limitations periods to claims under the Lanham Act and Pennsylvania common law).

[16] NIKE agrees that Lontex's state claims are congruent with its federal claims and, thus, rise and fall together.  (Lontex Br. at 16.) Thus, for the reasons discussed above, the Court should not enter judgment for Lontex on NIKE's Fifteenth Affirmative Defense.

[17] Pennsylvania's "borrowing statute" provides one exception to this general rule.  *Ross*, 766 F.2d at 826 n.3.  Under this statute, "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim."  42 Pa. Cons. Stat. § 5521(b).  Therefore, if a claim accrues outside Pennsylvania, Pennsylvania courts apply either Pennsylvania's statute of limitations or the statute of limitations of the place where the claim

In the FAC, Lontex pleaded two counts for state statutory and common-law claims under the laws of *fourteen* different inapplicable bodies of state law.  (ECF No. 20 at ¶¶ 74, 85.)  Despite dropping its Pennsylvania state claims and vaguely pleading claims under *fourteen* different inapplicable bodies of state law, Lontex filed its complaint in this district, alleging that a "substantial portion of events…giving rise to the claims occurred in this district," and that it—a Pennsylvania corporation, with it "trademark home situs being Pennsylvania"—suffered the "brunt of harm" in this district.  (ECF No. 20 at ¶¶ 8, 9.)  Accordingly, Pennsylvania law—including the applicable Pennsylvania statute of limitations—applies to Lontex's Fourth and Fifth Counts for common law trademark infringement and statutory trademark infringement and unfair competition.  *See Cottman Transmission Sys., Inc. v. Melody*, 851 F. Supp. 660, 670 (E.D. Pa. 1994) (in a trademark infringement action, applying the substantive law of Pennsylvania to all non-federal claims).[18]

### 2.    Lontex's state claims are time-barred under Pennsylvania law

The Pennsylvania Trademark Act (54 Pa. C.S.A. § 1123) does not provide an express limitations period.  Rather, a general statute of limitations provides a two-year limitation period in any action or proceeding to recover damages for injury to person or property that is founded on negligent, intentional, or otherwise tortious conduct.  *See* 42 Pa. C.S.A. § 5524(7).  Federal courts in Pennsylvania have held this two-year limitations period applies to statutory and common law trademark infringement and dilution claims.  *Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 882 (E.D. Pa. 2016); *Giordano v. Claudio*, 714 F. Supp. 2d 508, 523 n. 7 (E.D.

---

accrued, whichever bars the claim earlier in time.  *Id.*  Lontex's claims, as alleged, accrued in Pennsylvania.  (*See* ECF No. 20 at ¶¶ 8, 9.)

[18] Even though Lontex's pleading nominally asserts these state law claims under each state's law, Lontex did not separately plead separate and distinct counts for each state law cause of action, nor did it plead the elements of these purported state statutory and common law claims.  There is no evidence in the record that any of these fourteen other states have a substantial relationship to this matter.

Pa. 2010); *Guardian Life Ins. Co. of Am.*, 943 F. Supp. at 517.  The limitations period begins to accrue when plaintiff learns of the infringement.  *Am. Diabetes Ass'n*, 177 F. Supp. 3d at 883.

Here, Mr. Nathan testified that he discovered NIKE's alleged infringing conduct in December 2015.  (SOF ¶ 184.)  Lontex filed this lawsuit on December 31, 2018 (SOF ¶ 197), more than three years after Mr. Nathan claims he discovered NIKE's alleged infringing conduct.  Thus, Lontex's statutory unfair competition claims and common law infringement claims under Pennsylvania law are time-barred.  The court should deny Lontex's Motion and enter judgment in NIKE's favor dismissing Lontex's Fourth and Fifth Counts, as the exception for granting the non-movant summary judgment applies in this instance where the record is fully developed on a purely legal issue—the state statute of limitations issue, and there would be no prejudice to either party by disposing of these superfluous claims.  *Welding Engineers Ltd..*, 352 F. Supp. 3d at 428–29 (quoting FED. R. CIV. P. 56(f)(1)).  "Although notice of a court's intent to grant summary judgment pursuant to Rule 56(f)(1) is typically required, …the Third Circuit recognized…that an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue."  *Id.* (citing *Gibson*, 355 F.3d at 223-24 (affirming district court's grant of summary judgment in favor of a non-moving party and against a party that brought a motion for summary judgment, without first giving notice to moving party)); *see also  Zimmerlink*, 539 F. App'x at 49.

## IV.   **CONCLUSION**

For the foregoing reasons, this Court should deny Lontex's motion, and enter judgment in NIKE's favor dismissing Lontex's state trademark and unfair competition claims as a matter of law.

December 4, 2020                                 Respectfully submitted,

                                                By:   */s/ Gina L. Durhamt*

                                                DLA PIPER LLP (US)

                                                Gina L. Durham (admitted *pro hac vice*)
                                                555 Mission Street, Suite 2400
                                                San Francisco, CA 94105

                                                Frank W. Ryan (admitted *pro hac vice*)
                                                Andrew J. Peck (admitted *pro hac vice*)
                                                Marc E. Miller (admitted *pro hac vice*)
                                                1251 Avenue of the Americas
                                                New York, NY 100201

                                                Ben C. Fabens-Lassen
                                                1650 Market Street, Suite 5000
                                                Philadelphia, PA  19103

                                                *Attorneys for Defendant NIKE, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of December, 2020, I caused Defendant NIKE, Inc.'s

Memorandum of Law in Opposition to Lontex's Partial Motion for Summary Judgment to be filed

with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania

using the ECF system, it is available for viewing and downloading from the ECF system, and a

true and correct copy was served via ECF to all counsel of record registered with the ECF system.


BY: *<u>/s/ Ben Fabens-Lassen</u>*