**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LONTEX CORPORATION,** | **CIVIL ACTION** |
| **v.** | **NO.  18-5623** |
| **NIKE, INC.** | |

<u>**MEMORANDUM RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                                                    February 24, 2021

**I.      Introduction**

This litigation is a trademark dispute concerning a small but significant segment of the clothing market—athletic clothing—which both Plaintiff Lontex Corporation ("Lontex") and Defendant Nike, Inc. ("Nike") manufacture and sell.   Lontex owns a trademark, "cool compression," and asserts Nike is liable for infringement.

Lontex's First Amended Complaint alleges five counts against Nike:

1. **Count I**: Trademark Infringement under the Lanham Act in violation of 15 U.S.C. § 1114;

2. **Count II**: Trademark Infringement under the Lanham Act in violation of 15 U.S.C. § 1125(a);

3. **Count III**: Contributory Trademark Infringement under the Lanham Act in violation of 15 U.S.C. §§ 1114, 1125(a);

4. **Count IV**: State Common Law Trademark Infringement in violation of the laws of California, Florida, Texas, New York, New Jersey, North Carolina, Maryland, Massachusetts, Illinois, Georgia, Colorado, Minnesota, Washington, and the District of Columbia; and

5. **Count V**: State Statutory Trademark Infringement and Unfair Competition in violation of the following Deceptive and Unfair Business Practices Acts:

> (1) the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. §501.201 et seq., (2) California Business and Professions Code § 17200 et seq., (3) New York General Business Law § 349, (4) New Jersey Stat. § 56:4-1, (5) North Carolina General Statute Sec. 75-1.1 et seq., (6) Mass. Gen. Laws c. 93A, § 11, (7) Illinois

1

> Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., (8) Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 through 10-1-375, (9) Colorado Unfair Practices Act, Colo. Rev. Stat. §§6-2-101 through 6-2-117, (10) Minn. Stat. § 8.31, subds. 1 & 3a, & §§ 325D.43-325D.48, and (11) Washington Unfair Business Practices – Consumer Protection, Rev. Code Wash. 19.86.010, et seq.

ECF 20, "Am. Compl." ¶¶ 36–88.

Presently before the Court are the parties' Cross-Motions for Summary Judgment. Lontex seeks partial summary judgment on two of Nike's affirmative defenses, and Nike seeks summary judgment with respect to all of Lontex's claims. For the reasons that follow, Lontex's Motion will be granted in part and denied in part, and Nike's Motion will be denied.

## II.    Factual Background and Procedural History

Lontex manufactures and sells athletic apparel, and is the owner of three "cool compression" trademarks. ECF 20-1. Two of those trademarks cover the words "cool compression" with respect to certain lines of clothing. ECF 188-5, 188-6. These trademarks consist of "standard characters without claim to any particular font, style, size, or color." Id. The third trademark, no longer at issue in this case, contains the words "cool compression" accompanied by a logo. See Lontex Corp. v. Nike, Inc., No. 18-5623, 2020 WL 5947852 (E.D. Pa. Oct. 7, 2020). The crux of Lontex's complaint is that Nike's use of the words "cool compression" in relation to some of Nike's products infringes on Lontex's "cool compression" trademark. Further relevant factual background is discussed below with respect to each Motion.

This case has been exceptionally contentious in discovery proceedings and at one point, the Court felt that the best solution was to appoint a Master specializing in commercial litigation, intellectual property, and digital discovery issues. Sandra A. Jeskie, Esquire performed this role admirably and after her final report was approved, very few discovery problems arose. The parties proposed a post-discovery schedule which included the filing of dispositive motions under Rule

56, and Daubert motions on the same day.  Lontex moved for partial summary judgment on November 4, 2020 (ECF 188, "Lontex MSJ"), Nike responded on December 4, 2020 (ECF 201, "Nike Opp'n"), and Lontex replied on December 16, 2020 (ECF 218, "Lontex Reply").  Nike moved for summary judgment on November 5, 2020 (ECF 191, "Nike MSJ"), Lontex responded on December 4, 2020 (ECF 203, "Lontex Opp'n"), and Nike replied on December 16, 2020 (ECF 220, "Nike Reply").  Both parties filed Daubert Motions and responses.  ECF 187, 200, 189, 199, 190, 202.

These filings have been voluminous.  As a result of the undersigned's practice requirement that a paper copy of extensive exhibits be submitted to Chambers, along with the briefs and motions, the totality of briefs and exhibits consume approximately five large document boxes, including many tens of thousands of pages.  After initial review of these briefs and exhibits, the Court determined that the Daubert issues would be delayed and entered an order dated December 9, 2020 staying any reply briefs.  ECF 207.  As to the summary judgment motions, each party was required to summarize the holdings of the five cases and five most important exhibits already produced in discovery which supported its position.  Id.  This seemingly unusual order was appropriate because, from the initial briefing, the Court had doubts about granting summary judgment on any issue other than the statute of limitations.  The parties filed these summary statements on December 21, 2020.  ECF 225, 226.

The Court issued a list of questions to the parties, for discussion at oral argument which was held via video conference on February 2, 2021.  ECF 228.  The parties were then permitted to submit final statements summarizing their most important points.  ECF 232, 233.  Recognizing that there has been extensive discovery and that there are many factual disputes, this Memorandum will be confined to identifying the most material issues of fact.

## III.    Legal Standard

Summary judgment is proper if the movant can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a fact "might affect the outcome of the suit under the governing law," the factual dispute is material and will allow the nonmovant to survive summary judgment.  Id.  Only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" is a grant of summary judgment appropriate.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the district court is obligated to "review the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor."  In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015).

It is the responsibility of the litigant seeking summary judgment to inform the district court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the burden of proof on a particular issue rests with the nonmoving party at trial, the moving party's initial burden can be met by simply pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute.  Fed. R. Civ. P. 56(c).

