**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LONTEX CORPORATION,

                Plaintiff,

      v.

NIKE, INC.,

                Defendant.

Civil Action No.  2:18-cv-05623-MMB

**PLAINTIFF LONTEX CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO
EXCLUDE THE SURVEYS, REPORTS, AND RELATED TESTIMONY OF HAL
PORET, MATTHEW EZELL, AND CAROL A. SCOTT, PH.D.**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT ........................................................................................... 4

   A.   The Poret and Ezell Surveys are Inadmissible On the Issue of Reverse
        Confusion ........................................................................................ 4

      1.   Nike Concedes that Ezell's Survey, Report, and Related Testimony
           is Inadmissible for Reverse Confusion ...................................... 4

      2.   Poret Ignored Lontex's Potential Customer Base, which Infected
           His Universe Definition Beyond Rehabilitation ........................ 4

   B.   Nike's Opposition Cannot Remedy The Noise in Poret's Survey ......... 7

   C.   Mr. Ezell's Survey, Report, and Related Testimony Do Not Fit This Case ........ 10

   D.   The Surveys Failed to Sample the Proper Universe of Respondents and
        Should be Excluded Altogether .......................................................... 11

   E.   The Surveys, Reports, and Related Testimony are Prejudicial, Misleading,
        and a Waste of Time, and Should Be Excluded Pursuant to FRE 403 ............... 14

III.  CONCLUSION ...................................................................................... 15

i

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.*,
    2013 WL 12122803 (C.D. Cal. June 21, 2013) ........................................................................9

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252 (5th Cir. 1980) .............................................................................................5, 13

*AWGI, L.L.C. v. Atlas Trucking Co., L.L.C.*,
    No. 17-12131, 2020 WL 3546100 (E.D. Mich. June 30, 2020) ...............................................9

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
    No. CIV.A. 01-1524, 2003 WL 24010950 (W.D. Pa. Apr. 23, 2003), *aff'd by
    Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d
    Cir. 2004) ............................................................................................................................13

*Citizens Fin. Grp., Inc., v. Citizens Nat. Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004) ............................................................................................2, 15

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
    628 F.2d 500 (5th Cir.1980) ..................................................................................................5

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
    220 F. Supp. 2d 358 (D.N.J. 2002) ........................................................................................1

*Kars 4 Kids, Inc. v. Am. Can!*,
    No. 314CV7770PGSDEA, 2019 WL 1755912 (D.N.J. Apr. 18, 2019) ...................................13

*Macfarlan v. Ivy Hil SNF, LLC*,
    675 F.3d 266 (3d Cir. 2012).....................................................................................................7

*Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*,
    2015 U.S. Dist. LEXIS 74700, 2015 WL 3633987 (N.D. Ill. Jun. 10, 2015)..........................9

*PBM Prod., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ..................................................................................................6

*Squirt Co. v. Seven-Up Co.*,
    No. 78-375C (A), 1979 WL 25027 (E.D. Mo. Sept. 6, 1979) *aff'd* 628 F.2d
    1086 (8th Cir. 1980).................................................................................................7, 8, 9, 14

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 276 (2d Cir. 1999)..................................................................................................15

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 13-MD-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) ...............................................1

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010) ...........................................................................................4

*Trouble v. Wet Seal, Inc.*,
179 F. Supp. 2d 291 (S.D.N.Y. 2001) .........................................................................................15

*Valador, Inc. v. HTC Corp.*,
242 F. Supp. 3d 448 (E.D. Va. 2017), *aff'd*, 707 F. App'x. 138 (4th Cir. 2017)..............2, 6, 7

*Water Pik, Inc. v. Med-Sys., Inc.*,
No. 10-CV-01221-PAB-CBS, 2012 WL 2153162 (D. Colo. June 13, 2012) ..........................5

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
913 F. Supp. 1454 ........................................................................................................................14

**Other Authorities**

Federal Rule of Evidence 403.................................................................................................4, 15

Federal Rule of Evidence 702.............................................................................................3, 14, 15

Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep.
727 (2016) .............................................................................................................................8, 10

Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of
Squirt*, 98 Trademark Rep. 739 (2008) ..........................................................................................8

