**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LONTEX CORPORATION,** | **CIVIL ACTION** |
| **v.** | **NO.  18-5623** |
| **NIKE, INC.** | |

<u>**MEMORANDUM RE DAUBERT MOTIONS**</u>

**Baylson, J.**                                                    **March 25, 2021**

**I.      Introduction**

Plaintiff Lontex Corporation ("Lontex") and Defendant Nike, Inc. ("Nike") are both companies which manufacture and sell athletic clothing.  Lontex owns a trademark, "cool compression," and asserts Nike is liable for infringement under the Lanham Act and state law claims.  This case only concerns instances of Nike's use of the phrase "cool compression."

Currently pending before the Court are three motions that challenge the admissibility of expert testimony under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993):

- Lontex seeks to exclude the opinions of Nike's experts Hal Poret, Matthew Ezell, and Carol A. Scott, each of whom conducted a survey regarding likelihood of confusion and consumer purchase interest (ECF 189)

- Lontex also seeks to exclude the opinion of Nike's expert Paul Meyer, who opines on profit apportionment and corrective advertising (ECF 187)

- Nike seeks to exclude the opinions of Lontex's experts David Drews, Jeffrey Parkhurst, and Susan McDonald (ECF 190)

As a general proposition, Third Circuit law freely permits expert testimony as long as the expert has established basic qualifications, offers reliable testimony, and gives testimony that fits the facts of the case.  See Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) ("Rule 702 . . . has a liberal policy of admissibility."); Linkstrom v. Golden T. Farms, 883 F.2d 269, 270 (3d Cir. 1989) ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions."); see also In re Paoli R. Yard PCB Litigation, 916 F.2d 829, 859 (3d Cir. 1990) ("Rule 403 is a trial-oriented rule.  Precipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are therefore unfair and improper.").

The Court notes, that under some circumstances, holding an evidentiary hearing or oral argument on a complex Daubert motion may be appropriate, but is not necessary here.  The undersigned has previously conducted hearings on Daubert Motions in a multidistrict litigation case.  See In re Domestic Drywall Antitrust Litig., No. 15-1712, 2020 WL 1695434 (E.D. Pa. Apr. 7, 2020); In re Domestic Drywall Antitrust Litig., 322 F.R.D. 188 (E.D. Pa. 2017).  However, the circumstances in this case are distinct.  In the MDL, the Court sought, as the transferee Judge, to resolve the Daubert motions with greater detail because the cases would be transferred to a different district for trial, and assigned to a Judge who had no knowledge of the underlying facts. Additionally, in this case, there several important factual issues, particularly regarding substantive liability, which will require development in a trial setting before a final decision on the proposed expert testimony can be made.  Both parties in their motions and responses have attached significant amounts of complex data which deserves explanation.  Because of the pandemic, trial is not imminent.  Therefore, a pretrial hearing at this time is not the appropriate method for

determining admissibility.[1]  Lastly, here, the Court will not completely exclude any of the expert witnesses, reducing the risk of prejudice to any party.

Applying this standard, the Court will deny these motions, with one minor exception, described below, regarding Susan McDonald's testimony.

## II.    Background

The expert opinions in this case are offered on two issues that arise in a trademark case. The first is "likelihood of confusion" an important element of proving liability, and the second is damages.  The Court will briefly review the law in these two areas as context for considering these motions.

### a.  Elements of a Trademark Case

The Court discussed the standard for establishing liability in a trademark case extensively in its Opinion on the summary judgment motions in this case.  See ECF 234; Lontex Corp. v. Nike, Inc., No. 18-5623, 2021 WL 724971 (E.D. Pa. Feb. 24, 2021).  In order to prove its Lanham Act and state law claims, Lontex must show that Nike's "use of the mark to identify goods or services causes a likelihood of confusion."  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  In this Circuit, courts consider the factors laid out in Interpace Corp. v. Lapp, Inc. when determining whether a likelihood of confusion exists:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the

---

[1] Any issues described below as requiring further resolution by the Court at trial will likely be resolved outside the hearing of jury.

> extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because
> of the similarity of function; (10) other facts suggesting that the
> consuming public might expect the prior owner to manufacture a
> product in the defendant's market, or that he is likely to expand into
> that market.

721 F.2d 460, 463 (3d Cir. 1983).  The survey experts proffered by Nike are intended to rebut

Lontex's arguments regarding several of the Lapp factors.

There are two types of confusion in a trademark case.  Forward confusion occurs when "a

junior user of a mark is said to free-ride on the reputation and good will of the senior user by

adopting a similar or identical mark."  A&H Sportswear, 237 F.3d at 228.  "[R]everse confusion

occurs when the junior user saturates the market with a similar trademark and overwhelms the

senior user."  Id.  Lontex brings claims of forward and reverse confusion, and the expert reports

address both of these concepts.

### b.  Trademark Damages

"The Lanham Act provides two alternatives for calculating damages: either an award

subject to principles of equity that turns on evidence of the defendant's sales and profits, see 15

U.S.C. § 1117(a), or, alternatively, statutory damages . . . see id. at § 1117(c)."  Covertech

Fabricating, Inc. v. TVM Bldg. Prods., 855 F.3d 163, 176 (3d Cir. 2017).  "The choice between

these awards is at the plaintiff's election, and the district court enjoys wide discretion in applying

equitable principles."  Id.  When a plaintiff chooses an award of actual damages, "the trademark

owner is tasked with proving the infringer's sales before the burden of proof shifts to the defendant

to show costs and deductions."  Id. at 177.  The court "must ground its estimate in the record—

e.g., business records, credible witness testimony, expert testimony, or industry data."  Id.  "[I]n

evaluating whether equity supports disgorging the infringer's profits" the Court considers multiple

factors, which "include, but are not limited to (1) whether the defendant had the intent to confuse

4

or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 175 (3d Cir. 2005).

### III.     Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>
> and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, a district court judge functions as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The Third Circuit has clarified that "in doubtful cases," Rule 702 "favor[s] admissibility." Linkstrom, 883 F.2d at 270; see also Kannankeril, 128 F.3d at 806.

Rule 702 imposes three requirements for admissibility of expert testimony: "(A) the proffered witness must be an expert, i.e., must be qualified; (B) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (C) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

### a. Qualification

The Third Circuit defines the qualification requirement "liberally," allowing "a broad range of knowledge, skills, and training [to] qualify an expert." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). A district court abuses its discretion if it "exclude[s] testimony simply because [it] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir. 1996). The result of the Third Circuit's liberal approach to admitting expert testimony under Rule 702 is that arguments regarding an expert's qualifications generally relate to the weight to be given to the testimony—not to its admissibility. Id. at 782.

### b. Reliability

The reliability inquiry requires evaluating if "the expert's testimony is supported by good grounds." Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017). The Third Circuit has identified eight factors for district courts to consider in assessing whether "good grounds" support potential expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742 n.8. "While no one is dispositive, some analysis of these factors is necessary." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 834 (3d Cir. 2020).

The standard for determining reliability "is not that high . . . even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702." In re TMI Litig., 193 F.3d

613, 665 (3d Cir. 1999).  The court's focus in assessing reliability "must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595.  "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research."  Karlo, 849 F.3d at 81.  "A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect."  Paoli, 35 F.3d at 744.

### c.  Fit

An expert's testimony fits the case if the testimony will "assist the trier of fact."  Paoli, 35 F.3d at 743.  Thus, the fit requirement "goes primarily to relevance."  Daubert, 509 U.S. at 591.  Put another way, the fit requirement simply extends "the requirement of reliability, or 'good grounds,'. . . to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case."  Paoli, 35 F.3d at 743.

