**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION, | Civil Action No.:  18-cv-5623 |
| Plaintiff, | |
| | (Hon. Michael M. Baylson) |
| v. | |
| NIKE, INC., | |
| Defendant. | |

---

**DEFENDANT NIKE, INC.'S PRETRIAL MEMORANDUM**

---

Defendant NIKE, Inc. ("NIKE"), by its attorneys and pursuant to Federal Rule of Civil Procedure 26(a)(3), Local Civil Rule 16.1(c), this Court's Pretrial and Trial Procedures – Civil Cases, and this Court's Order dated February 24, 2021 (ECF No. 235), respectfully submits this Pretrial Memorandum.

## I.   NATURE OF THE ACTION AND JURISDICTION

This is an action for trademark infringement and unfair competition and for cancellation of trademark registrations.  The Court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. §1331 (federal case); (b) 28 U.S.C. § 1338 (action joining claim of unfair competition with substantial related trademark infringement claim); (c) 28 U.S.C. § 1367 (supplemental jurisdiction); (d) 28 U.S.C. § 2201 (declaratory judgment sought); and (e) 15 U.S.C. § 1119 (right of the court to rectify the trademark register).

Lontex alleges that NIKE has infringed Lontex's Cool Compression trademark (the "Cool Compression Mark" or "Asserted Mark") by using words like "cool" to describe its NIKE Pro apparel with sweat-wicking fabric and ventilation that keeps the wearer cool and "compression" to describe apparel that fits tightly to the skin.

Lontex asserts five counts: (1) trademark infringement under 15 U.S.C. § 1114 for infringement of its registered mark; (2) trademark infringement pursuant to 15 U.S.C. § 1125(a) for infringement of its common law rights; (3) contributory trademark infringement under §§ 1114, 1125(a); (4) common law trademark infringement under the laws of eight states; and (5) statutory trademark infringement and unfair competition under the laws of eleven states.  (Amended Compl. ¶¶ 36-88, ECF No. 20.)  Lontex alleges that it has continuously and consistently used the Cool Compression Mark in commerce since June 2007.  (*Id.* ¶¶ 10-15, 19; Ex. A.)

NIKE raises several affirmative defenses, including that: (1) Lontex's claims are barred by the doctrine of unclean hands and/or trademark misuse; (2) NIKE's use of the common words

"cool" and "compression" was a fair use under 15 U.S.C. § 1115(b)(4); (3) Lontex's claims are barred by laches and applicable statutes of limitations; and (4) Lontex's claims are barred because Lontex failed to mitigate any alleged injury or damages.  (NIKE Answer and Affirmative Defenses pp. 14-16, ECF No. 45.)  NIKE also asserts two counterclaims challenging the validity of Lontex's rights in the Cool Compression Mark.  (NIKE Counterclaims ¶¶ 16-30, ECF No. 45.)  NIKE alleges that Lontex: (i) abandoned the Cool Compression Mark through a sustained period of non-use, and (ii) submitted false statements to the United States Patent and Trademark Office (the "USPTO") regarding the extent of its use of the Cool Compression Mark in order to obtain and maintain its trademark registrations.  (*Id*.)

## II.     DEFENDANT'S COUNTER-STATEMENT OF THE CASE

Lontex is operated by Efraim Nathan and his daughter.  Lontex has been manufacturing and selling compression garments under the SWEAT IT OUT brand since 1990.  Lontex promoted its SWEAT IT OUT garments to its customers—such as athletic trainers employed by professional sports teams—as having a special high-grade compression fabric for prevention and rehabilitation of injury.  Lontex alleges that since 2007 it has described this compression fabric as "COOL COMPRESSION technology."  The evidence will show this is a fiction created for this litigation. Lontex never used the Cool Compression Mark in the marketplace between 2008 and 2016—not on its SWEAT IT OUT–branded garments and not on or within any brochure, website, social media, blog, press release, other piece of promotional material, or in any email communications with customers.  Lontex also filed false declarations with the USPTO to obtain and maintain the asserted Cool Compression trademark registrations.  Lontex even made many attempts to sell the Cool Compression trademark registrations as standalone assets but was never successful in consummating a deal.  Lontex resumed use of the Cool Compression Mark in 2016 only ***after*** it discovered NIKE using words like "cool" and "compression" to describe its NIKE Pro apparel.

NIKE, based in Beaverton, Oregon, is the world's leading designer, marketer, and distributor of authentic athletic footwear, apparel, equipment, and accessories for a wide variety of sports and fitness activities.  The famous NIKE mark and Swoosh design mark are among the most recognizable brands in the world.

NIKE launched the "NIKE Pro" product line in 2004, about a decade before the alleged infringing conduct Lontex complains of in this action.  NIKE created the NIKE Pro line to provide baselayer garments (apparel that is worn close to the body, typically under other apparel) with the design ideal of creating thermoregulation and comfort.  Since at least as early as 2009, the NIKE Pro baselayer garments were offered with a "compression" fit as a tighter fitting alternative to the "fitted" fit.  The NIKE Pro line also has garments that keep the wearer "cool" and garments that keep the wearer "warm."

