```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   LONTEX CORPORATION          )      18-CV-5623
                                 )
 4                   Plaintiff   )
            vs.                  )
 5                               )
     NIKE, INC.                  )
 6                               )      Philadelphia, PA
                                 )      October 28, 2021
 7                   Defendant   )      9:05 a.m.

 8
                          TRIAL - DAY 9
 9           BEFORE THE HONORABLE MICHAEL M. BAYLSON
                    UNITED STATES DISTRICT JUDGE
10                        AND A JURY

11   APPEARANCES:

12   For the Plaintiff:         BEN L. WAGNER, ESQUIRE
                                MICHAEL A. SCHWARTZ, ESQUIRE
13                              TROUTMAN PEPPER HAMILTON SANDERS
                                11682 El Camino Real, Suite 400
14                              San Diego, CA  92130
                                ben.wagner@troutman.com
15

16   For the Defendant:        MICHAEL HYNES, ESQUIRE
                                GINA L. DURHAM, ESQUIRE
17                              ILANA H. EISENSTEIN, ESQUIRE
                                DLA PIPER LLP
18                              1251 Avenue of the Americas
                                New York, NY  10020
19                              michael.hynes@us.dlapiper.com
                                gina.durham@dlapiper.com
20                              ilana.eisenstein@dlapiper.com

21                 SHANNAN GAGLIARDI, RDR, CRR
                        OFFICIAL COURT REPORTER
22          U.S. DISTRICT COURT, EASTERN DISTRICT OF PA
                    601 Market Street, Room 2609
23                   Philadelphia, PA  19106
                          (267)299-7254
24

25
```

I N D E X

For the Plaintiff:

DAVID DREWS
Cross by Ms. Eisenstein, 11
Redirect by Mr. Wagner, 46
Recross by Ms. Eisenstein, 51

JEFFREY D. PARKHURST
Direct on Voir Dire by Mr. Wagner, 54
Direct by Mr. Wagner, 71
Cross by Mr. Hynes, 79
Redirect by Mr. Wagner, 98
Recross by Mr. Hynes, 100

For the Defendant:

PAUL K. MEYER
Direct on Voir Dire by Mr. Hynes, 115
Direct by Mr. Hynes, 118
Cross by Mr. Schwartz, 166
Redirect by Mr. Hynes, 184

1                    (Clerk opens court at 9:05 a.m.)

2             THE COURT:  Good morning, everyone.  As you may know,

3    one of the jurors is running late.

4             Well, there are a couple things to discuss.

5             Is there anything further to discuss at sidebar on

6    the topic of settlement?

7             MR. WAGNER:  Not that plaintiff is aware of at the

8    time.

9             MS. EISENSTEIN:  No, Your Honor.

10            THE COURT:  Okay.  Thank you.

11            All right.  So Mr. Wagner sent an email last night

12   that he omitted discussing one item with Mr. Drews and wants to

13   ask that question before the cross-examination.

14            Any objection?

15            MS. EISENSTEIN:  Yes, Your Honor, on two grounds.  I

16   mean, not only has the witness stepped down from the stand, but

17   more importantly, this is this NFL loss profits analysis that

18   Your Honor already looked at in the liability phase.

19            THE COURT:  Yes.

20            MS. EISENSTEIN:  I believe you excluded it rightfully

21   at that phase.

22            THE COURT:  Yeah.  I'm looking at this exhibit.

23            MS. EISENSTEIN:  Right, because it's not reliable.

24   It's based on units that Nike purportedly comped two teams, not

25   even sold to teams, and an average unit that doesn't even make

 1   a lot of sense.  And it's also already encompassed in the lost

 2   sales data that Mr. Drews already testified about.

 3            So I think for all those reasons, this is not

 4   relevant, proper, reliable evidence that should be warranting

 5   reopening the witness who's already been closed.

 6            THE COURT:  All right.  Mr. Wagner.

 7            MR. WAGNER:  Your Honor --

 8            THE COURT:  What about the fact that this data is

 9   already in the overall sales figures?

10            MR. WAGNER:  It is not.  It has been prominently

11   featured both in our opening, in Mr. Nathan's testimony twice,

12   and we didn't do it on the first phase because it wasn't

13   relevant to liability.  It is relevant in damages, and the jury

14   is expecting to hear what happened to the teams, the five teams

15   and the four teams, that Mr. Nathan twice testified went up and

16   went down.  It would be highly prejudicial for the jury not to

17   hear this.  It's clearly relevant, and it's for the jury to

18   determine the weight.

19            THE COURT:  Let me see if I understand this.  So the

20   top chart tends to show that for the Houston -- it's in black

21   and white.

22            MR. WAGNER:  I'm sorry.  I have a color copy.  Want

23   to trade?

24            THE COURT:  I think that would be easier.

25            MR. WAGNER:  I don't have a bunch of copies, so can I

1  trade you out so I have a copy to look at?  Thank you, Your

2  Honor.  Our printer broke.

3          THE COURT:  Does Nike have the colored one?

4          MS. EISENSTEIN:  Yes, I do, Your Honor.

5          THE COURT:  So this shows that for these four teams,

6  there were more sales in the 2016 to 2019 period than there

7  were in the 2011 to 2015 period.  The top chart; is that right?

8          MR. WAGNER:  That's correct, Your Honor.

9          THE COURT:  All right.  Now, these are sales by whom?

10         MR. WAGNER:  These are sales by Lontex from its sales

11  data.

12         THE COURT:  What do you think this proves?

13         MR. WAGNER:  This shows four teams that did not

14  receive Nike's Cool Compression product.  It doesn't matter if

15  they paid for it or didn't pay for it.  They had those

16  products, they had the compression garments, and then they

17  stopped buying nearly as much from us.  And in the five teams

18  that did have an overlap -- oh, I'm sorry.  The top one is the

19  people that didn't get units from Nike.

20         THE COURT:  They did not?

21         MR. WAGNER:  They did not get units from Nike, and

22  they increased their purchases from Lontex over that period.

23  Wait.  And on the bottom one, the folks that did receive units

24  from Nike of Cool Compression products purchased less from our

25  client.  The opposite effect for teams that received Nike's

1    product.

2             THE COURT:  Does Nike -- do you concede the accuracy

3    of the data that lives up to these charts?

4             MS. EISENSTEIN:  Not at all, Your Honor, because for

5    one thing the very premise that there was no overlap on one set

6    of teams and there was overlap on the others is false.

7    Mr. Heil testified these teams have NFL-wide deals that apply

8    to all the teams that get Nike products.  They all get an

9    allotment of Nike products.

10            What they're looking at here is sort of the

11   individual comp data that's for free products that were given,

12   and I think it's very telling that this is in average units for

13   both Lontex and for Nike because the units don't reflect, I

14   think Mr. Wagner just referred to it, sales data.

15            It's very misleading to suggest that the units

16   reflect lost sales, because many of Lontex's units, we saw this

17   in the spreadsheet, were comps.  And it would be a huge

18   distraction for the jury to have to go back to that exhibit,

19   for us to have to go back and show on cross-examination, go

20   painfully through each of these teams.  We haven't pivoted the

21   tables that way to demonstrate that most of these, if not all

22   of them, are comps.

23            And the same is true on the Nike data, because this

24   overlap issue doesn't reflect the league-wide distribution

25   deal.

1          THE COURT:  Mr. Wagner, I have a concern.  I'll say

2     this and then I'll hear from you.  I have a concern that there

3     was testimony that both Lontex and Nike and other companies in

4     this business give material to sports teams without charging

5     them.

6          Your entire direct about Mr. Drews so far has been

7     about lost sales and sales revenue and things like that.  And

8     when you introduce the concept of comped material, that is

9     comped clothing, that is clothing that is given to the

10    professional teams without charge, it enters a topic of

11    confusion, and a lot of issues could be the reason for that

12    other than Nike's infringement of the Lontex Cool Compression

13    trademark.  And I'm going to charge the jury that, you know, it

14    is your burden to prove damages that have been caused by the

15    infringement of that trademark.  And this goes, in my view,

16    beyond that.

17         MR. WAGNER:  Your Honor, if I might, you asked a

18    simple question of counsel, does it accurately reflect the

19    numbers.

20         THE COURT:  She said no.

21         MR. WAGNER:  Let me say the two things it does.  She

22    did not contest that the teams that are listed in the no

23    overlap did not receive the style numbers at issue in this

24    case, and the teams that are, did receive units.  Free or not,

25    that's not the point.  Remember, these are the same type of

1    products that if you get it from one and you don't get it from

2    another.

3           And the second piece of information she didn't say is

4    that these accurately reflect Lontex's actual unit

5    distribution.  These are taken straight from the records.  She

6    has not demonstrated or suggested that there's anything

7    inaccurate about them.  She simply suggested that they tend to

8    confuse the jury, which I appreciate the concern about the jury

9    being confused.

10           But the question here is whether Nike's distribution

11    of Cool Compression products in catalogs, which you've heard

12    the trainers testify they received the catalogs, they opened it

13    up, they saw Nike Pro Cool Compression.  You heard Ryan Heil

14    tell you that on the screen it shows the same Cool Compression

15    tech sheet name.

16           So those people, whether they paid for it or not,

17    when they got those products from Cool Compression, they then

18    stopped buying as much of the Cool Compression products from

19    Lontex.  That is for the jury to determine the weight.  It is

20    highly suggestive that five teams all went huge up and four

21    teams all went huge down.

22           Nike's had these numbers for years.  We produced

23    these numbers in our original report.  If they had any other

24    suggestion from the evidence, they were welcome to show a

25    conflicting chart a long time ago.

1          THE COURT:  All right.  Thank you.  I'm going to

2    sustain the objection.  The data here is de minimis.  That's

3    something else.  We've been talking about, you know, very

4    sizable sales by Lontex over a long period of time for where

5    they sold the material on a sales basis, and that's what is the

6    fundamental basis of the damages computation that the witnesses

7    testified to yesterday and also Mr. Nathan.

8          All right.  This data concerns units that are just de

9    minimis.  That's the only way I can describe it.  And I think

10   it doesn't lead to any, in my view, support for the plaintiff's

11   damage theory, let alone for the liability theory, which is why

12   I didn't allow it there.  I don't think it adds anything, and I

13   think it enters a topic of confusion because of the fact that

14   these are not sales.  These are comps and they could relate to

15   a lot of different motivation.

16          Objection sustained.

17          MR. WAGNER:  I thank you for at least letting us

18   argue about it.

19          THE COURT:  Okay.  You're welcome.

20          Let's see if the jury's here.

21          Where is Mr. Drews?  Are you ready for the cross?

22   Who is going to cross-examine?

23          MS. EISENSTEIN:  I am, Your Honor.  Yes, Your Honor.

24          MS. DURHAM:  Could I just ask, we have a pending

25   Daubert on Mr. Parkhurst.  I'd just like to know when you would

 1   like to address that.

 2          THE COURT:  That's with Mr. Parkhurst?

 3          MS. DURHAM:  Right, who will be right after

 4   Mr. Drews, I understand.

 5          THE COURT:  I am aware of that.  Let me know if the

 6   jury is here.

 7          Ms. Durham, is this the issue of the opportunity

 8   value opinion?

 9          MS. DURHAM:  I understand they're dropping that

10   portion of his opinion, but we have outstanding issues about

11   testimony we believe they will offer about online impressions.

12          THE COURT:  Which topic?

13          MS. DURHAM:  Online views with respect to Cool

14   Compression.

15          THE COURT:  I think it would be better if we finish

16   this witness's testimony first.

17          MS. DURHAM:  Thank you, Your Honor.

18          THE DEPUTY CLERK:  They're all here.

19          THE COURT:  Bring the jury in.

20          THE DEPUTY CLERK:  All rise.

21                   (The jury enters the courtroom at 9:18

22                   a.m.)

23          THE COURT:  Everyone be seated, please.

24          Ladies and gentlemen, good morning.  Mr. Drews is on

25   the stand ready for cross-examination.

1          Please proceed.

2                          - - -

3                  CROSS-EXAMINATION

4                          - - -

5   BY MS. EISENSTEIN:

6      Q.   Good morning.

7      A.   Good morning.

8      Q.   Good morning, Mr. Drews.  So, Mr. Drews, I want to

9   start with your lost sales calculation.

10          MS. EISENSTEIN:  Could we pull up PX-3000, please?

11  BY MS. EISENSTEIN:

12     Q.   So the gray there for you indicates what you estimate

13  to be the lost sales; is that right?

14     A.   Yes, that's what that represents.

15     Q.   Okay.  So every dollar in decline essentially from --

16  what is that top period where it starts?  Is that 2015?

17     A.   Yes.

18     Q.   All the way through the fourth quarter of 2020 you

19  attributed to Nike's use of the Cool Compression trademark; is

20  that right?

21     A.   This only has information through 2019.

22     Q.   Okay.  So every dollar through 2019 of declining

23  revenue you attributed to Nike's use of the Cool Compression

24  trademark; is that correct?

25     A.   No.  This demonstrates the difference between the

1   level of activity they were able to achieve for the three years

2   prior to 2015 through 2019.

3          Q.   Right.  So all of that decline is attributable, in

4   your view, to Nike's use of the Cool Compression trademark?

5   It's a yes-or-no question.

6          A.   Yes, that's correct.

7          Q.   And you totaled that to be $223,846; is that right?

8          A.   That is the lost profit.

9          Q.   To Lontex; is that correct?

10         A.   Yes.

11         Q.   Okay.  And that includes losses from professional

12   sports teams that you heard Mr. Nathan talk about; is that

13   correct?

14         A.   That's my understanding, yes.

15         Q.   The decline in revenue, I should say, for --

16              THE COURT:  He wasn't in the courtroom when

17   Mr. Nathan testified.

18   BY MS. EISENSTEIN:

19         Q.   I see.  So you didn't consider Mr. Nathan's testimony

20   in your opinion?

21         A.   No, no.  I developed that opinion outside of

22   Mr. Nathan's testimony.

23         Q.   Okay.  And you didn't consider the other evidence

24   that you've heard or that the jurors heard at trial in forming

25   this opinion, right?

1       A.    That's a pretty broad question.  I don't know what

2    you're actually referring to there.

3       Q.    You weren't sitting through the trial; is that right?

4       A.    That's correct.

5       Q.    You didn't revise your opinion based on anything you

6    heard or that happened at trial; is that right?

7       A.    That's right.

8       Q.    And you didn't consider in the lost profits analysis

9    whether there was any decrease in marketing activity by Lontex,

10   did you?

11      A.    Well, I understand that there was a decrease in

12   marketing activity, which is understandable when you have a

13   drop in revenue for a business of this size.

14      Q.    What I asked is, you didn't consider it in this

15   number?

16      A.    No.  What I considered is that Mr. Nathan said in his

17   deposition that he --

18      Q.    I asked you whether you considered it or not,

19   Mr. Drews.

20      A.    And I'm answering your question.

21            THE COURT:  Answer yes or no, and then you can

22   explain.

23            THE WITNESS:  Could you repeat the question, please?

24   BY MS. EISENSTEIN:

25      Q.    You did not consider the drop in advertising in

1    considering what the lost revenues were, correct?

2         A.   I did consider it.

3         Q.   Okay.  And you said that you considered it in terms

4    of basically discounting it at all, right?  You gave no weight

5    to the drop in advertising.

6              Is that another way to put it?

7         A.   No, I don't think that's accurate.

8         Q.   You know that Mr. Nathan sold his products at the

9    trade shows, right?

10        A.   Yes.

11        Q.   Okay.  And it didn't change your analysis that at

12   least according to Mr. Nathan's own taxes he didn't attend

13   trade shows in three of these years, correct?

14        A.   That's correct.  My understanding from Mr. Nathan's

15   deposition testimony is that he transitioned --

16        Q.   I'm not asking you about his deposition testimony,

17   Mr. Drews.  I ask you to answer my questions, please.

18             THE COURT:  Answer the question yes or no.

19             THE WITNESS:  Okay.

20             MS. EISENSTEIN:  Thank you.

21             THE COURT:  What's your answer?

22             THE WITNESS:  Could you repeat the question, please?

23   BY MS. EISENSTEIN:

24        Q.   Yes.  It didn't change your analysis that Mr. Nathan

25   did not attend the trade shows in 2015, 2016, or 2017, correct?

1    A.    That's correct.

2    Q.    And you didn't engage in a customer-by-customer

3  analysis, correct?

4    A.    No, I did not.

5          THE COURT:  It is correct that you did not?  When you

6  have negatives in the question and then you say is that

7  correct...

8          MS. EISENSTEIN:  That's a fair point, Your Honor.

9  BY MS. EISENSTEIN:

10   Q.    Right.  You conducted no customer-by-customer

11 analysis?

12   A.    That's correct.

13   Q.    So that gets you to $223,846 in lost profits; is that

14 right?

15   A.    Yes, that's correct.

16   Q.    I want to turn to your analysis of royalties.  You

17 suggested that a reasonable royalty rate would lead to a

18 7,464,141-dollar reasonable royalty rate; is that right?

19   A.    Yes, that's correct.

20         MS. EISENSTEIN:  We can take this down, please.

21 Thank you.

22 BY MS. EISENSTEIN:

23   Q.    And you testified that in coming up with -- just to

24 start with the royalty rate for a minute, and you used a

25 royalty rate of 10 percent; is that right?

DREWS - CROSS

1          A.    Yes.

2          Q.    And you said that you looked at a whole series of

3    different agreements to come up with a reasonable royalty rate,

4    right?

5          A.    That was part of the analysis, yes.

6          Q.    And those agreements, I think you put up a

7    presentation, although it wasn't in evidence, there were eight

8    different agreements, and they had names like Gramicci and

9    William Rast, Hardy Amies, Throwdown, Newport Harbor, World

10   Trade International, Protege.

11              Those are the ones you considered?

12         A.    Those were also part of the presentation that was

13   just up on the screen.

14         Q.    But it wasn't entered as an exhibit, right?  You may

15   not know.

16         A.    I do not know.

17         Q.    So let's just take a couple of these.  So William

18   Rast, you're aware that that deal that you found a royalty rate

19   in that case involved a collaboration between Justin Timberlake

20   and others, and it contemplated licensing involving other

21   well-known celebrities, right?

22         A.    Yes.

23         Q.    Okay.  And you were comparing that to the license of

24   Lontex's Cool Compression brand; is that correct?

25         A.    Yeah.  It was part of the analysis, yes.

1    Q.   But you thought that that was comparable; is that

2    right?

3    A.   Well, I took that difference into consideration.

4    Q.   Except that that deal had a 5 percent royalty rate,

5    right?

6    A.   Yes.

7    Q.   And you assigned a 10 percent royalty rate here,

8    correct?

9    A.   That wasn't the only deal that I analyzed.

10   Q.   Okay.  And Hardy Amies, you're aware that that

11   involved -- there we go.  Hardy Amies, are you aware that that

12   involved one Sir Edwin Hardy Amies, who is the dressmaker for

13   Queen Elizabeth II, right?

14   A.   Yes.

15   Q.   He's a pretty famous guy, right?

16   A.   In certain circles, that's correct.

17   Q.   Well-known trademark?

18   A.   Yes.

19   Q.   And the royalty rate there didn't just involve

20   license of a trademark, right?

21   A.   There may have been other things included in that

22   license agreement, yes.

23   Q.   Right.  There was a business acquisition purchase.

24   There was some kind of other licensing and distribution

25   agreement, right?

DREWS - CROSS

1      A.   Yes, but none of those were part of the royalty rate

2   for the trademark itself.

3      Q.   Right.  But the royalty rate was part of a larger

4   deal for the license, correct?

5      A.   There were other aspects to that license, yes.

6      Q.   Right.  And the same is true for the Rast deal,

7   right?  That was a pretty complicated deal involving different

8   promotional and distribution arrangements between

9   celebrity-type figures, correct?

10      A.   Yes.  I took those differences into consideration.

11      Q.   But yet you just took the 10 percent royalty rate

12   from Hardy Amies and used it here, right?

13      A.   I would not say that's accurate.

14      Q.   And then you used the Ohio State and Michigan deals

15   that Nike cut for Nike's own brands as part of your royalty

16   rate analysis, correct?

17      A.   I didn't actually have those license agreements.

18   Those were news reports.  But I used that as kind of a sanity

19   check for the conclusion of 10 percent.

20      Q.   I see.  So the sanity check of Nike's licensing and

21   equipment deal with major universities was part of the

22   comparators; is that right?

23      A.   It was part of the analysis, yes.

24      Q.   Ultimately, the value of the brands that are at issue

25   in these deals is very high, you would agree?

1   A.   In some cases, yes.

2   Q.   Right.  The value of Justin Timberlake's brand is

3   pretty high, right?

4   A.   I would agree with that, yes.

5   Q.   The value of Queen Elizabeth II's dressmaker's brand

6   is pretty high, right?

7   A.   It's probably a pretty good brand, yes.

8   Q.   And the value of Nike's brand is pretty high, right?

9   A.   Yes.  As I testified yesterday, I took that into

10   consideration as well.

11   Q.   Probably one of the most well-known brands in the

12   world, right?

13   A.   Certainly in this area of products.

14   Q.   Okay.  And when you consider the royalty amount, I'm

15   not talking about the rate, the royalty amount that you put,

16   the 7.4 million, did you consider the value of Lontex's Cool

17   Compression brand?

18   A.   Yes, I did.

19   Q.   Okay.  And wouldn't you agree with me -- well, let's

20   just talk about what a royalty rate is.

21   A royalty rate is an agreement to pay a certain

22   amount of money to use, in this case, a brand name for a period

23   of time, right?

24   A.   Yes.

25   Q.   It's like a rental agreement, right?

DREWS - CROSS

1     A.    In essence, that's correct.

2     Q.    Yeah.  So, you know, for a certain amount, let's say

3 10 percent of the sales in your case, you get the right to use

4 the name, right?

5     A.    Yes.

6     Q.    Wouldn't you agree with me that it would make no

7 sense to rent the name for way more than you could buy it

8 outright?

9     A.    It depends on the circumstances.

10     Q.    Especially if it's not exclusive, right?

11     A.    Well, that certainly enters into the equation.

12     Q.    Right, exclusivity?

13     A.    Yes.

14     Q.    So a lot of these deals were exclusive deals, right,

15 the ones that are on this list?

16     A.    A few of them were.

17     Q.    Yeah.  Because an exclusive deal is just like it's a

18 rent and it's only for me, right?

19     A.    Yes.

20     Q.    Okay.  But a nonexclusive deal is just I get to use

21 it, and the person next to me gets to use it if they want to

22 enter into a deal, and someone else might get to use it, too,

23 right?

24     A.    That's an overly simplified way to look at it, but a

25 nonexclusive deal does allow for licensing to other parties.

1      Q.   Okay.  And so it can't make any sense to have a

2   royalty, a total royalty, that is just you know, you know, not

3   even ten times more but, you know, substantially more than the

4   actual value of the trademark itself, right?

5      A.   Well, that difference is largely due to the extent of

6   use and the difference between how Lontex has been able to

7   utilize the trademark and how Nike utilized the trademark.

8      Q.   Right.  But the value of the trademark, whoever's

9   using it, is ultimately the anchor point for what a reasonable

10   royalty rate would be, right?

11      A.   Yes.  And I think you have to provide compensation

12   for the intended use.

13      Q.   Okay.  But you would agree with me that it comes down

14   to the value of the trademark, right?

15      A.   Well, in my world, a value of the trademark --

16           THE COURT:  Answer yes or no.  Then you can explain.

17           THE WITNESS:  Okay.

18   BY MS. EISENSTEIN:

19      Q.   I'm not asking you to -- just to be clear, Mr. Drews,

20   I'm not asking you for a valuation of the trademark.  I don't

21   want you to value the trademark.  I'm just asking you a simple

22   question.  It's just a yes-or-no question, which is, the value

23   of the trademark is the anchor point for a reasonable royalty

24   rate, correct?

25      A.   Yes, and that value includes all uses, including

DREWS - CROSS

1    those of the licensee.

2            MS. EISENSTEIN:  Okay.  We can take that down.  Thank

3    you.

4    BY MS. EISENSTEIN:

5        Q.   All right.  I next want to talk about profits.

6            You testified to something called profits

7    disgorgement, right?

8        A.   Yes.

9        Q.   And that's a big word for saying what are the profits

10   that Nike gained from the use of the Cool Compression

11   trademark, right?

12       A.   That's correct, yes.

13       Q.   And that last part is important, isn't it, from the

14   use of the Cool Compression trademark?

15       A.   Yes, it is.

16       Q.   It's not just Nike's sale of products, right?

17       A.   That's correct.  It's Nike's sale of products

18   associated with the use of the trademark.

19       Q.   Right.  But that's not what you did here, right?  You

20   multiplied all of Nike's sales for the style number and

21   deducted just the cost of goods, and that was the number you

22   came up with, right?

23       A.   Those are the profits associated with the use of the

24   trademark.  That's correct.

25       Q.   Right.  So you took -- I'm just going to, if I

DREWS - CROSS

1  could -- I know we've seen these style numbers a lot of times

2  and they've been in small font, so I just want to make sure we

3  have them in front of you, okay?

4          MS. EISENSTEIN:  May I approach the witness, Your

5  Honor?  May I approach, Your Honor?

6          THE COURT:  Yes, yes.  I'm sorry.  Thank you.

7          MS. EISENSTEIN:  Can we put up on the screen DX-1222?

8  BY MS. EISENSTEIN:

9      Q.   Would you agree with me that this is the list of the

10  style numbers that you included in your analysis?

11      A.   This appears to be accurate, yes.

12      Q.   Okay.  I think the last time we looked at these,

13  they'd been in tiny letters, so I wanted to make sure that we

14  had them in a place where we could reference them, okay?

15      A.   Okay.

16      Q.   So in order to come up with your profits number, you

17  took every sale for the products that are listed here

18  nationwide, right?

19      A.   Throughout the U.S., that's correct.

20      Q.   And it included all the sales of those products in

21  Nike stores, right?

22      A.   Yes, that was part of the analysis.

23      Q.   It included all the sales of those products, Nike

24  online, right, Nike.com?

25      A.   Yes.

DREWS - CROSS

Q.   It included all the sales of those products to wholesalers, right?

A.   Well, to retailers through the wholesale operation, yes.

Q.   Okay.  And, like, by retailers, many of those are really big businesses, right?

A.   Some of them are, yes.

Q.   They're like B-to-B transactions right, business-to-business?

A.   That's correct.

Q.   And the person who is buying these products is not a consumer that's walking into a store, right?

A.   That's my understanding, correct.

Q.   Right.  They are sophisticated buyers in some cases, right?

A.   Yes.

Q.   And some of those big retailers are very sophisticated buyers, right?

A.   That's correct, yes.

Q.   And you also included not only all that, but you also included every sale from those retailers to their consumers; isn't that right?

A.   That was the third component, yes.

Q.   Okay.  And you multiplied all of that, in the case of the third-party assumptions of the revenues, and then that was

1  the revenue number that you used, right?

2       A.   Yes.

3       Q.   And then for Nike you subtracted just what's called

4  cost of goods sold, right?

5       A.   And freight.  So got down to the gross margin.

6  That's correct.

7       Q.   Okay.  Let's just first talk about that piece of it.

8            So you didn't give Nike credit for any other costs

9  that it incurs in promoting its brands, for example; is that

10  right?

11      A.   That's correct.

12      Q.   Okay.  You didn't give it any credit for the other

13  efforts that it makes to distribute these products, correct?

14      A.   That's correct.

15      Q.   You didn't give any credit to Nike for the cost of

16  generating demand, right?

17      A.   That's correct.

18      Q.   And you know that Nike spends a lot of money on that,

19  right?  We've all seen it.

20      A.   Yes, they do.

21      Q.   And so that's the net profit number that you come up

22  with, right?

23      A.   I'm sorry.  What are you asking about?

24      Q.   That after you subtract -- you're right.  That was a

25  bad question.  I'm sorry.

1      After you subtract the cost of goods sold, you reach

2  the net profit margin, right?

3      A.   When you subtract the cost of goods sold, you reach

4  the gross margin.

5      Q.   The gross margin.  And that's what you went with; is

6  that correct?

7      A.   That's correct.

8      Q.   Thank you for the accounting correction.

9           All right.  So in addition to not considering the

10  other costs, you also didn't consider that Cool Compression

11  wasn't everywhere, right?

12      A.   That is not consistent with my -- it's not consistent

13  with my understanding.

14      Q.   Okay.  Well, you didn't sit through all the trial,

15  right?

16      A.   No, I did not.

17      Q.   You had testified at the liability phase that --

18           THE COURT:  Ladies and gentlemen of the jury, we have

19  a rule in this case that each party is only allowed to have one

20  representative here.  All the other witnesses are not allowed

21  to be in the courtroom with other people testifying, so that's

22  why Mr. Drews was not in the courtroom.

23           Go ahead.

24           MS. EISENSTEIN:  Thank you, Your Honor, for that

25  clarification.

DREWS - CROSS

1  BY MS. EISENSTEIN:

2      Q.   But nevertheless, in formulating your expert opinion,

3  you testified in the liability phase that you considered the

4  evidence and the summary exhibits to determine these style

5  numbers that are here on -- up here on the screen, correct?

6      A.   Yes.

7      Q.   Okay.  And you didn't conduct your own analysis about

8  how extensive the use of Cool Compression was, right?

9      A.   I did in the lead-up to the delivery of my report.

10  So I verified, for example, that it was sold in every one of

11  the 50 states.

12      Q.   Okay.  And you saw that there were a couple -- I

13  think in your report you had maybe ten exhibits that showed

14  particular instances of where Cool Compression was listed on a

15  website, for example?

16      A.   By retailers of Nike products, yes.

17      Q.   And the investigation, you said that it was sold in

18  50 states, you mean that there were sales of these style

19  numbers in 50 states, correct?

20      A.   And as I understand, Lontex's operation also.

21      Q.   Right.  You were just talking about the sales of

22  these style numbers in 50 states, correct?

23      A.   Well, I thought you were asking about Lontex's sales,

24  so maybe I had some confusion as to which part of that I was

25  answering.

DREWS - CROSS

1     Q.   Okay.  I'm sorry.  I should have been more clear.

2          I'm talking about Nike's use of Cool Compression

3     because we're talking about Nike's profits right now, correct?

4     A.   Yes.

5     Q.   Okay.  So in terms of the use by Nike of the term

6     "Cool Compression," you did not conduct an investigation to see

7     when and how and where Cool Compression was used, right?

8     A.   That was not my task, no.

9     Q.   And so you didn't consider, like, for example, if

10    there was a consumer, just take one hypothetical consumer who

11    walked into a Nike store, went to the rack, purchased a

12    product -- went to the register and purchased it, they didn't

13    look at the website ahead of time, they didn't hear from a

14    sales associate or read a tech sheet.

15         You counted that sale, right, in this number?

16    A.   Yes.

17    Q.   And you remember, I think you admitted previously,

18    that the products themselves didn't have Cool Compression

19    written on them, right?

20    A.   I believe some of them had it on a label, but it

21    wasn't plastered across the front of the product.

22    Q.   Right.  It wasn't on the hang tag, right?

23    A.   That's my understanding.

24    Q.   You don't actually know, do you?

25    A.   No.  That is my understanding, that it was not on the

1  hang tag.

2      Q.   Okay.  And even if the consumer never saw the words

3  or heard the words "Cool Compression," it still is in your

4  number, correct?

5      A.   If they purchased the product, it would be in my

6  analysis, yes.

7      Q.   We talked before about those sophisticated buyers at

8  wholesale, right?

9      A.   Yes.

10      Q.   And you'd agree with me that those buyers are not

11  buying because of the product name, right?

12          MR. WAGNER:  Objection.  Calls for speculation and

13  legal opinion.  It's beyond the scope.

14          THE COURT:  Overruled.

15          Can you answer the question?

16          THE WITNESS:  I don't know what the buyers consider

17  when they purchase these products.

18  BY MS. EISENSTEIN:

19      Q.   Right.  You don't know?

20      A.   I don't know.

21      Q.   Okay.  And if they bought based on data and sales

22  projections in bulk, you nevertheless included it in your

23  number, correct?

24      A.   As I understand it, these buyers were trained on

25  these products using those tech sheets --

DREWS - CROSS

1     Q.   I asked you a question.  If they bought -- I'm asking

2     you a hypothetical question.

3          If the buyer was a sophisticated buyer who was buying

4     it on the data, the sales projections, and their own forecast

5     in bulk, it's still in the number, right?

6     A.   Yes.

7     Q.   And I want to talk to you for a minute just about

8     Nike.com.

9          That's not a big percentage of your number, right?

10    A.   I don't recall off the top of my head what the

11    percentage is.

12    Q.   Okay.  Nike.com is just a couple of million dollars

13    of sales of these products, right?

14    A.   Okay.

15    Q.   And I know you looked at the summary exhibit because

16    we talked about that the last time, right?

17    A.   Yes.

18    Q.   And did you look on the summary exhibit at which of

19    these style numbers had evidence that Nike used Cool

20    Compression with respect to them on its website?

21    A.   I don't believe I looked to that level of detail.

22    Q.   Okay.  You didn't do a style number, by-style number

23    analysis, for the online sales to see whether or not there was

24    any Cool Compression on Nike's website?

25    A.   Just to the fact that these style numbers were sold

1    through Nike.com.

2            MS. EISENSTEIN:  May I approach the witness, Your

3    Honor?

4            THE COURT:  Yes.

5            THE WITNESS:  Thank you.

6    BY MS. EISENSTEIN:

7        Q.   Okay.  I'm showing you what's been marked as Exhibit

8    DX-1223, 1224, and 1225.

9            Do you see those?

10       A.   Yes, I do.

11       Q.   And I think some of the exhibits that you had

12   previously relied on were those from the Wayback Machine,

13   right?  Are you familiar with that, the archive.org?

14       A.   I am familiar with it, but I'm not sure which

15   exhibits you're referencing.

16       Q.   Okay.  You've previously seen that there was -- some

17   of the summary exhibits came from Wayback.org, right?

18       A.   I don't know that I recognized that they came from

19   that, but that's plausible.  That's what that tool is used for.

20       Q.   All right.  Let's start with DX-1227.  Let's take a

21   look at that one.

22            This is an image from Wayback Machine dated March 27,

23   2016.  Is that what it says?

24       A.   I hope you're not going to ask me to read these tiny

25   --

DREWS - CROSS

1      Q.    Maybe we can blow it up a little bit more.  It's also

2  on your page, if you want to look down at 1223.

3      A.    I'm sorry.  What was the question?

4      Q.    This is an image from the Wayback Machine, and you

5  can see at the top it reads March 27, 2016, right?

6      A.    Yes, it does.

7      Q.    Okay.  Let's go look down below.  It says, if you can

8  look at the URL for a minute, you'd agree with me that this is

9  from the Nike.com store, right?

10     A.    Yes.

11     Q.    And then let's look at the image below.  That says

12 Nike Pro Cool, right?

13     A.    Yes, it does.

14     Q.    Okay.  Not Nike Pro Cool Compression, right?  And can

15 you see the style number?  I know it's little there.  It's

16 there on the right-hand side.

17     A.    703098.

18     Q.    Okay.  Is that on your list?

19     A.    Yes, it is.

20     Q.    Okay.  So you'd agree with me that this doesn't say

21 Nike Pro Cool Compression like some of the other styles we

22 looked at, right?

23     A.    This particular printout does not that I can see.

24     Q.    Right.  This particular printout on this particular

25 date and time does not include the Cool Compression in the

DREWS - CROSS

1  title, right?

2       A.   That's correct.

3       Q.   Okay.  But you included all the sales from Nike.com

4  of this product in your analysis, correct?

5       A.   Yes, that's correct.

6       Q.   Let's look at Exhibit DX-1224, please.

7            Similarly, an image from the Wayback Machine.  This

8  time dated November 14, 2016, right?

9       A.   Yes, that's correct.

10      Q.   Okay.  And that's also Nike.com on the URL, right?

11      A.   Yes, it is.

12      Q.   Let's look at down below, and, again, that one's

13 similar right, Nike Pro Cool?

14      A.   That is what it says, yes.

15      Q.   And let's see the style number there.

16           THE COURT:  What is this number?

17           MS. EISENSTEIN:  DX-1224.

18           THE COURT:  Go ahead.

19 BY MS. EISENSTEIN:

20      Q.   And you see the style number there in small letters?

21      A.   I believe it says 703086.

22      Q.   You recognize that one as one of the style numbers in

23 your analysis?

24      A.   Yes, it is.

25      Q.   All the sales through Nike.com for this one is in

DREWS - CROSS

1  your number, too, right?

2      A.   Yes, it is.

3      Q.   Okay.  Let's go to -- we're just going to do one more

4  of these, DX-1225.

5          You'd agree with me that this is an image from the

6  Wayback Machine dated July 4, 2017?

7      A.   Yes.

8      Q.   And this is also Nike.com, right?

9      A.   Yes, it is.

10      Q.   All right.  Let's look at that shirt.  That's also

11  Nike Pro, right?

12      A.   Yes.  That's what it says.

13      Q.   And then short sleeve training top?

14      A.   Yes.

15      Q.   Okay.  And then let's look at the style number there.

16          That's one of the styles you included in your

17  analysis, right?

18      A.   Yes, it is.

19      Q.   And all the sales from Nike.com for this shirt are in

20  there, too, right?

21      A.   That's correct.

22      Q.   So I want to go back to the wholesalers for a minute.

23  I think they've also been called authorized retailers from time

24  to time, right?

25      A.   That's my understanding, yes.

DREWS - CROSS

1    Q.   You remember back when we last spoke in the liability

2    phase, we talked about the number of retailers that were

3    featured in Lontex's retailer exhibit.

4         Do you remember that?

5    A.   Yes.

6    Q.   And I think we had counted, like, 28 that were in

7    that exhibit, right?

8    A.   I think that was accurate, yes.

9    Q.   Okay.  And you had said that Nike sold to

10   approximately 1,530 entities at wholesale, right?

11   A.   Somewhere around there.  I may be off by a few.

12   Q.   And I think you did the math for me and said that

13   that was about 2 percent, the 28 retailers -- just in terms of

14   number of retailers were about 2 percent of the number of

15   entities that Nike sold these products to that are on your

16   style list, right?

17   A.   That's correct.

18   Q.   And the other 98 percent of retailers, all the sales

19   to them are in your analysis, too, right?

20   A.   Yes.

21   Q.   You counted all of those profits, correct?

22   A.   That's correct.

23   Q.   Now, the next thing I want to address in your profit

24   calculation is what the value of Nike's own brand is to those

25   sales.

1          Did you consider that at all?

2     A.    That's kind of baked into the cake, yes.

3     Q.    Well, you gave zero credit for Nike's brand, right?

4     A.    Well, when we're talking about the defendant's

5 profits calculation, you're basically calculating the profits.

6 It's more of an accounting exercise.

7     Q.    Right.  So it's not trying to decide what was the

8 value of the Cool Compression brand or the Cool Compression

9 mark to the transaction.  It's just saying a sale where Cool

10 Compression some time was used with respect to that style

11 number, right?

12    A.    Yes.

13         MS. EISENSTEIN:  All right.  I want to look at

14 PX-3003, please.  Can we blow that up?

15 BY MS. EISENSTEIN:

16    Q.    You prepared this chart, right?

17    A.    Yes, I did.

18    Q.    And it has a before number and an after number in a

19 simple block chart; is that right?

20    A.    Yes.

21    Q.    And the before is you said before April 8, 2016; is

22 that right?

23    A.    Yes, that's correct.

24    Q.    And the after is after April 8, 2016, right?

25    A.    Yes.

1  Q.   And I just want to be clear about what these numbers

2  represent, okay?

3  A.   Okay.

4  Q.   All right.  So these numbers represent the total

5  sales of all those style numbers before that date, nationwide,

6  and after that date at wholesale, right?

7  A.   Yes.  And April 8th itself is in the before

8  calculation.

9  Q.   Okay.  Thank you for clarifying that.

10      And so if there was evidence that Nike stopped using

11  Cool Compression at some point in this period, that didn't

12  matter to this chart, right?

13  A.   That's correct.

14  Q.   Okay.  So if Nike had, for example, taken down Cool

15  Compression from its website, it still is in the after box,

16  right?

17  A.   That's correct.  I have not seen evidence that that

18  is the case, but that would be correct, yes.

19  Q.   Well, if there was evidence, like maybe the -- for

20  example, the exhibits I just showed you where it says Nike Pro

21  and not Nike Pro Cool Compression, that didn't matter to this

22  analysis, right?

23  A.   That's correct.  My understanding is that --

24  Q.   I asked you if it was correct or not.

25      THE COURT:  He just agreed it was correct.

DREWS - CROSS

 1          You may explain briefly.

 2          THE WITNESS:  My understanding is that these types of

 3   ads change fairly frequently, so to pull out one particular

 4   date amongst the full range of three and a half or almost four

 5   years is I don't think representative of what was actually

 6   marketed.

 7   BY MS. EISENSTEIN:

 8      Q.   Right.  And so you had reviewed screenshots and

 9   evidence in the exhibits from particular dates and times,

10   right?

11      A.   Yes.

12      Q.   And that's not representative of what happened

13   throughout the entire three-and-a-half-year period, is it?

14      A.   No.  It's a fluid situation.

15      Q.   Okay.  So you don't really know if you have, for

16   example, a screenshot from 2015, whether that screenshot

17   appeared or that website would appear the same way in 2017,

18   right?

19      A.   That's correct.

20      Q.   So if the website no longer said Cool Compression on

21   it in 2017, that should make a difference, shouldn't it?

22      A.   It depends.  The --

23      Q.   It should make a difference to whether or not it's

24   wholesale sales of a Cool Compression product, shouldn't it?

25      A.   Again, it depends on what's in the mind of the

1   consumer.

2      Q.   Okay.  So if the product was one that was sold at

3   wholesale, the consumer is a sophisticated buyer, right?

4      A.   And the consumer may be familiar with that through

5   those tech sheets, but yes.

6      Q.   And so if there was once a tech sheet multiple years

7   ago, even if it was changed, it remains in the after category;

8   is that correct?

9      A.   That's correct.

10     Q.   Now, I just want to talk for a minute about the

11   non-Nike retailer -- you can take that down.  The non-Nike

12   retailer sales.  You put up a number of those retailers.

13          So this is not them buying from Nike, right?  So we

14   talked about the sophisticated buyer buying from Nike for their

15   purchase, right?  That's that wholesale?

16     A.   That's the wholesale, yes.

17     Q.   And then those entities are retailers, right?  Like a

18   Modell's or Foot Locker or Dick's Sporting Goods, right?

19     A.   Yes.

20     Q.   And then they go ahead and sell through their own

21   channels online or their stores, their brick and mortar stores,

22   the product, correct?

23     A.   That's correct.

24     Q.   And they make a profit on those sales, right?

25     A.   Yes, they do.

1    Q.    And through some sort of assumptions, you estimated

2    their profit on this, right?

3    A.    Yes.

4    Q.    You only got a few of those retailers' sales data,

5    right?

6    A.    Direct from the retailers, that's correct.

7    Q.    Right.  And the rest of them, you just made

8    assumptions to estimate what their profits must be, right?

9    A.    Based on the unit sales from Nike to those retailers.

10   Q.    Right.  But you don't know what their profits are?

11   A.    No, that's correct.

12   Q.    But you nevertheless put up a 95-million-dollar

13   number about their profits; is that right?

14   A.    No, that's not correct.

15   Q.    That was the total.  Sorry.  39-million-dollar number

16   of their profits?

17   A.    That's correct.

18   Q.    And you added that to Nike's total sales to get a

19   95-million-dollar number; is that right?

20   A.    Yes.

21   Q.    Well, this 39-million-dollar number -- we don't need

22   to necessarily focus on this.  You can go ahead and take that

23   down.

24         I just want to ask a question, a general question,

25   not really about the number itself but about how you got there.

1          Those profits from what Dick's sells to its customers

2     or Modell's sells to its customers, those are Dick's profits,

3     right?

4          A.   Yes.

5          Q.   And Modell's profits, right?

6          A.   That's correct.

7          Q.   And Foot Locker's profits, right?

8          A.   Yes.

9          Q.   Those are not Nike's profits, right?

10         A.   That's correct.

11         Q.   And I believe your slide had said defendant's

12    profits, right?

13         A.   Yes.

14         Q.   And as far as you know, those entities are not

15    defendants here, correct?

16         A.   That's correct.

17         Q.   Right.  It's just Nike, right?

18         A.   Yes.

19         Q.   All right.  The last thing I want to ask you about is

20    corrective advertising.

21              You gave an estimate of the value of corrective

22    advertising; is that right?

23         A.   Of the estimated cost to correct the impressions in

24    the marketplace, yes.

25         Q.   Okay.  Let me start with how you got to impressions

DREWS - CROSS

1   in the marketplace.

2          That's a big word for how many people saw the Cool

3   Compression mark; is that right?

4       A.   Yes.

5       Q.   And you didn't do that analysis yourself, did you?

6       A.   No.  I relied on Mr. Parkhurst.

7       Q.   So everything that you said about corrective

8   advertising rises or falls with Mr. Parkhurst's analysis; is

9   that right?

10      A.   Well, that's certainly one component.  I wouldn't say

11  everything rises or falls on that.

12      Q.   That's fair.  The component about the number of

13  impressions rises or falls with Mr. Parkhurst, right?

14      A.   Yes.  That part of the analysis is based on

15  Mr. Parkhurst.

16      Q.   Okay.  And the impact of those impressions, that

17  rises or falls with Mr. Parkhurst, right?

18      A.   What do you mean by impact?

19      Q.   He's the one who gave an opinion about whether those

20  impressions made any difference, right?

21      A.   Yes.

22      Q.   And you just were estimating what the cost would be

23  if you had to print that many ads; is that right?

24      A.   That's kind of an oversimplified way to express it,

25  but, yes, it's the cost to generate the number of impressions

DREWS - CROSS

1   to correct the misinformation in the marketplace.

2       Q.   Okay.  Whatever that may be?

3       A.   Whatever they may be.

4       Q.   Okay.  But you don't really know what the

5   misinformation is in the marketplace.  You just are saying is

6   if it was what Mr. Parkhurst said it was, this is the cost of

7   putting ads in these places; is that right?

8       A.   That's right.  I did not do that part of the

9   analysis.

10      Q.   Okay.  I don't know if you have that presentation

11  that says corrective advertising.  I don't think it was an

12  exhibit.  The next one.  One more.  Yeah, here we go.

13           It doesn't look like the same numbers as you put in

14  your presentation.  Let's see.

15      A.   No.  This has been updated to reflect the reduced

16  number of product numbers.

17      Q.   Oh, I see.  All right.  Well, so let's look at -- I

18  think it's PX-3007 is your new one; is that right?

19      A.   Yes, that's correct.

20      Q.   So you have some estimates of advertising in all of

21  these different places; is that right?

22      A.   That's correct.

23      Q.   Of purchasing AdWords for up to 600,000 Google

24  impressions; is that right?

25      A.   That's correct.

DREWS – CROSS

1 Q. Print ad in Runner's World, right?

2 A. Print and digital.

3 Q. And Health magazine, right?

4 A. Yes.

5 Q. Men's Health?

6 A. Yes.

7 Q. All of that and Instagram targeted advertising,

8 right?

9 A. That's correct.

10 Q. Facebook targeted advertising?

11 A. Yes.

12 Q. And you added all that up to get a 33-million-dollar

13 number?

14 A. Over time, yes.

15 Q. Yeah.  And you haven't seen any advertising by Nike

16 of Cool Compression on Facebook, have you?

17 A. Personally, I have not.

18 Q. No.  And you haven't seen it in this case, have you?

19 A. I can't recall if I have or not.

20 Q. You haven't seen any advertising by Nike of Cool

21 Compression on Instagram, have you?

22 A. No, I have not.

23 Q. You haven't seen that Nike had purchased any AdWords

24 for Cool Compression, right?

25 A. I don't know if they have or not.

DREWS - CROSS

1        Q.   You didn't see Nike take out ads in Runner's World or

2   Health or Men's Health or Shape or Muscle & Fitness magazine

3   with Cool Compression, right?

4        A.   That's correct.

5        Q.   And this corrective advertising idea, isn't it right

6   that the idea behind corrective advertising is, you said

7   misimpressions, but it's to restore the value of the Cool

8   Compression brand to what it was before Nike used it.

9             Isn't that the concept?

10            MR. WAGNER:  Objection.  Calls for a legal

11   conclusion.

12            MS. EISENSTEIN:  You can take that down.

13            THE COURT:  Overruled.

14            THE WITNESS:  So what was the question?

15   BY MS. EISENSTEIN:

16       Q.   You would agree with me that the point of corrective

17   advertising is to restore the value of the Cool Compression

18   brand in the marketplace that was lost due to Nike's use of the

19   term?

20       A.   That is certainly one aspect of it, yes.

21       Q.   And so, once again, isn't corrective advertising

22   really tied back to what the value is of the Cool Compression

23   trademark itself?

24       A.   That is one consideration, yes.

25       Q.   And yet you put up a 33-million-dollar number for a

DREWS – REDIRECT

1    trademark that was for sale for $800,000, correct?

2         A.   That's correct.

3         Q.   I'm just asking yes or no.

4         A.   That's correct.

5         Q.   And you suggest a number of $33 million in corrective

6    advertising when Lontex spent no more than $16,000 a year on

7    advertising itself; is that right?

8         A.   That's correct.  But as I mentioned before, the value

9    of the mark --

10        Q.   Is that right or not?  Go ahead.  You can finish.

11   The value of the mark...

12        A.   The value of the mark incorporates not only the use

13   by Lontex but also the use by Nike.

14        Q.   Right.  But ultimately it has to do with the value of

15   the trademark to either party, correct?

16        A.   That's correct, in total.

17             MS. EISENSTEIN:  No further questions, Your Honor.

18             THE COURT:  Thank you.  Redirect.

19             MR. WAGNER:  Yes, Your Honor.

20                            - - -

21                     REDIRECT EXAMINATION

22                            - - -

23   BY MR. WAGNER:

24        Q.   While corrective advertising is fresh in everyone's

25   mind, you said one consideration is the value of the trademark,

DREWS - REDIRECT

1    correct?

2         A.   Yes.

3         Q.   Is another consideration changing the minds of the

4    consumers who now associate Cool Compression with Nike?

5         A.   That's correct.

6         Q.   And you were also asked for profit analysis, that you

7    don't know what their profits are for each third-party

8    retailer, correct?

9         A.   That's correct.

10        Q.   Is it standard practice to extrapolate revenue and

11   profit from available data where reported revenue is not

12   available?

13        A.   Yes, it is.

14        Q.   Is there anything improper about that accounting

15   methodology?

16             MS. EISENSTEIN:  Objection, Your Honor.  Leading.

17             THE COURT:  Overruled.

18             THE WITNESS:  No, no.  That's standard practice for

19   this type of an analysis.

20   BY MR. WAGNER:

21        Q.   In fact, did the experts that Nike put up to rebut

22   you in your analysis also consider extrapolation principles?

23        A.   I believe that's correct, yes.

24        Q.   Now, when you calculated licenses, you looked at

25   comparable licenses available in the marketplace, correct?

1    A.    Yes.

2    Q.    Did any of those licenses that you looked at give the

3    licensee the ability to refuse to pay a royalty on a sale if

4    they forgot to put a trademark in a particular place?

5         MS. EISENSTEIN:  Objection, Your Honor.

6         THE COURT:  Well, sustained.  Rephrase the question.

7    It's argumentative.

8    BY MR. WAGNER:

9    Q.    Did the comparable licenses that you looked at

10   require royalties at a product-wide level?

11   A.    I'm sorry.  Could you repeat that?

12   Q.    Did the comparable licenses you looked at require

13   payment of licenses on sales based on the product style as a

14   whole?

15   A.    Yes, based on approved product sales.

16   Q.    Was there any reduction allowed based on whether the

17   licensee included the trademark on a particular sales material?

18   A.    Not to my knowledge.

19   Q.    Was there any reduction or omission of a sale for

20   that product based on whether the licensee claimed it didn't

21   matter to use the trademark on that particular sale?

22   A.    No.  Any time that an approved product was sold under

23   that license, then the royalty would have to be paid.

24   Q.    Did the particular licenses that you considered, the

25   comparable licenses, allow for an exclusion of a sale based on

DREWS - REDIRECT

1   whether a buyer was believed to be of a certain sophistication

2   level?

3       A.   No.

4       Q.   And the object of a hypothetical -- of a reasonable

5   royalty is to track an actual real-world trademark license,

6   correct?

7       A.   Yes.  The analysis for the hypothetical negotiation

8   between the two parties is designed to emulate what has

9   actually transpired with real-world transactions.

10      Q.   So counsel suggested that Mr. Nathan did not attend

11  the trade shows for certain years.

12           Did Lontex's tax returns reflect a correct inclusion

13  of an item on each expense line the same exact way every year,

14  or did they change it around where certain expenses were

15  reported?

16           MS. EISENSTEIN:  Objection, Your Honor.

17           THE COURT:  Sustained.  He didn't prepare the tax

18  returns.

19  BY MR. WAGNER:

20      Q.   Did you review the tax returns of Lontex in preparing

21  your opinion?

22      A.   I did review the tax returns, yes.

23      Q.   Did you review the expense line items for those tax

24  returns?

25      A.   I believe I did.

DREWS - REDIRECT

1      Q.   And did you notice that the line items used to

2   expense certain expenses was consistent across the board?

3      A.   I don't recall to that level of detail.

4      Q.   Now, also, counsel asked you did you consider a

5   customer-by-customer analysis, correct?

6      A.   Yes.

7      Q.   Now, you didn't consider every customer that Nike

8   sold to, correct?

9      A.   What do you mean by consider?

10     Q.   Let me ask it this way.  You did consider a set of

11  NFL teams that did and didn't receive products at issue in this

12  case in forming your opinion on lost profits, correct?

13          MS. EISENSTEIN:  Objection, Your Honor.

14          THE COURT:  Sustained.

15  BY MR. WAGNER:

16     Q.   Did you evaluate certain customers that Lontex -- I'm

17  sorry.

18          Did you evaluate certain customers that Lontex and

19  Nike both sold relevant products to in coming to your lost

20  profits opinion?

21          THE COURT:  Answer that yes or no.

22          THE WITNESS:  Yes, I did.

23  BY MR. WAGNER:

24     Q.   Counsel also -- I want to put up Exhibit 31A, which

25  you testified on last week.

1          Do you recall -- let's go to page 4.  We see the

2    PX-1621 that you had marked next to sellers that appeared on

3    Nike's sales reports.

4          A.   Yes.

5          Q.   Now, you confirmed that only about 2 percent of the

6    1,500 retailers are on this list, correct?

7          A.   That's correct.

8          Q.   What percent of total sales for the styles at issue

9    did those 2 percent comprise?

10         A.   I believe it's around 75 percent.

11              MR. WAGNER:  No further questions.

12              THE COURT:  Recross.

13                            - - -

14                    RECROSS EXAMINATION

15                            - - -

16   BY MS. EISENSTEIN:

17         Q.   Let's just talk about the royalties for a minute.

18              So on those deals, the right was to put the mark on

19   the product, right?

20         A.   Yes.

21         Q.   Those were deals where the challenged mark actually

22   was on the physical item itself, right?

23         A.   I don't know if that's the case for every product,

24   but that's essentially what a trademark license allows for.

25         Q.   Right.  And so it makes sense then that every single

DREWS − RECROSS

1    product sold with that mark on it would get a royalty, right?

2        A.   Yes, it does.

3        Q.   And you said that it's designed to evaluate

4    real-world transaction, right?

5        A.   Yes.

6        Q.   In the real world, would anyone pay $7.4 million for

7    a royalty deal when they could buy the trademark for a tenth of

8    that price?

9        A.   I don't know that they could buy it for a tenth of

10   that price.

11       Q.   Well, if they could.

12       A.   Well, in that hypothetical, I think that's something

13   they would take into consideration.

14       Q.   They would take into consideration whether to pay

15   7.4 million in royalties versus $800,000 to buy it outright?

16       A.   It's something they would take into consideration,

17   yes.

18       Q.   Would you take that deal?

19       A.   That's not the business I'm in.

20       Q.   Would you take that deal if it was in the business

21   you were in?

22       A.   Which deal?

23       Q.   You have a business, right?

24       A.   Yes.

25       Q.   And you use your own trademark in your business,

1    don't you?

2         A.   Yes, I do.

3         Q.   Well, would you take the deal if you wanted to

4    license another trademark for $7.4 million if you could buy it

5    for 800,000?

6         A.   I would take the purchase option in that

7    hypothetical.

8              MS. EISENSTEIN:  Okay.  No further questions, Your

9    Honor.

10             THE COURT:  All right.  Thank you, Mr. Drews.  You're

11   excused as a witness.

12             THE WITNESS:  Thank you.

13                  (Witness excused.)

14             THE COURT:  Who is the next witness?

15             MR. WAGNER:  Jeff Parkhurst.

16             THE COURT:  What we're going to do, ladies and

17   gentlemen of the jury, we're going to have Mr. Parkhurst come

18   in.  You can examine him about his qualifications, Mr. Wagner,

19   and then we're going to take a mid-morning recess because I

20   have to go over some legal issues before he can continue his

21   testimony.

22             So have Mr. Parkhurst come in, please.  All right.

23   Please come up to the witness stand.

24             Swear the witness, please.

25             Remain standing, please.  Please take off your mask

PARKHURST – DIRECT ON VOIR DIRE

1    while you testify.  Thank you.

2              THE DEPUTY CLERK:  Raise your right hand.

3                     (Witness sworn.)

4              THE DEPUTY CLERK:  You can be seated.  Please state

5    your full name and spell your last name for the record.

6              THE WITNESS:  My name is Jeffrey D. Parkhurst.  Last

7    name is spelled P-A-R-K-H-U-R-S-T.

8                          – – –

9              DIRECT EXAMINATION ON VOIR DIRE

10                         – – –

11   BY MR. WAGNER:

12       Q.   Mr. Parkhurst, I understand that you prepared an

13   evaluation of impressions of the relevant Nike products in this

14   case; is that correct?

15       A.   I did, yes.

16       Q.   Before we talk about that, I want to talk about your

17   expertise that was based on.

18              Can we go to Exhibit 36, which is a copy of your CV?

19       A.   Is it coming up?  Yes, that is a copy of my CV.

20       Q.   Can you tell us about your background?

21       A.   Yes.

22       Q.   What school did you attend?

23       A.   I went to University of Chicago, got an MBA in

24   finance, a little bit of accounting.  Got an MBA in marketing

25   from Xavier University, which is in Cincinnati, and I started

PARKHURST – DIRECT ON VOIR DIRE

1   out with a Bachelor of Computer Science with University of

2   Minnesota.

3       Q.   What is it that you do for a profession?

4       A.   I do marketing, branding, intersection with

5   analytics.  You can see that I have my own firm called

6   BrandOptions, and if you go to the website, you'll see I do

7   business strategy, I do brand strategy, brand valuation, I'm

8   known for that kind of globally, and analytics.

9       Q.   And in preparing brand valuation, sales, and

10  marketing, what role does marketplace investigation play in

11  your work, marketplace investigation of the marketplace in

12  which the brand exists?

13      A.   Yeah.  All of those things are very important, you

14  know.  I've generated over 500 million in profits for my

15  clients.  That's something I focus on, make money for the

16  client.  And when you say marketplace, you're looking for

17  answers to key questions and opportunities that reveal those

18  kind of profits you can go get.

19      Q.   And what role -- what do you do with respect to

20  investigating the marketplace to understand where a brand fits

21  in it?

22      A.   You analyze the marketplace, you understand the role

23  of the brand in the marketplace.  It leads then to marketing

24  and other activities.

25      Q.   Let's take an example from your CV.

1          What project did you do for Kraft -- let's go to one

2    of the ones that's in the apparel industry.

3          For Levi Strauss, what project did you do for Levi

4    Strauss?

5       A.    Yeah.  It was interesting.  So they have the Dockers

6    brand, which was mostly male at the time, mostly just pants.

7    We actually did consumer research on that one to understand how

8    different categories that they did not yet have, like belts,

9    ties, underwear, socks, about six or eight new categories, and

10   we tested the marketplace, if the Dockers brand would resonate

11   across those categories both with men and with women.  So it

12   was a market research study.

13      Q.    And how does, in your profession, the conversion

14   rates of marketing campaigns translate into your line of work?

15      A.    So one thing you do is you're constantly optimizing.

16   Conversion rates relate in part to the number of people you

17   reach, and the conversion tells you what percent of them want

18   the product.  That's really important for profits.

19          And so you work to reach more people to increase the

20   sales.  And one of the key KPIs, or measures of that, is

21   conversion rate, and it's been around for a long time.

22      Q.    What do you mean a long time?

23      A.    Well, in every industry, words change.  So conversion

24   rate is very much the standard if we're talking about digital.

25   But I was doing optimization in the 1990s with similar media

PARKHURST – DIRECT ON VOIR DIRE

1    tactics, and we were looking at basically profits given, number

2    of people contacted.

3         Q.   Is conversion rate methodology used in print ads?

4         A.   You can find measures of conversion in most every

5    media channel.  So, for example, I was on the Sprint

6    relationship, about a billion in advertising each year, and we

7    measured across 16 different media tactics from digital

8    display, SEO, search, to the classic offline stuff like network

9    TV, radio, print ads.  And you can measure the conversion or

10   profits that each one of those generated.  In that case, it was

11   off of regression models.

12        THE COURT:  What exactly do you mean by the term

13   "conversion"?

14        THE WITNESS:  Well, conversion as a definition would

15   be for -- and we'll put it in the digital limelight.  For the

16   number of pages that were seen by people, what percent of those

17   actually bought the product?  So that percent who brought the

18   product would be your conversion rate.  So if you have

19   3 percent conversion rate, you had a hundred visits, that would

20   be converting to then three sales.

21   BY MR. WAGNER:

22        Q.   Does that work in the reverse as well, that if

23   there's -- in your industry, that if you know the number of

24   purchases that took place in a given channel, you can

25   extrapolate how many eyes it took to get to those sales?

PARKHURST – DIRECT ON VOIR DIRE

1      A.    Yeah, yes.  And it's very straightforward math.

2      Q.    And these conversion rates, are there benchmarks that
3  can be looked at for any given medium of advertising or use?

4      A.    There is tracking for sure.  So there's a study we
5  have in a booklet we handed over here recently that showed over
6  7 billion journeys measured.  So for me, that's a good sample
7  size.  That's not a small sample size.

8            And from that, we were able to pull conversions for
9  the United States market, and in that example, it was across
10  all of the U.S., all categories, but it was consistently in the
11  three --

12      Q.    Let's not talk about the conversion rates yet.  I
13  want to make sure we qualify you first.

14      A.    Sure.

15      Q.    So amongst conversion rates, are there industry
16  benchmarks that break down based on the type of medium and the
17  type of product at issue?

18      A.    Yes, yes.

19      Q.    So there's industry benchmarks for apparel, correct?

20      A.    Yes, you can find those.

21      Q.    And there's industry benchmarks for sporting goods,
22  correct?

23      A.    Yes.

24      Q.    Industry benchmarks for -- are there industry
25  measurements of conversion rates for particular websites?

1        A.    Yes.  For example, you can find between Safari,

2    Chrome, you know, other internet sites, you can find different

3    conversion rates there.  Not dramatic but they do exist.  So

4    you can measure conversion rates multiple ways.

5        Q.    You're talking about the actual site that's used to

6    convert can be measured as well, right down to the level of did

7    they come from Google or did they come from Facebook?

8        A.    Yes.

9        Q.    How about the ability to investigate and determine a

10    conversion rate for a particular website like Nike.com?

11        A.    Yes, you can do that.  So the way I think about it is

12    at the brand level.  If you can get it, that's good.  Nike.com,

13    Nike.com apparel, even better.  Next level up would be at the

14    apparel category level is meaningful because conversions for

15    pontoon boats versus apparel can be very different.

16            THE COURT:  I think we've covered enough for the

17    present purposes.

18            Ladies and gentlemen of the jury, as I said, we're

19    going to take a break now.  We have to stay on the record

20    because there's a legal issue here which I have to resolve

21    before the witness can continue his testimony.  So this break

22    will be about 15 minutes.  The jury is excused.

23                        (The jury exits the courtroom at 10:22

24                        a.m.)

25            THE COURT:  Okay.  Now, I have here my Daubert

1    opinion, and so I understand that one of the things you want to

2    ask him about is corrective advertising; is that correct?

3              MR. WAGNER:  That's correct.

4              THE COURT:  Nike did not object to that; is that

5    correct?

6              MS. DURHAM:  Your Honor, we do object to it.  You had

7    raised issues regarding this during the liability phase, and we

8    have the same concerns, because these extrapolations are, you

9    know, almost shock the conscience.

10             During the liability phase, you said, How can he say

11   that almost 10 million people looked at the accused products

12   based on 309,000 units of sale?  Well, he didn't end there,

13   Your Honor.  He gets up to a number that's like 200 -- over 200

14   million views.

15             THE COURT:  Well, is there any portion of his

16   proposed testimony to which you agree?

17             MS. DURHAM:  No, Your Honor, because the assumptions

18   he makes regarding conversion rates are not industry

19   benchmarks.

20             THE COURT:  What's your offer of proof?  Let's start

21   with that.  What opinions do you want to have the witness

22   render?

23             MR. WAGNER:  Your Honor, we prepared a slide of the

24   opinions that we wanted to introduce.

25             THE COURT:  Can I see it, please?  You can put it on

1    the screen.

2           MR. WAGNER:  And if I might, before it comes up, what

3    you're really looking at is two real aspects of analysis here.

4    The first is breaking up the pie, when he talked about the

5    different channels and understanding the consumer's different

6    avenues to purchasing a product.

7           THE COURT:  I'm looking at -- what are you referring

8    to?

9           MR. WAGNER:  It starts with testimony.  Do you see in

10   the first slide where there's details, where there's a chart?

11   It begins at page 6.

12          THE COURT:  Number of consumers who viewed Nike's

13   Cool Compression products online.

14          MR. WAGNER:  That's correct.  Let me walk you through

15   the offer of proof.  Do you see there the third item down that

16   says 309,536?

17          THE COURT:  Yes.

18          MR. WAGNER:  Those are the units that Nike reported

19   in this case in its sales reports of units of the styles at

20   issue, just the styles that are still at issue in this case.

21          Above that --

22          THE COURT:  Where does that number come from?

23          MR. WAGNER:  That comes from the Nike sales data that

24   was reported to us.

25          THE COURT:  Ms. Durham, do you agree with that?

1          MS. DURHAM:  The 309 units does come from Nike, Your

2    Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. WAGNER:  Then the conversion rate of 3.1 percent,

5    that comes from a number of sources, including a company whose

6    job it is to track Nike.com conversion rates.

7          THE COURT:  I just want to know what he's going to

8    testify to.  All right.  Is there an objection to that?

9          MS. DURHAM:  Well, yeah.  We have an objection that

10   that's not actually Nike's conversion rate, Your Honor.

11          Conversion rates are not as simple as counsel and

12   Mr. Parkhurst are suggesting.  There is no industry benchmark.

13   Mr. Parkhurst is relying on things like blog posts for his

14   offer that there is a standard benchmark conversion rate.

15          THE COURT:  What's the next offer of proof?

16          MR. WAGNER:  The next page is the number of consumers

17   who viewed Nike Cool Compression products online at retailers.

18          So in order -- so the two offers of proof, right, are

19   that Nike gave us this 6,444,674.  That comes from their own

20   numbers, okay.  There are industry benchmarks for how much --

21   what percent of consumers in apparel or any other industry

22   convert to buying online, and 18.7 percent is the lowest of

23   those benchmarks.

24          THE COURT:  Does Nike agree with the 1,204,000

25   figure?

1          MR. HYNES:  Absolutely not.  Your Honor, they are

2     conflating unit sales with purchasers.  So the assumption here

3     is that a purchaser buys a single product, and that's it.  So

4     what they've done is they've taken the purchases and then

5     converted the purchase numbers, the unit sales, into individual

6     people.  And then they said those individual people have gone

7     to the website at different times.

8          THE COURT:  You're saying somebody could have -- one

9     person could have bought three items or four items?

10          MR. HYNES:  Yeah, or that person could have gone back

11     to the website the next day.  I mean, it's just stacked to make

12     up a giant number.

13          THE COURT:  This is 3010.  So you object to 3010?

14          MR. HYNES:  I'm sorry.  Where are you looking?  Yes.

15     PX-3010.  Yes, we do, Your Honor.

16          THE COURT:  What's your response to that?

17          MR. WAGNER:  My response to that is that they had an

18     opportunity to convert different or to provide different

19     numbers for that and the --

20          THE COURT:  Wait a minute.  He's not objecting -- he

21     may be objecting to the conversion rates, but on this one, he

22     objects to the million two number.  He says that's not

23     accurate.

24          MR. WAGNER:  Let me make an offer of proof as to

25     that, Your Honor.  Their expert did not provide any data on

1      industries for multiple purchases of the same product.

2              THE COURT:  Where did you get this number?

3              MR. WAGNER:  This number is a standard industry

4      conversion of 18.7 percent of buyers buy their apparel online.

5      Actually, the Gen Xers are 60 percent.  The Generation Y and Z

6      are 60 percent.  Our expert used 18.7, the lowest benchmark in

7      the industry.

8              THE COURT:  What's the next offer of proof?

9              MR. WAGNER:  The next is number of consumers who

10     viewed accused product online but purchased offline.  That's

11     based on, again, industry benchmarks of how many people used

12     the online searching, online researching of a product on a

13     product page in order to then go and purchase in-store.

14              And in apparel, again, it's much lower than other

15     industries.  It's at 19 percent.  Other industries are bigger

16     because people end up going in to try it on or whatever they

17     do.  That is a conservative 19 percent number.  It's based on

18     industry standards.  It is reliable.  It is not based on junk

19     science or anything else, and it is purely an issue of

20     cross-examination.

21              THE COURT:  What is the next offer of proof?

22              MR. WAGNER:  Those are the --

23              THE COURT:  What are your objections to those,

24     Mr. Hynes?

25              MR. HYNES:  It's the same thing, Your Honor.  I mean,

1    all this is doing is designed to shock the jury into thinking

2    that 80 million different people looked at these ads.  And the

3    way that they do it is they take the purchases and pretend,

4    with no factual foundation, that one person is buying one

5    garment at a time, and that one person is looking at one

6    website at a time, and that one person is never going back to

7    that website or that store again.  And they just stack it and

8    stack it and stack it, and they base it on a conversion rate,

9    Your Honor --

10             THE COURT:  Mr. Parkhurst.  Let me ask you, are you

11   listening to this?

12             THE WITNESS:  Yes, absolutely.

13             THE COURT:  Is that correct that if you have one

14   purchaser looking at one website, is that how your methodology

15   was conducted?

16             THE WITNESS:  The purchaser would be one person

17   because we do not have the multiple buyers of three shirts or

18   whatever.  That's true.  The second number is how many would

19   have looked at it and the conversion number to get you to that.

20   And there are people of all types and all types of journeys

21   through it, but that's what the conversion measures.  How many

22   bought and how many got to the page and saw the product?

23             THE COURT:  Okay.  What's the next offer of proof?

24             MR. WAGNER:  Your Honor, if I might, the idea that

25   there's multiple purchases per person or multiple views per

1    person is an issue that their rebuttal expert has information

2    on, and he's free to present it.  It is not a reason to exclude

3    the testimony altogether.  It does not have to be a perfect fit

4    in order to allow the testimony.

5              THE COURT:  What's the next offer of proof?

6              MR. WAGNER:  The next offer of proof is simply that

7    three views are required to correct a misimpression.  That's

8    the final item of data which creates the number of -- takes the

9    number of viewers and then says how many times do we have to

10   show them the right corrective advertising to fix that view

11   that they have of seeing Cool Compression with Nike.

12             THE COURT:  Do you have an objection to that?

13             MR. HYNES:  Absolutely, Your Honor.  Now I have

14   240 million Lontex ads that they say they need to run to people

15   who most of them have never even heard of Lontex.

16             By the way, Your Honor, on the conversion rate,

17   Mr. Parkhurst's original report was based on a blog post, like

18   just a chat room.  That's where his original conversion rate

19   came from.  And then yesterday, we just got a stack of papers

20   that are supposed to back that up.  So it's a discovery rule

21   violation also.

22             But the bottom line, Your Honor, is it's just bad

23   assumption after bad assumption after bad assumption.  And

24   normally I would say let me cross-examine him, Your Honor, but

25   240 million ads, 80 million views, like, those are giant

 1   numbers that would definitely confuse and cause prejudice to

 2   us.

 3                    MR. WAGNER:  Your Honor, one thing on the blog post.

 4                    THE COURT:  Yes, sir.

 5                    MR. WAGNER:  There has been nothing withheld

 6   whatsoever.  If you look at the last page, we included --

 7                    THE COURT:  What is the last page?

 8                    MR. WAGNER:  The last page is the report of

 9   September 15, 2020, in which we provided --

10                    THE COURT:  Wait, wait, wait.  I'm looking at this

11   notebook.  What are you referring to?

12                    MR. WAGNER:  I'm sorry.  The last tab.  The last tab

13   and the last two pages of the last tab.

14                    That second to last page, it says Appendix 1, which

15   was provided to them over a year ago, which shows

16   Mr. Parkhurst's actual screenshots from his actual

17   investigation of the conversion rate of Nike.com, which they

18   say we got off a blog post.  That's not what we got.

19                    We got it off of here, because he went back and

20   looked and investigated behind the blog post to find that

21   Similarweb provided that data.  And then he went and talked to

22   Similarweb, had a presentation, and had screenshots of the data

23   they provided from the actual source.

24                    THE COURT:  I'm going to take a 5-minute recess.

25   I'll come back, I'll make a ruling, and then we can proceed.

1        Thank you.

2                    (Recess taken from 10:33 a.m. to 10:40

3                    a.m.)

4        THE COURT:  All right.  I've considered this.

5        Now, first of all, before I rule on this, in the

6   initial report of this witness, I believe it is suggested he

7   was going to testify about expansion plans by other entities,

8   and there was an objection to that.

9        Now, you didn't include that in the offer of proof.

10  I assume you're no longer going to do that.

11       MR. WAGNER:  We made a strategic decision not to

12  present that portion.

13       THE COURT:  All right.  Fine.

14       My decision on this is I will allow you to ask the

15  witness about the first exhibit, 3009, in part because Nike

16  does not object to the number of 309,000.  And this will give

17  the witness the chance to explain conversion rates, and he can

18  give his opinion about why he picked 3.10 percent, because I

19  think he has enough expertise to do that.

20       I will sustain the objection to 3010 and 3011 because

21  there's some dispute about the numbers there, and also I think

22  it is collateral and it is not essential.  I know we're in

23  damages.  I know that the plaintiff's entitled to a very

24  liberal standard of admissibility of evidence, but I think

25  having the first exhibit admitted with the witness's testimony

1    will satisfy the plaintiff's right to present this type of

2    argument of damages to the jury without getting into more

3    detail in 3010 and 3011, in which the numbers are much, much

4    larger.  And I don't think the jury has to hear that, and

5    there's some dispute about it.

6              If I let in 3010 and 3011, we're going to get into a

7    collateral debate with Nike's experts potentially, and I just

8    think the jury will get confused.

9              That's my ruling.  Bring the jury in.

10             MR. WAGNER:  I have a question on the logistics.

11             THE COURT:  Do you have any more direct on his

12   qualifications?

13             MR. WAGNER:  No more.  Remember the final offer was

14   that it's going to take three views --

15             THE COURT:  Oh, he can testify to that, his opinion.

16             MR. HYNES:  I'm sorry to interrupt, Your Honor, but

17   the way they've set this up is it's stacked, right.  So they've

18   taken the first exhibit, stacked it on the second, stacked it

19   on the second.

20             THE COURT:  They can't use that second or third.

21             MR. HYNES:  That's okay.  But then they come up with

22   80 million to 240 million, and that's the basis for the

23   34-million-dollar budget.  I just don't want him to go there,

24   Your Honor.

25             THE COURT:  We'll talk about that later.

1          Is Mr. Drews still here?

2          MR. WAGNER:  Mr. Drews is still here.  We can recall

3    him and say that based on the number presented, the number is X

4    percent of whatever I said before.

5          MR. HYNES:  That doesn't sound like it meets an

6    expert standard, Your Honor.

7          THE COURT:  That's my decision.  I want to be fair to

8    both sides here, but I have to give the plaintiff some leeway.

9    But I don't want so much of this data coming in that the jury's

10   going to get confused.  Okay.  Bring the jury in.

11         Are you done with your qualifications?

12         MR. WAGNER:  Yes, Your Honor.

13         THE COURT:  Do you want to examine the witness on

14   qualifications?

15         MR. HYNES:  No, I don't, Your Honor.

16         THE COURT:  All right.  Thank you.

17         Now, you're going to rest on damages after this

18   witness?

19         MR. WAGNER:  Yes, Your Honor.  I don't think we need

20   to recall -- his number had the number of views.  The jury can

21   see the difference between the number of views --

22         THE COURT:  So he's your final witness?

23         MR. WAGNER:  Yes.

24         THE COURT:  I think Mr. Drews should stay just in

25   case.

PARKHURST - DIRECT

1          MR. WAGNER:  Well, he will stay just in case anything

2     is said in the rebuttal presentation.

3          THE COURT:  I'm going to allow him -- after

4     Mr. Parkhurst is done, I'm going to allow both of them to sit

5     in the courtroom for Nike's presentation.

6          MR. WAGNER:  Yes, Your Honor.

7          THE COURT:  Yes.  Bring the jury in.

8               (The jury enters the courtroom at 10:50

9               a.m.)

10         THE COURT:  All right.  Everyone be seated, please.

11         Ladies and gentlemen, thank you for your patience.

12    We are now ready to proceed.  I understand that Nike counsel

13    has no questions about the witness's qualifications, so

14    Mr. Wagner will proceed directly into his questions in

15    accordance with my rulings.

16                              - - -

17                       DIRECT EXAMINATION

18                              - - -

19    BY MR. WAGNER:

20       Q.   So I'd like to turn to page 3 of your slide titled

21    Nike Cool Compression Products.

22         Can you walk us through an introduction of what you

23    did to assess information about consumer views on Nike.com?

24       A.   Well, we started with the sales units that tied to

25    that product.

PARKHURST – DIRECT

1          THE COURT:  Can you speak closer to the microphone,

2   please?

3          THE WITNESS:  We started with the number we were

4   given.

5   BY MR. WAGNER:

6      Q.   Could you actually scoot your chair forward?  I think

7   it would help everybody.  The screen is in the way anyway.

8      A.   Closer view.

9          We started with the number of 6.4 and change million

10  units sold.  And then the definition of a conversion is, which

11  we kind of talk about, is number of units sold versus total

12  views.  And this page here talks about what those kind of pages

13  would have been, you know, across the total media plan.

14         We don't have the media plan, the actual media plan,

15  but what you would see here would be products seen on Nike.com

16  or third-party retailers.  There's plenty there.  Eastbay, Foot

17  Locker, Dick's Sporting Goods.  But also, as you may know,

18  digital expands into other areas, so you might run across those

19  product views and see the product in location listings and

20  search engine results and other social media profiles,

21  Facebook, Instagram, and Twitter.  There are celebrities that

22  have a hundred million followers on Instagram, so these numbers

23  can get big.

24     Q.   So we're just talking about Nike.com today, correct?

25     A.   Yes.

1        MR. WAGNER:  Okay.  So let's go to slide 6, which is

2   Exhibit 3009, which I move to admit.

3                    (Exhibit PX-3009 admitted into evidence.)

4   BY MR. WAGNER:

5        Q.   So in Exhibit 3009, that number of 309,536 from

6   Nike.com, was that a number provided by Nike in this case?

7        A.   Yes.  I received that through Mr. Drews' report and

8   it came from Nike, the 309,000.

9        Q.   Does that represent the number of style units in this

10  case that were sold on Nike.com?

11       A.   Reports show me that that was the units bought

12  online.

13       Q.   And is that the starting point that you used to then

14  calculate how many views took place on Nike.com to obtain that

15  many purchases?

16       A.   Yes.  What this shows is -- the 4.8 percent is just a

17  plug, because given the 309,000 versus 6,444,674, you multiply

18  that by some number is 4.8 percent.

19            So now to answer your question more directly, from

20  that 309,000, if you divide by the conversion rate, percent who

21  bought the product, 3.1 percent here, you're going to come up

22  with the total number of consumers who viewed the product

23  online at 9,985,032.

24       Q.   Now, for this conversion rate, what is the benchmark

25  in the industry based on your assessment of the apparel

PARKHURST – DIRECT

conversion rate online?

A.   I consistently see conversion rates across studies, including apparel, in the 3 percent to 4 percent range.  I run into them all the time.  I ran into a study, overall conversion rates, 7 billion journeys looked at, and the range was in the 3 to 4 percent range for the U.S. market, as an example.

But you do want to get down to apparel.  If you can, even better is Nike, because you're getting closer to the real activity.

Q.   Are there industry participants that track conversion rates by particular websites?

A.   Yes.  The study I just mentioned with the 7 billion, that's somebody who has their own tracking mechanism.  There are organizations who have business models just to estimate traffic.  In this case, we looked at Similarweb which was the source of --

Q.   What is Similarweb?

A.   Similarweb is a company that will, through their platform, software, will measure various traffic of various websites and report back things like conversion rates.

Q.   Were there any reports that you looked at as to the accuracy of Similarweb's conversion rates compared to other offers of particular site conversion rates?

A.   Right.  So we followed up -- I followed up, and we talked with Similarweb directly, one of their people can

PARKHURST - DIRECT

1  describe the site and take us through that, and they described

2  a lot of things.  And that's where we got further confirmation

3  of how they got to the 3.1 percent.  So we weren't just reading

4  an article.  We dug deeper and confirmed that.

5          And then we learned more about -- I think they cover,

6  like, up to 190 countries, millions of journeys.  So they don't

7  have a problem with sample size, and it was open.  So some of

8  these forecast models do the best they can, but they can

9  overestimate.  So Similarweb is an example of one in this

10  example who overestimated by a little bit, and you can correct

11  your conversions off of that.  There's another player out there

12  called SEMrush that measures, and they have their own data

13  things going on.  And then of course Google Analytics is, you

14  know, a fairly reputable organization --

15      Q.   Let me ask you --

16      A.   -- in my view.

17      Q.   As between Similarweb and SEMrush, based on industry

18  evaluations, which one has a higher overestimation on visitors

19  to the site?

20      A.   Similarweb was 17 percent above estimate.  And I

21  can't recall SEMrush, but it was different.

22      Q.   So this conversion rate, do you know what sources of

23  consumer journeys were assessed to come up with this

24  3.1 percent conversion rate?

25      A.   Similarweb does this analysis on over 5,000 websites,

PARKHURST - DIRECT

1    of which Nike.com was one of them.

2        Q.    And does it track journeys from places like Google

3    searches?

4        A.    So of course I didn't go through every journey, there

5    being millions, but that is how they track journeys, is they

6    follow behaviors tracking through the system.  And then that

7    can lead to a conversion on how many actually bought.

8        Q.    Is it a spread of journeys that come from a variety

9    of sources, or all just one source like Google?

10        A.    They do.  So if you've got different media tactics

11    hitting the marketplace, you would have potentially organic

12    search, which is a person just on a Friday night shopping or

13    Sunday, whatever, organically driving through and hitting the

14    web pages that way.

15            Or you would have media marketing, where you're on an

16    Instagram account and you hit on an ad and it takes you right

17    to the page where the product is.  So there's all types of

18    journeys, and how you design your media plan and digital plan

19    kind of decides that.

20        Q.    And what did you ultimately do to decide to use

21    3.1 percent taking into account the apparel conversion rates in

22    the industry and the specific Nike.com conversion rates that

23    you were able to investigate?

24        A.    So I stayed with the 3.1 percent because that was

25    Nike.com.  There are apparel figures that are a little bit

PARKHURST - DIRECT

1    higher, 3.67 percent, through other studies that --

2              THE COURT:  The question is why you used 3.1.

3              THE WITNESS:  Because it was quantified, reasonable

4    sample size, and it was specific to Nike.com's conversion

5    behavior.

6    BY MR. WAGNER:

7         Q.   And so that gave you a number of consumers who looked

8    at Nike Cool Compression online of 9,985,032, correct?

9         A.   Yes.

10        Q.   Did Nike provide you any data from which to determine

11   how many of those consumers made multiple purchases on

12   Nike.com?

13        A.   I did not see that.

14        Q.   Did Nike provide any data on the number of people

15   that visited particular parts of its page?

16        A.   Did not see that.

17        Q.   Did Nike even provide the total number of visitors to

18   its page in discovery in this case to your awareness?

19        A.   I did not see that.

20        Q.   Did Nike provide you anything from which you could

21   use their conversion rates that they attract from Nike.com?

22        A.   Did not receive any conversion rates.

23        Q.   So in your professional opinion, is $9,985,032 a

24   reasonable number of consumers?

25              THE COURT:  You said dollars.

PARKHURST - CROSS

1          THE WITNESS:  Yes.

2          MR. WAGNER:  Thank you.

3   BY MR. WAGNER:

4       Q.   Is 9,985,032 a reasonable number of consumers that it

5   would take to make 309,536 purchases on Nike.com?

6       A.   That is my view.  I've tracked in other roles a

7   number of impressions, and that is not a big number.  I hear

8   big number here, but there are companies that do billions of

9   impressions per year.

10          THE COURT:  We're sticking to Nike.

11          Next question.

12   BY MR. WAGNER:

13       Q.   And to get back to your qualifications, this type of

14   data that you assess for companies is the actual sort of data

15   that has led to over $500 million in additional sales for the

16   companies you work for, correct?

17       A.   Yes.  For example, I had mentioned modeling, and in

18   there would be impressions for certain digital channels.

19          MR. WAGNER:  No more questions.

20          THE COURT:  Cross-examination.

21          MR. HYNES:  Thank you, Your Honor.

22                          - - -

23                     CROSS-EXAMINATION

24                          - - -

25   BY MR. HYNES:

PARKHURST - CROSS

1      Q.    Good morning, Mr. Parkhurst.

2      A.    Hello.

3      Q.    My name is Michael Hynes.

4      A.    Hi Michael.

5      Q.    We haven't met before, have we?

6      A.    We have not.

7      Q.    I'm just going to ask you a few questions about the

8   testimony you just provided.

9      A.    Sure.

10     Q.    Now, you know Mr. Drews, right?

11     A.    Yes.  Met this week in-person.

12     Q.    Okay.  And is it fair to say that the opinion you

13  just shared with the jury supports Mr. Drews' damages report?

14     A.    It is an input to his damage report, yes.

15     Q.    And just on the corrective advertising piece of

16  Mr. Drews' report, right?

17     A.    Yes.

18     Q.    Okay.  Did you have any input into the amount of

19  money that Mr. Drews has listed in the advertising campaign?

20     A.    I did not.

21     Q.    You did not, okay.  He came up with that number on

22  his own?

23     A.    Yes.

24     Q.    Without you?

25     A.    Yes.

1    Q.   Were you asked to provide a budget for the corrective

2    advertising campaign?

3    A.   No.  I was asked to calculate the number of

4    impressions and views that were out there eligible for

5    corrective advertising.

6    Q.   So all that work that you did for Levi's that you

7    talked about earlier, that could have been used to create a

8    budget for the advertising if you were asked, right?

9    A.   In other roles, I can do that.  Actually, for Levi,

10   there wasn't a budget because it was a classic quantitative

11   market research study.

12   Q.   Okay.  I guess my point is, if they asked you to do

13   an advertising budget to support Mr. Drews' report, you could

14   have fulfilled that request, right?

15   A.   I think I have some skill in that area.

16   Q.   Sounds like it.  You testified you added $500 million

17   worth of value to companies based in part on the marketing

18   advice you provided to them, right?

19   A.   That's true.

20   Q.   Okay.  But you didn't do that here?

21   A.   No.

22   Q.   Okay.  Did you do any investigation into Lontex's

23   marketplace?

24   A.   When you say marketplace, like, what their activity

25   is?

PARKHURST - CROSS

1     Q.   Well, let's start with an investigation.

2          Did you do any investigation into Lontex's market?

3     A.   It's in my expert report from February 10th, but with

4  all clients, I try to understand about their business to learn

5  a little bit about his product, a little bit on his history, a

6  little bit on some of the clients they sold to or marketed to,

7  a little bit on sales, like, were they in every state in the

8  U.S., were they not.

9          And potentially -- and then I looked at where you

10  could grow, you know.  What's interesting is, there are retail

11  medical businesses that have 1,600 outlets.  That would be

12  something to look at.  So I look at opportunity too.

13    Q.   Okay.  So I guess the answer to my question was, yes,

14  you had conducted an investigation, or no, into Lontex?

15    A.   I learned about Lontex, and then I learned about Nike

16  relative to this as best I could.

17    Q.   Okay.  So yes?

18    A.   Yes.

19    Q.   Okay.  Great thank you.

20         So how many of Lontex's customers did you interview?

21    A.   I did not interview any Lontex customer that I

22  recall.

23    Q.   So you're aware that Lontex's customers include

24  physical therapists, athletic trainers, and athletes?

25    A.   Yes.

1      Q.   Especially those who are hoping to treat injuries or

2    recover from injuries or prevent themselves from becoming

3    injured?

4      A.   Yes.

5      Q.   Okay.  Now, Nike doesn't count those customers among

6    its base layer marketplace targets, does it?

7      A.   I don't -- they have -- you know, they have a classic

8    target in part, I think, because they go after Gen Y and Gen Z,

9    but I did not research all the different behaviors of their

10   audience.  And relative to the conversion rates, it wouldn't be

11   a factor from that measurement.  Yeah.

12     Q.   Okay.  So you didn't -- for purposes of your

13   conversion rate opinion, you didn't really consider whether or

14   not Nike has a different marketplace than Lontex, right?  I

15   mean, that's what you just said, isn't it?

16     A.   I believe I wrote that there would be some concerns

17   with overlap.  So some of the consumers that Lontex wants, Nike

18   also wants, and there will be overlap on reaching them.

19     Q.   So who are you talking about, the athletic trainers,

20   the physical therapists, or the athletes that are looking to

21   prevent injuries?

22     A.   Those would be specific people.  I think I was

23   thinking more like the broader audience of Gen Y and Gen Z who

24   buy sporting apparel like Nike apparel.

25     Q.   I see.  Okay.  And are you familiar with Lontex's

PARKHURST - CROSS

1   marketing efforts to attract Gen Y?

2        A.   No, not at all.

3        Q.   Are you familiar with Lontex's marketing efforts to

4   attract Gen X?

5        A.   No.

6        Q.   And Gen X and Gen Y are just what we call people of a

7   certain generation, right?

8        A.   Yeah.  There's certain years in which they were born.

9        Q.   Okay.  So do you agree with Mr. Drews that corrective

10  advertising is meant to help Lontex recover its place in the

11  marketplace following Nike's infringement of its trademark?

12       A.   I would say the --

13       Q.   I'm just asking if you agreed with Mr. Drews.  I can

14  pull up his testimony.

15       A.   Can you just say that again then?

16       Q.   Yeah, sure.

17            Do you agree with Mr. Drews' testimony yesterday that

18  corrective advertising is meant to help Lontex recover its

19  place in the marketplace?

20       A.   I think that's true if --

21       Q.   That's good.  Thank you.

22            Now, would you agree with me that -- well, strike

23  that.

24            Okay.  What I'd like to do, Mr. Parkhurst, is just

25  talk about consumer surveys for a second, okay?

PARKHURST - CROSS

1          A.    All right.

2          Q.    Have you performed any studies in this case to

3     determine whether any -- which consumers were influenced, if

4     any, by seeing Cool Compression on Nike.com?

5          A.    I did not see or execute any surveys on consumers.

6          Q.    But you're familiar with consumer surveys, right?

7          A.    Yes.

8          Q.    Do you do them yourself?

9          A.    Periodically.

10         Q.    So if you were asked to do one by Lontex, you could

11    have done a consumer survey, right?

12         A.    I'd say that's true.

13         Q.    Okay.  Do you know Susan McDonald?

14         A.    I do not.

15         Q.    So is it fair to say you didn't rely on a single

16    consumer survey in connection with your opinion here today?

17         A.    None of the --

18         Q.    It's really just yes or no.  You relied on a consumer

19    survey or you didn't.

20         A.    Pending the definition of consumer survey, the

21    conversion rates follow journeys, thousands and thousands of

22    journeys, and that is, in its own way, a form of consumer

23    research.

24         Q.    How many journeys did you go on with these consumers

25    for purposes of this case?

1          A.   On every client, I visit the brand, so I was one of

2     those clients, one of those customers.  I went to Dick's Sports

3     Goods looking for Nike Cool Compression.

4          Q.   So you went on the journey?

5          A.   I went on the journey.

6          Q.   Did you go on the journey to Nike.com?

7          A.   I've been on Nike.com, but not for that in

8     particular.

9          Q.   And you didn't find the words "Cool Compression" on

10    Nike.com, did you?

11         A.   Well, we're talking just about Nike.com.

12         Q.   Well, yeah.  That's the slide.

13         A.   So I was on Nike.com since this started in 2019 and

14    checked it out, but I was not on Nike.com in 2016 through '18,

15    which could have been different.

16         Q.   Have you seen any evidence in connection with your

17    work today that Lontex's trademark Cool Compression was ever

18    displayed on Nike.com ever?

19         A.   I have not seen the evidence in person that I would

20    be interested --

21         Q.   That would be no, right, you just haven't seen it?

22         A.   I did not go online in 2016 through '18.

23              THE COURT:  The question is, have you seen -- on

24    Nike.com, did you see the words "Cool Compression"?

25              You can answer that yes or no.

1            THE WITNESS:  I don't recall seeing Cool Compression

2     online.  I've seen it in other places.

3     BY MR. HYNES:

4          Q.   On Nike.com, you don't recall seeing it there?

5          A.   Not recently.

6          Q.   Since that's what this case is all about, don't you

7     think you would have remembered it if you had seen it?

8          A.   My analysis covered --

9          Q.   It's okay.  I withdraw the question, Mr. Parkhurst.

10         A.   Okay.  Thank you.

11         Q.   Can we go to figure -- well, the document that

12    Mr. Wagner just showed you, that chart?

13         A.   Sure.

14         Q.   Okay.  Is this it?

15         A.   This is it.

16         Q.   I just want to try to understand kind of what you did

17    here.

18              So if we start with that first line, 6,444,674,

19    right?

20         A.   Yes.

21         Q.   Now, that is sales, that's unit sales, right?

22         A.   Unit sales.

23         Q.   So if we're just using as an example, it's like

24    shirts, right?  I know they're not all shirts, but just bear

25    with me.

PARKHURST - CROSS

1        A.    It's individual unit sales.

2        Q.    Okay.  Now, do you know how many of those sales

3   represent products where Cool Compression was included in a

4   description?

5        A.    These were given to me from Mr. Drews, which came

6   from Nike, which were --

7        Q.    So that's a no, right?  You don't know?

8             We established that this number came from Nike.  I'm

9   just asking do you know how many of those sales involve

10  products where Cool Compression was a phrase used to describe

11  those products.

12       A.    So the semantics there would be it may or may not

13  have been on the clothing, but it could have been on the -- in

14  the marketplace that they would have seen it.

15       Q.    I understand the could-have-been.  I'm just asking

16  you can you name one for sure.  Like, not could have been.

17  Just one product, one of these 6,444,674.

18            Can you identify one that was described with Cool

19  Compression on Nike.com?

20       A.    I'm more familiar with seeing it in other media

21  channels that would have hit that audience.

22       Q.    So that's a no, right?

23       A.    I said I'm not familiar.

24       Q.    Okay.  Let's go to the third line here.  That's

25  309,536.

1          Now, that says purchasers, right?

2     A.    It does.

3     Q.    That's different than unit sales, correct?

4     A.    A purchaser is different than one unit sale.

5     Q.    Sure.  Because the unit sale is a T-shirt and the

6  purchaser is a person, right?

7     A.    That's true.

8     Q.    Okay.  So you presumed that every single one of those

9  300 -- excuse me, each one of the 6 million -- well, hang on.

10         Can you remind me the relationship between the

11  309,536 and the 6,444,674?

12    A.    So the 6,444,674 would have been total sales whether

13  at Nike.com or in other channels.  The 309,536 would have been

14  number given to us from Nike, which were online sales at

15  Nike.com.

16    Q.    Are they people or T-shirts?

17    A.    The 309,536 would be unit sales.

18    Q.    So they're T-shirts?

19    A.    Or other physical products.

20    Q.    Okay.  So you presume then that only one -- that

21  everybody who visited the website to make a purchase bought one

22  T-shirt, in my hypothetical.  I know there are more products.

23         Right?

24    A.    Well, the measure here is one-to-one.  309,000 would

25  translate to eventually 9.985 million people, consumers, who

PARKHURST - CROSS

1  saw the product.

2      Q.   We'll get to the -- I know you want to talk about the

3  last line.  We'll get there.  I promise.

4      A.   All right.

5      Q.   I'm focused on the 309,536 right now, okay?

6      A.   Yes.

7      Q.   So what you did was you assumed that everybody who

8  visited Nike.com went and purchased one T-shirt, right?

9      A.   Right.  We don't -- if Nike has the multiple unit

10  sales, we'd be happy to look at that.

11      Q.   I'm sure.  But from your own experience, you know

12  that when somebody visits a website, sometimes they buy more

13  than one item, right?

14      A.   I don't know if that's 99 percent.  It could be just

15  1 percent to do that.

16      Q.   So you're telling me that 99 percent of people, 99

17  out of a hundred people go on to Nike.com, buy one item, and

18  then 1 out of 100 buys more than one item?  Is that what you're

19  telling me?

20      A.   I don't have that measurement.  In our analysis, we

21  excluded other consumer views, and that helped us to be

22  conservative.

23      Q.   So I'll just stick with your hypothetical.  If 1 out

24  of 100 people bought two T-shirts, then we really have 99

25  instead of 100 hundred, so you've double counted that person in

1   your analysis, right?  If that turned out to be true, that one

2   person bought two T-shirts instead of one?

3          A.   Sure.  Your numbers would be off by one unit.

4          Q.   If it was 1 out of 100 hundred who bought two

5   T-shirts and 99 who bought one T-shirt, then you double counted

6   by one?

7          A.   To help you with the math, that would bring it from

8   309,536 down to 309,535.

9          Q.   That's right.  If it was 1 out of 100 people who

10  bought more than one item when they visited the website, right?

11         A.   1 out of 100.

12         Q.   Okay.  Now, the other way I think you double counted

13  here is you also excluded purchase -- the same --

14         A.   Hang on a second.

15         Q.   No.  I'd like to ask the questions.  Your counsel

16  will stand up, and he'll give you the chance to clarify

17  whatever you like.

18         A.   Thank you.  Cool.

19         Q.   So the other way -- the other thing I'm interested in

20  is, what if the same person visited the Nike website more than

21  once in that 4-year period that you've analyzed here?  Would

22  that also result in a double counting here?

23         A.   Can you ask that again?

24         Q.   Yeah, sure.  So you've also presumed in your 309,536

25  that not only is the person buying one shirt per visit, but

1    also that that person is never going to visit Nike again, and

2    the next person who does a purchase is just a brand new person,

3    right?

4         A.   True, yeah.

5         Q.   So it would be double counting again if a person who

6    visited the Nike website in 2015 visited it again in 2017 and

7    made another purchase, right?

8         A.   Can you ask that again?

9         Q.   Sure.  So if the consumer, say it was me, I went on

10   Nike.com in 2015 and bought a T-shirt, let's say I'm number 5

11   of your 309,536, and then three years later, I went and did the

12   same thing, then I would be counted again.  I could be

13   Number 308,535, right?

14        A.   So we always have --

15        Q.   Can you answer yes or no to that, or you can't?

16        A.   Yes.  That's possible.

17        Q.   Okay.  Do you think, you know, over a 4-year period,

18   you know, the same person might visit Nike.com more than once?

19   Do you think that's likely?

20        A.   I do that with other websites, so yes.

21        Q.   And you didn't account for that possibility in this

22   slide, did you?

23        A.   (No response.)

24        Q.   It's okay.  I can withdraw the question,

25   Mr. Parkhurst.

1      A.    Okay.  Good.

2      Q.    So the number of consumers who looked at -- well, let

3  me back up.

4            So let's go to, before I get to the conversion

5  rate -- actually, we can get there now.

6            So the 3.1 did not come from Nike, right?

7      A.    We have not seen a conversion rate from Nike.

8      Q.    So it says Nike.com conversion rate, but you didn't

9  get it from Nike?

10     A.    It's sourced in the document where it came from.

11     Q.    Yeah, I have that.  In your original report, which is

12 dated February 10, 2020, you have a footnote for that item, and

13 it says www.retaildive.com, and then it cites a news article;

14 is that right?

15     A.    It does, yes.

16     Q.    That's the only source you have for that 3.1 percent

17 conversion rate in your original report, right?

18     A.    Following the original report, there's a supplemental

19 report that talked about that.

20     Q.    Is that a yes?  That's where that number came from?

21     A.    It came from that cite, which we further detailed

22 later.

23     Q.    Right.  So you got it off the site, plugged it in the

24 slide, and then you found some other stuff later that supported

25 the 3.1 that you put in the slide in the first place, fair?

1        A.   I'm not sure of the timing of that slide, so this

2   slide actually was built long after my report was filed.  It's

3   actually a year after my supplemental that details how we got

4   to the 3.1.  So that was probably 15 months ago.

5        Q.   So your slide was prepared after your original

6   report?

7        A.   And the other reports.

8        Q.   And the other reports.  But the 3.1 percent dates all

9   the way back to your original report, right?

10       A.   Well, it's reasonable.  It stayed the same.  You

11  follow upstream to learn how they got to that number.  I would

12  have been more concerned if I kept going upstream and it

13  changed every time.  So we went to the source, and they

14  clarified for us.

15       Q.   So you came up with 3.1 based on retaildive.com, and

16  then the rest of the support came after you put it in your

17  original report, right?

18       A.   That's true.  The 3.1 was put in.  Retail, that

19  location has, like, 7 million articles they put out.  So some

20  of these sources in the modern day of, you call it blogs, are

21  actually pretty reputable.

22       Q.   So I don't have the experience you had, but I could

23  have gone on that website and put that number in that chart,

24  too, right?

25       A.   You could have done that, sure.

1      Q.    Okay.  So let's go to the 9,985,032.

2            You list that as the number of consumers who looked

3      at Nike Cool Compression online, Nike.com, right?

4      A.    Yes.

5      Q.    But that really isn't true, is it, because you

6      testified earlier that you never saw Cool Compression on

7      Nike.com, right?

8      A.    Well, Nike.com with the conversion rate who bought --

9      so the conversion rate --

10     Q.    Can you just answer my question, Mr. Parkhurst?

11     Mr. Wagner can ask you to clarify.

12           Do you want me to repeat it?

13     A.    Sure.

14     Q.    Okay.  So it says in that last line:  Number of

15     consumers who looked at Nike Cool Compression online, Nike.com,

16     9,985,032.

17           And that's not true, is it?

18     A.    I think it is true, because you've got 309,000 who

19     bought the product online, and the conversion rate for Nike.com

20     is at 3.1 percent with a reasonable sample size.  So my math

21     comes out to the 9.9 million.

22     Q.    I guess I agree you did the math correctly.  What I'm

23     having a problem with is you testified that you have never seen

24     Cool Compression on Nike.com, right?  That's yes or no.

25           THE COURT:  He said that already.  He said that

1    already.

2    BY MR. HYNES:

3    Q.   So then it's actually -- you actually cannot testify

4    under oath that one person, one consumer, looked at Cool

5    Compression online, Nike.com, can you, because you don't know

6    that for certain?

7    A.   I would take me out of the equation on that.  If I

8    don't recall seeing, you know -- Cool Compression, I've seen,

9    like, on tags and stuff like that, so...

10   Q.   Oh, you have?

11   A.   I believe I saw one, so...

12   Q.   Do you remember what product that tag was on?

13   A.   I don't.

14   Q.   You think it was a Lontex product?

15   A.   To be honest, I have seen multiple pictures in other

16   sources of Cool Compression, so I've seen it in other places

17   where their media plan touched a lot of people.

18   Q.   Okay.  Well, I'm just looking at this line right

19   here.

20        So don't you think that that suggests that your

21   opinion is 9,985,032 people saw Cool Compression on Nike.com?

22   I mean, don't you think that's what it's trying to portray?

23   A.   Well, it's pretty simple for me.  The 309,536 are

24   Cool Compression products.  And Nike gave us that number, is

25   that right?  You're not going to answer.

1        THE COURT:  You can't ask him questions.

2        THE WITNESS:  Sorry.

3        THE COURT:  What is your testimony?

4        THE WITNESS:  So my point is, 309,536, given to us

5   from Nike, are considered Cool Compression products.  So then I

6   applied the conversion rate for Nike.com, and that gets you to

7   the 9,985,032.  And so they had to journey to get to those

8   309,000 units, and that's what my methodology shows.

9   BY MR. HYNES:

10       Q.   And the journey, I think, is they went to their

11  computer or their phone and went to Nike.com and then made a

12  purchase, right?

13       A.   So there's many different journeys.

14       Q.   Can you please just answer my question?

15       A.   Say it again.

16       Q.   Yeah.  Isn't the journey for this slide that an

17  individual went to Nike.com and made a purchase of one of the

18  products that Lontex is complaining about, right?

19       A.   They eventually got to that.  Their journey can come

20  from multiple sources.  So we're talking here about Nike.com,

21  but how they got into Nike.com could have come from an

22  Instagram ad that pushed them in.  And I don't have that media

23  plan, but that's what people do now with digital, is touch

24  points that you touch and it takes you in.  If you're a

25  Facebook user, it can take you directly into the location.

1          So the journey is more than just going to Nike.com

2     and buying.  There's other things driving you there.

3          THE COURT:  Next question.

4          MR. HYNES:  Okay, Your Honor.

5     BY MR. HYNES:

6          Q.   The 9,985,032, do you know how that number compares

7     to Lontex's customer base?

8          A.   It's much larger.

9          Q.   Can you be more specific?

10         A.   I don't have today their actual number of current

11    customers for Lontex.

12         Q.   Do you know how many units that Lontex sold between

13    2006 and 2018?

14         A.   I believe there's a number in the 25,000-unit range.

15         Q.   Yeah.  25,755, right?

16         A.   Yeah.

17         Q.   And of those, do you know how many were sold in the

18    2015 to 2018 period we're talking about?

19         A.   Don't recall, but a smaller number.

20         Q.   5,553, does that sound right?

21         A.   I don't want to say something -- I didn't read that

22    number recently, so it could be.

23         Q.   I just took it from Mr. Drews' report.

24         A.   Great.

25         Q.   So let's assume, like you did for Nike, that every

PARKHURST - REDIRECT

1    Lontex product was sold to a different person, okay?

2         A.   Okay.  Yep.

3         Q.   So if that's the case, then you believe that at least

4    9,979,479 people need to learn about Lontex for the first time

5    through a corrective ad, right?

6         A.   So --

7         Q.   That's yes or no.

8         A.   Okay.  Then ask it again.

9         Q.   Sure.  So if that's the case, then you believe that

10   there are 9,979,479 people that need to learn about Lontex for

11   the first time in a corrective ad, right?

12        A.   True.

13             MR. HYNES:  Okay.  I have no further questions, Your

14   Honor.

15             THE COURT:  Any redirect?

16             MR. WAGNER:  Just a couple, Your Honor.

17                              - - -

18                      REDIRECT EXAMINATION

19                              - - -

20   BY MR. WAGNER:

21        Q.   So the purpose of corrective advertising is to --

22             THE COURT:  You're leading.  You're starting off by

23   leading.

24             MR. WAGNER:  Okay.

25   BY MR. WAGNER:

1    Q.   Is corrective advertising focused on -- what is

2  corrective advertising intended to fix?

3    A.   It's intended to fix the specific people that may

4  have gotten confused by that product or saw that product to be

5  right size, that this is, in this case, a Cool Compression that

6  belongs to Lontex.  Why that's important --

7            THE COURT:  Next question.

8  BY MR. WAGNER:

9    Q.   Why is that important?

10    A.   Because people grow their brands.  So that's

11  9.9 million people, you know, the number given, that may have

12  not have bought Lontex, but it would -- they might be a future

13  opportunity to grow the market.  So if you sully the whole

14  market, that's a problem.

15    Q.   And you had talked about this duplicate purchaser,

16  there were two items, right?  There was the first that buys

17  multiple products at the same time, and the second that buys

18  multiple products over time.

19            Do you recall that testimony?

20    A.   Yes.

21    Q.   On the person that buys multiple products at the same

22  time, was there any way for you to determine how many people

23  bought two Cool Compression products at Nike.com at the same

24  time?

25    A.   No.

PARKHURST - RECROSS

1    Q.    Did Nike give you that data?

2    A.    No.

3    Q.    Is there any way that you can conclude whether

4    someone would buy a Cool Compression product and a pair of

5    shoes as opposed to a Cool Compression product and another Cool

6    Compression product?

7    A.    No.  So that's why --

8         THE COURT:  The answer is no.  Next question.

9    BY MR. WAGNER:

10   Q.    One more time.  If someone bought a Nike.com Cool

11   Compression product, if they returned and viewed a pair of

12   shoes and became a second-time purchaser, was there any way to

13   determine if they had seen Cool Compression that second time?

14   A.    Not to my knowledge.

15   Q.    Nike didn't provide that information to you?

16   A.    They did not.

17        MR. WAGNER:  No more questions.

18        THE COURT:  Recross.

19        MR. HYNES:  Just three questions, Your Honor.

20        THE COURT:  Go ahead.

21                          - - -

22                   RECROSS EXAMINATION

23                          - - -

24   BY MR. HYNES:

25   Q.    Just real quick, Mr. Parkhurst.

1        A.    Sure.

2        Q.    Since you don't know whether coolcompression.com was

3   on Nike.com, you can't know whether anybody was confused by

4   seeing Cool Compression on Nike.com, right?

5        A.    They may have seen it before they got to Nike.com

6   because the journeys can be different.

7        Q.    And that's just you kind of envisioning someone on

8   their journey, right?  It's not an expert opinion, is it?

9        A.    I think it is an expert opinion.  There's multiple

10  journeys.  It's meant to be touched.

11        What's different now is the consumers have changed.

12  They're on their mobile phones.  They're in other places.  So

13  to reach your desired audience, you have to go through multiple

14  media channels, and so you could see Cool Compression there to

15  attract them to Nike.com.

16        Q.    And do you think it would have been more reliable to

17  do a formal consumer survey to figure that out instead of

18  imagining someone on this journey?

19        A.    I don't imagine journeys.

20        MR. HYNES:  Thank you, Mr. Parkhurst.

21              (Witness excused.)

22        THE COURT:  Are there any more witnesses for the

23  plaintiff?

24        MR. WAGNER:  No, Your Honor.  Plaintiff rests.

25        THE COURT:  All right.

1          So, ladies and gentlemen, the plaintiff is resting

2    their case on damages.  As I indicated, Nike did not give an

3    opening address on damages.

4          Who would like to do that?  Do you want to do that

5    now?  Do you need a recess before that happens?

6          MS. EISENSTEIN:  Yeah, if we could take a couple

7    minutes, Your Honor.  It's going to be me.

8          THE COURT:  I think I'll do that.  Also, I have to

9    give counsel the chance to make certain motions at this time.

10   So I promise you we're going to keep this recess short, ten

11   minutes.  We'll probably adjourn around 12:30 for lunch.  All

12   right.  Keep an open mind.  The jury is excused.

13                    (The jury exits the courtroom at 11:32

14                    a.m.)

15         THE COURT:  Is your first witness the Zoom witness?

16         MS. DURHAM:  Yes, Your Honor, but we need to confer

17   with him given the changes that were made with Parkhurst.

18         THE COURT:  I want to keep going.  Can you call your

19   expert?

20         MR. HYNES:  We won't need much time, Your Honor.

21         THE COURT:  Does Nike want to make a motion now that

22   the plaintiff has rested on damages?

23         MS. EISENSTEIN:  Yes, Your Honor.

24         THE COURT:  Before you do that.  That's one reason I

25   excused the jury.

1                The second reason is, who is going to give the

2      opening?  You can get your papers ready and so forth.  While

3      that is happening, can somebody else get the witness ready so

4      when Ms. Eisenstein is done her opening, we can do the Zoom

5      witness?  Can we do that?

6                MR. HYNES:  Yes, Your Honor.  We'll be very

7      efficient.  We only have two witnesses for our whole case.

8                THE COURT:  Do you want to call the Zoom witness

9      first?

10               MR. HYNES:  I do.  I need to tell him about the

11     development so he doesn't start testifying about --

12               THE COURT:  You can do that while Ms. Eisenstein -- I

13     know you don't want to miss her opening, but...

14               MR. HYNES:  I will miss the opening if I need to.

15               THE COURT:  I'm going to allow Drews and Parkhurst to

16     sit in the courtroom during your damages phase just in case.

17     If they need to be recalled, they've heard the testimony.

18               I'll be back in five minutes.

19               One more question.  Am I getting any points for

20     charge on damages?

21               MR. WAGNER:  Yes, Your Honor.  We're going to have

22     them ready for you at lunch.

23               THE COURT:  Very good.  And the jury questionnaire.

24               The jury questionnaire in my view should just say we,

25     the jury, find damages as follows and have the categories

1    you're seeking with the dollar sign blank.

2          MR. WAGNER:  Yes.  I think we should call it items of

3    relief just because profit disgorgement -- we'll submit our

4    form.

5          THE COURT:  Okay.  Thank you.  5-minute recess.

6                 (Recess taken from 11:34 a.m. to 11:41

7                 a.m..)

8          THE COURT:  Okay.  We'll now have Nike's motion on

9    the conclusion of plaintiff's evidence on damages.

10         MS. DURHAM:  Thank you, Your Honor.  Nike moves

11   pursuant to Rule 50(a) seeking judgment as a matter of law on

12   Lontex's failure to prove entitlement to any damages at all, or

13   at a minimum, to any damages in excess of the demonstrated

14   value of the asserted trademark.

15         Nike also moves under Rule 50(a) seeking judgment as

16   a matter of law that Lontex is not entitled to punitive

17   damages.

18         Finally, Your Honor, Nike also moves under Rule 50(a)

19   seeking judgment as a matter of law that Lontex is not entitled

20   to an award of corrective advertising.

21         THE COURT:  Okay.  I'll take that motion under

22   advisement.

23         Bring the jury in.  We'll now have the opening and

24   you're making arrangements -- when Ms. Eisenstein is done,

25   we'll have the Zoom witness.

 1           MS. EISENSTEIN:  Your Honor, we decided to forego the

 2    Zoom witness in light of Mr. Parkhurst's testimony, so we just

 3    have one live witness in our case.

 4           THE COURT:  You're just going to go with your expert?

 5           MS. EISENSTEIN:  Yep.

 6           THE COURT:  Okay.  Thank you.

 7                    (The jury enters the courtroom at 11:43

 8                    a.m.)

 9           THE COURT:  Okay.  Everyone be seated, please.

10           Ladies and gentlemen, we'll now have the opening

11    address by Nike counsel.

12           MS. EISENSTEIN:  Thank you, Your Honor.

13           Ladies and gentlemen of the jury, you have found that

14    Nike committed trademark infringement when it used the words

15    "Cool Compression" to describe its products.  And in reaching

16    your verdict, I have seen how each of you paid close attention

17    to the evidence in the case, the testimony as it was given from

18    the witness stand, and the judge's instructions on the law.

19           We respect your verdict, and that verdict in the

20    liability phase is one that I know was the product of careful

21    deliberation by each of you.  The liability phase was about

22    Nike's use of the words "Cool Compression" and the Cool

23    Compression trademark.  Now it's up to you to decide what the

24    damages were that were caused by that use.

25           The use of the trademark is what this case is about.

1    After all, it's a trademark infringement case.  You'll hear,

2    and you've already heard, that there's a number of ways to

3    decide damages, but they really boil down to two questions.  It

4    might have seemed complicated listening to these experts and

5    all of these different measures, but I hope I can simplify it

6    for you.

7              What was the value of the harm to Lontex caused by

8    Nike's use of the term "Cool Compression" and the Cool

9    Compression trademark?  That's the first question.  The second

10   question was:  Was there any value that Nike unfairly gained as

11   a result of its use of the Cool Compression trademark?

12             Another way to think about this, and you heard this

13   from Mr. Drews just now, is what is the value of the Cool

14   Compression trademark itself?  The value of Cool Compression to

15   Lontex, the value of Cool Compression trademark to Nike.

16   That's the law, but it's also common sense.  Trademarks are

17   property.  They have a value.  And your verdict in this case

18   should be anchored by that value.

19             So let's start with the evidence of the value of the

20   Cool Compression trademark to Lontex.  You have already heard

21   evidence that could help you decide that question, and that

22   evidence came from Mr. Nathan himself and the documents that

23   you saw yesterday.

24             Mr. Nathan, as you know, tried to sell the Cool

25   Compression trademarks multiple times between 2014 and 2016,

and in the process, he put a value on it, as did his potential

business partners.  As a starting point, Mr. Nathan and Lontex

Corporation entered into an 800,000-dollar binding contract to

sell Cool Compression if a bidder came in at that price.

Mr. Nathan offered to sell not only the Cool Compression mark

but the whole Sweat It Out business, including the Sweat It Out

mark for $500,000.  And he did that to multiple potential

buyers, as well as he offered $300,000 for the whole business,

including the mark and part of the proceeds of this lawsuit, to

Mr. Liebaert in 2016.

          And he offered, prior to that, to sell the Cool

Compression trademark for $150,000 to a man at a company called

ING.  He approached over 20, maybe 100 buyers of the trademark

to be sold at any price to be negotiated, but we know that none

of those buyers wanted to purchase the trademark.  So we don't

know what the potential business partners might have paid, but

we know that the ones that he approached did not pay those

prices.  It's up to you to decide what the value of the

trademark was to Lontex and whether to assign any value to it

at all.

          You've also heard evidence of lost profits.  That's

another way to look at the harm caused by Nike's use of the

Cool Compression trademark.  You saw that Lontex revenues did

decline during the relevant time period, indeed they continue

to decline to the present day.  You also saw that Lontex's

marketing efforts, the advertising, the trade shows, the travel and entertainment, those declined commensurate with the revenues.  At least according to Lontex's own tax returns.

You saw Mr. Drews say that even ignoring all those changes and counting every dollar decrease during the relevant time period, the total is $223,846.  That also includes the decrease in sales that Mr. Nathan talked about that he experienced in certain major league teams.  That's still a lot compared to how Mr. Nathan valued the Cool Compression trademark itself, which he offered to buyers for $150,000.

But Mr. Drews didn't stop with lost sales or the value of the trademark.  He claims you could also award Lontex lost royalties, royalties for Nike's use of that trademark. And you heard him tell you that royalty is a percentage of sales for use of a trademark, like a rental fee.  You have to decide whether royalties are an appropriate measure of damages here.  And you heard Mr. Drews admit, why would anyone enter into a royalty contract for the right to use, to borrow a trademark, that is far more than the price of buying the trademark outright?  That kind of deal just wouldn't make sense.

Mr. Drews also based his royalty rates based on the terms of ten deals, and they involve terms that you didn't get to see, parties like Justin Timberlake and the designer to Queen Elizabeth who aren't here, trademarks we don't know

1  really anything about, much less their value, but he did say

2  those are some pretty valuable brands.  He also said that those

3  were trademark deals that involve the trademark being

4  physically on the product, not a different kind of licensing

5  deal that might apply to this kind of use.

6      But you did get to see the terms of Mr. Nathan's

7  deals where he proposed to sell the Cool Compression marks.

8  Remember we went through those in great detail yesterday, and

9  that is the better measure of value.

10      You also heard Mr. Nathan claim that he lost valuable

11  business deals with Mr. Liebaert, with NovaCare, with

12  Mr. Leach, and several other people, and he said that that was

13  due to Nike's use of the Cool Compression trademark.  But I

14  think we all know that that's not the case now.  The value of

15  the trademark to Mr. Nathan is grounded in the evidence that

16  you have before you in the case.

17      So let's talk about what value Cool Compression had

18  to Nike, whether there was any value that Nike unfairly

19  received as a result of its use of the Cool Compression

20  trademark.  And I want you to keep something in mind, and I

21  hope that you will.  The value that matters here is not the

22  value of Nike's whole business.  That's not the issue here.

23  This is a trademark infringement case, and the value that

24  matters is the value that Nike got from use of the mark, not

25  for all its sales.

And that's the problem with Mr. Drews.  Instead of looking at whether the value of Cool Compression contributed to the sales of Nike products, he took every dollar on every product of the styles at issue that Nike sold everywhere in the country, online, in stores, and even at other companies' stores where no one said Cool Compression appeared, and he added all of that up to come up with his numbers.  I think even he acknowledged that isn't right.  Cool Compression wasn't everywhere, and you know that from the evidence you've seen, not just in the damages phase, but throughout this case.

You're probably tired of hearing us say that it wasn't on the products, but I'm going to say it again.  It wasn't on the products.  It wasn't on the hang tags.  It wasn't on the big signs or the billboards or the TV commercials.  I think that's been established by now.

You've heard Mr. Drews admit -- let's just talk about the wholesalers because he had that big number for wholesale prices.  You heard Mr. Drews admit that he saw evidence involving only 2 percent of those wholesalers selling to their downstream customers.  Remember those are like the Foot Locker or the Sports Authority, who bought these products from Nike and then used Cool Compression in their own marketing material.  Only 2 percent.  But he included that other 98 percent in that number.

You also know that Mr. Drews admitted that the

1  wholesale buyers, the sophisticated buyers of the big retail

2  stores like Nordstrom or Dick's, that they don't necessarily

3  buy based on a tech sheet or a catchy catchphrase in the

4  product description.  These are buyers that buy based on data

5  and forecast and sales predictions.  So you have to ask whether

6  Nike's use of Cool Compression in the documents that went --

7  those tech sheets or catalogs that went to those buyers, what

8  that contributed to those bulk sale.

9          And you heard about the online sales and how not

10  every online sale involved Cool Compression, even of these

11  products, and also not for the entire period of time.

12  Mr. Drews said it's just a snapshot and those sites change

13  day-by-day, and I think you saw evidence of that today.

14          You'll hear more evidence from our expert, Mr. Paul

15  Meyer, that tracks the evidence in this case and the retailers

16  and where we have seen evidence that Nike used Cool Compression

17  trademarks in any way, shape, or form, and what these numbers

18  are, the total numbers.  Mr. Drews is going to present those

19  sales, and they're far less than -- Mr. Meyer, excuse me, is

20  going to present those sales, and they're far less than what

21  Mr. Drews presents.

22          You are the judges of where you saw Cool Compression

23  used.  I'm not going to purport to tell you that.  You've heard

24  the evidence.  You are the judges of where you saw Nike use

25  Cool Compression.  But the evidence does not support Mr. Drews'

1    testimony that assumes that Cool Compression was involved in

2    every single sale that Nike made of these products.

3            So even for those where you saw the Cool Compression,

4    whether it be on the Nike.com website, in the tech sheet, in

5    the catalog, there's still another question you have to ask.

6    What value did Nike gain from the use of Cool Compression in

7    the places where you did see it used?  Was it driving the

8    product sale and what was the Cool Compression trademark's

9    contribution to those sales?

10           Now, whatever your views about Nike are, Nike

11   products have their own value, and that's apart from Cool

12   Compression.  Nike has its own technology and materials.  They

13   have the Swoosh, the Jumpman, the Nike Pro.  Some of the most

14   iconic brands in the world.  They are sold in stores and online

15   through Nike distribution channels.  Nike has entered into

16   agreements and deals with sports teams and colleges and

17   athletes.  That has significant value, and by that, I mean that

18   is one of the major reasons that consumers buy these products.

19           Sometimes that is the only reason that a consumer

20   buys those products, because it has the Nike Pro on the

21   waistband, because it has the Michael Jordan Jumpman on the

22   shirt, or the tights with the Swoosh, or a base layer that

23   their team already committed to purchase and wear with their

24   uniform.

25           Nike is a big company, and it spends real money

putting those products to market.  Its own brands have value and it is proper for you to fully account for that in considering of the sales where Cool Compression was involved, what was its contribution to the sale.

        And you heard Carol Scott's study.  She measured whether Cool Compression generated additional interest when used in online sales and found it didn't contribute anything.  But you don't need an expert to tell you that.  You don't need Ms. Scott, you don't need Mr. Parkhurst to tell you that.  You are an ordinary consumer too.  You can rely on your own experience and common sense about how you make purchasing decisions to decide how much weight to give the use of Cool Compression in the places where you've seen Nike use it.

        You all knew about Nike before you walked in the door.  You had bought Nike products, and I think you know that had nothing to do with the Cool Compression mark.  But Mr. Drews did not account for the value of Nike brands or products at all in his analysis.  And you will hear our expert, Mr. Paul Meyer, testify about that in just a moment.

        And, of course, I'll just go back to the wholesalers for just a minute because that was a big fraction of the sales, right, is the Nike sales to the wholesalers to the big retail, the Dick's, the Modell's, the Foot Locker.  And you know that they didn't purchase because of the Cool Compression brand, the Cool Compression trademark either.

I just want to say a word about experts, and you can use the same standard for our expert as for the experts you've heard so far in the case.  I think you heard today that the experts so far have based their conclusions on assumptions that are not grounded in the evidence in this case.  They didn't listen to the evidence in the case.  They didn't necessarily adjust their figures based on the evidence in this case, the evidence of the value of this trademark and the evidence of how the trademark was used.

Let me give you a couple of examples.  We just talked about how Mr. Drews' profits were based on the assumption that every dollar that was spent on the products at issue was driven by Cool Compression or even that it had Cool Compression anywhere near it.  I know you know that's not the evidence you saw.

You just heard Mr. Parkhurst's wild internet view numbers, which assumed that all of these millions of people saw Cool Compression based on Nike.com sales.  And anyway, he made an opinion that was to support a corrective advertising number, a number that I think was in the many, many tens of millions of dollars.

You heard Mr. Drews admit, though, that the value of corrective advertising is to restore the brand, the brand Cool Compression trademark, to its value.  It's thus tied to the value of the Cool Compression mark, not tens of millions of

 1  dollars of advertising for a business, for Lontex, which didn't

 2  spend more than $16,000 in advertising in a given year, and

 3  during the years in question only spent several thousand

 4  dollars in advertising.  That just doesn't make any sense, and

 5  it doesn't comport with the evidence in this case.

 6          You will hear from Mr. Paul Meyer, and after that,

 7  I'm going to have another chance to address you again on

 8  closing arguments.  I ask that you ground your damages finding

 9  in the evidence in this case and tie your damages award to the

10  value of the Cool Compression trademark.

11          THE COURT:  Please call your first witness.

12          MR. HYNES:  Your Honor, we'll only have one witness.

13          THE COURT:  Yes.

14          MR. HYNES:  Mr. Meyer.

15          THE COURT:  Come up to the witness stand.

16          THE DEPUTY CLERK:  You can take off your mask.

17          THE WITNESS:  Thank you.

18                  (Witness sworn.)

19          THE DEPUTY CLERK:  You can be seated.

20          Please state your full name and spell your last name

21  for the record.

22          THE WITNESS:  Paul Kevin Meyer, M-E-Y-E-R.

23                          - - -

24              DIRECT EXAMINATION ON VOIR DIRE

25                          - - -

MEYER – DIRECT ON VOIR DIRE

1    BY MR. HYNES:

2        Q.    Good morning, Mr. Meyer.

3        A.    Good morning.

4        Q.    Can you please tell the jury a little bit about

5    yourself and what you do for a living.

6        A.    Yes.  I run a consulting company that has offices in

7    Chicago, Los Angeles, and San Francisco, and we consult with

8    businesses on financial accounting, business strategic issues,

9    and then we also provide valuation analysis.  And some of that

10   takes into situations like this.  I spent a lot of time in

11   intellectual property and how you value intellectual property,

12   those assets, whether it's a patent, trademark, trade secret,

13   copyright.  So consulting company, and I've been doing this for

14   about 30 years.

15       Q.    So we're going to get a little bit deeper into your

16   background.  It's kind of something we have to do as a legal

17   matter.

18             Could you tell us a little bit more about what you

19   did before you formed your consulting firm?

20       A.    Yes.  I went to school -- I grew up on the East

21   Coast.  I went to public schools.  I attended University of

22   Virginia, graduated with a business degree.  Focused on

23   accounting and quantitative methods.  Worked for a time in

24   public accounting, and then in the mid-1980s, got into

25   consulting work for some larger international firms doing lots

MEYER - DIRECT ON VOIR DIRE

of different financial and economic and beginning valuation

analyses.

          And then in 1994, I started a company with a

long-time colleague.  We grew that to 400 people, and we had

that for ten years.  And then the last 15 years, I've been

doing similar consulting.  And now the last ten years back with

my own firm with about 75 employees, and their backgrounds are

engineering, finance, accountings, economics.

     Q.   Do you have any professional memberships or

certifications?

     A.   Yes.  I'm a CPA.  I grew up in Virginia at the sort

of end of my childhood days, so I went to school at UVA, was

certified initially as a CPA in Virginia.  Moved to California

in the mid-1980s, started getting into some high-technology

clients, and then I got my CPA license also issued in

California.

     Q.   Have you had any teaching positions or where you

would lecture on topics that are relevant to the issues we're

discussing today?

     A.   Yes.  I've done a lot of just lecturing in general on

valuation at schools and in professional groups.  But I've been

teaching at Stanford University now one class since 1992 as an

adjunct professor.  And that's at the engineering school, and

it's focused on valuation, accounting, and finance for

engineers who may someday run companies.  And that's -- with

MEYER - DIRECT

1   Covid there there's been some changes, so we've been online,

2   but I've been doing that since 1992.

3       Q.   Have you been recognized as an expert witness in the

4   past?

5       A.   Yes.  I've testified in about 70 trials recognized as

6   an expert and testified in Virginia, Delaware, New Jersey, New

7   York, and then around the country, and also in London.

8           MR. HYNES:  Your Honor, we would offer Mr. Meyer as

9   an expert.

10          THE COURT:  Any questions on qualifications?

11          MR. SCHWARTZ:  No questions, Your Honor, at this

12   time.

13                          - - -

14                   DIRECT EXAMINATION

15                          - - -

16   BY MR. HYNES:

17       Q.   Okay.  Mr. Meyer you talked about valuing of

18   intellectual property earlier.

19           Can you tell us a little bit more about what you

20   meant by that?

21       A.   Yes.  So when you think about intellectual property,

22   it's an intangible asset, so it's something that's really

23   defined by sometimes a legal document.  But ultimately, the

24   valuation will be if you want to license it or buy it, what

25   would one pay for the intellectual property.

MEYER - DIRECT

1          Ultimately, it's defined, and so you understand the

2     scope of that property, and the best way really to do it is,

3     like, a market approach to look at prior transactions or prior

4     licenses.  You have to get to something that's comparable, and

5     the analogy we overuse is, when you're going to rent an

6     apartment or buy a house, you try to find the neighborhood and

7     the comps and make adjustments for the number of bedrooms or

8     bathrooms and, you know, garage and things like that, which

9     you're seeking data from the past about what others had paid

10    for a comparable asset.

11         So when you go to value intellectual property, you

12    look for prior licensing, prior acquisition agreements, and

13    then there's other methods also.  You can look at an income

14    approach and a cost approach.  But the market approach, you're

15    looking at transactions and prices from prior deals, is very,

16    very relevant.

17    Q.   Okay.  And we're talking about a trademark in this

18    case, is that the intellectual property?

19    A.   Yes, that is the property in this case.  Yes, sir.

20    Q.   Okay.  Did you prepare some slides to help explain

21    your testimony to the jury?

22    A.   Yes, I have.

23    Q.   Okay.  Are these the slides?

24    A.   Yes, they are.

25         MR. HYNES:  Okay.  Can we go to the next slide,

1  please?

2  BY MR. HYNES:

3      Q.   Can you tell us what you were asked to do in this

4  case?

5      A.   Yes.  There was really two parts of the assignment.

6  Obviously, one was, as I mentioned a moment ago, to look at the

7  value of the 406 and the 053 trademarks, which are in this

8  case.

9          And then secondly, Mr. Drews sponsored some damage

10  claims on behalf of the plaintiff, Lontex, and I was asked to

11  review those and, to the extent I did not agree, to provide

12  rebuttal positions about that.

13      Q.   Just to be clear, the two trademarks referenced in

14  the top of that slide, those are the Cool Compression

15  trademarks that the jury has found that Nike used in this case,

16  right?

17      A.   That's correct.

18          MR. HYNES:  Okay.  Can we go to the next slide?

19  BY MR. HYNES:

20      Q.   Can you tell me about this one?

21      A.   Yes.  Before we get into my underlying analyses and

22  basis and support, on this slide, I laid out on the left-hand

23  side the claims that Mr. Drews testified to on behalf of the

24  plaintiff, and the jury heard those opinions yesterday and

25  today.  And that's, you know, the 95.7 million for Nike's

1  profits, the lost profit figure of 223,000, reasonable royalty

2  about 7.5 million, and there was a corrective advertising

3  claim.

4  On the right-hand side, these are the results of my

5  analysis.  I'll explain to the Court how I came up with the

6  Nike profit figure there of 2.8 million up to 7.1 million, and

7  that's before apportionment.  We'll talk about what

8  apportionment means.  And with apportionment, $800,000 is my

9  opinion on Nike's profits.

10  Secondly, lost profits, I'll explain that based on

11  the work of Mr. Drews, I don't believe there's been any lost

12  profits that have been proven.  We'll talk about that.

13  Reasonable royalty, we'll discuss the asking price

14  put forth by Mr. Nathan.  $800,000 I believe is the maximum.

15  And then lastly, I'll just comment that on the

16  advertising, that Lontex's actual advertising was much lower.

17  Q.   Okay.  Are you going to explain why the numbers are

18  so different?

19  A.   Yes, I am.

20  MR. HYNES:  Okay.  Can we go to the next slide?  Next

21  one.

22  BY MR. HYNES:

23  Q.   Okay.  Maybe you can tell us a little bit about your

24  rebuttals to Mr. Drews' analysis.

25  A.   Thank you.  Here's an overall sort of a laundry list

MEYER – DIRECT

 1   of different types of adjustments I made to Mr. Drews' Nike

 2   profit claim.

 3           So the first item I'll talk about, I removed the

 4   non-Nike retailer profits, and I'll explain why in just a

 5   moment.

 6           Secondly, there was some summaries produced by the

 7   plaintiff at trial representing that these were instances where

 8   Cool Compression was used in the sales process.  I've gone

 9   through that data at length, and I've segregated from those

10   source documents and those references those sales and profits

11   to basically show the jury what that tells us.  That's the

12   second point.

13           Third, I'll talk about cost, costs that relate to

14   getting to gross profit, and then what's called full costing,

15   when you take operating costs and get to net profits.  So I'll

16   talk about that.  And I have numbers for both.  So you have

17   revenues, takeaway costs.  I'll present net profits and gross

18   profits.

19           And then lastly, as Ms. Eisenstein just mentioned,

20   you then have a profit figure and you then have to apportion

21   between the value of the trademark to making those profits

22   versus the value that Nike brings to its business and its

23   brand.  And I have an opinion about how you can separate the

24   trademark contributions from Nike's contributions, and that's

25   called apportionment.  That's Item No. 4.

MEYER - DIRECT

1    Q.   Before we get much further, you said the word

2    "apportionment" a couple of times.

3         Can you explain to the jury what that word means?

4    A.   Yes.  Ultimately, when you're talking about a profit

5    figure, the question or the query is how much of that profit

6    came from intellectual property that's involved, the

7    trademarks, and how much of that profit came from something

8    Nike brought to the table.

9         So it's history, it's branding, it's expenditures on

10   sales and marketing, it's infrastructure, it's technology.  So

11   you have to split that profit between both the trademark and

12   then Nike's contribution.  So basically it's a value, a

13   contribution -- a value contributor between trademarks and

14   Nike.

15   Q.   So if you don't apply any apportionment, I mean, what

16   are you left with?

17   A.   Well, in the absence, it's where the numbers stand

18   right now with Mr. Drews.  The numbers that the jury has from

19   Mr. Drews on Nike's profits are a hundred percent left with

20   Cool Compression and the trademarks.  So a hundred percent goes

21   to Lontex, and so that's not correct.  Something has to go to

22   Nike and, most likely, and you'll hear from me, a lot of it.

23   But right now, his numbers are a hundred percent unapportioned,

24   and all are being assigned to Lontex trademarks.

25   Q.   Okay.  Just a couple more introductory questions for

1   you, Mr. Meyer.

2            What is a royalty?  You see that in the first line

3   there.

4        A.   Well, ultimately, you heard a little bit about this

5   this morning.  If someone owns intellectual property trademarks

6   and they're open to licensing out the trademark for some type

7   of use, they'll be paid a royalty, is the consideration given

8   to have use of that property.  And most of us are familiar from

9   growing up where there's a running royalty.  You know, someone

10  agrees to do something and there's sales and then you charge so

11  much for each sale.

12           It's commonplace in today's economy to charge either

13  running royalties, per-unit royalties, but also paid-up

14  royalties.  You pay an amount, and then you have use of that

15  intellectual property for some term, five years, ten years,

16  until the patents expire.  But it's consideration to use the

17  property.

18           And a royalty basically is less value than owning the

19  property.  If you own the property, you can keep it to

20  yourself, or you can license one entity or many.  It's up to

21  you.  So it's always best to own intellectual property because

22  you have all the ownership rights and not just use rights from

23  licensing.

24       Q.   Now, in this particular case, there was no agreement

25  between Lontex and Nike, so why is it still appropriate to be

1    talking about royalties?

2        A.   Well, in intellectual property cases like this, you

3    have the situation where you're trying to figure out what the

4    parties should pay -- one party should pay the other.  And so

5    you heard the notion presented by Mr. Drews called the

6    hypothetical negotiation, and that just means you go back in

7    time and contemplate, if Lontex and Nike had sat down to figure

8    out what to pay for the trademarks, what would that amount be

9    based on the different factors that go into understanding the

10   value of those trademarks.

11       Q.   And is that a method that you've used before?

12       A.   Yes.  I've used it hundreds of times.  It came out of

13   a patent case in 1971 called Georgia-Pacific, and it's commonly

14   used in patent cases to determine royalties and sometimes in

15   cases like this with trademark, because it's also intellectual

16   property.

17       Q.   So moving down, you make a reference in number 2

18   there to plaintiff's summaries.

19            Can you explain what those are to the jury?  Although

20   the jury has seen them, so you can be quick about it.

21       A.   Yes.  The PX-30A, PX-30B, and PX-31 were introduced

22   in court, and they're from the plaintiff's side.  They're

23   summaries of where they believe there's indications of the use

24   of the language "Cool Compression" in the Nike products.  And

25   so I've done a detailed analysis of those source documents now

MEYER – DIRECT

and those styles and have summarized what they teach us or tell
us about the revenues and profits that come from what the
plaintiffs produced.

Q.   And number 3 says:  Show full absorption costing net
profits.

Can you just briefly describe what you mean by that?

A.   Yes.  Once again, some of the business terms are
complicated, but the notions are simple.

So you have revenues, which is all your units you
sell at prices.  So you have your revenues.  Then you deduct
what's called the cost of goods, the cost of making those
revenues.  And then you get a subtotal, and that's what we call
gross profit.  It's really the profit before you contemplate
all the other costs it takes of running a business.  And the
big word for that is the operating expenses.  It includes
selling, administrative, it can include management, include
insurance, it can include IT, research and development.

And in my study here, if you go to Nike's 10-Ks, they
spent about 32 percent a year on research and development, the
central infrastructure, and then what they call demand
creation, where they run advertising on major media, they have
significant endorsement deals, they have arrangements with
wholesalers where wholesalers, you heard about in this case,
will advertise and Nike will reimburse them.  Those are sort of
like co-op deals with the wholesalers.  And all those costs are

MEYER - DIRECT

1    not in cost of goods.

2           So those are deducted below the gross profits.  So I

3    will show the Court, when you take out those costs, the net

4    profits are lower, and if you really want to understand the

5    true cost of all of Nike's resources it takes to make the top

6    line revenues, you need to consider all those operating costs.

7           MR. HYNES:  Okay.  Can we go to the next slide,

8    please?

9    BY MR. HYNES:

10          Q.   What's depicted here, Mr. Meyer?

11          A.   Well, there's been three channels of the products in

12   this case that have been presented.  And we're going to talk

13   about the Nike profits from wholesale.  And that's when Nike,

14   on the business-to-business basis, sells to the non-Nike

15   retailers.

16          Nike also has its own retail channel, so it has its

17   outlet stores and it has its high-end stores in the big cities

18   and it has an online presence.  So those are all Nike retail.

19          And then you have the item which is the profits

20   related to the retailers that are not part of Nike.  So those

21   are profits that are earned by other companies that have their

22   own owners and shareholders, and those profits do not come back

23   to Nike.  I call those the non-Nike retail profits, and I'll

24   explain to the jury why I believe that they would be covered by

25   a royalty.

MEYER - DIRECT

1      Q.   So by non-Nike retail profits, there's actually two

2   transactions in that bucket, right?

3      A.   Yes.  First, Nike at wholesale sells to the big

4   retailers like Dick's or Modell's or Sports Authority or Foot

5   Locker, all the big sort of sporting goods companies.  And once

6   those entities have the Nike product, they have their own

7   retail channels, and that includes both the stores, the bricks

8   and mortar, but also the online presence.  And those profits,

9   once again, do not come back to Nike.

10     Q.   Thank you.

11          MR. HYNES:  Can we go to the next slide?  Well,

12  actually, can we go back one more second?  I'm sorry.

13  BY MR. HYNES:

14     Q.   Mr. Meyer -- oh, you talked about royalty already.

15  My mistake.  We can keep going.  Slide six.

16          What is this, Mr. Meyer?

17     A.   Well, when the plaintiff produced at trial the PX-30A

18  and B and PX-31 and had website captures and some in-store

19  circulars and other information produced, I did an analysis of

20  all those documents.  And in that process, I've identified for

21  Nike's wholesaler customers all the styles in those plaintiff

22  summaries, and I'll explain to the jury how I found out what

23  those style numbers were.

24          And I did a whole separate analysis to take all those

25  retailers and style numbers, add them up to get revenues.  I

MEYER - DIRECT

1    then adjust for online presence, sales, and then I deduct costs

2    to show what those profits are based on what the plaintiff

3    produced at trial.

4        Q.   Okay.  Were those summaries available to you prior to

5    the trial starting?

6        A.   No.  They came in at trial.  So in that process, I

7    did some updating of my analysis.

8        Q.   Okay.  So did you include all Nike wholesale revenue

9    in your analysis here?

10       A.   No.  So what I've included in here is the Nike

11   wholesale revenues for these 26 customers of Nike based on the

12   style numbers and analysis I did of those plaintiff summaries.

13           MR. HYNES:  Okay.  Can you please pull up DX-1229,

14   please?

15   BY MR. HYNES:

16       Q.   Do you recognize this, Mr. Meyer?

17       A.   Yes.  In the course of doing my analysis, I updated

18   some of my work papers, my underlying summaries, to make

19   certain I did all the work properly, and this is one of those

20   updated schedules.  This is a demonstrative one, trial update.

21           MR. HYNES:  Could you post DX-1230, please?

22   BY MR. HYNES:

23       Q.   What about this one?

24       A.   This is my attachment 5 from my report in this case.

25   It's been updated to include the current style numbers that are

MEYER – DIRECT

1   in the case, and their foundation is basically a summary of all

2   the wholesale and Nike retail quantities, net sales, average

3   prices, cost of goods, and then gross price and net price is

4   one of my updated work papers.

5           MR. HYNES:  Can we go to the next one, which is

6   DX-1233?

7   BY MR. HYNES:

8       Q.   How about this one, Mr. Meyer?

9       A.   So this is my work paper that shows the summary from

10  the plaintiff, trial summaries, the websites and the circulars,

11  and some other documentation in their PX-31.  There's 26 Nike

12  customers here, and I've gone through and analyzed and

13  summarized all the net sales from those customers.  So I call

14  this basically sales and profits for customers identified in

15  PX-30A, PX-30B, and PX-31.  It's a new attachment that supports

16  my opinions.

17          MR. HYNES:  Can we go to the next one, please,

18  DX-1234?

19  BY MR. HYNES:

20      Q.   Do you recognize this, Mr. Meyer?

21      A.   This is quite detailed and hard to explain in open

22  court, but this is now taking all those retail sales I

23  mentioned a moment ago, and on attachment 13, I reduce them to

24  the style numbers identified by the plaintiffs.

25          And I'll show the jury in a second a summary of all

1   this, but this is my supporting work paper, attachment 13, for

2   that work.

3        Q.   Okay.  The next one?

4        A.   This is a similar analysis, my attachment 14.  This

5   does the same type of analysis for within the Nike retail

6   channel online sales, three styles were identified by the

7   plaintiff.  I've summarized those revenues, and I'll show them

8   in a moment how that informs my opinion.

9        Q.   Okay.  And one more, please.

10       A.   Lastly, this is sort of like the key to the analysis,

11  attachment 15.  This summarizes all the plaintiff summaries

12  that I was able to look at produced at trial on PX-30A, PX-30B,

13  and PX-31.  And then from that, I did all my analysis, so it

14  lists out those retailers, and then the style numbers I picked

15  up in my revenues and summaries.

16       Q.   Okay.  Thank you.

17            MR. HYNES:  Can you please go back to Slide No. 7?

18  BY MR. HYNES:

19       Q.   Can you explain the methodology that you applied

20  here, Mr. Meyer?

21       A.   Yes.  So basically, in the updated information from

22  the plaintiff, the jury saw there was, in PX-30 and 31, there

23  were website sort of captures, and there were some in-store

24  circulars.  And then so I really focused on those, and I

25  focused on those and looked at all those and pulled out the

MEYER - DIRECT

1   style numbers that were identified where the position from the

2   plaintiff was that Cool Compression was used.  And so I've

3   listed those out in my analysis and on this slide.

4          I also went -- and this is always in situations where

5   there were Nike wholesale sales.  I went further and I looked

6   for -- so I focused on style numbers that were identified.  And

7   if there were not any style numbers, I went to the source

8   documents.  And I looked at all the source documents, and I

9   said, okay, is the source document -- what can I tell here

10  about the use of Cool Compression?

11         And if I saw the Cool Compression language, I then

12  picked up all those, and you'll see when we get to it in a

13  moment, like for Dick's, only a few style numbers were

14  identified by the plaintiff, but I picked up $19 million of

15  Dick's sales.

16         So this basically is a summary from the plaintiff

17  trial summaries that allows me then to summarize for the jury

18  the revenues and the quantities that apply to those retailers

19  and those style numbers.

20  Q.   How does that differ from what Mr. Drews did?

21  A.   So Mr. Drews, if it was identified over basically a

22  4-year period, if a style showed up one time on a website with

23  Cool Compression, then for the entire 4-year period, he

24  accumulated all that revenue, a hundred percent.

25         What this analysis does, it goes back to that point

MEYER - DIRECT

1  in time, identifies the retailer and the style number, and then

2  allows you to segregate it down to the style level.  So it's

3  really an aggregation that's much more specific to these

4  documents that are now in the court record.

5      Q.   Maybe we should go through a couple of examples.

6           MR. HYNES:  Could you please pull up 31A, which is

7  the plaintiff's summary, and slide 7?

8  BY MR. HYNES:

9      Q.   Okay.  So, Mr. Meyer, you talked about the Dick's

10  data that you found in the plaintiff's summaries earlier.

11          Can you explain what this is and what you did with

12  it?

13     A.   Right.  So this was in PX-31, and we first go and

14  say, okay, were style numbers for Dick's identified.  You'll

15  see some style numbers here.  And then I went back when there

16  were not style numbers.  I looked at those, but then confirmed

17  that.  But then I went back and looked for other items like

18  PX-1451, and there were no style numbers, but I saw the

19  language Cool Compression.

20          So with this one, ultimately, it allowed me to

21  summarize for Dick's all styles.  Basically it's $19 million.

22  I put it all in my analysis, which really benefits the

23  plaintiff, because they didn't identify style numbers that you

24  can trace back to what's accused in the case.

25     Q.   Was the source of the Dick's revenue that you folded

 1  into your analysis, did that come from a big Nike spreadsheet?

 2      A.   Right.  The big Nike spreadsheet that has all the

 3  Nike sales to wholesalers, including Dick's.  That's what I

 4  used.  So go on there, query and say, okay, for Dick's, across

 5  this period, how much was sold to Dick's for all styles,

 6  because of what I mentioned a moment ago.

 7      Q.   So how many dollars worth of Dick's did you leave out

 8  of your analysis?

 9      A.   Zero.  A hundred percent of Dick's is now in my

10  numbers.

11      Q.   Okay.  Maybe we can look at another example.

12           MR. HYNES:  Can we go to slide 13 of this same

13  exhibit, PX-31A?  Thank you.

14  BY MR. HYNES:

15      Q.   So do you see Zappos, Mr. Meyer?  I'm sorry.  I want

16  to go to Hibbett, the bottom left-hand side there.

17           Does that look familiar?

18      A.   Yeah.  So I saw Hibbett, and then I said, okay, was

19  the style number identified.  No, it was not.  So then I went

20  back to PX-1539, the actual source document, and I looked at

21  that, and I could see that Hibbett obviously is a seller of

22  sports apparel.  And although there were no style numbers on

23  the document that the plaintiff had provided, I could see the

24  words Cool Compression.

25           And so because of that, and there were sales

MEYER - DIRECT

1    obviously made to Nike to Hibbett, so I picked up all those

2    sales.  And I believe those sales were about 2.6 million.  Even

3    though no style numbers were referenced, I dug deeper into the

4    store documents.

5              MR. HYNES:  Can you pull up PX-1539 that you see

6    referenced there on the summary exhibit?

7    BY MR. HYNES:

8         Q.    Okay.  Is this what you looked at?

9         A.    Yes.  It may be hard to see, but you'll see the title

10   says Nike men's Cool Compression tights gray.  There's no style

11   number identified, but I mentioned I went deeper than that and

12   looked at it and picked up -- because of the words, I picked up

13   everything.

14             You'll see also it's out of stock, and I believe the

15   date on it is in 2020.  That's up in the left-hand corner.  If

16   you go up, you'll see the date up there in September of 2020.

17             So I did all that.  But once again, no style numbers

18   were identified, but I picked up all the styles for Hibbett in

19   my analysis to the plaintiff's benefit.

20        Q.    Maybe one more example and then we can move on.

21             MR. HYNES:  Can you go to PX-31, slide 13?  It's the

22   same slide we were just looking at, but can we look at Zappos,

23   please, the bottom right corner there.

24             THE WITNESS:  Yes.  This was provided by the

25   plaintiff for Zappos, and there were no style numbers.  So I

1  dug deeper in looked at the source document backing up this

2  summary that the plaintiff had presented.

3          MR. HYNES:  Can we pull up Exhibit PX-32, please?

4  BY MR. HYNES:

5      Q.   What's this?

6      A.   Well, this was the backup for what was summarized by

7  the plaintiff.  What I saw there was just a website address.

8  There was no documentation, no style number, no way to really

9  corroborate.  So this I did not pick up.  So this would not be

10 in my summary of the Nike customer revenues by styles.

11         MR. HYNES:  Okay.  Could we go back to slide 7,

12 please, from Mr. Meyer's presentation?

13 BY MR. HYNES:

14     Q.   So how many retailers did you end up including in

15 your analysis?

16     A.   You'll see I numbered them.  It starts with Champ's,

17 goes down through 14 on the first side, then we end up on the

18 left-hand side, 15 through 26.  So I've added 26 wholesale

19 customers basically when Nike's now selling to the wholesaler,

20 and I've shown for these customers what style numbers I picked

21 up.

22         So either I pick up specific ones that have been part

23 of this case and accused to use the Cool Compression trademark,

24 and then if it says all style numbers, I got all revenues and

25 sales to that customer as I just described a moment ago for

Dick's.

Q.   I want to change gears now for a second, Mr. Meyer.

Have you heard the term "brick and mortar"?

A.   Yes.

Q.   What does it mean to you?

A.   Basically it's a retailer that has a store, a physical store that you can go in and look at the merchandise and buy something.

Q.   Did you treat brick and mortar sales differently than online sales?

A.   Yes, because my understanding, with the use of the trademarks, was that they were essentially consumer-facing.

So for the Nike customers, I wanted to identify the sales that they made through their online channel, because my understanding is that the evidence in the case doesn't really support the sales inside the brick and mortar.

I think everybody's heard that Cool Compression is never branded on the clothing.  You can see the Swoosh, you can see Dri-FIT, Nike Pro, but there's not any Cool Compression actually on the apparel.  And it's not on the hang tag that you can take away physically.  So it shows up on the websites and that would be consumer-facing.  So in my analysis for the jury, I focused on the online sales made by the Nike customers.

Now, with, like, the circulars that were in the stores, if you go into Big 5 and you get a shopping cart, there

MEYER – DIRECT

will be, like, almost like we used to get on Sunday mornings in
the papers, there will just be a listing of a bunch of
products, circulars.  I did not apply an online adjustment.  I
just took all the sales, because what the assumption was that
those were made through a physical store, bricks and mortar.

But if it was a website reference and the retailer
had a website presence, I split it out between bricks and
mortar and online.  And like East Bay is just online, so I
didn't -- I knew those were all online sales, so that was an
easy one.

So the goal was to get to the Nike wholesaler sales
to its customers that went through an online channel, and
there, the assumption was that a consumer could see that and
then be moved to purchase the Nike accused product.

Q.   And you did that because most of the evidence
provided in plaintiff's summaries related to online use as
opposed to brick and mortar?

A.   That's my understanding, having seen depositions and
seen some of the trial transcripts.

And this schedule here allows me to estimate for
these retailers how much is sold through an online channel
versus a brick and mortar.  This is data from Statista, which
is a big research group I use commonly in these type of cases.
And it shows over time -- I went back to 2010 that for the U.S.
retail sales had grown from basically around 5 percent, and

1  then they were up to 10 percent in 2019.  And then obviously

2  with the pandemic they've spiked up a little bit, and right now

3  they're about in that 12 or 13 percent.

4       MR. HYNES:  Okay.  Can we go to the next slide?

5  BY MR. HYNES:

6       Q.  What does this slide tell you?

7       A.  Well, I wanted to dig deeper about the online

8  adjustment, so some of the Nike retail customers were so large,

9  like Dick's, that they're public companies.  Public companies

10  file a 10-K, which discloses all their financial data to the

11  investors and the public.  Also a lot of data about business

12  operations, who is running it, strategies.  It's called the

13  10-Ks filed with the SEC.

14       So from Dick's Sporting Goods, I found from their

15  10-K that said 2017, their E-commerce channel was about

16  12.4 percent of the total net sales, so the overall data said

17  less than 15 percent, 10 percent through 2019, and now we have

18  Dick's at 12.4 percent in 2017.

19       MR. HYNES:  And the next slide, please.

20  BY MR. HYNES:

21       Q.  What about this one?

22       A.  This was another Nike customer.  It's called the

23  Academy Sports & Outdoors.  I did the same type of analysis,

24  looked for the E-commerce sales, and those were by management

25  of the Academy.  They told their investors and the public that

MEYER – DIRECT

1   10.4 percent and 5.1 percent was the amount of their sales

2   online in 2020 and 2019.  So that's another datapoint.

3       Q.   What did you do with this particular datapoint point?

4       A.   Ultimately, what I did was -- remember, once again,

5   the sales I was going to summarize as being the ones related to

6   Cool Compression are the online channels, so I actually used a

7   percentage of 25 percent.  So I adjusted it upwards, and I then

8   applied that against the retailers that had both bricks and

9   mortar and online.

10          So I used a 25 percent, and I feel like it's almost

11  double what I saw in my research, but I feel it's fair in these

12  circumstances.

13      Q.   And by using that higher number, who does that

14  benefit?

15      A.   It benefits the plaintiff.

16          MR. HYNES:  Can you go to the next slide?

17  BY MR. HYNES:

18      Q.   Can you tell us about this slide, please?

19      A.   Yes.  So those work schedules that were hard to read

20  a moment ago that we went through -- and I apologize for

21  that -- I've summarized all the data on those schedules into

22  this flowchart so that the jury can see basically what this

23  analysis is telling me and telling us.

24          And so here we've seen this figure from Mr. Drews.

25  We're both starting with the same figure.  This is the

MEYER – DIRECT

 1   wholesale channel, $74.6 million in that first bucket there.
 2   And then from there, working off the plaintiff's summaries of
 3   the website captures and the circulars and the other source
 4   documents, I then went through and identified all the sales for
 5   those retailers, and that drops the number down to
 6   39.1 million?
 7          So the difference is retailers for which no
 8   documentation or summaries were provided by the plaintiff.
 9   Once I have 39.1 million, remember, I did the next cut.  I
10   said, okay, what styles do I then identify.  And as I
11   mentioned, I used the styles that the plaintiff provided, or I
12   used for, like Dick's, all the styles.  And when I use that
13   style filter, it sort of cuts the number down a bit more and
14   goes to 28.5 million.  Now we're down to that point.
15          And as we mentioned a moment ago, for the sales that
16   were both bricks and mortar and online, I used the online
17   percentage of 25 percent, so now I have 11.9 million where I
18   believe that represents an appropriate indicator of the
19   revenues that Nike has earned in the wholesale channel based on
20   the documentation that the plaintiff submitted at court.
21          And so once I have that, that's revenues, and then I
22   had to obviously put in the costs and deduct the costs it would
23   take Nike to make those profits.  So I go to A down below, and
24   that's the wholesale profits there.  I repeat the 11.9 million.
25   Going back to my work papers, I applied the gross margin, which

MEYER – DIRECT

is about 50 percent.  I actually do it for every style.  I

actually have the gross margin cost of goods by every style, so

it's an actual number from Nike's records.

It reduces 11.9 million down to 6.3 million, and

that's now the gross profits.  So that's not the same basis as

Mr. Drews' numbers.  The numbers he presented for the Nike

wholesale claim are gross profits.  This is now at gross

profits.

I believe it's also important for the jury to

consider net profits.  Obviously, Nike spends a lot of

resources, investment, infrastructure.  These products that we

are talking about today have been marketed and sold by Nike ten

years before infringement, so they built up all that.  So, to

me, those costs, all the operating costs, they're about

31.7 percent of sales.  So I do the math, and now I'm at

$2.5 million?

So it's my opinion that in the wholesale channel,

based on the plaintiff's summaries, the PX-30 and PX-31, this

is an appropriate quantification of the profits earned by Nike,

gross profits and net profits.

Q.   Do you have an opinion as to which profit figure,

gross or net, is most appropriate?

A.   Well, I believe both should be considered, and I

think the thing that's important is that particularly with

Mr. Drews, since he does not apportion, he does zero

1   apportionment, so he's at gross profits with no apportionment

2   to Nike's contributions.  One way you can reflect the

3   contributions is deduct the operating costs, the research and

4   development for new fabrics, all the seams in the compression

5   gear, all the branding, and when LeBron James or Kevin Durant

6   or all the other players under endorsement wear these products,

7   that's part of building all that.

8          Plus, also, I mentioned in the operating costs, you

9   also have when Nike reimburses wholesalers for their

10  advertising.  So if Dick's does an advertising campaign, you'll

11  see them on sports shows, you know, the Dick's commercials,

12  some of those have deals with Nike where they pay for some of

13  that.  That's all not in gross profits.  That's paid for below

14  that.

15         So, to me, the net profits are very important,

16  particularly if you want to reflect the full investment of Nike

17  to drive and make all these sales.

18     Q.   That's just the wholesale, right?

19     A.   That's just the wholesale channel.  That's the

20  74.6 million that Mr. Drews and I both started from.

21            THE COURT:  How much longer?

22            MR. HYNES:  It would be okay to take a break, Your

23  Honor.  We have a little while to go.

24            THE COURT:  All right.  Ladies and gentlemen, we're

25  going to take a luncheon break now.  You have lunch waiting for

1    you, is that correct, or it will be?

2           THE DEPUTY CLERK:  I have to confirm that it's been

3    delivered.

4           THE COURT:  I want to give counsel a chance to

5    prepare their closing arguments.  Lontex may have rebuttal

6    testimony when this witness is done.  I don't know that, but

7    we'll find that out.

8           So I'd like to return here at 1:15.  That will give

9    us about 40 minutes.  Keep an open mind, and we're moving

10   along.  And thank you for your patience.

11          The jury is excused until 1:15.

12                      (The jury exits the courtroom at 12:42

13                      p.m.)

14          THE COURT:  All right.  What's a rough estimate?

15          MR. HYNES:  Twenty-five minutes, Your Honor.

16          THE COURT:  And cross?

17          MR. SCHWARTZ:  I think it's going to be significantly

18   less, Your Honor.

19          MR. HYNES:  This is our only witness, Your Honor.

20          THE COURT:  At the moment, do you think you're going

21   to have any rebuttal?

22          MR. WAGNER:  I don't anticipate it so far.  We'll see

23   what happens in the next 25 minutes, but...

24          THE COURT:  All right.  Okay.  So we'll complete the

25   witness.  If there's no rebuttal, then we'll have to have a

1    charge conference.

2              MR. WAGNER:  We did email -- because our printer is

3    broken, we apologize -- the charge and the jury --

4              THE COURT:  You sent it to my chambers email?

5              MR. WAGNER:  Yes, both to Ms. DiSanti and your

6    chambers and opposing counsel.

7              THE COURT:  What about Nike, any requests for charge

8    on damages?

9              MS. DURHAM:  Yes, Your Honor.  We would request,

10   pursuant to Rule 51, that we be able to see the instructions

11   prior to the closing.

12             THE COURT:  Well, you won't see them, but I'll tell

13   you what they're going to be.

14             The question is, do you have any requests for charge

15   on damages?

16             MS. DURHAM:  Yes, we do, Your Honor.  We have

17   supplemental jury instructions that I -- did we file them yet

18   or no?

19             THE COURT:  Are they ready?

20             MS. DURHAM:  We do have them ready, Your Honor.

21             THE COURT:  Can I have a copy now or whenever?

22             MS. EISENSTEIN:  We'll hand them up, Your Honor.

23             THE COURT:  Somebody can bring them back to chambers

24   if they're not ready.  I'd like to look at them over the lunch

25   break.

1          MR. SCHWARTZ:  Your Honor, could we also have a copy,

2    please?

3          THE COURT:  Okay.  1:15.  Thank you.

4                    (Recess taken from 12:43 p.m.

5          THE COURT:  Just for what it's worth, we're not going

6    to go any later probably today than 4:15 or 4:20.  I have to

7    leave the building shortly after 4:30, just to let you know.

8          So we'll finish this witness, you'll let me know if

9    you have any rebuttal, then we'll have a charge conference on

10   damages, and then we'll probably get to argument.  I don't know

11   if I'll be able to charge the jury today or not.  We'll see

12   where we are.

13         Any questions about scheduling or requests or

14   objections or anything else?

15         MR. HYNES:  Your Honor, the only -- I think we can

16   deal with it at the charging conference, the corrective

17   advertising amount.

18         THE COURT:  Yes.

19         MR. HYNES:  And then the second thing is, I'm going

20   to move into evidence the witness's supporting schedules, but

21   obviously his slide shouldn't go to the jury room, even though

22   the jury has seen the slides.

23         THE COURT:  The slides can go to the jury room.  If

24   they're admitted into evidence, they go.  Mr. Drews' slides are

25   going to the jury.

MEYER - DIRECT

1          MR. HYNES:  Oh, they are?

2          THE COURT:  If you want them to go, they'll go.

3     Absolutely.

4          MR. HYNES:  Thank you, Your Honor.

5          THE COURT:  Anything else?  All right.  Bring the

6     jury in, please.

7          MR. WAGNER:  Your Honor, while we're on the record,

8     we would formally move for Drews' PowerPoint to be moved into

9     evidence.

10         THE COURT:  PowerPoints are moved into evidence.  I

11    think the charts would be helpful to the jury.

12         MR. HYNES:  Certainly helpful to me.

13         THE COURT:  I can tell you one thing.  There's not a

14    lot of case law on damages on trademark cases, but we're doing

15    our best.  Not a lot of appellate authority.  I'll put it that

16    way.

17                    (The jury enters the courtroom at 1:22

18                     p.m.)

19         THE COURT:  Okay.  Everyone be seated, please.  We'll

20    continue the direct examination of Mr. Meyer.

21         MR. HYNES:  Thank you, Your Honor.

22    BY MR. HYNES:

23    Q.   Mr. Meyer, I think where we last left us we were

24    talking about the accused products wholesale revenue and

25    profits.  Now we're moving on to Nike retail revenue and

1 profits, which is slide 12.

2          Can you tell us what's going on with this slide,

3 Mr. Meyer?

4     A.    Yeah.  So I embarked on a similar analysis that I

5 conducted of the wholesale revenues and profits, and so here I

6 went to the Nike retail channel.  Those revenues are

7 $35.5 million.  Those are consistent with Mr. Drews.

8          And from there, I did a similar look at the PX-30A

9 and 30B documents and 31 and searched for situations where the

10 plaintiff's summaries had identified style numbers, went into

11 those source documents, and there was three style numbers I

12 found.

13          From there, working through the Nike digital retail

14 channel, because once again I was working from the proposition

15 that the consumer-facing exposure to Cool Compression, the

16 language, occurs through the online channel.  That online

17 channel was $7 million of the total of 35.5 million.

18          From there, I looked at the three styles that

19 connected to the plaintiff summaries of the websites.  From

20 that, that was $1.4 million.  And then it was all online, so it

21 wasn't necessary to adjust it for the 25 percent.  So I had a

22 hundred percent online and the 1.4 million.

23          Then when you convert the revenue numbers to profits,

24 you'll see an A at the bottom left.  The 1.4 million less cost

25 of goods is 800,000, and then when you deduct the 31.7 percent

1   for the Nike operating costs, including R and D and the

2   demand-creation accounts, you're at $300,000 for that channel.

3         So similar analysis, similar structure, similar

4   filtering of the counts, and this would be the profits made in

5   the Nike retail channel.

6   Q.   And as before, were you attempting to tie the revenue

7   to evidence that Cool Compression was used?

8   A.   That's right.  The evidence presented to the jury in

9   PX-30A and B and PX-31.

10  Q.   Now, earlier in the presentation you were talking

11  about non-Nike retail and why you excluded -- why you talked

12  about royalties.

13        Could you explain to the jury what you meant by that?

14  A.   Yes.  And so once again we've moved past the

15  wholesale and the Nike retail.  We then have the non-Nike

16  retail, the Dick's and the big sellers of retail.  And from my

17  perspective, first off, those are profits not made by Nike.

18  They're not enjoyed by Nike to their shareholders or part of

19  reinvesting in the company, so I pull them out for that reason.

20        And secondly, if you had the royalty to use the Cool

21  Compression logo, that royalty would cover all sales.  It would

22  cover sales in the wholesale channel, the Nike retail channel,

23  and then the channel that's non-Nike retail.  So to me the

24  royalty would basically cover that use, so I view that as being

25  basically covered through not being Nike profits and then,

MEYER – DIRECT

1    secondarily, covered by the royalty.

2        Q.    Can we go to slide 13, please?

3              Can you tell us about this slide, Mr. Meyer?

4        A.    Yes.  And so if I summarize for the jury the gross

5    profits and the net profits by channel for Nike wholesale and

6    Nike retail, you move across the schedule, and you'll see the

7    6.3 million for gross profits from a wholesale, and then the

8    net profits are 2.5 million.  Retail 800,000 down to 300,000.

9    And then the total amounts of profits before apportionment that

10   can be documented through the system based on the plaintiff

11   summaries at trial is 7.1 million gross profits, net profits

12   2.8 million.  So I've summarized that in the yellow box, and

13   that's before we talked about how you would then split the

14   profits between the trademark value and contributions and the

15   Nike contributions.

16       Q.    Can we go to slide 14, please?

17             So we've talked about apportionment, Mr. Meyer.  Why

18   is apportionment appropriate to apply here in your view?

19       A.    Well, once again, right now we know with this claim

20   from Mr. Drews it's a hundred percent.  All the profits stay

21   with Cool Compression.  We know that's not correct.  We know

22   obviously you have to split those with all the resources that

23   Nike has expended.

24             And so you then go down the process of studying

25   Nike's business.  You study the history of the Lontex

MEYER - DIRECT

trademarks and that value in business, and then you come to a

determination of how to split the profits between Nike and

Lontex.

Q.    How did you get the 800,000-dollar price that we see

on slide 14 here?

A.    Well, I mentioned earlier today that the most

appropriate way to value intellectual property like a trademark

is from market data.  That market data can be prior licensing

or prior sales of the trademarks or contracts entered into to

sell the trademarks, where there's an agreement to sell the

trademark.  So you have information from business records

amongst businesspeople that represent value before you look at

these circumstances.

And in this case, I know there's been exhaustive

testimony to the jury about the agreement on August 5, 2015,

where Mr. Nathan willingly committed to a contract with

Mr. Kaufman at the U.S. Trademark Exchange to enter an

agreement, and that for the two trademarks plus a graphic

trademark on Cool Compression, in this case, if $800,000 as an

offer or more was submitted, that those trademarks would have

been acquired for that price.

That's market data that's highly relevant, in my

opinion, to determining the value of the trademarks in this

case.  That's a market data transaction, so to me, with

apportionment, that allows us to go back in time

MEYER – DIRECT

 1    contemporaneously and set that value based on those agreements.

 2         Q.    Can you turn to the next slide, please?

 3              Is that the only market datapoint that you had?

 4         A.    No.  I studied the entire file and Mr. Nathan's

 5    deposition, went through a lot of documents that related to

 6    various correspondences with Lontex and Mr. Nathan that

 7    documented his history of attempts to sell the trademark.

 8              So, number one, we talked about the two marks,

 9    $800,000.  They were in the Exchange from August 5 of 2015

10    through, I think, around holiday time 2015, four months.  In

11    that period, there was no offers received and certainly nothing

12    $800,000 or more.  So basically the market was telling you that

13    the trademarks were not worth even 800,000.

14              Secondly, as you saw, I believe, yesterday, there was

15    a communication by Mr. Nathan on August 14, 2015 to Mr. Kaufman

16    at the U.S. Trademark Exchange saying, by the way, you're my

17    broker for these trademark.  Here's my history trying to sell

18    these trademarks.  There's an email exchange, and he lays out

19    20 entities where Mr. Nathan attempted to approach those

20    entities, and there was no interest.

21              Lastly, in April 2015, Mr. Nathan was in

22    communications with ING Source, Inc., out of North Carolina.

23    They make apparel.  And there was back and forth about, once

24    again, the Cool Compression trademarks.  And the offer that

25    Mr. Nathan made was to sell the 406 for $150,000, and there's

1    an email back from ING Source, Inc., saying that's not

2    acceptable, we don't see that value.

3            And so this all tells me, with market valuation data,

4    $800,000 would be a very appropriate figure, but, once again,

5    there was no offers received at that.

6    Q.    Okay.  Can you go to the next slide?  I'm going to

7    move through these quickly because the jury's already seen

8    them.

9            Mr. Meyer, is this one page of the agreement you were

10   talking about?

11   A.    Yes.  I studied the agreement, and I think they've

12   heard about the price and terms and the asking price.

13   Basically, it says there if consultant, which is the broker,

14   brings them the offer, they would accept it.

15           And then it defines the trademarks.  There were

16   actually five marks.  Three of them related to Cool Compression

17   at 800,000, and then the right to sell was six months.  And

18   then there's some other -- it was a commitment in the client

19   representations that Mr. Nathan would act in good faith to

20   accomplish the sale of the marks.  That was all important to

21   me.

22   Q.    Can you go to the next slide, please?

23           Is this that email from Mr. Higgins that

24   you referenced earlier?

25   A.    Yes, April 3, 2015, just saying once again thank you,

MEYER – DIRECT

1    but it's not clear the value for us.

2        Q.   Next line, is this the 20 different company email you

3    were referring to earlier?

4        A.   That's correct.

5        Q.   We can go to the next slide.

6            So what other factors did you consider in your

7    apportionment analysis?

8        A.   Well, I did a very exhaustive study of Nike's

9    business and the products that are in this case, and I wrote a

10   report.  And I had a big section about all the contributions of

11   Nike, and I've attempted on this slide to summarize those

12   contributions at a very high level.

13           So what I did here was, there is currently 32 styles

14   that are in the case of the products.  These are the top ten

15   styles.  So basically the case is really about ten styles,

16   91 percent of the sales.  So once again I went back and looked

17   at these styles, and you'll even see in the long style

18   descriptions that NP is Nike Pro.

19           So these are all Nike Pro products, and the Nike Pro

20   products start at, I believe, around 2004.  It was a big

21   initiative of Nike's and became Nike's biggest apparel line.

22   So Nike Pro's been around since 2004, so before infringement in

23   2015, there was ten years of Nike Pro success.  It was very

24   important saying once again Nike was successful at selling

25   these products before the infringement.

MEYER - DIRECT

1          Secondly, Dri-FIT has been around since 2002.  The

2     Dri-FIT's obviously, on the documents, in the back sort of

3     waistband position, and that's been around since 2002, once

4     again, part of these product lines.  Obviously, the logo goes

5     back to the 1970s.  And when I've gone through and looked at

6     various depictions of the products in this case, the 32 SKUs,

7     virtually all of them have this branding right on the product.

8          So it's important to me that, when the jury

9     apportions the profits, they give significant consideration to

10    what Nike has brought to making the sales.  Because behind all

11    these brands are significant year-over-year investments and

12    endorsements and advertising and just building reputations with

13    teams and sponsoring events, and that's all part of Nike's

14    brand.  I think it's listed as the 16th most valuable brand in

15    the world.

16         Once again, this goes to apportionment and making

17    certain that whatever profit is awarded, it fully accounts for

18    what Nike brings in, as I mentioned a moment ago, provides

19    appropriate value to the two trademarks.

20    Q.   So without apportionment, is it fair to say just read

21    the Swoosh logo off the shirt?

22         MR. SCHWARTZ:  Objection, Your Honor.  Leading.

23         MR. HYNES:  I'll withdraw it.

24         THE COURT:  Can you rephrase the question?

25         MR. HYNES:  Yes, Your Honor.

MEYER – DIRECT

1  BY MR. HYNES:

2      Q.   If there's no apportionment, what does the product

3  look like to you?

4      A.   Well, basically, if there's no apportionment, you're

5  looking at a compression set of shorts or tights or tank tops

6  with really no logos on them.  And if you look at the catalogs,

7  they talk about how the seams and whatnot have been worked on,

8  so you don't have the chafing and all these things that Nike

9  has worked on for moisture and whatnot.  The technology plus

10  the branding, basically, would not be recognized if there's no

11  apportionment.

12      Q.   Can we go to slide 22, please?

13          Can you talk a little bit about Mr. Drews' royalty

14  claim?

15      A.   Yes.  The numbers are pretty simple.  Basically, it's

16  10 percent times the $74.6 million wholesale, so it's about

17  seven and a half million dollars.

18          And I watched his testimony this morning, and to me

19  it's really an important, you know, marketing economic fact

20  that no businessperson who is looking to license or acquire a

21  trademark is going to pay a royalty of 7 and a half million

22  dollars when the trademarks are available to purchase for

23  $800,000.

24          THE COURT:  Excuse me one second.

25          MR. HYNES:  Yes, Your Honor.

MEYER - DIRECT

1          (Pause.)

2          THE COURT:  All right.  I'm sorry.  Go ahead, please.

3          MR. HYNES:  Thank you, Your Honor.

4    BY MR. HYNES:

5      Q.   Have you had a chance to review the agreements that

6    Mr. Drews relied upon to inform his royalty opinions?

7      A.   Yes.  There were eight agreements that I went through

8    in detail and critiqued in my report, and then there were the

9    two agreements with Ohio State and Michigan between Nike and

10   those two entities, and I don't believe any of the agreements

11   are comparable to our situation here.  First off, they already

12   have a transaction telling us what we need to.

13         Secondarily, when I looked at those agreements, I

14   looked at thousands of licenses in my career looking for a

15   comparability, and you have to really look at the scope of

16   what's being licensed.

17         And in this situation, it's a nonexclusive license in

18   the U.S. for Nike to practice the two trademarks and those

19   eight agreements, when you read them, they are very detailed.

20   Some of the brands are very unique, as was pointed out to

21   Mr. Drews on his examination this morning.

22         And then others, most of them had worldwide rights,

23   which is much broader than U.S.  Many had exclusive rights.  An

24   exclusive license is much more valuable than nonexclusive.

25   This would be nonexclusive.

MEYER – DIRECT

1        And there was just a lot of additional arrangements.

2   There was some distribution aspects, too, related to, like, MMA

3   and UFC and karate, and they provided for different sort of

4   sponsorships and territorial issues, tie-in agreements.  And

5   Mr. Drews didn't go through those agreements and say, okay, if

6   it said 5 percent, well, we need to adjust it down to 2 percent

7   to take out the additional grant that came from the license.

8   So I don't believe any of those are comparable to this

9   situation on the eight?

10        And then with the Ohio State and Michigan agreements,

11   I think the jury will understand this, they're very complicated

12   deals between Nike and those two universities to basically

13   sponsor those athletic programs.  So you may know that a lot of

14   times the big apparel companies, the Under Armours, the Adidas,

15   and the Nike, like to be known as, you know, we supply all

16   athletic teams at Ohio State or Michigan.

17        I didn't go to those schools.  I went to Virginia.

18   The people that went there are very proud of that.  And then

19   the Nike logo is displayed on, and you can read the agreements,

20   all the athletic wear of those teams.  So if Ohio State is

21   playing in a big bowl game, you see the Nike tie-in.

22        So these agreements aren't just a simple license for

23   basically to have Michigan or Ohio State logos on Nike retail

24   products.  They are ten-year agreements with different rights

25   and moneys going back and forth.

MEYER - DIRECT

1          The point is, those are all appropriate agreements

2     for Ohio State and Michigan and Nike to have, but they're not

3     comparable to this situation.  So when Mr. Drews said that,

4     well, that allows me to say that my 10 percent is reasonable

5     because those agreements are 12 and a half and 15 percent, it's

6     not comparable.

7          One aspect of those agreements says if Nike sells

8     some of the game day type apparel through its retail channels,

9     it pays those rates, but you have to account for the entire

10    agreement and everything that the schools are getting back

11    because they're giving product to all those athletic teams for

12    ten years with lots of exposure.  So they're not comparable.

13    Q.   Did you conduct an analysis of Mr. Drews' lost

14    profits calculation?

15    A.   Yes, I did.

16    Q.   Can we go to slide 24, please?

17         Can you tell us about that?

18    A.   Yes.  First off, it's not done customer by customer.

19    And in a situation like this, Mr. Nathan's built a nice

20    business, but it's a pretty compact business.  You can study

21    specific customer situations and do an analysis customer by

22    customer, and he didn't choose to do that.  He picked out a

23    3-year period before infringement compared to after

24    infringement and assumed the entire drop in sales was due to

25    what's being alleged in the case, not accounting for any

MEYER − DIRECT

 1    changes in Mr. Nathan's business independent of what's in this

 2    case.

 3            And so I have some slides on this, but we know that

 4    Mr. Nathan was spending less on advertising, less on trade

 5    shows and travel and the things that he does to promote his

 6    business.  And as those costs and resource expenditures drop,

 7    so do the sales.  So anyway, I believe that the proper analysis

 8    wasn't done of lost revenues that are being alleged.

 9            Additionally, with this slide, it's more than this,

10    but the top 50 wholesale customers of Nike are not Lontex

11    customers.  So even if there's a situation where there's

12    property being used by Lontex by Nike, it's not -- it's in

13    these accounts, not in Mr. Nathan's accounts.

14    Q.    Can you go to the next slide, please?

15            Were you referring to this slide earlier?

16    A.    Yes, because I went back and I looked at Mr. Nathan's

17    business, and he identified in this situation all the Cool

18    Compression product sales, and then the rest of the business

19    was non-Cool Compression.

20            And if you look at the period before 2015 on the

21    left-hand side, that's blue.  That's Cool Compression before

22    the period of infringement, and afterwards you see the drop.

23    So basically the sales were about $160,000 before.  Now they're

24    $100,000 a year in revenue.  That's for the Cool Compression.

25            On the right side, you'll see the drop in the rest of

MEYER - DIRECT

his business, and in that same period, if I match it up,

business dropped almost 70 percent.

        So it says to me that if you go down the path of lost

profits, it's not what he's put forward.  But you have to be

done on a very smaller customer-by-customer basis and that

doesn't exist in this case.

Q.    Did you rely on Lontex's business records for this

chart?

A.    Yes, I did.

Q.    Could you please pull up DX-1231?

        Is this one of those records?

A.    Yes.  This document is the summary I put together

from the income statement of Lontex, their historical

advertising and other expenses that are incurred when you're

out promoting your business like Mr. Nathan does.

Q.    Can you pull up 1232, please?

        What's this one?

A.    This one is similar, but now it looks at the sales I

just put on the bar chart for the jury.  This is the underlying

data from 2011 through '14 that we look at and then the period

afterwards.  So you see on the far right-hand side the

different averages that I put out on the bar chart.  So this is

the support from Lontex records.

Q.    Could we go to the next slide, please?

        Can you tell us what this is?

MEYER - DIRECT

1     A.   This would be a similar comparison basically on the

2  left-hand side.  You'll see just looking at how much was spent

3  by Lontex on advertising before the period of infringement, and

4  then it drops.  And you'll see the purple bars.  And then when

5  you go beyond advertising and look at meals, entertainment,

6  trade shows, travel, other selling and the website, it drops

7  even more.  Once again, these are the activities that you have

8  to spend money on to build your sales, just like Nike has to

9  spend money on its operating costs.

10     Q.   And where did you get these figures?

11     A.   These came from Lontex's financial statements.

12     Q.   Next slide.  Did you look at -- I'm sorry.  Did you

13  look at Mr. Drews' corrective advertising damages analysis?

14     A.   I haven't seen all the details.  I noted some

15  changes.  But my position here is basically, when it relates to

16  any type of an advertising claim, I think it's important to

17  look at how much was spent on Lontex's business over time with

18  advertising and the level of sales because, once again, that's

19  the business that has been impacted.

20        So the jury has to decide what that impact is, but if

21  you're impacting a business with item two that's doing sales of

22  158,000 a year in Cool Compression, well, if there's been

23  impact, and the jury gets to decide that, measure that in the

24  context of $160,000 a year, not tens of millions of dollars is

25  my point.

1          Similarly, with advertising, you'll see over the

2     period of eight, nine years, in item three, that Lontex was

3     advertising at about $8,000 a year.  And so to me, looking at

4     companies forensically, I would keep those points in mind.

5          Q.   Okay.  Just two more slides and then we'll be done,

6     Mr. Meyer, and you'll hear some cross-examination questions,

7     okay?

8          A.   That's fine.

9          Q.   Can we go to the next -- oh, we're here.

10          Okay.  Can you please walk us through this chart?

11          A.   Yes.  I thought it was important, after going through

12     a lot of the analyses, I know it's a lot of numbers and a lot

13     of economic concepts, but on one page here I've mapped out for

14     the jury the various metrics I think are important in

15     determining the level of damages.

16          And so if we start on the far right-hand side, we

17     have the red little bar.  That's Mr. Drews' lost profit claim,

18     $224,000 approximately.  Then that mapped out, the two bars

19     next to it, the green bars, the 7.1 million is the gross

20     profits that came from the analysis that I described today of

21     the plaintiff's summaries that went into the record documenting

22     their position on impact.  And then the 2.8 million is that

23     same analysis at net profits taking out operating expenses.

24     And so those are basically my opinions about the Nike profits

25     based on plaintiff's summaries.

1          Next to it I map out how I apportion that.  I use the

2     $800,000 asking price in the contract that Mr. Nathan had.

3     That's my apportioned profits, so we're right at 800,000.  Then

4     I compare next to that the communication with ING in April of

5     2015 to sell the 406 for $150,000, which was turned down.

6          We keep going to the left, and then if we look at

7     Lontex's total revenue from 2011 to 2018, it's about

8     $1,043,000.  As I mentioned a moment ago, once again, when you

9     look at impacts on Lontex from the standpoint of looking at it

10    financially, you keep it in the context of the business and the

11    business that was operating before infringement.  That gives

12    you a good metric there.

13         Lastly, I mentioned this a moment ago, the average

14    Cool Compression sales by Lontex before infringement were

15    $158,000 a year, which is a nice business.  And I say just once

16    again it's a good financial metric to keep in perspective on

17    damages.

18         And then in the yellow box, I summarize my overall

19    opinion, and you'll see the profits of the 2.8 million to

20    7.1 million before apportionment.  After apportionment,

21    800,000.  On the royalty, if you can buy the trademarks for

22    800,000, you would make that choice, not license at seven and a

23    half million.

24         Lastly, I don't believe the lost profits have been

25    appropriately documented and proven.

MEYER - DIRECT

1    Q.   Last slide.   What do you think is the biggest

2    difference between the way you went about your analysis and the

3    way Mr. Drews went about his?

4    A.   I think the Nike profits is the biggest damage

5    element for Mr. Drews.   My analysis now has gone to the level

6    of tieing those revenues to what the plaintiff produced in the

7    case, to the style numbers and to the source documents, which I

8    looked at, and summarized all the style numbers and then priced

9    those out for the jury.   So my numbers on the profits track

10   along with the evidence in the case.

11        He basically has claimed a hundred percent of all the

12   revenues from the identified styles through the entire period

13   with no apportionment to Nike.   A hundred percent goes to Cool

14   Compression.   So that's the biggest difference there.

15        I fully recognize that the trademarks were for sale

16   in 2015 for $800,000 through an Exchange that existed in 2015,

17   and to this day you can go online and list your trademarks on

18   the same Exchange.   It's a viable system to acquire trademark

19   rights.   So I recognize that.

20        And then lost profits, you know, we talked about in

21   reasonable royalty.   Once again, I would keep in mind the

22   ownership price of 800,000.   That really is the biggest

23   difference in summary, and then the corrective advertising I

24   point those points out.

25        MR. HYNES:   Thank you.   I tender the witness, Your

MEYER - CROSS

1    Honor.

2            THE COURT:  Thank you.  Cross-examination.

3            MR. SCHWARTZ:  Thank you, Your Honor.

4                            - - -

5                       CROSS-EXAMINATION

6                            - - -

7    BY MR. SCHWARTZ:

8        Q.   Good afternoon, Mr. Meyer.

9        A.   Good afternoon.

10       Q.   Let's talk about some of your opinions.  Before we do

11   that, let's talk about a few facts.

12           Am I correct that Nike spent about three to

13   $4 billion a year for demand creation during the time period of

14   2014 to 2018?

15       A.   I don't have the numbers exactly in front of me, but

16   I know in that range.  We can look at the 10-Ks.  That's about

17   right.

18       Q.   And in this case, you do not believe that Nike spent

19   any money for demand creation related to Nike Cool Compression

20   products; am I correct?

21       A.   I don't follow that question.

22       Q.   How much money did Nike spend to create demand for

23   the Cool Compression products that Nike infringed on Lontex's

24   trademark?

25       A.   Well, as you may know, Nike doesn't track their

MEYER – CROSS

1  demand creation against the product line specifically.  That's

2  their practice.  It's below the line.  It's below gross profit.

3  So they track it overall to the company driving demand for all

4  the sales.

5      Q.   During your deposition, am I correct that you said

6  Nike spent no money for demand creation because they weren't

7  using the term "Cool Compression"?

8      A.   I believe that was testimony that was given by maybe

9  a Nike representative, but my understanding is that they did

10  not spend money specifically on products.  They spent the money

11  to create the overall brand which drives the products.  That's

12  what's been building their business.

13      Q.   But you tried to model a percentage of the revenues

14  for the Cool Compression that was attributed to demand

15  creation; am I correct?

16      A.   I'm not following that question.

17      Q.   Okay.  Let me see if I can help you here.

18           MR. SCHWARTZ:  Ms. DiSanti, can we use the Elmo here?

19  It may be quicker.

20           THE DEPUTY CLERK:  Of course.

21           MR. SCHWARTZ:  May I approach the witness, too, Your

22  Honor?

23           THE COURT:  Yes.

24  BY MR. SCHWARTZ:

25      Q.   I'm going to show you what we marked as PX-3020.

MEYER – CROSS

1        Is this an attachment from the report you prepared in

2  this case?

3      A.   Yes.  It's a summary of Nike's 10-K, their financial

4  statements for 2015 through 2018.

5        MR. SCHWARTZ:  Your Honor, may I move to admit

6  PX-3020?

7        THE COURT:  Any objection?

8        MR. HYNES:  No objection.

9        THE COURT:  Admitted.

10              (Exhibit PX-3020 admitted into evidence.)

11  BY MR. SCHWARTZ:

12      Q.   You said this is from Nike's own financial

13  statements?

14      A.   Right from their income statement that they filed

15  with the SEC.

16      Q.   So in this particular graph, am I correct that you

17  attributed 10 percent of the revenues to demand creation; am I

18  correct?

19      A.   Well, I didn't attribute that.  That's how Nike

20  reports when it spends money on selling and marketing and

21  endorsements in its financials.  I just sort of summarized that

22  so that we know basically those resource expenditures are below

23  gross profit.  That's what Nike reports.

24      Q.   But on this particular chart, attachment six, these

25  are the revenues for the Nike Pro Cool Compression products; am

MEYER - CROSS

1    I correct?

2        A.    These are the overall Nike entity revenues of the

3    entire company.

4        Q.    But here you want this jury to deduct 10 percent of

5    all of the revenues of the Nike Cool Compression products

6    because you think that that is a legitimate expense to deduct

7    to create demand for a product that they were infringing on?

8        A.    Understood.  But they're also using the Swoosh and

9    Dri-FIT and the Pro line and the technology from Nike, so this

10   is where those accounts are recorded below gross profits.

11       Q.    Let's also talk about the evidence in the case.  We

12   can take this off.

13            When you were looking through Nike's summaries, am I

14   correct that you were focused on the online uses by Nike of the

15   Lontex Cool Compression trademark?

16       A.    I would agree I focused on online, which, from my

17   perspective, was where there could be potential consumer-facing

18   interface or impacts.

19       Q.    So you didn't include any Nike Factory Store sales.

20   You completely took them off of your numbers; am I correct?

21       A.    The Factory stores, which are the outlet stores?

22       Q.    The brick and mortar stores that you talked about.

23            You're familiar with them; am I correct?

24       A.    Right, right.  In that channel, I did not look at

25   that because my understanding is, in the brick and mortar,

MEYER - CROSS

1   there's no hashtag, there's no Cool Compression on garments.

2   You don't see it in the bricks and mortar, is my understanding.

3        Q.   Okay.  That's your understanding from Nike?

4        A.   I believe the record indicates.

5        Q.   Were you here during the testimony of Kenisha Likely?

6        A.   I was not.

7        Q.   Were you here during the testimony of Dominique

8   Williams?

9        A.   No, I was not.

10       Q.   Would it surprise you if both of these former Nike

11  Factory Store employees said that they marketed to consumers

12  using the Cool Compression name that they were taught by Nike?

13       A.   I understood there was training to some of the

14  workers in the stores about different aspects of the products

15  and the descriptions.  I understood that.

16       Q.   You're not listening to my question, Mr. Meyer.

17            THE COURT:  Wait, wait.  You can't say that.

18            MR. SCHWARTZ:  Let me ask another question, Your

19  Honor.  I apologize.

20  BY MR. SCHWARTZ:

21       Q.   Mr. Meyer, you did not include any Nike Factory

22  stores in your calculations; am I correct?

23       A.   In the calculation today, that is correct.

24       Q.   Would it have changed your opinion and your

25  calculations if you knew that this jury heard that Nike Factory

MEYER - CROSS

1    Store employees marketed the trademark Cool Compression to its

2    customers in the store?

3         A.   That would not change my opinion.

4         Q.   And you also did not include retailers' non-online

5    use of Cool Compression; am I correct?

6         A.   Yes, sir.

7         Q.   And that's because you didn't believe the retailers

8    marketed to their customers with Cool Compression?

9         A.   Well, it's the record I've seen in the case, that in

10   the physical stores, you don't have the branding on the

11   garments, you don't have the hashtags, you don't have the

12   promotions.  I've seen nothing in the case about signage in

13   stores about Cool Compression.  I'm not seeing that, but if you

14   want to show me something, I'm happy to look at it.

15        Q.   Well, were you here when the jury heard the testimony

16   of Sean Cunningham and Mark Smith?

17             THE COURT:  No.  He wasn't here for any of the

18   testimony.

19   BY MR. SCHWARTZ:

20        Q.   Are you aware that Sean Cunningham told this jury

21   that he was walking down an aisle in Dick's and saw a Cool

22   Compression sign with Nike's Cool Compression products that

23   were using the Lontex trademark?

24        A.   I'm aware of that.  I'm aware of that.

25        Q.   And that did not change your opinion to completely

1 | discount all of the retailers' brick and mortar stores?

2 | A.   When I realized that that's tens of millions of

3 | dollars in those stores and that would be the level of

4 | evidence, I have set that aside.  I don't believe that's enough

5 | forensic evidence to do what I did today, which was document

6 | the online sales.

7 | Q.   Okay.  So you discounted Sean Cunningham's testimony.

8 | Did you also discount Mark Smith's testimony about

9 | his encounter with Nike Cool Compression products at a brick

10 | and mortar store?

11 | A.   I was aware of that also and, for the same reason,

12 | did not make any changes.

13 | Q.   You didn't give any credit whatsoever to that

14 | testimony; is that correct?

15 | A.   That's right.  Once again, I'm looking for

16 | documentation in the stores like I saw online and I summarized

17 | for the jury today.

18 | MR. SCHWARTZ:  Okay.  Could we put up Exhibit 1451?

19 | And if we can blow up this Dick's circular -- I'm sorry.  If we

20 | could go to page 4 of the Dick's circular, and if we could blow

21 | up by that red polo shirt.

22 | BY MR. SCHWARTZ:

23 | Q.   Were you aware, sir, that Dick's advertised in its

24 | circulars a line of Nike Pro Cool Compression tops, tights, and

25 | shorts?

MEYER - CROSS

1    A.   Yes, I'm aware that there was some circulars like

2   this.

3    Q.   And despite being aware of circulars like this, you

4   didn't credit any of the retailer sales for Dick's other than

5   online?

6    A.   Well, that's not true.  I looked at the plaintiff's

7   summaries that were produced to the jury documenting their

8   position on infringement, and I quantified for the jury those

9   results.  I looked at the circulars, and for me, I don't want

10  to see just one anecdotal circular.  I want to see what was

11  summarized in 30 and 31 in the PX's so I can do a rigorous

12  analysis and summarize it with accuracy.  This is something

13  one-off, and I didn't see this in 30 or 31 at this level.

14   Q.   So you made credibility assessments by rejecting the

15  testimony of Mr. Cunningham and Mr. Smith even though it was

16  corroborated by the circular?

17   A.   Well, I don't think it was.  I looked at the

18  documentation in the case, and particularly what the plaintiff

19  gave the jury to document the infringement, and I've quantified

20  that.

21   Q.   Okay.  You also rejected -- well, let me go back.

22        When we looked at those summaries, you were aware

23  that Mr. Drews had gone back to check the Nike sales records to

24  see which of those retailers actually bought directly from

25  Nike?

MEYER - CROSS

1   A.   Let me understand that question.  I think I did the

2  same thing.  Are you talking about in the plaintiff's

3  summaries?

4   Q.   Yes.  And you saw that there was a documentation,

5  PX-1621, for each of the retailers for which Nike's own sales

6  records show that they bought directly from Nike?

7   A.   I think Mr. Drews and I agree on the sales levels in

8  the case.  Where we disagree vastly is whether those sales

9  levels had been tied back to Cool Compression and also

10  apportioned for Nike's contributions.  We don't disagree on the

11  sales levels but what they mean to the jury.

12   Q.   And that's because you rejected some of the evidence

13  in this case; am I correct?

14   A.   I don't believe I have, but the jury can decide that.

15   MR. SCHWARTZ:  Could we look at Exhibit PX-1532?

16  BY MR. SCHWARTZ:

17   Q.   I believe, if we could blow that up, that was shown

18  to you by Mr. Hynes.

19   Do you remember you said that you were not including

20  any sales from Zappos because all you had was an email

21  Mr. Nathan sent to himself from a website address for Zappos?

22   A.   This is documentation that the plaintiff provided to

23  the jury.  I went through this.  When I saw this, it didn't say

24  to me -- I couldn't do much more here.  I couldn't look at

25  source documents, then summarize all styles or certain styles,

1    which I did for the other ones.  So this is all I had.

2         Q.   You just told the jury you couldn't look at source

3    documents.

4              Did you try to paste -- sorry.  I touched the screen.

5              Did you, Mr. Meyer, try to verify, put that website

6    address in your own browser?

7         A.   Well, I didn't because I received this a couple days

8    ago.  This is from 2016.  There was no more documentation.  I

9    believe the plaintiff testified that they spent five years with

10   six people trying to find all documentation.

11        Q.   Sir, my question was very simple.

12             Did you paste this address in a browser, yes or no?

13        A.   I did not.

14        Q.   And if you had pasted that address in a browser and

15   saw that it showed Nike Pro Cool Compression tights, would that

16   change your opinion?

17        A.   On your hypothetical, if I had that documentation,

18   I'd analyze it.  And if there were style numbers identified

19   there or there was Cool Compression, the language, I would have

20   picked that up.  That wasn't the case in the documentation, but

21   I would have done that.

22        Q.   So you made a credibility decision to reject

23   Mr. Nathan's document without ever putting this in a browser to

24   see whether it came up Nike Pro Cool Compression?

25        A.   I disagree with that.  I worked from those trial

1  exhibits and went back to the source documents, and this was

2  the only source document behind this PX reference.  And so this

3  is all there was.  It stopped there.  But if I could go through

4  real source documents, and that's what I'm trained in, I then

5  traced it down and documented it.

6      Q.   Now, as part of your methodology, you had mentioned

7  that the Nike Pro products go back to 2004.

8           Did you try to compare Nike's own revenues for its

9  Nike Pro products prior to the infringement and compare it to

10  after the infringement?

11     A.   I did not do that.

12     Q.   That would have been one way to see if the Nike Pro

13  product sold more using the Cool Compression trademark; am I

14  correct?

15     A.   Well, we don't know that, because I studied the

16  period of '04 through '14, went to all the reports, studied the

17  Pro Combat line, it became the biggest compression line, I

18  believe, in the world.  Nike built it out.  So I knew the sales

19  were significant in December 2014, and then basically

20  understood why everybody was saying they were selling before

21  the infringement.  So I didn't believe it was necessary in

22  these circumstances.

23     Q.   Would you have expected Nike to advertise in its

24  public reports that it was infringing during the time period

25  after 2014 so that you would be able to compare apples to

1    apples?

2        A.    Well, there's two pieces to that.  Nike's a highly

3    watched company by all the big financial analysts, and they

4    watch what sells.  And they actually report to the public and

5    shareholders, oh, by the way, these are the brands that are

6    selling.  And I looked at all those analyst reports, it's in my

7    expert report, and nowhere did it mention Cool Compression.

8    It's not recognized by the financial market.  It's not

9    recognized, I would say, before 2014, not mentioned after 2014.

10   It's all documented.

11        So Nike's reporting its 10-K, and we can agree maybe

12   Nike, if they were using it inappropriately, wouldn't say that.

13   But the analysts would be coming in saying, oh, look at this

14   big change in sales, it's all about Cool Compression.  None of

15   that exists in my forensic analysis.

16        Q.    Sir, my question is, did you look, for instance, at

17   the Nike Pro style numbers in 2014 and compare those with the

18   Nike Pro Cool Compression style numbers in 2015, just to make

19   that simple comparison?

20        A.    I have not done that.

21        Q.    So let's talk about the value of a trademark.  And I

22   think you compared it to the value of buying a product; am I

23   correct?

24        A.    It can be.  It's not the best analogy, but it's the

25   one most of us every day relate to because we relate to real

MEYER – CROSS

1    estate and renting and buying.

2         Q.   And it's simple supply and demand; am I correct?

3         A.   I think it's much more complex than that, actually.

4    It's basically knowing about what the assets are, whether it's

5    an apartment or a house, but obviously supply and demand does

6    impact it.

7         Q.   And it depends who the buyer is as to what the value

8    of that property is; am I correct?

9         A.   I don't agree with that.  I valued a lot of assets,

10   and an asset like this on an Exchange, it's not about the

11   buyer.  It's basically about what the seller wants for it.

12   Over time, there's supply and demand, but very rarely in real

13   estate do you see a situation where buyers are paying a lot

14   more than everybody else in the neighborhood because nobody

15   wants to do that.

16        Q.   Let's break that down.

17             First of all, you keep mentioning the Exchange.  Had

18   you ever heard of this U.S. Trademark Exchange prior to this

19   case?

20        A.   I have not, but I researched it since and I checked

21   it out even recently, and it has lots of trademarks for sale on

22   there.

23        Q.   It's a website?

24        A.   Well, it's an online business that basically is

25   aggregated trademarks to help owners find buyers.  That's what

MEYER - CROSS

1    it does.

2         Q.   It's not sponsored by the U.S. Trademark Office, is

3    it?

4         A.   I didn't say it was.

5         Q.   My question was yes or no.

6              Was it sponsored by the U.S. Trademark Office?

7         A.   I don't believe so.

8         Q.   Do you know the revenues of the U.S. Trademark

9    Exchange?

10        A.   I do not.

11        Q.   It's not a publicly traded company; am I correct?

12        A.   Agreed.

13        Q.   Do you know how much it spends to advertise all these

14   marks that you say it sells?

15        A.   I don't know what it spends on that.  Obviously it

16   has an Exchange, because Mr. Nathan listed the marks on the

17   Exchange before the marketing agreement.  So he had them on the

18   Exchange for a nominal price.  And then he went further and

19   said --

20        Q.   Sir, what was my question?  My question was, do you

21   know how much the U.S. Trademark Exchange advertises?

22        A.   I don't know that number.

23        Q.   Do you know how much revenues the U.S. Trademark

24   Exchange obtains on an annual basis?

25        A.   I do not.

MEYER - CROSS

1    Q.   So let's talk about the remedies of a trademark

2    infringement case.

3         You're familiar with that; am I right?

4    A.   To some extent.  Not from a legal perspective, but

5    from doing intellectual property valuation and damage

6    assignments.

7    Q.   So you understand that the infringer, here nike's

8    profits, the reason that that's an element of damages is to

9    deter Nike from willfully infringing on others?

10        MR. HYNES:  Objection.

11        THE COURT:  Sustained.

12   BY MR. SCHWARTZ:

13   Q.   Sir, you understand that the damage element for

14   profits is not to match Mr. Nathan and Lontex's own profits?

15        MR. HYNES:  Your Honor, objection.

16        THE COURT:  Sustain that as well.

17        THE WITNESS:  Could I have that read back, please?

18        THE COURT:  You don't have to answer.

19        THE WITNESS:  Thank you, Your Honor.

20   BY MR. SCHWARTZ:

21   Q.   Sir, let's talk a little bit about your retention in

22   this case.

23        Am I correct that you've worked with the law firm DLA

24   on at least three or four prior cases to this?

25   A.   Over the last 20 years, yes, three or four.

1    Q.    Am I correct that you've also worked with Nike on

2    three or four prior cases?

3    A.    Over the last 15 years, three or four, yes.

4    Q.    And you mentioned you testified in how many different

5    court cases?

6    A.    Since 1987, around 70 trials.

7    Q.    And you've also testified in at least 250

8    depositions; am I correct?

9    A.    Since 1985-ish, yes.

10    Q.    And you own the company that you testify for, TM

11    Financial?

12    A.    Well, I'm an owner in a consulting company that

13    provides one aspect of what we do is litigation damage analysis

14    valuation.

15    Q.    So you make a profit on the work that you and also

16    other consultants do; am I correct?

17    A.    Ultimately, we pay our consultants and we pay our

18    owners.

19    Q.    That wasn't my question, sir.

20         Do you make a profit on the work that both you do and

21    other consultants that work for you do?

22    A.    I guess at some level I profit from that because,

23    ultimately, I get paid out of the firm's profits.

24    Q.    And by the time of your deposition, am I correct that

25    you billed at least 150 hours to this matter?

1    A.    I believe for my analysis and study, yes, that's

2    correct.

3    Q.    So that was in September of 2020, a little bit more

4    than a year ago; am I right?

5    A.    Yes.

6    Q.    How much more time did you put into this matter in

7    the last year?

8    A.    I wouldn't know exactly, but maybe another 50 hours.

9    Q.    Okay.  So about 200 hours total, approximately?

10   A.    That's okay.

11   Q.    And am I correct that by the time of your deposition,

12   you also had four or five other consultants, billing a total

13   among those four or five of at least another 150 hours?

14   A.    Overall.  They weren't full-time.  They were aspects.

15   So probably -- I was asked about this at deposition.  Whatever

16   that testimony was, I'd stand by that.

17   Q.    And over the last year, have any of those other

18   consultants also billed to this matter?

19   A.    I'd say a little bit, yeah.

20   Q.    Approximately how many more hours, another 50 hours?

21   A.    That would be okay.

22   Q.    So there's been about 400 hours between yourself and

23   people at your firm that have worked on the Lontex versus Nike

24   case?

25   A.    That sounds about right, to do a proper analysis.

MEYER - CROSS

1    Q.   Am I correct you charge $700 an hour for your time?

2    A.   Yes, I do.

3    Q.   What is the average amount of time that -- or the

4    average hourly rate of the other folks that have billed about

5    200 hours on this matter?

6    A.   It would be between 300 and 450 an hour, so you could

7    take a midpoint.

8    Q.   Okay.  So my math is not the greatest, but it sounds

9    like you billed about $140,000 yourself in this matter; am I

10   correct?

11   A.   If that's your math, I wouldn't disagree with that.

12   Q.   And your colleagues, you've billed an additional at

13   least $70,000 for their time?

14   A.   If that's your math, I wouldn't disagree with that.

15   Q.   So you have made on this matter at least $210,000?

16   A.   Well, my firm.  It's my firm's revenues.  But I'm not

17   disagreeing that at some point, if we cover our costs, I would

18   get some profit out of that.

19   Q.   So you have an interest in this case?

20   A.   No, I don't.  The outcome of this case doesn't impact

21   me financially either way.  I just bill my time based on hours

22   incurred, and I have plenty of clients that, if Nike doesn't

23   hire me, I'm just walking away doing what I do.

24   Q.   Because you're a paid expert?

25   A.   No, I'm not.

MEYER - REDIRECT

1          MR. SCHWARTZ:  No further questions.

2          THE COURT:  Redirect.

3                          - - -

4                    REDIRECT EXAMINATION

5                          - - -

6    BY MR. HYNES:

7      Q.   The $800,000, did the Trademark Exchange set that

8    price?

9      A.   No.  Mr. Nathan did.

10     Q.   Okay.  Now, Mr. Meyer, I'm afraid I feel compelled,

11   you did make a mistake.

12         MR. HYNES:  Could you please pull up slide 7 from

13   Mr. Meyer's deck, please?

14   BY MR. HYNES:

15     Q.   Can you read the wholesale customer at number 9?

16     A.   Oh, yes, I see that.  I did make a mistake.

17         MR. HYNES:  Can you please pull up Exhibit 30B, slide

18   number 17?

19   BY MR. HYNES:

20     Q.   What's that?

21     A.   So this was the Big 5 circular, and when I saw this

22   along with some of the identified styles, since I knew this

23   would be in the shopping cart in Dick's, I think I told the

24   jury earlier today that I put all the Dick's revenue, like

25   19 million, in my analysis because I didn't want -- I couldn't

MEYER - REDIRECT

```
 1  break it out.  So I assumed all the brick and mortar revenue

 2  also came in.  That's what I did.

 3           MR. HYNES:  Can you go back to slide 7?

 4  BY MR. HYNES:

 5      Q.   So that's the Big 5 flyer for the retail, right, and

 6  then what's number 9 there?

 7      A.   And then Amazon.  That's -- all the style numbers are

 8  in there also.

 9      Q.   And can you look at number 16 there too?

10           MR. HYNES:  And if you wouldn't mind going to again

11  30B, slide 9.

12  BY MR. HYNES:

13      Q.   Do you see the bottom right-hand corner there?

14      A.   Yes.

15      Q.   Do you know who issues that catalog?

16      A.   That's from BSN at the top.

17           MR. HYNES:  So can you go back to slide 7?

18  BY MR. HYNES:

19      Q.   So you captured that one, too, right?

20      A.   Right.  I picked up -- I think there were five

21  styles, and four had sales.  So one had no sales.  I picked up

22  all the styles for BSN.

23      Q.   That's not website evidence, is it?

24      A.   That's correct.  It's not.

25           MR. HYNES:  No further questions, Your Honor.
```

1      MR. WAGNER:  Nothing further, Your Honor.

2      THE COURT:  Okay.  Thank you.

3               (Witness excused.)

4      THE COURT:  Any further testimony from Nike?

5      MR. HYNES:  Your Honor, we rest our defense.

6      THE COURT:  Any rebuttal testimony?

7      MR. WAGNER:  We have no rebuttal testimony.

8      THE COURT:  Ladies and gentlemen, once again I need

9  to see counsel at sidebar just on scheduling, and we'll just

10 take a few minutes.

11              (Discussion held at sidebar off the

12               record.)

13     THE COURT:  Okay.  Ladies and gentlemen, once again,

14 thank you for your patience.

15     So the next item is to have counsel give you their

16 closing arguments on damages, and that will be shorter than

17 before.  Each attorney will have 20 -- each side will have 20

18 minutes, and the plaintiff will reserve 5 of those 20 for

19 rebuttal.  Then I have to give you the charge.

20     Now, under our rules, I have to go over the charge

21 with counsel before they give the argument.  We're going to do

22 that right now while you take a break.  My estimate is it's

23 going to take about 15 minutes, and we'll try and be back

24 within that time.  But just bear with us, and then I'll likely

25 give you the charge this afternoon so you can begin

1    deliberations.

2          However, we can't stay late today, so it's the same

3    thing with last time.  You'll have a few minutes to deliberate.

4    But if you need more time -- you should not rush through this.

5    This is very important.  You may have to come back tomorrow

6    morning to continue deliberations.  We don't know yet.  Let's

7    just see how it goes.

8          So the jury is excused for 15 minutes.  Thank you.

9                    (The jury exits the courtroom at 2:24 p.m.)

10         THE COURT:  I'm now looking at the requests that were

11   handed up today.  So as far as Lontex goes -- basically, I'm

12   going to say whether it's covered or not.

13         MR. HYNES:  I'm sorry, Your Honor.  I'm having

14   trouble hearing you.

15         THE COURT:  I'm sorry.  I'm going through the

16   requests that were handed up today to say whether each item

17   will be covered or rejected, and then I will go over what I

18   intend to charge the jury on.  I'm not giving you the exact

19   language because I haven't finished writing all the exact

20   language.  I'm working on it with my law clerk.

21         So I am looking at the Lontex.  These items are not

22   numbered, but the first one is items of recovery.  That will be

23   covered.  Actual damages will be covered.  As I understand what

24   you mean by lost opportunity, this relates to Mr. Nathan's

25   efforts to what he described to expand the business.

Next is causation.  I'm going to cover that.  And next is punitive damages under Pennsylvania State law.  I will cover that.  On defendant's profits, I will cover that.  Actually, the requested charge for both profits is similar.  And then actual damages lost profits, I will cover that.

Looking at Nike's supplement, I'm not going to give a contention statement as I did before for either party on profit disgorgement.  I will cover that, and I'm working through the language that both of you used to come up with what I think is correct.

Corrective advertising, I will cover that, but much more briefly than is set forth by Nike.  As to punitive damages, I will cover that with the standard Pennsylvania charge.

Okay.  Now, here is what I'm going to start out with.  A plain vanilla charge, as I call it, on compensatory damages, which means basically that it's the amount of money that Lontex should deserve that will reasonably and fairly compensate it for any injury that the jury finds was caused by Nike's infringement.  Compensatory damages must be based solely on the injury caused to Lontex by Nike's use of the Cool Compression trademark.

Then I will say that the difficulty or uncertainty doesn't preclude recovery.  Instead, you should use your own best judgment in determining the amount of damages, but you may

not do so by speculation or conjecture.

Then I'm going to itemize the four items that are claimed:  The lost profits on sales with a short definition, the loss of royalties, cost of corrective advertising.  And then I'm going to say that if you decide that damages for corrective advertising should be awarded here, those damages should not exceed the value of the trademark because the purpose of damages for corrective advertising is to repair any damage that Nike did to the Cool Compression trademark and restore the value of the trademark to the value it had before the infringement began.  Your assessment of the value of the trademark must be based on the evidence and cannot be based on guessing or speculation.

Any exceptions so far to what I just read?  Lontex?

MR. WAGNER:  Your Honor, I will note for the record that we do not believe that the value cap applies to corrective advertising.  There's no Third Circuit case on point.

THE COURT:  Nike?

MS. DURHAM:  Your Honor, I just wanted to clarify. You said under compensatory that the categories would be lost profits, royalties, and corrective advertising.

THE COURT:  Yeah, but I haven't come to disgorgement yet.

MS. DURHAM:  Thank you, Your Honor.  I mean, we believe that corrective advertising should not be included at

 1   all, but if you're inclined to include it, we would ask for the

 2   clarifying instruction on not to exceed value.

 3            THE COURT:  Well, I may -- I'm going to change the

 4   language, Mr. Wagner, and say:  If you decide that damages for

 5   corrective advertising should be awarded, you may conclude --

 6   you may conclude that these damages should not exceed the value

 7   of the trademark.

 8            And then I'll read the rest of it.  But I think that

 9   that's an appropriate comment.  Instead of saying should not, I

10   will say the jury may conclude.

11            MS. DURHAM:  May I?

12            THE COURT:  Wait.  I'm not done yet.

13            MS. DURHAM:  I'm sorry.  I just have one question on

14   corrective.

15            Will that include any instruction regarding the need

16   for there to be actual confusion?

17            THE COURT:  No.  I'm not going there.  I know you

18   requested that.  Look, in the liability phase, I clearly said

19   the law requires that the test is likelihood, not actual

20   confusion.  I don't think confusion -- I can't find any

21   authority that whether or not there was confusion is a relevant

22   factor on damages.  But it is clear that the plaintiff has the

23   burden of showing that its injury was caused by Nike's

24   infringement.  I don't think it has to be tied to confusion.

25            Do you have an exception on that?

1          MS. DURHAM:  We do, Your Honor, because corrective

2     advertising grows out of the concept of false advertising, and

3     it's sort of like fitting a -- like a square peg into a round

4     hole.  So you have to correct for something, and that's why you

5     have this element of actual confusion when you have a

6     corrective advertising remedy in play in a trademark case, Your

7     Honor.

8          THE COURT:  Okay.  I hear you but I'm not going to

9     charge that.

10         MR. WAGNER:  Your Honor, I just wanted to put on the

11    record, we still take exception to the instruction.

12         THE COURT:  Well, you're both taking exception, so I

13    may be totally wrong by both counts.

14              I'm now looking at Lontex's.

15              The actual damages, I will cover that with the

16    general language that damages for lost opportunities are

17    available.  There is a Third Circuit case on this, TSE v.

18    Ventana, 297 F.3d 210.

19              Next is causation.  I've already stated that.  All

20    right.  And then punitive damages.

21         MR. WAGNER:  Your Honor, for the causation, are you

22    going to indicate whether you're giving a contributed

23    materially aspect --

24         THE COURT:  I'll say if Nike's infringement

25    contributed materially to injury, then it is the cause of that

injury.  Yeah, I will say that.  I think that's correct.  Then I'll give a charge on lost profits and corrective advertising.

Now, however, I'm going to add the following even though neither of you have requested it, but I think it is necessary and appropriate to give the jury some guidance here.  And it's as follows.  I'm going to tell the jury, I'll say that the prior instructions I gave them on credibility and so forth still apply.  I'm going to tell them as far as confusion goes, that the relevant test on liability is likelihood of confusion, but it was not necessary then to prove actual confusion.

However, in determining compensatory damages, Lontex is only entitled to damages it has proven by a preponderance of the evidence have been caused by Nike's use of Cool Compression.  I think that is a correct statement.

I'm going to say then you may not award compensatory damages against Nike because of the relative size of Nike compared to Lontex.  Furthermore, you cannot award compensatory damages to Lontex for any damages claimed by Lontex that you find were not caused by the Nike use of the Cool Compression trademark.

Then I'm going to say that I'm going to give you some further instructions on some specific issues here.  First, Mr. Nathan's attempt to sell the Cool Compression trademark in various ways and its negotiations with third parties on various topics may be considered.  Whether it reflects Mr. Nathan's

1  opinion of the value of the Lontex Cool Compression trademark

2  and whether you should consider the amount of money he was

3  willing to accept is important in determining the damages of

4  Nike's infringement of the Cool Compression trademark.

5          Two, there is no evidence that Nike used the phrase

6  "Cool Compression" on any of the garments that it was selling.

7  However, there is evidence that Nike did use Cool Compression

8  trademark on certain labels and used it in the tech sheets and

9  on its websites and/or in its catalog.  You should consider the

10 nature of Nike's use of the Cool Compression trademark in

11 determining the extent to which Nike's infringement caused

12 injury to Lontex, which may affect the amount of damages in

13 this case.

14         Third, Lontex's efforts to expand and increase its

15 sales and whether or not Nike's infringement hindered these

16 efforts.

17         And lastly, whether Lontex and Nike's marketing and

18 consumer bases are similar or different and whether this

19 affects Lontex's computation of damages.

20         You may not assume that all sales of Nike products

21 that used a Cool Compression product number resulted from

22 Nike's use of the Cool Compression trademark.

23         Any exceptions to that, Mr. Wagner?

24         MR. WAGNER:  Yes, Your Honor.  To the extent that,

25 assuming that all style numbers used within the Cool

1    Compression lines don't use Cool Compression, we believe that

2    that could mistake the jury as to the value of the inference

3    and circumstantial evidence.

4            THE COURT:  Well, I have grave doubts about the

5    propriety of your expert using all of these product numbers

6    that say Cool Compression as assuming the basis for sales, and

7    this goes to the disgorgement of profits.  And it may be, if

8    the jury awards a big number for that, I may feel I have

9    equitable power to reduce it.

10           MR. WAGNER:  Your Honor, one point on that is I

11   understand on one end you have grave concerns.  On the other

12   end, we should have grave concerns that only exactly where the

13   infringement was found and presented to the jury in a very

14   short trial means there's no circumstantial evidence of broader

15   usage across many channels.  So I think it's up to the jury to

16   determine where.  I only ask that the jury still be given an

17   instruction on the value of circumstantial evidence.

18           THE COURT:  There's a lot of circumstantial evidence

19   in this case to consider.

20           Ms. Durham.

21           MS. DURHAM:  Your Honor, there's no evidence in the

22   record that Nike used Cool Compression on any labels, so we

23   would request --

24           THE COURT:  No, you used it on the care label.

25           MS. DURHAM:  No.

1           MR. WAGNER:  We would agree with counsel's

2    representation.  It says Nike Pro Cool on --

3           THE COURT:  How about on the washing label?  The

4    words Cool Compression appear there?

5           MS. DURHAM:  No.  It's not anywhere on the product,

6    on any label, on any hang tag.  Nowhere on the product, Your

7    Honor.

8           MR. HYNES:  You may be thinking of the Lontex

9    products, Your Honor.  That's where the Cool Compression label

10   appears.

11          THE COURT:  You're stipulating none of those were on

12   any of the Nike products?

13          MR. WAGNER:  We don't know if the labels on that --

14   retailer label typed it on and put it on with it, but we're not

15   saying the inside care label --

16          MS. DURHAM:  There's no evidence --

17          MR. WAGNER:  I'm not disagreeing with you.

18          MS. DURHAM:  I don't mean to interrupt you, Counsel,

19   but there is no evidence in the record of what you just

20   speculated as to.

21          THE COURT:  I'll change that.  Just a minute.

22          MS. DURHAM:  Your Honor, could we just go back one,

23   too?  I don't mean to jump around but...

24          MR. WAGNER:  Just because of that one item, we won't

25   make exception.

 1          MS. DURHAM:  It sounded like you were going to take

 2     Lontex's proposal to give a separate instruction on loss of

 3     business opportunities based on this Tse v. Ventana case.  We

 4     don't think that's appropriate here, Your Honor.

 5          They withdrew Mr. Parkhurst on their business

 6     opportunity theory, and they've not cited the whole case here

 7     in their authority.  This says, you know, it can't be wholly

 8     speculative that they did not -- well, excuse me.  Let me start

 9     over.

10          This case says you need to show to a factual

11     certainty with evidence that there was a lost business

12     opportunity, and we just don't think that's appropriate in this

13     case.

14          THE COURT:  You're correct to some extent.  The way I

15     phrased it was Mr. Nathan's testimony about how he had wanted

16     to expand the business and he blamed it on Nike that he was

17     unable to expand.  So I would rather -- on lost opportunities,

18     I would rather say inability to expand.

19          MS. DURHAM:  Your Honor, my concern with having this

20     separate, like, failure to expand or lost opportunities is that

21     it invites speculation on top of what would have been lost

22     profits.

23          THE COURT:  I'm going to tell the jury that there can

24     be no duplication of damages except when we come to punitive

25     damages.  I'm going to emphasize that.

1            What's your opinion, Mr. Wagner, of saying inability

2    to expand?

3            MR. WAGNER:  I have no preference as to that.  I

4    think that our proposed jury form actually lists Liebaert

5    because I think it's very clear that it's the Liebaert

6    opportunity we're talking about.

7            THE COURT:  I'm not going to go into the specific

8    evidence.

9            MR. WAGNER:  Your Honor, on the label, I think what

10   you may have meant is if it was evidence of it being used on

11   the store displays.  As Mr. Sean Cunningham testified, it was

12   on the table, it was on the stands, as Kenisha Likely said, it

13   was on hanging displays in front of the product.  That's what

14   the evidence was presented in liability, store displays.

15           THE COURT:  All right.  So, however, there is

16   evidence that Nike did use the Cool Compression trademark on

17   some store displays, in the tech sheets, and on its websites

18   and in its catalogs.  I'll say at least once that they may not

19   duplicate damages in different categories.  Then I'm going to

20   have just the general charge on expert testimony.

21           Okay.  That's it.  Any other exceptions or requests?

22           MS. DURHAM:  Yeah.  Your Honor, may we be heard on

23   your inclusion of punitive damages?

24           THE COURT:  Sure.

25           MS. DURHAM:  Okay.  So we do not believe punitive

1    damages should be included at all as a matter of law.  As, Your

2    Honor, I believe knows from our prior briefing on this issue,

3    this is a case based on federal trademark infringement, and

4    you've got, essentially, a parallel claim of trademark

5    infringement under state law.  Federal law does not allow for

6    punitive damages, and there is no authority that Pennsylvania

7    law would contemplate punitive damages as well, Your Honor.

8           Furthermore, I'm not sure what your instruction will

9    say on that, but we have serious concerns that the jury will be

10   confused that, you know, the willfulness instruction given at

11   the liability phase will double for the standard for punitive

12   damages, and that's just not correct, Your Honor.  It's a

13   completely different standard for punitive damages than would

14   be applied for the willfulness standard at the liability phase,

15   which was defined by not conducting a trademark search and

16   post-notice sales.

17          THE COURT:  All right.  You have an exception.  There

18   is a pending state Law claim here.  I wrote an opinion about

19   how Pennsylvania law applies after there was a lot of confusion

20   about where the plaintiff was going with state law claims.  And

21   the charge will -- there's a standard punitive damages charge

22   that the Pennsylvania Supreme Court has approved many times,

23   and that's what I'm going to read.  You have an exception, but

24   we'll have a separate category for that if the jury awards any

25   punitive damages.  And if it turns out you're correct, on

1    post-trial motions, it will be very simple to eliminate it.

2              All right.  I need five minutes.

3              MR. HYNES:  Your Honor, may I?

4              THE COURT:  Yes, sir.

5              MR. HYNES:  It's clear that the jury already found

6    that Nike used the trademark.  When you list all the places

7    where there's disputed evidence where it was used, I feel like

8    it's unnecessary.  They've heard the evidence.

9              THE COURT:  You have an exception.  I think this is

10   important, because as I understand Mr. Drews' calculations and

11   all, he has assumed that every time there was a sale by Nike of

12   something, of a product style that was listed under Cool

13   Compression, that that's automatic profits to Nike and can be

14   disgorged.  And I just think that that is a very dangerous

15   assumption.  As a matter of fact, I'm saying the jury can't

16   assume that.  So I'm surprised that you don't like it.  I think

17   it's important to remind the jury of the limited use of the

18   trademark by Nike.

19             MR. HYNES:  Thank you, Your Honor.

20             Will we be able to see the language on punitive

21   damages before it's read?

22             THE COURT:  Well, it's what the plaintiff suggested.

23   You suggested punitive damages.  No, you didn't.  I'm going to

24   take the plaintiff's language.

25             MS. DURHAM:  Your Honor, that is taken from a case

1   involving priest molestation.  We really don't think that's the

2   appropriate instruction.

3          THE COURT:  I'll look at it one more time.  I need

4   five minutes.  Then we'll come back and have arguments.  Thank

5   you.

6                          (Recess taken from 2:45 p.m. to 2:51 p.m.)

7                          (The jury enters the courtroom at 2:51

8                          p.m.)

9          THE COURT:  Be seated, everyone.

10         Ladies and gentlemen, we are now ready for argument.

11  Mr. Wagner will go first and reserve five minutes for rebuttal.

12         MR. WAGNER:  It's been a quick couple of days.  Thank

13  you for your patience and attentiveness.  Thank you for being

14  here and hearing the evidence.

15         So I was thinking about a story that I tell my kid.

16  A kid story.  You might have heard it too.  It's about a little

17  girl down at the beach, tide washed out, picking up starfish

18  and tossing them back in the ocean.  She keeps picking up a

19  starfish and tossing it back.

20         An old man comes up and says, What are you doing?

21  She says, I'm tossing starfish back in the ocean.  He looks all

22  the way up, says there's miles of shore, you can't possibly

23  make a difference.  She leans down, smiles, picks up another

24  starfish, tosses it back.  She says, for that starfish, I made

25  all the difference.

You're here today to make that difference.  Lontex may not have been important enough to Nike to care about, may not have been important enough to avoid willfully infringing its Cool Compression trademark, but it's important enough for you to make a difference.

Counsel reminded you that you're a Federal jury, and that means something.  Before you all came here, right, we all came with our common experiences.  We came with our common sense.  And you may be a Federal jury for the first time, but you've all been here before.  You have all seen the kid, the bully at school, whatever it is, that doesn't know when to stop.

You have to ask yourself two questions, right, when you have a kid like that.  What did they do and what did they do about it?  That's how you figure out what the right measure to dole out to them is.

What did they do?  Here, you've already found Nike willfully infringed.  Nike knew about Cool Compression in April 2016, and for two more years continued, 27 catalogs, to push out Cool Compression names to the marketplace.  It ignored the request to contact its 1,500 retailers, and it kept willfully infringing.  It kept building that building all the way up on Cool Compression property that belonged to Lontex.

So what did it do?  It willfully infringed the trademark.  It engaged in illegal activity that hurt my client.

Now the question is, what did they do about it, right?  Well, we already know what they did about it before this lawsuit happened.  We know that for two more years, they did nothing. Even though five days could have been enough, even though two years was way too long, they didn't stop.  And that's the question that I'm here before you today.  There are a lot of items you'll see on the bucket, right, the bucket of stuff that the law provides.

We're going to put it on your screen.  I'm not going to spend a lot of time on it.  You see the ranges, and you'll get the instructions from the judge.  But the question that I want to focus on today is the questions that go to what I said at the beginning, right, what do you do with the bully?

And that's deterrence and that's punishment, and that is a power that is in your hands today.  It's not in Nike's hands to decide what happens to Lontex.  They already had that opportunity.  Now it's your turn to decide what happens to Lontex, the small company who built a name for themselves, who built a life for themselves, and built it around the Cool Compression stretch technology only to have Nike, again, be too big to care and for Lontex to be too little to care about.

So when you think about fashioning, there's two items, disgorgement of defendant's profits and punitive damages on there.  Those are the two items where you're going to decide, what does it take to stop a company like Nike from

1   doing this again?  What does it take to tell Nike what you did

2   was wrong and it matters?  And it not only matters to Lontex,

3   it not only matters to all the other little companies that

4   folks do this type of thing to, but it matters to Nike.

5          Now, we can all stand there like little ants and

6   throw pieces of sand at Nike, the ants that it squashes, the

7   Lontex, or we can make something that really sends a message,

8   not just so the guys that came here, that continued to

9   infringe, that didn't seem to listen, the Nike Pro management

10  team.  We have to send a message that makes them listen.  You

11  have the opportunity to be sure that they hear you.

12         And that first part, that willful infringement, means

13  nothing to Nike unless it actually affects them.  You can't sit

14  there and whisper at them.  You have to shout at them.  Do

15  better.  Do different.  Change.  Next time, you don't get to

16  walk on someone for three years.  You don't get to bury your

17  head in the sand before you ever start building that skyscraper

18  in the first place.  It means something.

19         You heard them talk about how they're the 16th

20  largest most important trademark in the whole world.  They know

21  about trademarks.  This isn't like someone else's backyard.

22  They know what they're doing.  And you have to send that

23  message.

24         Two things.  First of all, how do you make them

25  listen?  They made $95 million in profits, the infringers did.

1    And remember, contributory infringement means they're

2    responsible for the folks that sold after them.  So what do you

3    do?  You hear the 7-million-dollar number of a guy who

4    literally -- I remember telling you guys, there's 6.5 million

5    in sales.  I can't show you each sale, but I'll show you

6    enough.

7            The judge instructed you on circumstantial evidence

8    and inference, so what did I do?  I didn't show you just the

9    tip of the iceberg.  We took sonar all around.  We got people

10   to come in.  We showed you lots of exhibits.  And at each of

11   those measurements, Cool Compression, Cool Compression, Cool

12   Compression.  But their expert wants to just focus on each

13   place we sonared.  Grab it up and say, here, I added up all the

14   little sonar areas around, you know, the iceberg.  Just give

15   them that.  No.  Look at the evidence, see what happened and

16   see it for what it is.

17           And the issue here is not that Mr. Nathan decided to

18   put his trademark up for sale.  The issue is that Nike still in

19   this case wants you to think that everyone else is lying except

20   for them, that they are still the victim here.  That comes back

21   to that question of what do they do about it.  They got before

22   you and tried to explain to you to distance themselves from

23   retailer sales, not even having any thought to the fact that we

24   had their sales records and put them before you to show that

25   they actually sold to all those people.

1              Is that the type of activity, like a bully, that gets

2     what they did, that's remorseful, that understands?  No.

3     They're still telling you, just make it as if we, you know, had

4     some contract where we could force him to sell even though we

5     didn't know.  He didn't know that the contract had that term

6     buried in the term.  He was very clear in his email.

7              So they have no remorse, they want to come back, and

8     they want to tell you to give them a free pass.  They want to

9     tell you, just make it a whisper.  But it didn't just stop with

10    telling you things about their sales that go way beyond common

11    sense.  It goes beyond that, and it goes to what they did in

12    the first phase, which they continue now in this damages phase,

13    right.

14             They call everyone else a liar.  It's like the bully

15    got called into the principal's office, and instead of

16    acknowledging fault, did you see any remorse on any of their

17    eyes when my client testified yesterday about the crushing

18    impact on his business?  I don't think you did.  Instead, what

19    you heard was everyone else is lying, everyone else who came in

20    and told the principal that they bullied on them, too, they're

21    all lying.  That's not the sign of a kid who gets it, who is

22    ready to change.  No.

23             Do you think it was easy to get all the way to where

24    we are today?  Do you think coming here and getting before you

25    was a bed of roses?  No.  To get to here, we're not back where

1    2015 took us.  We are a whole lot way further.  And the folks

2    that get this far to get before you, they deserve to have their

3    voice heard, and they deserve to have the corporation hear it.

4           So when you think about what it takes to deter Nike,

5    remember, it made $95 million on the products.  Every one of

6    those sales, Cool Compression was on it?  No.  We're not saying

7    that.  We can't say that because we can't go to all 6.5 million

8    people and see.  It's impossible.  I didn't say we'd keep you

9    here three months, right?  I said we'd get through this quick.

10   But you have enough evidence to make a reasonable assessment of

11   how many profits Nike made that used the Cool Compression

12   product.

13          Now, Nike also comes before you unremorseful and asks

14   you to take away from that things like the secretary, right,

15   the heating, the shipping, all their costs, like it's running a

16   regular business.  Make a willful infringer deduct everything.

17   No, we get it.  You take away the amount of the cost for the

18   product, but you don't take away all that other stuff.  As

19   their expert said, incremental costs are marginal.

20          Nike wants you to act like this was just business as

21   usual, but isn't that the problem, that Nike still wants you to

22   treat like this is business as usual?  No.  This was willful

23   infringement.  They did not get a license.  They did not make a

24   negotiation back in 2015 which, by the way, you'll notice

25   everything they tell you has a little twist, right?  They want

you to think that Mr. Nathan is a liar now, right, that he's a cheater.

So they tell you about David Chandler and they wave out in front of you a letter from a lawyer saying, hey, that 500,000-dollar-offer -- they don't show you the actual offer, all the details.  They just show you a shorthand reference that a lawyer said to Chandler in canceling a dialogue.

They tried to tell you, hey, I'll show you a flashy graph, a flashy graph that shows sales going like this.  Our expert showed you the Cool Compression sales.  They were solid.  They were steady.  What did they do?  They threw on the GSA military sales to flash and dash you into ignoring and pretending that Mr. Nathan didn't actually suffer.

Is that the sound of a corporation that gets the message?  Is that a sound of one of the biggest companies in the world that gets the message?  You have to make them get the message, because today, it's not just about what they did.  It's about all the way up until the end of evidence what they're still doing.  They need to know that what they did was wrong.

To have a label of willful infringer has to mean something, and that's what defendant's profits do.  They deter someone like Nike and Nike itself from doing that again.  They make sure they listen and they hear.  In a voice that not just Lontex can hear, not just you can hear, but the management as

 1  high up as it needs to go actually hears.

 2          And second, punitive damages.  Punitive damages.

 3  You'll hear the standard.  You'll see the standard as met.

 4  That gives you the chance to, again, figure out what's the

 5  number.  What's the number for a company like Nike to make them

 6  listen?

 7          So I ask you, when you consider all of this, consider

 8  this from Nike's perspective.  Consider what it takes for you,

 9  right.  You are the principal in this bully scenario.  You've

10  had the kid give you all the excuses in the book.  Tell you

11  everyone else in the school is lying.  Tell you, oh, you got

12  video of it?  Well, there's a whole bunch of other things I

13  didn't get caught for.  Well, I'll just tell you I didn't do

14  it.

15          That's what you did, willful infringement, and it's

16  what you did about it, nothing.  What you did when you got

17  caught, you dragged us all the way here to have a Federal jury

18  finally find willful infringement, and then you kept on pegging

19  away at Mr. Nathan as a liar.  You kept telling the other

20  witnesses they're lying.  That's not the truth.  You know the

21  truth.

22          So these other items of damages you've heard the

23  testimony on, I told you, I don't have a number for Liebaert.

24  I don't have a number for that opportunity.  But you have

25  enough.  You guys have the business plans.  You can figure out

1   a reasonable amount.

2         And that's your job.  Not to speculate, but to come

3   up with a reasonable amount.  At the end of the day, each of

4   these items are what the trademark law allows for, and I ask

5   that you consider here what it's going to take to make all this

6   time, to make all this effort be the one time that we have to

7   all go through this.  Don't make someone else go through this.

8   Don't make Nike get away with it because the numbers don't

9   justify change.

10         THE COURT:  Okay.  Counsel for Nike, Ms. Eisenstein.

11         MS. EISENSTEIN:  Good afternoon, ladies and

12   gentlemen.  You just heard counsel for Lontex say a lot of

13   emotional things, and I understand that there is emotion in

14   this case and that it's been an emotional trial in many

15   respects.  Because this is a trial about a small business

16   person and a big company, and that makes it hard to evaluate

17   the evidence.

18         But I want to focus on what, again, this trial is

19   really about, and it's about trademark infringement.  And we

20   acknowledge that.  We do accept your verdict.  And we're here

21   to talk about what the damages are from that.  That isn't an

22   appeal to emotion.  It's an appeal to evidence.  And that's

23   what I'm asking you to do right now.  I think you didn't hear

24   from counsel a lot of discussion about what the actual evidence

25   is with respect to damages, and that's what I want to focus on

 1   here today.

 2           So the question, and I think you're going to hear

 3   this from the judge in his instructions, and you should follow

 4   his instructions on the law, that the damages here are really

 5   tied to the value of the trademark.  You're going to hear the

 6   judge say that.  How did Nike's infringement cause harm to

 7   Lontex, and what value did Nike gain from the use of the Cool

 8   Compression trademark?  In a trademark infringement case, that

 9   is the anchor, the value of the trademark.  The value to Lontex

10   of his trademark and the value to Nike of that same trademark.

11   They're really two sides of the exact same coin.

12           You have now heard from Lontex's expert and our

13   expert that this value of the Cool Compression trademark is

14   what you should anchor your verdict in, and you've heard

15   evidence that sets the maximum value.

16           Can we have the first slide, please?

17           So I won't belabor this because you've heard this

18   evidence now multiple times before.  You saw the contract for

19   the U.S. Trademark Exchange promising to sell the Cool

20   Compression trademark for 800,000.  You saw the initial deal to

21   Mr. Liebaert, Mr. Nathan offering to sell the Cool Compression

22   trademark for $600,000, to Chandler for $500,000, the

23   renegotiated deal to Mr. Liebaert for three, and the offer to

24   sell it for $150,000 to ING.  We know that none of these

25   business partners took that deal, but there's really no dispute

1   that the value of the Cool Compression trademark is under that

2   range.

3            Let's talk about royalties.  What is a reasonable

4   royalty?  You're going to hear from the judge that this is

5   measured by the value of the trademark.  But this Mr. Drews,

6   the plaintiff's own expert agreed to, no one would pay more to

7   borrow the trademark than to buy it outright.  Mr. Drews

8   acknowledged that he wouldn't take that deal, and Mr. Meyer

9   confirmed the analysis.  And you're going to hear from the

10  judge that once again reasonable royalties is ultimately

11  measured by the value of the trademark too.

12           Let's talk about corrective advertising.

13           Can we go to the next slide, please?

14           Corrective advertising follows largely the same

15  principles.  It's tied also to the value of the trademark, the

16  value of the business, and the type of advertising that existed

17  before with respect to the Cool Compression trademark.  Look at

18  how much -- you heard Mr. Meyer.  Look at how much was spent on

19  Lontex's own business on advertising and the level of sales,

20  the value of the mark itself.

21           It makes no sense to pay more in corrective

22  advertising than the mark itself is worth, or for that matter,

23  the whole business would be worth.  The numbers that are being

24  thrown around are just far afield from what appropriate measure

25  of corrective advertising could be, and you'll hear the law

1   from the judge on that.

2            So let's talk about the harm to Lontex, because we

3   recognize that there may have been harm from Nike's use of the

4   Cool Compression trademark, and I want to specifically address

5   that.  But it's still incumbent upon you to decide a dollar

6   amount of how much that was, and that dollar amount needs to be

7   tied to the evidence that you heard as you judge it.  I'm not

8   here to tell you about credibility.  That's your job to decide.

9            Can we go to the next slide?

10           But there is evidence in this case of what that harm

11  in monetary terms amounts to.  The harm to Lontex, this is from

12  Mr. Drews, the plaintiff's own expert, he quantified it

13  223,000 -- sorry $223,846.  Remember, he said that's counting

14  every dollar of drop between -- during the relevant time

15  period, that whole gray area.  He didn't consider the drop in

16  marketing activity.

17           And if we can go to the next slide.

18           He didn't consider the changes in the advertising,

19  the trade show attendance, and the other marketing activities

20  in Lontex.

21           Can we go to the next slide?

22           And he didn't consider the long history of decline.

23  If you look closely at Mr. Drews's slide, it starts at 2010,

24  not back at 2006.

25           And I do want to say something next about the lost

1    deals, because I think the evidence here was not something that

2    Nike put at issue.  This was a question that Mr. Nathan raised,

3    and he said that because of Nike's use of the Cool Compression

4    trademark and the places where you saw it being used, that he

5    lost significant business opportunities.

6           Can we go to the next slide?

7           This is the Chandler documents, and this is for you

8    to decide whether or not that was a real business opportunity

9    or not and whether it was Nike and the use of Cool Compression

10   that caused that deal to fall through, or whether it was

11   because of this.

12          Go to the next slide.

13          And this is the Liebaert deal.  I think we all know

14   why that deal fell apart.  Mr. Liebaert did his due diligence

15   on Lontex's finances, and it wasn't because of Nike's use of

16   Cool Compression at all.

17          Can we go to the next slide?  Can you go back one,

18   please, for just a moment?

19          So that's talking about the harm to Lontex.  Did

20   Lontex lose opportunities as a result of Nike's use of the

21   phrase "Cool Compression" on the materials where you saw it,

22   and did it lose sales as a result of that use?  That's the

23   evidence that you've seen.

24          The next question is whether there's an award that's

25   appropriate based on the value that Nike got from the use of

1    Cool Compression, and that's where I think you heard and you

2    saw the line, the big line item for profits disgorgement that

3    Mr. Wagner presented to you.

4            And that is a big number.  And it's a big number

5    because Nike sells a lot of these products.  You know they sell

6    a lot of these products.  They have stores everywhere across

7    the United States.  They have a massive online presence.  They

8    sell to all the familiar retailers that you know.  Of course

9    they have a lot of sales.  That's not the question.  This isn't

10   about Nike's sales.  It's about Nike's use of the term "Cool

11   Compression."

12           Can we go to the next slide?

13           Where did you see Cool Compression appear?  I'm not

14   telling you what to find.  You've seen the evidence that was

15   presented, and that's what you should base your verdict on.  It

16   isn't everywhere, though.  That much we know, right?  It is not

17   everywhere.  And this slide is just one example of that.  I

18   showed this to Mr. Drews.  These are products at issue during

19   the time at issue where Nike.com did not use the term "Cool

20   Compression" at that time.

21           Can we go to the next slide?

22           And this is what Mr. Drews acknowledged just earlier

23   today.  He looked at, you know, the snapshots that were part of

24   the exhibit that we've now looked at many, many times, PX-31A

25   and 31B and 30A and 30B.  Those were those summary slides.  We

1    spent a lot of time looking at them, and I know you have too.

2    But one way or another, those are the pieces of evidence that

3    we have.  And as Mr. Drews acknowledged, if you have a

4    screenshot from 2015, whether that screenshot appeared or that

5    website would appear the same way in 2017, he really doesn't

6    know.  We really don't know that.  It's just a snapshot.

7            Now, you heard Mr. Wagner say that Nike, after it

8    learned of Mr. Nathan's claim of our use of -- that we were

9    using Cool Compression infringing on his trademark, that we

10   just ignored him, that we were out to crush him, and that we

11   didn't make any changes.

12           You're the judge of the facts, but I do want to

13   recall you back to the liability phase and the testimony on

14   those points.  You may not have thought that Nike did enough,

15   and that's up to you to decide, but I don't think it's fair to

16   read the evidence that Nike set out to crush Mr. Nathan or even

17   it ignored him.

18           You heard Katie Bromert that she did send notice to

19   all the other retailers to stop using Cool Compression.  Maybe

20   they didn't stop fast enough, maybe that wasn't enough effort,

21   but that was done.  You heard the testimony from the other Nike

22   witnesses that Nike itself took measures to change its

23   catalogs, to change its own listings, and even change its

24   internal references to product names to remove Cool

25   Compression.

1      So I don't think it's fair to say that Nike did

2  nothing.  You can decide whether it was enough -- and you did

3  decide it wasn't enough when you made your findings in the

4  liability phase.  But now we're talking about damages, and the

5  question comes back to harm.

6      So once we decide where was Cool Compression, so it's

7  not everywhere.  That was what Mr. Drews tried to convince you

8  of, it's all the sales.  You have to look at the sales where

9  you believe Cool Compression and the channels of sales where

10 you think Cool Compression appeared at all, and where that is.

11     Then you have another question.  What is the

12 contribution of Cool Compression to the sale?  I think that

13 Mr. Meyer used a big word to describe that, which is

14 apportionment.  That's saying how much of the sale do you

15 attribute to the use of the Cool Compression mark, and how much

16 of the sale do you attribute to Nike.

17     So then we go to the next slide.

18     These are Nike's own brands.  They're very familiar

19 to everyone, to you, and that's not a brag.  That's not to say

20 we're the big company and this is the little company, so you

21 shouldn't award an appropriate damage.  It's just a fact.  It's

22 a fact in evidence, and it's a fact that's based on your common

23 experience that Nike brands have value.  They have a lot of

24 value in the marketplace and to consumers.

25     Nike materials have value.  The technology has value.

1    The investment in the technology has value.  Those things are

2    real.  The athlete endorsements have value and cost.  Those big

3    splashy marketing campaigns, whether you like them or don't

4    like them, they have value, and there are customers who buy

5    products because of them.

6              So the question that you're left with is, what value

7    did Cool Compression contribute?  It's a hard one to answer,

8    and you've seen a lot of different ways to measure it.  But

9    really, if you think about it, it comes right back to where we

10   started.  The best measure is the value of the trademark

11   itself.  After all, if the Cool Compression trademark had

12   value, it would be reflected in the market price for that

13   trademark.  And you see that in the royalty deals that

14   Mr. Drews testified about that were in totally different

15   contexts.  Those brands like Justin Timberlake and the designer

16   for Queen Elizabeth's clothes, those are valuable brands, and

17   there's value in those licenses.  And Cool Compression has a

18   value too.  And that is really the value that should be

19   attributed here and the one on which we have significant

20   evidence.

21             Can we go to the next slide?

22             It comes back to where we started, the value of the

23   Cool Compression trademark.  We're asking that you base your

24   verdict on that.

25             Can you please take the slides down?

 1          Just before I close -- and I'm going to just step

 2    away from the microphone for a minute so I can talk directly to

 3    you.  I want to say a few things about plaintiff's request for

 4    punitive damages.

 5          This is a serious thing, and I know you are all going

 6    to consider it seriously.  You're going to hear an instruction

 7    on punitive damages, and you're going to hear that punitive

 8    damages is not for the ordinary case.  We know that -- and this

 9    is not to minimize trademark infringement.  We take that very

10    seriously, and the company and all of us take your finding

11    extremely seriously, a finding of trademark infringement in a

12    Federal Court.

13          But punitive damages, you will hear, is reserved for

14    conduct that is outrageous, that is extraordinary.  I don't

15    think the evidence supports that.  I ask you to give your

16    damages award based on the evidence as you've heard it here and

17    to tie it to the value of the trademark, the evidence of that,

18    that you've heard in court.

19          Thank you very much for your attention over the last

20    two weeks, and thank you for your careful deliberations in this

21    case.

22          THE COURT:  Five minutes for Mr. Wagner.

23          MR. WAGNER:  Counsel just assured you that Nike takes

24    your verdict seriously.  Did you see Nike Pro management whisk

25    in here, do their testimony, leave?  Do you see them back

there?  Do you see anyone else of them?  No, you don't, right?
Because counsel's assurance that they take you seriously isn't
worth the paper it was printed on.  She doesn't work at Nike.
She doesn't know Nike management.  Because there's so many
rungs below before it ever gets to that.  So please do not
listen to an assurance that they get the message.

Willful infringement is a serious thing.  She just
told you that punitive damages are reserved for serious cases.
Well, trademark infringement that is willful, you'll see on the
instruction, you're already there.  You're already well into
that territory.

And a couple things that got said, she said it makes
no sense to pay more to Lontex on that verdict form than the
property is worth, as far as Nike claims it was worth, when
they built the skyscraper.  In other words, we should leave the
skyscraper standing.  All that flooding of the market with Cool
Compression, the fact that Cool Compression stretch technology
is still the name that Lontex uses to this day to sell to
professional teams across the country, to sell to thousands of
people that he goes and speaks to every year.  Make him abandon
that.  Write him a check so he can go start over with a new
trademark.  It's as if you just heard Nike tell you, well, we
built it without looking.  We finished it after we knew, but
don't make us move our building.  Because, you see, it would
cost more for us to move our building than to just kick him out

1   of his property than to just make Lontex leave.

2          Corrective advertising, one of those items that she

3   was talking about, is designed to make sure that the folks that

4   now think that Nike is Cool Compression not think that anymore.

5   Because that's still Lontex's property, and it's still your job

6   to make sure.  Or it's your option and responsibility, whatever

7   you want to call it, to make sure, as a Federal jury, that

8   Lontex keeps its brand, that it can fix its brand.  That

9   whatever bed and breakfast it had built on there before Nike

10  came and slammed its building down, it can still run.  It

11  doesn't have to get up and leave.  That's the wrong concept,

12  and you shouldn't apply it.

13         And you're going to hear an instruction, too, about

14  what it means to cause injury.  And it's not what you might

15  think would happen if you had to show that that and only that

16  caused it.  Why?  Because when we're in a situation like this,

17  nike's going to get up there and they told you, oh, in 2017,

18  right, they brought up the deposition testimony where he said

19  that Bobby DiLullo had cancer.  Did you notice that was a year

20  after March 2016 when the deal got blown away forever?  So they

21  still want to mismatch things up and tell you not to pay

22  attention too closely to the evidence.

23         That graph.  They just showed you the graph.  I told

24  you they don't get it.  What did they do when they found out?

25  They're still showing you the charts of military sales that

1   have nothing to do with this case.  I want to be straight with

2   you.  I want to be clear with you.  That number on disgorgement

3   of profits, for example, 95 million, I told you not every

4   single use was Cool Compression.

5          But you have a lot of indicators.  Tech sheets,

6   catalogs, online, you have witnesses telling you all across the

7   country where they side.  You can figure out, right, where

8   between the exact amount that we showed you, which their expert

9   says is 7 million, and we're at 95 million, the truth lies.

10  That's for you to draw those inferences.

11         So remember that what you're here to do today is to

12  make sure that we don't have this again.  Nike did not get the

13  message.  They will not get the message.  If you write on that

14  verdict form with a pen that only ants can hear, you have to

15  remember that Nike is the defendant here.  And you'll see all

16  the instructions about taking into account everything that

17  makes sure that Nike hears the message.

18         So, please, answer the questions.  I know you did a

19  great job.  We are so amazed that we were able to be presenting

20  this to you and that we got all the way here before you, and we

21  just ask, please, do what's right, do what's fair, do what's

22  just.

23         We're going to trust you to do the right thing, and

24  we thank you for your time.

25         THE COURT:  Okay.  Unless any members of the jury

1    needs a break, I'm going to go right into the charge.  About

2    15-20 minutes, half the length of the prior charge.

3            I don't see any hands raised, so we'll proceed.

4            The first thing is to remind you that the principles

5    of law that I gave you before still apply in this area of the

6    case, even though it's a different issue.  When I instructed

7    you before about your duties and deliberation and your

8    consideration of credibility of witnesses and things like that,

9    they still apply.  I'm not going to repeat them at this time.

10           You must decide what compensatory damages, if any,

11   Lontex is entitled to.  Compensatory damages means the amount

12   of money that will reasonably and fairly compensate Lontex for

13   any injury you find that Nike's infringement of the Cool

14   Compression trademark contributed materially to.

15           Compensatory damages must be based solely on the

16   injury caused to Lontex by Nike's use of the Cool Compression

17   trademark.  In determining compensatory damages, the difficulty

18   or uncertainty in ascertaining the precise amount of damages

19   does not preclude discovery.  Instead, you should use your best

20   judgment in determining the amount of such damages.  You may

21   not, however, determine damages by speculation or conjecture.

22           Compensatory damages consist of the amount of money

23   required to compensate Lontex for the injury caused by Nike's

24   infringement.  Lontex must prove the amount of each category of

25   compensatory damages by a preponderance of the evidence.  And

1  you will recall I gave you the definition of compensatory

2  damages about the two balances of tipping the scales.  Even

3  just a little bit satisfies that burden, but if the scales

4  remain even, then the party has not persuaded you by a

5  predominance of evidence.

6          Compensatory damages consist of the amount of money

7  required to compensate Lontex for the injury caused by Nike's

8  infringement.  Lontex must prove the amount of each category by

9  a preponderance of the evidence.  I read that before.  I

10 apologize.

11         Here are several categories of compensatory damages,

12 which Lontex is seeking.

13         First is Lontex's lost profits on lost sales.  This

14 consists of the revenue Lontex would have earned but for Nike's

15 infringement, less the expenses Lontex would have sustained in

16 earning these revenues.  In assessing the amount of lost

17 profits, the amount should be a reasonable approximation from

18 the evidence put before you.

19         Secondly, Lontex's inability to expand its business

20 to the extent that this was because of Nike's infringement of

21 the Cool Compression trademark.  This may have been referred to

22 before as lost business opportunity.

23         Third is loss of royalties.  A royalty is a payment

24 for the right to use a trademark.  In determining lost

25 royalties, you should determine the royalty Lontex and Nike

1   would have agreed upon if they had negotiated the terms of a

2   royalty before Nike's trademark infringement.

3        And last is the cost of corrective advertising.  This

4   is the amount Lontex claims it needs to counteract the effect

5   of Nike's infringement.  If you decide that damages for

6   corrective advertising should be awarded here, you may conclude

7   that these damages should not exceed the value of the

8   trademark.  This is because the purposes of corrective

9   advertising for damages is to repair any damage that Nike did

10  to the Cool Compression trademark and restore the value of the

11  trademark to the value it had before the infringement began.

12  Your assessment of the value of the trademark must be based on

13  the evidence.  It cannot be based on guessing or stipulation.

14       Now, there's another category of damages that Lontex

15  is seeking here, which I will call disgorgement of profits.  On

16  the verdict sheet, it's just referred to as Nike's profits.

17       Lontex seeks disgorgement of Nike's profits for sales

18  of products using the Cool Compression trademark.  In other

19  words, Lontex seeks as an award of profits that Nike has gained

20  through the sale of products using the Cool Compression

21  trademark.  Disgorgement of profits is not automatic or

22  warranted in all trademark infringement cases.  In deciding

23  whether to award Lontex a disgorgement of Nike's profits, you

24  may consider the following nonexclusive list of factors.

25       First, whether in infringing the Cool Compression

1    trademark, Nike had the intent to confuse or deceive.

2          Secondly, whether sales of products that carry the

3    words "Cool Compression" were diverted from Lontex to Nike.

4          Third, the adequacy of other remedies such as

5    compensatory damages.

6          Four, any unreasonable delay by Lontex in asserting

7    its trademark rights.

8          Five, the public interest in making Nike's

9    infringement of the Cool Compression trademark unprofitable.

10         And six and last, whether this is a case of palming

11   off.  In other words, whether Nike misrepresented Lontex's Cool

12   Compression products as Nike's own.  In this case, no evidence

13   has been presented to suggest that Nike was palming off.

14         If you decide to grant Lontex an award on Nike's

15   profits from sales of products using the Cool Compression

16   trademark, you must assess how much money Lontex is entitled

17   to.  The burden is on Lontex to prove by a preponderance of the

18   evidence Nike's sales of products using the Cool Compression

19   trademark.

20         If Lontex meets its burden, the burden then shifts to

21   Nike to prove by a preponderance of the evidence any costs or

22   deductions from those sales.  If Nike meets its burden, these

23   costs and deductions may be subtracted from the sales shown by

24   Lontex.

25         It is important to avoid duplicating in awarding

1   damages in the different categories.  As to one type of damage,

2   you may not award that same type or amount of damage in more

3   than one category.

4          Now I'm going to give you some general principles

5   concerning some of the testimony you heard today and how you

6   may consider it on the issue of damages.  I'm not telling you

7   how to do it.  I'm just pointing out some issues that you

8   should take into account in determining damages.

9          I charged you before on the issue of confusion, but

10  the relevant test is the likelihood of confusion.  It was not

11  necessary to prove actual confusion.  However, in your

12  determining of compensatory damages, Lontex is only entitled to

13  damages that it has proven by a preponderance of the evidence

14  that have been caused by Nike's use of the Cool Compression

15  trademark.  You may not award compensatory damages against Nike

16  because of the relative size of Nike compared to Lontex.

17  Further, you may not award compensatory damages for Lontex for

18  any damages claimed by Lontex that you find were not caused by

19  the Nike use of the Cool Compression trademark.

20         I will now address some of these item of evidence

21  that were introduced in this trial that and you may or may not

22  find to be relevant in ascertaining damages.

23         First, Mr. Nathan's attempt to sell the Cool

24  Compression trademark in various ways and his negotiations with

25  third parties on various topics.  You should consider his

testimony as to whether it reflects Mr. Nathan's opinion of the value of the Lontex Cool Compression trademark and whether you should consider the amount of money he was willing to accept as important in determining the damages of Nike's infringement of the Cool Compression trademark.

Second, there is no evidence that Nike used the phrase "Cool Compression" on any of its garments that it was selling.  However, there is evidence that Nike did use the Cool Compression trademark on certain store displays and also used it in the tech sheets and on its websites and/or in its catalog.  You should consider the nature of Nike's use of the Cool Compression trademark in determining the extent to which Nike's infringement caused injury to Lontex, which may affect the amount of damages in this case.

Third, Lontex's efforts to expand and increase its sales and whether Nike's infringement hindered this effect.

And four, whether Nike and Nike's marketing and consumer bases are similar or different and whether this affects Lontex's computation of damages.

You may not assume that all sales of Nike products which used a Cool Compression product number resulted from Nike's use of the Cool Compression trademark.

You have heard expert testimony here, and I just want to remind you like before, because it's important to both parties, that's where the Lontex computations came from, from

1    its expert.  And Mr. Meyer, the most recent witness, gave you

2    his opinion on Nike's behalf as to what the appropriate damages

3    were.

4         You must consider the fact that these experts have

5    been retained by the parties to make calculations that support

6    the contentions of each party.  You may take this into account

7    in considering the opinions and the calculations that the

8    experts conveyed in their testimony.  You are not bound to

9    accept the calculations of any expert, and you should make your

10   own determination to the amount of damages, if any, that should

11   be awarded to each separate category awarding duplication of

12   damages.

13        I'm now going to charge you on punitive damages.

14   Punitive damages are a special type of damages, and I'm going

15   to give you the requirements for that.  You're not required to

16   award punitive damages unless you find that Lontex has proven

17   the elements of it and you believe it's appropriate.  I said to

18   you before that you can't award the same item of damage in more

19   than one category of compensatory damages, but you can award

20   punitive damages in addition to the compensatory damages, even

21   if there may be some overlap or duplication.

22        Under Pennsylvania trademark law, punitive damages

23   may be awarded for conduct that is outrageous based on the

24   defendant's evil motive or its reckless indifference to the

25   rights of others.  As the name suggests, punitive damages are

1   penal in nature and are proper only in cases where the

2   defendant's actions are so outrageous as to demonstrate

3   willful, wanton, or reckless conduct.  The purpose of punitive

4   damages in a trademark infringement case is to punish the

5   trademark infringer for outrageous conduct and to deter the

6   infringer and others like the infringer from similar conduct.

7          Punitive damages are damages separate from

8   compensatory damages awarded against an infringer for his

9   outrageous conduct and to deter the infringer and others like

10  the infringer from similar conduct in the future.

11         When assessing the propriety of the imposition of

12  punitive damages, the state of mind of the infringer is vital.

13  The infringer's act or failure to act must be intentional,

14  reckless, or malicious.

15         If you decide that Lontex is entitled to an award of

16  punitive damages, it is your job to fix the amount of such

17  damages.  In doing so, you may consider any or all of the

18  following factors.

19         First, the character of Nike's acts.

20         Second, the nature and extent of the harm to Lontex

21  that Nike caused or intended to cause.  You may include in this

22  Lontex's trouble and expense in seeking to protect its interest

23  in legal proceedings and in this suit.

24         And three, the wealth of Nike insofar as it is

25  relevant in fixing an amount that will punish them and deter

1    others from like conduct in the future.

2          It is not necessary that you award compensatory

3    damages to Lontex in order to assess punitive damages against

4    Nike.  The amount of punitive damages awarded, if any, must not

5    be the result of passion or prejudice against Nike on the part

6    of the jury.  The sole purpose of punitive damages is to punish

7    Nike's conduct and deter Nike and others from similar acts in

8    the future.

9          Now I must, as before, invite counsel to sidebar to

10   see if they have any corrections.  In the meantime, we'll ask

11   Ms. DiSanti to hand out the verdict form so you can look at it

12   while we're at sidebar.

13          (Sidebar discussion as follows:)

14          THE COURT:  Okay.  Lontex, any corrections?

15          MR. WAGNER:  Other than the exceptions that we

16   already put on record, I did not hear a causation charge that

17   included contributing materially to an injury.

18          THE COURT:  You're right.  Can I borrow this?

19          MR. WAGNER:  Yes.

20          THE COURT:  Thank you.

21          MR. WAGNER:  You can keep it.

22          THE COURT:  All right.  Nike?

23          MS. DURHAM:  Your Honor, we believe that we need to

24   be clear that the punitive award is only applicable to sales

25   made in the State of Pennsylvania and Nike's conduct in

```
1   Pennsylvania.

2             THE COURT:  Denied.

3             MR. WAGNER:  That's not the rule.

4             THE COURT:  Denied.  Next.

5             MS. EISENSTEIN:  Your Honor, there's just one other

6   matter.  In counsel's closing, he suggested that no one from

7   Nike was here, and we have two representatives from Nike here.

8   And I think we wish to correct the record about that, in

9   particular because of the emphasis.

10            MR. HYNES:  Can you also instruct the jury that

11  there's a one-representative rule in the courthouse?

12            THE COURT:  I said that before.

13            MR. HYNES:  Yeah, but he in his closing criticized

14  Nike for having its witnesses leave.

15            THE COURT:  I'm going to correct that.

16            MR. HYNES:  Thank you.

17            MS. DURHAM:  I just want to make clear that all of

18  our objections in our prior motion on punitive stand including

19  that the passing off is required for common law trademark

20  infringement for punitives.  We also believe that that claim is

21  time barred, Your Honor.

22            THE COURT:  I hear you and I think I've covered that.

23            Okay.  Thank you.

24                    (End of sidebar discussion.)

25            THE COURT:  Ladies and gentlemen, I have two
```

1    comments.

2            First of all, I did tell you that Lontex has to prove

3    that the damages you award caused its damage, but I should add

4    that if Nike's infringement contributed materially to an

5    injury, then it is the cause of that injury.  This may relate

6    back to the second question you had on liability as to whether

7    Nike had contributed to sales of Cool Compression trademark

8    items to third parties.  If you recall, that was one of the

9    questions on the liability verdict.  So if you find that Nike's

10   infringement contributed materially to an injury, you can

11   consider that as the cause of that injury.

12           The second comment is that I am instructing you to

13   disregard any argument about who was present in the courtroom

14   or not present in the courtroom.  As a matter of fact, Nike has

15   had -- of course Mr. Nathan is a representative of Lontex, but

16   Nike has had its representatives in the courtroom throughout

17   the case that were here by permission.  But in addition, they

18   called witnesses.

19           But I think I said earlier today, each party was only

20   allowed to have one representative in the courtroom.  All the

21   other witnesses are what we call sequestered.  They have to

22   stay outside until they're called in to testify.  So Nike has

23   had witnesses here during the case and did have its

24   representative here during the entire case.  You must disregard

25   any argument about that.

1          All right.  Now, coming to the verdict form.  It has

2     the various categories, and you don't have to find damages in

3     all categories.  It's up to you.  If you don't find for damage

4     in a particular category, just put a zero.  But if you do find

5     a damage, you should put the dollar sign and then the amount of

6     dollars that go to it.  And then if you find punitive damages

7     under the instruction, then you put that dollar sign.

8          Then when you're done, whatever the total is of all

9     these items will be added up, and that will become the total

10    judgment that would be entered in favor of Lontex and against

11    Nike.

12         Okay.  The jury may retire at this time.

13         There's one typo in the instruction that has to be

14    fixed, and then you'll get it.  And the exhibits will come out

15    shortly.  Now, it's now 2:43 to be exact.  I don't want you to

16    rush through this.  It's very important.  However, if you can

17    be unanimous on all these different categories within the next

18    half hour, we'll be here to take the verdict.

19         If you don't have a verdict by 4:15, then I instruct

20    you that you should stop your deliberations and come back

21    tomorrow morning at 9:00.  There are various reasons why that

22    is important, but I'll now ask you to begin your deliberations.

23         Thank you very much.

24                   (The jury exits the courtroom at 3:42 p.m.)

25         THE COURT:  Okay.  Thank you very much.  I think

 1    everybody was very well-prepared throughout this case and moved

 2    along very promptly.

 3            Let's just talk one minute about -- as I said, I

 4    can't linger.  If they come back tomorrow, of course I'll be

 5    here.  In the event there is a verdict, I think it's wise and

 6    helpful to you, I think, to set a schedule for post-trial

 7    motions that is reasonable and fair.  And I assume there's

 8    going to be damages awarded.  I have no idea how much, but I

 9    assume that Nike will want to file post-trial motions.  And I

10    assume plaintiff may want to file post-trial motions for

11    attorneys' fees and perhaps for other things.

12            And what I think -- now, I understand Nike has been

13    getting daily copy of the transcript, and I don't know what

14    arrangements that Lontex is making for that.  But there's no

15    reason to delay motions to get the transcripts.  There's such

16    good attorneys in all respects, I'm not sure you need to quote

17    specific pages in great detail for me to understand the motions

18    and rule on them, but I'm not going to stop you.

19            But I am interested in page limits, and I'd like to

20    know first from Nike counsel what you would like in terms of

21    the time frame.  And what I envision is an opening brief, and

22    each of you would have an opposing brief and then a reply

23    brief.  The dates would be mutual for everybody, so we'd have

24    one date by which post-trial motions will be filed by both

25    sides.

1              MR. WAGNER:  That would include attorneys' fees?

2              THE COURT:  Yeah.  And let me say this about

3    attorneys' fees because I've done this before.  Not a lot.

4    You're welcome to look at my opinions.

5              But in a case like this where we have law firms that

6    I know keep good records and so forth, I am really not

7    interested in getting an appendix of a thousand pages with all

8    your time entries.  My suggestion is that you exchange time

9    entries -- you exchange the totals for each record keeper, and

10   if there's a dispute about somebody, then you would show your

11   opposing counsel the underlying data supporting the amount for

12   that person and deleting any -- redacting or deleting any

13   privileged communications.

14             But I am not interested in having to make decisions

15   as to whether somebody, either one of you or one of your

16   colleagues, spent ten hours or eight hours on a particular

17   brief and so forth.  This has been a contentious case.  It has

18   been a very well-handled case.  It's been -- and I've said this

19   before.  All of you have done very, very well in representing

20   your clients.  You deserve whatever credit and compensation

21   that comes to you.  I mean that very sincerely.

22             So what would Nike like in terms of a time period?

23   I'd like a page limit for opening briefs, opposing briefs, and

24   then on a reply brief.  And I'm not rushing anybody, okay,

25   because this could be important.  I have no idea what the jury

1    is going to find, but this case will undoubtedly go to the

2    Third Circuit, and I want you to be able to make your best case

3    for your post-trial motions.

4            MR. HYNES:  Your Honor, I think 30 days is what we'd

5    like.  The page limit, I think, is really going to turn on what

6    happens.

7            THE COURT:  Well, 30 days.  And then how long for the

8    responsive brief?  Another 30?

9            MR. HYNES:  Yeah.  30 and 30, Your Honor.  Page limit

10   is just a little tough.

11           THE COURT:  Fourteen days for a reply brief.

12           MR. WAGNER:  Your Honor, the only reason I object to

13   30 and 30, because that's literally between the 25th and the

14   30th.  So I would say 21 days so we're all out of here for a

15   little bit of time at Christmas.

16           MR. HYNES:  Your Honor, we're never going to object

17   to Christmas.

18           THE COURT:  Let's put specific dates in.  So today is

19   October 28th.  So when is Thanksgiving?  Let's modify this

20   slightly so I don't ruin anybody's holidays.  Thanksgiving is

21   the 25th.  Let's say opening briefs will be filed by noon on

22   November 24th.  It's four days short of 30 days.  So the

23   opening briefs will be due on November 24th, and then the

24   opposing briefs will be due on December 22nd, which is just two

25   days short of 30 days.  And then if you want a little longer

```
 1   for the reply briefs because of the holidays, that's fine with
 2   me.
 3               MR. WAGNER:  Did you have a time on December 22?  You
 4   said noon for November.
 5               THE COURT:  Midnight is fine.
 6               MR. WAGNER:  What gave you the idea we like to file
 7   things late?
 8               THE COURT:  You have been filing things all hours of
 9   the night.  I'm aware.
10          How about we make the reply briefs due by
11   January 13th?  It's a little under two weeks, but that way you
12   don't have to kill yourselves over the holiday.  And I'm going
13   to be away during that time.  Well, I'm going to change that.
14   Wait a minute.  I'll make that earlier.  How about
15   January 11th; is that fair?  January 11th for reply briefs?
16   I'm going to insist on page limits.
17               MR. WAGNER:  What gave you the idea we like to file
18   lots of pages?  It's just a joke, Your Honor.  We filed lots of
19   pages.
20               THE COURT:  Here's what I think.  I think the opening
21   briefs, because the party filing the opening brief gets a reply
22   brief.  So I think 25 pages is fair for the opening briefs and
23   35 for the opposing briefs and 15 for the reply briefs.  So
24   that will apply to -- now, I have no problem -- if Nike's
25   filing post-trial motions, they really ought to be just one
```

brief.  I don't see any reason to have more than one brief,
whether it's for new trial or JNOV or anything else.

        If you're filing, say, a brief for, you know, I don't
know if you intend to file for treble damages or attorneys'
fees.  If you are, you ought to put it in one brief.  I'm
really looking for one brief on all post-trial motions with
this schedule.

        Any other comments?

        You're going to take your own exhibits.  You can come
back tomorrow.  If the jury reaches a verdict today, you're
welcome to come back tomorrow.  Leave everything here tonight
and come back tomorrow, if you prefer.

        MR. HYNES:  Sorry, Your Honor.  I'm not familiar with
the local rule.  Are we permitted to speak with the jurors
after the verdict is in?

        THE COURT:  Yes.  When they reach a verdict, I'm
going to go back and just say thank you.  And I don't discuss
the case or their verdict, but I say thank you to them.  I see
if they have any questions.  I will tell them in open court
that if they want to talk to any of you, they certainly are
allowed to.  But if they don't want to, they don't have to, and
they should just get on the elevator and go about their
business.  I'll say that when the verdict comes in, and I'll
repeat that when I go in the jury room.

        MR. HYNES:  Thank you, Your Honor.

 1           THE COURT:  Okay.  Well, we'll see what happens

 2    between now and 4:15.  If there's no verdict, we'll go home and

 3    resume at 9:00.

 4           MR. SCHWARTZ:  Can we gather our exhibits?  I know

 5    they may not want to see them now, but at least we'll have them

 6    together.

 7           THE COURT:  I think you should get them because I

 8    said they'd be coming out.  I think the schedules are relevant.

 9    They ought to see those.

10           MR. SCHWARTZ:  Agree.

11           THE COURT:  All right.  Thank you.  Court's adjourned

12    until 4:15.  If there's no verdict, they'll just go home.  I'm

13    not going to come back in here.

14           MR. SCHWARTZ:  Understood.  Thank you, Your Honor.

15                      (Recess taken from 3:53 p.m. to 4:15 p.m.)

16                      (Proceedings adjourned at 4:15 p.m.)

17

18                         CERTIFICATE

19

20    I certify that the foregoing is a correct transcript from the

21    record of proceedings in the above-entitled matter.

22

23

24    *Shannan Gagliardi*  10/28/21

25    Shannan Gagliardi, RDR, CRR

**MR. HYNES: [77]** 63/1 63/10 63/14 64/25 66/13 69/16 69/21 70/5 70/15 78/21 97/4 98/13 100/19 101/20 102/20 103/6 103/10 103/14 115/12 115/14 118/8 119/25 120/18 121/20 127/7 128/11 129/13 129/21 130/5 130/17 131/17 133/6 134/12 135/5 135/21 136/3 136/11 139/4 139/19 140/16 143/22 144/15 144/19 146/15 146/19 147/1 147/4 147/12 147/21 155/23 155/25 156/25 157/3 165/25 168/8 180/10 180/15 184/12 184/17 185/3 185/10 185/17 185/25 186/5 187/13 195/8 199/3 199/5 199/19 231/10 231/13 231/16 236/4 236/9 236/16 238/13 238/25

**MR. SCHWARTZ: [15]** 118/11 144/17 146/1 155/22 166/3 167/18 167/21 168/5 170/18 172/18 174/15 184/1 239/4 239/10 239/14

**MR. WAGNER: [83]** 3/7 4/7 4/10 4/22 4/25 5/8 5/10 5/13 5/21 7/17 7/21 9/17 29/12 45/10 46/19 51/11 53/15 60/3 60/23 61/2 61/9 61/14 61/18 61/23 62/4 62/16 63/17 63/24 64/3 64/9 64/22 65/24 66/6 67/3 67/5 67/8 67/12 68/11 69/10 69/13 70/2 70/12 70/19 70/23 71/1 71/6 73/1 78/2 78/19 98/16 98/24 100/17 101/24 103/21 104/2 144/22 145/2 145/5 147/7 186/1 186/7 189/15 191/10 191/21 193/24 194/10 195/1 195/13 195/17 195/24 197/3 197/9 200/12 218/23 230/15 230/19 230/21 231/3 235/1 236/12 237/3 237/6 237/17

**MS. DURHAM: [32]** 9/24 10/3 10/9 10/13 10/17 60/6 60/17 62/1 62/9 102/16 104/10 145/9 145/16 145/20 189/19 189/24 190/11 190/13 191/1 194/21 194/25 195/5 195/16 195/18 195/22 196/1 196/19 197/22 197/25 199/25 230/23 231/17

**MS. EISENSTEIN: [33]** 3/9 3/15 3/20 3/23 5/4 6/4 9/23 11/10 14/20 15/8 15/20 22/2 23/4 23/7 26/24 31/2 33/17 36/13 45/12 46/17 47/16 48/5 49/16 50/13 53/8 102/6 102/23 105/1 105/5 105/12 145/22 209/11 231/5

**THE COURT: [224]** 3/2 3/10 3/19 3/22 4/6 4/8 4/19 4/24 5/3 5/5 5/9 5/12 5/20 6/2 7/1 7/20 9/1 9/19 10/2 10/5 10/12 10/15 10/19 10/23 12/16 13/21 14/18 14/21 15/5 21/16 23/6 26/18 29/14 31/4 33/16 33/18 37/25 45/13 46/18 47/17 48/6 49/17 50/14 50/21 51/12 53/10 53/14 53/16 57/12 59/16 59/25 60/4 60/15 60/20 60/25 61/7 61/12 61/17 61/22 61/25 62/3 62/7 62/15 62/24 63/8 63/13 63/16 63/20 64/2 64/8 64/21 64/23 65/10 65/13 65/23 66/5 66/12 67/4 67/7 67/10 67/24 68/4 68/13 69/11 69/15 69/20 69/25 70/7 70/13 70/16 70/22 70/24 71/3 71/7 71/10 72/1 77/2 77/25 78/10 78/20 85/23 94/25 96/1 96/3 97/3 98/15 98/22 99/7 100/8 100/18 100/20 101/22 102/8 102/15 102/18 102/21 102/24 103/8 103/12 103/15 103/23 104/5 104/8 104/21 105/4 105/6 105/9 115/11 115/13 115/15 118/10 143/21 143/24 144/4 144/14 144/16 144/20 144/24 145/4 145/7 145/12 145/19 145/21 145/23 146/3 146/5 146/18 146/23 147/2 147/5 147/10 147/13 147/19 155/24 156/24 157/2 166/2 167/23 168/7 168/9 170/17 171/17 180/11 180/16 180/18 184/2 186/2

189/18 189/22 190/3 190/12 190/17 191/8 191/12 191/24 194/4 194/18 194/24 195/3 195/11 195/21 196/14 196/23 197/7 197/15 197/24 198/17 199/4 199/9 199/22 200/3 200/9 209/10 218/22 221/25 230/14 230/18 230/20 230/22 231/2 231/4 231/12 231/15 231/22 231/25 233/25 235/2 236/7 236/11 236/18 237/5 237/8 237/20 238/16 239/1 239/7 239/11

**THE DEPUTY CLERK: [8]** 10/18 10/20 54/2 54/4 115/16 115/19 144/2 167/20

**THE WITNESS: [26]** 13/23 14/19 14/22 21/17 29/16 31/5 38/2 45/14 47/18 50/22 53/12 54/6 57/14 65/12 65/16 72/3 77/3 78/1 86/1 96/2 96/4 115/17 115/22 135/24 180/17 180/19

**$**

**$1,043,000 [1]** 164/8
**$1.4 [1]** 148/20
**$1.4 million [1]** 148/20
**$100,000 [1]** 160/24
**$140,000 [1]** 183/9
**$150,000 [5]** 107/12 108/10 152/25 164/5 210/24
**$158,000 [1]** 164/15
**$16,000 [2]** 46/6 115/2
**$160,000 [2]** 160/23 162/24
**$19 [2]** 132/14 133/21
**$19 million [2]** 132/14 133/21
**$2.5 [1]** 142/16
**$2.5 million [1]** 142/16
**$210,000 [1]** 183/15
**$223,846 [4]** 12/7 15/13 108/6 212/13
**$224,000 [1]** 163/18
**$300,000 [2]** 107/8 149/2
**$33 [1]** 46/5
**$33 million [1]** 46/5
**$35.5 [1]** 148/7
**$35.5 million [1]** 148/7
**$4 [1]** 166/13
**$4 billion [1]** 166/13
**$500 [2]** 78/15 80/16
**$500 million [2]** 78/15 80/16
**$500,000 [2]** 107/7 210/22
**$600,000 [1]** 210/22
**$7 [1]** 148/17
**$7 million [1]** 148/17
**$7.4 [2]** 52/6 53/4
**$7.4 million [2]** 52/6 53/4
**$70,000 [1]** 183/13
**$700 [1]** 183/1
**$74.6 [2]** 141/1 156/16
**$74.6 million [2]** 141/1 156/16
**$8,000 [1]** 163/3
**$800,000 [12]** 46/1 52/15 121/8 121/14 151/19 152/9 152/12 153/4 156/23 164/2 165/16 184/7
**$9,985,032 [1]** 77/23
**$95 [2]** 203/25 206/5
**$95 million [2]** 203/25 206/5

**'**

**'04 [1]** 176/16
**'14 [2]** 161/20 176/16
**'18 [2]** 85/14 85/22

**0**

**053 [1]** 120/7

**1**

**1 percent [1]** 89/15
**1,204,000 [1]** 62/24
**1,500 [2]** 51/6 201/21
**1,530 [1]** 35/10
**1,600 [1]** 81/11
**1.4 million [2]** 148/22 148/24
**10 [1]** 92/12
**10 million [1]** 60/11
**10 percent [11]** 15/25 17/7 18/11 18/19 20/3 139/1 139/17 156/16 159/4 168/17 169/4
**10-K [4]** 139/10 139/15 168/3 177/11
**10-Ks [3]** 126/18 139/13 166/16
**10.4 [1]** 140/1
**100 [8]** 2/9 89/18 89/24 89/25 90/4 90/9 90/11 107/13
**10020 [1]** 1/18
**10:22 [1]** 59/23
**10:33 [1]** 68/2
**10:40 [1]** 68/2
**10:50 [1]** 71/8
**10th [1]** 81/3
**11 [1]** 2/4
**11.9 million [3]** 141/17 141/24 142/4
**115 [1]** 2/13
**11682 [1]** 1/13
**118 [1]** 2/14
**11:32 [1]** 102/13
**11:34 [1]** 104/6
**11:41 [1]** 104/6
**11:43 [1]** 105/7
**11th [2]** 237/15 237/15
**12 [3]** 139/3 148/1 159/5
**12.4 percent [2]** 139/16 139/18
**1222 [1]** 23/7
**1223 [2]** 31/8 32/2
**1224 [3]** 31/8 33/6 33/17
**1225 [2]** 31/8 34/4
**1227 [1]** 31/20
**1229 [1]** 129/13
**1230 [1]** 129/21
**1231 [1]** 161/10
**1232 [1]** 161/16
**1233 [1]** 130/6
**1234 [1]** 130/18
**1251 [1]** 1/18
**12:30 [1]** 102/11
**12:42 [1]** 144/12
**12:43 [1]** 146/4
**13 [5]** 130/23 131/1 134/12 135/21 150/2
**13 percent [1]** 139/3
**13th [1]** 237/11
**14 [6]** 33/8 131/4 136/17 150/16 151/5 152/15
**1451 [2]** 133/18 172/18
**15 [10]** 59/22 67/9 93/4 117/5 131/11 136/18 181/3 186/23 187/8 237/23
**15 percent [2]** 139/17 159/5
**15-20 [1]** 222/2
**150 [2]** 181/25 182/13
**1532 [1]** 174/15
**1539 [2]** 134/20 135/5
**158,000 [1]** 162/22
**16 [2]** 57/7 185/9
**1621 [1]** 51/2 174/5

**1**

**166** [1]  2/14
**16th** [2]  155/14 203/19
**17** [1]  184/18
**17 percent** [1]  75/20
**18-CV-5623** [1]  1/3
**18.7** [1]  64/6
**18.7 percent** [2]  62/22 64/4
**184** [1]  2/15
**19 million** [1]  184/25
**19 percent** [2]  64/15 64/17
**190** [1]  75/6
**19106** [1]  1/23
**1970s** [1]  155/5
**1971** [1]  125/13
**1980s** [2]  116/24 117/14
**1985-ish** [1]  181/9
**1987** [1]  181/6
**1990s** [1]  56/25
**1992** [2]  117/22 118/2
**1994** [1]  117/3
**1:15** [3]  144/8 144/11 146/3
**1:22** [1]  147/17

**2**

**2 percent** [7]  35/13 35/14 51/5 51/9 110/19
  110/23 158/6
**2.5 million** [1]  150/8
**2.6 million** [1]  135/2
**2.8 million** [4]  121/6 150/12 163/22 164/19
**20** [8]  107/13 152/19 154/2 180/25 186/17
  186/17 186/18 222/2
**200** [4]  60/13 60/13 182/9 183/5
**2002** [2]  155/1 155/3
**2004** [3]  154/20 154/22 176/7
**2006** [2]  97/13 212/24
**2010** [2]  138/24 212/23
**2011** [3]  5/7 161/20 164/7
**2014** [7]  106/25 166/14 176/19 176/25 177/9
  177/9 177/17
**2015** [24]  5/7 11/16 12/2 14/25 38/16 91/6
  91/10 97/18 151/15 152/9 152/10 152/15
  152/21 153/25 154/23 160/20 164/5 165/16
  165/16 168/4 177/18 206/1 206/24 215/4
**2016** [14]  5/6 14/25 31/23 32/5 33/8 36/21
  36/24 85/14 85/22 106/25 107/10 175/8
  201/19 220/20
**2017** [9]  14/25 34/6 38/17 38/21 91/6 139/15
  139/18 215/5 220/17
**2018** [5]  97/13 97/18 164/7 166/14 168/4
**2019** [8]  5/6 11/21 11/22 12/2 85/13 139/1
  139/17 140/2
**2020** [7]  11/18 67/9 92/12 135/15 135/16
  140/2 182/3
**2021** [1]  1/6
**21** [1]  236/14
**210** [1]  191/18
**22** [2]  156/12 237/3
**223,000** [2]  121/1 212/13
**22nd** [1]  236/24
**24** [1]  159/16
**240 million** [3]  66/14 66/25 69/22
**24th** [2]  236/22 236/23
**25** [2]  144/23 237/22
**25 percent** [4]  140/7 140/10 141/17 148/21
**25,000-unit** [1]  97/14
**25,755** [1]  97/15
**250** [1]  181/7

**MN** [1]  1/23
**26** [4]  129/11 130/11 136/18 136/18
**2609** [1]  1/22
**267** [1]  1/23
**27** [3]  31/22 32/5 201/19
**28** [3]  1/6 35/6 35/13
**28.5 million** [1]  141/14
**28th** [1]  236/19
**297** [1]  191/18
**299-7254** [1]  1/23
**2:24** [1]  187/9
**2:43** [1]  233/15
**2:45** [1]  200/6
**2:51** [2]  200/6 200/7

**3**

**3 percent** [2]  57/19 74/3
**3-year** [1]  159/23
**3.1** [7]  77/2 92/6 92/25 93/4 93/8 93/15
  93/18
**3.1 percent** [8]  62/4 73/21 75/3 75/24 76/21
  76/24 92/16 94/20
**3.10 percent** [1]  68/18
**3.67 percent** [1]  77/1
**30** [14]  116/14 131/22 142/18 173/11 173/13
  236/4 236/7 236/8 236/9 236/9 236/13
  236/13 236/22 236/25
**300** [2]  88/9 183/6
**300,000** [1]  150/8
**3000** [1]  11/10
**3003** [1]  36/14
**3007** [1]  43/18
**3009** [4]  68/15 73/2 73/3 73/5
**3010** [6]  63/13 63/13 63/15 68/20 69/3 69/6
**3011** [3]  68/20 69/3 69/6
**3020** [3]  167/25 168/6 168/10
**308,535** [1]  91/13
**309** [1]  62/1
**309,000** [8]  60/12 68/16 73/8 73/17 73/20
  88/24 94/18 96/8
**309,535** [1]  90/8
**309,536** [13]  61/16 73/5 78/5 87/25 88/11
  88/13 88/17 89/5 90/8 90/24 91/11 95/23
  96/4
**30A** [7]  125/21 128/17 130/15 131/12 148/8
  149/9 214/25
**30B** [7]  125/21 130/15 131/12 148/9 184/17
  185/11 214/25
**30th** [1]  236/14
**31** [13]  125/21 128/18 130/11 130/15 131/13
  131/22 133/13 135/21 142/18 148/9 149/9
  173/11 173/13
**31.7 percent** [2]  142/15 148/25
**31A** [4]  50/24 133/6 134/13 214/24
**31B** [1]  214/25
**32** [3]  136/3 154/13 155/6
**32 percent** [1]  126/19
**33-million-dollar** [2]  44/12 45/25
**34-million-dollar** [1]  69/23
**35** [1]  237/23
**35.5 million** [1]  148/17
**36** [1]  54/18
**39-million-dollar** [2]  40/15 40/21
**39.1 million** [2]  141/6 141/9
**3:42** [1]  233/24
**3:53** [1]  239/15

**4**

**4 percent** [2]  74/3 74/6

**2-1-year** [1]  80/24 132/22 132/23
**4.8 percent** [2]  73/16 73/18
**40** [1]  144/9
**400** [3]  1/13 117/4 182/22
**406** [3]  120/7 152/25 164/5
**450** [1]  183/6
**46** [1]  2/5
**4:15** [6]  146/6 233/19 239/2 239/12 239/15
  239/16
**4:20** [1]  146/6
**4:30** [1]  146/7

**5**

**5 percent** [3]  17/4 138/25 158/6
**5,000** [1]  75/25
**5,553** [1]  97/20
**5-minute** [2]  67/24 104/5
**5.1 percent** [1]  140/1
**50** [10]  27/11 27/18 27/19 27/22 104/11
  104/15 104/18 160/10 182/8 182/20
**50 percent** [1]  142/1
**500 million** [1]  55/14
**500,000-dollar-offer** [1]  207/5
**51** [2]  2/5 145/10
**54** [1]  2/7
**5623** [1]  1/3

**6**

**6 million** [1]  88/9
**6,444,674** [6]  62/19 73/17 86/18 87/17 88/11
  88/12
**6.3** [1]  142/4
**6.3 million** [1]  150/7
**6.4** [1]  72/9
**6.5 million** [2]  204/4 206/7
**60 percent** [2]  64/5 64/6
**600,000** [1]  43/23
**601** [1]  1/22

**7**

**7 billion** [3]  58/6 74/5 74/12
**7 million** [2]  93/19 221/9
**7,464,141-dollar** [1]  15/18
**7-million-dollar** [1]  204/3
**7.1 million** [4]  121/6 150/11 163/19 164/20
**7.4 million** [2]  19/16 52/15
**7.5** [1]  121/2
**70** [2]  118/5 181/6
**70 percent** [1]  161/2
**703086** [1]  33/21
**703098** [1]  32/17
**71** [1]  2/8
**7254** [1]  1/23
**74.6 million** [1]  143/20
**75** [1]  117/7
**75 percent** [1]  51/10
**79** [1]  2/8

**8**

**80 million** [3]  65/2 66/25 69/22
**800,000** [10]  53/5 148/25 150/8 152/13
  153/17 164/3 164/21 164/22 165/22 210/20
**800,000-dollar** [1]  107/3 151/4
**8th** [1]  37/7

**9**

**9,979,479** [2]  98/4 98/10
**9,985,032** [8]  73/23 77/8 78/4 94/1 94/16
  95/21 96/7 97/6

**9.9 million [2]** 94/21 99/11
**9.985 million [1]** 88/25
**91 percent [1]** 154/16
**92130 [1]** 1/14
**95 million [2]** 221/3 221/9
**95-million-dollar [2]** 40/12 40/19
**95.7 million [1]** 120/25
**98 [1]** 2/9
**98 percent [2]** 35/18 110/23
**99 [3]** 89/16 89/24 90/5
**99 percent [2]** 89/14 89/16
**9:00 [2]** 233/21 239/3
**9:05 [2]** 1/7 3/1
**9:18 [1]** 10/21

# A

**a.m [11]** 1/7 3/1 10/22 59/24 68/2 68/3 71/9 102/14 104/6 104/7 105/8
**abandon [1]** 219/20
**ability [2]** 48/3 59/9
**able [11]** 12/1 21/6 58/8 76/23 131/12 145/10 146/11 176/25 199/20 221/19 236/2
**about [254]**
**above [3]** 61/21 75/20 239/21
**above-entitled [1]** 239/21
**absence [1]** 123/17
**absolutely [4]** 63/1 65/12 66/13 147/3
**absorption [1]** 126/4
**Academy [2]** 139/23 139/25
**accept [5]** 153/14 193/3 209/20 227/3 228/9
**acceptable [1]** 153/2
**accomplish [1]** 153/20
**accordance [1]** 71/15
**according [2]** 14/12 108/3
**account [9]** 76/16 76/21 91/21 113/2 113/17 159/9 221/16 226/8 228/6
**accounting [2]** 26/8 36/6 47/14 54/24 116/8 116/23 116/24 117/24 159/25
**accountings [1]** 117/8
**accounts [5]** 149/2 155/17 160/13 160/13 169/10
**accumulated [1]** 132/24
**accuracy [3]** 6/2 74/22 173/12
**accurate [5]** 14/7 18/13 23/11 35/8 63/23
**accurately [2]** 7/18 8/4
**accused [6]** 60/11 64/10 133/24 136/23 138/14 147/24
**achieve [1]** 12/1
**acknowledge [1]** 209/20
**acknowledged [4]** 110/8 211/8 214/22 215/3
**acknowledging [1]** 205/16
**acquire [2]** 156/20 165/18
**acquired [1]** 151/21
**acquisition [1]** 17/23 119/12
**across [14]** 28/21 50/2 56/11 57/7 58/9 72/13 72/18 74/2 134/4 150/6 194/15 214/6 219/19 221/6
**act [4]** 153/19 206/20 229/13 229/13
**actions [1]** 229/2
**activities [3]** 55/24 162/7 212/19
**activity [8]** 12/1 13/9 13/12 74/9 80/24 201/25 205/1 212/16
**acts [2]** 229/19 230/7
**actual [23]** 8/4 21/4 49/5 59/5 67/16 67/16 67/23 72/14 78/14 97/10 121/16 134/20 142/3 187/23 188/5 190/16 190/19 191/5 191/15 192/10 207/5 209/24 226/11

**9660 [3]** 3/2 3/24 4/2
**96130 [1]** 1/17
**98 [3]** 3/2
**9:06 [1]** 73/9

**...**
51/21 56/7 57/17 62/10 64/5 72/6 76/7 80/9 92/5 93/2 93/3 93/21 95/3 95/3 128/1 128/12 137/20 140/6 142/1 142/2 153/16 173/24 177/4 178/3 188/4 197/4 203/13 204/25 207/13 208/1
**ad [5]** 44/1 76/16 96/22 98/5 98/11
**add [3]** 128/25 192/3 232/3
**added [7]** 40/18 44/12 80/16 110/6 136/18 204/13 233/9
**addition [3]** 26/9 228/20 232/17
**additional [5]** 78/15 113/6 158/1 158/7 183/12
**Additionally [1]** 160/9
**address [12]** 10/1 35/23 102/3 105/11 115/7 136/7 174/21 175/6 175/12 175/14 212/4 226/20
**adds [1]** 9/12
**adequacy [1]** 225/4
**Adidas [1]** 219/20
**adjourn [1]** 102/11
**adjourned [2]** 239/11 239/16
**adjunct [1]** 117/23
**adjust [4]** 114/7 129/1 148/21 158/6
**adjusted [1]** 140/7
**adjustment [2]** 138/3 139/8
**adjustments [2]** 119/7 122/1
**administrative [1]** 126/16
**admissibility [1]** 68/24
**admit [6]** 73/2 108/17 110/16 110/18 114/22 168/5
**admitted [7]** 28/17 68/25 73/3 110/25 146/24 168/9 168/10
**ads [9]** 38/3 42/23 43/7 45/1 57/3 57/9 65/2 66/14 66/25
**advertise [3]** 126/24 176/23 179/13
**advertised [1]** 172/23
**advertises [1]** 179/21
**advertising [81]** 13/25 14/5 41/20 41/22 42/8 43/11 43/20 44/7 44/10 44/15 44/20 45/5 45/6 45/17 45/21 46/6 46/7 46/24 57/6 58/3 60/2 66/10 79/15 79/19 80/2 80/5 80/8 80/13 83/10 83/18 98/21 99/1 99/2 104/20 108/1 114/19 114/23 115/1 115/2 115/4 121/2 121/16 121/16 126/21 143/10 143/10 146/17 155/12 160/4 161/14 162/3 162/5 162/13 162/16 162/18 163/1 163/3 165/23 188/11 189/4 189/6 189/8 189/17 189/21 189/25 190/5 191/2 191/2 191/6 192/2 211/12 211/14 211/16 211/19 211/22 211/25 212/18 220/2 224/3 224/6 224/9
**advice [1]** 80/18
**advisement [1]** 104/22
**AdWords [2]** 43/23 44/23
**affect [2]** 193/12 227/13
**affects [3]** 193/19 203/13 227/19
**afield [1]** 211/24
**afraid [1]** 184/10
**after [34]** 10/3 25/24 26/1 36/18 36/24 36/24 37/6 37/15 39/7 66/23 66/23 70/17 71/3 82/8 93/2 93/3 93/5 93/16 106/1 115/6 146/7 159/23 163/11 164/20 176/10 176/25 177/9 198/19 204/2 215/7 217/11 219/23 220/20 238/15
**afternoon [4]** 166/8 166/9 186/25 209/11
**afterwards [2]** 160/22 161/21
**again [47]** 33/12 38/25 45/21 64/11 64/14 65/7 83/15 90/23 91/1 91/5 91/6 91/8 91/12 96/15 98/8 110/12 115/7 126/7 128/9 135/17

**...**
153/25 154/16 154/24 155/4 155/16 162/7 162/18 164/8 164/16 165/21 172/15 185/10 186/8 186/13 202/20 203/1 207/23 208/4 209/18 211/10 221/12
**against [8]** 140/8 167/1 192/16 226/15 229/8 230/3 230/5 233/10
**aggregated [1]** 178/25
**aggregation [1]** 133/3
**ago [15]** 8/25 39/7 67/15 93/4 120/6 130/23 134/6 136/25 140/20 141/15 155/18 164/8 164/13 175/8 182/4
**agree [25]** 18/25 19/4 19/19 20/6 21/13 23/9 29/10 32/8 32/20 34/5 45/16 60/1 66 61/25 62/24 83/9 83/17 83/22 94/22 120/11 169/16 174/7 177/11 178/9 195/1 239/10
**agreed [5]** 37/25 83/13 179/12 211/6 224/1
**agreement [12]** 17/22 17/25 19/21 19/25 124/24 151/10 151/15 151/18 153/9 153/11 159/10 179/17
**agreements [22]** 16/3 16/6 16/8 18/17 112/16 119/12 152/1 157/5 157/7 157/9 157/10 157/13 157/19 158/4 158/5 158/10 158/19 158/22 158/24 159/1 159/5 159/7
**agrees [1]** 124/10
**ahead [9]** 26/23 28/13 33/18 39/20 40/22 46/10 62/3 100/20 157/2
**aisle [1]** 171/21
**all [244]**
**alleged [2]** 159/25 160/8
**allotment [1]** 6/9
**allow [9]** 9/12 20/25 48/25 66/4 68/14 71/3 71/4 103/15 198/5
**allowed [6]** 26/19 26/20 48/16 133/20 232/20 238/21
**allows [7]** 51/24 132/17 133/2 138/20 151/25 159/4 209/4
**almost [6]** 38/4 60/9 60/11 138/1 140/10 161/2
**alone [1]** 9/11
**along [4]** 144/10 165/10 184/22 234/2
**already [21]** 3/18 4/1 4/2 4/5 4/9 94/25 95/1 106/2 106/20 112/23 128/14 153/7 157/11 191/19 199/5 201/17 202/2 202/16 219/10 219/10 230/16
**also [72]** 4/1 9/7 16/12 24/20 24/20 26/10 27/20 32/1 33/10 34/8 34/10 34/23 46/13 47/6 47/22 50/4 50/24 66/21 68/21 72/17 82/18 90/13 90/22 90/24 91/1 102/8 104/15 104/18 106/16 107/21 107/25 108/6 108/12 108/22 109/2 109/10 110/25 111/11 116/9 117/15 118/7 119/13 124/13 125/15 127/16 128/8 132/4 135/14 139/11 142/9 143/8 143/9 146/1 169/8 169/11 171/4 172/8 172/11 173/21 174/9 181/1 181/7 181/15 182/12 182/18 185/2 185/8 206/13 211/15 227/9 231/10 231/20
**although [3]** 16/7 125/19 134/22
**altogether [1]** 66/3
**always [3]** 91/14 124/21 132/4
**am [38]** 9/23 10/5 31/14 103/19 121/19 166/12 166/20 167/5 167/15 168/16 168/17 168/25 169/13 169/20 169/23 170/22 171/5 174/13 176/13 177/22 178/2 178/8 179/11 180/3 180/23 181/1 181/8 181/16 181/24 182/4 182/11 183/1 183/9 187/21 232/12 234/19 235/6 235/14
**amazed [1]** 221/19
**Amazon [1]** 185/7

**A**

**Americas [1]** 1/18
**Amies [5]** 16/9 17/10 17/11 17/12 18/12
**among [2]** 82/5 182/13
**amongst [2]** 38/4 58/15 151/12
**amount [39]** 19/14 19/15 19/22 20/2 79/18
124/14 125/8 140/1 146/17 183/3 188/17
188/25 193/2 193/12 206/17 209/1 209/3
212/6 212/6 221/8 222/11 222/18 222/20
222/22 222/24 223/6 223/8 223/16 223/17
224/4 226/2 227/3 227/14 228/10 229/16
229/25 230/4 233/5 235/11
**amounts [2]** 150/9 212/11
**analogy [1]** 119/5 177/24
**analyses [3]** 117/2 120/21 163/12
**analysis [78]** 3/17 13/8 14/11 14/24 15/3
15/11 15/16 16/5 16/25 18/16 18/23 23/10
23/22 27/7 29/6 30/23 33/4 33/23 34/17
35/19 37/22 42/5 42/8 42/14 43/9 47/6 47/19
47/22 49/7 50/5 61/3 75/25 86/8 89/20 90/1
113/18 116/9 121/5 121/24 125/25 128/19
128/24 129/7 129/9 129/12 129/17 131/4
131/5 131/10 131/13 132/3 132/25 133/22
134/1 134/8 135/19 136/15 137/22 139/23
140/23 148/4 149/3 154/7 159/13 159/21
160/7 162/13 163/20 163/23 165/2 165/5
173/12 177/15 181/13 182/1 182/25 184/25
211/9
**analyst [1]** 177/6
**analysts [2]** 177/3 177/13
**analytics [3]** 55/5 55/8 75/13
**analyze [2]** 55/22 175/18
**analyzed [3]** 17/9 90/21 130/12
**anchor [4]** 21/9 21/23 210/9 210/14
**anchored [1]** 106/18
**anecdotal [1]** 173/10
**Angeles [1]** 116/7
**annual [1]** 179/24
**another [23]** 8/2 14/6 47/3 53/4 75/11 91/7
100/5 106/12 107/22 112/5 115/7 134/11
139/22 140/2 170/18 182/8 182/13 182/20
200/23 215/2 216/11 224/14 236/8
**answer [18]** 13/21 14/17 14/18 14/21 21/16
29/15 50/21 73/19 81/13 85/25 91/15 94/10
95/25 96/14 100/8 180/18 217/7 221/18
**answering [2]** 13/20 27/25
**answers [1]** 55/17
**anticipate [1]** 144/22
**ants [3]** 203/5 203/6 221/14
**any [119]** 3/14 8/23 9/10 13/9 21/1 25/8
25/12 25/15 30/24 42/20 44/15 44/20 44/23
48/2 48/16 48/19 48/22 58/3 60/15 62/21
63/25 69/11 74/21 77/10 77/14 77/22 79/18
80/22 81/2 81/21 84/2 84/3 84/4 84/5 85/16
98/15 99/22 100/3 100/12 101/22 103/19
104/12 104/13 106/10 107/14 107/19 109/18
111/17 115/4 117/9 117/17 118/10 121/11
123/15 132/7 137/19 144/21 145/7 145/14
146/6 146/9 146/13 157/10 158/8 159/25
162/16 166/19 168/7 169/19 170/21 171/17
172/12 172/13 173/4 174/20 182/17 186/4
186/6 188/19 189/8 189/14 190/15 190/20
192/18 193/6 193/23 194/22 195/6 195/6
195/12 197/21 198/24 204/23 205/16 205/16
215/11 221/25 222/3 222/10 222/13 224/9
225/6 225/21 226/18 227/7 228/9 228/10
229/17 230/4 230/10 230/14 232/13 232/25
235/12 235/18 238/1 238/8 238/19 238/20

**anybody's [1]** 236/20
**anymore [1]** 220/4
**anyone [3]** 52/6 108/17 219/1
**anything [13]** 3/5 8/6 9/12 13/5 47/14 64/19
71/1 77/20 109/1 113/7 146/14 147/5 238/2
**anyway [3]** 72/7 114/18 160/7
**anywhere [2]** 114/14 195/5
**apart [2]** 112/11 213/14
**apartment [2]** 119/6 178/5
**apologize [4]** 140/20 145/3 170/19 223/10
**apparel [21]** 56/2 58/19 59/13 59/14 59/15
62/21 64/4 64/14 73/25 74/3 74/7 76/21
76/25 82/24 82/24 134/22 137/20 152/23
154/21 158/14 159/8
**appeal [2]** 209/22 209/22
**appear [4]** 38/17 195/4 214/13 215/5
**APPEARANCES [1]** 1/11
**appeared [5]** 38/17 51/2 110/6 215/4 216/10
**appears [2]** 23/11 195/10
**appellate [1]** 147/15
**appendix [2]** 67/14 235/7
**apples [2]** 176/25 177/1
**applicable [1]** 230/24
**applied [5]** 96/6 131/19 140/8 141/25 198/14
**applies [2]** 189/16 198/19
**apply [14]** 6/7 109/5 123/15 132/18 138/3
150/18 192/8 220/12 222/5 222/9 237/24
**apportion [3]** 122/20 142/25 164/1
**apportioned [2]** 164/3 174/10
**apportionment [22]** 121/7 121/8 121/8
122/25 123/2 123/15 143/1 143/1 150/9
150/17 150/18 151/25 154/7 155/16 155/20
156/2 156/4 156/11 164/20 164/20 165/13
216/14
**apportions [1]** 155/9
**appreciate [1]** 8/8
**approach [9]** 23/4 23/5 31/2 119/3 119/14
119/14 119/14 152/19 167/21
**approached [2]** 107/13 107/17
**appropriate [20]** 108/16 124/25 141/18
142/19 142/22 150/18 151/7 153/4 155/19
159/1 190/9 192/5 196/4 196/12 200/2
211/24 213/25 216/21 228/2 228/17
**appropriately [1]** 164/25
**approved [3]** 48/15 48/22 198/22
**approximately [4]** 35/10 163/18 182/9
182/20
**approximation [1]** 223/17
**April [7]** 36/21 36/24 37/7 152/21 153/25
164/4 201/19
**April 2015 [1]** 152/21
**April 2016 [1]** 201/19
**April 3 [1]** 153/25
**April 8 [2]** 36/21 36/24
**April 8th [1]** 37/7
**archive.org [1]** 31/13
**are [217]** 3/4 5/9 5/10 6/22 7/22 7/24 7/25
8/5 9/8 9/14 9/21 16/11 17/11 18/24
20/15 22/9 22/23 23/17 24/5 24/7 24/14
24/17 25/23 26/20 27/5 29/10 31/13 34/19
35/15 35/19 39/17 40/10 41/2 41/9 41/14
43/5 47/7 51/6 55/13 58/2 58/15 58/24 60/8
60/18 61/7 61/18 61/20 62/11 62/12 62/18
62/20 63/1 63/14 64/5 64/6 64/15 64/22
64/25 65/10 65/20 66/7 66/20 66/25 67/11
69/3 70/11 71/12 72/21 74/10 74/14 76/25
76/25 78/8 81/10 82/1 82/19 82/20 82/25
83/3 83/6 88/16 88/22 93/20 95/23 96/5

23/10 109/9 112/16 112/19 109/2 110/20
111/4 111/18 111/22 111/24 112/10 112/14
113/10 114/5 117/7 117/18 119/23 119/24
120/7 120/14 121/4 121/17 121/17 123/16
123/19 123/23 123/24 124/8 125/19 126/7
126/8 126/24 126/25 127/2 127/4 127/18
127/20 127/21 127/21 129/2 129/25 133/4
140/6 142/7 142/12 143/15 145/19 146/12
146/24 147/1 147/10 148/6 148/7 149/17
150/8 154/9 154/14 154/14 154/19 155/11
156/15 156/22 157/11 157/19 157/20 158/8
158/18 158/24 159/1 159/5 159/10 160/8
160/10 161/14 162/7 163/14 163/24 168/22
168/25 169/2 169/10 169/21 171/20 174/2
177/5 177/5 178/4 178/13 185/7 187/21
189/2 191/16 191/21 193/18 200/10 200/20
202/6 202/24 204/20 205/24 206/1 206/19
208/9 209/4 209/21 210/4 211/23 211/24
214/18 215/2 216/18 217/1 217/4 217/16
218/5 219/8 221/19 223/11 227/18 228/8
228/14 228/25 229/1 229/2 229/7 232/21
233/21 238/5 238/14 238/20 239/8
**area [4]** 19/13 80/15 212/15 222/5
**areas [2]** 72/18 204/14
**aren't [2]** 108/25 158/22
**argue [1]** 9/18
**argument [6]** 69/2 146/10 186/21 200/10
232/13 232/25
**argumentative [1]** 48/7
**arguments [4]** 115/8 144/5 186/16 200/4
**Armours [1]** 158/14
**around [18]** 35/11 49/14 51/10 56/21 102/11
118/7 138/25 152/10 154/20 154/22 155/1
155/3 181/6 195/23 202/19 204/9 204/14
211/24
**arrangements [5]** 18/8 104/24 126/22 158/1
234/14
**article [2]** 75/4 92/13
**articles [1]** 93/19
**as [134]** 3/2 5/17 8/18 16/14 18/15 18/18
19/9 19/10 27/20 27/24 29/24 31/7 33/22
41/14 41/14 43/13 46/8 48/13 53/11 57/14
57/22 59/6 59/18 62/11 62/11 63/24 72/17
74/6 74/21 75/17 81/16 86/23 94/2 100/5
102/2 103/25 104/11 104/15 104/19 105/17
106/10 106/24 107/1 107/2 107/8 107/8
109/19 114/2 116/16 117/13 117/22 118/3
118/5 118/8 120/6 122/19 136/25 138/16
140/5 141/10 141/15 142/5 142/21 149/6
149/24 151/19 152/14 155/14 155/18 157/20
158/15 160/6 164/8 166/25 167/25 176/6
178/7 180/16 187/11 187/11 187/23 188/7
188/12 188/16 192/6 192/8 192/8 194/2
194/6 195/20 197/3 197/11 197/12 198/1
198/1 198/7 199/10 199/15 205/3 206/18
206/20 206/22 207/25 208/1 208/3 208/19
212/7 213/20 213/22 215/3 218/16 219/14
219/14 219/22 220/7 223/22 224/16 224/19
225/4 225/12 226/1 227/1 227/3 228/2
228/25 229/2 229/24 230/9 230/13 232/6
232/11 232/14 234/3 235/15
**ascertaining [2]** 222/18 226/22
**aside [1]** 172/4
**ask [31]** 3/13 9/24 14/17 31/24 40/24 41/19
50/10 60/2 65/10 68/14 75/15 79/7 90/15
90/23 91/8 94/11 96/1 98/8 111/5 112/5
115/8 170/18 190/1 194/16 201/13 208/7
209/4 218/15 221/21 230/10 233/22
**asked [15]** 7/17 13/14 13/18 30/1 37/24 47/6

**A**

asked... [9]  50/4 80/1 80/3 80/8 80/12 84/10 120/3 120/10 182/15
asking [16]  14/16 21/19 21/20 21/21 25/23 27/23 30/1 46/3 83/13 87/9 87/15 121/13 153/12 164/2 209/23 217/23
asks [1]  206/13
aspect [4]  45/20 159/7 181/13 191/23
aspects [5]  18/5 61/3 158/2 170/14 182/14
asserted [1]  104/14
asserting [1]  225/6
assess [4]  71/23 78/14 225/16 230/3
assessed [1]  75/23
assessing [2]  223/16 229/11
assessment [4]  73/25 189/11 206/10 224/12
assessments [1]  173/14
asset [3]  118/22 119/10 178/10
assets [3]  116/12 178/4 178/9
assign [1]  107/19
assigned [2]  17/7 123/24
assignment [1]  120/5
assignments [1]  180/6
associate [2]  28/14 47/4
associated [2]  22/18 22/23
assume [8]  68/10 97/25 193/20 199/16 227/20 234/7 234/9 234/10
assumed [5]  89/7 114/17 159/24 185/1 199/11
assumes [1]  112/1
assuming [2]  193/25 194/6
assumption [8]  63/2 66/23 66/23 66/23 114/11 138/4 138/13 199/15
assumptions [5]  24/25 40/1 40/8 60/17 114/4
assurance [2]  219/2 219/6
assured [1]  218/23
athlete [1]  217/2
athletes [3]  81/24 82/20 112/17
athletic [6]  81/24 82/19 158/13 158/15 158/20 159/11
attachment [8]  129/24 130/15 130/23 131/1 131/4 131/11 168/1 168/24
attempt [2]  192/23 226/23
attempted [2]  152/19 154/11
attempting [1]  149/6
attempts [1]  152/7
attend [4]  14/12 14/25 49/10 54/22
attendance [1]  212/19
attended [1]  116/21
attention [3]  105/16 218/19 220/22
attentiveness [1]  200/13
attorney [1]  186/17
attorneys [1]  234/16
attorneys' [4]  234/11 235/1 235/3 238/4
attract [4]  77/21 83/1 83/4 101/15
attributable [1]  12/3
attribute [3]  168/19 216/15 216/16
attributed [5]  11/19 11/23 167/14 168/17 217/19
audience [4]  82/10 82/23 87/21 101/13
August [3]  151/15 152/9 152/15
August 14 [1]  152/15
August 5 [2]  151/15 152/9
authority [6]  110/21 128/4 147/15 190/21 196/7 198/6
authorized [1]  34/23
automatic [2]  199/13 224/21
available [6]  47/11 47/12 47/25 129/4 156/22 191/17

avenues [1]  61/6
average [6]  3/25 6/12 130/2 164/13 183/3 183/4
averages [1]  161/22
avoid [2]  201/3 225/25
award [21]  104/20 108/12 115/9 192/15 192/17 213/24 216/21 218/16 224/23 225/14 226/2 226/15 226/17 228/16 228/18 228/19 229/15 230/2 230/24 232/3
awarded [9]  155/17 189/6 190/5 224/6 228/11 228/23 229/8 230/4 234/8
awarding [2]  225/25 228/11
awards [2]  194/8 198/24
aware [15]  3/7 10/5 16/18 17/10 17/11 81/23 171/20 171/24 171/24 172/11 172/23 173/1 173/3 173/22 237/9
awareness [1]  77/18
away [10]  137/21 183/23 206/14 206/17 206/18 208/19 209/8 218/2 220/20 237/13

**B**

Bachelor [1]  55/1
back [75]  6/18 6/19 34/22 35/1 45/22 63/10 65/6 66/20 67/19 67/25 74/20 78/13 92/3 93/9 103/18 113/20 117/6 125/6 127/22 128/9 128/12 131/17 132/25 133/15 133/17 133/24 134/20 136/11 138/24 141/25 145/23 151/25 152/23 153/1 154/16 155/2 155/5 158/25 159/10 160/16 173/21 173/23 174/9 176/1 176/7 180/17 185/3 185/17 186/23 187/5 195/22 200/4 200/18 200/19 200/21 200/24 204/20 205/7 205/25 206/24 212/24 213/17 215/13 216/5 217/9 217/22 218/25 232/6 233/20 234/4 238/10 238/11 238/12 238/17 239/13
background [2]  54/20 116/16
backgrounds [1]  117/7
backing [1]  136/1
backup [1]  136/6
backyard [1]  203/21
bad [4]  25/25 66/22 66/23 66/23
baked [1]  36/2
balances [1]  223/2
bar [3]  161/19 161/22 163/17
barred [1]  231/21
bars [3]  162/4 163/18 163/19
base [6]  65/8 82/6 97/7 112/22 214/15 217/23
based [52]  3/24 13/5 29/21 40/9 42/14 48/13 48/15 48/16 48/20 48/25 54/17 58/16 60/12 64/11 64/17 64/18 66/17 70/3 73/25 75/17 80/17 93/15 108/22 108/22 111/3 111/4 114/4 114/7 114/11 114/18 121/10 125/9 129/2 129/11 141/19 142/18 150/10 152/1 163/25 183/21 188/20 189/12 189/12 196/3 198/3 213/25 216/22 218/16 222/15 224/12 224/13 228/23
bases [2]  193/18 227/18
basically [38]  14/4 36/5 57/1 122/11 123/12 124/18 130/1 130/14 131/21 132/16 132/21 133/21 136/19 137/6 138/25 140/22 149/24 149/25 152/12 153/13 154/15 156/4 156/10 156/15 158/12 158/23 160/23 162/1 162/15 163/24 165/11 168/22 176/19 178/4 178/11 178/24 187/11 188/17
basically the [1]  160/23
basis [9]  9/5 9/6 69/22 120/22 127/14 142/5 161/5 179/24 194/6

Bay [1]  138/8
BAYLSON [1]  1/9
be [190]  4/4 4/16 4/24 6/17 7/11 10/3 10/15 10/23 11/13 12/7 21/10 21/19 23/11 26/21 29/5 35/11 37/1 37/18 39/4 40/8 42/22 43/2 43/3 48/23 49/1 54/4 57/15 57/18 57/20 58/3 59/6 59/13 59/15 59/22 63/21 65/16 66/3 70/7 71/10 72/15 78/18 81/11 82/10 82/16 82/18 82/22 85/20 85/21 87/12 88/17 89/10 89/14 89/21 90/1 90/3 91/5 91/12 91/12 95/15 97/9 97/22 99/4 99/12 101/6 101/10 102/7 103/6 103/17 103/18 105/9 106/18 107/14 107/14 112/4 115/19 118/24 120/13 124/7 124/25 125/8 125/20 127/24 135/9 136/9 137/22 138/1 138/2 138/14 142/23 143/22 144/1 144/17 145/10 145/13 146/11 147/8 147/11 147/19 149/4 150/10 151/8 153/4 156/10 157/25 158/15 161/4 162/1 163/5 167/19 169/17 172/3 176/25 177/13 177/24 182/21 183/6 184/23 186/16 186/23 187/17 187/22 187/23 188/20 189/16 189/12 189/12 189/20 189/25 190/5 190/16 190/24 191/13 192/25 194/7 194/16 195/8 196/7 196/24 197/22 198/1 198/9 198/14 199/1 199/13 199/20 200/9 201/9 202/20 202/21 203/11 209/6 211/23 211/25 212/6 217/12 217/18 221/1 221/2 221/19 222/15 223/17 224/6 224/12 224/13 225/23 226/22 228/11 228/21 228/23 229/13 230/5 230/24 233/9 233/10 233/13 233/15 233/17 233/18 234/4 234/8 234/23 234/24 235/25 236/2 236/21 236/23 236/24 237/13 237/25 239/8
beach [1]  200/17
bear [2]  86/24 186/24
became [3]  100/12 154/21 176/17
because [107]  3/23 4/12 6/4 6/13 6/16 6/23 9/13 20/17 28/3 29/11 30/15 53/19 59/14 59/20 60/8 60/17 64/16 65/17 67/19 68/15 68/18 68/20 73/17 74/8 76/24 77/3 80/10 82/8 88/5 94/5 94/18 95/5 99/10 101/6 104/3 110/17 112/20 112/21 113/21 113/24 124/21 125/15 133/23 134/6 134/25 135/12 137/11 137/14 138/4 138/15 145/2 148/14 153/7 155/10 159/5 159/11 160/16 162/18 167/6 169/6 169/25 171/7 174/12 174/20 175/7 176/15 177/25 178/14 179/16 181/22 183/24 184/25 187/19 189/7 191/1 192/16 195/24 197/5 199/10 206/7 207/17 209/8 209/15 210/17 212/2 213/1 213/3 213/11 213/15 214/5 217/5 219/2 219/4 219/24 220/5 220/16 223/20 224/8 226/16 227/24 231/9 235/3 235/25 236/13 237/1 237/21 239/7
become [1]  233/9
becoming [1]  82/2
bed [2]  205/25 220/9
bedrooms [1]  119/7
been [74]  4/5 4/10 7/6 7/14 9/3 17/21 21/6 23/2 23/13 28/1 31/7 34/23 43/15 56/21 67/5 72/13 80/7 85/7 85/15 87/13 87/13 87/15 87/16 88/12 88/13 93/12 101/16 110/15 116/13 117/5 117/21 118/1 118/1 118/2 118/3 121/11 121/12 127/11 127/12 129/25 136/22 142/12 144/2 151/14 151/21 154/22 155/1 155/3 156/7 162/19 162/22 164/24 167/12 174/9 176/12 182/22 192/13 196/21 200/12 201/2 201/3 201/10 202/4 209/14 212/3 223/21 225/13 226/14 228/5 234/12 235/17 235/18 235/18 237/8

**B**

**before [83]** 1/9 3/13 29/7 36/18 36/21 36/21 37/5 37/7 45/8 46/8 53/20 54/16 59/21 61/2 68/5 70/4 79/5 92/4 101/5 102/5 102/24 109/16 113/14 116/19 120/21 121/7 123/1 125/11 126/13 142/13 149/6 150/9 150/13 151/12 154/22 154/25 159/23 160/20 160/21 160/23 162/3 164/11 164/14 164/20 166/10 176/20 177/9 179/17 186/17 186/21 188/7 189/10 199/21 201/7 201/10 202/2 202/6 203/17 204/21 204/24 205/24 206/2 206/13 210/18 211/17 218/1 219/5 220/9 221/20 222/5 222/7 223/9 223/18 223/22 224/2 224/11 226/9 227/24 228/18 230/9 231/12 235/3 235/19

**began [2]** 189/11 224/11

**begin [2]** 186/25 233/22

**beginning [2]** 117/1 202/13

**begins [1]** 61/11

**behalf [3]** 120/10 120/23 228/2

**behavior [1]** 77/5

**behaviors [2]** 76/6 82/9

**behind [4]** 45/6 67/20 155/10 176/2

**being [16]** 8/9 76/5 109/3 123/24 140/5 149/24 149/25 157/16 159/25 160/8 160/12 173/3 197/10 200/13 211/23 213/4

**belabor [1]** 210/17

**believe [51]** 3/20 10/11 28/20 30/21 33/21 41/11 47/23 49/25 51/10 68/6 82/16 95/11 97/14 98/3 98/9 121/11 121/14 125/23 127/24 135/2 135/14 141/18 142/9 142/23 152/14 154/20 157/10 158/8 160/7 164/24 166/18 167/8 170/4 171/7 172/4 174/14 174/17 175/9 176/18 176/21 179/7 182/1 189/16 189/25 194/1 197/25 198/2 216/9 228/17 230/23 231/20

**believed [1]** 49/1

**belonged [1]** 201/23

**belongs [1]** 99/6

**below [11]** 32/7 32/11 33/12 127/2 141/23 143/13 167/2 167/2 168/22 169/10 219/5

**belts [1]** 56/8

**BEN [1]** 1/12

**ben.wagner [1]** 1/14

**benchmark [4]** 62/12 62/14 64/6 73/24

**benchmarks [9]** 58/2 58/16 58/19 58/21 58/24 60/19 62/20 62/23 64/11

**benefit [2]** 135/19 140/14

**benefits [2]** 133/22 140/15

**best [10]** 75/8 81/16 119/2 124/21 147/15 177/24 188/25 217/10 222/19 236/2

**better [5]** 10/15 59/13 74/8 109/9 203/15

**between [27]** 11/25 16/19 18/8 21/6 49/8 59/1 70/21 75/17 88/10 97/12 106/25 122/21 123/11 123/13 124/25 138/7 150/14 151/2 157/9 158/12 165/2 182/22 183/6 212/14 221/8 236/13 239/2

**beyond [5]** 7/16 29/13 162/5 205/10 205/11

**bidder [1]** 107/4

**big [40]** 22/9 24/6 24/17 30/9 42/2 72/23 78/7 78/8 110/14 110/17 111/1 112/25 113/21 113/22 126/15 127/17 128/3 128/5 134/1 134/2 137/25 138/23 149/16 154/10 154/20 158/14 158/21 177/3 177/14 184/21 185/5 194/8 202/21 209/16 214/2 214/4 214/4 216/13 216/20 217/2

**bigger [1]** 64/15

**biggest [7]** 154/21 165/1 165/4 165/14

**bill [1]** 183/21

**billboards [1]** 110/14

**billed [5]** 181/25 182/18 183/4 183/9 183/12

**billing [1]** 182/12

**billion [5]** 57/6 58/6 74/5 74/12 166/13

**billions [1]** 78/8

**binding [1]** 107/3

**bit [22]** 32/1 54/24 75/10 76/25 81/5 81/5 81/6 81/7 116/4 116/15 116/18 118/19 121/23 124/4 139/2 141/13 156/13 180/21 182/3 182/19 223/3 236/15

**black [1]** 4/20

**blamed [1]** 196/16

**blank [1]** 104/1

**block [1]** 36/19

**blog [5]** 62/13 66/17 67/3 67/18 67/20

**blogs [1]** 93/20

**blow [5]** 32/1 36/14 172/19 172/20 174/17

**blown [1]** 220/20

**blue [1]** 160/21

**board [1]** 50/2

**boats [1]** 59/15

**Bobby [1]** 220/19

**boil [1]** 106/3

**book [1]** 208/10

**booklet [1]** 58/5

**born [1]** 83/8

**borrow [3]** 108/18 211/7 230/18

**both [24]** 4/11 6/13 7/3 50/19 56/11 70/8 71/4 122/16 123/11 128/7 140/8 140/25 141/16 142/23 143/20 145/5 170/10 181/20 188/4 188/9 191/12 191/13 227/24 234/24

**bottom [6]** 5/23 66/22 134/16 135/23 148/24 185/13

**bought [24]** 29/21 30/1 57/17 63/9 65/22 73/11 73/21 76/7 88/21 89/24 90/2 90/4 90/5 90/10 91/10 94/8 94/19 99/12 99/23 100/10 110/21 113/15 173/24 174/6

**bound [1]** 228/8

**bowl [1]** 158/21

**box [3]** 37/15 150/12 164/18

**brag [1]** 216/19

**brand [32]** 16/24 19/2 19/5 19/7 19/8 19/17 19/22 35/24 36/3 36/8 45/8 45/18 55/7 55/7 55/9 55/12 55/20 55/23 56/6 56/10 59/12 85/1 91/2 113/24 114/23 114/23 122/23 155/14 155/14 167/11 220/8 220/8

**branded [1]** 137/18

**branding [6]** 55/4 123/9 143/5 155/7 156/10 171/10

**BrandOptions [1]** 55/6

**brands [16]** 18/15 18/24 19/11 25/9 99/10 109/2 112/14 113/1 113/17 155/11 157/20 177/5 216/18 216/23 217/15 217/16

**break [10]** 58/16 59/19 59/21 143/22 143/25 145/25 178/16 185/1 186/22 222/1

**breakfast [1]** 220/9

**breaking [1]** 61/4

**brick [11]** 39/21 137/3 137/9 137/16 138/17 138/22 169/22 169/25 172/1 172/9 185/1

**bricks [6]** 128/7 138/5 138/7 140/8 141/16 170/2

**brief [14]** 234/21 234/22 234/23 235/17 235/24 236/8 236/11 237/21 237/22 238/1 238/1 238/3 238/5 238/6

**briefing [1]** 198/2

**briefly [3]** 38/1 126/6 188/12

**briefs [12]** 235/23 235/23 236/21 236/23

**bring [8]** 10/19 69/9 70/10 71/7 90/7 104/23 145/23 147/5

**brings [3]** 122/22 153/14 155/18

**broad [1]** 13/1

**broader [3]** 82/23 157/23 194/14

**broke [1]** 5/2

**broken [1]** 145/3

**broker [2]** 152/17 153/13

**Bromert [1]** 215/18

**brought [4]** 57/17 123/8 155/10 220/18

**browser [4]** 175/6 175/12 175/14 175/23

**BSN [2]** 185/16 185/22

**bucket [2]** 128/2 141/1 202/7 202/7

**budget [5]** 69/23 80/1 80/8 80/10 80/13

**build [1]** 162/8

**building [10]** 143/7 146/7 155/12 167/12 201/22 201/22 203/17 219/24 219/25 220/10

**built [10]** 93/2 142/13 159/19 176/18 202/18 202/19 202/19 219/15 219/23 220/9

**bulk [3]** 29/22 30/5 111/8

**bullied [1]** 205/20

**bully [5]** 201/11 202/13 205/1 205/14 208/9

**bunch [3]** 4/25 138/2 208/12

**burden [7]** 7/14 190/23 223/3 225/17 225/20 225/20 225/22

**buried [1]** 205/6

**bury [1]** 203/16

**business [69]** 7/4 13/13 17/23 24/9 24/9 52/19 52/20 52/23 52/25 55/7 74/14 81/4 107/2 107/6 107/8 107/16 109/11 109/22 115/1 116/8 116/22 122/22 126/7 126/14 127/14 127/14 130/11 150/25 151/1 151/11 154/9 159/20 159/20 160/1 160/6 160/17 160/18 161/1 161/2 161/7 161/15 162/17 162/19 162/21 164/10 164/11 164/15 167/12 178/24 187/25 196/3 196/5 196/11 196/16 205/18 206/16 206/20 206/22 208/25 209/15 210/25 211/16 211/19 211/23 213/5 213/8 223/19 223/22 238/23

**businesses [3]** 24/6 81/11 116/8

**businesspeople [1]** 151/12

**businessperson [1]** 156/20

**buy [19]** 20/7 52/7 52/9 52/15 53/4 64/4 82/24 89/12 89/17 100/4 111/3 111/4 112/18 118/24 119/6 137/8 164/21 211/7 217/4

**buyer [7]** 30/3 30/3 39/3 39/14 49/1 178/7 178/11

**buyers [18]** 24/14 24/18 29/7 29/10 29/16 29/24 64/4 65/17 107/8 107/13 107/15 108/10 111/1 111/1 111/4 111/7 178/13 178/25

**buying [14]** 5/17 8/18 24/11 29/11 30/3 39/13 39/14 62/22 65/4 90/25 97/2 108/19 177/22 178/1

**buys [6]** 63/3 89/18 99/16 99/17 99/21 112/20

**C**

**CA [1]** 1/14

**cake [1]** 36/2

**calculate [2]** 73/14 80/3

**calculated [1]** 47/24

**calculating [1]** 36/5

**calculation [6]** 11/9 35/24 36/5 37/8 159/14 170/23

**calculations [6]** 170/22 170/25 199/10 228/5 228/7 229/9

**C**

**California [2]** 117/13 117/16
**call [15]** 83/6 93/20 102/18 103/8 104/2 115/11 126/12 126/20 127/23 130/13 188/16 205/14 220/7 224/15 232/21
**called [16]** 22/6 25/3 34/23 55/5 75/12 107/12 122/14 122/25 125/5 125/13 126/11 132/12 139/22 205/15 232/18 232/22
**Calls [2]** 29/12 45/10
**came [32]** 22/22 31/17 31/18 66/19 73/8 79/21 87/5 87/8 92/10 92/20 92/21 93/15 93/16 106/22 107/4 121/5 123/6 123/7 125/12 129/6 158/7 162/11 163/20 175/24 185/2 201/7 201/8 201/8 203/8 205/19 220/10 227/25
**Camino [1]** 1/13
**campaign [3]** 79/19 80/2 143/10
**campaigns [2]** 56/14 217/3
**can [213]** 4/25 9/9 13/21 15/20 21/16 22/2 23/7 29/15 32/1 32/5 32/7 32/14 33/2 36/14 39/11 40/22 45/12 46/10 53/18 53/20 54/4 54/18 54/20 55/5 55/18 57/4 57/9 57/24 58/3 58/20 59/1 59/2 59/4 59/6 59/11 59/12 59/15 59/21 60/10 60/25 60/25 67/25 68/17 69/15 70/2 70/20 71/22 72/1 72/23 74/7 74/25 75/8 75/8 75/10 76/7 80/9 83/13 83/15 85/25 86/11 87/16 87/18 88/10 90/23 91/8 91/15 91/24 92/5 94/10 94/11 95/5 96/14 96/19 96/25 97/9 100/3 101/6 102/18 103/2 103/3 103/4 103/5 103/12 106/5 113/10 114/1 115/16 115/19 116/4 118/19 119/13 119/25 120/3 120/18 120/20 121/20 121/23 122/23 123/3 124/19 124/20 125/20 126/6 126/16 126/17 127/7 128/11 128/12 128/15 129/13 130/5 130/17 131/17 131/19 132/9 133/11 133/24 134/11 134/12 135/5 135/20 135/21 135/22 136/3 137/7 137/18 137/18 137/21 139/4 140/16 140/18 140/22 143/2 145/21 145/23 146/15 146/23 147/13 148/2 150/2 150/3 150/10 150/16 151/8 152/2 153/6 153/22 154/5 155/24 156/12 156/13 158/19 159/16 159/17 159/20 160/14 161/16 161/25 163/9 163/10 164/21 165/17 166/16 167/17 167/18 169/12 172/19 173/11 174/14 177/11 177/24 184/15 184/17 185/3 185/9 185/17 186/25 199/13 203/5 203/7 207/25 207/25 208/25 210/16 211/13 212/9 212/17 212/21 213/6 213/17 213/17 214/12 214/21 216/2 217/21 217/25 218/2 219/21 220/8 220/10 221/7 221/14 228/19 230/11 230/18 230/21 231/10 232/10 233/16 238/9 239/4
**can't [19]** 21/1 44/19 69/20 75/21 91/15 96/1 101/3 170/17 187/22 190/20 196/7 199/15 200/22 203/13 204/5 206/7 206/7 228/18 234/4
**canceling [1]** 207/7
**cancer [1]** 220/19
**cannot [4]** 95/3 189/12 192/17 224/13
**cap [1]** 189/16
**captured [1]** 185/19
**captures [3]** 128/18 131/23 141/3
**care [5]** 194/24 195/15 201/2 202/21 202/21
**career [1]** 157/14
**careful [2]** 105/20 218/20
**Carol [1]** 113/5
**Carolina [1]** 152/22
**carry [1]** 225/2

**case [120]** 7/24 16/19 19/22 20/3 24/24 26/19 37/18 44/18 50/12 51/23 54/14 57/10 61/19 61/20 70/25 71/1 73/6 73/10 74/15 77/18 84/2 84/25 86/6 98/3 98/9 99/5 102/2 103/7 103/16 105/3 105/17 105/25 106/1 106/17 109/14 109/16 109/23 110/10 111/15 114/3 114/5 114/6 114/7 115/5 115/9 119/18 119/19 120/4 120/8 120/15 124/24 125/13 126/23 127/12 129/24 130/1 133/24 136/23 137/15 147/14 151/14 151/19 151/24 154/9 154/14 154/15 155/6 159/25 160/2 161/6 165/7 165/10 166/18 168/2 169/11 171/9 171/12 173/18 174/8 174/13 175/20 178/19 180/2 180/22 182/24 183/19 183/20 189/17 191/6 191/17 193/13 194/19 196/3 196/6 196/10 196/13 198/3 199/25 204/19 209/14 210/8 212/10 218/8 218/21 221/1 222/6 225/10 225/12 227/14 229/4 232/17 232/23 232/24 234/1 235/5 235/17 235/18 236/1 236/2 238/18
**cases [13]** 19/1 24/14 125/2 125/14 125/15 133/23 147/14 180/24 181/2 181/5 219/8 224/22 229/1
**catalog [4]** 112/5 185/15 193/9 227/11
**catalogs [8]** 8/11 8/12 111/7 156/6 197/18 201/19 215/23 221/6
**catchphrase [1]** 111/3
**catchy [1]** 111/3
**categories [12]** 56/8 56/9 56/11 58/10 103/25 189/20 197/19 223/11 226/1 233/2 233/3 233/17
**category [10]** 39/7 59/14 198/24 222/24 223/8 224/14 226/3 228/11 228/19 233/4
**caught [2]** 208/13 208/17
**causation [4]** 188/1 191/19 191/21 230/16
**cause [7]** 67/1 191/25 210/6 220/14 229/21 232/5 232/11
**caused [20]** 7/14 105/24 106/7 107/22 188/19 188/21 190/23 192/13 192/19 193/11 213/10 220/16 222/16 222/23 223/7 226/14 226/18 227/13 229/21 232/3
**celebrities [2]** 16/21 72/21
**celebrity [1]** 18/9
**celebrity-type [1]** 18/9
**central [1]** 126/20
**certain [20]** 17/16 19/21 20/2 49/1 49/11 49/14 50/2 50/16 50/18 78/18 83/7 83/8 95/6 102/9 108/8 129/19 155/17 174/25 193/8 227/9
**certainly [7]** 19/13 20/11 42/10 45/20 147/12 152/11 238/20
**certainty [1]** 196/11
**CERTIFICATE [1]** 239/18
**certifications [1]** 117/10
**certified [1]** 117/13
**certify [1]** 239/20
**chafing [1]** 156/8
**chair [1]** 72/6
**challenged [1]** 51/21
**chambers [3]** 145/4 145/6 145/23
**Champ's [1]** 136/16
**chance [7]** 68/17 90/16 102/9 115/7 144/4 157/5 208/4
**Chandler [4]** 207/3 207/7 210/22 213/7
**change [21]** 14/11 14/24 38/3 49/14 56/23 72/9 111/12 137/2 171/3 171/25 175/16 177/14 190/3 195/21 203/15 205/22 209/9 215/22 215/23 215/23 237/13

**changes [8]** 102/17 108/5 118/1 160/1 162/15 172/12 212/18 215/11
**changing [1]** 47/3
**channel [23]** 57/5 57/24 127/16 131/6 137/14 138/12 138/21 139/15 141/1 141/19 142/17 143/19 148/6 148/14 148/16 148/17 149/2 149/5 149/22 149/22 149/23 150/5 169/24
**channels [13]** 39/21 61/5 78/18 87/21 88/13 101/14 112/15 127/11 128/7 140/6 159/8 194/15 216/9
**character [1]** 229/19
**charge [28]** 7/10 7/13 103/20 124/10 124/12 145/1 145/3 145/7 145/14 146/9 146/11 183/1 186/19 186/20 186/25 187/18 188/4 188/14 188/16 191/9 192/2 197/20 198/21 198/22 221/1 222/2 228/13 230/16
**charged [1]** 226/9
**charging [2]** 7/4 146/16
**chart [14]** 4/20 5/7 8/25 36/16 36/19 37/12 61/10 86/12 93/23 161/8 161/19 161/22 163/10 168/24
**charts [3]** 6/3 147/11 220/25
**chat [1]** 66/18
**cheater [1]** 207/2
**check [4]** 18/19 18/20 173/23 219/21
**checked [2]** 85/14 178/20
**Chicago [2]** 54/23 116/7
**childhood [1]** 117/12
**choice [1]** 164/22
**choose [1]** 159/22
**Christmas [2]** 236/15 236/17
**Chrome [1]** 59/2
**Cincinnati [1]** 54/25
**circles [1]** 17/16
**Circuit [3]** 189/17 191/17 236/2
**circular [5]** 172/19 172/20 173/10 173/16 184/21
**circulars [10]** 128/19 130/10 131/24 137/24 138/3 141/3 172/24 173/1 173/3 173/9
**circumstances [4]** 20/9 140/12 151/13 176/22
**circumstantial [5]** 194/3 194/14 194/17 194/18 204/7
**cite [1]** 92/21
**cited [1]** 196/6
**cites [1]** 92/13
**cities [1]** 127/17
**claim [12]** 109/10 121/3 122/2 142/7 150/19 156/14 162/16 163/17 198/4 198/18 215/8 231/20
**claimed [5]** 48/20 165/11 189/3 192/18 226/18
**claims [6]** 108/12 120/10 120/23 198/20 219/14 224/4
**clarification [1]** 26/25
**clarified [1]** 93/14
**clarify [3]** 90/16 94/11 189/19
**clarifying [2]** 37/9 190/2
**class [1]** 117/22
**classic [3]** 57/8 80/10 82/7
**clear [12]** 21/19 28/1 37/1 120/13 154/1 190/22 197/5 199/5 205/6 221/2 230/24 231/17
**clearly [2]** 4/17 190/18
**clerk [2]** 3/1 187/20
**client [6]** 5/25 55/16 85/1 153/18 201/25 205/17

**C**

clients [7]  55/15 81/4 81/6 85/2 117/15
183/22 235/20
close [2]  105/16 218/1
closed [1]  4/5
closely [2]  212/23 220/22
closer [3]  72/1 72/8 74/8
closing [6]  115/8 144/5 145/11 186/16 231/6
231/13
clothes [1]  217/16
clothing [4]  7/9 7/9 87/13 137/18
co [1]  126/25
co-op [1]  126/25
Coast [1]  116/21
coin [1]  210/11
collaboration [1]  16/19
collateral [2]  68/22 69/7
colleague [1]  117/4
colleagues [2]  183/12 235/16
colleges [1]  112/16
color [1]  4/22
colored [1]  5/3
Combat [1]  176/17
come [40]  16/3 23/16 25/21 53/17 53/22
53/23 59/7 59/7 61/22 62/1 67/25 69/21
73/21 75/23 76/8 92/6 96/19 96/21 110/7
115/15 126/2 127/22 128/9 134/1 151/1
187/5 188/9 189/22 196/24 200/4 204/10
205/7 209/2 233/14 233/20 234/4 238/9
238/11 238/12 239/13
comes [14]  21/13 61/2 61/23 62/5 62/19
94/21 200/20 204/20 206/13 216/5 217/9
217/22 235/21 238/23
coming [8]  15/23 50/19 54/19 70/9 177/13
205/24 233/1 239/8
commensurate [1]  108/2
comment [3]  121/15 190/9 232/12
comments [2]  232/1 238/8
commerce [2]  139/15 139/24
commercials [2]  110/14 143/11
commitment [1]  153/18
committed [3]  105/14 112/23 151/16
common [7]  106/16 113/11 201/8 201/8
205/10 216/22 231/19
commonly [2]  125/13 138/23
commonplace [1]  124/12
communication [2]  152/15 164/4
communications [2]  152/22 235/13
comp [1]  6/11
compact [1]  159/20
companies [14]  7/3 78/8 78/14 78/16 80/17
117/25 127/21 128/5 139/9 139/9 158/14
163/4 203/3 207/15
companies' [1]  110/5
company [22]  62/5 74/18 107/12 112/25
116/6 116/13 117/3 149/19 154/2 167/3
169/3 177/3 179/11 181/10 181/12 202/18
202/25 208/5 209/16 216/20 216/20 218/10
comparability [1]  157/15
comparable [12]  17/1 47/25 48/9 48/12
48/25 119/4 119/10 157/11 158/8 159/3
159/6 159/12
comparators [1]  18/22
compare [5]  164/4 176/8 176/9 176/25
177/17
compared [6]  74/22 108/9 159/23 177/22
192/17 226/16
compares [1]  97/6

comparison [2]  162/1 177/19
comped [3]  3/24 7/8 7/9
compelled [1]  184/10
compensate [4]  188/18 222/12 222/23 223/7
compensation [2]  21/11 235/20
compensatory [23]  188/16 188/20 189/20
192/11 192/15 192/17 222/10 222/11 222/15
222/17 222/22 222/25 223/1 223/6 223/11
225/5 226/12 226/15 226/17 228/19 228/20
229/8 230/2
complaining [1]  96/18
complete [1]  144/24
completely [3]  169/20 171/25 198/13
complex [1]  178/3
complicated [4]  18/7 106/4 126/8 158/11
component [3]  24/23 42/10 42/12
comport [1]  115/5
compression [268]
comprise [1]  51/9
comps [4]  6/17 6/22 9/14 119/7
computation [3]  9/6 193/19 227/19
computations [1]  227/25
computer [2]  55/1 96/11
concede [1]  6/2
concept [4]  7/8 45/9 191/2 220/11
concepts [1]  163/13
concern [4]  7/1 7/2 8/8 196/19
concerned [1]  93/12
concerning [1]  226/5
concerns [6]  9/8 60/8 82/16 194/11 194/12
198/9
conclude [5]  100/3 190/5 190/6 190/10
224/6
conclusion [3]  18/19 45/11 104/9
conclusions [1]  114/4
conduct [17]  27/7 28/6 159/13 218/14
228/23 229/3 229/5 229/6 229/9 229/10
230/1 230/7 230/25
conducted [4]  15/10 65/15 81/14 148/5
conducting [1]  198/15
confer [1]  102/16
conference [3]  145/1 146/9 146/16
confirm [1]  144/2
confirmation [1]  75/2
confirmed [4]  51/5 75/4 133/16 211/9
conflating [1]  63/2
conflicting [1]  8/25
confuse [3]  8/8 67/1 225/1
confused [6]  8/9 69/8 70/10 99/4 101/3
198/10
confusion [16]  7/11 9/13 27/24 190/16
190/20 190/20 190/21 190/24 191/5 192/8
192/9 192/10 198/19 226/9 226/10 226/11
conjecture [2]  189/1 222/21
connected [1]  148/19
connection [2]  84/16 85/16
conscience [1]  60/9
conservative [2]  64/17 89/22
consider [40]  12/19 12/23 13/8 13/14 13/25
14/2 19/14 19/16 26/10 28/9 29/16 36/1
47/22 50/4 50/7 50/9 50/10 82/13 127/6
142/10 154/6 193/2 193/9 194/19 208/7
208/7 208/8 209/5 212/15 212/18 212/22
218/6 224/24 226/6 226/25 227/3 227/11
228/4 229/17 232/11
consideration [13]  17/3 18/10 19/10 45/24
46/25 47/3 52/13 52/14 52/16 124/7 124/16
155/9 222/8

considered [15]  13/14 14/3 16/11 27/3
48/24 68/4 96/5 142/23 192/25
considering [4]  14/1 26/9 113/3 228/7
consist [2]  222/22 223/6
consistent [4]  26/12 26/12 50/2 148/7
consistently [2]  58/10 74/2
consists [1]  223/14
constantly [1]  56/15
consult [1]  116/7
consultant [1]  153/13
consultants [5]  181/16 181/17 181/21
182/12 182/18
consulting [6]  116/6 116/13 116/19 116/25
117/6 181/12
consumer [30]  24/12 28/10 28/10 29/2 39/1
39/3 39/4 56/7 71/23 75/23 83/25 84/6 84/11
84/16 84/18 84/20 84/22 89/21 91/9 95/4
101/17 112/19 113/10 137/12 137/22 138/13
148/15 169/17 193/18 227/18
consumer's [1]  61/5
consumer-facing [4]  137/12 137/22 148/15
169/17
consumers [23]  24/21 47/4 61/12 62/16
62/21 64/9 73/22 77/7 77/11 77/24 78/4
82/17 84/3 84/5 84/24 88/25 92/2 94/2 94/15
101/11 112/18 170/11 216/24
contact [1]  201/21
contacted [1]  57/2
contemplate [3]  125/7 126/13 198/7
contemplated [1]  16/20
contemporaneously [1]  152/1
contention [1]  188/7
contentions [1]  228/6
contentious [1]  235/17
contest [1]  7/22
context [2]  162/24 164/10
contexts [1]  217/15
continue [6]  53/20 59/21 107/24 147/20
187/6 205/12
continued [2]  201/19 203/8
contract [7]  107/3 108/18 151/16 164/2
205/4 205/5 210/18
contracts [1]  151/9
contribute [2]  113/7 217/7
contributed [8]  110/2 111/8 191/22 191/25
222/14 232/4 232/7 232/10
contributing [1]  230/17
contribution [5]  112/9 113/4 123/12 123/13
216/12
contributions [9]  122/24 122/24 143/2 143/3
150/14 150/15 154/10 154/12 174/10
contributor [1]  123/13
contributory [1]  204/1
conversion [63]  56/13 56/16 56/17 56/21
56/23 57/3 57/4 57/9 57/13 57/14 57/18
57/19 58/2 58/12 58/15 58/25 59/3 59/4
59/10 60/18 62/4 62/6 62/10 62/11 62/14
63/21 64/4 65/8 65/19 65/21 66/16 66/18
67/17 68/17 72/10 73/20 73/24 74/1 74/2
74/4 74/10 74/20 74/22 74/23 75/22 75/24
76/7 76/21 76/22 77/4 77/21 77/22 82/10
82/13 84/21 92/4 92/7 92/8 92/17 94/8 94/9
94/19 96/6
conversions [3]  58/8 59/14 75/11
convert [4]  59/6 62/22 63/18 148/23
converted [1]  63/5
converting [1]  57/20
conveyed [1]  228/8
convince [1]  216/7

## C

**Cool [268]**
**coolcompression.com [1]** 101/2
**copies [1]** 4/25
**copy [7]** 4/22 5/1 54/18 54/19 145/21 146/1 234/13
**copyright [1]** 116/13
**corner [3]** 135/15 135/23 185/13
**corporation [4]** 1/3 107/3 206/3 207/14
**correct [158]** 5/8 11/24 12/6 12/9 12/13 13/4 14/1 14/13 14/14 14/25 15/1 15/3 15/5 15/7 15/12 15/15 15/19 16/24 17/8 17/16 18/4 18/9 18/16 20/1 21/24 22/12 22/17 22/24 23/19 24/10 24/13 24/19 25/6 25/11 25/13 25/14 25/17 26/6 26/7 27/5 27/19 27/22 28/3 29/4 29/23 33/2 33/4 33/5 33/9 34/21 35/17 35/21 35/22 36/23 37/13 37/17 37/18 37/23 37/24 37/25 38/19 39/8 39/9 39/22 39/23 40/6 40/11 40/14 40/17 41/6 41/10 41/15 41/16 41/23 43/1 43/19 43/22 43/25 44/9 45/4 46/1 46/2 46/4 46/8 46/15 46/16 47/1 47/5 47/8 47/9 47/23 47/25 49/6 49/12 50/5 50/8 50/12 51/6 51/7 54/14 58/19 58/22 60/2 60/3 60/5 61/14 65/13 66/7 72/24 75/10 77/8 78/16 88/3 120/17 123/21 144/1 150/21 154/4 166/12 166/20 167/5 167/15 168/16 168/18 169/1 169/14 169/20 169/23 170/22 170/23 171/5 172/14 174/13 176/14 177/23 178/2 178/8 179/11 180/23 181/1 181/8 181/16 181/24 182/2 182/11 183/1 183/10 185/24 188/10 191/4 192/1 192/14 196/14 198/12 198/25 231/8 231/15 239/20
**correction [1]** 26/8
**corrections [2]** 230/10 230/14
**corrective [49]** 41/20 41/21 42/7 43/11 45/5 45/6 45/16 45/21 46/5 46/24 60/2 66/10 79/15 80/1 80/5 83/9 83/18 98/5 98/11 98/21 99/1 99/2 104/20 114/19 114/23 121/2 146/16 162/13 165/23 188/11 189/4 189/6 189/8 189/16 189/21 189/25 190/5 190/14 191/1 191/6 192/2 211/12 211/14 211/21 211/25 220/22 224/3 224/6 224/8
**correctly [1]** 94/22
**correspondences [1]** 152/6
**corroborate [1]** 136/9
**corroborated [1]** 173/16
**cost [23]** 22/21 25/4 25/15 26/1 26/3 41/23 42/22 42/25 43/6 119/14 122/13 126/11 126/11 127/1 127/5 130/3 142/2 148/24 189/4 206/17 217/2 219/25 224/3
**costing [2]** 122/14 126/4
**costs [24]** 25/8 26/10 122/13 122/15 122/17 126/14 126/25 127/3 127/6 129/1 141/22 141/22 142/14 142/14 143/3 143/8 149/1 160/6 162/9 183/17 206/15 206/19 225/21 225/23
**could [65]** 7/11 9/14 9/24 11/10 13/23 14/22 20/7 23/1 23/14 48/11 52/7 52/9 52/11 53/4 63/8 63/9 63/10 72/6 77/20 80/7 80/13 81/10 81/16 84/10 85/15 87/13 87/15 87/16 89/14 91/12 93/22 93/25 96/21 97/22 101/14 102/6 106/21 108/12 112/10 123/21 133/6 134/21 134/23 136/11 138/13 146/1 149/13 161/10 161/24 169/17 172/18 172/20 172/24 174/15 174/17 176/3 180/17 183/6 184/12 194/2 195/22 202/4 205/4 211/25 235/25
**could-have-been [1]** 87/15
**couldn't [4]** 174/24 174/24 175/2 184/25

71/12 90/15 102/9 105/11 144/4 145/6 186/9 186/15 186/21 195/18 201/6 209/10 209/12 209/24 218/23 230/9 234/20 235/11
**counsel's [3]** 195/1 219/2 231/6
**count [1]** 82/5
**counted [7]** 28/15 35/6 35/21 89/25 90/5 90/12 91/12
**counteract [1]** 224/4
**counting [4]** 90/22 91/5 108/5 212/13
**countries [1]** 75/6
**country [4]** 110/5 118/7 219/19 221/7
**counts [2]** 149/4 191/13
**couple [13]** 3/4 16/17 27/12 30/12 98/16 102/6 114/10 123/2 123/25 133/5 175/7 200/12 219/12
**course [8]** 75/13 76/4 113/20 129/17 167/20 214/8 232/15 234/4
**court [15]** 1/1 1/21 1/22 3/1 121/5 125/22 127/3 130/22 133/4 141/20 181/5 198/22 218/12 218/18 238/19
**Court's [1]** 239/11
**courthouse [1]** 231/11
**courtroom [19]** 10/21 12/16 26/21 26/22 59/23 71/5 71/8 102/13 103/16 105/7 144/12 147/17 187/9 200/7 232/13 232/14 232/16 232/20 233/24
**cover [13]** 75/5 149/21 149/22 149/24 183/17 188/1 188/3 188/3 188/5 188/8 188/11 188/13 191/15
**covered [10]** 59/16 86/8 127/24 149/25 150/1 187/12 187/17 187/23 187/23 231/22
**Covid [1]** 118/1
**CPA [3]** 117/11 117/13 117/15
**create [4]** 80/7 166/22 167/11 169/7
**creates [1]** 66/8
**creation [6]** 126/21 149/2 166/13 166/19 167/1 167/6 167/15 168/17
**credibility [5]** 173/14 175/22 192/7 212/8 222/8
**credit [7]** 25/8 25/12 25/15 36/3 172/13 173/4 235/20
**criticized [1]** 231/13
**critiqued [1]** 157/8
**cross [17]** 2/4 2/8 2/14 3/13 6/19 9/21 9/22 10/25 11/3 64/20 66/24 78/20 78/23 144/16 163/6 166/2 166/5
**cross-examination [10]** 3/13 6/19 10/25 11/3 64/20 78/20 78/23 163/6 166/2 166/5
**cross-examine [2]** 9/22 66/24
**CRR [2]** 1/21 239/25
**crush [2]** 215/10 215/16
**crushing [1]** 205/17
**Cunningham [4]** 171/16 171/20 173/15 197/11
**Cunningham's [1]** 172/7
**current [2]** 97/10 129/25
**currently [1]** 154/13
**customer [20]** 15/2 15/2 15/10 15/10 50/5 50/5 50/7 81/21 97/7 136/10 136/25 139/22 159/18 159/18 159/21 159/21 159/22 161/5 161/5 184/15
**customers [26]** 41/1 41/2 50/16 50/18 81/20 81/23 82/5 85/2 97/11 110/20 128/21 129/11 130/12 130/13 130/14 136/19 136/20 137/13 137/23 138/12 139/8 160/10 160/11 171/2 171/8 217/4
**cut [2]** 18/15 141/9
**cuts [1]** 141/13

## D

**daily [1]** 234/13
**damage [16]** 9/11 79/14 120/9 165/4 180/5 180/13 181/13 189/9 216/21 224/9 226/1 226/2 228/18 232/3 233/3 233/5
**damages [141]** 4/13 7/14 9/6 68/23 69/2 70/17 79/13 102/2 102/3 102/22 103/16 103/20 103/25 104/9 104/12 104/13 104/17 105/24 106/3 108/16 110/10 115/8 115/9 145/8 145/15 146/10 147/14 162/13 163/15 164/17 180/8 186/16 187/23 188/2 188/5 188/13 188/16 188/20 188/25 189/5 189/6 189/8 190/4 190/6 190/22 191/15 191/16 191/20 192/11 192/12 192/16 192/18 192/18 193/3 193/12 193/19 196/24 196/25 197/19 197/23 198/1 198/6 198/7 198/12 198/13 198/21 198/25 199/21 199/23 202/23 205/12 208/2 208/2 208/22 209/21 209/25 210/4 216/4 218/4 218/7 218/8 218/13 218/16 219/8 222/10 221/22 221/22 222/7 222/20 222/22 222/25 223/2 223/6 223/11 224/5 224/7 224/9 224/14 225/5 226/1 226/6 226/8 226/12 226/13 226/15 226/17 226/18 226/22 227/4 227/14 227/19 228/2 228/10 228/12 228/13 228/14 228/14 228/16 228/19 228/20 228/20 228/22 228/25 229/4 229/7 229/7 229/8 229/12 229/16 229/17 230/3 230/3 230/4 230/6 232/3 232/2 233/6 234/8 238/4
**dangerous [1]** 199/14
**dash [1]** 207/12
**data [41]** 4/2 4/8 5/11 6/3 6/11 6/14 6/23 9/2 9/8 29/21 30/4 40/4 47/11 61/23 63/25 66/8 67/21 67/22 70/9 75/12 77/10 77/14 78/14 78/14 100/1 111/4 119/9 122/9 133/10 138/22 139/10 139/11 139/16 140/21 151/8 151/8 151/22 151/24 153/3 161/20 235/11
**datapoint [3]** 140/2 140/3 152/3
**date [7]** 32/25 37/5 37/6 38/4 135/15 135/16 234/24
**dated [4]** 31/22 33/8 34/6 92/12
**dates [4]** 38/9 93/8 234/23 236/18
**Daubert [2]** 9/25 59/25
**DAVID [2]** 2/4 207/3
**day [11]** 1/8 63/11 93/20 107/25 111/13 111/13 159/8 165/17 177/25 209/3 219/18
**days [12]** 117/12 175/7 200/12 202/4 236/4 236/7 236/11 236/14 236/22 236/22 236/25 236/25
**de [2]** 9/2 9/8
**deal [28]** 6/25 16/18 17/4 17/9 18/4 18/6 18/7 18/21 20/17 20/20 20/22 20/25 52/7 52/18 52/20 52/22 53/3 108/20 109/5 146/16 210/20 210/23 210/25 211/8 213/10 213/13 213/14 220/20
**deals [19]** 6/7 18/14 18/25 20/14 20/14 51/18 51/21 108/23 109/3 109/7 109/11 112/16 119/15 126/22 126/25 143/12 158/12 213/17 213/17
**debate [1]** 69/7
**deceive [1]** 225/11
**December [3]** 176/19 236/24 237/3
**December 22 [1]** 237/3
**December 22nd [1]** 236/24
**decide [27]** 36/7 76/20 105/23 106/3 106/21 107/18 108/16 113/12 162/20 162/23 174/14 189/5 190/4 202/16 202/17 202/25 212/5

**decide...** [10] 212/8 213/8 215/15 216/2 216/3 216/6 222/10 224/5 225/14 229/15
**decided** [2] 105/1 204/17
**decides** [1] 76/19
**deciding** [1] 224/22
**decision** [4] 68/11 68/14 70/7 175/22
**decisions** [2] 113/12 235/14
**deck** [1] 184/13
**decline** [6] 11/15 12/3 12/15 107/24 107/25 212/22
**declined** [1] 108/2
**declining** [1] 11/22
**decrease** [4] 13/9 13/11 108/5 108/7
**deduct** [8] 126/10 129/1 141/22 143/3 148/25 169/4 169/6 206/16
**deducted** [2] 22/21 127/2
**deductions** [2] 225/22 225/23
**deeper** [6] 75/4 116/15 135/3 135/11 136/1 139/7
**defendant** [4] 1/7 1/16 2/11 221/15
**defendant's** [7] 36/4 41/11 188/3 202/23 207/22 228/24 229/2
**defendants** [1] 41/15
**defense** [1] 186/5
**defined** [3] 118/23 119/1 198/15
**defines** [1] 153/15
**definitely** [1] 67/1
**definition** [5] 57/14 72/10 84/20 189/3 223/1
**degree** [1] 116/22
**Delaware** [1] 118/6
**delay** [2] 225/6 234/15
**deleting** [2] 235/12 235/12
**deliberate** [1] 187/3
**deliberation** [2] 105/21 222/7
**deliberations** [5] 187/1 187/6 218/20 233/20 233/22
**delivered** [1] 144/3
**delivery** [1] 27/9
**demand** [15] 25/16 126/20 149/2 166/1 166/19 166/22 167/1 167/3 167/6 167/14 168/17 169/7 178/2 178/5 178/12
**demand-creation** [1] 149/2
**demonstrate** [2] 6/21 229/2
**demonstrated** [2] 8/6 104/13
**demonstrates** [1] 11/25
**demonstrative** [1] 129/20
**Denied** [2] 231/2 231/4
**depends** [4] 20/9 38/22 38/25 178/7
**depicted** [1] 127/10
**depictions** [1] 155/6
**deposition** [9] 13/17 14/15 14/16 152/5 167/5 181/24 182/11 182/15 220/18
**depositions** [2] 138/18 181/8
**describe** [6] 9/9 75/1 87/10 105/15 126/6 216/13
**described** [5] 75/1 87/18 136/25 163/20 187/25
**description** [2] 87/4 111/4
**descriptions** [2] 154/18 170/15
**deserve** [4] 188/18 206/2 206/3 235/20
**design** [1] 76/18
**designed** [4] 49/8 52/3 65/1 220/3
**designer** [2] 108/24 217/15
**desired** [1] 101/13
**despite** [1] 173/3
**detail** [6] 30/21 50/3 69/3 109/8 157/8 234/17

**details** [4] 61/10 93/3 162/14 207/6
**deter** [7] 180/9 206/4 207/22 229/5 229/9 229/25 230/7
**determination** [2] 151/2 228/10
**determine** [12] 4/18 8/19 27/4 59/9 77/10 84/3 99/22 100/13 125/14 194/16 222/21 223/25
**determining** [13] 151/23 163/15 188/25 192/11 193/3 193/11 222/17 222/20 223/24 226/8 226/12 227/4 227/12
**deterrence** [1] 202/14
**developed** [1] 12/21
**development** [4] 103/11 126/17 126/19 143/4
**dialogue** [1] 207/7
**Dick's** [34] 39/18 41/1 41/2 72/17 85/2 111/2 113/23 128/4 132/13 132/15 133/9 133/14 133/21 133/25 134/3 134/4 134/5 134/7 134/9 137/1 139/9 139/14 139/18 141/12 143/10 143/11 149/16 171/21 172/19 172/20 172/23 173/4 184/23 184/24
**did** [214] 5/13 5/18 5/20 5/21 5/23 7/22 7/23 7/24 13/10 13/25 14/2 14/25 15/4 15/5 19/16 19/18 22/19 26/16 27/9 28/6 30/18 35/12 36/1 36/17 42/5 43/8 47/21 48/2 48/9 48/12 48/24 49/10 49/12 49/14 49/20 49/22 49/23 49/25 50/1 50/4 50/10 50/11 50/16 50/18 50/22 51/9 54/15 54/22 56/1 56/3 56/7 56/8 59/6 59/7 60/4 63/25 64/2 71/23 76/20 77/10 77/13 77/14 77/16 77/17 77/19 77/20 77/22 79/18 79/20 79/21 80/6 80/22 81/2 81/20 81/21 82/9 84/5 84/24 85/6 85/10 85/22 85/24 86/16 89/7 91/11 91/22 92/6 94/22 97/25 100/1 100/16 102/2 107/1 107/7 107/17 107/23 109/1 109/6 112/6 112/7 113/17 116/19 119/20 120/11 128/19 128/24 129/7 129/8 129/12 129/19 131/13 132/20 133/11 134/1 134/7 135/17 136/9 136/14 137/9 138/3 138/15 139/23 140/3 140/4 141/9 145/2 145/17 148/8 151/4 154/6 154/8 154/13 159/13 159/15 161/7 161/9 162/10 162/12 162/12 166/22 167/9 169/24 170/21 171/4 171/25 172/5 172/8 172/12 174/1 175/1 175/4 175/5 175/12 175/13 176/8 176/11 177/7 177/16 182/6 184/7 184/9 184/11 184/16 185/2 188/7 189/9 193/7 196/8 197/16 201/14 201/14 201/17 201/24 202/1 202/2 202/3 203/1 203/25 204/8 205/2 205/11 205/16 205/18 206/23 206/23 207/11 207/17 207/19 208/15 208/16 208/16 210/6 210/7 213/14 213/19 213/22 214/13 214/19 215/14 215/18 216/1 216/2 217/7 218/24 220/19 220/24 221/12 221/18 224/9 227/8 230/16 232/2 232/23 237/3
**didn't** [88] 4/12 5/15 5/19 8/3 9/12 12/19 12/23 13/5 13/8 13/14 14/11 14/12 14/24 15/2 17/19 18/17 25/8 25/12 25/15 26/10 26/14 27/7 28/9 28/12 28/13 28/18 30/22 37/11 37/21 42/5 45/1 48/20 49/17 50/7 50/11 60/12 68/9 76/4 80/20 82/12 82/13 84/15 84/19 85/9 91/21 92/8 97/21 100/15 108/11 108/23 113/7 113/24 114/5 114/6 115/1 133/23 138/9 158/5 158/17 159/22 168/19 169/19 171/7 172/13 173/4 173/13 174/23 175/7 176/21 179/4 184/25 199/23 202/5 203/9 204/8 205/5 205/5 205/9 206/8 207/13 208/13 208/13 209/23 212/15 212/18 212/22 215/11 215/20

**differ** [1] 132/20
**difference** [16] 11/25 17/3 21/5 21/6 38/21 38/23 42/20 70/21 141/7 165/2 165/14 165/23 200/23 200/25 201/1 201/5
**differences** [1] 18/10
**different** [48] 9/15 16/3 16/8 18/7 43/21 56/8 57/7 59/2 59/15 61/5 61/5 63/7 63/18 63/18 65/2 75/21 76/10 82/9 82/14 85/15 88/3 88/4 96/13 98/1 101/6 101/11 106/5 109/4 117/1 121/18 122/1 125/9 154/2 158/3 158/24 161/22 170/14 181/4 193/18 197/19 198/13 203/15 217/8 217/14 222/6 226/1 227/18 233/17
**differently** [1] 137/9
**difficulty** [2] 188/23 222/17
**dig** [1] 139/7
**digital** [9] 44/2 56/24 57/7 57/15 72/18 76/18 78/18 96/23 148/13
**diligence** [1] 213/14
**DiLullo** [1] 220/19
**Dire** [4] 2/7 2/13 54/9 115/24
**direct** [12] 2/7 2/8 2/13 2/14 7/6 40/6 54/9 69/11 71/17 115/24 118/14 147/20
**directly** [7] 71/14 73/19 74/25 96/25 173/24 174/6 218/2
**disagree** [5] 174/8 174/10 175/25 183/11 183/14
**disagreeing** [2] 183/17 195/17
**DiSanti** [3] 145/5 167/18 230/11
**discloses** [1] 139/10
**discount** [2] 172/1 172/8
**discounted** [1] 172/7
**discounting** [1] 14/4
**discovery** [3] 66/20 77/18 222/19
**discuss** [4] 3/4 3/5 121/13 238/17
**discussing** [2] 3/12 117/19
**discussion** [4] 186/11 209/24 230/13 231/24
**disgorged** [1] 199/14
**disgorgement** [12] 22/7 104/3 188/8 189/22 194/7 202/23 214/2 221/2 224/15 224/17 224/21 224/23
**display** [1] 57/8
**displayed** [2] 85/18 158/19
**displays** [5] 197/11 197/13 197/14 197/17 227/9
**dispute** [4] 68/21 69/5 210/25 235/10
**disputed** [1] 199/7
**disregard** [2] 232/13 232/24
**distance** [1] 204/22
**distraction** [1] 6/18
**distribute** [1] 25/13
**distribution** [7] 6/24 8/5 8/10 17/24 18/8 112/15 158/2
**DISTRICT** [5] 1/1 1/1 1/9 1/22 1/22
**diverted** [1] 225/3
**divide** [1] 73/20
**DLA** [2] 1/17 180/23
**dlapiper.com** [1] 1/19 1/20
**do** [190] 4/12 5/4 5/12 6/2 16/16 25/20 28/24 30/22 31/9 31/10 34/3 35/4 39/25 42/5 42/18 43/8 46/14 50/9 51/1 53/2 53/16 55/3 55/4 55/6 55/7 55/19 55/19 56/1 56/3 56/15 56/22 57/12 59/3 59/11 60/6 60/21 61/9 61/15 61/25 63/15 64/17 65/3 65/17 66/9 66/12 68/10 68/19 69/18 71/3 74/7 75/8 75/22 76/10 76/20 78/8 80/9 80/12 80/20 80/22 81/2 83/9 83/17 83/24 84/8 84/8 84/10 84/13 84/14 87/2 87/9 89/15 91/17 91/19 91/20

**D**

**do... [116]** 94/12 95/12 96/23 97/6 97/12 97/17 99/19 101/16 101/17 102/4 102/4 102/4 102/5 102/8 102/24 103/4 103/5 103/8 103/10 103/12 113/16 116/5 116/16 117/9 119/2 120/3 124/10 127/22 128/9 129/16 130/20 134/15 140/3 141/10 142/1 142/15 142/21 144/20 145/14 145/16 145/20 159/21 159/22 160/7 165/1 166/10 166/18 172/5 173/11 174/19 174/24 176/11 178/13 178/15 179/8 179/10 179/13 179/20 179/23 179/25 181/13 181/16 181/20 181/20 181/21 182/25 183/2 183/23 185/13 185/15 186/21 189/1 189/16 190/25 191/1 197/25 201/14 201/15 201/17 201/24 202/1 202/13 202/13 203/4 203/14 203/15 203/24 204/2 204/3 204/8 204/21 204/21 205/23 205/24 207/11 207/22 208/13 209/20 209/23 212/25 215/12 216/14 216/16 218/25 218/25 219/1 219/5 220/24 221/1 221/11 221/21 221/21 221/21 221/23 226/7 233/4

**Dockers [2]** 56/5 56/10

**document [20]** 86/11 92/10 118/23 132/9 134/20 134/23 136/1 161/12 172/5 173/19 175/23 176/2

**documentation [12]** 130/11 136/8 141/8 141/20 172/16 173/18 174/4 174/22 175/8 175/10 175/17 175/20

**documented [5]** 150/10 152/7 164/25 176/5 177/10

**documenting [2]** 163/21 173/7

**documents [20]** 106/22 111/6 122/10 125/25 128/20 132/8 132/8 133/4 135/4 141/4 148/9 148/11 152/5 155/2 165/7 174/25 175/3 176/1 176/4 213/7

**does [47]** 5/3 6/2 7/18 7/21 20/25 32/6 32/13 32/23 32/25 52/2 55/10 56/13 57/22 61/22 62/1 62/24 66/3 68/16 73/9 75/25 76/2 82/6 88/2 91/2 92/15 97/20 102/21 111/25 131/5 132/20 132/25 134/17 137/5 139/6 140/13 142/25 142/25 143/10 156/2 160/5 161/15 178/5 179/1 198/5 202/25 203/1 222/19

**doesn't [22]** 3/25 5/14 6/24 9/10 32/20 43/13 70/5 82/5 103/11 115/4 115/5 137/15 161/6 166/25 183/20 183/22 188/24 201/11 215/5 219/3 219/4 220/11

**doing [17]** 56/25 65/1 116/13 116/25 117/6 118/2 129/17 147/14 162/21 180/5 183/23 200/20 203/1 203/22 207/19 207/23 229/17

**dole [1]** 201/16

**dollar [23]** 11/15 11/22 15/18 40/12 40/15 40/19 40/21 44/12 45/25 69/23 104/1 107/3 108/5 110/3 114/12 151/4 204/3 207/5 212/5 212/6 212/14 233/5 233/7

**dollars [11]** 30/12 77/25 114/21 115/1 115/4 134/7 156/17 156/22 162/24 172/3 233/6

**Dominique [1]** 170/7

**don't [132]** 4/25 6/13 8/1 9/12 13/1 14/7 21/20 28/24 29/16 29/19 29/20 30/10 30/21 31/18 38/5 38/15 40/10 40/21 43/4 43/10 43/11 44/25 47/7 50/3 51/23 52/9 53/1 69/4 69/23 70/9 70/15 70/17 74/22 75/6 82/7 86/1 86/4 86/6 87/7 89/9 89/14 89/20 93/22 95/5 95/8 95/13 95/20 95/22 96/22 97/10 97/19 97/21 101/2 101/19 103/13 107/15 108/25 111/2 113/8 113/8 113/9 121/11 123/15 144/6 144/22 146/10 153/2 156/8 157/10 158/8 164/24 166/15 166/21 170/2 171/10

**door [1]** 113/15

**double [7]** 89/25 90/5 90/12 90/22 91/5 140/11 198/11

**doubts [1]** 194/4

**down [41]** 3/16 4/16 8/21 15/20 21/13 22/2 25/5 32/2 32/7 33/12 37/14 39/11 40/23 45/12 58/16 59/6 61/15 74/7 90/8 106/3 125/7 125/17 133/2 136/17 141/5 141/13 141/14 141/23 142/4 150/8 150/24 158/6 161/3 164/5 171/21 176/5 178/16 200/17 200/23 217/25 220/10

**downstream [1]** 110/20

**dragged [1]** 208/17

**dramatic [1]** 59/3

**draw [1]** 221/10

**dressmaker [1]** 17/12

**dressmaker's [1]** 19/5

**DREWS [66]** 2/4 3/12 4/2 7/6 9/21 10/4 10/24 11/8 11/8 13/19 14/17 21/19 26/22 53/10 70/1 70/2 70/24 79/10 79/19 83/9 83/13 87/5 103/15 106/13 108/4 108/11 108/17 108/22 110/1 110/16 110/18 110/25 111/12 111/18 111/21 113/17 114/22 120/9 120/23 121/11 123/18 123/19 125/5 132/20 132/21 140/24 142/25 143/20 148/7 150/20 157/6 157/21 158/5 159/3 165/3 165/5 173/23 174/7 211/5 211/7 212/12 214/18 214/22 215/3 216/7 217/14

**Drews' [18]** 73/7 79/13 79/16 80/13 83/17 97/23 111/25 114/11 121/24 122/1 142/6 146/24 147/8 156/13 159/13 162/13 163/17 199/10

**Drews's [1]** 212/23

**Dri [4]** 137/19 155/1 155/2 169/9

**Dri-FIT [3]** 137/19 155/1 169/9

**Dri-FIT's [1]** 155/2

**drive [1]** 143/17

**driven [1]** 114/12

**drives [1]** 167/11

**driving [4]** 76/13 97/2 112/7 167/3

**drop [9]** 13/13 13/25 14/5 159/24 160/6 160/22 160/25 212/14 212/15

**dropped [1]** 161/2

**dropping [1]** 10/9

**drops [3]** 141/5 162/4 162/6

**due [8]** 21/5 45/18 109/13 159/24 213/14 236/23 236/24 237/10

**dug [3]** 75/4 135/3 136/1

**duplicate [2]** 99/15 197/19

**duplicating [1]** 225/25

**duplication [3]** 196/24 228/11 228/21

**Durant [1]** 143/5

**DURHAM [4]** 1/16 10/7 61/25 194/20

**during [16]** 60/7 60/10 103/16 107/24 108/5 115/3 166/13 167/5 170/5 170/7 176/24

**duties [1]** 222/7

**DX [11]** 23/7 31/8 31/20 33/6 33/17 34/4 129/13 129/21 130/6 130/18 161/10

**DX-1222 [1]** 23/7

**DX-1223 [1]** 31/8

**DX-1224 [2]** 33/6 33/17

**DX-1225 [1]** 34/4

**DX-1227 [1]** 31/20

**DX-1229 [1]** 129/13

**DX-1230 [1]** 129/21

**DX-1231 [1]** 161/10

**DX-1233 [1]** 130/6

**DX-1234 [1]** 130/18

**E**

**E-commerce [2]** 139/15 139/24

**each [25]** 6/20 26/19 47/7 49/13 57/6 57/10 88/9 105/16 105/21 124/11 174/5 186/17 186/17 187/16 204/5 204/10 204/12 209/3 222/24 223/8 228/6 228/11 232/19 234/22 235/9

**earlier [13]** 80/7 94/6 118/18 133/10 149/10 151/6 153/24 154/3 160/15 184/24 214/22 232/19 237/14

**earned [4]** 127/21 141/19 142/19 223/14

**earning [1]** 223/16

**easier [1]** 4/24

**East [2]** 116/20 138/8

**Eastbay [1]** 72/16

**EASTERN [2]** 1/1 1/22

**easy [2]** 138/10 205/23

**economic [3]** 117/1 156/19 163/13

**economics [1]** 117/8

**economy [1]** 124/12

**Edwin [1]** 17/12

**effect [3]** 5/25 224/4 227/16

**efficient [1]** 103/7

**effort [2]** 209/6 215/20

**efforts [8]** 25/13 83/1 83/3 108/1 187/25 193/14 193/16 227/15

**efforts to [1]** 227/15

**eight [7]** 16/7 56/9 157/7 157/19 158/9 163/2 235/16

**EISENSTEIN [8]** 1/17 2/4 2/5 103/4 103/12 104/24 122/19 209/10

**either [7]** 46/15 113/25 124/12 136/22 183/21 188/7 235/15

**El [1]** 1/13

**element [4]** 165/5 180/8 180/13 191/5

**elements [1]** 228/17

**elevator [1]** 238/22

**eligible [1]** 80/4

**eliminate [1]** 199/1

**Elizabeth [3]** 17/13 19/5 108/25

**Elizabeth's [1]** 217/16

**Elmo [1]** 167/18

**else [15]** 9/3 20/22 64/19 103/3 146/14 147/5 178/14 204/19 205/14 205/19 205/19 208/11 209/7 219/1 238/2

**else's [1]** 203/21

**email [9]** 3/11 145/2 145/4 152/18 153/1 153/23 154/2 174/20 205/6

**embarked [1]** 148/4

**emotion [2]** 209/13 209/22

**emotional [2]** 209/13 209/14

**emphasis [1]** 231/9

**emphasize [1]** 196/25

**employees [3]** 117/7 170/11 171/1

**E**

emulate [1] 49/8
encompassed [1] 4/1
encounter [1] 172/9
end [11] 60/12 64/16 117/12 127/17 136/14
136/17 194/11 194/12 207/18 209/3 231/24
endorsement [2] 126/22 143/6
endorsements [3] 155/12 168/21 217/2
engage [1] 15/2
engaged [1] 201/25
engine [1] 72/20
engineering [2] 117/8 117/23
engineers [1] 117/25
enjoyed [1] 149/18
enough [15] 59/16 68/19 172/4 201/2 201/3
201/4 202/4 204/6 106/10 208/25 215/14
215/20 215/20 216/2 216/3
enter [3] 20/22 108/17 151/17
entered [5] 16/14 107/3 112/15 151/9 233/10
enters [8] 7/10 9/13 10/21 20/11 71/8 105/7
147/17 200/7
entertainment [2] 108/2 162/5
entire [11] 7/6 38/13 111/11 132/23 152/4
159/9 159/24 165/12 169/3 232/24
entities [9] 35/10 35/15 39/17 41/14 68/7
128/6 152/19 152/20 157/10
entitled [9] 68/23 104/16 104/19 192/12
222/11 225/16 226/12 229/15 239/21
entitlement [1] 104/12
entity [2] 124/20 169/2
entries [2] 235/8 235/9
envision [1] 234/21
envisioning [1] 101/7
equation [2] 20/11 95/7
equipment [1] 18/21
equitable [1] 194/9
Especially [2] 20/10 82/1
ESQUIRE [5] 1/12 1/12 1/16 1/16 1/17
essence [1] 20/1
essential [1] 68/22
essentially [4] 11/15 51/24 137/12 198/4
established [2] 87/8 110/15
estate [2] 178/1 178/13
estimate [8] 11/12 40/8 41/21 74/14 75/20
138/20 144/14 186/22
estimated [2] 40/1 41/23
estimates [1] 43/20
estimating [1] 42/22
evaluate [4] 50/16 50/18 52/3 209/16
evaluation [1] 54/13
evaluations [1] 75/18
even [34] 3/25 3/25 21/3 29/2 39/7 59/13
66/15 74/8 77/17 108/4 110/5 110/7 111/10
112/3 114/13 135/2 146/21 152/13 154/17
160/11 162/7 173/15 178/21 192/3 202/4
202/4 204/23 205/4 215/16 215/23 222/6
223/2 223/4 228/20
event [1] 234/5
events [1] 155/13
eventually [2] 88/25 96/19
ever [6] 85/17 85/18 175/23 178/18 203/17
219/5
every [31] 11/15 11/22 23/17 24/21 27/10
49/13 50/7 51/23 51/25 56/23 57/4 76/4 81/7
85/1 88/8 93/13 97/25 108/5 110/3 110/3
111/10 112/2 114/12 142/1 142/2 177/25
199/11 206/5 212/14 219/20 221/3
everybody [7] 72/7 88/21 89/7 176/20

everybody's [1] 137/17
everyone [12] 3/2 10/23 71/10 105/9 147/19
200/9 204/19 205/14 205/19 205/19 208/11
216/19
everyone's [1] 46/24
everything [8] 42/7 42/11 135/13 159/10
206/16 206/25 221/16 238/11
everywhere [7] 26/11 110/4 110/9 214/6
214/16 214/17 216/7
evidence [105] 4/4 8/24 12/23 16/7 27/4
30/19 37/10 37/17 37/19 38/9 68/24 73/3
85/16 85/19 104/9 105/17 106/19 106/21
106/22 107/21 109/15 110/9 110/18 111/13
111/14 111/15 111/16 111/24 111/25 114/5
114/6 114/7 114/8 114/14 115/5 115/9
137/15 138/15 146/20 146/24 147/9 147/10
149/7 149/8 165/10 168/10 169/11 172/4
172/5 174/12 185/23 189/12 192/13 193/5
193/7 194/3 194/14 194/17 194/18 194/21
195/16 195/19 196/11 197/8 197/10 197/14
197/16 199/7 199/8 200/14 204/7 204/15
206/10 207/18 209/17 209/22 209/24 210/15
210/18 212/7 212/10 213/1 213/23 214/14
215/2 215/16 216/22 217/20 218/15 218/16
218/17 220/22 222/25 223/5 223/9 223/18
224/13 225/12 225/18 225/21 226/13 226/20
227/6 227/8
evil [1] 228/24
exact [6] 49/13 187/18 187/19 210/11 221/8
233/15
exactly [4] 57/12 166/15 182/8 194/12
examination [21] 3/13 6/19 10/25 11/3
46/21 51/14 54/9 64/20 71/17 78/20 78/23
98/18 100/22 115/24 118/14 147/20 157/21
163/6 166/2 166/5 184/4
examine [4] 9/22 53/18 66/24 70/13
example [20] 25/9 27/10 27/15 28/9 37/14
37/20 38/16 55/25 57/5 58/9 59/1 74/6 75/9
75/10 78/17 86/23 134/11 135/20 214/17
221/3
examples [2] 114/10 133/5
exceed [4] 189/7 190/2 190/6 224/7
except [3] 17/4 196/24 204/19
exception [7] 190/25 191/11 191/12 195/25
198/17 198/23 199/9
exceptions [4] 189/14 193/23 197/21 230/15
excess [1] 104/13
exchange [19] 151/17 152/9 152/16 152/18
165/16 165/18 178/10 178/17 178/18 179/9
179/16 179/17 179/18 179/21 179/24 184/7
210/19 235/8 235/9
exclude [1] 66/2
excluded [4] 3/20 89/21 90/13 149/11
exclusion [1] 48/25
exclusive [5] 20/10 20/14 20/17 157/23
157/24
exclusivity [1] 20/12
excuse [4] 88/9 111/19 156/24 196/8
excused [9] 53/11 53/13 59/22 101/21
102/12 102/25 144/11 186/3 187/8
excuses [1] 208/10
execute [1] 84/5
exercise [1] 36/6
exhaustive [2] 151/14 154/8
exhibit [36] 3/22 6/18 16/14 30/15 30/18
31/7 33/6 35/3 35/7 43/12 50/24 54/18 68/15
68/25 69/18 73/2 73/3 73/5 134/13 135/6
136/3 168/10 172/18 174/15 184/17 214/24

Exhibit 3009 [2] 73/2 73/5
Exhibit 30B [1] 184/17
Exhibit 31A [1] 50/24
Exhibit 36 [1] 54/18
exhibits [12] 27/4 27/13 31/11 31/15 31/17
37/20 38/9 176/1 204/10 233/14 238/9 239/4
exist [2] 59/3 161/6
existed [2] 165/16 211/16
exists [2] 55/12 177/15
exits [5] 59/23 102/13 144/12 187/9 233/24
expand [9] 187/25 193/14 196/16 196/17
196/18 196/20 197/2 223/19 227/15
expands [1] 72/18
expansion [1] 68/7
expected [1] 176/23
expecting [1] 4/14
expended [1] 150/23
expenditures [3] 123/9 160/6 168/22
expense [5] 49/13 49/23 50/2 169/6 229/22
expenses [6] 49/14 50/2 126/15 161/14
163/23 223/15
experience [4] 89/11 93/22 113/11 216/23
experienced [1] 108/8
experiences [1] 201/8
expert [32] 27/2 63/25 64/6 66/1 70/6 81/3
101/8 101/9 102/19 105/4 111/14 113/8
113/18 114/2 118/3 118/6 118/9 177/7
183/24 194/5 197/20 204/12 206/19 207/10
210/12 210/13 211/6 212/12 221/8 227/23
228/1 228/9
expertise [2] 54/17 68/19
experts [8] 47/21 69/7 106/4 114/1 114/2
114/4 228/4 228/8
expire [1] 124/16
explain [18] 13/22 21/16 38/1 68/17 119/20
121/5 121/10 121/17 122/4 123/3 125/19
127/24 128/22 130/21 131/19 133/11 149/13
204/22
exposure [2] 148/15 159/12
express [1] 42/24
extensive [1] 27/8
extent [9] 21/5 120/11 180/4 193/11 193/24
196/14 223/20 227/12 229/20
extraordinary [1] 218/14
extrapolate [2] 47/10 57/25
extrapolation [1] 47/22
extrapolations [1] 60/8
extremely [1] 218/11
eyes [2] 57/25 205/17

**F**

F.3d [1] 191/18
fabrics [1] 143/4
Facebook [5] 44/10 44/16 59/7 72/21 96/25
facing [4] 137/12 137/22 148/15 169/17
fact [13] 4/8 9/13 30/25 47/21 156/19 199/15
204/23 216/21 216/22 216/22 219/17 228/4
232/14
factor [2] 82/11 190/22
factors [4] 125/9 154/6 224/24 229/18
Factory [5] 169/19 169/21 170/11 170/21
170/25
facts [2] 166/11 215/12
factual [2] 65/4 196/10
failure [2] 104/12 196/20 229/13
fair [14] 15/8 42/12 70/7 79/12 84/15 92/25
140/11 155/20 215/15 216/1 221/21 234/7
237/15 237/22

# F

**fairly [4]** 38/3 75/14 188/18 222/12
**faith [1]** 153/19
**fall [1]** 213/10
**falls [4]** 42/8 42/11 42/13 42/17
**false [2]** 6/6 191/2
**familiar [15]** 31/13 31/14 39/4 82/25 83/3 84/6 87/20 87/23 124/8 134/17 169/23 180/3 214/8 216/18 238/13
**famous [1]** 17/15
**far [16]** 7/6 41/14 108/19 111/19 111/20 114/3 114/4 144/22 161/21 163/16 187/11 189/14 192/8 206/2 211/24 219/14
**fashioning [1]** 202/22
**fast [1]** 215/20
**fault [1]** 205/16
**favor [1]** 233/10
**featured [2]** 4/11 35/3
**February [2]** 81/3 92/12
**February 10 [1]** 92/12
**February 10th [1]** 81/3
**federal [7]** 198/3 198/5 201/6 201/9 208/17 218/12 220/7
**fee [1]** 108/15
**feel [5]** 140/10 140/11 184/10 194/8 199/7
**fees [4]** 234/11 235/1 235/3 238/5
**fell [1]** 213/14
**few [9]** 20/16 35/11 40/4 79/7 132/13 166/11 186/10 187/3 218/3
**figure [17]** 62/25 86/11 101/17 121/1 121/6 122/20 123/5 125/3 125/7 140/24 140/25 142/21 153/4 201/15 208/4 208/25 221/7
**figures [5]** 4/9 18/9 76/25 114/7 162/10
**file [8]** 139/10 145/17 152/4 234/9 234/10 237/6 237/17 238/4
**filed [6]** 93/2 139/13 168/14 234/24 236/21 237/18
**filing [4]** 237/8 237/21 237/25 238/3
**filter [1]** 141/13
**filtering [1]** 149/4
**final [3]** 66/8 69/13 70/22
**finally [2]** 104/18 208/18
**finance [3]** 54/24 117/8 117/24
**finances [1]** 213/15
**financial [10]** 116/8 117/1 139/10 162/11 164/16 168/3 168/12 177/3 177/8 181/11
**financially [2]** 164/10 183/21
**financials [1]** 168/21
**find [25]** 57/4 58/20 59/1 59/2 67/20 85/9 103/25 119/6 144/7 175/10 178/25 190/20 192/19 208/18 214/14 222/13 226/18 226/22 228/16 232/9 233/2 233/3 233/4 233/6 236/1
**finding [3]** 115/8 218/10 218/11
**findings [1]** 216/3
**finds [1]** 188/19
**fine [4]** 68/13 163/8 237/1 237/5
**finish [3]** 10/15 46/10 146/8
**finished [2]** 187/19 219/23
**firm [6]** 55/5 116/19 117/7 180/23 182/23 183/16
**firm's [2]** 181/23 183/16
**firms [2]** 116/25 235/5
**first [45]** 4/12 10/16 25/7 58/13 61/4 61/10 68/5 68/15 68/25 69/18 86/18 92/25 98/4 98/11 99/16 102/15 103/9 106/9 115/11 122/3 124/2 128/3 133/13 136/17 141/1 149/17 157/11 159/18 178/17 187/22 192/22 200/11 201/9 203/12 203/18 203/24 205/12

**fit [4]** 66/3 137/19 155/1 169/9
**FIT's [1]** 155/2
**Fitness [1]** 45/2
**fits [1]** 55/20
**fitting [1]** 191/3
**five [17]** 4/14 5/17 8/20 103/18 124/15 144/15 153/16 175/9 182/12 182/13 185/20 199/2 200/4 200/11 202/4 218/22 225/8
**fix [5]** 66/10 99/2 99/3 220/8 229/16
**fixed [1]** 233/14
**fixing [1]** 229/25
**flash [1]** 207/12
**flashy [2]** 207/8 207/9
**flooding [1]** 219/16
**flowchart [1]** 140/22
**fluid [1]** 38/14
**flyer [1]** 185/5
**focus [6]** 40/22 55/15 202/12 204/12 209/18 209/25
**focused [10]** 89/5 99/1 116/22 117/24 131/24 131/25 132/6 137/23 169/14 169/16
**folded [1]** 133/25
**folks [6]** 5/23 183/4 203/4 204/2 206/1 220/3
**follow [5]** 76/6 84/21 93/11 166/21 210/3
**followed [2]** 74/24 74/24
**followers [1]** 72/22
**following [6]** 83/11 92/18 167/16 192/3 224/24 229/18
**follows [4]** 103/25 192/6 211/14 230/13
**font [1]** 23/2
**Foot [6]** 39/18 41/7 72/16 110/20 113/23 128/4
**footnote [1]** 92/12
**force [1]** 205/4
**forecast [3]** 30/4 75/8 111/5
**forego [1]** 105/1
**foregoing [1]** 239/20
**forensic [2]** 172/5 177/15
**forensically [1]** 163/4
**forever [1]** 220/20
**forgot [1]** 48/4
**form [8]** 84/22 104/4 111/17 197/4 219/13 221/14 230/11 233/1
**formal [1]** 101/17
**formally [1]** 147/8
**formed [1]** 116/19
**former [1]** 170/10
**forming [2]** 12/24 50/12
**formulating [1]** 27/2
**forth [8]** 103/2 121/14 152/23 158/25 188/12 192/7 235/6 235/17
**forward [2]** 72/6 161/4
**found [13]** 16/18 92/24 105/13 113/7 120/15 128/22 133/10 139/14 148/12 194/13 199/5 201/17 220/24
**foundation [2]** 65/4 130/1
**four [18]** 4/15 5/5 5/13 8/20 38/4 63/9 152/10 180/24 180/25 181/2 181/3 182/12 182/13 185/21 189/2 225/6 227/17 236/22
**Fourteen [1]** 236/11
**fourth [1]** 11/18
**fraction [1]** 113/21
**frame [1]** 234/21
**Francisco [1]** 116/7
**free [4]** 6/11 7/24 66/2 205/8
**freight [1]** 25/5
**frequently [1]** 38/3

**Friday [1]** 76/12
**front [5]** 23/3 28/21 166/15 197/13 207/4
**fulfilled [1]** 80/14
**full [7]** 38/4 54/5 115/20 122/14 126/4 143/16 182/14
**full-time [1]** 182/14
**fully [3]** 113/2 155/17 165/15
**fundamental [1]** 9/6
**further [17]** 3/5 46/17 51/11 53/8 75/2 92/21 98/13 123/1 132/5 179/18 184/1 185/25 186/1 186/4 192/22 206/1 226/17
**Furthermore [2]** 192/17 198/8
**future [4]** 99/12 229/10 230/1 230/8

# G

**GAGLIARDI [2]** 1/21 239/25
**gain [2]** 112/6 210/7
**gained [3]** 22/10 106/10 224/19
**game [2]** 158/21 159/8
**garage [1]** 119/8
**garment [1]** 65/5
**garments [5]** 5/16 170/1 171/11 193/6 227/7
**gather [1]** 239/4
**gave [14]** 14/4 36/3 41/21 42/19 62/19 77/7 95/24 173/19 192/7 222/5 223/1 228/1 237/6
**gear [1]** 143/5
**gears [1]** 137/2
**Gen [9]** 64/5 82/8 82/8 82/23 82/23 83/1 83/4 83/6 83/6
**general [5]** 40/24 117/20 191/16 197/20 226/4
**generate [1]** 42/25
**generated [3]** 55/14 57/10 113/6
**generating [1]** 25/16
**generation [2]** 64/5 83/7
**gentlemen [14]** 10/24 26/18 53/17 59/18 71/11 102/1 105/10 105/13 143/24 186/8 186/13 200/10 209/12 231/25
**Georgia [1]** 125/13
**Georgia-Pacific [1]** 125/13
**get [72]** 5/19 5/21 6/8 6/8 8/1 8/1 20/3 20/20 20/22 40/18 44/12 52/1 55/18 57/25 59/12 64/2 65/19 69/6 69/8 70/10 72/23 74/7 78/13 89/2 89/3 92/4 92/5 92/9 96/7 103/2 103/3 108/23 109/6 116/15 119/4 120/21 122/15 123/1 126/12 128/25 132/12 137/25 138/1 138/11 146/10 151/4 162/10 181/23 183/18 202/11 203/15 203/16 205/23 205/25 206/2 206/2 206/9 206/17 206/23 207/16 208/13 209/8 219/6 220/11 220/17 220/24 221/12 221/13 233/14 234/15 238/22 239/7
**gets [11]** 15/13 20/21 60/13 96/6 162/23 205/1 205/21 207/14 207/16 219/5 237/21
**getting [9]** 6/9 2 74/8 103/19 117/14 122/14 159/10 205/24 234/13 235/7
**giant [2]** 63/12 66/25
**GINA [1]** 1/16
**gina.durham [1]** 1/19
**girl [1]** 200/17
**give [34]** 7/4 25/8 25/12 25/15 48/2 68/16 68/18 70/8 90/16 100/1 102/2 102/9 103/1 113/12 114/10 144/4 144/8 159/9 172/13 186/15 186/19 186/21 186/25 188/6 192/2 192/5 192/21 196/2 204/14 205/8 208/10 218/15 226/4 228/15
**given [18]** 6/11 7/9 57/1 57/24 58/3 72/4 73/17 87/5 88/14 96/4 99/11 102/17 105/17

**G**

given... [5] 115/2 124/7 167/8 194/16 198/10
gives [2] 164/11 208/4
giving [3] 159/11 187/18 191/22
globally [1] 55/8
go [127] 6/18 6/19 6/19 17/11 26/23 32/7
33/18 34/3 34/22 39/20 40/22 43/12 46/10
51/1 53/20 54/18 55/6 55/18 56/1 62/3 64/13
69/23 73/1 76/4 82/8 84/24 85/6 85/22 86/11
87/24 89/17 92/4 94/1 100/20 101/13 105/4
113/20 119/11 119/25 120/18 121/20 123/21
125/6 125/9 126/18 127/7 128/11 128/12
130/5 130/17 131/17 133/5 133/13 134/4
134/12 134/16 135/15 135/21 136/11 137/7
137/25 139/4 140/16 141/23 143/23 146/6
146/21 146/23 146/24 147/2 147/2 150/2
150/16 150/24 151/25 153/6 153/22 154/5
156/12 157/2 158/5 158/17 159/16 160/14
161/3 161/24 162/5 163/9 165/17 172/20
173/21 176/3 176/7 185/3 185/17 186/20
187/17 195/22 197/7 200/11 202/12 205/10
206/7 208/1 209/7 209/7 211/13 212/9
212/17 212/21 213/6 213/12 213/17 213/17
214/12 214/21 216/17 217/21 219/21 222/1
233/6 236/1 238/17 238/22 238/24 239/2
239/12
goal [1] 138/11
goes [15] 7/15 123/20 132/25 136/17 141/14
155/4 155/16 165/13 187/7 187/11 192/8
194/7 205/11 205/11 219/20
going [123] 7/13 9/1 9/22 22/25 31/24 34/3
53/16 53/17 53/19 59/19 62/7 64/16 65/6
67/24 68/7 68/10 69/6 69/14 70/10 70/17
71/3 71/4 73/21 75/13 79/7 91/1 93/12 95/25
97/1 102/7 102/10 102/18 103/1 103/15
103/21 105/4 110/12 111/18 111/20 111/23
115/7 116/15 119/5 121/17 127/12 128/15
140/5 141/25 143/25 144/17 144/20 145/13
146/5 146/19 146/25 148/2 153/6 156/21
158/25 163/11 164/6 167/25 175/10 186/21
186/23 187/12 187/15 188/1 188/6 188/15
189/2 189/5 190/3 190/17 191/8 191/22
192/3 192/6 192/8 192/15 192/21 192/21
196/1 196/23 196/25 197/7 197/19 198/20
198/23 199/23 202/9 202/24 207/9
209/5 210/2 210/5 211/4 211/9 218/1 218/5
218/6 218/7 220/13 220/17 221/23 222/1
222/9 226/4 228/13 228/14 231/15 234/8
234/18 236/1 236/5 236/16 237/12 237/13
237/16 238/9 238/17 239/13
gone [8] 63/6 63/10 93/23 122/8 130/12
155/5 165/5 173/23
good [22] 3/2 10/24 11/6 11/7 11/8 19/7 58/6
59/12 79/1 83/21 92/1 103/23 116/2 116/3
153/19 164/12 164/16 166/8 166/9 209/11
234/16 235/6
goods [15] 22/21 25/4 26/1 26/3 39/18 58/21
72/17 85/3 126/11 127/1 128/5 130/3 139/14
142/2 148/25
Google [5] 43/23 59/7 75/13 76/2 76/9
got [36] 8/17 25/5 40/4 40/25 41/25 54/23
54/24 65/22 66/19 67/18 67/18 67/19 75/2
75/3 76/10 92/23 93/3 93/11 94/18 96/19
96/21 101/5 109/24 116/24 117/15 136/24
198/4 204/9 204/21 205/15 208/11 208/16
213/25 219/12 220/20 221/20
gotten [1] 99/4
Grab [1] 204/13

**Gr**

Gracie... [1] 16/8
Gramicci [1] 16/8
grant [2] 158/7 225/14
graph [5] 168/16 207/9 207/9 220/23 220/23
graphic [1] 151/18
grave [3] 194/4 194/11 194/12
gray [3] 11/12 135/10 212/15
great [5] 81/19 97/24 109/8 221/19 234/17
greatest [1] 183/8
green [1] 163/19
grew [3] 116/20 117/4 117/11
gross [24] 25/5 26/4 26/5 122/14 122/17
126/13 127/2 130/3 141/25 142/2 142/5
142/7 142/7 142/20 142/22 143/1 143/13
150/4 150/7 150/11 163/19 167/2 168/23
169/10
ground [1] 115/8
grounded [2] 109/15 114/5
grounds [1] 3/15
group [1] 138/23
groups [1] 117/21
grow [3] 81/10 99/10 99/13
growing [1] 124/9
grown [1] 138/25
grows [1] 191/2
GSA [1] 207/11
guess [4] 80/12 81/13 94/22 181/22
guessing [2] 189/13 224/13
guidance [1] 192/5
guy [2] 17/15 204/3
guys [3] 203/8 204/4 208/25

**H**

had [90] 5/15 5/16 8/22 8/23 16/8 17/4 23/14
26/17 27/13 27/24 28/20 30/19 31/11 35/6
35/9 37/14 38/8 41/11 42/23 44/23 51/2
57/19 60/6 63/17 67/22 67/22 70/20 78/17
81/14 86/7 93/22 96/7 99/15 100/13 109/17
110/17 113/15 113/16 114/13 117/4 117/17
119/9 125/7 128/18 134/23 136/2 138/7
138/25 140/8 141/22 148/10 148/21 149/20
152/3 154/10 157/5 157/22 157/23 164/2
173/23 174/9 174/20 175/1 175/14 175/17
176/6 178/17 179/17 182/12 185/21 185/21
189/10 196/15 202/16 204/24 205/3 205/5
208/10 217/11 220/9 220/15 220/19 224/1
224/11 225/1 232/6 232/7 232/15 232/16
232/23
half [8] 38/4 38/13 156/17 156/21 159/5
164/23 222/2 233/18
HAMILTON [1] 1/13
hand [14] 32/16 54/2 120/22 121/4 134/16
135/15 136/18 145/22 160/21 161/21 162/2
163/16 185/13 230/11
handed [3] 58/5 187/11 187/16
handled [1] 235/18
hands [3] 202/15 202/16 222/3
hang [7] 28/22 29/1 88/9 90/14 110/13
137/20 195/6
hanging [1] 197/13
happen [1] 220/15
happened [5] 4/14 13/6 38/12 202/3 204/15
happening [1] 103/3
happens [6] 102/5 144/23 202/16 202/17
236/6 239/1
happy [2] 89/10 171/14
Harbor [1] 16/9
hard [5] 130/21 135/9 140/19 209/16 217/7
Hardy [5] 16/9 17/10 17/11 17/12 18/12

**Ha**

has [76] 3/16 4/10 7/6 8/6 11/21 21/6 36/18
43/15 46/14 49/8 66/1 67/5 68/19 69/4 71/13
74/13 75/18 78/15 79/19 82/14 89/9 93/19
102/22 112/12 112/15 112/17 112/20 112/21
116/6 120/15 123/18 123/21 125/20 127/16
127/16 127/17 127/18 134/2 137/6 141/19
146/22 150/23 155/1 155/10 156/9 162/8
162/19 162/20 165/5 165/11 178/21 179/16
190/22 190/24 192/12 198/22 199/11 206/25
207/21 216/25 217/1 217/17 223/4 224/19
225/13 226/13 228/16 232/2 232/14 232/16
232/22 233/1 233/13 234/12 235/17 235/17
hashtag [1] 170/1
hashtags [1] 171/11
have [348]
haven't [10] 6/20 44/15 44/18 44/20 44/23
79/5 85/21 162/14 187/19 189/22
having [8] 68/25 94/23 138/18 187/13
196/19 204/23 231/14 235/14
he [88] 3/12 12/16 13/17 14/12 14/15 37/25
49/17 53/20 60/10 60/12 60/13 60/18 61/4
63/20 63/21 63/22 67/19 67/21 68/6 68/17
68/18 68/19 69/15 71/1 79/21 94/25 94/25
103/11 107/1 107/7 107/8 107/11 107/13
107/17 108/7 108/10 108/12 109/1 109/2
109/7 109/10 109/12 110/3 110/6 110/7
110/17 110/18 110/23 114/18 132/23 142/6
142/25 142/25 152/18 159/22 159/22 160/5
160/17 165/11 171/17 171/21 179/17 179/18
187/25 193/2 196/15 196/16 196/16 199/11
200/21 205/5 205/6 211/8 212/12 212/13
212/15 212/18 212/22 213/3 213/4 214/23
215/5 219/20 219/21 220/18 227/3 231/6
231/13
he'll [1] 90/16
he's [9] 17/15 42/19 62/7 63/20 66/2 70/22
143/1 161/4 207/1
head [2] 30/10 203/17
Health [4] 44/3 44/5 45/2 45/2
hear [33] 4/14 4/17 7/2 28/13 69/4 78/7
106/1 111/14 113/18 115/6 123/22 163/6
191/8 203/11 204/3 206/3 207/24 207/25
207/25 208/3 209/23 210/2 210/5 211/4
211/9 211/25 218/6 218/7 218/13 220/13
221/14 230/16 231/22
heard [57] 8/11 8/13 12/12 12/24 12/24 13/6
29/3 66/15 103/17 106/2 106/12 106/20
107/21 108/14 108/17 109/10 110/16 110/18
111/9 111/23 113/5 114/3 114/3 114/16
114/22 120/24 124/4 125/5 126/23 137/3
137/17 153/12 170/25 171/15 178/18 197/22
199/8 200/16 203/19 205/19 206/3 208/22
209/12 210/12 210/14 210/17 211/18 212/7
214/1 215/7 215/18 215/21 218/16 218/18
219/22 226/5 227/23
hearing [3] 110/11 187/14 200/14
hears [2] 208/1 221/17
heating [1] 206/15
Heil [2] 6/7 8/13
held [1] 186/11
Hello [1] 79/2
help [8] 72/7 83/10 83/18 90/7 106/21
119/20 167/17 178/25
helped [1] 89/21
helpful [3] 147/11 147/12 234/6
her [2] 103/4 103/13
here [117] 6/10 8/10 9/2 9/20 10/6 10/18

**H**

here... [111]  17/7 18/12 22/19 23/17 26/20
27/5 27/5 41/15 43/12 58/5 59/20 59/25 61/3
63/2 67/19 70/1 70/2 70/8 72/12 72/15 73/21
78/8 80/20 84/16 86/17 87/24 88/24 90/13
90/21 90/22 95/19 96/20 108/17 108/25
109/21 109/22 126/18 127/10 129/9 129/10
130/12 131/20 132/9 133/15 138/20 140/24
144/8 148/5 150/18 151/5 154/13 157/11
162/15 163/9 163/13 167/17 167/18 169/4
170/5 170/7 171/15 171/17 174/24 180/7
188/15 189/6 192/5 192/22 196/4 196/6
198/18 200/14 201/1 201/7 201/10 201/17
202/6 203/8 204/13 204/17 204/20 205/24
205/25 206/9 208/17 209/5 209/20 210/1
210/4 212/8 213/1 217/19 218/16 218/25
221/11 221/15 221/20 223/11 224/6 224/15
227/23 231/7 231/7 232/17 232/22 232/24
233/18 234/5 236/14 238/11 239/13
Here's [3]  121/25 152/17 237/20
hey [2]  207/4 207/8
Hi [1]  79/4
Hibbett [5]  134/16 134/18 134/21 135/1
135/18
Higgins [1]  153/23
high [8]  18/25 19/3 19/6 19/8 117/14 127/17
154/12 208/1
high-end [1]  127/17
high-technology [1]  117/14
higher [3]  75/18 77/1 140/13
highly [4]  4/16 8/20 151/22 177/2
him [17]  53/18 60/2 66/24 69/23 70/3 71/3
96/1 102/17 103/10 108/14 205/4 215/10
215/10 215/17 219/20 219/21 219/25
himself [2]  106/22 174/21
hindered [2]  193/15 227/16
hire [1]  183/23
his [49]  10/10 13/16 14/8 14/16 53/18 53/20
59/21 60/15 62/13 66/18 67/16 68/18 69/11
69/25 70/1 70/14 79/14 79/22 81/5 81/5
83/14 107/1 108/22 110/7 113/18 123/23
146/21 152/7 156/18 157/6 157/21 160/5
161/1 165/3 172/9 204/18 205/6 205/18
210/3 210/4 210/10 213/14 215/9 220/1
226/24 226/25 228/2 229/8 231/13
historical [1]  161/13
history [6]  81/5 123/9 150/25 152/7 152/17
212/22
hit [2]  76/16 87/21
hitting [2]  76/11 76/13
hole [1]  191/4
holiday [2]  152/10 237/12
holidays [2]  236/20 237/1
home [2]  239/2 239/12
honest [1]  95/15
Honor [129]  3/9 3/15 3/18 4/7 5/2 5/4 5/8
6/4 7/17 9/23 9/23 10/17 15/8 23/5 23/5
26/24 31/3 46/17 46/19 47/16 48/5 49/16
50/13 53/9 60/6 60/13 60/17 60/23 62/2
62/10 63/1 63/15 63/25 64/25 65/9 65/24
66/13 66/16 66/22 66/24 67/3 69/16 69/24
70/6 70/12 70/15 70/19 71/6 78/21 97/4
98/14 98/16 100/19 101/24 102/7 102/16
102/20 102/23 103/6 103/21 104/10 104/18
105/1 105/12 115/12 118/8 118/11 143/23
144/15 144/18 144/19 145/9 145/16 145/20
145/22 146/1 146/15 147/4 147/7 147/21
155/22 155/25 156/25 157/3 166/1 166/3

--- column 2 ---

186/1 186/5 187/13 189/15 189/19 189/24
191/1 191/7 191/10 191/21 193/24 194/10
194/21 195/7 195/9 195/22 196/4 196/19
197/9 197/22 198/2 198/7 198/12 199/13
199/19 199/25 230/23 231/5 231/21 236/4
236/9 236/12 236/16 237/18 238/13 238/25
239/14
**HONORABLE [1]**  1/9
hope [3]  31/24 106/5 109/21
hoping [1]  82/1
hour [3]  183/1 183/6 233/18
hourly [1]  183/4
hours [12]  181/25 182/8 182/9 182/13
182/20 182/20 182/22 183/5 183/21 235/16
235/16 237/8
house [2]  119/6 178/5
Houston [1]  4/20
how [93]  21/6 21/7 27/8 28/7 40/25 41/25
42/2 56/7 56/13 57/25 59/9 60/10 62/20
64/11 65/14 65/18 65/21 65/22 66/9 73/14
75/3 76/5 76/7 76/18 77/11 81/20 84/24 87/2
87/9 93/3 93/11 96/21 97/6 97/12 97/17
99/22 105/16 108/9 111/9 113/11 113/12
114/8 114/11 116/11 121/5 122/23 123/5
123/7 128/22 130/8 131/8 132/20 134/5
134/7 136/14 138/21 143/21 150/13 151/2
151/4 156/7 162/2 162/17 164/1 166/22
168/19 179/13 179/21 179/23 181/4 182/6
182/20 187/7 195/3 196/15 198/19 201/15
203/19 203/24 206/11 210/6 211/18 211/18
212/6 216/14 216/15 225/16 226/5 226/7
234/8 236/7 237/10 237/14
however [9]  187/2 192/3 192/11 193/7
197/15 222/21 226/11 227/8 233/16
huge [3]  6/17 8/20 8/21
hundred [14]  57/19 72/22 89/17 89/25 90/4
123/19 123/20 123/23 132/24 134/9 148/22
150/20 165/11 165/13
hundreds [1]  125/12
hurt [1]  201/25
**HYNES [9]**  1/16 2/8 2/9 2/13 2/14 2/15
64/24 59/3 174/18
hypothetical [10]  28/10 30/2 49/4 49/7
52/12 53/7 88/22 89/23 125/6 175/17

**I**

I'd [12]  9/25 71/20 83/24 84/12 90/15 144/8
145/24 175/18 182/16 182/19 234/19 235/23
I'll [41]  7/1 7/2 67/25 67/25 89/23 102/8
103/18 104/21 113/20 121/5 121/10 121/15
122/3 122/4 122/13 122/15 122/17 127/23
128/22 130/25 131/7 145/12 146/11 147/15
155/23 186/24 190/8 191/24 192/2 192/6
195/21 197/18 200/3 204/5 207/8 208/13
233/22 234/4 237/14 238/23 238/23
I'm [136]  3/22 4/22 5/18 7/13 9/1 13/20
14/16 19/14 21/19 21/20 21/21 22/25 23/6
25/23 25/25 28/1 28/2 30/1 31/7 31/14 32/3
46/3 48/11 50/16 52/19 55/7 61/7 63/14
67/10 67/12 67/24 69/16 71/3 71/4 79/7
83/13 87/8 87/15 87/20 87/23 89/5 89/11
90/19 91/10 93/1 94/22 95/18 103/15 110/12
111/23 115/7 117/11 128/12 134/15 142/15
146/19 153/6 157/2 162/12 167/16 167/25
171/13 171/14 171/24 171/24 172/15 172/19
173/1 176/4 181/12 183/16 183/23 183/25
184/10 187/10 187/11 187/13 187/13 187/15
187/15 187/18 187/20 188/1 188/6 188/8

--- column 3 ---

190/17 191/8 191/14 192/3 192/6 192/8
192/15 192/21 192/21 195/17 196/23 196/25
197/7 197/19 198/8 198/23 199/15 199/16
199/23 200/21 202/6 202/9 209/23 212/7
214/13 218/1 222/1 222/9 226/4 226/6 226/7
228/13 228/14 231/15 234/16 234/18 235/24
237/9 237/12 237/13 237/16 238/5 238/13
238/16 239/12
I've [36]  55/14 68/4 78/6 85/7 86/2 95/8
95/16 116/13 117/5 117/20 117/21 118/2
118/5 122/8 122/9 125/12 125/25 128/20
129/10 130/12 131/7 132/2 136/18 136/20
140/21 150/12 154/11 155/5 163/13 171/9
171/12 173/19 191/19 231/22 235/3 235/18
iceberg [2]  204/9 204/14
iconic [1]  112/14
idea [7]  45/5 45/6 65/24 234/8 235/25 237/6
237/17
identified [18]  128/20 130/14 130/24 131/6
132/1 132/6 132/14 132/21 133/14 134/19
135/11 135/18 141/4 148/10 160/17 165/12
175/18 184/22
identifies [1]  133/1
identify [4]  87/18 133/23 137/13 141/10
ignored [3]  201/20 215/10 215/17
ignoring [2]  108/4 207/12
II [1]  17/13
II's [1]  19/5
ILANA [1]  1/17
ilana.eisenstein [1]  1/20
illegal [1]  201/25
image [5]  31/22 32/4 32/11 33/7 34/5
imagine [1]  101/19
imagining [1]  101/18
impact [8]  42/16 42/18 162/20 162/23
163/22 178/6 183/20 205/18
impacted [1]  162/19
impacting [1]  162/21
impacts [2]  164/9 169/18
important [29]  22/13 55/13 56/18 99/6 99/9
142/9 142/24 143/15 153/20 154/24 155/8
156/19 162/16 163/11 163/14 187/5 193/3
199/10 199/17 201/2 201/3 201/4 203/20
225/25 227/4 227/24 233/16 233/22 235/25
importantly [1]  3/17
imposition [1]  229/11
impossible [1]  206/8
impressions [13]  10/11 41/23 41/25 42/13
42/16 42/20 42/25 43/24 54/13 78/7 78/9
78/18 80/4
improper [1]  47/14
inability [3]  196/18 197/1 223/19
inaccurate [1]  8/7
inappropriately [1]  177/12
**INC [3]**  1/5 152/22 153/1
inclined [1]  190/1
include [15]  32/25 68/9 81/23 126/16 126/16
126/17 129/8 129/25 169/19 170/21 171/4
190/1 190/15 229/21 235/1
included [18]  17/21 23/10 23/20 23/23 24/1
24/20 24/21 29/22 33/3 34/16 48/17 67/6
87/3 110/23 129/10 189/25 198/1 230/17
includes [5]  12/11 21/25 108/6 126/15 128/7
including [10]  21/25 62/5 74/3 107/6 107/9
134/3 136/14 149/1 174/19 231/18
inclusion [2]  49/12 197/23
income [3]  119/13 161/13 168/14
incorporates [1]  46/12

**I**

increase [3] 56/19 193/14 227/15
increased [1] 5/22
incremental [1] 206/19
incumbent [1] 212/5
incurred [2] 161/14 183/22
incurs [1] 25/9
indeed [1] 107/24
independent [1] 160/1
indicate [1] 191/22
indicated [1] 102/2
indicates [1] 11/12 170/4
indications [1] 125/23
indicator [1] 141/18
indicators [1] 221/5
indifference [1] 228/24
individual [5] 6/11 63/5 63/6 87/1 96/17
industries [3] 64/1 64/15 64/15
industry [20] 56/2 56/23 57/23 58/15 58/19
 58/21 58/24 58/24 60/18 62/12 62/20 62/21
 64/3 64/7 64/11 64/18 73/25 74/10 75/17
 76/22
inference [2] 194/2 204/8
inferences [1] 221/10
influenced [1] 84/3
inform [1] 157/6
information [8] 8/3 11/21 66/1 71/23 100/15
 128/19 131/21 151/11
informs [1] 131/8
infrastructure [3] 123/10 126/20 142/11
infringe [1] 203/9
infringed [3] 166/23 201/18 201/24
infringement [60] 7/12 7/15 83/11 105/14
 106/1 109/23 142/13 154/22 154/25 159/23
 159/24 160/22 162/3 164/11 164/14 173/8
 173/19 176/9 176/10 176/21 180/2 188/20
 189/11 190/24 191/24 193/4 193/11 193/15
 194/13 198/3 198/5 203/12 204/1 206/23
 208/15 208/18 209/19 210/6 210/8 218/9
 218/11 219/7 219/9 222/13 222/24 223/8
 223/15 223/20 224/2 224/5 224/11 224/22
 225/9 227/4 227/13 227/16 229/4 231/20
 232/4 232/10
infringer [10] 180/7 206/16 207/21 229/5
 229/6 229/6 229/8 229/9 229/10 229/12
infringer's [1] 229/13
infringers [1] 203/25
infringing [7] 169/7 176/24 180/9 201/3
 201/22 215/9 224/25
ING [5] 107/13 152/22 153/1 164/4 210/24
initial [2] 68/6 210/20
initially [1] 117/13
initiative [1] 154/21
injured [1] 82/3
injuries [3] 82/1 82/2 82/21
injury [17] 188/19 188/21 190/23 191/25
 192/1 193/12 220/14 222/13 222/16 222/23
 223/7 227/13 230/17 232/5 232/5 232/10
 232/11
input [2] 79/14 79/18
inside [2] 137/16 195/15
insist [1] 237/16
insofar [1] 229/24
Instagram [6] 44/7 44/21 72/21 72/22 76/16
 96/22
instance [1] 177/16
instances [1] 27/14 122/7
instead [9] 89/25 90/2 101/17 110/1 188/24

instruct [1] 231/10 233/19
instructed [2] 204/7 222/6
instructing [1] 232/12
instruction [13] 190/2 190/15 191/11 194/17
 196/2 198/8 198/10 200/2 218/6 219/10
 220/13 233/7 233/13
instructions [9] 105/18 145/10 145/17 192/7
 192/22 202/11 210/3 210/4 221/16
insurance [1] 126/17
intangible [1] 118/22
intellectual [15] 116/11 116/11 118/18
 118/21 118/25 119/11 119/18 123/6 124/5
 124/15 124/21 125/2 125/15 151/7 180/5
intend [2] 187/18 238/4
intended [4] 21/12 99/2 99/3 229/21
intent [1] 225/1
intentional [1] 229/13
interest [5] 113/6 152/20 183/19 225/8
 229/22
interested [5] 85/20 90/19 234/19 235/7
 235/14
interesting [2] 56/5 81/10
interface [1] 169/18
internal [1] 215/24
international [2] 16/10 116/25
internet [2] 59/2 114/16
interrupt [2] 69/16 195/18
intersection [1] 55/14
interview [2] 81/20 81/21
introduce [2] 7/8 60/24
introduced [2] 125/21 226/21
introduction [1] 71/22
introductory [1] 123/25
investigate [2] 59/9 76/23
investigated [1] 67/20
investigating [1] 55/20
investigation [9] 27/17 28/6 55/10 55/11
 67/17 80/22 81/1 81/2 81/14
investment [3] 142/11 143/16 217/1
investments [1] 155/11
investors [2] 139/11 139/25
invite [1] 230/9
invites [1] 196/21
involve [4] 17/19 87/9 108/23 109/3
involved [7] 16/19 17/11 17/12 111/10 112/1
 113/3 123/6
involving [4] 16/20 18/7 110/19 200/1
is [600]
ish [1] 181/9
isn't [15] 22/13 24/22 45/5 45/9 45/21 82/15
 94/5 96/16 110/8 203/21 206/21 209/21
 214/9 214/16 219/2
issue [24] 6/24 7/23 10/7 18/24 50/11 51/8
 58/17 59/20 61/20 61/20 64/19 66/1 109/22
 110/4 114/12 198/2 204/17 204/18 213/2
 214/18 214/19 222/6 226/6 226/9
issued [1] 117/15
issues [10] 7/11 10/10 53/20 60/7 116/8
 117/18 158/4 185/15 192/22 226/7
it [544]
it's [212] 3/23 3/24 4/1 4/17 4/17 4/20 6/12
 6/15 12/5 19/7 19/25 20/10 20/17 20/18
 21/22 22/16 22/17 26/12 29/13 30/5 32/1
 32/15 32/15 36/6 36/7 36/9 38/14 38/23
 41/17 42/25 43/18 45/7 48/7 51/10 52/3
 52/16 56/21 58/1 63/11 64/14 64/15 64/17
 64/25 66/20 66/22 69/14 69/17 81/3 84/18
 86/9 86/23 87/1 91/24 92/10 93/2 93/10 95/3

99/9 100/1 100/9 100/22 100/23 101/10 102/7
 105/23 106/1 106/16 107/18 111/12 114/24
 116/12 116/16 117/24 118/22 118/22 119/1
 123/9 123/9 123/9 123/10 123/10 123/12
 123/17 124/12 124/16 124/20 124/21 125/13
 125/15 126/13 129/25 130/15 133/2 133/21
 135/14 135/21 137/6 137/20 139/12 139/22
 140/10 140/11 142/3 142/9 142/17 144/2
 144/17 146/5 150/20 154/1 155/8 155/14
 156/15 156/16 156/19 157/17 159/5 159/18
 159/20 160/9 160/12 160/12 161/4 162/16
 163/12 164/7 164/16 165/18 167/2 167/2
 168/3 171/9 177/6 177/8 177/8 177/10
 177/14 177/24 177/24 178/2 178/3 178/4
 178/4 178/10 178/11 178/23 178/24 179/2
 179/11 183/16 185/24 186/22 187/2 187/12
 188/17 191/3 192/6 194/15 195/5 197/5
 197/5 198/12 199/5 199/8 199/17 199/21
 199/22 200/12 200/16 201/4 202/15 202/17
 205/14 206/8 206/15 207/17 207/18 208/15
 209/5 209/14 209/19 209/22 211/15 212/5
 214/4 214/10 215/6 215/15 216/1 216/6
 216/8 216/21 216/21 216/22 217/7 219/22
 220/5 220/6 220/14 222/6 224/16 227/24
 228/17 233/3 233/15 233/16 234/5 235/18
 236/22 237/11 237/18 238/2
item [21] 3/12 49/13 51/22 61/15 66/8 89/13
 89/17 89/18 90/10 92/12 122/3 122/25
 127/19 162/21 163/2 186/15 187/16 195/24
 214/2 226/20 228/18
itemize [1] 189/2
items [18] 49/23 50/1 63/9 63/9 99/16 104/2
 133/17 187/21 187/22 189/2 202/7 202/23
 202/24 208/22 209/4 220/2 232/8 233/9
its [66] 5/10 25/9 30/20 37/15 41/1 41/2
 61/19 77/15 77/18 82/6 83/10 83/11 83/18
 84/22 105/15 106/11 109/19 109/25 112/12
 113/1 113/4 114/24 122/22 122/22 127/16
 127/16 127/17 138/12 159/8 162/9 168/21
 171/1 172/23 176/8 176/23 177/11 190/23
 192/24 193/9 193/9 193/14 197/17 197/18
 201/4 201/21 215/22 215/23 215/23 220/8
 220/8 220/10 223/19 225/7 225/20 225/22
 227/7 227/10 227/10 227/15 228/1 228/24
 229/22 231/14 232/3 232/16 232/23
itself [14] 18/2 21/4 37/7 40/25 45/23 46/7
 51/22 106/14 108/10 207/23 211/20 211/22
 215/22 217/11

**J**

James [1] 143/5
January [3] 237/11 237/15 237/15
January 11th [2] 237/15 237/15
January 13th [1] 237/11
Jeff [1] 53/15
JEFFREY [2] 2/7 54/6
Jersey [1] 118/6
JNOV [1] 238/2
job [6] 62/6 209/2 212/8 220/5 221/19
 229/16
joke [1] 237/18
Jordan [1] 112/21
journey [11] 76/4 85/4 85/5 85/6 96/7 96/10
 96/16 96/19 97/1 101/8 101/18
journeys [16] 58/6 65/20 74/5 75/6 75/23
 76/2 76/5 76/8 76/18 84/21 84/22 84/24
 96/13 101/6 101/10 101/19
judge [10] 1/9 202/11 204/7 210/3 210/6
 211/4 211/10 212/1 212/7 215/12

**J**

**judge's [1]** 105/18
**judges [2]** 111/22 111/24
**judgment [6]** 104/11 104/15 104/19 188/25
222/20 233/10
**July [1]** 34/6
**July 4 [1]** 34/6
**jump [1]** 195/23
**Jumpman [2]** 112/13 112/21
**junk [1]** 64/18
**jurors [3]** 3/3 12/24 238/14
**jury [121]** 1/10 4/13 4/16 4/17 6/18 7/13 8/8
8/8 8/19 10/6 10/19 10/21 26/18 53/17 59/18
59/22 59/23 65/1 69/2 69/4 69/8 69/9 70/10
70/20 71/7 71/8 79/13 102/12 102/13 102/25
103/23 103/24 103/25 104/23 105/7 105/13
116/4 119/21 120/15 120/24 122/11 123/3
123/18 125/19 125/20 127/24 128/22 130/25
131/22 132/17 137/22 140/22 142/9 144/11
144/12 145/3 145/17 146/11 146/21 146/22
146/23 146/25 147/6 147/11 147/17 149/8
149/13 150/4 151/15 155/8 158/11 161/19
162/20 162/23 163/14 165/9 169/4 170/25
171/15 171/20 172/17 173/7 173/8 173/19
174/11 174/14 174/23 175/2 184/24 187/8
187/9 187/18 188/19 190/10 192/5 192/6
194/2 194/8 194/13 194/15 194/16 196/23
197/4 198/9 198/24 199/5 199/15 199/17
200/7 201/6 201/9 208/17 220/7 221/25
230/6 231/10 233/12 233/24 235/25 238/10
238/24
**jury's [3]** 9/20 70/19 153/7

**just [205]** 6/14 9/8 9/24 9/25 15/23 16/13
16/17 17/19 18/11 19/20 20/17 20/20 21/2
21/19 21/21 21/22 22/16 22/21 22/25 23/2
25/3 25/7 27/21 28/10 30/7 30/12 30/25 34/3
35/13 36/9 37/1 37/20 37/25 39/10 40/7
40/24 41/17 42/22 43/5 46/3 51/17 56/6
61/20 62/7 63/11 65/7 66/18 66/19 66/22
69/7 69/23 70/24 74/1 72/24 73/16 74/12
74/14 75/3 76/9 76/12 79/7 79/8 79/13 79/15
82/15 83/6 83/13 83/15 83/24 84/18 85/11
85/21 86/12 86/16 86/23 86/24 87/9 87/15
87/17 89/14 89/23 91/2 94/10 95/18 96/14
97/1 97/23 98/16 100/19 100/25 101/7
103/16 103/24 104/3 105/2 105/4 106/13
108/20 110/10 110/16 111/12 113/19 113/20
113/21 114/1 114/10 114/16 115/4 117/20
120/13 121/15 122/4 122/19 123/25 124/22
125/6 126/6 135/22 136/7 136/25 138/2
138/4 138/8 143/18 143/19 146/5 146/7
153/25 155/12 155/20 158/1 158/22 161/19
162/2 162/8 163/5 164/15 168/21 173/10
175/2 177/18 183/21 183/23 186/9 186/9
186/24 187/7 189/14 189/19 190/13 191/10
195/19 195/21 195/22 195/24 196/12 197/20
198/12 199/14 203/8 204/8 204/12 204/14
205/3 205/9 205/9 206/20 207/6 207/17
207/24 207/25 208/13 209/12 211/24 213/18
214/17 214/22 215/6 215/10 216/21 218/1
218/1 218/23 219/7 219/22 219/25 220/1
220/23 221/21 221/22 224/16 226/7
227/23 231/5 231/17 233/4 234/3 236/10
236/24 237/18 237/25 238/17 238/22 239/12
**justify [1]** 209/9
**Justin [4]** 16/19 19/2 108/24 217/15

**K**

**karate [1]** 158/3
**Katie [1]** 215/18
**Kaufman [2]** 151/17 152/15
**keep [16]** 102/10 102/12 102/18 109/20
124/19 128/15 144/9 163/4 164/6 164/10
164/16 165/21 178/17 206/8 230/21 235/6
**keeper [1]** 235/9
**keeps [2]** 200/18 220/8
**Kenisha [2]** 170/5 197/12
**kept [5]** 93/12 201/21 201/22 208/18 208/19
**Kevin [2]** 115/22 143/5
**key [3]** 55/17 56/20 131/10
**kick [2]** 219/25
**kid [6]** 200/15 200/16 201/10 201/14 205/21
208/10
**kill [1]** 237/12
**kind [15]** 17/24 18/18 36/2 42/24 55/8 55/18
72/11 72/12 76/19 86/16 101/7 108/20 109/4
109/5 116/16
**knew [7]** 113/14 138/9 170/25 176/18
184/22 201/18 219/23
**know [143]** 3/2 7/13 9/3 9/25 10/5 13/1 14/8
16/15 16/16 20/2 21/2 21/2 21/3 23/1 25/18
28/24 29/16 29/19 29/20 30/15 31/18 32/15
38/15 40/10 41/14 43/4 43/10 44/25 47/7
51/23 52/9 55/14 57/23 59/2 60/9 62/7 68/22
68/23 72/13 72/17 75/14 75/22 79/10 81/10
82/7 84/13 86/24 87/2 87/7 87/9 88/22 89/2
89/11 89/14 91/17 91/18 95/5 95/8 97/6
97/12 97/17 99/11 101/2 101/3 103/13
105/20 106/24 107/14 107/16 107/17 108/25
109/14 110/9 110/25 113/15 113/23 114/14
114/14 119/8 120/25 124/9 143/11 144/6
146/7 146/8 146/10 150/19 150/21 150/21
151/14 156/19 158/13 158/15 160/3 163/12
165/20 166/16 166/25 168/22 176/15 179/8
179/13 179/15 179/21 179/22 179/23 182/8
185/15 187/6 190/17 195/13 196/7 198/10
201/11 202/2 202/3 203/20 203/22 204/14
205/3 205/5 205/5 207/19 208/20 210/24
213/13 214/5 214/8 214/16 214/23 215/1
215/6 215/6 218/5 218/8 219/4 221/18
234/13 234/20 235/6 238/3 238/4 239/4
**knowing [1]** 178/4
**knowledge [2]** 48/18 100/14
**known [5]** 16/21 17/17 19/11 55/8 158/15
**knows [1]** 198/2
**KPIs [1]** 56/20
**Kraft [1]** 56/1
**Ks [3]** 126/18 139/13 166/16

**L**

**label [9]** 28/20 194/24 195/3 195/6 195/9
195/14 195/15 197/9 207/21
**labels [3]** 193/8 194/22 195/13
**ladies [14]** 10/24 26/18 53/16 59/18 71/11
102/1 105/10 105/13 143/24 186/8 186/13
200/10 209/11 231/25
**laid [1]** 120/22
**language [12]** 125/24 132/11 133/19 148/16
175/19 187/19 187/20 188/9 190/4 191/16
199/20 199/24
**large [1]** 139/8
**largely [2]** 21/5 211/14
**larger [4]** 18/3 69/4 97/8 116/25
**largest [1]** 203/20
**last [32]** 3/11 22/13 23/12 30/16 35/1 41/19

**L**

**lastly [7]** 121/15 122/19 131/10 152/21
164/13 164/24 193/17
**late [3]** 3/3 187/2 237/7
**later [5]** 69/25 91/11 92/22 92/24 146/6
**laundry [1]** 121/25
**law [25]** 104/11 104/16 104/19 105/18
106/16 147/14 180/23 187/20 188/2 190/19
198/1 198/5 198/5 198/7 198/18 198/19
198/20 202/8 209/4 210/4 211/25 222/5
228/22 231/19 235/5
**lawsuit [2]** 107/9 202/2
**lawyer [2]** 207/4 207/7
**layer [2]** 82/6 112/22
**lays [1]** 152/18
**Leach [1]** 109/12
**lead [4]** 9/10 15/17 27/9 76/7
**lead-up [1]** 27/9
**leading [4]** 47/16 98/22 98/23 155/22
**leads [1]** 55/23
**league [2]** 6/24 108/8
**league-wide [1]** 6/24
**leans [1]** 200/23
**learn [4]** 81/4 93/11 98/4 98/10
**learned [4]** 75/5 81/15 81/15 215/8
**least [12]** 9/17 14/12 98/3 108/3 180/24
181/7 181/25 183/12 183/13 183/13 197/18
239/5
**leave [8]** 134/7 146/7 218/25 219/15 220/1
220/11 231/14 238/11
**LeBron [1]** 143/5
**lecture [1]** 117/18
**lecturing [1]** 117/20
**led [1]** 78/15
**leeway [1]** 70/8
**left [12]** 120/22 123/16 123/19 134/16
135/15 136/18 147/23 148/24 160/21 162/2
164/6 217/6
**left-hand [6]** 120/22 134/16 135/15 136/18
160/21 162/2
**legal [8]** 29/13 45/10 53/20 59/20 116/16
118/23 180/4 229/23
**legitimate [1]** 169/6
**length [2]** 122/9 222/2
**less [11]** 5/24 109/1 111/19 111/20 124/18
139/17 144/18 148/24 160/4 160/4 223/15
**let [22]** 4/19 7/21 9/11 10/5 41/25 50/10
61/14 63/24 65/10 66/24 69/6 75/15 92/2
114/10 146/7 146/8 167/17 170/18 173/21
174/1 196/8 235/2
**let's [48]** 9/20 16/17 19/19 20/2 25/7 31/20
31/20 32/7 32/11 33/6 33/12 33/15 34/3
34/10 34/15 43/14 43/17 51/1 51/17 55/25
56/1 58/12 60/20 73/1 81/1 87/24 91/10 92/4
94/1 97/25 106/19 109/17 110/16 166/10
166/11 169/11 177/21 178/16 180/1 180/21
187/6 211/3 211/12 212/2 234/3 236/18
236/19 236/21
**letter [1]** 207/4
**letters [2]** 23/13 33/20
**letting [1]** 9/17
**level [18]** 12/1 30/21 48/10 49/2 50/3 59/6
59/12 59/13 59/14 133/2 154/12 162/18
163/15 165/5 172/3 173/13 181/22 211/19
**levels [3]** 174/7 174/9 174/11
**Levi [3]** 56/3 56/3 80/9

# L

**Levi's [1]** 80/6

**liability [19]** 3/18 4/13 9/11 26/17 27/3 35/1 60/7 60/10 105/20 105/21 190/18 192/9 197/14 198/11 198/14 215/13 216/4 232/6 232/9

**liar [3]** 205/14 207/1 208/19

**liberal [1]** 68/24

**license [20]** 16/23 17/20 17/22 18/4 18/5 18/17 48/23 49/5 51/24 53/4 117/15 118/24 124/20 156/20 157/17 157/24 158/7 158/22 164/22 206/23

**licensed [1]** 157/16

**licensee [4]** 22/1 48/3 48/17 48/20

**licenses [11]** 47/24 47/25 48/2 48/9 48/12 48/13 48/24 48/25 119/4 157/14 217/17

**licensing [9]** 16/20 17/24 18/20 20/25 109/4 119/12 124/6 124/23 151/8

**Liebaert [9]** 107/10 109/11 197/4 197/5 208/23 210/21 210/23 213/13 213/14

**lies [1]** 221/9

**life [1]** 202/19

**light [1]** 105/2

**like [114]** 7/7 9/25 10/1 16/8 19/25 20/17 24/5 24/8 28/9 32/21 37/1 37/19 39/17 43/13 56/8 57/8 59/10 60/13 62/13 66/17 66/25 70/5 71/20 74/20 75/6 76/2 76/9 80/16 80/24 81/7 82/23 82/24 83/24 86/23 87/16 90/15 90/17 93/19 95/9 95/9 97/25 102/4 108/15 108/24 110/20 111/2 116/10 119/3 119/8 125/2 125/15 126/25 128/4 131/10 132/13 133/17 137/24 138/1 138/1 138/8 139/9 140/10 141/12 144/8 145/24 151/7 156/3 158/2 158/15 159/19 161/15 162/8 172/16 173/1 173/3 178/10 183/9 184/24 191/3 191/3 196/1 196/20 199/7 199/16 201/14 202/25 203/5 203/21 205/1 205/14 206/14 206/15 206/20 206/22 207/9 207/23 208/5 217/3 217/4 217/15 220/16 222/8 227/24 229/6 229/9 230/1 234/19 234/20 235/5 235/22 235/23 236/5 237/6 237/17

**likelihood [3]** 190/19 192/9 226/10

**likely [5]** 91/19 123/22 170/5 186/24 197/12

**limelight [1]** 57/15

**limit [3]** 235/23 236/5 236/9

**limited [1]** 199/17

**limits [2]** 234/19 237/16

**line [22]** 49/13 49/23 50/1 56/14 66/22 86/18 87/24 89/3 94/14 95/18 124/2 127/6 154/2 154/21 167/1 167/2 169/9 172/24 176/17 176/17 214/2 214/2

**lines [2]** 155/4 194/1

**linger [1]** 234/4

**list [10]** 20/15 23/9 32/18 35/16 51/6 94/2 121/25 165/17 199/6 224/24

**listed [8]** 7/22 23/17 27/14 79/19 132/3 155/14 179/16 199/12

**listen [7]** 114/6 203/9 203/10 203/25 207/24 208/6 219/6

**listening [3]** 65/11 106/4 170/16

**listing [1]** 138/2

**listings [2]** 72/19 215/23

**lists [2]** 131/14 197/4

**literally [2]** 204/4 236/13

**litigation [1]** 181/13

**little [34]** 32/1 32/15 54/24 75/10 76/25 81/5 81/5 81/6 81/7 116/4 116/15 116/18 118/19 121/23 124/4 139/2 143/23 156/13 163/17

0/2 Document 375 Filed 01/04/21 2/2 Page 125/7 of 274 203/5 204/14 206/25 216/20 223/3 236/10 236/15 236/25 237/11

**live [1]** 105/3

**lives [1]** 6/3

**living [1]** 116/5

**LLP [1]** 1/17

**local [1]** 238/14

**location [3]** 72/19 93/19 96/25

**Locker [5]** 39/18 72/17 110/20 113/23 128/5

**Locker's [1]** 41/7

**logistics [1]** 69/10

**logo [4]** 149/21 155/4 155/21 158/19

**logos [2]** 156/6 158/23

**London [1]** 118/7

**long [10]** 8/25 9/4 56/21 56/22 93/2 117/4 154/17 202/5 212/22 236/7

**long-time [1]** 117/4

**longer [4]** 38/20 68/10 143/21 236/25

**LONTEX [137]** 1/3 5/10 5/22 6/13 7/3 7/12 8/19 9/4 12/9 13/9 21/6 46/6 46/13 49/20 50/16 50/18 66/14 66/15 81/14 81/15 81/21 82/14 82/17 83/10 83/18 84/10 95/14 96/18 97/11 97/12 98/1 98/4 98/10 99/6 99/12 104/16 104/19 106/7 106/15 106/20 107/2 107/19 107/23 108/12 115/1 120/10 123/21 123/24 124/25 125/7 144/5 150/25 151/3 152/6 160/10 160/12 161/13 161/23 162/3 163/2 164/9 164/14 169/15 171/23 182/23 187/11 187/21 188/17 188/21 189/14 192/11 192/17 192/18 192/18 193/1 193/12 193/17 195/8 201/1 201/23 202/16 202/18 202/21 203/2 203/7 207/25 209/12 210/7 210/9 212/2 212/11 212/20 213/19 213/20 219/13 219/18 220/1 220/8 222/11 222/12 222/16 222/23 222/24 227/7 223/8 223/12 223/14 223/15 223/25 224/4 224/14 224/17 224/19 224/23 225/3 225/6 225/14 225/16 225/17 225/20 225/24 226/12 226/16 226/17 226/18 227/2 227/13 227/25 228/16 229/15 229/20 230/3 230/14 232/2 232/15 233/10 234/14

**Lontex's [40]** 6/16 8/4 16/24 19/16 27/20 27/23 35/3 49/12 80/22 81/2 81/20 81/23 82/25 83/3 85/17 97/7 104/12 107/25 108/3 121/16 161/7 162/11 162/17 164/7 166/23 180/14 191/14 193/14 193/19 196/2 210/12 211/19 213/15 220/5 223/13 223/19 225/11 227/15 227/19 229/22

**look [62]** 5/1 20/24 28/13 30/18 31/21 32/2 32/7 32/8 32/11 33/6 33/12 34/10 34/15 36/13 43/13 43/17 67/6 81/12 81/12 89/10 107/22 119/3 119/12 119/13 120/6 131/12 134/11 134/17 135/22 137/7 145/24 148/8 151/12 156/3 156/6 157/15 160/20 161/20 162/5 162/12 162/13 162/17 164/6 164/9 166/16 169/24 171/14 174/15 174/24 175/2 177/13 177/16 185/9 190/18 200/3 204/15 211/17 211/18 212/23 216/8 230/11 235/4

**looked [48]** 3/18 16/2 23/12 30/15 30/21 32/22 47/24 48/2 48/9 48/12 58/3 60/11 65/2 65/19 67/20 74/5 74/15 74/21 77/7 81/9 92/2 94/2 94/15 95/4 131/25 132/5 132/8 133/16 133/17 134/20 135/8 135/12 136/1 139/24 148/18 154/16 155/5 157/13 157/14 160/16 165/8 173/6 173/9 173/17 173/22 177/6 214/23 214/24

**looking [31]** 3/22 6/10 55/16 57/1 61/3 61/7 63/14 65/5 65/14 67/10 82/20 85/3 95/18 110/2 119/15 135/22 156/5 156/20 157/14

251

2/2 Document 375 Filed 01/04/21 2/2 Page 125/8 of 274 215 187/10 187/21 188/6 191/14 215/1 219/23 238/6

**looks [2]** 161/18 200/21

**Los [1]** 116/7

**lose [2]** 213/20 213/22

**loss [4]** 3/17 189/4 196/2 223/23

**losses [1]** 12/11

**losses from [1]** 12/11

**lost [42]** 4/1 6/16 7/7 11/9 11/13 12/8 13/8 14/1 15/13 45/18 50/12 50/19 107/21 108/11 108/13 109/10 121/1 121/10 121/11 159/13 160/8 161/3 163/17 164/24 165/20 187/24 188/5 189/3 189/20 191/16 192/2 196/11 196/17 196/20 196/21 212/25 213/5 223/13 223/13 223/16 223/22 223/24

**lot [39]** 4/1 7/11 9/15 20/14 23/1 25/18 75/2 95/17 108/8 116/10 117/20 123/22 139/11 142/10 147/14 147/15 152/5 158/1 158/13 163/12 163/12 163/12 178/9 178/13 194/18 198/19 202/6 202/10 206/1 209/12 209/24 214/5 214/6 214/9 215/1 216/23 217/8 221/5 235/3

**lots [6]** 116/25 159/12 178/21 204/10 237/18 237/18

**lower [3]** 64/14 121/16 127/4

**lowest [2]** 62/22 64/6

**lunch [4]** 102/11 103/22 143/25 145/24

**luncheon [1]** 143/25

**lying [5]** 204/19 205/19 205/21 208/11 208/20

# M

**M-E-Y-E-R [1]** 115/22

**Machine [5]** 31/12 31/22 32/4 33/7 34/6

**made [27]** 40/7 42/20 68/11 77/11 91/7 96/11 96/17 102/17 112/2 114/18 122/1 135/1 137/14 137/23 138/5 149/4 149/17 152/25 173/14 175/22 183/15 200/24 203/25 206/5 206/11 216/3 230/25

**magazine [2]** 44/3 45/2

**major [4]** 18/21 108/8 112/18 126/21

**make [67]** 3/25 20/6 21/1 23/2 23/13 38/21 38/23 39/24 55/15 58/13 63/11 63/24 67/25 78/5 88/21 102/9 102/21 108/20 113/11 115/4 119/7 125/17 127/5 129/18 141/23 143/17 152/23 164/22 172/12 177/18 181/15 181/20 184/11 184/16 195/25 200/23 201/1 201/5 203/7 203/24 205/3 205/9 206/10 206/16 206/23 207/16 207/24 208/5 209/5 209/6 209/7 209/8 215/11 219/20 219/24 220/1 220/3 220/6 220/7 221/12 228/5 228/9 231/17 235/14 236/2 237/10 237/14

**makes [8]** 25/13 51/25 60/18 203/10 209/16 211/21 219/12 221/17

**making [7]** 104/24 122/21 126/11 155/10 155/16 225/8 234/14

**male [1]** 56/6

**malicious [1]** 229/14

**man [2]** 107/12 200/20

**management [6]** 126/16 139/24 203/9 207/25 218/24 219/4

**many [37]** 6/16 24/5 42/2 42/23 57/25 64/11 65/18 65/21 65/22 66/9 73/14 73/15 76/7 77/11 81/20 84/24 87/2 87/9 96/13 97/12 97/17 99/22 114/20 114/20 124/20 134/7 136/14 157/23 181/4 182/20 194/15 198/22 206/11 209/14 214/24 214/24 219/4

**map [1]** 164/1

**mapped [2]** 163/13 163/18

258

**M**

**March [3]** 31/22 32/5 220/20
**March 2016 [1]** 220/20
**March 27 [2]** 31/22 32/5
**margin [6]** 25/5 26/2 26/4 26/5 141/25 142/2
**marginal [1]** 206/19
**mark [19]** 36/9 42/3 46/9 46/11 46/12 51/18 51/21 52/1 107/5 107/7 107/9 109/24 113/16 114/25 171/16 172/8 211/20 211/22 216/15
**marked [3]** 31/7 51/2 167/25
**market [21]** 1/22 56/12 58/9 74/6 80/11 81/2 99/13 99/14 113/1 119/3 119/14 151/8 151/8 151/22 151/24 152/3 152/12 153/3 177/8 217/12 219/16
**marketed [6]** 38/6 81/6 142/12 170/11 171/1 171/8
**marketing [22]** 13/9 13/12 54/24 55/4 55/10 55/23 56/14 76/15 80/17 83/1 83/3 108/1 110/22 123/10 156/19 168/20 179/17 193/17 212/16 212/19 217/3 227/17
**marketplace [24]** 41/24 42/1 43/1 43/5 45/18 47/25 55/10 55/11 55/11 55/16 55/20 55/22 55/23 56/10 76/11 80/23 80/24 82/6 82/14 83/11 83/19 87/14 201/20 216/24
**marks [6]** 109/7 152/8 153/16 153/20 179/14 179/16
**mask [2]** 53/25 115/16
**massive [1]** 214/7
**match [2]** 161/1 180/14
**material [5]** 7/4 7/8 9/5 48/17 110/22
**materially [6]** 191/23 191/25 222/14 230/17 232/4 232/10
**materials [3]** 112/12 213/21 216/25
**math [9]** 35/12 58/1 90/7 94/20 94/22 142/15 183/8 183/11 183/14
**matter [20]** 5/14 37/12 37/21 48/21 104/11 104/16 104/19 116/17 181/25 182/6 182/18 183/5 183/9 183/15 198/1 199/15 211/22 231/6 232/14 239/21
**matters [6]** 109/21 109/24 203/2 203/2 203/3 203/4
**maximum [2]** 121/14 210/15
**may [72]** 3/2 16/14 17/21 23/4 23/5 31/2 35/11 38/1 39/4 43/2 43/3 63/21 72/17 87/12 87/12 99/3 99/11 101/5 117/25 135/9 144/5 158/13 166/25 167/19 167/21 168/5 187/5 188/25 190/3 190/5 190/6 190/10 190/11 191/13 192/15 192/25 193/12 193/20 194/7 194/8 195/8 197/10 197/18 197/22 199/3 201/2 201/2 201/9 212/3 215/14 222/20 223/21 224/6 224/24 225/23 226/2 226/6 226/15 226/17 226/21 226/21 227/13 227/20 228/6 228/21 228/23 229/17 229/21 232/5 233/12 234/10 239/5
**maybe [14]** 27/13 27/24 32/1 37/19 107/13 121/23 133/5 134/11 135/20 167/8 177/11 182/8 215/19 215/20
**MBA [2]** 54/23 54/24
**McDonald [1]** 84/13
**me [75]** 4/19 7/21 10/5 19/19 20/6 20/18 20/21 21/13 23/9 29/10 31/24 32/8 32/20 34/5 35/12 41/25 45/16 50/10 58/6 61/14 63/24 65/10 66/24 73/11 75/15 83/22 86/25 87/5 88/9 88/10 89/16 89/19 91/9 92/3 94/12 95/7 95/23 102/7 111/19 114/10 120/20 123/22 132/17 133/20 138/20 140/23 142/14 143/15 146/8 147/12 149/23 151/24 153/3 153/21 155/8 156/18 156/24 159/4 161/3

173/21 174/1 174/24 183/21 183/23 196/8 196/8 234/17 235/2 237/2
**meals [1]** 162/5
**mean [21]** 3/16 27/18 42/18 50/9 56/22 57/12 63/11 64/25 82/15 95/22 112/17 123/15 126/6 137/5 174/11 187/24 189/24 195/18 195/23 207/21 235/21
**meaningful [1]** 59/14
**means [11]** 12/8 123/3 125/6 188/17 194/14 201/7 203/12 203/18 204/1 220/14 222/11
**meant [6]** 83/10 83/18 101/10 118/20 149/13 197/10
**meantime [1]** 230/10
**measure [1]** 57/9 59/4 74/19 88/24 108/16 109/9 162/23 201/15 211/24 217/8 217/10
**measured [6]** 57/7 58/6 59/6 113/5 211/5 211/11
**measurement [2]** 82/11 89/20
**measurements [2]** 58/25 204/11
**measures [6]** 56/20 57/4 65/21 75/12 106/5 215/22
**mechanism [1]** 74/13
**media [15]** 56/25 57/5 57/7 72/13 72/14 72/14 72/20 76/10 76/15 76/18 87/20 95/17 96/22 101/14 126/21
**medical [1]** 81/11
**medium [2]** 58/3 58/16
**meets [3]** 70/5 225/20 225/22
**members [1]** 221/25
**memberships [1]** 117/9
**men [1]** 56/11
**men's [3]** 44/5 45/2 135/10
**mention [1]** 177/7
**mentioned [18]** 46/8 74/12 78/17 120/6 122/19 130/23 134/6 135/11 141/11 141/15 143/8 151/6 155/18 164/8 164/13 176/6 177/9 181/4
**mentioning [1]** 178/17
**merchandise [1]** 137/7
**message [10]** 203/7 203/10 203/23 207/15 207/16 207/17 219/6 221/13 221/13 221/17
**met [3]** 79/5 79/11 208/3
**method [1]** 125/11
**methodology [4]** 47/15 57/3 65/14 96/8 131/19 176/6
**methods [2]** 116/23 119/13
**metric [2]** 164/12 164/16
**metrics [1]** 163/14
**MEYER [37]** 2/13 111/15 111/19 113/19 115/6 115/14 115/22 116/2 118/8 118/17 124/1 127/10 128/14 128/16 129/16 130/8 130/20 131/20 133/9 134/15 137/2 147/20 147/23 148/3 150/3 150/17 153/9 163/6 166/8 170/16 170/21 175/5 184/10 211/8 211/18 216/13 228/1
**Meyer's [2]** 136/12 184/13
**MICHAEL [6]** 1/9 1/12 1/16 79/3 79/4 112/21
**michael.hynes [1]** 1/19
**Michigan [6]** 18/14 157/9 158/10 158/16 158/23 159/2
**microphone [2]** 72/1 218/2
**mid [3]** 53/19 116/24 117/14
**mid-1980s [2]** 116/24 117/14
**mid-morning [1]** 53/19
**Midnight [1]** 237/5
**midpoint [1]** 183/7
**might [12]** 7/17 20/22 61/2 65/24 72/18

220/14
**miles [1]** 200/22
**military [2]** 207/12 220/25
**million [76]** 19/16 30/12 40/12 40/15 40/19 40/21 44/12 45/25 46/5 52/6 52/15 53/4 55/14 60/1 60/14 63/22 65/2 66/14 66/25 66/25 69/22 69/22 69/23 72/9 72/22 78/15 80/16 88/9 88/25 93/19 94/21 99/11 120/25 121/2 121/6 121/6 132/14 133/21 135/2 141/1 141/6 141/9 141/14 141/17 141/24 142/4 142/4 142/16 143/20 148/7 148/17 148/7 148/20 148/22 148/24 150/7 150/8 150/11 150/12 156/16 156/17 156/21 163/19 163/22 164/19 164/20 164/23 184/25 203/25 204/3 204/4 206/5 206/7 221/3 221/9 221/9
**millions [7]** 75/6 76/5 114/17 114/20 114/25 162/24 172/2
**mind [9]** 38/25 46/25 102/12 109/20 144/9 163/4 165/21 185/10 229/12
**minds [1]** 47/3
**minimis [2]** 9/2 9/9
**minimize [1]** 218/9
**minimum [1]** 104/13
**Minnesota [1]** 55/2
**minute [14]** 15/24 30/7 32/8 34/22 39/10 51/17 63/20 67/24 104/5 113/21 195/21 218/2 234/3 237/14
**minutes [17]** 59/22 102/7 102/11 103/18 144/9 144/15 144/23 186/10 186/18 186/23 187/3 187/8 199/2 200/4 200/11 218/22 222/2
**misimpression [1]** 66/7
**misimpressions [1]** 45/7
**misinformation [2]** 43/1 43/5
**misleading [1]** 6/15
**mismatch [1]** 220/21
**misrepresented [1]** 225/11
**miss [2]** 103/13 103/14
**mistake [4]** 128/15 184/11 184/16 194/2
**MMA [1]** 158/2
**mobile [1]** 101/12
**model [1]** 167/13
**modeling [1]** 78/17
**Modell's [5]** 39/18 41/2 41/5 113/23 128/4
**models [3]** 57/11 74/14 75/8
**modern [1]** 93/20
**modify [1]** 236/19
**moisture [1]** 156/9
**molestation [1]** 200/1
**moment [15]** 113/19 120/6 122/5 130/23 131/8 132/13 134/6 136/25 140/20 141/15 144/20 155/18 164/8 164/13 213/18
**monetary [1]** 212/11
**money [20]** 19/22 25/18 55/15 79/19 112/25 162/8 162/9 166/19 166/22 167/6 167/10 167/10 168/20 188/17 193/2 222/12 222/22 223/6 225/16 227/3
**moneys [1]** 158/25
**months [4]** 93/4 152/10 153/17 206/9
**more [71]** 3/17 5/6 20/7 21/3 21/3 28/1 32/1 34/3 36/6 43/12 46/6 56/19 69/2 69/11 69/13 73/19 75/5 78/19 82/23 87/20 88/22 89/12 89/18 90/10 90/20 91/18 93/12 97/1 97/9 100/10 100/17 101/16 101/22 103/19 108/19 111/14 115/2 116/18 118/19 123/25 128/1 131/19 133/3 135/20 141/13 151/20 152/12 157/24 160/9 162/7 163/5 174/24 175/8 176/13 178/3 178/14 182/3 182/6 182/20

## M

**more... [12]** 187/4 188/12 200/3 201/19 202/3 211/6 211/21 219/13 219/25 226/2 228/18 238/1
**morning [14]** 3/2 10/24 11/6 11/7 11/8 53/19 79/1 116/2 116/3 124/5 156/18 157/21 187/6 233/21
**mornings [1]** 138/1
**mortar [17]** 39/21 128/8 137/3 137/9 137/16 138/5 138/8 138/17 138/22 140/9 141/16 169/22 169/25 170/2 172/1 172/10 185/1
**most [15]** 6/21 19/11 57/4 66/15 112/13 123/22 124/8 138/15 142/22 151/6 155/14 157/22 177/25 203/20 228/1
**mostly [2]** 56/6 56/6
**motion [4]** 102/21 104/8 104/21 231/18
**motions [11]** 102/9 199/1 234/7 234/9 234/10 234/15 234/17 234/24 236/3 237/25 238/6
**motivation [1]** 9/15
**motive [1]** 228/24
**move [9]** 73/2 135/20 146/20 147/8 150/6 153/7 168/5 219/24 219/25
**moved [6]** 117/13 138/14 147/8 147/10 149/14 234/1
**moves [3]** 104/10 104/15 104/18
**moving [3]** 125/17 144/9 147/25
**Mr [11]** 2/5 2/7 2/8 2/8 2/9 2/9 2/13 2/14 2/14 2/15 143/20
**Mr. [234]** 3/11 3/12 4/2 4/6 4/11 4/15 6/7 6/14 7/1 7/6 9/7 9/21 9/25 10/2 10/4 10/24 11/8 11/8 12/12 12/17 12/19 12/22 13/16 13/19 14/8 14/12 14/14 14/17 14/24 21/19 26/22 42/6 42/8 42/13 42/15 42/17 43/6 49/10 53/10 53/17 53/18 53/22 54/12 62/12 62/13 64/24 65/10 66/17 67/16 70/1 70/2 70/24 71/4 71/14 73/7 79/1 79/10 79/13 79/16 79/19 80/13 83/9 83/13 83/17 83/24 86/9 86/12 87/5 91/25 94/10 94/11 97/23 100/25 101/20 105/2 106/13 106/22 106/24 107/2 107/5 107/10 108/4 108/7 108/9 108/11 108/17 108/22 109/6 109/10 109/11 109/12 109/15 110/1 110/16 110/18 110/25 111/12 111/14 111/18 111/19 111/21 111/25 113/9 113/17 113/19 114/11 114/16 114/22 115/6 115/14 116/2 118/8 118/17 120/9 120/23 121/11 121/24 122/1 123/18 123/19 124/1 125/5 127/10 128/14 128/16 129/16 130/8 130/20 131/20 132/20 132/21 133/9 134/15 136/12 137/2 140/24 142/6 142/25 146/24 147/20 147/23 148/3 148/7 150/3 150/17 150/20 151/16 151/17 152/4 152/6 152/15 152/15 152/19 152/21 152/25 153/9 153/19 153/23 156/13 157/6 157/21 158/5 159/3 159/13 159/19 160/1 160/4 160/13 160/16 161/15 162/13 163/6 163/17 164/2 165/3 165/5 166/8 170/16 170/21 173/15 173/15 173/23 174/7 174/18 174/21 175/5 175/23 179/16 180/14 184/9 184/10 184/13 187/24 190/4 192/23 192/25 193/23 196/5 196/15 197/1 197/11 199/10 200/11 204/17 207/1 207/13 208/19 210/21 210/23 211/5 211/7 211/8 211/18 212/12 212/23 213/2 213/14 214/3 214/18 214/22 215/3 215/7 215/8 215/16 216/7 216/13 217/14 218/22 226/23 227/1 228/1 232/15
**Mr. Cunningham [1]** 173/15
**Mr. Drews [63]** 3/12 4/2 7/6 9/21 10/4 10/24
**Mr. Drews' [7]** 73/7 79/13 79/16 80/13 83/17 97/23 111/25 114/11 121/24 122/1 142/6 146/24 156/13 159/13 162/13 163/17 199/10
**Mr. Drews's [1]** 212/23
**Mr. Heil [1]** 6/7
**Mr. Higgins [1]** 153/23
**Mr. Hynes [2]** 64/24 174/18
**Mr. Kaufman [2]** 151/17 152/15
**Mr. Leach [1]** 109/12
**Mr. Liebaert [5]** 107/10 109/11 210/21 210/23 213/14
**Mr. Meyer [32]** 111/19 115/14 116/2 118/8 118/17 124/1 127/10 128/14 128/16 129/16 130/8 130/20 131/20 133/9 134/15 137/2 147/20 147/23 148/3 150/3 150/17 153/9 163/6 166/8 170/16 170/21 175/5 184/10 211/8 211/18 216/13 228/1
**Mr. Meyer's [2]** 136/12 184/13
**Mr. Nathan [39]** 4/15 9/7 12/12 12/17 13/16 14/8 14/24 49/10 106/22 106/24 107/2 107/5 108/7 108/9 109/10 109/15 121/14 151/16 152/6 152/15 152/19 152/21 152/25 153/19 160/4 161/15 164/2 174/21 179/16 180/14 184/9 204/17 207/1 207/13 208/19 210/21 213/2 215/16 232/15
**Mr. Nathan's [19]** 4/11 12/19 12/22 14/12 14/14 109/6 152/4 159/19 160/1 160/13 160/16 175/23 187/24 192/23 192/25 196/15 215/8 226/23 227/1
**Mr. Parkhurst [23]** 9/25 10/2 42/6 42/13 42/15 42/17 43/6 53/17 53/22 54/12 62/12 62/13 65/10 71/4 79/1 83/24 86/9 91/25 94/10 100/25 101/20 113/9 196/5
**Mr. Parkhurst's [5]** 42/8 66/17 67/16 105/2 114/16
**Mr. Paul [3]** 113/14 113/19 115/6
**Mr. Sean [1]** 197/11
**Mr. Smith [1]** 173/15
**Mr. Wagner [15]** 3/11 4/6 6/14 7/1 53/18 71/14 86/12 94/11 190/4 193/23 197/1 200/11 214/3 215/7 218/22
**Ms [8]** 2/4 2/5 103/4 103/12 104/24 122/19 194/20 209/10
**Ms. [6]** 10/7 61/25 113/9 145/5 167/18 230/11
**Ms. DiSanti [3]** 145/5 167/18 230/11
**Ms. Durham [2]** 10/7 61/25
**Ms. Scott [1]** 113/9
**much [44]** 5/17 8/18 56/24 62/20 64/14 69/3 69/3 70/9 97/8 102/20 109/1 113/12 121/16 123/1 123/25 123/7 124/11 133/3 134/5 138/21 143/21 157/23 157/24 162/2 162/17 166/22 174/24 178/3 179/13 179/21 179/23 182/6 188/11 211/18 211/18 212/6 214/16 216/14 216/15 218/19 225/16 233/23 233/25 234/8
**multiple [18]** 39/6 59/4 64/1 65/17 65/25 65/25 77/11 89/9 95/15 96/20 99/17 99/18 99/21 101/9 101/13 106/25 107/7 210/18

**multiply [1]** 73/17
**Muscle [1]** 45/2
**must [14]** 40/8 188/20 189/12 222/10 222/15 222/24 223/8 224/12 225/16 228/4 229/13 230/4 230/9 232/24
**mutual [1]** 234/23
**my [123]** 7/15 9/10 12/14 14/14 14/17 21/15 24/13 26/12 26/13 27/9 28/8 28/23 28/25 29/5 30/10 34/25 37/23 38/2 48/18 54/6 54/19 55/5 55/14 59/25 63/17 68/14 69/9 70/7 71/15 75/16 76/9 78/9 80/12 81/3 81/13 86/8 88/22 93/2 93/3 94/10 94/20 96/4 96/8 96/14 100/14 103/24 117/7 117/12 117/15 120/21 121/14 121/8 126/18 128/15 129/7 129/17 129/18 129/18 129/24 129/24 130/4 130/9 130/16 131/1 131/4 131/8 131/13 131/15 132/3 133/22 134/9 135/19 136/10 137/11 137/14 137/22 138/18 140/11 141/25 142/17 145/4 149/16 151/22 152/16 152/17 157/8 157/14 159/4 162/15 162/25 163/24 164/3 164/18 165/5 165/9 167/9 169/16 169/25 170/2 170/16 171/3 175/11 177/6 177/15 177/16 179/5 179/20 179/20 181/19 182/1 183/8 183/16 183/16 183/21 184/25 186/22 187/20 196/19 200/15 201/25 205/17 235/24 235/8

## N

**name [17]** 8/15 19/22 20/4 20/7 29/11 54/5 54/5 54/6 54/7 79/3 87/16 115/20 115/20 170/12 202/18 219/18 228/25
**names [3]** 16/8 201/20 215/24
**Nathan [39]** 4/15 9/7 12/12 12/17 13/16 14/8 14/24 49/10 106/22 106/24 107/2 107/5 108/7 108/9 109/10 109/15 121/14 151/16 152/6 152/15 152/21 152/25 153/19 160/4 161/15 164/2 174/21 179/16 180/14 184/9 204/17 207/1 207/13 208/19 210/21 213/2 215/16 232/15
**Nathan's [19]** 4/11 12/19 12/22 14/12 14/14 109/6 152/4 159/19 160/1 160/13 160/16 175/23 187/24 192/23 192/25 196/15 215/8 226/23 227/1
**nationwide [2]** 23/18 37/5
**nature [4]** 193/10 227/11 229/1 229/20
**near [1]** 114/14
**nearly [1]** 5/17
**necessarily [3]** 40/22 111/2 114/6
**necessary [6]** 148/21 176/21 192/5 192/10 226/11 230/2
**need [26]** 40/21 66/14 70/19 98/4 98/10 102/5 102/16 102/20 103/10 103/14 103/17 113/8 113/8 113/9 127/6 157/12 158/6 186/8 187/4 190/15 196/10 199/2 200/3 207/19 230/23 234/16
**needs [4]** 208/1 212/6 222/1 224/4
**negatives [1]** 15/6
**negotiated [2]** 107/14 224/1
**negotiation [3]** 49/7 125/6 206/24
**negotiations [2]** 192/24 226/24
**neighborhood [2]** 119/6 178/14
**neither [1]** 192/4
**net [18]** 25/21 26/2 122/15 122/17 126/4 127/3 130/2 130/3 130/13 139/16 142/10 142/20 142/22 143/15 150/5 150/8 150/11 163/23
**network [1]** 57/8
**never [8]** 29/2 65/6 66/15 91/1 94/6 94/23

**N**

**never... [2]** 137/18 236/16
**nevertheless [3]** 27/2 29/22 40/12
**new [10]** 1/18 43/18 56/9 91/2 118/6 118/6 130/15 143/4 219/21 238/2
**Newport [1]** 16/9
**news [2]** 18/18 92/13
**next [67]** 20/21 22/5 35/23 43/12 51/2 53/14 59/13 62/15 62/16 63/11 64/8 64/9 64/21 65/23 66/5 66/6 78/11 91/2 97/3 99/7 100/8 119/25 120/18 121/20 121/20 127/7 128/11 130/5 130/17 131/3 139/4 139/19 140/16 141/9 144/23 152/2 153/6 153/22 154/2 154/5 160/14 161/24 162/12 163/9 163/19 164/1 164/4 186/15 188/1 188/2 191/19 203/15 211/13 212/22 212/17 212/21 212/25 213/6 213/12 213/17 213/24 214/12 214/21 216/17 217/21 231/4 233/17
**NFL [3]** 3/17 6/7 50/11
**NFL-wide [1]** 6/7
**nice [2]** 159/19 164/15
**night [3]** 3/11 76/12 237/9
**NIKE [366]**
**nike's [114]** 5/14 5/25 7/12 8/10 8/22 11/19 11/23 12/4 18/15 18/20 19/8 22/16 22/17 22/20 28/2 28/3 30/24 35/24 36/3 40/18 41/9 45/18 51/3 61/12 62/10 69/7 71/5 83/11 104/8 105/22 106/8 107/22 108/13 109/13 109/22 111/6 120/25 121/9 122/24 123/12 123/19 126/18 127/5 128/21 136/19 142/3 143/2 150/25 154/8 154/21 154/21 155/13 168/3 168/12 169/13 171/22 174/5 174/10 176/8 177/2 177/11 180/7 188/6 188/19 188/21 190/23 191/24 192/13 193/4 193/10 193/11 193/15 193/17 193/22 202/15 208/8 210/6 212/3 213/3 213/15 213/20 214/10 214/10 216/18 220/17 222/13 222/16 222/23 223/7 223/14 223/20 224/2 224/5 224/16 224/17 224/23 225/8 225/12 225/14 225/18 226/14 227/1 227/13 227/16 227/17 227/22 228/2 229/19 230/7 230/25 232/4 232/9 237/24
**Nike.com [68]** 23/24 30/8 30/12 31/1 32/9 33/3 33/10 33/25 34/8 34/19 59/10 59/12 59/13 62/6 67/17 71/23 72/15 72/24 73/6 73/10 73/14 76/1 76/22 76/25 77/12 77/21 78/5 84/4 85/6 85/7 85/10 85/11 85/13 85/14 85/18 85/24 86/4 87/19 88/13 88/15 89/8 89/17 91/10 91/18 92/8 94/3 94/7 94/8 94/15 94/19 94/24 95/5 95/21 96/6 96/11 96/17 96/20 96/21 97/1 99/23 100/10 101/3 101/4 101/5 101/15 112/4 114/18 214/19
**Nike.com's [1]** 77/4
**nine [1]** 163/2
**no [151]** 3/9 6/5 7/20 7/22 11/25 12/5 12/21 12/21 13/16 13/21 14/4 14/7 14/18 15/4 15/10 20/6 21/16 21/22 26/16 28/8 28/25 38/14 38/20 40/11 40/14 42/6 43/15 44/18 44/22 46/3 46/6 46/17 47/18 47/18 48/22 49/3 50/21 51/11 53/8 60/17 62/12 65/4 68/10 69/13 70/15 71/13 78/19 80/3 80/21 81/14 83/2 83/5 84/18 85/21 85/25 87/1 87/22 90/15 91/15 91/23 94/24 98/7 98/13 99/25 100/2 100/7 100/8 100/17 101/24 110/6 118/11 124/24 129/6 129/10 131/17 133/18 134/19 134/22 135/3 135/10 135/17 135/25 136/8 136/8 136/8 141/7 143/1 144/25 145/18 152/11 152/20 153/5

167/6 168/8 170/1 170/1 170/9 171/17 175/8 175/12 179/5 183/20 183/25 184/1 184/9 185/21 185/25 186/7 189/17 190/17 193/5 194/14 194/21 194/24 194/25 195/5 195/16 195/19 196/24 197/3 198/6 199/23 204/15 205/2 205/7 205/22 205/25 206/6 206/17 206/22 210/25 211/6 211/21 219/1 219/13 225/12 227/6 231/6 234/8 234/14 235/25 237/24 239/2 239/12
**No. [1]** 122/25
**No. 4 [1]** 122/25
**nobody [1]** 178/14
**nominal [1]** 179/18
**non [11]** 39/11 39/11 122/4 127/14 127/23 128/1 149/11 149/15 149/23 160/19 171/4
**non-Cool [1]** 160/19
**non-Nike [9]** 39/11 39/11 122/4 127/14 127/23 128/1 149/11 149/15 149/23
**non-online [1]** 171/4
**none [6]** 18/1 84/17 107/14 177/14 195/11 210/24
**nonexclusive [6]** 20/20 20/25 157/17 157/24 157/25 224/24
**noon [2]** 236/21 237/4
**Nordstrom [1]** 111/2
**normally [1]** 66/24
**North [1]** 152/22
**not [331]**
**note [1]** 189/15
**notebook [1]** 67/11
**noted [1]** 162/14
**nothing [10]** 67/5 113/16 152/11 171/12 186/1 202/3 203/13 208/16 216/2 221/1
**notice [5]** 50/1 198/16 206/24 215/18 220/1
**notion [1]** 125/5
**notions [1]** 126/8
**NovaCare [1]** 109/11
**November [4]** 33/8 236/22 236/23 237/4
**November 14 [1]** 33/8
**November 24th [2]** 236/22 236/23
**now [101]** 5/9 28/3 35/23 39/10 47/4 47/24 50/4 50/7 51/5 59/19 59/25 66/13 68/5 68/9 70/17 71/12 73/19 73/24 79/10 82/5 83/22 86/21 87/2 88/1 89/5 90/12 92/5 96/23 101/11 102/5 102/21 104/8 104/23 105/10 105/23 106/13 109/14 110/15 112/10 117/6 117/22 123/18 123/23 124/24 125/25 130/22 133/4 134/9 136/19 137/2 137/24 139/2 139/17 141/14 141/17 142/5 142/7 142/15 143/25 145/21 147/25 149/10 150/19 160/23 161/18 165/5 176/6 184/10 186/20 186/22 187/10 188/15 191/14 192/3 200/10 202/1 202/17 203/5 205/12 206/13 207/1 209/23 210/12 210/18 214/24 215/7 216/4 220/4 224/14 226/4 226/20 228/13 230/9 233/1 233/15 233/15 233/22 234/12 237/24 239/2 239/5
**nowhere [2]** 177/7 195/6
**NP [1]** 154/18
**number [130]** 13/15 22/20 22/21 23/16 25/1 25/21 28/15 29/4 29/23 30/5 30/9 30/22 30/22 32/15 33/15 33/16 33/20 34/1 34/15 35/2 35/14 35/14 36/11 36/18 36/18 39/12 40/13 40/15 40/19 40/21 40/25 42/12 42/25 43/16 44/13 45/25 46/5 56/16 57/1 57/16 57/23 60/13 61/12 61/22 62/5 62/16 63/12 63/22 64/2 64/3 64/9 64/17 65/18 65/19 66/8 66/9 68/16 70/3 70/3 70/20 70/20 70/21 72/3

77/14 77/17 77/24 78/4 78/7 78/7 78/8 79/21 80/3 87/8 88/14 91/10 91/13 92/2 92/20 93/11 93/23 94/2 94/14 95/24 97/6 97/10 97/14 97/19 97/22 99/11 106/2 110/17 110/24 114/19 114/20 119/7 125/17 126/4 133/1 134/19 135/11 136/8 140/13 141/5 141/13 142/3 152/8 179/22 184/15 186/18 185/6 185/9 193/21 194/8 204/3 208/5 208/5 208/23 208/24 214/4 214/4 221/2 227/21
**number 2 [1]** 125/17
**number 3 [1]** 126/4
**Number 308,535 [1]** 91/13
**number 5 [1]** 91/10
**number 9 [2]** 184/15 185/6
**numbered [2]** 136/16 187/22
**numbers [77]** 7/19 7/23 8/22 8/23 23/1 23/10 27/5 27/19 27/22 30/19 30/25 33/22 37/1 37/4 37/5 43/13 43/16 62/20 63/5 63/19 67/1 68/21 69/3 72/22 90/3 110/7 111/17 111/18 114/17 121/17 122/16 123/17 123/18 123/23 128/23 128/25 129/12 129/25 130/24 131/14 132/1 132/6 132/7 132/13 132/19 133/14 133/15 133/16 133/18 133/23 134/10 134/22 135/3 135/17 135/25 136/20 136/24 142/6 142/6 148/10 148/11 148/23 156/15 163/12 165/7 165/8 165/9 166/15 169/20 175/18 177/17 177/18 185/7 193/25 194/5 209/8 211/23
**NY [1]** 1/18

**O**

**oath [1]** 95/4
**object [7]** 49/4 60/4 60/6 63/13 68/16 236/12 236/16
**objecting [2]** 63/20 63/21
**objection [19]** 3/14 9/2 9/16 29/12 45/10 47/16 48/5 49/16 50/13 62/8 62/9 66/12 68/8 68/20 155/22 168/7 168/8 180/10 180/15
**objections [3]** 64/23 146/14 231/18
**objects [1]** 63/22
**obtain [1]** 73/14
**obtains [1]** 179/24
**obviously [12]** 120/6 134/21 135/1 139/1 141/22 142/10 146/21 150/22 155/2 155/4 178/5 179/15
**occurs [1]** 148/16
**ocean [2]** 200/18 200/21
**October [2]** 1/6 236/19
**October 28th [1]** 236/19
**off [23]** 30/10 35/11 53/25 57/11 67/18 67/19 75/11 90/3 92/23 98/22 115/16 141/2 149/17 155/21 157/11 159/18 169/12 169/20 173/13 186/11 225/11 225/13 231/19
**offer [20]** 10/11 60/20 61/15 62/14 62/15 63/24 64/8 64/21 65/23 66/5 66/6 68/9 69/13 118/8 151/20 152/24 153/14 207/5 207/5 210/23
**offered [4]** 107/5 107/8 107/11 108/10
**offering [1]** 210/21
**offers [4]** 62/18 74/23 152/11 153/5
**office [3]** 179/2 179/6 205/15
**offices [1]** 116/6
**OFFICIAL [1]** 1/21
**offline [2]** 57/8 64/10
**oh [12]** 5/18 43/17 69/15 95/10 128/14 147/1 163/9 177/5 177/13 184/16 208/11 220/17
**Ohio [7]** 18/14 157/9 158/10 158/16 158/20 158/23 159/2

# O

**okay [168]** 3/10 9/19 11/15 11/22 12/11
12/23 14/3 14/11 14/19 16/23 17/10 19/14
19/19 20/20 21/1 21/13 21/17 22/2 23/3
23/12 23/14 23/15 24/5 24/24 25/7 25/12
26/14 27/7 27/12 28/1 28/5 29/2 29/21 30/12
30/14 30/22 31/7 31/16 32/7 32/14 32/18
32/20 33/3 33/10 34/3 34/15 35/9 37/2 37/3
37/9 37/14 38/15 39/2 41/25 42/16 43/2 43/4
43/10 53/8 59/25 62/3 62/20 65/23 69/21
70/10 73/1 79/12 79/18 79/21 80/12 80/20
80/22 81/13 81/17 81/19 82/5 82/12 82/25
83/9 83/24 83/25 84/13 86/9 86/10 86/14
87/2 87/24 88/8 88/20 89/5 90/12 91/17
91/24 92/1 94/1 94/14 95/18 97/4 98/1 98/2
98/8 98/13 98/24 104/5 104/8 104/21 105/6
105/9 118/17 119/17 119/20 119/23 119/25
120/18 121/17 121/20 121/23 123/25 127/7
129/4 129/8 129/13 131/3 131/9 131/16
132/9 133/9 133/14 134/4 134/11 134/18
135/8 136/11 139/4 141/10 143/22 144/24
146/3 147/19 153/6 158/5 163/5 163/7
163/10 167/17 170/3 172/7 172/18 173/21
182/9 182/10 182/21 183/8 184/10 186/2
186/13 188/15 191/8 197/21 197/25 209/10
221/25 230/14 231/23 233/12 233/25 235/24
239/1
**old [1]** 200/20
**omission [1]** 48/19
**omitted [1]** 3/12
**once [32]** 39/6 45/21 90/21 91/18 126/7
128/5 128/9 135/17 140/4 141/9 141/21
148/14 149/14 150/19 152/23 153/4 153/25
154/16 154/24 155/3 155/16 162/7 162/18
164/8 164/15 165/21 172/15 186/8 186/13
197/18 211/10 216/6
**one [161]** 3/3 3/12 5/3 5/18 5/23 6/5 6/5 8/1
17/12 19/11 26/19 27/10 28/10 31/21 33/22
33/22 33/25 34/3 34/16 38/3 39/2 42/10
42/19 43/12 43/12 43/18 45/20 45/24 46/25
56/1 56/7 56/15 56/20 57/10 60/1 63/8 63/21
65/4 65/4 65/5 65/5 65/6 65/13 65/14 65/16
67/3 74/25 75/9 75/18 76/1 76/9 84/10 85/1
85/2 87/16 87/17 87/17 87/18 88/4 88/8 88/9
88/20 88/21 88/24 88/24 89/8 89/13 89/17
89/18 90/1 90/2 90/3 90/5 90/6 90/10 90/25
95/4 95/4 95/11 96/17 100/10 102/24 103/19
105/3 105/20 110/6 112/18 115/12 117/22
118/25 120/6 120/20 121/21 124/20 125/4
128/12 129/19 129/20 129/23 130/4 130/5
130/8 130/17 131/3 131/9 132/22 133/20
135/20 138/10 139/21 143/2 147/13 152/8
153/9 156/24 159/7 161/11 161/17 161/18
163/13 173/10 173/13 176/12 177/25 181/13
185/19 185/21 187/22 190/13 194/10 194/11
195/22 195/24 200/3 206/5 207/15 209/6
211/6 213/17 214/17 215/2 217/7 217/19
220/2 226/1 226/3 228/19 231/5 231/6
231/11 232/8 232/20 233/13 234/3 234/24
235/15 235/15 237/25 238/1 238/5 238/6
**one's [1]** 33/12
**one-off [1]** 173/13
**one-representative [1]** 231/11
**ones [7]** 16/11 20/15 56/2 107/17 136/22
140/5 175/1
**online [63]** 10/11 10/13 23/24 30/23 39/21
61/13 62/17 62/22 64/4 64/10 64/12 64/12
73/12 73/23 74/1 77/8 85/22 86/2 88/14 94/3

113/7 118/1 127/18 128/8 129/1 131/6
137/10 137/14 137/23 138/3 138/8 138/8
138/9 138/12 138/16 138/21 139/7 140/2
140/6 140/9 141/16 141/16 148/16 148/16
148/20 148/22 165/17 169/14 169/19 171/4
172/6 172/16 173/5 178/24 214/7 221/6
**only [38]** 3/16 9/9 11/21 17/9 20/18 24/20
26/19 40/4 46/12 51/5 88/20 90/25 92/16
103/7 107/5 110/19 110/23 112/19 115/3
115/12 132/13 144/19 146/15 152/3 176/2
192/12 194/12 194/16 202/20 203/2 203/3
220/15 221/14 226/12 229/1 230/24 232/19
236/12
**op [1]** 126/25
**open [6]** 75/7 102/12 124/6 130/21 144/9
238/19
**opened [1]** 8/12
**opening [15]** 4/11 102/3 103/2 103/4 103/13
103/14 104/23 105/10 234/21 235/23 236/21
236/23 237/20 237/21 237/22
**opens [1]** 3/1
**operating [10]** 122/15 126/15 127/6 142/14
143/3 143/8 149/1 162/9 163/23 164/11
**operation [2]** 24/3 27/20
**operations [1]** 139/12
**opinion [39]** 10/8 10/10 12/20 12/21 12/25
13/5 27/2 29/13 42/19 49/21 50/12 50/20
60/1 68/18 69/15 77/23 79/12 82/13 84/16
95/21 101/8 101/9 114/19 121/9 122/23
131/8 142/17 142/21 151/23 164/19 170/24
171/3 171/25 175/16 193/1 197/1 198/18
227/1 228/2
**opinions [9]** 60/21 60/24 120/24 130/16
157/6 163/24 166/10 228/7 235/4
**opportunities [7]** 55/17 191/16 196/3 196/17
196/20 213/5 213/20
**opportunity [13]** 10/7 63/18 81/12 99/13
187/24 196/6 196/12 197/6 202/17 203/11
208/24 213/8 223/22
**opposed [2]** 100/5 138/17
**opposing [6]** 145/6 234/22 235/11 235/23
236/24 237/23
**opposite [1]** 5/25
**optimization [1]** 56/25
**optimizing [1]** 56/15
**option [2]** 53/6 220/6
**order [5]** 23/16 62/18 64/13 66/4 230/3
**ordinary [2]** 113/10 218/8
**organic [1]** 76/11
**organically [1]** 76/13
**organization [1]** 75/14
**organizations [1]** 74/14
**original [9]** 8/23 66/17 66/18 92/11 92/17
92/18 93/5 93/9 93/17
**other [86]** 7/3 7/12 8/23 12/23 16/20 17/21
17/24 18/5 20/25 25/8 25/12 26/10 26/20
26/21 32/21 35/18 55/24 59/2 62/21 64/14
64/15 68/7 72/18 72/20 74/22 77/1 78/6 80/9
86/2 87/20 88/13 88/19 89/21 90/12 90/19
90/19 91/20 92/24 93/7 93/8 95/15 95/16
97/2 101/12 109/12 110/5 110/23 119/13
125/4 126/14 127/21 128/19 130/11 133/17
141/3 143/6 153/18 154/6 161/14 162/6
173/4 175/1 181/16 181/21 182/12 182/17
183/4 194/11 197/21 203/3 206/18 208/12
208/19 208/22 212/19 215/19 215/21 219/15
224/18 225/4 225/11 230/15 231/5 232/21
234/11 238/8

228/25 229/6 229/9 230/1 230/7
**ought [3]** 237/25 238/5 239/9
**our [33]** 4/11 5/2 5/24 8/23 64/6 89/20 103/7
104/3 105/3 111/14 113/18 114/2 144/19
145/2 147/15 157/11 181/17 181/17 183/17
186/5 186/20 197/4 198/2 201/8 201/8 207/9
210/12 215/8 219/24 219/25 231/18 231/18
239/4
**out [73]** 5/1 38/3 45/1 55/1 75/11 80/4 85/14
89/17 89/18 89/23 90/1 90/4 90/9 90/11
93/19 94/21 95/7 101/17 107/6 107/6 120/22
124/6 125/3 125/8 125/12 127/3 128/22
131/14 131/25 132/3 134/7 135/14 138/7
144/7 149/19 152/18 152/22 157/20 158/7
159/22 161/15 161/22 163/13 163/18 163/23
164/1 165/9 165/24 176/18 178/21 181/23
183/18 185/1 188/15 191/2 198/25 200/17
201/15 201/16 201/20 207/4 208/4 208/25
215/10 215/16 219/25 220/24 221/7 226/7
230/11 233/14 236/14 239/8
**outcome [1]** 183/20
**Outdoors [1]** 139/23
**outlet [2]** 127/17 169/21
**outlets [1]** 81/11
**outrageous [5]** 218/14 228/23 229/2 229/5
229/9
**outright [4]** 20/8 52/15 108/20 211/7
**outside [2]** 12/21 232/22
**outstanding [1]** 10/10
**over [30]** 5/22 9/4 44/14 53/20 55/14 58/5
58/5 60/13 67/15 75/25 78/15 91/17 99/18
107/13 132/21 138/24 145/24 155/11 162/17
163/1 178/12 180/25 181/3 182/17 186/20
187/17 196/9 218/19 219/21 237/12
**overall [9]** 4/9 74/4 121/25 139/16 164/18
167/3 167/11 169/2 182/14
**overestimate [1]** 75/9
**overestimated [1]** 75/10
**overestimation [1]** 75/18
**overlap [8]** 5/18 6/5 6/6 6/24 7/23 82/17
82/18 228/21
**overly [1]** 20/24
**Overruled [3]** 29/14 45/13 47/17
**oversimplified [1]** 42/24
**overuse [1]** 119/5
**own [41]** 14/12 18/15 27/7 30/4 35/24 39/20
52/25 55/5 62/19 74/13 75/12 79/22 84/22
89/11 108/3 110/22 112/11 112/12 113/1
113/10 117/7 124/19 124/21 127/16 127/22
128/6 168/12 174/5 175/6 176/8 180/14
181/10 188/24 211/6 211/19 212/12 215/23
216/18 225/12 228/10 238/9
**owner [1]** 181/12
**owners [3]** 127/22 178/25 181/18
**ownership [2]** 124/22 165/22
**owning [1]** 124/18
**owns [1]** 124/5

# P

**P-A-R-K-H-U-R-S-T [1]** 54/7
**p.m [11]** 144/13 146/4 147/18 187/9 200/6
200/6 200/8 233/24 239/15 239/15 239/16
**PA [3]** 1/6 1/22 1/23
**Pacific [1]** 125/13
**page [23]** 32/2 51/1 61/11 62/16 64/13 65/22
67/6 67/7 67/8 67/14 71/20 72/12 76/17
77/15 77/18 153/9 163/13 172/20 234/19
235/23 236/5 236/9 237/16

**P**

**page 3 [1]** 71/20
**page 4 [2]** 51/1 172/20
**page 6 [1]** 61/11
**pages [9]** 57/16 67/13 72/12 76/14 234/17 235/7 237/18 237/19 237/22
**paid [11]** 5/15 8/16 48/23 105/16 107/16 119/9 124/7 124/13 143/13 181/23 183/24
**paid-up [1]** 124/13
**painfully [1]** 6/20
**pair [2]** 100/4 100/11
**palming [2]** 225/10 225/13
**pandemic [1]** 139/2
**pants [1]** 56/6
**paper [3]** 130/9 131/1 219/3
**papers [6]** 16/19 103/2 129/18 130/4 138/2 141/25
**parallel [1]** 198/4
**PARKHURST [28]** 2/7 9/25 10/2 42/6 42/13 42/15 42/17 43/6 53/15 53/17 53/22 54/6 54/12 62/12 62/13 65/10 71/4 79/1 83/24 86/9 91/25 94/10 100/25 101/20 102/17 103/15 113/9 196/5
**Parkhurst's [5]** 42/8 66/17 67/16 105/2 114/16
**part [28]** 16/5 16/12 16/25 18/1 18/3 18/15 18/21 18/23 22/13 23/22 27/24 42/14 43/8 56/16 68/15 80/17 82/8 107/9 127/20 136/22 143/17 149/18 155/4 155/13 176/6 203/12 214/23 230/5
**participants [1]** 74/10
**particular [23]** 27/14 32/23 32/24 32/24 38/3 38/9 48/4 48/17 48/21 48/24 58/25 59/10 74/11 74/23 77/15 85/8 124/24 140/3 168/16 168/24 231/9 233/4 235/16
**particularly [3]** 142/24 143/16 173/18
**parties [9]** 20/25 49/8 108/24 125/4 192/24 226/25 227/25 228/5 232/8
**partners [3]** 107/2 107/16 210/25
**parts [2]** 77/15 120/5
**party [11]** 24/25 26/19 46/15 47/7 72/16 125/4 188/7 223/4 228/6 232/19 237/21
**pass [1]** 205/8
**passing [1]** 231/19
**passion [1]** 230/5
**past [3]** 118/4 119/9 149/14
**paste [2]** 175/4 175/12
**pasted [1]** 175/14
**patent [3]** 116/12 125/13 125/14
**patents [1]** 124/16
**path [1]** 161/3
**patience [4]** 71/11 144/10 186/14 200/13
**PAUL [5]** 2/13 111/14 113/19 115/6 115/22
**Pause [1]** 157/1
**pay [19]** 5/15 19/21 48/3 52/6 52/14 107/17 118/25 124/14 125/4 125/4 125/8 143/12 156/21 181/17 181/17 211/6 211/21 219/13 220/21
**paying [1]** 178/13
**payment [2]** 48/13 223/23
**pays [1]** 159/9
**peg [1]** 191/3
**pegging [1]** 208/18
**pen [1]** 221/14
**penal [1]** 229/1
**pending [3]** 9/24 84/20 198/18
**PENNSYLVANIA [9]** 1/1 188/2 188/13 198/6 198/19 198/22 228/22 230/25 231/1

56/19 57/2 57/16 60/11 63/6 63/6 64/11 64/16 65/2 65/20 66/14 74/25 77/14 82/22 83/6 88/16 88/25 89/16 89/17 89/24 90/9 95/17 95/21 96/23 98/4 98/10 99/3 99/10 99/11 99/22 109/12 114/17 117/4 158/18 175/10 182/23 204/9 204/25 206/8 219/20
**PEPPER [1]** 1/13
**per [5]** 65/25 65/25 78/9 90/25 124/13
**per-unit [1]** 124/13
**percent [84]** 15/25 17/4 17/7 18/11 18/19 20/3 35/13 35/14 35/18 51/5 51/8 51/9 51/10 56/17 57/16 57/17 57/19 62/4 62/21 62/22 64/4 64/5 64/6 64/15 64/17 68/18 70/4 73/16 73/18 73/20 73/21 74/3 74/3 74/6 75/3 75/20 75/24 76/21 76/24 77/1 89/14 89/15 89/16 92/16 93/8 94/20 110/19 110/23 110/23 123/19 123/20 123/23 126/19 132/24 134/9 138/25 139/1 139/3 139/16 139/17 139/17 139/18 140/1 140/1 140/7 140/10 141/17 142/1 142/15 148/21 148/22 148/25 150/20 154/16 156/16 158/6 158/9 159/4 159/5 161/2 165/11 165/13 168/17 169/4
**percentage [6]** 30/9 30/11 108/14 140/7 141/17 167/13
**perfect [1]** 66/3
**performed [1]** 84/2
**perhaps [1]** 234/11
**period [31]** 5/6 5/7 5/22 9/4 11/16 19/22 37/11 38/13 90/21 91/17 97/18 107/24 108/6 111/11 132/22 132/23 134/5 152/11 159/23 160/20 160/22 161/1 161/20 162/3 163/2 165/12 166/13 176/16 176/24 212/15 235/22
**Periodically [1]** 84/9
**permission [1]** 232/17
**permitted [1]** 238/14
**person [28]** 20/21 24/11 63/9 63/10 65/4 65/5 65/6 65/16 65/25 66/1 76/12 79/11 85/19 88/6 89/25 90/2 90/20 90/25 91/1 91/2 91/2 91/5 91/18 95/4 98/1 99/21 209/16 235/12
**Personally [1]** 44/17
**perspective [5]** 149/17 164/16 169/17 180/4 208/8
**persuaded [1]** 223/4
**phase [7]** 3/18 3/21 4/12 26/17 27/3 35/2 60/7 60/10 103/16 105/20 105/21 110/10 190/18 198/11 198/14 205/12 205/12 215/13 216/4
**Philadelphia [2]** 1/6 1/23
**phone [1]** 96/11
**phones [1]** 101/12
**phrase [4]** 87/10 193/5 213/21 227/7
**phrased [1]** 196/15
**physical [7]** 51/22 81/24 82/20 88/19 137/7 138/5 171/10
**physically [2]** 109/4 137/21
**pick [2]** 136/9 136/22
**picked [13]** 68/18 131/14 132/12 132/14 135/1 135/12 135/12 135/18 136/20 159/22 175/20 185/20 185/21
**picking [2]** 200/17 200/18
**picks [1]** 200/23
**pictures [1]** 95/15
**pie [1]** 61/4
**piece [3]** 8/3 25/7 79/15
**pieces [3]** 177/2 203/6 215/2
**PIPER [1]** 1/17
**pivoted [1]** 6/20

83/19 92/25 203/18 204/13
**places [10]** 43/7 43/21 76/2 86/2 95/16 101/12 112/7 113/13 199/6 213/4
**plain [1]** 188/16
**plaintiff [43]** 1/4 1/12 2/2 3/7 70/8 101/23 101/24 102/1 102/22 120/10 120/24 122/7 128/17 128/21 129/2 129/12 130/10 131/7 131/11 131/22 132/2 132/14 132/16 133/23 134/23 135/25 136/2 136/7 140/15 141/8 141/11 141/20 148/19 150/10 165/6 173/18 174/22 175/9 186/18 190/22 198/20 199/22 234/10
**plaintiff's [21]** 9/10 68/23 69/1 104/9 125/18 125/22 133/7 133/10 135/19 138/16 141/2 142/18 148/10 163/21 163/25 173/6 174/2 199/24 211/6 212/12 218/3
**plaintiffs [2]** 126/3 130/24
**plan [7]** 72/13 72/14 72/14 76/18 76/18 95/17 96/23
**plans [2]** 68/7 208/25
**plastered [1]** 28/21
**platform [1]** 74/19
**plausible [1]** 31/19
**play [2]** 55/10 191/6
**player [1]** 75/11
**players [1]** 143/6
**playing [1]** 158/21
**please [63]** 10/23 11/1 11/10 13/23 14/17 14/22 15/20 33/6 36/14 53/22 53/23 53/24 53/25 53/25 54/4 60/25 71/10 72/2 96/14 105/9 115/11 115/20 116/4 120/1 127/8 129/13 129/14 129/21 130/17 131/9 131/17 133/6 135/23 136/3 136/12 139/19 140/18 146/2 147/6 147/19 150/2 150/16 152/2 153/22 156/12 157/2 159/16 160/14 161/10 161/16 161/24 163/10 180/17 184/12 184/13 184/17 210/16 211/13 213/18 217/25 219/5 221/18 221/21
**plenty [2]** 72/16 183/22
**plug [1]** 73/17
**plugged [1]** 92/23
**plus [3]** 143/8 151/18 156/9
**point [20]** 7/25 15/8 21/9 21/23 37/11 45/16 73/13 80/12 96/4 107/2 122/12 132/25 140/3 141/14 159/1 162/25 165/24 183/17 189/17 194/10
**pointed [1]** 157/20
**pointing [1]** 226/7
**points [5]** 96/24 103/19 163/4 165/24 215/14
**polo [1]** 172/21
**pontoon [1]** 59/15
**portion [3]** 10/10 60/15 68/12
**portray [1]** 95/22
**position [5]** 132/1 155/3 162/15 163/22 173/8
**positions [2]** 117/17 120/12
**possibility [1]** 91/21
**possible [1]** 91/16
**possibly [1]** 200/22
**post [14]** 66/17 67/3 67/18 67/20 129/21 198/16 199/1 234/6 234/9 234/10 234/24 236/3 237/25 238/6
**post-notice [1]** 198/16
**post-trial [8]** 199/1 234/6 234/9 234/10 234/24 236/3 237/25 238/6
**posts [1]** 62/13
**potential [4]** 107/1 107/7 107/16 169/17
**potentially [3]** 69/7 76/11 81/9

power [2]  194/9 202/15
PowerPoint [1]  147/8
PowerPoints [1]  147/10
PowerPoints are [1]  147/10
practice [4]  47/10 47/18 157/18 167/2
precise [1]  222/18
preclude [2]  188/24 222/19
predictions [1]  111/5
predominance [1]  223/5
prefer [1]  238/12
preference [1]  197/3
prejudice [2]  67/1 230/5
prejudicial [1]  4/16
premise [1]  6/5
prepare [3]  49/17 119/20 144/5
prepared [6]  36/16 54/12 60/23 93/5 168/1
234/1
preparing [2]  49/20 55/9
preponderance [6]  192/12 222/25 223/9
225/17 225/21 226/13
presence [5]  127/18 128/8 129/1 138/7 214/7
present [10]  59/17 66/2 68/12 69/1 107/25
111/18 111/20 122/17 232/13 232/14
presentation [9]  16/7 16/12 43/10 43/14
67/22 71/2 71/5 136/12 149/10
presented [11]  70/3 125/5 127/12 136/2
142/6 149/8 194/13 197/14 214/3 214/15
225/13
presenting [1]  221/19
presents [1]  111/21
presume [1]  88/20
presumed [2]  88/8 90/24
pretend [1]  65/3
pretending [1]  207/13
pretty [12]  13/1 17/15 18/7 19/3 19/6 19/7
19/8 93/21 95/23 109/2 156/15 159/20
prevent [2]  82/2 82/21
previously [3]  28/17 31/12 31/16
price [17]  52/8 52/10 107/4 107/14 108/19
121/13 130/3 130/3 151/4 151/21 153/12
153/12 164/2 165/22 179/18 184/8 217/12
priced [1]  165/8
prices [5]  107/18 110/18 119/15 126/10
130/3
priest [1]  200/1
principal [2]  205/20 208/9
principal's [1]  205/15
principles [4]  47/22 211/15 222/4 226/4
print [5]  42/23 44/1 44/2 57/3 57/9
printed [1]  219/3
printer [2]  5/2 145/2
printout [2]  32/23 32/24
prior [19]  12/2 17/9 119/3 119/3 119/12
119/12 119/15 129/4 145/11 151/8 151/9
176/9 178/18 180/24 181/2 192/7 198/2
222/2 231/18
privileged [1]  235/13
Pro [29]  8/13 32/12 32/14 32/21 33/13 34/11
37/20 37/21 112/13 112/20 137/19 154/18
154/19 154/19 154/23 168/25 169/9 172/24
175/15 175/24 176/7 176/9 176/12 176/17
177/17 177/18 195/2 203/9 218/24
Pro's [1]  154/22
probably [8]  19/7 19/11 93/4 102/11 110/11
146/6 146/10 182/15
problem [6]  75/7 94/23 99/14 110/1 206/21
127/24

proceeding [1]  146/7
proceedings [3]  229/23 239/16 239/21
proceeds [1]  107/9
process [5]  107/1 122/8 128/20 129/6 150/24
produced [9]  8/22 122/6 126/3 128/17
128/19 129/3 131/12 165/6 173/7
product [75]  5/14 6/1 28/12 28/21 29/5
29/11 33/4 38/24 39/2 39/22 43/16 48/10
48/13 48/15 48/20 48/22 51/19 51/23 52/1
56/18 57/17 57/18 58/17 61/6 63/3 64/1
64/10 64/12 64/13 65/22 71/25 72/19 72/19
73/21 73/22 76/17 81/5 87/17 89/1 94/19
95/12 95/14 98/1 99/4 99/4 100/4 100/5
100/6 100/11 105/20 109/4 110/4 111/4
112/8 128/6 138/14 155/4 155/7 156/2
159/11 160/18 167/1 169/7 176/13 177/22
193/21 194/5 195/5 195/6 197/13 199/12
206/12 206/18 215/24 227/21
product-wide [1]  48/10
products [98]  5/16 5/24 6/8 6/9 6/11 8/1
8/11 8/17 8/18 14/8 19/13 22/16 22/17 23/17
23/20 23/23 24/1 24/11 25/13 27/16 28/18
29/17 29/25 30/13 35/15 50/11 50/19 54/13
60/11 61/13 62/17 71/21 72/15 87/3 87/10
87/11 88/19 88/22 95/24 96/5 96/18 99/17
99/18 99/21 99/23 105/15 110/3 110/12
110/13 110/21 111/11 112/2 112/11 112/18
112/20 113/1 113/15 113/18 114/12 125/24
127/11 138/3 142/11 143/6 147/24 154/9
154/14 154/19 154/20 154/25 155/6 158/24
166/20 166/23 167/10 167/11 168/25 169/5
170/14 171/22 172/9 176/7 176/9 193/20
195/9 195/12 206/5 214/5 214/6 214/18
217/5 224/18 224/20 225/2 225/12 225/15
225/18 227/20
profession [2]  55/3 56/13
professional [6]  7/10 12/11 77/23 117/9
117/21 219/19
professor [1]  117/23
profiles [1]  72/20
profit [30]  12/8 25/21 26/2 35/23 39/24 40/2
47/6 47/11 104/3 121/1 121/6 122/2 122/14
122/20 123/4 123/5 123/7 123/11 126/13
126/13 142/21 155/17 163/17 167/2 168/23
181/15 181/20 181/22 183/18 188/7
profits [126]  3/17 13/8 15/13 22/5 22/6 22/9
22/23 23/16 28/3 35/21 36/5 36/5 40/8 40/10
40/13 40/16 41/1 41/2 41/5 41/7 41/9 41/12
47/7 50/12 50/20 55/14 55/18 56/18 57/1
57/10 107/21 114/11 121/1 121/9 121/10
121/12 122/4 122/10 122/15 122/17 122/18
122/21 123/19 126/2 126/5 127/2 127/4
127/13 127/19 127/21 127/22 127/23 128/1
128/8 129/2 130/14 141/23 141/24 142/5
142/7 142/8 142/10 142/19 142/20 142/20
143/1 143/13 143/15 147/25 148/1 148/5
148/23 149/4 149/17 149/25 150/5 150/5
150/7 150/8 150/9 150/11 150/11 150/14
150/20 151/2 155/9 159/14 161/4 163/20
163/23 163/24 164/3 164/19 164/24 165/4
165/9 165/20 169/10 180/8 180/14 180/14
181/23 188/3 188/4 188/5 189/3 189/21
192/2 194/7 196/22 199/13 202/23 203/25
206/11 207/22 214/2 221/3 223/13 223/17
224/15 224/16 224/17 224/19 224/21 224/23
225/15
profits with [1]  143/1
programs [1]  158/13
project [2]  56/1 56/3

prominently [1]  4/10
promise [2]  89/3 102/10
promising [1]  210/19
promote [1]  160/5
promoting [2]  25/9 161/15
promotional [1]  18/8
promotions [1]  171/12
promptly [1]  234/2
proof [11]  60/20 61/15 62/15 62/18 63/24
64/8 64/21 65/23 66/5 66/6 68/9
proper [5]  4/4 113/2 160/7 182/25 229/1
properly [1]  129/19
property [28]  106/17 116/11 116/11 118/18
118/21 118/25 119/2 119/11 119/18 119/19
123/6 124/5 124/8 124/15 124/17 124/19
124/19 124/21 125/2 125/16 151/7 160/12
178/8 180/5 201/23 219/14 220/1 220/5
proposal [1]  196/2
proposed [3]  60/16 109/7 197/4
proposition [1]  148/14
propriety [2]  194/5 229/11
protect [1]  229/22
Protege [1]  16/10
proud [1]  158/18
prove [9]  7/14 104/12 192/10 222/24 223/8
225/17 225/21 226/11 232/2
proven [5]  121/12 164/25 192/12 226/13
228/16
proves [1]  5/12
provide [11]  21/11 63/18 63/25 77/10 77/14
77/17 77/20 80/1 100/15 116/9 120/11
provided [14]  67/9 67/15 67/21 67/23 73/6
79/8 80/18 134/23 135/24 138/16 141/8
141/11 158/3 174/22
provides [3]  155/18 181/13 202/8
public [9]  116/21 116/24 139/9 139/9 139/11
139/25 176/24 177/4 225/8
publicly [1]  179/11
pull [13]  11/10 38/3 58/8 83/14 129/13 133/6
135/5 136/3 149/19 161/10 161/16 184/12
187/13
pulled [1]  131/25
punish [3]  229/4 229/25 230/6
punishment [1]  202/14
punitive [39]  104/16 188/2 188/12 191/20
196/24 197/23 197/25 198/6 198/7 198/11
198/13 198/21 198/25 199/20 199/23 202/23
208/2 208/2 218/4 218/7 218/7 218/13 219/8
228/13 228/14 228/16 228/20 228/22 228/25
229/3 229/7 229/12 229/16 230/3 230/4
230/6 230/24 231/18 233/6
punitives [1]  231/20
purchase [17]  17/23 29/17 39/15 53/6 63/5
64/13 88/21 90/13 91/2 91/7 96/12 96/17
107/15 112/23 113/24 138/14 156/22
purchased [7]  5/24 28/11 28/12 29/5 44/23
64/10 89/8
purchaser [7]  63/3 65/14 65/16 88/4 88/6
99/15 100/12
purchasers [2]  63/2 88/1
purchases [9]  5/22 57/24 63/4 64/1 65/3
65/25 73/15 77/11 78/5
purchasing [3]  43/23 61/6 113/11
purely [1]  64/19
purple [1]  162/4
purport [1]  111/23
purportedly [1]  3/24
purpose [4]  98/21 189/8 229/3 230/6

**P**

**purposes [4]** 59/17 82/12 84/25 224/8
**pursuant [2]** 104/11 145/10
**push [1]** 201/20
**pushed [1]** 96/22
**put [45]** 14/6 16/6 19/15 23/7 39/12 40/12 43/13 45/25 47/21 48/4 50/24 51/18 57/15 60/25 92/25 93/16 93/18 93/19 93/23 107/1 121/14 133/22 141/22 147/15 161/4 161/12 161/19 161/22 172/18 175/5 182/6 184/24 191/10 195/14 202/9 204/18 204/24 213/2 223/18 230/16 233/4 233/5 233/7 236/18 238/5
**putting [3]** 43/7 113/1 175/23
**PX [38]** 11/10 36/14 43/18 51/2 63/15 73/3 125/21 125/21 125/21 128/17 128/18 130/11 130/15 130/15 130/15 131/12 131/12 131/13 131/22 133/13 133/18 134/13 134/20 135/5 135/21 136/3 142/18 142/18 148/8 149/9 149/9 167/25 168/6 168/10 174/5 174/15 176/2 214/24
**PX's [1]** 173/11
**PX-1451 [1]** 133/18
**PX-1532 [1]** 174/15
**PX-1539 [2]** 134/20 135/5
**PX-1621 [2]** 51/2 174/5
**PX-30 [2]** 131/22 142/18
**PX-3000 [1]** 11/10
**PX-3003 [1]** 36/14
**PX-3007 [1]** 43/18
**PX-3009 [1]** 73/3
**PX-3010 [1]** 63/15
**PX-3020 [3]** 167/25 168/6 168/10
**PX-30A [6]** 125/21 128/17 130/15 131/12 148/8 149/9
**PX-30B [3]** 125/21 130/15 131/12
**PX-31 [9]** 125/21 128/18 130/11 130/15 131/13 133/13 135/21 142/18 149/9
**PX-31A [2]** 134/13 214/24
**PX-32 [1]** 136/3

**Q**

**qualifications [7]** 53/18 69/12 70/11 70/14 71/13 78/13 118/10
**qualify [1]** 58/13
**quantification [1]** 142/19
**quantified [4]** 77/3 173/8 173/19 212/12
**quantitative [2]** 80/10 116/23
**quantities [2]** 130/2 132/18
**quarter [1]** 11/18
**Queen [4]** 17/13 19/5 108/25 217/16
**query [2]** 123/5 134/4
**question [67]** 3/13 7/18 8/10 12/5 13/1 13/20 13/23 14/18 14/22 15/6 21/22 21/25 25/25 29/15 30/1 30/2 32/3 40/24 40/24 45/14 48/6 69/10 73/19 77/2 78/11 81/13 85/23 86/9 91/24 94/10 96/14 97/3 99/7 100/8 103/19 106/9 106/10 106/21 112/5 115/3 123/5 145/14 155/24 166/21 167/16 170/16 170/18 174/1 175/11 177/16 179/5 179/20 179/20 181/19 190/13 202/1 202/6 202/11 204/21 210/2 213/2 213/24 214/9 216/5 216/11 217/6 232/6
**questionnaire [2]** 103/23 103/24
**questions [27]** 14/17 46/17 51/11 53/8 55/17 71/13 71/14 78/19 79/7 90/15 96/1 98/13 100/17 100/19 106/3 118/10 118/11 123/25 146/13 163/6 184/1 185/25 201/13 202/12

**R**

**rack [1]** 28/11
**radio [1]** 57/9
**Raise [1]** 54/2
**raised [3]** 60/7 213/2 222/3
**ran [1]** 74/4
**range [7]** 38/4 74/3 74/5 74/6 97/14 166/16 211/2
**ranges [1]** 202/10
**rarely [1]** 178/12
**Rast [3]** 16/9 16/18 18/6
**rate [46]** 15/17 15/18 15/24 15/25 16/3 16/18 17/4 17/7 17/19 18/1 18/3 18/11 18/16 19/15 19/20 19/21 21/10 21/24 56/21 56/24 57/3 57/18 57/19 59/10 62/4 62/10 62/14 65/8 66/16 66/18 67/17 73/20 73/24 74/1 75/22 75/24 82/13 92/5 92/7 92/8 92/17 94/8 94/9 94/19 96/6 183/4
**rates [27]** 56/14 56/16 58/2 58/12 58/15 58/25 59/3 59/4 60/18 62/6 62/11 63/21 68/17 74/2 74/5 74/11 74/20 74/22 74/23 76/21 76/22 77/21 77/22 82/10 84/21 108/22 159/9
**rather [2]** 196/17 196/18
**RDR [2]** 1/21 239/25
**reach [6]** 26/1 26/3 56/17 56/19 101/13 238/16
**reaches [1]** 238/10
**reaching [2]** 82/18 105/15
**read [15]** 28/14 31/24 97/21 140/19 155/20 157/19 158/19 180/17 184/15 189/14 190/8 198/23 199/21 215/16 223/9
**reading [1]** 75/3
**reads [1]** 32/5
**ready [11]** 9/21 10/25 71/12 103/2 103/3 103/22 145/19 145/20 145/24 200/10 205/22
**real [14]** 1/13 49/5 49/9 52/4 52/6 61/3 74/8 100/25 112/25 176/4 177/25 178/12 213/8 217/2
**real-world [3]** 49/5 49/9 52/4
**realized [1]** 172/2
**really [42]** 24/6 38/15 40/25 43/4 45/22 56/18 61/3 82/13 84/18 89/24 94/5 106/3 109/1 118/22 119/2 120/5 126/13 127/4 131/24 133/3 133/22 136/8 137/15 154/15 156/6 156/19 157/15 165/22 200/1 203/7 209/19 210/4 210/11 210/25 215/5 215/6 217/9 217/18 235/6 236/5 237/25 238/6
**reason [11]** 7/11 66/2 102/24 103/1 112/19 149/19 172/11 180/8 234/15 236/12 238/1
**reasonable [22]** 15/17 15/18 16/3 21/9 21/23 49/4 77/3 77/24 78/4 93/10 94/20 121/1 121/13 159/4 165/21 206/10 209/1 209/3 211/3 211/10 223/17 234/7
**reasonably [2]** 188/18 222/12
**reasons [3]** 4/3 112/18 233/21
**rebut [1]** 47/21
**rebuttal [11]** 66/1 71/2 120/12 144/5 144/21 144/25 146/9 186/6 186/7 186/19 200/11
**rebuttals [1]** 121/24
**recall [16]** 30/10 44/19 50/3 51/1 70/2 70/20 75/21 81/22 86/1 86/4 95/8 97/19 99/19

**recalled [1]** 103/17
**receive [6]** 5/14 5/23 7/23 7/24 50/11 77/22
**received [7]** 5/25 8/12 73/7 109/19 152/11 153/5 175/7
**recent [1]** 228/1
**recently [4]** 58/5 86/5 97/22 178/21
**recess [10]** 53/19 67/24 68/2 102/5 102/10 104/5 104/6 146/4 200/6 239/15
**reckless [3]** 228/24 229/3 229/14
**recognize [6]** 33/22 129/16 130/20 165/15 165/19 212/3
**recognized [6]** 31/18 118/3 118/5 156/10 177/8 177/9
**record [17]** 54/5 59/19 115/21 133/4 147/7 163/21 170/4 171/9 186/12 189/15 191/11 194/22 195/19 230/16 231/8 235/9 239/21
**recorded [1]** 169/10
**records [10]** 8/5 142/3 151/11 161/7 161/11 161/23 173/23 174/6 204/24 235/6
**recover [3]** 82/2 83/10 83/18
**recovery [2]** 187/22 188/24
**Recross [6]** 2/5 2/9 51/12 51/14 100/18 100/22
**red [2]** 163/17 172/21
**redacting [1]** 235/12
**redirect [9]** 2/5 2/9 2/15 46/18 46/21 98/15 98/18 184/2 184/4
**reduce [2]** 130/23 194/9
**reduced [1]** 43/15
**reduces [1]** 142/4
**reduction [2]** 48/16 48/19
**reference [5]** 23/14 125/17 138/6 176/2 207/6
**referenced [4]** 120/13 135/3 135/6 153/24
**references [2]** 122/10 215/24
**referencing [1]** 131/4
**referred [3]** 6/14 223/21 224/16
**referring [5]** 13/2 61/7 67/11 154/3 160/15
**reflect [9]** 6/13 6/16 6/24 7/18 8/4 43/15 49/12 143/2 143/16
**reflected [1]** 217/12
**reflects [2]** 192/25 227/1
**refuse [1]** 48/3
**regarding [6]** 60/7 60/18 190/15
**register [1]** 28/12
**regression [1]** 57/11
**regular [1]** 206/16
**reimburse [1]** 126/24
**reimburses [1]** 143/9
**reinvesting [1]** 149/19
**reject [1]** 175/22
**rejected [3]** 173/21 174/12 187/17
**rejecting [1]** 173/14
**relate [6]** 9/14 56/16 122/13 177/25 177/25 232/5
**related [7]** 127/20 138/16 140/5 152/5 153/16 158/2 166/19
**relates [2]** 162/15 187/24
**relationship [2]** 57/6 88/10
**relative [4]** 81/16 82/10 192/16 226/16
**relevant [18]** 4/4 4/13 4/13 4/17 50/19 54/13 107/24 108/5 117/18 119/16 151/22 190/21 192/9 212/14 226/10 226/22 229/25 239/8
**reliable [4]** 3/23 4/4 64/18 101/16
**relied [4]** 31/12 42/6 84/18 157/6
**relief [1]** 104/3
**rely [3]** 84/15 113/10 161/7
**relying [1]** 62/13

**R**

remain [2]  53/25 223/4
remains [1]  39/7
remedies [2]  180/1 225/4
remedy [1]  191/6
remember [17]  7/25 28/17 35/1 35/4 69/13
95/12 109/8 110/20 140/4 141/9 174/19
204/1 204/4 206/5 212/13 221/11 221/15
remembered [1]  86/7
remind [4]  88/10 199/17 222/4 227/24
reminded [1]  201/6
remorse [2]  205/7 205/16
remorseful [1]  205/2
remove [1]  215/24
removed [1]  122/3
render [1]  60/22
renegotiated [1]  210/23
rent [3]  20/7 20/18 119/5
rental [2]  19/25 108/15
renting [1]  178/1
reopening [1]  4/5
repair [2]  189/8 224/9
repeat [7]  13/23 14/22 48/11 94/12 141/24
222/9 238/24
rephrase [2]  48/6 155/24
reply [8]  234/22 235/24 236/11 237/1 237/10
237/15 237/21 237/23
report [28]  8/23 27/9 27/13 66/17 67/8 68/6
73/7 74/20 79/13 79/14 79/16 80/13 81/3
92/11 92/17 92/18 92/19 93/2 93/6 93/9
93/17 97/23 129/24 154/10 157/8 168/1
177/4 177/7
reported [4]  47/11 49/15 61/18 61/24
REPORTER [1]  1/21
reporting [1]  177/11
reports [12]  18/18 51/3 61/19 73/11 74/21
93/7 93/8 168/20 168/23 176/16 176/24
177/6
represent [5]  37/2 37/4 73/9 87/3 151/12
representation [1]  195/2
representations [1]  153/19
representative [8]  26/20 38/5 38/12 167/9
231/11 232/15 232/20 232/24
representatives [2]  231/7 232/16
representing [2]  122/7 235/19
represents [2]  11/14 141/18
reputable [2]  75/14 93/21
reputations [1]  155/12
request [5]  80/14 145/9 194/23 201/21 218/3
requested [3]  188/4 190/18 192/4
requests [6]  145/7 145/14 146/13 187/10
187/16 197/21
require [2]  48/10 48/12
required [5]  66/7 222/23 223/7 228/15
231/19
requirements [1]  228/15
requires [1]  190/19
research [10]  56/7 56/12 80/11 82/9 84/23
126/17 126/19 138/23 140/11 143/3
researched [1]  178/20
researching [1]  64/12
reserve [2]  186/18 200/11
reserved [2]  218/13 219/8
resolve [1]  59/20
resonate [1]  56/10
resource [2]  160/6 168/22
resources [3]  127/5 142/11 150/22
respect [7]  10/13 30/20 36/10 55/19 105/19

respects [2]  209/15 234/16
response [2]  63/16 63/17 91/23
responsibility [1]  220/6
responsible [1]  204/2
responsive [1]  236/8
rest [7]  40/7 70/17 93/16 160/18 160/25
186/5 190/8
rested [1]  102/22
resting [1]  102/1
restore [5]  45/7 45/17 114/23 189/10 224/10
rests [1]  101/24
result [6]  90/22 106/11 109/19 213/20
213/22 230/5
resulted [2]  193/21 227/21
results [3]  72/20 121/4 173/9
resume [1]  239/3
retail [29]  81/10 93/18 111/1 113/22 127/16
127/18 127/23 128/1 128/7 130/2 130/22
131/5 138/25 139/8 147/25 148/6 148/13
149/5 149/11 149/15 149/16 149/16 149/22
149/23 150/6 150/8 158/23 159/8 185/5
retaildive.com [1]  93/15
retailer [11]  35/3 39/11 39/12 47/8 122/4
133/1 137/6 138/6 173/4 195/14 204/23
retailers [35]  24/3 24/5 24/17 24/21 27/16
34/23 35/2 35/13 35/14 35/18 39/12 39/17
40/6 40/9 51/6 62/17 72/16 111/15 127/15
127/20 128/4 128/25 131/14 132/18 136/14
138/21 140/8 141/5 141/7 171/7 173/24
174/5 201/21 214/8 215/19
retailers' [3]  40/4 171/4 172/1
retained [1]  228/5
retention [1]  180/21
retire [1]  233/12
return [1]  144/8
returned [1]  100/11
returns [6]  49/12 49/18 49/20 49/22 49/24
108/3
reveal [1]  55/17
revenue [19]  7/7 11/23 12/15 13/13 25/1
47/10 47/11 129/8 132/24 133/25 147/24
147/25 148/23 149/6 160/24 164/7 184/24
185/1 223/14
revenues [34]  14/1 24/25 107/23 108/3
122/17 126/2 126/9 126/10 126/12 127/6
128/25 129/11 131/7 131/15 132/18 136/10
136/24 141/19 141/21 148/5 148/6 160/8
165/6 165/12 167/13 168/17 168/25 169/2
169/5 176/8 179/8 179/23 183/16 223/16
reverse [1]  57/22
review [5]  49/20 49/22 49/23 120/11 157/5
reviewed [1]  38/8
revise [1]  13/5
right [330]
right-hand [5]  32/16 121/4 161/21 163/16
185/13
rightfully [1]  3/20
rights [8]  124/22 124/22 157/22 157/23
158/24 165/19 225/7 228/25
rigorous [1]  173/11
rise [1]  10/20
rises [4]  42/8 42/11 42/13 42/17
role [3]  55/10 55/19 55/22
roles [2]  78/6 80/9
room [5]  1/22 66/18 146/21 146/23 238/24
roses [1]  205/25
rough [1]  144/14
round [1]  191/3

royalties [10]  52/8 52/11 52/14 52/17 52/15
108/13 108/13 108/16 124/13 124/13 124/14
125/1 125/14 149/12 189/4 189/21 211/3
211/10 223/23 223/25
royalty [51]  15/17 15/18 15/24 15/25 16/3
16/18 17/4 17/7 17/19 18/1 18/3 18/11 18/15
19/14 19/15 19/20 19/21 21/2 21/2 21/10
21/23 48/3 48/23 49/5 52/1 52/7 108/14
108/18 108/22 121/1 121/13 124/2 124/7
124/9 124/18 127/25 128/14 149/20 149/21
149/24 150/1 151/3 156/21 157/6 164/11
165/21 211/4 217/13 223/23 223/25 224/2
ruin [1]  236/20
rule [11]  26/19 66/20 68/5 104/11 104/15
104/18 145/10 231/3 231/11 234/18 238/14
Rule 50 [3]  104/11 104/15 104/18
Rule 51 [1]  145/10
rules [1]  186/20
ruling [2]  67/25 69/9
rulings [1]  71/15
run [7]  66/14 72/18 74/3 116/6 117/25
126/21 220/10
rungs [1]  219/5
Runner's [2]  44/1 45/1
running [6]  3/23 124/9 124/13 126/14 139/12
206/15
rush [2]  187/4 233/16
rushing [1]  235/24
Ryan [1]  8/13

**S**

Safari [1]  59/1
said [61]  7/20 13/16 14/3 16/2 27/17 35/9
35/12 36/21 38/20 41/11 42/7 43/6 45/6
46/25 52/3 59/18 60/10 63/6 70/4 71/2 77/25
82/15 87/23 94/25 94/25 109/2 109/12 110/6
111/12 123/1 132/9 134/18 139/15 139/16
141/10 158/6 159/3 167/5 168/12 170/11
174/19 179/19 189/20 190/18 197/12 202/12
206/9 206/19 207/7 212/13 213/3 219/12
219/12 220/18 228/17 231/12 232/19 234/3
235/18 237/4 239/8
sale [30]  22/16 22/17 23/17 24/21 28/15 36/9
46/1 48/3 48/19 48/21 48/25 60/12 88/4 88/5
111/8 111/10 112/2 112/8 113/4 124/11
153/20 165/15 178/21 199/11 204/5 204/18
216/12 216/14 216/16 224/20
sales [176]  4/2 4/9 5/6 5/9 5/10 5/10 6/14
6/16 7/7 7/7 9/4 9/5 9/14 11/9 11/13 20/3
22/20 23/20 23/23 24/1 27/18 27/21 27/23
28/14 29/21 30/4 30/13 30/23 33/3 33/25
34/19 35/18 35/25 37/5 38/24 39/12 39/24
40/4 40/9 40/18 48/13 48/15 48/17 51/3 51/8
55/9 56/20 57/20 57/25 61/19 61/23 63/2
63/5 71/24 78/15 81/7 86/21 86/21 86/22
87/1 87/2 87/9 88/3 88/12 88/14 88/17 89/10
108/7 108/11 108/15 109/25 110/3 111/5
111/9 111/19 111/20 112/9 113/3 113/7
113/21 113/22 114/18 122/8 122/10 123/10
124/10 129/1 130/2 130/13 130/14 130/22
131/6 132/5 132/15 134/3 134/25 135/2
135/2 136/25 137/9 137/10 137/14 137/16
137/23 138/4 138/9 138/11 138/25 139/16
139/24 140/1 140/5 141/4 141/15 142/15
143/17 149/21 149/22 151/9 154/16 155/10
155/24 160/7 160/18 160/23 161/18 162/8
162/18 162/21 164/14 167/4 169/19 172/6
173/4 173/23 174/5 174/7 174/8 174/11
174/20 176/18 177/14 185/21 185/21 189/3

**sales... [31]** 193/15 193/20 194/6 198/16 204/5 204/23 204/24 205/10 206/6 207/9 207/10 207/12 211/19 213/22 214/9 214/10 216/8 216/8 216/9 220/25 223/13 224/17 225/2 225/15 225/18 225/22 225/23 227/16 227/20 230/24 232/7

**same [37]** 6/23 7/25 8/14 18/6 38/17 43/13 49/13 60/8 64/1 64/25 90/13 90/20 91/12 91/18 93/10 99/17 99/21 99/23 114/2 131/5 134/12 135/22 139/23 140/25 142/5 161/1 163/23 165/18 172/11 174/2 187/2 210/10 210/11 211/14 215/5 226/2 228/18

**sample [5]** 58/6 58/7 75/7 77/4 94/20

**San [2]** 1/14 116/7

**sand [2]** 203/6 203/17

**SANDERS [1]** 1/13

**sanity [2]** 18/18 18/20

**sat [1]** 125/7

**satisfies [1]** 223/3

**satisfy [1]** 69/1

**saw [40]** 6/16 8/13 27/12 29/2 42/2 65/22 89/1 94/6 95/11 95/21 99/4 106/23 107/23 107/25 108/4 110/18 111/13 111/22 111/24 112/3 114/15 114/17 131/22 132/11 133/18 134/18 136/7 140/11 152/14 171/21 172/16 174/4 174/23 175/15 184/21 210/18 210/20 213/4 213/21 214/2

**say [76]** 7/1 7/21 8/3 12/15 15/6 18/13 20/2 32/20 42/10 55/16 60/10 66/14 66/24 67/18 70/3 79/12 80/24 83/12 83/15 84/12 84/15 91/9 91/10 96/15 97/21 103/24 108/4 109/1 110/11 110/12 114/1 133/14 134/4 155/20 158/5 159/4 164/15 170/17 174/23 177/9 177/12 179/4 179/14 182/19 187/12 187/16 188/23 189/5 190/4 190/10 191/24 192/1 192/6 192/15 192/21 194/6 196/18 197/18 198/9 204/13 206/7 206/8 209/12 210/6 212/25 215/7 216/1 216/19 218/3 235/2 236/14 236/21 238/3 238/17 238/18 238/23

**saying [17]** 22/9 36/9 43/5 63/8 152/16 153/1 153/25 154/2 154/24 176/20 177/13 190/9 195/15 197/1 199/15 206/6 207/4 216/14

**says [30]** 31/23 32/7 32/11 33/14 33/21 34/12 37/20 43/11 61/6 63/22 66/9 67/14 88/1 92/8 92/13 94/14 126/4 135/10 136/24 153/13 159/7 161/3 195/2 196/7 196/10 200/20 200/21 200/22 200/24 221/9

**scales [2]** 223/2 223/3

**scenario [1]** 208/9

**schedule [4]** 138/20 150/6 234/6 238/7

**schedules [5]** 129/20 140/19 140/21 146/20 239/8

**scheduling [2]** 146/13 186/9

**school [6]** 54/22 116/20 117/12 117/23 201/11 208/11

**schools [4]** 116/21 117/21 158/17 159/10

**SCHWARTZ [2]** 1/12 2/14

**science [2]** 55/1 64/19

**scoot [1]** 72/6

**scope [3]** 29/13 119/2 157/15

**Scott [1]** 113/9

**Scott's [1]** 113/5

**screen [8]** 8/14 16/13 23/7 27/5 61/1 72/7 175/4 202/9

**screenshot [4]** 38/16 38/16 215/4 215/4

**screenshots [3]** 38/8 67/16 67/22

**seams [2]** 143/4 156/7

**search [4]** 57/8 72/20 76/12 198/15

**searched [1]** 148/9

**searches [1]** 76/3

**searching [1]** 64/12

**seated [7]** 10/23 54/4 71/10 105/9 115/19 147/19 200/9

**SEC [2]** 139/13 168/15

**second [24]** 8/3 65/18 67/14 69/18 69/19 69/20 83/25 90/14 99/17 100/12 100/13 103/1 106/9 122/12 128/12 130/25 137/2 146/19 156/24 208/2 227/6 229/20 232/6 232/12

**second-time [1]** 100/12

**secondarily [2]** 150/1 157/13

**secondly [8]** 120/9 121/10 122/6 149/20 152/14 155/1 223/19 225/2

**secret [1]** 116/12

**secretary [1]** 206/14

**section [1]** 7/4

**see [105]** 4/19 9/20 12/19 18/20 28/6 30/23 31/9 32/5 32/15 32/23 33/15 33/20 43/14 43/17 45/1 51/1 55/5 55/6 60/25 61/9 61/15 70/21 72/15 72/19 74/2 77/13 77/16 77/19 82/25 84/5 85/24 101/14 108/24 109/6 112/7 124/2 132/12 133/15 134/15 134/21 134/23 135/5 135/9 135/9 135/14 135/16 136/16 137/18 137/19 138/13 140/22 143/11 144/22 145/10 145/12 146/11 148/24 150/6 151/4 153/2 154/17 158/21 160/22 160/25 161/21 162/2 162/4 163/1 164/19 167/17 170/2 173/10 173/10 173/13 173/24 175/24 176/12 178/13 184/16 185/13 186/9 187/7 199/20 202/7 202/10 204/15 204/16 205/16 206/8 208/3 214/13 217/13 218/24 218/25 219/1 219/9 219/24 221/15 222/3 230/10 238/1 238/18 239/1 239/5 239/9

**seeing [8]** 66/11 84/4 86/1 86/4 87/20 95/8 101/4 171/13

**seeking [8]** 104/1 104/11 104/15 104/19 119/9 223/12 224/15 229/22

**seeks [2]** 217/4 224/19

**seem [1]** 203/9

**seemed [1]** 106/4

**seen [41]** 23/1 25/19 31/16 37/17 44/15 44/18 44/20 44/23 57/16 72/15 85/16 85/19 85/21 85/23 86/2 86/7 87/14 92/7 94/23 95/8 95/15 95/16 100/13 101/5 105/16 110/9 111/16 113/13 125/20 138/18 138/19 140/24 146/22 153/7 162/14 171/9 171/12 201/10 213/23 214/14 217/8

**segregate [1]** 133/2

**segregated [1]** 122/9

**sell [24]** 39/20 106/24 107/4 107/5 107/11 109/7 126/10 151/10 151/10 152/7 152/17 152/25 153/17 164/5 192/23 205/4 210/19 210/21 210/24 214/5 214/8 219/19 226/23

**seller [2]** 134/21 178/11

**sellers [2]** 51/2 149/16

**selling [10]** 110/19 126/16 136/19 154/24 162/6 168/20 176/20 177/6 193/6 227/8

**sells [8]** 41/1 41/2 127/14 128/3 159/7 177/4 179/14 214/5

**semantics [1]** 87/12

**SEMrush [3]** 75/12 75/17 75/21

**send [3]** 203/10 203/22 215/18

**sends [1]** 203/7

**sense [12]** 4/1 20/7 21/1 51/25 106/16

**sent [3]** 3/11 145/4 174/21

**SEO [1]** 57/8

**separate [7]** 122/23 128/24 196/2 196/20 198/24 228/11 229/7

**September [3]** 67/9 135/16 182/3

**September 15 [1]** 67/9

**sequestered [1]** 232/21

**series [1]** 16/2

**serious [4]** 198/9 218/5 219/7 219/8

**seriously [5]** 218/6 218/10 218/11 218/24 219/2

**set [10]** 6/5 50/10 69/17 152/1 156/5 172/4 184/7 188/12 215/16 234/6

**sets [1]** 210/15

**settlement [1]** 3/6

**seven [2]** 156/17 164/22

**several [3]** 109/12 115/3 223/11

**SHANNAN [2]** 1/21 239/25

**shape [2]** 45/2 111/17

**shared [1]** 79/13

**shareholders [3]** 127/22 149/18 177/5

**she [16]** 7/20 7/21 8/3 8/5 8/7 113/5 200/18 200/21 200/23 200/24 215/18 219/3 219/4 219/7 219/12 220/2

**sheet [6]** 8/15 28/14 39/6 111/3 112/4 224/16

**sheets [7]** 29/25 39/5 111/7 193/8 197/17 221/5 227/10

**shifts [1]** 225/20

**shipping [1]** 206/15

**shirt [11]** 34/10 34/19 88/5 88/22 89/8 90/5 90/25 91/10 112/22 155/21 172/21

**shirts [8]** 65/17 86/24 86/24 88/16 88/18 89/24 90/2 90/5

**shock [2]** 60/9 65/1

**shoes [2]** 100/5 100/12

**shopping [3]** 76/12 137/25 184/23

**shore [1]** 200/22

**short [6]** 34/13 102/10 189/3 194/14 236/22 236/25

**shorter [1]** 186/16

**shorthand [1]** 207/6

**shortly [2]** 146/7 233/15

**shorts [2]** 156/5 172/25

**should [47]** 4/4 12/15 28/1 38/21 38/23 70/24 103/24 104/2 106/18 125/4 125/4 133/5 142/23 187/4 188/18 188/24 189/6 189/7 189/25 190/5 190/6 190/9 193/2 193/9 194/12 198/1 210/3 210/14 214/15 217/18 219/15 222/19 223/17 223/25 224/6 224/7 226/8 226/25 227/3 227/11 228/9 228/10 232/3 233/5 233/20 238/22 239/7

**shouldn't [5]** 38/21 38/24 146/21 216/21 220/12

**shout [1]** 203/14

**show [25]** 4/20 6/19 8/24 66/10 73/11 122/11 126/4 127/3 129/2 130/25 131/7 167/25 171/14 174/6 196/10 204/5 204/5 204/8 204/24 207/5 207/6 207/8 212/19 220/15 235/10

**showed [11]** 27/13 37/20 58/5 86/12 132/22 175/15 204/10 207/10 214/18 220/23 221/8

**showing [3]** 31/7 190/23 220/25

**shown [3]** 136/20 174/17 225/23

**shows [18]** 5/5 5/13 8/14 14/9 14/13 14/25 49/11 67/15 73/16 96/8 108/1 130/9 137/21 138/24 143/11 160/5 162/6 207/9

**side [14]** 32/16 120/23 121/4 125/22 134/16

**S**

side... [9] 136/17 136/18 160/21 160/25 161/21 162/2 163/16 186/17 221/7
sidebar [7] 3/5 186/9 186/11 230/9 230/12 230/13 231/24
sides [3] 70/8 210/11 234/25
sign [5] 104/1 171/22 205/21 233/5 233/7
signage [1] 171/12
significant [7] 112/17 126/22 155/9 155/11 176/19 213/5 217/19
significantly [1] 144/17
signs [1] 110/14
similar [17] 33/13 56/25 117/6 131/4 148/4 148/8 149/3 149/3 149/3 161/18 162/1 188/4 193/18 227/18 229/6 229/10 230/7
Similarly [2] 33/7 163/1
Similarweb [10] 67/21 67/22 74/15 74/17 74/18 74/25 75/9 75/17 75/20 75/25
Similarweb's [1] 74/22
simple [12] 7/18 21/21 36/19 62/11 95/23 126/8 156/15 158/22 175/11 177/19 178/2 199/1
simplified [1] 20/24
simplify [1] 106/5
simply [2] 8/7 66/6
since [13] 85/13 86/6 101/2 117/22 118/2 142/25 154/22 155/1 155/3 178/20 181/6 181/9 184/22
sincerely [1] 235/21
single [6] 51/25 63/3 84/15 88/8 112/2 221/4
sir [12] 17/12 67/4 119/19 171/6 172/23 175/11 177/16 179/20 180/13 180/21 181/19 199/4
sit [4] 26/14 71/4 103/16 203/13
site [5] 59/5 74/23 75/1 75/19 92/23
sites [2] 59/2 111/12
sitting [1] 13/3
situation [11] 38/14 125/3 157/11 157/17 158/9 159/3 159/19 160/11 160/17 178/13 220/16
situations [4] 116/10 132/4 148/9 159/21
six [6] 56/9 128/15 153/17 168/24 175/10 225/10
sizable [1] 9/4
size [9] 13/13 58/7 58/7 75/7 77/4 94/20 99/5 192/16 226/16
skill [1] 80/15
SKUs [1] 155/6
skyscraper [3] 203/17 219/15 219/16
slammed [1] 220/10
sleeve [1] 34/13
slide [72] 41/11 60/23 61/10 71/20 73/1 85/12 91/22 92/24 92/25 93/1 93/2 93/5 96/16 119/25 120/14 120/18 120/22 121/20 127/7 128/11 128/15 131/17 132/3 133/7 134/12 135/21 135/22 136/11 139/4 139/6 139/19 140/16 140/18 146/21 148/1 148/2 150/2 150/3 150/16 151/5 152/2 153/6 153/22 154/5 154/11 156/12 159/16 160/9 160/14 160/15 161/24 162/12 165/1 184/12 184/17 185/3 185/11 185/17 210/16 211/13 212/9 212/17 212/21 212/23 213/6 213/12 213/17 214/12 214/17 214/21 216/17 217/21
slides [9] 119/20 119/23 146/22 146/23 146/24 160/3 163/5 214/25 217/25
slightly [1] 236/20
small [5] 23/2 33/20 58/7 202/18 209/15
smaller [2] 97/19 161/5

Smith [2] 171/16 173/15
Smith's [1] 172/8
snapshot [2] 111/12 215/6
snapshots [1] 214/23
so [434]
social [1] 72/20
socks [1] 56/9
software [1] 74/19
sold [32] 3/25 9/5 14/8 25/4 26/1 26/3 27/10 27/17 30/25 35/9 35/15 39/2 48/22 50/8 50/19 52/1 72/10 72/11 73/10 81/6 97/12 97/17 98/1 107/14 110/4 112/14 134/5 138/21 142/12 176/13 204/2 204/25
sole [1] 230/6
solely [2] 188/20 222/15
solid [1] 207/10
some [75] 17/24 19/1 24/7 24/14 24/17 27/24 28/20 31/11 31/16 32/21 36/10 37/11 40/1 43/20 53/20 68/21 69/5 70/8 73/18 75/7 80/15 81/6 82/16 82/17 92/24 93/19 109/2 112/13 116/9 116/25 117/14 118/1 119/20 120/9 122/6 124/6 124/15 126/7 128/18 129/7 129/18 130/11 131/23 133/15 138/19 139/8 143/12 143/12 153/18 157/20 158/2 159/8 160/3 162/14 163/6 166/10 170/13 173/1 174/12 180/4 181/22 183/17 183/18 184/22 192/5 192/21 192/22 196/14 197/17 205/4 226/4 226/5 226/7 226/20 228/21
somebody [7] 63/8 74/13 89/12 103/3 145/23 235/10 235/15
someday [1] 117/25
someone [11] 20/22 100/4 100/10 101/7 101/18 124/5 124/9 203/16 203/21 207/23 209/7
something [25] 9/3 22/6 52/12 52/16 55/15 81/12 97/21 109/20 116/16 118/22 119/4 123/7 123/21 124/10 137/8 171/14 173/12 191/4 199/12 201/7 203/7 203/18 207/22 212/25 213/1
sometimes [4] 89/12 112/19 118/23 125/14
Somewhere [1] 35/11
sonar [2] 204/9 204/14
sonared [1] 204/13
sophisticated [7] 24/14 24/18 29/7 30/3 39/3 39/14 111/1
sophistication [1] 49/1
sorry [25] 4/22 5/18 23/6 25/23 25/25 28/1 32/3 40/15 48/11 50/17 63/14 67/12 69/16 96/2 128/12 134/15 157/2 162/12 172/19 175/4 187/13 187/15 190/13 212/13 238/13
sort [14] 6/10 40/1 78/14 117/11 121/25 126/24 128/5 131/10 131/23 141/13 155/2 158/3 168/21 191/3
sound [4] 70/5 97/20 207/14 207/15
sounded [1] 196/1
sounds [3] 80/16 182/25 183/8
source [23] 67/23 74/16 76/9 92/16 93/13 122/10 125/25 132/7 132/8 132/9 133/25 134/20 136/1 141/3 148/11 152/22 153/1 165/7 174/25 175/2 176/1 176/2 176/4
sourced [1] 92/10
sources [6] 62/5 75/22 76/9 93/20 95/16 96/20
speak [2] 72/1 238/14
speaks [1] 219/20
special [1] 228/14
specific [12] 76/22 77/4 82/22 97/9 99/3 133/3 136/22 159/21 192/22 197/7 234/17

specifically [3] 167/1 167/10 212/4
speculate [1] 209/2
speculated [1] 195/20
speculation [5] 29/12 189/1 189/13 196/21 222/21
speculative [1] 196/8
spell [2] 54/5 115/20
spelled [1] 54/7
spend [6] 115/2 162/8 162/9 166/22 167/10 202/10
spending [1] 160/4
spends [6] 25/18 112/25 142/10 168/20 179/13 179/15
spent [15] 46/6 114/12 115/3 116/10 126/19 162/2 162/17 166/12 166/18 167/6 167/10 175/9 211/18 215/1 235/16
spiked [1] 139/2
splashy [1] 217/3
split [5] 123/11 138/7 150/13 150/22 151/2
spoke [1] 35/1
sponsor [1] 158/13
sponsored [3] 120/9 179/2 179/6
sponsoring [1] 155/13
sponsorships [1] 158/4
sporting [6] 39/18 58/21 72/17 82/24 128/5 139/14
sports [9] 7/4 12/12 85/2 110/21 112/16 128/4 134/22 139/23 143/11
spread [1] 76/8
spreadsheet [3] 6/17 134/1 134/2
Sprint [1] 57/5
square [1] 191/3
squashes [1] 203/6
stack [4] 65/7 65/8 65/8 66/19
stacked [4] 63/11 69/17 69/18 69/18
stand [10] 3/16 10/25 53/23 90/16 105/18 115/15 123/17 182/16 203/5 231/18
standard [15] 47/10 47/18 56/24 62/14 64/3 68/24 70/6 114/2 188/13 198/11 198/13 198/14 198/21 208/3 208/3
standards [1] 64/18
standing [2] 53/25 219/16
standpoint [1] 164/9
stands [1] 197/12
Stanford [1] 117/22
start [15] 11/9 15/24 31/20 41/25 60/20 81/1 86/18 103/11 106/19 154/20 163/16 188/15 196/8 203/17 219/21
started [10] 54/25 71/24 72/3 72/9 85/13 117/3 117/14 143/20 217/10 217/22
starting [5] 73/13 98/22 107/2 129/5 140/25
starts [1] 11/16 61/9 136/16 212/23
state [16] 18/14 54/4 81/7 115/20 157/9 158/10 158/16 158/20 158/23 159/2 188/2 198/5 198/18 198/20 229/12 230/25
stated [1] 191/19
statement [4] 161/13 168/14 188/7 192/14
statements [3] 162/11 168/4 168/13
states [8] 1/1 1/9 27/11 27/19 27/22 58/9 214/7
Statista [1] 138/22
stay [6] 59/19 70/24 71/1 150/20 187/2 232/22
stayed [2] 76/24 93/10
steady [1] 207/11
step [1] 218/1

**S**

**stepped [1]** 3/16
**stick [1]** 89/23
**sticking [1]** 78/10
**still [26]** 29/3 30/5 37/15 61/20 70/1 70/2 108/8 112/5 124/25 191/11 192/8 194/16 204/18 204/20 205/3 206/21 207/19 212/5 219/18 220/5 220/5 220/10 220/21 220/25 222/5 222/9
**stipulating [1]** 195/11
**stipulation [1]** 224/13
**stock [1]** 135/14
**stop [9]** 108/11 201/12 202/5 202/25 205/9 215/19 215/20 233/20 234/18
**stopped [4]** 5/17 8/18 37/10 176/3
**store [20]** 24/12 28/11 32/9 64/13 65/7 128/18 131/23 135/4 137/6 137/7 138/5 169/19 170/11 171/1 171/2 172/10 197/11 197/14 197/17 227/9
**stores [22]** 23/21 39/21 39/21 110/5 110/5 111/2 112/14 127/17 127/17 128/7 137/25 169/21 169/21 169/22 170/14 170/22 171/10 171/13 172/1 172/3 172/16 214/6
**story [2]** 200/15 200/16
**straight [2]** 8/5 221/1
**straightforward [1]** 58/1
**strategic [2]** 68/11 116/8
**strategies [1]** 139/12
**strategy [2]** 55/7 55/7
**Strauss [2]** 56/3 56/4
**Street [1]** 1/22
**stretch [2]** 202/20 219/17
**strike [1]** 83/22
**structure [1]** 149/3
**studied [4]** 152/4 153/11 176/15 176/16
**studies [3]** 74/2 77/1 84/2
**study [11]** 56/12 58/4 74/4 74/12 80/11 113/5 126/18 150/25 154/8 159/20 182/1
**studying [1]** 150/24
**stuff [5]** 57/8 92/24 95/9 202/7 206/18
**style [63]** 7/23 22/20 23/1 23/10 27/4 27/18 27/22 30/19 30/22 30/22 30/25 32/15 33/15 33/20 33/22 34/15 35/16 36/10 37/5 48/13 73/9 128/23 128/25 129/12 129/25 130/24 131/14 132/1 132/6 132/7 132/13 132/19 132/22 133/1 133/2 133/14 133/15 133/16 133/18 133/23 134/19 134/25 135/3 135/10 135/17 135/25 136/8 136/20 136/24 141/13 142/1 142/2 148/10 148/11 154/17 165/7 165/8 175/18 177/17 177/18 185/7 193/25 199/12
**styles [27]** 32/21 34/16 51/8 61/19 61/20 110/4 126/1 128/21 131/6 133/21 134/5 135/18 136/10 141/10 141/11 141/12 148/18 154/13 154/15 154/15 154/17 165/12 174/25 174/25 184/22 185/21 185/22
**submit [1]** 104/3
**submitted [2]** 141/20 151/20
**substantially [1]** 21/3
**subtotal [1]** 126/12
**subtract [3]** 25/24 26/1 26/3
**subtracted [2]** 25/3 225/23
**success [1]** 154/23
**successful [1]** 154/24
**such [4]** 222/20 225/4 229/16 234/15
**suffer [1]** 207/13
**suggest [3]** 6/15 46/5 225/13
**suggested [8]** 8/6 8/7 15/17 49/10 68/6

**suggesting [1]** 62/12
**suggestion [2]** 8/24 235/8
**suggestive [1]** 8/20
**suggests [2]** 95/20 228/25
**suit [1]** 229/23
**Suite [1]** 1/13
**sully [1]** 99/13
**summaries [25]** 122/6 125/18 125/23 128/22 129/4 129/12 129/18 130/10 131/11 131/15 132/17 133/10 138/16 141/2 141/8 142/18 148/10 148/19 150/11 163/21 163/25 169/13 173/7 173/22 174/3
**summarize [8]** 132/17 133/21 140/5 150/4 154/11 164/18 173/12 174/25
**summarized [10]** 126/1 130/13 131/7 136/6 140/21 150/12 165/8 168/21 172/16 173/11
**summarizes [1]** 131/11
**summary [16]** 27/4 30/15 30/18 31/17 130/1 130/9 130/25 132/16 133/7 135/6 136/2 136/10 161/12 165/23 168/3 214/25
**Sunday [2]** 76/13 138/1
**supplement [1]** 188/6
**supplemental [3]** 92/18 93/3 145/17
**supply [4]** 158/15 178/2 178/5 178/12
**support [9]** 9/10 80/13 93/16 111/25 114/19 120/22 137/16 161/23 228/5
**supported [1]** 92/24
**supporting [3]** 131/1 146/20 235/11
**supports [3]** 79/13 130/15 218/15
**supposed [1]** 66/20
**Supreme [1]** 198/22
**sure [30]** 23/2 23/13 31/14 58/4 58/13 58/14 79/9 83/16 86/13 87/16 88/5 89/11 90/3 90/24 91/9 93/1 93/25 94/13 98/9 101/1 197/24 198/8 203/11 207/24 220/3 220/6 220/7 221/12 221/17 234/16
**surprise [1]** 170/10
**surprised [1]** 199/16
**survey [5]** 84/11 84/16 84/19 84/20 101/17
**surveys [3]** 83/25 84/5 84/6
**Susan [1]** 84/13
**sustain [3]** 9/2 68/20 180/16
**sustained [6]** 9/16 48/6 49/17 50/14 180/11 223/15
**Swear [1]** 53/24
**Sweat [2]** 107/6 107/6
**Swoosh [5]** 112/13 112/22 137/18 155/21 169/8
**sworn [2]** 54/3 115/18
**system [3]** 76/6 150/10 165/18

**T**

**T-shirt [5]** 88/5 88/22 89/8 90/5 91/10
**T-shirts [5]** 88/16 88/18 89/24 90/2 90/5
**tab [3]** 67/12 67/12 67/13
**table [2]** 123/8 197/12
**tables [1]** 6/21
**tactics [3]** 57/1 57/7 76/10
**tag [5]** 28/22 29/1 95/12 137/20 195/6
**tags [2]** 95/9 110/13
**take [61]** 15/20 16/17 22/2 28/10 31/20 39/11 40/22 45/1 45/12 52/13 52/14 52/16 52/18 52/20 53/3 53/6 53/19 53/25 55/25 59/19 65/3 67/24 69/14 75/1 78/5 95/7 96/25 102/6 104/21 115/16 122/15 127/3 128/24 137/21 141/23 143/22 143/25 158/7 169/12 183/7 186/10 186/22 186/23 191/11 196/1 199/24 202/25 203/1 206/14 206/17 206/18

**takeaway [1]** 122/17
**taken [10]** 8/5 37/14 63/4 68/2 69/18 104/6 146/4 199/25 200/6 239/15
**takes [9]** 66/8 76/16 96/24 116/10 126/14 127/5 206/4 208/8 218/23
**taking [5]** 76/21 130/22 163/23 191/12 221/16
**talk [38]** 12/12 19/20 22/5 25/7 30/7 39/10 51/17 54/16 54/16 58/12 69/25 72/11 83/25 89/2 109/17 110/16 121/7 121/12 122/3 122/13 122/16 127/12 156/7 156/13 166/10 166/11 169/11 177/21 180/1 180/21 203/19 209/21 211/3 211/12 212/2 218/2 234/3 238/20
**talked [21]** 29/7 30/16 35/2 39/14 61/4 67/21 74/25 80/7 92/19 99/15 108/7 114/10 118/17 128/14 133/9 149/11 150/13 150/17 152/8 165/20 169/22
**talking [25]** 9/3 19/15 27/21 28/2 28/3 36/4 56/24 59/5 72/24 82/19 85/11 96/20 97/18 119/17 123/4 125/1 142/12 147/24 149/10 153/10 174/2 197/6 213/19 216/4 220/3
**talks [1]** 212/12
**tank [1]** 156/5
**target [1]** 82/8
**targeted [2]** 44/7 44/10
**targets [1]** 82/6
**task [1]** 28/8
**taught [1]** 170/12
**tax [6]** 49/12 49/17 49/20 49/22 49/23 108/3
**taxes [1]** 14/12
**teach [1]** 126/1
**teaching [2]** 117/17 117/22
**team [2]** 112/23 203/10
**teams [28]** 3/24 3/25 4/14 4/14 4/15 5/5 5/13 5/17 5/25 6/6 6/7 6/8 6/20 7/4 7/10 7/22 7/24 8/20 8/21 12/12 50/11 108/8 112/16 155/13 158/16 158/20 159/11 219/19
**tech [12]** 8/15 28/14 29/25 39/5 39/6 111/3 111/7 112/4 193/8 197/17 221/5 227/10
**technology [9]** 112/12 117/14 123/10 156/9 169/9 202/20 216/25 217/1 219/17
**tell [41]** 8/14 54/20 103/10 108/14 111/23 113/8 113/9 116/4 116/18 118/19 120/3 120/20 121/23 126/1 132/9 139/6 140/18 145/12 147/13 148/2 150/3 159/17 161/25 192/6 192/8 196/23 200/15 203/1 205/8 205/9 206/25 207/3 207/8 208/10 208/11 208/13 212/8 219/22 220/21 232/2 238/19
**telling [14]** 6/12 89/16 89/19 140/23 140/23 152/12 157/12 204/5 205/3 205/10 208/19 214/14 221/6 226/6
**tells [3]** 56/17 122/11 153/3
**ten [14]** 21/3 27/13 102/10 108/23 117/5 117/6 124/15 142/12 154/14 154/15 154/23 158/24 159/12 235/16
**ten-year [1]** 158/24
**tend [1]** 8/7
**tender [1]** 165/25
**tends [1]** 4/20
**tens [4]** 114/20 114/25 162/24 172/2
**tenth [2]** 52/7 52/9
**term [11]** 28/5 45/19 57/12 106/8 124/15 137/3 167/7 205/5 205/6 214/10 214/19
**terms [12]** 14/3 28/5 35/13 108/23 108/23 109/6 126/7 153/12 212/11 224/1 234/20 235/22

**territorial [1]** 158/4
**territory [1]** 219/11
**test [3]** 190/19 192/9 226/10
**tested [1]** 56/10
**testified [23]** 4/2 4/15 6/7 9/7 12/17 15/23 19/9 22/6 26/17 27/3 50/25 80/16 94/6 94/23 118/5 118/6 120/23 175/9 181/4 181/7 197/11 205/17 217/14
**testify [9]** 8/12 54/1 62/8 68/7 69/15 95/3 113/19 181/10 232/22
**testifying [2]** 26/21 103/11
**testimony [52]** 4/11 7/3 10/11 10/16 12/19 12/22 14/15 14/16 53/21 59/21 60/16 61/9 66/3 66/4 68/25 79/8 83/14 83/17 96/3 99/19 103/17 105/2 105/17 112/11 119/21 144/6 151/15 156/18 167/8 170/5 170/7 171/15 171/18 172/7 172/8 172/14 173/15 182/16 186/4 186/6 186/7 196/15 197/20 208/23 215/13 215/21 218/25 220/18 226/5 227/1 227/23 228/8
**Thanksgiving [2]** 236/19 236/20
**that [1422]**
**that's [286]**
**their [81]** 5/22 24/21 30/4 39/14 39/20 39/21 39/21 40/2 40/8 40/10 40/13 40/16 47/7 62/19 63/25 64/4 66/1 74/13 74/18 74/25 75/12 77/21 80/24 81/4 82/9 95/17 96/10 96/11 96/19 97/10 99/10 101/8 101/12 102/2 109/1 110/19 110/22 112/11 112/23 112/23 114/4 114/7 117/7 127/21 128/6 130/1 130/11 137/14 139/10 139/14 139/15 139/25 140/1 143/9 144/5 149/18 161/13 163/22 166/25 167/2 167/12 168/3 168/14 171/8 173/7 183/13 186/15 196/5 196/7 204/12 204/24 205/10 205/16 206/2 206/15 206/19 218/25 221/8 228/8 238/18 238/22
**them [84]** 6/22 7/5 8/7 20/16 23/3 23/14 23/14 24/7 28/19 28/20 30/20 35/19 39/13 40/7 56/17 66/10 66/15 67/15 71/4 74/4 76/1 80/18 82/18 84/8 96/22 101/15 103/22 125/20 126/24 128/25 130/23 131/7 136/16 143/11 145/12 145/17 145/20 145/22 145/23 145/24 147/2 149/19 153/8 153/14 153/16 155/7 156/6 157/19 157/22 169/20 169/23 179/17 192/7 192/8 200/18 201/16 203/10 203/13 203/14 203/14 203/19 203/24 204/2 204/15 204/20 204/24 205/8 205/20 207/16 208/5 215/1 217/3 217/4 217/5 218/25 219/1 222/9 229/25 234/18 238/18 239/5

**themselves [5]** 28/18 82/2 202/18 202/19 204/22
**then [173]** 5/16 7/2 8/17 13/21 15/6 18/14 21/16 24/25 25/3 32/11 34/13 34/15 39/17 39/20 48/23 51/25 53/19 55/23 57/20 62/4 63/4 63/6 64/13 66/9 66/19 67/21 67/25 69/21 72/10 73/13 75/5 75/13 76/6 81/9 81/15 83/15 88/20 89/18 89/24 90/5 91/11 91/12 92/13 92/24 93/16 95/3 96/5 96/11 98/3 98/8 98/9 110/22 116/9 116/24 117/3 117/5 117/15 118/7 119/13 120/9 121/15 122/14 122/19 122/20 122/20 123/12 124/10 124/14 126/10 126/12 126/20 127/19 129/1 129/1 130/3 131/13 131/14 131/24 132/11 132/17 132/23 133/1 133/15 133/16 133/17 134/18 134/19 135/20 136/17 136/24 138/14 139/1 139/1 140/7 141/2 141/4 141/10 141/21 144/25 146/9 146/10 146/19 148/20 148/23 148/25 149/15 149/23 149/25 150/7 150/9 150/13 150/24 151/1 153/15 153/17 153/18 157/8 157/22 158/10 158/18 160/18 161/20 162/4 162/4 163/5 163/18 163/22 164/3 164/6 164/18 165/8 165/20 165/23 174/25 176/4 176/19 179/18 185/6 185/7 186/19 186/24 187/17 188/5 188/23 189/2 189/5 190/8 191/20 191/25 192/1 192/10 192/15 192/21 197/19 200/4 208/18 216/11 216/17 223/4 225/20 232/5 233/5 233/6 237/7 233/8 233/14 233/19 234/22 235/10 235/24 236/7 236/23 236/25
**theory [3]** 9/11 9/11 196/6
**therapists [2]** 81/24 82/20
**there [185]** 3/4 3/5 5/6 5/6 6/5 6/6 7/2 9/12 11/12 13/2 13/9 13/11 16/7 17/11 17/19 17/21 17/23 17/24 18/5 27/12 27/18 28/10 30/23 31/16 32/15 32/16 33/15 33/20 34/15 34/20 35/11 37/10 37/19 39/6 40/25 47/14 48/16 48/19 58/2 58/4 58/15 58/24 59/3 60/12 60/15 61/15 62/8 62/12 62/14 62/20 65/20 67/5 68/8 68/21 69/23 72/16 72/21 74/10 74/13 74/21 75/11 76/4 76/25 78/8 78/18 80/4 80/10 81/10 82/16 82/18 86/4 87/12 88/22 89/3 92/5 97/2 98/10 99/16 99/16 99/22 100/3 100/12 101/14 101/22 106/10 109/18 118/1 120/5 121/2 121/6 122/6 124/3 124/24 125/18 131/22 131/22 131/23 132/5 132/7 133/15 133/18 134/4 134/16 134/22 134/25 135/6 135/16 135/23 135/25 136/7 136/8 137/25 138/2 138/13 141/1 141/2 141/24 148/8 148/11 148/11 148/18 152/11 152/14 152/20 152/23 153/5 153/13 153/15 154/13 154/23 157/7 157/8 158/1 158/2 158/18 164/12 165/14 169/17 170/13 173/1 174/4 175/8 175/18 175/19 175/19 176/3 176/3 178/22 185/6 185/8 185/9 185/13 185/20 190/16 190/17 190/21 191/17 193/5 193/7 195/4 195/19 196/11 196/23 197/15 198/6 198/17 198/19 199/11 202/6 202/24 203/5 203/14 209/13 212/3 212/10 217/4 219/11 219/10 220/9 220/17 227/6 227/8 228/21 233/21 234/5
**there's [76]** 8/6 57/23 58/4 58/19 58/21 59/20 61/10 61/10 65/25 68/21 69/5 72/16 75/11 76/17 83/8 92/18 96/13 97/2 97/14 101/9 106/2 112/5 118/1 119/13 121/11 124/9 124/10 125/23 127/11 128/1 130/11 135/10 137/19 144/25 147/13 151/10 151/14 152/18 152/25 153/18 156/2 156/4 156/10

**their [246]**
**they'd [2]** 23/13 239/8
**they'll [3]** 124/7 147/2 239/12
**they're [37]** 6/10 10/9 10/18 24/8 86/24 102/12 101/12 111/19 111/20 124/6 125/22 125/22 139/3 139/9 142/14 145/13 145/24 146/24 149/18 158/11 159/2 159/11 159/12 160/23 169/8 203/19 203/22 204/1 205/3 205/20 207/19 208/20 210/11 216/18 220/25 232/22
**they've [11]** 23/2 34/23 63/4 63/4 69/17 69/17 103/17 139/2 153/11 196/6 199/8
**thing [18]** 6/5 35/23 41/19 56/15 64/25 67/3 90/19 91/12 142/24 146/19 147/13 174/2 187/3 203/4 218/5 219/7 221/23 222/4
**things [27]** 3/4 7/7 7/21 17/21 55/13 60/1 62/13 74/20 75/2 75/13 97/2 119/8 156/8 160/5 203/24 205/10 206/14 208/12 209/13 217/1 218/3 219/12 220/21 222/8 234/11 237/7 237/8
**think [136]** 4/3 4/24 5/12 6/12 6/14 9/9 9/12 9/13 10/15 14/7 16/6 21/11 23/12 27/13 28/17 31/11 34/23 35/6 35/8 35/12 38/5 43/11 43/18 52/12 59/11 59/16 68/19 68/21 68/24 69/4 69/8 70/19 70/24 72/6 75/5 80/15 82/8 82/22 83/20 86/7 90/12 91/17 91/19 94/18 95/14 95/20 95/22 96/10 101/9 101/16 102/8 104/2 106/12 109/14 110/7 110/15 111/13 113/15 114/3 114/20 118/21 137/17 142/24 144/17 144/20 146/15 147/11 147/23 152/10 153/11 155/14 158/11 162/16 163/14 165/1 165/4 169/6 173/17 174/1 174/7 177/22 178/3 184/23 185/20 188/9 190/8 190/20 190/24 192/1 192/4 192/14 194/15 196/4 196/12 197/4 197/5 197/9 199/9 199/14 199/16 200/1 202/22 204/19 205/18 205/23 205/24 206/4 207/1 209/23 210/2 213/1 213/13 214/1 215/15 216/1 216/10 216/12 217/9 218/15 220/4 220/15 231/8 231/22 232/19 233/25 234/5 234/6 234/12 236/4 236/5 237/20 237/20 237/22 239/7 239/8
**thinking [4]** 65/1 82/23 195/8 200/15
**third [18]** 24/23 24/25 47/7 61/15 69/20 72/16 87/24 122/13 189/17 191/17 192/24 193/14 223/3 225/4 226/25 227/15 232/8

**these [109]** 5/5 5/9 5/10 6/3 6/7 6/20 6/21 7/25 8/4 8/5 8/22 8/23 9/14 9/14 14/13 16/17 18/25 20/14 23/1 23/12 24/11 25/13 27/4 27/18 27/22 29/17 29/24 29/25 30/13 30/19 30/25 31/24 34/4 35/15 37/1 37/4 38/2 43/7 43/21 58/2 60/8 65/2 72/22 75/8 84/24 87/5 87/17 93/20 106/4 106/5 110/21 111/4 111/10 111/17 112/2 112/18 114/17 119/23 121/4 122/7 129/11 133/3 136/20 138/21 138/23 140/11 142/11 143/6 143/17 151/13 152/17 152/18 153/7 154/14 154/17 154/19 154/25 155/4 155/11 156/8 158/22 160/13 162/7 162/10 162/11 168/24 169/2 170/10 176/22 177/5 179/13 187/21 190/6 193/15 194/5 208/22 209/4 210/24 214/5 214/6 214/18 216/18 223/16 224/7 225/22 226/20 228/4 233/9 233/17

**171/10 177/2
178/12 182/22 189/17 194/14 194/18 194/21
195/16 198/21 199/7 200/22 202/22 204/4
208/12 210/25 213/24 217/17 219/4 224/14
231/5 231/11 233/13 234/7 234/14 234/15
235/10 239/2 239/12**

**third... [1]** 236/2
**third-party [3]** 24/25 47/7 72/16
**this [385]**
**those [207]** 4/3 5/15 8/16 8/17 16/6 16/11
16/12 18/1 18/10 18/17 18/18 22/1 22/23
23/20 23/23 24/1 24/5 24/17 24/21 29/7
29/10 29/25 31/9 31/12 35/21 35/24 37/5
37/9 39/12 39/17 39/24 40/4 40/9 41/1 41/2
41/9 41/14 42/16 42/19 48/2 49/23 51/9
51/18 51/21 55/13 55/17 56/11 57/10 57/16
57/25 58/20 61/18 62/23 63/6 64/22 64/23
66/25 72/12 72/18 77/11 82/1 82/5 82/22
85/2 85/2 87/2 87/9 87/11 88/8 96/7 97/17
107/15 107/17 108/2 108/4 109/2 109/2
109/8 110/19 110/20 111/7 111/7 111/8
111/12 111/18 111/20 112/3 112/9 112/20
113/1 116/12 120/11 120/14 120/24 122/9
122/10 122/10 122/21 125/10 125/19 125/25
126/1 126/11 126/24 126/25 127/2 127/3
127/6 127/18 127/20 127/22 127/23 128/6
128/8 128/20 128/21 128/23 128/24 129/2
129/4 129/12 129/19 130/13 130/22 131/7
131/14 131/24 131/25 131/25 132/3 132/12
132/18 132/19 133/16 135/1 135/2 138/5
138/9 139/24 140/19 140/21 141/5 141/23
142/14 143/12 148/6 148/7 148/11 149/17
150/22 151/20 152/1 152/19 154/11 157/10
157/13 157/18 158/5 158/8 158/12 158/13
158/17 158/20 159/1 159/5 159/7 159/9
159/11 160/6 161/11 163/4 163/24 165/6
165/9 165/24 168/22 169/10 172/3 173/8
173/22 173/24 174/8 175/25 177/6 177/17
182/13 182/17 186/18 189/6 195/11 202/24
204/11 204/25 206/6 214/25 214/25 215/2
215/14 217/1 217/2 217/15 217/16 217/17
220/2 221/10 225/22 239/9
**though [10]** 114/22 135/3 146/21 173/15
192/4 202/4 202/4 205/4 214/16 222/6
**thought [5]** 17/1 27/23 163/11 204/23
215/14
**thousand [2]** 115/3 235/7
**thousands [4]** 84/21 84/21 157/14 219/19
**three [27]** 12/1 14/13 38/4 38/13 57/20
58/11 63/9 65/17 66/7 69/14 91/11 100/19
127/11 131/6 148/11 148/18 153/16 163/2
166/12 180/24 180/25 181/2 181/3 203/16
206/9 210/23 229/24
**three-and-a-half-year [1]** 38/13
**threw [1]** 207/11
**through [71]** 6/20 11/18 11/21 11/22 12/2
13/3 24/3 26/14 31/1 33/25 39/4 39/20 40/1
61/14 65/21 71/22 73/7 74/18 75/1 76/4 76/6
76/13 77/1 85/14 85/22 98/5 101/13 109/8
112/15 122/9 130/12 133/5 136/17 136/18
137/14 138/5 138/12 138/21 139/17 140/20
141/4 148/13 148/16 149/25 150/10 152/5
152/10 153/7 155/5 157/7 158/5 159/8
161/20 163/10 163/11 165/12 165/16 168/4
169/13 174/23 176/3 176/16 187/4 187/15
188/8 206/9 209/7 209/7 213/10 224/20
233/16
**through '14 [1]** 161/20
**through '18 [2]** 85/14 85/22
**throughout [5]** 23/19 38/13 110/10 232/16
234/1
**throw [1]** 203/6
**Throwdown [1]** 16/9

**thus [1]** 114/24
**tide [1]** 200/17
**tie [5]** 115/9 149/6 158/4 158/21 218/17
**tie-in [2]** 158/4 158/21
**tied [8]** 45/22 71/24 114/24 174/9 190/24
210/5 211/15 212/7
**tieing [1]** 165/6
**ties [1]** 56/9
**tights [5]** 112/22 135/10 156/5 172/24
175/15
**Timberlake [3]** 16/19 108/24 217/15
**Timberlake's [1]** 19/2
**time [82]** 3/8 8/25 9/4 19/23 23/12 28/13
30/16 32/25 33/8 34/23 34/24 36/10 44/14
48/22 56/6 56/21 56/22 65/5 65/6 74/4 93/13
98/4 98/11 99/17 99/18 99/22 99/24 100/10
100/12 100/13 102/9 102/20 107/24 108/6
111/11 116/10 116/23 117/4 118/12 125/7
132/22 133/1 138/24 151/25 152/10 162/17
166/13 176/24 178/12 181/24 182/6 182/11
182/14 183/1 183/3 183/13 183/21 186/24
187/3 187/4 199/11 200/3 201/9 202/10
203/15 209/6 209/6 212/14 214/19 214/20
215/1 221/24 222/9 231/21 233/12 234/21
235/8 235/8 235/22 236/15 237/3 237/13
**times [13]** 21/3 23/1 38/9 63/7 66/9 106/25
123/2 125/12 156/16 158/14 198/22 210/18
214/24
**timing [1]** 93/1
**tiny [2]** 23/13 31/24
**tip [1]** 204/9
**tipping [1]** 223/2
**tired [1]** 110/11
**title [2]** 33/1 135/9
**titled [1]** 71/20
**TM [1]** 181/10
**today [33]** 72/24 84/16 85/17 97/10 111/13
114/3 117/19 120/25 142/12 146/6 146/11
151/6 163/20 170/23 172/5 172/17 184/24
187/2 187/11 187/16 201/1 202/6 202/12
202/15 205/24 207/17 210/11 214/23 221/11
226/5 232/19 236/18 238/10
**today's [1]** 124/12
**together [2]** 161/12 239/6
**told [10]** 139/25 171/20 175/2 184/23 205/20
208/23 219/8 220/17 220/23 221/3
**tomorrow [6]** 187/5 233/21 234/4 238/10
238/11 238/12
**tonight [1]** 238/11
**too [22]** 20/22 34/1 34/20 35/19 81/12 93/24
113/10 158/2 167/21 185/9 185/19 195/23
200/16 202/5 202/20 202/21 205/20 211/11
215/1 217/18 220/13 220/22
**took [17]** 17/3 18/10 18/11 19/9 22/25 23/17
57/24 57/25 73/14 97/23 110/3 138/4 169/20
204/9 206/1 210/25 215/22
**tool [1]** 31/19
**top [13]** 4/20 5/7 5/18 11/16 30/10 32/5
34/13 120/14 127/5 154/14 160/10 185/16
196/21
**topic [4]** 3/6 7/10 9/13 10/12
**topics [3]** 117/18 192/25 226/25
**tops [2]** 156/5 172/24
**tosses [1]** 200/24
**tossing [3]** 200/18 200/19 200/21
**total [21]** 21/2 37/4 40/15 40/18 46/16 51/8
72/11 72/13 73/22 77/17 88/12 108/6 111/18
139/16 148/17 150/9 164/7 182/9 182/12

**totaled [1]** 12/7
**totally [3]** 191/13 217/14
**totals [1]** 235/9
**touch [2]** 96/23 96/24
**touched [3]** 95/17 101/10 175/4
**tough [1]** 236/10
**trace [1]** 133/24
**traced [1]** 176/5
**track [8]** 49/5 62/6 74/10 76/2 76/5 165/9
166/25 167/3
**tracked [1]** 78/6
**tracking [3]** 58/4 74/13 76/6
**tracks [1]** 111/15
**trade [12]** 4/23 5/1 14/9 14/13 14/25 16/10
49/11 108/1 116/12 160/4 162/6 212/19
**traded [1]** 179/11
**trademark [184]** 7/13 7/15 11/19 11/24 12/4
17/17 17/20 18/2 21/4 21/7 21/7 21/8 21/14
21/15 21/20 21/21 21/23 22/11 22/14 22/18
22/24 45/23 46/1 46/15 46/25 48/4 48/17
48/21 49/5 51/24 52/7 52/25 53/4 83/11
85/17 104/14 105/14 105/23 105/25 106/1
106/9 106/11 106/14 106/15 106/20 107/12
107/13 107/15 107/19 107/23 108/10 108/12
108/13 108/15 108/19 108/20 109/3 109/3
109/13 109/15 109/20 109/23 113/25 114/8
114/9 114/24 115/10 116/12 119/17 122/21
122/24 123/11 124/6 125/15 136/23 147/14
150/14 151/7 151/11 151/17 151/19 152/7
152/16 152/17 156/21 165/18 166/24 169/15
171/1 171/23 176/13 177/21 178/18 179/2
179/6 179/8 179/21 179/23 180/1 184/7
188/22 189/7 189/9 189/10 189/12 190/7
191/6 192/20 192/23 193/1 193/4 193/8
193/10 193/22 197/16 198/3 198/4 198/15
199/6 199/18 201/4 201/25 203/20 204/18
209/4 209/19 210/5 210/8 210/8 210/9
210/10 210/10 210/13 210/19 210/20 210/22
211/1 211/5 211/7 211/11 211/15 211/17
212/4 213/4 215/9 217/10 217/11 217/13
217/23 218/9 218/11 218/17 219/9 219/22
222/14 222/17 223/21 223/24 224/2 224/8
224/10 224/11 224/12 224/18 224/21 224/22
225/1 225/7 225/9 225/16 225/19 226/15
226/19 226/24 227/2 227/5 227/9 227/12
227/22 228/22 229/4 229/5 231/19 232/7
**trademark's [1]** 112/8
**trademarks [34]** 106/16 106/25 108/25
111/17 120/7 120/13 120/15 123/7 123/13
123/20 123/24 124/5 125/8 125/10 137/12
151/1 151/9 151/10 151/18 151/20 151/23
152/13 152/18 152/24 153/15 155/19 156/22
157/18 164/21 165/15 165/17 178/21 178/25
203/21
**traffic [2]** 74/15 74/19
**trained [2]** 29/24 176/4
**trainers [3]** 8/12 81/24 82/19
**training [2]** 34/13 170/13
**transaction [4]** 36/9 52/4 151/24 157/12
**transactions [5]** 24/8 49/9 119/3 119/15
128/2
**transcript [2]** 234/13 239/20
**transcripts [2]** 138/19 234/15
**transitioned [1]** 14/15
**translate [2]** 56/14 88/25
**transpired [1]** 49/9
**travel [3]** 108/1 160/5 162/6
**treat [3]** 82/1 137/9 206/22

**T**

treble [1] 238/4
trial [31] 1/8 12/24 13/3 13/6 26/14 122/7 128/17 129/3 129/5 129/6 129/20 130/10 131/12 132/17 138/19 150/11 175/25 194/14 199/1 209/14 209/15 209/18 226/21 234/6 234/9 234/10 234/24 236/3 237/25 238/2 238/6
trials [2] 118/5 181/6
tried [5] 106/24 167/13 204/22 207/8 216/7
trouble [2] 187/14 229/22
TROUTMAN [1] 1/13
troutman.com [1] 1/14
true [16] 6/23 18/6 65/18 80/19 83/20 84/12 88/7 90/1 91/4 93/18 94/5 94/17 94/18 98/12 127/5 173/6
trust [1] 221/23
truth [3] 208/20 208/21 221/9
try [8] 64/16 81/4 86/16 119/6 175/4 175/5 176/8 186/23
trying [5] 36/7 95/22 125/3 152/17 175/10
TSE [2] 191/17 196/3
turn [5] 15/16 71/20 152/2 202/17 236/5
turned [2] 90/1 164/5
turns [1] 198/25
TV [2] 57/9 110/14
Twenty [1] 144/15
Twenty-five [1] 144/15
twice [2] 4/11 4/15
twist [1] 206/25
Twitter [1] 72/21
two [44] 3/15 3/24 7/21 49/8 61/3 62/18 63/22 67/13 89/24 90/2 90/4 99/16 99/23 103/7 106/3 120/5 120/13 128/1 151/18 152/8 155/19 157/9 157/10 157/18 158/12 162/21 163/5 163/18 177/2 193/5 201/13 201/19 202/3 202/4 202/22 202/24 203/24 210/11 218/20 223/2 231/7 231/25 236/24 237/11
type [19] 7/25 18/9 47/19 58/16 58/17 69/1 78/13 124/6 131/5 138/23 139/23 159/8 162/16 203/4 205/1 211/16 226/1 226/2 228/14
typed [1] 195/14
types [5] 38/2 65/20 65/20 76/17 122/1
typo [1] 233/13

**U**

U.S [17] 1/22 23/19 58/10 74/6 81/8 138/24 151/17 152/16 157/18 157/23 178/18 179/2 179/6 179/8 179/21 179/23 210/19
UFC [1] 158/3
ultimately [13] 18/24 21/9 46/14 76/20 118/23 119/1 123/4 124/4 133/20 140/4 181/17 181/23 211/10
unable [1] 196/17
unanimous [1] 233/17
unapportioned [1] 123/23
uncertainty [2] 188/23 222/18
under [16] 48/22 95/4 104/15 104/18 104/21 143/6 158/14 186/20 188/2 189/20 198/5 199/12 211/1 228/22 233/7 237/11
underlying [4] 120/21 129/18 161/19 235/11
understand [27] 4/19 10/4 10/9 13/11 27/20 29/24 54/12 55/20 55/22 56/7 60/1 71/12 81/4 86/16 87/15 119/1 127/4 158/11 174/1 180/7 180/13 187/23 194/11 199/10 209/13 209/24 234/17
understanding [18] 12/14 14/14 24/13 26/13 28/23 28/25 34/25 37/23 38/2 61/5 125/9 137/11 137/15 138/18 167/9 169/25 170/2 170/3
understands [1] 205/2
understood [5] 169/8 170/13 170/15 170/20 239/14
underwear [1] 56/9
undoubtedly [1] 236/1
unfairly [2] 106/10 109/18
uniform [1] 112/24
unique [1] 157/20
unit [16] 3/25 8/4 40/9 63/2 63/5 86/21 86/22 87/1 88/3 88/4 88/5 88/17 89/9 90/3 97/14 124/13
UNITED [4] 1/1 1/9 58/9 214/7
units [22] 3/24 5/19 5/21 5/23 6/12 6/13 6/15 6/16 7/24 9/8 60/12 61/18 61/19 62/1 71/24 72/10 72/11 73/9 73/11 96/8 97/12 126/9
universities [2] 18/21 158/12
University [5] 54/23 54/25 55/1 116/21 117/22
unless [3] 203/13 221/25 228/16
unnecessary [1] 199/8
unprofitable [1] 225/9
unreasonable [1] 225/9
unremorseful [1] 206/13
until [5] 124/16 144/11 207/18 232/22 239/12
up [120] 4/15 6/3 8/13 8/20 11/10 15/23 16/3 16/6 16/13 22/22 23/7 23/16 25/21 27/5 27/9 32/1 36/14 39/12 40/12 43/23 44/12 45/25 47/21 50/24 53/23 54/19 59/13 60/13 61/2 61/4 63/12 64/16 66/20 69/17 69/21 73/21 74/24 74/24 75/6 75/23 79/21 83/14 90/16 92/3 93/15 105/23 107/18 110/7 110/7 115/15 116/20 117/11 121/5 121/6 124/9 124/13 124/20 128/25 129/13 131/15 132/12 132/14 132/22 133/6 135/1 135/5 135/12 135/12 135/15 135/16 135/18 136/1 136/3 136/9 136/14 136/17 136/21 136/22 137/21 139/1 139/2 142/13 145/22 161/1 161/10 161/16 172/18 172/19 172/21 174/17 175/20 175/24 184/12 184/17 185/20 185/21 187/11 187/16 188/9 194/15 200/17 200/18 200/20 200/22 200/23 201/23 204/13 204/3 204/18 207/18 208/1 209/3 215/15 220/11 220/17 220/18 220/21 233/3 233/9
update [1] 129/20
updated [6] 43/15 129/17 129/20 129/25 130/4 131/21
updating [1] 129/7
upon [3] 157/6 212/5 224/1
upstream [2] 93/11 93/12
upwards [1] 140/7
URL [2] 32/8 33/10
us [42] 5/17 6/19 17/7 54/20 61/24 62/19 67/2 71/22 75/1 88/14 89/21 93/14 95/24 96/4 110/11 116/18 118/19 120/3 121/23 122/11 124/8 126/1 126/2 140/18 140/23 144/9 147/23 148/2 150/3 151/25 154/1 157/12 159/17 161/25 163/10 177/25 186/24 206/1 208/17 218/10 219/24 219/25
us.dlapiper.com [1] 1/19
usage [1] 194/15
use [93] 11/19 11/23 12/4 19/22 20/3 20/20 20/21 20/22 21/6 21/12 22/10 22/14 22/18 22/23 27/8 28/2 28/5 45/18 46/12 46/13
understanding (continued) 25/21 27/3 69/20 77/21 105/22 105/24 105/25 106/8 106/11 107/22 108/13 108/15 108/18 109/5 109/13 109/19 109/24 111/6 111/24 112/6 113/12 113/13 114/2 114/22 124/8 124/14 124/16 124/22 125/23 132/10 136/23 137/11 138/16 138/23 141/12 149/20 149/24 164/1 167/18 171/5 188/21 188/24 192/13 192/19 193/7 193/10 193/22 194/1 197/16 199/17 210/7 212/3 213/3 213/9 213/15 213/20 213/22 213/25 214/10 214/19 215/8 216/15 221/4 222/16 222/19 223/24 224/16 226/19 227/8 227/11 227/22
used [57] 15/24 18/12 18/14 18/18 25/1 28/7 30/19 31/19 36/10 45/8 50/1 57/3 59/5 64/6 64/11 73/13 77/2 80/7 87/10 105/14 110/22 111/16 111/23 112/7 113/7 114/9 120/15 122/8 125/11 125/12 125/14 132/2 134/4 138/1 140/6 140/10 141/11 141/12 141/16 149/7 160/12 188/9 193/5 193/8 193/21 193/25 194/22 194/24 197/10 199/6 199/7 206/11 213/4 216/13 227/6 227/9 227/21
user [1] 96/25
uses [3] 21/25 169/14 219/18
using [18] 21/9 29/25 37/10 86/23 140/13 167/7 169/8 170/12 171/23 176/13 177/12 194/5 215/9 215/19 224/18 224/20 225/15 225/18
usual [2] 206/21 206/22
utilize [1] 21/7
utilized [1] 21/7
UVA [1] 117/12

**V**

valuable [5] 109/2 109/10 155/14 157/24 217/16
valuation [11] 21/20 55/7 55/9 116/9 117/1 117/21 117/24 118/24 153/3 180/5 181/14
value [123] 10/8 18/24 19/2 19/5 19/8 19/16 21/4 21/8 21/14 21/15 21/21 21/22 21/25 35/24 36/8 41/21 45/7 45/17 45/22 46/8 46/11 46/12 46/14 46/25 80/17 104/14 106/7 106/10 106/13 106/14 106/15 106/17 106/18 106/19 107/1 107/18 107/19 108/12 109/1 109/9 109/14 109/17 109/18 109/22 109/23 109/24 110/2 112/6 112/11 112/17 113/1 113/17 114/8 114/22 114/24 114/25 115/10 116/11 119/11 120/7 122/21 122/22 123/12 123/13 124/18 125/10 150/14 151/1 151/7 151/12 151/23 152/1 153/2 154/1 155/19 177/21 177/22 178/7 189/7 189/10 189/10 189/11 189/16 190/2 190/6 193/1 194/2 194/17 210/5 210/7 210/9 210/9 210/10 210/13 210/15 211/1 211/5 211/11 211/15 211/16 211/20 213/25 216/23 216/24 216/25 216/26 217/1 217/2 217/4 217/6 217/10 217/12 217/17 217/18 217/18 217/22 218/17 224/7 224/10 224/11 224/12 227/2
valued [2] 108/9 178/9
valuing [1] 118/17
vanilla [1] 188/16
variety [1] 76/8
various [11] 74/19 74/19 152/6 155/6 163/14 192/24 192/24 226/24 226/25 232/2 233/21
vastly [1] 174/8
Ventana [2] 191/18 196/3
verdict [25] 105/16 105/19 105/19 106/17 209/20 210/14 214/15 217/24 218/24 219/13 221/14 224/16 230/11 232/9 233/1 233/18 233/19 235/4 238/10 238/15 238/16 238/18

**V**

verdict... **[3]** 238/23 239/2 239/12
verified **[1]** 27/10
verify **[1]** 175/5
versus **[7]** 52/15 59/15 72/11 73/17 122/22
 138/22 182/23
very **[45]** 6/5 6/12 6/15 9/3 18/25 24/17
 55/13 56/24 58/1 59/15 68/23 103/23
 119/15 119/16 143/15 153/4 154/8 154/12
 154/23 157/19 157/20 158/11 158/18 161/5
 175/11 178/12 187/5 194/13 197/5 199/1
 199/14 205/6 216/18 218/9 218/19 233/16
 233/23 233/25 234/1 234/2 235/18 235/19
 235/19 235/21
viable **[1]** 165/18
victim **[1]** 204/20
video **[1]** 208/12
view **[11]** 7/15 9/10 12/4 66/10 72/8 75/16
 78/6 103/24 114/16 149/24 150/18
viewed **[5]** 61/12 62/17 64/10 73/22 100/11
viewers **[1]** 66/9
views **[15]** 10/13 60/14 65/25 66/7 66/25
 69/14 70/20 70/21 71/23 72/12 72/19 73/14
 80/4 89/21 112/10
violation **[1]** 66/21
Virginia **[5]** 116/22 117/11 117/13 118/6
 158/17
virtually **[1]** 155/7
visit **[4]** 85/1 90/25 91/1 91/18
visited **[7]** 77/15 88/21 89/8 90/10 90/20
 91/6 91/6
visitors **[2]** 75/18 77/17
visits **[2]** 57/19 89/12
vital **[1]** 229/12
voice **[2]** 206/3 207/24
Voir **[4]** 2/7 2/13 54/9 115/24
vs **[1]** 1/4

**W**

WAGNER **[20]** 1/12 2/5 2/7 2/8 2/9 3/11 4/6
 6/14 7/1 53/18 71/14 86/12 94/11 190/4
 193/23 197/1 200/11 214/3 215/7 218/22
waistband **[2]** 112/21 155/3
wait **[9]** 5/23 63/20 67/10 67/10 67/10
 170/17 170/17 190/12 237/14
waiting **[1]** 143/25
walk **[4]** 61/14 71/22 163/10 203/16
walked **[2]** 28/11 113/14
walking **[3]** 24/12 171/21 183/23
want **[76]** 4/22 11/8 15/16 20/21 21/21 22/5
 23/2 30/7 32/2 34/22 35/23 36/13 37/1 39/10
 40/24 41/19 50/24 54/16 56/17 58/13 60/1
 60/21 62/7 69/23 70/7 70/9 70/13 74/7 86/16
 89/2 94/12 97/21 102/4 102/18 102/21 103/8
 103/13 109/20 114/1 118/24 127/4 134/15
 137/2 143/16 144/4 147/2 169/4 171/14
 173/9 173/10 184/25 202/12 205/7 205/8
 205/8 206/25 209/18 209/25 212/4 212/25
 215/12 218/3 220/7 220/21 221/1 221/2
 227/23 231/17 233/15 234/9 234/10 236/2
 236/25 238/20 238/21 239/5
wanted **[9]** 23/13 53/3 60/24 107/15 137/13
 139/7 189/19 191/10 196/15
wanton **[1]** 229/3
wants **[9]** 3/12 82/17 82/18 178/11 178/15
 204/12 204/19 206/20 206/21
warranted **[1]** 224/22
warranting **[1]** 4/4

washed **[1]** 200/17
washing **[1]** 195/3
wasn't **[22]** 4/12 12/16 16/7 16/14 17/9
 26/11 28/21 28/22 80/10 110/8 110/12
 110/13 110/13 110/13 148/21 160/8 171/17
 175/20 181/19 213/15 215/20 216/3
watch **[1]** 177/4
watched **[2]** 156/18 177/3
wave **[1]** 207/3
way **[51]** 6/21 9/9 11/18 14/6 20/7 20/24
 38/17 42/24 49/13 50/10 59/11 65/3 66/16
 69/17 72/7 76/14 84/22 90/12 90/19 93/9
 99/22 100/3 100/12 106/12 107/22 111/17
 119/2 136/8 143/2 147/16 151/7 152/16
 165/2 165/3 176/12 177/5 183/21 196/14
 200/22 201/23 202/5 205/10 205/23 206/1
 206/24 207/18 208/17 215/2 215/5 221/20
 237/11
Wayback **[5]** 31/12 31/22 32/4 33/7 34/6
Wayback.org **[1]** 31/17
ways **[5]** 59/4 106/2 192/24 217/8 226/24
we **[307]**
we'd **[5]** 89/10 206/8 206/9 234/23 236/4
we'll **[36]** 57/15 69/25 89/2 89/3 102/11
 103/6 104/3 104/8 104/23 104/25 105/10
 115/12 121/7 121/12 121/13 144/7 144/22
 144/24 144/25 145/22 146/8 146/9 146/10
 146/11 147/19 163/5 186/9 186/23 198/24
 200/4 222/3 230/10 233/18 239/1 239/2
 239/5
we're **[48]** 28/3 34/3 36/4 53/16 53/17 53/19
 56/24 59/18 68/22 69/6 72/24 78/10 85/11
 86/23 96/20 97/18 102/10 103/21 116/15
 117/18 119/17 127/12 140/25 141/14 143/24
 144/9 146/5 147/7 147/14 147/25 163/9
 164/3 186/21 195/14 197/6 202/9 205/25
 206/6 209/20 216/4 216/20 217/23 220/16
 221/9 221/23 230/12 236/14 236/16
we've **[9]** 9/3 23/1 25/19 59/16 118/1 140/24
 149/14 150/17 214/24
wealth **[1]** 229/24
wear **[3]** 112/23 143/6 158/20
web **[1]** 76/14
website **[34]** 27/15 28/13 30/20 30/24 37/15
 38/17 38/20 55/6 59/10 63/7 63/11 65/3 65/7
 65/14 88/21 89/12 90/10 90/20 91/6 93/23
 112/4 128/18 131/23 132/22 136/7 138/6
 138/7 141/3 162/6 174/21 175/5 178/23
 185/23 215/5
websites **[11]** 58/25 74/11 74/20 75/25 91/20
 130/10 137/21 148/19 193/9 197/17 227/10
week **[2]** 50/25 79/11
weeks **[2]** 218/20 237/11
weight **[4]** 4/18 8/19 14/4 113/12
welcome **[4]** 8/24 9/19 235/4 238/11
well **[95]** 3/4 13/11 16/21 17/3 17/17 19/10
 19/11 19/19 20/11 21/5 21/15 24/3 26/14
 27/23 36/3 36/4 37/19 40/21 42/10 43/17
 48/6 52/11 52/12 53/3 56/23 57/14 57/22
 59/6 60/12 60/15 62/9 71/1 71/24 81/1 83/22
 85/11 85/12 86/11 88/9 88/24 92/2 93/10
 94/8 95/18 95/23 107/8 123/17 124/4 125/2
 127/11 128/11 128/17 136/6 139/7 142/23
 145/12 150/19 151/6 154/8 156/4 158/6
 159/4 162/22 166/25 168/19 171/9 171/15
 173/6 173/17 173/21 175/7 176/15 177/2
 178/24 180/16 181/12 183/16 190/3 191/12
 194/4 196/8 198/7 199/22 202/1 208/12

washed... (continued)
well-handled **[1]** 235/18
well-known **[3]** 16/21 17/17 19/11
well-prepared **[1]** 234/1
went **[52]** 4/15 4/16 8/20 8/21 26/5 28/11
 28/12 54/23 67/19 67/21 85/2 85/4 85/5 89/8
 91/9 91/11 93/13 96/10 96/11 96/17 109/8
 111/6 111/7 116/20 116/21 117/12 132/4
 132/5 132/7 133/15 133/17 134/19 135/11
 138/12 138/24 140/20 141/4 148/6 148/10
 152/5 154/16 157/7 158/17 158/18 160/16
 163/21 165/2 165/3 174/23 176/1 176/16
 179/18
were **[139]** 5/6 5/7 6/11 6/17 8/24 12/1 14/1
 16/7 16/12 16/23 18/1 18/5 18/18 20/14
 20/16 27/12 27/18 27/21 27/23 29/24 30/25
 31/12 35/2 35/6 35/14 42/22 47/6 49/14
 51/21 52/21 57/1 57/16 58/8 72/3 73/10
 74/21 75/23 76/23 80/1 80/4 80/8 81/7 81/8
 83/8 84/3 84/10 87/5 87/6 88/14 97/17 99/16
 102/17 105/24 105/24 109/3 114/11 120/3
 122/7 125/21 128/23 129/4 131/6 131/23
 131/23 132/1 132/5 132/6 132/7 132/13
 133/14 133/16 133/18 134/22 134/25 135/2
 135/3 135/18 135/22 135/25 137/12 137/24
 138/5 138/9 139/1 139/8 139/24 140/19
 141/8 141/16 147/23 149/6 149/10 152/9
 152/13 153/9 153/15 154/3 157/7 157/8
 160/15 160/23 164/14 165/15 169/7 169/13
 169/14 170/5 170/7 170/12 171/15 171/23
 172/23 173/7 173/22 174/19 175/18 176/19
 176/20 177/12 182/14 185/20 187/10 187/16
 192/19 195/11 196/1 207/10 207/11 214/23
 214/25 215/8 215/10 217/14 221/19 225/3
 226/18 226/21 228/3 232/17
weren't **[4]** 13/3 75/3 167/6 182/14
what **[271]**
what's **[32]** 14/21 25/3 31/7 38/25 60/20
 62/15 63/16 64/8 65/23 66/5 81/10 101/11
 122/14 126/11 127/10 133/24 136/5 144/14
 148/2 157/16 159/25 160/1 161/17 167/12
 184/20 185/6 197/1 208/4 208/5 221/21
 221/21 221/21
whatever **[15]** 43/2 43/3 64/16 65/18 70/4
 76/13 90/17 112/10 155/17 182/15 201/11
 220/6 220/9 233/8 235/20
whatnot **[2]** 156/7 156/9
whatsoever **[2]** 67/6 172/13
when **[80]** 7/8 8/17 9/25 12/16 13/12 15/5
 19/14 26/3 28/7 29/17 35/1 36/4 46/6 47/24
 52/7 55/16 61/4 80/24 89/12 90/10 103/4
 104/24 105/14 113/6 118/21 119/5 119/11
 122/15 123/4 127/3 127/13 128/17 132/12
 133/15 136/19 141/12 143/5 143/9 144/6
 148/23 148/25 155/5 155/8 156/22 157/13
 157/19 159/3 161/14 162/4 162/15 164/8
 168/20 169/13 171/5 172/2 173/22 174/23
 184/21 191/5 196/24 199/6 201/11 201/13
 202/22 205/17 206/4 208/7 208/16 216/3
 219/14 220/16 220/20 220/24 222/6 229/11
 233/8 236/19 238/16 238/23 238/24
whenever **[1]** 145/21
where **[87]** 9/4 9/21 11/16 23/14 27/14 28/7
 36/9 37/20 47/11 49/14 51/21 55/20 61/10
 61/10 61/22 63/14 64/2 66/18 75/2 76/15
 76/17 81/9 87/3 87/10 92/10 92/20 95/17
 109/7 110/6 111/16 111/22 111/24 112/3
 112/7 113/3 113/13 117/17 117/22 123/17

**W**

**where... [48]** 124/9 125/3 125/23 126/21
126/23 132/1 132/4 141/17 143/12 146/12
147/23 148/9 151/10 151/16 152/19 160/11
162/10 169/10 169/17 174/8 178/13 194/12
194/16 195/9 198/20 199/7 199/7 202/24
205/4 205/23 205/25 213/4 213/21 214/1
214/13 214/19 216/6 216/8 216/9 216/10
217/9 217/22 220/18 221/7 221/7 227/25
229/1 235/5

**whether [58]** 8/10 8/16 13/9 13/18 30/23
38/16 38/23 42/19 48/16 48/20 49/1 52/14
82/13 84/3 88/12 100/3 101/2 101/3 107/19
108/16 109/18 110/2 111/5 112/4 113/6
116/12 174/8 175/24 178/4 187/12 187/16
190/21 191/22 192/25 193/2 193/15 193/17
193/18 213/8 213/9 213/10 213/24 215/4
216/2 217/3 224/23 224/25 225/2 225/10
225/11 227/1 227/2 227/16 227/17 227/18
232/6 235/15 238/2

**which [84]** 8/8 8/11 9/11 10/12 13/12 21/22
27/24 30/18 31/14 50/24 52/22 54/18 54/25
55/12 56/6 59/20 60/16 66/8 67/9 67/14
67/15 67/17 69/3 72/10 73/1 73/2 74/15
75/18 76/1 76/12 77/10 77/20 83/8 84/3
85/15 87/5 87/6 88/14 92/11 92/21 108/10
114/17 115/1 119/8 120/7 126/9 127/19
130/5 133/6 133/22 138/22 139/10 141/7
141/25 142/21 148/1 153/13 157/23 164/5
164/15 165/7 167/11 169/16 169/21 172/5
173/24 174/5 175/1 188/17 193/1 193/12
198/15 205/12 206/24 216/13 217/19 221/8
223/12 224/15 227/12 227/13 227/21 234/24
236/24

**while [8]** 46/24 54/1 103/2 103/12 143/23
147/7 186/22 230/12

**whisk [1]** 218/24

**whisper [2]** 203/14 205/9

**white [1]** 4/21

**who [54]** 9/22 10/3 17/12 24/11 28/10 30/3
42/19 47/4 53/14 57/17 61/12 62/17 64/9
66/15 73/20 73/22 74/13 74/14 75/10 77/7
82/1 82/19 82/23 88/21 88/25 89/7 90/4 90/5
90/9 91/2 91/5 92/2 94/2 94/8 94/15 94/18
102/4 103/1 108/25 110/21 117/25 139/12
140/13 156/20 178/7 185/15 202/18 202/18
204/3 205/19 205/21 205/21 217/4 232/13

**who's [1]** 4/5

**whoever's [1]** 21/8

**whole [14]** 16/2 48/14 99/13 103/7 107/6
107/8 109/22 128/24 196/6 203/20 206/1
208/12 211/23 212/15

**wholesale [33]** 24/3 29/8 35/10 37/6 38/24
39/3 39/15 39/16 110/17 111/1 127/13 128/3
129/8 129/11 130/2 132/5 136/18 141/1
141/19 141/24 142/7 142/17 143/18 143/19
147/24 148/5 149/15 149/22 150/5 150/7
156/16 160/10 184/15

**wholesaler [3]** 128/21 136/19 138/11

**wholesalers [11]** 24/2 34/22 110/17 110/19
113/20 113/22 126/23 126/23 126/25 134/3
143/9

**wholly [1]** 196/7

**whom [1]** 5/9

**whose [1]** 62/5

**why [20]** 9/11 26/22 68/18 77/2 99/6 99/9
100/7 108/17 121/17 122/4 124/25 127/24
149/11 149/11 150/17 176/20 191/4 213/14

**wide [3]** 6/7 6/24 48/10

**wild [1]** 114/16

**will [73]** 10/3 10/11 59/22 68/14 68/16 68/20
69/1 69/8 71/1 71/14 74/18 74/19 82/18
90/16 103/14 109/21 113/18 115/6 118/24
126/24 126/24 127/3 138/1 138/2 144/1
144/8 158/11 186/16 186/17 186/17 186/18
187/17 187/17 187/22 187/23 188/2 188/3
188/5 188/8 188/11 188/13 188/18 188/23
189/15 190/10 190/15 191/15 192/1 198/8
198/9 198/11 198/21 199/1 199/20 200/11
218/13 221/13 222/12 223/1 224/15 226/20
229/25 233/9 233/9 233/14 234/9 234/24
236/1 236/21 236/23 236/24 237/24 238/19

**willful [9]** 203/12 206/16 206/22 207/21
208/15 208/18 219/7 219/9 229/3

**willfully [5]** 180/9 201/3 201/18 201/22
201/24

**willfulness [2]** 198/10 198/14

**William [2]** 16/9 16/17

**Williams [1]** 170/8

**willing [2]** 193/3 227/3

**willingly [1]** 151/16

**wise [1]** 234/5

**wish [1]** 231/8

**withdraw [3]** 86/9 91/24 155/23

**withdrew [1]** 196/5

**withheld [2]** 67/5

**within [4]** 131/5 186/24 193/25 233/17

**without [7]** 7/4 7/10 69/2 79/24 155/20
175/23 219/23

**witness [41]** 3/16 4/5 23/4 31/2 53/11 53/13
53/14 53/23 53/24 54/3 59/21 60/21 68/6
68/15 68/17 70/13 70/18 70/22 101/21
102/15 102/15 103/3 103/5 103/8 104/25
105/2 105/3 105/18 115/11 115/12 115/15
115/18 118/3 144/6 144/19 144/25 146/8
165/25 167/21 186/3 228/21

**witness's [4]** 10/16 68/25 71/13 146/20

**witnesses [12]** 9/6 26/20 101/22 103/7
208/20 215/22 221/6 222/8 231/14 232/18
232/21 232/23

**women [1]** 56/11

**won't [4]** 102/20 145/12 195/24 210/17

**word [7]** 22/9 42/2 114/1 123/1 123/3
126/15 216/13

**words [14]** 29/2 29/3 56/23 85/9 85/24
105/14 105/22 134/24 135/12 195/4 219/15
224/19 225/3 225/11

**work [21]** 55/11 56/14 56/19 57/22 78/16
80/6 85/17 116/25 121/11 129/18 129/19
130/4 130/9 131/1 131/2 140/19 141/25
181/15 181/20 181/21 219/3

**worked [7]** 116/23 156/7 156/9 175/25
180/23 181/1 182/23

**workers [1]** 170/14

**working [5]** 141/2 148/13 148/14 187/20
188/8

**world [14]** 16/9 19/12 21/15 44/1 45/1 49/5
49/9 52/4 52/6 112/14 155/15 176/18 203/20
207/16

**worldwide [1]** 157/22

**worth [9]** 80/17 134/7 146/5 152/13 211/22
211/23 219/3 219/14 219/14

**would [142]** 4/16 4/24 6/17 9/25 10/15 15/17
18/13 18/25 19/4 20/6 21/10 21/13 23/9 29/5
37/18 38/17 42/22 45/16 48/23 52/1 52/6
52/13 52/14 52/16 52/18 52/20 53/3 53/6

**y/10 Page 2 of 3 2/19 63/25**
66/24 67/1 72/7 72/13 72/15 72/15 76/11
76/15 78/5 78/18 81/11 82/16 82/22 83/12
83/22 85/19 85/21 86/7 87/12 87/14 87/21
88/12 88/13 88/17 88/24 90/3 90/7 90/21
91/5 91/12 93/1 95/7 99/12 100/4 101/16
102/4 108/17 117/18 118/8 118/25 125/8
127/24 136/9 137/22 141/22 143/22 145/9
147/8 147/11 149/4 149/21 149/21 149/24
150/13 151/20 153/4 153/14 153/19 156/10
157/25 162/1 163/4 164/22 165/21 169/16
170/10 170/24 171/3 172/3 175/15 175/19
175/21 176/12 176/23 176/25 177/9 177/13
182/21 183/6 183/17 184/23 189/20 190/1
194/23 195/1 196/17 196/18 196/21 198/7
198/13 211/6 211/23 215/5 217/12 219/24
220/15 223/14 223/15 224/1 233/10 234/20
234/22 234/23 235/1 235/10 235/22 236/14

**wouldn't [11]** 19/19 20/6 42/10 82/10
108/20 177/12 182/8 183/11 183/14 185/10
211/8

**write [2]** 219/21 221/13

**writing [1]** 187/19

**written [1]** 28/19

**wrong [4]** 191/13 203/2 207/20 220/11

**wrote [3]** 82/16 154/9 198/18

**www.retaildive.com [1]** 92/13

**X**

**Xavier [1]** 54/25

**Xers [1]** 64/5

**Y**

**yeah [31]** 3/22 16/25 20/2 20/17 43/12 44/15
55/13 56/5 58/1 62/9 63/10 82/11 83/8 83/16
85/12 90/24 91/4 92/11 96/16 97/15 97/16
102/6 134/18 148/4 182/19 189/22 192/1
197/22 231/13 235/2 236/9

**year [28]** 38/13 46/6 49/13 57/6 67/15 78/9
90/21 91/17 93/3 115/2 126/19 132/22
132/23 155/11 155/11 158/24 159/23 160/24
162/22 162/24 163/3 164/15 166/13 182/4
182/7 182/17 219/20 220/19

**year-over-year [1]** 155/11

**years [26]** 8/22 12/1 14/13 38/5 39/6 49/11
83/8 91/11 115/3 116/14 117/5 117/5 117/6
124/15 124/15 142/13 154/23 159/12 163/2
175/9 180/25 181/3 201/19 202/3 202/5
203/16

**yellow [2]** 150/12 164/18

**Yep [2]** 98/2 105/5

**yes [255]**

**yesterday [9]** 9/7 19/9 66/19 83/17 106/23
109/8 120/24 152/14 205/17

**yet [8]** 18/11 45/25 56/8 58/12 145/17 187/6
189/23 190/12

**York [2]** 1/18 118/7

**you [1268]**

**you referenced [1]** 153/24

**you'd [4]** 29/10 32/8 32/20 34/5

**you'll [31]** 55/6 106/1 111/14 123/22 132/12
133/14 135/9 135/14 135/16 136/16 143/10
146/8 148/24 150/6 154/17 160/25 162/2
162/4 163/1 163/6 164/19 187/3 202/7
202/10 206/24 208/3 208/3 211/25 219/9
221/15 233/14

**you're [74]** 9/19 13/2 16/18 17/10 25/24
31/15 31/24 36/5 53/10 55/16 56/15 59/5
61/3 63/8 68/10 70/17 73/21 74/8 76/15

## Y

**you're... [55]**  81/23 84/6 89/16 89/18 95/25 96/24 98/22 98/22 104/1 104/24 105/4 110/11 119/5 119/9 119/14 123/4 125/3 144/20 149/2 152/16 156/4 161/14 162/21 169/23 170/16 180/3 183/24 190/1 191/12 191/22 195/11 196/14 198/25 201/1 201/6 202/24 210/2 210/5 211/4 211/9 215/12 217/6 218/6 218/7 219/10 219/10 220/13 221/11 228/15 230/18 233/8 235/4 238/3 238/9 238/10

**you've [32]**  8/11 12/24 31/16 76/10 89/25 90/21 90/24 94/18 106/2 107/21 110/9 110/16 111/23 113/13 114/2 125/11 180/23 181/1 181/7 183/12 198/4 201/10 201/17 208/9 208/22 210/14 210/17 213/23 214/14 217/8 218/16 218/18

**your [314]**

**yourself [7]**  42/5 84/8 116/5 124/20 182/22 183/9 201/13

**yourselves [1]**  237/12

## Z

**Zappos [5]**  134/15 135/22 135/25 174/20 174/21

**zero [4]**  36/3 134/9 142/25 233/4

**Zoom [5]**  102/15 103/4 103/8 104/25 105/2