# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LONTEX CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>NIKE, INC.,<br><br>Defendant. | Civil Action No.  2:18-cv-05623-MMB<br><br>Hon. Michael M. Baylson |

# PLAINTIFF LONTEX CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS OMNIBUS POST-TRIAL MOTION

# TABLE OF CONTENTS

**Page**

I.   WILLFUL INFRINGER NIKE'S PROFITS SHOULD BE DISGORGED ..................... 1

    A.   Guiding Rules from Banjo Buddies, Marshak, W.E. Bassett and 4 Pillar Dynasty on Profit Disgorgement ........................................................................ 2

    B.   Nike's Willful Infringement Was So Outrageous As to Warrant Punitive Damages ................................................................................................ 4

    C.   Disgorgement Is Necessary To Deter Nike and Other Willful Infringers ............. 7

    D.   The Amount of The Profit Disgorgement ............................................................... 9

II.   TREBLING OF DAMAGES (AND ENHANCEMENT OF PROFIT DISGORGEMENT) ........................................................................................... 13

III.   POST-JUDGMENT INJUNCTIVE RELIEF ................................................... 13

IV.   NEW TRIAL ON AMOUNT OF ACTUAL DAMAGES AND PUNITIVE DAMAGES ........................................................................................................ 14

V.   LONTEX SHOULD BE AWARDED ATTORNEY'S FEES AND COSTS ................. 16

    A.   There Was An Unusual Discrepancy In The Merits of Nike's Positions ........... 17

    B.   Nike Litigated The Case In An Unreasonable Manner ........................................ 18

VI.   LONTEX'S REASONABLE ATTORNEY FEES ........................................... 20

    A.   The Reasonable Rates Applicable Here ............................................................... 20

    B.   The Hours Spent Were Reasonable ...................................................................... 22

    C.   The Johnson Factors Are Neutral Or Favor An Upward Multiplier .................... 23

VII.   LONTEX'S NON-TAXABLE COSTS ......................................................... 25

VIII.   POST-JUDGMENT INTEREST .................................................................. 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*4 Pillar Dynasty LLC v. N.Y. Co.*,
   933 F.3d 202 (2d Cir. 2018) ........................................................................... 1, 3, 4, 7, 10

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
   2016 WL 3522964 (M.D. Pa. June 28, 2016) ....................................................... 25

*Aronowitz v. Health-Chem Corp.*,
   513 F.3d 1229 (11th Cir. 2008) ............................................................................ 14

*Auto. Prod. v. Tilton Eng'g, Inc.*,
   1993 WL 660164 (C.D. Cal. Sept. 16, 1993) ......................................................... 9

*Banjo Buddies, Inc. v. Renosky*,
   399 F.3d 168 (3d Cir. 2005) ........................................................................... 1, 2, 7, 10, 13

*Blum v. Witco Chem. Corp.*,
   829 F.2d 367 (3d Cir.1987) .................................................................................... 24

*Chanel, Inc. v. Gordashevsky*,
   558 F. Supp. 2d 532 (D.N.J. 2008) ........................................................................ 17

*Citizens Fin. Group v. Citizens Nat'l Bank*,
   2003 U.S. Dist. LEXIS 25977 (W.D. Pa. Apr. 23, 2003) ...................................... 13

*Discovery Communications, Inc. v. Animal Planet, Inc.*,
   172 F. Supp. 2d 1282 (C.D. Cal. 2001) ................................................................. 18

*Drone Techs., Inc. v. Parrot S.A.*,
   2015 U.S. Dist. LEXIS 98829 (W.D. Pa. July 21, 2015) ...................................... 21

*Fair Wind Sailing, Inc. v. Dempster*,
   764 F.3d 303 (3d Cir. 2014) ................................................................................... 17

*Fifty-Six Hope Rd. Music v. A.V.E.L.A.*,
   778 F.3d 1059 (9th Cir. 2015) ................................................................................. 1

*Gavrieli Brands LLC v. Soto Massini Corp.*,
   2020 WL 1443215 (D. Del. Mar. 24, 2020) .......................................................... 14

*Gen. Instr. Corp. v. Nu-Tek Elecs. & Mfg.*,
   3 F. Supp. 2d 602 (E.D. Pa. 1998) ........................................................................ 24

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    2012 U.S. Dist. LEXIS 47391 (N.D. Oh. Apr. 4, 2012) ........................................13

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 414 (3d Cir. 1993) ................................................................16

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .........................................................................23

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
    2018 WL 2378406 (D.N.J. May 23, 2018) ...............................................25

*Int'l Star Class Yacht Racing Ass'n v. Hilfiger*,
    80 F.3d 749 (2d Cir. 1996) ................................................................18

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
    426 F.3d 694 (3d Cir. 2005) ..............................................................20

*Lanni v. New Jersey*,
    259 F.3d 146 (3d Cir. 2001) ..............................................................20

*Louis Vuitton Malletier v. Veit*,
    211 F. Supp. 2d 567 (E.D. Pa. 2002) ...................................................17

*Lugus IP, LLC v. Volvo Car Corp.*,
    2015 WL 1399175 (D.N.J. Mar. 26, 2015) .............................................20

*Mala v. Crown Bay Marina*,
    704 F.3d 239 (3d Cir. 2013) .................................................................2

*Marshak v. Treadwell*,
    595 F.3d 478 (3d Cir. 2009) .........................................................1, 2, 3

*Mathis v. Spears*,
    857 F.2d 749 (Fed. Cir. 1988) ............................................................21

*In re Nat'l Football League Players' Concussion Inj. Litig.*,
    2020 WL 7024244 (E.D. Pa. Nov. 30, 2020) .........................................22

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) .....................................................................17, 18

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Ponzini v. Monroe Cty.*,
 789 Fed. App'x 313 (3d Cir. 2019)........................................................15

*Route1 Inc. v. AirWatch LLC*,
 2020 WL 1955436 (D. Del. Apr. 23, 2020)...........................................21

*Rum Creek Coal Sales v. Caperton*,
 31 F.3d 169 (4th Cir. 1994) ..................................................................21

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*,
 781 F.2d 198 (Fed. Cir. 1986).........................................................17, 23

*Sands, Taylor & Wood Co. v. Quaker Oats*,
 1995 U.S. Dist. LEXIS 4797 (N.D. Ill. Apr. 11, 1995) .........................13

*SAS v. Sawabeh Info. Servs. Co.*,
 2015 WL 12763541 (C.D. Cal. June 22, 2015) .....................................25

*In re Schering-Plough Corp.*,
 2013 WL 12174570 (D.N.J. Aug. 28, 2013) ..........................................21

*Securacomm Consulting, Inc. v. Securacom Inc.*,
 224 F.3d 273 (3d Cir. 2013)..................................................................16

*Smith v. Phila. Hous. Auth.*,
 107 F.3d 223 (3d Cir. 1997)..................................................................20

*Souryavong v. Lackawanna Cty.*,
 159 F. Supp. 3d 514 (M.D. Pa. 2016), aff'd, 872 F.3d 122 (3d Cir. 2017) ...........................23

*SRI Int'l, Inc. v. Cisco Sys.*,
 14 F.4th 1323 (Fed. Cir. 2021) .........................................................9, 17

*Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*,
 2010 WL 742654 (E.D. Pa. Mar. 2, 2010)..............................................17

*W. E. Bassett Co. v. Revlon Inc.*,
 435 F.2d 656 (2d Cir. 1970)...........................................1, 3, 7, 8, 10

*Walker v. Verizon Pennsylvania*,
 2017 WL 3675384 (E.D. Pa. Aug. 25, 2017) .........................................23

## TABLE OF AUTHORITIES
### (continued)

Page

**Statutes**

15 U.S.C. § 1117.................................................................................2, 12

15 U.S.C. § 1117(a).......................................................................2, 12, 13, 17

28 U.S.C. § 1961(a)....................................................................................25

Lanham Act.........................................................................................1, 17

**Other Authorities**

Fed. R. Civ. P. 59.....................................................................................15

Fed. R. Civ. P. 59(a)..................................................................................14

Fed. R. Evid. 50(b)......................................................................................1

Fed. R. Evid. 59(e)......................................................................................1

Fed. R. Evid. 403....................................................................................8, 15

Fed. R. Evid. 408.......................................................................................15

Fed. R. Evid. 408(b)................................................................................8, 15

Senate Report No. 93-1400.........................................................................16

## I.      **WILLFUL INFRINGER NIKE'S PROFITS SHOULD BE DISGORGED**

This case is a model for deterrence-based disgorgement.  As the Court observed

throughout the trial, Nike tried to distance itself from its own willful conduct.  First, it failed to

use the systems it had in place to ensure that it did not infringe on the registered trademarks of

others.  Next, it failed to immediately stop using Lontex's trademark when it was put on notice

of its infringement.  And finally, at trial, its corporate representatives incredibly tried to claim

that Cool Compression was not part of the name of some of its products, when its own internal

naming documents proved that Cool Compression was part of the name of its products and was

the name listed on Nike.com and provided to other retailers, such as Dick's, who then sold

millions of infringing products.  Without the equitable remedy of disgorgement, willful infringer

Nike will continue to infringe on others knowing that companies like Lontex will not have the

resources to pursue an infringement case, especially when actual damages may not truly reflect

the harm caused by the willful and outrageous conduct of Nike proven in this case.

Four cases are directly on point and strongly support a deterrence-based profit

disgorgement award to deter Nike and others:  *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d

Cir. 2005); *Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009); *W. E. Bassett Co. v. Revlon Inc.*,

435 F.2d 656 (2d Cir. 1970); and *4 Pillar Dynasty LLC v. N.Y. Co.*, 933 F.3d 202 (2d Cir. 2018).

This issue is appropriate for this Court to decide, not only under FRE Rule 50(b) and

59(e) but because the jury decision is only advisory, and even were it not so, the Lanham Act

expressly gives the Court the power to modify any profit disgorgement to the ends of justice:

First, Nike's Trial Brief on Disgorgement (Dkt. 351 pp. 1-2) shows this equitable issue is for the

Court's final decision; the jury was given disgorgement as common practice to make findings on

a "primarily equitable" issue with the Court taking "that jury verdict into account in deciding

whether to award equitable relief." [10/27 Trial Tr. ("TT") p.185]; *see also Fifty-Six Hope Rd.*

*Music v. A.V.E.L.A.*, 778 F.3d 1059, 1075-76 (9th Cir. 2015) (profit disgorgement under 15 USC § 1117 is for judge, not jury).  <u>Second</u>, the advisory ruling on disgorgement "is not binding" and the Court is "free to reject [such] verdicts."  *Mala v. Crown Bay Marina*, 704 F.3d 239, 249 (3d Cir. 2013).  <u>Third</u>, no matter what profit determination is made initially, the Lanham Act's disgorgement provision expressly provides "if the court shall find the amount of the recovery based on profits [] inadequate…the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

A.   <u>**Guiding Rules from *Banjo Buddies, Marshak, W.E. Bassett and 4 Pillar Dynasty* on Profit Disgorgement**</u>

In *Banjo Buddies*, the Third Circuit held that any one of three rationales is sufficient to award profits: "if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement." *Banjo Buddies*, 399 F.3d. at 178. The Court affirmed disgorgement since infringement "interferes with the consumer's ability to make informed purchasing decisions" and thus "the public has an interest in discouraging this type of behavior," there were "no other adequate remedies" because the plaintiff's damages estimate was rejected "as too speculative" and thus if "profits are not assessed, [plaintiff] will be wholly uncompensated for [defendant's] infringing actions."  *Id.* at 175-176.  Further, "would-be infringers would be insufficiently deterred" absent disgorging the defendant's profits.  *Id.* at 178. "Even if Banjo Buddies receives a windfall in this case[,] it is preferable that Banjo Buddies rather than Renosky receive the benefits of Renonsky's infringement." *Id.*

In *Marshak*, the Third Circuit held it an abuse of discretion to award fees but not disgorge profits.  *Marshak*, 596 F.3d at 495.  As damages is only *one* of the *disjunctive* reasons for disgorgement, a party "did not need to establish actual damages to justify an accounting of profits."  *Id.*  Rejecting each of the defendants' arguments, the court found fees were not enough

deterrence, the risk of "windfall" did not make it inequitable, and the 5-year delay was nothing like the 50+ year delay under which prior case law had refused disgorgement. *Id.* at 495-496.

In *W.E. Bassett*, the Second Circuit found denial of profit disgorgement an abuse of discretion even with no actual damages, "no likelihood of immediate confusion," and where the infringing sales – while made using the trademark – could not have been caused by or apportioned to the use of the mark itself.  435 F.2d at 664.  Deterrence mandated disgorgement, as "an accounting [was] necessary to deter a willful infringer from doing so again." *Id.*

The *W.E. Bassett* court found Revlon's infringement of the mark Cuti by using the mark "Revlon Cuti-Trim" showed "an aura of indifference to plaintiff's rights and a smug willingness to determine unilaterally that the good will plaintiff had sought to foster could safely be treated as a nullity.  These elements amount to a species of bad faith and wrongful intent." *Id.* at 662. Excusing such behavior "would allow any company that is well enough known, to infringe a competing company's mark, especially if the competitor is small, merely by coupling its own name with the competitor's name." *Id.*  Instead, "it is essential to deter companies from willfully infringing a competitor's mark, and the only way the court can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* its profits from its use of the infringing mark." *Id.* (emphasis in original).

And recently, the Second Circuit in *4 Pillar Dynasty* reaffirmed these same basic principles, affirming a full disgorgement relying again on the well-established rule that "an accounting of profits is available, even if a plaintiff cannot show actual injury or consumer confusion." *4 Pillar Dynasty*, 933 F.3d at 212.  Unlike the other disjunctive rationales, the deterrence rationale "included no mention of actual consumer confusion." *Id.*  This universally-recognized rule "makes good sense" as "the deterrence rationale for disgorgement of profits,

however, focuses on the culpability of the willful infringer, and the presence or absence of actual consumer confusion may not always bear a logical connection to an infringer's good or bad faith" and "is very difficult to demonstrate." *Id.* & n.10.

