**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LONTEX CORPORATION | Civil Action No.  2:18-cv-05623-MMB |
| Plaintiff, | Hon. Michael M. Baylson |
| v. | |
| NIKE, INC., | |
| Defendant. | |

**PLAINTIFF LONTEX CORPORATION'S OPPOSITION TO DEFENDANT NIKE,
INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND
CONDITIONAL MOTION FOR A NEW TRIAL**

# TABLE OF CONTENTS

**Page**

I.    ARGUMENT ................................................................................................. 1

    A.    The Evidence Was More Than Sufficient to Support the Jury's Finding of Likely Confusion .................................................................................. 1

        1.    The Parties' Marks Were Similar and Used Similar in the Marketplace (*Lapp* factor 1) ....................................................... 1

        2.    The Evidence Amply Supports the Conceptual and Commercial Strength of Lontex's COOL COMPRESSION mark (*Lapp* factor 2)................................................................................ 3

        3.    Consumer Care (*Lapp* factor 3) .................................................. 6

        4.    Evidence of Actual Confusion Favors Lontex (*Lapp* factors 4 and 6) .......................................................................................... 7

        5.    Nike's State of Mind (*Lapp* factor 5)......................................... 9

        6.    Both Parties Sell Compression Garments, Target Overlapping Consumers, and Lontex's Customers Are Reached Through Nike's Ubiquitous Trade And Advertising Channels (*Lapp* factors 7, 8, & 9) ............................................................................................ 10

        7.    Likelihood of Expansion into the Other Party's Market (*Lapp* factor 10)...................................................................................... 12

    B.    The Jury Correctly Concluded Nike Engaged in Contributory Infringement...... 12

    C.    There Was No Erroneous Jury Instruction on Willfulness, Nor Can Nike Suggest Prejudice................................................................................. 15

    D.    The Jury Correctly Found that Nike Failed to Establish All Three Required Elements of Its Fair Use Defense ........................................ 20

    E.    The Record Amply Supports the Punitive Damages Award ............................. 24

    F.    Nike's Conditional Request for New Trial ....................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000)..........................................................................1, 2, 7, 12

*Aronowitz v. Health-Chem Corp.*,
   513 F.3d 1229 (11th Cir. 2008) ...................................................................26

*Byrnes & Keifer Co. v. Flavoripe Co.*,
   1 U.S.P.Q.2d (BNA) 1124 (W.D. Penn. 1986)..........................................21

*Caesars World, Inc. v. Venus Lounge, Inc.*,
   520 F.2d 269 (3d Cir. 1975)........................................................................24

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
   425 F.3d 211 (3d Cir. 2005)........................................................................22

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) ......................................................................4

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
   921 F.2d 467 (3d Cir. 1990).......................................................................8, 9

*Checkpoint Sys. v. Check Point Software Techs., Inc.*,
   269 F.3d 270 (3d. Cir. 2001).......................................................................7, 9

*Country Floors, Inc. v. Gepner*,
   930 F.2d 1056 (3d Cir. 1994)........................................................................3

*Dean v. Specialized Sec. Response*,
   876 F. Supp. 2d 549 (W.D. Penn. 2012).................................................15, 16

*Eddy v. V.I. Water & Power Auth.*,
   369 F.3d 227 (3d Cir. 2004)........................................................................16

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
   30 F.3d 466 (3d Cir. 1994).......................................................................15, 18

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016) .....................................................................5

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*,
   618 F.3d 1025 (9th Cir. 2010) ....................................................................23

*GFC Fin. Corp. v. GFC Capital Res. Grp., Inc.*,
    No. 93 CIV. 8001 (PKL), 1994 WL 30432 (S.D.N.Y. Feb. 2, 1994)........................2

*Giannone v. Giannone*,
    429 F. Supp. 3d 34 (E.D. Pa. 2019) ...................................................................25

*Giordano v. Claudio*,
    714 F. Supp. 2d 508 (E.D. Pa. 2010) .................................................................25

*Henley v. Devore*,
    2010 U.S. Dist. LEXIS 67987 (C.D. Cal. Jun. 10, 2010) .....................................23

*Hutchison v. Luddy*,
    582 Pa. 114, 870 A.2d 766 (2005) .........................................................16, 24, 26

*Kars 4 Kids Inc. v. Am. Can!*,
    2021 U.S. App. LEXIS 23672 & 22, 8 F.4th 209 (3d Cir. 2021) .........................16

*Kegan v. Apple Computer, Inc.*,
    1996 U.S. Dist. LEXIS 17081 (N.D. Ill. Nov. 12, 1996).........................................4

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)..........................................................................12, 17

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004).........................................................................................23

*Louis Vuitton Mallateir & Oakley, Inc. v. Veit*,
    211 F. Supp. 2d 567 (E.D. Pa.) (Reed, J.)......................................................16, 17

*Macdonald v. Winfield Corp.*,
    191 F.2d 32 (3d Cir. 1951)................................................................................24

*Marketquest Grp., Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017) ............................................................................22

*Martin" Int'l Mkt. Brands v. Martin Int'l Corp.*,
    2012 U.S. Dist. LEXIS 204543 (W.D. Penn. Oct. 24, 2012) .................................11

*McNeil Nutritionals, LLC v. Heartland Sweeteners*,
    LLC, 511 F.3d 350 (3d Cir. 2007).....................................................................8, 12

*New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC*,
    424 F. Supp. 3d 334 (D. Del. 2019)..................................................................6, 8

*Pa. State Univ. v. Univ. Orthopedics. Ltd.*,
    706 A.2d 863 (Pa. Super. Ct. 1998)..................................................................25

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ............................................................5

*Romag Fasteners, Inc. v. Fossil Grp., Inc.*,
   140 S. Ct. 1492 (2020) ......................................................................16

*In re Royal BodyCare, Inc.*,
   83 U.S.P.Q.2D (BNA) 1564 (TTAB 2007) .........................................21

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010) ..............................................................10

*Sandoz Inc. v. Lannett Co.*,
   2020 U.S. Dist. LEXIS 242558, 2020 WL 7695960 (E.D. Penn. Dec. 28,
   2020) ..................................................................................................24

*SecuraComm Consulting Inc. v. Securacom Inc.*,
   166 F.3d 182 (3d Cir. 1999) ..........................................................16, 17

*Zurco, Inc. v. Sloan Valve Co.*,
   785 F. Supp. 2d 476 (W.D. Penn. 2011) .............................................2

**Other Authorities**

FRCP 59 ..................................................................................................26

Restatement (Second) of Torts Section 46 ...............................................16

Nike's  motion for judgment or conditional new trial disregards the evidence that properly led the jury to find willful infringement warranting an award of punitive damages.  For the reasons below, Nike's motion should be denied in full.

