**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| LONTEX CORPORATION, |
| Plaintiff, |
| |
| v. |
| |
| NIKE, INC., |
| Defendant. |

Civil Action No.:  18-cv-5623

(Hon. Michael M. Baylson)

## DEFENDANT NIKE, INC.'S REPLY IN FURTHER SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND CONDITIONAL MOTION FOR A NEW TRIAL

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................1

II.     ARGUMENT .................................................................................................................1

        A.      The Evidence Was Not Sufficient to Support a Likelihood of Confusion. ............1

                1.      The parties' marketplace uses were dissimilar (*Lapp* factor 1). .................1

                2.      COOL COMPRESSION is an exceedingly weak mark (*Lapp* factor
                        2). .................................................................................................................2

                3.      The parties' consumers exercise a high level of care when
                        purchasing (*Lapp* factor 3). ........................................................................4

                4.      The actual confusion factors favor NIKE (*Lapp* factors 4 and 6). ..............5

                5.      NIKE had no intent to confuse consumers (*Lapp* factor 5). .......................6

                6.      The parties' products are meaningfully different, and they target
                        their respective products to different consumers through different
                        trade and advertising channels (*Lapp* factors 7, 8, and 9). ........................6

                7.      Likelihood of expansion in the other party's market (*Lapp* factor 10). ........7

        B.      Lontex Failed to Prove Contributory Infringement. .................................................7

        C.      JMOL of No Willfulness Is Required Under the Correct Legal Standard. ..............9

        D.      NIKE's Use of the Terms "Cool" and "Compression" Was Fair. ........................12

        E.      The Record Cannot Support an Award of Punitive Damages. .............................14

        F.      Judgment as a Matter of Law is Warranted, Rather Than a New Trial. ...............15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000)............................................................................................1, 2, 11

*Basketball Mktg. Co., Inc. v. FX Dig. Media, Inc.*,
  257 F. App'x 492 (3d Cir. 2007) ......................................................................................7, 8, 9

*Caesars World, Inc. v. Venus Lounge, Inc.*,
  520 F.2d 269 (3d Cir. 1975).................................................................................................14

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988) ...............................................................................................4

*Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.*,
  921 F.2d 467 (3d Cir. 1990)..................................................................................................15

*Checkpoint Sys., Inc. v. Check Point Software Techs. Inc.*,
  269 F.3d 270 (3d Cir. 2001)............................................................................................1, 2, 4

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
  125 F.3d 28 (2d Cir. 1997)....................................................................................................13

*Country Floors, Inc. v. Gepner*,
  930 F.2d 1056 (3d Cir. 1994)..................................................................................................2

*Dessert Beauty, Inc. v. Fox*
  568 F. Supp. 2d 416 (S.D.N.Y. 2008)..............................................................................12, 14

*Eddy v. V.I. Water & Power Auth.*,
  369 F.3d 227 (3d Cir. 2004)..................................................................................................10

*First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*,
  923 F. Supp. 693 (E.D. Pa. 1996) ..........................................................................................5

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
  30 F.3d 466 (3d Cir. 1994)....................................................................................................11

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*
  830 F.3d 1242 (11th Cir. 2016) ..............................................................................................3

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005)....................................................................................................2

*Gomez v. Allegheny Health Servs., Inc.*,
  71 F.3d 1079 (3d Cir. 1995)..............................................................................1

*Gucci Am. v. Daffy's Inc.*,
  354 F.3d 228 (3d Cir. 2005)...........................................................................11

*Henley v. DeVore*,
  733 F. Supp. 2d 1144 (C.D. Cal. 2010) .........................................................14

*Inwood Labs. v. Ives Labs.*,
  456 U.S. 844 (1982)........................................................................................7, 9

*Kars 4 Kids Inc. v. Am. Can!*,
  8 F.4th 209 (3d Cir. 2021) .........................................................................10, 11

*Kegan v. Apple Computer, Inc.*,
  1996 WL 667808 (N.D. Ill. Nov. 15, 1996) ...................................................3

*Kelly-Brown v. Winfrey*,
  95 F. Supp. 3d 350 (S.D.N.Y. 2015)...............................................................13

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (E.D. Pa. 2002) ..............................................................11

*Macdonald v. Winfield Corp.*,
  191 F.2d 32 (3d Cir. 1951)..............................................................................14

*New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC*,
  424 F. Supp. 3d 334 (D. Del. 2019)..................................................................4

*Pryer v. Slavic*,
  251 F.3d 448 (3d Cir. 2001).............................................................................15

*Rearden LLC v. Rearden Commerce, Inc.*
  683 F.3d 1190 (9th Cir. 2012) .........................................................................3

