**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| LONTEX COPRORATION | CIVIL ACTION |
|---|---|
| v. | NO. 18-5623 |
| NIKE, INC. | |

**MEMORANDUM RE: POST-TRIAL MOTIONS**

Baylson, J.                                                                             March 3, 2022

**I.      Introduction**

Plaintiff Lontex Corporation, a small athletic clothing manufacturer, sued Defendant Nike, Inc. in 2018 for trademark infringement.  After extensive pretrial proceedings, Lontex won a jury verdict in October 2021.  Trademarks are important concepts.  Trademarks are most often associated with products in commercial settings.  Trademarks foster free enterprise and enable consumers to have more choices to purchase.  Trademarks are pervasive; they are frequently found in literature, and in opera.  Hamlet has hesitation, Macbeth has ambition, Wotan has his spear. Papageno, a bird cage; and Rigoletto, a limp.  And for old movies, Dr. Strangelove has a Nazi salute, doing double duty as both a metaphor and a trademark.

Throughout this case, both Lontex and Nike were consistently contentious during discovery, on dispositive motions, on Daubert motions, and at trial.  The facts were disputed on many fronts.  Because the jury found for Lontex on all aspects of liability, the evidence must be considered in the light most favorable to Lontex.  Although Nike, in its post-trial briefs, acknowledges this principle, its contentions are often based on ignoring this standard.  Nike frequently asserts evidence that it raised at trial—claiming that it was not contradicted—but ignores the conclusion that the jury may have completely rejected Nike's witness, testimony, or the documentary evidence that Nike presented.

The trial was bifurcated into phases, the first dealing with liability and the second with damages.  The liability phase ended with the verdict in favor of Lontex, on all issues submitted to the jury by specific interrogatories.  The jury found that Nike had infringed on Lontex's "cool compression" trademark, that Nike was also liable to Lontex for contributory infringement, and that Nike had acted willfully.  The jury rejected Nike's affirmative defense of "fair use."

Although Lontex prevailed before the jury on liability, the jury's verdict on damages was a resounding rejection of the damages projections that Lontex presented through its own witnesses and experts.  The jury awarded Lontex $142,000 in compensatory damages as reasonable royalties and $365,000 in punitive damages.  Lontex's experts, however, had projected damages over $100,000,000 on several different theories.  Thus, the outcome of the case resulted in the jury finding Nike liable in all issues presented to the jury but awarding Lontex only a fraction of the damages that Lontex was seeking.

The Court's obligation on all of the voluminous post-trial motions is to determine whether Lontex's evidence supported the verdict against Nike, whether any errors were committed requiring a new trial, and whether the Court should award any additional damages under various provisions in the trademark statute on which Lontex relies in arguing that the Court should, indeed, increase the judgement substantially.

This case was well tried by experienced and highly competent counsel, and both parties, whose principal counsel were based in California, must be complimented by their wise use of Philadelphia counsel for portions of the trial.  The jury was attentive, and the witnesses testified concisely but in conflict.  The experts were well prepared, as in most cases, but strongly disputed each other.

The record of this case requires the Court to find that the jury's verdict on liability was supported by the facts and that the Court did not commit any error that requires a new trial in whole or in part.  However, the Court can and will exercise its discretion on equitable principles as allowed under the Lanham Act, the federal trademark statute.  15 U.S.C. § 1117.  Specifically, these equitable principles allow the Court to treble compensatory damages, to issue a permanent injunction, and to award attorneys' fees to Lontex.  This Memorandum will deal with all issues except for Lontex's request for attorneys' fees.

The subject matter of this case concerns clothing designed for individuals engaged in athletic activities.  Lontex, with significant entrepreneurship, diligence, and perseverance, built a small but successful business of athletic clothing.  First using the trademark "Sweat It Out," Lontex later applied for and secured a trademark registration for the term "cool compression," the trademark at issue.  This Court's opinions on the dispositive motions set forth more details about the basic background facts and legal issues in the case, which will not be repeated here.  See Lontex Corp. v. Nike, Inc., No. CV 18-5623, 2021 WL 724971 (E.D. Pa. Feb. 24, 2021) (Baylson, J.) (ruling on summary judgment motions); Lontex Corp. v. Nike, Inc., 384 F. Supp. 3d 546 (E.D. Pa. 2019) (Baylson, J.) (ruling on motion to dismiss).