## IV.    Lontex's Motion

Lontex has moved for partial summary judgment regarding two of Nike's asserted affirmative defenses. Nike's fourteenth affirmative defense asserts that Lontex's state law claims are time-barred. Nike's fifteenth affirmative defense asserts that Lontex's claims are barred by the equitable doctrines of laches, waiver, acquiescence, and estoppel.

### a. Factual Background

The facts relevant to the resolution of Lontex's Motion, considered in the light most favorable to Nike, are as follows. Lontex discovered Nike's alleged infringement in December 2015. ECF 214-1, Nike's Response to Lontex's Statement of Facts, "Nike SOF" ¶ 12. On April 8, 2016, counsel for Lontex contacted Nike stating "[i]t has recently come to our attention that Nike has begun advertising its directly competing goods using Lontex's 'Cool Compression' trademark." Nike SOF ¶ 14. Lontex stated that it would be willing to discuss Nike's licensing of the trademark, and asked Nike to "take immediate action to discontinue its trademark infringement" and provide Lontex with sales data relating to the allegedly infringing products. Id.

This letter prompted Nike to internally investigate its use and Lontex's use of "cool compression." Nike SOF ¶ 23. Throughout their continued communications, Nike emphasized that even prior to Lontex's letter, and for reasons unrelated to Lontex's trademark, Nike had started to change its use of "cool compression" and began updating its website accordingly. Nike SOF ¶ 16. Lontex continued to offer Nike a licensing agreement and request sales data to determine "appropriate compensation for past unauthorized use." Nike SOF ¶ 18. On July 19, 2016, Nike wrote:

> Nonetheless, as we previously shared, Nike is in the process of changing the format of all descriptors on its website and that should be completed in the coming months. As you can surely appreciate, the process takes time. In the interim, as previously explained, as a gesture of good faith we have attempted to offset "Cool" and "Compression" even further with the use of a hyphen.

Nike SOF ¶ 20.

Lontex responded:

> We are pleased to learn that Nike has agreed albeit without prejudice
> to its legal arguments, to discontinue its use of the registered
> incontestable "Cool Compression" trademark, and we acknowledge
> that a brief transition period is appropriate and would likely be
> permitted by a court. We hope that the remaining issues can be
> resolved amicably.

Nike SOF ¶ 22.  Communications continued throughout September and October 2016 in which Lontex continued to request money from Nike for alleged past infringement and for Nike to remove "cool compression" from its website and the websites of third-party retailers.  Nike SOF ¶ 24–29.

Nike did not hear from Lontex again until January 2018, when Lontex again wrote to Nike seeking damages for "past and possible continued infringement by Nike" and infringement by third-party retailers.  At this point, Lontex claimed that Nike's use had caused "the virtual total destruction of Lontex's business."  Nike SOF ¶ 32.  Lontex brought suit against Nike on December 31, 2018.  See ECF 1.

### b. Fourteenth Affirmative Defense: Statute of Limitations

Nike's fourteenth affirmative defense states that "Lontex's claims are barred, in part or in whole, by the applicable statute of limitations."  ECF 45, "Answer" 16.

### i. Parties' Contentions

Nike acknowledges that its statute of limitations defense only applies to Lontex's state law claims in Counts IV and V of the Amended Complaint.  Nike Opp'n 39.  The parties are also in agreement that Pennsylvania law applies to Lontex's state law claims for purposes of determining the statute of limitations.  ECF 230, Hr'g Tr. 6:10–15.  Nike argues that the relevant statute of

limitations is "the two-year limitation period in any action or proceeding to recover damages for injury to person or property that is founded on negligent, intentional, or otherwise tortious conduct."  Nike Opp'n 40 (citing 42 Pa. C.S.A. § 5524(7)).  Lontex argues that instead the six-year statute of limitations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") should apply.  Lontex Reply 5–6.

### ii. Discussion

As the parties are in agreement, the Court will assume that Pennsylvania law applies.  See also Ross v. Johns-Manville Corp., 766 F.2d 823, 826 (3d Cir. 1985) ("Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations.").  "Pennsylvania cases distinguish between common law fraud and claims brought pursuant to the UTPCPL." Fazio v. Guardian Life Ins. Co. of Am., 62 A.3d 396, 411 (Pa. Super. 2012).  Therefore, the Court will consider the appropriate statute of limitations for the two distinct state law claims in Counts IV and V separately.  Count V is brought pursuant to the Deceptive and Unfair Business Practices Acts of several other states, which are equivalent to the UTPCPL.  The UTPCPL has a six-year statute of limitations, and that is the limitations period which applies to Count V.  Gabriel v. O'Hara, 534 A.2d 488, 495 (Pa. Super. 1987).  Lontex's Count V was brought within this time period.

Lontex's Count IV brings a claim of common law trademark infringement.  Several of the cases discussed by the parties consider how courts have applied a state law statute of limitations to the Lanham Act which does not itself have a statute of limitations for purposes of determining whether laches applies.[1]  Such holdings are not relevant here where the Court is considering the

---

[1] While not relevant to Nike's statute of limitations defense, the Court notes that the Third Circuit has held that the most analogous state law for determining an appropriate time period for filing suit under the Lanham Act is the six-year limitation period in the UTPCPL.  Santana Prods. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 135 (3d Cir. 2005).

statute of limitations for a common law claim.  Both <u>Am. Diabetes Ass'n v. Friskney Family Tr., LLC</u>, 177 F. Supp. 3d 855, 882 (E.D. Pa. 2016) (Goldberg, J.) and <u>Guardian Life Ins. Co. of America v. American Guardian Life Assurance Co.</u>, 943 F. Supp. 509, 517 (E.D. Pa. 1996) (Padova, J.) held that a two-year statute of limitations applied to common law claims for unfair competition.  Lontex's Count IV was not brought within this time period.