## I.    __INTRODUCTION__

While Lontex's *Daubert* Motion ("Lontex *Daubert*") focused on specific deficiencies in the Experts' Surveys rising to a level warranting exclusion, Nike's opposition sidesteps those deficiencies by relying on incomplete deposition excerpts (including that of its own deponents) and soundbites from a few cases and secondary sources.[1] Nevertheless, considering the specific issues and relevant record in full, Nike has failed to meet its burden of establishing the admissibility of its Experts' Surveys, Reports, and related testimony.[2] Contrary to Nike's assertions, the issues raised in Lontex's *Daubert* are not merely "technical flaws." Opp. at 11. These flaws are substantial enough to warrant exclusion. *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002). Nike's opposition cannot rehabilitate the Experts' Surveys, Reports, and related testimony for the following reasons:

- ***Nike's opposition misses the mark on reverse confusion***: *First*, Nike concedes in its opposition that the Ezell Survey – which makes sweeping likelihood of confusion conclusions but never once mentions reverse or direct confusion – "tests *only* forward (or direct) confusion." Opp. at 22. (emphasis added). There is no substantive dispute. Thus, it should be excluded on the issue of reverse confusion and a limiting instruction given. *Second*, contrary to Nike's assertions, on the spectrum of "technical" to "fatal" sampling errors, the Poret Survey's altogether failure to capture the consistent majority of Lontex's target customers (*e.g.*, professional athletes and their trainers) is nowhere near a "sufficiently close approximation" of Lontex's customer base to survive exclusion

---

[1] The many technical flaws found in the Experts' Surveys rendering them with minimal evidentiary value have been addressed at length by Lontex's survey rebuttal expert, Susan Schwartz McDonald, Ph.D.

[2] In its opposition, Nike confusingly argues about Lontex's alleged inability to show likelihood of confusion. Opp. at 1, 6, 11. However, Nike's arguments have recently been rejected by the Court. *See*, ECF 234, Court's Memorandum and Opinion re Cross-Motions for Summary Judgment. In the *Daubert* context, it is blackletter law that Nike as the proffering party bears the burden to show that its Experts' opinions are admissible. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *15 (E.D. Pa. Nov. 24, 2020).

for reverse confusion. *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 459 (E.D. Va. 2017), *aff'd*, 707 F. App'x. 138 (4th Cir. 2017) (applying *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) and similar authority). Nike's reference to incomplete deposition excerpts fails when context is considered. Lontex *Daubert* at 4.

- ***Nike admits that the Poret Survey was excessively noisy***: Nike unabashedly acknowledges that the Poret Survey contains a "high level of noise" and bats its hands at two Jerre Swann articles as its license to do so. Opp. at 28. However, reliance on those secondary sources is misplaced as Jerre Swann explains in both articles that noise levels reaching that of Poret's Survey (59.5% here) are *inherently suspect* and *troubling*.

- ***The Ezell Survey, Report, and related testimony does not fit the facts of this case***: Lanham Act protection does not require a household name. And *Eveready* surveys are the "gold standard" *only* for this limited number of "*top-of-mind*" (household) marks. Opp. at 7, 25. (emphasis added). Lontex's COOL COMPRESSION® mark undisputedly did not maintain "top-of-mind" status in 2020 (especially as compared to Nike) that would support such a required foundational assumption for the tiny sample of Nike's selected universe. Despite having two years to adduce evidence, Nike can cite nothing beyond general allegations in the First Amended Complaint to suggest an *Eveready* survey is appropriate. But a case is tried and presented to a jury on actual evidence. Nike's Experts' certainly cite no evidence of the COOL COMPRESSION® mark's household status (*e.g.*, Apple, Coca-Cola, Ford, Levi's, McDonald's, Starbucks, etc.). When even Lontex's survey rebuttal expert, Dr. McDonald, readily concedes COOL COMPRESSION® is not a household name, a jury needs not receive a survey that does

2

nothing else beyond confirming the mark is not a household name.