## IV.  Lontex's Motion to Exclude the Opinions of Hal Poret, Matthew Ezell, and Carol A. Scott

### a.  Overview of Opinions

Although Lontex has not presented its own survey evidence, Nike retained three experts to conduct surveys regarding likelihood of confusion and consumer purchase interest.  Hal Poret conducted a "Squirt" survey, which gets its name from SquirtCo v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980).  The version of Squirt survey he conducted is a "sequential lineup survey" in which "respondents are shown the plaintiff's trade dress, and then, after a short delay, shown a line-up of other brands, including the accused product.  Respondents are asked if any of them are made by the same company as makes the product initially seen."  6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:177 (5th ed. 2017).  This survey method "is an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by

being confronted in the market with both similar and differing brands or trade dresses."  Id.  In general, a Squirt survey is appropriate where the senior mark is not well known, and the marks often appear side by side in the marketplace.  See Jerre B. Swann, Likelihood of Confusion Studies and the Straitened Scope of Squirt, 98 Trademark Rep. 739, 746 (2008); see also Parks LLC v. Tyson Foods, Inc., 863 F.3d 220, 233 (3d. Cir. 2017) ("Holders of weaker marks more frequently employ a Squirt survey").  Based on his survey results, Poret opined that "there is not a likelihood of confusion created by NIKE's use of 'Cool' and 'Compression' in connection with the relevant NIKE products."

Matthew Ezell conducted a survey using the Eveready methodology, which gets its name from Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976).  The Eveready survey method "has become a standard and widely accepted survey format for testing to shed light on whether confusion is likely or not."  McCarthy, supra, § 32:174.  "Unlike the 'Squirt' format, the 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience."  Id.  It "involves showing consumers only the potentially-infringing product and asking open-ended questions to determine whether they believe the product is associated with the senior mark."  Parks, 863 F.3d at 232.  "The 'Eveready' format is especially useful when the senior mark is readily recognized by buyers in the relevant universe."  Id.  Based on his survey, Ezell opined that "none of the relevant universe of potential purchasers of athletic performance apparel are likely to be confused or deceived by the belief that NIKE's athletic performance apparel (shown on a web page with the words COOL COMPRESSION) is made or put out by Lontex."

Carol A. Scott conducted a "purchase interest" survey.  In this survey, participants were split into a test group and a control group.  The test group was shown a product with "cool

compression" in the product name, and the control group was shown the same product without "cool compression" in the product name.  The participants were then asked to rate their interest in purchasing the product, as well as their reasons for wanting to purchase the product.  Based on the results, Scott opined that "use of 'Cool Compression' in the product descriptions resulted in no increase in consumers' interest in purchasing the product.  It is unlikely, therefore, that consumers' decisions to purchase NIKE products using 'Cool Compression' in the descriptions in the real world were driven by the perception of 'Cool Compression' as a brand name."

> **b.  Parties Arguments**

Lontex moved to exclude the opinions of Poret, Ezell, and Scott on November 4, 2020. ECF 189.  Nike responded on December 4, 2020, ECF 199, and Lontex replied on March 10, 2021, ECF 237.  Lontex makes several arguments regarding the inadmissibility of these surveys.  First, with respect to all three surveys, Lontex argues that they sampled an improper universe because the sample did not focus on Nike's specific customer base.  Lontex also argues that Poret and Ezell's survey are inadmissible to measure reverse confusion because they did not sample Lontex's customer base.  Also with respect to Poret's survey, Lontex contends that its controls included high rates of "noise."  The term "noise" essentially refers to a false positive rate, which results from inherent suggestiveness in consumer product surveys comparing two products, due to the fact that the survey presents both parties' products in close proximity.  See McCarthy, supra, § 32:187. Lastly, Lontex argues that all three surveys are prejudicial and misleading.

In response, Nike argues that the issues raised by Lontex are "technical flaws" which go towards weight, not admissibility, of an expert report.  With respect to the sampling universe of the survey, Nike argues that Lontex's arguments are factually incorrect based on testimony regarding the target customer of both companies.  Nike also clarifies that Ezell does not opine on

the issue of reverse confusion, and that Poret's survey does use an appropriate universe based on the facts in the record.  Nike also argues that Lontex has not provided any authority regarding its contentions that Poret's survey included too much noise.

### c.  Discussion

"Consumer surveys, in which a representative sample of the consumers of a product are presented with the parties' products in a controlled setting, are the most direct method of showing the likelihood of confusion created by an infringing defendant."  Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc., 921 F.2d 467, 475 (3d Cir. 1990).  The Third Circuit has even noted that, while a survey is not required, "a plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable."  Id.