NIKE never used "cool compression" as a trademark.  The exterior of NIKE Pro baselayer garments prominently features NIKE's Swoosh design mark on the chest or leg of the garment and the NIKE mark and "NIKE PRO" branding on the waistband, neck tape, hemline, and interior labeling.  No NIKE garment says "cool compression" anywhere on the garment, labeling, or any hangtags.  NIKE also never displayed "cool compression" in retail store signage, press releases, athlete endorsements, or e-mail blasts.  And NIKE never launched any marketing campaign using "cool compression."

Starting sometime in 2015, the words "cool" and "compression" appeared in the descriptions of some NIKE Pro baselayer garments on the nike.com e-commerce website and in some NIKE wholesale catalogs, as noted above to identify the features of the relevant features of these products.  By August 2016, these types of product descriptions no longer appeared on product detail pages within nike.com.  And by the end of 2017, these types of product descriptions no

longer appeared in NIKE wholesale catalogs.  There is thus no threat of future injury to Lontex.

Lontex claims that it discovered NIKE's alleged infringing conduct in December 2015, but it did not immediately reach out to NIKE.  Instead, Lontex engaged in a three-year effort to create the contrived appearance of consumer-facing use of "Cool Compression," putting a "Cool Compression" label inside its SWEAT IT OUT–branded garments and adding "Cool Compression" to its brochure, website, social media, and other promotional materials.  Lontex then filed this action on December 31, 2018.

## III.   DEFENDANT'S DAMAGES OR OTHER RELIEF SOUGHT

NIKE denies that it is liable for any damages sought by Lontex in this case.  NIKE is not seeking damages.   NIKE is, however, seeking a declaration that Lontex's asserted Cool Compression Mark is invalid and its trademark registrations cancelled because Lontex has abandoned its trademark and/or commited fraud on the USPTO.  If NIKE prevails on one or more Lanham Act counts of Lontex's First Amended Complaint, NIKE will seek its reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a).

## IV.   DEFENDANT'S WITNESS LIST

NIKE intends to call the following witnesses at trial on liablity issues.

| Name | Address |
|---|---|
| Kimberly Mack<br><br>VP Men's Sports Apparel, NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Parker Mangum<br><br>Insights Manager II, Global Men's NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Shannon Hall<br><br>Head Coach, NIKE Factory Store, NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Katie Bromert<br><br>Sr. Director/GM North America Sales Partners, NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Mary Catherine Schrader | Omaha, Nebraska |

| Name | Address |
|------|---------|
| Vicki Humphreys | 727 Shropshire Drive<br>West Chester, PA 19382 |
| Efraim Nathan<br><br>CEO, Lontex Corp. | 8 DeKalb Street, 4th Floor<br>Norristown, PA 19401 |
| Ben Bechtel<br><br>VP of Digital Media, 1SEO Technologies, Inc. | 1414 Radcliffe Street, Suite 301-B<br>Bristol, PA 19007 |
| Norman Lehrer | 52 Berlin Road, Suite 1000<br>Cherry Hill, NJ 08034 |
| Web Authentication Witness | c/o NIKE Counsel |
| Keith Dugger | 2001 Blake Street<br>Denver, CO 80205 |
| Kyle Davis | 7001 West 56th Street<br>Indianapolis, IN 46254 |
| Shawn Fcasni | One Citizens Bank Way<br>Philadelphia, PA  19148 |
| Hal Poret<br><br>Consumer Survey Expert | 142 Hunter Avenue<br>Sleepy Hollow, NY 10591 |
| Matthew Ezell<br><br>Consumer Survey Expert | 9114 Adams Ave #242<br>Huntington Beach, CA 92646 |
| Carol A. Scott, Ph.D.<br><br>Consumer Survey Expert | Anderson Graduate School of Management<br>University of California<br>Los Angeles, CA 90024 |

NIKE may call the following witnesses at trial on liablity issues, if the need arises.

| Name | Address |
|------|---------|
| Neil Munro<br><br>Senior Director, Sustainable Apparel, NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Nicholas Johnson<br><br>Senior Product Manager, NIKE, Inc. | 1 Bowerman Drive<br>Beaverton, Oregon 97005 |
| Chris Kindel | 1801 East 6th Street, Suite 300<br>Austin, Texas 78702 |
| Samantha Nathan<br><br>Office Manager, Lontex Corp. | 8 DeKalb Street, 4th Floor<br>Norristown, PA 19401 |
| Brian Cammarota | 312 Sheffield Drive<br>Plymouth Meeting, PA 19462 |

| Name | Address |
|------|---------|
| Howard Knudson | 6081 Valley Forge Dr. Coopersburg, PA 18036 |
| Najeeb Hosni | 717 N. Jerome St. Allentown, PA 18109 |
| Christopher Williams | 154 Temple Drive Maple Glen, PA 19002 |

NIKE intends to call the following witnesses at trial on damages issues.

| Name | Address |
|------|---------|
| Wilbert Forbes Campbell<br><br>Consultant, NIKE, Inc. | 1 Bowerman Drive Beaverton, Oregon 97005 |
| Carol A. Scott, Ph.D.<br><br>Consumer Survey Expert | Anderson Graduate School of Management University of California Los Angeles, CA 90024 |
| Paul K. Meyer<br><br>Damages Expert | Two Embarcadero Ctr., Suite 2510 San Francisco, CA 94111 |
| Jeff Anderson<br><br>Damages Expert | 7342 Girard Avenue, Suite 8 La Jolla, CA 92037 |
| Efraim Nathan<br><br>CEO, Lontex Corp. | 8 DeKalb Street, 4th Floor Norristown, PA 19401 |

NIKE reserves the right to call any individual identified on Plaintiff's witness list.