The district court's decision in *4 Pillar Dynasty*, therefore, to disgorge <u>all the defendants' gross profits</u> was a sound act of discretion.  *Id.* at 214-215.  This was so, even though "the evidence of willful conduct was less than overwhelming, where Plaintiffs introduced no evidence of actual consumer confusion, and where Plaintiffs' gross sales actually increased during the years that Defendants marketed infringing products." *Id.*

### B.   <u>Nike's Willful Infringement Was So Outrageous As to Warrant Punitive Damages</u>

What did Nike do?  And what did Nike do about it?  The jury held Nike a willful infringer, so egregious or outrageous that punitive damages were warranted.  *Romag v. Fossil* does not require willfulness, but it was more than present.  Such outrageous willfulness demands deterrence that can be "heard" in the ears of the giant Nike and felt in its pocketbook.  The jury's determinations were supported by substantial and significant evidence of willfulness:

<u>First</u>, Nike Pro management's Summer 2015 refresh involved 35 Cool Compression style names of compression shirts, shorts and tights. [PX 32-33].  Management had a detailed trademark clearing software for which "All Style Names continue to be submitted to Legal via ANAQUA." [PX 647].  But no Cool Compression style name was input.  Rather than own up, Parker Mangum (line manager) made excuses for this instance, but ultimately admitted on cross examination that he was unable to recall *ever* entering a single product name into ANAQUA.  Nick Johnson also admitted that he never entered a name in ANAQUA.  And the most senior Nike official to testify, Kimberly Mack-Ireland, eventually admitted during her cross-examination that consumer-facing Cool Compression product names were used, something

Ryann Heil and Shannon Hall then readily admitted.  Nike was willfully blind in adopting the Cool Compression trademark while breaking policy by failing to use its existing clearance tool.

Second, substantial evidence supported Nike's knowing adoption of Lontex's COOL COMPRESSION stretch technology trademark.  Specifically, White Sox head athletic trainer Brian Ball testified that the Nike Rep spent 2-3 hours for 18 home games a year with the players in the locker room, with access to their clothing.  Nike's MLB Rep, Ryan Heil, corroborated that this was for "competitive intelligence," including handling player garments.  Efraim Nathan testified to virtually ubiquitous use of Cool Compression branded Sweat It Out garments by MLB teams, and to regularly seeing pro athletes sporting its distinctive sun logo during game time and practice.  [PX 44].  The evidence overwhelmingly established that most inside tags displayed "Cool Compression" – right where Nike believed technology names should be displayed.  [PX 29 pp. 29-31].  Trainers like Sean Cunningham of the Florida Marlins and Keith Dugger of the Colorado Rockies testified that the Sweat It Out garments had their player numbers on the Cool Compression inside care label so clubroom staff could tell whose was whose.  Thus, for Nike not to have known about Lontex's Cool Compression is beyond the pale.

Third, Nike conducted itself with callous disregard and its infringement for two years following the April 2016 notice of infringement was undoubtedly willful.  Efraim Nathan also testified that Lontex confirmed with Nike in 2016 that it would stop using Cool Compression, and Nick Johnson and Parker Mangum's video testimony in Lontex's case in chief emphasized that Nike's own in-house legal directed Nike Pro to stop using "Cool Compression" product names.  While Nike's opening statement emphasized that 2016 was a critical date to pay attention to, Nike backed off from such focus when the evidence showed:

> ➢ 3.8 million units were sold at wholesale *after* this notice date, (PX 20A),

➢ Much "Cool Compression" retail use was from 2018 or later, (PX 31, PX 761),

➢ Nike provided hundreds of tech sheets with Cool Compression product names relied on at retail to guide retail-level discussions, acting as "ground zero" to "travel throughout the company and Nike's retailers…and eventually straight to the consumer," (DX 822 p.1),

➢ Yet, as confirmed by Debbie White, Shannon Hall, and many other witnesses, Nike failed (despite multiple requests from Lontex) to advise a single retailer or its own retail staff in that two year period *not* to use "Cool Compression" names,

➢ Nike's Katie Bromert admitted Nike "expected" retailers to comply if asked, but Nick Johnson admitted they would have no way to know to stop if not told, and

➢ Nike's infringing post-notice use of "Cool Compression" product names included 27 of Nike's wholesale catalogs from 2017, (PX 32), and 2017 Team Catalogs selling to football, baseball, basketball, soccer, and lacrosse teams and men's training across the country, (PX 31).

As for actual confusion, this case is a rarity insofar as multiple witnesses testified to it. Lontex customers and pro Head Athletic Trainers Sean Cunningham, Keith Dugger, and Brian Ball all had real-life encounters with the infringing Cool Compression products and mistakenly believed Lontex had made a deal with Nike letting it use Lontex's Cool Compression stretch technology. Evidence of actual confusion is "difficult to find," its "rarity" making "even a few incidents of actual confusion highly probative." [10/27 Trial Tr. p.80 (jury charge on Lapp Factor 6)]. The jury apparently rejected Nike's surveys as poorly conducted and lacking in probative force. In sum, Nike's willful infringement had real marketplace consequences, even if the jury felt unable to articulate a specific, non-speculative dollar amount for lost profits.

As a result, the jury found Nike's infringement was "outrageous conduct" that deserved punishment including punitive damages. [10/28 TT p.229]. Punitive damages in trademark

infringement cases are exceedingly rare, showing the degree of bad faith conduct by Nike before litigation, and making all the more unwarranted its conduct throughout litigation.

### C.   Disgorgement Is Necessary To Deter Nike and Other Willful Infringers

This is a classic case for deterrence-based disgorgement.  Willful infringer Nike conducted itself in such bad faith that its "outrageous conduct" demanded punitive damages. There was actual confusion, but actual confusion or damages are entirely unnecessary.  With actual damage "very difficult to demonstrate," (*4 Pillar Dynasty*, 933 F.3d at 212), and the tendency to find them "too speculative" in trademark cases, (*Banjo Buddies*, 399 F.3d. at 175-176), deterrence and compensation make disgorgement a critical remedy.[1]

Willful infringer Nike and others considering the cost of infringement need to be deterred.  If a willful infringer who chose to trod its path of infringement for two more years after notice, implicating as many as 3.8 million units of post-notice sales (over half of all units sold), in disregard of the April 2016 demand to cease, its own trademark policies, and its own in-house counsel's instruction to cease use, escapes with a mere half million dollars in damages, any large corporation considering the cost of infringement will simply infringe smaller companies, and decline to take sufficient steps to avoid or stop infringement.  [PX 20A].

The cost of avoiding infringement in the first place is far more than the minimal slap on the wrist it believes it will face, and the larger infringer is emboldened to "determine unilaterally that the good will plaintiff had sought to foster could safely be treated as a nullity."  *W.E. Bassett*, 435 F.2d at 659.   Absent profit disgorgement, nothing has been done to "serve the Congressional purpose of making infringement unprofitable." *Banjo Buddies*, 399 F.3d at 178. Like Revlon in *W.E. Bassett*, 435 F.2d at 659, excusing such behavior "if accepted, would allow any company that is well enough known, to infringe a competing company's mark, especially if

---

[1] Unlike in *4 Pillar Dynasty*, Sweat It Out garment sales with Cool Compression decreased.  [PX 3012 p.4].

the competitor is small, merely by coupling its own name with the competitor's name." *Id.*

And it goes beyond what Nike *did* in infringing, and into what Nike *did about it* right up through verdict.  This Court not only knows that Nike is a willful and outrageous infringer but also an infringer whose counsel advised Efraim Nathan in October 2016 that Nike would not settle on financial terms and instead threatened that Nike would "kill you" and "kill your business" – necessitating a two-year search for counsel able to take on the behemoth.  [10/27 TT 97:12-22].[2]  Willful infringers should be deterred from using size to threaten smaller IP owners into abandoning lawful claims or face punitive litigation strategies designed to destroy them.