I.      **ARGUMENT**

    A.      **The Evidence Was More Than Sufficient to Support the Jury's Finding of Likely Confusion**

        1.      **The Parties' Marks Were Similar and Used Similar in the Marketplace (*Lapp* factor 1)**

Nike's motion glosses over this factor, even though it is one of the most important factors and, when the goods compete, the single most important factor.  *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).

The jury was presented with evidence that 32 Nike Pro products were given Nike Pro Cool Compression product names.  Not sporadic use, but use at the retail level by retailers responsible for over 75% of the Accused Product sales.  [PX31A; 10/28 TT 51:10.]

The usage was without any stylization, just like Lontex's use of COOL COMPRESSION on its garment tags, and retailers even dropped some or all of "NIKE PRO" in many customer advertisements.  [*See, e.g.* PX 1650 (Nike: "Nike Pro Cool Compression"), PX 30B p. 17 (Big 5: "Cool Compression ¾ Tights"); PX 30A p. 22 (Big 5: "Cool compression Tights"); PX 1451 p. 4 (Dick's: "Men's Nike Cool Compression Tops, Tights and Shorts"); 10/18 TT 61:17-63:15 (Nike Factory customer dialogs).]

Nike's product name was called Nike Pro Cool Compression by retail associates and customers at the retail level in sales dialogues, as both Kenisha Likely and Dominique Williams testified from different parts of the country.  [10/18 TT 61:5-62:1; 10/20 TT 140:21-141:4, 143:23-144:16.]  And Kenisha Likely of the Nike Factory Store in Myrtle Beach, SC testified that "Nike Pro Cool Compression" was the signage used with the Cool Compression product,

while the shorter "Cool Compression" was used in sales dialogs.  [10/18 TT 67:10-17, 61:17-63:15.]

Nike emphasizes use of words like 3/4" or Tights, but these are purely generic terms which are given very little weight in comparing an infringing mark.  *GFC Fin. Corp. v. GFC Capital Res. Grp., Inc.*, No. 93 CIV. 8001 (PKL), 1994 WL 30432, at *1 (S.D.N.Y. Feb. 2, 1994).  In fact, retailers even dropped NIKE PRO from the product name.

And the jury properly weighed Nike's use of its NIKE PRO house mark as enhancing confusion (particularly as here when infringement of a technology mark was involved, e.g. like HP launching a computer called HP's Intel Computer).  *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 495 (W.D. Penn. 2011) (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228 (3d Cir. 2000)) ("the inclusion of a house name can be an aggravating factor when it causes the public to 'assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.").  As even Lontex's most sophisticated trainer customers testified, they mistakenly believed Nike had acquired Lontex's Cool Compression technology or rights to use it when they saw the NIKE PRO COOL COMPRESSION mark in commerce in Dick's store signage, in Nike catalogs, and online, including Keith Dugger, Sean Cunningham, and Brian Ball.  [*See* Dugger Clip Report (also "CR" herein) 2:2-4:13; Cunningham CR 22:12-23:14; 10/21 TT 182:2-183:13 (Ball).]  As Lontex emphasized in summary judgment briefing, it was for the trier of fact to determine whether a house mark aggravated or diminished confusion in the particular circumstances of this case.

Beyond this, even Nike's own Deborah White – Senior Director of Global Nike Athlete Training and Service Excellence – admitted in deposition testimony played for the jury as part of

Lontex's case in chief that the two terms COOL and COMPRESSION adjacent to one another create a strong commercial impression:  "A: 'Cool Compression' together sounds like it's a thing, like it's almost hyphenated, becoming a noun in and of itself.  That would -- I would think that would stand out to me like 'Dri-FIT.'  Dry is an adjective.  Fit is a noun.  Dri-FIT together becomes a thing.  Q. And that would have stood out to you because that's sort of more than just an adjective and a noun, it's a new thing that's being referred to, correct?  A. Yes." [White Depo. Designation Clip Report p. 24.]

Far from Nike's required showing that nothing more than a scintilla of evidence supported likely confusion, the similarity of marks here falls within the Third Circuit's *Country Floors* holding, where it found that COUNTRY FLOORS and COUNTRY TILES are not only similar, but similar enough that a jury can give similarity alone so much weight in the *Lapp* analysis as to allow a jury to find likely confusion.  *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1063 (3d Cir. 1994).

### 2.    The Evidence Amply Supports the Conceptual and Commercial Strength of Lontex's COOL COMPRESSION mark (*Lapp* factor 2)

The evidence at trial amply supported the commercial strength of the COOL COMPRESSION mark.  Efraim Nathan testified to regular presentations with thousands of customers and potential customers every year for over a decade in states across the country spanning a large variety of events (sporting events, industry meetings, phone calls, school and church presentations, etc.) which highlighted the COOL COMPRESSION technology by that name and resulted in over 20,000 sales.  [10/19 TT 57:8-59:10; 70:12-16, 79:9-14, 83:18-24; 10/27 TT 68:23-70:17, 118:20-25.]  Lontex placed COOL COMPRESSION on the inside garment label of most of its SWEAT IT OUT garments (notwithstanding Nike's limited evidence that a small handful of garments may have had SWEAT IT OUT labels), which by Nike's own

admission was a key method of promoting such technology marks.  [10/19 TT 50:21-51:8, 58:6-61:1, 65:5-20, 70:12-14; Nicholas Johnson CR, pp. 29-30.]  A mark must not be known by a significant "percentage of the total U.S. population" (Mtn. 5) to have commercial strength. *Kegan v. Apple Computer, Inc.*, 1996 U.S. Dist. LEXIS 17081, *33-35 (N.D. Ill. Nov. 12, 1996) (trier of fact could find strong mark because "some history of advertisements and promotion" and even though only $500 per year advertising, dollars "are not the only indication of mark reputation, as [s]uch reputation also may be achieved through effort").

Lontex's efforts paid off and gave its mark a unique and well-recognized trademark. Keith Dugger testified that essentially *all* trainers in the entire MLB organization referred to the COOL COMPRESSION technology in Lontex's SWEAT IT OUT garments by the COOL COMPRESSION name.  [Dugger CR, p. 10 at 15:16-22.]  Lontex's case in chief was filled with nine customers from across the country (Cunningham, Cammarota, Knudson, Dugger, Smith, Ball, Williams, Peduzzi, Goodwin) that testified to the regular use of COOL COMPRESSION as the name for Lontex's fabric technology, and to detailed memories of such use even many years later.