*Romag Fasteners, Inc. v. Fossil Group, Inc.*,
  140 S. Ct. 1492 (2020) (Opp. ) .......................................................................10

*Sabinsa Corp. v. Creative Compounds, LLC*,
  609 F.3d 175 (3d Cir. 2010) (Ambro, J., concurring)......................................6

*Sandoz Inc. v. Lannett Co., Inc.*,
  2020 WL 7695960 (E.D. Pa. Dec. 28, 2020)..................................................14

*Scanvec Amiable Ltd. v. Chang*,
  80 F. App'x 171 (3d Cir. 2003) ......................................................................15

*SecuraComm Consulting Inc. v. Securacom Inc.*,
    166 F.3d 182 (3d Cir. 1999)..................................................................9, 10, 11, 12

*SportFuel, Inc. v. Pepsi Co.*,
    932 F.3d 588 (7th Cir. 2019) .......................................................................12, 14

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
    868 F. Supp. 2d 415 (E.D. Pa. 2012) ...................................................................3

*Versa Prods. Co. v. Bifold Co. (Mfg.)*,
    50 F.3d 189 (3d Cir. 1995)................................................................................4, 5

*Xtreme Caged Combat v. ECC Fitness*,
    2013 WL 6022135 (E.D. Pa. Nov. 12, 2013) .......................................................2

**Statutes**

15 U.S.C. § 1115(b) .............................................................................................9

**Other Authorities**

11 FED. PRAC. & PROC. CIV. § 2803 (3d ed.) ..................................................15

Fed. R. Civ. P. 59 ...............................................................................................15

4 MCCARTHY ON TRADEMARKS § 23:21.50 (5th ed. 2021) .............................1

4 MCCARTHY ON TRADEMARKS § 3:4 (5th ed. 2021) ....................................13

4 MCCARTHY ON TRADEMARKS § 11:46 (5th ed. 2021) ................................13

4 MCCARTHY ON TRADEMARKS § 23:113 (5th ed. 2021) ..............................10

4 MCCARTHY ON TRADEMARKS § 11:49 (5th ed. 2021) ................................14

4 MCCARTHY ON TRADEMARKS § 23:13 (5th ed. 2021) ..................................5

4 MCCARTHY ON TRADEMARKS § 23:120 (5th ed. 2021) ..............................11

## I.     INTRODUCTION

Lontex's opposition fails to show there was sufficient evidence to support the jury's liability verdict.  Under Third Circuit law, the Court must grant JMOL "if the record is critically deficient of the minimum quantum of evidence from which the jury might reasonably afford relief."  *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995).  As such, NIKE's motion should be granted and JMOL of no liability should be entered in NIKE's favor.

## II.    ARGUMENT

### A.     <u>The Evidence Was Not Sufficient to Support a Likelihood of Confusion.</u>

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (internal quotation omitted).  The relevant inquiry for the Court is whether confusion is likely, not whether confusion is merely a possibility.  *Id.* at 198.  This assessment is a qualitative inquiry that looks at the record as a whole and not all *Lapp* factors will be relevant or afforded the same weight depending on the factual setting.  *Id.*

#### 1.     <u>The parties' marketplace uses were dissimilar (*Lapp* factor 1).</u>

Lontex improperly fails to compare NIKE's actual marketplace use of the words "cool" and "compression" with Lontex's actual marketplace use of COOL COMPRESSION.  In a trademark case, this use is key.  Similarity is assessed by comparing the overall commercial impression of each party's marketplace use; Lontex repeatedly ignores this fundamental tenet.  *A & H*, 237 F.3d at 216; *Checkpoint Sys., Inc. v. Check Point Software Techs. Inc.*, 269 F.3d 270, 281 (3d Cir. 2001); *see also* 4 McCarthy on Trademarks § 23:21.50 (5th ed. 2021).  A properly instructed jury was required to look at NIKE's entire marketplace use of the words "cool" and "compression" on its nike.com website, inside its retail stores, and in its wholesale catalogs.  The

trial evidence showed that NIKE's limited use of the words "cool" and "compression" together in written materials was ***always*** in connection with NIKE's marks and ***always*** as part of a lengthy style name that included several other descriptive phrases.  There is no evidence that NIKE ever used "cool compression" on its own in any written materials.  The evidence also showed that NIKE did not use "cool compression" on any store signage (6T 72:11-16), despite the vague and uncorroborated recollections of two former employees.  Based on the total commercial impression of each party's actual marketplace use, the only reasonable conclusion is this factor favors NIKE.[1]

    2. COOL COMPRESSION is an exceedingly weak mark (*Lapp* factor 2).

    Lontex failed to show it has a strong mark for either forward or reverse confusion.  Rather, the record establishes that COOL COMPRESSION consists of highly descriptive terms, was weakened by third-party use, and was not promoted in the way expected of a mark owner.