Certain aspects of this case resemble the biblical story of David and Goliath.  Lontex originated in Norristown, within this district.  Its offices remain there, although the manufacturing for its products is secured from many different outlets, both domestic and foreign.  Nike is, of course, one of the largest companies in the world, making athletic clothing of many types.

After Lontex initially registered the "cool compression" trademark in 2008, it did not use it immediately.  Although Nike asserted that Lontex only started using the "cool compression"

trademark to have grounds for this lawsuit to make up for commercial failures, the Court must reject this theory completely in view of the jury's verdict.

Lontex having owned a legitimate trademark in "cool compression," and having persuaded the jury that Nike violated that trademark, the evidence shows that Lontex used the trademark in its marketing efforts, primarily to athletic teams. Lontex president Efraim Nathan spent much of his time traveling to meet with representatives of professional sports teams, touting the benefits of his garments. As he explained, the concept of "cool compression" was that Lontex provided a superior product that athletes could wear while doing strenuous exercising or sports activities and, nonetheless, remain "cool" due to the "compression" aspect of its products. The cool compression garments were manufactured so that they are worn tightly on the body but nonetheless had stretching capabilities and remained comfortable for the individual wearing them. The trademark term "cool compression" not only presents a catchy alliteration but focuses upon two attractive factors for consumers of athletic clothing: a "compression" garment fits tightly on the wearer's body, but, nonetheless, the wearer remains "cool."

There is no dispute in this case that Nike manufactured similar products using compression technology. Lontex never asserted that Nike was violating any law in doing so. There is evidence in the case, as anyone who purchases athletic clothing from time to time may recognize, that many manufacturers make similar garments.

Lontex never contended that the term "cool compression" was visible on the outside of any Nike garments. Rather, the evidence showed that Nike used the term "cool compression" on labeling and also some promotional materials that were used to advertise its products in its own stores or in the stores of third-party retailers, such as Dick's Sporting Goods.

Thus, the essence of the case is that Nike, without much dispute, used the term "cool compression" to assist its efforts to sell its clothing, although it did not use the term itself on the outside of its clothing.  This difference may not have any legal significance, but it may account for the jury's award of damages in a relatively nominal amount compared to what Lontex was seeking.

## II.    Parties' Contentions

Both parties now move to modify or supplement the jury verdict.  In its Omnibus Post-Trial Motion (ECF 384), Lontex contends that Nike's profits from the sale of its cool compression products should be disgorged and that both the disgorged profits and the damages already awarded by the jury should be trebled.  (Pl.'s Mot. 1–13.)  In the alternative, Lontex moves for a new jury trial on the sole issue of damages.  (Id. at 14–16.)  Lontex also requests that the Court issue an injunction prohibiting Nike from commercial use of the term "cool compression" in relation to any Nike products and requiring that Nike advise retailers that purchased Nike products using "cool compression" to do the same.  (Id. at 13–14.)  Finally, Lontex moves for an award of attorney's fees and costs, which this Court will address separately.  (Id. at 20.)  Nike filed a Response (ECF 386), and Lontex filed a Reply (ECF 389).

Nike, which initially moved during the trial for judgment as a matter of law, has renewed that motion (ECF 382).  Nike contends that no reasonable jury could find that Nike committed trademark infringement or contributory trademark infringement, that no reasonable jury could find that Nike did so willfully, and that no reasonable jury could find that Nike's use of "cool compression" was not fair use.  (Def.'s Mot. 2–19.)  Nike further contends that no reasonable jury could find that an award of punitive damages was warranted.  (Id. at 24–25.)  Nike requests that the Court vacate the jury's verdict on liability and punitive damages and enter judgment in favor of Nike on its fair use affirmative defense.  In the alternative, Nike requests a new trial on these

grounds if—but only if—the Court grants Lontex's request for a new trial.  (Id. at 25.)  Lontex

filed a Response (ECF 387), and Nike filed a Reply (ECF 388).