However, Lontex also argues that the limitations period for a claim of trademark infringement is rolling.  "In cases of continuing infringement, the majority rule is that a plaintiff may recover for infringement which occurred during the statutory limitations period preceding the filing of the suit, but may not recover for infringement which occurred prior to that period." <u>Gloster v. Relios, Inc.</u>, No. 02-7140, 2006 WL 1737800, at *1 n.1 (E.D. Pa. June 26, 2006) (Pollak, J.).  Therefore, even though Lontex's Count IV was brought over two years after the initial discovery of the infringement, this claim is not barred in its entirety.  Lontex's Count IV, as it relates to Nike's conduct during the two years preceding the filing of this lawsuit, may proceed.

### c.  Fifteenth Affirmative Defense: Laches, Waiver, Acquiescence, and Estoppel

Nike's Fifteenth Affirmative Defense states that "Lontex's claims are barred, in part or in whole, by the doctrines of laches, waiver, acquiescence, and estoppel."  Answer 16.

### i.  Laches

"Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." <u>Santana Prods. v. Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123, 138 (3d Cir. 2005).  "Once the statute of limitations has expired, the defendant enjoys the benefit of a presumption of inexcusable delay and prejudice." <u>Id.</u> (quotation omitted).  "[T]he correct disposition of the equitable defense of laches can only be made by a close scrutiny of the

particular facts and . . . it usually requires the kind of record only created by full trial on the merits." Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1066 (3d Cir. 1991).

When determining whether there was inexcusable delay, "[b]ecause the Lanham Act does not specify a statute of limitation, courts must adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." Santana, 401 F.3d at 135.  Courts do so by "characteriz[ing] the essence of the claim in the pending case, and decid[ing] which statute provides the most appropriate limiting principle."  Id.  The Third Circuit has found that "[t]he UTPCPL is the most analogous state cause of action that would encompass all claims brought under § 43(a) of the Lanham Act."  Id. at 137.  Given the holding in Santana, along with the above discussion, Nike is generally not entitled to a presumption of delay.  However, "for the purpose of a laches analysis in a case involving continuing wrongs [as is the case with Lontex's Count IV], the statutory limitations period commences when the plaintiff knew or should have known about the cause of action."  Gloster, 2006 WL 1737800, at *1 n.1.

Nike has raised a material issue of fact regarding Lontex's delay.  After communications between the parties regarding Nike's alleged infringement ensued for several months, Nike did not hear from Lontex for two years.  This delay, while not extensive enough for the statute of limitations to have expired, is significant when considering that Lontex claimed its business was being completely destroyed and had already started the process of negotiating with Nike over this loss.

"To establish the second prong of laches, prejudice, a party must show that some change in the condition or relations of the parties occurred during the period in which the plaintiff unreasonably failed to act."  Appel v. Kaufman, 728 F. Supp. 2d 684, 698 (E.D. Pa. 2010) (McLaughlin, J.).  There are two types of prejudice a defendant might suffer.  "Evidentiary

9

prejudice occurs when, by reason of the delay, a defendant is unable to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories." Heraeus Electro-Nite Co. v. Midwest Instrument Co., No. 06-355, 2007 WL 2071905, at *4 (E.D. Pa. July 17, 2007) (Padova, J.). "Economic prejudice occurs when a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the patentee brought suit earlier." Id. In finding economic prejudice, the court does "not merely consider those losses attributable to a finding of liability for infringement, but must look for a change in the defendant's economic position during the period of delay." Id.

Nike has also raised a material dispute of fact regarding prejudice. Nike argues that Lontex only began using "cool compression" once its discovered Nike's alleged infringement, and that Nike is prejudiced because Lontex "delayed filing suit while creating the appearance of continuous consumer-facing use of the COOL COMPRESSION marks." Nike Opp'n 32. Evidence that only came to exist after Lontex put Nike on notice of potential infringement creates an issue of fact with respect to prejudice that resulted from Lontex's delay.

### ii. Acquiescence, Waiver, and Estoppel

"[T]he equitable defense of acquiescence [occurs] when the trademark owner, by affirmative word or deed, conveys its implied consent to the use of a mark." Covertech Fabricating, Inc. v. TVM Building Products, Inc., 855 F.3d 163, 175 (3d Cir. 2017) (quotation omitted). "Relevant considerations, required as elements in a number of our sister Circuits, may include whether (1) the senior user actively represented that it would not assert a right or a claim; (2) the senior user's delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." Id. at 175. Nike does not separately address the doctrines of waiver and estoppel, stating that the Third Circuit views waiver

and acquiescence as the same, and that laches is a kind of "equitable estoppel."  Therefore, the Court will not address these defenses separately.

Lontex argues that a defense of acquiescence requires active conduct on the part of the senior user, and that Lontex has not done anything that would constitute approval for Nike to use the "cool compression" trademark.  Nike argues that Lontex acquiesced to Nike's use of "cool compression" when Nike did not hear from Lontex for two years after Nike agreed to adjust its use of "cool compression" voluntarily.  Nike also argues that when Lontex did contact Nike again, Lontex only referenced third-party retailers use of "cool compression" not Nike's.

While the Court notes that acquiescence and laches are separate doctrines, they are related. Therefore, the Court finds that the evidence put forth regarding Lontex's delay and failure to communicate with Nike after Nike agreed to voluntarily adjust its use of "cool compression" creates a dispute of fact with respect to the defense of acquiescence.

With respect to the defenses of laches, waiver, acquiescence, and estoppel, Lontex's Motion will be denied.  Prior to trial, Nike must specify which of these legal theories it will pursue at trial.