- ***The Experts' improper universe warrants exclusion***: Nike's sweeping claim that its

  ███████████████████████████████████████████████████

  ██████████████ is easily disproven through even a cursory review of Nike.com. Nike's

  argument is further undercut by revieiwing the full testimony of its corporate

  representative, Neil Munro, including where Mr. Munro expands on how Nike ████████

  ███████████████████████████████████████████████████

  ███████████████████████████████████████████████████

  ███████████████████████████████████████████████████

  █████████. (*See* Wagner Decl. iso Lontex Opposition to Nike MSJ, ECF No. 189-2,

  Ex. 38 ("Munro Tr.") 35:19-36:13; 36:15-39:6). When taking Mr. Munro's deposition

  into context, the universe sampled was overinclusive and made it considerably unlikely

  that consumers with a genuine focus on athletic performance apparel as described by

  Nike were included in the universe. Nike's Experts gathered no data allowing for

  correction. For this additional reason, the Experts' Surveys are fatally flawed and

  warrant exclusion. This is also not a case for "judicial estoppel" – Nike made no

  suggestion of a need for customer lists for likelihood of confusion surveys, and had

  ample ability to run a proper survey.

- ***All Expert Surveys, Reports, and related testimony should be excluded pursuant to***
  ***FRE 403***: Juries cannot be presented with Surveys whose utility is outweighed by undue

  prejudice. Even if they eked over the line of admissibility, the Experts' Surveys, Reports,

  and related testimony should be excluded on this ground.

The Court should accordingly exclude the Experts' Surveys, Reports, and related

testimony pursuant to Federal Rules of Evidence 403 and 702.

## II.    <u>ARGUMENT</u>

Nike overstates the potential value of surveys in a case such as this. As the Court explained in *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010):

> Obviously, surveys do not measure the degree of actual confusion by real consumers making mistaken purchases . . . Reliance on expert studies is not unqualified and without hazards. Indeed, any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions.

While most surveys suffer such inherent fallibility, some rise to the level of exclusion, as is the case here.

### A.    <u>The Poret and Ezell Surveys are Inadmissible On the Issue of Reverse Confusion</u>

#### 1.    **Nike Concedes that Ezell's Survey, Report, and Related Testimony is Inadmissible for Reverse Confusion**

Nike outright concedes in its opposition that "Mr. Ezell's survey tests only forward (or direct) confusion . . . ." Opp. at 22. Nike proffers that Mr. Ezell will not seek to opine on the issue of reverse confusion in this case. *Id.* Mr. Ezell's Report speaks sweepingly of likelihood of confusion. Thus, the Court should grant Lontex's *Daubert* on this issue. Should Mr. Ezell's testimony be permitted on some other issue, it should only be after instructing the jury not to consider his Survey or testimony for reverse confusion purposes.

#### 2.    **Poret Ignored Lontex's Potential Customer Base, which Infected His Universe Definition Beyond Rehabilitation**

It is beyond dispute that the universe studied for reverse confusion is Lontex's potential customer base. Rather, the disagreement between Lontex and Nike is whether Mr. Poret actually surveyed a sufficiently close approximation of Lontex's potential customer base. Opp. at 28-31. Mr. Poret did not.

Nike is correct that theoretically a Lontex customer can be "10 or [] 80 . . . ." Opp. at 5

(quoting Nathan Tr. 287:17-289:21). But a salesman recognizing theoretically that anyone has access to a product, does not make all people part of the target or core customer group. For that, Lontex has four core demographics. Lontex *Daubert* at 4. Nike's Experts ignored them, and in doing so watered their likelihood of confusion results down beyond utility.

Nike disagrees with terminology (*e.g.*, "core"), but the *numbers* are undisputed. "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980); *Water Pik, Inc. v. Med-Sys., Inc.*, No. 10-CV-01221-PAB-CBS, 2012 WL 2153162, at *4 (D. Colo. June 13, 2012) (quoting *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir.1980)). It is undisputed that most of Lontex's sales during the infringement period were to professional teams and professional athletes, and that Nike's three surveys captured none of these. Lontex *Daubert* at 18-19 (citing Ex. I at Schedules 9-10, Ex. M). Those sales were backed by substantial marketing to this core target demographic since before COOL COMPRESSION® was even adopted. *See* ECF Nos. 203-54 (Kozak Decl. re MLB), 203-57 (Peduzzi Decl. re NFL), ECF No. 203-01 Wagner Decl. iso Lontex MSJ Oppo. at Ex. 41 ("Williams Tr." re Professional Soccer), 47:16-48:1, 158:6-159:1, 163:9-164:10. It is a strawman to dismiss this as a focus only on *actual* customers. Opp. at 29-30. Actual customers during the relevant period show (in *Amstar's* words) those most likely to "partake." *Amstar Corp.*, 615 F.2d at 264. Lontex has not suggested only its customers should have been sampled, but rather the demographic of professional teams should have been sampled – its own sales records show not all NFL, MLB, or other teams purchased Lontex COOL COMPRESSION® products during the relevant time period.