### i.  Survey Universe

The Third Circuit has observed "that mere technical unreliability goes to the weight accorded a survey, not its admissibility."  Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 121 (3d Cir. 2004).  "Typically, a court will not exclude a survey unless it is so flawed that it would be completely unhelpful or harmful to the trier of fact."  Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 315, 320 (E.D. Pa. 2007) (Pratter, J.).  "[W]hile a survey that excludes the entire relevant population may be so unreliable as to be inadmissible, see, e.g., Citizens, 383 F.3d at 118–21 . . . a survey that is simply underinclusive or has other flaws in sampling remains admissible but subject to challenge."  In re Suboxone Antitrust Litig., No. 13-2445, 2020 WL 6887885, at *17 (E.D. Pa. Nov. 24, 2020) (Goldberg, J.).  In a case of forward confusion, the proper universe to survey is potential customers of the junior user, but in a reverse

confusion case, the relevant universe is the senior user's customers.  See McCarthy, supra, § 32:159.

In Citizens, the Court considered a trademark dispute between two banks.  The District Court excluded the defendant's proposed survey expert on the basis that the survey relied on an "improper universe" because it was conducted outside of the plaintiff's market.  383 F.3d at 118. Plaintiff was alleging reverse confusion, and therefore, the plaintiff's market was the relevant universe for a consumer confusion survey.  Id. at 119.  In finding that the defendant's survey studied the wrong universe, the Court noted that the plaintiff bank's branches were based primarily in one county, and the survey was conducted in a different county.  Id.  The survey was conducted at a mall that was seven and seventeen miles away from the closest branches of the plaintiff bank, and the remaining eighteen branches were further away.  Id.  The Court also noted that the plaintiff's marketing efforts were focused on the one county with the vast majority of its branches, and that any customers outside of that main area were "spill over" and "not be a part of [the plaintiff's] customer base."  Id.  Based on this evidence, the Court found that the survey was "fundamentally flawed" and inadmissible.

Because this case concerns forward and reverse confusion, both Lontex and Nike's customer bases are relevant.  Nike points to evidence in the record that both Lontex and Nike considered themselves to have a broad customer base.  Nike cites to the deposition of Lontex's CEO who stated that Lontex's audience included "anybody that wants to be healthy, anybody that want to do any type of activity."  Lontex contends that its four core demographics are "professional athletes, individuals focusing on physical rehabilitation, serious non-professional athletes, and individuals seeking the benefits of compression technology."  Lontex also notes that "NFL teams alone accounted for well over half of Lontex's relevant sales."

Regarding Nike's customer base, Lontex points to a statement by Nike's corporate designee that Nike's "sharp point" for its apparel are individuals between the ages of 18-26 who are or were "game-day athlete[s]." Nike argues that Lontex "cherry picked" this statement and that in fact its customer base is "super democratic, a 15 year old boy to an 84 [year old] man" and that Nike "want[s] to allow everybody to have the ability to wear our product and to feel good about doing so."

Each of the surveys employed a similar universe. Scott's survey universe consisted of people between the ages of 18 and 64 who had either purchased athletic apparel in the past twelve months or planned to do so in the next twelve months. Poret's survey included individuals 18 and older who had purchased athletic apparel in the past six months or planned to in the next six months. Ezell surveyed people eighteen years of age or older who were likely to purchase athletic apparel in the next year. None of the survey experts designed their surveys to address different customer bases of the two companies, and Poret specifically stated that he "credited or gave the benefit of the doubt to Lontex's allegations or claims that there is meaningful overlap in the customers of both parties."

Given the factual disputes raised by the parties regarding each company's customer base, the Court will reserve a final ruling on the admissibility of the surveys until these issues are presented at trial. In particular, based on the evidence in the record regarding Lontex's customer base, as well as the Third Circuit's holding in Citizens, the Court has concerns about admitting Poret's survey for purposes of evaluating reverse confusion. Lontex's contentions regarding its customer base could constitute a "fatal flaw" in Poret's survey as it relates to reverse confusion. However, Nike has raised a factual issue regarding what Lontex's customer base actually is, and therefore the Court will delay a final ruling on this issue until the facts are developed at trial.