## A.      Defendant's Objections to Plaintiff's Witness List

Lontex states that it intends to call live during its case-in-chief any NIKE employee fact witness that NIKE intends to call live during its case.  (ECF 245 at 8.)  Lontex further states that it is prepared to introduce the discovery deposition testimony of any NIKE empolyee fact witness that NIKE <u>does not</u> intend to call live during its case.  (*Id*.)  As to all witnesses, Lontex has expressed a desire to "minimize impact of NIKE's witnesses so they will not have to testify twice for both Plaintiff's case and NIKE's defense" and to "minimize the duplication of their testimony." (*Id*.)  Lontex's statements, however, raise a host of legal issues and concerns regarding the orderly

presentation of witnesses at trial.

NIKE shares Lontex's desire to present live testimony while minimizing the burden of having to call witnesses twice and potential duplication of testimony.  At the same time, NIKE is concerned about the risk of jury confusion and unfair prejudice to NIKE.  The Court may need to exercise its discretion to alter the sequence of testimony to prevent such jury confusion and prejudice NIKE.  *See* Fed. R. Evid. 611(a).

As such, NIKE proposes that each party simply present its own witnesses during its own case-in-chief and cross-examine the other party's witnesses during the other party's case-in-chief, with leniency to allow for entire examination of the witness during cross (*i.e.*, not strictly limited to the scope of  direct-examination) if the questioning party identifies the witness as adverse.

## V.    DEFENDANT'S EXHIBIT LIST

Attached as **Exhibit A** is the schedule of exhibits that NIKE intends to offer at trial.

### A.    Defendant's Objections to Plaintiff's Exhibit List

Lontex has prepared a list of 44 "trial exhibits" that were included in its pretrial memorandum.  However, Lontex did not share with the Court its "detailed" trial exhibit list which includes more than 1,250 documents.  (Attached as **Exhibit B** is Lontex's "detailed" trial exhibit list.)  These are improper compilation exhibits.  Lontex has grouped together dissimilar and incomplete documents to create its proposed 44 "trial exhibits."  Some of Lontex's proposed "trial exhibits" group together hundreds of different documents.  As discussed below, Lontex's proposed trial exhibit list raises a host of legal issues and concerns that threaten to prejudice NIKE by confusing and misleading the jury.

Lontex's proposed exhibit list will disrupt the orderly offering of exhibits for admission into evidence at trial.  For example, Lontex's proposed Trial Exhibit 3 groups together different (1) NIKE "tech sheets," which are internal NIKE documents; (2) single page exceprts from NIKE

wholesale product catalogs, which are shared with retail buyers at third-party retailers; and (3) screen captures of third-party e-commerce retail websites, from a variety of third-party internet sources. Each of these documents will need to be offered for admission into evidence on its own and there may be very different requirements to authenticate or lay the necessary foundation for each document, and there may be different objections to each. These grouped documents may not be offered for admission into evidence all at once. Lontex wants to skip past the foundational formalities that would put these exhibits into proper context for the jury. Lontex's proposal that certain group "trial exhibits" will be presented as "representative samples" creates an issue for another reason. NIKE disputes that Lontex's selected samples are representative of what consumers in 2015 through 2018 actually encountered at the point of sale for the majority of the sales that Lontex categorizes as infringing. Unless Lontex can demonstrate that these examples of NIKE's alleged use were consumer-facing, the exhibits are not probative on the ultimate issue of whether consumers were likely to be confused because consumers never even saw those uses. *See e.g., 1-800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 409 (2d Cir. 2005) ("A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services.").

In addition, Lontex accuses more than 50 different NIKE products as infringing, but each of these products is different, and none of them have the words "cool compression" on them. As the evidence will show, there was no consistency in how those NIKE products were referred to in the marketplace. Lontex seems to be seeking the Court's endorsement at the pretrial stage to use

just a few example exhibits (some of which are not even consumer-facing and were never in the marketplace) and refer to them as "representative samples" to imply to the jury that *all* NIKE "accused" products were presented in a uniform way to the consuming public at the point of sale. NIKE seeks clarification that the Court is not endorsing this shortcut to evidentiary offerings. If Lontex wants to offer proof that consumers saw the words "cool compression" at the point of sale—notwithstanding the fact that those words were not on the product or product labeling and there was not a uniform presentation of each product to consumers by hundreds of different retailers (who all select their own point of sale presentations)—that is, of course, Lontex's burden to do at trial. But NIKE objects to portrayal of materials as "representative" when Lontex has not yet met its burden to even prove that to be true.

Lontex has also given "names" to each of its 44 "trial exhibits," which are often prejudical to NIKE and essentially reflect Lontex's counsel's subjective characterizations of the underlying group of documents. Lontex is not proposing to name exhibits objectively, such as "January 1, 2020 e-mail from John Smith to Jane Doe." Instead, Lontex is proposing, for example, to name a group of 27 different e-mails, screen captures, and other documents as "Sample of Lontex's Mitigation Efforts." Lontex's proposed exhibit group names are argument, not admissible evidence, and should not be submitted to the jury.