Lontex's tax returns produced early on showed its small company size and financially weak position, easy to exploit through aggressive litigation tactics.  And the Court observed that Nike did not litigate in normal fashion, but strategically litigated every single discovery and legal issue.  The docket bears this out.  Two motions to compel were required to get even a single corporate deponent knowledgeable on its relevant retail sales. [3/13/2020 Hrg. Tr. 56:13-20; Dkt. 175].  Nike ignored its own Supreme Court *Already v. Nike* authority to oppose Lontex's Motion to Amend which sought to *narrow* the case voluntarily.  [Dkt. 181].  Nike filed a charged motion for sanctions concerning the trainer declarations but never once sought to simply take their depositions.  [Dkt. 195 p.10].  This just scratches the surface.  *See also* pp. 18-19 below.

Nike's trial strategy involved many late-night motions and letter briefs.  Nike casually abandoned mid-trial the USPTO fraud claim that consumed massive amounts of discovery.  And Nike took incredible positions throughout the trial to distance itself from its own misconduct, including Katie Bromert's unexplainable trial testimony that a host of retailers were unauthorized

---

[2] Whatever the FRE 403 risk to the jury, there is no such risk to the Court appropriately considering this evidence.  And since Nike's representative clearly stated the matter would not settle, resulting in Mr. Nathan's response that litigation was thus inevitable *after which point* the threat was made, the Court should find this clearly ended the negotiations and the subsequent statement was not "during compromise negotiations" so as to be within FRE 408(b). [10/27 TT 97:12-22].

and must have bought counterfeit or grey goods, only then to admit on cross examination that she had no idea Nike produced its sales report in discovery – leading to David Drews on rebuttal tracing how most of Ms. Bromert's list *had in fact bought product directly from Nike.* [10/22 TT 140:2-10; PX 31A]. And Nike's fair use defense for non-trademark use was flatly inconsistent with its own trademark usage of similar terms like Dri-Fit, Hypercool, and Hyperwarm – let alone with its own Dr. Scott's survey finding 24 of 420 "mentioned cooling being a tribute of the cool compression products." [10/25 TT 116:22-117:20]; *cf. SRI Int'l, Inc. v. Cisco Sys.*, 14 F.4th 1323, 1332 (Fed. Cir. 2021) (damages enhanced in part because litigation misconduct, size of defendant, demonstrated disdain for plaintiff, and losing on key issues); *Auto. Prod. v. Tilton Eng'g, Inc.*, 1993 WL 660164, at *9 (C.D. Cal. Sept. 16, 1993) (enhancing damages "as a deterrent…especially appropriate in situations like this when a Goliath like AP (with $380 million in assets) tries to crush, through willful infringement and questionable litigation tactics, a David like Tilton (with $1.7 million in assets)"). Disgorgement deters and finally flips the table.

Willful infringer Nike's intent in infringing, the adequacy of other remedies, the lack of unreasonable delay, and the public interest in making the misconduct unprofitable – four key factors for profit disgorgement – all warrant disgorging profits to deter Nike and other would-be infringers. Anything less will embolden Nike and keep infringement as the most profitable path.

### D.     The Amount of The Profit Disgorgement

As Lontex stated in closing argument, not all sales took place with buyers who saw or heard the Cool Compression product name, so the proper disgorgement amount is between (1) the $95 million in non-duplicative gross profit for wholesale and retail sales of *all* Cool Compression product numbers during the infringement period (2015-2018) and (2) Nike's $7.1 million gross profit figure proposed by its expert. [10/27 Trial Tr. 22:1-10].

Nike's Paul Meyer computed $7.1 million in gross profits from sales to buyers that may

have seen the Cool Compression product names.  [DX 1237 pp. 11-13].  Deductions beyond gross profits (overhead and Nike's brand contribution) are inappropriate.  [*Id.* pp. 13-20].  As the Second Circuit confirmed in *Bassett*, all gross profits are necessarily disgorged even if "not because of" the mark but because defendant "made [the product] and [plaintiff] did not."  *W.E. Bassett*, 435 F.2d at 664.  Otherwise, large willful infringers will always point to their contributions and claim zero value from use – creating a sort of sense of impunity that Congress intended to deter.  Winnowing beyond gross profits is not logical given profit disgorgement may occur without "actual injury or consumer confusion," *4 Pillar Dynasty*, 933 F.3d at 212, and without any need to show unjust enrichment, *Banjo Buddies*, 399 F.3d. at 178.

Mr. Meyer also severely underestimated sales made to buyers who saw the infringing Cool Compression product names.  Mr. Meyer discounted substantial evidence that this Court should credit as to the extent of Nike and its retailer's uses of Cool Compression product names:

> ➤  $13.66 million by improper exclusion of Nike Factory Store Sales: Nike Factory Store workers Kenisha Likely and Dominique Williams (from different parts of the country) testified that the "Cool Compression" product names were used in their stores, spanning signage and customer sales dialogues.  Yet Mr. Meyer **excluded $13,655,813** in profits from Nike Factory Store sales – the largest part of Nike's $18 million in direct-sale profits.  [PX 3612 p.14].

> ➤  $6.84 million by improperly excluding retail profits for contributory infringement: Mr. Meyer excluded non-Nike retail sales as "covered by royalty."  [DX1237 pp. 5-6].  But Nike is a contributory infringer, and Lontex never elected to receive the *lesser* of royalties or profit disgorgement.  Non-Nike retail gross profits (sales minus cost of goods) were 36.5%.  [PX3012 p.16].  Even under Mr. Meyer's calculation of $11.9 million in wholesale revenues based on e-commerce, he improperly **excluded $6.84 million** in retail profits ($11.9m/63.5% - $11.9m).

➤ $2.47 million by ignoring any wholesale or retail sales for any of the 1,500 retailers who were not expressly included on the PX31 summary: Mr. Drews testified that the retailers using Cool Compression product names in PX31 / PX 31A accounted for around 75% of the total sales for the relevant Cool Compression product numbers – including many examples still on the internet to this day. [10/28 TT 51:8-10]. The most logical conclusion is that retailers used Cool Compression product names unless shown otherwise, which Nike's trial exhibits failed to do. This included $18.65 million more in wholesale sales, which using Mr. Meyer's same 25% e-commerce assumption and 53% gross profit calculation means he failed to include $2.47 million in e-commerce sales based on this faulty assumption. But instead, Mr. Meyer excluded all remaining retailers, and even peeled out retailers where the evidence of online usage was confirmed by supporting emails, even Nike's own internal emails purporting to identify retailers who used Cool Compression product names. [10/28 TT 135:21-136:10, 174:19-23 and PX 770 (PGA, 6pm, Scheels, Road Runner, Runners Plus, Soccer Plus, Tennis Plaza, etc.)]. And he even failed to include additional retailers from the PX30 By-Style Summary. [*Contrast* DX1237 p. 7 *with* PX30 (e.g. DC, Soccer & Rugby Imports, Sears, Walmart]. There was no meaningful evidence to show the remaining retailers somehow did *not* use Cool Compression product names – that would be unreasonable speculation on this backdrop.