And even the most sophisticated customer (who would know the most about compression garments) had *never* heard of "Cool Compression" used in any other way or by any other company than Lontex's technology prior to Nike's infringement.  [Cunningham CR p. 22:12-20; Dugger CR p. 4 at 109:01-109:13.]  Thus, the evidence was more than a scintilla and was instead sufficient to support commercial strength of the mark.  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) (advertising, length of time in business, public recognition, and uniqueness may demonstrate strength).

On conceptual strength, the mark is more than the sum of its parts.  Inherently distinctive

suggestive and even fanciful marks are often comprised of terms that themselves might be suggested as descriptive or asserted as individually weak.  As Nike's Motion emphasizes, dissection of the mark is improper.  Nike's own expert witness admitted that even when Nike used its mark with "COOL" and "COMPRESSION" only 24 of 420 surveyed respondents identified some form of "cooling being a tribute of the cool compression products."  [10/25 TT 116:22-117:8.]  Nike's Deborah White testified that COOL COMPRESSION together was itself more than an adjective or even a noun, but a new thing altogether.  [White Depo. Designation CR p. 24.]  And again, customers testified not knowing of other uses of COOL COMPRESSION, and certainly there was not enough to suggest a crowded and weak market for the mark COOL COMPRESSION – a showing that Nike (if it wanted such consideration to weigh in its favor) utterly failed its burden to show.  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (11th Cir. 2016) (Size, extent of use, duration of third-party use are important to show); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1211 (9th Cir. 2012) (840 uses not enough to prevent a reasonable jury from concluding strength of the mark "weighs significantly in favor" of likely confusion).  Thus, the jury appropriately concluded that the composite mark COOL COMPRESSION is an inherently distinctive and strong mark, and that the mark's conceptual strength favored Lontex.

Finally, on reverse confusion's comparative strength analysis for commercial strength, there was far more than enough evidence to suggest that Nike's use of NIKE PRO COOL COMPRESSION saturated or flooded the marketplace.  Nike's 31 Cool Compression styles were sold to over 1500 retailers, and evidence of usage of the COOL COMPRESSION names at the retail sales level was presented to the jury for retailers representing over 75% of Nike's 6,444,674 units sold across every state in the United States.  [PX 20A; PX 31A; 10/28 TT 50:24-

51:10.]  The online impressions that generated the online sales of the 31 infringing products

numbered over 10 million consumer impressions.  [10/28 TT 73:21-23, 78:4-9.]  And, the

biggest retailers like Dick's distributed circulars to their customers with the COOL

COMPRESSION product name prominently displayed for the entire line of infringing products.

[PX 1451 p. 4 (Dick's Circular "MEN'S NIKE COOL COMPRESSION TOPS, TIGHTS AND

SHORTS").]

Thus, the evidence amply supported the jury weighing this factor for Lontex for both

forward and reverse confusion.

### 3.    Consumer Care (*Lapp* factor 3)

Nike's theory of consumer care was not borne out at trial.  Brian Ball, one of the most

sophisticated and longstanding customers of Lontex, testified that he concluded Lontex had sold

the Cool Compression mark to Nike when he saw NIKE PRO COOL COMPRESSION products

advertised in a Nike catalog in his team's locker room.  [10/21 TT 182:11-183:10.]  As discussed

in the next section below, many other trainers testified to confusion.

Nike also overstates Lontex's product pricing to exaggerate the pricing difference, with

the mainstay of Lontex's SWEAT IT OUT garments selling in the $60's.  [PX 281 pp. 5-7

(Thigh Support Short).]

The goods are not surgical tools or cars, and both apparel products were marketed for

"performance" in addition to other purposes.  *See below* p. 10.  Thus, the evidence and the

resulting jury verdict was well within the band of cases that routinely find consumer care for

apparel products to favor likely confusion.  *New Balance Ath., Inc. v. USA New Bunren Int'l Co.*

*Ltd. LLC*, 424 F. Supp. 3d 334, 348 (D. Del. 2019) ("[C]ourts have repeatedly held that buyers of

athletic apparel and footwear are not likely to exercise a high degree of care").

While Nike may wish the jury had weighed the evidence differently, it fails in contending

that nothing more than insufficient evidence or a scintilla of evidence supported the conclusion that customer care favored Lontex.

### 4.     Evidence of Actual Confusion Favors Lontex (*Lapp* factors 4 and 6)

"Evidence of actual confusion is not required to prove likelihood of confusion.  While evidence of actual confusion would strengthen plaintiff's case, it is not essential.  We have recognized that it is difficult to find evidence of actual confusion because many instances are unreported.  For this reason, evidence of actual confusion may be highly probative of the likelihood of confusion. Since reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion."  *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 291 (3d. Cir. 2001).

This was the Third Circuit authority upon which the Court's jury instruction was based. And Lontex did present evidence of actual confusion by Lontex's actual customers, which is thus highly supportive of both forward and reverse confusion.  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d at 231 & 234.

The following witnesses testified to actual confusion based on marketplace encounters with Nike's NIKE PRO COOL COMPRESSION product names:  Sean Cunningham (Dick's sporting goods in-store signage); Keith Dugger (Dick's in-store signage and circular advertisements); Chris Peduzzi and Brian Ball (Nike catalogs at their clubhouses).  [*See* Cunningham Trial Depo. Direct CR 22, 34; Dugger Trial Depo. Re-Direct CR p. 4; 10/20 TT 54:20-56:8 (Peduzzi); 10/21 TT 182:11-183:10 (Ball).  And, Nike elicited testimony concerning additional instances of confusion by other Lontex customers.  [*See, e.g.* 10/18 TT 122:19-24; 130:13-19 (Smith).]  Thus, this is powerful evidence of likely confusion and actual confusion was properly weighed strongly in Lontex's favor.

Given Keith Dugger, Sean Cunningham, and Brian Ball are all actual Lontex customers and testified in great detail about their actual marketplace encounters with Nike's products (right down to the color of the signage Cunningham saw), Nike's suggestion on post-trial motion that "none" involved "actual marketplace conditions" is not supported by the evidence presented to the jury at trial.  Mtn. 7.  These customers' confusion came from a normal way it would arise in the actual marketplace – e.g. in-store or catalog usage by Nike.  And, the confused customers represented customers and potential customers from all over the country – including Colorado, Florida, Pennsylvania and Illinois.