    ***COOL COMPRESSION is conceptually weak***.  Lontex does not dispute that each of the words in COOL COMPRESSION is highly descriptive of its products.  It also does not dispute that the USPTO required Lontex to disclaim "compression" from its COOL COMPRESSION registrations, which "strongly suggest[s] that Plaintiff's mark cannot be considered suggestive." *Xtreme Caged Combat v. ECC Fitness*, 2013 WL 6022135, at *15 (E.D. Pa. Nov. 12, 2013). Finally, while Lontex criticizes the *amount* of third-party use evidence shown to the jury, it does not dispute that this evidence showed that third parties use the same or similar terms to describe tight-fitting athletic apparel designed to keep a wearer cool.  This further demonstrates the conceptual weakness of Lontex's mark. *See A & H Sportswear*, 237 F.3d at 223; *Freedom Card*,

---

[1] Lontex also mischaracterizes the Third Circuit's holding in *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1063 (3d Cir. 1994).  There, the court held that the marks' similarity created a genuine issue of material fact for resolution by a jury.  *Id*.  The court did not hold, as Lontex suggests, that the marks were "similar enough that a jury can give similarity alone so much weight in the *Lapp* analysis as to allow a jury to find likely confusion." (Opp. at 3.)  Rather, "none of these factors is determinative ... and each factor must be weighed and balanced." *Checkpoint Sys.*, 269 F.3d at 280.

*Inc. v. JPMorgan Chase & Co.,* 432 F.3d 463, 476 (3d Cir. 2005).[2]  This factor strongly disfavors Lontex for both forward and reverse confusion.

**COOL COMPRESSION is commercially weak**.  Lontex does not dispute that COOL COMPRESSION is not well-known by the consuming public.  Yet Lontex claims its sub-brand, known only to an infinitesimally small percentage of U.S. consumers, is still commercially strong. The law does not support Lontex's argument.[3]  In this Circuit, commercial strength is shown by evidence of "the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace."  *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 423 (E.D. Pa. 2012).  Undisputed facts establish that COOL COMPRESSION is commercially weak: (1) Lontex's annual self-described "COOL COMPRESSION" sales never exceeded $165,000 at any time in the last decade; (2) Lontex did not sell through mass-market retailers; (3) Lontex did not use the COOL COMPRESSION mark with most of the 20,000 garments it sold; (4) Lontex did not spend much time, money, or effort promoting COOL COMPRESSION (its advertising expenditures, never more than a few thousand annual dollars anyway, in fact declined between 2006 and 2019 (8T 76:8-78:19; DX 1197)).

Lontex nonetheless claims that Mr. Nathan's efforts resulted in recognition amongst "all trainers" in Major League Baseball (which likely totals less than 100 individuals), and that this is enough to show commercial strength.  (Opp. at 4.)  This evidence is insufficient, as Lontex's own

---

[2] The non-binding cases that Lontex cites do not help its argument.  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.* holds that "the number of third-party users is important, but there is no hard-and-fast rule establishing a single number that suffices to weaken a mark."  830 F.3d 1242, 1257 (11th Cir. 2016).  *Rearden LLC v. Rearden Commerce, Inc.* holds that third-party uses in different fields for unrelated goods are not enough to weaken a mark.  683 F.3d 1190, 1211 (9th Cir. 2012).

[3] Lontex cites *Kegan v. Apple Computer, Inc.*, but that out-of-circuit case merely held the plaintiff had raised enough evidence to avoid summary judgment as to whether its mark was a "distinctive mark under Illinois anti-dilution law."  1996 WL 667808, at *11 (N.D. Ill. Nov. 15, 1996).  The decision has no bearing on the commercial strength analysis under the second *Lapp* factor.

case citation confirms.  In *Century 21 Real Estate Corp. v. Sandlin*, the court found plaintiff's CENTURY 21 mark strong because the plaintiff had "expended ***several million dollars in advertising*** real estate services rendered in connection with the "Century 21" mark, and that the mark has been used in connection with real estate ***sales in excess of one billion dollars***."  846 F.2d 1175, 1179 (9th Cir. 1988) (emphasis added).  By contrast, Lontex barely advertised at all and relied almost entirely on word-of-mouth and in-person sales with minimal connection to the COOL COMPRESSION mark.  The lack of commercial strength of the mark heavily favors NIKE.

      3.    <u>The parties' consumers exercise a high level of care when purchasing (*Lapp* factor 3).</u>

The following facts are undisputed: (1) Lontex's specialized, medical-grade compression garments are far more expensive than NIKE Pro baselayer apparel; (2) Lontex sold its compression garments to a niche of sophisticated professionals in the sports medicine field; and (3) NIKE sold its NIKE Pro baselayer apparel primarily at wholesale to professional retail buyers and direct to the general consumer through its website and NIKE-owned retail outlets.  In such cases, "courts have generally not found Lanham Act violations."  *Checkpoint*, 269 F.3d at 284 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995)).