## III.    Lontex's Motion

### a. Disgorgement

Disgorgement of profits is an equitable remedy available in a federal trademark case.  See

15 U.S.C. § 1117(a).  However, it "does not follow as a matter of course upon the mere showing

of an infringement."  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 209

(3d Cir. 1999).

Lontex vigorously asserts, notwithstanding the jury's verdict not to award any damages for

disgorgement, that this Court should use its equitable powers to basically overrule the jury verdict

and make an award of a disgorgement of Nike's profits from selling cool compression products.

To determine whether a prevailing plaintiff in a trademark infringement suit is entitled to an award

of profits, courts consider factors that include, but are not limited to, 1) whether the defendant

intended to confuse or deceive, 2) whether sales have been diverted from the plaintiff to the

defendant, 3) the adequacy of other remedies, 4) any unreasonable delay by the plaintiff in

asserting its rights, 5) the public interest in making the defendant's conduct unprofitable, and 6)

whether the infringement is a case of "palming off."  Banjo Buddies, Inc. v. Renosky, 399 F.3d

168, 175 (3d Cir. 2005).

The Court finds that, on the whole, the Banjo Buddies factors favor non-disgorgement.

There is no evidence that Nike intended to confuse or deceive anyone through use of the term

"cool compression," nor that sales were diverted from Lontex to Nike.  To the contrary, several

past Lontex customers testified at trial, and none indicated that they had purchased Nike products

using the term "cool compression" when they meant to purchase Lontex cool compression

products.  There was also no evidence presented that Nike was "palming off"—in other words, that Nike sought to convince customers that Nike products using the words "cool compression" were actually Lontex products.

The third, fourth, and fifth factors are more favorable for Lontex.  The evidence indicates that Lontex did not unreasonably delay in asserting its rights, contacting Nike not long after it learned of the trademark infringement.  With regard to the adequacy of other remedies, the relatively low amount of compensatory damages awarded by the jury is not necessarily unreasonable because there is no evidence that Nike's use of the term "cool compression" had any causal relationship to a decline in Lontex's sales.  However, as will be discussed below, the compensatory damages awarded by the jury represent only a very small portion of Nike's profits from selling products that use the words "cool compression."  In addition, and relevant to the fifth factor, the jury found that punitive damages were warranted in this case.  Although one purpose of punitive damages is to deter future misconduct, the amount of punitive damages awarded in this case is likely far too low to significantly influence Nike's actions.

Lontex's contentions to increase the amount of damages awarded are not supported by enough evidence or any precedent.  Lontex argues that Nike's own expert witness, Paul Meyer, found that Nike enjoyed gross profits in excess of $7 million for selling products using the term "cool compression" (Tr. Day 9 at 150), and Lontex itself presented expert testimony that the disgorgement of Nike's profits should be up to $95.7 million (Tr. Day 8 at 206).  Nonetheless, the jury could have found, notwithstanding its determination that Nike was liable, that both Lontex's and Nike's estimation of the amount of profits that Nike gained was speculative or not entitled to any weight.  The jury in its discretion decided to reject any award for disgorgement.  The jury could have concluded that common sense alone would justify no award for disgorgement, because

it would be very hard to determine how much money, if any, Nike had gained by a consumer's decision to buy Nike clothing because the label and/or promotional material used the term "cool compression." There is nothing inconsistent with the jury finding that this was a violation of trademark law but that it did not benefit Nike and that therefore disgorgement would not be proper.

The Court also notes that Lontex has not presented any on-point precedents in the Third Circuit for a court overturning a jury's decision to reject disgorgement in a trademark infringement case. In support of its argument, Lontex cites <u>Marshak v. Treadwell</u>, 595 F.3d 478 (3d Cir. 2009). However, <u>Marshak</u> concerned a district court's decision to *not* award profits after an infringer repeatedly violated a previously issued injunction. <u>Marshak</u>, 595 F.3d at 494–96. In reversing the district court's decision, the Third Circuit emphasized that the defendants must not be allowed "to keep the fruits of their contempt when they have evaded the injunction for more than half a decade." <u>Id.</u> at 496. This has little bearing on the present case.