## V.      Nike's Motion

Nike has moved for summary judgment seeking dismissal of all of Lontex's claims.  Nike argues first, that no reasonable jury could find that Nike has committed trademark infringement, because no likelihood of confusion exists.  In a footnote, Nike argues that Lontex abandoned its trademark.  Next, Nike argues that its use of the term "cool compression" is protected by the affirmative defense of fair use.  Lastly, Nike argues that it is not contributorily liable for third-party use of the trademark.

### a.  Factual Background

11

The relevant facts with respect to Nike's Motion, viewed in the light most favorable to Lontex, are as follows. The record contains several examples of Nike's alleged infringement. For example, Lontex presents Nike catalogs marketed to sports teams which include products with the phrase "cool compression" in the name, products which use one of these words, or products which use both words separated by another word.[2] See, e.g., ECF 203-19. For example, the catalogues include products titled "Nike Pro Cool Fitted Short-Sleeve Top," "Nike Pro Cool Compression Short-Sleeve Top," and "Nike Pro Cool 6" Compression Short." Id. The record also includes images captured from Nike's website showing products with the same or similar names. ECF 203-38. Other examples demonstrate third-party retailers selling Nike products with "cool compression" in the name including Dick's Sporting Goods (ECF 203-23), Eastbay Running Store (ECF 203-27), Academy Sports + Outdoors (ECF 203-28), Amazon (ECF 203-41), and others.

The record also contains evidence regarding how Nike marketed its products in its stores, including the sworn declaration of a Nike Store employee. Kenisha Likely was a cashier at a Nike Factory Store in South Carolina from March 2013 to June 2016. ECF 203-56, "Likely Decl." ¶ 2. Ms. Likely explained that "Cool Compression" was "definitely a product name that was used for a number of apparel" sold at the Nike Factory Store. Likely Decl. ¶ 4. Ms. Likely explained that she "learned about the name 'cool compression' and to use it with Nike's 'cool compression shorts' and 'cool compression pants,' etc. because the mangers of the store would repeatedly tell [employees] about the name." Id. Ms. Likely recalled a specific example from her training in

---

[2] Both parties agree that the words "cool" and "compression" have different meanings depending on the context. The Court previously ruled that this case is limited to Nike's use of "cool compression" and that examples of alleged infringement where the words "cool" and "compression" are not used next to one another, are not at issue. However, these examples of Nike's use of "cool" and "compression" separately are relevant context for considering Nike's arguments, and are included here for that purpose.

which a manager told her that if someone asked for pants to respond with "Ok, well let me take you here to show you these Cool Compression pants." Id.

Lastly, the record demonstrates how these uses of "cool compression" were regarded by Lontex's customers. Lontex provides declarations from nine professional sports team trainers, the subject of a prior Motion for Sanctions by Nike. The circumstances related to these declarations are discussed in detail by the Court in a previous opinion. Lontex Corp. v. Nike, Inc., No. 18-5623, 2020 WL 6786134 (E.D. Pa. Nov. 18, 2020). Mike Kozak, who was an Assistant Athletic Trainer for the Miami Marlins, provided one of these declarations which is representative of the others. ECF 203-54, "Kozak Decl." Mr. Kozak explained that in his role as a trainer he was familiar with Lontex's products and used them because of their superior performance. Kozak Decl. ¶¶ 4–5. He stated that he had heard Lontex's CEO refer to Lontex's products with the "cool compression" trademark on several occasions. Kozak Decl. ¶ 6. Mr. Kozak was also familiar with the Nike products purchased by the Marlins. Kozak Decl. ¶ 9. As a part of his declaration, he reviewed several examples of Nike's alleged infringement, and stated "they make me believe that Nike is using Lontex's COOL COMPRESSION technology in these compression garments." Kozak Decl. ¶ 9.

### b. Parties Arguments

At oral argument, counsel for both parties agreed that the words "cool" and "compression" have different meanings when used in different contexts. When a trademark uses common words with various meanings, as here, several issues arise. One is that the trademark itself may not be valid based on its general nature. See United States PTO v. Booking.com B.V., 140 S. Ct. 2298, 2301 (2020) ("A generic name—the name of a class of products or services—is ineligible for federal trademark registration."). Nike has brought several counterclaims, arguing, among other

things, that Lontex's trademark is not valid.  However, Nike has not moved for summary judgment on this issue, and therefore the validity of Lontex's trademark is not at issue here.

A trademark using common words with various meanings also raises issues with respect to whether there is a likelihood of confusion and the fair use defense.  In Booking.com, while primarily considering whether "combining a generic term with '.com' yields a generic composite," the Supreme Court noted that the likelihood of confusion analysis and fair use defense are well-suited to protect against a plaintiff suing anyone who uses its trademarked generic term.  Id. at 2300.  The Court stated that "trademark law hems in the scope of such marks short of denying trademark protection altogether.  Notably, a competitor's use does not infringe a mark unless it is likely to confuse consumers."  Id. at 2307.  The Court further detailed the various ways in which the likelihood of confusion analysis takes into account the mark's distinctiveness:

> The weaker a mark, the fewer are the junior uses that will trigger a likelihood of consumer confusion.  When a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner. Similarly, in a crowded field of look-alike marks (e.g., hotel names including the word "grand"), consumers may have learned to carefully pick out one mark from another.

Id. (quotations omitted).  Lastly, the Court explained that the doctrine of fair use also protects potential defendants against liability based on their use of generic, descriptive words.  Id. at 2307–08.