Nike's Experts cannot fail to include into the sample universe the majority of Lontex's

actual and potential customer base in their Surveys and then suggest any sampling issues are mere "technicalities." The *Valador, Inc.* case is instructive. 242 F. Supp. 3d 448 (E.D. Va. 2017). In *Valador, Inc.*, an expert's opinions and survey results were excluded in part because he "failed to evaluate the proper universe of respondents" in a reverse confusion case. *Id.* at 459. The Court in *Valador, Inc.* explained that, even though a survey need not be an "'exact match'" of the proper universe, a survey must cover at least a "'sufficiently close approximation'" of the proper universe to be admissible. *Id.* (quoting *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011)). The universe sampled by the expert in *Valador, Inc.* was improper because he did not survey the "vast majority" of plaintiff's target audience – which was not a "sufficiently close approximation'" of those customers. *Id.* at 460. Wherever it is that the "sufficiently close approximation" line is drawn between "technical" and "fatal" audience sampling errors, altogether missing the target audience and potential customer base that drives the "vast majority" of Lontex's sales falls squarely on the side of *fatal* defects. *Id.*

Pushing this fatal sampling defect even further from that line, Nike claims Lontex's description of Lontex's four "core" demographics is debatable. Opp. at 18-19, 28-29. But Nike's debate does not go further than recasting this "core" target audience as something Nike still admittedly did not sample: "While Lontex claims that anyone can wear its garments, its marketing, product education, and sales efforts are <u>very specifically targeted to the sports medicine field: physicians, physical therapists, athletic trainers, the medical staff of professional and collegiate teams, and the athletes themselves</u>." *See* ECF 191-1, Nike's MSJ at 46 (emphasis added). Nike claims the target market is "medical-based" for "prevention and recovery of athletes." ECF No. 192 at 7-8 (quoting ECF No. 193 Dunham Decl. at Ex. 5 (Bechtel Depo.) at 118:24-119:17). But Nike did not survey those needing compression for medical-based purposes.

Thus, even Nike's casting of the target audience fails basic math just as poorly. Lontex *Daubert* at 19.

Nike's final attempt of "estoppel" to escape the consequences of these fatal errors is misguided. Opp. at 30-31. At any time prior to Nike's service of expert reports, Nike never once suggested it needed a list for survey sampling. *See, e.g.*, ECF No. 169 at 1-10. If Nike intended to run a proper reverse confusion survey and needed a customer list to do so, it has nothing but itself to blame for not articulating this, nor asking for an extension when it received the customer list in January 2020, nor for failing to use the public lists or many other Lontex customer lists it received in discovery since July 2019. ECF No. 169-1 (Wagner Decl. iso Oppo. to Sanctions) ¶¶15-17. And Nike, as an exclusive sponsor of all NFL and MLB teams, could have contacted any teams it wished. Unsurprisingly then, Nike cites an inapplicable case, *Macfarlan v. Ivy Hil SNF, LLC*, 675 F.3d 266 (3d Cir. 2012), a disability discrimination case without even remotely similar facts or subject matter. In sum, Nike had every opportunity to include professional sports teams and professional athletes in the universe sampled (or its own definition of the "medical-based" universe), but opted against it.

In sum, Nike was fully aware that Lontex's customer and potential customer base was predominantly within professional sports teams and professional athletes. Lontex *Daubert* at 18-19.  Nike cannot use a direct confusion survey as a two-for-one on reverse confusion as well, and its sampled universe was not a sufficiently close fit to Lontex's audience to come near to or cross the line out of "fatal" defects and into "technical" defects.  *Valador, Inc.*. 242 F. Supp. 3d at 459. Mr. Poret's survey and testimony should be excluded on the issue of reverse confusion.

### B.    Nike's Opposition Cannot Remedy The Noise in Poret's Survey

Nike concedes that Mr. Poret's Survey contains an impermissibly high level of noise. Opp. at 28 ("A relatively high level of noise is always present when the *Squirt* format is used

because, by design, various products are presented in a line-up."). This should be the end of it.