### ii.  Noise

The term "noise" essentially refers to a false positive rate.  "A continuing challenge raised against the Squirt method is that [it] is inherently and improperly leading because it tells the survey respondents about a senior user's trademark they are unfamiliar with."  McCarthy, supra, § 32:174.50.  Poret himself explains that the Sqiurt survey is "well-known to contain a degree of inherent suggestiveness due to the fact that it presents both parties' marks in close proximity and asks questions that suggest the potential for a connection."  The Third Circuit has also noted that "[c]ourts have sometimes criticized Squirt surveys for utilizing closed-ended questions that can lead participants to the desired answer . . . Nevertheless, a well-designed Squirt survey may show a likelihood of confusion."  Parks, 863 F.3d at 233.

Poret details the method he used to control for this "noise" or "inherent suggestiveness" by including a control group.  In the control group, participants took the same survey, but the allegedly infringing mark was replaced with a different mark.  In this case, the control mark was "compression" as opposed to "cool compression."  Poret then compared the responses of the control and test groups to address the issue of "noise."  This is likely a "technical" flaw in the survey which Lontex may raise and use to challenge the credibility of Poret's survey, but will not render it inadmissible.

### iii.  "Cool and Compression"

Lastly, while not raised by the parties, the Court notes that Poret's report is titled "Survey to Determine If Nike's Use of the Terms Cool and Compression Is Likely to Create Confusion With Respect to Lontex's Cool Compression Mark" and throughout the report he repeatedly refers to Nike's use of "the terms Cool and Compression."  As stated above, this case concerns the trademark of "cool compression" only.  Uses of the words "cool" and "compression" separately,

are not at issue.  None of the experts, including Poret, may refer to instances of "cool" and "compression" used separately when referencing instances of potential consumer confusion.

V.    **Nike's Motion to Exclude the Opinion of Susan McDonald**

      a.  **Overview of Opinion**

      Lontex retained Susan McDonald to offer rebuttal testimony regarding the three surveys introduced by Nike.  After reviewing Nike's studies, McDonald concludes that the methods used were ill-suited to the circumstances in this case and executed such that they would always produce the desired result of zero confusion.  McDonald explains that the parties' relative size, Lontex being much smaller and less well known than Nike, means that regular survey techniques are not appropriate here.  She also states that Nike's survey universe is both over and under inclusive.

      b.  **Parties Arguments**

      Nike argues that McDonald did not review relevant information, does not support her opinions with evidence, that she criticized reliable survey methods, and that she suggested more unorthodox methods should have been used.  Nike also argues that she goes beyond offering a rebuttal opinion and improperly opines on Nike's intent and makes legal conclusions.  Lontex responds that McDonald relied on the same information as Nike's experts in pointing out the flaws in their studies and that her methods are reliable.

      c.  **Discussion**

      Nike moved to exclude McDonald's opinion on November 4, 2020.  ECF 190.  Lontex responded on December 5, 2020, ECF 202, and Nike replied on March 10, 2021, ECF 238. McDonald opines multiple times on Nike's intent.  For example, she states that the survey finding of zero likelihood of confusion is "at clear odds with NIKE's original decision to appropriate 'cool compression' in marketing its own Nike Pro line."  McDonald also states "[t]he fact that NIKE

chose to use 'cool compression' should, itself, give pause.  NIKE is a talented marketing enterprise. They know a good phrase -- packed with potential meaning and commercial value -- when they see it."  "It is well settled that experts may not provide testimony concerning 'the state of mind' or 'culpability' of defendants."  <u>Suboxone</u>, 2020 WL 6887885, at *11.  Therefore, McDonald will not be allowed to opine on Nike's intent or the reasons why it used "cool compression."