Finally, Lontex's proposed exhibit list is needlessly complicated and will surely cause delay at trial and confusion among counsel, the court, and the jury. The documents on Lontex's detailed exhibit list are not serially numbered, and Lontex does not use a standard exhibit numbering convention like PX0001 through PX1250. Instead, Lontex has numbered its proposed exhibits with a confusing and laborious "Trial Exhibit Number" plus a "Sub-trial Exhibit Number" comprised of letters and sometimes more numbers, such that Lontex is proposing to use exhibit

numbers like **3a11**, **23j40**, and **37ag**.  Lontex's proposed "Exhibit 40," for example, includes 73 different documents from varying third-party sources that have numbers such as **40a**, **40aa**, **40ab**, **40b1**, **40k01** through **40z2**.  Lontex's proposed "Exhibit 36," on the other hand, includes 473 different documents that are all just numbered as Exhibit 36 without any differentiating sub-exhibit letters and numbers.  As another example, Lontex's proposed "Exhibit 37" includes 138 different documents that are grouped together into smaller sub-groups using just sub-exhibit letters, such that Exhibit **37a** comprises 18 different documents numbered as Exhibit **37a** through **37am**, while Exhibit **37h** comprises 11 different documents all numbered as Exhibit **37h**.

NIKE's proposed exhibit list, in stark contrast to Lontex's, is serially numbered using a standard exhibit numbering convention from DX0001 to DX0871.

The parties met and conferred on April 12, 2021 regarding these issues and Lontex refused to revise its proposed exhibit list, claiming essentially that Lontex is entitled to present its case to the jury in any manner it pleases and that its exhibit compilations, numbering, and naming are just advocacy.  NIKE remains willing to meet and confer regarding the parties' exhibit lists such that the parties will be prepared to come to trial with a Local Rule 16.1 compliant schedule of all exhibits to be offered in evidence at trial, together with a statement of those agreed to be admissible and the grounds for objection to any not so agreed upon.

NIKE reserves the right to make objections to the manner in which Plaintiff uses any of its proposed exhibits at trial.

## VI.     DEFENDANT'S ESTIMATED TIME FOR TRIAL

Based on Lontex's estimate that it requires 10 days to put on its case, NIKE estimates that the entire jury trial will require 15-17 days.

## VII.   SPECIAL COMMENTS REGARDING LEGAL ISSUES, STIPULATIONS, AMENDMENTS OF PLEADINGS, OR OTHER APPROPRIATE MATTERS

### A.   Anticipated Legal Issues

The Court may be required to rule on the following legal issues:

### 1.   Bifurcating Trial Into Phases on Infringement and Damages

NIKE intends to move the Court to bifurcate trial into two phases—(1) Infringement and (2) Damages—pursuant to Fed. R. Civ. P. 42(b) and, given that Lontex opposes bifurcation, NIKE respectfully requests a briefing schedule where the parties can more fully state their positions and enable the Court to make an informed decision on this important issue.

Rule 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Thus, Rule 42(b) permits bifurcation of any issues in a case. *See Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1198 (3d Cir. 1989) (Rule 42(b) "expressly authorizes a separate trial of any separate issue").  Bifurcation "is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir. 1978).  Bifurcation "may ... be appropriate where the evidence offered on two different issues will be wholly distinct ... or where litigation of one issue may obviate the need to try another."  *Plaza-Bonilla v. Cortazzo*, No. CIV.A.07-2045, 2009 WL 977297, at *2 (E.D. Pa. Apr. 9, 2009) (granting bifurcation of damages and liability). The standard for permitting bifurcation is not a high one, and a district court's concern for clarifying the issues to be tried suffices to permit the court to separate the trials.  *See Harrington v. Cleburne County Board of Educ.,* 251 F.3d 935, 938 (11th Cir. 2001)

With Lontex's four claims (one of which apparently invokes the laws of seven different states) and its multiple complex damages theories, plus NIKE's four affirmative defenses and two

counterclaims, a 15-17 day jury trial could stretch to four weeks, particularly since Lontex indicated that it will need 10 days to present its case.[1]  This Court accordingly should bifurcate the trial into phases, as it will likely make the trial shorter and easier to schedule, allow for an orderly adjudication of claims, simplify the issues, and promote judicial economy for the Court and the potential jurors, particularly in this trying time of the COVID-19 public health crisis when court operations and jury trials are severly restricted.  *See B. Braun Med. Inc. v. Abbott Lab'ys*, No. CIV. A. 93-3883, 1994 WL 468155, at *1 (E.D. Pa. Aug. 29, 1994) (granting motion to bifurcate liability/willfulness from damages in "complex patent action" for the following reason: the case "involves a counterclaim, many witnesses and voluminous documents.  Defendants estimate that the trial may take four weeks.  Even Plaintiff's more conservative estimate is 12–15 days.  The parties have filed a 168–page Proposed Final Pretrial Order in which Plaintiff lists some 367, and Defendant some 200, exhibits.  The complexity of the case is exacerbated by the fact that trial will be by jury.  The Court finds it likely that the jury will become confused if required to consume this amount of information at one time").  Moreover, NIKE's proposed bifurcation as outlined below is intended to create efficiencies in the proceeding that may obviate the need to empanel a jury for the full 15-17 days.