➤ Remainder excluded by improper exclusion of all brick and mortar in-store sales except for Dick's: The Court heard and saw ample testimony and documentation of in-store sales usage by third-party retailers for whom Nike is contributorily liable. Nike showed no meaningful evidence of third-party retailers using product names *other* than Cool Compression, despite product pages and advertisements showing that at least 75% of retailers used Cool Compression product names. The tech sheets and catalogs used to educate these retailers

consistently used such names. [PX 32-33]. Testimony by Efraim Nathan, Keith Dugger and Sean Cunningham spanned Cool Compression product name in-store usage by many retailers in states across the country (Dick's, Wal-Mart, REI, Foot Locker, Modell's, Macy's; Colorado, Pennsylvania, Florida). The reasonable conclusion is that all retailers used the infringing names (which Nike educated them on) ubiquitously to achieve the sales of the infringing product numbers. Nike failed its burden to show how to parse these sales further.

Against this backdrop, through Mr. Meyer's testimony, Nike misapprehended Lontex's required showing – Lontex's statutory burden and the one it met was to show Nike's "gross sales only," and it has at all times been *Nike's* burden to show all elements deducted. 15 U.S.C. § 1117. Despite the ubiquitous evidence of usage of Cool Compression product names for the infringing product numbers, Nike submitted virtually no evidence at trial (other than from its own Nike.com) of times where retailers used names *other* than Cool Compression in reference to the Cool Compression product numbers. This was a failing of Nike's burden, not Lontex.

At a minimum, $7.1 million in gross profit should be disgorged. Correcting Mr. Meyer's first three improper exclusions adds $22.53 million. The Court could instead award 75% of the $95 million ($71.2 million) based on the percent of sales by retailers with direct trial evidence of Cool Compression product name usage. And, given Nike's outrageous conduct proven in this case, the Court would be well within its discretion to award the full $95 million in gross profit.

In any event, the Court need not reach exact percentages, since a "reasonable approximation" is all that is required, (10/28 TT 223:17), and for deterrence purposes it remains free to adjust upward the profit disgorgement amount "for such sum as the court shall find to be just." 15 U.S.C. §1117(a). The unremorseful Nike spends over $3 billion per year in its own demand creation and has U.S. sales that dwarf that number. [PX 3020]. Thus, Lontex requests

that the Court select an amount of disgorgement that will truly deter Nike and other companies

from willfully infringing on competitors' trademarks, between $7.1 million and $95 million.

## II.     TREBLING OF DAMAGES (AND ENHANCEMENT OF PROFIT DISGORGEMENT)

Under 15 U.S.C. § 1117(a), the Court has the power to treble damages and to enhance

(whether treble or otherwise) profit disgorgement.  Such enhancement usually results from

willfulness, and the *Banjo Buddies* factors also are considered.  *Groeneveld Transp. Efficiency,*

*Inc. v. Lubecore Int'l, Inc.*, 2012 U.S. Dist. LEXIS 47391, *2-4 (N.D. Oh. Apr. 4, 2012)

(factors); *Citizens Fin. Group v. Citizens Nat'l Bank*, 2003 U.S. Dist. LEXIS 25977, *53 (W.D.

Pa. Apr. 23, 2003) (willfulness provides the "usual basis" to enhance).

Enhancement is particularly required for royalty awards that are only a small percent of

infringing sales: "Would a profit-seeking businessperson not unwilling to violate federal law pay

10 cents to make one dollar?  If the answer is, 'Yes,' then the willful trademark infringement has

not been made sufficiently unprofitable," "enhancement is not a penalty," and "it might have

been an abuse of discretion [] not to have awarded…treble damages." *Sands, Taylor & Wood*

*Co. v. Quaker Oats*, 1995 U.S. Dist. LEXIS 4797, *7 (N.D. Ill. Apr. 11, 1995).

Thus, the damages and profit disgorgement should be trebled.

## III.    POST-JUDGMENT INJUNCTIVE RELIEF

Nike only notified a handful of retailers to stop using the Cool Compression product

names, and has been held a contributory infringer.  Google search results from even 2020 show

Cool Compression product names still flood the marketplace.  Nike continued infringing for two

years through wholesale catalogs and team catalogs on Nike.com, Nick Johnson and others did

not notify new employees not to use Cool Compression product names, and nothing has changed

about ANAQUA to indicate that COOL and COMPRESSION will not be used adjacent as Cool

Compression product names in the future.  And no corrective advertising was awarded so as to allow Lontex to use such funds to protect the marketplace from Nike's confusion.

Thus, final injunctive relief is important, as the ongoing marketplace use threatens continued infringement, and there is a reasonable probability the infringement will resume at some point in the future, legal remedies are insufficient to protect the smaller Lontex against the large Nike with its massive distribution channels, and the extreme effort Lontex endured to obtain judgment for past infringement warrants an injunction for which Nike's further direct or contributory infringement of the COOL COMPRESSION trademark should not require a full new lawsuit from start to finish and may instead be remedied by way of contempt. *Gavrieli Brands LLC v. Soto Massini Corp.*, 2020 WL 1443215, at *9 (D. Del. Mar. 24, 2020) (granting post-judgment motion for trademark permanent injunction).

Lontex requests that Nike be enjoined as follows:  (1) Nike must advise all retailers that purchased the Cool Compression products (PX32-33) to cease use in verbal or written form of any use of the phrase "Cool Compression" with Nike products, and (2) Nike is permanently enjoined from directly or indirectly using in commerce the terms "COOL COMPRESSION" for any apparel products, (a) including verbally and in-writing, (b) whether as a product or style name, description, or otherwise, (c) whether at wholesale or retail, (d) in any medium designed for viewing by non-Nike persons such as catalogs, advertisements, website, and social media, and (e) in any medium (e.g. SKU and tech sheets) providing information for use by retailers.

IV.  <u>**NEW TRIAL ON AMOUNT OF ACTUAL DAMAGES AND PUNITIVE DAMAGES**</u>

If the Court believes that equitable disgorgement is not appropriate, Lontex moves in the alternative for a new trial under FRCP 59(a) to have the jury determine the "amount of damages" for actual damages and punitive damages. *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229,

1242 (11th Cir. 2008) (proper remedy under FRCP 59 for trial error going to damages is limited

new trial "as to the amount of damages").  The motion is based on the prejudicial exclusion of

(1) the NFL Team Overlap v. No Overlap Exhibit (PX19) as critical to a proper actual damages

award, and (2) the exclusion of Nike's 2016 threat to "kill" and "destroy" Lontex if it dared to

sue Nike as critical to fixing the proper amount of punitive damages against Nike for willful

infringement which nevertheless continued for two more years.  *Ponzini v. Monroe Cty.*, 789

Fed. App'x 313, 315 (3d Cir. 2019) (improper exclusion of evidence is grounds for new trial).

PX19 NFL Team Overlap:  Lontex introduced the NFL overlap v. no overlap concept in

its opening statement, and Mr. Nathan testified in both phases that some teams increased sales

dramatically while others decreased dramatically.  But Nike's request and this Court's decision

to exclude PX19 and David Drews' related testimony deprived the jury of any explanation other

than to incorrectly conclude that Lontex struggled to make sales for no reason relating to Nike.