Nike is also incorrect that the jury had to disregard actual confusion unless the confused person testified they made a resulting purchase based on that confusion – while a trier of fact is free to minimize or disregard evidence of the presence or absence of actual confusion (i.e. Nike's flawed surveys), its weighing will not be second-guessed.  *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d 350, 366 (3d Cir. 2007) (trier of fact was not "compelled" on threat of error to weigh single instance in favor of infringement on preliminary injunction); *New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 349 (D. Del. 2019) (single mix-up in side-by-side comparison at deposition by corporate officer weighed in favor of infringement).

The survey landscape does not compel disregarding the jury's conclusion on the issue of actual confusion.  Where "other evidence exists" of actual confusion beyond a survey (as here), there is no automatic logical conclusion that the plaintiff's absence of its own survey suggests it believed a survey would be harmful.  *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475-476 (3d Cir. 1990).  In the presence of such multiple sources of actual confusion evidence, Lontex did not need to run a survey or face an adverse inference that it

expected negative results from such survey.  *Id.*

And, the jury was free to disregard Nike's survey evidence.  As explained by Dr. Susan McDonald, Hal Poret's survey was riddled with errors, supporting Dr. McDonald's conclusion that "no relevant surveys" existed in this case regarding actual or likely confusion.  [10/25 TT 189:2-198:22, 211:5-9.]  Dr. McDonald specifically identified problems in Nike's survey including the "wrong respondents, wrong problem definition, wrong stimulus presentation, wrong measurements, wrong research procedures."  [*Id.*]  The Court instructed the jury on the ability to weigh the surveys based on how well they were conducted, and the jury clearly concluded that Hal Poret's survey was entitled to little or no weight, as was its prerogative.  [Dkt. 241, p. 10 (Daubert Order); 10/26 TT 80:10-14 ("it is up to you to determine how much or little weight to give a survey").]

The evidence allowed these factors to appropriately weigh strongly in Lontex's favor.

### 5.      Nike's State of Mind (*Lapp* factor 5)

Nike's state of mind is addressed in Lontex's Post-Trial Motion (Dkt. 384-01 pp. 4-9) and applies equally here, which evidence Nike ignores.  Further evidence on willfulness also is addressed below.  *See below* pp. 15 (willfulness discussion) and 12 (contributory infringement discussion).  In addition, on the issues of law, Nike urges the same erroneously narrow rules of law which the Court rejected on summary judgment, rejected in its proposed jury instructions, and simply now rehashed for a third time here.  *Id.*  While this factor if absent does <u>not</u> favor Nike (a lack of intent does not demonstrate a lack of likely confusion), the jury properly weighed Nike's state of mind in Lontex's favor.  *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d. Cir. 2001).

> **6.      Both Parties Sell Compression Garments, Target Overlapping Consumers, and Lontex's Customers Are Reached Through Nike's Ubiquitous Trade And Advertising Channels (*Lapp* factors 7, 8, & 9)**

The inquiry of relatedness of goods for likely confusion is whether consumers "*may* see them as related." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 189 (3d Cir. 2010). The Third Circuit cites with approval findings of related goods for "scarves and apparel" with "cosmetics and fragrances," "batteries and lamps with light bulbs and lamps" and "pipe tobacco and bar accessories with scotch whisky." *Id.*

The products at issue in this case were not different, as might be the case with software engineers and nuclear submarines.  There is nothing so different about the goods of Lontex or Nike that the compression garments would be seen as unrelated or unlikely to be related; rather they significantly overlap at least in terms of many of their key features.  Lontex offered compression shirts, shorts and tights to aid performance, prevention and rehabilitation, often referring to them descriptively as "performance" garments.  [PX 477; 10/19 TT 47:10-14; 10/20 TT 61:4-23].  Nike promoted wearing its infringing compression shirts, shorts and tights "so your performance remains at its peak."  [PX 1416, p.1.]  Both promoted the compression garments as, respectively, "better breathability and evaporation [and] moisture management" (Lontex) and "evaporates quickly to help keep you comfortable and dry" and having "breathability" (Nike).  [*Id.*; DX 1186, PX 345, DX 947, p. 2.]  Nike even presented to the jury evidence of its athletes in compression garments hooked up to "Nike Sport Research Lab" measurement tools, an admitted prominent portion of its campaign to convince customers that its products were battle tested and high-performance.  [DX 1186; 10/22 TT 48:16-49:25.]  And as Nike acknowledges, the goods were close enough together that Mr. Nathan took a Nike Pro compression garment for years to presentations to show why Lontex's garments performed better.  Mtn. 10, citing 10/19 TT 54:2-56:16.  That a competing product performs inferior does

not stop it from being a competitor, and it is a non sequitur to suggest that a product that blows its competitors out of the market is not in direct competition for infringement purposes.

Similarly, although Nike claims it is set up for different marketing channels, *any* overlap of customers or features is enough to weigh in favor of infringement. *Martin" Int'l Mkt. Brands v. Martin Int'l Corp.*, 2012 U.S. Dist. LEXIS 204543 *37 (W.D. Penn. Oct. 24, 2012).  Such overlap existed here:

First, Nike's catalogs with Cool Compression garments ended up in the hands of a number of testifying athletic trainers that purchased Lontex's Sweat It Out garments with Cool Compression technology – leading at least one of them to testify to believing that Nike had acquired Lontex's Cool Compression products.  [10/21 TT 182:2-25.]

Second, because Nike failed to notify any of its infringing retailers for whom the jury held it contributorily liable, both parties' Cool Compression branding appears online.  The jury received evidence of overlapping social media campaigns and search results of the competing products where the two butted up against or in close proximity to one another.  [PX 700 (Twitter); PX 1563 p. 4 (Google).]

Third, and beyond the above overlap, the testimony showed that customers of Lontex (e.g. specifically, team trainers) saw Nike Pro Cool Compression products advertised as such in general circulation, including in-store signage and in circulars.  [Dugger Trial Depo. Direct CR 18-19; Cunningham Trial Depo. Direct CR 31-33 (Dick's Sporting Goods signage "COOL COMPRESSION").].  This was the result of Nike's ubiquitous promotion, as branding expert Jeff Parkhurst testified that at least ten million online viewers were exposed to online product listings for the Nike Pro Cool Compression products.  [10/28 TT 73:21-23, 78:4-9.]  Nike's sales were ubiquitous and flooded the marketplace, reaching consumers in every state.  [PX 20].

Anywhere Lontex's customers were, Nike was, making attempts at marketplace dissection particularly inapt in this case.

Thus, Nike's trade channels and promotions were so ubiquitous that there were more than enough opportunities for an "appreciable" number of consumers to face likely confusion by its related compression shirts, shorts and tights.  *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir. 2007).

Thus, the jury determination in favor of Lontex on these *Lapp* factors was more than supported by substantial evidence, far beyond a scintilla.