Despite Mr. Ball's fleeting puzzlement, Mr. Ball and all of Lontex's other professional customers never mistakenly purchased a lower-priced NIKE garment while believing it was Lontex's higher-priced one.  And Lontex undisputedly never sold through any general consumer retail outlets.  Lontex's cases on the level of care exercised by *general* apparel consumers are thus irrelevant.  *See New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 348 (D. Del. 2019)) (cited in Opp. at 6).  The parties' apparel products were not proximate in the general consumer marketplace, making confusion all the less likely.  This factor favors NIKE.

4

4.      The actual confusion factors favor NIKE (*Lapp* factors 4 and 6).

***Length of time of NIKE's use without actual confusion*** (**Lapp** *factor 4*).  Lontex concedes that, although NIKE sold more than 6 million units of the products at issue from 2015 to 2018, Lontex failed to identify even one instance of actual consumer confusion *in the purchasing context*, which is what matters.  This confirms that NIKE's use was not likely to cause any consumer confusion.  *See Versa Prods.*, 50 F.3d at 205 ("If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be.").

***No evidence of actual confusion*** (**Lapp** *factor 6*).  Lontex did not produce any competent evidence of consumer confusion under actual marketplace conditions.  Lontex's professional customers never confused Lontex's products with NIKE's or vice versa.  Mr. Nathan's admissions of no actual confusion refuted Lontex's counsel's attempt to create a contrary impression through Lontex's professional customers.  Indeed, several professional athletic trainers admitted they were ***not*** confused between NIKE and Lontex or the parties' products.  And these were Lontex's *own* customers and Lontex's *own* witnesses.  Lontex elicited "generalized confusion" testimony from these friendly witnesses, yet failed to deliver evidence of a mistaken purchasing decision.  That is the only confusion that counts.  *See, e.g.*, *First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 705 (E.D. Pa. 1996) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions."); 4 McCarthy § 23:13 ("[N]ot all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases.").  And it is completely absent—indeed, it is negated—here.

Also, NIKE's was the only survey presented, *and* it was consistent with the complete lack

of evidence of actual confusion from 2015 to 2018.  Lontex did not submit any consumer survey, presumably because it "expected that any survey results would undermine its case." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 190 (3d Cir. 2010) (Ambro, J., concurring).

No actual consumer confusion existed, despite three years of NIKE's alleged use in the marketplace.  As such, these factors point strongly against a finding of likelihood of confusion.

5.  NIKE had no intent to confuse consumers (*Lapp* factor 5).

As shown in the prior post-trial briefing (ECF 382-1 at 8-10 and ECF 386 at 7-9), there is no evidence that NIKE intended to confuse or deceive consumers.  There is no evidence that NIKE intended to prey on Lontex or its purported goodwill when it used these common words to describe its own products.  There is no evidence that NIKE even intended to adopt "cool compression" as a trademark—much less for the *purpose of confusing or deceiving consumers*, as this factor requires.  *See Sabinsa*, 609 F.3d at 187 ("[C]ourts must look at whether the defendant chose the mark to intentionally confuse consumers," and a "defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.").  Also, neither fact that Lontex emphasized at trial as proof of NIKE's culpable intent—that NIKE did not perform a trademark clearance search for the phrase "cool compression" and continued to sell the products after Lontex first sent a cease-and-desist letter—shows the requisite "intent to confuse or deceive" consumers.  Whatever else those facts might mean in this case, they are simply not enough to establish what this factor requires.

6.  The parties' products are meaningfully different, and they target their respective products to different consumers through different trade and advertising channels (*Lapp* factors 7, 8, and 9).

The undisputed evidence showed the parties sold different products to different consumers in different ways.  Lontex sold a highly specialized, expensive, sports medicine product through physical therapists and athletic trainers for injury prevention and rehabilitation.  NIKE, by contrast,

sold baselayer products primarily at wholesale to professional buyers who in turn sold the products widely through general consumer retail outlets at an accessible price point.  There was no evidence of direct competition or that purchasers might substitute the NIKE Pro products for Lontex's products, or vice versa.  Lontex's physical therapist and athletic trainer customers admitted they do not buy NIKE Pro products for injury prevention and rehabilitation.  These factors favor NIKE.

7.    Likelihood of expansion in the other party's market (*Lapp* factor 10).

The evidence showed that neither Lontex nor NIKE was likely to expand into each other's market: Lontex is not expanding its compression garments into mainstream retail outlets that carried NIKE products; NIKE will not carry Lontex's garments in its own digital and brick-and-mortar retail outlets; and NIKE is not expanding the NIKE Pro products at issue into the healthcare or medical field for injury prevention and rehabilitation.  This factor favors NIKE.