In the final analysis, there is simply no evidence that any measurable portion of the profits that Nike made through the sale of products using the words "cool compression" would have otherwise flowed to Lontex, a much smaller company that targets its cool compression products to a much more specialized consumer base. The Court will not order a disgorgement of profits.

### b. Treble Damages

A court may treble or otherwise enhance damages in a trademark infringement case to provide adequate compensation to a prevailing plaintiff. 15 U.S.C. § 1117(a). Although the Court denies any amount of profit disgorgement, consistent with the jury verdict, the Court will treble the award of compensatory damages. This is principally because of the finding of willfulness.

The Lanham Act embodies a "Congressional purpose of making infringement unprofitable." <u>Banjo Buddies</u>, 399 F.3d at 178. Preventing an infringer from profiting off

infringement is especially important when the infringement is willful.  See Romag Fasteners, Inc v. Fossil, Inc., 140 S. Ct. 1492, 1494 (2020) ("Without question, a defendant's state of mind may have a bearing on what relief a plaintiff should receive. An innocent trademark violator often stands in very different shoes than an intentional one.").  This is "a principle reflected in the Lanham Act's text . . . which permits greater statutory damages for certain willful violations than for other violations." Id. at 1497.

In this case, the Court must credit Lontex's evidence that, despite Lontex notifying Nike of its trademark and requesting that Nike cease use of the trademark, Nike basically ignored this undisputed fact and continued to use the "cool compression" trademark in various ways.  (See Johnson Dep. 53–59.)  That Nike's use of the trademark may have been—given Nike's huge size and wide array of products—relatively minor or incidental is no defense.  As Congress demonstrated many years ago by passing the Lanham Act, and more recently by passing the Trademark Modernization Act of 2020, trademarks are an important property right for businesses in the United States.  A jury verdict finding a major corporation liable, and indeed finding that it acted willfully, should be acknowledged by the Court in granting the request for treble damages.

Furthermore, there is evidence that Nike substantially profited from the sale of trademark infringing products.  As noted, Nike's own expert, Paul Meyer, testified that Nike's profits from the sale of products using the term "cool compression" amounted to $2.8 million in net profits and $7.1 million in gross profits (Tr. Day 9 at 150), an amount greatly exceeding the compensatory damages awarded to Lontex.  Meyer also testified that the portion of Nike's profits attributable specifically to the "cool compression" mark may have amounted to as much as $800,000.  (Id. at 121.)  This again significantly exceeds the amount of compensatory damages awarded to Lontex.

Though few, if any, of Nike's sales may have otherwise gone to Lontex, that does not change the fact that Nike was financially enriched by activity that involved willfully infringing Lontex's registered trademark.  Even if trebling damages does overcompensate Lontex to some degree, "it is preferable that [the plaintiff] rather than [the defendant] receive the benefits of [the defendant's] infringement."  Banjo Buddies, 399 F.3d at 178.

Although the Court rejects Lontex's request for disgorgement, it does so because the jury has already spoken on that issue.  However, trebling is solely an equitable remedy for the Court, for which the jury had no knowledge or responsibility.  The Court concludes that given the overall circumstances of this case, treble compensatory damages are appropriate.  For these reasons, the Court will treble the compensatory damages that the jury awarded Lontex and increase this amount of damages from $142,000 to $426,000.

### c.  Post-Judgment Injunctive Relief

A plaintiff seeking a permanent injunction in a trademark infringement case must establish 1) that it has suffered an irreparable injury; 2) that monetary damages are inadequate to compensate for that injury; 3) that, considering the balance of hardship between the parties, an injunction is warranted; and 4) that an injunction would not disserve the public interest.   eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see also Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 216 (3d Cir. 2014) (applying this analysis to trademark infringement cases).  Under the Trademark Modernization Act of 2020, a prevailing plaintiff in a trademark infringement action is "entitled to a rebuttable presumption of irreparable harm."  15 U.S.C § 1116(a).