Nike argues that Lontex cannot prevent Nike from using "cool compression," when Nike only uses those words in a commonly understood, descriptive sense.  At oral argument, relying on Booking.com, Nike emphasized that Lontex's trademark of "cool compression" is limited by the fact that it consists of words with ordinary meanings that are commonly used by athletic apparel companies to describe their products.  Nike explains that it uses the term "cool" to "describe the

14

thermoregulation qualities of its baselayer apparel products" and uses "compression" to describe "the tight fit." It is common knowledge that these qualities are advantageous for athletes or people engaging in exercise. Nike asserts that its descriptive use also explains why some of Nike's product names include both "cool" and "compression," but others do not. It also explains why these terms do not always appear next to one other in Nike's product names.

Nike also argues that the Court must consider the context in which Nike used "cool compression" and that "consumers that look at these know that they are buying from Nike. They know that Nike has for years used compression to describe this tight-fitting fit of its products. Same with cool." Hr'g Tr. 27:18–21. As result, Nike argues "those words don't transcend into any sort of trademark meaning to the consumers here." Hr'g Tr. 27:24–25. Nike further explains that its use of "cool compression" differs from Lontex's: "Nike has not put it up on the top header of its website or called it out in any trademark fashion like, by the way, Lontex has. If you look at the uses side-by-side, they look very different." Hr'g Tr. 27:25–28:4. Despite Nike's admitted use of "cool compression," Nike asserts that there are no material facts at issue in this case, and that it cannot be held liable to Lontex as a matter of law.

Lontex emphasizes the evidence in the record which demonstrates Nike's repeated uses of Lontex's full trademark in several product names. It also highlights the statements from its customers that they were confused by Nike's use of "cool compression." Lontex argues that these facts, and the highly fact-specific nature of a trademark case, require the Court to deny Nike's Motion for Summary Judgment.

Lontex has presented evidence that it uses its trademark to help sell its product, and that its customers recognize "cool compression" to mean something specific with respect to Lontex. As a result, Lontex contends that Nike's conceded use of the term of "cool compression" has caused

consumer confusion.  Lontex argues that Nike puts too much emphasis on the fact that Nike uses "cool compression" alongside its "Nike Pro" trademark.  "Sweat It Out" is the brand name which Lontex uses to market its products, and uses alongside "cool compression."  Lontex points out that "everyone has a house mark" and what's more relevant is how Lontex used the "cool compression" mark.  Lontex argues that it used the mark to promote its particular product, which has special properties that are valued in the marketplace.  Lontex argues that evidence in the record, including depositions from its customers like Mr. Kozak, demonstrate this.  Lontex argues that there are material facts in dispute, particularly as to the extent and context in which Nike has used the mark, and whether there was a likelihood of customer confusion.

### c.  Likelihood of Confusion

In order to prove its Lanham Act and state law claims,[3] Lontex must show that Nike's "use of the mark to identify goods or services causes a likelihood of confusion." A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  In this Circuit, courts consider the factors laid out in Interpace Corp. v. Lapp, Inc. when determining whether a likelihood of confusion exists:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same;

---

[3] The elements for Lanham Act trademark infringement (15 U.S.C. § 1114) and unfair competition, (15 U.S.C. § 1125(a)) are the same.  A & H Sportswear, Inc., 237 F.3d at 210. State law claims for trademark infringement are also the same, without the requirement of interstate commerce.  R.J. Ants., Inc. v. Marinelli Enterprises, LLC, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011) (Tucker, J.).

> (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

721 F.2d 460, 463 (3d Cir. 1983).  "The Lapp factors are best understood as 'tools to guide a qualitative decision.'  None of them in itself is determinative and each must be 'weighed and balanced' based on the particular facts of the case."  Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC, 793 F.3d 313, 320 (3d Cir. 2015) (quoting Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 709 (3d Cir. 2004)).  "Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting.  A district court should utilize the factors that seem appropriate to a given situation."  Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005).  The Third Circuit has stated that "[f]ailure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception."  Country Floors, 930 F.2d at 1062–63.

When analyzing a claim of reverse confusion,[4] the second, fifth, and sixth Lapp factors must be analyzed differently than in a typical direct confusion case."  Freedom Card, 432 F.3d at 472.

### i.  Lapp Factor One – Degree of Similarity

In Country Floors, the Third Circuit held that the "similarity [of the marks] alone [wa]s enough to raise a genuine factual dispute on [plaintiff's] § 32 Lanham Act trademark infringement

---

[4] "While the essence of a direct confusion claim is that a junior user of a mark is said to free-ride on the reputation and good will of the senior user by adopting a similar or identical mark, reverse confusion occurs when the junior user saturates the market with a similar trademark and overwhelms the senior user."  A&H Sportswear, Inc., 237 F.3d at 228 (quotation omitted).

claim."  930 F.2d at 1063; see also Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175,

183 (3d Cir. 2010) ("The single most important factor in determining likelihood of confusion is

mark similarity.").

Marks are "confusingly similar if ordinary consumers would likely conclude that [they]

share a common source, affiliation, connection or sponsorship."  Fisons Horticulture, Inc. v.

Vigoro Indus., 30 F.3d 466, 477 (3d Cir. 1994).  "The proper test is not side-by-side comparison

but whether the labels create the same overall impression when viewed separately."  Kos Pharms.,

369 F.3d at 713 (internal quotations omitted).  "[T]he court looks to sight, sound, and meaning,

and compares whether these elements combine to create a general commercial impression that is

the same for the two marks."  A&H Sportswear, Inc., 237 F.3d at 229.  "Where the goods . . . are

directly competitive, the degree of similarity required to prove a likelihood of confusion is less

than in the case of dissimilar products."  3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS

AND UNFAIR COMPETITION § 23:20.1 (4th ed. 2003).