Nike does not seem to have a problem with Mr. Poret's 59.5% noise level in his control, not because there is case authority stating as much, but because two Jerre Swann articles apparently say that high levels of noise are to be expected. *See* Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 738 (2016); Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 754 (2008). However, Jerre Swann's articles say no such thing. To the contrary, Jerre Swann explains in *Eveready and Squirt-Cognitively Updated*, "while a robust control may temper a traditional *Squirt's* suggestiveness, any format that can generate a level of 'noise' as high as 80% is *inherently suspect*." (emphasis added). And in *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, Jerre Swann warns, "I am further *troubled* by a [*Squirt*] design that often reflects control cell 'noise' of *more than 25 percent*." (emphasis added). Mr. Poret's staggering rate of 59.5% confusion rate in the control groups of his *Squirt* survey falls right in between the 25% and 80% noise levels that Jerre Swann advised were inherently suspect and troubling. Nike provides no support for its conclusion that Mr. Poret's *noisy* controls are appropriate.

Rather, Mr. Poret's Survey shows that as many as 60% of its subjects (and at a minimum 27%) are being ignored, leaving only the remainder that happen to be the most particularly cautious grapes in the bunch. Noise levels that high confirm a survey design that has essentially measured the quantum of most likely-to-be-confused audience members, and then categorically excluded them from the survey results. This works at 9%, when 9 in 10 respondents are still being measured. But one cannot categorically exclude a minimum of nearly 1 in 3 (or 6 in 10)

respondents that demonstrated a penchant for confusion, and suggest the confusion among the remainder sufficiently approximates the marketplace. The buffer is too large.

This is the basic conclusion recognized by *Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.*, 2013 WL 12122803, at *4 (C.D. Cal. June 21, 2013). While claiming Lontex "made up" its noise limit for *Squirt*, (Opp. at 28), it is Nike that has "made up" a false distinction for *Academy of Motion Pictures* that it can cite no Court as having accepted. The rationale of the *Daubert* exclusion based on 18% noise in that case was that surveys "yield[ing] confusion estimates that exceeded 10 percent" are problematic because "the control itself would begin to reach an actionable level of confusion." *Id.* at *4. That same "actionable level of confusion" exists for both *Squirt* and *Eveready* surveys, and thus the underlying rationale is not distinguishable on the basis that *Academy of Motion Pictures* excluded an *Eveready* study. *See, e.g.*, *Squirt Co. v. Seven-Up Co.*, No. 78-375C (A), 1979 WL 25027, at *20 (E.D. Mo. Sept. 6, 1979) (levels as low as about 11% had credited the survey as inferring likely confusion) *aff'd* 628 F.2d 1086 (8th Cir. 1980). In fact, the commentators recognize such levels of likely confusion, without regard to the format of the survey. 2 Gilson on Trademarks § 5.17 (2020) (explaining surveys around 10% supporting likely confusion, without distinguishing between survey formats).

Despite over 50 years since the *Squirt* decision to pull from, Nike has not cited conflicting cases to support that a noise levels similar to here and well above *Academy of Motion Pictures* satisfy *Daubert* sufficient to demonstrate admissibility of the survey. Opp. at 27-28; *contrast AWGI, L.L.C. v. Atlas Trucking Co., L.L.C.*, No. 17-12131, 2020 WL 3546100, at *35 (E.D. Mich. June 30, 2020) (likelihood of confusion supported by net 19% confusion after subtracting 2% noise in *Squirt* survey), *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015

U.S. Dist. LEXIS 74700, *28, 2015 WL 3633987 (N.D. Ill. Jun. 10, 2015) (six percent noise for Squirt survey format).

Because Mr. Poret is a survey expert whose survey produced noise at nearly 60%, which it failed to reduce below 27% by modifying the controls, Nike has not demonstrated sufficient reliability or fit to the facts to be admissible under *Daubert*.