In other instances, McDonald's opinion appears to address both intent as well as improper legal conclusions.  In her report McDonald states "Lontex has rights in the term, 'cool compression,' whenever NIKE used either that term, or off-hand variations (COOL COMP), it was appropriating another company's registered mark as its own."  When asked about these types of comments, McDonald stated

> This is a registered mark . . . It is clear there is a registration . . . So, I'm offering no legal opinions about what can be registered . . . I'm just saying there is a registration for cool compression which means that while cool can be used by itself and compression with [sic] be used by itself, cool compression is ring fenced by that registration.

"Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion."  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 217 (3d Cir. 2006).  McDonald may not offer her opinion regarding how a trademark registration impacts another company's ability to use that phrase.  Her statement here is both incorrect on the law and impermissible for an expert opinion.

However, the Court will not preclude McDonald's opinion in its entirety.  She may give her opinion regarding issues with the surveys conducted by Nike's experts.  McDonald's report comments on the substance of each of Nike's surveys based on her review of how they were conducted and relying on her expertise.  Lontex explains that McDonald relied on the same

information as Nike's experts in reviewing their reports and commenting on them.  Such rebuttal testimony is admissible.

## VI.    Nike's Motion to Exclude the Opinion of Jeffrey Parkhurst

### a.  Overview of Opinion

Parkhurst provides an opinion regarding Lontex's brand and expansion potential as well as corrective advertising.  Parkhurst's opinion begins with background on branding, explaining how a brand creates value and how a brand can change over time.  He then evaluated Lontex's brand and discussed potential expansion opportunities.  In discussing expansion potential, Parkhurst employed a "case study" methodology in which he describes the expansion of several companies which achieved significant success in a short period of time.  Next, he explains various factors which can hurt a brand's growth.  Lastly, he opines on the corrective action necessary to restore Lontex's brand through advertising.

### b.  Parties Arguments

With respect to Parkhurst's "opportunity value" opinion, Nike argues that this opinion is speculative, does not consider causation, and that the "case study" method is unreliable.  Nike emphasizes that Parkhurst has essentially discussed the expansion of several other companies and provided no explanation for how the success of these companies indicates that Lontex would have achieved similar success.  Nike also argues that this opinion does not address how Nike prevented such expansion from occurring, and therefore Nike is not responsible for any "lost profits" resulting from a lack of expansion.  Lontex argues that there is no causation requirement for expert testimony regarding brand valuation and that Nike downplays the data that Parkhurst relied upon to claim that it is speculative, when he used a widely adopted methodology.  Parkhurst also offered an opinion on corrective advertising which Nike argues should be excluded because he did not

conduct a survey regarding consumer perception and his method is too speculative. Lontex responds again that Parkhurst used a standard method to arrive at his opinion.

### c. Discussion

Nike moved to exclude Parkhurst's opinion on November 4, 2020. ECF 190. Lontex responded on December 5, 2020, ECF 202, and Nike replied on March 10, 2021, ECF 238. There are no Third Circuit cases which discuss speculative damages in the trademark context, but there are cases which discuss expert opinions regarding "the prospective consequences of a tortious injury." <u>Paoli</u>, 916 F.2d at 851. In such cases, a plaintiff must "establish with a degree of reasonable medical certainty through expert testimony that such expenses will be incurred." <u>Id.</u> Similarly, an "expert's testimony regarding future earnings loss must be accompanied by a sufficient factual foundation before it can be submitted to the jury." <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 754 (3d Cir. 2000).

Parkhurst's "opportunity value" opinion essentially amounts to an opinion that any small company could become wildly successful in a short period of time. Based on the evidence in the record regarding Lontex's business, this opinion is likely too speculative to be helpful. While Parkhurst may employ this "case study" method in a consulting context to advise companies on their growth, that is entirely different from providing an expert opinion regarding what was likely to happen to Lontex's brand success. Nike has pointed to several factual disputes regarding whether Lontex was likely to expand its business in the manner described. Therefore, once the Court hears further evidence regarding the basis for Parkhurst's opportunity value opinion, it will determine whether this is appropriate for a jury. Regardless, Parkhurst may discuss the value of Lontex's brand and ways that brand may lose value.