**Bifurcating and Sequencing Trial on Liability and Damages Issues**:  In its March 25, 2021 Memorandum Opinion, the Court stated: "Given the importance of the jury's liability finding for determining damages, which may require the jury answering specific interrogatories on specific liability issues, the Court is considering bifurcation of the trial in this case with respect to liability and damages."  (ECF 241 at 20, n.3.)  Given the importance of the jury's findings on liability

---

[1] Assuming the Court schedules full trial days every day for 10 days straight, Lontex seeks two weeks to put on its case.  Likely, if Lontex is granted 10 days to present its case, this may take three weeks or more on the Court's calendar before NIKE presents its case.

issues, NIKE agrees that the Court should exercise its discretion to further bifurcate trial between liability and damages but subject to certain and specific conditions.

NIKE briefly states its position outlining the specific issues and evidence that NIKE would seek to bifurcate and sequence to a jury.  There would be many efficiencies gained by segregating the evidence of the parties' sales data and other financial information and the expert testimony concerning the complex damages claims raised by Lontex.  The jury's job would be simplified in Phase 1 because it would not need to grapple with complex damages issues while it is deciding issues of infringement and fair use.  Should the jury find that Lontex has met its burden of proof on liablity, there would be additional efficiencies gained by having the same jury that heard the liablity cases then hear Lontex's damages case in Phase 2, given that some of the evidence put on for the liablity case will relate to some of the issues presented in the damages case.

**Detailed NIKE Financials**:  Detailed NIKE financial information, including evidence of the number of NIKE units sold and the revenues and costs associated with such sales have no bearing on the jury's liability determination.  During the liablity case, the jury will be determining: (1) whether Lontex's trademarks are valid; and, if they are, (2) whether NIKE's alleged conduct did, or was likely to, cause consumer confusion under the applicable *Lapp* factors, or (3) whether NIKE's alleged conduct constitutes a fair use.  The number of NIKE units sold and the revenues and costs associated with such sales are not probative evidence on any of these three paramount issues.  The volume of NIKE's sales is not even probative evidence on whether Lontex has suffered any actual damages.  This evidence bears only on the quantum of damages, should the jury find liablity in the first instance.  *See PR Acquisition LLC v. BMW of N. Am., LLC*, No. CIV.A. 03-3731, 2004 WL 2496849, at *5 (E.D. Pa. Nov. 3, 2004) (Baylson, J.) (bifurcating "liability and damages" with proof on the amount of damages reserved until after plaintiff established liability).

Indeed, the Court already reviewed *in camera* some of NIKE's financial information in the context of a pretrial motion, and held that NIKE's highly-confidential document showing, for a number of products, the quantity sold, cost of goods sold, and discounts is "***not at all relevant on any issues of liability in this case***."  (ECF 127 at 5 (emphasis added).)  Moreover, the Court found, "[i]t is possible that some of the data on this document might be relevant on the issue of damages, but … not at this time."  (*Id*. at 5-6.)  NIKE's detailed, product level financial information relating to sales, costs, and profit margins remains highly-confidential and competitively-sensitive information.  And there is no reason why Lontex should be permitted to present NIKE's highly-confidential financial information in open court unless and until it proves its liablity case and demonstrates that it is even entitled to seek damages.  Because the Court is not likely to close the courtroom during trial, the best way to address NIKE's concerns and interests in maintaining the confidentiality of its highly-confidential financial information would be to keep this information out of the case during Phase 1 until it is necessary for it to come in during Phase 2.

Finally, and importantly, the number of NIKE units sold and the revenues associated with such sales could have an unfair prejudicial impact upon the jury's liability determination.  Lontex intends to portray NIKE as a bad actor because NIKE is a large company that has successfully sold millions of units of its popular NIKE Pro products.  Evidence regarding the volume of NIKE's sales is likely to distract, confuse and/or mislead the jury on the paramount issues of validity, likelihood of confusion, and fair use.  *See* Fed. R. Evid. 403; *see also Alfwear, Inc. v. Icon Health & Fitness, Inc.*, No. 2:17-CV-00476-EJF, 2018 WL 6592728, at *2 (D. Utah Dec. 14, 2018) (bifurcating trial on trademark infringement liability and damages because, *inter alia*, "damages evidence could distract and confuse the jury in this case.").