That was an inaccurate impression, created because the most critical evidence showing a direct

inverse relationship was excluded.  As noted above, proving actual damages in a trademark case

already is incredibly difficult, and exclusion of this evidence was highly material to the jury's

determination that it could not identify an amount of actual damages to award.

Threat to Kill and Destroy:  As noted above, Mr. Nathan testified at trial (with the jury in

recess) that it was only *after* Nike's attorney unequivocally stated no settlement would be

reached, and Mr. Nathan said he therefore had no choice but to sue, that Nike's attorney made

the threat to "kill" Lontex and make Mr. Nathan never work a day in his life if it did sue.  The

Court excluded the evidence either under FRE 408 or FRE 403.  This vindictive threat came after

settlement talks stopped not "during compromise negotiations." FRE 408(b).  It was critical

context for punitive damages which outweighed any risk of prejudice.  There are degrees of

outrageous conduct, and bullying on top of willfulness begets more than the smaller quantum of punitive damages awarded.  The exclusion was prejudicial.

A new trial is warranted on the sole issues of the amount of actual and punitive damages.

## V.      LONTEX SHOULD BE AWARDED ATTORNEY'S FEES AND COSTS

The jury's verdict in Lontex's favor makes it the prevailing party.  *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 418 n.5 (3d Cir. 1993).  Fee awards to prevailing parties are a linchpin to securing robust trademark laws that protect the rights of consumers and ordinary businesses against large corporate infringers such as Nike.  *See* Senate Report No. 93-1400 ("Trademark and unfair competition cases … present a particularly compelling need for attorney fees.").  Indeed, actual damages are typically modest relative to the reasonable fees necessary to litigate such complex trademark cases.  Further, trademarks serve an important public interest in protecting the consuming public, whereas "[e]ffective enforcement of trademark rights is left to the trademark owners and they should, in the interest of preventing purchaser confusion, be encouraged to enforce trademark rights." *Id*.

The jury's finding of willful infringement and Nike's litigation positions and conduct strongly support an award of Lontex's attorney's fees and non-taxable costs.  An award is also consistent with the jury's inquiry – "Can damages be for legal fees and not a dollar amount?" – indicating that the jury believed Lontex should be awarded fees.  [*See* 10/29 TT 2:6–11].

Willfulness has historically been serious culpable conduct that supports awarding fees. *See Securacomm Consulting, Inc. v. Securacom Inc*., 224 F.3d 273, 280 (3d Cir. 2013) ("culpable conduct may be broader than willful infringement"); Senate Report No. 93-1400 ("the remedy should be available in exceptional cases, i.e., in infringement cases where the acts of infringement can be characterized as 'malicious,' 'fraudulent, ' 'deliberate,' or 'willful.'").  More recently, however, the Supreme Court relaxed the standard for awarding attorney's fees to

encompass conduct broader than willfulness.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) (applying *Octane Fitness* to trademark claims).

The Lanham Act expressly permits a fee award to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a); *see also Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*, 2010 WL 742654, at *4 (E.D. Pa. Mar. 2, 2010) (awarding 50% attorney's fees).  "[E]xceptional cases include those where the Court has made a finding of willfulness."  *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 539 (D.N.J. 2008); *see also Louis Vuitton Malletier v. Veit*, 211 F. Supp. 2d 567 (E.D. Pa. 2002).  Also, "[a] district court may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'"  *Fair Wind Sailing*, 764 F.3d at 315.  Courts regularly award fees in cases even absent willful infringement.  *See, e.g., SRI Int'l, Inc. v. Cisco Sys.*, 14 F.4th 1323, 1332 (Fed. Cir. 2021) (finding "no abuse of discretion" where "in the absence of a willfulness finding," the district court "again found this case to be 'exceptional,' justifying a full award of attorney fees").

Lontex's discussion as to the basis of profit disgorgement – what Nike *did* and what Nike *did about it* when caught willfully infringing – similarly shows this is an "exceptional case." *Supra* pp. 4-6.  A number of additional points are addressed below.

### A.      There Was An Unusual Discrepancy In The Merits of Nike's Positions

The jury found willful infringement and awarded punitive damages for the reasons discussed previously, showing this was not a close case of infringement.  *Supra* pp. 4-6; *see also* Dkt. 353; Dkt. 356 at 2 ("punitive damages require . . . that NIKE's conduct was so egregious or outrageous").  It is quite the burden to "explain why this is not an exceptional case in the face of [an] express finding of willful infringement."  *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*,

781 F.2d 198, 201 (Fed. Cir. 1986).  Nike was both willfully blind in not using its clearance

software *and* then willfully continuing infringement two years after notice and Nike legal's

instruction to stop – either of which alone aligns with other exceptional-case findings.  *See, e.g.,*

*Int'l Star Class Yacht Racing Ass'n v. Hilfiger*, 80 F.3d 749, 754 (2d Cir. 1996) ("Hilfiger failed

to conduct a full trademark search on 'STAR CLASS' before using the mark in direct

contravention of the advice of its attorneys"); *Discovery Communications, Inc. v. Animal Planet,*

*Inc.*, 172 F. Supp. 2d 1282, 1291–92 (C.D. Cal. 2001) (awarding fees where defendants used

mark after cease and desist letter, and after agreeing to stop using the mark).

Nike abandoned its laches and fraud on the USPTO defenses at trial, and the jury rejected

each of Nike's remaining defenses.  Nike made claims like putting a trademark for sale abandons

the trademark, (10/25 TT 146:13–20), and "Cool Compression" is fair use even though only 24

of 420 respondents in its own survey identified any "cooling" feature when shown the product

name (*id*. 116:22-117:11).  And Nike refused even the most basic attempts to narrow the case to

its core – even when *Nike* created the very Supreme Court authority mandating it.  *See* Dkt. 181.

Thus, consideration of the discrepancy in merits further supports exceptional case status.

### B.   Nike Litigated The Case In An Unreasonable Manner

Viewed under the totality of the circumstances as the Supreme Court instructed in *Octane*

*Fitness*, Nike's litigation conduct was unreasonable and further supports an award of fees.

First, despite Nike's knowledge that it was infringing, it challenged almost every single

discovery request seeking information about, among other things, its trademark clearance

system, its continuing infringement, and its directions to retailers.  Nike refused to provide

proper corporate representatives to testify at depositions.  And, at trial, Nike's highest level

executive tried to evade answering questions that went to the heart of Nike's liability.  As this

Court observed, this case had "a lot of [discovery] issues."  [2/2/2021 Hrg. Tr. 4:19–21].

Second, Nike unreasonably drove up costs by presenting testimony from three different survey experts, all of whom presented flawed analyses.  The jury plainly rejected Nike's attempt to overwhelm them with multiple purported "experts," Nike's Matthew Ezell survey was so poor that he was not even deposed by Lontex and his survey was not even presented at trial, and Lontex efficiently presented rebuttal testimony from only a single survey expert in response.

Third, Nike's unsuccessful summary judgment motion was overly broad, relying on multiple disputed issues of fact, and required significant resources in response. [*See* 2/2/2021 Hrg. Tr. 5:1–5 (observing that the volume "totaled six cartons of documents")].