### 7. Likelihood of Expansion into the Other Party's Market (*Lapp* factor 10)

As just noted, the parties were direct competitors who both sold compression products and advertised them for their breathability and performance-enhancement.  The parties sold in the same states.  [PX 20 & 20A.]  Thus, the jury was correct in weighing this factor in favor of Lontex, because the Third Circuit holds competitors are – far from a potential future expansion – already by definition "in each other's markets."  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d at 212.

In sum, the similarity of the markets and direct competition all but assured the jury's finding of infringement here.  The other *Lapp* factors were further supportive of likely confusion, and none were sufficient to push Nike into the "scintilla" territory where the finding of likely confusion could be taken away from the jury on a post-trial motion.  *See, e.g. Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 725 (3d Cir. 2004) (judgment for plaintiff; seven Lapp factors for plaintiff and at most Lapp factor 3 for defendant).

### B. The Jury Correctly Concluded Nike Engaged in Contributory Infringement

As noted in Lontex's post-trial motion, the jury was presented with evidence from which

it was entitled to conclude that Nike knew of Lontex's COOL COMPRESSION trademark when it infringing shirts, shorts and tights were launched in 2015.  Dkt. 384-01, pp. 5-6.  Yet Nike nevertheless launched 32 styles of NIKE PRO COOL COMPRESSION shirts, shorts and tights followed with hundreds of training tech sheets on its Sports Knowledge Underground ("SKU") system expressly designed to train third-party retailers and increase sell-through.  [PX 33 (tech sheet summary); *see, e.g.* PX 660 p. 3 ("SKU is designed to increase sell through … and give retail sales associates confidence in their Nike product knowledge"); Johnson Depo. Designation CR 23-25 (tech sheets went to SKU).]  Its retailers then used the product names as intended, product names that *Nike* came up with and was expected to come up with, not its retailers who resell thousands of products of many brands.  [10/22 TT 152:8-18 (Naming was Nike's job); PX 31 (retailer usage).]

Beyond this, Nike ignores the evidence that its continued wholesale sales activity to retailers post-notice, which supported the jury's finding of (1) intentional inducement and (2) continued supply with knowledge of infringement.  Mtn. 12.  An important part of the jury's finding of willfulness was Nike's promotion of the NIKE PRO COOL COMPRESSION product names through its training tech sheets and wholesale catalogs, followed by the ongoing use in catalogs and no attempt to notify retailers for two years that the COOL COMPRESSION product names should not be used.

In Fall 2016, at Nike Legal's direction in response to Lontex's demand, Nike instructed internally that COOL COMPRESSION product names had to be phased out, and represented to Lontex that its phase-out would take a matter of three months.  [Johnson Depo. Direct Examination Designation CR at 9-11; PX 11; 10/19 TT 106:16-25].  In light of the retailer usage of the product names, Lontex expressly urged Nike in 2016 to contact retailers to cease use, and

again in January 2018 – requests which Nike ignored.  [1/19 TT 106:10-20 & 107:23-108:3.]  It was not until June 2018 that Nike first contacted retailers to advise them of the infringement. [10/22 TT 140:12-141:10.]

Instead of ceasing all infringing use on notice from Lontex, Nike continued to distribute 27 catalogs to wholesalers for 2017 products still selling the products under the NIKE PRO COOL COMPRESSION product names.  [PX 32.]  These retailers comprised the majority of Nike's retail sales.  [PX 20A.]  Prior to its limited June 2018 contact with certain retailers, Nike made no announcement to retailers or retail staff to cease using the adjacent terms COOL and COMPRESSION for COOL COMPRESSION product names.  [10/22 TT 143:6-19; Johnson Depo. Designation CR p. 39; White Depo. Designation CR pp.14-15.]  But Nike's Katie Bromert testified that it was Nike's job to come up with product names, not the retailers to which it sold its many thousands of products.  [10/22 TT 152:8-18.]  Nike was not a rock stuck in a river flowing around it that could not be changed.  To the contrary, Nike "expected" retailers to comply when Nike asked to cease use of COOL COMPRESSION in product names.  [*Id.* 130:20-131:1; 141:19-25.]

Nike knew that the retailers to whom it continued to sell would continue the infringement as a result.  Nike's Nike Pro product line manager Nick Johnson testified that retailers would have had no reason to change the COOL COMPRESSION product names if not notified by Nike.  [Johnson Depo Designation CR pp.39-40.]  The evidence confirmed his testimony, with Lontex's By-Retailer Summary showing an abundance of third-party retailers (mostly having purchased directly from Nike) using the infringing product names from 2017 through 2020.  [PX 31 & 31A, pp. 7-14; 10/21 TT 46:5-22 (dates listed in PX 31 are date of retailer usage); 10/25 TT 215:17-219:7 (direct wholesale sales from Nike annotated in PX 31A by PX 1621 notation)].

So much so, in fact, that Nike compiled a whole list of third-party retailers still using Cool Compression product names online in June 2018, when it had finished its own sales and only then decided to contact retailers. [*See, e.g.* 10/22 TT 140:12-141:10; PX 770 & 775.]

Ample evidence supports that Nike sold product to third-party retailers which it knew would continue to sell at retail. Nike intended that the retailers continue using the NIKE PRO COOL COMPRESSION product names given to them, names which Nike had told Lontex it no longer intended to use. Accordingly, there was sufficient evidence to support the jury's contributory infringement verdict.

C. **There Was No Erroneous Jury Instruction on Willfulness, Nor Can Nike Suggest Prejudice**

Nike argues that the willfulness instruction was erroneous, and then claims the evidence was insufficient to support willfulness. Nike's arguments as to legal error of the jury instruction fails, both as a matter of correct legal standards and insofar as it fails to show any prejudice or injustice. *Dean v. Specialized Sec. Response*, 876 F. Supp. 2d 549, 552-553 (W.D. Penn. 2012) (new trial "disfavored by the law" and error must have "resulted in prejudice," e.g. to "prevent injustice"). Further, the evidence extensively supported willfulness, both as discussed above regarding contributory infringement and as discussed in Lontex's pending Post-Trial Motion (*see* Dkt. 384-01 pp. 4-9). That evidence applies equally to Nike's argument attacking the willfulness finding in this Motion. Yet further details concerning the supporting evidence of willfulness are also included below.

<u>First</u>, in cases involving reverse confusion, Third Circuit precedent placed carelessness as the relevant standard, but this Court instructed the jury on recklessness as the lowest form of culpable state for purposes of willfulness, putting it well within Third Circuit precedent and more favorable to an infringement defendant than was required. *Fisons Horticulture, Inc. v. Vigoro*

*Indus.*, 30 F.3d 466, 480 (3d Cir. 1994).