In sum, not one *Lapp* factor favors Lontex.  Moreover, taken as a whole, the evidence at trial was not sufficient for a reasonable jury to find that an appreciable number of consumers are likely to be confused as to the source of the parties' products.  Accordingly, this Court should find as a matter of law that NIKE did not infringe the COOL COMPRESSION trademark.

**B.    Lontex Failed to Prove Contributory Infringement.**

JMOL of no contributory infringement is warranted for two reasons.  First, Lontex concedes that its contributory infringement claim fails if the Court finds that there was no substantial evidence of direct infringement.  (Opp. at 12-15.)  Second, Lontex did not prove, as required, that NIKE: (1) ***intentionally induced*** another to infringe the COOL COMPRESSION trademark; or (2) continued to supply a product to one that NIKE ***knew*** was infringing the COOL COMPRESSION trademark with that product.  *See Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 854-55 (1982); *Basketball Mktg. Co., Inc. v. FX Dig. Media, Inc.*, 257 F. App'x 492, 495 (3d Cir. 2007).

Lontex wrongly contends it proved to the jury "that Nike knew of Lontex's COOL

COMPRESSION trademark when its infringing shirts, shorts and tights were launched in 2015."

(Opp. at 13 (citing ECF 384-01 at 5-6).)[4]  To the contrary, the trial evidence showed that NIKE's

long-standing use of "cool" and "compression" to "describe its products"—for many years before

the NIKE Pro products at issue were ever sold—had ***nothing*** to do with Lontex or the COOL

COMPRESSION mark.  (5T at 100:4-12.)  NIKE indisputably was not even aware of Lontex until

it received a demand letter in April 2016.  (*See, e.g., id.* at 66:15–67:16; 6T at 172:17-22.)

Moreover, the "vast majority" of contributory infringement cases concern manufacturers

selling product to retailers and encouraging those retailers to infringe a trademark.  *Basketball

Mktg.*, 257 F. App'x at 495, n.5.  Yet such conduct is entirely absent from this record.  NIKE sold

NIKE Pro product to retailers, but never encouraged retailers to infringe the COOL

COMPRESSION mark.  The undisputed evidence showed that NIKE did not control how retailers

sold NIKE products or the content that retailers used on their own websites.  (5T at 123:14-125:10.)

NIKE's retailers were free to exercise their discretion to use (or not use) the product descriptors

for fit (*e.g.*, compression, fitted, tight, or classic), silhouette (*e.g.*, shirt, tank, shorts, or tights), and

length (*e.g.*, short sleeve, long sleeve, 3/4 length, 2", 3", 6", or 9") included in NIKE's lengthy

style names.  This evidence is insufficient to support a verdict that NIKE intentionally induced or

encouraged retailers to infringe the COOL COMPRESSION mark.

Lontex also failed to adduce sufficient evidence to support a finding that NIKE continued

---

[4] Lontex's argument hangs on pure speculation that NIKE was aware of Lontex and its mark—and thus intended to infringe and induce others to infringe—because NIKE representatives spent time in professional sports team locker rooms.  Lontex assumes that the jury then made the inferential leap that NIKE representatives surreptitiously inspected professional players' undergarments, learned of interior garment tags that sometimes said "Cool Compression," and reported back to the NIKE Pro product development team, who then created "NIKE Pro Cool Compression" with knowledge of Lontex.  Even if this wildly speculative tale were true (and it is not), Lontex did not present sufficient evidence from which a reasonable jury could conclude that NIKE intended to confuse and deceive customers ***and*** that NIKE encouraged retailers to do the same.

selling NIKE Pro products to retailers **with knowledge that the retailers were infringing**.  *See Inwood Labs.*, 456 U.S. at 854–55.  Instead, Lontex wrongly contends that NIKE's sales of NIKE Pro product to retailers, even after Lontex sent NIKE a cease-and-desist letter, somehow shows that NIKE **knew** retailers were infringing and continued selling product anyway.  (Opp. at 13-15.)  But the evidence showed that NIKE asserted a fair use defense in response to Lontex's letter— reasonably believing the use of the words "cool" and "compression" to describe two different features of its own products was protected by 15 U.S.C. § 1115(b) and thus did not infringe—and continued to sell its product.  The evidence further showed that, at this time, NIKE embarked on a company-wide product naming structure change that included removing the product descriptors for fit (*e.g.*, compression, fitted, tight, or classic) from the style name—a business decision unrelated to Lontex.  (PX11; 2T 186:13 (Munro Clip Report at 21-24).)  While this change was first implemented internally and on the nike.com website, the evidence showed it would take until the Spring 2018 season to reach downstream retailers and partners.  (Munro Clip Report at 23-24.)  NIKE contacted retailers in June 2018 and asked them to remove the "compression" fit product descriptor from style names to be consistent with NIKE's changed naming structure.  (5T 129:16-131:1; PX 775).  This evidence does not support a finding that NIKE knew retailers were infringing and continued selling product anyway.  "Cases finding contributory infringement usually involve more central participation than is to be found on this record."  *Basketball Mktg.*, 257 F. App'x at 495 n.5.  Accordingly, JMOL of no contributory infringement is warranted