The Court finds that Lontex is entitled to injunctive relief.  An injunction that prohibits Nike from using the term "cool compression" in relation to its products will allow Lontex to use

the trademark without fear of future infringement drawing it into another burdensome legal battle against an opponent with much deeper pockets—something that monetary damages alone will not accomplish.  See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004) (discussing how "lack of control over one's mark" is injurious to a trademark owner).  Nor is being barred from using the term "cool compression" any serious hardship to Nike.

Finally, the Court finds that an injunction would not disserve the public interest.  See id. at 730 ("In light of our holding that 'there is a likelihood of consumer confusion created by' the use of confusingly similar marks, 'it follows that if such use continues, the public interest would be damaged.  Conversely, a prohibition upon [defendant's] use of [its] mark[] would eliminate that confusion.'" (quoting Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 198 (3d Cir. 1990)).  As the Trademark Modernization Act shows, there continues to be a strong Congressional interest in preventing and deterring trademark infringement.

The Court will therefore enjoin Nike from commercial use of the term "cool compression" in relation to its own products.  The Court will also require that Nike advise all retailers to which it sold products using the term "cool compression" to cease use of the term in relation to Nike products.  The Court will require that Nike provide Lontex with the names and contact information of retailers to whom this notice is sent.  However, the Court will not enjoin non-parties to this case.

### d.  New Trial

In the alternative, Lontex moves under Federal Rule of Civil Procedure 59(a) for a new trial on the issue of damages.  "The decision to grant a new trial is within the sound discretion of the trial court, and such requests are disfavored." Ponzini v. Monroe Cnty., 789 F. App'x 313, 315 (3d Cir. 2019) (non-precedential).  Lontex bases its motion on the Court's exclusion at trial of two pieces of evidence.  See id. (noting that "[a]lthough Rule 59 does not enumerate specifics, '[a]

11

court may grant a new trial on the grounds of . . . improper admission or exclusion of evidence'" (citation omitted)).

The first piece of evidence was a diagram showing increases and decreases in Lontex sales to particular football teams.  (Pl.'s Mot. 15.)  Finding that this diagram risked confusing and misleading the jury and had very little probative value to Lontex, the Court excluded it under Federal Rule of Evidence 403.  (Tr. Day 9 at 9.)

The second piece of evidence was a statement made by an attorney previously retained by Nike.  Lontex characterized the statement, which was made during negotiations between Lontex and Nike, as a threat.  (Pl.'s Mot. 15–16.)  The Court excluded the statement on the grounds that it was both made during settlement negotiations, see Fed. R. Evid. 408, and was very inflammatory and unfairly prejudicial, see Fed. R. Evid. 403.  (Tr. Day 8 at 185–85.)

The Court finds that these two pieces of evidence were correctly excluded for the reasons stated at trial.  "District Courts are vested with broad discretion in making admissibility determinations."  Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 423 (3d Cir. 2006).  "This is particularly true with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."  United States v. Finley, 726 F.3d 483, 491 (3d Cir. 2013) (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)).  Excluding this evidence caused no prejudice to any party.  Therefore, the Court will not grant a new trial.

## IV.     Nike's Motion

Judgment as a matter of law should be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a).  Although courts should grant judgment as a matter of law sparingly, "a scintilla of evidence is not enough to sustain a verdict of liability."  Ambrose v. Twp. of Robinson, 303 F.3d 488, 492 (3d Cir. 2002) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993)).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  Foster v. Nat'l Fuel Gas Co., 316 F.3d 424, 428 (3d Cir. 2003) (quoting Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)).

In deciding a motion for judgment as a matter of law, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).

### a.  Trademark Infringement

Nike contends that Lontex failed to produce evidence from which a reasonable jury could find that Nike's use of the term "cool compression" created a likelihood of confusion between Lontex products and Nike products—a necessary element of a trademark infringement claim.  This is the overarching factual dispute between the parties in this case.

In the Third Circuit, the factfinder in a trademark infringement case considers a set of factors known as the Lapp factors to determine whether a likelihood of confusion existed.  A & H Sportswear, 237 F.3d at 215.  "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001).

The Lapp factors consist of the following:

> 1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  The Court will review each Lapp factor and briefly note relevant evidence presented at trial.