Nike contends that the Nike and Lontex products at issue would not appear similar in the

context of the marketplace because they were branded with the companies' names in addition to

"cool compression."  Nike explains that the context in which the term "cool compression" appears

in its marketing makes it clear that it's a descriptive term and that the only branding associated

with its clothing is Nike branding.  Nike emphasizes that it does not use "cool compression" in

any repeated, consistent way, and that it did not use the phrase on its own, only within certain

product descriptions.  By contrast, Lontex uses its "cool compression" on its own and in headers,

as opposed to product descriptions.

Lontex argues that its trademark is simply the words "cool compression" without

stylization and that its primary uses of the mark are on its clothing care labels and on its website.

Lontex also argues that Nike retail associates referred to Nike products as "cool compression."  It argues that the use of the words "cool compression" makes Nike's use very similar to Lontex's and that the addition of other words around cool compression does not make a difference.

### ii.  **<u>Lapp</u> Factor Two – Strength of the Mark**

"The term 'strength' in the context of trademarks refers to the distinctiveness of the mark; its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." <u>Kinbook, LLC v. Microsoft Corp.</u>, 866 F. Supp. 2d 453, 465 (E.D. Pa. 2012) (Pratter, J.).  "In evaluating the strength of a mark under <u>Lapp</u>, courts look to (1) the inherent features of the mark contributing to its distinctiveness or 'conceptual strength' and (2) the factual evidence of the mark's marketplace recognition or 'commercial strength.'" <u>Id.</u>  In making a claim of forward confusion, Lontex must prove both "conceptual" and "commercial" strength. <u>A & H Sportswear</u>, 237 F.3d at 221.  In making a claim of reverse confusion, Lontex must establish that its mark is conceptually strong, and for commercial strength, whether "any advertising or marketing campaign by [Nike] has resulted in a saturation in the public awareness of the junior user's mark." <u>Freedom Card</u>, 432 F.3d at 473.

### 1.  **Conceptual Strength**

Ranked from weakest to strongest, "[c]ourts classify the distinctiveness or conceptual strength of a mark as either (1) generic, like Diet Chocolate Fudge Soda; (2) descriptive, like Security Center; (3) suggestive, like Coppertone; or (4) arbitrary or fanciful, like Kodak." <u>Sabinsa</u>, 609 F.3d at 185.

> Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product.  Suggestive marks require consumer imagination, thought, or perception to determine what the product is.  Descriptive marks forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods.  Generic marks function as the common descriptive name of a product class.

Id. (quotations omitted).

Nike argues that Lontex's mark is conceptually weak because it is descriptive.  It explains that Lontex itself uses the terms "cool" and "compression" in a descriptive manner, as do numerous other companies when describing athletic apparel.  Lontex explains that its mark is a composite of two words in which "cool" modifies "compression" and that it makes use of alliteration.  It argues that "cool compression" is arbitrary or fanciful because there is nothing inherently "cool" about "compression," so when the mark is taken as a composite it is not descriptive of anything.

## 2.  Commercial Strength

"In examining a mark's commercial strength, [courts] examine marketplace recognition." Freedom Card, 432 F.3d at 472.  "Such evidence includes records showing the nature of the mark, the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace.  Steak Umm Co., LLC v. Steak 'Em Up, Inc., 868 F. Supp. 2d 415, 427 (E.D. Pa. 2012) (Stengel, J.).

Nike argues that Lontex's mark is not well known by the general public, that Lontex does not sell its products through large retailers, that it had a relatively small amount of sales, and that it has not dedicated significant efforts to marketing "cool compression."  Lontex argues that even as a small company without significant sales it can have a commercially strong mark.  Further, Lontex argues that testimony from team trainers who have used Lontex's products demonstrates their familiarity with "cool compression."  Lontex also emphasizes that it marketed its product in various ways including putting the name on care labels, discussing it in sales presentations and industry trade shows, and in smaller customer gatherings.

### iii.  **Lapp Factor Three – Degree of Care**

20

The third <u>Lapp</u> factor is "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase."  721 F.2d at 463.  "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion."  <u>Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.</u>, 269 F.3d 270, 284 (3d Cir. 2001).  "[C]ourts have repeatedly held that buyers of athletic apparel and footwear are not likely to exercise a high degree of care."  <u>New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC</u>, 424 F. Supp. 3d 334, 348 (D. Del. 2019) (collecting district court cases).

### iv.  <u>Lapp</u> Factor Five – Intent

"In evaluating this factor, courts must look at whether the defendant chose the mark to intentionally confuse consumers, and thereby capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its proposed mark."  <u>Sabinsa</u>, 609 F.3d at 187. "A defendant that persisted in its plan to adopt a mark after being warned of too close resemblance between its proposed mark and plaintiff's mark is not blameless."  <u>Kos Pharms.</u>, 369 F.3d at 721 (quotation omitted).  "Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice."  <u>Louis Vuitton Malletier & Oakley, Inc. v. Veit</u>, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) (Reed, J.).  Intent to confuse varies slightly when considering direct and reverse confusion.  "The difference is that the tenor of the intent to confuse evidence changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion), to the deliberate intent to push the senior user out of the market (reverse confusion)." <u>Freedom Card</u>, 432 F.3d at 479 (citations omitted).

Nike argues that it had no knowledge of the "cool compression" mark and that there is no evidence that it intended to use Lontex's mark.  It again points to the fact that these are commonly

used terms in the athletic apparel industry.  Nike argues that it has been using these terms to describe its products for a long time, and that the fact that they sometimes appear next to one another does not indicate Nike's intent to use Lontex's mark.  Nike explains that it did not conduct a trademark search because it would not typically do so for descriptive terms, and that it is not required to do so in order to show it acted in good faith.  Nike also argues that continuing to use "cool compression" after Lontex's first contact regarding its trademark is also not sufficient to show bad faith.  In response, Lontex argues that Nike had notice of "cool compression" based on Nike's unique access to professional sports teams that are Lontex customers.  Lontex also argues that Nike's post-notice infringement is definitive evidence of bad faith.