### C.  Mr. Ezell's Survey, Report, and Related Testimony Do Not Fit This Case

In addition to being wholly irrelevant to the issue of reverse confusion, Mr. Ezell's Survey, Report, and related testimony as it relates to direct (forward) confusion has no place in this case. Throughout this litigation, Nike has scoffed at any possible confusion (even evidence of actual confusion) between itself and Lontex. It is not disputed that Lontex's footprint in the U.S. does not compare to Nike, but that has not precluded Lontex's COOL COMPRESSION® technology from becoming well-known within Lontex's current niche. Thus, while Lontex is popular and well-known among its four core demographics, it is not nearly as well-known as Nike is with the public at large. In other words, Lontex's COOL COMPRESSION® is currently not part of the small percentage of marks with "top-of-mind" status. *See* Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 738 (2016). Nike also relies on Jerre Swann's *Eveready and Squirt-Cognitively Updated* to claim that an *Eveready* survey is the "gold standard" for forward confusion. Opp. at 7, 25. However, that soundbite is also overstated as Jerre Swann explains that *Eveready* surveys are only the "gold standard" when assessing confusion as to "top-of-mind" marks. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 738 (2016).

Acknowledging that it is talking out of both sides of its mouth by claiming that Lontex is sufficiently well-known for an *Eveready*, Nike's strained argument justifying Mr. Ezell's *Eveready* Survey is only "supported" by Lontex's First Amended Complaint. Opp. at 23-26.

10

However, general allegations from the First Amended Complaint will not be presented to the jury, nor has all the discovery in this case presented any evidence Nike could come forward with in Opposition to this Motion that would allow a jury to conclude the foundational facts for an *Eveready* study "fit" the facts of this case. Even Lontex's own expert does not try to suggest otherwise. *See* McDonald Rebuttal ¶¶ 29-30 ("Perhaps Mr. Ezell imagined that in a circumstance where Plaintiff is too small a company to be known to a random sample of Defendant's potential customers, an *Eveready* survey simply affirms what seems self-evident: there is low absolute number (and hence percentage) of people nationwide who will believe there to be an association since only a small number of people are aware of the senior user's brand to begin with.").

Thus, Nike has failed to refute Dr. McDonald's expert testimony that an *Eveready* survey does not apply here.

### D.    The Surveys Failed to Sample the Proper Universe of Respondents and Should be Excluded Altogether

Nike now wishes to take the "PRO" out of its "NIKE PRO" products, and each of its surveys suffer from this flaw. Lontex *Daubert* at 4-6. This it cannot do, as it must show its sample was a sufficiently close approximation of the relevant market, a fair sampling of those most likely to partake of the relevant goods. *See*, *supra*, § A.2. Nike's Experts' Surveys, Reports, and related testimony all hinge on sampling from the proper universe of respondents. As explained above, Nike made the perplexing decision to survey a universe that did not actually align with its own target demographic or "sharp point." Lontex *Daubert* at 13-16; *see also* McDonald Rebuttal ¶ 13 (explaining that Nike failed to survey a universe that "align[ed] with NIKE's own definition of the market for its Nike Pro Line of apparel . . . ."). Mr. Munro further describes Nike's "sharp point" as follows:



The Accused Products consist of compression apparel under Nike's "Nike Pro" line of products – not the entirety of Nike's apparel line. Thus, Nike's claim that i███████████ ██████████████████████████████████████████████ is severely undercut by Mr. Munro's testimony. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████



███████████████████████ *See*, *e.g.*, Munro Tr. 35:19-36:13; 38:4-39:6; 40:13-41:8. All other potential customers are merely a theoretical spill-over or a

secondary benefit to Nike. Whether Nike is "ageist" in having a Nike Pro subset of products to target a young audience of serious athletes is a question better left for Nike to answer. Opp. at 18. In light of the above, it is not a sufficiently accurate approximation for the Experts to toss in over half of the survey respondents from the U.S. population that do not actually fall within Nike's core demographic. (*See* Wagner Decl. iso Lontex *Daubert*, Ex. A, Poret Report at 36; Ex. B, Ezell Report, ¶ 15 n.5; Ex. C, Scott Report, ¶ 24). This misapplication of survey methodology rendered the universe sampled overinclusive and made it far less likely that consumers with a genuine focus on athletic performance apparel as described by Nike were included. Nike gathered no data that would allow the trier of fact to parse out the effect of this dramatic over inclusiveness. For this additional reason, the Experts' Surveys are fatally flawed and warrant exclusion.