Additionally, corrective advertising is sometimes part of a damages award in trademark cases, and Parkhurst may provide his opinion on this issue. The challenges raised by Nike relate to "technical" flaws in his calculations which it may address through its rebuttal witness.[2]

VII.    **Nike's Motion to Exclude the Opinion of David Drews**

        a.  **Overview of Opinion**

Drews provided a damages analysis for Lontex and reached an opinion regarding four categories of damages: (1) Nike's profits from products using the trademark, (2) a "reasonable royalty" which is an estimate of how much Nike would have paid Lontex to license the trademark, (3) Lontex's lost profits, and (4) "corrective advertising" which is the amount Lontex would need to spend to educate customers who have been confused regarding the trademark.

        b.  **Parties Arguments**

Nike argues Drews' opinions regarding corrective advertising, reasonable royalties, and profit disgorgement should be excluded. With respect to corrective advertising, Nike argues that Drews' opinion is based on Parkhurst's analysis, and since Parkhurst's analysis should be excluded, so should Drews' opinion. Lontex reasserts that Parkhurst's opinion is admissible, but that even if it is not, Drews has provided additional analysis which should be admitted.

Nike argues Drews' royalties opinion is too speculative because there is no evidence that Lontex ever licensed or attempted to license its trademark. Lontex responds that there is no requirement that Lontex intended to license its trademark, and that bad faith, or other considerations, can also permit a recovery for reasonable royalties. Lontex also points out that it offered a license to Nike.

---

[2] The Court notes that Nike has retained Jeff Anderson to serve as a rebuttal witness to both Jeffery Parkhurst and David Drews. Lontex has not filed a motion to exclude Anderson's opinion.

Lastly, Nike argues Drews' opinion regarding Nike's profits should be precluded because Drews assumed that every sale of one of the allegedly infringing products was due to its use of "cool compression." Lontex argues that it is Lontex's burden to prove Nike's sales and then the burden shifts to Nike to prove how much it actually profited. Lontex also notes that Nike's own expert stated that a damages expert should assume the underlying infringement has occurred.

### c. Discussion

Nike moved to exclude Drews' opinion on November 4, 2020. ECF 190. Lontex responded on December 5, 2020, ECF 202, and Nike replied on March 10, 2021, ECF 238. First, as the Court determined above that Parkhurst's corrective damages analysis was admissible, Drews' will be as well. Second, regarding reasonable royalties, the Third Circuit has noted that "[a] royalty is a measure of damages for past infringement, often used in patent cases and in the context of trade secrets, but its use in trademark has been atypical." A&H Sportswear, 166 F.3d at 208. Its most frequent use has been where a royalty was awarded for past infringement, there was "continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated." Id. at 208–209. The Court then noted that it "need not speculate whether circumstances other than bad faith or a prior licensing agreement would authorize such an award." Id. at 209. The Court finds that this is sufficient to hold that reasons other than intent may warrant an award of a reasonable royalty and Lontex may introduce this expert to be a part of the Court's damages analysis.

Lastly, regarding Nike's profits, the Court agrees that it is Nike's burden to present evidence regarding its finances and any facts which should be included as deductions from its total sales. "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Once Lontex proves

Nike's sales, the burden shifts to Nike to demonstrate the "costs or deductions" which reduce the amount of its total sales to its profits.  Nike, through presentation of its own evidence and experts, may seek to introduce facts and make arguments regarding how a damages award should be calculated.

Additionally, in <u>Citizens</u>, the Third Circuit noted that when jury interrogatories make certain findings, the remedies provided by the Court must be strictly consistent with those jury findings.  383 F.3d at 123–125.  In that case, the jury found that the defendant bank had committed trademark infringement, but that the plaintiff bank had not suffered financial injury, and therefore no economic damages were warranted.  As there remain significant questions regarding the extent and type of damages which may be appropriate in this case, the testimony of Drews and the other experts opining on damages may also be limited depending on the jury's findings on liability.[3]

## VIII.   Lontex's Motion to Exclude the Opinion of Paul K. Meyer

### a.  Overview of Meyer Opinion

Paul K. Meyer is a founding member and the President of TM Financial Forensics, LLC, a business, economic, financial, and damagers consulting company.  Meyer's experience is in consulting on intellectual property related issues including analyzing lost profits and other financial impacts of infringement.  Meyer was retained by Nike to respond to Lontex's damages expert, David Drews, and to offer his own opinion on damages.