**Damages Experts**:  As the Court already recognized in its Memorandum Opinion on the

parties' *Daubert* motions, the testimony of Lontex's experts opining on damages (Mr. Parkhurst and Mr. Drews) may be limited depending on the jury's findings on liablity.  (ECF 241 at 20.) Moreover, the opinions offered by Mr. Parkhurst and Mr. Drews relate only to pecuniary matters. Each expert witness ***expressly assumed a finding of liability*** in rendering their respective opinions. Neither expert witness is providing opinions that establish liability.  Mr. Parkhurst offers an opinion on what the so-called "opportunity value" of the Cool Compression Marks would have been but for NIKE's alleged infringement.  Mr. Parkhurst need not testify on this "opportunity value" opinion unless and until Lontex's proves liablity.  Mr. Parkhurst also offers an opinion that speculates about the size and scope of a prospective corrective advertising campaign that Lontex allegedly requires as a result of NIKE's alleged infringement.  Again, Mr. Parkhurst need not testify on corrective advertising if Lontex cannot prove liablity.  Finally, Mr. Drews testifies about a range of damages theories, assuming—as damages experts typically do—that liability will be established at trial.  Mr. Drews is not offering an opinion on trademark infringement liablity and he need not testify in this matter unless and until Lontex proves liabilty.

For NIKE's part, Mr. Meyer rebuts Mr. Drews's damages opinions, again, based on an assumption that liability will be established at trial.  Mr. Anderson rebuts Mr. Parkhurst's "opportunity value" and "corrective advertising" opinions, again, based on an assumption that liability will be established at trial.  There will be no need for any of these expert witnesses to testify if Lontex fails to prove its case and the jury does not find Lontex has established liability. *See Alfwear*, 2018 WL 6592728 at *2 ("If the jury in the first phase finds in the Defendants' favor, then there would be no trial on damages, and no time whatsoever would be used in presenting evidence, argument and instructions on issues regarding damages.  In the end, this would promote economy.") (quoting *Smith-Walker v. Zielinski*, No. IP 01-0343-C-T/K, 2003 WL 21254221, at *4

(S.D. Ind. Apr. 29, 2003)).  And, more importantly, there will be no need for a jury to wade through the numerous, complex damages issues that Lontex has raised, which include: actual damages in the form of lost royalties, lost sales and/or profits, past corrective advertising, future corrective advertising, exemplary and punitive damages under Colorado, Georgia, Illinois, Minnesota, New Jersey, New York, and Washington law, enhancement and disgorgement of NIKE's profits, based on deterrence, unjust enrichment or plaintiff's sustained damages.  Bifurcation of trial between liablity and damages would potentially avoid up to 3 days of expert witness testimony and would potentially save the jury many, many hours of deliberation given the breadth and complexity of the damages issues raised by Lontex's claims.

**Bifurcation of liability and damages only if tried to the same jury**:  Lontex's claims for trademark infringement and actual damages under the Lanham Act and the analogous state laws are legal claims for the jury to decide.[2]  Other than the evidence discussed above, some of the evidence and testimony that the parties put on for the liablity case in Phase 1 will relate to the evidence and testimony the parties put on for the damages case in Phase 2.  As a result, and for the sake of efficiency, the issues of liablity and damages should be decided by the same jury.  *See Alfwear*, 2018 WL 6592728, at *2 (ordering phased, bifurcated trial and holding that "[e]fficiency will only be gained however by having the same jury try the issues immediately following each other, otherwise witnesses will have to be recalled, foundations laid, etc.").  That said, NIKE proposes that Lontex be required to first prove liablity and that it is entitled to recover under the Lanham Act and analogous state law, leaving for additional proof as to the quantum or amount of

---

[2] Lontex's other claims, however, such as an accounting for profits, are equitable in nature and will be decided by the Court, not the jury.  *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 209 (3d Cir. 1999) (en banc) ("[A]n accounting for profits is a form of equitable relief...." (quoting *Williamson-Dickie Mfg. Co. v. Davis Mfg. Co.*, 251 F.2d 924, 927 (3d Cir. 1958)).

damages and reasonableness thereof if the jury and/or the court finds that Lontex has, in fact, met its burden of proof on liablity in the first phase.

### 2.   Open Questions Regarding Lontex's state law claims

In a trademark infringement case, it is typical for a plaintiff to assert claims under the Lanham Act and the corollary claim under state law in the state where the federal claim has been filed.  *See*, *e.g.,* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 22:1.50 (5th ed.) ("[i]t is the usual practice in a Complaint for trademark infringement based on the federal Lanham Act to include as alternative counts infringement under the relevant state statutory and/or common law.").  In this Court sitting in Pennsylvania, that would be Pennsylvania common law or state statutory trademark infringement along with the Lanham Act claims.  But that is not what Lontex has done here.  While Lontex's initial complaint asserted state and common law claims under the laws of various states, including Pennsylvania (ECF No. 1 ¶¶  70, 74), Lontex amended its complaint in response to NIKE's Rule 12 motion *and withdrew any claims for violations of Pennsylvania law*.  (ECF No. 20 ¶¶ 73-88.)  Lontex does not plead a claim under Pennsylvania law, even though it is a resident of Pennsylvania that opted to file this action in Pennsylvania, and it agreed at summary judgment that Pennsylvania law governed NIKE's delay-based defenses. Instead, it pleaded by vague reference the laws of *14 different states* (*not* including Pennsylvania) under two omnibus counts entitled "State Common Law Trademark Infringement" (Count IV) and "State Statutory Trademark Infringement and Unfair Competition" (Count V).