Fourth, Nike took unreasonable positions, such as disputing Lontex's trademark ownership despite the public registration and USPTO issuance.  [2/2/2021 Hrg. Tr. 16:14-17:15].

Fifth, while Nike had every right to decline to engage in any settlement discussions and require a trial, the consequences are that significant attorney fees were required.

Sixth, Nike represented throughout the litigation that it was unable to unearth any evidence that it used COOL COMPRESSION in sales or marketing.  According to Nike's counsel, "The words COOL COMPRESSION don't exist in Nike's vernacular."  [9/29/2020 Hrg. Tr. 11:5-6].  However, the evidence at trial – discovered independently by Lontex – demonstrated that Nike regularly used COOL COMPRESSION in marketing both to retailers (such as Dick's) and to consumers (such as at a Nike Factory Store).  Despite plain discovery requests from Lontex, Nike's zealous advocacy resulted in obscured discovery failing to turn over this type of highly probative evidence.  [*E.g., id*. at 8:6–10 ("I ordered [Nike] to produce a managerial witness who was knowledgeable about sales, and for Nike to intercept that and say it had to be – to say that I didn't say actual sales meant that I can produce the women they did – the woman they did, who didn't have any knowledge of actual sales.  That's my problem.")].

In sum, Nike's litigation positions and manner of conducting litigation further render this an exceptional case warranting an award of Lontex's reasonable attorney's fees.

## VI.    LONTEX'S REASONABLE ATTORNEY FEES

Lontex promptly provided attorney fee's data to Nike, who then confirmed having no objections "to the reasonableness of the hours recorded or the rates claimed in Lontex's data," but later clarified that "NIKE reserves all rights … to raise further objections," and Nike refused to produce evidence of its own attorneys time and rates.  [Wagner Dec., ¶ 20, Ex. 8].  Despite Nike's current position, the Court should find that the rates and hours are reasonable.

"In the Third Circuit, courts calculate attorneys' fees pursuant to the 'lodestar' approach, which requires multiplying the amount of time reasonably expended by reasonable hourly rates." *Lugus IP, LLC v. Volvo Car Corp*., 2015 WL 1399175, at *6 (D.N.J. Mar. 26, 2015).  "First, the plaintiff bears the burden of establishing a *prima facie* case by producing sufficient evidence of what constitutes a reasonable market rate 'for the essential character and complexity of the legal services rendered.'"  *Smith v. Phila. Hous. Auth*., 107 F.3d 223, 225 (3d Cir. 1997).  The "current market rate must be used," being the higher "rate at the time of the fee petition, not the rate at the time the services were performed."  *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001).

If the plaintiff has satisfied its burden, the defendant may contest the *prima facie* case, but only with record evidence and any objections must be made with "sufficient specificity."  *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc*., 426 F.3d 694, 703 n.5 (3d Cir. 2005).

The Court previously noted the complexity of this case and high level of skill applied by all the lawyers.  Further, the rates and hours spent on this matter by Lontex's counsel were well within reason when compared to the prevailing market rates in the local Philadelphia community.

### A.    The Reasonable Rates Applicable Here

Reasonable rates account for the actual rates regularly charged by the attorneys on the

case. *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).  Reasonableness

may also be supported by billing surveys.  *See Mathis v. Spears*, 857 F.2d 749, 756 (Fed. Cir.

1988) (affirming district court's consideration of AIPLA survey).  In support of its Motion,

Lontex presents evidence of rates from: (1) American Intellectual Property Law Association

(AIPLA) Economic Survey, and (2) Valeo Rates Report for AmLaw 100 firms in Pennsylvania.

The AIPLA Economic Survey and Valeo Rates Report are well-established sources relied

upon by courts to determine reasonable rates.  *See, e.g., Drone Techs., Inc. v. Parrot S.A.*, 2015

U.S. Dist. LEXIS 98829, at *12-13 (W.D. Pa. July 21, 2015); *Route1 Inc. v. AirWatch LLC*,

2020 WL 1955436, at *3 (D. Del. Apr. 23, 2020).

As set forth below, the rates for counsel are reasonable, and are ordinary rates collected

on matters by Troutman Pepper and Mintz. The reasonableness is further supported when

compared to the prevailing rates for intellectual property attorneys (Wagner Dec., Exs. 5-6):

| Attorney Rates | Minimum | Maximum | Average (total fee/hrs) |
|---|---|---|---|
| Troutman Pepper | $475 | $1,050 | $720.54 |
| Mintz Levin | $480 | $1,020 | $673.98 |
| 101 or more attorneys  AIPLA Third Quartile | $375 | $1,200 | $740 |
| Philadelphia AIPLA Third Quartile | $355 | $1,069 | $664 |
| Valeo Rates Report: AmLaw 100 fee motions | $400 | $1,385 | $870[3] |

The third quartile data is particularly relevant since Troutman Pepper and Mintz are

AmLaw 100 firms, and thus the rates must be compared to other firms of similar size.  *See In re

Schering-Plough Corp.*, 2013 WL 12174570, at *44 (D.N.J. Aug. 28, 2013) ("the hourly rates

charged here … are in line with rates charged by other comparable law firms, including … the

Defendants lead counsel").  Indeed, Troutman Pepper and Mintz's rates are below the average

---

[3] Average of rates for equity partner, partner, attorney, counsel, and associate.

rates reported by Valeo for AmLaw 100 firms in the Philadelphia region.  [Wagner Dec. Ex. 6].

Similarly, the rates for non-attorney professionals are reasonable when compared to the prevailing market rates reported by Valeo and recently approved rates within this District. [*See* Wagner Dec. Ex. 6]; *In re Nat'l Football League Players' Concussion Inj. Litig*., 2020 WL 7024244, at *2 (E.D. Pa. Nov. 30, 2020) (approving $260.00/hour for paralegals).

| Non-Attorney Rates | Minimum | Maximum | Average |
|---|---|---|---|
| Troutman Pepper | $240 | $325 | $306.51 |
| Mintz Levin | $340 | $340 | $340 |
| Valeo Rates Report: AmLaw 100 fee motions | -- | -- | $324 |

## B.       The Hours Spent Were Reasonable

Given the complexity of the claims and defenses presented, Lontex's counsel expended a reasonable number of hours, efficiently litigating the case without waste.  In the Court's ordered meet and confer process for objecting to fees, Nike's objections did not even purport to identify any unreasonable amounts of hours spent on any tasks, but rather challenged about 10% of fees as spent on claims or issues that were unsuccessful or for entries it requested more detail. [Wagner Decl., ¶ 20, Ex. 8].  Thus, there is no basis to reject or reduce any time entries.

Turning to the total hours, Troutman Pepper spent 6,416 hours over 3 years up through trial.  [Wagner Decl., ¶ 10, Ex. 3].  Total hours for Mintz Levin for pleadings and pre-trial work on this case totaled 219.2.  [*Id*. ¶ 11, Ex. 4].  .  As set forth in Exhibits 3 and 4, Lontex requests a total of **$4,449,389.50** in legal fees reasonable expended on this matter, including $146,166.50 for work by Mintz Levin, and $4,303,223 for work by Troutman Pepper.