Second, as Nike acknowledges, the Third Circuit recently repeatedly addressed without criticism a willfulness finding based on an instruction of recklessness, a finding which was relevant to multiple issues on appeal. *Kars 4 Kids Inc. v. Am. Can!*, 2021 U.S. App. LEXIS 23672 n.12 & 22, 8 F.4th 209, 221 (3d Cir. 2021). And Justice Sotomayor's recent concurrence also identifies recklessness as a sufficient culpability for willful infringement. *Romag Fasteners, Inc. v. Fossil Grp., Inc.*, 140 S. Ct. 1492, 1498 (2020). Nike's own proposed standard of "deliberate disregard" is a classic formulation of recklessness. Mtn. 14 *quoting SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999); *see Eddy v. V.I. Water & Power Auth.*, 369 F.3d 227, 232 (3d Cir. 2004) (defining "reckless" as "where he acts recklessly in deliberate disregard" (alterations in original omitted)) quoting Section 46 of the Restatement (Second) of Torts at Comment i). Nike has certainly cited no authority rejecting the formulation of willfulness as including recklessness, as provided in *Kars 4 Kids* or *Romag Fasteners*.

Third, Nike relies on an asserted distinction without any of the required prejudice. *Dean v. Specialized Sec. Response*, 876 F. Supp. 2d at 552-553. The jury also found punitive damages, which requires "outrageous" conduct, so "outrageous" as to be "intentional, reckless or malicious." *Hutchison v. Luddy*, 582 Pa. 114, 121-22, 870 A.2d 766, 770-71 (2005). Whatever Nike claims was inaccurate about the willfulness instruction, the punitive damages instruction was correctly given, and the finding of punitive damages necessarily satisfies any higher standard Nike suggests should have been presented to the jury – showing a lack of prejudice necessary to reverse the jury's verdict.

Finally, Nike's argument that post-notice use could not legally count as willfulness is not correct. Mtn. pp. 16-17. As this Court found on summary judgment in relying on the same

*Louis Vuitton* decision Nike now criticizes yet again: "Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice."  Dkt. 235 (Order) p. 21 quoting *Louis Vuitton Mallateir & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa.) (Reed, J.).  Use "after being warned of too close resemblance" is not blameless.  *Id.* quoting *Kos Pharms*, 369 F.3d at 721.

Nike cites to *SecuraComm* as supposedly suggesting a contrary "majority rule" about post-notice use, but ignores *SecuraComm's* critical language: "A defendant's refusal to cease using a mark upon demand is not necessarily indicative of bad faith.  This is particularly true when the trademark at issue is not registered." *SecuraComm Consulting Inc.*, 166 F.3d at 189. That post-notice use is not "necessarily" (e.g. automatically) bad faith, is a far cry from suggesting post-notice use cannot be indicative of bad faith.  Further, in *SecuraComm*, there was no evidence that any advice of counsel had been disregarded or that the infringer knew of the plaintiff, which allowed *SecuraComm* to distinguish itself from other cases finding intent on exactly such basis.  *Id.* at 188-189.

Hence, as discussed in this section further below, the jury was well within bounds by concluding that post-notice use for two years of an incontestable federally-registered trademark – despite a promise to stop within months and an express internal instruction coming from Nike Legal to do so – showed willful infringement.  And as noted in Lontex's Post-Trial brief, the evidence was sufficient to reject Nike's self-serving testimony and conclude that it knew of Lontex's Cool Compression mark prior to adoption.  Dkt. 384-1 (Lontex's Mtn.) p. 5.

Even were Nike's "rule" about post-notice use correct (it is not), Nike does not meet it. Nike suggests it was like the defendant in *SecuraComm*, who simply stood on its belief that it was not infringing and therefore continued using the accused mark in such reliance (and on the

plaintiff's silence in response to such proposed ongoing use).  Mtn. p. 17.  Nike now claims it

had a right to continue selling in good faith based on a belief of fair use – but that is not what

happened as shown at trial and its narrative was contradicted by the evidence.

Nike's legal department expressly directed that Nike stop using "Cool Compression" in

product names, Nike "could not have those words … next to each other as a way of complying,

based off of direction from legal."  [Johnson Depo. Direct Examination Designation CR at 9-10.]

The directive was not "optional."  [*Id.* at 10-11.]  Due to "being challenged for a trademark

infringement on "Cool Compression" ….  The COMPRESSION callout needs to come out of the

product name."  [PX 11.]

But the Nike organization failed to do so and distributed 27 wholesale catalogs in 2017

with NIKE PRO COOL COMPRESSION product names still front and center for the relevant

garments.  [PX 32].  Nike Team sports ignored that instruction as well, and distributed sports

catalogs in 2017 for each of Men's Training, Basketball, Football, Lacrosse, and Baseball with

the infringing mark.  [PX 31 pp. 2-3; e.g. PX 1472 pp. 26-27.]  And far from trickling sales, the

post-notice period was when the majority of the relevant styles were sold.  [PX 20A; 10/22 TT

137:13-16].  Thus, Nike has no analog in the case law that required the jury to find against

willfulness.

And although *Fison* provides multiple factors to consider in assessing the adequacy of a

trademark search based on the follow-up steps taken by a defendant to evaluate the impediments

to use revealed by any marks disclosed in such search, Nike failed to clear even the first hurdle

(e.g. running a search) because it built its massive product line of shirts, shorts and tights on

Lontex's COOL COMPRESSION property without even the most basic title search.  *Fisons*, 30

F.3d at 480.  And Lontex's COOL COMPRESSION trademarks were supported by incontestable

trademark registrations, giving conclusive nationwide exclusive use for the compression shirts, shorts and tights.  [PX 310 p. 19, 1A, 1B.]

Despite many excuses for why a trademark search was never run in the first place, Nike's Product Line Managers were each forced to admit on the stand that they had not or did not recall ever having used the ANAQUA clearance system during the relevant timeframe – period. [Johnson Depo. Designation CR p.14; 10/22 TT 114:2-19 (Mangum).]  The jury heard evidence that Nike had a system in place to avoid just such infringement by style names, but failed to use it.  [PX 647 / DX 628 at left 4th bullet point.]  Nike's unambiguous documentation provided without exclusion "all style names continue to be submitted to legal via ANAQUA." [PX 647/DX-628 at bullet point 4).]