### C.      JMOL of No Willfulness Is Required Under the Correct Legal Standard.

Lontex's opposition points to no evidence supporting a finding that NIKE had "an intent to infringe or a deliberate disregard of [Lontex's] rights."  *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999).  But that is what the Third Circuit requires to prove willfulness.  *Id.*  This failure alone is enough to warrant JMOL of no willfulness.

Rather than identify evidence that might support the jury's verdict under the Third Circuit's legal standard (*i.e.*, facts showing a deliberate intent to deceive), Lontex doubles down on its misstatements of the law, which already resulted in an erroneous willfulness jury charge. (Opp. at 15-19.)  Lontex then repeats the two legally insufficient factual pillars of its willfulness case: that NIKE (1) did not run a trademark clearance search; and (2) continued to sell its products after Lontex sent a demand letter in 2016.  (*Id.*)  But the Third Circuit's binding opinion in *Securacomm* forecloses all of Lontex's arguments.

Adopting Lontex's proposed formulation, the jury charge stated: "This encompasses a number of culpable mental states, including an intent of promoting confusion and appropriating the prior user's goodwill ***or reckless infringement***."  (7T at 83:23-84:1 (emphasis added).)  But neither the Supreme Court nor the Third Circuit has adopted "reckless infringement" as a culpable mental state sufficient to support willfulness.  Lontex again cites *Romag Fasteners, Inc. v. Fossil Group, Inc.*, 140 S. Ct. 1492 (2020) (Opp. at 16), but the Court's holding—willfulness is not a prerequisite to profits disgorgement—is not relevant to the jury charge here.  Justice Sotomayor's concurrence, cited by Lontex, is (1) not binding authority and (2) merely notes some "[c]ourts of equity . . . defined 'willfulness' to encompass a range of culpable mental states—including the equivalent of recklessness."  *Id.* at 1498.  The Third Circuit, like "most courts[,] use[s] 'willful' as a synonym for intent to confuse."  McCarthy § 23:113 (citing *SecuraComm*, 166 F.3d at 187).[5]

Lontex again cites *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209 (3d Cir. 2021), misstating that the Circuit "repeatedly addressed without criticism a willfulness finding based on an instruction

---

[5] Lontex incorrectly claims that the Third Circuit held that "deliberate disregard" is a "classic formulation of recklessness."  (Opp. at 16 (citing *Eddy v. V.I. Water & Power Auth.*, 369 F.3d 227, 232 (3d Cir. 2004).)  *Eddy* is a case concerning a claim for intentional infliction of emotional distress under Virgin Islands law with no relevance here. 369 F.3d at 231.  And the Restatement's definition of recklessness that *Eddy* cites does not even include that language.  *Id.* at 231-32.

of recklessness." (Opp. at 16.)  First, the district court's willfulness charge in *Kars 4 Kids* was not before the Third Circuit because the charge was not challenged on appeal.  Second, Lontex cites footnote dicta (not a holding), which summarizes the parties' contentions about whether willfulness bars laches, an issue that was ultimately remanded.  *Kars 4 Kids*, 8 F.4th at 221, n.12.

Lontex also claims that the charge's erroneous inclusion of reckless infringement is proper because, in reverse confusion cases, "Third Circuit precedent placed carelessness as the relevant standard" for willfulness.  (Opp. at 15 (citing *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 480 (3d Cir. 1994).)  Lontex is wrong again.  The Third Circuit has not adopted "carelessness" as the proper standard for willfulness, even in reverse confusion cases.  In fact, later Third Circuit panels (ignored again by Lontex) *directly rejected* the "carelessness" formulation and said *Fisons*'s holding is "manifestly out of step with our prior holdings." *SecuraComm*, 166 F.3d at 189; *Gucci Am. v. Daffy's Inc.*, 354 F.3d 228, 235 n.8 (3d Cir. 2005); *A & H Sportswear*, 237 F.3d at 232-33.