### i.  Degree of Similarity Between the Marks

In assessing this factor, the factfinder attempt[s] to "move into the mind of the roving consumer," and determine "whether the [marks] create the same overall impression when viewed separately."  Checkpoint, 269 F.3d at 281 (citation omitted).  The factfinder must determine whether the "average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two."  Id. (citation omitted).

In this case, both Lontex and Nike used the term "cool compression" in association with their products.  There was evidence that, in addition to including the term "cool compression" on product labels, the term was used by Nike employees in Nike stores, as well as salespersons for third-party retailers, to promote the infringing Nike products.  (See Tr. Day 1 at 63–68; Tr. Day 5 at 152.)  A reasonable jury could find this contributed to a likelihood of confusion.

### ii.  Strength of the Owner's Mark

This factor considers "(1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition."  Checkpoint, 269 F.3d at 282.  Significantly, the

United States Patent and Trademark Office considered "cool compression" a distinct enough trademark to register it in the first place. See United States PTO v. Booking.com B.V., 140 S. Ct. 2298, 2301 (2020) ("A generic name—the name of a class of products or services—is ineligible for federal trademark registration."). Furthermore, Lontex presented evidence that the mark has some degree of commercial strength and marketplace recognition. Several past Lontex customers testified that they associated the term "cool compression" with Lontex's products. (See, e.g., Tr. Day 4 at 181.)

### iii.  Purchaser Care and Attention

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." Checkpoint, 269 F.3d at 284. Lontex provided very limited evidence on this point. The Court does note, however, that "courts have repeatedly held that buyers of athletic apparel and footwear are not likely to exercise a high degree of care. New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC, 424 F. Supp. 3d 334, 348 (D. Del. 2019) (surveying relevant cases).

### iv.  Intent of Defendant

"[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." Checkpoint, 269 F.3d at 286 (citation omitted).

At trial, Lontex presented testimony from several current or former Nike employees about the procedures that Nike used to avoid trademark infringement when naming products. (See, e.g., Mangum Dep. 111–124.) A reasonable jury might find that Nike make did not make adequate efforts to avoid infringing Lontex's trademark. Lontex also presented testimony suggesting that

Nike continued using the term "cool compression" even after it learned that Lontex owned a trademark in the term.  (See Johnson Dep. 53–59.)

Viewing this evidence as a whole, a reasonable jury might find that Nike acted with reckless indifference to Lontex's trademark right to the term "cool compression," supporting a finding of a likelihood of confusion.

### v.  Actual Confusion and Length of Time Before Confusion Arose

On these two Lapp factors—actual confusion and the length of time before actual confusion arose—Lontex presented very little evidence.  Lontex did present testimony from a witness, Sean Cunningham, who stated that he confused Nike products with Lontex products when he saw a display at a retail outlet for Nike products that used the term "cool compression." (Cunningham Dep. 31–33.)  However, Lontex did not present any evidence that any actual purchaser had been confused by Nike's use of the term "cool compression."  See First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc., 923 F. Supp. 693, 705 (E.D. Pa. 1996) (Joyner, J.) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions.").

Lontex's lack of evidence of actual confusion is not, however, dispositive.  Though "evidence of actual confusion may be highly probative of the likelihood of confusion," it "is not required to prove likelihood of confusion."  Checkpoint, 269 F.3d at 291; see also Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 (3d Cir. 1994) ("[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential.").

### vi.  Similarity of Marketing Channels and Target Markets

These two factors take into account that "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion," and that, similarly, "when parties

target their sales efforts to the same consumers, there is a stronger likelihood of confusion." Checkpoint, 269 F.3d at 288–89 (citation omitted).

Lontex presented evidence showing certain overlaps in how and to whom Lontex's and Nike's products were marketed.  Lontex and Nike both targeted their products to professional sports teams, though Nike also sold its products to a much broader consumer base through its retail operations.  (Tr. Day 2 at 54; Tr. Day 4 at 182.)  Furthermore, both the Lontex and Nike products at issue were promoted as improving athletic performance.  (Tr. Day 2 at 47; PX 1416.)