### v.  **Lapp** Factors Four and Six – Actual Confusion and Length of Time

Lapp factors four and six are closely related and consider "the length of time the defendant has used the mark without evidence of actual confusion arising" and "the evidence of actual confusion."  721 F.2d at 463.  "[I]t is difficult to find evidence of actual confusion because many instances are unreported.  For this reason, evidence of actual confusion may be highly probative of the likelihood of confusion."  Checkpoint Sys., 269 F.3d at 291.

Nike argues that "Lontex has not produced any competent evidence of consumer confusion under actual marketplace conditions."  Nike MSJ 34.  Lontex responds that the declarations of professional sports team trainers are highly probative on this point.

### vi.  **Lapp Factors Seven, Eight, Nine, and Ten – Marketing Channels, Target Audience, Similar Goods, and Other Factors**

The seventh, eighth, and ninth Lapp factors are as follows:

> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting

that the consuming public might expect the prior owner to
manufacture a product in the defendant's market, or that he is likely
to expand into that market.

721 F.2d at 463.

For <u>Lapp</u> factors seven and eight, "[t]he greater the similarity in advertising and marketing
campaigns, the greater the likelihood of confusion." <u>Checkpoint Sys.</u>, 269 F.3d at 288–89. <u>Lapp</u>
factor nine "focuses not on consumer sophistication but on the products themselves, since the
determination is whether consumers may see them as related." <u>Sabinsa</u>, 609 F.3d at 189.

Nike emphasizes that it targets and sells its products to different customers than Lontex
does, and in different ways. Nike explains that its products are widely available and marketed to
the general public, and that Lontex focuses on selling its products through physical therapists and
athletic trainers. It emphasizes that Lontex's products are meant for injury prevention or
rehabilitation, while Nike's products are generally used for regular exercise. In response, Lontex
argues that Nike also sells to professional sports teams and competes with Lontex in selling to
other serious athletes and trainers. Lontex also emphasizes that at baseline both companies'
products serve the same function and customers would understand them that way.

### vii.   **Lapp Factors Analysis**

As made clear from the above discussion, the likelihood of confusion analysis in a
trademark case is a fact-intensive inquiry, and cannot typically be decided at the summary
judgment stage. While Nike presents strong legal arguments regarding Lontex's claim of
trademark infringement, there are several material question of fact with respect to the <u>Lapp</u> factors
which prevent the Court from granting summary judgment.

While Nike argues its use of "cool compression" is different from Lontex's such that the
uses are not "confusingly similar," there is a dispute of fact with respect to the first <u>Lapp</u> factor.

Nike is correct that it uses the words "cool compression" in a different context than Lontex generally, but Lontex explains the significance of the similarity in the "general commercial impression" of the marks.   In the marketplace, both companies refer to their products in conversations with customers and advertisements as "cool compression."  Ms. Likely's declaration demonstrates that at least in some instances, some of Nike's products were referred to simply as "cool compression."  This use is comparable to the use described by Mr. Kozak in his declaration regarding Lontex's marketing.  These instances in which both companies refer to their products in a marketing setting as "cool compression" create a dispute of fact with respect to the first <u>Lapp</u> factor.

The Court further finds that the declaration of Mr. Kozak and the other professional sports team trainers create disputed facts with respect to several of the <u>Lapp</u> factors, but most importantly with respect to "actual confusion."  These declarations are sworn statements of "actual confusion" from Lontex customers.  Given how important actual confusion is to the <u>Lapp</u> analysis and the requirement that the Court view all the evidence in Lontex's favor, the Court must give these statements their due weight.  Nike disparages theses declarations and argues that Lontex essentially created these statements themselves.  On summary judgment, it is not the role of this Court to weigh evidence and determine the credibility of certain declarants.  Nike may challenge the reliability of this evidence at trial, but at this stage, the Court finds that it weighs heavily against granting summary judgment.

The professional sports team trainers' declarations also create a dispute of fact with respect to <u>Lapp</u> factor two, strength of the mark, given the statements regarding the trainers' impressions of Lontex and their respect for Lontex's product.  The statements regarding the trainers' knowledge of Lontex and Nike's competing products marketed to professional sports teams also creates an

issue of fact with respect to <u>Lapp</u> factors seven, eight, nine, and ten.  While Nike and Lontex may have chosen to market their products differently in some ways, and clearly Nike has a significantly larger customer base, that does not dictate a finding for Nike.  Lontex has raised several issues of fact with respect to overlapping customers of the two companies, including but not limited to, professional sports teams.

Taken together, these selections from the evidentiary record require that the court deny summary judgment.  As stated above, the Court notes that there are many more facts raised by the parties, but the Court need not go beyond identifying these few material facts for purposes of deciding this Motion.

### d.  Abandonment

In a footnote, Nike argues that "[s]eparate and apart from Lontex's failure to establish a likelihood of confusion, Lontex's claims fail because it abandoned any trademark rights in COOL COMPRESSION."  Nike MSJ 17.  The Court declines to address this argument given that it is made solely in a footnote.  It was not addressed by Lontex in opposition, or by Nike in its reply.  <u>See</u> <u>John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.</u>, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").  Further, Nike admitted at oral argument that whether Lontex owns a valid trademark of "cool compression" "is not material for purposes of this motion because [Nike] only moved as to the lack of likelihood of confusion."  Hr'g Tr. 16:22–24.