Nike claims *Kars 4 Kids, Inc. v. Am. Can!*, No. 314CV7770PGSDEA, 2019 WL 1755912, at *8 (D.N.J. Apr. 18, 2019) is inapt because the survey in that case encompassed "all adults in the United States." However, Nike's Experts are treading similar ground as they deliberately ignored relevant testimony relating to its own "sharp point" and Lontex's four core demographics and opted instead for a survey universe consisting of any individuals aged 18-64 years who merely purchased "athletic apparel" in the recent past. Lontex *Daubert* at 6-11. It could be that some respondents buried in Nike's overinclusive universe happen to fall within "those purchasers most likely to partake of the alleged infringer's goods or services," (*Amstar Corp.*, 615 F.2d at 264), but the Experts provided zero information that would allow the trier of fact to determine whether any relevant respondents are present. The results are skewed against knowing how such "sharp point" and narrow subset actually think. *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. CIV.A. 01-1524, 2003 WL 24010950, at *1 (W.D. Pa.

Apr. 23, 2003), *aff'd by Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) (rejecting survey because survey was "fatally flawed due to an irrelevant and improper universe . . . ."); *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1467 (excluding trademark survey because it was "clearly not representative" of the relevant consumer market).

Thus, this fatal sampling defect of all Surveys warrants their exclusion based on their improper fit.

**E.**    **The Surveys, Reports, and Related Testimony are Prejudicial, Misleading, and a Waste of Time, and Should Be Excluded Pursuant to FRE 403**

Even if admissible, the Surveys, Reports, and related testimony must be excluded under Federal Rule of Evidence 403 because individually and cumulatively the flaws are so large that their probative value is substantially outweighed by their prejudicial effect. Nike criticizes Lontex's argument that in the Lontex Daubert as "underdeveloped" in a throwaway footnote at the very end of its opposition. Opp. at 31. Nike's decision to dedicate a mere footnote to avoid a waiver argument does nothing to rehabilitate its Experts' Surveys, Reports, and related testimony.

As explained in the Lontex Daubert and at length by Dr. McDonald, the Surveys suffer from incurable maladies in design deficiencies. There is more than enough fodder for the Court to exclude each Experts' materials for an overinclusive and underinclusive universe, the complete irrelevance of an *Eveready* survey for this particular case, and the inherently suspect and troubling noise issues in Mr. Poret's *Squirt* survey. However, even if the Surveys had any possible relevance to the likelihood of confusion question (which they do not for the above reasons), or eked slightly above the exclusion line on their own, exclusion is still warranted

because the "technical flaws" in each Survey cause their probative value to be outweighed by the potential prejudice to the trier of fact.

This situation of cumulatively prejudicial maladies is a common reason to exclude surveys. *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (finding exclusion pursuant to FRE 403 where "the lack of a proper universe and sample, the poor choice of location, the lack of proper stimuli, and questions that have little or no relevance to issues in the case" the prejudicial effect of Defendant's survey substantially outweighed its probative value); *see also Citizens Fin. Grp., Inc.*, 383 F.3d at 121 (holding district court properly excluded survey because its "methodology was fundamentally flawed and because the danger of undue prejudice far outweighed the limited probative value of the survey, especially for a jury"); *Starter Corp. v. Converse, Inc.*, 170 F.3d 276, 297 (2d Cir. 1999) (holding district court "did not abuse its discretion finding that any probative value of the survey was outweighed by its potential to confuse the issues in the case").

Thus, the surveys risk prejudicially misleading the jury by credential-waiving and cumulative effect, and should be excluded under FRE 403 even were they to clear FRE 702.

## III.    <u>CONCLUSION</u>

For all these reasons, the Court should exclude from evidence the Experts' Surveys, the Reports, and any related testimony.

Dated: March 10, 2021

TROUTMAN PEPPER HAMILTON SANDERS LLP

By: */s/ Ben L. Wagner*

Ben L. Wagner (CA SBN 243594)
ben.wagner@troutman.com
*Admitted Pro Hac Vice*
11682 El Camino Real, Suite 400
San Diego, CA  92130-2092
Telephone:   858-509-6000
Facsimile:    858 509 6040

Michael A. Schwartz (PA 60234)
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

*Attorneys for Plaintiff*
*LONTEX CORPORATION*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2021, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Ben L. Wagner*
Ben L. Wagner