Meyer opines that Nike was not unjustly enriched because no profits related to Nike's sales of the allegedly infringing products are attributed to Nike's use of "cool compression."  Meyer

---

[3] Given the importance of the jury's liability finding for determining damages, which may require the jury answering specific interrogatories on specific liability issues, the Court is considering bifurcation of the trial in this case with respect to liability and damages.  The parties should state their views on this issue in their pretrial memoranda.

also asserts that if the Court determines that a damages award is appropriate it should not exceed the price that a party would pay to acquire the asserted trademarks. Meyer also states that he believes Drews' opinion related to royalties, lost profits, and corrective advertising damages are unsupported, speculative, and unreliable.

The basis for these opinions is, stated generally, that Nike's profits from the allegedly infringing products are due to several factors, none of which is the use of the trademark. Meyer states that Drews did not conduct any analysis regarding how Nike's use of the trademark contributed to sales or increased profits. Meyer relies on several pieces of data to determine that none of the profit Nike earned from the allegedly infringing products was due to its use of the trademark. First, Meyer relies on the surveys by Nike's experts which demonstrate that the use of "cool compression" did not increase purchases of the products. Second, Meyer considered Nike's efforts to increase sales of the allegedly infringing products which include Nike's brand, affiliation with famous athletes, advertising and marketing, established distribution channels, and proprietary technology platforms and trademarks.

With respect to the amount that the trademarks are worth, Meyer relies on Lontex's representations to the U.S. Trademark Exchange regarding the amount for which it was willing to sell its trademarks.

### b. Parties' Arguments

On November 4, 2020, Lontex moved to exclude Meyer's opinion. ECF 187. On December 4, 2020, Nike responded, ECF 200, and on March 10, 2021, Lontex replied, ECF 236. Regarding the issue of profit apportionment, Lontex argues that Meyer did not rely on a quantitative analysis, the opinion is outside his area of expertise, and the information he relied on could be understood by a jury and therefore Meyer has not added an opinion of value. In response,

Nike argues that qualitative evaluation is appropriate and there is no requirement that an expert must provide quantitative analysis, that Meyer's area of expertise includes economic damages, and that the materials he relies on are those which are appropriate for an expert to rely on.

With respect to corrective advertising, Lontex argues that this subject is outside Meyer's area of expertise, because he has not conducted a corrective advertising analysis before.  Nike responds that Meyer's expertise in economic damages matters is sufficient to serve as a rebuttal witness on this subject.

### c.  Discussion

First, Lontex's arguments regarding Meyer's qualifications are unpersuasive.  Meyer has "over thirty years of experience consulting on financial, account, economic and damages matters" and has particular experience in "intellectual property infringement, misappropriate, valuation and licensing-related matters."  Given the Third Circuit's "liberal standard governing the qualifications of a proffered expert witness" and "acceptance of more general qualifications," this experience is sufficient to allow Meyer to opine on profit apportionment and serve as a rebuttal witness regarding corrective advertising.  Holbrook, 80 F.3d at 782.

With respect to the data relied upon by Meyer and the fact that he conducted a "qualitative" analysis, the Court finds that Meyer's opinion relied on appropriate information and is sufficient to help the jury determine damages.  In Covertech, the Third Circuit explained that "where a district court endeavors to calculate damages under the Lanham Act on the basis of the defendant's actual profits . . . it must ground its estimate in the record—e.g., business records, credible witness testimony, expert testimony, or industry data" with the goal of achieving a "reasonable estimate." 855 F.3d at 177.  The Third Circuit has not imposed the strict quantitative analysis requirement that Lontex suggests.

IX.     **Conclusion**

For the foregoing reasons, all three pending motions will be denied with the minor exception described above regarding McDonald's opinion.  An appropriate order follows.

/Volumes/Judge Baylson/CIVIL 18/18-5623 Lontex Corp v Nike/18cv5623 Memo Re Daubert Motions Final.docx