In its pretrial memorandum, Lontex states that it is "streamlining" its state law claims and that it only "intends at trial to pursue [the Fifth Count] as to infringing sales made into Colorado, Georgia, Illinois, Minnesota, New Jersey, New York, and Washington."  (ECF 245 at 18.)  Lontex goes on to state its true intention: it believes that this Court should award it "additional or complimentary items of relief as it relates to exemplary/punitive and profit disgorgement."  (*Id.*)

Without standing under the Pennsylvania Unfair Trade Practices Statute, 73 Pa. C.S. §§ 201–2, 201–3, which creates a private right of action "*only* [for] consumers who have purchased or leased goods or services for personal, family, or household purposes," *World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 446 (W.D. Pa. 2003), Lontex searches to other states for any remedy it can find to increase its unfounded damages claims.  But Lontex has not established that its Fifth Count is even viable under Colorado, Georgia, Illinois, Minnesota, New Jersey, New York, and Washington law.  Lontex lacks standing to pursue claims under several of these laws,[3] while its claims would be time-barred under others.[4]

Plaintiffs are not entitled to skip over a necessary choice-of-law analysis by cherry-picking the favorable damages regimes of state laws that do not apply under straight forward choice-of-law principles.  If Lontex were interested in streamlining this case, it would have dropped the Fifth Count altogether.  Instead, Lontex's vaguely pleaded claim and its proposal to pursue it under the laws of seven different states creates inefficiencies and potential jury confusion.  If Lontex pursues this claim as suggested in its pretrial memorandum, the jury instructions and special interrogatories will balloon exponentially to account for the liability and damages issues that must be decided under the laws of these seven states.  Since Lontex already agreed at summary judgment that Pennsylvania law governed this claim (ECF 234 at 6), the Court should find that Pennsylvania law

---

[3] *See e.g.*, *Iler Grp., Inc. v. Discrete Wireless, Inc.*, 90 F. Supp. 3d 1329, 1342 (N.D. Ga. 2015) (Georgia law); *IPOX Schuster, LLC v. Nikko Asset Management Co.*, 304 F.Supp.3d 746 (N.D. Ill. 2018) (Illinois law); *Satomi Owners Ass'n v. Satomi, LLC*, 159 P.3d 460 (Wash App. 2007) (Washington law).

[4] *See e.g.*, Colo. Rev. Stat. Ann. § 13-80-102(1)(i)) (Colorado law); *McCready v. Ill. Sec'y of State, White*, 382 Ill. App. 3d 789, 798 (2008) (Illinois law); *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1069-70 (D. Minn. 2013) (Minnesota law); *Gaidon v. Guardian Life Ins. Co. of Am.*, 727 N.Y.S.2d 30, 35 (2001) (New York law).

governs, and the claim should be dropped or dismissed before trial because Lontex lacks standing to pursue it.

To promote efficiency and clarify the applicable law, the Court should resolve this issue before trial.

> **3.**     **Whether Mr. Nathan's claimed use of the COOL COMPRESSION Marks in oral communications and presentations constitutes "use in commerce"**

Lontex alleges that Mr. Nathan has, since 2007, orally referred to Lontex's fabric technology as "Cool Compression" technology.  Whether true or not, Mr. Nathan's use of COOL COMPRESSION in oral presentations does not establish "use in commerce" sufficient to establish trademark rights and/or avoid abandonment.  Rather, "use" is established through "the bona fide use of a mark in the ordinary course of trade"—that is, "when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale and the goods are sold or transported in commerce."  15 U.S.C. § 1127.  For this reason, courts have rejected this so-called "verbal use" argument:

> [W]e are aware of no case law supporting the proposition that a seller of goods who declines to use a mark as a trademark on the packaging of his goods obtains trademark rights in the mark through its own verbal use. Embracing such a verbal use doctrine would open the door to all varieties of claims where a party took no steps to use a mark on packaging to identify it as the source of the goods to potential customers.

*George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 402-03 (4th Cir. 2009).  The Court should resolve the issue of whether Mr. Nathan's "verbal use" constitutes "use" under 15 U.S.C. § 1127 before trial.

4.      **Whether disgorgement of profits is an available remedy in this case and, relatedly, whether the Court or the jury should decide that question**

While the Lanham Act authorizes a trademark owner to recover an infringer's profits resulting from its violation, the Third Circuit holds that such an award is subject to the principles of equity and is never automatic and never a matter of right. *Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.,* 855 F.3d 163, 177 (3d Cir. 2017) (vacating a $4,054,319 award of profits in light of insufficient trial record to approximate actual damages). Disgorgement of profits "is a form of equitable relief, and it does not follow as a matter of course upon the mere showing of an infringement. It will be denied where an injunction satisfies the equities of a case, as for example, where there is a clear showing that no profit was made." *A & H Sportswear*, 166 F.3d at 208. Disgorgement of profits is only available "if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005); *see also Marshak*, 595 F.3d at 495.

In addition, courts often hold that profits disgorgement is "inconsistent with a claim of reverse confusion," which is what Lontex asserts here. *See Philips*, 2016 WL 3545529, at *27; *A & H Sportswear*, 2002 WL 27735, at *5; *Fabick, Inc. v. JFTCO*, Inc., 944 F.3d 649 (7th Cir. 2019) (affirming denial of profits in a reverse confusion case and stating that profits are unlikely to be suitable for reverse confusion); *Visible Systems Corp. v. Unisys Corp*., 551 F.3d 65, 89 U.S.P.Q.2d 1194 (1st Cir. 2008) (affirming ruling that profits were not available as a matter of law).