The totals above are well within the AIPLA survey data (Ex. 5) for a case of this size and complexity where over $25 million is at risk, for which attorney fees typically exceed $7 million:

**Litigation-Trademark Infringement >$25M Inclusive of pre-trial, trial, post-trial, and appeal (when applicable) (000s)**

|  | Total | 1-3 Attorneys | 4-15 Attorneys | 16-59 Attorneys | 60 or more Attorneys | All Corporate |
|---|---|---|---|---|---|---|
| Number of Respondents | 21 | 4 | 4 | 3 | 8 | 2 |
| Mean (Average) | $3,381 | $402 | $453 | $2,310 | $7,020 | ISD |
| 10th Percentile 10% | $118 | ISD | ISD | ISD | ISD | ISD |
| First Quartile 25% | $550 | $131 | $133 | ISD | $7,313 | ISD |
| Median (Midpoint) | $1,000 | $500 | $475 | $2,000 | $7,500 | ISD |
| Third Quartile 75% | $7,500 | $575 | $750 | ISD | $7,995 | ISD |
| 90th Percentile 90% | $8,028 | ISD | ISD | ISD | ISD | ISD |

The amounts above do not include post-trial fees incurred since October 31, for which Lontex will provide an update upon filing its reply brief, as "[t]he prevailing party is entitled to recover a reasonable fee for the preparation of post-trial motions and fee petitions." *Walker v. Verizon Pennsylvania*, 2017 WL 3675384, at *13 (E.D. Pa. Aug. 25, 2017). Having not seen Nike's post-trial motions, Lontex estimates this will be at least $150,000. [Wagner Decl. ¶ 10].

### C.    The *Johnson* Factors Are Neutral Or Favor An Upward Multiplier

As set forth above, Nike did not to object to the rates or reasonableness of hours recorded, and thus Nike has identified no basis for downward adjusting a fee award.[4] *See Souryavong v. Lackawanna Cty*., 159 F. Supp. 3d 514, 524 (M.D. Pa. 2016), aff'd, 872 F.3d 122 (3d Cir. 2017) ("the district court cannot decrease a fee award based on factors not raised").

Nevertheless, Lontex briefly addresses the twelve *Johnson* factors that the Court may consider to adjust the lodestar. *See Hensley v. Eckerhart,* 461 U.S. 424, 434–37 (1983). As set forth below, the *Johnson* factors support a multiplier increasing the lodestar figure for fees.

*(1) Time and labor, (2) novelty, (3) skill required, (4) preclusion of other employment, (5) customary fee, (7) time limitations, and (9) the experience, reputation, and ability of the attorney*. These factors are neutral, as they are subsumed by the lodestar analysis. To the extent they warrant additional consideration, the Court has previously observed the complexity of

---

[4] Nike has identified $489,307.75 in fees to which it objected. Pursuant to the Court's instruction, Lontex is prepared to address those line items with a special master to the extent the Court refers the matter.

issues and skill by the lawyers involved in the case, which supports an upward adjustment.

      *(6) Whether the fee is fixed or contingent, (10) "undesirability" of the case, and (11) nature and length of the professional relationship with the client*.  Lontex does not seek a multiplier based on these factors, and therefore they are neutral.

      *(8) Amount involved and the results obtained*.  Lontex prevailed on all of its claims, and Nike failed to prevail on any of its claims at trial.  The crux of Lontex's damages claim has always been disgorgement of Nike's profits, an equitable remedy that remains to be decided by the Court.  While Lontex dismissed its design mark claim early in this case to streamline the issues, the design mark claim was effectively co-extensive with the successful word mark claim.  Similarly, the fact that Lontex's counterfeiting claim was dismissed does not merit any reduction in the fee award.  *See Blum v. Witco Chem. Corp*., 829 F.2d 367, 378 (3d Cir.1987) (the Supreme Court "has rejected the notion that the fee award should be reduced 'simply because the plaintiff failed to prevail on every contention raised in the [case].'").  Further, Lontex was fully vindicated by the jury's finding of Nike having willfully infringed, in addition to finding Nike liable for punitive damages – not merely a finding of infringement.  Simply because the jury award is relatively modest does not diminish the importance of holding willful infringers such as Nike accountable, which in complex cases such as this requires substantial investment of attorney time and costs.  *See Gen. Instr. Corp. v. Nu-Tek Elecs. & Mfg*., 3 F. Supp. 2d 602, 612 (E.D. Pa. 1998) (rejecting argument that $60,000 damages award was a limited success).  Further, despite overwhelming evidence to support willful infringement, Nike exercised its right to decline settlement efforts and require a trial, leaving Lontex with no choice but to expend substantial resources going to trial.  This factor supports an upward multiplier.

      *(12) Awards in similar cases*.  Where a defendant is found to be a willful infringer, fees

above $4 million are appropriate. *See, e.g., SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541, at *25 (C.D. Cal. June 22, 2015) (awarding $4,842,113.16 in fees in 2015 even where "the damages plaintiffs ultimately obtained were minuscule").

## VII.    LONTEX'S NON-TAXABLE COSTS

In addition to attorney fees, Lontex seeks an award of non-taxable costs reasonably incurred in this litigation under the exceptional case determination. "The reasonableness of costs is assessed on the same basis as attorney fees." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 2018 WL 2378406, at *18 (D.N.J. May 23, 2018). "Plaintiff may also recover 'related non-taxable expenses,' which may include 'costs for postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food.'" *Arlington Indus. v. Bridgeport Fittings, Inc.*, 2016 WL 3522964, at *12 (M.D. Pa. June 28, 2016).

Reasonable and necessary costs that Lontex incurred are detailed as set forth in the Declaration of Ben Wagner, Exhibits 9 and 10. These costs include expert fees, local counsel fees, travel, meals, hotel, and electronic discovery database and production fees, amounting to **$631,951.36.** To the extent any costs previously submitted by Lontex (*see* Dkt. 279) are deemed non-taxable, Lontex requests those costs be awarded pursuant to this motion.

## VIII.   POST-JUDGMENT INTEREST

Lontex is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961(a). Judgment was entered judgment on October 29, 2021. The relevant Treasury yield is 0.11%. https://fred.stlouisfed.org/series/WGS1YR (week ending 10/22). Post-judgment interest should be awarded (at present) at a daily rate of $1.52. Any alternative relief granted such as enhancement or disgorgement of Nike's profits should similarly include post-judgment interest.

Dated:       November 24, 2021               TROUTMAN PEPPER HAMILTON
                                             SANDERS LLP


                                      By:  /s/ *Ben L. Wagner*
                                             Ben L. Wagner (CA SBN 243594)
                                             ben.wagner@troutman.com
                                             *Admitted Pro Hac Vice*
                                             11682 El Camino Real, Suite 400
                                             San Diego, CA  92130-2092
                                             Telephone:   858.509.6000
                                             Facsimile:   858.509.6040


                                             Michael A. Schwartz (PA 60234)
                                             TROUTMAN PEPPER HAMILTON
                                             SANDERS LLP
                                             3000 Two Logan Square
                                             Eighteenth & Arch Streets
                                             Philadelphia, PA 19103-2799


                                             *Attorneys for Plaintiff*
                                             LONTEX CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 24, 2021, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Ben L. Wagner*
Ben L. Wagner