Even disregarding this evidence (as the jury was not required to do, and Nike is not free to do on this motion), crediting Nike's self-serving testimony still required entering into ANAQUA all "external" consumer-facing style names.  [10/22 TT 80:19-21.]  The NIKE PRO COOL COMPRESSION name was a "style name" (something Nike's highest-ranking witness, Ms. Mack-Ireland, ultimately admitted during cross-examination), and in fact the name used on the consumer-facing Nike.com product listing.  [10/22 TT 79:19-25 & PX 1396 (style name); 10/22 TT 82:19-83:11 & DX 947 (Nike.com)].

Nike knew the power its style names wielded, had a required process for legal review, and its Nike Pro management utterly failed to follow that policy.  Nike continued selling using the infringing product name for two years after notice, despite express direction from its legal department that such uses were to stop.  By Nike's own internal staff's admission, a delay of even a *week* in stopping use of COOL COMPRESSION was too long and worthy of apology. [PX 775.]  Nike gives no Third Circuit case requiring the jury to reject willfulness on such facts.

Thus, Nike has done nothing to meet its high burden in suggesting that the willfulness verdict should be vacated or that Nike should get a new trial based on the jury instruction given.

### D.   The Jury Correctly Found that Nike Failed to Establish All Three Required Elements of Its Fair Use Defense

Nike failed each of the three elements of its affirmative defense of fair use, any one of which was sufficient to reject fair use:

First, Nike failed to show non-trademark use.  Nike and Lontex both framed the trademark use as *whether or not* NIKE PRO COOL COMPRESSION *was the product name.* Lontex's closing argument made the fair use argument by framing the question as one of whether it was in fact the product name.  [10/26 TT  41:3-5.]  As discussed above, the evidence amply supported that NIKE PRO COOL COMPRESSION (or COOL COMPRESSION) was Nike's product name.  *See above* p. 19.

While Nike's Motion focuses on the lack of COOL COMPRESSION on the garment, it ignores the substantial evidence the jury relied on that starts with, but goes far beyond, both Nike and third-party online stores' prominent use of the product name front and center in online listings (far more visible than anything on the garment). [*See, e.g.* PX 30, 30A, 103, 134.]

The use translated to in-store and in-store related shopping experience as well.  Nike's Tech Sheets included the COOL COMPRESSION product names as the most prominent text in hundreds of sheets, designed to train retailers and their staff.  PX 1396, 1404 & 1418 (example tech sheets); PX 33 (tech sheet summary).  And the natural result followed.  At retail, the Cool Compression products were all grouped together in-store and were included in common COOL COMPRESSION signage and customer circulars.  [*See, e.g.* 10/18 TT 67:10-17 (Nike Factory Store signage "NIKE PRO COOL COMPRESSION"); Cunningham Trial Depo. (played 10/18) Direct Exam Clip Report 31-33 (Dick's Sporting Goods signage "COOL COMPRESSION"); PX

1451 p. 4 (Dick's Circular "MEN'S NIKE COOL COMPRESSION TOPS, TIGHTS AND SHORTS").]

As a result, Nike fails to establish that the jury's only reasonable conclusion was that its use was non-trademark, e.g. not as a product name.  *Byrnes & Keifer Co. v. Flavoripe Co.*, 1 U.S.P.Q.2d (BNA) 1124, 1125, 1128 (W.D. Penn. 1986) (use of "blend" in NIPPY BLEND infringed BLENDD mark and fair use defense was "without merit" because use of "blend" in same scripting showed it was "indeed a part of the product name and not merely used in its descriptive sense"); *cf. In re Royal BodyCare, Inc.*, 83 U.S.P.Q.2D (BNA) 1564, 1569 (TTAB 2007) (product mark "serves to identify a particular product within a line of merchandise").

Nike suggests that its house mark vitiates the trademark use of the product mark here, but ignores that the jury was presented with a host of other marks used by Nike confirming that consumers are used to seeing Nike use product name and technology name trademarks (such as Dri-Fit) alongside or prominently with its house mark in trademark fashion all the time (the same as Lontex's SWEAT IT OUT and COOL COMPRESSION mark).  [PX 8 p. 30.]

<u>Second</u>, evidence defeating Nike's claim of both non-trademark use and purely descriptive use included substantial evidence from Nike itself:

> ➢ As noted, Nike's Deborah White admitted COOL COMPRESSION is "a thing, like it's almost hyphenated, becoming a noun in and of itself" which would "stand out" like Nike's admittedly-trademarked Dri-Fit technology trademark, an "adjective and a noun, it's a new thing that's being referred to." [White Depo. Designation Clip Report  p. 24; 10/22 TT 116:1-15 (Mangum).]

> ➢ Nike used NIKE PRO COOL COMPRESSION in the same naming hierarchy as NIKE PRO HYPERWARM and NIKE PRO HYPERCOOL, and both

HYPERWARM and HYPERCOOL are registered trademarks of Nike.  [PX 638; 10/19 TT 97:16-25 (E. Nathan); 10/22 TT 116:1-15 (Mangum).]  And they were likewise also used as tech platforms.  [PX 647/DX 628.]  HYPERWARM (very warm) and HYPERCOOL (very cool) were admitted trademarks of Nike, used in the same mode and manner, and Nike's registration of those marks to use in such similar manner was ample evidence for the jury to treat as an admission of trademark use.

➢ Nike's own expert witness admitted that even when Nike used its mark with "COOL" and "COMPRESSION" in customer-facing sales pages, only 24 out of 420 (<6%) surveyed respondents identified some form of "cooling being a tribute of the cool compression products."  [10/25 TT 116:22-117:8.]

➢ COOL COMPRESSION appeared prominently in the product names without any difference in font or scripting, and the COOL COMPRESSION product names appeared prominently in print promotions and online sales.  [PX 30A & 30B.]; *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017) (use alongside house mark made fair use a jury issue to resolve).

➢ As noted above, many witnesses testified to actual confusion in thinking the product names' use of COOL COMPRESSION indicated Nike had obtained some sort of rights to Lontex's products or technology, which shouldn't have happened over and over again if the terms were being used purely descriptively as a non-trademark.  *See above* p. 2; *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 245 (3d Cir. 2005) ("even though a finding of likely confusion would not foreclose assertion of the statutory descriptive fair use defense, courts

might nonetheless factor the extent of confusion into determining whether the purportedly descriptive use was not fair.").

➢ Retail staff like Nike store employee Kenisha Likely were specifically trained to use COOL COMPRESSION as the product names, even dropping NIKE PRO from the product names for store dialogues with consumers.  [10/18 TT 61:17-63:15.]