The Third Circuit—like most federal courts, *see* 4 McCarthy § 23:120 (collecting cases)—has held that continued sale after receiving a cease-and-desist letter is **not** sufficient to establish willful infringement.  Yet Lontex persists in citing a district court's non-binding and inapposite decision to support the erroneous charge.  (Opp. at 16-17 (citing *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002).)  Lontex's view contradicts the Third Circuit's *SecuraComm* holding that "[defendant's] failure to stop using the [challenged] mark after receiving [plaintiff's] cease and desist letter does not support a finding of willful infringement."  166 F.3d at 189.  In *SecuraComm*, as here, the defendant had several reasons to believe it had a right to use the challenged designation, including "a plausible basis for believing that its use of its name was not likely to cause confusion."  *Id.*  Likewise, NIKE reasonably believed

the use of the words "cool" and "compression" to describe two different features of its own products was protected by the statute and thus did not infringe.  *SecuraComm* is dispositive here.

Finally, Lontex wrongly contends that the jury was properly instructed that it could find willfulness if NIKE did not conduct a trademark clearance search.  (Opp. at 18-19.)  The Third Circuit has held that "failure to conduct a trademark search is insufficient to establish that its infringement was willful or intentional."  *SecuraComm*, 166 F.3d at 189.  Thus, Lontex's version of the fact is legally insufficient to support the jury's verdict.  Even if it were relevant (and it is not), the NIKE Pro product team did not submit "cool compression" for trademark clearance because NIKE does not submit generic product descriptors for fit (here, "compression") to the NIKE legal department for clearance.  (5T at 111:8-23; 1T at 133:12 (Johnson Dep. at 144:18-22, 145:7-13, 150:5-10, 150:17-24).)  Even if deemed "careless," the Third Circuit has held that "carelessness is not the same as deliberate indifference with respect to another's rights in a mark or a calculated attempt to benefit from another's goodwill."  *SecuraComm*, 166 F.3d at 189.

Finally, contrary to Lontex's claim that NIKE "fails to show any prejudice or injustice," resulting from the instructional error (Opp. at 15), that is not required for a JMOL of no willfulness. The only issue is whether substantial evidence supports the willfulness verdict under the correct legal standard.  It does not.  JMOL of no willfulness thus should be granted.

### D.     NIKE's Use of the Terms "Cool" and "Compression" Was Fair.

Under the correct legal standard, NIKE's good-faith use of "cool" and "compression" for their commonly understood meanings to describe its own products was fair as a matter of law.

**Non-Trademark Use**:  Lontex concedes that its focus was on proving that NIKE used the words "cool" and "compression" in a product (or style) name.  (Opp. at 20.)  But courts hold that using words in a product name does ***not*** automatically transform them into source-identifying trademarks.  *See Dessert Beauty*, *Inc. v. Fox* 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008); *SportFuel,*

*Inc. v. Pepsi Co.*, 932 F.3d 588, 598 (7th Cir. 2019). This is because product names often include descriptive or generic terms to tell consumers ***what*** the product is, but not ***who*** is the source.

The evidence showed that NIKE used the words "cool" and "compression" to tell customers what its products were, not as a source-identifying trademark or as a symbol to attract public attention. Trademark owners prominently display their marks; NIKE did not do that with these words. It did not put "cool compression" on any NIKE products, labels, or hangtags (1T at 88:4-90:1; 5T at 59:14-17; 9T at 194:21-195:21; DX2000–DX2004; DX2037–DX2039), and it did not run any marketing campaigns with "cool compression," or put "cool compression" on store signage or displays (6T at 72:11-16; DX1012 at 3, 5, 6). NIKE did not treat "cool compression" as a trademark, brand, or "franchise," seek legal clearance to use "cool compression," or apply to register "cool compression" as a trademark. (5T at 111:8-14.) NIKE's use of "cool" and "compression" was inconsistent—the antithesis of source-identifying trademark use. *Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 363-64 (S.D.N.Y. 2015); *see also* MᶜCARTHY § 3:4 ("Trademark Usage Should be Immediately Evident…"). NIKE did not display the product descriptors "cool" and "compression" prominently—they were most often in a small, 8-point font—which "generally does not constitute trademark use." MᶜCARTHY § 11:46. The vague and uncorroborated recollections of some Lontex witnesses are insufficient to overcome the overwhelming evidence that NIKE did not advertise these words on store signage. Finally, NIKE branded its apparel with NIKE's *actual* marks, which is highly probative of NIKE's non-trademark use. *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30–31 (2d Cir. 1997).

**Descriptive Use**. It is undisputed that NIKE used "cool" and "compression" to describe two different product features: "cool" described lightweight, breathable fabric with mesh panels that kept the wearer cool, and "compression" meant super tight fit to lock in the wearer. (5T at

58:23-59:5; 65:8-22; DX2000–DX2004; DX2037–DX2039.)  This was evident from NIKE's catalogs and webpages and their detailed product descriptions.  (*See* ECF 382-1 at 20-24.)  Lontex chastises NIKE's descriptive use as "internal 'subjective' intention," (Opp. at 23), but even Mr. Nathan himself admitted that NIKE used the words just to describe its products.  (DX0283.)