### vii.   Relationship Between Goods in Minds of Consumers

This factor considers "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." Checkpoint, 269 F.3d at 286.  The question "is whether the goods are similar enough that a customer would assume they were offered by the same source." Id.

Lontex presented testimony from several past Lontex customers who stated that when they encountered Nike cool compression products, they thought there might be an association between those products and Lontex's.  (See, e.g., Tr. Day 4 at 182.)  Furthermore, on a fundamental level, both Lontex's and Nike's products are compression garments marketed as athletic apparel.  The products are similar enough that a reasonable factfinder may well find that this factor favors finding a likelihood of confusion.  See Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 189 (3d Cir. 2010) (noting "cases where the relationship of goods was close enough to find likelihood of confusion, including: women's scarves and apparel with women's cosmetics and fragrances; liquor with restaurant selling liquor; batteries and lamps with light bulbs and lamps; and pipe tobacco and bar accessories with scotch whisky").

17

### viii.   Perceived Likelihood of Expansion into the Other's Market

Under this factor, a factfinder "look[s] not only to evidence that a plaintiff has actually moved into the defendant's market, but also to 'other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that it is likely to expand into that market.'"  <u>Checkpoint</u>, 269 F.3d 270, 290 (3d Cir. 2001) (citation omitted). Because Lontex and Nike are already direct competitors, a reasonable jury would find that this factor favors Lontex.  <u>See</u> <u>A & H Sportswear.</u>, 237 F.3d 198, 212 (3d Cir. 2000) ("[D]irectly competing goods . . . are already in each other's markets.").

### ix.   Discussion

The Court finds that Lontex presented sufficient, though not overwhelming, evidence that Nike's use of the term "cool compression" created a likelihood of confusion.  More evidence was presented with regard to some factors than others, but a jury need not find that every single factor favors Lontex to find a likelihood of confusion.  <u>See</u> <u>Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC</u>, 793 F.3d 313, 320 (3d Cir. 2015) ("'The Lapp factors are best understood as 'tools to guide a qualitative decision.' None of them in itself is determinative and each must be 'weighed and balanced' based on the particular facts of the case." (citations omitted) (quoting <u>Kos</u>, 369 F.3d at 709).

Viewing the evidence in the light most favorable to Lontex, the jury was entitled to conclude that by using the term "cool compression," Nike could tout the quality and features of its own athletic apparel beneficial to its customers.  By including the term "cool compression" on its labels and promotional materials, Nike emphasized the benefits of the customer being "cool" while wearing garments that use compression technology, allowing users to remain comfortable while exercising.

Simply stated, the jury, drawing reasonable inferences, was entitled to conclude that Nike was using the trademark term "cool compression" to bolster sales of clothing it manufactured. The jury was entitled to conclude that Nike's use of "cool compression" symbolized, if not summarized, these two important aspects of athletic clothing. This evidence and the reasonable inferences are sufficient to sustain the jury's verdict and are important <u>Lapp</u> factors.

 Although Lontex did not dispute Nike's evidence that Nike was likely initially unaware of the "cool compression" trademark, Lontex presented evidence that it had notified Nike of its ownership of the "cool compression" trademark, but Nike continued using the trademark. There was evidence that Nike received this notice and considered it internally but basically ignored it— or at least the jury was entitled to come to that conclusion. This evidence, of course, supports the jury's verdict that Nike's infringement was willful.

The Court cannot overlook the significance of the specific term "cool compression" in the marketing and sale of athletic clothing. Lontex seized upon a "catchy" two-word alliteration that had marketing resonance but that no other athletic clothing manufacturer had employed. In trademarks, originality is important. The two words together speak volumes about the apparel to the consumer market for athletic clothing. The garment will fit tightly to the body, but the wearer will remain "cool." The jury was entitled to use its common sense in weighing evidence about this trademark owned by Lontex but infringed by Nike.

The Court concludes that based on the evidence presented at trial, a reasonable jury could find that there was a likelihood of confusion between Lontex and Nike products and that Nike is therefore liable for trademark infringement.