### e.  Fair Use

Next, Nike claims that it is entitled to summary judgment on the basis of its "fair use."  "Classic fair use is an affirmative defense to a traditional trademark infringement count."  MCCARTHY ON TRADEMARKS § 11:45.  It "protects from liability anyone who uses a descriptive

term, 'fairly and in good faith' and 'otherwise than as a mark,' merely to describe her own goods." Booking.com, 140 S. Ct. at 2307–08 (quoting 15 U.S.C. § 1115(b)(4)).  The justification for this doctrine is that "[b]y choosing a descriptive term, the trademark owner must live with the result that everyone else in the marketplace remains free to use the term in its original 'primary' or descriptive sense."  MCCARTHY ON TRADEMARKS § 11:45.

To prevail on summary judgment with a fair use defense, Nike must demonstrate that: (1) it used "cool compression" in a non-trademark manner; (2) the use is descriptive of its goods or services; and (3) it used "cool compression" in good faith.  See 15 U.S.C. § 1115(b)(4).  The Supreme Court has held that the affirmative defense of fair use is still available, even where some likelihood of confusion exists.  KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 114 (2004).

"While summary judgment on the fair use defense in a trademark case is possible," the Ninth Circuit has stated that granting summary judgment on this basis "is generally disfavored." Marketquest Group, Inc. v. BIC Corp., 862 F.3d 927, 935 (9th Cir. 2017).

### i.   Non-Trademark Manner

"Words or phrases function as trademarks when they are used by a source of a product to identify itself to the public as the source of its product and to create in the public consciousness an awareness of the uniqueness of the source and of its products."  SportFuel, Inc. v. PepsiCo, Inc., 932 F.3d 589, 596 (7th Cir. 2019).

Nike cites to Dessert Beauty, Inc. v. Fox, 568 F. Supp. 2d 416 (S.D.N.Y 2008), aff'd, 329 Fed. App'x. 333 (2d Cir. 2009).  In Dessert Beauty, the court explained that "[w]ords on a product's packaging generally do not serve as a trademark where there is also a conspicuously

visible trademark that clearly serves that function." <u>Id.</u> at 424.  The court further explained that product names

> generally do not amount to trademark use because such names, as a "common descriptive name of a product," are generic, <u>San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.</u>, 483 U.S. 522, 532 n.7 (1987), and generic terms cannot be trademarked under the Lanham Act, see, e.g., <u>Papercutter, Inc. v. Fay's Drug Co.</u>, 900 F.2d 558, 562 (2d Cir. 1990).  Product names identify a category or class of goods, but do not indicate the source of the goods.

<u>Id.</u>

In response, Lontex relies on <u>Marketquest</u>.  In that case the court distinguished between uses of the trademarked phrase "all-in-one," finding that some uses could potentially be construed as trademark uses and others could not.  For example, using the phrase "all-in-one" "without a trademark symbol, and positioned as a heading over a list of all the products consolidated 'in one' catalogue" was not a trademark usage because the company name, Norwood, "was used to indicate the source of the goods, rather than 'All-in-One.'"  <u>Marketquest</u>, 862 F.3d at 936.  By contrast, references to "the 2011 Norwood All in ONE catalogue" and "a Norwood ALL in ONE Basket" "could reasonably be understood to indicate source."  <u>Id.</u>

### ii.  Descriptive

Lontex argues that its "Cool Compression mark is somewhere on the spectrum between suggestive and arbitrary for compression garments."  Lontex Opp'n 69.  Nike argues that "[r]egardless whether the protected mark is descriptive, suggestive, arbitrary, or fanciful . . . , the public's right to use descriptive words . . . in good faith in their ordinary descriptive sense must prevail over the exclusivity claims of the trademark owner."  <u>Car-Freshner Corp. v. SC Johnson & Son, Inc.</u>, 70 F. 3d 267, 270 (2d Cir. 1995).  Nike also notes that "one can make a non-infringing, descriptive 'fair use' even if the senior user is not using the term in a descriptive sense . . . . That

is, the key is the junior user's descriptive use, not the senior user's descriptive use." Smith v. Ames Dep't Stores, 988 F. Supp. 827, 836 n.7 (D.N.J. 1997) (quotation omitted).[5]

### iii.  Good Faith

Lontex argues that Nike cannot prove that it acted in good faith because Nike should have conducted a trademark search before using cool compression and because Nike did not cease its use of "cool compression" immediately upon Lontex's demand.  Nike asserts that Dessert Beauty addressed both of these arguments in favor of a finding of bad faith, and found that they were not sufficient.  568 F. Supp. 2d at 427.

### iv.  Fair Use Defense Analysis

As there are issues of material fact with respect to the fair use defense, the Court must deny summary judgment on this basis as well.  Whether Nike's use of "cool compression" was as a trademark and purely descriptive are questions of fact, and the declarations of Mr. Kozak and the other professional sports team trainers are relevant here.  These declarations demonstrate that Nike's use of "cool compression" could be perceived as a trademark and could be considered to not be purely descriptive.  Mr. Kozak clearly stated that he perceived Nike's use of "cool compression" to indicate that Nike was using Lontex's product.  As above, Nike makes important legal arguments on this issue, but cannot demonstrate that there are no genuine disputes of material fact with respect to the fair use defense.

### f.  Contributory Liability

Nike argues that it cannot be liable under a contributory infringement theory because Lontex cannot prove direct infringement.  As the Court declines to grant summary judgment on

---

[5] The Court notes that both parties cited this same sentence from Smith v. Ames Dep't Stores, but that Lontex inverted senior and junior user such that the sentence had the opposite meaning.

Lontex's trademark infringement claims, summary judgment will be denied with respect to contributory liability as well.

## VI.    Conclusion

For the reasons stated above, Lontex's Motion will be granted in part and denied in part, and Nike's Motion will be denied.  An appropriate Order follows.

O:\CIVIL 18\18-5623 Lontex Corp v Nike\18cv5623 Memorandum Re SJ Motions .docx