In *Banjo Buddies*, the Third Circuit set forth six non-exhaustive factors to determine whether an alleged infringer's profits should be awarded to a trademark holder upon a finding of trademark infringement. 399 F.3d at 175. These factors include: (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other

20

remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

Moreover, courts hold that a remedy of disgorgement of profits under the Lanham Act does not invoke a party's Seventh Amendment right to a jury trial. *See e.g.*, *JL Beverage Co., LLC v. Jim Beam Brands Co.,* No. 18-16597, --- F. App'x. ---, 2020 WL 2765083, at *1 (9th Cir. May 27, 2020) (citing *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074-76 (9th Cir. 2015)); *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.,* 921 F.3d 1343, 1359 (11th Cir. 2019).

Should there be a finding of liability for trademark infringement, the Court would likely need to resolve the issue of whether disgorgement of profits is an available remedy in this case and, relatedly, whether the Court or the jury should decide that question.

### 5. Whether the Court or the jury should decide any of NIKE's equitable affirmative defenses

NIKE's unclean hands and/or trademark misuse and its laches affirmative defenses are equitable in nature. As such, these affirmative defenses are therefore issues for the court, not the jury to decide. *See e.g., Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, No. 12 C 9686, 2016 WL 723135, at *2 (N.D. Ill. Feb. 24, 2016); *see* Federal Civil Jury Instructions of the Seventh Circuit 13.5.3 (2017) ("laches, acquiescence, and other equitable defenses to trademark infringement actions" are issues for the court, not the jury).

### 6. Whether to exclude some or all of the expert opinions of Jeffrey Parkhurst and David Drews

In its Memorandum Opinion on the parties' *Daubert* motions, the Court stated as to Mr. Parkhurst: "Nike has pointed to several factual disputes regarding whether Lontex was likely to expand its business in the manner described. Therefore, once the Court hears further evidence regarding the basis for Parkhurst's opportunity value opinion, it will determine whether this is

21

appropriate for a jury." (ECF 241 at 17.) And as to Mr. Drews, the Court stated: "As there remain significant questions regarding the extent and type of damages which may be appropriate in this case, the testimony of Drews and the other experts opining on damages may also be limited depending on the jury's findings on liability." (*Id*. at 20.)

If the Court does not bifurcate trial, the Court will likely need to resolve these issues during the course of the trial.

### B.     Anticipated Motions in Limine

NIKE anticipates making multiple motions *in limine* and would like to discuss a briefing schedule and oral argument at the Final Pretrial Conference.

### C.     Stipulations

Lontex proposed a first round of stipulations on April 7, 2021 and the parties have met and conferred regarding the same. NIKE has not proposed any stipulations at this time.

### D.     Amendments of Pleadings

None at this time.

### E.     Other appropriate matters to be addressed at the Final Pretrial Conference

NIKE identifies the following issues that it intends to raise at the April 21, 2021 conference. NIKE intends to seek Lontex's cooperation in reaching agreement with respect to many of these issues and will seek the Court's guidance where necessary to resolve any disputes:

1.  **Bifurcation**: a briefing schedule and oral argument date for a motion to bifurcate.

2.  **Trial date**: NIKE shares Lontex desire to present all witnesses live rather than through discovery or trial depositions and therefore also seeks setting a more certain trial date as soon as recovery from the COVID-19 health crisis permits. NIKE agrees that the parties should have at least 30 days' notice of that certain trial date.

3.  **Deposition designations**: a schedule for exchanges proposed designations.

4. **Motions in limine**: a briefing schedule and oral argument date.

5. **Exhibit list**: a schedule for exchanges of proposed exhibits and objections.

6. **Proposed Jury Voir Dire Questions**: a schedule for exchanges of proposed voire dire questions.

7. **Proposed Jury Instructions**: a schedule for exchanges of proposed jury instructions.

8. **Proposed Jury Interrogatories**: a schedule for exchanges of proposed jury interrogatories.

9. **Trial Demonstratives**: the Court's preferred procedures for presentation.

10. **Opening and Closing Arguments**: length of time each side be allowed for each argument.

11. **Confidentiality issues**: the parties' exhibit lists anticipate presenting at trial material designated Confidential or Highly-Confidential under the protective order entered in the case.  NIKE seeks the Court's guidance on the use of such documents or information at trial.  (ECF 44 ¶ 12.)

April 15, 2021

Respectfully submitted,

By:  _/s/ Gina L. Durham_

DLA PIPER LLP (US)

Gina L. Durham (*pro hac vice*)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Frank W. Ryan (*pro hac vice*)
Andrew J. Peck (*pro hac vice*)
Michael D. Hynes (*pro hac vice*)
Marc E. Miller (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 100201

Ilana H. Eisenstein
Ben C. Fabens-Lassen
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Attorneys for Defendant NIKE, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of April, 2021, I caused Defendant NIKE, Inc.'s Pretrial Memorandum to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system, it is available for viewing and downloading from the ECF system, and a true and correct copy was served via ECF to all counsel of record registered with the ECF system.

BY: */s/ Ben C. Fabens-Lassen*