➢ Nike suggested only minimal examples to the jury of supposed "inconsistencies," which the jury was free to discredit or give minimal weight in crediting the overwhelming evidence showing sufficiently consistent and prominent (e.g. not "8-point font," Mtn. 22) use of COOL COMPRESSION in product names – particularly the By-Retailer, By-Style-Number, Tech Sheet, and Catalog Summary Exhibits.  [PX 30A, 30B, 31, 31A, 32, 33.]

What Nike now asserts as its internal "subjective" intention in initially selecting the terms COOL and COMPRESSION to use in product names, the jury had more than sufficient evidence to conclude that the NIKE PRO COOL COMPRESSION product names were not used in a purely descriptive non-trademark manner as far as "objective" marketplace fair use was concerned.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1039 (9th Cir. 2010) ("subjective good faith is relevant to the inquiry, but the overall analysis focuses on whether [defendant's] use was 'objectively fair.'") *quoting KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004).

Finally, the same evidence supporting willfulness and punitive damages was more than enough to find Nike failed in satisfying the required element of good faith.  Moreover, Nike's burden to prove good faith was a higher burden than simply avoiding a finding of willful

infringement. *Henley v. Devore*, 2010 U.S. Dist. LEXIS 67987, *56 (C.D. Cal. Jun. 10, 2010) (good faith requires "reasonable steps to assure fair use before infringement," so failure to obtain IP lawyer clearance allowed reasonable jury to decide against good faith).

For these reasons, there was more than enough evidence supporting the jury's rejection of Nike's fair use defense, and the defense was properly rejected on any one or more of the three required elements.

### E.     The Record Amply Supports the Punitive Damages Award

Nike's challenge begins by claiming Pennsylvania common law trademark infringement was not in the case for the jury to decide.  The Court already heard all such arguments from Nike and rejected this argument in its pretrial choice-of-law ruling, when it allowed the claim to proceed to trial.  [Dkt. 281 p. 9 & 282.]

Nike also renews its challenge that Pennsylvania trademark infringement does not permit punitive damages, a challenge rejected when the Court determined the jury should be instructed on punitive damages.  Nike is wrong to claim the Lanham Act has a "bar on punitive damage" (Mtn. 25) – it simply does not provide such remedy for Lanham Act violations.  The remedy here was made under Pennsylvania law for violation of Pennsylvania law (which supplied the language for the jury instruction).  Dkt. 312 pp. 68-69.  Pennsylvania is <u>not</u> a state that restricts punitive damages remedies to only certain types of claims, indeed even allowing such damages on a claim of liability for negligence and finding it "error of law" to "conflate[] theories of liability with the distinct issue of damages."  *Hutchison v. Luddy*, 582 Pa. 114, 125-126 (2005) (error to find punitive damages not available even on negligence claim).

Thus, unsurprisingly, punitive damages awards for unfair competition claims (of which trademark infringement is merely a subset) have been awarded and affirmed.  *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 272 (3d Cir. 1975) *citing Macdonald v. Winfield Corp.*,

191 F.2d 32, 38 (3d Cir. 1951) (affirming punitive damages award under Pennsylvania state unfair competition claim); *Sandoz Inc. v. Lannett Co.*, 2020 U.S. Dist. LEXIS 242558, *18, 2020 WL 7695960 (E.D. Penn. Dec. 28, 2020) (The Pennsylvania "Superior Court [has] upheld an award of punitive damages for tortious interference and unfair competition").

Next, contrary to Nike's argument that "passing off is an essential element" of a Pennsylvania trademark infringement claim, (Mtn. 25), Lontex's proposed jury instructions correctly provided that the state law trademark infringement claim applies the same standard as Lanham Act trademark infringement.  Dkt. 312, p. 60 *citing Giannone v. Giannone*, 429 F. Supp. 3d 34, 39 (E.D. Pa. 2019) (same standards).

Nike waived any argument that an additional element of "passing off" not required for Lanham Act trademark infringement was required to show state-law liability.  Nike failed to preserve any objection when it both proposed a verdict form from the outset that did not include it as a separate claim for decision by the jury, (Dkt. 310), and offered no separate jury instruction on it or instruction that direct liability for trademark infringement required a finding of passing off (Dkt. 311).  Nike has no basis to now argue passing-off was required to find liability.

In any event, Nike is wrong on the law.  Nike's single authority addressing passing off and unfair competition (*Pa. State Univ.*) simply recognized that passing off is sufficient to satisfy Pennsylvania's law of unfair competition, but subsequent courts citing it have expressly held that Pennsylvania unfair competition claims include traditional trademark infringement claims and in no way are "restricted to passing off."  *Giordano v. Claudio*, 714 F. Supp. 2d 508, 521-522 (E.D. Pa. 2010) citing and applying *inter alia Pa. State Univ. v. Univ. Orthopedics. Ltd.*, 706 A.2d 863, 870 (Pa. Super. Ct. 1998).

Finally, Nike's substantive arguments about the factual showing for punitive damages

inappropriately constricts the analysis and fails to offer a basis for rejecting the jury's finding. The jury was properly instructed that conduct is "outrageous" if it is shown to "demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 582 Pa. 114, 121-22, 870 A.2d 766, 770-71 (2005). As noted in the willfulness and contributory infringement discussions above, the evidence supported conduct meeting the criteria of recklessness and willfulness, both when Nike first adopted the infringing product names and with its continued post-notice actions. *See above* pp. 12 & 15.

### F.   Nike's Conditional Request for New Trial

Although Nike purports to make a conditional request for new trial based on any new trial granted to Lontex, the scope of any relief of a new trial is limited based on the claimed errors and to the distinct errors warranting a new trial, e.g. a damages error might warrant trial on such damages but does not support a new trial on liability. *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1242 (11th Cir. 2008) (proper remedy under FRCP 59 for trial error going to damages is limited new trial "as to the amount of damages"). Thus, Nike may not use Lontex's request for a new trial as to damages to support its conditional request for a new trial, and this offers an additional reason to deny Nike's request for new trial.

Dated:    December 22, 2021        TROUTMAN PEPPER HAMILTON
SANDERS LLP


By: /s/ *Ben L. Wagner*
    Ben L. Wagner (CA SBN 243594)
    ben.wagner@troutman.com
    *Admitted Pro Hac Vice*
    11682 El Camino Real, Suite 400
    San Diego, CA  92130-2092
    Telephone:   858.509.6000
    Facsimile:   858.509.6040

    Michael A. Schwartz (PA 60234)
    TROUTMAN PEPPER HAMILTON
    SANDERS LLP
    3000 Two Logan Square
    Eighteenth & Arch Streets
    Philadelphia, PA 19103-2799

    *Attorneys for Plaintiff*
    LONTEX CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2021, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Ben L. Wagner*

Ben L. Wagner