**Good Faith**.  As discussed in NIKE's opening brief (ECF 382-1 at § II.A.5)), and above, the evidence showed NIKE acted in good faith, and no evidence was enough to negate good faith. Indeed, neither failure to run a trademark clearance search nor continued sale of products after a cease-and-desist letter is sufficient to negate good faith.  *See Dessert Beauty*, 568 F. Supp. 2d at 426-28; *SportFuel*, 932 F.3d at 600-02; *see also* McCarthy § 11:49 (collecting cases).[6]

**E.**     **The Record Cannot Support an Award of Punitive Damages.**

Lontex does not dispute that it abandoned its Pennsylvania claim for common law trademark infringement in its Amended Complaint and again in its Pretrial Memorandum.  (ECF 20 and 245.)  Thus, it remains error to have this claim on the damages verdict form.  Also, as this Court previously ruled (ECF 281), the Lanham Act does not allow for the recovery of punitive damages.  Even Lontex cites a case that confirms a plaintiff cannot recover punitive damages under the Lanham Act.  *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975) (reversing damages award).[7]  Lontex still cites no case from this Circuit awarding punitive

---

[6] Lontex contends for the first time that "Nike's burden to prove good faith was a higher burden than simply avoiding a finding of willful infringement."  (Opp. at 23-24 (citing *Henley v. DeVore*, 733 F. Supp. 2d 1144, 1165 (C.D. Cal. 2010)).  This is not the law in the Third Circuit, and Lontex's out-of-circuit case concerning *willful copyright infringement* and the *Copyright Act's statutory fair use defense* is inapposite and should be disregarded.

[7] Lontex's other cases (*Macdonald v. Winfield Corp.*, 191 F.2d 32 (3d Cir. 1951), and *Sandoz Inc. v. Lannett Co., Inc.*, 2020 WL 7695960, at *1 (E.D. Pa. Dec. 28, 2020), cited at Opp. 24-25) are also inapposite because neither case concerned trademark infringement claims under the Lanham Act or Pennsylvania common law.

damages under Pennsylvania common law for mere trademark infringement.[8]   Rather, Pennsylvania law "allows punitive damages only for 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'"  *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 471 (3d Cir. 1990).  Because the record contained "no evidence of outrageous conduct or willful disregard for [plaintiff's] rights," the Third Circuit affirmed a directed verdict of no punitive damages.  *Id.*  This case should follow suit.

### F.   Judgment as a Matter of Law is Warranted, Rather Than a New Trial.

NIKE continues to seek only JMOL and not a new trial.  Lontex has requested a new trial on damages, which should be denied, as set forth in NIKE opposition (ECF 386).  However, if the Court grants that request in whole or in part without granting a complete JMOL in NIKE's favor, then NIKE requests, in the alternative, a new trial on the grounds stated in this motion.  NIKE's alternative request for a new trial is thus purely conditional on whether this Court grants a new trial on any ground that Lontex may raise in its post-trial motions.  Contrary to Lontex's contention that the scope of any new trial would be limited to damages only, Fed. R. Civ. P. 59 gives the Court broad discretion to grant NIKE's alternative request for a new trial on the grounds stated in this motion.  *See* 11 FED. PRAC. & PROC. CIV. § 2803 (3d ed.).  Also, as even Lontex argued in opposing bifurcation (ECF 259), the liability issues in this case are too intertwined with the damages issues for this Court to allow a new trial to proceed on damages alone under Third Circuit law.  *See Pryer v. Slavic*, 251 F.3d 448 (3d Cir. 2001).

---

[8] Lontex's contentions about "passing off" are wrong.  The Third Circuit has held, in the trademark-infringement context, that a "claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival."  *Scanvec Amiable Ltd. v. Chang,* 80 F. App'x 171, 180 (3d Cir. 2003).  NIKE did not "waive" this argument, as it was raised several times, including NIKE's motion for a directed verdict.  (4T 158:24-159:16.)

January 11, 2022

Respectfully submitted,

By:   */s/ Gina L. Durham*

DLA PIPER LLP (US)

Gina L. Durham (admitted *pro hac vice*)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Michael D. Hynes (admitted *pro hac vice*)
Andrew J. Peck (admitted *pro hac vice*)
Marc E. Miller (admitted *pro hac vice*)
Lane E. McKee (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 100201

Ilana H. Eisenstein
Ben C. Fabens-Lassen
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Attorneys for Defendant NIKE, Inc.*