### b. Contributory Infringement

Nike also contends that Lontex's contributory infringement claim fails as a matter of law. First, Nike argues that no reasonable jury could find that Nike committed direct trademark infringement and Nike therefore cannot be liable for contributory infringement. (Def.'s Mot. 12.) Having determined that a reasonable jury could indeed find that Nike committed direct trademark infringement, the Court rejects this argument.

Second, Nike submits that the no reasonable jury could find that Nike 1) intentionally induced another to infringe the "cool compression" trademark or 2) continued to supply a product that Nike knew infringed the "cool compression" trademark. (Def.'s Mot. 12.)  See Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 387 (3d Cir. 2016) (describing the elements of a contributory infringement claim).  At trial, Lontex presented evidence that Nike provided third-party retailers with materials using the term "cool compression" to describe certain Nike products.  (Johnson Dep. 23–25.)  Lontex presented further evidence that third-party retail workers may have been encouraged by Nike to publicly refer to these products with the term "cool compression."  (Tr. Day 5 at 152.)  Finally, Lontex presented evidence that Nike continued this activity even after Lontex contacted Nike about Lontex's trademark rights to "cool compression."  (Johnson Dep. 249–52.)  The Court concludes that a reasonable jury could find from this evidence that Nike is liable for contributory infringement.

### c. Willful Infringement and Punitive Damages

Nike next asserts that Lontex failed as a matter of law to prove that Nike committed willful trademark infringement.   First, Nike argues that the Court erred in instructing the jury that "willfulness" can include a mens rea of recklessness.  (Def.'s Mot. 16–18.)  Second, Nike argues

that, in any event, Lontex failed to produce evidence from which a reasonable jury could find that Nike acted recklessly in infringing Lontex's trademark.  (Def.'s Mot. 19.)

With regard to Nike's first argument, the Court notes the Third Circuit's recent indication that willful infringement can be committed by a reckless infringer.  See Kars 4 Kids Inc. v. Am. Can!, 8 F.4th 209, 221 n.4 (3d Cir. 2021) ("The District Court stated that the [infringement] was 'willful,' but did not say whether it reached this conclusion because it found that Kars 4 Kids was a knowing infringer or reckless infringer."); see also Romag, 140 S. Ct. 1492, 1498 (2020) (Sotomayor, J., concurring) (discussing how in trademark infringement cases, "[c]ourts of equity . . . defined 'willfulness' to encompass a range of culpable mental states—including the equivalent of recklessness" (citing McCarthy on Trademarks and Unfair Competition § 30:62 (5th ed.)).

With regard to Nike's second argument, the Court finds that the same evidence that could support a reasonable jury finding in favor of Lontex on the Lapp factor of intent could also support a reasonable jury finding of reckless infringement.

For these same reasons, the Court also finds that the jury was entitled to award punitive damages to Lontex for Lontex's trademark infringement claim under Pennsylvania law.  See Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) ("[P]unitive damages . . . are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct.").

### d.  Fair Use

Finally, Nike argues that its fair use affirmative defense should be granted as a matter of law.  To prevail on a fair use defense, a defendant must establish that it 1) did not use the mark at issue as a trademark, 2) used the mark fairly and in good faith, and 3) used the mark in a purely descriptive manner to describe only its own products.  15 U.S.C. § 1115(b)(4).

The Court has already reviewed evidence, particularly in relation to the issue of Nike's willfulness, from which a reasonable jury could find that Nike did not use "cool compression" fairly and in good faith.  The Court therefore finds that Nike is not entitled to judgment as a matter of law on its fair use defense.

Because a reasonable jury could come to the verdict that the jury in this case did, the Court will deny Nike's request for judgment as a matter of law.

### e.  New Trial

Nike's request for a new trial is conditional upon the Court granting Lontex's request for a new trial for the reasons stated in Lontex's Motion.  (Def.'s Mot. 25.)  Since the Court is not granting Lontex's request for a new trial, the Court will also not grant Nike's conditional request for a new trial.

## V.    Conclusion

For the foregoing reasons, the Court will deny Nike's Motion and grant Lontex's Motion in part.  An appropriate Order follows.

O:\CIVIL 18\18-5623 Lontex Corp v Nike\18cv5623 Memorandum re Post-Trial Motions.docx